# EXHIBIT 1



US011246933B1

(12) **United States Patent**
Maier et al.

(10) Patent No.: **US 11,246,933 B1**
(45) Date of Patent: **\*Feb. 15, 2022**

(54) **BIODEGRADABLE LIPIDS FOR THE DELIVERY OF ACTIVE AGENTS**

(71) Applicant: **ALNYLAM PHARMACEUTICALS, INC.**, Cambridge, MA (US)

(72) Inventors: **Martin Maier**, Cambridge, MA (US); **Muthusamy Jayaraman**, Cambridge, MA (US); **Akin Akinc**, Cambridge, MA (US); **Shigeo Matsuda**, Cambridge, MA (US); **Pachamuthu Kandasamy**, Cambridge, MA (US); **Kallanthottathil G. Rajeev**, Cambridge, MA (US); **Muthiah Manoharan**, Cambridge, MA (US)

(73) Assignee: **ALNYLAM PHARMACEUTICALS, INC.**, Cambridge, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/302,311**

(22) Filed: **Apr. 29, 2021**

**Related U.S. Application Data**

(63) Continuation of application No. 16/520,183, filed on Jul. 23, 2019, now Pat. No. 11,071,784, which is a
(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 47/18* | (2017.01) |
| *A61K 48/00* | (2006.01) |
| *A61K 9/127* | (2006.01) |
| *A61K 9/51* | (2006.01) |
| *A61K 31/713* | (2006.01) |
| *C07D 317/30* | (2006.01) |
| *C07C 211/09* | (2006.01) |
| *C07C 211/10* | (2006.01) |
| *C07C 211/11* | (2006.01) |
| *C07C 217/08* | (2006.01) |
| *C07C 229/12* | (2006.01) |
| *C07C 327/22* | (2006.01) |
| *C07C 327/28* | (2006.01) |
| *C07C 327/32* | (2006.01) |
| *C07C 235/06* | (2006.01) |
| *C07C 251/38* | (2006.01) |
| *C07F 5/02* | (2006.01) |
| *C07D 233/54* | (2006.01) |
| *C07D 207/32* | (2006.01) |
| *C07D 295/08* | (2006.01) |
| *C07D 295/12* | (2006.01) |
| *C07D 295/14* | (2006.01) |
| *C07C 323/12* | (2006.01) |
| *C07C 323/58* | (2006.01) |

(Continued)

(52) **U.S. Cl.**
CPC ............ *A61K 47/18* (2013.01); *A61K 9/1272* (2013.01); *A61K 9/5123* (2013.01); *A61K 31/7088* (2013.01); *A61K 31/713* (2013.01); *A61K 31/7105* (2013.01); *C07C 31/125* (2013.01); *C07C 211/09* (2013.01); *C07C 211/10* (2013.01); *C07C 211/11* (2013.01); *C07C 217/08* (2013.01); *C07C 229/12* (2013.01); *C07C 235/06* (2013.01); *C07C 251/38* (2013.01); *C07C 323/12* (2013.01); *C07C 323/58* (2013.01); *C07C 327/22* (2013.01); *C07C 327/28* (2013.01); *C07C 327/32* (2013.01); *C07D 207/32* (2013.01); *C07D 233/54* (2013.01); *C07D 295/08* (2013.01); *C07D 295/12* (2013.01); *C07D 295/14* (2013.01); *C07D 317/30* (2013.01); *C07F 5/022* (2013.01)

(58) **Field of Classification Search**
CPC .... A61K 9/1272; A61K 9/5123; A61K 47/18; C07C 211/00; C07C 217/00; C07C 229/00; C07C 235/00; C07C 251/00; C07C 323/00; C07C 327/00
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,466,678 A | 4/1949 | Bruson et al. | |
| 2,856,420 A | 10/1958 | Crawford, Jr. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2081119 A1 | 10/1991 | |
| EP | 0685234 A1 | 12/1995 | |

OTHER PUBLICATIONS

Chesnoy, et al., Structure and Function of Lipid-DNA Complexes For Gene Delivery, Annu. Rev. Biophys. Biomol. Struct., 2009, 29:27-47.

(Continued)

*Primary Examiner* — Theodore R. Howell
(74) *Attorney, Agent, or Firm* — Blank Rome LLP

(57) **ABSTRACT**

The present invention relates to a cationic lipid having one or more biodegradable groups located in a lipidic moiety (e.g., a hydrophobic chain) of the cationic lipid. These cationic lipids may be incorporated into a lipid particle for delivering an active agent, such as a nucleic acid. The invention also relates to lipid particles comprising a neutral lipid, a lipid capable of reducing aggregation, a cationic lipid of the present invention, and optionally, a sterol. The lipid particle may further include a therapeutic agent such as a nucleic acid.

**28 Claims, No Drawings**

**Specification includes a Sequence Listing.**

**US 11,246,933 B1**

Page 2

**Related U.S. Application Data**

continuation of application No. 14/677,801, filed on Apr. 2, 2015, now Pat. No. 10,369,226, which is a continuation of application No. 13/708,383, filed on Dec. 7, 2012, now Pat. No. 9,061,063.

(60) Provisional application No. 61/623,274, filed on Apr. 12, 2012, provisional application No. 61/568,133, filed on Dec. 7, 2011.

(51) **Int. Cl.**
    **C07C 31/125**          (2006.01)
    **A61K 31/7088**         (2006.01)
    **A61K 31/7105**         (2006.01)

(56)                    **References Cited**

               U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,340,299 A | 9/1967 | Weintraub et al. | |
| 3,729,564 A | 4/1973 | Chang et al. | |
| 3,872,171 A | 3/1975 | Cronin et al. | |
| 3,931,430 A | 1/1976 | Tada et al. | |
| 4,121,898 A | 10/1978 | Kirschnek et al. | |
| 4,694,084 A | 9/1987 | Breuninger et al. | |
| 5,155,260 A | 10/1992 | Zubovics et al. | |
| 5,705,385 A | 1/1998 | Bally et al. | |
| 5,756,785 A | 5/1998 | O'Lenick, Jr. | |
| 5,807,861 A | 9/1998 | Klein et al. | |
| 5,820,873 A | 10/1998 | Choi et al. | |
| 5,919,743 A | 7/1999 | O'Lenick, Jr. | |
| 5,965,542 A | 10/1999 | Wasan et al. | |
| 5,976,567 A | 11/1999 | Wheeler et al. | |
| 5,981,501 A | 11/1999 | Wheeler et al. | |
| 6,013,813 A | 1/2000 | O'Lenick, Jr. | |
| 6,077,509 A | 6/2000 | Weiner et al. | |
| 6,107,286 A | 8/2000 | Byk et al. | |
| 6,300,321 B1 | 10/2001 | Scherman et al. | |
| 6,320,017 B1 | 11/2001 | Ansell | |
| 6,333,433 B1 | 12/2001 | Banerjee et al. | |
| 6,346,516 B1 | 2/2002 | Banerjee et al. | |
| 6,410,328 B1 | 6/2002 | Maclachlan et al. | |
| 6,503,945 B2 | 1/2003 | Banerjee et al. | |
| 6,534,484 B1 | 3/2003 | Wheeler et al. | |
| 6,541,649 B2 | 4/2003 | Banerjee et al. | |
| 6,586,410 B1 | 7/2003 | Wheeler et al. | |
| 6,620,794 B1 | 9/2003 | O'Lenick, Jr. et al. | |
| 6,815,432 B2 | 11/2004 | Wheeler et al. | |
| 6,858,224 B2 | 2/2005 | Wheeler et al. | |
| 6,986,902 B1 | 1/2006 | Chen et al. | |
| 7,112,337 B2 | 9/2006 | Huang et al. | |
| 7,470,781 B2 | 12/2008 | Crouzet et al. | |
| 7,745,651 B2 | 6/2010 | Heyes et al. | |
| 7,799,565 B2 | 9/2010 | MacLachlan et al. | |
| 7,803,397 B2 | 9/2010 | Heyes et al. | |
| 7,811,602 B2 | 10/2010 | Cullis et al. | |
| 7,901,708 B2 | 3/2011 | MacLachlan et al. | |
| 7,982,027 B2 | 7/2011 | MacLachlan et al. | |
| 8,034,376 B2 | 10/2011 | Manoharan et al. | |
| 8,158,601 B2 | 4/2012 | Chen et al. | |
| 8,283,333 B2 | 10/2012 | Yaworski et al. | |
| 8,329,070 B2 | 12/2012 | MacLachlan et al. | |
| 8,466,122 B2 | 6/2013 | Heyes et al. | |
| 8,569,256 B2 | 10/2013 | Heyes et al. | |
| 8,575,123 B2 | 11/2013 | Manoharan et al. | |
| 8,642,076 B2 | 2/2014 | Manoharan et al. | |
| 8,691,750 B2 | 4/2014 | Constien et al. | |
| 8,722,082 B2 | 5/2014 | Manoharan et al. | |
| 8,754,062 B2 | 6/2014 | de Fougerolles et al. | |
| 8,802,644 B2 | 8/2014 | Chen et al. | |
| 8,822,668 B2 | 9/2014 | Yaworski et al. | |
| 9,006,487 B2 | 4/2015 | Anderson et al. | |
| 9,012,498 B2 | 4/2015 | Manoharan et al. | |
| 9,029,590 B2 | 5/2015 | Colletti et al. | |
| 9,061,063 B2 | 6/2015 | Maier et al. | |
| 9,139,554 B2 | 9/2015 | Hope et al. | |
| 9,394,234 B2 | 7/2016 | Chen et al. | |
| 9,463,247 B2 | 10/2016 | Ansell et al. | |
| 9,604,908 B2 | 3/2017 | Stanton et al. | |
| 9,682,922 B2 | 6/2017 | Manoharan et al. | |
| 10,369,226 B2 * | 8/2019 | Maier .................. C07D 295/12 |
| 2003/0031704 A1 | 2/2003 | Huang et al. | |
| 2003/0153081 A1 | 8/2003 | Tagawa et al. | |
| 2003/0187114 A1 | 10/2003 | Breitscheidel et al. | |
| 2003/0229037 A1 | 12/2003 | Massing et al. | |
| 2004/0142025 A1 | 7/2004 | MacLachlan et al. | |
| 2004/0142474 A1 | 7/2004 | Mahato et al. | |
| 2005/0064595 A1 | 3/2005 | MacLachlan et al. | |
| 2005/0234270 A1 | 10/2005 | Kaizik et al. | |
| 2006/0051405 A1 | 3/2006 | MacLachlan et al. | |
| 2006/0100177 A1 | 5/2006 | Nishimura et al. | |
| 2007/0042031 A1 | 2/2007 | MacLachlan et al. | |
| 2009/0209037 A1 | 8/2009 | Tagawa et al. | |
| 2009/0247608 A1 | 10/2009 | Manoharan et al. | |
| 2010/0285112 A1 | 11/2010 | Novobrantseva et al. | |
| 2011/0009641 A1 | 1/2011 | Anderson et al. | |
| 2011/0045473 A1 | 2/2011 | De Fougerolles et al. | |
| 2011/0091525 A1 | 4/2011 | Heyes et al. | |
| 2011/0097720 A1 | 4/2011 | Ciufolini et al. | |
| 2011/0117125 A1 | 5/2011 | Hope et al. | |
| 2011/0256175 A1 | 10/2011 | Hope et al. | |
| 2011/0262527 A1 | 10/2011 | Heyes et al. | |
| 2011/0300205 A1 | 12/2011 | Geall et al. | |
| 2011/0305770 A1 | 12/2011 | Zhao et al. | |
| 2011/0311582 A1 | 12/2011 | Manoharan et al. | |
| 2011/0311583 A1 | 12/2011 | Manoharan et al. | |
| 2012/0017411 A1 | 1/2012 | Groszkiewicz et al. | |
| 2012/0027796 A1 | 2/2012 | Manoharan et al. | |
| 2012/0027803 A1 | 2/2012 | Manoharan et al. | |
| 2012/0046478 A1 | 2/2012 | Manoharan et al. | |
| 2012/0058144 A1 | 3/2012 | Manoharan et al. | |
| 2012/0058188 A1 | 3/2012 | MacLachlan et al. | |
| 2012/0095075 A1 | 4/2012 | Manoharan et al. | |
| 2012/0101148 A1 | 4/2012 | Aking et al. | |
| 2012/0128760 A1 | 5/2012 | Manoharan et al. | |
| 2012/0136073 A1 | 5/2012 | Yang et al. | |
| 2012/0183602 A1 | 7/2012 | Chen et al. | |
| 2012/0225434 A1 | 9/2012 | Ciufolini et al. | |
| 2012/0244207 A1 | 9/2012 | Fitzgerald et al. | |
| 2012/0251618 A1 | 10/2012 | Schrum et al. | |
| 2012/0295832 A1 | 11/2012 | Constien et al. | |
| 2013/0017223 A1 | 1/2013 | Hope et al. | |
| 2013/0022649 A1 | 1/2013 | Yaworski et al. | |
| 2013/0108685 A1 | 5/2013 | Kuboyama et al. | |
| 2013/0122104 A1 | 5/2013 | Yaworski et al. | |
| 2013/0123338 A1 | 5/2013 | Heyes et al. | |
| 2013/0129811 A1 | 5/2013 | Kuboyama et al. | |
| 2013/0261172 A1 | 10/2013 | Kariko et al. | |
| 2013/0274504 A1 | 10/2013 | Colletti et al. | |
| 2013/0280305 A1 | 10/2013 | Kuboyama et al. | |
| 2013/0323269 A1 | 12/2013 | Manoharan et al. | |
| 2013/0338210 A1 | 12/2013 | Manoharan et al. | |
| 2014/0044772 A1 | 2/2014 | MacLachlan et al. | |
| 2014/0121393 A1 | 5/2014 | Manoharan et al. | |
| 2014/0134260 A1 | 5/2014 | Heyes et al. | |
| 2014/0179761 A1 | 6/2014 | Manoharan et al. | |
| 2014/0256785 A1 | 9/2014 | Manoharan et al. | |
| 2014/0294937 A1 | 10/2014 | MacLachlan et al. | |
| 2014/0295449 A1 | 10/2014 | Ciufolini et al. | |
| 2014/0308304 A1 | 10/2014 | Manoharan et al. | |
| 2014/0323548 A1 | 10/2014 | Budzik et al. | |
| 2015/0174260 A1 | 6/2015 | Yang et al. | |
| 2015/0174261 A1 | 6/2015 | Kuboyama et al. | |
| 2015/0284317 A1 | 10/2015 | Colletti et al. | |
| 2015/0343062 A1 | 12/2015 | Kuboyama et al. | |
| 2016/0009637 A1 | 1/2016 | Manoharan et al. | |
| 2016/0009657 A1 | 1/2016 | Anderson et al. | |
| 2016/0095924 A1 | 4/2016 | Hope et al. | |

           FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0685457 A1 | 12/1995 | |
| FR | 02909378 A1 | 6/2008 | |
| GB | 1277947 A | 6/1972 | |
| JP | H05286824 A | 11/1993 | |

# US 11,246,933 B1

Page 3

(56)        **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | H09110814 | A | 4/1997 |
| JP | H09278726 | A | 10/1997 |
| JP | H09301936 | A | 11/1997 |
| JP | 2007230789 | A | 9/2007 |
| JP | 4681425 | B2 | 5/2011 |
| JP | 5-331118 | B2 | 10/2013 |
| WO | WO-91016024 | A1 | 10/1991 |
| WO | WO-9528146 | A1 | 10/1995 |
| WO | WO-9730024 | A2 | 8/1997 |
| WO | WO-9816599 | A1 | 4/1998 |
| WO | WO-98017757 | A2 | 4/1998 |
| WO | WO-9933493 | A1 | 7/1999 |
| WO | WO-0003683 | A1 | 1/2000 |
| WO | WO-0107548 | A1 | 2/2001 |
| WO | WO-0148233 | A1 | 7/2001 |
| WO | WO-03053409 | A1 | 7/2003 |
| WO | WO-2005060934 | A1 | 7/2005 |
| WO | WO-2005120461 | A2 | 12/2005 |
| WO | WO-2006052767 | A2 | 5/2006 |
| WO | WO-2006138380 | A2 | 12/2006 |
| WO | WO-2008001505 | A1 | 1/2008 |
| WO | WO-2008042973 | A2 | 4/2008 |
| WO | WO-2009086228 | A1 | 7/2009 |
| WO | WO-2009086558 | A1 | 7/2009 |
| WO | WO-2009088891 | A1 | 7/2009 |
| WO | WO-2009088892 | A1 | 7/2009 |
| WO | WO-2009129385 | A1 | 10/2009 |
| WO | WO-2009129395 | A1 | 10/2009 |
| WO | WO-2009132131 | A1 | 10/2009 |
| WO | WO-2010030739 | A1 | 3/2010 |
| WO | WO-2010042877 | A1 | 4/2010 |
| WO | WO-2010048536 | A2 | 4/2010 |
| WO | WO-2010054384 | A1 | 5/2010 |
| WO | WO-2010054401 | A1 | 5/2010 |
| WO | WO-2010054405 | A1 | 5/2010 |
| WO | WO-2010054406 | A1 | 5/2010 |
| WO | WO-2010057150 | A1 | 5/2010 |
| WO | WO-2010057160 | A1 | 5/2010 |
| WO | WO-2010088537 | A2 | 8/2010 |
| WO | WO-2010129709 | A1 | 11/2010 |
| WO | WO-2011000107 | A1 | 1/2011 |
| WO | WO-2011036557 | A1 | 3/2011 |
| WO | WO-2011056682 | A1 | 5/2011 |
| WO | WO-2011066651 | A1 | 6/2011 |
| WO | WO-2011075656 | A1 | 6/2011 |
| WO | WO-2011136368 | A1 | 11/2011 |
| WO | WO-2011136369 | A1 | 11/2011 |
| WO | WO-2011140627 | A1 | 11/2011 |
| WO | WO-2011141703 | A1 | 11/2011 |
| WO | WO-2011141704 | A1 | 11/2011 |
| WO | WO-2011141705 | A1 | 11/2011 |
| WO | WO-2011143230 | A1 | 11/2011 |
| WO | WO-2011153493 | A2 | 12/2011 |
| WO | WO-2012000104 | A1 | 1/2012 |
| WO | WO-2012019630 | A1 | 2/2012 |
| WO | WO-2012054365 | A2 | 4/2012 |
| WO | WO-2012068176 | A1 | 5/2012 |
| WO | WO-2013014073 | A1 | 1/2013 |
| WO | WO-2013016058 | A1 | 1/2013 |
| WO | WO-2013059496 | A1 | 4/2013 |
| WO | WO-2013086322 | A1 | 6/2013 |
| WO | WO-2013086354 | A1 | 6/2013 |
| WO | WO-2013086373 | A1 | 6/2013 |
| WO | WO-2013143555 | A1 | 10/2013 |
| WO | WO-2014007398 | A1 | 1/2014 |
| WO | WO-2014008334 | A1 | 1/2014 |
| WO | WO-2014028487 | A1 | 2/2014 |
| WO | WO-2014089239 | A1 | 6/2014 |

OTHER PUBLICATIONS

International Search Report issued in PCT/US2012/068491 dated Apr. 5, 2013.

Debal, et al., Synthesis 6, 391-93 (1976).

Akinc et al., A combinatorial library of lipid-like materials for delivery of RNAi therapeutics, Nature Biotechnology 2008, 26(5), 561-569.

Banerjee et al. Novel Series of Non-Glycerol-Based Cationic Transfection Lipids for Use in Liposomal Gene Delivery, J. Med. Chem. 1999, 42(21), 4292-4299.

Mahidhar et al. Distance of Hydroxyl Functionality from the Quaternized Center Influence DNA Binding and in Vitro Gene Delivery Efficacies of Cationic Lipids with Hydroxyalkyl Headgroups, J. Med. Chem. 2004, 47(23), 5721-5728.

Mukherjee et al. Covalent Grafting of Common Trihydroxymethylaminomethane in the Headgroup Region Imparts High Serum Compatibility and Mouse Lung Transfection Property to Cationic Amphiphile, J. Med. Chem. 2008. 51(6), 1967-1971.

Nguyen et al., Lipid-derived nanoparticles for immunostimulatory RNA adjuvant delivery, Proc. Natl. Acad. Sci, 2012, 109(14), E797-E803.

Rajesh et al., Dramatic Influence of the Orientation of Linker between Hydrophilic and Hydrophobic Lipid Moiety in Liposomal Gene Delivery, J. Am. Chem. Soc. 2007, 129, 11408-11420.

Srinivas et al. Cationic Amphiphile with Shikimic Acid Headgroup Shows More Systemic Promise Than Its Mannosyl Analogue as DNA Vaccine Carrier in Dendritic Cell Based Genetic Immunization, J. Med. Chem. 2010, 53(3), 1387-1391.

Whitehead et al. Synergistic silencing: combinations of lipid-like materials for efficacious siRNA delivery, Mol Ther., 2011, 19(9), 1688-94.

Aberle, et al., A Novel Tetraester Construct That Reduces Cationic Lipid-Associated Cytotoxicity Implications for the Onset of Cytotoxicity, Biochemistry, 1998, 6533-6540.

Alexidis et al., "Novel 1,4 Substituted Piperidine Derivatives. Synthesis and Correlation of Antioxidant Activity with Structure and Lipophilicity," J. Pharm. Pharmacol. 47:131-137, 1995.

Basha et al., Influence of cationic lipid composition on gene silencing properties of lipid nanoparticle formulations of siRNA in antigen-presenting cells. Mol Ther. Dec. 2011;19(12):2186-200.

Cattanach et al., "Studies in the Indole Series. Part IV. Tetrahydro-1H-pyrido[4,3-b]-indoles as Serotonin Antagonists," J. Chem. Soc. Perkin 1. 10:1235-1243, 1968.

Cook et al., "Synthesis and Characterization of cis-Dioxomolybdenum(IV) Complexes with Sterically Bulky Tripodal Tetradentate Ligands," Inorganica Chimica Acta 144:81-87, 1988.

Farhood et al., Effect of Cationic Cholesterol. Derivatives on Gene Transfer and Protein Kinase C Activity, Biochimica et Biophysica Acta 1992, 1111:239-246.

Frisch et al., "A New Triantennary Galactose-Targeted PEGylated Gene Carrier, Characterization of Its Complex with DNA, and Transfection of Hepatoma Cells," Bioconjugate Chem. 15:754-764, 2004.

Hafez et al., "On the mechanism whereby cationic lipids promote intracellular delivery of polynucleic acids," Gene Therapy 8:1188-1196, 2001.

Jayaraman et al., "Maximizing the Potency of siRNA Lipid Nanoparticles for Hepatic Gene Silencing In Vivo," Angew. Chem. Int. Ed. 51:8529-8533, 2012.

Koh et al., "Delivery of antisense oligodeoxyribonucleotide lipopolyplex nanoparticles assembled by microfluidic hydrodynamic focusing," Journal of Controlled Release 141(1):62-69, 2010.

Lee et al., Lipid nanoparticle siRNA systems for silencing the androgen receptor in human prostate cancer in vivo , Int. J. Cancer: 131, E781-E790 (2012).

Leventis, et al., Interactions of Mammalian Cells with Lipid Dispersions Containing Novel Metabolizable Cationic Amphiphiles, Biochimica et Biophysica Acta (1990) 1023:124-132.

Lin P.J.C., et al., Influence of cationic lipid composition on uptake and intracellular processing of lipid nanoparticle formulations of siRNA. Nanomedicine: NBM 2013;9:233-246.

Lv, et al., Toxicity of Cationic Lipids and Cationic Polymers in Gene Delivery, Journal of Controlled Release, 2006, 114:100-109.

Novobrantseva et al., "Systemic RNAi-mediated Gene Silencing in Nonhuman Primate and Rodent Myeloid Cells," Molecular Therapy—Nucleic Acids 1(e4), 2012.

**US 11,246,933 B1**
Page 4

(56)          **References Cited**

OTHER PUBLICATIONS

Nuhn et al., Synthesis, calorimetry, and X-ray diffraction of lecithins containing branched fatty acid chains, Chemistry and Physics of Lipids, 1986, 39, 221-236.

Obika et al., Symmetrical cationic triglycerides: an efficient synthesis and application to gene transfer, Bioorganic & Medicinal Chemistry, 2001, 9(2), 245-254.

Schar et al., "Long Chain Linear Fatty Alcohols from ZIEGLER—Synthesis, their Mixtures, Derivatives and Use," IP.com Prior Art Database Technical Disclosure, Jan. 17, 2011.

Semple et al., "Interactions of liposomes and lipid-based carrier systems with blood proteins: Relation to clearance behaviour in vivo," Advanced Drug Delivery Reviews 32:3-17, 1998.

Semple et al., Rational design of cationic lipids for siRNA delivery, Nature Biotechnology vol. 28, pp. 172-176 (2010).

Sheikh et al., In vitro lipofection with novel series of symmetric 1,3-dialkoylamidopropane-based cationic surfactants containing single primary and tertiary amine polar head groups, Chemistry and Physics of Lipids, 2003, 124(1), p. 49-61.

Spelios et al., Effect of spacer attachment sites and pH-sensitive headgroup expansion on cationic lipid-mediated gene delivery of three novel myristoyl derivatives. Biophysical Chemistry 2007, 129 (2-3) , 137-147.

Tang F, Hughes JA. Synthesis of a single-tailed cationic lipid and investigation of its transfection. J Control Release. Dec. 6, 1999;62(3):345-58.

Wilson et al., "The combination of stabilized plasmid lipid particles and lipid nanoparticle encapsulated CpG containing oligodeoxynucleotides as a systemic genetic vaccine," J Gene Med 11:14-25, 2009.

Yamada et al. CAS:120:27761, 1994. (151923-87-4).

* cited by examiner

**1**

## BIODEGRADABLE LIPIDS FOR THE DELIVERY OF ACTIVE AGENTS

This application is a continuation of U.S. patent application Ser. No. 16/520,183, filed Jul. 23, 2019, which is a continuation of U.S. patent application Ser. No. 14/677,801, filed Apr. 2, 2015, now U.S. Pat. No. 10,369,226, which is a continuation of U.S. patent application Ser. No. 13/708, 383, filed Dec. 7, 2012, now U.S. Pat. No. 9,061,063, which claims the benefit of U.S. Provisional Application No. 61/568,133, filed Dec. 7, 2011, and U.S. Provisional Application No. 61/623,274, filed Apr. 12, 2012, each of which is hereby incorporated by reference.

### TECHNICAL FIELD

The present invention relates to biodegradable lipids and to their use for the delivery of active agents such as nucleic acids.

### BACKGROUND

Therapeutic nucleic acids include, e.g., small interfering RNA (siRNA), micro RNA (miRNA), antisense oligonucleotides, ribozymes, plasmids, immune stimulating nucleic acids, antisense, antagomir, antimir, microRNA mimic, supermir, U1 adaptor, and aptamer. In the case of siRNA or miRNA, these nucleic acids can down-regulate intracellular levels of specific proteins through a process termed RNA interference (RNAi). The therapeutic applications of RNAi are extremely broad, since siRNA and miRNA constructs can be synthesized with any nucleotide sequence directed against a target protein. To date, siRNA constructs have shown the ability to specifically down-regulate target proteins in both in vitro and in vivo models. In addition, siRNA constructs are currently being evaluated in clinical studies.

However, two problems currently faced by siRNA or miRNA constructs are, first, their susceptibility to nuclease digestion in plasma and, second, their limited ability to gain access to the intracellular compartment where they can bind the protein RISC when administered systemically as the free siRNA or miRNA. Lipid nanoparticles formed from cationic lipids with other lipid components, such as cholesterol and PEG lipids, and oligonucleotides (such as siRNA and miRNA) have been used to facilitate the cellular uptake of the oligonucleotides.

There remains a need for improved cationic lipids and lipid nanoparticles for the delivery of oligonucleotides. Preferably, these lipid nanoparticles would provide high drug:lipid ratios, protect the nucleic acid from degradation and clearance in serum, be suitable for systemic delivery, and provide intracellular delivery of the nucleic acid. In addition, these lipid-nucleic acid particles should be well-tolerated and provide an adequate therapeutic index, such that patient treatment at an effective dose of the nucleic acid is not associated with significant toxicity and/or risk to the patient.

### SUMMARY

The present invention relates to a cationic lipid and PEG lipid suitable for forming nucleic acid-lipid particles. Each of the cationic and PEG lipids of the present invention includes one or more biodegradable groups. The biodegradable groups are located in a lipidic moiety (e.g., a hydrophobic chain) of the cationic or PEG lipid. These cationic and PEG lipids may be incorporated into a lipid particle for

**2**

delivering an active agent, such as a nucleic acid (e.g., an siRNA). The incorporation of the biodegradable group(s) into the lipid results in faster metabolism and removal of the lipid from the body following delivery of the active agent to a target area. As a result, these lipids have lower toxicity than similar lipids without the biodegradable groups.

In one embodiment, the cationic lipid is a compound of formula (I), which has a branched alkyl at the alpha position adjacent to the biodegradable group (between the biodegradable group and the teriary carbon):



Formula (I)

or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), wherein

R' is absent, hydrogen, or alkyl (e.g., $C_1$-$C_4$ alkyl);
with respect to $R^1$ and $R^2$,

(i) $R^1$ and $R^2$ are each, independently, optionally substituted alkyl, alkenyl, alkynyl, cycloalkylalkyl, heterocycle, or $R^{10}$;

(ii) $R^1$ and $R^2$, together with the nitrogen atom to which they are attached, form an optionally substituted heterocyclic ring; or

(iii) one of $R^1$ and $R^2$ is optionally substituted alkyl, alkenyl, alkynyl, cycloalkyl, cycloalkylalkyl, or heterocycle, and the other forms a 4-10 member heterocyclic ring or heteroaryl (e.g., a 6-member ring) with (a) the adjacent nitrogen atom and (b) the $(R)_a$ group adjacent to the nitrogen atom;

each occurrence of R is, independently, $—(CR^3R^4)—$;

each occurrence of $R^3$ and $R^4$ are, independently H, halogen, OH, alkyl, alkoxy, $—NH_2$, $R^{10}$, alkylamino, or dialkylamino (in one preferred embodiment, each occurrence of $R^3$ and $R^4$ are, independently H or $C_1$-$C_4$ alkyl);

each occurrence of $R^{10}$ is independently selected from PEG and polymers based on poly(oxazoline), poly(ethylene oxide), poly(vinyl alcohol), poly(glycerol), poly(N-vinylpyrrolidone), poly[N-(2-hydroxypropyl)methacrylamide] and poly(amino acid)s, wherein (i) the PEG or polymer is linear or branched, (ii) the PEG or polymer is polymerized by n subunits, (iii) n is a number-averaged degree of polymerization between 10 and 200 units, and (iv) wherein the compound of formula has at most two $R^{10}$ groups (preferably at most one $R^{10}$ group);

the dashed line to Q is absent or a bond;

when the dashed line to Q is absent then Q is absent or is $—O—$, $—NH—$, $—S—$, $—C(O)—$, $—C(O)O—$, $—OC(O)—$, $—C(O)N(R^4)—$, $—N(R^5)C(O)—$, $—S—S—$, $—OC(O)O—$, $—O—N=C(R^5)—$, $—C(R^5)=N—O—$, $—OC(O)N(R^5)—$, $—N(R^5)C(O)N(R^5)—$, $—N(R^5)C(O)O—$, $—C(O)S—$, $—C(S)O—$ or $—C(R^5)=N—O—C(O)—$; or

when the dashed line to Q is a bond then (i) b is 0 and (ii) Q and the tertiary carbon adjacent to it (C*) form a substituted or unsubstituted, mono- or bi-cyclic heterocyclic group having from 5 to 10 ring atoms (e.g., the heteroatoms in the heterocyclic group are selected from O and S, preferably O);

each occurrence of $R^5$ is, independently, H or alkyl (e.g. $C_1$-$C_4$ alkyl);

US 11,246,933 B1

**3**

X and Y are each, independently, alkylene or alkenylene (e.g., $C_4$ to $C_{20}$ alkylene or $C_4$ to $C_{20}$ alkenylene);

$M^1$ and $M^2$ are each, independently, a biodegradable group (e.g., —OC(O)—, —C(O)O—, —SC(O)—, —C(O)S—, —OC(S)—, —C(S)O—, —S—S—, —C(R$^5$)═N—, —N═C(R$^5$)—, —C(R$^5$)═N—O—, —O—N═C(R$^5$)—, —C(O)(NR$^5$)—, —N(R$^5$)C(O)—, —C(S)(NR$^5$)—, —N(R$^5$)C(O)—, —N(R$^5$)C(O)N(R$^5$)—, —OC(O)O—, —OSi(R$^5$)$_2$O—, —C(O)(CR$^3$R$^4$)C(O)O—, —OC(O)(CR$^3$R$^4$)C(O)—, or



(wherein R$^{11}$ is a $C_2$-$C_8$ alkyl or alkenyl));

each occurrence of R$^5$ is, independently, $C_1$-$C_8$ alkyl (e.g., methyl, ethyl, isopropyl, n-butyl, n-pentyl, or n-hexyl);

a is 1, 2, 3, 4, 5 or 6;

b is 0, 1, 2, or 3; and

$Z^1$ and $Z^2$ are each, independently, $C_8$-$C_{14}$ alkyl or $C_8$-$C_{14}$ alkenyl, wherein the alkenyl group may optionally be substituted with one or two fluorine atoms at the alpha position to a double bond which is between the double bond and the terminus of $Z^1$ or $Z^2$



(e.g.,                          ).

The R'R$^1$R$^2$N—(R)$_a$-Q-(R)$_b$— group can be any of the head groups described herein, including those shown in Table 1 below, and salts thereof. In one preferred embodiment, R'R$^1$R$^2$N—(R)$_a$-Q-(R)$_b$— is (CH$_3$)$_2$N—(CH$_2$)$_3$—C(O)O—, (CH$_3$)$_2$N—(CH$_2$)$_2$—NH—C(O)O—, (CH$_3$)$_2$N—(CH$_2$)$_2$—C(O)O—NH—, or (CH$_3$)$_2$N—(CH$_2$)$_3$—C(CH$_3$)═N—O—.

In one embodiment, R$^1$ and R$^2$ are both alkyl (e.g., methyl).

In a further embodiment, a is 3. In another embodiment, b is 0.

In a further embodiment, a is 3, b is 0 and R is —CH$_2$—. In yet a further embodiment, a is 3, b is 0, R is —CH$_2$— and Q is —C(O)O—. In another embodiment, R$^1$ and R$^2$ are methyl, a is 3, b is 0, R is —CH$_2$— and Q is —C(O)O—.

In another embodiment, X and Y are each, independently —(CH$_2$)$_n$— wherein n is 4 to 20, e.g., 4 to 18, 4 to 16, or 4 to 12. In one embodiment, n is 4, 5, 6, 7, 8, 9, or 10. In one exemplary embodiment, X and Y are —(CH$_2$)$_6$—. In another embodiment, X and Y are —(CH$_2$)$_7$—. In yet another embodiment, X and Y are —(CH$_2$)$_9$—. In yet another embodiment, X and Y are —(CH$_2$)$_8$—.

In further embodiments, M$^1$ and M$^2$ are each, independently, —OC(O)— or —C(O)O—. For example, in one embodiment, M$^1$ and M$^2$ are each —C(O)O—.

In another embodiment, the cationic lipid is a compound of formula (II), which has a branched alkyl at the alpha position adjacent to the biodegradable group (between the biodegradable group and the terminus of the tail, i.e., Z$^1$ o Z$^2$):

**4**



Formula (II)

or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), wherein

R' is absent, hydrogen, or alkyl (e.g., $C_1$-$C_4$ alkyl);

with respect to R$^1$ and R$^2$,

(i) R$^1$ and R$^2$ are each, independently, optionally substituted alkyl, alkenyl, alkynyl, cycloalkylalkyl, heterocycle, or R$^{10}$;

(ii) R$^1$ and R$^2$, together with the nitrogen atom to which they are attached, form an optionally substituted heterocylic ring; or

(iii) one of R$^1$ and R$^2$ is optionally substituted alkyl, alkenyl, alkynyl, cycloalkyl, cycloalkylalkyl, or heterocycle, and the other forms a 4-10 member heterocyclic ring or heteroaryl (e.g., a 6-member ring) with (a) the adjacent nitrogen atom and (b) the (R)$_a$ group adjacent to the nitrogen atom;

each occurrence of R is, independently, —(CR$^3$R$^4$)—;

each occurrence of R$^3$ and R$^4$ are, independently, H, halogen, OH, alkyl, alkoxy, —NH$_2$, R$^{10}$, alkylamino, or dialkylamino (in one preferred embodiment, each occurrence of R$^3$ and R$^4$ are, independently H or $C_1$-$C_4$ alkyl);

each occurrence of R$^{10}$ is independently selected from PEG and polymers based on poly(oxazoline), poly(ethylene oxide), poly(vinyl alcohol), poly(glycerol), poly(N-vinylpyrrolidone), poly[N-(2-hydroxypropyl)methacrylamide] and poly(amino acid), wherein (i) the PEG or polymer is linear or branched, (ii) the PEG or polymer is polymerized by n subunits, (iii) n is a number-averaged degree of polymerization between 10 and 200 units, and (iv) wherein the compound of formula has at most two R$^{10}$ groups (preferably at most one R$^{10}$ group);

the dashed line to Q is absent or a bond;

when the dashed line to Q is absent then Q is absent or is —O—, —NH—, —S—, —C(O)O—, —C(O)O—, —OC(O)—, —C(O)N(R$^4$)—, —N(R$^5$)C(O)—, —S—S—, —OC(O)O—, —O—N═C(R$^5$)—, —C(R$^5$)═N—O—, —OC(O)N(R$^5$)—, —N(R$^5$)C(O)N(R$^5$)—, —N(R$^5$)C(O)O—, —C(O)S—, —C(S)O— or —C(R$^5$)═N—O—C(O)—; or

when the dashed line to Q is a bond then (i) b is 0 and (ii) Q and the tertiary carbon adjacent to it (C*) form a substituted or unsubstituted, mono- or bi-cyclic heterocyclic group having from 5 to 10 ring atoms (e.g., the heteroatoms in the heterocyclic group are selected from O and S, preferably O);

each occurrence of R$^5$ is, independently, H or alkyl;

X and Y are each, independently, alkylene (e.g., $C_6$-$C_8$ alkylene) or alkenylene, wherein the alkylene or alkenylene group is optionally substituted with one or two fluorine atoms at the alpha position to the M$^1$ or M$^2$ group



(e.g.,                          );

US 11,246,933 B1

**5**

$M^1$ and $M^2$ are each, independently, a biodegradable group (e.g., —OC(O)—, —C(O)O—, —SC(O)—, —SC(O)O—, —OC(O) S—, —OC(S)—, —C(S)O—, —S—S, —C(R^3)=N—, —N=C(R^5)—, —C(R^5)=N—O—, —O—N=C(R^5)—, —C(O)(NR^5)—, —N(R^5)C(O)—, —C(S)(NR^5)—, —N(R^5)C(O)—, —N(R^5)C(O)N(R^5)—, —OC(O)O—, —OSi(R^5)_2O—, —C(O)(CR^3R^4)C(O)O—, —OC(O) (CR^3R^4)C(O)—, or



(wherein $R^{11}$ is a $C_2$-$C_8$ alkyl or alkenyl));

each occurrence of $R^5$ is, independently, $C_1$-$C_8$ alkyl (e.g., methyl, ethyl, isopropyl);

a is 1, 2, 3, 4, 5 or 6;

b is 0, 1, 2, or 3; and

$Z^1$ and $Z^2$ are each, independently, $C_8$-$C_{14}$ alkyl or $C_8$-$C_{14}$ alkenyl, wherein (i) the alkenyl group may optionally be substituted with one or two fluorine atoms at the alpha position to a double bond which is between the double bond and the terminus of $Z^1$ or $Z^2$



and (ii) the terminus of at least one of $Z^1$ and $Z^2$ is separated from the group $M^1$ or $M^2$ by at least 8 carbon atoms.

In another embodiment, X and Y are each, independently —$(CH_2)_n$— wherein n is 4 to 20, e.g., 4 to 18, 4 to 16, or 4 to 12. In one embodiment, n is 4, 5, 6, 7, 8, 9, or 10. In one exemplary embodiment, X and Y are —$(CH_2)_6$—. In another embodiment, X and Y are —$(CH_2)_7$—. In yet another embodiment, X and Y are —$(CH_2)_9$—. In yet another embodiment, X and Y are —$(CH_2)_8$—.

The $R'R^1R^2N$—$(R)_a$-Q-$(R)_b$— group can be any of the head groups described herein, including those shown in Table 1 below, and salts thereof. In one preferred embodiment, $R'R^1R^2N$—$(R)_a$-Q-$(R)_b$— is $(CH_3)_2N$—$(CH_2)_3$—C (O)O—, $(CH_3)_2N$—$(CH_2)_2$—NH—C(O)O—, $(CH_3)_2N$—$(CH_2)_2$—OC(O)—NH—, or $(CH_3)_2N$—$(CH_2)_3$—C(CH_3) =N—O—.

In another embodiment, the cationic lipid is a compound of formula (III), which has a branching point at a position that is 2-6 carbon atoms (i.e., at the beta (β), gamma (γ), delta (δ), epsilon (ε) or zeta position(ζ)) adjacent to the biodegradable group (between the biodegradable group and the terminus of the tail, i.e., $Z^1$ or $Z^2$):

Formula (III)



**6**

or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), wherein

R', $R^1$, $R^2$, R, $R^3$, $R^4$, $R^{10}$, Q, $R^5$, $M^1$, $M^2$, $R^z$, a, and b are defined as in formula (I);

$L^1$ and $L^2$ are each, independently, $C_1$-$C_5$ alkylene or $C_2$-$C_5$ alkenylene;

X and Y are each, independently, alkylene (e.g., $C_4$ to $C_{20}$ alkylene or $C_6$-$C_8$ alkylene) or alkenylene (e.g., $C_4$ to $C_{20}$ alkenylene); and

$Z^1$ and $Z^2$ are each, independently, $C_8$-$C_{14}$ alkyl or $C_8$-$C_{14}$ alkenyl, wherein the alkenyl group may optionally be substituted with one or two fluorine atoms at the alpha position to a double bond which is between the double bond and the terminus of $Z^1$ or $Z^2$



(e.g.,                ),

and with the proviso that the terminus of at least one of $Z^1$ and $Z^2$ is separated from the group $M^1$ or $M^2$ by at least 8 carbon atoms.

In one embodiment, $L^1$ and $L^2$ are each —$CH_2$—. In another embodiment, $L^1$ and $L^2$ are each —$(CH_2)_2$—. In one embodiment, $L^1$ and $L^2$ are each —$(CH_2)_3$—. In yet another embodiment, $L^1$ and $L^2$ are each —$(CH_2)_4$—. In yet another embodiment, $L^1$ and $L^2$ are each —$(CH_2)_5$—. In yet another embodiment, $L^1$ and $L^2$ are each —$CH_2$—CH=CH—. In a preferred embodiment, $L^1$ and $L^2$ are each —$CH_2$— or —$(CH_2)_2$.

In one embodiment, X and Y are each, independently —$(CH_2)_n$, wherein n is 4 to 20, e.g., 4 to 18, 4 to 16, or 4 to 12. In one embodiment, n is 4, 5, 6, 7, 8, 9, or 10. In one exemplary embodiment, X and Y are —$(CH_2)_7$—. In another exemplary embodiment, X and Y are —$(CH_2)_8$—. In yet another exemplary embodiment, X and Y are —$(CH_2)_9$—.

The $R'R^1R^2N$—$(R)_a$-Q-$(R)_b$— group can be any of the head groups described herein, including those shown in Table 1 below, and salts thereof. In one preferred embodiment, $R'R^1R^2N$—$(R)_a$-Q-$(R)_b$— is $(CH_3)_2N$—$(CH_2)_3$—C (O)O—, $(CH_3)_2N$—$(CH_2)_2$—NH—C(O)O—, $(CH_3)_2N$—$(CH_2)_2$—OC(O)—NH—, or $(CH_3)_2N$—$(CH_2)_3$—C(CH_3) =N—O—.

In another embodiment, the cationic lipid is a compound of formula (IIIA), which has a branching point at a position that is 2-6 carbon atoms (i.e., at the beta (β), gamma (γ), delta (δ), epsilon (ε) or zeta position(ζ)) from the biodegradable groups $M^1$ and $M^2$ (i.e., between the biodegradable group and the terminus of the tail, i.e., $Z^1$ or $Z^2$):

Formula (IIIA)



or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), wherein

US 11,246,933 B1

**7**

R', R$^1$, R$^2$, R, R$^3$, R$^4$, R$^{10}$, Q, R$^5$, M$^1$, M$^2$, a, and b are defined as in formula (I);

each R$^z$ is, independently, C$_1$-C$_8$ alkyl (e.g., C$_3$-C$_6$ alkyl or C$_2$-C$_3$ alkyl);

L$^1$ and L$^2$ are each, independently, C$_1$-C$_5$ alkylene (e.g., C$_2$-C$_3$ alkylene) or C$_2$-C$_5$ alkenylene;

**8**

X and Y are each, independently, alkylene (e.g., C$_4$ to C$_{20}$ alkylene or C$_7$-C$_9$ alkylene) or alkenylene (e.g., C$_4$ to C$_{20}$ alkenylene or C$_7$-C$_9$ alkenylene); and

Z$^1$ and Z$^2$ are each, independently, C$_1$-C$_8$ alkyl (e.g., C$_1$-C$_6$ alkyl, such as C$_1$, C$_3$ or C$_5$ alkyl) or C$_2$-C$_8$ alkenyl (such as C$_2$-C$_6$ alkenyl);

wherein said cationic lipid is not one selected from:



n = 0-2



n = 0-2

US 11,246,933 B1

9    10

-continued



In one embodiment, $L^1$ and $L^2$ are each —(CH$_2$)$_2$—. In another embodiment, $L^1$ and $L^2$ are each —(CH$_2$)$_3$—.

In one embodiment, X and Y are each, independently —(CH$_2$)$_n$ wherein n is 4 to 20, e.g., 4 to 18, 4 to 16, 4 to 12 or 7-9. In one embodiment, n is 4, 5, 6, 7, 8, 9, or 10. In one exemplary embodiment, X and Y are —(CH$_2$)$_7$—. In yet another exemplary embodiment, X and Y are —(CH$_2$)$_9$.

In one preferred embodiment, $M^1$ and $M^2$ are —C(O)O— (where the carbonyl group in $M^1$ and $M^2$ is bound to the variable X, and the oxygen atom in $M^1$ and $M^2$ is bound to the variable $L^1$ and $L^2$).

The R'R$^1$R$^2$N—(R)$_a$-Q-(R)$_b$— group can be any of the head groups described herein, including those shown in Table 1 below, and salts thereof. In one preferred embodiment, R'R$^1$R$^2$N—(R)$_a$-Q-(R)$_b$— is (CH$_3$)$_2$N—(CH$_2$)$_3$—C(O)O—, (CH$_3$)$_2$N—(CH$_2$)$_2$—NH—C(O)O—, (CH$_3$)$_2$N—(CH$_2$)$_2$—OC(O)—NH—, or (CH$_3$)$_2$N—(CH$_2$)$_3$—C(CH$_3$)═N—O—.

In one preferred embodiment, $Z^1$ and $Z^2$ are branched alkyl or branched alkenyl groups.

In one embodiment of formula (IIIA), $Z^1$, $Z^2$, and each R$^z$ are C$_3$-C$_8$ alkyl (such as a C$_3$-C$_6$ alkyl). In another embodiment of formula (IIIA), $Z^1$, $Z^2$, and each R$^z$ are C$_3$-C$_8$ branched alkyl (such as a C$_3$-C$_6$ branched alkyl). In yet another embodiment of formula (IIIA), $Z^1$, $Z^2$, and each R$^z$ are C$_3$-C$_8$ straight alkyl (such as a C$_3$-C$_6$ straight alkyl).

In one embodiment of formula (IIIA), the branching point is at the second position (the β-position) from the biodegradable groups $M^1$ and $M^2$ in each tail. $Z^1$, $Z^2$, and each R$^z$ can be C$_3$-C$_8$ alkyl (e.g., a C$_3$-C$_6$ alkyl), such as a C$_3$-C$_6$ branched alkyl (e.g., a C$_3$-C$_6$ branched alkyl) or a C$_3$-C$_8$ straight alkyl (e.g., a C$_3$-C$_6$ straight alkyl). In one preferred embodiment, $M^1$ and $M^2$ are —C(O)O— (where the carbonyl group in $M^1$ and $M^2$ is bound to the variable X, and the oxygen atom in $M^1$ and $M^2$ is bound to the variable $L^1$ and/or $L^2$).

In one embodiment of formula (IIIA), the branching point is at the third position (the γ-position) from the biodegradable groups $M^1$ and $M^2$ in each tail. $Z^1$, $Z^2$, and each R$^z$ can be C$_3$-C$_8$ alkyl (e.g., a C$_3$-C$_6$ alkyl), such as a C$_3$-C$_6$ branched alkyl (e.g., a C$_3$-C$_6$ branched alkyl) or a C$_3$-C$_8$ straight alkyl (e.g., a C$_3$-C$_6$ straight alkyl). In one preferred embodiment, $M^1$ and $M^2$ are —C(O)O— (where the carbonyl group in $M^1$ and $M^2$ is bound to the variable X, and the oxygen atom in $M^1$ and $M^2$ is bound to the variable $L^1$ and/or $L^2$).

In one embodiment of formula (IIIA), the branching point is at the third position (the γ-position) from the biodegradable groups $M^1$ and $M^2$ in each tail.

In another embodiment of formula (IIIA), $M^1$ and/or $M^2$ are not —O(C(O)— (where the oxygen atom in $M^1$ and/or $M^2$ is bound to the variable X, and the carbonyl in $M^1$ and/or $M^2$ is bound to the variable $L^1$ and/or $L^2$). In yet another embodiment of formula (IIIA), $Z^1$, $Z^2$, and R$^z$ are not C$_3$-C$_{10}$ cycloalkyl(C$_1$-C$_6$ alkyl).

In another embodiment, the cationic lipid is a compound of formula (IV), which has a branching point at a position that is 2-6 carbon atoms (i.e., at beta (β), gamma (γ), delta (δ), epsilon (ε) or zeta position(ζ)) adjacent to the biodegradable group (between the biodegradable group and the terminus of the tail, i.e., $Z^1$ or $Z^2$):

Formula (IV)



or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), wherein

R', R$^1$, R$^2$, R, R$^3$, R$^4$, R$^{10}$, Q, R$^5$, M$^1$, M$^2$, a, and b are defined as in formula (I);

$L^1$ and $L^2$ are each, independently, C$_1$-C$_5$ alkylene or C$_2$-C$_5$ alkenylene;

X and Y are each, independently, alkylene or alkenylene (e.g., C$_{12}$-C$_{20}$ alkylene or C$_{12}$-C$_{20}$ alkenylene); and

each occurrence of Z is independently C$_1$-C$_4$ alkyl (preferably, methyl).

For example, in one embodiment, -$L^1$-C(Z)$_3$ is —CH$_2$C(CH$_3$)$_3$. In another embodiment, -$L^1$-C(Z)$_3$ is —CH$_2$CH$_2$C(CH$_3$)$_3$.

In one embodiment, the total carbon atom content of each tail (e.g., —X-M$^1$-L$^1$-C(Z)$_3$ or —Y-M$^2$-L$^2$-C(Z)$_3$) is from about 17 to about 26. For example, the total carbon atom content can be from about 19 to about 26 or from about 21 to about 26.

In another embodiment, X and Y are each, independently —(CH$_2$)$_n$— wherein n is 4 to 20, e.g., 4 to 18, 4 to 16, or 4 to 12. In one embodiment, n is 4, 5, 6, 7, 8, 9, or 10. In one exemplary embodiment, X and Y are —(CH$_2$)$_6$—. In

**11**

another embodiment, X and Y are —(CH$_2$)$_7$—. In yet another embodiment, X and Y are —(CH$_2$)$_9$—. In yet another embodiment, X and Y are —(CH$_2$)$_8$—.

In one embodiment, the cationic lipid is a compound of formula (V), which has an alkoxy or thioalkoxy (i.e., —S-alkyl) group substitution on at least one tail:



Formula (V)

or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), wherein

R', R$^1$, R$^2$, R, R$^3$, R$^4$, R$^{10}$, Q, R$^5$, M$^1$, M$^2$, a, and b are defined as in formula (I);

X and Y are each, independently, alkylene (e.g., C$_6$-C$_8$ alkylene) or alkenylene, wherein the alkylene or alkenylene group is optionally substituted with one or two fluorine atoms at the alpha position to the M$^1$ or M$^2$ group



(e.g.,                    );

Z$^1$ and Z$^2$ are each, independently, C$_8$-C$_{14}$ alkyl or C$_8$-C$_{14}$ alkenyl, wherein (i) the C$_8$-C$_{14}$ alkyl or C$_8$-C$_{14}$ alkenyl of at least one of Z$^1$ and Z$^2$ is substituted by one or more alkoxy (e.g., a C$_1$-C$_4$ alkoxy such as —OCH$_3$) or thioalkoxy (e.g., a C$_1$-C$_4$ thioalkoxy such as —SCH$_3$) groups, and (ii) the alkenyl group may optionally be substituted with one or two fluorine atoms at the alpha position to a double bond which is between the double bond and the terminus of Z$^1$ or Z$^2$



(e.g.,                    ).

In one embodiment, the alkoxy substitution on Z$^1$ and/or Z$^2$ is at the beta position from the M$^1$ and/or M$^2$ group.

In another embodiment, X and Y are each, independently —(CH$_2$)$_n$— wherein n is 4 to 20, e.g., 4 to 18, 4 to 16, or 4 to 12. In one embodiment, n is 4, 5, 6, 7, 8, 9, or 10. In one exemplary embodiment, X and Y are —(CH$_2$)$_6$—. In another embodiment, X and Y are —(CH$_2$)$_7$—. In yet another embodiment, X and Y are —(CH$_2$)$_9$—. In yet another embodiment, X and Y are —(CH$_2$)$_8$—.

The R'R$^1$R$^2$N—(R)$_a$-Q-(R)$_b$— group can be any of the head groups described herein, including those shown in Table 1 below, and salts thereof. In one preferred embodiment, R'R$^1$R$^2$N$^2$N—(R)$_a$-Q-(R)$_b$— is (CH$_3$)$_2$N—(CH$_2$)$_3$—C (O)O—, (CH$_3$)$_2$N—(CH$_2$)$_2$—NH—C(O)O—, (CH$_3$)$_2$N—(CH$_2$)$_2$—OC(O)—NH—, or (CH$_3$)$_2$N—(CH$_2$)$_3$—C(CH$_3$)=N—O—.

In one embodiment, the cationic lipid is a compound of formula (VIA), which has one or more fluoro substituents on at least one tail at a position that is either alpha to a double bond or alpha to a biodegradable group:

**12**



Formula (VIA)

or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), wherein

R$^1$, R$^2$, R, a, and b are as defined with respect to formula (I);

Q is absent or is —O—, —NH—, —S—, —C(O)—, —C(O)O—, —OC(O)—, —C(O)N(R$^4$)—, —N(R$^5$)C (O)—, —S—S—, —OC(O)O—, —N—C(R$^5$)—, —C(R$^5$)=N—O—, —OC(O)N(R$^5$)—, —N(R$^5$)C(O)N (R$^5$)—, —N(R$^5$)C(O)O—, —C(O)S—, —C(S)O— or —C(R$^5$)=N—O—C(O)O—;

R' is absent, hydrogen, or alkyl (e.g., C$_1$-C$_4$ alkyl); and each of R$^9$ and R$^{10}$ are independently C$_{12}$-C$_{24}$ alkyl (e.g., C$_{12}$-C$_{20}$ alkyl), C$_{12}$-C$_{24}$ alkenyl (e.g., C$_{12}$-C$_{20}$ alkenyl), or C$_{12}$-C$_{24}$ alkoxy (e.g., C$_{12}$-C$_{20}$ alkoxy) (a) having one or more biodegradable groups and (b) optionally substituted with one or more fluorine atoms at a position which is (i) alpha to a biodegradable group and between the biodegradable group and the tertiary carbon atom marked with an asterisk (*), or (ii) alpha to a carbon-carbon double bond and between the double bond and the terminus of the R$^9$ or R$^{10}$ group; each biodegradable group independently interrupts the C$_{12}$-C$_{24}$ alkyl, alkenyl, or alkoxy group or is substituted at the terminus of the C$_{12}$-C$_{24}$ alkyl, alkenyl, or alkoxy group, wherein

(i) at least one of R$^9$ and R$^{10}$ contains a fluoro group;

(ii) the compound does not contain the following moiety:



wherein ---- is an optional bond; and

(iii) the terminus of R$^9$ and R$^{10}$ is separated from the tertiary carbon atom marked with an asterisk (*) by a chain of 8 or more atoms (e.g., 12 or 14 or more atoms).

In one preferred embodiment, the terminus of R$^9$ and R$^{10}$ is separated from the tertiary carbon atom marked with an asterisk (*) by a chain of 18-22 carbon atoms (e.g., 18-20 carbon atoms).

In another embodiment, the terminus of the R$^9$ and/or R$^{10}$ has the formula —C(O)O—CF$_3$.

In another embodiment, the cationic lipid is a compound of formula (VIB), which has one or more fluoro substituents on at least one tail at a position that is either alpha to a double bond or alpha to a biodegradable group:



Formula (VIB)

US 11,246,933 B1

13                                    14

or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), wherein

R', R$^1$, R$^2$, R, R$^3$, R$^4$, R$^{10}$, Q, R$^5$, M$^1$, M$^2$, a, and b are defined as in formula (I);

X and Y are each, independently, alkylene (e.g., C$_6$-C$_8$ alkylene) or alkenylene, wherein the alkylene or alkenylene group is optionally substituted with one or two fluorine atoms at the alpha position to the M$^1$ or M$^2$ group and



(e.g.,                                );

Z$^1$ and Z$^2$ are each, independently, C$_8$-C$_{14}$ alkyl or C$_8$-C$_{14}$ alkenyl, wherein said C$_8$-C$_{14}$ alkenyl is optionally substituted by one or more fluorine atoms at a position that is alpha to a double bond



(e.g.,                                ).

wherein at least one of X, Y, Z$^1$, and Z$^2$ contains a fluorine atom.

In one embodiment, at least one of Z$^1$ and Z$^2$ is substituted by two fluoro groups at a position that is either alpha to a double bond or alpha to a biodegradable group. In one embodiment, at least one of Z$^1$ and Z$^2$ has a terminal —CF$_3$ group at a position that is alpha to a biodegradable group (i.e., at least one of Z$^1$ and Z$^2$ terminates with an —C(O) OCF$_3$ group).

For example, at least one of Z$^1$ and Z$^2$ may include one or more of the following moieties:



In one embodiment, X and Y are each, independently —(CH$_2$)$_n$ wherein n is 4 to 20, e.g., 4 to 18, 4 to 16, or 4 to 12. In one embodiment, n is 4, 5, 6, 7, 8, 9, or 10. In one exemplary embodiment, X and Y are —(CH$_2$)$_7$—. In another exemplary embodiment, X and Y are —(CH$_2$)$_9$—. In yet another embodiment, X and Y are —(CH$_2$)$_8$—.

The R'R$^1$R$^2$N—(R)$_a$-Q-(R)$_b$— group can be any of the head groups described herein, including those shown in Table 1 below, and salts thereof. In one preferred embodiment, R'R$^1$R$^2$N—(R)$_a$-Q-(R)$_b$— is (CH$_3$)$_2$N—(CH$_2$)$_3$—C

(O)O—, (CH$_3$)$_2$N—(CH$_2$)$_2$—NH—C(O)O—, (CH$_3$)$_2$N— (CH$_2$)$_2$—OC(O)—NH—, or (CH$_3$)$_2$N—(CH$_2$)$_3$—C(CH$_3$) ═N—O—.

In one embodiment, the cationic lipid is a compound of formula (VII), which has an acetal group as a biodegradable group in at least one tail:



Formula (VII)

or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), wherein

R', R$^1$, R$^2$, R, R$^3$, R$^4$, R$^{10}$, Q, R$^5$, a, and b are defined as in formula (I);

X and Y are each, independently, alkylene (e.g., C$_6$-C$_8$ alkylene) or alkenylene, wherein the alkylene or alkenylene group is optionally substituted with one or two fluorine atoms at the alpha position to the M$^1$ or M$^2$ group



(e.g.,                                );

M$^1$ and M$^2$ are each, independently, a biodegradable group (e.g., —OC(O)—, —C(O)O—, —SC(O)—, —C(O) S—, —OC(S)—, —C(S)O—, —S—S—, —C(R$^5$)═N—, —N═C(R$^5$)—, —C(R$^5$)═N—O—, —O—N═C(R$^5$)—, —C(O)(NR$^5$)—, —N(R$^5$)C(O)—, —C(S)(NR$^5$)—, —N(R$^5$)C(O)—, —N(R$^5$)C(O)N(R$^5$)—, —OC(O)O—, —OSi(R$^5$)$_2$O—, —C(O)(CR$^3$R$^4$)C(O)O—, —OC(O) (CR$^3$R$^4$)C(O)—, or



(wherein R$^{11}$ is a C$_4$-C$_{10}$ alkyl or C$_4$-C$_{10}$ alkenyl);

with the proviso that at least one of M$^1$ and M$^2$ is



and

Z$^1$ and Z$^2$ are each, independently, C$_4$-C$_{14}$ alkyl or C$_4$-C$_{14}$ alkenyl, wherein the alkenyl group may optionally be substituted with one or two fluorine atoms at the alpha position to a double bond which is between the double bond and the terminus of Z$^1$ or Z$^2$

US 11,246,933 B1

**15**



(e.g., [structure] ).

In one embodiment, each of $M^1$ and $M^2$ is



In another embodiment, X and Y are each, independently —$(CH_2)_n$— wherein n is 4 to 20, e.g., 4 to 18, 4 to 16, or 4 to 12. In one embodiment, n is 4, 5, 6, 7, 8, 9, or 10. In one exemplary embodiment, X and Y are —$(CH_2)_6$—. In another embodiment, X and Y are —$(CH_2)_7$—. In yet another embodiment, X and Y are —$(CH_2)_9$—. In yet another embodiment, X and Y are —$(CH_2)_8$—.

The R'R'¹R²N—$(R)_a$-Q-$(R)_b$— group can be any of the head groups described herein, including those shown in Table 1 below, and salts thereof. In one preferred embodiment, R'R'¹R²N—$(R)_a$-Q-$(R)_b$— is $(CH_3)_2N$—$(CH_2)_3$—C(O)O—, $(CH_3)_2N$—$(CH_2)_2$—NH—C(O)O—, $(CH_3)_2N$—$(CH_2)_2$—OC(O)—NH—, or $(CH_3)_2N$—$(CH_2)_3$—C(CH_3)=N—O—.

In another embodiment, the present invention relates to a cationic lipid or a salt thereof having:

(i) a central carbon atom,

(ii) a nitrogen containing head group directly bound to the central carbon atom, and

(iii) two hydrophobic tails directly bound to the central carbon atom, wherein each hydrophobic tail is of the formula —$R^e$-M-$R^f$ where $R^e$ is a $C_4$-$C_{14}$ alkyl or alkenyl, M is a biodegradable group, and $R^f$ is a branched alkyl or alkenyl (e.g., a $C_{10}$-$C_{20}$ alkyl or $C_{10}$-$C_{20}$ alkenyl), such that (i) the chain length of —$R^e$-M-$R^f$ is at most 20 atoms (i.e. the total length of the tail from the first carbon atom after the central carbon atom to a terminus of the tail is at most 20), and (ii) the group —$R^e$-M-$R^f$ has at least 20 carbon atoms (e.g., at least 21 atoms). Optionally, the alkyl or alkenyl group in $R^e$ may be substituted with one or two fluorine atoms at the alpha position to the $M^1$ or $M^2$ group



(e.g., [structure] ).

Also, optionally, the alkenyl group in $R^f$ may be substituted with one or two fluorine atoms at the alpha position to a double bond which is between the double bond and the terminus of $R^f$



(e.g., [structure] ).

**16**

In one embodiment, the cationic lipid of the present invention (such as of formulas I-VII) has assymetrical hydrophobic groups (i.e., the two hydrophobic groups have different chemical formulas). For example, the cationic lipid can have the formula:



Formula (VIII)

or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), wherein

G is branched or unbranched $C_3$-$C_{15}$ alkyl, alkenyl or alkynyl (e.g., a n-$C_8$ alkyl n-$C_9$ alkyl, or n-$C_{10}$ alkyl);

$R^{12}$ is a branched or unbranched alkylene or alkenylene (e.g., $C_6$-$C_{20}$ alkylene or $C_6$-$C_{20}$ alkenylene such as $C_{12}$-$C_{20}$ alkylene or $C_{12}$-$C_{20}$ alkenylene);

$M_1$ is a biodegradable group, —OC(O)—, —C(O)O—, —SC(O)—, —C(O)S—, —OC(S)—, —C(S)O—, —S—S, —C(R⁵)=N—, —N=C(R⁵)—, —C(R⁵)=N—O—, —O—N=C(R⁵)—, —C(O)(NR⁵)—, —N(R⁵)C(O)—, —C(S)(NR⁵)—, —N(R⁵)C(O)—, —N(R⁵)C(O)N(R⁵)—, —OC(O)O—, —OSi(R⁵)₂O—, —C(O)(CR³R⁴)C(O)O—, or



(wherein $R^{11}$ is a $C_2$-$C_8$ alkyl or alkenyl));

$R^3$ and $R^4$ are defined as in formula (I);

each occurrence of $R^5$ is, independently, H or alkyl (e.g., $C_1$-$C_4$ alkyl);

$R^{13}$ is branched or unbranched $C_3$-$C_{15}$ alkyl, alkenyl or alkynyl;

[ Primary Group ]

comprises a protonatable group having a pK$_a$ of from about 4 to about 13, more preferably from about 5 to about 8 (e.g. from about 5 to about 7, or from about 5 to about 6.5, or from about 5.5 to about 6.5, or from about 6 to about 6.5).

In one embodiment, the primary group includes (i) a head group, and (ii) a central moiety (e.g., a central carbon atom) to which both the hydrophobic tails are directly bonded. Representative central moieties include, but are not limited to, a central carbon atom, a central nitrogen atom, a central carbocyclic group, a central aryl group, a central hetrocyclic group (e.g., central tetrahydrofuranyl group or central pyrrolidinyl group) and a central heteroaryl group.

Representative

[ Primary Group ]'s

US 11,246,933 B1

**17**

include, but are not limited to,

**18**

-continued

where n is 0-6.

Representative asymmetrical cationic lipids include:

**19**                                                                                 **20**

-continued



wherein w is 0, 1, 2, or 3; and x and y are each independently 1, 2, 3, 4, 5, 6, or 7.

In a preferred embodiment of the aforementioned biodegradable cationic lipids, the biodegradable cationic lipid has a log P value of at least 10.1 (as calculated by the software available at http://www.molinspiration.com/services/logp.html from Molinspiration Cheminformatics of Slovensky Grob, Slovak Republic). More preferably, the log P value is at least 10.2 or 10.3.

In another preferred embodiment of the aforementioned biodegradable cationic lipids, the biodegradable cationic lipid in the lipid nanoparticle has a HPLC retention time (relative to the retention time of cholesterol in the lipid nanoparticle), hereafter referred to as $t_{lipid}$–$t_{chol}$, of at least 1.4. (The HPLC parameters are provided in the examples below. Unless otherwise specified, the formulation of the lipid nanoparticle used is that described in Example 31). More preferably, the $t_{lipid}$–$t_{chol}$ value is at least 1.75, 2.0, or 2.25.

In another embodiment, the biodegradable cationic lipid of the present invention is not one selected from:



n = 0-2



n = 0-2



n = 0-2



n = 0-2

US 11,246,933 B1

21                                                                                      22

-continued



m = 1-6; n = 0-3

R$_1$ = R$_2$ = Me, Et, iPr etc.



where m and n are integers, and m+n=13



where m and n are integers, and m+n=13



where m and n are integers, and m+n=13



where m and n are integers, and m+n=13

In yet another embodiment, the biodegradable cationic lipid is not one selected from those disclosed in International Publication No. WO 2011/153493 and U.S. Patent Publication No. 2012/0027803, both of which are hereby incorporated by reference.

Yet another embodiment is a biodegradable cationic lipid having (i) a log P value of at least 10.1 and/or a t$_{lipid}$–t$_{chol}$, of at least 1.4, and (2) one or more biodegradable groups (such as an ester group) located in the mid- or distal section of a lipidic moiety (e.g., a hydrophobic chain) of the cationic lipid, with the proviso that the compound is not selected from

US 11,246,933 B1

**23**                                                                                          **24**

In another embodiment, the biodegradable cationic lipid is not one selected from those disclosed in International Publication No. WO 2011/153493 and U.S. Patent Publication No. 2012/0027803, both of which are hereby incorporated by reference. The incorporation of the biodegradable group(s) into the cationic lipid results in faster metabolism and removal of the cationic lipid from the body following delivery of the active pharmaceutical ingredient to a target area. In a preferred embodiment, the cationic lipid includes a branched alkyl or branched alkenyl group in its biodegradable group(s). In another preferred embodiment, the cationic lipid has a log P of at least 10.2 or 10.3. In yet another preferred embodiment, the cationic lipid has a $t_{lipid}$–$t_{chol}$, of at least 1.75, 2.0, or 2.25. The cationic lipid preferably has a pKa of from about 4 to about 7 (such as 6.0 to 6.5).

In one embodiment, the cationic lipid having a log P value of at least 10.1 and/or a $t_{lipid}$–$t_{chol}$, of at least 1.4 comprises (a) a head group (preferably a nitrogen containing head group, such as the head groups described herein), (b) at least two hydrophobic tails, each of the formula -(hydrophobic chain)-(biodegradable group)-(hydrophobic chain), and (c) a linker group (for instance, a single central carbon atom) which is bound to the head group and the hydrophobic tails. The cationic lipid preferably has one, two, three, four or more of the properties listed below:

(i) a pKa of from about 4 to about 7 (such as 6.0 to 6.5);

(ii) in at least one hydrophobic tail (and preferably all hydrophobic tails), the biodegradable group is separated from the terminus of the hydrophobic tail by from about 6 to about 12 carbon atoms (for instance, 6 to 8 carbon atoms or 8 to 12 carbon atoms),

(iii) for at least one hydrophobic tail (and preferably all hydrophobic tails), the chain length from the linker group to the terminus of the hydrophobic tail is at most 21 (e.g., at most 20, or from about 17 to about 21, from about 18 to about 20, or from about 16 to about 18) (The atom(s) in the linker group are not counted when calculating the chain length.);

(iv) for at least one hydrophobic tail (and preferably all hydrophobic tails), the total number of carbon atoms in the hydrophobic tail is from about 17 to about 26 (such as from about 19 to about 26, or from about 21 to about 26);

(v) for at least one hydrophobic tail (and preferably all hydrophobic tails), the number of carbon atoms between the linker group and the biodegradable group ranges from about 5 to about 10 (for example, 6 to 10, or 7 to 9);

(vi) for at least one hydrophobic tail (and preferably all hydrophobic tails), the total number of carbon atoms between the linker group and the terminus of the hydrophobic tail is from about 15 to about 20 (such as from 16 to 20, 16 to 18, or 18 to 20);

(vii) for at least one hydrophobic tail (and preferably all hydrophobic tails), the total number of carbon atoms between the biodegradable group and the terminus of the hydrophobic tail is from about 12 to about 18 (such as from 13 to 25);

(viii) for at least one hydrophobic tail (and preferably all hydrophobic tails), the terminal hydrophobic chain in the hydrophobic tail is a branched alkyl or alkenyl group, for example, where the branching occurs at the α, β, γ, or δ position on the hydrophobic chain relative to the biodegradable group;

(ix) when formulated as a lipid nanoparticle (such as in Example 35), the cationic lipid has an in vivo half life ($t_{1/2}$) in the liver of less than about 3 hours, such as less than about 2.5 hours, less than about 2 hours, less than about 1.5 hours, less than about 1 hour, less than about 0.5 hour or less than about 0.25 hours;

(x) when formulated as a lipid nanoparticle (such as in Example 35), the cationic lipid is eliminated from the liver in mice with a greater than 10-fold reduction in lipid levels relative to $C_{max}$ within the first 24 hours post-dose;

US 11,246,933 B1

<table>
<tr><td>25</td><td>26</td></tr>
</table>

(xi) when formulated as a lipid nanoparticle (such as in Example 35), the cationic lipid is eliminated from the spleen in mice with an equal or greater than 10-fold reduction in lipid levels relative to $C_{max}$ within the first 168 hours post-dose; and

(xii) when formulated as a lipid nanoparticle (such as in Example 35), the cationic lipid is eliminated from plasma with a terminal plasma half-life (t½β) in rodents and non-human primates of 48 hours or shorter.

The present invention embodies compounds having any combination of some or all of the aforementioned properties. These properties provide a cationic lipid which remains intact until delivery of an active agent, such as a nucleic acid, after which cleavage of the hydrophobic tail occurs in vivo. For instance, the compounds can have all of properties (i) to (viii) (in addition to the log P or $t_{lipid}-t_{chol}$ value). In another embodiment, the compounds have properties (i), (ii), (iii), and (viii). In yet another embodiment, the compounds have properties (i), (ii), (iii), (v), (vi), and (viii).

Another embodiment is a method of preparing a cationic lipid comprising:

(a) designing a cationic lipid having a log P value of at least 10.1 and/or a $t_{lipid}-t_{chol}$, of at least 1.4, and optionally also having one, two, three, four, or more properties from the list above (i.e., properties (i)-(xii)); and

(b) synthesizing the cationic lipid of step (a). The cationic lipid in step (a) may comprises (a) a head group (preferably a nitrogen containing head group, such as the head groups described herein), (b) at least two hydrophobic tails, each of the formula -(hydrophobic chain)-(biodegradable group)-(hydrophobic chain), and (c) a linker group (for instance, a single central carbon atom) which is bound to the head group and the hydrophobic tails. Step (a) may comprise:

(a)(i) preparing one or more cationic lipids having a log P value of at least 10.1 and/or a $t_{lipid}-t_{chol}$, of at least 1.4, and optionally also having one, two, three, four, or more properties from the list above (i.e., properties (i)-(xii));

(a)(ii) screening the cationic lipids to determine their efficacy and/or toxicity in lipid nanoparticles; and

(a)(iii) selecting a cationic lipid for synthesis.

Yet another embodiment is a method of designing a cationic lipid comprising:

(a) selecting a cationic lipid having a log P value of at least 10.1 and/or a $t_{lipid}-t_{chol}$, of at least 1.4, and optionally also having one, two, three, four, or more properties from the list above (i.e., properties (i)-(xii)); and

(b) optionally,

(i) preparing one or more cationic lipids having a log P value of at least 10.1 and/or a $t_{lipid}-t_{chol}$, of at least 1.4, and optionally also having one, two, three, four, or more properties from the list above (i.e., properties (i)-(xii));

(ii) screening the cationic lipids to determine their efficacy and/or toxicity in lipid nanoparticles; and

(iii) optionally, selecting a cationic lipid for further development or use.

In one embodiment, the PEG lipid has the formula:

Formula (IX)



wherein

$G_1$ is branched or unbranched $C_3$-$C_{15}$ alkyl, alkenyl or alkynyl (e.g., a n-$C_8$ alkyl n-$C_9$ alkyl, or n-$C_{10}$ alkyl); or $G_1$ is —$R^{12}$-$M_1$-$R^{13}$;

$R^{12}$ is a branched or unbranched alkylene or alkenylene (e.g., $C_6$-$C_{20}$ alkylene or $C_6$-$C_{20}$ alkenylene such as $C_{12}$-$C_{20}$ alkylene or $C_{12}$-$C_{20}$ alkenylene);

$M_1$ is a biodegradable group (e.g., —OC(O)—, —C(O)O—, —SC(O)—, —C(O)S—, —OC(S)—, —C(S)O—, —S—S, —C($R^5$)=N—, —N=C($R^5$)—, —C($R^5$)=N—O—, —O—N=C($R^5$)—, —C(O)(NR$^5$)—, —N($R^5$)C(O)—, —C(S)(NR$^5$)—, —N($R^5$)C(O)—, —N($R^5$)C(O)N($R^5$)—, —OC(O)O—, —OSi($R^5$)$_2$O—, —C(O)(CR$^3$R$^4$)C(O)O—, —OC(O)(CR$^3$R$^4$)C(O)—, or



(wherein $R^{11}$ is a $C_2$-$C_8$ alkyl or alkenyl));

$R^3$ and $R^4$ are defined as in formula (I);

each occurrence of $R^5$ is, independently, H or alkyl (e.g., $C_1$-$C_4$ alkyl);

$R^{13}$ is branched or unbranched $C_3$-$C_{15}$ alkyl, alkenyl or alkynyl;

Pegylated Primary Group

comprises a PEG moiety, such as



moiety wherein b is an integer from 10 to 1,000 (e.g., 5-100, 10-60, 15-50, or 20-45); $R^3$ is —H, —$R^c$, or —OR$^c$; and $R^c$ is —H, alkyl, acyl, cycloalkyl, alkenyl, alkynyl, aryl, heteroaryl, or heterocyclyl.

In one embodiment, the pegylated primary group includes (i) a head group having a PEG moiety, and (ii) a central moiety (e.g., a central carbon atom) to which both the hydrophobic tails are directly bonded. Representative central moieties include, but are not limited to, a central carbon atom, a central nitrogen atom, a central carbocyclic group, a central aryl group, a central hetrocyclic group (e.g., central tetrahydrofuranyl group or central pyrrolidinyl group) and a central heteroaryl group.

Representative

Pegylated Primary Group 's

include, but are not limited to,

US 11,246,933 B1

27

-continued



where b is 10-100 (e.g., 20-50 or 40-50)

Another embodiment of the present invention is a PEG lipid (or a salt thereof) having:

(i) a pegylated primary group including a head group which includes a PEG moiety (e.g., having from 10 to 1000 repeating units such as ethoxy units)), and

(iii) one or more hydrophobic tails (preferably, two hydrophobic tails) directly bound to the pegylated primary group, wherein at least one hydrophobic tail is of the formula —R$^e$-M-R$^f$ where R$^e$ is a C$_4$-C$_{14}$ alkyl or alkenyl, M is a biodegradable group, and R$^f$ is a branched alkyl or alkenyl (e.g., a C$_{10}$-C$_{20}$ alkyl or C$_{10}$-C$_{20}$ alkenyl), such that (i) the chain length of —R$^e$-M-R$^f$ is at most 20 atoms (i.e. the total length of the tail from the first carbon atom after the central carbon atom to a terminus of the tail is at most 20), and (ii) the group —R$^e$-M-R$^f$ has at least 20 carbon atoms (e.g., at least 21 atoms). Optionally, the alkyl or alkenyl group in R$^e$ may be substituted with one or two fluorine atoms at the alpha position to the M$^1$ or M$^2$ group

28



Also, optionally, the alkenyl group in R$^f$ may be substituted with one or two fluorine atoms at the alpha position to a double bond which is between the double bond and the terminus of R$^f$



In one embodiment, the pegylated primary group includes (i) a head group having a PEG moiety, and (ii) a central moiety (e.g., a central carbon atom) to which the hydrophobic tails are directly bound. The PEG moiety may have 5-100, 10-60, 15-50, or 20-45 repeating units. For example, the PEG moiety may have the formula



moiety wherein b is an integer from 10 to 1,000 (e.g., 5-100, 10-60, 15-50, or 20-45); R$^3$ is —H, —R$^c$, or —OR$^c$; and R$^c$ is —H, alkyl (e.g., C$_1$-C$_4$ alkyl), acyl, cycloalkyl, alkenyl, alkynyl, aryl, heteroaryl, or heterocyclyl.

Yet another embodiment is a lipid particle that includes a cationic lipid and/or PEG lipid of the present invention. In one embodiment, the lipid particle includes a cationic lipid of the present invention (e.g., of one of formulas (I)-(VIII)). In another embodiment, the lipid particle includes a PEG lipid of the present invention (e.g., of formula (IX)). In yet another embodiment, the lipid particle includes a cationic lipid of the present invention and a PEG lipid of the present invention.

In a preferred embodiment, the lipid particle includes a neutral lipid, a lipid capable of reducing aggregation, a cationic lipid, and optionally, a sterol (e.g., cholesterol). Suitable neutral lipids include, but are not limited to, distearoylphosphatidylcholine (DSPC), dipalmitoylphosphatidylcholine (DPPC), POPC, DOPE, and SM. Suitable lipids capable of reducing aggregation include, but are not limited to, a PEG lipid, such as PEG-DMA, PEG-DMG, and those of the present invention (e.g., of formula (IX)) or a combination thereof.

The lipid particle may further include an active agent (e.g., a therapeutic agent). The active agent can be a nucleic acid such as a plasmid, an immunostimulatory oligonucleotide, an siRNA, an antisense oligonucleotide, a microRNA, an antagomir, an aptamer, or a ribozyme. In a preferred embodiment, the nucleic acid is a siRNA. In another preferred embodiment, the nucleic acid is a miRNA.

In another embodiment, the lipid particle includes a cationic lipid of the present invention, a neutral lipid and a sterol. The lipid particle may further include an active agent, such as a nucleic acid (e.g., an siRNA or miRNA).

US 11,246,933 B1

29      30

In yet another embodiment, the lipid particle includes a PEG lipid of the present invention, a cationic lipid, a neutral lipid, and a sterol. The lipid particle may further include an active agent, such as a nucleic acid (e.g., an siRNA or miRNA).

The lipid particles described herein may be lipid nanoparticles.

Yet another embodiment of the invention is a pharmaceutical composition which includes a lipid particle of the present invention and a pharmaceutically acceptable carrier.

In one embodiment, the cationic lipid remains intact until delivery of the nucleic acid molecule after which cleavage of the hydrophobic tail occurs in vivo.

In another embodiment, the PEG lipid remains intact until delivery of the nucleic acid molecule after which cleavage of the hydrophobic tail occurs in vivo.

In another embodiment, the present invention relates to a method of delivering a nucleic acid molecule comprising administering a nucleic acid lipid particle comprising (i) the nucleic acid molecule and (ii) a cationic lipid and/or a PEG lipid of the present invention. In one embodiment, the cationic lipid and/or a PEG lipid remains intact until delivery of the nucleic acid molecule after which cleavage of the hydrophobic tail occurs in vivo.

Yet another aspect is a method of modulating the expression of a target gene in a cell by providing to the cell a lipid particle of the present invention. The active agent can be a nucleic acid selected from a plasmid, an immunostimulatory oligonucleotide, an siRNA, an antisense oligonucleotide, a microRNA, an antagomir, an aptamer, and a ribozyme. In a preferred embodiment, the nucleic acid is a siRNA or miRNA.

Yet another aspect is a method of treating a disease or disorder characterized by the overexpression of a polypeptide in a subject by providing to the subject pharmaceutical composition of the present invention, wherein the active agent is a nucleic acid selected from an siRNA, a microRNA, and an antisense oligonucleotide, and wherein the siRNA, microRNA, or antisense oligonucleotide includes a polynucleotide that specifically binds to a polynucleotide that encodes the polypeptide, or a complement thereof. In a preferred embodiment, the nucleic acid is a siRNA or miRNA.

Yet another aspect is a method of treating a disease or disorder characterized by underexpression of a polypeptide in a subject by providing to the subject a pharmaceutical composition of the present invention, wherein the active agent is a plasmid that encodes the polypeptide or a functional variant or fragment thereof.

Yet another aspect is a method of inducing an immune response in a subject by providing to the subject a pharmaceutical composition wherein the active agent is an immunostimulatory oligonucleotide.

Yet another aspect is a transfection agent that includes the composition or lipid particles described above, where the composition or lipid particles include a nucleic acid. The agent, when contacted with cells, can efficiently deliver nucleic acids to the cells. Yet another aspect is a method of delivering a nucleic acid to the interior of a cell, by obtaining or forming a composition or lipid particles described above, and contacting the composition or lipid particles with a cell.

DETAILED DESCRIPTION

In one aspect, the present invention relates to a lipid particle that includes a neutral lipid, a lipid capable of reducing aggregation (e.g., a PEG lipid), a cationic lipid, and optionally a sterol. In certain embodiments, the lipid particle further includes an active agent (e.g., a therapeutic agent). Various exemplary embodiments of these lipids, lipid particles and compositions comprising the same, and their use to deliver therapeutic agents and modulate gene and protein expression are described in further detail below.

The Cationic Lipid

In one embodiment, the cationic lipid is a compound of any one of Formulas I-VIII. The following disclosure represents various embodiments of the compounds described above, including the compounds of Formulas I-VIII.

In one embodiment, $M^1$ and $M^2$ are each, independently:

—OC(O)—, —C(O)O—, —SC(O)—, —C(O)S—, —OC(S)—, —C(S)O—, —S—S—, —C($R^5$)=N—, —N=C($R^5$)—, —C($R^5$)=N—O—, —O—N=C($R^5$)—, —C(O)(N$R^5$)—, —N($R^5$)C(O)—, —C(S)(N$R^5$)—, —N($R^5$)C(O)—, —N($R^5$)C(O)N($R^5$)—, —OC(O)O—, —OSi($R^5$)$_2$O—, —C(O)(C$R^3R^4$)C(O)O—, —OC(O)(C$R^3R^4$)C(O)—, or



(wherein $R^{11}$ is a $C_2$-$C_8$ alkyl or alkenyl).

In another embodiment, $M^1$ and $M^2$ are each, independently:

—OC(O)—, —C(O)O—, —C($R^5$)=N—, —N=C($R^5$)—, —C($R^5$)=N—O—, —O—N=C($R^5$)—, —O—C(O)O—, —C(O)(N$R^5$)—, —N($R^5$)C(O)—, —C(O)S—, —SC(O)—, —C(S)O—, —OC(S)—, —OSi($R^5$)$_2$O—, —C(O)(C$R^3R^4$)C(O)O—, or —OC(O)(C$R^3R^4$)C(O)—.

In yet another embodiment, $M^1$ and $M^2$ are each, independently:

—C(O)—O—, —OC(O)—, —C($R^5$)=N—, —C($R^5$)=N—O—, —O—C(O)O—, —C(O)(N$R^5$)—, —C(O)S—, —C(S)O—, —OSi($R^5$)$_2$O—, —C(O)(C$R^3R^4$)C(O)O—, or —OC(O)(C$R^3R^4$)C(O)—.

In another embodiment, $M^1$ and $M^2$ are each —C(O)O—.

In one embodiment, $R^1$ and $R^2$ are each, individually, optionally substituted alkyl, cycloalkyl, cycloalkylalkyl, or heterocycle. In one embodiment, $R^1$ is alkyl and $R^2$ is alkyl, cycloalkyl or cycloalkylalkyl. In one embodiment, $R^1$ and $R^2$ are each, individually, alkyl (e.g., $C_1$-$C_4$ alkyl, such as methyl, ethyl, or isopropyl). In one embodiment, $R^1$ and $R^2$ are both methyl. In another embodiment, $R^1$ and $R^2$, together with the nitrogen atom to which they are attached, form an optionally substituted heterocyclic ring (e.g., N-methylpiperazinyl). In another embodiment, one of $R^1$ and $R^2$ is



(e.g., $R^1$ is one of the two aforementioned groups and $R^2$ is hydrogen).

In one embodiment, R' is hydrogen or alkyl. In another embodiment, R' is hydrogen or methyl. In one embodiment, R' is absent. In one embodiment, R' is absent or methyl.

US 11,246,933 B1

31

For cationic lipid compounds which contain an atom (e.g., a nitrogen atom) that carries a positive charge, the compound also contains a negatively charged counter ion. The counterion can be any anion, such as an organic or inorganic anion. Suitable examples of anions include, but are not limited to, tosylate, methanesulfonate, acetate, citrate, malonate, tartarate, succinate, benzoate, ascorbate, α-keto-glutarate, α-glycerophosphate, halide (e.g., chloride), sulfate, nitrate, bicarbonate, and carbonate. In one embodiment, the counterion is a halide (e.g., Cl).

In one embodiment each R is, independently, —(CR$^3$R$^4$)—, wherein R$^3$ and R$^4$ are each, independently, H or alkyl (e.g., C$_1$-C$_4$ alkyl). For example, in one embodiment each R is, independently, —(CHR$^4$)—, wherein each R$^4$ is, independently H or alkyl (e.g., C$_1$-C$_4$ alkyl). In another embodiment, each R is, independently, —CH$_2$—, —C(CH$_3$)$_2$— or —CH(iPr)- (where iPr is isopropyl). In another embodiment, each R is —CH$_2$—.

In another embodiment R$^5$ is, in each case, hydrogen or methyl. For example, R$^5$ can be, in each case, hydrogen.

In one embodiment, Q is absent, —C(O)O—, —OC(O)—, —C(O)N(R$^5$)—, —N(R$^5$)C(O)—, —S—S—, —OC(O)O—, —C(R$^5$)=N—O—, —OC(O)N(R$^5$)—, —N(R$^5$)C(O)N(R$^5$)—, —N(R$^5$)C(O)O—, —C(O)S—, —C(S)O— or —C(R$^5$)=N—O—C(O)—. In one embodiment, Q is —C(O)O—.

In one embodiment, the dashed line to Q is absent, b is 0 and R'R$^1$R$^2$N—(R)$_a$-Q- and the tertiary carbon adjacent to it (C*) form the following group:



where n is 1 to 4 (e.g., n is 2).

In one embodiment, the dashed line to Q is absent, b is 0 and R'R$^1$R$^2$N—(R)$_a$-Q- and the tertiary carbon adjacent to it form the following group:



where n is 1 to 4 (e.g., n is 2), and R$^1$, R$^2$, R, a, and b are as defined with respect to formula (I). In one embodiment, a is 3.

In one embodiment, the dashed line to Q is absent, b is 0 and R'R$^1$R$^2$N—(R)$_a$-Q- and the tertiary carbon adjacent to it form the following group:



32

where n is 1 to 4 (e.g., n is 2), and R$^1$, R$^2$, R, a, and b are as defined with respect to formula (I). In one embodiment, a is 0. For example, the group can be:



In one embodiment, b is 0. In another embodiment, a is 2, 3, or 4 and b is 0. For example, in one embodiment, a is 3 and b is 0. In another embodiment, a is 3, b is 0, and Q is —C(O)O—.

In certain embodiments, the biodegradable group present in the cationic lipid is selected from an ester (e.g., —C(O)O— or —OC(O)—), disulfide (—S—S—), oxime (e.g., —C(H)=N—O— or —O—N=C(H)—), —C(O)—O—, —OC(O)—, —C(R$^5$)=N—, —N=C(R$^5$)—, —C(R$^5$)=N—O—, —O—N=C(R$^5$)—, —O—C(O)O—, —C(O)N(R$^5$), —N(R$^5$)C(O)—, —C(S)N(R$^5$)—, (NR$^5$)C(S)—, —N(R$^5$)C(O)N(R$^5$)—, —C(O)S—, —SC(O)—, —C(S)O—, —OC(S)—, —OSi(R$^5$)$_2$O—, —C(O)(CR$^3$R$^4$)C(O)O—, or —OC(O)(CR$^3$R$^4$)C(O)—.

A suitable cholesterol moiety for the cationic lipids of the present invention (including compounds of formulas I-VI) has the formula:



Additional embodiments include a cationic lipid having a head group, one or more hydrophobic tails, and a central moiety between the head group and the one or more tails. The head group can include an amine; for example an amine having a desired pK$_a$. The pK$_a$ can be influenced by the structure of the lipid, particularly the nature of head group; e.g., the presence, absence, and location of functional groups such as anionic functional groups, hydrogen bond donor functional groups, hydrogen bond acceptor groups, hydrophobic groups (e.g., aliphatic groups), hydrophilic groups (e.g., hydroxyl or methoxy), or aryl groups. The head group amine can be a cationic amine; a primary, secondary, or tertiary amine; the head group can include one amine group (monoamine), two amine groups (diamine), three amine groups (triamine), or a larger number of amine groups, as in an oligoamine or polyamine. The head group can include a functional group that is less strongly basic than an amine, such as, for example, an imidazole, a pyridine, or a guanidinium group. The head group can be zwitterionic. Other head groups are suitable as well.

Representative central moieties include, but are not limited to, a central carbon atom, a central nitrogen atom, a central carbocyclic group, a central aryl group, a central

US 11,246,933 B1

33

34

hetrocyclic group (e.g., central tetrahydrofuranyl group or central pyrrolidinyl group) and a central heteroaryl group. Additionally, the central moiety can include, for example, a glyceride linker, an acyclic glyceride analog linker, or a cyclic linker (including a spiro linker, a bicyclic linker, and a polycyclic linker). The central moiety can include functional groups such as an ether, an ester, a phosphate, a phosphonate, a phosphorothioate, a sulfonate, a disulfide, an acetal, a ketal, an imine, a hydrazone, or an oxime. Other central moieties and functional groups are suitable as well.

In one embodiment, the cationic lipid is a racemic mixture. In another embodiment, the cationic lipid is enriched in one diastereomer, e.g. the cationic lipid has at least 95%, at least 90%, at least 80% or at least 70% diastereomeric excess. In yet another embodiment, the cationic lipid is enriched in one enantiomer, e.g. the lipid has at least 95%, at least 90%, at least 80% or at least 70% enantiomer excess. In yet another embodiment, the cationic lipid is chirally pure, e.g. is a single optical isomer. In yet another embodiment, the cationic lipid is enriched for one optical isomer.

Where a double bond is present (e.g., a carbon-carbon double bond or carbon-nitrogen double bond), there can be isomerism in the configuration about the double bond (i.e. cis/trans or E/Z isomerism). Where the configuration of a double bond is illustrated in a chemical structure, it is understood that the corresponding isomer can also be present. The amount of isomer present can vary, depending on the relative stabilities of the isomers and the energy required to convert between the isomers. Accordingly, some double bonds are, for practical purposes, present in only a single configuration, whereas others (e.g., where the relative sta-

bilities are similar and the energy of conversion low) may be present as inseparable equilibrium mixture of configurations.

In some cases, a double-bonded unsaturation is replaced by a cyclic unsaturation. The cyclic unsaturation can be a cycloaliphatic unsaturation, e.g., a cyclopropyl, cyclobutyl, cyclopentyl, cyclohexyl, cycloheptyl, or cyclooctyl group.

In some cases, the cyclic group can be a polycyclic group, e.g., a bicyclic group or tricyclic group. A bicyclic group can be bridged, fused, or have a spiro structure. In some cases, a double bond moiety can be replaced by a cyclopropyl moiety, e.g.,



can be replaced by



The cationic lipid includes one or more biodegradable groups. The biodegradable group(s) include one or more bonds that may undergo bond breaking reactions in a biological environment, e.g., in an organism, organ, tissue, cell, or organelle. Functional groups that contain a biodegradable bond include, for example, esters, dithiols, and oximes. Biodegradation can be a factor that influences the clearance of the compound from the body when administered to a subject. Biodegredation can be measured in a cell based assay, where a formulation including a cationic lipid is exposed to cells, and samples are taken at various time points. The lipid fractions can be extracted from the cells and separated and analyzed by LC-MS. From the LC-MS data, rates of biodegradation (e.g., as $t_{1/2}$ values) can be measured.

For example, the compound

(Compound 1)



includes an ester linkage in each aliphatic chain, which can undergo hydrolysis in a biological environment, for example, when exposed to, e.g., a lipase or an esterase. The structure of the compound, of course, influences the rate at which the compound undergoes biodegradation. Thus, a compound where the methyl substituent is on the other side of the biodegradable group such as



would be expected to exhibit a different rate of biodegradation. Greater effects on that rate would be expected from changes in the structure of the compound at the site of hydrolysis. One modification that can influence the rate of hydrolysis, and thereby influence the rate of biodegradation

US 11,246,933 B1

**35**

and clearance from a subject's body, is to make the leaving group of the hydrolysis reaction have a secondary, rather than primary, alcohol.

**36**

For example, without wishing to be bound by theory, Compound 1 shown above may be metabolized as shown in the scheme below:



In one embodiment, a cationic lipid of any of the embodiments described herein has an in vivo half life ($t_{1/2}$) (e.g., in the liver, spleen or plasma) of less than about 3 hours, such as less than about 2.5 hours, less than about 2 hours, less than about 1.5 hours, less than about 1 hour, less than about 0.5 hour or less than about 0.25 hours. The cationic lipid preferably remains intact, or has a half-life sufficient to form a stable lipid nanoparticle which effectively delivers the desired active pharmaceutical ingredient (e.g., a nucleic acid) to its target but thereafter rapidly degrades to minimize any side effects to the subject. For instance, in mice, the cationic lipid preferably has a $t_{1/2}$ in the spleen of from about 1 to about 7 hours.

In another embodiment, a cationic lipid of any of the embodiments described herein containing a biodegradable group or groups has an in vivo half life ($t_{1/2}$) (e.g., in the liver, spleen or plasma) of less than about 10% (e.g., less than about 7.5%, less than about 5%, less than about 2.5%) of that for the same cationic lipid without the biodegrable group or groups.

Some cationic lipids can be conveniently represented as a hydrophobic group combined via a central moiety (such as a carbon atom) with a headgroup. By way of example, the compound:

US 11,246,933 B1

37

38

can be thought of as a combination of a headgroup, a central moiety, and two hydrophobic groups as follows:



Head Group

Central Moiety

Hydrophobic Groups

The present invention includes compounds composed of any combination of the head and hydrophobic groups listed below (in combination with a central moiety, such as a central carbon atom).

Some suitable head groups include those depicted in Table 1A:

TABLE 1A



TABLE 1A-continued

US 11,246,933 B1

**39**

TABLE 1A-continued

**40**

TABLE 1A-continued

41

42

(where n is 0-5)

R = H, alkyl (e.g., methyl)
X = halogen (e.g., Cl)

R = H, alkyl (e.g., methyl)
X = halogen (e.g., Cl)

R = H, alkyl (e.g., methyl)
X = halogen (e.g., Cl)

(where n is 0-5)

Suitable primary groups include, but are not limited to, those that are a combination of a head group from table 1A with a central carbon atom. Other suitable primary groups include those in table 1B below:

TABLE 1B

US 11,246,933 B1

**43**

TABLE 1B-continued



**44**

TABLE 1B-continued



Some suitable hydrophobic tail groups include those depicted in Table 1C:

TABLE 1C

US 11,246,933 B1

45 46

TABLE 1C-continued

US 11,246,933 B1

47       48

TABLE 1C-continued

US 11,246,933 B1

49                                                              50

TABLE 1C-continued

US 11,246,933 B1

51                                                          52

TABLE 1C-continued

US 11,246,933 B1

53                                                                                                    54

TABLE 1C-continued

55                                                      56

TABLE 1C-continued



Other suitable tail groups includes those of the formula $-R^{12}-M^1-R^{13}$ where $R^{12}$ is a $C_4$-$C_{14}$ alkyl or $C_4$-$C_{14}$ alkenyl, $M^1$ is a biodegradable group as defined above, and $R^{13}$ is a branched alkyl or alkenyl (e.g., a $C_{10}$-$C_{20}$ alkyl or $C_{10}$-$C_{20}$ alkenyl), such that (i) the chain length of $-R^{12}-M^1-R^{13}$ is at most 21 atoms (i.e., the total length of the tail from the first carbon after the tertiary carbon (marked with an asterisk) to a terminus of the tail is at most 21), and (ii) the group $-R^{12}-M^1-R^{13}$ has at least 20 carbon atoms (e.g., at least 21 or 22 carbon atoms).

In one preferred embodiment, the chain length of $-R^{12}-M^1-R^{13}$ is at most 21 (e.g., at most 20). For example, the chain length can be from about 17 to about 24 or from about 18 to about 20.

In one embodiment, the total carbon atom content of each tail ($-R^{12}-M^1-R^{13}$) is from about 17 to about 26. For example, the total carbon atom content can be from about 19 to about 26 or from about 21 to about 26.

In one embodiment, the tail has the formula:



where $R^{13}$ is an alkyl or alkenyl group having from about 13 to about 17 carbon atoms, and the total carbon length of the tail from the first carbon (the leftmost carbon atom above) to a terminus of the tail is at most 20. Preferably, the tail has from about 22 to about 26 carbon atoms. In one embodiment, the maximum length of $R^{13}$ from its attachment point to the ester group of the compound is 12 carbon atoms (e.g., the maximum length can be 11 carbon atoms). In one preferred embodiment, the branch in the alkyl or alkenyl group is at the δ-position or later from the point of attachment of $R^{13}$ to the ester group. Suitable $R^{13}$ groups include, but are not limited to



C13 (C21)
Length: C9 (18)



C14 (C22)
Length: C9 (18)

-continued



C15 (C23)
Length: C10 (19)



C13 (C21)
Length: C9 (18)



C14 (C22)
Length: C9 (18)



C15 (C23)
Length: C10 (19)



C16 (C24)
Length: C10 (19)



C17 (C25)
Length: C11 (20)



C16 (C24)
Length: C10 (19)



C17 (C25)
Length: C11 (20)

US 11,246,933 B1

**57**

-continued



C13 (C21)
Length: C8 (17)



C15 (C23)
Length: C9 (18)

For example, the cationic lipid can be



or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), where $R^{13}$ is selected from the groups mentioned above.

Another example is a tail of the formula



where $R^{13}$ is an alkyl or alkenyl group having from about 13 to about 15 carbon atoms, and the total carbon length of the tail from the first carbon (i.e., the leftmost carbon atom, which is attached to a tertiary carbon) to a terminus of the tail is at most 20. Preferably, the tail has from about 24 to about 26 carbon atoms. In one embodiment, the maximum length of $R^{13}$ from its attachment point to the ester group of the compound is 10 carbon atoms (e.g., the maximum length can be 9 carbon atoms). In one preferred embodiment, the branch in the alkyl or alkenyl group is at the δ-position or later from the point of attachment of $R^{13}$ to the ester group. Suitable $R^{13}$ groups include, but are not limited to



C13 (C23)
Length: C9 (20)

**58**

-continued



C14 (C24)
Length: C9 (20)



C13 (C23)
Length: C9 (20)



C14 (C24)
Length: C9 (20)



C13 (C24)
Length: C8 (19)

For example, the cationic lipid can be



or a salt thereof (e.g., a pharmaceutically acceptable salt thereof), where $R^{13}$ is selected from the groups above.

The $R^{13}$ group may be derived from a natural product, such as dihydrocitgronellol, lavandulol, phytol, or dihydro-phytol. In one embodiment, the $R^{13}$ group in the tails above is a dihydrocitronellol group (either as a racemic group or a chirally pure group):



For example, the cationic lipid having a dihydroitronellol group can be

US 11,246,933 B1

59           60



or

or a salt thereof.

In another embodiment, the $R^{13}$ group in the tails above is a lavandulol group or a homolog of it as shown below:

In another embodiment, the $R^{13}$ group in the tails above is a phytol or dihydro phytol group:



Lavandulol



homolog



Phytol



Dihydrophytol

For instance, the cationic lipid can be:



A cationic lipid of the formula:

US 11,246,933 B1

61

62

can also be thought of as a combination of a headgroup, a linker moiety, and two parts of the hydrophobic chains as follows:



Various headgrops, linker moieties, and hydrophobic chains I and II are listed below. The present invention includes compounds composed of any combination of the head, linker, hydrophobic chain I, and hydrophobic chain II groups listed below.

TABLE 2A

Representative headgroups



TABLE 2A-continued

Representative headgroups

US 11,246,933 B1

**63**

TABLE 2A-continued

Representative headgroups



**64**

TABLE 2A-continued

Representative headgroups



R = H, alkyl; X= halogen

R = H, alkyl; X = halogen

R = H, alkyl; X = halogen

US 11,246,933 B1

**65**

TABLE 2A-continued

Representative headgroups



(where n is 0-5)

**66**

TABLE 2A-continued

Representative headgroups

5

10

n = 0-6

15

20

25

30

35

40

45

50

55

60

65

US 11,246,933 B1

**67**

TABLE 2A-continued

Representative headgroups



**68**

TABLE 2B-continued

Representative linker groups



n = 0-3



n = 0-3

TABLE 2B

Representative linker groups



m = 1-5; n = 0-3



m = 0-5; n = 0-3



n = 0-5



m = 0-5; n = 0-3



m = 0-5; n = 0-3





m = 1-4; n/o = 0-3
x = O or S



m = 0-5; n = 0-3



m = 0-5; n = 0-3



m = 0-5; n = 0-3



m = 0-5; n = 0-3

US 11,246,933 B1

**69**

TABLE 2B-continued

Representative linker groups



m = 0-5; n = 0-3



m = 0-5; n = 0-3



n = 0-5



m = 1-4; n = 0-3
R = COOH, COOME, COOEt,
CN, CONH2, CONHMe



m = 1-4; n/o = 1-3



n = 1-5





R = H, Me, Et, Pr, allyl

**70**

TABLE 2B-continued

Representative linker groups



R = Me, Et, Pr, allyl
R1 = Me, Et, Pr, allyl



n = 0-6



n = 0-6



n = 0-6



m = 0-5; n = 0-3

TABLE 2C

Representative hydrophobic
chain I and/or Ia, and combination thereof



p = 0-15

US 11,246,933 B1

**71**

TABLE 2C-continued

Representative hydrophobic
chain I and/or Ia, and combination thereof



p = 0-15,  q = 0-15



p = 0-15, q = 0-15



p = 0-15, q = 1-4, r = 0-15



p = 0-15, q = 1-4, r = 0-15



p = 0-15, q = 0-6



p = 0-15



m = 0-4; n = 0-4;
R = Me, Et, Pr, iPr, Bu, iBu



n = 1-7



m = 1-4, n = 1-10, p = 0-15, q = 0-15
R = Me, Et, OMe

**72**

TABLE 2D

Representative biodegradable
moieties I and/or Ia and combinations thereof

US 11,246,933 B1

**73**

TABLE 2D-continued

Representative biodegradable
moieties I and/or Ia and combinations thereof



n = 0-6

R = H, Me, Et, cyclic alkyl,
alicylic, aromatic

X = CH₂, O, S

TABLE 2E

Representative hydrophobic
chain II and/or IIa and combinations thereof

n = 0-6; m = 0-16

**74**

TABLE 2E-continued

Representative hydrophobic
chain II and/or IIa and combinations thereof

n = 0-6

n = 0-8

n = 0-8; m = 0-6

n = 0-8
R = OMe, Me, Et, n-Pr, n-Bu

n = 0-8
R = OMe, Me, Et, Pr

n = 0-8
R = OMe, Me, Et, Pr

US 11,246,933 B1

75

TABLE 2E-continued

Representative hydrophobic
chain II and/or IIa and combinations thereof



m = 0-6; n = 0-6; p = 0-6



m = 0-6; n = 0-6; p = 0-6



m = 0-6; n = 0-6; p = 0-6

76

TABLE 2E-continued

Representative hydrophobic
chain II and/or IIa and combinations thereof



m = 0-6; n = 0-6; p = 0-6; q = 0-6

Other cationic lipids of the present invention include those in Table 3 below. Each asymmetric carbon atom in the compounds below can be either chirally pure (R or S) or racemic. These cationic lipids as well as those in the working examples (such as Examples 36 and 37) are suitable for forming nucleic acid-lipid particles.

US 11,246,933 B1

**77**                                                                                 **78**

-continued

79 80

-continued

US 11,246,933 B1

| 81 | 82 |
|---|---|

-continued

US 11,246,933 B1

| 83 | 84 |

-continued

US 11,246,933 B1

85

86

-continued

US 11,246,933 B1

| 87 | 88 |

-continued

US 11,246,933 B1

89 90

-continued

91

92

US 11,246,933 B1

93 94

-continued

US 11,246,933 B1

95

96

-continued

US 11,246,933 B1

| 97 | 98 |

-continued

US 11,246,933 B1

| 99 | 100 |

-continued

US 11,246,933 B1

| 101 | 102 |
|---|---|

-continued

US 11,246,933 B1

**103**

**104**

-continued

US 11,246,933 B1

105

106

-continued

US 11,246,933 B1

**107**                                                           **108**

-continued

US 11,246,933 B1

| **109** | | **110** |

-continued

US 11,246,933 B1

| 111 | 112 |

-continued

US 11,246,933 B1

**113**                                                                              **114**

-continued

US 11,246,933 B1

| 115 | 116 |

-continued

US 11,246,933 B1

**117**                                                **118**

-continued

US 11,246,933 B1

**119**

**120**

-continued

US 11,246,933 B1

| 121 | 122 |
|---|---|

-continued

US 11,246,933 B1

123          124

-continued

US 11,246,933 B1

**125**                                                **126**

-continued

US 11,246,933 B1

| 127 | 128 |
|-----|-----|

-continued

US 11,246,933 B1

129                                                         130

-continued

US 11,246,933 B1

| 131 | 132 |

-continued

US 11,246,933 B1

**133**                                                     **134**

-continued

US 11,246,933 B1

-continued

US 11,246,933 B1

137                                                                138

-continued

US 11,246,933 B1

| 139 | 140 |

-continued

US 11,246,933 B1

| 141 | 142 |

-continued

US 11,246,933 B1

| 143 | 144 |

-continued

US 11,246,933 B1

| 145 | 146 |

-continued

US 11,246,933 B1

147 148

-continued

US 11,246,933 B1

149          150

-continued

US 11,246,933 B1

| 151 | 152 |
|---|---|

-continued

US 11,246,933 B1

| 153 | 154 |

-continued

US 11,246,933 B1

155 156

-continued

US 11,246,933 B1

| 157 | 158 |
|---|---|

-continued

US 11,246,933 B1

159 160

-continued

US 11,246,933 B1

-continued

161                                                    162

US 11,246,933 B1

| 163 | 164 |

-continued

US 11,246,933 B1

165

166

-continued

US 11,246,933 B1

167                                                      168

-continued

US 11,246,933 B1

| 169 | 170 |

-continued

US 11,246,933 B1

| 171 | 172 |
|-----|-----|

-continued

US 11,246,933 B1

173        174

-continued

US 11,246,933 B1

175                                                         176

-continued

US 11,246,933 B1

177 178

-continued

US 11,246,933 B1

179                                                              180

-continued

US 11,246,933 B1

**181**

**182**

-continued

US 11,246,933 B1

183 184

-continued

US 11,246,933 B1

| 185 | 186 |
|---|---|

-continued

US 11,246,933 B1

| 187 | 188 |
|---|---|

-continued

US 11,246,933 B1

| 189 | 190 |
|---|---|

-continued

US 11,246,933 B1

191 192

-continued

US 11,246,933 B1

**193**                                                                    **194**

-continued

US 11,246,933 B1

195                                                                196

-continued

US 11,246,933 B1

| 197 | 198 |

-continued

US 11,246,933 B1

| 199 | 200 |

-continued

US 11,246,933 B1

201 202

-continued

US 11,246,933 B1

203                                                                              204

-continued

US 11,246,933 B1

205 206

-continued

US 11,246,933 B1

207         208

-continued

US 11,246,933 B1

| 209 | 210 |

-continued

US 11,246,933 B1

**211**                                                                 **212**

-continued

US 11,246,933 B1

213 214

-continued

US 11,246,933 B1

215                                                216

-continued

US 11,246,933 B1

**217** **218**

-continued

US 11,246,933 B1

**219**          **220**

-continued

**221**

**222**

-continued

US 11,246,933 B1

223                                                              224

-continued

US 11,246,933 B1

**225**                                                             **226**

-continued

US 11,246,933 B1

| 227 | 228 |
|---|---|

-continued

US 11,246,933 B1

| 229 | 230 |
|---|---|

-continued

US 11,246,933 B1

| 231 | | 232 |
|---|---|---|

-continued

US 11,246,933 B1

233                                                                                              234

-continued

US 11,246,933 B1

| 235 | 236 |
|---|---|

-continued

US 11,246,933 B1

**237**                                                                 **238**

-continued

US 11,246,933 B1

239                                                          240

-continued

US 11,246,933 B1

241                                                          242

-continued

US 11,246,933 B1

**243**

**244**

-continued

US 11,246,933 B1

245          246

-continued

US 11,246,933 B1

247          248

-continued

US 11,246,933 B1

**249**        **250**

-continued

US 11,246,933 B1

| 251 | 252 |

-continued

253

254

-continued

US 11,246,933 B1

255                                                                                  256

-continued

US 11,246,933 B1

257                                                                  258

-continued

US 11,246,933 B1

| 259 | 260 |
|---|---|

-continued

US 11,246,933 B1

| 261 | | 262 |
|---|---|---|

-continued

US 11,246,933 B1

263          264

-continued

US 11,246,933 B1

265 266

-continued

US 11,246,933 B1

267                                                          268

-continued

US 11,246,933 B1

269                                                                   270

-continued

US 11,246,933 B1

| 271 | 272 |

-continued



R = H, Me





R = H, Me

US 11,246,933 B1

273 274

-continued

US 11,246,933 B1

| 275 | 276 |

-continued

US 11,246,933 B1

277

278

-continued

US 11,246,933 B1

| 279 | 280 |
|---|---|

-continued

US 11,246,933 B1

| 281 | 282 |
|---|---|

-continued

US 11,246,933 B1

283                                                          284

-continued

US 11,246,933 B1

285                                                              286

-continued

US 11,246,933 B1

-continued

US 11,246,933 B1

| 289 | 290 |
|---|---|

-continued

US 11,246,933 B1

291

292

-continued

US 11,246,933 B1

| 293 | 294 |
|---|---|

-continued

US 11,246,933 B1

295 296

-continued

US 11,246,933 B1

297                                                          298

-continued

US 11,246,933 B1

**299** | **300**

-continued

US 11,246,933 B1

301

302

-continued

US 11,246,933 B1

303                                                                    304

-continued

US 11,246,933 B1

305          306

-continued

US 11,246,933 B1

307 308

-continued

US 11,246,933 B1

| 309 | 310 |

-continued

US 11,246,933 B1

| 311 | 312 |

-continued

US 11,246,933 B1

| 313 | 314 |

-continued

US 11,246,933 B1

| 315 | 316 |
|---|---|

-continued

US 11,246,933 B1

317 318

-continued

US 11,246,933 B1

| 319 | 320 |

-continued

US 11,246,933 B1

321                                                          322

-continued

US 11,246,933 B1

323                                           324

-continued

US 11,246,933 B1

325 326

-continued

US 11,246,933 B1

327

328

-continued

US 11,246,933 B1

| 329 | 330 |
|---|---|

-continued

US 11,246,933 B1

| 331 | 332 |

-continued

US 11,246,933 B1

| 333 | 334 |

-continued



In another aspect, the present invention relates to a method of preparing a compound of Formula I-VII. Suitable exemplary synthetic methods are illustrated in Schemes 1-27 shown in the Examples section below.

In one embodiment, the cationic lipid of the present invention is selected from the following compounds, and salts thereof (including pharmaceutically acceptable salts thereof). These cationic lipids are suitable for forming nucleic acid-lipid particles.

US 11,246,933 B1

**335**                                                                                    **336**

US 11,246,933 B1

**337**

**338**

-continued

US 11,246,933 B1

**339**   **340**

-continued

US 11,246,933 B1

341            342

-continued



In another embodiment, the cationic lipid of the present invention is selected from the following compounds, and salts thereof (including pharmaceutically acceptable salts thereof):

US 11,246,933 B1

**343**                                                **344**

-continued

US 11,246,933 B1

**345**                    **346**

-continued

US 11,246,933 B1

**347**                                                                **348**

-continued

US 11,246,933 B1

**349**                                                                **350**

-continued

US 11,246,933 B1

**351**                                                                **352**

-continued

In another embodiment, the cationic lipid of the present invention is selected from the following compounds, and salts thereof (including pharmaceutically acceptable salts thereof):

US 11,246,933 B1

**353**                                                                                    **354**

US 11,246,933 B1

**355**

**356**

Additional representative cationic lipids include, but are not limited to:



n = 1-5                m = 0-3                p = 1-5



r = 0-2          n = 0-5          m = 0-3          p = 0-5
q = 0-5



r = 0-2          n = 0-5          m = 0-3          p = 0-5
q = 0-5



n = 1-5

m = 0-3



r = 0-2          n = 1-5

m = 0-3

US 11,246,933 B1

357                                                                 358

-continued

n = 1-5

m = 0-3

r = 0-2          n = 0-5

m = 0-3

X = O, S, NH, CH$_2$

r = 0-2, n = 1-5, and m = 1-5

r = 0-2          X = O, S, NH, CH$_2$          m = 0-5          p = 0-3
                                               n = 0-5          q = 0-3

r = 0-2          X = O, S, NH, CH$_2$          m = 0-5          p = 0-3
                                               n = 0-5          q = 0-3

US 11,246,933 B1

359         360

-continued



p = 1-3

n = 1-5

m = 0-3



r = 0-2

m = 0-5
n = 0-5

p = 0-3
q = 0-3



r = 0-2

m = 0-5
n = 0-5

p = 0-3
q = 0-3



p = 1-3

n = 1-5

m = 0-3



p = 1-3

n = 0-5

m = 0-3

US 11,246,933 B1

361 362

-continued



p = 1-3          n = 1-5

m = 0-3; q = 0-4; r = 0-4



p = 1-3          n = 0-5

m = 0-3; q = 0-4; r = 0-4

US 11,246,933 B1

**363**　　　　　　　　　　　　　　　　**364**

-continued

US 11,246,933 B1

365

366

-continued

r = 0, 1, or 2

US 11,246,933 B1

367

368

-continued



X = O, S, NH, CH₂

r = 0, 1, or 2

X = O, S, NH, CH₂

r = 0, 1, or 2

X = O, S, NH, CH₂

r = 0, 1, or 2

X = O, S, NH, CH₂

US 11,246,933 B1

369

370

-continued

X = O, S, NH, CH₂

r = 0, 1, or 2

X = O, S, NH, CH₂

r = 0, 1, or 2

X = O, S, NH, CH₂

r = 0, 1, or 2

X = O, S, NH, CH₂

r = 0, 1, or 2

X = O, S, NH, CH₂

r = 0, 1, or 2

X = O, S, NH, CH₂

r = 0, 1, or 2

US 11,246,933 B1

371          372

-continued



X = O, S, NH, CH$_2$

r = 0, 1, or 2



X = O, S, NH, CH$_2$

r = 0, 1, or 2



X = O, S, NH, CH$_2$

r = 0, 1, or 2



X = O, S, NH, CH$_2$

r = 0, 1, or 2



X = O, S, NH, CH$_2$

r = 0, 1, or 2



X = O, S, NH, CH$_2$

US 11,246,933 B1

373                                                                 374

-continued

X = O, S, NH, CH₂

X = O, S, NH, CH₂

X = O, S, NH, CH₂

X = O, S, NH, CH₂
r = 0, 1, or 2

X = O, S, NR, CH₂
r = 0, 1, or 2

X = O, S, NH, CH₂
r = 0, 1, or 2

375

376

-continued



X = O, S, NR, CH₂

$r = 0, 1,$ or $2$



X = O, S, NR, CH₂

$r = 0, 1,$ or $2$



X = O, S, NR, CH₂

$r = 0, 1,$ or $2$



$r = 0, 1,$ or $2$



X = O, S, NR, CH₂

$r = 0, 1,$ or $2$



X = O, S, NR, CH₂

$r = 0, 1,$ or $2$

US 11,246,933 B1

377 378

-continued



m = 0-5, n = 0, 1, or 2



X = O, S, NR, CH$_2$

m = 0-5, n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2

US 11,246,933 B1

379                                                              380

-continued



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2

US 11,246,933 B1

**381**                                                                **382**

-continued



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2



n = 0, 1, or 2

US 11,246,933 B1

**383**

**384**

-continued

n = 0, 1, or 2

n = 0, 1, or 2

R, R' = CH₃, Cylcopentyl etc

US 11,246,933 B1

**385**                                         **386**

-continued



X = O, S, NR, CH₂, COO, NHCOO, OCONH

n = 0, 1, or 2

US 11,246,933 B1

**387**

**388**

-continued



X = O, S, NR, CH₂, COO, NHCOO, OCONH

n = 0, 1, or 2

US 11,246,933 B1

389 390

-continued



X = O, S, NR, CH$_2$

r = 0, 1, or 2



X = O, S, NR, CH$_2$

r = 0, 1, or 2



n = 1-5



n = 1-5



n = 1-5

US 11,246,933 B1

**391**                                                **392**

-continued



p = 0-3

n = 1-5

m = 0-3



n = 0-5          m = 0-5



n = 0-5          m = 0-5



n = 0-5          m = 0-5



n = 0-5          m = 0-5



n = 0-5          m = 0-5

US 11,246,933 B1

**393**

**394**

-continued

n = 0-5     m = 0-5

p = 0-3

n = 0-5     m = 0-5

p = 0-3

p = 1-3

n = 0-5     m = 0-5

R = alkyl, substituted alkyl, aryl

n = 1-5

m = 0-3

= Bodipy, Alexa-647 or other label (e.g., other fluorescent label)

r = 1-4     n = 0-5     m = 0-3     p = 0-5
q = 0-5

US 11,246,933 B1

395 396

-continued



r = 1-4  n = 0-5  m = 0-3  p = 0-5
q = 0-5



r = 1-4  n = 0-5  m = 0-3

Alternatively, for the compounds above having a head of the formula



(where X can be, for example, —C(O)O—), the head can have one methylene unit between the X group (or other functional group) and nitrogen atom. For example, the head can be:



Cationic lipids include those having alternative fatty acid groups and other dialkylamino groups than those shown, including those in which the alkyl substituents are different (e.g., N-ethyl-N-methylamino-, and N-propyl-N-ethyl-amino-).

In certain embodiments, the cationic lipids have at least one protonatable or deprotonatable group, such that the lipid is positively charged at a pH at or below physiological pH (e.g. pH 7.4), and neutral at a second pH, preferably at or above physiological pH. Such lipids are also referred to as cationic lipids. It will, of course, be understood that the addition or removal of protons as a function of pH is an equilibrium process, and that the reference to a charged or a neutral lipid refers to the nature of the predominant species and does not require that all of the lipid be present in the charged or neutral form. The lipids can have more than one protonatable or deprotonatable group, or can be zwitterionic.

In certain embodiments, protonatable lipids (i.e., cationic lipids) have a $pK_a$ of the protonatable group in the range of about 4 to about 11. For example, the lipids can have a $pK_a$

of about 4 to about 7, e.g., from about 5 to about 7, such as from about 5.5 to about 6.8, when incorporated into lipid particles. Such lipids may be cationic at a lower pH formulation stage, while particles will be largely (though not completely) surface neutralized at physiological pH around pH 7.4.

In particular embodiments, the lipids are charged lipids. As used herein, the term "charged lipid" includes, but is not limited to, those lipids having one or two fatty acyl or fatty alkyl chains and a quaternary amino head group. The quaternary amine carries a permanent positive charge. The head group can optionally include an ionizable group, such as a primary, secondary, or tertiary amine that may be protonated at physiological pH. The presence of the quaternary amine can alter the pKa of the ionizable group relative to the pKa of the group in a structurally similar compound that lacks the quaternary amine (e.g., the quaternary amine is replaced by a tertiary amine).

Included in the instant invention is the free form of the cationic lipids described herein, as well as pharmaceutically acceptable salts and stereoisomers thereof. The cationic lipid can be a protonated salt of the amine cationic lipid. The term "free form" refers to the amine cationic lipids in non-salt form. The free form may be regenerated by treating the salt with a suitable dilute aqueous base solution such as dilute aqueous NaOH, potassium carbonate, ammonia and sodium bicarbonate.

The pharmaceutically acceptable salts of the instant cationic lipids can be synthesized from the cationic lipids of this invention which contain a basic or acidic moiety by conventional chemical methods. Generally, the salts of the basic cationic lipids are prepared either by ion exchange chromatography or by reacting the free base with stoichiometric amounts or with an excess of the desired salt-forming inorganic or organic acid in a suitable solvent or various combinations of solvents. Similarly, the salts of the acidic compounds are formed by reactions with the appropriate inorganic or organic base.

Thus, the pharmaceutically acceptable salts of the cationic lipids of this invention include non-toxic salts of the cationic lipids of this invention as formed by reacting a basic instant

US 11,246,933 B1

**397**

cationic lipids with an inorganic or organic acid. For example, non-toxic salts include those derived from inorganic acids such as hydrochloric, hydrobromic, sulfuric, sulfamic, phosphoric, nitric and the like, as well as salts prepared from organic acids such as acetic, propionic, succinic, glycolic, stearic, lactic, malic, tartaric, citric, ascorbic, pamoic, maleic, hydroxymaleic, phenylacetic, glutamic, benzoic, salicylic, sulfanilic, 2-acetoxy-benzoic, fumaric, toluenesulfonic, methanesulfonic, ethane disulfonic, oxalic, isethionic, and trifluoroacetic (TFA).

When the cationic lipids of the present invention are acidic, suitable "pharmaceutically acceptable salts" refers to salts prepared form pharmaceutically acceptable non-toxic bases including inorganic bases and organic bases. Salts derived from inorganic bases include aluminum, ammonium, calcium, copper, ferric, ferrous, lithium, magnesium, manganic salts, manganous, potassium, sodium, and zinc. In one embodiment, the base is selected from ammonium, calcium, magnesium, potassium and sodium. Salts derived from pharmaceutically acceptable organic non-toxic bases include salts of primary, secondary and tertiary amines, substituted amines including naturally occurring substituted amines, cyclic amines and basic ion exchange resins, such as arginine, betaine caffeine, choline, N,N$^1$-dibenzylethylenediamine, diethylamin, 2-diethylaminoethanol, 2-dimethylaminoethanol, ethanolamine, ethylenediamine, N-ethylmorpholine, N-ethylpiperidine, glucamine, glucosamine, histidine, hydrabamine, isopropylamine, lysine, methylglucamine, morpholine, piperazine, piperidine, polyamine resins, procaine, purines, theobromine, triethylamine, trimethylamine tripropylamine, and tromethamine.

It will also be noted that the cationic lipids of the present invention may potentially be internal salts or zwitterions, since under physiological conditions a deprotonated acidic moiety in the compound, such as a carboxyl group, may be anionic, and this electronic charge might then be balanced off internally against the cationic charge of a protonated or alkylated basic moiety, such as a quaternary nitrogen atom.

One or more additional cationic lipids, which carry a net positive charge at about physiological pH, in addition to those specifically described above, may also be included in the lipid particles and compositions described herein. Such cationic lipids include, but are not limited to N,N-dioleyl-N,N-dimethylammonium chloride ("DODAC"); N-(2,3-dioleyloxy)propyl-N,N—N-triethylammonium chloride ("DOTMA"); N,N-distearyl-N,N-dimethylammonium bromide ("DDAB"); N-(2,3-dioleoyloxy)propyl)-N,N,N-trimethylammonium chloride ("DOTAP"); 1,2-Dioleyloxy-3-trimethylaminopropane chloride salt ("DOTAP.Cl"); 3β-(N—(N',N'-dimethylaminoethane)-carbamoyl)cholesterol ("DC-Chol"), N-(1-(2,3-dioleyloxy)propyl)-N-2-(sperminecarboxamido)ethyl)-N,N-dimethylammonium trifluoroacetate ("DOSPA"), dioctadecylamidoglycyl carboxyspermine

**398**

("DOGS"),           1,2-dileoyl-sn-3-phosphoethanolamine ("DOPE"), 1,2-dioleoyl-3-dimethylammonium propane ("DODAP"), N, N-dimethyl-2,3-dioleyloxy)propylamine ("DODMA"), and N-(1,2-dimyristyloxyprop-3-yl)-N,N-dimethyl-N-hydroxyethyl ammonium bromide ("DMRIE"). Additionally, a number of commercial preparations of cationic lipids can be used, such as, e.g., LIPOFECTIN (including DOTMA and DOPE, available from GIBCO/BRL), and LIPOFECTAMINE (comprising DOSPA and DOPE, available from GIBCO/BRL).

PEG Lipids

Suitable head groups for the PEG lipids include, but are not limited to those shown in Table 3 below.

TABLE 3



Representative PEG lipids include, but are not limited to:



,

US 11,246,933 B1

399

400

-continued

US 11,246,933 B1

401     402

-continued



wherein

n is an integer from 10 to 100 (e.g. 20-50 or 40-50);

s, s', t and t' are independently 0, 1, 2, 3, 4, 5, 6 or 7; and m is 1, 2, 3, 4, 5, or 6.

Other representative PEG lipids include, but are not limited to:



$r = 20\text{-}45$     $m = 0\text{-}3$     $p = 1\text{-}5$

$X = Y = CH_2, O, S$



$r = 20\text{-}45$     $n = 1\text{-}5$

$X = Y = CH_2, O, S$     $m = 0\text{-}3$



$r = 20\text{-}45$     $n = 1\text{-}5$

$X = Y = CH_2, O, S$     $m = 0\text{-}3$

US 11,246,933 B1

**403**

-continued

**404**



$r = 20\text{-}45$

$X = O, S, NH, CH_2$

$m = n = r = 0\text{-}10$



$r = 20\text{-}45$

$n = 1\text{-}5$

$m = 0\text{-}3$



$r = 20\text{-}45$

$n = 1\text{-}5$



$r = 20\text{-}45$

$n = 1\text{-}5$

$m = 0\text{-}3$



$r = 20\text{-}45$

$X = Y = O, S, NH, CH_2$

$n = 0\text{-}5$

$m = 0\text{-}5$

US 11,246,933 B1

405                                                          406

-continued

r = 20-45

X = Y = O, S, NH, CH$_2$          n = 0-5

r = 20-45

n = 0-5          m = 0-5

r = 20-45

X = Y = O, S, NH, CH$_2$          n = 0-5          m = 0-5

R = alkyl, substituted alkyl, aryl, benzyl

The Other Lipid Components

The lipid particles and compositions described herein may also include one or more neutral lipids. Neutral lipids, when present, can be any of a number of lipid species which exist either in an uncharged or neutral zwitterionic form at physiological pH. Such lipids include, for example, diacylphosphatidylcholine, diacylphosphatidylethanolamine, ceramide, sphingomyelin, dihydrosphingomyelin, cephalin, and cerebrosides. In one embodiment, the neutral lipid component is a lipid having two acyl groups (e.g., diacylphosphatidylcholine and diacylphosphatidylethanolamine). In one embodiment, the neutral lipid contains saturated fatty acids with carbon chain lengths in the range of C$_{10}$ to C$_{20}$. In another embodiment, the neutral lipid includes mono or diunsaturated fatty acids with carbon chain lengths in the range of C$_{10}$ to C$_{20}$. Suitable neutral lipids include, but are not limited to, DSPC, DPPC, POPC, DOPE, DSPC, and SM.

The lipid particles and compositions described herein may also include one or more lipids capable of reducing aggregation. Examples of lipids that reduce aggregation of particles during formation include polyethylene glycol (PEG)-modified lipids (PEG lipids, such as PEG-DMG and PEG-DMA), monosialoganglioside Gm1, and polyamide oligomers ("PAO") such as (described in U.S. Pat. No. 6,320,017, which is incorporated by reference in its entirety). Suitable PEG lipids include, but are not limited to, PEG-modified phosphatidylethanolamine and phosphatidic acid, PEG-ceramide conjugates (e.g., PEG-CerC14 or PEG-CerC20) (such as those described in U.S. Pat. No. 5,820,873, incorporated herein by reference), PEG-modified dialkylamines and PEG-modified 1,2-diacyloxypropan-3-amines, PEG-modified diacylglycerols and dialkylglycerols, mPEG (mw2000)-diastearoylphosphatidylethanolamine (PEG-DSPE).

The lipid particles and compositions may include a sterol, such as cholesterol.

Lipid Particles

In a further aspect, the present invent relates to lipid particles that include one or more of the cationic lipids described herein. In one embodiment, the lipid particle includes one or more compounds of formula I-VII.

Lipid particles include, but are not limited to, liposomes. As used herein, a liposome is a structure having lipid-containing membranes enclosing an aqueous interior.

Another embodiment is a nucleic acid-lipid particle (e.g., a SNALP) comprising a cationic lipid of the present invention, a non-cationic lipid (such as a neutral lipid), optionally a PEG-lipid conjugate (such as the lipids for reducing aggregation of lipid particles discussed herein), optionally a sterol (e.g., cholesterol), and a nucleic acid. As used herein, the term "SNALP" refers to a stable nucleic acid-lipid particle. A SNALP represents a particle made from lipids, wherein the nucleic acid (e.g., an interfering RNA) is encapsulated within the lipids. In certain instances, SNALPs are useful for systemic applications, as they can exhibit extended circulation lifetimes following intravenous (i.v.) injection, they can accumulate at distal sites (e.g., sites physically separated from the administration site), and they can mediate silencing of target gene expression at these distal sites. The nucleic acid may be complexed with a condensing agent and encapsulated within a SNALP as set forth in International Publication No. WO 00/03683, the disclosure of which is herein incorporated by reference in its entirety.

For example, the lipid particle may include a cationic lipid, a fusion-promoting lipid (e.g., DPPC), a neutral lipid, cholesterol, and a PEG-modified lipid. In one embodiment, the lipid particle includes the above lipid mixture in molar ratios of about 20-70% cationic lipid: 0.1-50% fusion pro-

**407**

moting lipid: 5-45% neutral lipid: 20-55% cholesterol: 0.5-15% PEG-modified lipid (based upon 100% total moles of lipid in the lipid particle).

In another embodiment of the lipid particle, the cationic lipid is present in a mole percentage of about 20% and about 60%; the neutral lipid is present in a mole percentage of about 5% to about 25%; the sterol is present in a mole percentage of about 25% to about 55%; and the PEG lipid is PEG-DMA, PEG-DMG, or a combination thereof, and is present in a mole percentage of about 0.5% to about 15% (based upon 100% total moles of lipid in the lipid particle).

In particular embodiments, the molar lipid ratio, with regard to mol % cationic lipid/DSPC/Chol/PEG-DMG or PEG-DMA) is approximately 40/10/40/10, 35/15/40/10 or 52/13/30/5. This mixture may be further combined with a fusion-promoting lipid in a molar ratio of 0.1-50%, 0.1-50%, 0.5-50%, 1-50%, 5%-45%, 10%-40%, or 15%-35%. In other words, when a 40/10/40/10 mixture of lipid/DSPC/Chol/PEG-DMG or PEG-DMA is combined with a fusion-promoting peptide in a molar ratio of 50%, the resulting lipid particles can have a total molar ratio of (mol % cationic lipid/DSPC/Chol/PEG-DMG or PEG-DMA/fusion-promoting peptide) 20/5/20/5/50. In another embodiment, the neutral lipid, DSPC, in these compositions is replaced with POPC, DPPC, DOPE or SM.

In one embodiment, the lipid particles comprise a cationic lipid of the present invention, a neutral lipid, a sterol and a PEG-modified lipid. In one embodiment, the lipid particles include from about 25% to about 75% on a molar basis of cationic lipid, e.g., from about 35 to about 65%, from about 45 to 65%, about 60%, about 57.5%, about 57.1%, about 50% or about 40% on a molar basis. In one embodiment, the lipid particles include from about 0% to about 15% on a molar basis of the neutral lipid, e.g., from about 3 to about 12%, from about 5 to about 10%, about 15%, about 10%, about 7.5%, about 7.1% or about 0% on a molar basis. In one embodiment, the neutral lipid is DPPC. In one embodiment, the neutral lipid is DSPC. In one embodiment, the formulation includes from about 5% to about 50% on a molar basis of the sterol, e.g., about 15 to about 45%, about 20 to about 40%, about 48%, about 40%, about 38.5%, about 35%, about 34.4%, about 31.5% or about 31% on a molar basis. In one embodiment, the sterol is cholesterol.

The lipid particles described herein may further include one or more therapeutic agents. In a preferred embodiment, the lipid particles include a nucleic acid (e.g., an oligonucleotide), such as siRNA or miRNA.

In one embodiment, the lipid particles include from about 0.1% to about 20% on a molar basis of the PEG-modified lipid, e.g., about 0.5 to about 10%, about 0.5 to about 5%, about 10%, about 5%, about 3.5%, about 1.5%, about 0.5%, or about 0.3% on a molar basis. In one embodiment, the PEG-modified lipid is PEG-DMG. In one embodiment, the PEG-modified lipid is PEG-c-DMA. In one embodiment, the lipid particles include 25-75% of cationic lipid, 0.5-15% of the neutral lipid, 5-50% of the sterol, and 0.5-20% of the PEG-modified lipid on a molar basis.

In one embodiment, the lipid particles include 35-65% of cationic lipid, 3-12% of the neutral lipid, 15-45% of the sterol, and 0.5-10% of the PEG-modified lipid on a molar basis. In one embodiment, the lipid particles include 45-65% of cationic lipid, 5-10% of the neutral lipid, 25-40% of the sterol, and 0.5-5% of the PEG-modified lipid on a molar basis. In one embodiment, the PEG modified lipid comprises a PEG molecule of an average molecular weight of 2,000 Da. In one embodiment, the PEG modified lipid is PEG-distyryl glycerol (PEG-DSG).

**408**

In one embodiment, the ratio of lipid:siRNA is at least about 0.5:1, at least about 1:1, at least about 2:1, at least about 3:1, at least about 4:1, at least about 5:1, at least about 6:1, at least about 7:1, at least about 11:1 or at least about 33:1. In one embodiment, the ratio of lipid:siRNA ratio is between about 1:1 to about 35:1, about 3:1 to about 15:1, about 4:1 to about 15:1, or about 5:1 to about 13:1. In one embodiment, the ratio of lipid:siRNA ratio is between about 0.5:1 to about 12:1.

In one embodiment, the lipid particles are nanoparticles. In additional embodiments, the lipid particles have a mean diameter size of from about 50 nm to about 300 nm, such as from about 50 nm to about 250 nm, for example, from about 50 nm to about 200 nm.

In one embodiment, a lipid particle containing a cationic lipid of any of the embodiments described herein has an in vivo half life ($t_{1/2}$) (e.g., in the liver, spleen or plasma) of less than about 3 hours, such as less than about 2.5 hours, less than about 2 hours, less than about 1.5 hours, less than about 1 hour, less than about 0.5 hour or less than about 0.25 hours.

In another embodiment, a lipid particle containing a cationic lipid of any of the embodiments described herein has an in vivo half life ($t_{1/2}$) (e.g., in the liver, spleen or plasma) of less than about 10% (e.g., less than about 7.5%, less than about 5%, less than about 2.5%) of that for the same cationic lipid without the biodegrable group or groups.

Additional Components

The lipid particles and compositions described herein can further include one or more antioxidants. The antioxidant stabilizes the lipid particle and prevents, decreases, and/or inhibits degradation of the cationic lipid and/or active agent present in the lipid particles. The antioxidant can be a hydrophilic antioxidant, a lipophilic antioxidant, a metal chelator, a primary antioxidant, a secondary antioxidant, salts thereof, and mixtures thereof. In certain embodiments, the antioxidant comprises a metal chelator such as EDTA or salts thereof, alone or in combination with one, two, three, four, five, six, seven, eight, or more additional antioxidants such as primary antioxidants, secondary antioxidants, or other metal chelators. In one preferred embodiment, the antioxidant comprises a metal chelator such as EDTA or salts thereof in a mixture with one or more primary antioxidants and/or secondary antioxidants. For example, the antioxidant may comprise a mixture of EDTA or a salt thereof, a primary antioxidant such as a-tocopherol or a salt thereof, and a secondary antioxidant such as ascorbyl palmitate or a salt thereof. In one embodiment, the antioxidant comprises at least about 100 mM citrate or a salt thereof. Examples of antioxidants include, but are not limited to, hydrophilic antioxidants, lipophilic antioxidants, and mixtures thereof. Non-limiting examples of hydrophilic antioxidants include chelating agents (e.g., metal chelators) such as ethylenediaminetetraacetic acid (EDTA), citrate, ethylene glycol tetraacetic acid (EGTA), 1,2-bis(o-aminophenoxy) ethane-N,N,N',N'-tetraacetic acid (BAPTA), diethylene triamine pentaacetic acid (DTPA), 2,3-dimercapto-1-propane-sulfonic acid (DMPS), dimercaptosuccinic acid (DMSA), cc-lipoic acid, salicylaldehyde isonicotinoyl hydrazone (SIH), hexyl thioethylamine hydrochloride (HTA), desferri-oxamine, salts thereof, and mixtures thereof. Additional hydrophilic antioxidants include ascorbic acid, cysteine, glutathione, dihydrolipoic acid, 2-mercaptoethane sulfonic acid, 2-mercaptobenzimidazole sulfonic acid, 6-hydroxy-2, 5,7,8-tetramethylchroman-2-carboxylic acid, sodium meta-bisulfite, salts thereof, and mixtures thereof. Non-limiting examples of lipophilic antioxidants include vitamin E isomers such as α-, β-, γ-, and δ-tocopherols and α-, β-, γ-, and

409
410

δ-tocotrienols; polyphenols such as 2-tert-butyl-4-methyl phenol, 2-fert-butyl-5-methyl phenol, and 2-tert-butyl-6-methyl phenol; butylated hydroxyanisole (BHA) (e.g., 2-teri-butyl-4-hydroxyanisole and 3-tert-butyl-4-hydroxy-anisole); butylhydroxytoluene (BHT); tert-butylhydroqui-none (TBHQ); ascorbyl palmitate; rc-propyl gallate; salts thereof; and mixtures thereof. Suitable antioxidants and formulations containing such antioxidants are described in International Publication No. WO 2011/066651, which is hereby incorporated by reference.

In another embodiment, the lipid particles or compositions contain the antioxidant EDTA (or a salt thereof), the antioxidant citrate (or a salt thereof), or EDTA (or a salt thereof) in combination with one or more (e.g., a mixture of) primary and/or secondary antioxidants such as α-tocopherol (or a salt thereof) and/or ascorbyl palmitate (or a salt thereof).

In one embodiment, the antioxidant is present in an amount sufficient to prevent, inhibit, or reduce the degradation of the cationic lipid present in the lipid particle. For example, the antioxidant may be present at a concentration of at least about or about 0.1 mM, 0.5 mM, 1 mM, 10 mM, 100 mM, 500 mM, 1 M, 2 M, or 5M, or from about 0.1 mM to about 1 M, from about 0.1 mM to about 500 mM, from about 0.1 mM to about 250 mM, or from about 0.1 mM to about 100 mM.

The lipid particles and compositions described herein can further include an apolipoprotein. As used herein, the term "apolipoprotein" or "lipoprotein" refers to apolipoproteins known to those of skill in the art and variants and fragments thereof and to apolipoprotein agonists, analogues or fragments thereof described below.

In a preferred embodiment, the active agent is a nucleic acid, such as a siRNA. For example, the active agent can be a nucleic acid encoded with a product of interest, including but not limited to, RNA, antisense oligonucleotide, an antagomir, a DNA, a plasmid, a ribosomal RNA (rRNA), a micro RNA (miRNA) (e.g., a miRNA which is single stranded and 17-25 nucleotides in length), transfer RNA (tRNA), a small interfering RNA (siRNA), small nuclear RNA (snRNA), antigens, fragments thereof, proteins, peptides, vaccines and small molecules or mixtures thereof. In one more preferred embodiment, the nucleic acid is an oligonucleotide (e.g., 15-50 nucleotides in length (or 15-30 or 20-30 nucleotides in length)). An siRNA can have, for instance, a duplex region that is 16-30 nucleotides long. In another embodiment, the nucleic acid is an immunostimulatory oligonucleotide, decoy oligonucleotide, supermir, miRNA mimic, or miRNA inhibitor. A supermir refers to a single stranded, double stranded or partially double stranded oligomer or polymer of ribonucleic acid (RNA) or deoxy-ribonucleic acid (DNA) or both or modifications thereof, which has a nucleotide sequence that is substantially identical to an miRNA and that is antisense with respect to its target. miRNA mimics represent a class of molecules that can be used to imitate the gene silencing ability of one or more miRNAs. Thus, the term "microRNA mimic" refers to synthetic non-coding RNAs (i.e. the miRNA is not obtained by purification from a source of the endogenous miRNA) that are capable of entering the RNAi pathway and regulating gene expression.

The nucleic acid that is present in a lipid-nucleic acid particle can be in any form. The nucleic acid can, for example, be single-stranded DNA or RNA, or double-stranded DNA or RNA, or DNA-RNA hybrids. Non-limiting examples of double-stranded RNA include siRNA. Single-stranded nucleic acids include, e.g., antisense oligonucle-otides, ribozymes, microRNA, and triplex-forming oligo-nucleotides. The lipid particles of the present invention can also deliver nucleic acids which are conjugated to one or more ligands.

Pharmaceutical Compositions

The lipid particles, particularly when associated with a therapeutic agent, may be formulated as a pharmaceutical composition, e.g., which further comprises a pharmaceutically acceptable diluent, excipient, or carrier, such as physiological saline or phosphate buffer.

The resulting pharmaceutical preparations may be sterilized by conventional, well known sterilization techniques. The aqueous solutions can then be packaged for use or filtered under aseptic conditions and lyophilized, the lyophilized preparation being combined with a sterile aqueous solution prior to administration. The compositions may contain pharmaceutically acceptable auxiliary substances as required to approximate physiological conditions, such as pH adjusting and buffering agents, and tonicity adjusting agents, for example, sodium acetate, sodium lactate, sodium chloride, potassium chloride, and calcium chloride. Additionally, the lipidic suspension may include lipid-protective agents which protect lipids against free-radical and lipid-peroxidative damages on storage. Lipophilic free-radical quenchers, such as α-tocopherol and water-soluble iron-specific chelators, such as ferrioxamine, are suitable.

The concentration of lipid particle or lipid-nucleic acid particle in the pharmaceutical formulations can vary, for example, from less than about 0.01%, to at or at least about 0.05-5% to as much as 10 to 30% by weight.

Methods of Manufacture

Methods of making cationic lipids, lipid particles containing them, and pharmaceutical compositions containing the cationic lipids and/or lipid particles are described in, for example, International Publication Nos. WO 2010/054406, WO 2010/054401, WO 2010/054405, WO 2010/054384, WO 2010/042877, WO 2010/129709, WO 2009/086558, and WO 2008/042973, and U.S. Patent Publication Nos. 2004/0142025, 2006/0051405 and 2007/0042031, each of which is incorporated by reference in its entirety.

For example, in one embodiment, a solution of one or more lipids (including a cationic lipid of any of the embodiments described herein) in an organic solution (e.g., ethanol) is prepared. Similarly, a solution of one or more active (therapeutic) agents (such as, for example an siRNA molecule or a 1:1 molar mixture of two siRNA molecules) in an aqueous buffered (e.g., citrate buffer) solution is prepared. The two solutions are mixed and diluted to form a colloidal suspension of siRNA lipid particles. In one embodiment, the siRNA lipid particles have an average particle size of about 80-90 nm. In further embodiments, the dispersion may be filtered through 0.45/2 micron filters, concentrated and diafiltered by tangential flow filtration.

Definitions

As used herein, the term "cationic lipid" includes those lipids having one or two fatty acid or fatty aliphatic chains and an amino acid containing head group that may be protonated to form a cationic lipid at physiological pH. In some embodiments, a cationic lipid is referred to as an "amino acid conjugate cationic lipid."

A subject or patient in whom administration of the complex is an effective therapeutic regimen for a disease or disorder is preferably a human, but can be any animal, including a laboratory animal in the context of a clinical trial or screening or activity experiment. Thus, as can be readily

US 11,246,933 B1

**411**

appreciated by one of ordinary skill in the art, the methods, compounds and compositions of the present invention are particularly suited to administration to any animal, particularly a mammal, and including, but by no means limited to, humans, domestic animals, such as feline or canine subjects, farm animals, such as but not limited to bovine, equine, caprine, ovine, and porcine subjects, wild animals (whether in the wild or in a zoological garden), research animals, such as mice, rats, rabbits, goats, sheep, pigs, dogs, and cats, avian species, such as chickens, turkeys, and songbirds, i.e., for veterinary medical use.

Many of the chemical groups recited in the generic formulas above are written in a particular order (for example, —OC(O)—). It is intended that the chemical group is to be incorporated into the generic formula in the order presented unless indicated otherwise. For example, a generic formula of the form —$(R)_r$-$(M^1)_k$-$(R)_m$— where $M^1$ is —C(O)O— and k is 1 refers to —$(R)_r$—C(O)O—$(R)_m$— unless specified otherwise. It is to be understood that when a chemical group is written in a particular order, the reverse order is also contemplated unless otherwise specified. For example, in a generic formula —$(R)_r$-$(M^1)_k$-$(R)_m$— where $M^1$ is defined as —C(O)NH— (i.e., —$(R)_r$—C(O)NH—$(R)_m$—), the compound where $M^1$ is —NHC(O)— (i.e., —$(R)_r$—NHC(O)—$(R)_m$—) is also contemplated unless otherwise specified.

The term "biodegradable cationic lipid" refers to a cationic lipid having one or more biodegradable groups located in the mid- or distal section of a lipidic moiety (e.g., a hydrophobic chain) of the cationic lipid. The incorporation of the biodegradable group(s) into the cationic lipid results in faster metabolism and removal of the cationic lipid from the body following delivery of the active pharmaceutical ingredient to a target area.

As used herein, the term "biodegradable group" refers to a group that include one or more bonds that may undergo bond breaking reactions in a biological environment, e.g., in an organism, organ, tissue, cell, or organelle. For example, the biodegradable group may be metabolizable by the body of a mammal, such as a human (e.g., by hydrolysis). Some groups that contain a biodegradable bond include, for example, but are not limited to esters, dithiols, and oximes. Non-limiting examples of biodegradable groups are —OC(O)—, —C(O)O—, —SC(O)—, —C(O)S—, —OC(S)—, —C(S)O—, —S—S—, —C($R^5$)=N—, —N=C($R^5$)—, —C($R^5$)=N—O—, —O—N=C($R^5$)—, —C(O)(N$R^5$)—, —N($R^5$)C(O)—, —C(S)(N$R^5$)—, —N($R^5$)C(O)—, —N($R^5$)C(O)N($R^5$)—, —OC(O)O—, —OSi($R^5$)$_2$O—, —C(O)(C$R^3R^4$)C(O)O—, or —OC(O)(C$R^3R^4$)C(O)—.

As used herein, an "aliphatic" group is a non-aromatic group in which carbon atoms are linked into chains, and is either saturated or unsaturated.

The terms "alkyl" and "alkylene" refer to a straight or branched chain saturated hydrocarbon moiety. In one embodiment, the alkyl group is a straight chain saturated hydrocarbon. Unless otherwise specified, the "alkyl" or "alkylene" group contains from 1 to 24 carbon atoms. Representative saturated straight chain alkyl groups include methyl, ethyl, n-propyl, n-butyl, n-pentyl, and n-hexyl. Representative saturated branched alkyl groups include isopropyl, sec-butyl, isobutyl, tert-butyl, and isopentyl.

The term "alkenyl" refers to a straight or branched chain hydrocarbon moiety having one or more carbon-carbon double bonds. In one embodiment, the alkenyl group contains 1, 2, or 3 double bonds and is otherwise saturated. Unless otherwise specified, the "alkenyl" group contains from 2 to 24 carbon atoms. Alkenyl groups include both cis

**412**

and trans isomers. Representative straight chain and branched alkenyl groups include ethylenyl, propylenyl, 1-butenyl, 2-butenyl, isobutylenyl, 1-pentenyl, 2-pentenyl, 3-methyl-1-butenyl, 2-methyl-2-butenyl, and 2,3-dimethyl-2-butenyl.

The term "alkynyl" refers to a straight or branched chain hydrocarbon moiety having one or more carbon-carbon triple bonds. Unless otherwise specified, the "alkynyl" group contains from 2 to 24 carbon atoms. Representative straight chain and branched alkynyl groups include acetylenyl, propynyl, 1-butynyl, 2-butynyl, 1-pentynyl, 2-pentynyl, and 3-methyl-1-butynyl.

Unless otherwise specified, the terms "branched alkyl", "branched alkenyl", and "branched alkynyl" refer to an alkyl, alkenyl, or alkynyl group in which one carbon atom in the group (1) is bound to at least three other carbon atoms and (2) is not a ring atom of a cyclic group. For example, a spirocyclic group in an alkyl, alkenyl, or alkynyl group is not considered a point of branching.

Unless otherwise specified, the term "acyl" refers to a carbonyl group substituted with hydrogen, alkyl, partially saturated or fully saturated cycloalkyl, partially saturated or fully saturated heterocycle, aryl, or heteroaryl. For example, acyl groups include groups such as ($C_1$-$C_{20}$)alkanoyl (e.g., formyl, acetyl, propionyl, butyryl, valeryl, caproyl, and t-butylacetyl), ($C_3$-$C_{20}$)cycloalkylcarbonyl (e.g., cyclopropylcarbonyl, cyclobutylcarbonyl, cyclopentylcarbonyl, and cyclohexylcarbonyl), heterocyclic carbonyl (e.g., pyrrolidinylcarbonyl, pyrrolid-2-one-5-carbonyl, piperidinylcarbonyl, piperazinylcarbonyl, and tetrahydrofuranylcarbonyl), aroyl (e.g., benzoyl) and heteroaroyl (e.g., thiophenyl-2-carbonyl, thiophenyl-3-carbonyl, furanyl-2-carbonyl, furanyl-3-carbonyl, 1H-pyrroyl-2-carbonyl, 1H-pyrroyl-3-carbonyl, and benzo[b] thiophenyl-2-carbonyl).

The term "aryl" refers to an aromatic monocyclic, bicyclic, or tricyclic hydrocarbon ring system. Unless otherwise specified, the "aryl" group contains from 6 to 14 carbon atoms. Examples of aryl moieties include, but are not limited to, phenyl, naphthyl, anthracenyl, and pyrenyl.

The terms "cycloalkyl" and "cycloalkylene" refer to a saturated monocyclic or bicyclic hydrocarbon moiety such as cyclopropyl, cyclobutyl, cyclopentyl, and cyclohexyl. Unless otherwise specified, the "cycloalkyl" or "cycloalkylene" group contains from 3 to 10 carbon atoms.

The term "cycloalkylalkyl" refers to a cycloalkyl group bound to an alkyl group, where the alkyl group is bound to the rest of the molecule.

The term "heterocycle" (or "heterocyclyl") refers to a non-aromatic 5- to 8-membered monocyclic, or 7- to 12-membered bicyclic, or 11- to 14-membered tricyclic ring system which is either saturated or unsaturated, and which contains 1 to 3 heteroatoms if monocyclic, 1-6 heteroatoms if bicyclic, or 1-9 heteroatoms if tricyclic, independently selected from nitrogen, oxygen and sulfur, and wherein the nitrogen and sulfur heteroatoms may be optionally oxidized, and the nitrogen heteroatom may be optionally quaternized. For instance, the heterocycle may be a cycloalkoxy group. The heterocycle may be attached to the rest of the molecule via any heteroatom or carbon atom in the heterocycle. Heterocycles include, but are not limited to, morpholinyl, pyrrolidinonyl, pyrrolidinyl, piperidinyl, piperazinyl, hydantoinyl, valerolactamyl, oxiranyl, oxetanyl, tetrahydrofuranyl, tetrahydropyranyl, tetrahydropyridinyl, tetrahydroprimidinyl, tetrahydrothiophenyl, tetrahydrothiopyranyl, tetrahydropyrimidinyl, tetrahydrothiophenyl, and tetrahydrothiopyranyl.

US 11,246,933 B1

413

414

The term "heteroaryl" refers to an aromatic 5-8 membered monocyclic, 7-12 membered bicyclic, or 11-14 membered tricyclic ring system having 1-3 heteroatoms if monocyclic, 1-6 heteroatoms if bicyclic, or 1-9 heteroatoms if tricyclic, where the heteroatoms are selected from O, N, or S (e.g., carbon atoms and 1-3, 1-6, or 1-9 heteroatoms of N, O, or S if monocyclic, bicyclic, or tricyclic, respectively). The heteroaryl groups herein described may also contain fused rings that share a common carbon-carbon bond.

The term "substituted," unless otherwise indicated, refers to the replacement of one or more hydrogen radicals in a given structure with the radical of a specified substituent including, but not limited to: halo, alkyl, alkenyl, alkynyl, aryl, heterocyclyl, thiol, alkylthio, oxo, thioxy, arylthio, alkylthioalkyl, arylthioalkyl, alkylsulfonyl, alkylsulfonylalkyl, arylsulfonylalkyl, alkoxy, aryloxy, aralkoxy, aminocarbonyl, alkylaminocarbonyl, arylaminocarbonyl, alkoxycarbonyl, aryloxycarbonyl, haloalkyl, amino, trifluoromethyl, cyano, nitro, alkylamino, arylamino, alkylaminoalkyl, arylaminoalkyl, aminoalkylamino, hydroxy, alkoxyalkyl, carboxyalkyl, alkoxycarbonylalkyl, aminocarbonylalkyl, acyl, aralkoxycarbonyl, carboxylic acid, sulfonic acid, sulfonyl, phosphonic acid, aryl, heteroaryl, heterocyclic, and an aliphatic group. It is understood that the substituent may be further substituted. Exemplary substituents include amino, alkylamino, dialkylamino, and cyclic amino compounds.

The term "halogen" or "halo" refers to fluoro, chloro, bromo and iodo.

The following abbreviations may be used in this application:

DSPC: distearoylphosphatidylcholine; DPPC: 1,2-Dipalmitoyl-sn-glycero-3-phosphocholine; POPC: 1-palmitoyl-2-oleoyl-sn-phosphatidylcholine; DOPE: 1,2-dileoyl-sn-3-phosphoethanolamine; PEG-DMG generally refers to 1,2-dimyristoyl-sn-glycerol-methoxy polyethylene glycol (e.g., PEG 2000); TBDPSCl: tert-Butylchlorodiphenylsilane; DMAP: dimethylaminopyridine; HMPA: hexamethylphosphoramide; EDC: 1-ethyl-3-(3-dimethylaminopropyl) carbodiimide; DIPEA: diisopropylethylamine; DCM: dichloromethane; TEA: triethylamine; TBAF: tetrabutylammonium fluoride

Methods to prepare various organic groups and protective groups are known in the art and their use and modification is generally within the ability of one of skill in the art (see, for example, Green, T. W. et. al., *Protective Groups in Organic Synthesis* (1999); Stanley R. Sandler and Wolf Karo, *Organic Functional Group Preparations* (1989); Greg T. Hermanson, *Bioconjugate Techniques* (1996); and Leroy G. Wade, *Compendium Of Organic Synthetic Methods* (1980)). Briefly, protecting groups are any group that reduces or eliminates unwanted reactivity of a functional group. A protecting group can be added to a functional group to mask its reactivity during certain reactions and then removed to reveal the original functional group. In some embodiments an "alcohol protecting group" is used. An "alcohol protecting group" is any group which decreases or eliminates unwanted reactivity of an alcohol functional group. Protecting groups can be added and removed using techniques well known in the art.

The compounds may be prepared by at least one of the techniques described herein or known organic synthesis techniques.

EXAMPLES

Example 1

Scheme 1. ALNY-322/quaternary salts



1

TBDPSCl
Et₃N/DMAP/CH₂Cl₂
86%

2

OsO₄/NMO
t-BuOH/THF/H₂O
94%

3

NaIO₄
THF/CH₂Cl₂/MeOH/H₂O
97%

4

LiHMDS/THF/HMPA
⁻Br⁺Ph₃P

5

US 11,246,933 B1

**415**                                                                                **416**

-continued



Compound 2: To a solution of compound 1 (10.0 g, 18.8 mmol, see International Publication No. WO 2010/054406) in CH₂Cl₂ (80 mL) were added triethylamine (7.86 mL, 56.4 mmol), DMAP (459 mg, 3.76 mmol) and tert-butyl(chloro)diphenylsilane (9.62 mL, 37.6 mmol). The reaction mixture was stirred for 24 hours. The mixture was then diluted with CH₂Cl₂ and washed with aqueous saturated NaHCO₃ solution. The organic layer was separated and dried over anhydrous Na₂SO₄. After filtration and concentration, the crude product was purified by silica gel column chromatography (0-5% EtOAc in hexane) to afford 2 (12.4 g, 16.1 mmol, 86%, $R_f$=0.24 with hexane). ¹H NMR (400 MHz, CDCl₃) δ 7.66-7.68 (m, 4H), 7.33-7.42 (m, 6H), 5.30-5.39 (m, 4H), 3.67-3.72 (m, 1H), 1.97-2.04 (m, 8H), 1.07-1.42 (m, 52H), 1.05 (s, 9H), 0.88 (t, J=6.8 Hz, 6H).

Compound 3: To a solution of 2 (12.4 g, 16.1 mmol) in tert-butanol (100 mL), THF (30 mL) and H₂O (10 mL) were added 4-methylmorpholine N-oxide (4.15 g, 35.4 mmol) and osmium tetroxide (41 mg, 0.161 mg). The reaction mixture was stirred for 16 hours, then quenched by adding sodium bisulfite. After removing the solvents by evaporation, the residue was extracted with Et₂O (500 mL) and H₂O (300 mL). The organic layer was separated and dried over anhydrous Na₂SO₄. After filtration and concentration, the crude was purified by silica gel column chromatography (hexane:EtOAc=1:1, $R_f$=0.49) to afford 3 (12.7 g, 15.1 mmol, 94%). ¹H NMR (400 MHz, CDCl₃) δ 7.66-7.68 (m, 4H), 7.33-7.43 (m, 6H), 3.67-3.73 (m, 1H), 3.57-3.62 (m, 4H), 1.82 (t, J=5.0 Hz, 4H), 1.10-1.51 (m, 60H), 1.04 (s, 9H), 0.88 (t, J=6.8 Hz, 6H).

Compound 4: To a solution of 3 (12.6 g, 15.0 mmol) in 1,4-dioxane (220 mL), CH₂Cl₂ (70 mL), MeOH (55 mL), and H₂O (55 mL) was added NaIO₄ (7.70 g, 36.0 mmol). The reaction mixture was stirred for 16 hours at room temperature. The mixture was extracted with Et₂O (500 mL) and H₂O (300 mL). The organic layer was separated and dried over anhydrous Na₂SO₄. After filtration and concentration, the crude product was purified by silica gel column chromatography (Hexane:EtOAc=9:1, $R_f$=0.30) to afford 4 (7.98 g, 14.5 mmol, 97%). Molecular weight for C₃₅H₅₄NaO₅Si (M+Na)⁺ Calc. 573.3740, Found 573.3.

Compound 7: To a solution of 5 (see, Tetrahedron, 63, 1140-1145, 2006; 1.09 g, 2.18 mmol) in THF (20 mL) and HMPA (4 mL), LiHMDS (1 M THF solution, 4.36 mL, 4.36 mmol) was added at −20° C. The resulting mixture was stirred for 20 minutes at the same temperature, then cooled to −78° C. A solution of 4 (500 mg, 0.908 mmol) in THF (4 mL) was added. The mixture was stirred and allowed to warm to room temperature overnight. MS analysis showed the formation of the di-acid (6; C₅₃H₈₅O₅Si (M−H)⁻ calc. 829.6166, observed 829.5). To the mixture, NaHCO₃ (1.10 g, 13.1 mmol) and dimethyl sulfate (1.24 mL, 13.1 mmol) were added and stirred for 2 hours at room temperature. The reaction was quenched by adding saturated NH₄Cl aqueous solution (50 mL) then extracted with Et₂O (2×100 mL). The organic layer was separated and dried over anhydrous Na₂SO₄. After filtration and concentration, the crude product was purified by silica gel column chromatography (Hexane:EtOAc=9:1, $R_f$=0.35) to afford 7 (270 mg, 0.314 mmol, 35%). Molecular weight for C₅₅H₉₀NaO₅Si (M+Na)⁺ Calc. 881.6455, Found 881.6484.

Compound 8: To a solution of 7 (265 mg, 0.308 mmol) in THF (2.5 mL), n-TBAF (1 M THF solution, 0.555 mL, 0.555 mmol) was added. The reaction mixture was stirred for 14 hours at 45° C. After concentration, the mixture was purified by silica gel column chromatography (Hexane:EtOAc=3:1, $R_f$=0.52) to afford 8 (155 mg, 0.250 mmol, 81%). Molecular weight for C₃₉H₇₂NaO₅ (M+Na)⁺ Calc. 643.5277, Found 643.5273.

US 11,246,933 B1

**417**

Compound 9: To a solution of compound 8 (150 mg, 0.242 mmol) and 4-(dimethylamino)butyric acid hydrochloride (49 mg, 0.290 mmol) in CH$_2$Cl$_2$ (5 mL) were added diisopropylethylamine (0.126 mL, 0.726 mmol), N-(3-dimethylaminopropyl)-N'-ethylcarbodiimide hydrochloride (56 mg, 0.290 mmol) and DMAP (6 mg, 0.0484 mmol). The reaction mixture was stirred at room temperature for 14 hours. The reaction mixture was then diluted with CH$_2$Cl$_2$ (100 mL) and washed with saturated NaHCO$_3$ aq. (50 mL). The organic layer was dried over MgSO$_4$, filtered and

**418**

concentrated. The crude product was purified by silica gel column chromatography (0-5% MeOH in CH$_2$Cl$_2$) to afford compound 9 (121 mg, 0.165 mmol, 68%, R$_f$=0.25 developed with 5% MeOH in CH$_2$Cl$_2$). Molecular weight for C$_{45}$H$_{84}$NO$_6$ (M+H)$^+$ Calc. 734.6299, Found 734.5.

Compound 10: Treatment of compound 9 with CH$_3$Cl in CH$_3$CN and CHCl$_3$ can afford compound 10.

Example 2



Scheme 2

US 11,246,933 B1

**419**  **420**

-continued



19 (74%)



20 92%



21

Compound 12: To a solution of 11 (Journal of Medicinal Chemistry (1995), 38, 636-46; 1.25 g, 2.58 mmol) in THF (20 mL) and HMPA (4 mL), LiHMDS (1 M THF solution, 2.58 mL, 2.58 mmol) was added at −20° C. The mixture was stirred for 20 min at the same temperature, then cooled to −78° C. A solution of 4 (500 mg, 0.908 mmol) in THF (9 mL) and HMPA (0.9 mL) was added. The mixture was stirred from −78° C. to room temperature overnight. The reaction was quenched by adding H$_2$O (40 mL) then extracted with Et$_2$O (150 mL×3). The organic layer was separated and dried over anhydrous Na$_2$SO$_4$. After filtration and concentration, the crude was purified by silica gel column chromatography (Hexane:EtOAc=9:1, R$_f$=0.35) to give 12 (136 mg, 0.169 mmol, 19%). Molecular weight for C$_{51}$H$_{82}$NaO$_5$Si (M+Na)$^+$ Calc. 825.5.

Using 13 in place of 5, a procedure analogous to that described for compound 7 was followed to afford compound 12 (135 mg, 0.168 mmol, 46%).

Compound 15/Compound 16: To a solution of 12 (800 mg, 0.996 mmol) in THF (5 mL), n-TBAF (1 M THF solution, 5 mL, 5.00 mmol) was added. The reaction mixture was stirred for 16 h at 45° C. After concentration, the mixture was purified by silica gel column chromatography to give 15 (Hexane:EtOAc=3:1, R$_f$=0.46, 372 mg, 0.659 mmol, 66%) and 16 (CH$_2$Cl$_2$:MeOH=95:5, R$_f$=0.36, 135 mg, 0.251 mmol, 25%). Molecular weight for 15; C$_{35}$H$_{64}$NaO$_5$ (M+Na)$^+$ Calc. 587.4651, Found 587.4652. Molecular weight for 16; C$_{33}$H$_{61}$O$_5$ (M+H)$^+$ Calc. 537.4519, Found 537.5.

Compound 17: To a solution of compound 15 (164 mg, 0.290 mmol) and 4-(dimethylamino)butyric acid hydrochloride (58 mg, 0.348 mmol) in CH$_2$Cl$_2$ (5 mL) were added diisopropylethylamine (0.152 mL, 0.870 mmol), N-(3-dimethylaminopropyl)-N'-ethylcarbodiimide hydrochloride (67 mg, 0.348 mmol) and DMAP (7 mg, 0.058 mmol). The reaction mixture was stirred at room temperature for 14 hours. The reaction mixture was diluted with CH$_2$Cl$_2$ (100

mL) and washed with saturated NaHCO$_3$ aq. (50 mL). The organic layer was dried over MgSO$_4$, filtered and concentrated. The crude was purified by silica gel column chromatography (0-5% MeOH in CH$_2$Cl$_2$) to give compound 17 (158 mg, 0.233 mmol, 80%, R$_f$=0.24 developed with 5% MeOH in CH$_2$Cl$_2$). Molecular weight for C$_{45}$H$_{84}$NO$_6$ (M+H)$^+$ Calc. 734.6299, Found 734.5.

Compound 18: Treatment of compound 17 with CH$_3$Cl in CH$_3$CN and CHCl$_3$ can afford compound 18.

Compound 19: To a solution of 16 (130 mg, 0.242 mmol) in THF (2 mL) and MeOH (2 mL), trimethylsilyldiazomethane (2 M solution in Et$_2$O, 0.158 mL, 0.315 mmol) was added. The reaction mixture was stirred for 14 h. After evaporation, the residue was purified by silica gel column chromatography (Hexane:EtOAc=3:1, R$_f$=0.50) to give 19 (99 mg, 0.180 mmol, 74%). $^1$H NMR (400 MHz, CDCl$_3$) δ 5.29-5.40 (m, 4H), 4.12 (q, J=7.1 Hz, 2H), 3.66 (s, 3H), 3.55-3.59 (m, 1H), 2.30 (dd, J=14.7, 7.2 Hz, 4H), 1.98-2.07 (m, 8H), 1.60-1.68 (m, 4H), 1.23-1.43 (m, 37H).

Compound 20: To a solution of compound 19 (95 mg, 0.168 mmol) and 4-(dimethylamino)butyric acid hydrochloride (42 mg, 0.252 mmol) in CH$_2$Cl$_2$ (3 mL) were added diisopropylethylamine (0.088 mL, 0.504 mmol), N-(3-dimethylaminopropyl)-N'-ethylcarbodiimide hydrochloride (48 mg, 0.504 mmol) and DMAP (4 mg, 0.034 mmol). The reaction mixture was stirred at room temperature for 14 hours. The reaction mixture was diluted with CH$_2$Cl$_2$ (100 mL) and washed with saturated NaHCO$_3$ aq. (50 mL). The organic layer was dried over MgSO$_4$, filtered and concentrated. The crude was purified by silica gel column chromatography (0-5% MeOH in CH$_2$Cl$_2$) to give compound 20 (103 mg, 0.155 mmol, 92%, R$_f$=0.19 developed with 5% MeOH in CH$_2$Cl$_2$). $^1$H NMR (400 MHz, CDCl$_3$) δ 5.29-5.40 (m, 4H), 4.83-4.89 (m, 1H), 4.12 (q, J=7.1 Hz, 2H), 3.67 (s, 3H), 2.28-2.34 (m, 4H), 2.23 (s, 6H), 1.98-2.07 (m, 8H), 1.76-1.83 (m, 2H), 1.60-1.68 (m, 4H), 1.23-1.51 (m, 35H).

Compound 21: Treatment of compound 20 with CH$_3$Cl in CH$_3$CN and CHCl$_3$ can afford compound 21.

US 11,246,933 B1

**421**                                                                                                 **422**

Example 3: Alternate Synthesis for Di-Aldehyde
Intermediate 4

Scheme 3



The di-aldehyde 4 can be synthesized as shown in Scheme 3, using 1-bromo-9-decene. Di-aldehyde containing a head group 27 can be useful for the synthesis of terminal ester-substituted lipids using, e.g., a Wittig reaction. Ozonolysis can afford di-aldehyde 4 and 27.

Example 4: Alternate Synthesis for Compound 8

Scheme 4

US 11,246,933 B1

**423**                                                                                    **424**



Compound 8 can be synthesized as shown in Scheme 4.

Compound 29: To a stirred suspension of NaH (60% in oil, 82 g, 1.7096 mol) in 500 mL anhydrous DMF, a solution of compound 28 (250 g, 1.7096 mol) in 1.5 L DMF was added slowly using a dropping funnel at 0° C. The reaction mixture was stirred for 30 minutes, then benzyl bromide (208.86 mL, 1.7096 mol) was added under an atmosphere of nitrogen. The reaction was then warmed to ambient temperature and stirred for 10 hours. The mixture was then quenched with crushed ice (~2 kg) and extracted with ethyl acetate (2×1 L). The organic layer was washed with water (1 L) to remove unwanted DMF, dried over $Na_2SO_4$ and evaporated to dryness in vacuo. The crude compound

was purified on 60-120 silica gel, eluted with 0-5% MeOH in DCM to afford compound 29 (220 g, 54%) as a pale yellow liquid. [1]H NMR (400 MHz, CDCl$_3$): δ=7.33-7.24 (m, 5H), 4.49 (s, 2H), 3.63-3.60 (m, 2H), 3.47-3.43 (m, 2H), 1.63-1.51 (m, 4H), 1.39-1.23 (m, 8H).

Compound 30: Compound 29 (133 g, 0.5635 mol) was dissolved in 1.5 L of DCM, CBr$_4$ (280.35 g, 0.8456 mol) was added into this stirring solution and the reaction mixture was cooled to 0° C. under an inert atmosphere. PPh$_3$ (251.03 g, 0.9571 mol) was then added in portions keeping the temperature below 20° C. After complete addition, the reaction mixture was stirred for 3 hours at room temperature. After completion of the reaction, the solid (PPh$_3$O) that precipi-

US 11,246,933 B1

425

tated from the reaction mixture was removed by filtration, and the filtrate was diluted with crushed ice (~1.5 kg) and extracted with DCM (3×750 mL). The organic layer was separated, dried over anhydrous $Na_2SO_4$ and distilled under vacuum. The resulting crude compound was chromatographed on 60-120 mesh silica gel column using 0-5% ethyl acetate in hexanes as eluting system to afford compound 30 (150 g, 89%) as pale yellow liquid. [1]H NMR (400 MHz, $CDCl_3$): δ=7.33-7.25 (m, 5H), 4.49 (s, 2H), 3.47-3.41 (m, 2H), 3.41-3.37 (m, 2H), 1.86-1.80 (m, 4H), 1.62-1.56 (m, 2H), 1.42-1.29 (m, 8H).

Compound 31: To freshly activated Mg turnings (24.08 g, 1.003 mol) was added 200 mL anhydrous THF, followed by the addition of pinch of iodine into the mixture under an inert atmosphere. A solution of Compound 30 (150 g, 0.5016 mol) in 1 L of dry THF was added slowly, controlling the exothermic reaction. The reaction was then heated to reflux for 1 hour, then cooled to room temperature. Methyl formate (60.24 g, 1.0033 mol) was then added slowly and the reaction was continued for 2 hours. After completion, the reaction was quenched by slow addition of 10% HCl followed by water (1 L) and extracted with ethyl acetate (3×1 L). The organic layer was taken in 5 litre beaker, diluted with 500 mL of methanol and cooled to 0° C. To this solution, an excess of $NaBH_4$ (~5 eq) was added in portions to ensure hydrolysis of the formate ester which was not cleaved by addition of HCl. The resulting solution was stirred for an hour and then volatilites were removed under vacuum. The residue was taken in water (1 L) and acidified by 10% HCl solution (pH 4). The product was then extracted with ethyl acetate (3×1 L). the organic phase was then dried and concentrated on rotary evaporator to afford the desired compound 31 (57 g, 24%) as solid. [1]H NMR (400 MHz, $CDCl_3$): δ=7.35-7.32 (m, 8H), 7.29-7.24 (m, 2H), 4.49 (s, 4H), 3.56 (m, 1H), 3.46-3.43 (m, 4H), 1.63-1.56 (m, 4H), 1.44-1.34 (m, 28H). [13]C NMR (100 MHz, $CDCl_3$): δ=138.56, 128.21, 127.49, 127.34, 72.72, 71.76, 70.37, 37.37, 29.64, 29.56, 29.47, 29.33, 26.07, 25.54.

Compound 32: Compound 31 (56 g, 0.1196 mol) was dissolved in 700 mL dry THF and cooled to 0° C. TBSCl (36.06 g, 0.2396 mol) was added slowly followed by the addition of imidazole (32.55 g, 0.4786 mol) under an inert atmosphere. The reaction was then stirred at room temperature for 18 hours. Upon completion, the reaction was quenched with ice (~1 kg) and extracted with ethyl acetate (3×500 mL). The organic layer was separated, washed with saturated $NaHCO_3$ solution to remove acidic impurities, dried over $Na_2SO_4$ and evaporated under reduce pressure to afford a crude compound that was purified by silica gel (60-120 mesh) and eluted with 0-10% ethyl acetate hexane to afford (60 g, 82%) of compound 32 as yellowish oil. [1]H NMR (400 MHz, $CDCl_3$): δ=7.33-7.24 (m, 10H), 4.49 (s, 4H), 3.60-3.57 (m, 1H), 3.46-3.43 (m, 4H), 1.61-1.54 (m, 4H), 1.41-1.26 (m, 28H), 0.87 (s, 9H), 0.02 (s, 6H).

Compound 33: Compound 32 (60 g, 0.1030 mol) was dissolved in 500 mL ethyl acetate and degassed with $N_2$ for 20 minutes. (10 wt %) Pd on carbon (12 g) was added and the reaction was stirred under an atmosphere of hydrogen for 18 hours. After completion, the mixture was filtered through a bed of celite and washed with ethyl acetate. The filtrate was evaporated under vacuum to afford compound 33 (19 g, 46%) that was pure enough to use in the next synthetic sequence. [1]H NMR (400 MHz, $CDCl_3$): δ=3.64-3.58 (m, 5H), 1.59 (br, 2H), 1.57-1.51 (m, 4H), 1.38-1.22 (m, 28H), 0.87 (s, 9H), 0.02 (s, 6H).

Compound 34: Compound 33 (8.2 g, 0.0199 mol) was dissolved in 100 mL dry DCM and cooled to 0° C. TEA

426

(22.14 mL, 0.1592 mol) was added under an inert atmosphere. After stirring the mixture for 5 minutes, mesyl chloride (4.6 mL, 0.059 mol) was added drop wise and the reaction was stirred further for 3 hours. After completion of the reaction, the mixture was quenched with ice (~200 g) and extracted with DCM (3×75 mL). The organic layer was dried over anhydrous sodium sulfate and evaporated to afford a crude compound which was purified on a 60-120 mesh silica gel column using 0-30% ethyl acetate in hexane as eluting system to afford compound 34 (8.2 g, 73%) as a pale yellow liquid. [1]H NMR (400 MHz, $CDCl_3$): δ=4.22-4.19 (m, 4H), 3.60-3.58 (m, 1H), 2.99 (s, 6H), 1.75-1.69 (m, 4H), 1.38-1.28 (m, 28H), 0.86 (s, 9H), 0.02 (s, 6H).

Compound 35: To a solution of compound 34 (8.2 g, 0.0146 mol) in 400 mL dry ether was added $MgBr_2Et_2O$ (22.74 g, 0.08817 mol) in portions at 0° C. under a nitrogen atmosphere. After complete addition, the reaction mixture was heated to reflux for 28 hours. After completion of reaction, inorganic material formed in the reaction was removed by filtration. The filtrate was evaporated and the resulting crude compound was purified on 60-120 mesh silica gel column using 0-3% ethyl acetate in hexanes as eluting system to afford compound 35 (6.6 g, 85%) as a colorless liquid. [1]H NMR (400 MHz, $CDCl_3$): δ=3.61-3.58 (m, 1H), 3.41-3.37 (t, 4H, J=6.8 Hz), 1.87-1.80 (m, 4H), 1.42-1.25 (m, 24H), 0.87 (s, 9H), 0.012 (s, 6H).

Compound 36: A solution of ethynyl trimethyl silane (5.3 mL, 0.0378 mol) in 60 mL dry THF was cooled to –78° C. and 1.4 M n-BuLi (23 mL, 0.03405 mol) in hexane was added slowly under an inert atmosphere. The reaction was stirred for 10 minutes, then HMPA (2.3 g, 0.01324 mol) was added and the resulting mixture was then stirred for 2 hours at 0° C., then cooled to –78° C. To this solution of compound 35 (5 g, 0.0094 mol) in 60 mL dry THF was added slowly and after complete addition, the reaction was warmed to room temperature and maintained for 18 hours. The reaction progress was monitored by [1]H NMR. After completion, the reaction mixture was cooled to 0° C. and quenched by careful addition of saturated $NH_4Cl$ solution (50 mL) followed by water (200 mL). The aqueous phase was extracted with hexane (3×250 mL). The organic layer was dried and solvent removed under vacuum to afford compound 36 (5 g, 94%), which was used without further purification. [1]H NMR (400 MHz, $CDCl_3$): δ=3.62-3.56 (m, 1H), 2.21-2.17 (m, 4H), 1.49-1.47 (m, 4H), 1.37-1.26 (m, 24H), 0.87 (s, 9H), 0.13 (s, 18H), 0.021 (s, 6H).

Compound 37: To a stirred solution of compound 36 (5 g, 0.0088 mol) in 50 mL methanol, was added $K_2CO_3$ (6.1 g, 0.044 mol) in one portion, and the resulting mixture was stirred for 18 hours at ambient temperature. Volatilities were then removed on a rotary evaporator and the crude mixture was diluted with 100 mL water and extracted with hexane (3×100 mL). The organic layer was dried over $Na_2SO_4$ and evaporated under vacuum to afford compound 37 (3.5 g, 97%) which was used which was used without further purification. [1]H NMR (400 MHz, $CDCl_3$): δ=3.60-3.58 (m, 1H), 2.19-2.14 (m, 4H), 1.93-1.92 (m, 2H), 1.54-1.49 (m, 4H), 1.37-1.27 (m, 24H), 0.87 (s, 9H), 0.02 (s, 6H).

Compound 39: Compound 37 (2.5 g, 0.00598 mol) was dissolved in 25 mL dry THF and cooled to –40° C. n-BuLi (1.4 M in hexane 12.9 mL, 0.01794 mol) was added slowly, followed, after a 10 minute interval, by slow addition of HMPA (25 mL). The resulting mixture was maintained for 30 minutes –40° C. under a nitrogen atmosphere. A solution of compound 38 (3.5 g, 1.01196 mol) in 25 mL dry THF was then added drop wise to the cooled reaction mixture. The resulting mixture was warmed to room temperature over 2

US 11,246,933 B1

**427**

hours, then stirred at room temperature for 18 hours. The mixture was then quenched by adding saturated NH$_4$Cl solution (~50 mL) and the product was extracted with ethyl acetate (3×50 mL). The solvent was removed on a rotary evaporator and the resulting crude product was purified by (100-200 mesh) silica gel column using 0-3% ethyl acetate in dichloromethane as eluting system to afford compound 39 (0.9 g, 18%) as a yellow oil. $^1$H NMR (400 MHz, CDCl$_3$): δ=4.56-4.55 (m, 2H), 3.87-3.83 (m, 2H), 3.74-3.68 (m, 2H), 3.59-3.57 (m, 1H), 3.49-3.46 (m, 2H), 3.39-3.33 (m, 2H), 2.13-2.10 (m, 8H), 1.87-1.75 (m, 2H), 1.74-1.66 (m, 2H), 1.57-1.42 (m, 20H), 1.40-1.19 (m, 40H), 0.87 (s, 9H), 0.02 (s, 6H).

Compound 40: To a solution of compound 39 (504 mg, 0.598 mmol) in 10 mL dry ether was added MgBr$_2$Et$_2$O (926 mg, 3.59 mmol). The reaction mixture was stirred for 14 hours, then quenched by adding saturated NaHCO$_3$ aqueous solution. The product was extracted with CH$_2$Cl$_2$. The organic layer was dried over Na$_2$SO$_4$, filtered and concentrated. The crude product was purified by silica gel column chromatography to afford compound 40 (307 mg, 0.455 mmol, 76%, R$_f$=0.36 developed with hexane:EtOAc=2:1). $^1$H NMR (400 MHz, CDCl$_3$) δ 3.59-3.66 (m, 5H), 2.14 (t, J=6.6 Hz, 8H), 1.21-1.59 (m, 52H), 0.88 (s, 9H), 0.03 (s, 6H).

**428**

Compound 41: To a stirred solution of 40 (180 mg, 0.267 mmol) in anhydrous DMF (5 mL) was added pyridinium dichromate (603 mg, 1.60 mmol). The reaction mixture was stirred for 48 hours. After dilution with water (20 mL), the mixture was extracted with Et$_2$O (3×40 mL). The organic layer was dried over Na$_2$SO$_4$, filtered and concentrated. The crude product was purified by silica gel column chromatography to afford compound 41 (53 mg, 0.075 mmol, 28%, R$_f$=0.25 developed with CH$_2$Cl$_2$:MeOH:AcOH=95:4.5:0.5). Molecular weight for C$_{43}$H$_{77}$O$_5$Si (M–H)$^-$ Calc. 701.5540, Found 701.5. This compound can be synthesized by TEMPO oxidation.

Compound 42: A procedure analogous to that described for compound 19 afforded compound 42 (23 mg 0.032 mmol, 21% from compound 40). $^1$H NMR (400 MHz, CDCl$_3$) δ 3.67 (s, 6H), 3.59-3.62 (m, 1H), 2.30 (t, J=7.5 Hz, 4H), 2.13 (t, J=6.8 Hz, 8H), 1.27-1.64 (m, 48H), 0.88 (s, 9H), 0.03 (s, 6H).

Reduction using P-2 nickel conditions can give compound 43 and subsequent deprotection by TBAF can afford compound 8.

Example 5: Alternate Synthesis for Compound 8



Scheme 5

US 11,246,933 B1

**429**                                              **430**



-continued

8

Compound 8 can be synthesized as shown in Scheme 5. The bromide 51 can be converted to its Grignard reagent then coupled with ethyl formate to afford compound 52. Subsequent acid treatment, oxidation, and reduction can give compound 8.

Example 6: Alternate Synthesis for Compound 8

Scheme 6

US 11,246,933 B1

**431**

Compound 8 can be synthesized as shown in Scheme 6. Either bromides of compound 58, 60, or 62 can be reacted with ethyl formate to generate terminal-functionalized di-olefin chain. Compound 8 can then be prepared from the diolefin chain compounds using standard chemical reactions.

Example 7: General Synthetic Scheme for Terminal Ester Lipids

Scheme 7



101

102

103

104

**432**

-continued



106

107

108

110

n = 0-8
m = 0-8
p = 0-3
R = R₁ = R₂ = Me, Et, Pr, BN, t-Bu, pH, alkyl, aryl, cycloalkyl, etc.

As shown in Scheme 7, chain length and linker length as well as alkyl groups in ester functionality and substituents on nitrogen atom can be derivatized.

Example 8: General Synthetic Scheme 2 for Terminal Ester Lipids

Scheme 8



101

102

111

112

113

or

114

US 11,246,933 B1



**433**                                    **434**

n = 0-8
m = 0-8
p = 0-3
R = Me, Et, Pr, Bn, t-Bu, Ph, alkyl, aryl, cycloalkyl, and alkyl esters, etc.
R₁ = R₂ = Me, Et, Pr, Bn, t-Bu, Ph, alkyl, aryl, cycloalkyl

As shown in Scheme 8, copper-mediated coupling affords di-yne containing lipid chain with terminal functional groups, which can be easily reduced to generate di-ene containing lipid chains. The length of linker and lipid chain as well as functional substituent groups (R, R₁, R₂) can be derivatized.

Example 9: Synthesis of Terminal Benzyl Ester Lipid

Compound 201: Compound 7 (1.30 g, 1.51 mmol) was treated with lithium hydroxide monohydrate (317 mg, 7.55 mmol) in THF (25 mL) and H₂O (5 mL) for 12 h. Amberlite IR-120 (plus) ion exchange resin was added then stirred for 10 minutes. The resulting clear solution was filtered, washed with THF/H₂O and evaporated. Co-evaporation with toluene gave the compound 201 (1.22 g, 1.47 mmol, 97%). Molecular weight for $C_{53}H_{85}O_5Si$ (M−H)⁻ Calc. 829.6166, Found 829.5.

Scheme 9

[Chemical scheme showing reactions from compound 7 → 201 → 202 → 203 → 204 with reagents LiOH, THF/H₂O, 97%; BnOH, EDCl/DMAP, CH₂Cl₂/DIPEA, 71%; n-TBAF, THF, 52%; EDCl/DMAP, CH₂Cl₂/DIPEA, 61%]

US 11,246,933 B1

435

436

Compound 202: A procedure analogous to that described for compound 9 was followed with benzylalcohol and 201 (101 mg, 0.121 mmol) to afford compound 202 (87 mg, 0.0860 mmol, 71%). $^1$H NMR (400 MHz, CDCl$_3$) δ 7.68-7.66 (m, 4H), 7.42-7.30 (m, 16H), 5.38-5.30 (m, 4H), 5.11 (s, 4H), 3.71-3.68 (m, 1H), 2.35 (t, J=7.6 Hz, 4H), 2.04-1.97 (m, 8H), 1.66-1.62 (m, 4H), 1.40-1.07 (m, 44H), 1.04 (s, 9H).

Compound 203: A procedure analogous to that described for compound 8 was followed with 202 (342 mg, 0.338 mmol) to afford compound 202 (136 mg, 0.176 mmol, 52%). $^1$H NMR (400 MHz, CDCl$_3$) δ 7.38-7.30 (m, 10H), 5.38-5.30 (m, 4H), 5.11 (s, 4H), 3.57 (brs, 1H), 2.35 (t, J=7.6 Hz, 4H), 2.01-1.98 (m, 8H), 1.66-1.60 (m, 4H), 1.45-1.25 (m, 44H).

Compound 204: A procedure analogous to that described for compound 9 was followed with 203 (133 mg, 0.172 mmol) to afford compound 204 (93 mg, 0.105 mmol, 61%). $^1$H NMR (400 MHz, CDCl$_3$) δ 7.38-7.26 (m, 10H), 5.38-5.30 (m, 4H), 5.11 (s, 4H), 4.88-4.83 (m, 1H), 2.37-2.27 (m, 8H), 2.22 (s, 6H), 2.03-1.97 (m, 8H), 1.81-1.26 (m, 50H).

Example 10: Synthesis of Terminal t-Butyl Ester Lipid and the Derivatives

Compound 206: A procedure analogous to that described for compound 12 was followed with 205 (3.80 g, 0.7.61 mmol) and 4 (1.75 g, 3.17 mmol) to afford compound 206 (2.00 g, 2.12 mmol, 67%). $^1$H NMR (400 MHz, CDCl$_3$) δ 7.68-7.66 (m, 4H), 7.42-7.33 (m, 6H), 5.39-5.31 (m, 4H), 3.71-3.68 (m, 1H), 2.20 (t, J=7.6 Hz, 4H), 2.01-1.98 (m, 8H), 1.59-1.55 (m, 4H), 1.44 (s, 18H), 1.41-1.11 (m, 44H), 1.04 (s, 9H).

Compound 207: A procedure analogous to that described for compound 8 was followed with 206 (265 mg, 0.281 mmol) to afford compound 207 (161 mg, 0.228 mmol, 81%). $^1$H NMR (400 MHz, CDCl$_3$) δ 5.38-5.30 (m, 4H), 3.58 (brs, 1H), 2.20 (t, J=7.4 Hz, 4H), 2.01-1.98 (m, 8H), 1.59-1.55 (m, 4H), 1.44 (s, 18H), 1.35-1.26 (m, 44H).

Compound 208: A procedure analogous to that described for compound 9 was followed with 207 (158 mg, 0.224 mmol) to afford compound 208 (138 mg, 0.169 mmol, 75%). Molecular weight for C$_{51}$H$_{96}$NO$_6$ (M+H)$^+$ Calc. 818.7238, Found 818.7.

Compound 209: Compound 208 (148 mg, 0.181 mmol) was treated with TFA (1.5 mL) in CH$_2$Cl$_2$ (6 mL) for 2.5 h. After evaporation and co-evaporation with toluene gave the compound 209 (154 mg, quant.). Molecular weight for C$_{43}$H$_{80}$NO$_6$ (M+H)$^+$ Calc. 706.5980, Found 706.5.



Scheme 10

US 11,246,933 B1

**437**

Compound 210: A procedure analogous to that described for compound 9 was followed with 209 (0.061 mmol) and cis-2-Hexen-1-ol (18.3 mg, 0.183 mmol) to afford compound 210 (32 mg, 0.0368 mmol, 60%). Molecular weight for $C_{55}H_{100}NO_6$ (M+H)+ Calc. 870.7551, Found 870.5.

Example 11: Synthesis of Internal Ester/Amide Lipids-1

**438**

mmol) in $CH_2Cl_2$ (35 mL) for 14 h. Aqueous work-up then column chromatography gave compound 215 (244 mg, 0.346 mmol, 35%). Molecular weight for $C_{43}H_{80}NO_6$ (M+H)+ Calc. 706.5986, Found 706.4.

Compound 217: Compound 211 (425 mg, 0.845 mmol) was treated with 216 (525 mg, 3.08 mmol) and $K_2CO_3$ (1.17 g, 8.45 mmol) in $CH_2Cl_2$ (35 mL) for 14 h. Aqueous work-up then column chromatography gave compound 217



Scheme 11

213
75%

212
DIPEA/CH₂Cl₂

211

214
K₂CO₃/CH₂Cl₂
35%

215

K₂CO₃/CH₂Cl₂
n = 1 (216)
n = 3 (218)

n = 1 (217), 66%
n = 3 (219), 66%
n = 1, 3
n = 1, 3

Compound 213: Compound 211 (503 mg, 1.0 mmol) was treated with 212 (533 mg, 3.0 mmol) in $CH_2Cl_2$ (35 mL) and DIPEA (1.74 mL, 10 mmol) for 14 h. Aqueous work-up then column chromatography gave compound 213 (506 mg, 0.748 mmol, 75%). Molecular weight for $C_{41}H_{78}N_3O_4$ (M+H)+ Calc. 676.5992, Found 676.4.

Compound 215: Compound 211 (503 mg, 1.0 mmol) was treated with 214 (469 mg, 3.0 mmol) and $K_2CO_3$ (1.38 g, 10

(407 mg, 0.554 mmol, 66%). Molecular weight for $C_{45}H_{84}NO_6$ (M+H)+ Calc. 734.6299, Found 734.4.

Compound 219: Compound 211 (503 mg, 1.0 mmol) was treated with 218 (595 mg, 3.0 mmol) and $K_2CO_3$ (1.38 g, 10 mmol) in $CH_2Cl_2$ (35 mL) for 14 h. Aqueous work-up then column chromatography gave compound 219 (519 mg, 0.657 mmol, 66%). Molecular weight for $C_{49}H_{92}NO_6$ (M+H)+ Calc. 790.6925, Found 790.7.

US 11,246,933 B1

**439**                                    **440**

Example 12: Synthesis of Internal Ester Lipid-223

Scheme 12

NaBH(OAc)₃
AcOH/CH₂Cl₂
44%

218

EDCI/DIPEA/DMAP/CH₂Cl₂
81%

220

221

222

223

45

Compound 221: A procedure analogous to that described for compound 9 was followed with 220 (390 mg, 1.93 mmol) and 218 (765 mg, 3.86 mmol) to afford compound 221 (878 mg, 1.56 mmol, 81%). ¹H NMR (400 MHz, CDCl₃) δ 5.67-5.61 (m, 2H), 5.54-5.48 (m, 2H), 4.62 (d, J=6.8 Hz, 4H), 2.47 (t, J=7.2 Hz, 4H), 2.33 (t, J=7.2 Hz, 4H), 2.12-2.06 (m, 4H), 1.93-1.86 (m, 4H), 1.38-1.26 (m, 32H), 0.88 (t, J=6.8 Hz, 6H).

50

Compound 222: Compound 221 (318 mg, 0.565 mmol) was treated with NaBH(OAc)₃ (360 mg, 1.70 mmol) in CH₂Cl₂ (5 mL) and AcOH (0.2 mL) for 16 h. After evapo-

ration, column chromatography gave compound 222 (141 mg, 0.250 mmol, 44%). Molecular weight for $C_{35}H_{65}O_5$ (M+H)⁺ Calc. 565.4832, Found 565.4.

Compound 223: A procedure analogous to that described for compound 9 was followed with 222 (137 mg, 0.243 mmol) to afford compound 223 (137 mg, 0.202 mmol, 83%). Molecular weight for $C_{41}H_{76}NO_6$ (M+H)⁺ Calc. 678.5673, Found 678.5.

Example 13: Synthesis of Internal Ester Lipid-227



Scheme 13

216

EDCI/DIPEA/DMAP/CH₂Cl₂
78%

224

US 11,246,933 B1

| 441 | 442 |

-continued



225



226



227

Compound 225: A procedure analogous to that described for compound 9 was followed with 224 (200 mg, 0.774 mmol) and 216 (264 mg, 1.55 mmol) to afford compound 225 (341 mg, 0.606 mmol, 78%). Molecular weight for $C_{35}H_{62}NaO_5$ (M+Na)$^+$ Calc. 585.4495, Found 585.5.

Compound 226: Compound 225 (283 mg, 0.503 mmol) was treated with NaBH$_4$ (57 mg, 1.51 mmol) in THF (5 mL) and AcOH (0.2 mL) for 8 h. After evaporation, column chromatography gave compound 226 (185 mg, 0.328 mmol,

65%). Molecular weight for $C_{35}H_{64}NaO_5$ (M+Na)$^+$ Calc. 587.4651, Found 587.3.

Compound 227: A procedure analogous to that described for compound 9 was followed with 226 (230 mg, 0.407 mmol) to afford compound 227 (248 mg, 0.366 mmol, 90%). Molecular weight for $C_{41}H_{76}NO_6$ (M+H)$^+$ Calc. 678.5673, Found 678.5.

Example 14: Synthesis of Terminal Ester Lipid with Linoleyl Chain-232

Scheme 14



228



4



229

US 11,246,933 B1

**443**                                                                 **444**

-continued



230

231

232

Compound 230: A procedure analogous to that described for compound 7 was followed with 228 (3.27 g, 6.0 mmol) and 4 (1.27 g, 2.30 mmol) to afford compound 230 (1.31 g, 1.53 mmol, 67%). $^1$H NMR (400 MHz, CDCl$_3$) δ 7.68-7.66 (m, 4H), 7.42-7.33 (m, 6H), 5.42-5.29 (m, 8H), 3.71-3.68 (m, 1H), 3.66 (s, 6H), 2.77 (t, J=5.8 Hz, 4H), 2.33-2.28 (m, 4H), 2.11-2.01 (m, 8H), 1.69-1.60 (m, 4H), 1.43-1.10 (m, 32H), 1.04 (s, 9H).

Compound 231: A procedure analogous to that described for compound 8 was followed with 230 (1.30 g, 1.52 mmol) to afford compound 231 (611 mg, 0.990 mmol, 65%). $^1$H

NMR (400 MHz, CDCl$_3$) δ 5.41-5.29 (m, 8H), 3.67 (s, 6H), 3.58 (brs, 1H), 2.77 (t, J=5.8 Hz, 4H), 2.32 (t, J=7.4 Hz, 4H), 2.10-2.00 (m, 8H), 1.69-1.60 (m, 4H), 1.43-1.29 (m, 32H).

Compound 232: A procedure analogous to that described for compound 9 was followed with 231 (520 mg, 0.843 mmol) to afford compound 232 (600 mg, 0.822 mmol, 97%). Molecular weight for C$_{45}$H$_{80}$NO$_6$ (M+H)$^+$ Calc. 730.5986, Found 730.5.

Example 15: Synthesis of Terminal Ester Lipid with Linoleyl Chain-232

Scheme 15



111

112

233

234

231

US 11,246,933 B1

**445** **446**

-continued



232

Compound 231 was also synthesized as shown Scheme 15.

Compound 112: Compound 111 (840 mg, 2.69 mmol) was treated with dimethyl (1-diazo-2-oxopropyl)phosphonate (0.970 mL, 6.46 mmol) and $K_2CO_3$ (1.49 g, 10.8 mmol) in MeOH (40 mL) for 6 h. Aqueous work-up then column chromatography gave compound 112 (700 mg, 2.30 mmol,

mmol) and a solution of 234 (290 mg, 0.476 mmol) in EtOH (3 mL) was added then stirred for 1 h. The reaction mixture was filtered through Celite and evaporated. Aqueous work-up then column chromatography gave compound 231 (219 mg, 0.355 mmol, 75%). Molecular weight for $C_{39}H_{69}O_5$ $(M+H)^+$ Calc. 617.5145, Found 617.3.

Example 16: Synthesis of Internal Oxime Lipid-238

Scheme 16



86%). $^1$H NMR (400 MHz, CDCl$_3$) δ 3.58 (brs, 1H), 2.18 (td, J=7.1, 2.6 Hz, 4H), 1.94 (t, J=2.6 Hz, 2H), 1.56-1.25 (m, 28H).

Compound 234: Compound 112 (207 mg, 0.680 mmol) was treated with 233 (316 mg, 1.36 mmol), $K_2CO_3$ (282 mg, 2.04 mmol), NaI (408 mg, 2.72 mmol) and CuI (518 mg, 2.72 mmol) in DMF (3.5 mL) for 18 h. Aqueous work-up then column chromatography gave compound 234 (292 mg, 0.480 mmol, 71%). Molecular weight for $C_{39}H_{61}O_5$ $(M+H)^+$ Calc. 609.4519, Found 609.5.

Compound 231: To a stirred solution of nickel(II) acetate tetrahydrate (533 mg, 2.14 mmol) in EtOH (28.5 mL), 1 M solution of NaBH$_4$ in EtOH (2.14 mL) was added at room temperature. After 30 min, ethylenediamine (0.574 mL, 8.57

Compound 237: Compound 235 (465 mg, 1.78 mmol) was treated with hydrazine monohydrate (64-65%, 0.135 mL, 1.78 mmol) in EtOH (15 mL) for 4 h. After filtration then evaporation, the crude was re-suspended in EtOH (5 mL). To this solution was added compound 111 (160 mg, 0.512 mmol) and AcOH (a few drops). Aqueous work-up then column chromatography gave compound 237 (165 mg, 0.306 mmol, 60%). Molecular weight for $C_{33}H_{67}N_2O_3$ $(M+H)^+$ Calc. 539.5152, Found 539.3.

Compound 238: A procedure analogous to that described for compound 9 was followed with 237 (162 mg, 0.301 mmol) to afford compound 238 (168 mg, 0.258 mmol, 86%). Molecular weight for $C_{39}H_{78}N_3O_4$ $(M+H)^+$ Calc. 652.5992, Found 652.4.

US 11,246,933 B1

**447** | **448**

Example 17



Scheme 17



ALNY-319

8-benzyloxy-octan-1-ol (240): To a stirred suspension of NaH (60% in oil, 82 g, 1.7096 mol) in 500 mL anhydrous DMF, a solution of compound 239 (250 g, 1.7096 mol) in 1.5 L DMF was added slowly using a dropping funnel at 0° C. The reaction mixture was stirred for 30 minutes, then benzyl bromide (208.86 mL, 1.7096 mol) was added slowly under a nitrogen atmosphere. The reaction was then warmed to ambient temperature and stirred for 10 hours. After completion of reaction, the mixture was quenched with crushed ice (~2 kg) and extracted with ethyl acetate (2×1 L).

The organic layer washed with water (1 L) to remove unwanted DMF, dried over $Na_2SO_4$ and evaporated to dryness under vacuum. The crude compound was purified on 60-120 silica gel, eluted with 0-5% MeOH in DCM to afford compound 240 (220 g, 54%) as pale yellow liquid. $H^1$ NMR (400 MHz, $CDCl_3$): δ=7.33-7.24 (m, 5H), 4.49 (s, 2H), 3.63-3.60 (m, 2H), 3.47-3.43 (m, 2H), 1.63-1.51 (m, 4H), 1.39-1.23 (m, 8H).

(8-bromo-octyloxymethyl)-benzene (241): Compound 240 (133 g, 0.5635 mol) was dissolved in 1.5 L of DCM,

US 11,246,933 B1

**449**

CBr$_4$ (280.35 g, 0.8456 mol) was added to this stirring solution and the reaction mixture was cooled to 0° C. under an inert atmosphere. PPh$_3$ (251.03 g, 0.9571 mol) was then added in portions maintaining the temperature below 20° C. and after complete addition, the reaction mixture was stirred for 3 hours at room temperature. After completion of reaction, solid (PPh$_3$O) precipitated out from the reaction mixture was isolated by filtration and the filtrate was diluted with crushed ice (~1.5 kg) and extracted with DCM (3×750 mL). The organic layer was separated, dried over anhydrous Na$_2$SO$_4$ and distilled under vacuum. The resulting crude compound was chromatographed on 60-120 mesh silica gel column using 0-5% ethyl acetate in hexanes as eluting system to afford compound 241 (150 g, 89%) as pale yellow liquid. $^1$H NMR (400 MHz, CDCl$_3$): δ=7.33-7.25 (m, 5H), 4.49 (s, 2H), 3.47-3.41 (m, 2H), 3.41-3.37 (m, 2H), 1.86-1.80 (m, 4H), 1.62-1.56 (m, 2H), 1.42-1.29 (m, 8H).

1, 17-bis-benzyloxy-heptadecan-9-ol (242): To freshly activated Mg turnings (24.08 g, 1.003 mol) was added 200 mL anhydrous THF, followed by the addition of pinch of iodine into the mixture under inert atmosphere. After initiation of the Grignard formation a solution of Compound 241 (150 g, 0.5016 mol) in 1 L of dry THF was added slowly controlling the exothermic reaction. After complete addition, the reaction was heated to reflux for 1 hour, then cooled to room temperature. Methyl formate (60.24 g, 1.0033 mol) was then added slowly and reaction was continued for 2 hours. After completion, the reaction was quenched by slow addition of 10% HCl followed by water (1 L) and extracted with ethyl acetate (3×1 L). The organic layer was taken in 5 litre beaker, diluted with 500 mL of methanol and cooled to 0° C. To this solution excess of NaBH$_4$ (~5 eq) was added in portions to ensure the hydrolysis of formate ester which was not cleaved by addition of HCl. The resulting solution was stirred for an hour and then volatilites were removed under vacuum. The residue was taken in water (1 L) and acidified by 10% HCl solution (P$^H$ 4). The product was then extracted with ethyl acetate (3×1 L). The organic phase was then dried and concentrated on rotary evaporator to afford compound 242 (57 g, 24%) as solid. $^1$H NMR (400 MHz, CDCl$_3$): δ=7.35-7.32 (m, 8H), 7.29-7.24 (m, 2H), 4.49 (s, 4H), 3.56 (m, 1H), 3.46-3.43 (m, 4H), 1.63-1.56 (m, 4H), 1.44-1.34 (m, 28H). C$^{13}$ NMR (100 MHz, CDCl$_3$): δ=138.56, 128.21, 127.49, 127.34, 72.72, 71.76, 70.37, 37.37, 29.64, 29.56, 29.47, 29.33, 26.07, 25.54.

[9-benzyloxy-1-(8-benzylozy-octyl)-nonyloxy]-tert-butyl-dimethyl-silane (243): Compound 242 (56 g, 0.1196 mol) was dissolved in 700 mL of anhydrous THF and cooled to 0° C. TBMS-Cl (36.06 g, 0.2396 mol) was added slowly followed by addition of imidazole (32.55 g, 0.4786 mol) under an inert atmosphere. The reaction was then stirred at room temperature for 18 hours, then quenched with ice (~1 kg). The product was extracted with ethyl acetate (3×500 mL). The organic layer was separated, washed with saturated NaHCO$_3$ solution to remove the acidic impurity, dried over Na$_2$SO$_4$ and evaporated under reduce pressure to obtain crude compound which was purified by silica gel (60-120 mesh) and eluted with 0-10% ethyl acetate hexane to afford (60 g, 82%) of compound 243 as yellowish oil. H$^1$ NMR (400 MHz, CDCl$_3$): δ=7.33-7.24 (m, 10H), 4.49 (s, 4H), 3.60-3.57 (m, 1H), 3.46-3.43 (m, 4H), 1.61-1.54 (m, 4H), 1.41-1.26 (m, 28H), 0.87 (s, 9H), 0.02 (s, 6H) 9-(tert-butyl-dimethyl-silanyloxy)-heptadecane-1, 17-diol (244): Compound 243 (60 g, 0.1030 mol) was dissolved in 500 mL ethyl acetate and degassed with N$_2$ for 20 min. (10 wt %) Pd on carbon (12 g) was added and reaction was stirred under an atmosphere of hydrogen for 18 hours. After completion, the

**450**

mixture was filtered through a bed of celite and washed with ethyl acetate. The filtrate was evaporated under vacuum. Compound 244 (19 g, 46%) thus obtained was pure enough to carry out the next reaction. $^1$H NMR (400 MHz, CDCl$_3$): δ=3.64-3.58 (m, 5H), 1.59 (br, 2H), 1.57-1.51 (m, 4H), 1.38-1.22 (m, 28H), 0.87 (s, 9H), 0.02 (s, 6H).

9-(tert-butyl-dimethyl-silanyloxy)-heptadecanedioic acid (245): To a stirred solution of 244 (2 g, 0.0049 mol) in anhydrous DMF (40 mL) was added pyridinium dirchromate (2.7 g, 0.0074 mol) at 0° C. under an inert atmosphere. The reaction mixture was then allowed to warm to room temperature over a period of 10-15 minutes and continued for 24 hours. Then, the reaction was diluted with water (100 mL). The aqueous phase was extracted using DCM (3×40 mL). The organic phase was washed with brine (1×25 mL) and concentrated under vacuum to afford crude acid which was then purified by (100-200 mesh) silica gel column using 0-30% ethyl acetate in hexanes system. Pure product (245) was obtained (0.7 g, 33%) as a pale yellow oil. $^1$H NMR (400 MHz, CDCl$_3$): δ=3.61-3.56 (m, 1H), 2.35-2.32 (m, 4H), 1.64-1.59 (m, 4H), 1.40-1.19 (m, 24H), 0.86 (s, 9H), 0.017 (s, 6H); LC-MS [M+H]−431.00; HPLC (ELSD) purity ~96.94%

Di((Z)-non-2-en-1-yl) 9-((tert-butyldimethylsilyl)oxy) heptadecanedioate (246): The diacid 245 (0.42 g, 0.97 mmol) was dissolved in 20 mL of dichloromethane and to it cis-2-nonen-1-ol (0.35 g, 2.44 mmol) was added followed by Hunig's base (0.68 g, 4.9 mmol) and DMAP (12 mg). To this mixture EDCI (0.47 g, 2.44 mmol) was added and the reaction mixture was stirred at room temperature overnight. The reaction mixture was then diluted with CH$_2$Cl$_2$ (40 mL) and washed with saturated NaHCO$_3$ (50 mL), water (60 mL) and brine (60 mL). The combined organic layers were dried over anhydrous Na$_2$SO$_4$ and solvents were removed in vacuo. The crude product thus obtained was purified by Combiflash Rf purification system (40 g silicagel, 0-10% MeOH in CH$_2$Cl$_2$) to afford the pure product 246 (0.35 g, 53%) as a colorless oil. $^1$H NMR (400 MHz, CDCl$_3$): δ $^1$H NMR (400 MHz, CDCl$_3$) δ 5.64 (dt, J=10.9, 7.4 Hz, 2H), 5.58-5.43 (m, 2H), 4.61 (d, J=6.8 Hz, 4H), 3.71-3.48 (m, 1H), 2.30 (t, J=7.6 Hz, 4H), 2.20-1.98 (m, 4H), 1.71-1.53 (m, 4H), 1.31 (ddd, J=8.3, 7.0, 3.7 Hz, 34H), 1.07-0.68 (m, 14H), 0.02 (s, 5H). $^{13}$C NMR (101 MHz, CDCl$_3$) δ 178.18, 139.81, 127.78, 81.73, 81.42, 81.10, 76.72, 64.59, 41.52, 41.32, 38.76, 36.09, 34.10, 33.93, 33.80, 33.70, 33.59, 33.55, 33.26, 31.95, 30.34, 29.69, 29.58, 29.39, 27.01, 22.56, 18.48, 0.01.

Di((Z)-non-2-en-1-yl) 9-hydroxyheptadecanedioate (247): The silyl protected diester 246 (0.3 g, 0.44 mmol) was dissolved in 1 M solution of TBAF in THF (6 mL) and the solution was kept at 40° C. for two days. The reaction mixture was diluted with water (60 mL) and extracted with ether (2×50 mL). The combined organic layers were concentrated and the thus obtained crude product was purified by column to isolate the pure product (0.097 g, 39%). $^1$H NMR (400 MHz, CDCl$_3$) δ 5.64 (dt, J=10.9, 7.4 Hz, 2H), 5.52 (dt, J=11.0, 6.8 Hz, 2H), 4.61 (d, J=6.8 Hz, 4H), 3.57 (s, 1H), 2.30 (t, J=7.5 Hz, 4H), 2.09 (q, J=7.1 Hz, 4H), 1.75-1.53 (m, 4H), 1.53-1.06 (m, 36H), 0.88 (t, J=6.8 Hz, 6H). $^{13}$C NMR (101 MHz, CDCl$_3$) δ 173.98, 135.64, 123.57, 77.54, 77.22, 76.91, 72.14, 60.41, 37.69, 34.54, 31.89, 29.70, 29.60, 29.44, 29.29, 29.07, 27.76, 25.80, 25.15, 22.82, 14.29.

Di((Z)-non-2-en-1-yl) 9-((4-(dimethylamino)butanoyl) oxy)heptadecanedioate: The alcohol 247 (0.083 g, 0.147 mmol) was dissolved in 20 mL of dichloromethane and to it dimethylaminobutyric acid hydrochloride (0.030 g, 0.176

US 11,246,933 B1

**451**

mmol) was added followed by Hunig's base (0.045 g, 0.44 mmol) and DMAP (2 mg). To this mixture EDCI (0.034 g, 0.176 mmol) was added and the reaction mixture was stirred at room temperature overnight and the TLC (silica gel, 10% MeOH in $CH_2Cl_2$) showed complete disappearance of the starting alcohol. The reaction mixture was diluted with $CH_2Cl_2$ (40 mL) and washed with saturated $NaHCO_3$ (50 mL), water (60 mL) and brine (60 mL). The combined organic layers were dried over anhyd. $Na_2SO_4$ and solvents were removed in vacuo. The crude product thus obtained was purified by Combiflash Rf purification system (40 g silicagel, 0-10% MeOH in $CH_2Cl_2$) to isolate the pure product (0.062 g, 62%) as a colorless oil. $^1H$ NMR (400 MHz, $CDCl_3$) δ 5.74-5.58 (m, 2H), 5.51 (dtt, J=9.7, 6.8, 1.3 Hz, 2H), 4.95-4.75 (m, 1H), 4.61 (d, J=6.8 Hz, 4H), 2.35-2.24 (m, 8H), 2.22 (d, J=7.9 Hz, 6H), 2.09 (q, J=6.9 Hz, 4H), 1.83-1.72 (m, 2H), 1.60 (dd, J=14.4, 7.2 Hz, 4H), 1.49 (d, J=5.7 Hz, 4H), 1.41-1.13 (m, 30H), 0.88 (t, J=6.9 Hz, 6H). $^{13}C$ NMR (101 MHz, $CDCl_3$) δ 173.72, 173.36, 135.40,

**452**

123.35, 74.12, 60.18, 58.95, 45.46, 34.30, 34.11, 32.45, 31.67, 29.38, 29.35, 29.17, 29.07, 28.84, 27.53, 25.28, 24.93, 23.16, 22.59, 14.06. MW calc. for $C_{41}H_{75}NO_6$ (MH+): 678.04, found: 678.5.

Example 18

The following shorter route was used for the synthesis of analogs of Compound 1 of the present invention The commercial 9-bromonon-1-ene 248 was treated with magnesium to form the corresponding Grignard reagent which was reacted with ethylformate to give the corresponding adduct 249 which on treatment with bromobutyryl chloride to provide the bromoester 250. The bromoester 250 on treatment with $RuO_4$ provided the diacid 251. The bromodiacid 251 on treatment with dimethylamine provided the amino diacid 252. The diacid 252 on treatment with oxalyl chloride in the presence of DMF provided the diacid chlorides 253. The lipids 254a-n were synthesized by treating the acid Chloride 253 with respective alcohols.

Scheme 18

US 11,246,933 B1

**453** **454**

| No | Starting Alcohol (ROH) | Product |
|---|---|---|
| 254a |  |  |
| 254aS |  |  |
| 254aF |  |  |
| 254b |  |  |

US 11,246,933 B1

455                                              456

-continued



| No | Starting Alcohol (ROH) | Product |
|---|---|---|

254bS

254bF

254bF2

254c

US 11,246,933 B1

-continued



| No | Starting Alcohol (ROH) | Product |
|---|---|---|
| 2544cS | | |
| 2544cF | | |
| 2544d | | |
| 2544dS | | |

US 11,246,933 B1

459                                                           460

-continued

| No | Starting Alcohol (ROH) | Product |
|----|------------------------|---------|
| 254e | | |
| 254es | | |
| 254dF | | |
| 254f | | |
| 254fs | | |

US 11,246,933 B1

461                                462

-continued



| No | Starting Alcohol (ROH) | Product |
|----|------------------------|---------|
| 254f | | |
| 254g | | |
| 254gs | | |
| 254h | | |
| 254hs | | |

US 11,246,933 B1

463                                                                                                    464

-continued



| No | Starting Alcohol (ROH) | Product |
|----|------------------------|---------|
| 254hF | | |
| 254i | | |
| 254is | | |
| 254hF | | |
| 254j | | |

US 11,246,933 B1

465                                                    466

-continued

| No | Starting Alcohol (ROH) | Product |
|----|------------------------|---------|
| 254js | | |
| 254jF | | |
| 254k | | |
| 254ks | | |
| 254kS | | |

US 11,246,933 B1

467                                                    468

-continued

| No | Starting Alcohol (ROH) | Product |
|----|------------------------|---------|
| 254l | | |
| 254lF | | |
| 254m | | |
| 254ns | | |

US 11,246,933 B1

469 470

-continued

| No | Starting Alcohol (ROH) | Product |
|----|------------------------|---------|
| 254ns | | |
| 254os | | |

**471**

### Synthesis of nonadeca-1,18-dien-10-ol (249)

To a flame dried 500 mL RB flask, freshly activated Mg turnings (9 g) were added and the flask was equipped with a magnetic stir bar, an addition funnel and a reflux condenser. This set-up was degassed and flushed with argon and 100 mL of anhydrous ether was added to the flask via syringe. The bromide 3 (51.3 g, 250 mmol) was dissolved in anhydrous ether (100 mL) and added to the addition funnel. About 5 mL of this ether solution was added to the Mg turnings while stirring vigorously. An exothermic reaction was noticed (to confirm/accelerate the Grignard reagent formation, 5 mg of iodine was added and immediate decolorization was observed confirming the formation of the Grignard reagent) and the ether started refluxing. The rest of the solution of the bromide was added dropwise while keeping the reaction under gentle reflux by cooling the flask in water. After the completion of the addition the reaction mixture was kept at 35° C. for 1 hour and then cooled in ice bath. Ethyl formate (9 g, 121 mmol) was dissolved in anhydrous ether (100 mL) and transferred to the addition funnel and added dropwise to the reaction mixture with stirring. An exothermic reaction was observed and the reaction mixture started refluxing. After the initiation of the reaction the rest of the ethereal solution of formate was quickly added as a stream and the reaction mixture was stirred for a further period of 1 h at ambient temperature. The reaction was quenched by adding 10 mL of acetone dropwise followed by ice cold water (60 mL). The reaction mixture was treated with aq. $H_2SO_4$ (10% by volume, 300 mL) until the solution became homogeneous and the layers were separated. The aq. phase was extracted with ether (2×200 mL). The combined ether layers were dried ($Na_2SO_4$) and concentrated to afford the crude product which was purified by column (silica gel, 0-10% ether in hexanes) chromatography. The product fractions were evaporated to provide the pure product 249 as a white solid (30.6 g, 90%). $^1H$ NMR (400 MHz, CDCl$_3$) δ 7.26 (s, 1H), 5.81 (ddt, J=16.9, 10.2, 6.7 Hz, 8H), 5.04-4.88 (m, 16H), 3.57 (dd, J=7.6, 3.3 Hz, 4H), 2.04 (q, J=6.9 Hz, 16H), 1.59 (s, 1H), 1.45 (d, J=7.5 Hz, 8H), 1.43-1.12 (m, 94H), 0.88 (t, J=6.8 Hz, 2H). $^{13}C$ NMR (101 MHz, cdcl$_3$) δ 139.40, 114.33, 77.54, 77.22, 76.90, 72.21, 37.70, 34.00, 29.86, 29.67, 29.29, 29.12, 25.85.

### Synthesis of nonadeca-1,18-dien-10-yl 4-bromobutanoate (250)

To a solution of the alcohol 249 (5.6 g, 20 mol) in anhydrous DCM (300 mL) was added slowly and carefully Bromobutryl chloride (20 mmol) at 0° C. under inert atmosphere. The reaction mixture was warmed to room temperature, stirred for 20 h and monitored by TLC (silica gel, 10% ethyl acetate in hexanes). Upon completion of the reaction, mixture was diluted with water (400 mL) and organic layer was separated out. Organic phase was then washed with sat. solution of NaHCO$_3$ (1×400 mL) followed by brine (1×100 mL) and concentrated under vacuum. Crude product was then purified by silica gel (100-200 mesh) column, eluted with 2-3% ethyl acetate in hexane solution to give 6 g (90%) of desired product 250 as colorless liquid. $^1H$ NMR (400 MHz, CDCl$_3$) δ 5.80 (ddt, J=16.9, 10.2, 6.7 Hz, 2H), 5.05-4.81 (m, 5H), 3.46 (t, J=6.5 Hz, 2H), 2.48 (t, J=7.2 Hz, 2H), 2.17 (p, J=6.8 Hz, 2H), 2.11-1.93 (m, 4H), 1.65-1.44 (m, 4H), 1.43-1.17 (m, 19H). $^{13}C$ NMR (101 MHz, cdcl$_3$) δ

**472**

172.51, 139.37, 114.35, 77.54, 77.23, 76.91, 74.86, 34.31, 33.99, 33.01, 32.96, 29.65, 29.56, 29.24, 29.09, 28.11, 25.52.

### Synthesis of 9-((4-bromobutanoyl)oxy)heptadecanedioic acid (251)

To a solution of the bromoester 250 (12.1 g, 28.2 mmol) in dichloromethane (300 mL) and acetonitrile (300 mL), RuCl$_3$ (1.16 g, 5 mol %) was added and the mixture was cooled to 10° C. and sodium metaperiodate (60 g) in water (400 mL) was added dropwise. It was stirred at 10° C. for 20 hr. The reaction mixture was diluted with water, The layers were separated and to the organic layer, was added saturated brine solution with stirring followed by 3% sodium sulfide solution drop wise for the decolourisation (dark green to pale yellow). The layers were separated, the organic layer was dried over sodium sulfate and evaporated at reduced pressure to afford pure product. MW calcd for $C_{20}H_{35}BrO_7$ 467.39; Found 465.4 (M−2H). $^1H$ NMR (400 MHz, DMSO) δ 11.94 (s, 2H), 4.88-4.69 (m, 1H), 3.53 (t, J=6.6 Hz, 2H), 2.43 (t, J=7.2 Hz, 2H), 2.17 (t, J=7.4 Hz, 4H), 2.09-1.95 (m, 2H), 1.90 (s, 3H), 1.46 (s, 7H), 1.23 (s, 15H).

### Synthesis of 9-((4-(dimethylamino)butanoyl)oxy)heptadecanedioic acid (252)

The Bromoacid 251 (2 mmol) is dissolved in 2M solution of dimethylamine in THF (20 mL) and to it 1 g of anhudrous K$_2$CO$_3$ was added and the mixture was heated in a pressure bottle at 50° C. overnight. The TLC showed the completion of the reaction. The reaction mixture was acidified with acetic acid and diluted with water (100 mL) and extracted with dichloromethane (2×60 mL). The combined organic layers were concentrated dried and used as such in the next reaction. MW calcd for $C_{23}H_{43}NO_6$ 429.59; Found 430.6 (MH)$^+$. 1H NMR (400 MHz, DMSO) δ 11.87-11.82 (m, 7H), 5.75 (d, J=0.7 Hz, 15H), 4.85-4.69 (m, 38H), 3.64-3.55 (m, 12H), 3.35-2.83 (m, 106H), 3.01-2.90 (m, 59H), 2.94 (ddd, J=30.6, 7.7, 4.0 Hz, 63H), 2.90-2.73 (m, 9H), 2.70 (s, 221H), 2.57-2.46 (m, 91H), 2.44-2.30 (m, 76H), 2.17 (t, J=7.3 Hz, 147H), 1.89 (tq, J=15.5, 7.6 Hz, 88H), 1.79-1.69 (m, 13H), 1.65-1.32 (m, 311H), 1.28 (d, J=46.0 Hz, 598H).

### Synthesis of 9-((4-(dimethylamino)butanoyl)oxy)heptadecanedioyl chloride (253)

The diacid 252 is converted to the corresponding diacid chloride 253 by treating it with oxalyl chloride in dichloromethane in the presence of catalytic DMF and the crude acid chloride obtained after the concentration of the reaction mixture was used as such for the coupling with different alcohols.

### General Procedure for the Synthesis of Cationic Lipids 254a-n

To a solution of the acid chloride 253 (500 mg, 1 mmol) in dichloromethane (30 mL) the corresponding alcohol (5 equivalent) was added at room temperature followed by solid K$_2$CO$_3$ (1 g) and the solution was stirred for 16 h at room temperature. The reaction mixture was diluted with dichloromethane (100 mL) and washed with satd. NaHCO$_3$ (100 mL) and the organic layer was dried (Anhyd. Na$_2$SO$_4$)

US 11,246,933 B1

**473**

and concentrated to obtain the crude product which was purified by Combiflash Rf purification system.

Compound 254b: By using the above procedure the lipid 254b was isolated in 72% yield (554 mg). 1H NMR (400 MHz, CDCl3) δ 4.91-4.78 (m, 1H), 4.05 (t, J=6.7 Hz, 4H), 3.81 (s, 6H), 3.63 (t, J=6.4 Hz, 1H), 2.29 (dt, J=15.2, 7.5 Hz, 8H), 2.21 (s, 6H), 1.84-1.69 (m, 2H), 1.57 (dt, J=13.4, 5.2 Hz, 9H), 1.53-1.40 (m, 4H), 1.27 (s, 43H). 13C NMR (101 MHz, cdcl3) δ 174.45, 174.13, 173.59, 77.54, 77.22, 76.91, 74.34, 64.54, 59.17, 51.65, 45.67, 34.56, 34.35, 34.27, 32.67, 29.59, 29.40, 29.33, 29.31, 29.25, 28.83, 26.06, 25.51, 25.18, 25.11, 23.38. MW calcd for $C_{43}H_{79}NO_{10}$ 770.09; Found 770.68.

Compound 254c: By using the above procedure the lipid 254c was isolated in 69% (490 mg). 1H NMR (400 MHz, CDCl3) δ 5.71-5.36 (m, 4H), 4.89-4.72 (m, 1H), 4.59 (d, J=6.8 Hz, 4H), 2.26 (ddd, J=22.3, 13.0, 8.6 Hz, 9H), 2.19 (s, 6H), 2.12-1.95 (m, 4H), 1.82-1.68 (m, 2H), 1.63-1.37 (m, 8H), 1.37-1.00 (m, 32H), 0.85 (t, J=6.8 Hz, 6H). 13C NMR (101 MHz, cdcl3) δ 173.94, 173.57, 135.61, 123.57, 77.54, 77.22, 76.91, 74.34, 60.40, 59.16, 45.65, 34.52, 34.33, 32.66, 31.88, 29.59, 29.57, 29.38, 29.28, 29.06, 27.75, 25.49, 25.14, 23.35, 22.81, 14.28. MW calcd for $C_{43}H_{83}NO_6$: 710.12; Found 710.81.

Compound 254d: By using the above procedure the lipid 254d was isolated in 67% yield (456 mg). 1H NMR (400 MHz, CDCl3) δ 4.92-4.78 (m, 1H), 4.05 (t, J=6.7 Hz, 4H), 3.63 (t, J=6.4 Hz, 1H), 2.39-2.24 (m, 8H), 2.21 (s, 6H), 1.89-1.70 (m, 2H), 1.69-1.54 (m, 8H), 1.51 (dd, J=17.2, 6.3 Hz, 4H), 1.27 (s, 42H), 0.88 (t, J=6.8 Hz, 6H). MW calcd for: $C_{41}H_{79}NO_6$: 682.07; Found 682.96.

Compound 254e: By using the above procedure the lipid 254e was isolated in 70% (474 mg). 1H NMR (400 MHz,

**474**

CDCl3) δ 5.49 (ddd, J=12.9, 9.8, 7.3 Hz, 2H), 5.40-5.23 (m, 2H), 4.92-4.77 (m, 1H), 4.05 (t, J=6.9 Hz, 4H), 2.32 (ddd, J=23.4, 14.5, 7.1 Hz, 12H), 2.21 (s, 6H), 2.07-1.91 (m, 4H), 1.84-1.70 (m, 2H), 1.66-1.39 (m, 8H), 1.40-1.15 (m, 26H), 0.88 (t, J=6.8 Hz, 5H). MW calc. for $C_{41}H_{75}NO_6$ (MH+): 678.04, found: 678.5.

Compound 254f: By using the above procedure the lipid 254f was isolated in 73% (559 mg). 1H NMR (400 MHz, CDCl3) δ 5.87-5.62 (m, 2H), 5.55 (dtt, J=9.1, 6.4, 1.3 Hz, 2H), 4.93-4.75 (m, 1H), 4.50 (dd, J=6.5, 0.6 Hz, 4H), 2.40-2.17 (m, 13H), 2.12-1.95 (m, 4H), 1.89-1.67 (m, 2H), 1.69-1.44 (m, 7H), 1.41-1.12 (m, 25H), 0.88 (t, J=6.9 Hz, 5H). MW calc. for $C_{41}H_{75}NO_6$ (MH+): 678.04, found: 678.5.

Compound 254g: By using the above procedure the lipid 254g was isolated in 63% (432 mg). 1H NMR (400 MHz, CDCl3) δ 4.93-4.77 (m, 1H), 4.20-3.95 (m, 4H), 2.44-2.23 (m, 8H), 2.21 (s, 6H), 1.84-1.66 (m, 3H), 1.68-1.34 (m, 15H), 1.35-1.17 (m, 20H), 1.17-1.04 (m, 5H), 0.88 (dd, J=12.4, 6.6 Hz, 16H). MW calcd for $C_{43}H_{83}NO_6$: 710.12; Found 710.81.

Compound 254h: By using the above procedure the lipid 254h was isolated in 66% (466 mg). 1H NMR (400 MHz, CDCl3) δ 5.08 (ddd, J=7.1, 5.9, 1.3 Hz, 2H), 4.91-4.75 (m, 1H), 4.22-3.97 (m, 4H), 2.39-2.22 (m, 8H), 2.23 (d, J=16.7 Hz, 7H), 2.09-1.84 (m, 4H), 1.86-1.71 (m, 3H), 1.71-1.02 (m, 44H), 0.91 (t, J=4.9 Hz, 6H). MW calcd for $C_{43}H_{79}NO_6$: 706.12; Found 706.81.

Example 19

In another approach the following synthetic approach is used for the synthesis of Compound 1 of the present invention.

Scheme 19

US 11,246,933 B1

**475**　　　　　　　　　　　　　　**476**

-continued



20

Example 20

Scheme 20

477 478

-continued



9



ALNY-319

8-benzyloxy-octan-1-ol (2): To a stirred suspension of NaH (60% in oil, 82 g, 1.7096 mol) in 500 mL anhydrous DMF, a solution of compound 1 (250 g, 1.7096 mol) in 1.5 L DMF was added slowly with dropping funnel at 0° C. Reaction mixture was stirred for 30 min and to it Benzyl bromide (208.86 mL, 1.7096 mol) was added slowly under nitrogen atmosphere. Reaction was then warmed to ambient temperature and stirred for 10 h. After completion of reaction, mixture was quenched with crushed ice (~2 kg) and extracted with Ethyl acetate (2×1 L). Organic layer washed with water (1 L) to remove unwanted DMF, dried over Na$_2$SO$_4$ and evaporated to dryness under vacuum. The crude compound was purified on 60-120 silica gel, eluted with 0-5% MeOH in DCM to afford compound 2 (220 g, 54%) as pale yellow liquid. H$^1$ NMR (400 MHz, CDCl$_3$): δ=7.33-7.24 (m, 5H), 4.49 (s, 2H), 3.63-3.60 (m, 2H), 3.47-3.43 (m, 2H), 1.63-1.51 (m, 4H), 1.39-1.23 (m, 8H).

(8-bromo-octyloxymethyl)-benzene (3): Compound 2 (133 g, 0.5635 mol) was dissolved in 1.5 L of DCM, CBr$_4$ (280.35 g, 0.8456 mol) was added into this stirring solution and reaction mixture was cooled to 0° C. under inert atmosphere. PPh$_3$ (251.03 g, 0.9571 mol) was then added in portions keeping the temperature below 0° C. and after complete addition reaction was stirred for 3 h at room temperature and monitored by TLC. After completion of reaction, solid (PPh$_3$O) precipitated out from the reaction mixture was filtered off and filtrate was diluted with crushed ice (~1.5 kg) and extracted with DCM (3×750 mL). Organic layer was separated, dried over an Na$_2$SO$_4$ and distilled under vacuum. Resulting crude compound was chromatographed on 60-120 mesh silica gel column using 0-5% ethyl acetate in hexanes as eluting system to give compound (150 g, 89%) as pale yellow liquid. H$^1$ NMR (400 MHz, CDCl$_3$): δ=7.33-7.25 (m, 5H), 4.49 (s, 2H), 3.47-3.41 (m, 2H), 3.41-3.37 (m, 2H), 1.86-1.80 (m, 4H), 1.62-1.56 (m, 2H), 1.42-1.29 (m, 8H).

1, 17-bis-benzyloxy-heptadecan-9-ol (4): To freshly activated Mg turnings (24.08 g, 1.003 mol) was added 200 mL anhydrous THF was added followed by the addition of pinch of iodine into the mixture under inert atmosphere. After initiation of the Grignard formation a solution of Compound 3 (150 g, 0.5016 mol) in 1 L of dry THF was added slowly controlling the exothermic reaction. After complete addition reaction was refluxed for 1 h and then cooled to room temperature. (60.24 g, 1.0033 mol) methyl formate was then added slowly and reaction was continued for 2 h. After completion, the reaction was quenched by slow addition of 10% HCl followed by water (1 L) and extracted with Ethyl Acetate (3×1 L). Organic layer was taken in 5 lit beaker, diluted with 500 mL of methanol and cooled to 0° C. To this solution excess of NaBH$_4$ (~5 eq) was added in portions to ensure the hydrolysis of formate ester which was not cleaved by addition of HCl. Resulting solution was stirred for an hour and then volatiles were stripped off under vacuum. Residue was taken in water (1 L) and acidified by 10% HCl solution (P$^H$ 4).

Product was then extracted out with ethyl acetate (3×1 L). Organic phase was then dried and concentrated on rotary evaporator to get the desired compound 4 (57 g, 24%) as solid. H$^1$ NMR (400 MHz, CDCl$_3$): δ=7.35-7.32 (m, 8H), 7.29-7.24 (m, 2H), 4.49 (s, 4H), 3.56 (m, 1H), 3.46-3.43 (m, 4H), 1.63-1.56 (m, 4H), 1.44-1.34 (m, 28H). C$^{13}$ NMR (100 MHz, CDCl$_3$): δ=138.56, 128.21, 127.49, 127.34, 72.72, 71.76, 70.37, 37.37, 29.64, 29.56, 29.47, 29.33, 26.07, 25.54.

[9-benzyloxy-1-(8-benzylozy-octyl)-nonyloxy]-tert-butyl-dimethyl-silane (5): Compound 4 (56 g, 0.1196 mol) was dissolved in 700 mL of anhydrous THF and cooled to 0° C. TBMS-Cl (36.06 g, 0.2396 mol) was added slowly followed by addition of Imidazole (32.55 g, 0.4786 mol) under inert atmosphere. Reaction was then stirred at room temperature for 18 h. Reaction was judged complete by TLC and then quenched with ice (~1 kg) and extracted with Ethyl acetate (3×500 mL). Organic layer was separated, washed with Sat NaHCO$_3$ solution to remove the acidic impurity, dried over Na$_2$SO$_4$ and evaporated under reduce pressure to obtain crude compound which was purified by silica gel (60-120 mesh) and eluted with 0-10% ethyl acetate hexane to yield (60 g, 82%) of compound 5 as yellowish oil. H$^1$ NMR (400 MHz, CDCl$_3$): δ=7.33-7.24 (m, 10H), 4.49 (s,

4H), 3.60-3.57 (m, 1H), 3.46-3.43 (m, 4H), 1.61-1.54 (m, 4H), 1.41-1.26 (m, 28H), 0.87 (s, 9H), 0.02 (s, 6H)

9-(tert-butyl-dimethyl-silanyloxy)-heptadecane-1, 17-diol (6): Compound 5 (60 g, 0.1030 mol) was dissolved in 500 mL ethyl acetate and degassed with N₂ for 20 min. (10 wt %) Pd on carbon (12 g) was added and reaction was stirred under H₂ atmosphere for 18 h. After completion of reaction (by TLC) mixture was filtered through celite bed and washed with ethyl acetate. Filtrate was evaporated under vacuum. The compound 6 (19 g, 46%) thus obtained was pure enough to carry out the next reaction. H¹ NMR (400 MHz, CDCl₃): δ=3.64-3.58 (m, 5H), 1.59 (br, 2H), 1.57-1.51 (m, 4H), 1.38-1.22 (m, 28H), 0.87 (s, 9H), 0.02 (s, 6H).

9-(tert-butyl-dimethyl-silanyloxy)-heptadecanedioic acid (7): To a stirred solution of 6 (2 g, 0.0049 mol) in anhydrous DMF (40 mL) was added pyridinium dichromate (2.7 g, 0.0074 mol) at 0° C. under inert atmosphere. Reaction mixture was then allowed to warm to room temperature over a period of 10-15 minutes and continued for 24 h. Progress of the reaction was monitored by TLC. After complete oxidation reaction was diluted with water (100 mL). Aqueous phase was extracted with DCM (3×40 mL). Organic phase was washed with brine (lx 25 mL) and concentrated under vacuum to afford crude acid which was then purified by (100-200 mesh) silica gel column using 0-30% ethyl acetate in hexanes system. Pure product 26-003 was obtained (0.7 g, 33%) as pale yellow oil. H¹ NMR (400 MHz, CDCl₃): δ=3.61-3.56 (m, 1H), 2.35-2.32 (m, 4H), 1.64-1.59 (m, 4H), 1.40-1.19 (m, 24H), 0.86 (s, 9H), 0.017 (s, 6H); LC-MS [M+H]=431.00; HPLC (ELSD) purity ~96.94%

Di((Z)-non-2-en-1-yl)   9-((tert-butyldimethylsilyl)oxy) heptadecanedioate (8): The diacid 7 (0.42 g, 0.97 mmol) was dissolved in 20 mL of dichloromethane and to it cis-2-nonen-1-ol (0.35 g, 2.44 mmol) was added followed by Hunig's base (0.68 g, 4.9 mmol) and DMAP (12 mg). To this mixture EDCI (0.47 g, 2.44 mmol) was added and the reaction mixture was stirred at room temperature overnight and the TLC (silica gel, 5% MeOH in CH₂Cl₂) showed complete disappearance of the starting acid. The reaction mixture was diluted with CH₂Cl₂ (40 mL) and washed with saturated NaHCO₃ (50 mL), water (60 mL) and brine (60 mL). The combined organic layers were dried over anhyd. Na₂SO₄ and solvents were removed in vacuo. The crude product thus obtained was purified by Combiflash Rf purification system (40 g silicagel, 0-10% MeOH in CH₂Cl₂) to isolate the pure product 8 (0.35 g, 53%) as a colorless oil. ¹H NMR (400 MHz, CDCl₃): δ ¹H NMR (400 MHz, CDCl₃) δ 5.64 (dt, J=10.9, 7.4 Hz, 2H), 5.58-5.43 (m, 2H), 4.61 (d, J=6.8 Hz, 4H), 3.71-3.48 (m, 1H), 2.30 (t, J=7.6 Hz, 4H), 2.20-1.98 (m, 4H), 1.71-1.53 (m, 4H), 1.31 (ddd, J=8.3, 7.0, 3.7 Hz, 34H), 1.07-0.68 (m, 14H), 0.02 (s, 5H). ¹³C NMR (101 MHz, CDCl₃) δ 178.18, 139.81, 127.78, 81.73, 81.42, 81.10, 76.72, 64.59, 41.52, 41.32, 38.76, 36.09, 34.10,

33.93, 33.80, 33.70, 33.59, 33.55, 33.26, 31.95, 30.34, 29.69, 29.58, 29.39, 27.01, 22.56, 18.48, 0.01.

Di((Z)-non-2-en-1-yl) 9-hydroxyheptadecanedioate (9): The silyl protected diester 8 (0.3 g, 0.44 mmol) was dissolved in 1 M solution of TBAF in THF (6 mL) and the solution was kept at 40° C. for two days after which the TLC showed the completion of the reaction. The reaction mixture was diluted with water (60 mL) and extracted with ether (2×50 mL). The combined organic layers were concentrated and the thus obtained crude product was purified by column to isolate the pure product (0.097 g, 39%). ¹H NMR (400 MHz, CDCl₃) δ 5.64 (dt, J=10.9, 7.4 Hz, 2H), 5.52 (dt, J=11.0, 6.8 Hz, 2H), 4.61 (d, J=6.8 Hz, 4H), 3.57 (s, 1H), 2.30 (t, J=7.5 Hz, 4H), 2.09 (q, J=7.1 Hz, 4H), 1.75-1.53 (m, 4H), 1.53-1.06 (m, 36H), 0.88 (t, J=6.8 Hz, 6H). ¹³C NMR (101 MHz, CDCl₃) δ 173.98, 135.64, 123.57, 77.54, 77.22, 76.91, 72.14, 60.41, 37.69, 34.54, 31.89, 29.70, 29.60, 29.44, 29.29, 29.07, 27.76, 25.80, 25.15, 22.82, 14.29.

Di((Z)-non-2-en-1-yl)   9-((4-(dimethylamino)butanoyl) oxy)heptadecanedioate: The alcohol 9 (0.083 g, 0.147 mmol) was dissolved in 20 mL of dichloromethane and to it dimethylaminobutyric acid hydrochloride (0.030 g, 0.176 mmol) was added followed by Hunig's base (0.045 g, 0.44 mmol) and DMAP (2 mg). To this mixture EDCI (0.034 g, 0.176 mmol) was added and the reaction mixture was stirred at room temperature overnight and the TLC (silica gel, 10% MeOH in CH₂Cl₂) showed complete disappearance of the starting alcohol. The reaction mixture was diluted with CH₂Cl₂ (40 mL) and washed with saturated NaHCO₃ (50 mL), water (60 mL) and brine (60 mL). The combined organic layers were dried over anhyd. Na₂SO₄ and solvents were removed in vacuo. The crude product thus obtained was purified by Combiflash Rf purification system (40 g silicagel, 0-10% MeOH in CH₂Cl₂) to isolate the pure product (0.062 g, 62%) as a colorless oil. ¹H NMR (400 MHz, CDCl₃) δ 5.74-5.58 (m, 2H), 5.51 (dtt, J=9.7, 6.8, 1.3 Hz, 2H), 4.95-4.75 (m, 1H), 4.61 (d, J=6.8 Hz, 4H), 2.35-2.24 (m, 8H), 2.22 (d, J=7.9 Hz, 6H), 2.09 (q, J=6.9 Hz, 4H), 1.83-1.72 (m, 2H), 1.60 (dd, J=14.4, 7.2 Hz, 4H), 1.49 (d, J=5.7 Hz, 4H), 1.41-1.13 (m, 30H), 0.88 (t, J=6.9 Hz, 6H). ¹³C NMR (101 MHz, CDCl₃) δ 173.72, 173.36, 135.40, 123.35, 74.12, 60.18, 58.95, 45.46, 34.30, 34.11, 32.45, 31.67, 29.38, 29.35, 29.17, 29.07, 28.84, 27.53, 25.28, 24.93, 23.16, 22.59, 14.06. MW calc. for C₄₁H₇₅NO₆ (MH⁺): 678.04, found: 678.5.

In another embodiment the following shorter route was used for the synthesis of the di((Z)-non-2-en-1-yl) 9-((4-(dimethylamino)butanoyl)oxy)heptadecanedioate. The commercial 9-bromon-1-ene 10 was treated with magnesium to form the corresponding Grignard reagent which was reacted with ethylformate to give the corresponding adduct 11 which on treatment with bromobutyryl chloride to provide the bromoester 12. The bromoester 12 on treatment with RuO₄ provided the diacid 13. The bromodiacid 13 on treatment with dimethylamine provided the amino diacid 14. The aminodiacid 14 on coupling with the alcohol 15 provided the product in good yields.

Example 21

Scheme 21



US 11,246,933 B1

**481**                                                                                                **482**

-continued



17

18

H₂/Pd-C / EtOAc

19

[O]

20

HO— / EDCl, DMAP, DIPEA

ALNY-319

Example 22

Scheme 22

17

PCC

[H]

[O]

US 11,246,933 B1

**483**                                                              **484**

-continued



Example 23

10

Scheme 23



Example 24

Scheme 24

US 11,246,933 B1

**485**　　　　　　　　　　　　　　　　　　**486**

-continued



211



502



503

Compound 501: To a stirred solution of 2-hydroxy 1-octanol 5 g (31.25 mmol), DMAP 0.38 g (3.1 mmol) in dry pyridine (100 mL) was added DMTr-Cl and stirred at room temperature for 14 h. 10 mL of water was added and extracted with ethyl acetate, washed with saturated NaHCO₃ and brine. The organic layer was dried over Na₂SO₄ and concentration of the solvent gave 20 g of crude product 500 which was co-evaporated with toluene twice and used for the next step without further purification. To the above crude DMTr ether in dry THF (250 mL) were added NaH and iodo methane at 0° C. and then brought to room temperature over 30 min. and then stirred for two days. 5 mL of water was added and concentrated followed by column chromatography (0-30% ethyl acetate in hexane) gave the corresponding product 501 (10.25 g, R$_f$ 0.45, 20% ethyl acetate in hexane) and 8.4 g of recovered starting material 500. ¹H NMR (400 MHz, CDCl₃) δ 7.47-6.8 (m, 13H), 3.79 (s, 6H), 3.42 (s, 3H), 3.29-3.26 (m, 1H), 3.13-3.04 (m, 2H), 1.55-1.47 (m, 2H), 1.3-1.2 (m, 10H), 0.89 (t, J=6.4 Hz, 3H).

Alcohol 502: The compound 501 (10.25 g, 21.5 mmol) was dissolved in 75 mL of 80% acetic acid and stirred at room temperature for 14 h. 10 mL of methanol was added and concentrated, followed by column chromatography (0-50% ethyl acetate in hexane) yielded the expected product 502 as colorless oil (1.8 g, 82%, R$_f$ 0.3, 30% ethyl acetate in hexane). ¹H NMR (400 MHz, CDCl₃) δ 3.71-3.65 (m, 1H), 3.5-3.45 (m, 1H), 3.41 (s, 3H), 3.28-3.25 (m, 1H), 1.93-1.9 (m, 1H), 1.45-1.41 (m, 2H), 1.39-1.27 (m, 10H), 0.88 (s, J=6.8 Hz, 3H).

Compound 503: Compound 503 was synthesized following general experimental procedure for compound 213. 0.3 g as pale yellow oil (52%, R$_f$=0.2, 5% methanol in dichloromethane). ¹H NMR (400 MHz, CDCl₃) δ 4.87-4.84 (m, 1H), 4.18-4.00 (m, 4H), 3.4 (s, 6H), 3.37-3.19 (m, 2H), 2.34-2.26 (m, 6H), 2.2 (s, 6H), 1.8-1.6 (m, 2H), 1.63-1.2 (m, 50H), 0.88 (s, J=6.8 Hz, 6H).

Example 25

Scheme 25



11



504

US 11,246,933 B1

**487**                                                           **488**

-continued



505

$\xrightarrow{\text{HBTU, MeOH}}$



506

$\xrightarrow[\text{MeI 20\%}]{\text{KHMDS}}$



507

$\xrightarrow[\text{MeOH}]{\text{LiOH}}$



508

$\xrightarrow[\text{55\% (2 steps)}]{\text{EDC, DIEA, DCM}}$



509

$\xrightarrow[\text{2 days}]{\text{HF .Pyr.}}$



510

$\xrightarrow[\text{EDC, DIEA}]{}$

US 11,246,933 B1

**489**        **490**

-continued



511

167 mg, 66% (2 steps)

Compound 504: To a stirred solution of alcohol 11 (4.01 g, 22.25 mmol), TBDPS-Cl (12.24 g, 44.5 mmol) and DMAP (0.54 g, 4.42 mmol) was added triethyl amine (8.99 g, 90 mmol) and stirred at room temper for 14 h. To the above solution was added imidazole (1.51 g, 22.25 mmol) and continued to stir for 14 h at room temperature. 20 mL of water was added and extracted with DCM followed by washing with 2N HCl, brine and dried over anhydrous $Na_2SO_4$. Concentration of the solvent gave the crude product which was purified by column chromatography (0-10% ethyl acetate in hexane) to yield compound 504 (7.38 g, 79%, $R_f$: 0.8, 5% ethyl acetate in hexane). $^1H$ NMR (400 MHz, $CDCl_3$) δ 7.68-7.66 (m, 4H), 7.43-7.33 (m, 6H), 5.86-5.76 (m, 2H), 5.02-4.91 (m, 4H), 3.73-3.67 (m, 1H), 2.04-1.99 (m, 4H), 1.42-1.08 (m, 24H), 1.05 (s, 9H).

Compound 505: To a stirred solution of diene 504 (7.38 g, 17.6 mmol) and $RuCl_3$ (0.18 g, 0.88 mmol) in 400 mL of DCM/$CH_3CN$(1:1) was added $NaIO_4$ (37.6 g, 176 mmol) dissolved in 400 mL of water drop wise around 5° C. over 30 min. and stirred at room temperature for 3 h. The organic layer was separated followed by washing with 3% $Na_2S$ solution (100 mL), water (250 mL) brine and dried over anhydrous $Na_2SO_4$. Concentration of the solvent gave the crude product 505 (4 g, 42%, $R_f$: 0.3, 40% ethyl acetate in hexane), which was used for the next step without further purification.

Compound 506: To a stirred solution of the acid 505 (4 g, 7.22 mmol), HBTU (6.02 g, 15.88 mmol), HOBt (2.14 g, 15.88 mmol) and DMAP (88 mg, 0.72 mmol) in 75 mL of dry DCM was added 5 mL of methanol and stirred at room temperature for 14 h. 10 mL of water was added followed by extraction with DCM (3×50 mL), washing with saturated $NaHCO_3$, water, brine and dried over anhydrous $Na_2SO_4$. Concentration of the solvent gave the crude product which was purified by column chromatography (0-30% ethyl acetate in hexane) to yield compound 506 (2 g, 47.6%, $R_f$: 0.3, 10% ethyl acetate in hexane). $^1H$ NMR (400 MHz, $CDCl_3$) δ 7.67-7.65 (m, 4H), 7.41-7.33 (m, 6H), 3.66 (s, 6H), 2.28 (t, J=7.2 Hz, 4H), 1.63-1.07 (m, 24H), 1.04 (s, 9H).

Compound 507: To a stirred solution of dimethyl ester 506 (1.0 g, 1.79 mmol) in dry THF (20 mL) were added KHMDS (0.752 g, 3.76 mmol) and methyl iodide (0.762 g, 5.37 mmol) at 0° C. and then brought to room temperature over 30 min. and stirred for 24 h. 10 mL of sat. $NH_4Cl$ solution was added followed by extraction with ethyl acetate (3×50 mL), washing with water, brine and dried over anhydrous $Na_2SO_4$. Concentration of the solvent gave the crude product, which was purified by column chromatography (0-5% ethyl acetate in hexane) to obtain the product 507 (0.218 g, 20%, $R_f$: 0.8, 5% ethyl acetate in hexane). $^1H$ NMR (400 MHz, $CDCl_3$) δ 7.68-7.65 (m, 4H), 7.41-7.33 (m, 6H),

3.70-3.67 (m, 1H), 3.67 (s, 6H), 2.43-2.38 (m, 2H), 1.59-1.07 (m, 24H), 1.13 (d, J=7.2 Hz, 6H), 1.04 (s, 9H).

Compound 509: To a stirred solution of methyl ester 507 (0.4 g, 0.66 mmol) in 10 mL of MeOH/THF (1:1) was added LiOH (0.079 g, 3.27 mmol) in 1 mL of water and stirred at room temperature for 24 h. To the above solution was added KOH (0.183 g, 3.27 mmol) in 1 mL of water and stirred for another 2 days. 2 mL of sat. $NH_4Cl$ solution was added followed by extraction with ethyl acetate (3×25 mL), washing with water, brine and dried over anhydrous $Na_2SO_4$. Concentration of the solvent gave the crude product 508 (0.45 g, $R_f$: 0.2, 10% ethyl acetate in hexane), which was used for the next step without further purification. To a stirred solution of the above di-acid 508 (0.45 g), cis-2-Nonen-1-ol (0.66 g, 4.6 mmol) and EDC.HCl (0.82 g, 4.6 mmol) in dry DCM (15 mL) was added DIEA (1.2 g, 9.24 mmol) and stirred at room temperature for 3 days. 10 mL of water was added followed by extraction with DCM followed by washing with 2N HCl, brine and dried over anhydrous $Na_2SO_4$. Concentration of the solvent gave the crude product which was purified by column chromatography (0-10% ethyl acetate in hexane) to yield compound 509 (0.3 g, 55%, $R_f$: 0.5, 3% ethyl acetate in hexane). $^1H$ NMR (400 MHz, $CDCl_3$) δ 7.67-7.65 (m, 4H), 7.42-7.33 (m, 6H), 5.67-5.6 (m, 2H), 5.55-5.49 (m, 2H), 4.615 (d, J=4 Hz, 4H), 3.71-3.65 (m, 1H), 2.44-2.35 (m, 2H), 2.10 (q, J=8.0 Hz, 4H), 1.64-1.07 (m, 40H), 1.13 (d, J=8.0 Hz, 6H), 1.04 (s, 9H), 0.86 (t, J=10 Hz, 6H).

Compound 511: To a stirred solution of silyl ether 509 (0.3 g, 0.36 mmol) in dry THF were added pyridine (1 mL) and HF.Pyr., (1 mL) drop wise and stirred at 45° C. for 48 h. The solvent was evaporated and used for the next step without purification.

To a stirred solution of the above crude alcohol 510, N,N-Dimethyl amino butyric acid (0.34 g, 2.04 mmol), EDC.HCl (0.39 g, 2.04 mmol) and DMAP (0.06 g, 0.51 mmol) in dry DCM (10 mL) was added DIEA (0.5 g, 3.88 mmol) and stirred at room temperature for 2 days. 10 mL of water was added followed by extraction with DCM (3×25 mL), washing with saturated $NaHCO_3$, water, brine and dried over anhydrous $Na_2SO_4$. Concentration of the solvent gave the crude product which was purified by column chromatography (0-30% ethyl acetate in 1% TEA containing hexane) to yield compound 511 (0.167 g, 66%, $R_f$: 0.4, 10% MeOH in DCM). Molecular weight for $C_{43}H_{79}NO_6$ (M+H)$^+$ Calc. 706.59, Found 706.5.

US 11,246,933 B1

491 492

Example 26

Scheme 26



Compound 512: To a stirred solution of 4-Pentynoic acid in 100 mL of THF/HMPA (4:1) at −78° C. was added nBuLi (3.1 g, 49 mmol) drop wise and stirred for 30 min. Then the reaction mixture was brought to 0° C. and stirred for 2 h. Again, the reaction mixture was cooled to −78° C. and n-butyl bromide (3.07 g, 22.44 mmol) was added drop wise and stirred at room temperature for 14 h. 10 mL of sat. NH₄Cl solution was added followed by extraction with ethyl acetate (3×25 mL), washing with water, brine and dried over anhydrous Na₂SO₄. Concentration of the solvent gave the crude product, which was purified by column chromatography (0-30% ethyl acetate in hexane) to yield compound 512 (0.4 g, R$_f$ 0.8, 30% ethyl acetate in hexane). $^1$H NMR (400 MHz, CDCl₃) δ 2.59-2.55 (m, 2H), 2.49-2.44 (m, 2H), 2.16-2.11 (m, 2H), 1.49-1.34 (m, 4H), 0.9 (t, J=6.0 Hz, 3H).

Compound 513: To a suspension of Ni(OAc)₂ (0.45 g, 2.53 mmol) in EtOH (20 mL) was added NaBH₄ (0.096 g, 12.65 mmol) portion wise at room temperature and stirred for 15 min. under H₂ atm. Filtered off the solid followed by concentration of the solvent gave compound 513 (0.35 g, 88.6%, R$_f$: 0.6, 20% ethyl acetate in hexane). $^1$H NMR (400 MHz, CDCl₃) δ 10.88 (br s, 1H), 5.47-5.41 (m, 1H), 5.35-5.31 (m, 1H), 2.43-2.33 (m, 4H), 2.07-2.03 (m, 2H), 1.36-2.27 (m, 4H), 0.9 (t, J=8.0 Hz, 3H).

Compound 515: To a stirred solution of di-acetate 514 (1.5 g, 3.09 mmol) in MeOH (100 mL) was added a piece of sodium metal (0.05 g, 2.17 mmol) and stirred at room temperature for 14 h. Neutralized with dry ice and concentrated followed by extraction with ethyl acetate (3×50 mL), washing with water, dried over anhydrous Na₂SO₄. Con-

US 11,246,933 B1

**493**

centration of the solvent gave the crude product 515 (1.1 g, 88.7%), which was used for the next step without purification.

Compound 516: To a stirred solution of the above diol 515 (0.4 g, 1 mmol), 513 (0.341 g, 2.19 mmol), DMAP (0.1 g, 0.82 mmol) and EDC.HCl (0.57 g, 2.98 mmol) in dry DCM (15 mL) was added DIEA (5.97 g, 6 mmol) and stirred at room temperature for 2 days. 10 mL of water was added followed by extraction with ethyl acetate followed by washing with 1N HCl, brine and dried over anhydrous Na$_2$SO$_4$. Concentration of the solvent gave the crude product which was purified by column chromatography (0-10% ethyl acetate in hexane) to yield compound 516 (0.335 g, 50%, R$_f$: 0.6, 5% ethyl acetate in hexane). $^1$H NMR (400 MHz, CDCl$_3$) δ 5.45-5.38 (m, 2H), 5.36-5.29 (m, 2H), 4.06 (t, J=8 Hz, 4H), 3.63-3.58 9 m, 1H), 2.39-2.31 (m, 8H), 2.07-2.02 (m, 4H), 1.65-1.57 (m, 4H), 1.4-1.28 (m, 32H), 0.9 (t, J=6.0 Hz, 6H), 0.88 (s, 9H), 0.03 (s, 6H).

Compound 517: To a stirred solution of silyl ether 516 (0.3 g, 0.36 mmol) in dry THF (5 mL) were added pyridine (1 mL) and HF.Pyr. (1 mL) drop wise and stirred at 45° C. for 24 h. The solvent was evaporated followed by purifica-

**494**

tion by column chromatography gave product 517 (0.2 g, 72%, R$_f$: 0.4, 10% ethyl acetate in hexane). $^1$H NMR (400 MHz, CDCl$_3$) δ 5.43-5.36 (m, 2H), 5.34-5.27 (m, 2H), 4.04 (t, J=8 Hz, 4H), 3.59-3.53 (m, 1H), 2.37-2.3 (m, 8H), 2.05-2.0 (m, 4H), 1.61-1.29 (m, 37H), 0.88 (t, J=8.0 Hz, 6H).

Compound 518: To a stirred solution of the alcohol 517 (0.2 g, 0.355 mmol), N,N-Dimethyl amino butyric acid (0.36 g, 2.14 mmol), EDC.HCl (0.406 g, 2.14 mmol) and DMAP (0.043 g, 0.36 mmol) in dry DCM (10 mL) was added DIEA (0.55 g, 4.26 mmol) and stirred at room temperature for 2 days. 10 mL of water was added followed by extraction with DCM (3×25 mL), washing with saturated NaHCO$_3$, water, brine and dried over anhydrous Na$_2$SO$_4$. Concentration of the solvent gave the crude product which was purified by column chromatography (0-30% ethyl acetate in 1% TEA containing hexane) to yield compound 518 (0.172 g, 72%, R$_f$: 0.2, 5% MeOH in DCM). $^1$H NMR (400 MHz, CDCl$_3$) δ 5.43-5.36 (m, 2H), 5.32-5.27 (m, 2H), 4.87-4.83 (m, 1H), 4.03 (t, J=6 Hz, 4H), 2.36-2.2 (m, 6H), 2.32 (s, 6H), 2.03-1.25 (m, 40H), 0.88 (t, J=6.0 Hz, 6H).

Example 27



519

520

NaOMe
MeOH



94%
521



cat. DMAP
67%

522

RuCl$_3$
NaIO$_4$

US 11,246,933 B1



**495**

**496**

82%
524

83%
523

60%
525

25

Compound 521: To a suspension of Mg in Et$_2$O was added alkyl bromide (25 g, 107.7 mmol) drop wise at 40° C. over one hour. Ethyl formate was added to the above reaction mixture at 0-5° C. and then the reaction mixture was stirred at room temperature for 14 h. The reaction mixture was poured onto the ice cold sat. NH$_4$Cl solution followed by extraction with Et$_2$O (3×250 mL), washing with water, brine and dried over anhydrous Na$_2$SO$_4$. Concentration of the solvent gave the crude product, which was re-dissolved in MeOH (250 mL) and a small piece of sodium (0.1 g) was added and stirred at room temperature for 14 h. The solvent was evaporated and 100 mL of water was added followed by filtration of the solid, washing with water (2×100 mL) gave pale yellow powder 521 (17 g, 94%, %, R$_f$: 0.8, 10% ethyl acetate in hexane). $^1$H NMR (400 MHz, CDCl$_3$) δ 5.84-5.74 (m, 2H), 5.0-4.89 (m, 4H), 3.64-3.49 (m, 1H), 2.04-1.99 (m, 4H), 1.79 (br s, 1H), 1.44-1.23 (m, 32H).

Compound 522: To a stirred solution of 521 (10 g, 29.73 mmol) and DMAP (0.1 g, 0.82 mmol) in dry DCM (50 mL) was added 4-bromo butyryl chloride (6.56 g, 35.68 mmol)

and stirred at room temperature for 14 h. 5 mL of saturated NaHCO$_3$ was added and the organic layer was separated and dried over anhydrous Na$_2$SO$_4$. Concentration of the solvent gave the crude product which was purified by column chromatography (0-10% ethyl acetate in hexane) to yield compound 522 (9.6 g, 66.7%, R$_f$: 0.9, 5% ethyl acetate in hexane).

Compound 524: Oxidation was carried out to get compound 523 (8.6 g, 83.5%, R$_f$: 0.1, 5% MeOH in DCM) following same experimental procedure as for compound 505. This crude material was dissolved in 2N N,N-dimethyl amine in THF (20 mL) and heated to 60° C. in a sealed tube for 14 h. Concentrated the reaction mixture and then pH of the reaction mixture was brought to 3. This mixture was freeze-dried to obtain compound 524 as HCl salt (4 g, 82%). Molecular weight for C27H51NO6 (M+H)$^+$ Calc. 486.37, Found 486.2. $^1$H NMR (400 MHz, CDCl$_3$) δ 4.94-4.89 (m, 1H), 3.32-3.3 (m, 2H), 3.2-3.16 (m, 2H), 2.91 (s, 6H), 2.47 (t, J=8 Hz, 2H), 2.28 (t, J=8 Hz, 4H), 2.05-1.97 (m, 2H), 1.61-1.56 (8H), 1.4-1.25 (m, 22H).

526

526s



US 11,246,933 B1

**497**                                                                                                **498**

-continued

527

527s

528

528s

Synthesis of Ester 525, 526, 527 and 528

The title compounds were synthesized following the experimental procedure as for compound 516.

Compound 525: (0.75 g, 60%, $R_f$: 0.3, 5% MeOH in DCM). $^1$H NMR (400 MHz, CDCl$_3$) δ 5.65-5.59 (m, 2H), 5.53-5.47 (m, 2H), 4.87-4.81 (m, 1H), 4.595 (d, J=4.0 Hz, 4H), 2.43-2.25 (m, 8H), 2.2 (s, 6H), 2.1-2.03 (m, 4H), 1.81-1.73 (m, 2H), 1.61-1.56 (m, 4H), 1.48-1.47 (m, 4H), 1.36-1.23 (m, 32H), 0.86 (t, J=8.0 Hz, 6H).

Compound 526: (0.358 g, 60.9%, $R_f$: 0.5, 5% MeOH in DCM). $^1$H NMR (400 MHz, CDCl$_3$) δ 4.87-4.81 (m, 1H), 4.07-3.95 (m, 4H), 2.32-2.24 (m, 6H), 2.2 (s, 6H), 1.80-1.69 (m, 4H), 1.6-1.14 (m, 46H), 0.88-0.84 (m, 24H).

Compound 527: (0.258 g, 56.8%, $R_f$: 0.5, 5% MeOH in DCM). Molecular weight for C47H91NO6 (M+H)$^+$ Calc. 766.23; Found: 766.7. $^1$H NMR (400 MHz, CDCl$_3$) δ 4.86-4.80 (m, 1H), 4.12-4.02 (m, 4H), 2.31-2.23 (m, 8H), 2.19 (s, 6H), 1.80-1.72 (m, 2H), 1.66-1.06 (m, 52H), 0.87 (d, J=8.0 Hz, 6H), 0.84 (d, J=8.0 Hz, 12H).

Compound 528: (0.3 g, 68.1%, $R_f$: 0.5, 5% MeOH in DCM). Molecular weight for C47H91NO6 (M+H)$^+$ Calc. 766.23; Found: 766.7. $^1$H NMR (400 MHz, CDCl$_3$) δ 4.86-4.80 (m, 1H), 4.12-4.02 (m, 4H), 2.31-2.21 (m, 8H), 2.19 (s, 6H), 1.79-1.72 (m, 2H), 1.66-0.98 (m, 52H), 0.87 (d, J=8.0 Hz, 6H), 0.835 (d, J=4.0 Hz, 12H).

Example 28

Scheme 28:

R = Me (531),
Propyl (532)

1. nBuLi
2. Ni cat.
3. TBAF

R' = H
(529),
Propyl
(530)

X = O or S

533: R = Me
R' = H
534: R = Me
R' = Propyl
535: R = Propyl
R' = H
536: R = Propyl
R' = Propyl

US 11,246,933 B1

**499**                                                                                           **500**

-continued



537: R = Me
      R' = H
538: R = Me
      R' = Propyl
539: R = Propyl
      R' = H
540: R = Propyl
      R' = Propyl

Synthesis of compounds 533, 534, 535 and 536: The title compounds (1 mmol) are synthesized following the experimental procedure of compound 513 except de-silylation step and it is done using TBAF in THF at room temperature.

Synthesis of compounds 537, 538, 539 and 540: The title compounds (1 mmol) are synthesized following the experimental procedure of compound 525.

Example 29

Scheme 29

US 11,246,933 B1

**501**                                                                                                **502**

-continued



X = O/NH
R = alkyl/aryl
n = 0-10
242



X = O/NH
R = alkyl/aryl
n = 0-10
243

Compound 243 (X═O/NH, R=alkyl/aryl) can be synthesized as shown in Scheme 16-2. Tosyl group of 239 can be replaced with phthalimide group by nucleophilic substitution. After deprotection followed by coupling with 111 under acidic conditions, 242 can be synthesized. Standard esterification gives cationic lipid 243 and its analogs.

Example 30: Synthesis of Ester-Containing Lipids



15: n = 3, 40%

14

16

17: n = 1
18: n = 3

3

12: n = 1
13: n = 3

11

6

US 11,246,933 B1

**503**  -continued  **504**



19: n = 1
20: n = 3

21: n = 1
22: n = 3

23

24: n = 3

Compound 15: Compound 13 (503 mg, 1.0 mmol) was treated with 14 (469 mg, 3.0 mmol) in the presence of EDCI (2.30 g, 12.0 mmol), DMAP (235 mg, 1.92 mmol) and DIEA (8.34 mL, 47.9 mmol) in $CH_2Cl_2$ (50 mL) for 14 h. Aqueous work-up then column chromatography gave compound 15 (1.22 g, 1.54 mmol, 40%).

Molecular weight for $C_{49}H_{92}NO_6$ $(M+H)^+$ Calc. 790.6925, Found 790.7.

Compound 16: This compound was synthesized from 13 and tetrahydrolavandulol using a procedure analogous to that described for compound 15. Yield: 0.358 g, 61%. [1]H NMR (400 MHz, $CDCl_3$) δ 4.87-4.81 (m, 1H), 4.07-3.95 (m, 4H), 2.32-2.24 (m, 6H), 2.2 (s, 6H), 1.80-1.69 (m, 4H), 1.6-1.14 (m, 46H), 0.88-0.84 (m, 24H).

Compound 17: This compound was synthesized from 12 (1.0 g, 2.15 mmol) and 3 (1.03 g, 5.16 mmol) using a procedure analogous to that described for compound 15.

Yield: 856 mg (50%). [1]H NMR (400 MHz, $CDCl_3$) δ 4.91-4.79 (m, 1H), 4.08 (t, J=7.1 Hz, 4H), 2.35-2.25 (m, 14H), 1.89-1.76 (m, 2H), 1.67-1.13 (m, 62H), 0.88 (t, J=7.0 Hz, 12H). [13]C NMR (100 MHz, $CDCl_3$) δ 174.08, 74.45, 63.08, 45.27, 34.76, 34.56, 34.28, 33.70, 32.61, 32.39, 29.54, 29.36, 29.28, 26.36, 25.47, 25.13, 22.83, 14.26. Molecular weight for $C_{49}H_{56}NO_6$ $(M+H)^+$ Calc. 794.7238, Found 794.6.

Compound 18: This compound was synthesized from 13 (1.0 g, 2.15 mmol) and 3 (1 g) using a procedure analogous to that described for compound 15.

Yield: 1 g (59%). [1]H NMR (400 MHz, $CDCl_3$) δ 4.94-4.74 (m, 1H), 4.17-3.85 (m, 4H), 2.46-2.19 (m, 12H), 1.93-1.79 (m, 2H), 1.74-1.45 (m, 10H), 1.37 (d, J=20.2 Hz, 2H), 1.35-1.13 (m, 44H), 0.88 (t, J=6.9 Hz, 12H). [13]C NMR (101 MHz, $CDCl_3$) δ 174.19, 77.53, 77.21, 76.90, 63.12, 34.81, 34.66, 34.35, 33.76, 32.66, 32.45, 29.76, 29.73, 29.63, 29.48, 29.39, 26.42, 25.57, 25.23, 22.89, 14.32. Molecular weight for $C_{53}H_{103}NO_6$ $(M+H)^+$ Calc. 850.38, Found 850.7.

Compound 19: This compound was synthesized from 12 and 11 using a procedure analogous to that described for compound 15.

Yield: 860 mg (51%). [1]H NMR (400 MHz, $CDCl_3$) δ 4.90-4.81 (m, 1H), 4.04 (t, J=6.8 Hz, 4H), 2.37-2.17 (m, 14H), 1.84-1.06 (m, 48H), 0.93-0.78 (m, 24H). [13]C NMR (100 MHz, $CDCl_3$) δ 174.06, 74.35, 65.51, 64.91, 59.05, 45.51, 43.77, 37.10, 34.55, 34.29, 32.55, 29.54, 29.37, 29.34, 29.28, 28.58, 28.19, 26.99, 26.74, 25.47, 25.15, 22.90, 22.82, 19.60, 19.41, 19.28. Molecular weight for $C_{47}H_{92}NO_6$ $(M+H)^+$ Calc. 766.6925, Found 766.5.

Compound 20: This compound was synthesized from 13 and 11 using a procedure analogous to that described for compound 15.

[1]H NMR (400 MHz, $CDCl_3$) δ 4.86 (p, J=6.2 Hz, 1H), 4.04 (t, J=6.7 Hz, 4H), 2.38-2.17 (m, 14H), 1.84-1.07 (m, 56H), 0.93-0.76 (m, 24H). [13]C NMR (100 MHz, $CDCl_3$) δ 174.11, 173.46, 74.44, 64.90, 59.06, 45.51, 43.77, 37.11, 34.59, 34.32, 32.57, 29.71, 29.67, 29.57, 29.43, 29.34, 28.58, 28.20, 27.60, 26.75, 25.51, 25.20, 22.90, 22.82, 19.41, 19.28. Molecular weight for $C_{51}H_{100}NO_6$ $(M+H)^+$ Calc. 822.7551, Found 822.6.

Compound 21: This compound was synthesized from 12 and 6 using a procedure analogous to that described for compound 15.

[1]H NMR (400 MHz, $CDCl_3$) δ 4.91-4.78 (m, 1H), 4.15-3.98 (m, 4H), 2.39-2.18 (m, 14H), 1.84-1.11 (m, 44H), 0.92-0.77 (m, 24H). [13]C NMR (100 MHz, $CDCl_3$) δ 174.06, 173.44, 74.36, 63.73, 59.03, 45.48, 41.00, 36.98, 34.56, 34.29, 32.54, 29.60, 29.54, 29.49, 29.36, 29.28, 28.52, 25.47, 25.13, 23.15, 22.85, 22.81, 19.49, 18.89. Molecular weight for $C_{45}H_{88}NO_6$ $(M+H)^+$ Calc. 738.6612, Found 738.6.

Compound 22: This compound was synthesized from 13 and 6 using a procedure analogous to that described for compound 15.

Yield: 900 mg (57%). [1]H NMR (400 MHz, $CDCl_3$) δ 4.92-4.78 (m, 1H), 4.15-3.91 (m, 4H), 3.33-3.08 (m, 1H), 2.36-2.15 (m, 14H), 1.79 (dq, J=14.3, 7.2 Hz, 2H), 1.74-1.55 (m, 8H), 1.55-1.37 (m, 9H), 1.35-0.95 (m, 36H), 0.96-0.61

US 11,246,933 B1

**505**

(m, 27H). $^{13}$C NMR (101 MHzCDCl$_3$) δ 174.16, 173.52, 77.54, 77.22, 76.91, 74.48, 63.76, 59.10, 45.55, 42.02, 41.04, 38.75, 37.09, 37.02, 34.65, 34.36, 32.62, 30.71, 29.75, 29.72, 29.64, 29.62, 29.53, 29.48, 29.44, 29.38, 28.56, 28.45, 25.56, 25.23, 23.59, 23.23, 22.90, 22.86, 19.54, 19.03, 18.94. Molecular weight for C$_{49}$H$_{95}$NO$_6$ (M+H)$^+$ Calc. 794.2817, Found 794.7.

Compound 24: This compound was synthesized from 13 and 23 using a procedure analogous to that described for compound 15.

Yield: 0.567 g (30%). $^1$H NMR (400 MHz, CDCl$_3$) δ 4.85 (p, J=6.1 Hz, 1H), 4.20-3.93 (m, 4H), 2.41-2.18 (m, 13H), 1.92-1.72 (m, 2H), 1.56 (ddd, J=27.4, 16.4, 5.8 Hz, 12H), 1.39 (s, 2H), 1.25 (s, 54H). 0.91 (dt, J=13.7, 6.4 Hz, 11H). $^{13}$C NMR (101 MHz, CDCl$_3$) δ 174.18, 173.51, 77.54, 77.23, 76.91, 74.50, 63.12, 59.10, 45.55, 34.81, 34.66, 34.38, 33.76, 32.67, 32.62, 32.45, 29.77, 29.73, 29.64, 29.49, 29.39, 26.42, 25.57, 25.24, 23.23, 22.89, 14.32. Molecular weight for C$_{47}$H$_{88}$NO$_6$ (M+H)$^+$ Calc. 762.6612, Found 762.5.

Example 31: Synthesis of Alcohol Components



Compound 2: Compound 2 was synthesized from 1 using a procedure analogous to that described in *Journal of the Organic Chemistry,* 2009, 1473.

$^1$H NMR (400 MHz, CDCl$_3$) δ 3.66 (s, 3H), 2.23 (d, J=6.9 Hz, 2H), 1.84 (brs, 1H), 1.27 (d, J=11.5 Hz, 16H), 0.88 (t, J=6.8 Hz, 6H). $^{13}$C NMR (100 MHz, CDCl$_3$) δ 174.29, 51.49, 39.25, 35.22, 34.00, 32.24, 26.34, 22.77, 14.22.

**506**

Compound 3: To a suspension of LiAlH$_4$ (2.84 g, 74.9 mmol) in THF (85 mL) was added a solution of compound 2 (8.55 g, 37.4 mmol) in THF (25 mL). The reaction mixture was refluxed overnight. Aqueous workup then column chromatography gave pure compound 3 (7.35 g, 36.7 mmol, 98%) as a colorless oil.

$^1$H NMR (400 MHz, CDCl$_3$) δ 3.66 (t, J=7.0 Hz, 2H), 1.59-1.12 (m, 19H), 0.88 (t, J=6.9 Hz, 6H).

Compound 4: Tetrahydrolavandulol (10.1 g, 63.8 mmol) was treated with methansulfonyl chloride (6.38 mL) in CH$_2$Cl$_2$ (200 mL) and Et$_3$N (17.6 mL). Aqueous workup gave the crude mesylate, which was treated with KCN (4.98 g, 76.5 mmol) in EtOH (90 mL) and H$_2$O (10 mL). Aqueous workup then column chromatography gave pure compound 4 (8.36 g, 50.0 mmol, 72%) as a colorless oil.

$^1$H NMR (400 MHz, CDCl$_3$) δ 2.38-2.23 (m, 2H), 1.86-1.78 (m, 1H), 1.59-1.42 (m, 3H), 1.40-1.07 (m, 3H), 0.93-0.89 (m, 12H). $^{13}$C NMR (100 MHz, CDCl$_3$) δ 119.73, 41.69, 36.46, 30.10, 28.44, 28.33, 22.82, 22.59, 19.62, 19.11, 19.05.

Compound 6: The cyano derivative 4 was converted to the ethyl ester under acidic conditions to give compound 5 and the ester was reduced by LiAlH$_4$ in THF to give compound 6.

Compound 7: Tetrahydrolavandulol (98.1 g, 51.2 mmol) was oxidized with PCC (16.6 g, 76.8 mmol) in CH$_2$Cl$_2$ (200

US 11,246,933 B1

**507**

mL). Aqueous workup then column chromatography gave pure compound 7 (6.19 g, 39.6 mmol, 77%) as a colorless oil.

$^1$H NMR (400 MHz, CDCl$_3$) δ 9.60 (d, J=3.1 Hz, 1H), 2.05-1.79 (m, 1H), 1.71-1.36 (m, 4H), 1.23-1.04 (m, 2H), 1.02-0.82 (m, 12H).

Compound 9: To a solution of compound 7 (2.0 g, 12.8 mmol) in toluene (40 mL) and CH$_2$Cl$_2$ (18 mL) and was added 8 (3.96 g, 11.8 mmol). The mixture was heated at 70° C. overnight. Column chromatography gave pure compound 9 (1.40 g, 6.59 mmol, 51%) as a colorless oil.

$^1$H NMR (400 MHz, CDCl$_3$) δ 6.77 (dd, J=15.6, 9.9 Hz, 1H), 5.76 (d, J=15.6 Hz, 1H), 3.73 (s, 3H), 1.97-1.83 (m, 1H), 1.72-1.64 (m, 1H), 1.54-1.40 (m, 2H), 1.37-1.22 (m, 1H), 1.18-0.97 (m, 2H), 0.94-0.78 (m, 12H). $^{13}$C NMR (100 MHz, CDCl$_3$) δ 167.19, 152.54, 121.70, 51.53, 49.66, 36.95, 31.76, 29.49, 28.29, 22.92, 22.54, 20.84, 19.24.

Compound 10: To a solution of compound 9 (1.0 g, 4.71 mmol) in MeOH (15 mL) was added Pd—C (125 mg). The mixture was stirred under H$_2$ atmosphere overnight. The mixture was filtered over Celite then evaporated to give pure compound 10 (924 mg, 4.31 mmol, 92%) as a colorless oil.

$^1$H NMR (400 MHz, CDCl$_3$) δ 3.67 (s, 3H), 2.41-2.16 (m, 2H), 1.74-1.57 (m, 2H), 1.57-1.42 (m, 2H), 1.33-1.02 (m, 5H), 0.88-0.83 (m, 12H). $^{13}$C NMR (100 MHz, CDCl$_3$) δ 174.78, 51.62, 43.71, 36.97, 32.69, 29.23, 28.56, 27.94, 25.92, 22.85, 22.79, 19.32, 19.19.

Compound 11: To a suspension of LiAlH$_4$ (444 mg, 11.7 mmol) in THF (12 mL) was added a solution of compound 10 (1.25 g, 5.83 mmol) in THF (8 mL). The reaction mixture was refluxed overnight. Aqueous workup gave the crude compound 11 (1.1 g) as a colorless oil.

$^1$H NMR (400 MHz, CDCl$_3$) δ 3.63 (t, J=6.7 Hz, 2H), 1.74-1.66 (m, 1H), 1.60-1.45 (m, 3H), 1.37-1.05 (m, 7H), 0.88-0.82 (m, 12H). $^{13}$C NMR (100 MHz, CDCl$_3$) δ 63.75, 44.00, 37.16, 31.22, 29.40, 28.61, 28.28, 26.62, 22.90, 22.82, 19.43, 19.28.

Example 32: Synthesis of Ester-Containing Lipids

**508**

Compound 26: Compound 25 (840 mg, 1.03 mmol) was stirred in TFA (9 mL) and CH$_2$Cl$_2$ (36 mL) for 3 h at room temperature. Evaporation of the solvents and co-evaporation with toluene 3 times gave compound 26.

Molecular weight for C$_{43}$H$_{80}$NO$_6$ (M+H)$^+$ Calc. 706.5986, Found 706.4.

Compound 27: Compound 26 from the previous step was treated with 2,2-dimethylpropanol (363 mg, 4.12 mmol) in the presence of EDCI (592 mg, 3.09 mmol), DMAP (50 mg, 0.412 mmol) and DIEA (1.44 mL, 8.24 mmol) in CH$_2$Cl$_2$ (10 mL) for 14 h. Aqueous work-up then column chromatography gave compound 27 (575 mg, 0.679 mmol, 66%).

$^1$H NMR (400 MHz, CDCl$_3$) δ 5.40-5.28 (m, 4H), 4.91-4.81 (m, 1H), 3.76 (s, 4H), 2.34-2.27 (m, 8H), 2.22 (s, 6H), 2.03-1.97 (m, 8H), 1.83-1.26 (m, 50H), 0.94 (s, 18H). $^{13}$C NMR (100 MHz, CDCl$_3$) δ 174.14, 173.53, 130.09, 129.92, 74.41, 73.72, 59.12, 45.61, 34.60, 34.32, 32.64, 31.45, 29.93, 29.85, 29.71, 29.68, 29.48, 29.32, 29.28, 27.39, 27.33, 26.62, 25.52, 25.22, 23.32.

Molecular weight for C$_{53}$H$_{100}$NO$_6$ (M+H)$^+$ Calc. 846.7551, Found 846.5.

Example 33: Synthesis of Quaternary Lipids

A. The amino lipids synthesized in Examples 31 and 32 can be converted to the corresponding quaternary lipids as shown below by treatment with CH$_3$Cl in CH$_3$CN and CHCl$_3$.



25

TFA/CH$_2$Cl$_2$

26

HO

27

US 11,246,933 B1

509                                                                                510



15: n = 3, p = 3, R = H
24: n = 3, p = 1, R = Me

$$\xrightarrow[\text{CH}_3\text{CN/CHCl}_3]{\text{CH}_3\text{Cl}}$$

15Q: n = 3, p = 3, R = H
24Q: n = 3, p = 1, R = Me

16: m = 0, n = 3
19: m = 2, n = 1
20: m = 2, n = 3
21: m = 1, n = 1
22: m = 1, n = 3

$$\xrightarrow[\text{CH}_3\text{CN/CHCl}_3]{\text{CH}_3\text{Cl}}$$

16Q: m = 0, n = 3
19Q: m = 2, n = 1
20Q: m = 2, n = 3
21Q: m = 1, n = 1
22Q: m = 1, n = 3

17: n = 1
18: n = 3

$$\xrightarrow[\text{CH}_3\text{CN/CHCl}_3]{\text{CH}_3\text{Cl}}$$

US 11,246,933 B1

**511**                                                              **512**

-continued



17Q: n = 1
18Q: n = 3



27T

CH$_3$Cl/CH$_3$CN/CHCl$_3$     R = Me, Et, iPr, t-Bu, other alkyl/allyl groups



27TQ

B. Synthesis of BODIPY-Lipid Conjugates

Synthesis of BODIPY-labeled lipid



101

EDCl/DIPEA/DMAP/CH$_2$Cl$_2$
69%



102

BocHN       NH$_2$
DIPEA/DMF
51%



103

HCHO/NaBH$_3$CN
THF/AcOH
45%



104

TFA/CH$_2$Cl$_2$
quant.

US 11,246,933 B1

513 514

-continued



105

BODIPY® 493/503 (Life Technology #D2191)
Et₃N/CH₂Cl₂ quant.



106

Compound 102: To a solution of compound 101 (2.00 g, 4.30 mmol) and cis-2-nonen-1-ol (1.81 mL, 10.7 mmol) in CH₂Cl₂ (20 mL) were added diisopropylethylamine (3.00 mL, 17.2 mmol), N-(3-dimethylaminopropyl)-N'-ethylcarbodiimide hydrochloride (2.06 g, 10.7 mmol) and DMAP (106 mg, 0.868 mmol). The reaction mixture was stirred at room temperature for 18 hours. The reaction mixture was diluted with CH₂Cl₂ (200 mL) and washed with saturated NaHCO₃ aq. (100 mL). The organic layer was dried over MgSO₄, filtered and concentrated. The crude was purified by silica gel column chromatography (0-5% EtOAc in Hexane) to give compound 102 (2.11 g, 2.96 mmol, 69%, $R_f$=0.45 developed with 10% EtOAc in Hexane).

$^1$H NMR (500 MHz, CDCl₃) δ 5.67-5.61 (m, 2H), 5.54-5.49 (m, 2H), 4.89-4.84 (m, 1H), 4.62 (d, J=6.5 Hz, 4H), 3.46 (t, J=6.5 Hz, 2H), 2.48 (t, J=7.3 Hz, 2H), 2.30 (t, J=7.5 Hz, 4H), 2.20-2.14 (m, 2H), 2.12-2.04 (m, 4H), 1.63-1.60 (m, 4H), 1.51-1.50 (m, 4H), 1.37-1.27 (m, 32H), 0.88 (t, J=6.8 Hz, 6H). $^{13}$C NMR (100 MHz, CDCl₃) δ 173.90, 172.45, 135.58, 123.51, 74.74, 60.36, 34.47, 34.24, 32.93, 32.91, 31.83, 29.54, 29.48, 29.31, 29.21, 29.01, 28.03, 27.70, 25.43, 25.08, 22.76, 14.23.

Molecular weight for C₃₉H₆₉BrNaO₆ (M+Na)⁺ Calc. 735.42, Found 735.2.

Compound 103: To a solution of 102 (2.11 g, 2.96 mmol) in DMF (20 mL) was added a solution of N-Boc-1,6-diaminohexane (670 mg, 3.10 mmol) in DMF (20 mL) at 0° C. The mixture was stirred for 18 hours at room temperature. Then additional N-Boc-1,6-diaminohexane (160 mg, 0.740 mmol) in DMF (1 mL) was added and the mixture was stirred for 12 hour. The reaction was quenched by adding

saturated NaHCO₃ aq. (100 mL) then extracted with Et₂O (150 mL×3). The organic layer was separated and dried over anhydrous MgSO₄. After filtration and concentration, the crude was purified by silica gel column chromatography (5% MeOH in CH₂Cl₂, $R_f$=0.24) to give 103 (1.28 g, 1.51 mmol, 51%).

$^1$H NMR (400 MHz, CDCl₃) δ 5.67-5.61 (m, 2H), 5.55-5.50 (m, 2H), 4.88-4.81 (m, 1H), 4.61 (d, J=6.8 Hz, 4H), 4.54 (brs, 1H), 3.11-3.08 (m, 2H), 2.67-2.59 (m, 4H), 2.35 (t, J=7.4 Hz, 2H), 2.29 (t, J=7.6 Hz, 4H), 2.10-2.07 (m, 4H), 1.84-1.81 (m, 4H), 1.63-1.57 (m, 4H) 1.50-1.47 (m, 8H), 1.44 (s, 9H), 1.38-1.27 (m, 34H), 0.88 (t, J=6.8 Hz, 6H). $^{13}$C NMR (100 MHz, CDCl₃) δ 173.90, 173.53, 135.57, 123.50, 74.49, 60.36, 49.82, 49.29, 40.64, 34.47, 34.24, 32.68, 31.83, 30.16, 29.89, 29.54, 29.50, 29.33, 29.23, 29.01, 28.58, 27.69, 27.11, 26.80, 25.44, 25.37, 25.09, 22.76, 14.23.

Molecular weight for C₅₀H₉₃N₂O₈ (M+H)⁺ Calc. 849.69, Found 849.5.

Compound 104: To a solution of 103 (1.16 g, 1.37 mmol) in THF (20 mL) were added formaldehyde (37 wt. % in H₂O, 0.306 mL, 4.11 mmol), sodium cyanoborohydride (1 M solution in THF, 2.06 mL, 2.06 mmol) and acetic acid (0.008 mL, 0.137 mmol) at 0° C. The mixture was stirred at room temperature for 17 hours. The reaction was quenched by adding saturated NaHCO₃ aq. (50 mL) then extracted with Et₂O (100 mL×3). The organic layer was separated and dried over anhydrous MgSO₄. After filtration and concentration, the crude was purified by silica gel column chromatography (8% MeOH in CH₂Cl₂, $R_f$=0.46) to give 104 (531 mg, 0.615 mmol, 45%).

US 11,246,933 B1

515

$^1$H NMR (400 MHz, CDCl$_3$) δ 5.66-5.60 (m, 2H), 5.53-5.47 (m, 2H), 4.86-4.80 (m, 1H), 4.61-4.59 (m, 5H), 3.12-3.07 (m, 2H), 2.89-2.78 (m, 4H), 2.62 (s, 3H), 2.40 (t, J 6.8 Hz, 2H), 2.28 (t, J=7.4 Hz, 4H), 2.11-2.06 (m, 4H), 1.99-1.92 (m, 2H), 1.69-1.27 (m, 57H), 0.87 (t, J=6.8 Hz, 6H). $^{13}$C NMR (100 MHz, CDCl$_3$) δ 173.86, 172.45, 156.18, 135.55, 123.45, 75.24, 60.32, 56.68, 55.83, 40.72, 40.36, 34.40, 34.09, 31.79, 31.29, 29.92, 29.49, 29.41, 29.26, 29.17, 28.96, 28.55, 27.65, 26.49, 26.30, 25.41, 25.02, 24.79, 22.71, 20.12, 14.19.

Molecular weight for C$_{51}$H$_{95}$N$_2$O$_8$ (M+H)$^+$ Calc. 863.71, Found 863.6.

Compound 105: To a solution of compound 104 (525 mg, 0.608 mmol) in CH$_2$Cl$_2$ (8 mL) was added trifluoroacetic acid (2 mL) at 0° C. The reaction mixture was stirred at 0° C. for 1 hour and at room temperature for 3 hours. The reaction mixture was evaporated and co-evaporated with toluene 3 times then dried in vacuo overnight to give compound 105 (603 mg, 0.603 mmol calculated as 2 TFA salt, quantitatively, R$_f$=0.24 developed with 8% MeOH in CH$_2$Cl$_2$).

$^1$H NMR (400 MHz, CDCl$_3$) δ 8.06 (brs, 1H), 5.68-5.61 (m, 2H), 5.55-5.49 (m, 2H), 4.87-4.81 (m, 1H), 4.62 (d, J=6.8 Hz, 4H), 4.28 (brs, 3H), 3.20-3.02 (m, 6H), 2.82 (d, J=4.0 Hz, 3H), 2.45-2.40 (m, 2H), 2.30 (t, J=7.4 Hz, 4H), 2.12-2.00 (m, 6H), 1.78-1.22 (m, 52H), 0.88 (t, J=6.8 Hz, 6H).

516

6H). $^{13}$C NMR (100 MHz, CDCl$_3$) δ 174.04, 172.08, 161.84, 161.47, 135.63, 123.44, 117.60, 114.71, 75.56, 60.41, 55.69, 55.27, 39.94, 39.64, 34.44, 34.06, 31.82, 30.72, 29.53, 29.43, 29.28, 29.19, 29.00, 27.69, 26.58, 25.42, 25.27, 25.05, 24.60, 23.06, 22.75, 19.00, 14.22.

Molecular weight for C$_{46}$H$_{87}$N$_2$O$_6$ (M+H)$^+$ Calc. 763.66, Found 763.4.

Compound 106: To a solution of 105 (23.8 mg, 0.0240 mmol, calculated as 2TFA salt) in CH$_2$Cl$_2$ (1 mL) and Et$_3$N (0.050 mL, 0.360 mmol) was added a solution of BODIPY® 493/503 (10 mg, 0.0240 mmol, Life Technology #D2191) in CH$_2$Cl$_2$ (2 mL). The reaction mixture was stirred for 1 h. The reaction mixture was loaded onto silica gel column chromatography and eluted with 0-5% MeOH in CH$_2$Cl$_2$. The product color fractions were collected (5% MeOH in CH$_2$Cl$_2$, R$_f$=0.36) to give 106 (26 mg, 0.024 mmol, quantitatively).

$^1$H NMR (400 MHz, CDCl$_3$) δ 6.05 (s, 2H), 5.67-5.61 (m, 2H), 5.54-5.48 (m, 2H), 4.85-4.82 (m, 1H), 4.61 (d, J=6.8 Hz, 4H), 3.37-3.32 (m, 2H), 3.27-3.22 (m, 2H), 2.51-2.44 (m, 17H), 2.34-2.27 (m, 8H), 2.12-2.06 (m, 4H), 1.60-1.21 (m, 52H), 0.88 (t, J=6.8 Hz, 6H).

Molecular weight for C$_{62}$H$_{104}$BF$_2$N$_4$O$_7$ (M+H)$^+$ Calc. 1065.80, Found 1065.5.

Example 34: Multi-Ester Containing Lipids and Acetal Linked Lipids

US 11,246,933 B1

**517**

Synthesis of compound 5002: To a stirred solution of alcohol 5001 (1.0 g, 5.15 mmol), Glycolic anhydride 5000 (5.66 mmol) in DCM (20 mL) was added DMAP (1.26 g, 10.41 mmol) and stirred at room temperature for 48 h. The

**518**

chromatography to get 5006 (0.1 g, 12%) and 5007 (0.2 g, 36%). LCMS for compound 5006: Calculated: 857.62 ($M^+$), Found: 858.5 ($M^{30}+1$), 880.5 ($M^++Na$). LCMS for compound 5007: Calculated: 559.4 ($M^+$), Found: 560.4 ($M^{30}+1$).



40

reaction mixture was concentrated followed by column purification gave the corresponding product 5002 (1.4 g, 86%) as DMAP salt. LCMS: Calculated: 316.22 ($M^+$), Found: 315.1 ($M^+$-1).

Synthesis of compound 5004: To a stirred solution of alcohol 5003 (9.0 g, 44.6 mmol), 4-(Dimethylamino)butyric acid hydrochloride (8.1 g, 48.3 mmol) and EDC (10.3 g, 53.6 mmol) in DCM (100 mL) was added DIEPA (23 g, 178.3 mmol) and stirred at room temperature overnight. After usual work up, the crude product was purified by column chromatography (9.0 g, 90%).

Synthesis of compound 5005: To a stirred solution of diene 5004 (4.0 g, 18 mmol) in 10 mL of THF was added 9-BBN and stirred overnight. To the above solution was added 6.6 mL of 3M NaOAc and 7.4 mL of 30% $H_2O_2$ at 0-5° C. The reaction mixture was stirred at room temperature overnight. After usual work up, the crude material was purified by column chromatography to added 5005 (2.6 g, 55%) as viscous oil. LCMS: Calculated: 261.19 ($M^+$), Found: 262.1 ($M^++1$).

Synthesis of compound 5006 and 5007: To a stirred solution of diene 5005 (260 mg, 1 mmol), acid 5002 (1.0 g, 2.28 mmol), EDC (387 mg, 2 mmol) in 10 mL of DCM was added DIEA (516 mg, 4 mmol) and stirred overnight. After usual work up, the crude material was purified by column

Synthesis of compound 5011: To a stirred solution of alcohol 5008 (2.66 g 10 mmol) in 5 mL of Chlorotrimethylsilane was added paraformaldehyde (0.3 g, 10 mmol) and stirred at room temperature overnight. The excess Chlorotrimethylsilane was evaporated followed by drying under reduced pressure gave the corresponding product 5009 and used for next step without purification. The compound 5009 was added dropwise to the solution of diol (261 mg, 1 mmol), DIEA (2.5 g, 19.4 mmol) and DMAP (20 mg, 0.16 mmol) in DCM (10 mL) and stirred overnight. Concentration of the solvent gave the crude product 5010, which was dissolved in 5 mL of THF and 2 mL of 1N NaOH was added and stirred for 2 days at room temperature. After usual work up, the crude material was purified by column chromatography to get the corresponding product 5011 (200 mg, 28%). LCMS for compound 5010: Calculated: 1131.95 ($M^+$), Found: 1096.98 ($M^+$-Cl⁻). LCMS for compound 5011: Calculated: 704.63 ($M^+$), Found: 727.5 ($M^++Na$).

Synthesis of compound 5012: To a stirred solution of alcohol 5011 (200 mg, 0.284 mmol), 4-(Dimethylamino)butyric acid hydrochloride (103 mg, 0.57 mmol), EDC (109 mg, 0.57 mmol) in 10 mL of DCM was added DIEA (294 mg, 4 mmol) and stirred overnight. After usual work up, the crude material was purified by column chromatography to get 5012 (190 mg, 85%). LCMS for compound 5012: Calculated: 817.72 ($M^+$), Found: 818.5 ($M^++Na$).

US 11,246,933 B1

519                                                                      520



5013

5014

5015

DIEA

5017

TBAF

5016

5018

<div style="column">

Synthesis of compound 5016: To a stirred solution of alcohol 5013 (1.0 g 7.03 mmol) in 5 mL of Chlorotrimethylsilane was added acetaldehyde (0.3 g, 7.03 mmol) and stirred at room temperature for 2 h. The excess Chlorotrimethylsilane was evaporated followed by drying under reduced pressure gave the corresponding product 5014 and used for next step without purification. The compound 5014 was added dropwise to the solution of diol 5015 (223 mg, 0.55 mmol), DIEA (2 mL g, 11.5 mmol) and DMAP (20 mg, 0.16 mmol) in DCM (10 mL) and stirred overnight. 10 mL of water was added followed by extraction with DCM (3×30 mL), washed with water, saturated NaHCO$_3$, brine and dried over anhydrous Na$_2$SO$_4$. Concentration of the solvent gave the crude product, which was used for the next step without purification. LCMS for compound 5016: Calculated: 738.66 (M$^+$), Found: 761.5 (M$^+$+Na).

Synthesis of compound 5017: To a stirred solution of alcohol 5016 in 5 mL of THF was added 0.54 mL of 1M TBAF in THF (0.54 mmol) and stirred for 2 days at room temperature. After usual work up, the crude material was purified by column chromatography to get 5017. However, it contains some inseparable impurity and hence used for next step without further purification. LCMS for compound 5017: Calculated: 624.57 (M$^+$), Found: 647.5 (M$^+$+Na).

Synthesis of compound 5018: To a stirred solution of alcohol 5017 (0.55 mmol), 4-(Dimethylamino)butyric acid hydrochloride (116 mg, 0.64 mmol), EDC (123 mg, 0.64 mmol) in 10 mL of DCM was added DIEA (165 mg, 1.28 mmol) and stirred for 2 days. After usual work up, the crude material is purified by column chromatography (0-10% MeOH in 1% Et$_3$N containing DCM) to get 5018 (300 mg, 75% from 5015). LCMS for compound 5018: Calculated: 737.65 (M$^{30}$+), Found: 738.6 (M$^{30}$+1), 760.5 (M$^+$+Na$^+$).

Example 35: Preparation of Lipid Nanoparticles

The cationic lipids described herein are used to formulate liposomes containing the AD-1661 duplex (shown in the table below) using an in-line mixing method as described in International Publication No. WO 2010/088537, which is

</div>

<div style="column">

incorporated by reference in its entirety. The lipid nanoparticles had the formulation shown in the table below.

| Component | Mole Percentage (Based on 100% of the lipid components in the LNP) |
| --- | --- |
| Cationic lipid | 50% |
| Distearoylphosphatidylcholine (DSPC) | 10% |
| Cholesterol | 38.5% |
| 1-(monomethoxy-polyethyleneglycol)-2,3-dimyristoylglycerol (PEG-DMG) (with an average PEG molecular weight of 2000) | 1.5% |
| siRNA (AD-1661) | — |

The siRNA AD-1661 duplex has the sequence shown below.

| Duplex | Sequence 5'-3' | SEQ ID NO: | Target |
| --- | --- | --- | --- |
| AD-1661 | GGAfUfCAfUfCfUfCAAGfUfCfUfUAfCdTsdT | 1 | FVII |
| | GfUAAGAfCfUfUGAGAfUGAfUfCfCdTsdT | 2 | |

Lower case is 2'OMe modification and Nf is a 2'F modified nucleobase, dT is deoxythymidine, s is phosphothioate

The lipid nanoparticles was prepared as follows. Cationic lipid, DSPC, cholesterol, and PEG-DMG in the ratio recited in the table above were solubilized in ethanol at a total lipid concentration of 25 mg/mL.

A siRNA stock solution was prepared by solubilizing the siRNA AD-1661 in a low pH acetate or citrate buffer (pH=4) at 0.8 mg/mL.

The stock solutions should be completely clear and the lipids should be completely solubilized before combining with the siRNA. Therefore, if it was determined appropriate, the stock solutions were heated to completely solubilize the lipids.

The individual stock solutions were combined by pumping each solution to a T-junction (i.e., by in-line mixing).

</div>

US 11,246,933 B1

**521**

Specifically, the ethanol solution (at 5 ml/min, via 0.01 in. PEEK tube) and aqueous buffer solution (at 15 mL/min, via 0.02 in. PEEK tube) were mixed through a T-junction (PEEK Tee body, IDEX).

After the T-junction a single tubing is placed where the combined stream will emit. Ethanol is removed and exchanged for PBS by dialysis. The lipid formulations are then concentrated using centrifugation or diafiltration to an appropriate working concentration.

Lipid nanoparticles containing the cationic lipids listed in the table in Example 36 were prepared as described above.

Example 36: Efficacy of Lipid Nanoparticles

Factor VII (FVII), a prominent protein in the coagulation cascade, is synthesized in the liver (hepatocytes) and secreted into the plasma. FVII levels in plasma can be determined by a simple, plate-based colorimetric assay. As such, FVII represents a convenient model for determining siRNA-mediated downregulation of hepatocyte-derived proteins.

Test formulations of the lipid nanoparticles prepared in Example 35 were initially assessed for their FVII knockdown in female 7-9 week old, 15-25 g, female C57Bl/6 mice at 0.1, 0.3, 1.0 and 5.0 mg/kg with 3 mice per treatment group. All studies included animals receiving either phosphate-buffered saline (PBS, control group) or a benchmark formulation. Formulations were diluted to the appropriate

**522**

concentration in PBS immediately prior to testing. Mice were weighed and the appropriate dosing volumes calculated (10 μl/g body weight). Test and benchmark formulations as well as PBS (for control animals) were administered intravenously via the lateral tail vein. Animals were anesthetised 24 hours later with an intraperitoneal injection of ketamine/xylazine and 500-700 μl of blood was collected by cardiac puncture into serum separator tubes (BD Microtainer). Blood was centrifuged at 2,000×g for 10 minutes at 15° C. and serum was collected and stored at −70° C. until analysis. Serum samples were thawed at 37° C. for 30 minutes, diluted in PBS and aliquoted into 96-well assay plates. Factor VII levels were assessed using a chromogenic assay (Biophen FVII kit, Hyphen BioMed) according to the manufacturer's instructions and absorbance was measured in a microplate reader equipped with a 405 nm wavelength filter. Plasma FVII levels were quantified and $ED_{50}$ values (dose resulting in a 50% reduction in plasma FVII levels compared to control animals) were calculated using a standard curve generated from a pooled sample of serum from control animals. Those formulations of interest showing high levels of FVII knockdown ($ED_{50} \ll 0.1$ mg/kg) were re-tested in independent studies at a lower dose range to confirm potency and establish $ED_{50}$ levels.

The following table shows $ED_{50}$ values for some of the cationic lipids described herein. Two asterisks (**) indicates an $ED_{50}$ value between 0.001 and 0.10. One asterisk (*) indicates an $ED_{50}$ value greater than 0.10.

| $ED_{50}$ | Cationic Lipid |
|---|---|
| ** |  |
| ** |  |
| ** |  |
| ** |  |

US 11,246,933 B1

| 523 | 524 |

-continued

| ED$_{50}$ | Cationic Lipid |
|---|---|
| ** |  |
| ** |  |
| ** |  |
| ** |  |
| * |  |
| ** |  |
| * |  |
| ** |  |
| ** |  |

US 11,246,933 B1

| 525 | 526 |

-continued

| ED$_{50}$ | Cationic Lipid |
| --- | --- |

** 

** 

** 

** 

** 

** 

US 11,246,933 B1

527 | 528

-continued

| ED$_{50}$ | Cationic Lipid |
|---|---|
| ** |  |
| ** |  |
| ** |  |
| ** |  |
| ** |  |

US 11,246,933 B1

529          530

-continued

| ED$_{50}$ | Cationic Lipid |
|---|---|
| ** |  |
| ** |  |

### Example 37: Hydrophobicity and Stability

The log P values for the biodegradable cationic lipids listed in the table below were calculated using the software available at http://www.molinspiration.com/services/logp.html from Molinspiration Cheminformatics of Slovensky Grob, Slovak Republic.

Furthermore, the HPLC retention time for each biodegradable cationic lipid was measured in lipid nanoparticles prepared from them. The lipid nanoparticles were prepared as described in Example 35 using AD-1661 as the payload. The retention times are reported in the table below relative to the retention time for cholesterol.

The HPLC buffer used was a mixture of two solutions (Solution #1 and Solution #2).

Solution #1: 80% methanol/20% 10 mM NH$_4$HCO$_3$

Solution #2: 80% methanol/20% isopropanol

The ratios of the two solutions in the mixture changed over time as indicated in the table below.

| Time (mm) | Solution #1 (vol %) | Solution #2 (vol %) |
|---|---|---|
| 0 | 70 | 30 |
| 4 | 10 | 90 |
| 6 | 10 | 90 |
| 6.1 | 70 | 30 |
| 8 | 70 | 30 |

The size of the lipid nanoparticles was measured before and after undergoing dialysis overnight. In general, greater changes in lipid nanoparticle size are indicative of lesser stability.

Dynamic laser light scattering was used to determine the lipid nanoparticle size (expressed as the intensity weighted diameter) with a Zetasizer (Malvern Instruments, Inc. of Westborough, Mass.). All measurements were made at 532 nm wavelength at the scattering angle of 173° using normal resolution mode as the analysis model.

The results of these experiments are provided in the table below.

| Cationic Lipid | logP | t(lipid) − t(chol) | LNPs Size (nm) change |
|---|---|---|---|
|  | 9.647 | −1.4 | 170 -> 260 |

US 11,246,933 B1

**531**　　　　　　　　　　　　　　　**532**

-continued

| Cationic Lipid | logP | t(lipid) – t(chol) | LNPs Size (nm) change |
|---|---|---|---|
|  | 9.972 | 0.848 | 73 -> 77 |
|  | 10.093 | 1.44 | 60 -> 67 |
|  | 10.201 | 1.751 | 59 -> 60 |
|  | 10.259 | 2.106 | |
|  | 10.313 | 2.365 | 56 -> 56 |
|  | 10.315 | 2.219 | 68 -> 67 |

US 11,246,933 B1

**533**                 **534**

-continued

| Cationic Lipid | logP | t(lipid) – t(chol) | LNPs Size (nm) change |
|---|---|---|---|
|  | 10.416 | 2.707 | |
|  | 10.495 | 3.178 | |

These and other changes can be made to the embodiments in light of the above-detailed description. In general, in the following claims, the terms used should not be construed to limit the claims to the specific embodiments disclosed in the specification and the claims, but should be construed to include all possible embodiments along with the full scope of equivalents to which such claims are entitled. Accordingly, the claims are not limited by the disclosure.

SEQUENCE LISTING

```
<160> NUMBER OF SEQ ID NOS: 2

<210> SEQ ID NO 1
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<221> NAME/KEY: source
<223> OTHER INFORMATION: /note="Description of Artificial Sequence:
      Synthetic oligonucleotide"
<220> FEATURE:
<221> NAME/KEY: source
<223> OTHER INFORMATION: /note="Description of Combined DNA/RNA
      Molecule: Synthetic oligonucleotide"
<220> FEATURE:
<221> NAME/KEY: modified_base
<222> LOCATION: (3)..(4)
<223> OTHER INFORMATION: 2'F modified nucleobase
<220> FEATURE:
<221> NAME/KEY: modified_base
<222> LOCATION: (6)..(9)
<223> OTHER INFORMATION: 2'F modified nucleobase
<220> FEATURE:
<221> NAME/KEY: modified_base
<222> LOCATION: (13)..(16)
<223> OTHER INFORMATION: 2'F modified nucleobase
<220> FEATURE:
<221> NAME/KEY: modified_base
<222> LOCATION: (18)..(18)
<223> OTHER INFORMATION: 2'F modified nucleobase
<220> FEATURE:
<221> NAME/KEY: modified_base
<222> LOCATION: (20)..(21)
<223> OTHER INFORMATION: Deoxythymidine
<220> FEATURE:
<221> NAME/KEY: misc_feature
<222> LOCATION: (20)..(21)
<223> OTHER INFORMATION: Phosphothioate bond

<400> SEQUENCE: 1

ggaucaucuc aagucuuact t                                          21
```

US 11,246,933 B1

535                                                                                                     536

-continued

```
<210> SEQ ID NO 2
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<221> NAME/KEY: source
<223> OTHER INFORMATION: /note="Description of Artificial Sequence:
      Synthetic oligonucleotide"
<220> FEATURE:
<221> NAME/KEY: source
<223> OTHER INFORMATION: /note="Description of Combined DNA/RNA
      Molecule: Synthetic oligonucleotide"
<220> FEATURE:
<221> NAME/KEY: modified_base
<222> LOCATION: (1)..(1)
<223> OTHER INFORMATION: 2'F modified nucleobase
<220> FEATURE:
<221> NAME/KEY: modified_base
<222> LOCATION: (6)..(8)
<223> OTHER INFORMATION: 2'F modified nucleobase
<220> FEATURE:
<221> NAME/KEY: modified_base
<222> LOCATION: (13)..(13)
<223> OTHER INFORMATION: 2'F modified nucleobase
<220> FEATURE:
<221> NAME/KEY: modified_base
<222> LOCATION: (16)..(18)
<223> OTHER INFORMATION: 2'F modified nucleobase
<220> FEATURE:
<221> NAME/KEY: modified_base
<222> LOCATION: (20)..(21)
<223> OTHER INFORMATION: Deoxythymidine
<220> FEATURE:
<221> NAME/KEY: misc_feature
<222> LOCATION: (20)..(21)
<223> OTHER INFORMATION: Phosphothioate bond

<400> SEQUENCE: 2

guaagacuug agaugaucct t                                                                        21
```

What is claimed is:

1. A cationic lipid comprising a primary group and two biodegradable hydrophobic tails, wherein (a) the primary group includes a head group and a central moiety to which both the biodegradable hydrophobic tails and the head group are directly bonded, wherein the primary group has a protonatable group having a $pK_a$ of from about 4 to about 11, (b) the cationic lipid has an in vivo half life ($t_{1/2}$) of less than about 3 hours in the liver, (c) the cationic lipid has a logP value of at least 10.1, and (d) each biodegradable hydrophobic tail has the formula -(hydrophobic chain)-(biodegradable group)-(hydrophobic chain),

wherein in at least one biodegradable hydrophobic tail,

(i) the terminal hydrophobic chain in the hydrophobic tail is a branched alkyl group, where the branching occurs at the α-position relative to the biodegradable group;

(ii) the biodegradable group is separated from a terminus of the hydrophobic tail by from 6 to 12 carbon atoms;

(iii) the at least one biodegradable hydrophobic tail has the formula —$R^{12}$-$M^1$-$R^{13}$, where $R^{12}$ is a $C_4$-$C_{14}$ alkylene or $C_4$-$C_{14}$ alkenylene, $M^1$ is the biodegradable group, and $R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl; and

(iv) the total carbon atom content of the tail —$R^{12}$-$M^1$-$R^{13}$ is 21 to 26.

2. The cationic lipid of claim 1, wherein the central moiety is selected from the group consisting of a central carbon atom, a central nitrogen atom, a central carbocyclic group, a central aryl group, a central heterocyclic group, and a central heteroaryl group.

3. The cationic lipid of claim 1, wherein the biodegradable group is —OC(O)—.

4. The cationic lipid of claim 1, wherein the biodegradable group is —C(O)O—.

5. The cationic lipid of claim 1, wherein the chain length of —$R^{12}$-$M^1$-$R^{13}$ is at most 21 atoms from the first carbon atom after the primary group to a terminus of the tail.

6. The cationic lipid of claim 1, wherein

each biodegradable group is independently selected from the group consisting of —OC(O)—, —C(O)O—, —SC(O)—, —C(O)S—, —OC(S)—, —C(S)O—, —S—S—, —C(R⁵)═N—, —N═C(R⁵)—, —C(R⁵)═N—O—, —O—N═C(R⁵)—, —C(O)(NR⁵)—, —N(R⁵)C(O)—, —C(S)(NR⁵)—, —N(R⁵)C(O)—, —N(R⁵)C(O)N(R⁵)—, —OC(O)O—, —OSi(R⁵)₂O—, —C(O)(CR³R⁴)C(O)O—, —OC(O)(CR³R⁴)C(O)—, or



each occurrence of R³ and R⁴ is, independently, H, halogen, OH, alkyl, alkoxy, —NH₂, R¹⁰, alkylamino, or dialkylamino;

each occurrence of R⁵ is, independently, H or alkyl;

each occurrence of R¹⁰ is, independently, selected from polyethylene glycol (PEG) and polymers based on

US 11,246,933 B1

537

poly(oxazoline), poly(ethylene oxide), poly(vinyl alcohol), poly(glycerol), poly(N-vinylpyrrolidone), poly[N-(2-hydroxypropyl)methacrylamide] and poly(amino acid)s, wherein (i) the PEG or polymer is linear or branched, (ii) PEG or polymer is polymerized by n subunits, (iii) n is a number-averaged degree of polymerization between 10 and 200 units and (iv) the compound of formula has at most two $R^{10}$ groups; and $R^{11}$ is a $C_2$-$C_8$ alkyl or $C_2$-$C_8$ alkenyl.

**7.** The cationic lipid of claim **1**, wherein in both biodegradable hydrophobic tails,

(i) the terminal hydrophobic chain in the hydrophobic tail is a branched alkyl group, where the branching occurs at the α-position relative to the biodegradable group;

(ii) the biodegradable group is separated from a terminus of the hydrophobic tail by from 6 to 12 carbon atoms;

(iii) the biodegradable hydrophobic tail has the formula —$R^{12}$-$M^1$-$R^{13}$, where $R^{12}$ is a $C_4$-$C_{14}$ alkylene or $C_4$-$C_{14}$ alkenylene, $M^1$ is the biodegradable group, and $R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl; and

(iv) the total carbon atom content of the tail —$R^{12}$-$M^1$-$R^{13}$ is 21 to 26.

**8.** The cationic lipid of claim **1**, wherein the cationic lipid has a logP value of at least about 10.2.

**9.** The cationic lipid of claim **1**, wherein the cationic lipid has a $t_{lipid}$–$t_{chol}$ value of at least about 1.75.

**10.** The cationic lipid of claim **1**, wherein the cationic lipid has a pKa value of from about 4 to about 7.

**11.** The cationic lipid of claim **10**, wherein the cationic lipid has a pKa value of from about 6 to about 6.5.

**12.** The cationic lipid of claim **1**, wherein the cationic lipid has a logP value of at least about 10.1 and/or a $t_{lipid}$–$t_{chol}$ value of at least about 1.4.

**13.** A cationic lipid comprising (i) a head group, (ii) two hydrophobic tails, each of the formula -(hydrophobic chain)-(biodegradable group)-(hydrophobic chain), and (iii) a linker group bound to the head group and the hydrophobic tails, wherein the cationic lipid has:

(i) a log P value of at least 10.1;

(ii) a pKa of from about 4 to about 7;

(iii) for at least one hydrophobic tail, the biodegradable group is separated from a terminus of the hydrophobic tail by from 6 to 12 carbon atoms;

(iv) for at least one hydrophobic tail, the total number of carbon atoms in the hydrophobic tail is from 21 to 26;

(v) for at least one hydrophobic tail, the number of carbon atoms between the linker group and the biodegradable group in the hydrophobic tail ranges from about 5 to about 10;

(vi) for at least one hydrophobic tail, the total number of carbon atoms between the linker group and a terminus of the hydrophobic tail is from about 15 to about 20;

(vii) for at least one hydrophobic tail, the terminal hydrophobic chain in the hydrophobic tail is a branched alkyl or branched alkenyl group; and

(viii) when formulated as a lipid nanoparticle, the cationic lipid has an in vivo half life ($t_{1/2}$) in the liver of less than about 3 hours.

**14.** The cationic lipid of claim **1**, wherein the branched alkyl group has only one carbon atom which is bound to three other carbon atoms.

**15.** The cationic lipid of claim **1**, wherein the at least one biodegradable hydrophobic tail has the formula



538

where $R^{13}$ is a branched alkyl group having from 13 to 17 carbon atoms, and the total carbon length of the tail from the first carbon to a terminus of the tail is at most 20.

**16.** A method of delivering a nucleic acid molecule comprising administering to a subject a lipid particle comprising:

(i) a nucleic acid molecule,

(ii) a cationic lipid according to claim **1**, and

(iii) a PEG lipid.

**17.** The method of claim **16**, wherein the pKa of the cationic lipid is 6.0 to 7.0.

**18.** A cationic lipid comprising a primary group and two biodegradable hydrophobic tails, wherein

the primary group comprises (i) a head group that optionally comprises a primary, secondary, or tertiary amine, and (ii) a central moiety to which the head group and the two biodegradable hydrophobic tails are directly bonded;

the central moiety is a central carbon or nitrogen atom;

each biodegradable hydrophobic tail independently has the formula -(hydrophobic chain)-(biodegradable group)-(hydrophobic chain), wherein the biodegradable group is —OC(O)— or —C(O)O—;

for at least one biodegradable hydrophobic tail, the terminal hydrophobic chain in the biodegradable hydrophobic tail is a branched alkyl, where the branching occurs at the α-position relative to the biodegradable group and the biodegradable hydrophobic tail has the formula —$R^{12}$-$M^1$-$R^{13}$, where $R^{12}$ is a $C_4$-$C_{14}$ alkylene or $C_4$-$C_{14}$ alkenylene, $M^1$ is the biodegradable group, $R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl, and the total carbon atom content of the tail —$R^{12}$-$M^1$-$R^{13}$ is 21 to 26;

in at least one hydrophobic tail, the biodegradable group is separated from a terminus of the hydrophobic tail by from 6 to 12 carbon atoms; and

the lipid has a pKa in the range of about 4 to about 11 and a logP of at least 10.1.

**19.** The cationic lipid of claim **18**, wherein the biodegradable group is —OC(O)—.

**20.** The cationic lipid of claim **18**, wherein the biodegradable group is —C(O)O—.

**21.** The cationic lipid of claim **18**, wherein both biodegradable hydrophobic tails have the formula —$R^{12}$-$M^1$-$R^{13}$.

**22.** The cationic lipid of claim **18**, wherein the chain length of —$R^{12}$-$M^1$-$R^{13}$ is at most 21 atoms from the first atom after the central moiety to a terminus of the tail.

**23.** The cationic lipid of claim **18**, wherein the lipid has a pKa of from about 5 to about 7 when incorporated into a lipid particle.

**24.** The cationic lipid of claim **18**, wherein, in at least one hydrophobic tail, the number of carbon atoms between the central moiety and the biodegradable group in the hydrophobic tail ranges from 5 to 10.

**25.** The cationic lipid of claim **18**, wherein, in at least one hydrophobic tail, the total number of carbon atoms between the central moiety and a terminus of the hydrophobic tail ranges from 15 to 20.

**26.** The cationic lipid of claim **18**, wherein in at least one hydrophobic tail, the biodegradable group is separated from a terminus of the hydrophobic tail by from 8 to 12 carbon atoms.

**27.** The cationic lipid of claim **26**, wherein in at least one hydrophobic tail, the biodegradable group is separated from a terminus of the hydrophobic tail by 8 carbon atoms.

**28.** The cationic lipid of claim **18**, wherein in both biodegradable hydrophobic tails,

US 11,246,933 B1

539

540

(i) the terminal hydrophobic chain in the hydrophobic tail is a branched alkyl group, where the branching occurs at the α-position relative to the biodegradable group;

(ii) the biodegradable group is separated from a terminus of the hydrophobic tail by from 6 to 12 carbon atoms;

(iii) the biodegradable hydrophobic tail has the formula —$R^{12}$-$M^1$-$R^{13}$, where $R^{12}$ is a $C_4$-$C_{14}$ alkylene or $C_4$-$C_{14}$ alkenylene, $M^1$ is the biodegradable group, and $R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl; and

(iv) the total carbon atom content of the tail —$R^{12}$-$M^1$-$R^{13}$ is 21 to 26.

\* \* \* \* \*

# EXHIBIT 2

**Preliminary Infringement Chart for Claims 18, 19, 21, 22, and 24-27 of the Alnylam '933 Patent**

| 18. | A cationic lipid comprising a primary group and two biodegradable hydrophobic tails, wherein | | The Pfizer vaccine uses ((4-hydroxybutyl)azanediyl) bis(hexane-6,1-diyl)bis(2-hexyldecanoate) (Exhibit 4 at 15), which is also called ALC-0315 (Exhibit 5 at 21-22).<br><br>Literature provides the following structure:<br><br><br><br>*See* Exhibit 21 at 8 (Linde Schoenmaker, et al., *mRNA-lipid Nanoparticle COVID-19 Vaccines: Structure and Stability*, Int'l J. of Pharms. 601 (2021)). |
|-----|---|---|---|
| | the primary group comprises | | |
| | | (i) a head group that optionally comprises a primary, secondary, or tertiary amine, and | ALC-0315 has a head group:<br><br><br><br>Optional limitation for amine in the head group. |

| | | (ii) a central moiety to which the head group and the two biodegradable hydrophobic tails are directly bonded; | ALC-0315 has a central moiety that is a nitrogen, and the head group and both tails are directly bonded to it:<br><br> |
|---|---|---|---|
| | the central moiety is a central carbon or nitrogen atom; | | The central moiety of ALC-03315 is a nitrogen atom. |
| | each biodegradable hydrophobic tail independently has the formula -(hydrophobic chain)-(biodegradable group)-(hydrophobic chain), wherein the biodegradable group is -OC(O)- or -C(O)O-; | | ALC-0315 has biodegradable tails of the form: (hydrophobic chain)-(biodegradable group )-(hydrophobic chain).  The biodegradable group is OC(O):<br><br> |

| for at least one biodegradable hydrophobic tail, the terminal hydrophobic chain in the biodegradable hydrophobic tail is a branched alkyl, | The terminal hydrophobic chains in both biodegradable hydrophobic tails of ALC-0315 are a branched alkyls:<br> |
|---|---|
| | where the branching occurs at the α-position relative to the biodegradable group and | The branching in ALC-0315's biodegradable tails occurs at the α-position:<br> |

| | | the biodegradable hydrophobic tail has the formula -$R^{12}$-$M^1$-$R^{13}$, | ALC-0315's biodegradable tails have the formula -$R^{12}$-$M^1$-$R^{13}$:  |
| | | where $R^{12}$ is a $C_4$-$C_{14}$ alkylene or $C_4$-$C_{14}$ alkenylene, | The $R^{12}$ for ALC-0315 is a $C_4$-$C_{14}$ alkylene:  |

| | | | $M^1$ is the biodegradable group, | $M^1$ for ALC-0315 is - OC(O)-, which is the biodegradable group: |
| --- | --- | --- | --- | --- |



| | | | $R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl, and | The branched biodegradable tails of ALC-0315 has the structure: |
| --- | --- | --- | --- | --- |



$R^{13}$ is a $C_{10}$-$C_{20}$ alkyl chain.

| | | the total carbon atom content of the tail -$R^{12}$-$M^1$-$R^{13}$ is 21 to 26; | The total carbon count is 21-26 for at least one tail -$R^{12}$-$M^1$-$R^{13}$ in ALC-0315:  |
| --- | --- | --- | --- |
| | in at least one hydrophobic tail, the biodegradable group is separated from a terminus of the hydrophobic tail by from 6 to 12 carbon atoms; and | | For ALC-0315, a terminus is separated from the biodegradable group by from 6 to 12 carbon atoms for the top chain and by from 6 to 12 carbon atoms for the bottom chain:  |

6

| | |
|---|---|
| the lipid has a pKa in the range of about 4 to about 11 and a logP of at least 10.1 | The pKa for ALC-0315 is 6.09.  *See* Exhibit 25 at 8 (Michael D. Buschmann, et al., *Nanomaterial Delivery Systems for mRNA Vaccines*, Vaccines 2021, 9, 65.)<br><br>The logP for ALC-0315 is 10.37.  *See* Exhibit 26 (Molinspiration logP Calculator, http://www.molinspiration.com/services/logp.html)<br> |

| 19. | The cationic lipid of claim 18, wherein the biodegradable group is –OC(O)–. | $M^1$ for ALC-0315 is - OC(O) -, which is the biodegradable group:  |
|---|---|---|
| 21. | The cationic lipid of claim 18, wherein both biodegradable hydrophobic tails have the formula -$R^{12}$-$M^1$-$R^{13}$. | The biodegradable tails of ALC-0315 have the formula $R^{12}$-$M^1$-$R^{13}$:  |

| 22. | The cationic lipid of claim 18, wherein the chain length of $-R^{12}-M^1-R^{13}$ is at most 21 atoms from the first atom after the central moiety to a terminus of the tail. | For ALC-0315, it is at most 21 atoms from the first atom after the central moiety to a terminus:  |
| 24. | The cationic lipid of claim 18, wherein, in at least one hydrophobic tail, the number of carbon atoms between the central moiety and the biodegradable group in the hydrophobic tail ranges from 5 to 10. | For ALC-0315, the number of carbon atoms between the central moiety and the biodegradable group ranges from 5 to 10:  |

| 25. | The cationic lipid of claim 18, wherein, in at least one hydrophobic tail, the total number of carbon atoms between the central moiety and a terminus of the hydrophobic tail ranges from 15 to 20. | For ALC-0315, the total number of carbon atoms between the central moiety and a terminus of the hydrophobic tail ranges from 15 to 20:<br><br> |
| --- | --- | --- |
| 26. | The cationic lipid of claim 18, wherein in at least one hydrophobic tail, the biodegradable group is separated from a terminus of the hydrophobic tail by from 8 to 12 carbon atoms. | For ALC-0315, a terminus is separated from the biodegradable group by from 8 to 12 carbon atoms for the top chain and by from 8 to 12 carbon atoms for the bottom chain:<br><br> |

| 27. | The cationic lipid of claim 26, wherein in at least one hydrophobic tail, the biodegradable group is separated from a terminus of the hydrophobic tail by 8 carbon atoms. | For ALC-0315, a terminus is separated from the biodegradable group by 8 carbon atoms for the top chain and by 8 carbon atoms for the bottom chain:  |

11

# EXHIBIT 3



Our STN:  BL 125742/0                                                **BLA APPROVAL**

BioNTech Manufacturing GmbH                                          August 23, 2021
Attention:  Amit Patel
Pfizer Inc.
235 East 42nd Street
New York, NY 10017

Dear Mr. Patel:

Please refer to your Biologics License Application (BLA) submitted and received on
May 18, 2021, under section 351(a) of the Public Health Service Act (PHS Act) for
COVID-19 Vaccine, mRNA.

**LICENSING**

We are issuing Department of Health and Human Services U.S. License No. 2229 to
BioNTech Manufacturing GmbH, Mainz, Germany, under the provisions of section
351(a) of the PHS Act controlling the manufacture and sale of biological products.  The
license authorizes you to introduce or deliver for introduction into interstate commerce,
those products for which your company has demonstrated compliance with
establishment and product standards.

Under this license, you are authorized to manufacture the product, COVID-19 Vaccine,
mRNA, which is indicated for active immunization to prevent coronavirus disease 2019
(COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)
in individuals 16 years of age and older.

The review of this product was associated with the following National Clinical Trial
(NCT) numbers:  NCT04368728 and NCT04380701.

**MANUFACTURING LOCATIONS**

Under this license, you are approved to manufacture COVID-19 Vaccine, mRNA drug
substance at Wyeth BioPharma Division of Wyeth Pharmaceuticals LLC, 1 Burtt Road,
Andover, Massachusetts.  The final formulated product will be manufactured, filled,
labeled and packaged at Pfizer Manufacturing Belgium NV, Rijksweg 12, Puurs,
Belgium and at Pharmacia & Upjohn Company LLC, 7000 Portage Road, Kalamazoo,
Michigan.  The diluent, 0.9% Sodium Chloride Injection, USP, will be manufactured at
Hospira, Inc., (b) (4)                                          and at Fresenius Kabi
USA, LLC, (b) (4)                                          .

Page 2 – STN BL 125742/0 – Elisa Harkins

You may label your product with the proprietary name, COMIRNATY, and market it in 2.0 mL glass vials, in packages of 25 and 195 vials.
We did not refer your application to the Vaccines and Related Biological Products Advisory Committee because our review of information submitted in your BLA, including the clinical study design and trial results, did not raise concerns or controversial issues that would have benefited from an advisory committee discussion.

**DATING PERIOD**

The dating period for COVID-19 Vaccine, mRNA shall be 9 months from the date of manufacture when stored between -90ºC to -60ºC (-130ºF to -76ºF).  The date of manufacture shall be no later than the date of final sterile filtration of the formulated drug product (at Pharmacia & Upjohn Company LLC in Kalamazoo, Michigan, the date of manufacture is defined as the date of sterile filtration for the final drug product; at Pfizer Manufacturing Belgium NV in Puurs, Belgium, it is defined as the date of the (b) (4) Following the final sterile filtration, (b) (4) , no reprocessing/reworking is allowed without prior approval from the Agency.  The dating period for your drug substance shall be (b) (4) when stored at (b) (4) We have approved the stability protocols in your license application for the purpose of extending the expiration dating period of your drug substance and drug product under 21 CFR 601.12.

**FDA LOT RELEASE**

Please submit final container samples of the product in final containers together with protocols showing results of all applicable tests.  You may not distribute any lots of product until you receive a notification of release from the Director, Center for Biologics Evaluation and Research (CBER).

**BIOLOGICAL PRODUCT DEVIATIONS**

You must submit reports of biological product deviations under 21 CFR 600.14.  You should identify and investigate all manufacturing deviations promptly, including those associated with processing, testing, packaging, labeling, storage, holding and distribution.  If the deviation involves a distributed product, may affect the safety, purity, or potency of the product, and meets the other criteria in the regulation, you must submit a report on Form FDA 3486 to the Director, Office of Compliance and Biologics Quality, electronically through the eBPDR web application or at the address below. Links for the instructions on completing the electronic form (eBPDR) may be found on CBER's web site at https://www.fda.gov/vaccines-blood-biologics/report-problem-center-biologics-evaluation-research/biological-product-deviations:

Food and Drug Administration
Center for Biologics Evaluation and Research
Document Control Center

Page 3 – STN BL 125742/0 – Elisa Harkins

10903 New Hampshire Ave.
WO71-G112
Silver Spring, MD 20993-0002

**MANUFACTURING CHANGES**

You must submit information to your BLA for our review and written approval under 21 CFR 601.12 for any changes in, including but not limited to, the manufacturing, testing, packaging or labeling of COVID-19 Vaccine, mRNA, or in the manufacturing facilities.

**LABELING**

We hereby approve the draft content of labeling including Package Insert, submitted under amendment 74, dated August 21, 2021, and the draft carton and container labels submitted under amendment 63, dated August 19, 2021.

**CONTENT OF LABELING**

As soon as possible, but no later than 14 days from the date of this letter, please submit the final content of labeling (21 CFR 601.14) in Structured Product Labeling (SPL) format via the FDA automated drug registration and listing system, (eLIST) as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.  Content of labeling must be identical to the Package Insert submitted on August 21, 2021.  Information on submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As* at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible via publicly available labeling repositories.

**CARTON AND CONTAINER LABELS**

Please electronically submit final printed carton and container labels identical to the carton and container labels submitted on August 19, 2021, according to the guidance for industry *Providing Regulatory Submissions in Electronic Format — Certain Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-regulatory-submissions-electronic-format-certain-human-pharmaceutical-product-applications.

All final labeling should be submitted as Product Correspondence to this BLA STN BL 125742 at the time of use and include implementation information on Form FDA 356h.

**ADVERTISING AND PROMOTIONAL LABELING**

Page 4 – STN BL 125742/0 – Elisa Harkins

You may submit two draft copies of the proposed introductory advertising and promotional labeling with Form FDA 2253 to the Advertising and Promotional Labeling Branch at the following address:

> Food and Drug Administration
> Center for Biologics Evaluation and Research
> Document Control Center
> 10903 New Hampshire Ave.
> WO71-G112
> Silver Spring, MD 20993-0002

You must submit copies of your final advertising and promotional labeling at the time of initial dissemination or publication, accompanied by Form FDA 2253 (21 CFR 601.12(f)(4)).

All promotional claims must be consistent with and not contrary to approved labeling. You should not make a comparative promotional claim or claim of superiority over other products unless you have substantial evidence or substantial clinical experience to support such claims (21 CFR 202.1(e)(6)).

## ADVERSE EVENT REPORTING

You must submit adverse experience reports in accordance with the adverse experience reporting requirements for licensed biological products (21 CFR 600.80), and you must submit distribution reports at monthly intervals as described in 21 CFR 600.81.  For information on adverse experience reporting, please refer to the guidance for industry *Providing Submissions in Electronic Format —Postmarketing Safety Reports for Vaccines* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-submissions-electronic-format-postmarketing-safety-reports-vaccines.  For information on distribution reporting, please refer to the guidance for industry *Electronic Submission of Lot Distribution Reports* at http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Post-MarketActivities/LotReleases/ucm061966.htm.

## PEDIATRIC REQUIREMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We are deferring submission of your pediatric studies for ages younger than 16 years for this application because this product is ready for approval for use in individuals 16 years of age and older, and the pediatric studies for younger ages have not been completed.

Your deferred pediatric studies required under section 505B(a) of the Federal Food, Drug, and Cosmetic Act (FDCA) are required postmarketing studies.  The status of these postmarketing studies must be reported according to 21 CFR 601.28 and section 505B(a)(4)(C) of the FDCA.  In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

Label your annual report as an "**Annual Status Report of Postmarketing Study Requirement/Commitments**" and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements under section 506B of the FDCA are released or fulfilled.  These required studies are listed below:

1.  Deferred pediatric Study C4591001 to evaluate the safety and effectiveness of COMIRNATY in children 12 years through 15 years of age.

    Final Protocol Submission:  October 7, 2020

    Study Completion:  May 31, 2023

    Final Report Submission:  October 31, 2023

2.  Deferred pediatric Study C4591007 to evaluate the safety and effectiveness of COMIRNATY in infants and children 6 months to <12 years of age.

    Final Protocol Submission:  February 8, 2021

    Study Completion:  November 30, 2023

    Final Report Submission:  May 31, 2024

3.  Deferred pediatric Study C4591023 to evaluate the safety and effectiveness of COMIRNATY in infants <6 months of age.

    Final Protocol Submission:  January 31, 2022

    Study Completion:  July 31, 2024

    Final Report Submission:  October 31, 2024

Submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.
Submit final study reports to this BLA STN BL 125742.  In order for your PREA PMRs to be considered fulfilled, you must submit and receive approval of an efficacy or a labeling

Page 6 – STN BL 125742/0 – Elisa Harkins

supplement.  For administrative purposes, all submissions related to these required pediatric postmarketing studies must be clearly designated as:

- **Required Pediatric Assessment(s)**

We note that you have fulfilled the pediatric study requirement for ages 16 through 17 years for this application.

**POSTMARKETING REQUIREMENTS UNDER SECTION 505(o)**

Section 505(o) of the Federal Food, Drug, and Cosmetic Act (FDCA) authorizes FDA to require holders of approved drug and biological product applications to conduct postmarketing studies and clinical trials for certain purposes, if FDA makes certain findings required by the statute (section 505(o)(3)(A), 21 U.S.C. 355(o)(3)(A)).

We have determined that an analysis of spontaneous postmarketing adverse events reported under section 505(k)(1) of the FDCA will not be sufficient to assess known serious risks of myocarditis and pericarditis and identify an unexpected serious risk of subclinical myocarditis.

Furthermore, the pharmacovigilance system that FDA is required to maintain under section 505(k)(3) of the FDCA is not sufficient to assess these serious risks.

Therefore, based on appropriate scientific data, we have determined that you are required to conduct the following studies:

4. Study C4591009, entitled "A Non-Interventional Post-Approval Safety Study of the Pfizer-BioNTech COVID-19 mRNA Vaccine in the United States," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

   Final Protocol Submission:  August 31, 2021

   Monitoring Report Submission:  October 31, 2022

   Interim Report Submission:  October 31, 2023

   Study Completion:  June 30, 2025

   Final Report Submission:  October 31, 2025

5. Study C4591021, entitled "Post Conditional Approval Active Surveillance Study Among Individuals in Europe Receiving the Pfizer-BioNTech Coronavirus

Disease 2019 (COVID-19) Vaccine," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  August 11, 2021

Progress Report Submission:  September 30, 2021

Interim Report 1 Submission:  March 31, 2022

Interim Report 2 Submission:  September 30, 2022

Interim Report 3 Submission:  March 31, 2023

Interim Report 4 Submission:  September 30, 2023

Interim Report 5 Submission:  March 31, 2024

Study Completion:  March 31, 2024

Final Report Submission:  September 30, 2024

6.  Study C4591021 substudy to describe the natural history of myocarditis and pericarditis following administration of COMIRNATY.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  January 31, 2022

Study Completion:  March 31, 2024

Final Report Submission:  September 30, 2024

7.  Study C4591036, a prospective cohort study with at least 5 years of follow-up for potential long-term sequelae of myocarditis after vaccination (in collaboration with Pediatric Heart Network).

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  November 30, 2021

Study Completion:  December 31, 2026

Page 8 – STN BL 125742/0 – Elisa Harkins

Final Report Submission:  May 31, 2027

8.  Study C4591007 substudy to prospectively assess the incidence of subclinical myocarditis following administration of the second dose of COMIRNATY in a subset of participants 5 through 15 years of age.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this assessment according to the following schedule:

Final Protocol Submission:  September 30, 2021

Study Completion:  November 30, 2023

Final Report Submission:  May 31, 2024

9.  Study C4591031 substudy to prospectively assess the incidence of subclinical myocarditis following administration of a third dose of COMIRNATY in a subset of participants 16 to 30 years of age.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  November 30, 2021

Study Completion:  June 30, 2022

Final Report Submission:  December 31, 2022

Please submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.

Please submit final study reports to the BLA.  If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement to this BLA STN BL 125742.  For administrative purposes, all submissions related to these postmarketing studies required under section 505(o) must be submitted to this BLA and be clearly designated as:

- **Required Postmarketing Correspondence under Section 505(o)**
- **Required Postmarketing Final Report under Section 505(o)**
- **Supplement contains Required Postmarketing Final Report under Section 505(o)**

Section 505(o)(3)(E)(ii) of the FDCA requires you to report periodically on the status of any study or clinical trial required under this section.  This section also requires you to periodically report to FDA on the status of any study or clinical trial otherwise

Page 9 – STN BL 125742/0 – Elisa Harkins

undertaken to investigate a safety issue.  In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

You must describe the status in an annual report on postmarketing studies for this product.  Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released.  The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing requirement;
- the original milestone schedule for the requirement;
- the revised milestone schedule for the requirement, if appropriate;
- the current status of the requirement (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status for the study or clinical trial.  The explanation should include how the study is progressing in reference to the original projected schedule, including, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

We will consider the submission of your annual report under section 506B of the FDCA and 21 CFR 601.70 to satisfy the periodic reporting requirement under section 505(o)(3)(E)(ii) provided that you include the elements listed in section 505(o) and 21 CFR 601.70.  We remind you that to comply with section 505(o), your annual report must also include a report on the status of any study or clinical trial otherwise undertaken to investigate a safety issue.  Failure to periodically report on the status of studies or clinical trials required under section 505(o) may be a violation of FDCA section 505(o)(3)(E)(ii) and could result in regulatory action.

**POSTMARKETING COMMITMENTS SUBJECT TO REPORTING REQUIREMENTS UNDER SECTION 506B**

We acknowledge your written commitments as described in your letter of August 21, 2021 as outlined below:

10. Study C4591022, entitled "Pfizer-BioNTech COVID-19 Vaccine Exposure during Pregnancy: A Non-Interventional Post-Approval Safety Study of Pregnancy and Infant Outcomes in the Organization of Teratology Information Specialists (OTIS)/MotherToBaby Pregnancy Registry."

    Final Protocol Submission:  July 1, 2021

Study Completion:  June 30, 2025

Final Report Submission:  December 31, 2025

11. Study C4591007 substudy to evaluate the immunogenicity and safety of lower dose levels of COMIRNATY in individuals 12 through <30 years of age.

Final Protocol Submission:  September 30, 2021

Study Completion:  November 30, 2023

Final Report Submission:  May 31, 2024

12. Study C4591012, entitled "Post-emergency Use Authorization Active Safety Surveillance Study Among Individuals in the Veteran's Affairs Health System Receiving Pfizer-BioNTech Coronavirus Disease 2019 (COVID-19) Vaccine."

Final Protocol Submission:  January 29, 2021

Study Completion:  June 30, 2023

Final Report Submission:  December 31, 2023

13. Study C4591014, entitled "Pfizer-BioNTech COVID-19 BNT162b2 Vaccine Effectiveness Study - Kaiser Permanente Southern California."

Final Protocol Submission:  March 22, 2021

Study Completion:  December 31, 2022

Final Report Submission:  June 30, 2023

Please submit clinical protocols to your IND 19736, and a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMC sequential number for each study/clinical trial and the submission number as shown in this letter.

If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement.  Please use the following designators to prominently label all submissions, including supplements, relating to these postmarketing study commitments as appropriate:

- **Postmarketing Commitment – Correspondence Study Update**
- **Postmarketing Commitment – Final Study Report**
- **Supplement contains Postmarketing Commitment – Final Study Report**

For each postmarketing study subject to the reporting requirements of 21 CFR 601.70, you must describe the status in an annual report on postmarketing studies for this product.  Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released.  The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing commitment;
- the original schedule for the commitment;
- the status of the commitment (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status including, for clinical studies, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

**POST APPROVAL FEEDBACK MEETING**

New biological products qualify for a post approval feedback meeting.  Such meetings are used to discuss the quality of the application and to evaluate the communication process during drug development and marketing application review.  The purpose is to learn from successful aspects of the review process and to identify areas that could benefit from improvement.  If you would like to have such a meeting with us, please contact the Regulatory Project Manager for this application.

Sincerely,

Mary A. Malarkey                          Marion F. Gruber, PhD
Director                                        Director
Office of Compliance                       Office of Vaccines
  and Biologics Quality                      Research and Review
Center for Biologics                        Center for Biologics
  Evaluation and Research                    Evaluation and Research

# EXHIBIT 4

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use COMIRNATY safely and effectively. See full prescribing information for COMIRNATY.**

**COMIRNATY® (COVID-19 Vaccine, mRNA) suspension for injection, for intramuscular use**
**Initial U.S. Approval: 2021**

--------------------------- **INDICATIONS AND USAGE**---------------------------
COMIRNATY is a vaccine indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older. (1)

----------------------**DOSAGE AND ADMINISTRATION**----------------------
- COMIRNATY supplied in multiple dose vials with gray caps and labels with gray borders MUST NOT be diluted prior to use. (2.1)
- For intramuscular injection only. (2.2)
- COMIRNATY is administered intramuscularly as a series of 2 doses (0.3 mL each) 3 weeks apart. (2.3)

--------------------- **DOSAGE FORMS AND STRENGTHS**----------------------
Suspension for injection. A single dose is 0.3 mL. (3)

----------------------------- **CONTRAINDICATIONS** -----------------------------
Known history of a severe allergic reaction (e.g., anaphylaxis) to any component of COMIRNATY. (4)

----------------------- **WARNINGS AND PRECAUTIONS** -----------------------
- Postmarketing data demonstrate increased risks of myocarditis and pericarditis, particularly within 7 days following the second dose. (5.2)
- Syncope (fainting) may occur in association with administration of injectable vaccines, including COMIRNATY. Procedures should be in place to avoid injury from fainting. (5.4)

----------------------------- **ADVERSE REACTIONS** -----------------------------
- In clinical studies of participants 16 through 55 years of age, the most commonly reported adverse reactions (≥10%) were pain at the injection site (88.6%), fatigue (70.1%), headache (64.9%), muscle pain (45.5%), chills (41.5%), joint pain (27.5%), fever (17.8%), and injection site swelling (10.6%). (6.1)
- In clinical studies of participants 56 years of age and older, the most commonly reported adverse reactions (≥10%) were pain at the injection site (78.2%), fatigue (56.9%), headache, (45.9%), muscle pain (32.5%), chills (24.8%), joint pain (21.5%), injection site swelling (11.8%), fever (11.5%), and injection site redness (10.4%). (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Pfizer Inc. at 1-800-438-1985 or VAERS at 1-800-822-7967 or http://vaers.hhs.gov.**

**See 17 for PATIENT COUNSELING INFORMATION.**

**Revised: 12/2021**

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**1   INDICATIONS AND USAGE**
**2   DOSAGE AND ADMINISTRATION**
    2.1   Preparation for Administration
    2.2   Administration Information
    2.3   Vaccination Schedule
**3   DOSAGE FORMS AND STRENGTHS**
**4   CONTRAINDICATIONS**
**5   WARNINGS AND PRECAUTIONS**
    5.1   Management of Acute Allergic Reactions
    5.2   Myocarditis and Pericarditis
    5.3   Syncope
    5.4   Altered Immunocompetence
    5.5   Limitation of Effectiveness
**6   ADVERSE REACTIONS**
    6.1   Clinical Trials Experience
    6.2   Postmarketing Experience

**8   USE IN SPECIFIC POPULATIONS**
    8.1   Pregnancy
    8.2   Lactation
    8.4   Pediatric Use
    8.5   Geriatric Use
**11   DESCRIPTION**
**12   CLINICAL PHARMACOLOGY**
    12.1   Mechanism of Action
**13   NONCLINICAL TOXICOLOGY**
    13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility
**14   CLINICAL STUDIES**
**16   HOW SUPPLIED/STORAGE AND HANDLING**
**17   PATIENT COUNSELING INFORMATION**

\* Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

## 1   INDICATIONS AND USAGE

COMIRNATY is a vaccine indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older.

## 2   DOSAGE AND ADMINISTRATION

For intramuscular injection only.

### 2.1   Preparation for Administration

The storage, preparation, and administration information in this Prescribing Information apply to COMIRNATY for individuals 16 years of age and older supplied in multiple dose vials with gray caps and labels with gray borders, which **MUST NOT** be diluted prior to use.

**COMIRNATY Multiple Dose Vial with Gray Cap and Label with a Gray Border**

| Age Range | Dilution Information | Doses Per Vial | Dose Volume |
|---|---|---|---|
| 16 years and older | Do not dilute prior to use | 6 | 0.3 mL |

**DO NOT DILUTE**

- COMIRNATY multiple dose vial with a gray cap and a label with a gray border contains a volume of 2.25 mL, supplied as a frozen suspension that does not contain preservative. Each vial must be thawed prior to administration. **DO NOT DILUTE** prior to use.
- Vials may be thawed in the refrigerator [2ºC to 8ºC (35ºF to 46ºF)] or at room temperature [up to 25ºC (77ºF)] *[see How Supplied/Storage and Handling (16)]*.
- Refer to thawing instructions in the panels below.
- One vial contains 6 doses of 0.3 mL.

| Preparation Instructions |
|---|
| **COMIRNATY Vial with Gray Cap and Label with Gray Border –**<br>**Vial Verification** |



| | |
|---|---|
| ✓ **Gray plastic cap and label with gray border.** | • Verify that the vial of COMIRNATY has a gray plastic cap and a label with a gray border. |

| **Preparation Instructions** |
| --- |
| **COMIRNATY Vial with Gray Cap and Label with Gray Border –** <br> **Thawing Prior to Use** |



**Store in the refrigerator for up to 10 weeks prior to use.**

- Thaw vial(s) of COMIRNATY before use either by:
  - Allowing vial(s) to thaw in the refrigerator [2ºC to 8ºC (35ºF to 46ºF)]. A carton of 10 vials may take up to 6 hours to thaw, and thawed vials can be stored in the refrigerator for up to 10 weeks.
  - Allowing vial(s) to sit at room temperature [up to 25ºC (77ºF)] for 30 minutes.
- Vials may be stored at room temperature [up to 25ºC (77ºF)] for up to 12 hours prior to use.



**Gently × 10**

- Before use, mix by inverting vaccine vial gently 10 times.
- Do not shake.
- Prior to mixing, the thawed vaccine may contain white to off-white opaque amorphous particles.
- After mixing, the vaccine should appear as a white to off-white suspension with no visible particles.
- Do not use if liquid is discolored or if particles are observed after mixing.

| Preparation Instructions |
|---|
| **COMIRNATY Vial with Gray Cap and Label with Gray Border –**<br>**Preparation of Individual 0.3 mL Doses** |

| | |
|---|---|
| <br>**Withdraw 0.3 mL dose of vaccine.** | • Withdraw <u>0.3 mL</u> of COMIRNATY preferentially using low dead-volume syringes and/or needles.<br>• Each dose must contain 0.3 mL of vaccine.<br>• If the amount of vaccine remaining in a single vial cannot provide a full dose of 0.3 mL, discard the vial and any excess volume.<br>• Administer immediately. |
| <br>**Record the date and time of**<br>**first puncture.**<br>**Use within 12 hours after first**<br>**puncture.** | • Record the date and time of first vial puncture on the COMIRNATY vial label.<br>• Store between 2°C to 25°C (35°F to 77°F).<br>• Discard any unused vaccine 12 hours after first puncture. |

Vials of COMIRNATY with gray caps and labels with gray borders contain 6 doses of 0.3 mL of vaccine. Low dead-volume syringes and/or needles can be used to extract 6 doses from a single vial. If standard syringes and needles are used, there may not be sufficient volume to extract 6 doses from a single vial. Irrespective of the type of syringe and needle,
- each dose must contain 0.3 mL of vaccine.
- if the amount of vaccine remaining in the vial cannot provide a full dose of 0.3 mL, discard the vial and any excess volume.
- do not pool excess vaccine from multiple vials.

## 2.2   Administration Information

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit. The vaccine will be a white to off-white suspension. Do not administer if vaccine is discolored or contains particulate matter.

Administer a single 0.3 mL dose of COMIRNATY intramuscularly.

## 2.3   Vaccination Schedule

COMIRNATY is administered intramuscularly as a series of 2 doses (0.3 mL each) 3 weeks apart.

There are no data available on the interchangeability of COMIRNATY with COVID-19 vaccines from other manufacturers to complete the vaccination series. Individuals who have received 1 dose of COMIRNATY should receive a second dose of COMIRNATY to complete the vaccination series.

## 3   DOSAGE FORMS AND STRENGTHS

COMIRNATY is a suspension for injection. Each dose of COMIRNATY supplied in vials with gray caps and labels with gray borders is 0.3 mL.

## 4   CONTRAINDICATIONS

Do not administer COMIRNATY to individuals with known history of a severe allergic reaction (e.g., anaphylaxis) to any component of the COMIRNATY *[see Description (11)]*.

## 5   WARNINGS AND PRECAUTIONS

## 5.1   Management of Acute Allergic Reactions

Appropriate medical treatment used to manage immediate allergic reactions must be immediately available in the event an acute anaphylactic reaction occurs following administration of COMIRNATY.

## 5.2   Myocarditis and Pericarditis

Postmarketing data demonstrate increased risks of myocarditis and pericarditis, particularly within 7 days following the second dose. The observed risk is higher among males under 40 years of age than among females and older males. The observed risk is highest in males 12 through 17 years of age. Although some cases required intensive care support, available data from short-term follow-up suggest that most individuals have had resolution of symptoms with conservative management. Information is not yet available about potential long-term sequelae. The CDC has published considerations related to myocarditis and pericarditis after vaccination, including for vaccination of individuals with a history of myocarditis or pericarditis (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html).

## 5.3   Syncope

Syncope (fainting) may occur in association with administration of injectable vaccines, including COMIRNATY. Procedures should be in place to avoid injury from fainting.

**5.4    Altered Immunocompetence**

Immunocompromised persons, including individuals receiving immunosuppressant therapy, may have a diminished immune response to the COMIRNATY.

**5.5    Limitation of Effectiveness**

COMIRNATY may not protect all vaccine recipients.

# 6   ADVERSE REACTIONS

In clinical studies, the most commonly reported ($\geq$10%) adverse reactions in participants 16 through 55 years of age following any dose were pain at the injection site (88.6%), fatigue (70.1%), headache (64.9%), muscle pain (45.5%), chills (41.5%), joint pain (27.5%), fever (17.8%), and injection site swelling (10.6%).

In clinical studies, the most commonly reported ($\geq$10%) adverse reactions in participants 56 years of age and older following any dose were pain at the injection site (78.2%), fatigue (56.9%), headache, (45.9%), muscle pain (32.5%), chills (24.8%), joint pain (21.5%), injection site swelling (11.8%), fever (11.5%), and injection site redness (10.4%).

## 6.1   Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a vaccine cannot be directly compared to rates in the clinical trials of another vaccine and may not reflect the rates observed in practice.

The safety of COMIRNATY was evaluated in participants 16 years of age and older in 2 clinical studies conducted in Germany (Study 1), United States, Argentina, Brazil, Turkey, South Africa, and Germany (Study 2). Study BNT162-01 (Study 1) was a Phase 1/2, 2-part, dose-escalation trial that enrolled 60 participants, 18 through 55 years of age and 36 participants, 56 through 85 years of age. Study C4591001 (Study 2) is a Phase 1/2/3 multicenter, multinational, randomized, saline placebo-controlled, double-blinded (Phase 2/3), dose-finding, vaccine candidate-selection and efficacy study that has enrolled approximately 44,047 participants (22,026 COMIRNATY; 22,021 placebo) 16 years of age or older (including 378 and 376 participants 16 through 17 years of age in the vaccine and placebo groups, respectively). Upon issuance of the Emergency Use Authorization (December 11, 2020) for COMIRNATY, participants were unblinded to offer placebo participants COMIRNATY. Participants were unblinded in a phased manner over a period of months to offer placebo participants COMIRNATY. Study 2 also included 200 participants with confirmed stable human immunodeficiency virus (HIV) infection; HIV-positive participants are included in safety population disposition but are summarized separately in safety analyses. Confirmed stable HIV infection was defined as documented viral load <50 copies/mL and CD4 count >200 cells/mm$^3$ within 6 months before enrollment, and on stable antiretroviral therapy for at least 6 months.

At the time of the analysis of the ongoing Study 2 with a data cut-off of March 13, 2021, there were 25,651 (58.2%) participants (13,031 COMIRNATY and 12,620 placebo) 16 years of age and older followed for $\geq$4 months after the second dose.

Participants 16 years and older in the reactogenicity subset were monitored for solicited local and systemic reactions and use of antipyretic medication after each vaccination in an electronic diary. Participants are being monitored for unsolicited adverse events, including serious adverse events, throughout the study [from Dose 1 through 1 month (all unsolicited adverse events) or 6 months (serious adverse events) after the last vaccination].

Demographic characteristics in Study 2 were generally similar with regard to age, gender, race, and ethnicity among participants who received COMIRNATY and those who received placebo. Overall, among the total participants who received either COMIRNATY or placebo, 50.9% were male, 49.1% were female, 79.3% were 16 through 64 years of age, 20.7% were 65 years of age and older, 82.0% were White, 9.6% were Black or African American, 25.9% were Hispanic/Latino, 4.3% were Asian, and 1.0% were American Indian or Alaska Native.

<u>Local and Systemic Adverse Reactions Solicited in the Study 2</u>

Table 1 and Table 2 present the frequency and severity of reported solicited local and systemic reactions, respectively, within 7 days following each dose of COMIRNATY and placebo in the subset of participants 16 through 55 years of age included in the safety population who were monitored for reactogenicity with an electronic diary.

Table 3 and Table 4 present the frequency and severity of reported solicited local and systemic reactions, respectively, within 7 days of each dose of COMIRNATY and placebo for participants 56 years of age and older.

In participants 16 through 55 years of age after receiving Dose 2, the mean duration of pain at the injection site was 2.5 days (range 1 to 70 days), for redness 2.2 days (range 1 to 9 days), and for swelling 2.1 days (range 1 to 8 days) for participants in the COMIRNATY group. In participants 56 years of age and older after receiving Dose 2, the mean duration of pain at the injection site was 2.4 days (range 1 to 36 days), for redness 3.0 days (range 1 to 34 days), and for swelling 2.6 days (range 1 to 34 days) for participants in the COMIRNATY group.

**Table 1:   Study 2 – Frequency and Percentages of Participants with Solicited Local Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 16 Through 55 Years of Age – Reactogenicity Subset of the Safety Population\***

|  | COMIRNATY Dose 1 $N^a$=2899 $n^b$ (%) | Placebo Dose 1 $N^a$=2908 $n^b$ (%) | COMIRNATY Dose 2 $N^a$=2682 $n^b$ (%) | Placebo Dose 2 $N^a$=2684 $n^b$ (%) |
|---|---|---|---|---|
| Redness[c] | | | | |
| Any (>2.0 cm) | 156 (5.4) | 28 (1.0) | 151 (5.6) | 18 (0.7) |
| Mild | 113 (3.9) | 19 (0.7) | 90 (3.4) | 12 (0.4) |
| Moderate | 36 (1.2) | 6 (0.2) | 50 (1.9) | 6 (0.2) |
| Severe | 7 (0.2) | 3 (0.1) | 11 (0.4) | 0 |
| Swelling[c] | | | | |
| Any (>2.0 cm) | 184 (6.3) | 16 (0.6) | 183 (6.8) | 5 (0.2) |
| Mild | 124 (4.3) | 6 (0.2) | 110 (4.1) | 3 (0.1) |
| Moderate | 54 (1.9) | 8 (0.3) | 66 (2.5) | 2 (0.1) |
| Severe | 6 (0.2) | 2 (0.1) | 7 (0.3) | 0 |

| | COMIRNATY Dose 1 N[a]=2899 n[b] (%) | Placebo Dose 1 N[a]=2908 n[b] (%) | COMIRNATY Dose 2 N[a]=2682 n[b] (%) | Placebo Dose 2 N[a]=2684 n[b] (%) |
|---|---|---|---|---|
| Pain at the injection site[d] | | | | |
| Any | 2426 (83.7) | 414 (14.2) | 2101 (78.3) | 312 (11.6) |
| Mild | 1464 (50.5) | 391 (13.4) | 1274 (47.5) | 284 (10.6) |
| Moderate | 923 (31.8) | 20 (0.7) | 788 (29.4) | 28 (1.0) |
| Severe | 39 (1.3) | 3 (0.1) | 39 (1.5) | 0 |

Notes: Reactions were collected in the electronic diary (e-diary) from Day 1 to Day 7 after vaccination.

No Grade 4 solicited local reactions were reported in participants 16 through 55 years of age.

\* Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

a. N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction was the same, therefore, this information was included in the column header.

b. n = Number of participants with the specified reaction.

c. Mild: >2.0 to ≤5.0 cm; Moderate: >5.0 to ≤10.0 cm; Severe: >10.0 cm.

d. Mild: does not interfere with activity; Moderate: interferes with activity; Severe: prevents daily activity.

**Table 2:   Study 2 – Frequency and Percentages of Participants with Solicited Systemic Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 16 Through 55 Years of Age – Reactogenicity Subset of the Safety Population\***

| | COMIRNATY Dose 1 N[a]=2899 n[b] (%) | Placebo Dose 1 N[a]=2908 n[b] (%) | COMIRNATY Dose 2 N[a]=2682 n[b] (%) | Placebo Dose 2 N[a]=2684 n[b] (%) |
|---|---|---|---|---|
| Fever | | | | |
| ≥38.0°C | 119 (4.1) | 25 (0.9) | 440 (16.4) | 11 (0.4) |
| ≥38.0°C to 38.4°C | 86 (3.0) | 16 (0.6) | 254 (9.5) | 5 (0.2) |
| >38.4°C to 38.9°C | 25 (0.9) | 5 (0.2) | 146 (5.4) | 4 (0.1) |
| >38.9°C to 40.0°C | 8 (0.3) | 4 (0.1) | 39 (1.5) | 2 (0.1) |
| >40.0°C | 0 | 0 | 1 (0.0) | 0 |
| Fatigue[c] | | | | |
| Any | 1431 (49.4) | 960 (33.0) | 1649 (61.5) | 614 (22.9) |
| Mild | 760 (26.2) | 570 (19.6) | 558 (20.8) | 317 (11.8) |
| Moderate | 630 (21.7) | 372 (12.8) | 949 (35.4) | 283 (10.5) |
| Severe | 41 (1.4) | 18 (0.6) | 142 (5.3) | 14 (0.5) |
| Headache[c] | | | | |
| Any | 1262 (43.5) | 975 (33.5) | 1448 (54.0) | 652 (24.3) |
| Mild | 785 (27.1) | 633 (21.8) | 699 (26.1) | 404 (15.1) |
| Moderate | 444 (15.3) | 318 (10.9) | 658 (24.5) | 230 (8.6) |
| Severe | 33 (1.1) | 24 (0.8) | 91 (3.4) | 18 (0.7) |
| Chills[c] | | | | |
| Any | 479 (16.5) | 199 (6.8) | 1015 (37.8) | 114 (4.2) |
| Mild | 338 (11.7) | 148 (5.1) | 477 (17.8) | 89 (3.3) |
| Moderate | 126 (4.3) | 49 (1.7) | 469 (17.5) | 23 (0.9) |
| Severe | 15 (0.5) | 2 (0.1) | 69 (2.6) | 2 (0.1) |

| | COMIRNATY Dose 1 N[a]=2899 n[b] (%) | Placebo Dose 1 N[a]=2908 n[b] (%) | COMIRNATY Dose 2 N[a]=2682 n[b] (%) | Placebo Dose 2 N[a]=2684 n[b] (%) |
|---|---|---|---|---|
| Vomiting[d] | | | | |
| Any | 34 (1.2) | 36 (1.2) | 58 (2.2) | 30 (1.1) |
| Mild | 29 (1.0) | 30 (1.0) | 42 (1.6) | 20 (0.7) |
| Moderate | 5 (0.2) | 5 (0.2) | 12 (0.4) | 10 (0.4) |
| Severe | 0 | 1 (0.0) | 4 (0.1) | 0 |
| Diarrhea[e] | | | | |
| Any | 309 (10.7) | 323 (11.1) | 269 (10.0) | 205 (7.6) |
| Mild | 251 (8.7) | 264 (9.1) | 219 (8.2) | 169 (6.3) |
| Moderate | 55 (1.9) | 58 (2.0) | 44 (1.6) | 35 (1.3) |
| Severe | 3 (0.1) | 1 (0.0) | 6 (0.2) | 1 (0.0) |
| New or worsened muscle pain[e] | | | | |
| Any | 664 (22.9) | 329 (11.3) | 1055 (39.3) | 237 (8.8) |
| Mild | 353 (12.2) | 231 (7.9) | 441 (16.4) | 150 (5.6) |
| Moderate | 296 (10.2) | 96 (3.3) | 552 (20.6) | 84 (3.1) |
| Severe | 15 (0.5) | 2 (0.1) | 62 (2.3) | 3 (0.1) |
| New or worsened joint pain[e] | | | | |
| Any | 342 (11.8) | 168 (5.8) | 638 (23.8) | 147 (5.5) |
| Mild | 200 (6.9) | 112 (3.9) | 291 (10.9) | 82 (3.1) |
| Moderate | 137 (4.7) | 55 (1.9) | 320 (11.9) | 61 (2.3) |
| Severe | 5 (0.2) | 1 (0.0) | 27 (1.0) | 4 (0.1) |
| Use of antipyretic or pain medication[f] | 805 (27.8) | 398 (13.7) | 1213 (45.2) | 320 (11.9) |

Notes: Reactions and use of antipyretic or pain medication were collected in the electronic diary (e-diary) from Day 1 to Day 7 after each dose.

No Grade 4 solicited systemic reactions were reported in participants 16 through 55 years of age.

*   Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

a.  N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction or use of antipyretic or pain medication was the same, therefore, this information was included in the column header.

b.  n = Number of participants with the specified reaction.

c.  Mild: does not interfere with activity; Moderate: some interference with activity; Severe: prevents daily activity.

d.  Mild: 1 to 2 times in 24 hours; Moderate: >2 times in 24 hours; Severe: requires intravenous hydration.

e.  Mild: 2 to 3 loose stools in 24 hours; Moderate: 4 to 5 loose stools in 24 hours; Severe: 6 or more loose stools in 24 hours.

f.  Severity was not collected for use of antipyretic or pain medication.

**Table 3:** **Study 2 – Frequency and Percentages of Participants with Solicited Local Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 56 Years of Age and Older – Reactogenicity Subset of the Safety Population\***

|  | COMIRNATY Dose 1 $N^a$=2008 $n^b$ (%) | Placebo Dose 1 $N^a$=1989 $n^b$ (%) | COMIRNATY Dose 2 $N^a$=1860 $n^b$ (%) | Placebo Dose 2 $N^a$=1833 $n^b$ (%) |
|---|---|---|---|---|
| Redness[c] |  |  |  |  |
| Any (>2.0 cm) | 106 (5.3) | 20 (1.0) | 133 (7.2) | 14 (0.8) |
| Mild | 71 (3.5) | 13 (0.7) | 65 (3.5) | 10 (0.5) |
| Moderate | 30 (1.5) | 5 (0.3) | 58 (3.1) | 3 (0.2) |
| Severe | 5 (0.2) | 2 (0.1) | 10 (0.5) | 1 (0.1) |
| Swelling[c] |  |  |  |  |
| Any (>2.0 cm) | 141 (7.0) | 23 (1.2) | 145 (7.8) | 13 (0.7) |
| Mild | 87 (4.3) | 11 (0.6) | 80 (4.3) | 5 (0.3) |
| Moderate | 52 (2.6) | 12 (0.6) | 61 (3.3) | 7 (0.4) |
| Severe | 2 (0.1) | 0 | 4 (0.2) | 1 (0.1) |
| Pain at the injection site[d] |  |  |  |  |
| Any (>2.0 cm) | 1408 (70.1) | 185 (9.3) | 1230 (66.1) | 143 (7.8) |
| Mild | 1108 (55.2) | 177 (8.9) | 873 (46.9) | 138 (7.5) |
| Moderate | 296 (14.7) | 8 (0.4) | 347 (18.7) | 5 (0.3) |
| Severe | 4 (0.2) | 0 | 10 (0.5) | 0 |

Notes: Reactions were collected in the electronic diary (e-diary) from Day 1 to Day 7 after vaccination.
No Grade 4 solicited local reactions were reported in participants 56 years of age and older.
\*   Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.
a.   N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction was the same, therefore, the information was included in the column header.
b.   n = Number of participants with the specified reaction.
c.   Mild: >2.0 to ≤5.0 cm; Moderate: >5.0 to ≤10.0 cm; Severe: >10.0 cm.
d.   Mild: does not interfere with activity; Moderate: interferes with activity; Severe: prevents daily activity.

**Table 4:** **Study 2 – Frequency and Percentages of Participants with Solicited Systemic Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 56 Years of Age and Older – Reactogenicity Subset of the Safety Population\***

|  | COMIRNATY Dose 1 $N^a$=2008 $n^b$ (%) | Placebo Dose 1 $N^a$=1989 $n^b$ (%) | COMIRNATY Dose 2 $N^a$=1860 $n^b$ (%) | Placebo Dose 2 $N^a$=1833 $n^b$ (%) |
|---|---|---|---|---|
| Fever |  |  |  |  |
| ≥38.0°C | 26 (1.3) | 8 (0.4) | 219 (11.8) | 4 (0.2) |
| ≥38.0°C to 38.4°C | 23 (1.1) | 3 (0.2) | 158 (8.5) | 2 (0.1) |
| >38.4°C to 38.9°C | 2 (0.1) | 3 (0.2) | 54 (2.9) | 1 (0.1) |
| >38.9°C to 40.0°C | 1 (0.0) | 2 (0.1) | 7 (0.4) | 1 (0.1) |
| >40.0°C | 0 | 0 | 0 | 0 |

| | COMIRNATY Dose 1 N$^a$=2008 n$^b$ (%) | Placebo Dose 1 N$^a$=1989 n$^b$ (%) | COMIRNATY Dose 2 N$^a$=1860 n$^b$ (%) | Placebo Dose 2 N$^a$=1833 n$^b$ (%) |
|---|---|---|---|---|
| Fatigue$^c$ | | | | |
| Any | 677 (33.7) | 447 (22.5) | 949 (51.0) | 306 (16.7) |
| Mild | 415 (20.7) | 281 (14.1) | 391 (21.0) | 183 (10.0) |
| Moderate | 259 (12.9) | 163 (8.2) | 497 (26.7) | 121 (6.6) |
| Severe | 3 (0.1) | 3 (0.2) | 60 (3.2) | 2 (0.1) |
| Grade 4 | 0 | 0 | 1 (0.1) | 0 |
| Headache$^c$ | | | | |
| Any | 503 (25.0) | 363 (18.3) | 733 (39.4) | 259 (14.1) |
| Mild | 381 (19.0) | 267 (13.4) | 464 (24.9) | 189 (10.3) |
| Moderate | 120 (6.0) | 93 (4.7) | 256 (13.8) | 65 (3.5) |
| Severe | 2 (0.1) | 3 (0.2) | 13 (0.7) | 5 (0.3) |
| Chills$^c$ | | | | |
| Any | 130 (6.5) | 69 (3.5) | 435 (23.4) | 57 (3.1) |
| Mild | 102 (5.1) | 49 (2.5) | 229 (12.3) | 45 (2.5) |
| Moderate | 28 (1.4) | 19 (1.0) | 185 (9.9) | 12 (0.7) |
| Severe | 0 | 1 (0.1) | 21 (1.1) | 0 |
| Vomiting$^d$ | | | | |
| Any | 10 (0.5) | 9 (0.5) | 13 (0.7) | 5 (0.3) |
| Mild | 9 (0.4) | 9 (0.5) | 10 (0.5) | 5 (0.3) |
| Moderate | 1 (0.0) | 0 | 1 (0.1) | 0 |
| Severe | 0 | 0 | 2 (0.1) | 0 |
| Diarrhea$^e$ | | | | |
| Any | 168 (8.4) | 130 (6.5) | 152 (8.2) | 102 (5.6) |
| Mild | 137 (6.8) | 109 (5.5) | 125 (6.7) | 76 (4.1) |
| Moderate | 27 (1.3) | 20 (1.0) | 25 (1.3) | 22 (1.2) |
| Severe | 4 (0.2) | 1 (0.1) | 2 (0.1) | 4 (0.2) |
| New or worsened muscle pain$^c$ | | | | |
| Any | 274 (13.6) | 165 (8.3) | 537 (28.9) | 99 (5.4) |
| Mild | 183 (9.1) | 111 (5.6) | 229 (12.3) | 65 (3.5) |
| Moderate | 90 (4.5) | 51 (2.6) | 288 (15.5) | 33 (1.8) |
| Severe | 1 (0.0) | 3 (0.2) | 20 (1.1) | 1 (0.1) |
| New or worsened joint pain$^c$ | | | | |
| Any | 175 (8.7) | 124 (6.2) | 353 (19.0) | 72 (3.9) |
| Mild | 119 (5.9) | 78 (3.9) | 183 (9.8) | 44 (2.4) |
| Moderate | 53 (2.6) | 45 (2.3) | 161 (8.7) | 27 (1.5) |
| Severe | 3 (0.1) | 1 (0.1) | 9 (0.5) | 1 (0.1) |
| Use of antipyretic or pain medication$^f$ | 382 (19.0) | 224 (11.3) | 688 (37.0) | 170 (9.3) |

Notes: Reactions and use of antipyretic or pain medication were collected in the electronic diary (e-diary) from Day 1 to Day 7 after each dose.

The only Grade 4 solicited systemic reaction reported in participants 56 years of age and older was fatigue.

\*   Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

a.   N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. N for each reaction or use of antipyretic or pain medication was the same, therefore was included in the column header.

b.   n = Number of participants with the specified reaction.

|  | COMIRNATY Dose 1 $N^a$=2008 $n^b$ (%) | Placebo Dose 1 $N^a$=1989 $n^b$ (%) | COMIRNATY Dose 2 $N^a$=1860 $n^b$ (%) | Placebo Dose 2 $N^a$=1833 $n^b$ (%) |
|---|---|---|---|---|

c. Mild: does not interfere with activity; Moderate: some interference with activity; Severe: prevents daily activity; Grade 4 reactions were defined in the clinical study protocol as emergency room visit or hospitalization for severe fatigue, severe headache, severe chills, severe muscle pain, or severe joint pain.

d. Mild: 1 to 2 times in 24 hours; Moderate: >2 times in 24 hours; Severe: requires intravenous hydration; Grade 4 emergency visit or hospitalization for severe vomiting.

e. Mild: 2 to 3 loose stools in 24 hours; Moderate: 4 to 5 loose stools in 24 hours; Severe: 6 or more loose stools in 24 hours; Grade 4: emergency room or hospitalization for severe diarrhea.

f. Severity was not collected for use of antipyretic or pain medication.

In participants with chronic, stable HIV infection the frequencies of solicited local and systemic adverse reactions were similar to or lower than those observed for all participants 16 years of age and older.

<u>Unsolicited Adverse Events</u>

Overall, 11,253 (51.1%) participants in the COMIRNATY group and 11,316 (51.4%) participants in the placebo group had follow-up time between ≥4 months to <6 months after Dose 2 in the blinded placebo-controlled follow-up period with an additional 1,778 (8.1%) and 1,304 (5.9%) with ≥6 months of blinded follow-up time in the COMIRNATY and placebo groups, respectively.

A total of 12,006 (54.5%) participants originally randomized to COMIRNATY had ≥6 months total (blinded and unblinded) follow-up after Dose 2.

In an analysis of all unsolicited adverse events reported following any dose, through 1 month after Dose 2, in participants 16 years of age and older (N=43,847; 21,926 COMIRNATY group vs. 21,921 placebo group), those assessed as adverse reactions not already captured by solicited local and systemic reactions were nausea (274 vs. 87), malaise (130 vs. 22), lymphadenopathy (83 vs. 7), asthenia (76 vs. 25), decreased appetite (39 vs. 9), hyperhidrosis (31 vs. 9), lethargy (25 vs. 6), and night sweats (17 vs. 3).

In analyses of all unsolicited adverse events in Study 2 from Dose 1 up to the participant unblinding date, 58.2% of study participants had at least 4 months of follow-up after Dose 2. Among participants 16 through 55 years of age who received at least 1 dose of study vaccine, 12,995 of whom received COMIRNATY and 13,026 of whom received placebo, unsolicited adverse events were reported by 4,396 (33.8%) participants in the COMIRNATY group and 2,136 (16.4%) participants in the placebo group. In a similar analysis in participants 56 years of age and older that included 8,931 COMIRNATY recipients and 8,895 placebo recipients, unsolicited adverse events were reported by 2,551 (28.6%) participants in the COMIRNATY group and 1,432 (16.1%) participants in the placebo group. Among participants with confirmed stable HIV infection that included 100 COMIRNATY recipients and 100 placebo recipients, unsolicited adverse events were reported by 29 (29%) participants in the COMIRNATY group and 15 (15%) participants in the placebo group. The higher frequency of reported unsolicited adverse events among COMIRNATY recipients compared to placebo recipients was primarily attributed to events that are consistent with adverse reactions solicited among participants in the reactogenicity subset (Table 3 and Table 4).

Throughout the placebo-controlled safety follow-up period, Bell's palsy (facial paralysis) was reported by 4 participants in the COMIRNATY group and 2 participants in the placebo group. Onset of facial paralysis was Day 37 after Dose 1 (participant did not receive Dose 2) and Days 3, 9, and 48 after Dose 2. In the placebo group the onset of facial paralysis was Day 32 and Day 102. Currently available information is insufficient to determine a causal relationship with the vaccine. In the analysis of blinded, placebo-controlled follow-up, there

were no other notable patterns or numerical imbalances between treatment groups for specific categories of non-serious adverse events (including other neurologic or neuro-inflammatory, and thrombotic events) that would suggest a causal relationship to COMIRNATY. In the analysis of unblinded follow-up, there were no notable patterns of specific categories of non-serious adverse events that would suggest a causal relationship to COMIRNATY.

*Serious Adverse Events*

In Study 2, among participants 16 through 55 years of age who had received at least 1 dose of vaccine or placebo (COMIRNATY =12,995; placebo = 13,026), serious adverse events from Dose 1 up to the participant unblinding date in ongoing follow-up were reported by 103 (0.8%) COMIRNATY recipients and 117 (0.9%) placebo recipients. In a similar analysis, in participants 56 years of age and older (COMIRNATY = 8,931; placebo = 8,895), serious adverse events were reported by 165 (1.8%) COMIRNATY recipients and 151 (1.7%) placebo recipients who received at least 1 dose of COMIRNATY or placebo, respectively. In these analyses, 58.2% of study participants had at least 4 months of follow-up after Dose 2. Among participants with confirmed stable HIV infection serious adverse events from Dose 1 up to the participant unblinding date in ongoing follow-up were reported by 2 (2%) COMIRNATY recipients and 2 (2%) placebo recipients.

In the analysis of blinded, placebo-controlled follow-up, there were no notable patterns between treatment groups for specific categories of serious adverse events (including neurologic, neuro-inflammatory, and thrombotic events) that would suggest a causal relationship to COMIRNATY. In the analysis of unblinded follow-up, there were no notable patterns of specific categories of serious adverse events that would suggest a causal relationship to COMIRNATY.

## 6.2   Postmarketing Experience

The following adverse reactions have been identified during postmarketing use of COMIRNATY, including under Emergency Use Authorization. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to vaccine exposure.

Cardiac Disorders: myocarditis, pericarditis
Gastrointestinal Disorders: diarrhea, vomiting
Immune System Disorders: severe allergic reactions, including anaphylaxis, and other hypersensitivity reactions (e.g., rash, pruritus, urticaria, angioedema)
Musculoskeletal and Connective Tissue Disorders: pain in extremity (arm)

## 8   USE IN SPECIFIC POPULATIONS

## 8.1   Pregnancy

There is a pregnancy exposure registry that monitors pregnancy outcomes in women exposed to COMIRNATY during pregnancy. Women who are vaccinated with COMIRNATY during pregnancy are encouraged to enroll in the registry by visiting https://mothertobaby.org/ongoing-study/covid19-vaccines/.

Risk Summary

All pregnancies have a risk of birth defect, loss, or other adverse outcomes. In the US general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2% to

4% and 15% to 20%, respectively. Available data on COMIRNATY administered to pregnant women are insufficient to inform vaccine-associated risks in pregnancy.

A developmental toxicity study has been performed in female rats administered the equivalent of a single human dose of COMIRNATY on 4 occasions; twice prior to mating and twice during gestation. These studies revealed no evidence of harm to the fetus due to the vaccine *(see Animal Data)*.

Data

*Animal Data*

In a developmental toxicity study, 0.06 mL of a vaccine formulation containing the same quantity of nucleoside-modified messenger ribonucleic acid (mRNA) (30 mcg) and other ingredients included in a single human dose of COMIRNATY was administered to female rats by the intramuscular route on 4 occasions: 21 and 14 days prior to mating, and on gestation days 9 and 20. No vaccine-related adverse effects on female fertility, fetal development, or postnatal development were reported in the study.

## 8.2   Lactation

Risk Summary

It is not known whether COMIRNATY is excreted in human milk. Data are not available to assess the effects of COMIRNATY on the breastfed infant or on milk production/excretion. The developmental and health benefits of breastfeeding should be considered along with the mother's clinical need for COMIRNATY and any potential adverse effects on the breastfed child from COMIRNATY or from the underlying maternal condition. For preventive vaccines, the underlying maternal condition is susceptibility to disease prevented by the vaccine.

## 8.4   Pediatric Use

Safety and effectiveness of COMIRNATY in individuals 16 through 17 years of age is based on safety and effectiveness data in this age group and in adults *[see Adverse Reactions (6) and Clinical Studies (14.1)]*.

The safety and effectiveness of COMIRNATY in individuals younger than 16 years of age have not been established.

## 8.5   Geriatric Use

Of the total number of COMIRNATY recipients in Study 2 as of March 13, 2021 (N = 22,026), 20.7% (n = 4,552) were 65 years of age and older and 4.2% (n = 925) were 75 years of age and older *[see Clinical Studies (14.1)]*. No overall differences in safety or effectiveness were observed between these recipients and younger recipients.

## 11   DESCRIPTION

COMIRNATY (COVID-19 Vaccine, mRNA) is a sterile suspension for injection for intramuscular use. COMIRNATY is supplied as a frozen suspension in multiple dose vials with gray caps and labels with gray borders. Each 0.3 mL dose of COMIRNATY supplied in multiple dose vials with gray caps and labels with gray borders contains 30 mcg of a nucleoside-modified messenger RNA (mRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2.

Each 0.3 mL dose of the COMIRNATY supplied in multiple dose vials with gray caps and labels with gray borders also includes the following ingredients: lipids (0.43 mg ((4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate), 0.05 mg 2-(polyethylene glycol 2000)-N,N-ditetradecylacetamide, 0.09 mg 1,2-distearoyl-sn-glycero-3-phosphocholine, and 0.19 mg cholesterol), 0.06 mg tromethamine, 0.4 mg tromethamine hydrochloride, and 31 mg sucrose.

COMIRNATY does not contain preservative.

The vial stoppers are not made with natural rubber latex.

## 12   CLINICAL PHARMACOLOGY

### 12.1   Mechanism of Action

The nucleoside-modified mRNA in COMIRNATY is formulated in lipid particles, which enable delivery of the mRNA into host cells to allow expression of the SARS-CoV-2 S antigen. The vaccine elicits an immune response to the S antigen, which protects against COVID-19.

## 13   NONCLINICAL TOXICOLOGY

### 13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility

COMIRNATY has not been evaluated for the potential to cause carcinogenicity, genotoxicity, or impairment of male fertility. In a developmental toxicity study in rats with COMIRNATY there were no vaccine-related effects on female fertility *[see Use in Specific Populations (8.1)]*.

## 14   CLINICAL STUDIES

Efficacy in Participants 16 Years of Age and Older

Study 2 is an ongoing, multicenter, multinational, randomized, placebo-controlled, observer-blind, dose-finding, vaccine candidate–selection, and efficacy study in participants 12 years of age and older. Randomization was stratified by age: 12 through 15 years of age, 16 through 55 years of age, or 56 years of age and older, with a minimum of 40% of participants in the ≥56-year stratum. The study excluded participants who were immunocompromised and those who had previous clinical or microbiological diagnosis of COVID-19. Participants with preexisting stable disease, defined as disease not requiring significant change in therapy or hospitalization for worsening disease during the 6 weeks before enrollment, were included as were participants with known stable infection with HIV, hepatitis C virus (HCV), or hepatitis B virus (HBV).

In Study 2, based on data accrued through March 13, 2021, approximately 44,000 participants 16 years of age and older were randomized equally and received 2 doses of COMIRNATY or placebo. Participants are planned to be followed for up to 24 months, for assessments of safety and efficacy against COVID-19.

Overall, among the total participants who received COMIRNATY or placebo, 51.4% or 50.3% were male and 48.6% or 49.7% were female, 79.1% or 79.2% were 16 through 64 years of age, 20.9% or 20.8% were 65 years of age and older, 81.9% or 82.1% were White, 9.5% or 9.6% were Black or African American, 1.0% or 0.9% were American Indian or Alaska Native, 4.4% or 4.3% were Asian, 0.3% or 0.2% Native Hawaiian or other Pacific Islander, 25.6% or 25.4% were Hispanic/Latino, 73.9% or 74.1% were non-Hispanic/Latino, 0.5% or 0.5% did not report ethnicity, 46.0% or 45.7% had comorbidities [participants who have 1 or more comorbidities that increase the risk of severe COVID-19 disease: defined as subjects who had at least 1 of the

Charlson comorbidity index category or body mass index (BMI) $\geq$30 kg/m$^2$], respectively. The mean age at vaccination was 49.8 or 49.7 years and median age was 51.0 or 51.0 in participants who received COMIRNATY or placebo, respectively.

<u>Efficacy Against COVID-19</u>

The population for the analysis of the protocol pre-specified primary efficacy endpoint included 36,621 participants 12 years of age and older (18,242 in the COMIRNATY group and 18,379 in the placebo group) who did not have evidence of prior infection with SARS-CoV-2 through 7 days after the second dose. The population in the protocol pre-specified primary efficacy analysis included all participants 12 years of age and older who had been enrolled from July 27, 2020, and followed for the development of COVID-19 through November 14, 2020. Participants 18 through 55 years of age and 56 years of age and older began enrollment from July 27, 2020, 16 through 17 years of age began enrollment from September 16, 2020, and 12 through 15 years of age began enrollment from October 15, 2020.

For participants without evidence of SARS-CoV-2 infection prior to 7 days after Dose 2, vaccine efficacy against confirmed COVID-19 occurring at least 7 days after Dose 2 was 95.0% (95% credible interval: 90.3, 97.6), which met the pre-specified success criterion. The case split was 8 COVID-19 cases in the COMIRNATY group compared to 162 COVID-19 cases in the placebo group.

The population for the updated vaccine efficacy analysis included participants 16 years of age and older who had been enrolled from July 27, 2020, and followed for the development of COVID-19 during blinded placebo-controlled follow-up through March 13, 2021, representing up to 6 months of follow-up after Dose 2. There were 12,796 (60.8%) participants in the COMIRNATY group and 12,449 (58.7%) in the placebo group followed for $\geq$4 months after Dose 2 in the blinded placebo-controlled follow-up period.

SARS-CoV-2 variants of concern identified from COVID-19 cases in this study include B.1.1.7 (Alpha) and B.1.351 (Beta). Representation of identified variants among cases in vaccine versus placebo recipients did not suggest decreased vaccine effectiveness against these variants.

The updated vaccine efficacy information is presented in Table 5.

**Table 5:** **Vaccine Efficacy – First COVID-19 Occurrence From 7 Days After Dose 2, by Age Subgroup – Participants 16 Years of Age and Older Without Evidence of Infection and Participants With or Without Evidence of Infection Prior to 7 Days After Dose 2 – Evaluable Efficacy (7 Days) Population During the Placebo-Controlled Follow-up Period**

| | First COVID-19 occurrence from 7 days after Dose 2 in participants without evidence of prior SARS-CoV-2 infection* | | |
|---|---|---|---|
| Subgroup | COMIRNATY N[a]=19,993 Cases n1[b] Surveillance Time[c] (n2[d]) | Placebo N[a]=20,118 Cases n1[b] Surveillance Time[c] (n2[d]) | Vaccine Efficacy % (95% CI[e]) |
| All participants | 77 6.092 (19,711) | 833 5.857 (19,741) | 91.1 (88.8, 93.1) |
| 16 through 64 years | 70 4.859 (15,519) | 709 4.654 (15,515) | 90.5 (87.9, 92.7) |
| 65 years and older | 7 1.233 (4192) | 124 1.202 (4226) | 94.5 (88.3, 97.8) |

| Subgroup | COMIRNATY N$^a$=21,047 Cases n1$^b$ Surveillance Time$^c$ (n2$^d$) | Placebo N$^a$=21,210 Cases n1$^b$ Surveillance Time$^c$ (n2$^d$) | Vaccine Efficacy % (95% CI$^e$) |
|---|---|---|---|
| **First COVID-19 occurrence from 7 days after Dose 2 in participants with or without* evidence of prior SARS-CoV-2 infection** | | | |
| All participants | 81 6.340 (20,533) | 854 6.110 (20,595) | 90.9 (88.5, 92.8) |
| 16 through 64 years | 74 5.073 (16,218) | 726 4.879 (16,269) | 90.2 (87.5, 92.4) |
| 65 years and older | 7 1.267 (4315) | 128 1.232 (4326) | 94.7 (88.7, 97.9) |

Note: Confirmed cases were determined by Reverse Transcription-Polymerase Chain Reaction (RT-PCR) and at least 1 symptom consistent with COVID-19 (symptoms included: fever; new or increased cough; new or increased shortness of breath; chills; new or increased muscle pain; new loss of taste or smell; sore throat; diarrhea; vomiting).

*   Participants who had no evidence of past SARS-CoV-2 infection (i.e., N-binding antibody [serum] negative at Visit 1 and SARS-CoV-2 not detected by NAAT [nasal swab] at Visits 1 and 2), and had negative NAAT (nasal swab) at any unscheduled visit prior to 7 days after Dose 2 were included in the analysis.

a.   N = Number of participants in the specified group.

b.   n1 = Number of participants meeting the endpoint definition.

c.   Total surveillance time in 1000 person-years for the given endpoint across all participants within each group at risk for the endpoint. Time period for COVID-19 case accrual is from 7 days after Dose 2 to the end of the surveillance period.

d.   n2 = Number of participants at risk for the endpoint.

e.   Two-sided confidence interval (CI) for vaccine efficacy is derived based on the Clopper and Pearson method adjusted to the surveillance time.

Subgroup analyses of vaccine efficacy (although limited by small numbers of cases in some subgroups) did not suggest meaningful differences in efficacy across genders, ethnic groups, geographies, or for participants with obesity or medical comorbidities associated with high risk of severe COVID-19.

Efficacy Against Severe COVID-19

Efficacy analyses of secondary efficacy endpoints supported benefit of COMIRNATY in preventing severe COVID-19. Vaccine efficacy against severe COVID-19 is presented only for participants with or without prior SARS-CoV-2 infection (Table 6) as the COVID-19 case counts in participants without prior SARS-CoV-2 infection were the same as those in participants with or without prior SARS-CoV-2 infection in both the COMIRNATY and placebo groups.

**Table 6:** **Vaccine Efficacy – First Severe COVID-19 Occurrence in Participants 16 Years of Age and Older With or Without\* Prior SARS-CoV-2 Infection Based on Protocol[†] or Centers for Disease Control and Prevention (CDC)[‡] Definition From 7 Days After Dose 2 – Evaluable Efficacy (7 Days) Population During the Placebo-Controlled Follow-up**

| Vaccine Efficacy – First Severe COVID-19 Occurrence | | | |
|---|---|---|---|
| | **COMIRNATY** **Cases** **n1[a]** **Surveillance Time[b] (n2[c])** | **Placebo** **Cases** **n1[a]** **Surveillance Time[b] (n2[c])** | **Vaccine Efficacy %** **(95% CI[d])** |
| 7 days after Dose 2[d] | 1 6.353 (20,540) | 21 6.237 (20,629) | 95.3 (70.9, 99.9) |
| Vaccine Efficacy – First Severe COVID-19 Occurrence Based on CDC Definition | | | |
| | **COMIRNATY** **Cases** **n1[a]** **Surveillance Time[b] (n2[c])** | **Placebo** **Cases** **n1[a]** **Surveillance Time[b] (n2[c])** | **Vaccine Efficacy %** **(95% CI[d])** |
| 7 days after Dose 2[d] | 0 6.345 (20,513) | 31 6.225 (20,593) | 100 (87.6, 100.0) |

Note: Confirmed cases were determined by Reverse Transcription-Polymerase Chain Reaction (RT-PCR) and at least 1 symptom consistent with COVID-19 (symptoms included: fever; new or increased cough; new or increased shortness of breath; chills; new or increased muscle pain; new loss of taste or smell; sore throat; diarrhea; vomiting).

\*   Participants who had no evidence of past SARS-CoV-2 infection (i.e., N-binding antibody [serum] negative at Visit 1 and SARS-CoV-2 not detected by NAAT [nasal swab] at Visits 1 and 2), and had negative NAAT (nasal swab) at any unscheduled visit prior to 7 days after Dose 2 were included in the analysis.

[†] Severe illness from COVID-19 is defined in the protocol as confirmed COVID-19 and presence of at least 1 of the following:
- Clinical signs at rest indicative of severe systemic illness (respiratory rate ≥30 breaths per minute, heart rate ≥125 beats per minute, saturation of oxygen ≤93% on room air at sea level, or ratio of arterial oxygen partial pressure to fractional inspired oxygen <300 mm Hg);
- Respiratory failure [defined as needing high-flow oxygen, noninvasive ventilation, mechanical ventilation or extracorporeal membrane oxygenation (ECMO)];
- Evidence of shock (systolic blood pressure <90 mm Hg, diastolic blood pressure <60 mm Hg, or requiring vasopressors);
- Significant acute renal, hepatic, or neurologic dysfunction;
- Admission to an Intensive Care Unit;
- Death.

[‡] Severe illness from COVID-19 as defined by CDC is confirmed COVID-19 and presence of at least 1 of the following:
- Hospitalization;
- Admission to the Intensive Care Unit;
- Intubation or mechanical ventilation;
- Death.

a.   n1 = Number of participants meeting the endpoint definition.
b.   Total surveillance time in 1000 person-years for the given endpoint across all participants within each group at risk for the endpoint. Time period for COVID-19 case accrual is from 7 days after Dose 2 to the end of the surveillance period.
c.   n2 = Number of participants at risk for the endpoint.
d.   Two-side confidence interval (CI) for vaccine efficacy is derived based on the Clopper and Pearson method adjusted to the surveillance time.

# 16  HOW SUPPLIED/STORAGE AND HANDLING

COMIRNATY Suspension for Intramuscular Injection, multiple dose vials with gray caps and labels with gray borders are supplied in a carton containing 10 multiple dose vials (NDC 0069-2025-10) or 25 multiple dose vials (NDC 0069-2025-25).

One vial contains 6 doses of 0.3 mL.

During storage, minimize exposure to room light, and avoid exposure to direct sunlight and ultraviolet light.

Do not refreeze thawed vials.

<u>Vial Storage Prior to Use</u>

Cartons of COMIRNATY multiple dose vials with gray caps and labels with gray borders will arrive frozen at ultra-cold conditions in thermal containers with dry ice.

Once received, frozen vials may be immediately transferred to the refrigerator [2ºC to 8ºC (35ºF to 46ºF)], thawed and stored for up to 10 weeks. The 10-week refrigerated expiry date should be recorded on the carton at the time of transfer. A carton of 10 vials may take up to 6 hours to thaw at this temperature.

Alternatively, frozen vials may be stored in an ultra-low temperature freezer at -90ºC to -60ºC (-130ºF to -76ºF). Do not store vials at -25°C to -15°C (-13°F to 5°F). Once vials are thawed, they should not be refrozen.

If cartons of COMIRNATY multiple dose vials with gray caps and labels with gray borders are received at 2°C to 8°C, they should be stored at 2°C to 8°C. Check that the carton has been updated to reflect the 10-week refrigerated expiry date.

Regardless of storage condition, the vaccine should not be used after the expiration date printed on the vial and cartons.

<u>Vial Storage During Use</u>

If not previously thawed at 2ºC to 8ºC (35ºF to 46ºF), allow vials to thaw at room temperature [up to 25ºC (77ºF)] for 30 minutes.

COMIRNATY multiple dose vials with gray caps and labels with gray borders may be stored at room temperature [8°C to 25°C (46°F to 77°F)] for a total of 12 hours prior to the first puncture. After first puncture, the vial should be held between 2ºC to 25ºC (35°F to 77°F). Vials should be discarded 12 hours after first puncture.

**DO NOT DILUTE PRIOR TO USE**.

<u>Transportation of Vials</u>

If local redistribution is needed, vials may be transported at -90°C to -60°C (-130°F to -76°F), or at 2°C to 8°C (35°F to 46°F).

## 17  PATIENT COUNSELING INFORMATION

Inform vaccine recipient of the potential benefits and risks of vaccination with COMIRNATY.

Inform vaccine recipient of the importance of completing the 2 dose vaccination series.

There is a pregnancy exposure registry for COMIRNATY. Encourage individuals exposed to COMIRNATY around the time of conception or during pregnancy to register by visiting https://mothertobaby.org/ongoing-study/covid19-vaccines/.

Advise vaccine recipient to report any adverse events to their healthcare provider or to the Vaccine Adverse Event Reporting System at 1-800-822-7967 and www.vaers.hhs.gov.

This product's labeling may have been updated. For the most recent prescribing information, please visit https://dailymed.nlm.nih.gov/dailymed/.



Manufactured for
BioNTech Manufacturing GmbH
An der Goldgrube 12
55131 Mainz, Germany

*Pfizer*

Manufactured by
Pfizer Inc., New York, NY 10017

LAB-1490-0.3

US Govt. License No. 2229

# EXHIBIT 5

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine (nucleoside modified)**

**CBER CMC BLA Review Memorandum**

**BLA STN 125742**

**COVID-19 mRNA Vaccine (nucleoside modified) [COMIRNATY™]**

**CDR Donald Ertel, Regulatory Officer, OCBQ/DMPQ/MRB1**
**Laura Fontan, Consumer Safety Officer, OCBQ/DMPQ/MRB1**
**Alifiya Ghadiali, Consumer Safety Officer, OCBQ/DMPQ/MRBII**
**Kathleen R. Jones, Biologist, OCBQ/DMPQ/MRB1**
**Nicole Li, Microbiologist, OCBQ/DMPQ/MRB1**
**Gregory Price, Biologist, OCBQ/DMPQ/MRB1**

## CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine (nucleoside modified)

1. **BLA#:** STN 125742

2. **APPPLICANT:** BioNTech Manufacturing GmbH, US License Number 2229

3. **PRODUCT NAME/PRODUCT TYPE**

COVID-19 mRNA Vaccine (nucleoside modified); COVID-19 Vaccine (BNT162, PF-07302048); COMIRNATY

4. **GENERAL DESCRIPTION OF THE FINAL PRODUCT**
   a. **Pharmacological category**
      Vaccine

   b. **Dosage form**
      Liquid

   c. **Strength/Potency**
      30 mcg

   d. **Route of administration**
      Intramuscular

   e. **Indication(s)**
      Active immunization to prevent COVID-19 caused by SARS-CoV-2 in individuals ≥16 years of age

5. **MAJOR MILESTONES**
Submitted
   Roll 1 Submission: May 6, 2021
   Roll 2 Submission (final): May 18, 2021
Received: May 18, 2021
First Committee Meeting: June 3, 2021
Filing Meeting: June 29, 2021
Filing Action: July 16, 2021
PDUFA ADD: January 16, 2022

6. **CMC/QUALITY REVIEW TEAM**

| Reviewer/Affiliation | Section/Subject Matter |
|---|---|
| CDR Donald Ertel, Regulatory Officer, OCBQ/DMPQ/MRB1 | Drug Product and Diluent (Sections 3.2.P and 3.2.R) |
| Laura Fontan, CSO, OCBQ/DMPQ/MRBI | Drug Product, Facilities and Equipment (Puurs), and Executed Batch Records (Sections 3.2.P and 3.2.A.1) |

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

| Reviewer/Affiliation | Section/Subject Matter |
|---|---|
| Alifiya Ghadiali, CSO, OCBQ/DMPQ/MRBII | Facilities and Equipment (Chesterfield) (Section 3.2.A.1) |
| Kathleen R. Jones, Biologist, OCBQ/DMPQ/MRBI | DS and Facilities and Equipment (Chesterfield, ACMF, Andover Suite (b)(4)) (Sections 3.2.S and 3.2.A.1) |
| Nicole Li, Microbiologist, OCBQ/DMPQ/MRBI | DS and Facilities and Equipment (Chesterfield, ACMF, Andover Suite (b)(4)) (Sections 3.2.S and 3.2.A.1) |
| Gregory Price, Biologist, OCBQ/DMPQ/MRBI | Drug Product, Facilities and Equipment (Kalamazoo), and Executed Batch Records (Sections 3.2.P and 3.2.A.1) |

## 7.   SUBMISSION(S) REVIEWED

| Date Received | Submission | Comments/ Status |
|---|---|---|
| May 6, 2021 | STN 125742/0 | Original submission (Part 1 of rolling submission) |
| May 18, 2021 | STN 125742/0.1 | Part 2 of rolling submission / Reviewed |
| May 24, 2021 | STN 125742/0.4 (response to May 20, 2021 information request (IR)) | Manufacturing schedule for Pfizer Andover, Pfizer Puurs, and Pfizer Kalamazoo / Reviewed |
| July 28, 2021 | STN 125742/0.19 (response to July 2, 2021 IR) | (b) (4) / Reviewed |

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine**
**(nucleoside modified)**

| Date Received | Submission | Comments/ Status |
|---|---|---|
| July 30, 2021 | STN 125742/0.24 (response to July 26, 2021 IR) | (b) (4)<br><br>Pfizer Puurs sterilization/ depyrogenation revalidations and equipment cleaning validation; Pfizer Kalamazoo equipment qualification, information, and cleaning validation; DP sterilizing filter validation and shipping study / Reviewed |
| August 3, 2021 | STN 125742/0.29 (response to July 26, 2021 IR) | DS equipment (due to file size limitation, remaining supporting documentation provided to Question 10, response received July 30, 2021) / Reviewed |
| August 10, 2021 | STN 125742/0.39 (response to August 6, 2021 IR) | Pfizer Puurs (b) (4) step / Reviewed |

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine**
**(nucleoside modified)**

| Date Received | Submission | Comments/ Status |
|---|---|---|
| August 11, 2021 | STN 125742/0.43 (response to August 5, 2021 IR) | Pfizer Chesterfield utilities and equipment information and cleaning validation; Pfizer Andover EM, equipment hold times, manufacturing and equipment information; Pfizer Kalamazoo container closure integrity testing (CCIT) and equipment (b) (4); Pfizer Puurs visual inspection and CCIT; Drug product release and stability testing / Reviewed |
| August 13, 2021 | STN 125742/0.47 (response to August 11, 2021 IR) | Diluent supplier manufacturer and shipping procedures / Reviewed |
| August 17, 2021 | STN 125742/0.56 (response to August 16, 2021 IR) | Diluent suppliers / Reviewed |
| August 17, 2021 | STN 125742/0.57 (response to August 13, 2021 IR) | Pfizer Andover computer systems and equipment qualifications; Pfizer Kalamazoo equipment qualifications, utilities information, equipment cleaning validation, and visual inspection; Pfizer Puurs cleaning validation / Reviewed |
| August 19, 2021 | STN 125742/0.62 (response to August 17, 2021 IR) | Drug substance (b) (4) hold time / Reviewed |

**8.   ACRONYM KEY**
**List of abbreviations and acronyms**

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

| Abbreviations/Acronyms | Description |
| --- | --- |
| AAVP | active air viable particulates |
| AC | acceptance criteria |
| ACMF | Andover Clinical Manufacturing Facility |
| (b) (4) | |
| AHU | air handling units |
| AOAC | Association of Official Analytical Collaboration |
| AQL | acceptance quality limit |
| ARD | Analytical Research and Development |
| ASTM | formerly known as American Society for Testing and Materials |
| BI | biological indicator |
| BLA | Biologics License Application |
| BSC | biosafety cabinet |
| BSL | biosafety level |
| CBER | Center for Biologics Evaluation and Research |
| CCIT | container closure integrity testing |
| CEA | clean environmental area |
| CFU | colony forming units |
| CGMP | current good manufacturing practice |
| (b) (4) | |
| (b) (4) | |
| CHT | clean hold time |
| CIP | clean-in-place |
| CMF | Chesterfield Manufacturing Facility |
| CNC | controlled non-classified |
| COP | clean-out-of-place |
| CPF | Chesterfield Pilot Facility |
| CPP | critical process parameter |
| DBSQC | Division of Biological Standards and Quality Control |
| DHT | dirty hold time |
| DI | data integrity |
| DMPQ | Division of Manufacturing and Product Quality |
| DNA | deoxyribonucleic acid |
| DP | Drug product |
| DS | Drug substance |
| DSPC | 1,2-distearoyl-*sn*-glycero-3-phosphocholine |
| (b) (4) | |

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

| Abbreviations/Acronyms | Description |
|---|---|
| (b) (4) | |
| EIR | establishment inspection report |
| EM | environmental monitoring |
| (b) (4) | |
| ERES | electronic records and electronic signature |
| EU | endotoxin unit |
| EUA | Emergency Use Authorization |
| (b) (4) | |
| FC | flexible container |
| (b) (4) | |
| FDA | Food and Drug Administration |
| FV | functional verification |
| (b) (4) | |
| HEPA | high efficiency particulate air |
| (b) (4) | |
| (b) (4) | |
| HVAC | heating, ventilation, and air conditioning |
| (b) (4) | |
| IPT-C | in-process test for control |
| IPT-M | in-process tests for monitoring |
| IOQ | installation and operational qualification |
| IQ | installation qualification |
| IR | information request |
| ISO | International Organization for Standardization |
| (b) (4) | |
| (b) (4) | |
| KCl | potassium chloride |
| KH2PO4 | monobasic potassium phosphate |
| (b) (4) | |
| (b) (4) | |
| LNP | lipid nanoparticles |
| MAL | material air lock |
| MCB | master cell bank |
| MCS | manufacturing control system |
| MOC | material of construction |
| MVD | maximum valid dilution |
| MWCO | molecular weight cut-off |

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine (nucleoside modified)**

| Abbreviations/Acronyms | Description |
|---|---|
| N/A | not applicable |
| Na2HPO4*2 H2O | dibasic sodium phosphate, dihydrate |
| NaCl | sodium chloride |
| NAI | No Action Indicated |
| NaOH | sodium hydroxide |
| NMT | no more than |
| (b) (4) |  |
| OAI | Official Action Indicated |
| OOS | out-of-specification |
| OQ | operational qualification |
| OVRR | Office of Vaccines Research and Review |
| PAL | personnel air lock |
| (b) (4) |  |
| (b) (4) |  |
| (b) (4) |  |
| (b) (4) |  |
| (b) (4) |  |
| (b) (4) |  |
| PLC | programmable logic controller |
| PLI | pre-license inspection |
| PP | polypropylene |
| PPQ | process performance qualification |
| PQ | performance qualification |
| PV | process validation |
| PW | purified water |
| q.s | quantum satis (as much as may suffice) |
| QAT | quality attributes |
| RAL | residue acceptance limit |
| RNA | ribonucleic acid |
| (b) (4) |  |
| (b) (4) |  |
| SCADA | supervisory data and collection |
| SIP | sterilize-in-place |
| SOP | standard operating procedure |
| SS | stainless steel |
| (b) (4) |  |
| (b) (4) |  |

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

| Abbreviations/Acronyms | Description |
|---|---|
| (b) (4) | |
| TC | thermocouple |
| TCV | temperature-controlled vehicle |
| (b) (4) | |
| (b) (4) | |
| (b) (4) | |
| TNTC | too numerous to count |
| TOC | total organic carbon |
| TYMC | total yeast microbial count |
| (b) (4) | |
| (b) (4) | |
| (b) (4) | |
| (b) (4) | |
| v/v | volume per volume |
| VAI | Voluntary Action Indicated |
| (b) (4) | |
| VNC | validation nonconformances |
| VRL | visual residue limit |
| WAL | waste air lock |
| WCB | working cell bank |
| WFI | water for injection |

## 9.   REVIEWER SUMMARY AND RECOMMENDATION
## A.  EXECUTIVE SUMMARY

Pfizer-BioNTech submitted documentation to Biologics License Application (BLA) 125742/0 to support licensure of COMIRNATY™, a COVID-19 vaccine intended for the prevention of COVID-19 in adults ≥ 16 years of age. DMPQ reviewed and evaluated the (b) (4)              , DS and DP manufacturing process and facilities proposed for use to manufacture COMIRNATY™. Coverage of information in this review memo includes data to validate and support the consistency of the manufacturing process and product quality; facility information which includes utilities, cross-contamination prevention measures, and maintenance of controlled environments; and equipment for use in manufacturing including qualification, cleaning and sterilization, and types of equipment used (i.e., dedicated or shared, multi-use or single-use). Note, the facilities proposed for use to manufacture COMIRNATY™ under the BLA are facilities that are used to manufacture the Pfizer-BioNTech COVID-19 Vaccine under Emergency Use Authorization (EUA), which was originally issued on December 11, 2020. However, not all facilities used to manufacture the Pfizer-BioNTech COVID-19 Vaccine under EUA are proposed for use under the BLA.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

As part of the BLA review, PLIs were performed to ensure the product meets all predetermined specifications, the production process is validated and controlled, and the facility and associated systems and equipment are operated with quality oversight consistent with the CGMP requirements. The PLIs were performed at the DS manufacturing facility at Wyeth BioPharma Division of Wyeth Pharmaceuticals, LLC in Andover, MA (referred to as Pfizer Andover) from July 19 – 23, 2021 and at the DP manufacturing facility at Pfizer Manufacturing Belgium NV in Puurs, Belgium (referred to as Pfizer Puurs) from June 24 – July 2, 2021. Note, Division of Manufacturing and Product Quality (DMPQ's) review and assessment of the Pfizer Andover and Pfizer Puurs facilities are documented in separate establishment inspection reports (EIR). At the conclusion of the Pfizer Andover PLI, a Form FDA 483 was issued on July 23, 2021 with thirteen inspectional observations, which the firm responded to on August 2, 2021. A review of Pfizer Andover's responses with inspectional follow-up recommendations is documented in a separate 483 response memo dated August 21, 2021. All inspectional 483 observations were resolved, and the Pfizer Andover PLI was classified as Voluntary Action Indicated (VAI). No Form FDA 483 was issued at the conclusion of the Pfizer Puurs PLI, and the PLI was classified as No Action Indicated (NAI).

In addition to the PLIs, facility inspections were waived following an evaluation of the inspection compliance histories of the (b) (4) and another DP manufacturer and release testing facilities for Pfizer Inc. in Chesterfield, MO; Pharmacia & Upjohn Company LLC in Kalamazoo, MI; Pfizer Ireland Pharmaceuticals in Dublin, Ireland; (b) (4) , the inspection waivers of the facilities are documented in a separate inspection waiver memo dated August 9, 2021.

The COMIRNATY™ vaccine multi-dose vial requires dilution with 1.8 mL of 0.9% Sodium Chloride Injection, USP prior to administration of the vaccine product. Pfizer-BioNTech will provide the 2 mL or 10 mL vials of 0.9% Sodium Chloride Injection, USP diluent manufactured by Fresenius Kabi USA, LLC (b) (4) or Hospira, Inc. in (b) (4) , respectively. The saline diluent will be supplied separately to healthcare providers shipped in parallel with COMIRNATY™. Both the 2 mL and 10 mL single dose vials of 0.9% Sodium Chloride Injection, USP are packaged in cartons of 25 vials and shipped in a corrugated box with other ancillary supplies (masks, syringes, gloves, etc.). Cartons of the saline diluent will be clearly labeled to indicate that it is for use with COMIRNATY™.

Based on the information submitted to BLA 125742/0 and in conjunction with the PLIs and inspectional compliance history evaluations, the production process, facilities, equipment, and controls appear acceptable for the licensure of COMIRNATY™ and approval is recommended.

**B. RECOMMENDATION**
    **I.   APPROVAL**

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

Approval is recommended with inspectional follow-up recommendations below.

CBER understands the inspectional recommendations may or may not be taken (based on risk and available resources) and is not requesting documentation to be submitted as evidence of completion.

*Pfizer Inc. in Chesterfield, MO (known as Pfizer Chesterfield), FEI: 1940118*

(b) (5), (b) (7)(E)

*Wyeth BioPharma Division of Wyeth Pharmaceuticals, LLC in Andover, MA (known as Pfizer Andover), FEI: 1222181*

(b) (5), (b) (7)(E)

*Pfizer Manufacturing Belgium NV, Puurs, Belgium (known as Pfizer Puurs), FEI: 1000654629*

(b) (5), (b) (7)(E)

## II.  SIGNATURE BLOCK

| Reviewer/Title/Affiliation | Concurrence | Signature and Date |
|---|---|---|
| CDR Donald Ertel, Regulatory Officer, OCBQ/DMPQ/MRB1 | Concur | |

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

| Reviewer/Title/Affiliation | Concurrence | Signature and Date |
|---|---|---|
| Laura Fontan, CSO, OCBQ/DMPQ/MRBI | Concur | |
| Alifiya Ghadiali, CSO, OCBQ/DMPQ/MRBII | Concur | |
| Kathleen R. Jones, Biologist, OCBQ/DMPQ/MRBI | Concur | |
| Nicole Li, Microbiologist, OCBQ/DMPQ/MRBI | Concur | |
| Gregory Price, Biologist, OCBQ/DMPQ/MRBI | Concur | |
| Lori Peters, Branch Chief, OCBQ/DMPQ/MRBI | Concur | |
| John A. Eltermann, Jr., Division Director, OCBQ/DMPQ | Concur | |
| Mary A. Malarkey, Office Director, OCBQ | Concur | |

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

Module 3

**3.2.S DRUG SUBSTANCE**

(b) (4)



(b) (4)

19 pages have been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)

## 3.2.P DRUG PRODUCT
### 3.2.P.1 Description and Composition of the Drug Product
The BNT162b2 DP is supplied as a preservative-free, multi-dose concentrate to be
diluted for intramuscular injection, containing six doses.  The DP is a sterile dispersion
of RNA-containing lipid nanoparticles (LNPs) in aqueous cryoprotectant buffer.  Each
vial, containing 0.45 mL of the DP at (b) (4) is designed to contain a total of six doses
after dilution by the addition of 1.8 mL of sterile 0.9% sodium chloride solution, with
each dose containing 30 μg of RNA in 0.3 mL.  There is no manufacturing overage.

The DP is supplied in a 2 mL glass vial sealed with a bromobutyl rubber stopper and an
aluminum seal with flip-off plastic cap.

The composition of the DP, including amount per vial and function and quality
standard applicable to each component, is given in the table below.

**Composition of BNT162b2 Drug Product, multi-dose vial  (225 μg/vial)**

| Name of Ingredients | Reference to Standard | Function | Concentration (mg/mL) | Amount per vial | Amount per dose |
|---|---|---|---|---|---|
| BNT162b2 DS | In-house specification | Active ingredient | 0.5 | 225 μg | 30 μg |
| ALC-0315 | In-house specification | Functional lipid | 7.17 | 3.23 mg | 0.43 mg |
| ALC-0159 | In-house specification | Functional lipid | 0.89 | 0.4 mg | 0.05 mg |
| DSPC | In-house specification | Structural lipid | 1.56 | 0.7 mg | 0.09 mg |
| Cholesterol | Ph. Eur. and/or USP-NF | Structural lipid | 3.1[b] | 1.4 mg | 0.2 mg |
| Sucrose | USP-NF and Ph. Eur. | Cryoprotectant | 103[b] | 46 mg | 6 mg |
| Sodium chloride | USP-NF and Ph. Eur. | Buffer component | 6 | 2.7 mg | 0.36 mg[e] |
| Potassium chloride | USP-NF and/or Ph. Eur.[a] | Buffer component | 0.15 | 0.07 mg | 0.01 mg |
| Dibasic sodium phosphate, dihydrate[c] | USP-NF and Ph. Eur. | Buffer component | 1.08 | 0.49 mg | 0.07 mg |

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

| Name of Ingredients | Reference to Standard | Function | Concentration (mg/mL) | Amount per vial | Amount per dose |
|---|---|---|---|---|---|
| Monobasic potassium phosphate[d] | USP-NF and/or Ph. Eur.[a] | Buffer component | 0.15 | 0.07 mg | 0.01 mg |
| Water for Injection | USP-NF and Ph. Eur. | Solvent/vehicle | q.s. | q.s. | q.s. |

a. Supplier Certificate of Analysis confirms compliance to both USP-NF and Ph. Eur., however incoming testing may be performed only in accordance with a site's local compendia.
b. Values are rounded to maintain the same level of precision as the label claim, with trailing zeros not shown, where applicable. For example, 46 mg sucrose is rounded from (b) (4) mg (103 mg/mL).
c. Dibasic sodium phosphate, dihydrate (Na2HPO4*2 H2O) is named as (b) (4)
d. Monobasic potassium phosphate (KH2PO4) is named as (b) (4)
e. The diluent (0.9% sodium chloride Injection) contributes an additional 2.16 mg per dose.

Abbreviations:
ALC-0315 = ((4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate)
ALC-0159 = 2-[(polyethylene glycol)-2000]-N,N-ditetradecylacetamide
DSPC = 1,2-distearoyl-sn-glycero-3-phosphocholine
q.s. = quantum satis (as much as may suffice)
(b) (4)

## 3.2.P.2 Pharmaceutical Development
## 3.2.P.2.1 Components of the Drug Product
### 3.2.P.2.1.1 DS
The RNA component of the DS is the only active ingredient in the BNT162b2 DP.  The DS is a single-stranded, 5'-capped mRNA produced by in (b) (4) and provided for DP manufacture as a (b) (4) aqueous solution (b) (4) in (b) (4)


### 3.2.P.2.4 Container Closure System
The container closure system for the commercial BNT162b2 DP is a 2 mL Type I borosilicate glass vial and a 13 mm bromobutyl stopper.  Multiple vendors of the glass vial are utilized on a global basis.

The glass vial meets (b) (4) requirements for chemical testing for Type I glass containers.  The elastomeric stoppers meet (b) (4) chemical testing requirements for elastomeric closures.

Reference Section 3.2.P.7 Container Closure System for description of container closure and stopper functional testing; reference Section 3.2.P.5.3 for CCIT evaluation.

> ***Reviewer's comment***: *The evaluation of suitability, chemical compatibility & resistance, extractables/leachables, safety of the materials of construction, biological activity, and photostability is deferred to the OVRR reviewer.*

22

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

### 3.2.P.2.5 Microbiological Attributes

The manufacturing process utilizes pre-sterilized raw materials and supplies, HEPA-filtered, classified production areas, and personnel gowning controls.  During manufacturing, the formulated bulk DP is (b) (4) sterile filtered prior to being aseptically filled into vials.  The sterilizing filter is integrity tested.

The final product storage conditions do not support microbial growth, as the product is stored frozen at -90°C to -60°C.  The container closure system and its components were selected based on their ability to protect the quality of the product over its shelf life and have been qualified for use.

The BNT162b2 container closure system has been tested by both (b) (4)  CCIT methods.  Both studies have produced acceptable data and verify that the stopper/vial/cap combination maintains integrity when challenged with a (b) (4)

.  Container closure integrity testing is covered in Section 3.2.P.5.3.

### 3.2.P.2.6 Compatibility

The initial in-use period for the thawed, undiluted vial is room temperature for not more than 2 hours. Pfizer initiated formal thermal cycling stability studies on both emergency use lots and PPQ lots in order to further support the in-use period.

(b) (4)



**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine (nucleoside modified)**

> ***Reviewer's comment***: *The in-use period of 6 hours is supported by the results of the microbial in-use study, which demonstrates safe use of the multi-dose vials over 6 hours at ambient temperatures.*

### 3.2.P.3 Manufacture
### 3.2.P.3.1 Manufacturer(s)

Table P.3.1-2 in the submission (recreated with additional information below) lists the manufacturing and testing facilities for BNT162b2 DP manufacturing and release testing.

| Site | FEI/DUNS Number | Responsibility |
|---|---|---|
| Pfizer Manufacturing Belgium NV Rijksweg 12 Puurs, 2870 Belgium | FEI: 1000654629 DUNS: 370156507 | LNP production and bulk DP formulation<br>Fill and finish<br>Primary packaging<br>Secondary packaging<br>Release and stability testing: Sterility (including (b) (4) sterility), Endotoxin, Appearance, Appearance (Visible Particulates), (b) (4), Container Content, LNP (b) (4) (b) (4), RNA (b) (4), RNA Content, ALC- 0315 Content, ALC-0159 Content, DSPC Content, Cholesterol Content, Lipid Identities, RNA (b) (4) |
| Pharmacia & Upjohn Company LLC[c] 7000 Portage Road Kalamazoo, MI 49001 United States | FEI: 1810189 DUNS: 618054084 | LNP production and bulk DP formulation<br>Fill and finish<br>Primary packaging<br>Secondary packaging<br>Release and stability testing:  Sterility (including (b) (4) sterility), Endotoxin, Appearance, Appearance (Visible Particulates), (b) (4), Subvisible Particles, Container Content, LNP (b) (4) LNP (b) (4), RNA Content, RNA (b) (4), ALC-0315 Content, ALC-0159 Content, DSPC Content, Cholesterol Content, Lipid Identities, RNA (b) (4), Container Closure Integrity |
| Wyeth BioPharma Division of Wyeth Pharmaceuticals LLC[a] 1 Burtt Road Andover, MA 01810 United States | FEI: 1222181 DUNS: 174350868 | Release and stability testing: Identity of encoded RNA sequence, (b) (4) |

## CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
## (nucleoside modified)

| Site | FEI/DUNS Number | Responsibility |
|---|---|---|
| (Analytical Research & Development) Wyeth BioPharma Division of Wyeth Pharmaceuticals LLC a 1 Burtt Road Andover, MA 01810 United States | FEI: 1222181 DUNS: 174350868 | Drug Product release and stability testing: Appearance, Appearance (Visible Particulates), (b) (4), Container Content, LNP (b) (4), LNP (b) (4), RNA (b) (4), RNA Content, ALC-0315 Content, ALC-0159 Content, DSPC Content, Cholesterol Content, Lipid Identities, Identity of encoded RNA sequence, (b) (4), RNA (b) (4), Container Closure Integrity In-process testing |
| Pfizer Inc. 875 Chesterfield Parkway West Chesterfield, MO 63017 United States | FEI: 1940118 DUNS: 004954111 | Release and stability testing: Appearance, Appearance (Visible Particulates), (b) (4), Container Content, LNP (b) (4), LNP (b) (4), RNA (b) (4), RNA Content, ALC-0315 Content, ALC-0159 Content, DSPC Content, Cholesterol Content, Lipid Identities, Identity of encoded RNA sequence, (b) (4), RNA (b) (4), Container Closure Integrity |
| Pfizer Ireland Pharmaceutical Grange Castle Grange Castle Business Park Clondalkin, Dublin 22 Ireland | FEI: 3004145594 DUNS: 985586408 | Release and stability testing: (b) (4), Identity of Encoded RNA Sequence, (b) (4) |
| (b) (4) | FEI: (b) (4) DUNS: (b) (4) | Release testing: Sterility |
| (b) (4) | FEI: (b) (4) DUNS: (b) (4) | Release testing: Sterility |
| Fresenius Kabi USA, LLC (b) (4) | FEI: (b) (4) DUNS: (b) (4) | Diluent Manufacturer |

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

| Site | FEI/DUNS Number | Responsibility |
|------|-----------------|----------------|
| Hospira, Inc. (b) (4) | FEI: (b) (4) DUNS: (b) (4) | Diluent Manufacturer |

[a] The legal entity name change from Wyeth BioPharma Division of Wyeth Pharmaceuticals was changed at the acquisition by Pfizer in 2009, since then the Wyeth Pharmaceuticals manufacturing site in Andover, Massachusetts belongs to Pfizer's production sites and is part of Pfizer's GMP system.
[b] (b) (4) is a wholly owned subsidiary of Pfizer Inc.
[c] Pharmacia & Upjohn Company LLC is a wholly owned subsidiary of Pfizer Inc.

### 3.2.P.3.3 Description of Manufacturing Process

The following paragraphs describe the DP manufacturing process, which occurs at both the Pfizer Kalamazoo and Pfizer Puurs locations:

The manufacturing process for BNT162b2 DP includes LNP production and bulk DP formulation followed by fill and finish activities.

(b) (4)



2 pages have been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



<u>Fill/Finish Operations</u>
Two locations, Pfizer Kalamazoo and Pfizer Puurs, each with multiple filling lines, are used for fill and finish manufacturing operations. Process controls are the same for both sites unless otherwise described. Please refer to 3.2.A.1 for a description of the facilities and equipment.

<u>Sterile Filtration</u>
(b) (4)

The process parameters for sterile filtration are summarized in Table P.3.3-1 and IPT-C tests are summarized in Table P.3.3-2. Tests for monitoring (IPT-M) are summarized in Table P.3.3-3.  The tables are reproduced below.

(b) (4)

The following two tables describe the in-process acceptance criteria for sterile filtration.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



Preparation of Vials and Stoppers
The vials are processed through the vial washer, where they are rinsed with (b) (4).  After washing, the vials are depyrogenated by means of (b) (4) application.

Bulk stoppers are washed and depyrogenated with (b) (4) .

Aseptic Filling
The (b) (4)
DP is aseptically filled into vials.  Prior to filling, (b) (4)

All non-conforming vials are rejected.

The process parameters for aseptic filling are summarized in Table P.3.3-4 and IPT-C tests are summarized in Table P.3.3-5, both reproduced below.

**Process Parameters for Aseptic Filling**



**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)

Stoppering and Capping

At the end of aseptic filling, a stopper is (b) (4) seated onto each filled vial. Vials are subsequently transferred to the capping station. The stoppered vials are transferred to the capper.  A 100% check on the presence and position of the stopper is performed. The capper automatically rejects vials unless the stopper is (b) (4) seated.  The stoppered vials are capped with aluminum overseals under (b) (4) airflow and crimped onto each vial.

(b) (4)

Visual Inspection

Vials are 100% inspected for defects either through automated visual inspection or manual visual inspection.

During the 100% automated inspection process the vials are fed to the inspection machine.  The vials undergo a check for product (b) (4) defects.  The rejected vials are segregated in prelabeled reject trays.  The acceptable vials are transferred to trays.

For automated inspection, prior to each batch, (b) (4)

If required, vials may undergo 100% manual visual inspection.  Vials are manually inspected for product (b) (4) defects.  The stoppers and caps are inspected for (b) (4) .  All rejected vials are segregated into prelabeled reject trays. The remaining acceptable vials are placed into trays.

Vials passing automated or manual inspection are statistically sampled to meet Acceptance Quality Limit (AQL). Throughout the inspection process, samples are taken

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

for AQL testing. Defects are classified as Critical, Major or Minor and are addressed according to site procedures.

Labeling, Packaging, and Freezing
The labeling and packaging of the BNT162b2 vaccine vials for commercial distribution is performed on a fully automated or semi-automated packaging line.  Inspected vials are individually labeled with a vial label.  A printer on the vial labeler is used to print batch-specific information on the vial labels.  The labeler has (b) (4)

After labeling, the vials are placed into trayboxes using an automated trayer or a manual traying process.  After filling of the boxes, vial quantities are verified, an insert may be added, and the boxes are manually closed and labeled.

A sample for identity testing is taken after labeling operations are completed.

Packaged BNT162b2 vials are frozen and stored in a freezer at -90°C to -60°C pending shipment for commercial distribution.

Storage, Packaging and Shipment of BNT162b2 Drug Product
Drug product (DP) vials are stored according to conditions supported by Section 3.2.P.8.1 Stability Summary and Conclusions (modRNA).

DP is shipped under qualified conditions as supported by Section 3.2.P.3.5 Shipping Validation, validating shipping conditions of -90°C to -15°C including a maximum cumulative time of (b) (4) at (b) (4) .  The final packaged products are transported by established transportation routes to point of use.

When DP is shipped at -90°C to -60°C, the trayboxes containing the vials are moved from the freezer and placed into validated shippers that use dry ice for temperature control.  Temperature monitoring devices are inserted and activated for all shipping containers.  Temperatures during shipment are verified to ensure that the product maintains -90°C to -60°C. The product can be warmed up to a maximum of (b) (4) to perform transfers and redistribution during shipping with multiple transfers allowed within that timeframe. The product temperature in the shipper can be maintained by adding additional dry ice. Alternative qualified insulated thermal conveyances may be used following appropriate qualification.

When DP is shipped at -20±5°C, the trayboxes containing the vials are moved from the freezer and may be shipped using a temperature-controlled vehicle (TCV). All TCV shipments are monitored for temperature during shipment to ensure that the temperature within the TCV remains within -20±5°C, and temperatures during transport are verified. Upon arrival at a qualified distribution center or logistics service provider,

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

the trayboxes containing the vials are transferred to a freezer for storage at -90°C to -60°C.

The DP shipment may also be shipped directly at -20±5°C in thermal conveyances that use (b) (4) material for temperature control or following deconsolidation at a qualified distribution center or logistics service provider into smaller bundles or quantities. Temperature monitoring devices are inserted and activated for all shipping containers. Temperatures during shipment are verified to ensure that the product is maintained at -90°C to -15°C. Alternative qualified insulated thermal conveyances may be used following appropriate qualification.

A maximum cumulative time of (b) (4) is allowed at (b) (4) during shipping and deconsolidation of the DP until arrival at point of use. Process parameters for storage and shipping are summarized in Table 3.2.P.3.3-8, reproduced below.



> *Reviewer's comment:* *The description of the manufacturing process is complete and sufficiently detailed. Please refer to 3.2.P.3.5 for review of the validation studies supporting these processes.*

**Hold Times**
The hold times of the DP in-process materials during (b) (4) are provided in Table 3.2.P.3.3-9 of the submission and are reproduced below. All hold times following (b) (4) are in alignment with the validated media fill times, ensuring acceptable microbial control during the DP manufacturing process. The (b) (4) processing steps are performed within the maximum times determined by the (b) (4) validation.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine (nucleoside modified)**

| Material or In-Process Hold Description | Process Steps | Target Hold Time |
|---|---|---|
| | | |



### 3.2.P Diluent

The COMIRNATY™ vaccine requires dilution with 0.9% Sodium Chloride Injection, USP diluent prior to administration of the vaccine product. Pfizer did not include information in the BLA, Module 3, regarding the suppliers for this diluent. The original labeling proposal (in Module 1) provides a description of the plan as follows:

For the licensed commercial vaccine, a similar approach will be used as was done under EUA. Pfizer-BioNTech will provide the same 0.9% Sodium Chloride Injection, USP diluent manufactured by Fresenius Kabi LLC or the Hospira, Inc. saline diluent (if needed). The saline diluent will be supplied separately to healthcare providers (shipped in parallel with shipments of the COMIRNATY™, with arrivals synchronized so that diluent is delivered before the vaccine is delivered). Cartons of the saline diluent will be clearly labeled to indicate that it is for use with COMIRNATY™, specifically: cartons of the 0.9% Sodium Chloride Injection, USP diluent supplied by Fresenius Kabi LLC will be ink print stamped on the side of the carton opposite the Fresenius Kabi diluent label with the following text: "For Use with COMIRNATY™ [COVID-19 mRNA Vaccine (nucleoside modified)]". The information is printed from a (b) (4) printer in dot matrix font in a default font size of 7 in black ink. No physical label can be applied, as the packaging line is fully automated and does not have this capability. Cartons of the 0.9% Sodium

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

Chloride Injection, USP diluent supplied by Hospira, Inc., will be labeled, same text as mentioned, on the side of the carton opposite the Hospira diluent label.

Images of the cartons and relevant stamps were supplied as attachments.

> *Reviewer's Comment: Per amendment 125742/0.47, the manufacturers table and FDA Form 356h have been updated with the diluent manufacturers. Pfizer provided a description of the diluent shipping and controls in Module 3.  Pfizer identified three manufacturers of diluents. It was found that one of the three manufacturers,* (b) (4) *. (FEI#* (b) (4) *), currently has a pending Warning Letter (reference WL* (b) (4) *issued* (b) (4) *) and Official Action Indicated status.  An IR was issued and, per amendment 125742/0.56, Pfizer has removed all references to this supplier from the BLA, including in the recently added Diluent Manufacturers table. All diluents have been verified as approved under ANDA / NDA as follows:*

| Proprietary Name | NDC Package Code | Appl. #. | Labeler Name | Product NDC | Package Description |
|---|---|---|---|---|---|
| Sodium Chloride | 63323-186-02 | ANDA 088912 | Fresenius Kabi USA, LLC (b) (4) FEI: (b) (4) | 63323-186 | 25 VIAL, SINGLE-DOSE in 1 TRAY (63323-186-02) > 2 mL in 1 VIAL, SINGLE-DOSE (63323-186-04) |
| Sodium Chloride | 0409-4888-10 | NDA 018803 | Hospira, Inc. (b) (4) FEI: (b) (4) | 0409-4888 | 25 VIAL, SINGLE-DOSE in 1 TRAY (0409-4888-10) > 10 mL in 1 VIAL, SINGLE-DOSE (0409-4888-02) |

> *The information provided appears acceptable.*

**3.2.P.3.4 Controls of Critical Steps and Intermediates (Pfizer Puurs and Pfizer Kalamazoo)**

<u>In-Process Monitoring and Control of Fill and Finish</u>
Sterile filtration process controls and target range/acceptance criteria, and microbial process controls and acceptance criteria are provided in Table 3.2.P.3.4.1 and Table 3.2.P.3.4.2 in the submission and are reproduced below.

One page has been determined to be not releasabe: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine (nucleoside modified)**



Aseptic Filling

During production, an in-process fill (b) (4) test is performed at (b) (4) The filling process controls and target ranges/acceptance criteria are provided in Table 3.2.P.3.4-5 in the submission, and are reproduced below.



Capping

Capping process controls and acceptable ranges are provided in Table 3.2.P.3.4-6 and are reproduced below.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



<u>Process Step Hold Times –</u> (b) (4)

The table below provides the hold times of the DP in-process materials during (b) (4) . All hold times following (b) (4) were verified and are consistent with the validated media fill times, ensuring acceptable microbial control during the DP manufacturing process.  The (b) (4) processing steps are within the maximum times determined by the (b) (4) validation which is reviewed below in Section 3.2.P.3.5.



Freezing process controls and acceptable ranges are provided in Table 3.2.P.3.4-7. The acceptable range for freezing is -90°C to -60°C and is defined as a critical process parameter (CPP).

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

*Reviewer's comment: In process monitoring and controls were defined for the BNT162b2 manufacturing fill finish steps.  The parameters defined are supported by the process validation provided and appear acceptable.  The controls defined for sterile filtration agree with the parameters established from the (b) (4) studies discussed in the (b) (4)           validation for (b) (4) (3.2.P.3.5). The integrity test parameters and wetting agents defined also agree with the integrity test limits defined in 3.2.P.3.5.  The (b) (4)           filters from (b) (4)           will be used for the sterile filtration of the DP bulk in the commercial operations.  The information appears acceptable.*

*The time limit defined for aseptic processing agrees with the parameters established during the media fills for each line (3.2.P.3.5).  The media fills on the (b) (4) filling line support up to (b) (4)           filling time; however, the production limit has been set at (b) (4)  .  The media fills on the (b) (4) filling line support up to (b) (4)           filling time; however, a production limit has been set at (b) (4)  .*

*The process controls set for capping on filling lines (b) (4)           are within the validation parameters defined in the capping process validation provided in 3.2.P.3.5.  In process monitoring and controls appear acceptable.*

### 3.2.P.3.4.2 Time Out of Freezing

The BNT162b2 DP has an allowable time out of freezing during movement from freezers to packaging and into shippers of (b) (4)           each for transfer and limited to (b)(4) total transfers. (b) (4)           is used to ensure the product temperature in the secondary packaging material does not exceed (b) (4).

The BNT162b2 DP has allowable out of condition post freezing at -90°C to -60°C during manufacture, packaging and transport of up to (b) (4)           cycles reaching a maximum of (b) (4)

Table 3.2.P.3.4-2, reproduced below, shows the time allowed out of freezing for the BNT162b2 DP.

Note: The same acceptable ranges are listed in the manufacturing process description in Table 3.3-8 Process Parameters for Storage and Shipping.



**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



*Reviewer's comment*: *The allowable times out of freezing are supported by stability data for DP.  Container closure integrity testing was performed on samples that were exposed to worst case shipping hazards.  All lots tested were integral.*

*In addition, transfers of DP to freezers, into* (b) (4) *, and into shipping containers were observed during the recent inspection from June 24 to July 2, 2021.  Each of these transfers was timed and was far less than* (b) (4) *. The information provided appears acceptable.*

### 3.2.P.3.5 Process Validation and Evaluation
**MANUFACTURING PROCESS**
**3.2.P.3.5 Process Performance Qualification (PPQ) Data**
The PPQ data from the LNP production and bulk DP formulation and fill/finish locations (Pfizer Puurs, Pfizer Kalamazoo) were provided. An overview of the process validation phases is described below.



7 pages have been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine**
**(nucleoside modified)**

(b) (4)



<u>Visual Inspection</u>
During inspection of the BNT162b2 filled vials, 100% automated or manual inspection of the validation batches was performed, followed by Acceptable Quality Level (AQL) sampling of the inspected vials.  The requirement for the inspection process is that the vials for AQL inspection must not exceed the acceptance criteria for critical ((b) (4) ), major ((b) (4)    ) and minor defects ((b) (4)    ).  For each process validation lot,

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

the number of filled vials that were inspected along with the total rejection percentages
are presented in the table below.

| Drug Product Lot | Number of Vials Inspected | Number of Vials Accepted | Number of Vials Rejected | Vials Rejected (%) |
|---|---|---|---|---|
|  | | | | |

An IR was submitted for clarification on the visual inspection process and a response
was received under STN 125742/0.57. According to Pfizer all PV lots above were
inspected via automated visual inspection. The allowable alert limit of rejects for visual
inspection is (b) (4) (critical), (b) (4) (major), and (b) (4) (minor). All PV lots passed this
acceptance criteria.

All validation lots were AQL sampled following inspection ((b) (4)    ) and met the AQL
acceptance criteria for critical ((b) (4)    ), major ((b) (4)       ) and minor ((b) (4)) defects.

> **Reviewer's comment:** *Pfizer did not provide adequate information regarding the
> visual inspection validation including which lots were inspected by automated
> methods and which were inspected visually as well as the acceptance criteria for
> the allowable limit of rejects. The information provided appears acceptable.*

Labeling and Packaging
The validation of integrated labeling and secondary packaging operations for
commercial distribution involved running (b) (4) of product-filled vials through the
automated labeling and packaging equipment. This validation run included (b) (4)
                              testing.

The process validation run included enhanced inspection to established Acceptable
Quality Level (AQL) limits for critical, major, and minor defects. The results complied
with the acceptance criteria which demonstrates suitable validation of the labeling and
packaging operations.

> **Reviewer's comment**: *Labeling and packaging of the BNT162b2 DP were
> reviewed during the recent surveillance inspection conducted by OBPO in May
> 2021. No major issues were identified. Labeling and packaging appear
> acceptable.*

Freezing
After the labeling and secondary packaging process, the packaged DP was frozen for
storage and distribution. The freezing of the product was monitored to ensure that the

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

process performs within the established limits.  The process parameter for freezing of the BNT162b2 DP is a freezing temperature of -90 to -60ºC.  All (b) (4) PV lots passed this acceptance criteria.

> **Reviewer's comment**: Freezing operations of the BNT162b2 DP were reviewed during the recent surveillance inspection conducted by OBPO in May of 2021. No issues were identified regarding this operation.  The information appears acceptable.

**Hold Times Pfizer Kalamazoo**

The routine in-process hold times for the BNT162b2 DP manufacturing process were confirmed during the manufacture of the process validation lots.  Process validation lots (b) (4) were subjected to a cumulative hold time study.  The study evaluated the cumulative effect of the maximum process hold times for each process step, from (b) (4) , on the microbiological and physicochemical quality of the DP.  The maximum hold times are established based on the hold times of the cumulative hold process validation lot. Microbial testing was performed for (b) (4) held (b) (4) , or as otherwise deemed appropriate.  Hold time relevant to (b) (4) operations ((b) (4) ) are within those qualified by media fill which will be presented in its own section below.  The (b) (4) processing steps are within the maximum (b) (4) time determined by (b) (4) validation.  Additional information is presented below.

The in-process hold times for each step in the manufacturing train were provided for each PV lot, and will be deferred to OVRR for review.



One page has been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

**Hold Times Pfizer Puurs**

The routine in-process hold times for the BNT162b2 DP manufacturing process were confirmed during process validation lot manufacture.

Process validation lots (b) (4)                    were subjected to cumulative hold times to evaluate the maximum process hold times for each process step, from (b) (4)                    , on the microbiological and physicochemical quality of the DP. The maximum hold times are established based on the hold times of the cumulative hold process validation lot.

In addition, microbial testing was performed for (b) (4)                held (b) (4)            or as otherwise deemed appropriate.

The evaluated in-process hold times for the process validation lots are listed in Table 3.2.P.3.5-1, which includes hold time data from DP lots (b) (4)                    . The following table incorporates the hold time data from Table 3.2.P.3.5-1 and process hold times defined in Table 3.2.P.3.4-1 for (b) (4)                            manufacturing activities.



One page has been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)



(b) (4)

(b) (4)

**Validation of** (b) (4) **at Kalamazoo**

(b) (4)

8 pages have been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



**Validation of Aseptic Filling Process by Media Fills (Pfizer Kalamazoo)**

Media fills were conducted for (b) (4) Lines (b) (4) to validate of the aseptic processing steps for consistent manufacture of sterile products. Media fills are conducted (b) (4) with all shifts included in the routine media fill schedule. Environmental and personnel monitoring are also performed for each media fill.



**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

- Acceptance criterion (b) (4).



*__Reviewer's comment__: (b) (4) Lines (b) (4) are existing fill lines used to fill FDA approved products and have been validated for filling other products. The media fill studies included in this application appear acceptable with no issues identified and the filling line and environment appear to be in a state of control.*

**Validation of Aseptic Filling Process by Media Fills (Pfizer Puurs)**
Media fills were performed to validate the aseptic process at Puurs for 2mL components on the (b) (4) filling line and (b) (4) vial line. Media fill re-qualification is required (b) (4) for each filling line. All personnel that enter the filling area including process control technicians, maintenance personnel, and quality assurance must take part in at least (b) (4).

6 pages have been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)



**Sterilization Processes for Product-Contact Equipment and Components (Pfizer Kalamazoo)**

(b) (4)



11 pages have been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



(b) (4)

**Shipping Validation**

Pfizer's facilities in Kalamazoo, MI and Puurs, Belgium perform DP manufacturing, primary packaging, labeling, and secondary packaging operations for BNT162b2 DP. Following these activities, BNT162b2 DP is shipped in its final packaging to US receiving agencies and dosing sites directly or via the Pfizer US logistics center in Pleasant Prairie, WI (PPLC).

The following shipping methods are used (or planned):

- Transport to Logistics Centers and distribution sites occur at shipping conditions of -90 to -60°C via passive thermal conveyance or at shipping conditions of -20±5°C via active or passive shipping conveyances. Shipments at -90 to -60°C occur within thermal shipping conveyances that passively maintain temperature conditions of -90 to -60°C using dry ice.

- Shipments at -20±5°C may occur under active control via temperature-controlled vehicle (TCV). All TCV shipments are monitored for temperature during shipment to ensure that the temperature within the TCV remains within -20±5°C, and temperatures during transport are verified.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

- (b) (4)

  Planned for future implementation (estimated
  November 2021).

All shipments of BNT162b2 DP are continuously temperature monitored to confirm that
the appropriate temperatures are maintained. The worst-case location identified during
the OQ of the thermal shipper, i.e., (b) (4)                                  , is identified for
placing temperature monitor during routine shipments.

Shipment Methods

| Method | Temperature requirements | Qualification status | Controls used/ comments |
|---|---|---|---|
| Softbox | -90°C to -60°C using dry ice. | OQ completed: <br> -Minimum and maximum chamber studies (worst case temperature conditions for (b) (4) ) <br> PQ completed: <br> -(b) (4) shipments using representative (b) (4) (average transit time of (b) (4) ) from Puurs, Belgium, to Kalamazoo, Michigan, US <br> -Simulated transportation hazards such as (b) (4) | Continuously temperature monitored in worst case location with GPS |
| Temperature Controlled Vehicle | -20°C ±5°C | OQ completed PQ ongoing | Continuously temperature monitored and active control in Vehicle |
| (b) (4) | (b) (4) | OQ ongoing PQ ongoing | Currently not in use |

Qualification of Passive Thermal Conveyance with Dry Ice
The results from the three OQ tests for the (b) (4) temperature conditions are
presented in Table 3.2.P.3.5-1 (Maximum temperature recorded was (b) (4) for a (b) (4)
      duration).

Summary results from the performance qualification are shown in Table 3.2.P.3.5-2.
The monitor data demonstrated that the shippers performed within the -90°C to -60°C
temperature range. The lowest recorded temperature between the three shipments was
(b) (4) and the highest was (b) (4).

84

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

OQ of the Passive Thermal Conveyance with Phase Change Material (b) (4)
A chamber test performed with a minimum load and maximum volume strategy
simulating worst-case temperature conditions and shipping durations demonstrated the
thermal conveyance is capable of maintaining (b) (4) . Results for the (b) (4)
temperature conditions are presented in Table 3.2.P.3.5-3. Additional OQ studies and
PQ studies are planned.

Qualification of the Frozen Temperature Controlled Vehicle (TCV)
DP manufacturing facilities may ship BNT162b2 DP in its final packaging to Logistics
Centers and distribution sites for temporary storage and deconsolidation via -20°C ±5°C
TCV).

OQ testing was performed (b) (4)

Qualification of TCVs for transport from manufacturing sites in the US to Logistics
Centers and distribution sites in the US and for transport from manufacturing sites in the
EU to Logistics Centers and distribution sites in the EU are ongoing.

> **Reviewer's comment:** *In BLA 125742/0.24 Pfizer stated that all shipments of
> BNT162b2 DP will be continuously temperature monitored to confirm that the
> appropriate temperatures are maintained via passive thermal conveyance in the
> TCV.*
>
> *In addition, Pfizer clarified that they have not yet started shipping using the* (b) (4)
> *controlled shipping method from either Pfizer Puurs or Pfizer Kalamazoo
> and qualification studies are expected to be completed by November 2021.
> Pfizer also stated they will provide results of these studies prior to
> implementation.* (b) (5), (b) (7)(E)
>
> *The studies supporting the
> shipping method and transport were on-going at the time of BLA approval.*
>
> *The shipping information appears acceptable.*

Simulated Shipping Study (exposure to (b) (4) )
A simulated shipping study was performed to simulate realistic shipping conditions that
expose representative product to concurrent shipping hazards based on (b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)                          standards. After exposure to simulated distribution hazard conditions, samples were evaluated for CCI and DP quality to determine the physical and chemical stability of the product in its primary container.

The simulation included (b) (4)

Results are shown in Table 3.2.P.3.5-11 in the BLA. and indicate that container closure integrity was maintained during shipping simulations.

> *Reviewer's comment: Container closure integrity testing is performed on samples that were exposed to worst case shipping hazards.  All samples tested were integral.  Therefore, the hazards of routine shipping do not appear to impact the integrity of the container closure system.  The shipping hazards were performed to mimic the global supply chain shipping logistics as a worst-case scenario.  The information appears acceptable.*

## 3.2.P.5 Control of Drug Product
### 3.2.P.5.1 and 3.2.P.5.6 Specification(s) and Justification of Specification(s)
Pfizer lists (b) (4) quality attributes (QATs) as specifications for BNT162b2 DP (tested at release and throughout shelf life).  DMPQ performs primary review of CCIT. The analytical methods used by Pfizer are (b) (4)                   analysis. Refer to 3.2.P.5.3 for more information.

### 3.2.P.5.3 Validation of Analytical Procedures (Container Closure Integrity Testing)

(b) (4)                 is Pfizer's standard CCIT method for routine testing (at $T_0$, (b) (4) months) on stability lots. Separate 3.2.P.2 Microbiological Attributes documents were provided for both the Puurs and Kalamazoo sites.

According to Pfizer, the original validation of the (b) (4)      test method verified (b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

At Kalamazoo, Pfizer performs the (b) (4)

At Puurs, Pfizer performs the (b) (4)

Acceptance criteria for the (b) (4)     test method consist of the following:

For the (b) (4)          test method, the challenge consisted of (b) (4)



*Reviewer's comment: CCIT validation incorporated worst-case capping and
shipping conditions. The CCIT method at Pfizer Kalamazoo appears consistent
with standard industry methods. Pfizer reports that the CCIT method at Pfizer
Puurs is validated, but the method appears less than optimal with the* (b) (4)
       *positive control and* (b) (4)          *analysis. An IR was sent
for further evaluation of the* (b) (4)      *method validation protocol, summary*

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

*report and assay performance procedure that is followed at Pfizer Puurs and
Pfizer Kalamazoo. In amendment 125742/0.43, Pfizer states that Pfizer Puurs is
not currently registered as a site for CCIT for DP stability.  Protocol #CCT-
052421-R0-JJB provides documented evidence of the transfer of the CCIT* (b) (4)
*Test (Test Method TM100010635) from the Pfizer Andover, MA site to the
Pfizer Kalamazoo, MI site. The test method at the Pfizer Kalamazoo, MI site is
now identified as TM-01-9305A / MCD-086951. TM100010635 was evaluated,
see section 3.2.R. The information appears acceptable.*

### 3.2.P.5.4 Batch Analyses

The Batch Analysis section reflects the global development effort and the DP lots
included are not limited to those produced in market-specific registered manufacturing
facilities. In the submission, in Table 3.2.P.5.4-1, Pfizer listed (b) (4) batches that were
identified as non-clinical (the first batch produced in March 2020), clinical or emergency
supply. Of those (b) (4) batches, (b) (4) batches support either stability, PPQ, or both. From
that list, Pfizer identified the following batches (total of (b) (4) at the respective DP facilities)
that support PPQ (or process validation) and/or stability, as indicated, for the BLA:

| DP Lot # | Manufacture Date | LNP Site | DP Fill / Finish Site | # Vials | On Stability (yes/no) |
|---|---|---|---|---|---|
| | | Puurs | Puurs | | Yes |
| | | Puurs | Puurs | | Yes |
| | | Kalamazoo | Kalamazoo | | Yes |
| | | Puurs | Puurs | | Yes |
| (b) (4) | | Puurs | Puurs | (b) (4) | No |
| | | Puurs | Puurs | | Yes |
| | | Kalamazoo | Kalamazoo | | Yes |
| | | Puurs | Puurs | | No |
| | | Kalamazoo | Kalamazoo | | No |
| | | Kalamazoo | Kalamazoo | | No |
| | | Kalamazoo | Kalamazoo | | Yes |
| | | Puurs | Puurs | | No |

The analytical testing strategy applied to BNT162b2 DP has evolved throughout the
development history. Pfizer reports that all of the PPQ batches were tested against (b) (4)
quality attributes, including, those tests under DMPQ purview with acceptance criteria
defined the same as in 3.2.P.5.1 Specifications, appearance, appearance (visible
particulates), (b) (4) , vial content (volume), bacterial endotoxin, and
sterility.

Pfizer provided summaries of the results in tables in the submission for all
prementioned batches.  Pfizer reports that all results met the acceptance criteria (AC)
at the time of release.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

> ***Reviewer's comment****: Pfizer reports no out-of-specification (OOS) results for
> appearance, appearance (visible particulates),* (b) (4) *, vial content
> (volume), bacterial endotoxin, or sterility at release for any of the PV or
> additional PPQ batches. All the PV batches (* (b)(4) * for Kalamazoo and* (b)(4) * for Puurs)
> are accounted for in the batch analysis. The AC for the quality attributes, under
> DMPQ purview, did not change from the reported commercial AC
> (specification). Evaluation of the results and AC, including analytical method
> evolution, for the other* (b)(4) * quality attributes is deferred to the OVRR reviewer.
> Pfizer did not include CCIT results in the batch analysis; however, Pfizer reports
> that CCIT is tested at release and stability at* (b) (4) *months. No CCIT
> failures were reported. The information provided appears acceptable.*

**3.2.P.7 Container Closure System**
Pfizer provided separate 3.2.P.7. Container Closure System documents for the Puurs
and Kalamazoo facilities, respectively.

The primary container closure system for the BNT162b2 vaccine consists of the
following components:

| Component | Description |
|---|---|
| Vial | 2 mL Type I borosilicate glass vial, 13 mm finish |
| Vial Stopper | 13mm vial stopper composed of gray elastomer (bromobutyl rubber) coated with (b) (4) |
| Vial Seal | 13 mm aluminum vial seal with tamper-evident PP flip off cap |

Vial (Product Container)
The vial consists of a clear and colorless Type I borosilicate glass vial with a 2 mL
nominal fill volume and 13 mm finish (lip/flange) diameter. Pfizer reports the following
vial manufacturers (suppliers):

| Vial Manufacturer | Vial used at Pfizer site: |
|---|---|
| (b) (4) | Puurs |
| | Puurs |
| | Puurs |
| | Puurs |
| | Puurs |
| | Kalamazoo |
| | Kalamazoo |
| | Kalamazoo |
| | Kalamazoo |
| | Kalamazoo |

Pfizer reports that the vials from all the manufacturers have the same materials of
construction and critical dimensions, and the vials from each supplier are considered
equivalent in terms of processability, container closure integrity and DP interaction. The

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

vial meets (b) (4) requirements for Type I glass containers. The vials are sterilized by (b) (4) by Pfizer at each DP facility.

Pfizer reports the same dimensions for vials from all suppliers as follows:

| Measurements | Limits |
|---|---|
| Finish Outside Diameter | (b) (4) |
| Finish Inside Diameter | |
| Finish Lip Height | |
| Body Outside Diameter | |
| Overall Height | |

The testing performed on the vials at the DP manufacturing sites is as follows:

| Test | | Requirements |
|---|---|---|
| Visual Inspection | | Performed per (b) (4) |
| Physical Inspection | | Performed per (b) (4) |
| (b) (4) | Type I Glass tests | Manufacturer's certification per (b) (4) |

Vial Stopper
The elastomeric closure is a vial stopper composed of (b) (4) gray bromobutyl rubber that is not manufactured from dry natural rubber (latex).  The vial stopper meets the requirements of (b) (4) requirements for functional tests of (b) (4) . Vial stoppers are sterilized by (b) (4) depyrogenated by Pfizer at each DP facility.  Both facilities, Puurs and Kalamazoo, use the same stopper suppliers, (b) (4) .

The dimensions of the vial stoppers:

| Measurements | Limits |
|---|---|
| Height | (b) (4) |
| Plug Outside Diameter | |
| Flange Thickness | |

Stopper Functional Properties:
For functional properties, Pfizer performed testing as follows:



**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



(b) (4)

The testing performed per (b) (4) on the vial stoppers is:
- Visual Inspection
- Dimensional testing
- Identification of (b) (4)

Vial Seal (Cap)
The vial seal is a 13 mm flip-off design constructed of aluminum with a PP tamper-evident flip-off vial seal that has no embossing. For both facilities, Pfizer Puurs and Pfizer Kalamazoo, the cap is supplied by (b) (4) and, for Kalamazoo only, (b) (4) is included as an additional supplier.

Pfizer reports the dimensions for seals as follows:

| Description | Limits |
|---|---|
| Flip-Off Cap Diameter | (b) (4) |
| Seal Inner Diameter |  |
| Overall Height |  |

The testing performed per (b) (4) on the vial seal is visual and physical inspection.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

Secondary Packaging Components
DP vials are placed into corrugated boxes with lids.

**3.2.A APPENDICES**
**3.2.A.1 Facilities and Equipment**

**PFIZER, INC., CHESTERFIELD, MO (USA):** (b) (4)
**MANUFACTURING AND DS/DP RELEASE AND STABILITY TESTING**

(b) (4)

(b) (4)

One page has been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



(b) (4)

**Utilities Pfizer Chesterfield**

Critical utilities include purified water (PW), clean steam, compressed air, (b) (4)
. The water system has been qualified to meet (b) (4)
requirements; furthermore, the (b) (4) PW is routinely sampled and tested to meet
chemistry and microbial limits of (b) (4) .

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine (nucleoside modified)**

> *Reviewer's comment*:  *Pfizer Chesterfield PW is routinely sampled and tested to meet* (b) (4) *standards.* (b) (4)



> *The information appears acceptable.*

### Heating, Ventilation, and Air Conditioning Pfizer Chesterfield

There are (b) (4) air handling units that supply conditioned air to the BNT162b2 (b) (4) production areas.  Air handling units (AHU) (b) (4) provide 100% filtered outside air with (b) (4) to (b) (4) (ISO-(b)(4)), where the (b) (4) were manufactured and the (b) (4) is performed.  (b) (4) provides 100% filtered outside air with (b) (4) and clean preparation areas (non-classified). (b) (4) provides 100% filtered outside air with (b) (4) manufacturing suite for BNT162b2.  While the manufacturing area is classified as (b) (4), the supply air is high efficiency particulate air (HEPA) filtered to minimize the introduction of environmental contaminants.  Qualified (b) (4) provide additional environmental control.

> *Reviewer's comment:  Pfizer provided the AHUs that service all BNT162b2 manufacturing areas, and there is* (b) (4) *within these rooms.  Pfizer Chesterfield has updated the level of control by* (b) (4) *of supply air to the manufacturing areas.  The* (b) (4) *step is the beginning of the BNT162b2 manufacturing process with* (b) (4) *steps in the subsequent DS and DP manufacturing operations.  This information appears acceptable.*

### Environmental Monitoring Pfizer Chesterfield

The (b) (4) Suite (b)(4) environmental monitoring (EM) qualification served as justification for the routine EM program, EM frequencies, acceptance criteria (alert and action levels), and facility environmental control procedures. EM parameters were conducted both at rest and in operations.

Controlled, classified areas ((b) (4), ISO (b)(4), and ISO (b)(4)) are monitored for (b) (4). Applicable standard operating procedures (SOPs) contain summaries of the EM tests performed,

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine**
**(nucleoside modified)**

frequencies, and alert/action levels. EM trend reports are generated on a (b) (4) basis to evaluate adequacy of environmental controls and quality levels.

(b) (4) action levels are provided in Table 3.2.A.1-2 in the submission, and (b) (4) action levels are provided in Table 3.2.A.1-3 in the submission (combined below).



(b) (4) monitoring action levels are provided in Table 3.2.A.1-4 in the submission (duplicated below).

| ISO Class | Action Level |
|-----------|--------------|
| (b) (4)   |              |

(b) (4) air and personnel monitoring action levels are provided in Table 3.2.A.1-5 in the submission (duplicated below).

| Sample Type | Action Level |
|-------------|--------------|
| (b) (4)     |              |

**Reviewer's Comment:** *EM is performed routinely. The* (b) (4) *acceptance criteria appear appropriate for upstream production.  The information appears acceptable.*

**Contamination and Cross Contamination Controls Pfizer Chesterfield**
General contamination controls include: (b) (4)

Additional microbial controls include: (b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)

> *Reviewer's comment:* *Cross-contamination and microbial controls designed to minimize contamination from multiple sources including people, product, equipment, waste, and environment appear acceptable.*

**Equipment Summary Pfizer Chesterfield**
This section contains an overview of the process equipment, equipment qualifications, and the equipment cleaning and sanitization (if applicable) for the equipment used to manufacture the (b) (4) at Pfizer Chesterfield. Prior to use for BNT162b2 (b) (4) manufacturing, all critical equipment underwent an equipment verification process to verify that equipment is properly calibrated, maintained, and deemed fit for use in manufacturing.

(b) (4)



One page has been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



*The information appears acceptable.*

**Equipment Cleaning Validation Pfizer Chesterfield**

All equipment utilized in the CMF for (b) (4)            manufacturing is either single-use or dedicated. All dedicated equipment undergoes a complete (b) (4)
        to use, is thoroughly cleaned and sampled to ensure no product carryover prior to use. Components on each piece of equipment that control parameters that could potentially impact product quality are calibrated prior to use and maintained on a calibration schedule.

The production equipment is regularly cleaned per site procedures. Fixed equipment is cleaned using the (b) (4)            or per the appropriate SOP ((b) (4)
        ). Portable equipment, such as (b) (4)
            in a parts or glass washer. In general, (b) (4)
procedures consist of (b) (4)
                are used as cleaning agents. All final rinse steps utilize (b) (4)   .

Equipment cleaning validation was performed during routine processing. Samples were collected in accordance with approved site procedures. The results of the cleaning validation (Table 3.2.A.1-3 through Table 3.2.A.1-12) were provided in the submission (summarized below).

One page has been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine (nucleoside modified)**

*Reviewer's comment:  Acceptance criteria were met for all equipment for which cleaning validation results were provided.* (b) (4)

*The information provided appears acceptable.  However, during the execution of the cleaning validation, fifteen deviations were encountered,* (b) (5), (b) (7)(E)

### Disinfectant Effectiveness Pfizer Chesterfield

The effectiveness of the various disinfectant agents used against microbial isolates recovered from the manufacturing areas, as well as (b) (4) test organisms have been evaluated following (b) (4) guidance.  The effectiveness of general and sporicidal disinfectants was determined using a minimum (b) (4) reduction for vegetative bacteria and yeast and effectiveness of sporicidal disinfectants was determined using a minimum (b) (4) reduction for spore-forming bacteria and mold.

*Reviewer's Comment: The sponsor stated that the disinfectant efficacy study was performed using* (b) (4) *methodology and with* (b) (4) *microorganisms. The study was not provided as part of the BLA.  The study INX100155064, a general summary report of disinfectant efficacy study performed at other FDA approved/licensed buildings was reviewed as part of the EUA and found acceptable.  Additionally, facility cleaning SOP-MG-05206 was reviewed as part of the EUA and found acceptable.  The qualification of the cleaning efficacy study for CPF appears to be low risk given the operations performed and the compliance history of the site.  The information provided appears acceptable.*

### WYETH PHARMACEUTICALS LLC, ANDOVER, MA (USA): DRUG SUBSTANCE MANUFACTURING AND DS/DP RELEASE AND STABILITY TESTING

### Pfizer Andover Clinical Manufacturing Facility (ACMF)

ACMF, located in Building (b) is a new multi-product building that commenced manufacturing operations in March 2019 and is intended to manufacture DSs for

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

various clinical products. Building (b)(4) is part of the Pfizer Andover campus that includes other production facilities and laboratories that have been inspected numerous times by the FDA. ACMF is managed by Pfizer Biotherapeutics Pharmaceutical Sciences and is operated under Pfizer Global Quality Standards and Pharmaceutical Sciences Quality procedures. ACMF has experience with similar routine manufacturing operations (including (b)(4)) for other biological products.

ACMF has (b)(4) separate cleanroom production suites. Production suites consists of (b)(4) suites ((b)(4)) and (b)(4) suites ((b)(4)). Suite (b)(4) is dedicated for the manufacturing of BNT162b2. Suite (b)(4) is located on the (b)(4) floor and solutions preparation and support are also located on the (b)(4) floor.

The facility layouts for the (b)(4) floor were provided in Section 3.2.A.1: Andover ACMF General Facility Layout Building (b)(4). Both Suites (b)(4) are equipped with personnel air locks (PAL), material air locks (MAL), and waste air locks (WAL). Suite (b)(4) includes an (b)(4) Suite (b)(4) contains a (b)(4). Between the suites is a (b)(4) suites contain (b)(4) (ISO-(b)(4)). Solution preparation is performed on the (b)(4) floor (ISO-(b)(4)) and weighing and dispensing (ISO-(b)(4)) is on the (b)(4) floor.

The production suites are supported by process operations support, validated utilities, controlled warehousing for receiving and storage of raw materials and supplies, and shipping of materials. Critical utilities (compressed air, clean steam, and PW) are generated in Building (b)(4). However, (b)(4) are supplied from bulk (b)(4).

The ACMF facility, equipment, and utility systems are supported by preventive maintenance and calibration programs. It is also designed for segregation and unidirectional flow of personnel, equipment, materials, samples, product, and waste.

Heating, ventilation, and air conditioning (HVAC) air filtration and pressurization create different zones (classification), and the EM system ensures that the appropriate cleanliness and segregation is maintained for manufacturing. Temperature is set at (b)(4) for manufacturing areas and is monitored and alarmed. (b)(4) is monitored in the manufacturing areas. To mitigate cross-contamination risks, all open processes are performed in (b)(4), and most operations are performed using (b)(4) systems.

Additionally, ACMF associated Analytical Research and Development (ARD) labs will be used for DS and DP release and stability testing. The ARD laboratories located in Building (b)(4) consists of newly designated BNT162b2 mRNA vaccine laboratory spaces, located within and alongside the pre-existing ARD laboratory areas and systems. Pfizer ARD laboratories in Andover and Chesterfield operate as one organization under one

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

set of procedures, documentation systems and following the same Pfizer Quality standards.

*Facility Flows*
Procedures ensure appropriate flows, personnel gowning, and sanitization of the facility and equipment.  Flows within the facility are described below.

*Access Control and Personnel Flow:* All facilities are access-controlled and gowning procedures are supported by defined hygienic measures and guidelines. Increased gowning is required based on operations performed in the manufacturing areas.  To reduce the risk of product contamination and provide personnel protection, personnel and material entry into separate manufacturing areas are segregated.

*Product Flow:* All raw materials are released by the Quality group and are weighed and dispensed into closed, labeled containers.  Solution preparation occurs in classified processing areas where solutions are batched and packaged according to master records.  Prepared solutions are transported to Suite (b) (4)
.

*Material and Equipment Flow:* Fixed, stainless steel (SS) equipment is (b) (4)
per validated automation control and approved instructions. Clean and soiled mobile equipment is staged in separate designated areas within ACMF. Mobile equipment is transferred to and from the production suites and support areas via Controlled Not-Classified corridors and elevator, and non-classified service corridors per approved instruction. Separate paths exist for the flow of clean and soiled equipment.

All process equipment utilized in the BNT162b2 DS process is (b) (4)
and introduced into Suites (b) (4)   via the MALs. Once in the suite, the equipment is prepared for processing through final cleaning and set up with disposable components. After manufacturing is complete, the single use equipment is disconnected and discarded as waste. Any non-disposable product contact equipment is (b) (4).

*Waste Flow:* Waste is placed into closed containers prior to transfer.  Hazardous waste is appropriately labeled and transferred through the area's waste airlocks.

> **Reviewer's comment:** *A general overview of BNT162b2 DS manufacturing areas was provided.  The facility appears suitable sized and adequately designed to manufacture BNT162b2 DS. All manufacturing areas are access controlled, and diagrams for personnel, samples, product and product intermediate, consumable materials, equipment, and waste flows were provided.  Flow patterns do not appear to present unnecessary challenges that could potentially introduce contaminants during manufacturing.*

*Media and Buffer Preparation Area:*

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)



*Reviewer's Comment:* *From the descriptions provided, the buffer and equipment preparation areas appear acceptable.*

**Utilities ACMF**
Critical utilities include WFI, clean steam, and compressed air.  The WFI storage (b) (4)

Clean steam is generated via (b) (4)

Compressed air is generated by (b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)

> ***Reviewer's comment:*** *The critical utilities of WFI, clean steam, and
> compressed air were described in general terms.  The qualification of the utilities
> for ACMF appear acceptable.*

**Heating, Ventilation, and Air Conditioning ACMF**
Building (b) (4) HVAC systems are designed to provide air volume, air flow, HEPA filtered
air, and room pressurization.  The supply air processed by the HVAC units is delivered
through HEPA filtration.  The manufacturing areas were designed to minimize the
possibility of product contamination by using separate air handling units, pressure
differential zones, air locks, gowning rooms, and defined flows for personnel,
equipment, materials, and waste.

Temperature is set at (b) (4) for manufacturing areas and is monitored and alarmed.
(b) (4) is monitored in the manufacturing areas.  To mitigate
cross-contamination risks, all open processes are performed in (b) (4) , and most
operations are performed using (b) (4) systems.

The air handling units supporting BNT162b2 DS manufacture are listed in Table
3.2.A.1-2 in the submission (duplicated below).



The HVAC system has been qualified, demonstrating that the system operates to
design specifications and maintains the facility within design parameters.  Qualification
tests the system's ability to provide required air changes, pressurization, temperature,
and relative humidity in the production areas.  Rooms were monitored for (b) (4)

. The integrity of the HEPA / (b) (4) filters were verified
and certified.

Differential pressures are maintained and monitored between adjacent spaces, and
(b) (4) . Additionally, temperature is

105

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

monitored and alarmed throughout the facilities and relative humidity is monitored within the ISO Class (b) (4) manufacturing areas.

> ***Reviewer's comment:*** *The HVAC system has been qualified and maintains ISO-(b)(4) and ISO-(b)(4) manufacturing areas. Pfizer clarified that each manufacturing suite and buffer preparation area has a dedicated air handling unit to mitigate any risk of cross contamination, and provided the diagrams showing the different air handling units for Level (b)(4) and Level (b)(4). The room classifications, temperature, relative humidity, and gowning are appropriate for the operations performed in each area. While the qualification of the HVAC system in Building (b)(4) was not provided in the BLA, qualification of the HVAC system in approved/licensed buildings at the Andover site have been observed/assessed during previous FDA inspections. The HVAC systems appear acceptable.*

**Environmental Monitoring ACMF**

ACMF EM qualification of classified areas served as justification for the routine EM program, EM frequencies, acceptance criteria (alert and action quality levels), media types, incubation, maximum personnel room capacity and facility environmental control procedures. EM was conducted both at rest and in operation, and included (b) (4). At rest is defined as the status of the facility with all services functioning, standard processing equipment installed, and with no personnel or manufacturing activities being performed other than EM. Unlike at rest, the definition of in operation includes routine personnel and production-related activities being performed or simulated. A facility is in operation status from the time of the (b) (4).

Controlled, classified (ISO-(b)(4), ISO-(b)(4), and ISO-(b)(4)) areas are monitored for (b) (4). Summaries of the EM tests performed, frequencies, and alert/action levels are found in the applicable SOPs. Trending of EM is generated (b) (4) to evaluate adequacy of environmental controls and quality levels.

(b) (4)

(b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine**
**(nucleoside modified)**



(b) (4)

*Reviewer's Comment:* *EM is performed routinely.  In Amendment 125742/0.43, Pfizer clarified the definition of at rest and in operation, which have been incorporated into the EM narrative above, and that the* (b) (4) *limits are applicable for both at rest and in operation monitoring.  The EM program appears acceptable.*

**Contamination and Cross-Contamination Controls ACMF**
Suites (b) (4) are campaign dedicated to manufacture BNT162b2.  Cross contamination controls include use of (b) (4)

.  All equipment are cleaned, and nondedicated product contact equipment are changed over

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

between uses for different products.  In campaign dedicated areas, a clearance of product, components, documentation, and equipment must be performed with an area inspection at the end of the campaign.  Surfaces and equipment exteriors are cleaned according to approved procedures, and procedures are in place for special sanitization activities in response to EM excursions or breaches in normal environmental controls. Routine EM is performed to ensure that room classifications are maintained.

Environmental controls are maintained via HVAC design and control, procedural controls for gowning and flow, and facility and equipment surface sanitization. (b) (4) are used for non-critical operations (sample aliquoting) and critical operations, such as making (b) (4) .

Procedures for labeling, flow, storage, and use of materials and equipment are established to avoid potential mix-ups or cross-contamination in manufacturing areas. Product processing takes place in areas that are product dedicated on a campaign basis. In campaign dedicated areas, a clearance of product, components, documentation, and equipment together with an area inspection at the end of the campaign provides assurance that no batch specific materials or documents remain, and that the area may be used for the manufacture of a different product.

Control and Cross-Contamination Controls are summarized below.
*Contamination from other products*: Operations take place in areas that are dedicated for use with a single product on a campaign basis, with a documented changeover cleaning verification and clearance between uses for different products.  All solutions and materials required for operations are specified in approved procedures and production records. Product and non-product solutions are transferred in portable bioprocess containers. All product and non-product solution containers are identified according to description, batch number, and storage conditions.

*Contamination from equipment:* Status of fixed equipment is indicated and tracked by validated automation control, and the status of non-fixed equipment is indicated in accordance with approved labeling procedures. Clean and soiled equipment are stored closed, in separate designated areas within the manufacturing suites, and have separate flow paths.  Procedural and validated automation controls exist to ensure that equipment is only used with its designated product. In addition, single use technology is utilized within the facility for many product processing operations.

*Contamination from people:* Gowning procedures are designed to minimize contamination and cross-contamination.  Gowning is appropriate for the operations. Gowns are changed when damaged or soiled, and discarded upon exiting each production area. Gloves are changed between working with different products within the facility. Fresh, pre-sterile, single use gowning is required prior to performing open operations in the bulk fill room. Personnel monitoring is conducted per site procedures.

*Contamination from system failures:* Environmental controls for parameters such as differential pressure, temperature, and relative humidity controls are continuously

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

monitored and alarmed.  Critical equipment and systems are powered by emergency back-up power systems. Critical control systems are on uninterrupted power supply to allow continuous operation during power outages. Site procedures exist for disaster recovery and response to unplanned system failures of monitoring systems and environmental control systems.

*Contamination from Waste:* Liquid process waste is disposed through the facility waste system, which is equipped with (b) (4) . Liquid waste is treated and discharged in accordance with local and state regulations. All solid waste is removed from the facility on a routine basis. Procedures exist for handling and disposal of biohazardous waste in dedicated, single-use containers. Hazardous chemical waste is removed from the manufacturing areas on a regular basis in accordance with approved procedures.  Procedures exist for routine facility cleaning, sanitization, and spill response for containment and remediation of process spills.

The product changeover program is a procedural approach for providing assurance that potential cross-product contamination from one manufacturing process to the next does not occur.  The Quality group reviews and approves the changeover documentation.

All product processing areas or systems undergo a product clearance after completion of a product campaign.  These area product clearances are performed and documented by trained personnel in accordance with approved procedures and physical inspection of the area.  Execution of product clearance is documented in cGMP records, which are reviewed and approved by manufacturing and quality as part of the changeover approval process.

> ***Reviewer's comment:*** *Cross-contamination controls are designed to minimize contamination from multiple sources including people, product, equipment, waste, and environment and appear acceptable.  EM is performed in all classified areas, and action and alert limits appear acceptable.*
>
> *In Amendment 125742/0.43, Pfizer clarified the ACMF suites (*(b) (4)*) are segregated manufacturing suites that were not used for any product prior to BNT162b2 DS manufacturing. The suites and product contact equipment used for BNT162b2 are dedicated to the production of BNT162b2. No other product is manufactured in the ACMF suites or used with the dedicated equipment, and production of BNT162b2 in ACMF is ongoing with no plans to change-over to another product.*

## Equipment Summary ACMF

This section contains an overview of the process equipment, equipment qualifications, and the equipment cleaning and sanitization (if applicable) for the equipment used to manufacture the DS at Pfizer Andover.

*Critical Process Equipment:*

One page has been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



(b) (4)

### Equipment Qualification ACMF

All equipment used in the manufacturing process and equipment preparation meet specific requirements and are qualified for their intended use.  Equipment qualification is performed for new equipment or changes to existing equipment.  Installation qualification (IQ) and OQ provide evidence that the equipment/systems are installed and consistently operate in accordance with design and pre-defined acceptance requirements.  The routine calibration frequency is defined in the qualification report.  The PQ demonstrates that equipment or systems will consistently perform per pre-determined acceptance criteria.



(b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



(b) (4)

**Equipment Cleaning Overview ACMF**
The product contact equipment and parts used for BNT162b2 are single use or
campaign dedicated and cleaned using validated procedures.

*Cleaning Procedures:*
The production equipment is regularly cleaned by (b) (4) (fixed equipment) or (b) (4)
(portable equipment, hoses, etc.).  Both (b) (4) consist of (b) (4)
Monitoring of the
cleaning processes during routine production is performed via testing for (b) (4)

*Cleaning Validation Overview:*
Cleaning validation is performed to demonstrate that the intended cleaning procedure is
efficient and can consistently remove residual product, (b) (4)
. (b) (4) of equipment and (b) (4) is applied during

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

cleaning validation, where appropriate.  Sample plan and locations (based on most difficult to clean and representative locations) are defined in the cleaning validation protocol and procedures and specific to equipment being cleaned.  Cleaning verification is performed when cleaning validation is in process or is not in place.  Cleaning verification sampling will be performed on any batches not being sampled for cleaning validation.

Cleaning validation will be performed for the (b) (4)                       .  No product contact parts are washed in the parts washer.  Product contact small parts (b) (4)
                                                          ) are cleaned via (b) (4)
        cleaning procedure in suite.  The procedure includes a (b) (4)
                                              .

Cleaning validation consists of the following:



Post cleaning validation, periodic cleaning verification (based on risk approach) is performed to provide ongoing assurance regarding the state of control of validated cleaning procedures.

> **Reviewer's comment:**  *A description of the BNT162b2 manufacturing equipment was provided.  Cleaning verification is performed if cleaning validation is not performed, as in the case of small product contact items and hoses cleaned manually via (b) (4)    .  The cleaning validation plan appears acceptable.*

*Cleaning Validation information*
Cleaning validation was performed on only the (b) (4)                        is product dedicated, and the (b) (4)
                                     The acceptance criteria are found in the table below



3 pages have been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



(b) (4)

### Disinfectant Effectiveness ACMF

The effectiveness of the various disinfectant agents used against microbial isolates recovered from the manufacturing areas, as well as (b) (4) test organisms have been evaluated following (b) (4) information chapter. The effectiveness of general and sporicidal disinfectants was determined using a minimum (b) (4) reduction for vegetative bacteria and yeast and effectiveness of sporicidal disinfectants was determined using a minimum (b) (4) reduction for spore-forming bacteria and mold.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

> ***Reviewer's Comment:*** *The sponsor stated that the disinfectant efficacy study was performed using* (b) (4) *methodology and with* (b) (4) *microorganisms. The disinfectant efficacy study appears acceptable.*

## Computer Systems ACMF

The critical steps in BNT162b2 drug manufacturing include (b) (4), which use equipment with automated control by computer systems that are identified in the table below.



The systems have local control using programmable logic controllers (PLCs) that are part of the overall automation strategy. The Supervisory Data and Collection (SCADA) component of the automation provides an operator interface and a means to collect and archive data in the (b) (4).

ACMF uses (b) (4) to control and monitor equipment. The validation activities of (b) (4) and associated PLCs included installation/operational qualification (IOQ), which were completed and approved by quality assurance and summarized in (b) (4) Qualification Report. An electronic records and electronic signature (ERES) and Data Integrity (DI) assessment of the computerized system was carried out in accordance with Pfizer's DI and Data Lifecycle Controls policy associated with data and operations. (b) (4) recipes for (b) (4) specific to BNT162b2 were approved and implemented in accordance with the change management procedure to create and modify (b) (4) recipes in ACMF. A summary of the critical steps controlled by the computer systems are described below.

(b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)

The parameters controlled and/or monitored by the automated control systems in BNT162b manufacturing process include:

*Reviewer's Comment: In Amendment 125742/0.57, Pfizer provided a list of the critical BNT162b2 DS manufacturing steps that are computer-controlled with a brief description of the validation process and parameters monitored, which have been incorporated into the narrative above.  IOQ was performed according to site procedures and documented, which appears acceptable.*

## Pfizer Andover Suite (b) (4)

Pfizer Andover is currently licensed for manufacturing recombinant DNA derived protein DS intermediates and DSs using (b) (4)
.  There is no manufacturing of products containing penicillin, cephalosporins, live viruses, spore-forming organisms, or cytotoxic drugs.  The categories of DS are found in Table 3.2.A.1-1 in the submission (duplicated below).

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)

Facility Overview
Building (b)(4) is a (b) (4)-story building containing manufacturing suites (b) (4), and now Suite (b)(4). Suites (b) (4) are multiproduct suites, and Building (b)(4) allows for concurrent multiproduct manufacturing, with programs and operating procedures for gowning and segregation/directional control of flows of personnel, equipment, tools, instruments, materials, samples, and waste to mitigate contamination/cross contamination. BNT162b2 DS manufacturing operations occur within Suite (b)(4).

- Suite (b) (4) is a new segregated manufacturing suite dedicated to the production of BNT162b2 created from existing Suite (b)(4). Suite (b)(4) of Building (b)(4) has been inspected by the FDA (January 2019; Voluntary Action Indicated (VAI)) and is used to manufacture other FDA approved products (b) (4)).
- Suite (b)(4) has dedicated personnel, equipment and material entrances and exits, serviced by a dedicated HVAC system.
- Suite (b)(4) design, construction, and materials of construction details are consistent with existing suites.
- All support services and utilities utilized in Suite (b)(4) are utilized by existing suites.
- All raw materials, supplies, and shipping of materials utilize the same controlled warehousing, receiving and storage as other suites.
- All facilities, process equipment, and utility systems are supported by procedure-based preventive maintenance and calibration programs utilized by the existing suites.
- All current operations in Suite (b)(4) will be consistent with the general operational and quality policies and procedures as the existing suites.

Quality Control laboratories associated with COVID-19 are located in Building (b)(4) and Building (b)(4).

The process flow diagram indicates that any open operations, consisting of aseptic connections, are performed in the (b) (4) and no open operations occur outside of the (b) (4). All components in the (b) (4), and final filtration and dispensing are (b) (4). The equipment used in the (b) (4) are dedicated and (b) (4).

*Area Classifications*

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

Areas in Suite  used for the manufacturing of BNT162b2 are classified based on the manufacturing operations occurring in those areas.  Area classifications are found in Table 3 in the submission (duplicated below).

Area Classification and Biosafety Level (BSL) for the COVID-19 Vaccine Drug Substance Manufacturing Facility



*Temperature and Relative Humidity*
Temperature is monitored and alarmed in the raw material and solution storage areas, and manufacturing suites.  The processing areas, Suite (b)(4), and solution preparation area are set to (b)(4) and monitored and alarmed at (b)(4) . The raw materials warehouse is monitored and alarmed at (b)(4) . All ISO-(b)(4) and ISO-(b)(4) manufacturing areas are operated and monitored within a relative humidity range of (b)(4).

*Flows*
*Personnel Flow:*  Personnel flow is controlled through restricted access and signage. Personnel may not move between these areas freely but must de-gown and exit one area and enter another through the designated gowning rooms.

*Product, Material, and Waste Flow:* All raw materials used in Suite (b)(4) are released by the Quality group. The exterior surfaces of instruments and supplies are (b)(4) Suite (b)(4).  The exterior surfaces of material containers are (b)(4) into the controlled areas of Suite (b)(4) through designated equipment and MALs. There are no transfers of process intermediates from Suite (b)(4), and in-process samples are transported in (b)(4) .  Drug substance is dispensed into (b)(4) within the designated areas of Suite (b)(4) . (b)(4) BNT162b2 DS exits Suite (b)(4) for (b)(4) via the MALs and (b)(4) corridor.  Waste is placed into closed containers prior to transfer. Hazardous waste is appropriately labeled and transferred to the suite out-lock. Waste is transferred through the area's equipment and material in/out-lock.

*Equipment Flow:*  Process equipment is labeled with status.  Fixed equipment is (b)(4) . Clean and soiled, product contact mobile equipment and parts are staged in a contained fashion in separately designated areas within Suite (b)(4) and are cleaned within the suite. Non-product contact mobile equipment and small parts may be transferred to and from the Product Services Equipment Processing areas. Separate paths exist for the flow of clean and soiled equipment. All process equipment utilized in the BNT162b2 DS process are (b)(4) . The equipment are introduced into Suite (b)(4) via the materials airlocks associated with each suite where the equipment are (b)(4) . Once in the suite the equipment are prepared for processing through final

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

cleaning and set up with disposable components.  After manufacturing is complete the single use equipment are disconnected and discarded as waste.

> *Reviewer's Comment: A general overview of BNT162b2 DS manufacturing areas in Suite (b)(4) is provided.  All manufacturing areas are access controlled, and gowning is progressive.  Diagrams for personnel, product, consumable materials, equipment, and waste flows were provided. There are different flows for clean and soiled equipment.  Flow patterns do not appear to present unnecessary challenges that could potentially introduce contaminants during manufacturing. The information appears acceptable.*

> *Drug substance is manufactured in ISO-(b)(4) areas with DS (b)(4) in a (b)(4).  The area classification appears acceptable, as the majority of the process is closed and performed in (b)(4) systems.  Additionally, all open manipulations occur in the (b)(4).*

## Description of Buffer Preparation Area

Buffer preparation for BNT162b2 is performed within a dedicated suite.  The suite consists of (b)(4) preparation rooms ((b)(4)) that are separated by airlocks. Solutions are formulated in (b)(4)

> *Reviewer's Comment:  From the descriptions provided, the buffer and equipment preparation areas appear acceptable.*

## Utilities Suite (b)(4)

Critical utilities such as WFI, clean steam, and compressed air are existing utility systems in Building (b)(4).  The utilities for Building (b)(4), including Suite (b)(4), have been evaluated during multiple past FDA inspections.  Suite (b)(4) was made from space in Suite (b)(4) and the utilities for Suite (b)(4) were reviewed during the recent PLI of Pfizer Andover.

There were no changes to the WFI, including no additional WFI drops, or clean steam points of use due to the addition of Suite (b)(4).  The WFI system has been installed, validated, and is operational for use in manufacturing commercial products in Building (b)(4).  Routine sampling is performed to verify bioburden (action limit: (b)(4)) and endotoxin (action limit: (b)(4)).  The system is monitored, alarmed, and trended for (b)(4) to verify the system is in a state of chemical control.

The clean steam system has been installed, validated, and is operational for use in manufacturing commercial products in Building (b)(4).  Routine sampling is performed to verify that the system is in a state of control for chemical ((b)(4))

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

and (b) (4)                                        and (b) (4)
                    . Steam quality testing for the clean steam distribution system is performed for
(b) (4)

> *Reviewer's Comment:  The critical utilities of WFI and clean steam were
> described in general terms and appear acceptable.*

Compressed Air System
The compressed air system provides compressed air to various process and instrument
use points in Building (b)(4) . Compressed air is produced by (b) (4)

                    Points-of-use are equipped with a (b) (4)      in product contact
applications including, but not limited to, (b) (4)
                    The compressed air distribution piping was modified to add (b) (4)
additional points of use within Suite (b)(4) .  The new compressed air distribution points of
use were validated for (b) (4)


Compressed air is sampled from representative points and routinely tested for the
(b) (4)

                                                                    are continuously
monitored and alarmed at the compressed air sources.

> *Reviewer's Comment:  Compressed air was described in general terms.
> Validation data were not provided for the compressed air but monitoring data
> from July to December 2020 were provided in the EUA (27034.76).  (b) (4)  new
> points of use were added to the compressed air in Suite (b)(4) . All samples met
> acceptance criteria. The information provided appears acceptable.*

**Heating, Ventilation and Air Conditioning Suite (b)(4)**
The HVAC systems supplying the air to the manufacturing areas in Building (b)(4)  are
designed to provide air volumes, air flows, HEPA filtered air, and room pressurization
appropriate for the required environmental classification.

Suite (b)(4) has its own dedicated HVAC unit (HVAC (b) (4); Drawing A-8034902 in section
3.2.A.1).  Construction of Suite (b)(4) involved (b) (4)

                    All the make-up air consists of air drawn from outside and
conditioned resulting in (b) (4)      .  The supply air is delivered to manufacturing
areas through HEPA filters.  A gowning room or air lock is located between all corridors
of lower and higher classification.

The HVAC systems were designed and qualified to maintain pressure-controlled
environments that are based on manufacturing operations performed in that area that

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

are monitored between adjacent spaces.  Temperature is monitored and alarmed in the raw material and solution storage areas as well as throughout the manufacturing suites. Additionally, relative humidity in classified manufacturing areas is monitored.

*HVAC Validation*
The HVAC system for Building (b) (4) production areas has been validated.  As part of the performance validation, all classified production areas are tested under (b) (4) conditions.  Rooms were monitored for (b) (4) .

The integrity of the HEPA/ (b) (4) filters was verified and certified.

> ***Reviewer's Comment:***  *The HVAC system has been validated and maintains ISO (b)(4) manufacturing areas.  The HVAC system for Suite (b)(4) was reviewed as part of the January 2019 FDA inspection.  Manufacturing suites, Suites (b) (4) , each have dedicated air handling units. The HVAC controls and segregation for each suite appears acceptable.*

**Environmental Monitoring Suite (b)(4)**
The existing EM program used in the classified areas within Building (b)(4) was applied to include Suite (b)(4) .

*EM Qualification*
Area classification served as justification for routine EM program, EM frequencies, acceptance criteria (alert and action limits), media types, incubation, and facility environment control procedures.  EM testing was conducted at (b) (4)

*Routine EM*
Suite (b)(4) has been assigned an environmental classification of ISO-(b)(4) with (b) (4) (ISO-(b)(4) air supply). (b) (4) are used for non-critical operations ((b) (4) ) and critical operations ((b) (4) ).  Buffer preparation and autoclaving used for BNT162b2 manufacturing is performed in product service areas of Suite (b) (4) and Suite (b) (4) . These areas are controlled classified manufacturing spaces with established routine EM programs. Additionally, periodic monitoring for mold and fungi is conducted with specialized media and incubation conditions for areas. The routine EM tests and action limits are found in the Table 3.2.A.1-4 in the submission (duplicated below):

(b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



*Reviewer's Comment: All alert and action limits appear acceptable.  Action limits are appropriate for the operations performed in the* (b) (4) *.*

*In Amendment 125742/0.43, Pfizer clarified the definition of at rest and in operation, which have been incorporated into the ACMF EM narrative above and apply to Suite* [6] *, and that the* (b) (4) *limits are applicable for* (b) (4) *monitoring.  The EM information appears acceptable.*

**Contamination and Cross-Contamination Controls Suite** [6]
Suite [6] is dedicated to manufacturing of BNT162b2 and has dedicated personnel. Product contact equipment are either single use (i.e., disposable) or multi-use (i.e., reusable stainless-steel equipment) but dedicated to BNT162b2.  Cross contamination controls include (b) (4)

Procedures for labeling, flow, storage, and use of materials and equipment are established to avoid mix-ups and cross contamination.  Batch records include a specific product code designation.

*Contamination and cross-contamination controls are summarized below:*

*Contamination from equipment:* Status of fixed equipment is indicated and tracked by validated automation control, and the status of non-fixed equipment is indicated in accordance with approved labeling procedures. Clean and soiled equipment is stored closed, in separate designated areas within the manufacturing suites, and have separate flow paths.  Procedural and validated automation controls exist to ensure that equipment is only used with its designated product. In addition, single use technology is utilized within the facility for many product processing operations.

*Contamination from people:* Gowning procedures are designed to minimize contamination and cross-contamination.  Gowning is appropriate for the operations. Gowns are changed when damaged or soiled, and discarded upon exiting each production area. Gloves are changed between working with different products within the facility.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

*Contamination from system failures:* Environmental controls for parameters such as differential pressure, temperature, and relative humidity controls are continuously monitored and alarmed.  Critical equipment and systems are powered by emergency back-up power systems. Critical control systems are on uninterrupted power supply to allow continuous operation during power outages. Site procedures exist for disaster recovery and response to unplanned system failures of monitoring systems and environmental control systems.

*Contamination from waste:* Liquid process waste is disposed through the facility waste system, which is equipped with (b) (4)                                . Liquid waste is treated and discharged in accordance with local and state regulations. All solid waste is removed from the facility on a routine basis. Procedures exist for handling and disposal of biohazardous waste in dedicated, single-use containers. Hazardous chemical waste is removed from the manufacturing areas on a regular basis in accordance with approved procedures.  Procedures exist for routine facility cleaning, sanitization, and spill response for containment and remediation of process spills.

> *Reviewer's comment:*  Cross-contamination controls are designed to minimize contamination from multiple sources including people, product, equipment, waste, and environment.  EM is performed in all classified areas, and action and alert limits appear acceptable (see EM section). The information provided appears acceptable.
>
> In Amendment 125742/0.74, Pfizer clarified Suite (b)(4) is a segregated manufacturing suite that was not used for any product prior to BNT162b2 DS manufacturing. The suite and product contact equipment used for BNT162b2 are dedication to the production of BNT162b2. No other product is manufactured in Suite (b)(4) or used with the dedicated equipment, and production of BNT162b2 in Suite (b)(4) is ongoing with no plans to change-over to another product.

**Equipment Summary Suite (b)(4)**
This section contains an overview of the process equipment, equipment qualification, and the equipment cleaning and sanitization (if applicable) for the equipment used to manufacture the DS at Pfizer Andover Suite (b)(4).

*Critical Process Equipment:*
(b) (4)

7 pages have been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)



The parameters controlled and/or monitored by the automated control systems in BNT162b manufacturing process in Suite (b)(4) are the same parameters in ACMF.  For additional details about the controlled and monitored parameters, refer above to the ACMF Computer Systems section.

> ***Reviewer's Comment:*** *In Amendment 125742/0.57, Pfizer provided a list of the critical BNT162b2 DS manufacturing steps that are computer-controlled with a brief description of the validation process and parameters monitored, which have been incorporated into the narrative above.  IOQ was performed according to site procedures and documented in reports.  The information appears acceptable.*

**DRUG PRODUCT MANUFACTURING FACILITY, PFIZER, KALAMAZOO, MICHIGAN**

The Pharmacia & Upjohn Company LLC site located at 7000 Portage Road, Kalamazoo, MI 49001-1099, (referred to as Pfizer Kalamazoo) is a DP manufacturing site for sterile injectable products, including biological medicinal products such as human vaccines.  This site has an acceptable compliance history with the FDA and recently underwent a Level 1 surveillance inspection in May 2021 which included Building (b) (4) which houses the BNT162b2 manufacturing areas.  Within Building (b) (4), the (b) (4) areas are used for LNP formulation and filling of the BNT162b2 DP, respectively.  The May 2021 surveillance inspection covered the licensed biological products manufactured at the site and also included the observation of the BNT162b2 DP manufacturing operations

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

and review of associated quality documentation.  The inspection did not identify
significant deficiencies and was classified as Voluntary Action Indicated (VAI).

**Heating, Ventilation, and Air Conditioning Pfizer Kalamazoo**
The HVAC systems are designed to provide properly filtered air with volumes, air
velocities and room pressurization schemes commensurate with the required room
classifications for each respective area.  The manufacturing rooms with their respective
grades are listed below.



Differential pressure is maintained and monitored between adjacent rooms.  Room
pressures are set up in (b) (4)

All fresh air is taken from outside, (b) (4)
AHUs that supply the cleanrooms.

HVAC systems have been qualified, demonstrating adherence to the parameters
required for each respective area classification designation.  Monitoring is performed for
pressures, temperature, and humidity as appropriate.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine (nucleoside modified)**

- The operating temperature specification is (b) (4) in all Grade (b) (4) areas.
- Relative humidity measurements are continuously monitored in critical rooms if required ((b) (4)).
- Supply HEPA filters installation measurements show no leakage of (b) (4) of the measured upstream concentration.
- (b) (4) testing ((b) (4) testing) for Grade (b)(4) processing areas are performed.
- (b) (4) / Area Classifications were executed to monitor and evaluate the (b) (4) under (b) (4)' and (b) (4)' conditions in classified areas.
- Environmental Qualifications were also performed. As part of the qualification, all classified production areas were tested under (b) (4) conditions. Rooms were monitored for (b) (4) .

**Environmental Monitoring Pfizer Kalamazoo**

A facility EM program is in place to sample air, surfaces, and equipment for the presence of microorganisms.  The cleaning and sanitization program is evaluated by performing microbiological surveys and reviewing and trending data to ensure the program is effective.  The routine EM program is in place to detect an adverse change in microbiological conditions.  Specifications for each room grade are defined as follows:



One page has been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)

All personnel entering the cleanrooms are trained and certified for the work required. The personnel monitoring program is to provide information on the type and possible sources of microorganisms that are isolated from and potentially transmitted by cleanroom personnel.  Personnel aseptic technique and behavior as well as the adequacy of gowning procedures are monitored using this approach.  A total of (b) (4) sites per operator are monitored including (b) (4) the sites were chosen because (b) (4)
                                                    Routine personnel monitoring is conducted for all personnel who have entered the aseptic area under operational conditions at least (b) (4) per shift.

> **Reviewer's comment:** *The HVAC system was qualified, and EM is in place for* (b) (4)                              . *The recent surveillance inspection conducted by ORA/OBPO in May 2021 covered the HVAC and EM trends in Building* (b) (4) *from May 1, 2019 to May 11, 2021 and no trends were noted.  The information provided in the BLA appears acceptable.*

**Purified Water and Water for injection Pfizer Kalamazoo**
Purified water is generated from (b) (4)

Microbial control is achieved by (b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

through looped distribution piping at a rate that ensures turbulent flow and positive distribution loop return pressure during normal operating conditions.  Hoses used to dispense PW and WFI are drained after use.  WFI and PW are stored and distributed at (b) (4)                                temperatures.  WFI system temperature is (b) (4) and PW system is (b) (4).  The water is delivered at the use points based on user-defined temperatures.

WFI and PW water quality criteria are provided below:

WFI



PW

For microbial control the systems are routinely tested for (b) (4) (b) (4) .  Testing is conducted to ensure the water quality meets current (b) (4) requirements.  (b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)

**Clean Steam Pfizer Kalamazoo**

(b) (4)    grade clean/ pure steam is prepared from (b) (4)

The clean steam (b) (4)    are continuously monitored in-line.  Clean steam is tested at representative test stations tested at least (b) (4) . Clean steam meets the minimum quality (b) (4)    requirements for (b) (4) .  Additionally, the following thermodynamic properties of clean steam are tested at least (b) (4)  at representative use points:

(b) (4)

Water (b) (4)    are continuously monitored in-line.  Water quality is also monitored by physical, chemical, and microbiological tests in conformance with applicable compendial requirements.

> **Reviewer's comment:** *The water systems and clean steam systems were reviewed during the recent surveillance inspection conducted by ORA/OBPO in May 2021 and no trends were noted.*
>
> *An information request was sent to Pfizer to request more information about the water quality criteria for WFI and PW as well as the water monitoring programs at Kalamazoo (STN 125742/0.57 The information is presented in the water systems sections above.  The information provided appears acceptable.*

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

**Compressed Air Pfizer Kalamazoo**

(b) (4)  grade compressed air is prepared from (b) (4)



Compressed air for BNT162b2 manufacture at Kalamazoo is used during the (b) (4) . The compressed air alert limit is (b) (4). An action level is reached following an investigation of an alert limit where follow-up testing also meets or exceeds alert limits. All organisms are identified following positive tests and an action level is also reached if there is a trend identified (i.e., the organism has been identified at that sample location in the last (b) (4) ). The compressed air is (b) (4) at the POU.

> ***Reviewer's comment:*** *The compressed air is a qualified utility and undergoes routine sampling. An information request was sent to Pfizer to obtain more information regarding air and (b) (4) usage in BNT162b2 manufacture as well as the monitoring limits which were also not provided in the original submission (STN 125742/0.57). Pfizer confirmed (b) (4) is not used in the manufacture of BNT162b2. The information for the compressed air appears acceptable.*

**Equipment Summary Pfizer Kalamazoo**
New equipment for manufacturing BNT162b2 (i.e., (b) (4) ), (b) (4) freezers and ultra-low temperature storage freezers, etc.) were installed within the existing footprint of the main DP production building (Building (b) (4) ). The critical equipment used in the manufacture of BNT162b2 along with the description of product contact status is presented in the table below.

**Critical Equipment Used in Manufacturing of BNT162b2 at Pfizer-Kalamazoo**

(b) (4)

One page has been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



All equipment was qualified prior to use according to Pfizer.  It should be noted that all product-contact equipment is either BNT162b2 dedicated or single-use.

An IR was submitted to Pfizer regarding any new product contact equipment that may have been added to BNT162b2 manufacture that was not included in the original EUA 27034 submission and to confirm all equipment is BNT162b2-dedicated (STN 125742/0.24.  Pfizer provided a list of equipment and the qualification status.  All equipment has been qualified and is dedicated to BNT162b2 manufacture.

An additional IR was sent to Pfizer to obtain the qualification summary documents for the operational and performance qualification (OQ/PQ) of the new equipment at Pfizer Kalamazoo (STN 125742/0.57).

Pfizer provided the release report (b) (4) *COVID Vaccine* (b) (4) *Summary System Acceptance* which was provided to confirm that verification testing was conducted on all equipment and equipment software/hardware utilized for BNT162b2 manufacture.

Pfizer stated all verification documentation was reviewed by the qualified subject matter experts and any non-conformances during qualification were addressed and resolved.  All testing for each piece of equipment was provided along with whether the testing passed acceptance criteria, or a non-conformance occurred.  Pfizer provided an explanation of all non-conformances and these were reviewed.  Following an investigation all non-conformances were resolved.

In addition, Pfizer provided the *Release Report* and the (b) (4) *COVID Vaccine Formulation* (b) (4) *System Acceptance and Release Report* which they state is representative of all groupings of (b) (4) in terms of testing.  This testing included installation and functional verification (FV).  For this report (b) (4) was provided.  All non-conformances were investigated and resolved.

*Reviewer's comment (Equipment Qualifications): From the data provided, it appears all new pieces of equipment have been qualified for their intended use*

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

*which included installation, software/hardware, and FV.  Pfizer listed all non-conformances during the various qualifications and according to Pfizer all were resolved.  The information provided appears acceptable.*

**Equipment Cleaning Validation Pfizer Kalamazoo**

All product contact equipment is (b) (4)
, with an automated system that uses cleaning recipes or is manually cleaned with appropriate cleaning agents.  The DP stoppering parts and tank change parts are disassembled and (b) (4)                     in a qualified (b) (4) washer.

The cleaning procedure consists of the following steps:

(b) (4)

The final rinse steps use (b) (4)                 and the wash steps in some cases employ the use of cleaning additives.

Cleaning validations (CV) were performed on all BNT162b2 product contact equipment. Each CV consisted of 3 consecutive successful runs using a representative or challenge material held for a defined extended DHT.  Sample locations were defined as the most difficult to clean and representative of product contact locations.

Pfizer Kalamazoo provided the cleaning validation sample requirements for the various pieces of equipment used in the manufacture of BNT162b2.  All equipment has a validated soiled hold time of (b) (4) except for the (b) (4)         which have a soiled hold time of (b) (4) . The following bullets summarize the cleaning validation for the major manufacturing equipment:

The maximum validated CHTs for each piece of equipment are as follows:

(b) (4)

BNT162b2 (b) (4)     CV Results

2 pages have been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



**Contamination and Cross-Contamination Controls Pfizer Kalamazoo**

The Building <sup>(b) (4)</sup> facility is designed as a multi-product facility and is used in the manufacture of aseptically processed DPs. All new products are evaluated for potential impact to existing products prior to introduction into the area.  There is no manufacture of products containing penicillin, cephalosporin, live viruses, spore forming organisms or cytotoxic drugs.  The Pfizer Kalamazoo Building facility is licensed as a multi-product facility.

Contamination Controls Pfizer Kalamazoo

The Building <sup>(b) (4)</sup> facility has been designed to minimize the potential of product contamination and personnel exposure using a combination of controls including pressure differential zones, airlocks, gowning rooms and defined pathways for the flow of personnel, equipment, materials and waste.  Manufacturing areas are classified as Grade <sup>(b) (4)</sup> and Grade <sup>(b) (4)</sup> controlled environments and are appropriate to the operations that take place within each area.  Air pressure cascades are maintained from areas of (b) (4) .  A gowning room or airlock is located between all areas of lower and higher classification.  A Grade <sup>(b) (4)</sup> environment is used in the aseptic filling area.  Room finishes are durable, smooth and cleanable.

Site standard operating procedures (SOPs) describe the flow of materials, equipment and personnel through the facility to prevent contamination and mix-up.  Procedures also ensure that appropriate storage conditions are met throughout the manufacturing process.  Routine EM is performed in the aseptic area to ensure that microbial and particulate levels remain in control.

Cross-contamination Controls Pfizer Kalamazoo

Introductions of new product families, updates to manufacturing processes, and changes to the facility design or equipment are assessed via the site change management process.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

The general principles to prevent cross-contamination within the Aseptic Manufacturing facility include:
- A controlled utilities system
- Validated cleaning and sanitization procedures for equipment
- Material, personnel, and waste flow controls through air locks with access controls
- Different pressure zones
- Gowning requirements
- A documented EM program for classified rooms

Contamination from other products Pfizer Kalamazoo
The following are the strategies applied to mitigate cross-contamination from other products:
- Only one lot of product is filled at a time.
- The (b) (4) facility is fully dedicated to formulation of the BNT162b2 DP.
- Production and formulation areas are regularly cleaned and sanitized as per site procedures.
- Clean and clearance procedures are in place for formulation and filling lines according to site procedures.

Contamination from Equipment Pfizer Kalamazoo
The following are the strategies applied to mitigate cross-contamination from equipment:
- Equipment is cleaned per site procedures.  Cleaned and soiled equipment are identified and segregated.
- Product contact equipment and components are cleaned and either depyrogenated or sterilized via validated processes prior to use for each batch.
- Product contact tubing and hoses are either one time use and discarded after each process order or prepared for re-use using site procedures.
- Equipment is properly maintained through a preventive maintenance program.

Contamination from People Pfizer Kalamazoo
The following are the mitigation strategies:
- Personnel entering production areas require gowning training or a trained escort per site procedures.
- Site procedures adhere with CGMPs and are used for production activities.
- Personnel monitoring is conducted per site procedures.

Contamination from System Failures Pfizer Kalamazoo
The following are the mitigation strategies:
- Classified production areas and cold rooms are monitored for temperature through automated control systems, with appropriate warnings and alarms, and are maintained as per site procedures.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

- Differential pressure between rooms of the same and different classifications are monitored and maintained as per site procedures.
- Recovery from a disruption to a controlled area is performed as per site procedures.

Contamination from Waste Pfizer Kalamazoo
- Production waste is disposed according to site procedures.
- Production waste receptacles are emptied and sanitized as applicable per site procedures.

Product Changeover Operations Pfizer Kalamazoo
Product changeover procedures provide a high level of assurance that potential cross-product contamination from one manufacturing process to the next does not occur.  The product changeover process is executed and documented according to approved procedures that are designed to ensure that cross-product contamination risks are minimized.

Product Clearance Pfizer Kalamazoo
Product processing areas undergo a clearance process after completion of a product lot.  These product clearances are performed and documented by trained personnel in accordance with approved site procedures.  Successful completion of these activities provides documented evidence of control over product, product specific components, product specific documentation, and equipment between uses for processing of different products.

**Disinfectant Effectiveness Pfizer Kalamazoo**
The effectiveness of the various disinfectant agents used against microbial isolates recovered from the manufacturing areas, as well as (b) (4) test organisms, have been evaluated following (b) (4) guidance and (b) (4) methodology and their effectiveness of disinfection has been demonstrated on representative surfaces in the facility.  The effectiveness of general and sporicidal disinfectants was determined using a minimum (b) (4) reduction for vegetative bacteria and yeast and effectiveness of sporicidal disinfectants was determined using a minimum (b) (4) reduction for spore-forming bacteria and mold.

> ***Reviewer's comment:***  *Pfizer provided flow and air classification diagrams which appear acceptable.  An EM system is in place and was reviewed above. The Building* (b)(4) *contamination controls, cleaning and disinfectant efficacy studies were reviewed during the recent surveillance inspection conducted by ORA/OBPO in May 2021 and no issues were noted.  The information provided appears acceptable to support the cross-contamination measures.*

**DRUG PRODUCT MANUFACTURING FACILITY, PFIZER, PUURS, BELGIUM**

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

The Pfizer Manufacturing Belgium NV site, located at Rijksweg 12, 2870 Puurs, Belgium (also known as Pfizer Puurs), will produce BNT162b2 Drug Product (DP), including the steps of LNP formation/Formulation Bulk DP, Fill/Finish, and Labeling and Packaging. Manufacturing areas for the commercial supply at Pfizer Puurs are located in several buildings across the campus, including:

- (b) (4)              Building (which includes the (b) (4) and (b) (4)                , stopper processors and the (b) (4)    area used for BNT162b2 production) is an existing building. The building is approved as multiproduct. (b) (4)   is an existing suite that is used to formulate multiple products; however, these products are not approved in the US. (b) (4) and the (b) (4)     area are existing suites that are respectively used to formulate and (b) (4)      multiple US licensed products.

- (b) (4) Building consisting of (b) (4)                   areas, which includes the (b) (4) Vial Filling Line used for filling BNT162b2 DP. (b) (4) Vial Filling Line is an existing suite that is used to fill multiple products; however, these products are not approved in the US.

- (b) (4) Building consisting of (b) (4)             and (b) (4) includes the (b) (4)                and the (b) (4) filling line. (b) (4)                     are new suites inside the licensed facility. The vaccine building has been inspected by FDA and other regulatory agencies. The building is licensed/approved as multiproduct. (b) (4)           and the (b) (4) Filling Line have been recently inspected by FDA. (b) (4)       are used for LNP (b) (4)     and sterile filtration of the BNT162b2 product. (b) (4) vial filling line is used for filling BNT162b2 DP.

The Pfizer Puurs facility, equipment, and utility systems are supported by preventive maintenance and calibration programs. Procedures ensure appropriate flows, personnel gowning, and sanitization of the facility and equipment. The Heating, Ventilation, and Air Conditioning (HVAC) system air filtration and pressurization create different classification zones coupled with EM to ensure appropriate cleanliness and segregation are maintained for manufacturing. To additionally mitigate cross-contamination risks, (b) (4) process steps are performed under (b) (4)      in a Grade (b)(4) environment, in either a (b) (4)              .

**Facility Description Pfizer Puurs**
The DS is (b) (4) in the (b) (4)            Building in Room (b) (4) which is (b) (4)               . LNP/Formulation activities of BNT162b2 are conducted in the (b) (4)  Facility. The (b) (4)  Facility is a (b) (4)-story structure, divided into a manufacturing area on the (b) (4) floor with a technical area (i.e., area used for (b) (4)                             , etc.) and offices on the (b) (4) floor. On the (b) (4) floor, (b) (4)               , (Room (b) (4)), (b) (4) (Room (b) (4)) and (b) (4) (Rooms (b) (4)              ) are used for LNP (b) (4)     /Formulation Bulk DP and

150

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine**
**(nucleoside modified)**

filtration of BNT162b2 (b) (4) DP. (b) (4) are in Grade (b)(4) classified areas.

The BNT162b2 DP filling takes place in a Grade (b) (4) filling line (b) (4) (Room (b) (4)), surrounded by Grade (b)(4) environment. Visual inspection of the filled product is also conducted on the (b) (4) floor in Room (b) (4) (Grade (b)(4) environment).

Buffer formulation activities and DS (b) (4) are conducted in the (b) (4) Building. The (b) (4) Building is a (b) (4)-story structure, divided into a manufacturing area on the (b) (4) floor and a technical area on the (b) (4) floor. On the (b) (4) floor, (b) (4) are used for buffer formulation. Also, BNT162b2 DS is (b) (4) area on the (b) (4) floor.

Filling and inspection are also conducted in the (b) (4) Building (Filling Line (b) (4)). The (b) (4) Building is a (b) (4)-story structure, divided into a packaging area on the (b) (4) floor, a filling and preparation area on the (b) (4) floor and a formulation and preparation area on the (b) (4) floor. The BNT162b2 DP filling takes place in a Grade (b)(4) filling line (b) (4) (Room (b) (4)), surrounded by a Grade (b)(4) environment. Inspection of the filled product is also conducted on the (b) (4) floor in Room (b) (4) (Grade (b)(4)).

Area classification drawings and flows were provided in Section 3.2.A.1 for the (b) (4) Building, (b) (4) Building and the (b) (4) Building. The production suites are supported by technical support, validated utilities, controlled warehousing for receiving and storage of raw materials and supplies, and shipping of materials. Critical utilities (clean steam, WFI, and purified water) are generated in mechanical areas and supplied to the (b) (4) Building, (b) (4) Building and the (b) (4) Building. Compressed air and (b) (4) systems are installed in the (b) (4) Building, (b) (4) Building and in the (b) (4) Building. The (b) (4) and (b) (4) are also located in the mechanical areas.

The Pfizer Puurs facility, equipment, and utility systems are supported by preventive maintenance and calibration programs. It is also designed for segregation and directional flow of personnel, equipment, materials, samples, product, and waste. Procedures ensure appropriate flows, personnel gowning, and sanitization of the facility and equipment.  HVAC air filtration and pressurization create different zones (classification), and the EM system ensure that the appropriate cleanliness and segregation are maintained for manufacturing.

> ***Reviewer's comment:*** *A general overview of BNT162b2 DP manufacturing areas was provided.  The room classifications appear appropriate for the operations performed in each area.   All diagrams for personnel, product, consumable materials, and waste flows were provided.  The flow patterns appear acceptable.*

**Formulation, filtration, filling and capping Pfizer Puurs**

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine (nucleoside modified)**

The BNT162b2 DP solution is manufactured in (b) (4)                              .
Manufacturing (b) (4) are disassembled and cleaned using manual and/or (b) (4)
procedures. The manual method is considered a back-up method to the (b) (4).

(b) (4)

Product is dispensed into containers by volume and periodically checked for fill (b) (4).

Aseptic processing is conducted using (b) (4) technology.  The main function of the (b) (4) is the protection of the aseptic filling process against (b) (4) contamination by creating a Grade [b] environment. This is achieved by (b) (4)

Prior to capping, (b) (4)      stopper detection systems are set-up and verified to ensure rejection of improperly seated stoppers.  The capping station is set-up with parameters specific to the BNT162b2 DP stopper used for the 2 mL presentation.

>    ***Reviewer's comment:*** *The overview of the formulation, filtration, filling, and capping appears acceptable. See Section 3.2.P.3.5 for evaluation of individual sterilization validations.*

**Utilities Pfizer Puurs**

Clean Steam System
The clean steam system serving the (b) (4)  Building, (b) (4) Building as well as the (b) (4)            Building consists of several Clean Steam Generators (CSG). The CSG process feed water ((b) (4)    ) to produce clean steam. The clean steam is delivered to (b) (4)           clean steam headers and distributed to the points of

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

use located in the clean rooms and technical areas. The CSG uses (b) (4) to prevent cross contamination from the industrial steam.

(b) (4)

The clean steam systems serving the (b) (4) Building, (b) (4) and the (b) (4) Building have been validated. The validation demonstrated that the system operates according to design specifications and maintains the system within the design parameters.

The clean steam system for the commercial manufacturing areas was designed and qualified to meet the criteria for the following attributes as specified in (b) (4) (as appropriate):

(b) (4)

The clean steam quality is monitored by routine (b) (4) sampling of the clean steam (b) (4) at least (b) (4) . Representative user points are tested on a (b) (4) basis for (b) (4) .

Water for injection System
A WFI system is installed in the (b) (4) Building, (b) (4) Building and (b) (4) Building. The water system serving the (b) (4) Building, (b) (4) Building and (b) (4) Building consists of a (b) (4)

(b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)

The following test functions have been met for the WFI system:
- All critical controls, alarms, and indicators operate according to design specification.

(b) (4)

The WFI distribution system is sampled and tested (b) (4) for (b) (4) analysis and every (b) (4) for (b) (4) analysis. Each WFI system has inline measurements for (b) (4) . All WFI points of use are routinely sampled and tested at least every (b) (4) for (b) (4) analysis. The testing is performed to current (b) (4) WFI requirements for (b) (4) analysis.

(b) (4)   Compressed Air
A (b) (4) compressed air system is installed in the (b) (4) Building, (b) (4) Building as well as in the (b) (4) Building. The systems comply with the description and requirements described hereafter.

The compressed air system consists of (b) (4)

The validation demonstrated that the system operates according to design specifications.
The following test functions have been met during validation of the compressed air system:

154

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

- All of the critical controls, alarms and indicators operate per design
  specifications.
- System critical points of use meet the following acceptance criteria:

Routine sampling is performed for (b) (4)
are monitored continuously at the (b) (4) .

(b) (4)

*Reviewer's comment:* Descriptions and the respective qualification/validation
overviews were provided for Clean Steam, WFI, PW, compressed air, and
(b) (4) . The descriptions provided were applicable to the (b) (4) Building,
(b) (4) Building and the (b) (4) Building and supplied adequate
detail. The acceptance criteria provided for the systems appear acceptable.

**Heating, Ventilation, and Air Conditioning Pfizer Puurs**
Several HVAC systems serve the (b) (4) Building, (b) (4) Building and (b) (4)
Building. Each clean room has its own recirculation unit.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine**
**(nucleoside modified)**

The HVAC Systems serving the (b) (4) building, (b) (4) Building and (b) (4) Building consist of an arrangement of (b) (4) AHUs and a number of recirculation AHUs. The Qualified Building Information System monitors temperature, RH, and pressurization of each clean room.

All fresh air is taken from outside (b) (4) air is supplied either directly to the cleanroom or indirectly via the recirculation AHUs.

The supply air is delivered to the manufacturing areas through HEPA filters for the (b) (4) Building, (b) (4) Building and (b) (4) Building. All HEPA filters are included in an existing routine program for performance testing. The return air from the rooms is removed through return air grids. The installation is equipped with necessary airflow measuring stations; (b) (4) sensors. All classified areas are equipped with terminal HEPA filters.

The HVAC systems were designed and qualified to meet criteria that include the following:

(b) (4)

As part of the qualification, all classified production areas were tested under (b) (4) conditions. Rooms were monitored for (b) (4) .

In addition, the room pressure, temperature, and RH are continuously monitored, with control elements in the HVAC system modulated to maintain the desired parameters.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

> ***Reviewer's comment:*** *The HVAC systems serving the* (b) (4) *buildings used for BNT162b2 manufacturing have been qualified and maintain Grade (b) (4) manufacturing areas.  The utilities appear acceptable. Also refer to the EM (EM) review below.*

**Manufacturing Rooms Used for BNT162b2 Manufacturing Pfizer Puurs**

Tables 3.2.A.1-1 through 3 summarize room locations and classification for the formulation area, buffer preparation area and support areas for equipment such as parts washers, autoclaves and stopper processors, filling lines and inspection areas used for the manufacture of BNT162b2 DP.  The tables are reproduced below.



**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



**Equipment Summary Pfizer Puurs**

This section contains an overview of the process equipment, equipment qualifications, and the equipment cleaning and sanitization (if applicable) for the equipment used to manufacture the BNT162b2 DP at Pfizer Puurs.

Qualified equipment is cleaned and dried prior to use and sterilized or sanitized when necessary. The equipment detailed in Table 3.2.A.1-4 and Table 3.2.A.1-5 (reproduced below) supports the BNT162b2 manufacturing process. The BNT162b2 manufacturing process equipment is qualified for use through installation, operational, and performance qualification (IQ, OQ, PQ) activities to demonstrate that the equipment operates according to design specifications and is maintained within its design parameters.

**Product Contact Equipment/Materials Pfizer Puurs**



One page has been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine (nucleoside modified)**



*Reviewer's comment:  The building locations of the major equipment to be used in manufacturing were provided for reference. The BNT162b2 manufacturing process equipment has been qualified and performance qualifications performed. The product contact equipment/materials were also provided, including the materials of construction, cleaning and sterilization/sanitization method.  Most of the direct product contact equipment is dedicated or single use.*

*Sterilization/depyrogenation performance qualification summaries for the product contact equipment were submitted under 3.2.P.3.5 and appear acceptable. In addition, the capper qualification summary was submitted in 3.2.P.3.5 and appears acceptable.  A cleaning validation summary was submitted in 3.2.A.1 and is discussed in the cleaning validation section.*

*The equipment qualification and cleaning/sterilization validation studies were reviewed and appear acceptable. Further details regarding the equipment cleaning can be referenced in the cleaning validation section of this review memo.*

**Preparation of Equipment and Components Pfizer Puurs**

Equipment is cleaned and dried prior to use and sterilized or sanitized when necessary. Cleaned and/or sterilized equipment is stored in order to prevent contamination before use.

All equipment and primary packaging components (i.e., vials and stoppers) used in the production of parenteral products, such as BNT162b2, are sterilized/ depyrogenated according to approved, validated cycles.    Equipment that cannot be sterilized by these two methods is (b) (4)                                             and enter through dedicated airlocks.

Vials
Vials are processed through (b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)

Stoppers
The preparation of sterile stoppers is performed in the preparation areas of the (b) (4) Building or the (b) (4) Building. (b) (4)

Stopper validation (b) (4)

**Product contact equipment Pfizer Puurs**
Product contact line equipment parts are assembled from (b) (4). Accessories, such as filters, etc., are assembled and (b) (4).

Validation of (b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



(b) (4)

> *Reviewer's comment: The overview of the equipment preparation, cleaning,
> sterilization and depyrogenation provided, appears acceptable. Reference memo
> Section 3.2.P.3.5 for evaluation of individual sterilization validations.*

**Visual Inspection Pfizer Puurs**
The BNT162b2 DP vials are one hundred percent inspected for cosmetic, particulate,
and other product defects using manual inspection techniques in the inspection
department, an in-line automated visual inspection machine, or an off-line automated
inspection line.

The automated inspection (b) (4) vial lines are qualified to
inspect BNT162b2 DP vials for cosmetic, fill level and particulate defects.



The automated visual inspection lines are fully automated systems that inspect filled
vials for cosmetic, fill level and particulate defects.  Equipment verification and
performance qualification were performed to qualify the system for inspection of
BNT162b2 vials.

The Installation Verification verified that the Automated Inspection Lines were installed
in accordance with specifications and the intended use of the system.

The Operational Verification verified that the Automated Inspection Lines operate as
defined and that the system is fit for its intended use.

The Performance Qualification (PQ) verified that the Automated Inspection Lines
perform in accordance with expected quality attributes when inspecting BNT162b2 vials.
The PQ consisted of the following parts:



A verification run is performed at the (b) (4) in routine production
(mode) to verify that the system, the set-up and the BNT162b2 Inspection Program is

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

capable of rejecting defective samples at 100% on the right camera. It also checks the functioning of the reject system.  The purpose of this test was to verify that all samples of the verification set were rejected correctly.

PQs verified that the automated visual inspection systems could detect the following:



The results are summarized in Table 3.2.A.1-6, Table 3.2.A.1-7 and Table 3.2.A.1-8 of the submission.

> **Reviewer's comment:** *The overview of the automated visual inspection system qualification appears acceptable.  The goal of the phase 1 testing was to identify*
> (b) (4)
> *. Phase 2 PQ testing focuses on batch quality control by increased AQL testing* (b) (4) *and defect trending to assess process variability at batch scale.  The qualification documents reviewed appear acceptable.  No concerns were noted.*

**Contamination and Cross-Contamination Controls Pfizer Puurs**

The (b) (4) Building is a multi-product facility dedicated for vaccine manufacturing. Formulation and filling of BNT162b2 DP is performed in the (b) (4) Building.

The (b) (4) Building and (b) (4) Building are multi-product facilities and are used in the manufacture of aseptically processed DPs. Filling of BNT162b2 is performed in the (b) (4) Building.

The introduction of new product families, updates to manufacturing processes, and changes to the facility design or equipment are assessed via the site change

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine**
**(nucleoside modified)**

management process. Site Standard Operating Procedures describe the flow of materials, equipment and personnel through the facility to prevent contamination and mix-up. Procedures also ensure that appropriate storage conditions are met throughout the manufacturing process.

Cross contamination controls include use of (b) (4)



> *Reviewer's comment: Cross-contamination controls are designed to minimize contamination from multiple sources including people, product, equipment, waste, and environment. EM is performed in all classified areas, and action and alert limits appear acceptable. Performing the aseptic filling of BNT162b2* (b) (4) *Grade* (b) (4) *greatly mitigates potential microbiological contamination.*
>
> *Product contact (mRNA and LNP) BTN162b2 formulation and filling equipment is not shared with other products and is currently dedicated. The* (b) (4) *filling line is used for BNT162b2 DP filling activities only.*

**Environmental Monitoring Pfizer Puurs**

Classified areas in the manufacturing buildings are routinely monitored for (b) (4) . Summaries of the action levels for Grade (b)(4), Grade (b)(4) and Grade (b)(4) areas are detailed in Table 3.2.A.1-8.

(b) (4) levels on (b) (4) in the (b) (4) are monitored according to site procedures. During operation, (b) (4) are monitored at the completion of the batch or campaign (if applicable) prior to (b) (4) .

> *Reviewer's comment: EM is performed in all classified areas, and action and alert limits appear acceptable per review of the information in the BLA.*
>
> *The procedures describe the types of EM, sampling locations, frequency and the alert and action limits for the classified rooms. The firm performs* (b) (4) . *The Grade* (b)(4) *monitoring includes* (b) (4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

(b) (4)

*monitoring which is managed under an SOP.* (b) (4)
*is also described per SOP. Both filling lines*
(b) (4)     *are equipped with a* (b) (4)     *consisting of*
(b) (4)          *that are controlled per line by a* (b) (4) .

## Equipment Cleaning Overview Pfizer Puurs

All the equipment and parts used in the manufacture of BNT162b2 will be cleaned using validated processes before use.  Large equipment, such as tanks, are cleaned by (b) (4) methods. Small, removable, easy to disassemble equipment, may alternatively be cleaned by (b) (4) method.

The (b) (4) cleaning process generally consists of (b) (4)

Routine monitoring of the cleaning process is performed by (b) (4)

The results are held to the same requirements as those established during the cleaning validation for each applicable cleaning process and any excursions over action limits would be investigated.

## Equipment Cleaning Validation Pfizer Puurs

There are two approaches taken for cleaning: 1) cleaning validation and 2) cleaning verification. A cleaning validation approach is currently being implemented for the BNT162b2 DP manufacturing process.

The equipment used for BNT162b2 is cleaned manually or automatically by trained operators. Dirty and cleaned equipment are stored in separate clean rooms to prevent cross contamination.

Prior to cleaning validation, commissioning, qualification and cleanability/development studies are performed to demonstrate, through testing, that the equipment/systems perform as designed and are able to reduce challenge material to within the predefined acceptance criteria.  Cleaning validation studies consist of three consecutive, successful cleaning validation runs using a representative or challenge material.

Sample plans and sample locations are clearly defined in the cleaning validation protocols and are dependent on the equipment being cleaned. Sample locations are selected based on the most difficult to clean and representative product-contact locations. Sampling and testing are performed to demonstrate that the intended cleaning is effective, robust and consistently meets the cleaning validation requirements.

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**

The cleaning validation execution includes the following evaluations:



(b) (4)

4 pages have been determined to be not releasable: (b)(4)

**CBER CMC BLA Review Memo, STN 125742, COVID-19 mRNA Vaccine
(nucleoside modified)**



**Facility Cleaning Overview Pfizer Puurs**
Cleaning and sanitization of the facilities are performed on a regular and routine basis according to established procedures. Maximum time intervals for cleaning are established for production lines. Additionally, complete sanitizations are performed at regularly scheduled intervals. During these sanitizations, all ceilings, walls, cabinets, tabletops, partitions, etc., are cleaned and sanitized. Floors are also cleaned and sanitized. Monitoring is performed to verify the efficacy of the sanitization.

> *Reviewer's comment:  An overview of the facility cleaning was provided, however, the validation demonstrating the efficacy of the cleaning agents was not provided in the BLA.*

**3.2.R Regional Information (USA)**

**Executed Batch Records**
Executed batch records were provided with this submission for filling and inspection of Lot (b) (4), LNP formulation for Lot (b) (4), and Packaging for Lot (b) (4).  This information appears acceptable.

**Method Validation Package**
Pfizer provided Test Method TM100010635, (b) (4)  Test for Container Closure Integrity Testing of Stoppered, Capped and Crimped Vials for PF-07302048 COVID-19 Drug Product.

> *Reviewer's comment: This method was reviewed. The method appears to be consistent with the summary provided in section 3.2.P.2 Microbiological Attributes and appears acceptable.*

# EXHIBIT 6

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

**(Mark One)**

☒      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2021

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to

<u>Commission file number 1-3619</u>



# PFIZER INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **13-5315170** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

235 East 42nd Street, New York, New York 10017
(Address of principal executive offices) (zip code)
(212) 733-2323
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| <u>Title of each class</u> | <u>Trading Symbol(s)</u> | <u>Name of each exchange on which registered</u> |
|---|---|---|
| Common Stock, $.05 par value | PFE | New York Stock Exchange |
| 0.250% Notes due 2022 | PFE22 | New York Stock Exchange |
| 1.000% Notes due 2027 | PFE27 | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:** None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files.)   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large Accelerated filer ☒     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐ Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the voting stock held by non-affiliates of the registrant, computed by reference to the closing price as of the last business day of the registrant's most recently completed second fiscal quarter, July 4, 2021, was approximately $223 billion. This excludes shares of common stock held by directors and executive officers at July 4, 2021. Exclusion of shares held by any person should not be construed to indicate that such person possesses the power, directly or indirectly, to direct or cause the direction of the management or policies of the registrant, or that such person is controlled by or under common control with the registrant. The registrant has no non-voting common stock.

The number of shares outstanding of the registrant's common stock as of February 22, 2022 was 5,623,346,471 shares of common stock, all of one class.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Proxy Statement for the 2022 Annual Meeting of Shareholders           Part III

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Defined Terms | i |
| Available Information | iii |
| Forward-Looking Information and Factors that May Affect Future Results | 1 |
| **PART I** | 3 |
| ITEM 1. BUSINESS | 3 |
|     About Pfizer | 3 |
|     Commercial Operations | 4 |
|     Collaboration and Co-Promotion Agreements | 4 |
|     Research and Development | 5 |
|     International Operations | 6 |
|     Sales and Marketing | 6 |
|     Patents and Other Intellectual Property Rights | 7 |
|     Competition | 8 |
|     Pricing Pressures and Managed Care Organizations | 9 |
|     Raw Materials | 10 |
|     Government Regulation and Price Constraints | 10 |
|     Environmental Matters | 12 |
|     Human Capital | 12 |
| ITEM 1A. RISK FACTORS | 13 |
| ITEM 1B. UNRESOLVED STAFF COMMENTS | N/A |
| ITEM 2. PROPERTIES | 23 |
| ITEM 3. LEGAL PROCEEDINGS | 23 |
| ITEM 4. MINE SAFETY DISCLOSURES | N/A |
| INFORMATION ABOUT OUR EXECUTIVE OFFICERS | 23 |
| **PART II** | 24 |
| ITEM 5. MARKET FOR THE COMPANY'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 24 |
| ITEM 6. [RESERVED] | 25 |
| ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 26 |
| ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 48 |
| ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 49 |
| ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 107 |
| ITEM 9A. CONTROLS AND PROCEDURES | 107 |
| ITEM 9B. OTHER INFORMATION | N/A |
| ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS | N/A |
| **PART III** | 110 |
| ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 110 |
| ITEM 11. EXECUTIVE COMPENSATION | 110 |
| ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 110 |
| ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 110 |
| ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES | 110 |
| **PART IV** | 111 |
| ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES | 111 |
|     15(a)(1) Financial Statements | 111 |
|     15(a)(2) Financial Statement Schedules | 111 |
|     15(a)(3) Exhibits | 111 |
| ITEM 16. FORM 10-K SUMMARY | 114 |

N/A = Not Applicable

## DEFINED TERMS

Unless the context requires otherwise, references to "Pfizer," "the Company," "we," "us" or "our" in this Form 10-K (defined below) refer to Pfizer Inc. and its subsidiaries. Pfizer's fiscal year-end for subsidiaries operating outside the U.S. is as of and for the year ended November 30 for each year presented. Pfizer's fiscal year-end for U.S. subsidiaries is as of and for the year ended December 31 for each year presented. References to "Notes" in this Form 10-K are to the Notes to the consolidated financial statements in *Item 8. Financial Statements and Supplementary Data* in this Form 10-K. We also have used several other terms in this Form 10-K, most of which are explained or defined below.

| Term | Definition |
|---|---|
| Form 10-K | This Annual Report on Form 10-K for the fiscal year ended December 31, 2021 |
| Proxy Statement | Proxy Statement for the 2022 Annual Meeting of Shareholders, which will be filed no later than 120 days after December 31, 2021 |
| AbbVie | AbbVie Inc. |
| ABO | Accumulated benefit obligation represents the present value of the benefit obligation earned through the end of the year but does not factor in future compensation increases |
| ACA (also referred to as U.S. Healthcare Legislation) | U.S. Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act |
| ACIP | Advisory Committee on Immunization Practices |
| Akcea | Akcea Therapeutics, Inc. |
| ALK | anaplastic lymphoma kinase |
| Alliance revenues | Revenues from alliance agreements under which we co-promote products discovered or developed by other companies or us |
| Anacor | Anacor Pharmaceuticals, Inc. |
| ASR | accelerated share repurchase agreement |
| Arena | Arena Pharmaceuticals, Inc. |
| Array | Array BioPharma Inc. |
| Arvinas | Arvinas, Inc. |
| Astellas | Astellas Pharma Inc., Astellas US LLC and Astellas Pharma US, Inc. |
| ATTR-CM | transthyretin amyloid cardiomyopathy |
| Beam | Beam Therapeutics Inc. |
| Biogen | Biogen Inc. |
| Biohaven | Biohaven Pharmaceutical Holding Company Ltd., Biohaven Pharmaceutical Ireland DAC and BioShin Limited. (collectively, Biohaven) |
| BioNTech | BioNTech SE |
| Biopharma | Pfizer Biopharmaceuticals Group |
| BLA | Biologics License Application |
| BMS | Bristol-Myers Squibb Company |
| BNT162b2* | Pfizer-BioNTech COVID-19 Vaccine, also known as Comirnaty |
| BOD | Board of Directors |
| BRCA | BReast CAncer susceptibility gene |
| CDC | U.S. Centers for Disease Control and Prevention |
| cGMPs | current Good Manufacturing Practices |
| Comirnaty* | Pfizer-BioNTech COVID-19 Vaccine, also known as BNT162b2 |
| Consumer Healthcare JV | GSK Consumer Healthcare JV |
| COVID-19 | novel coronavirus disease of 2019 |
| CMA | conditional marketing authorisation |
| CStone | CStone Pharmaceuticals |
| DEA | U.S. Drug Enforcement Agency |
| Developed Europe | Includes the following markets: Western Europe, Scandinavian countries and Finland |
| Developed Markets | Includes the following markets: U.S., Developed Europe, Japan, Canada, South Korea, Australia and New Zealand |
| Developed Rest of World | Includes the following markets: Japan, Canada, South Korea, Australia and New Zealand |
| EC | European Commission |
| EMA | European Medicines Agency |
| Emerging Markets | Includes, but is not limited to, the following markets: Asia (excluding Japan and South Korea) and Latin America, Central Europe, Eastern Europe, the Middle East, Africa and Turkey |
| EPS | earnings per share |
| ESOP | employee stock ownership plan |
| EU | European Union |
| EUA | emergency use authorization |
| Exchange Act | Securities Exchange Act of 1934, as amended |
| FASB | Financial Accounting Standards Board |
| FCPA | U.S. Foreign Corrupt Practices Act |
| FDA | U.S. Food and Drug Administration |
| FFDCA | U.S. Federal Food, Drug and Cosmetic Act |

| | |
|---|---|
| GAAP | Generally Accepted Accounting Principles |
| GDFV | grant-date fair value |
| GIST | gastrointestinal stromal tumors |
| GPD | Global Product Development organization |
| GSK | GlaxoSmithKline plc |
| Hospira | Hospira, Inc. |
| Ionis | Ionis Pharmaceuticals, Inc. |
| IPR&D | in-process research and development |
| IRC | Internal Revenue Code |
| IRS | U.S. Internal Revenue Service |
| JAK | Janus kinase |
| JV | joint venture |
| King | King Pharmaceuticals LLC (formerly King Pharmaceuticals, Inc.) |
| LIBOR | London Interbank Offered Rate |
| Lilly | Eli Lilly and Company |
| LOE | loss of exclusivity |
| MCO | managed care organization |
| mCRC | metastatic colorectal cancer |
| mCRPC | metastatic castration-resistant prostate cancer |
| mCSPC | metastatic castration-sensitive prostate cancer |
| mRNA | messenger ribonucleic acid |
| MD&A | Management's Discussion and Analysis of Financial Condition and Results of Operations |
| Medivation | Medivation LLC (formerly Medivation, Inc.) |
| Meridian | Meridian Medical Technologies, Inc. |
| Moody's | Moody's Investors Service |
| MTM | mark-to-market |
| Mylan | Mylan N.V. |
| Mylan-Japan collaboration | a pre-existing strategic collaboration between Pfizer and Mylan for generic drugs in Japan that terminated on December 21, 2020 |
| Myovant | Myovant Sciences Ltd. |
| NAV | net asset value |
| NDA | new drug application |
| nmCRPC | non-metastatic castration-resistant prostate cancer |
| NMPA | National Medical Product Administration in China |
| NSCLC | non-small cell lung cancer |
| NYSE | New York Stock Exchange |
| OPKO | OPKO Health, Inc. |
| OTC | over-the-counter |
| Paxlovid* | an oral COVID-19 treatment (nirmatrelvir [PF-07321332] tablets and ritonavir tablets) |
| PBM | pharmacy benefit manager |
| PBO | Projected benefit obligation; represents the present value of the benefit obligation earned through the end of the year and factors in future compensation increases |
| PC1 | Pfizer CentreOne |
| PGS | Pfizer Global Supply |
| Pharmacia | Pharmacia Corporation |
| PMDA | Pharmaceuticals and Medical Device Agency in Japan |
| PRAC | Pharmacovigilance Risk Assessment Committee |
| PsA | psoriatic arthritis |
| QCE | quality consistency evaluation |
| RA | rheumatoid arthritis |
| RCC | renal cell carcinoma |
| R&D | research and development |
| ROU | right of use |
| Sandoz | Sandoz, Inc., a division of Novartis AG |
| S&P | Standard & Poor's |
| SEC | U.S. Securities and Exchange Commission |
| Tax Cuts and Jobs Act or TCJA | Legislation commonly referred to as the U.S. Tax Cuts and Jobs Act of 2017 |
| Therachon | Therachon Holding AG |
| Trillium | Trillium Therapeutics Inc. |
| TSAs | transition service arrangements |
| UC | ulcerative colitis |

| U.K. | United Kingdom |
| Upjohn Business | Pfizer's former global, primarily off-patent branded and generics business, which included a portfolio of 20 globally recognized solid oral dose brands, including Lipitor, Lyrica, Norvasc, Celebrex and Viagra, as well as a U.S.-based generics platform, Greenstone, that was spun-off on November 16, 2020 and combined with Mylan to create Viatris |
| U.S. | United States |
| Valneva | Valneva SE |
| VBP | volume-based procurement |
| Viatris | Viatris Inc. |
| ViiV | ViiV Healthcare Limited |
| WHO | World Health Organization |
| WRDM | Worldwide Research, Development and Medical |
| WTO | World Trade Organization |

*   This Form 10-K includes discussion of the COVID-19 vaccine that Pfizer has co-developed with BioNTech (BNT162b2) and our oral COVID-19 treatment (Paxlovid). This Form 10-K may refer to the vaccine by its brand name, Comirnaty (approved under a BLA), or as BNT162b2 (authorized under EUA). The vaccine is FDA-approved to prevent COVID-19 in individuals 16 years of age and older. The vaccine is authorized by the FDA to prevent COVID-19 in individuals 5 years of age and older. In addition, Comirnaty/BNT162b2 is authorized by the FDA for a third dose in certain immunocompromised individuals 5 years of age and older and as a booster dose in individuals 12 years of age and older. Paxlovid has been authorized for emergency use by the FDA under an EUA, for the treatment of mild-to-moderate COVID-19 in adults and pediatric patients (12 years of age and older weighing at least 40 kg [88 lbs]) with positive results of direct SARS CoV-2 viral testing, and who are at high-risk for progression to severe COVID-19, including hospitalization or death. The emergency uses are only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of the medical product under Section 564(b)(1) of the FFDCA unless the declaration is terminated or authorization revoked sooner. The FDA has issued EUAs to certain other companies for products intended for the prevention or treatment of COVID-19 and may continue to do so during the duration of the Declaration. Please see the EUA Fact Sheets at *www.cvdvaccine-us.com* and *www.covid19oralrx.com*.

This Form 10-K includes discussion of certain clinical studies relating to various in-line products and/or product candidates. These studies typically are part of a larger body of clinical data relating to such products or product candidates, and the discussion herein should be considered in the context of the larger body of data. In addition, clinical trial data are subject to differing interpretations, and, even when we view data as sufficient to support the safety and/or effectiveness of a product candidate or a new indication for an in-line product, regulatory authorities may not share our views and may require additional data or may deny approval altogether.

Some amounts in this Form 10-K may not add due to rounding. All percentages have been calculated using unrounded amounts. All trademarks mentioned are the property of their owners.

## AVAILABLE INFORMATION

Our website is located at *www.pfizer.com*. This Form 10-K, our Quarterly Reports on Form 10-Q, our Current Reports on Form 8-K and our proxy statements, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, are, or will be, available (free of charge) on our website, in text format and, where applicable, in interactive data file format, as soon as reasonably practicable after we electronically file this material with, or furnish it to, the SEC.

Throughout this Form 10-K, we "incorporate by reference" certain information from other documents filed or to be filed with the SEC, including our Proxy Statement. Please refer to this information. This Form 10-K will be available on or about February 24, 2022. Our Proxy Statement will be available on our website on or about March 17, 2022.

Our 2021 Environmental, Social and Governance (ESG) report, which provides enhanced ESG disclosures, will be available on our website on or about March 17, 2022. We also have a Pfizer Investor Insights website, which includes articles on the company, its products and its pipeline, located at *insights.pfizer.com*. Information in our ESG Report and on the Pfizer Investor Insights website are not incorporated by reference into this Form 10-K.

We may use our website as a means of disclosing material information and for complying with our disclosure obligations under Regulation Fair Disclosure promulgated by the SEC. These disclosures are included on our website in the "About—Investors" or "News" sections. Accordingly, investors should monitor these portions of our website, in addition to following our press releases, SEC filings, public conference calls and webcasts, as well as our social media channels (our Facebook, YouTube and LinkedIn pages and Twitter accounts (@*Pfizer* and @*Pfizer_News*)). The information contained on our website, our Facebook, YouTube and LinkedIn pages or our Twitter accounts, or any third-party website, is not incorporated by reference into this Form 10-K.

Information relating to corporate governance at Pfizer, including our Corporate Governance Principles; Director Qualification Standards; Pfizer Policies on Business Conduct (for all of our employees, including our Chief Executive Officer, Chief Financial Officer and Principal Accounting Officer); Code of Business Conduct and Ethics for Members of the Board of Directors; information concerning our Directors; ways to communicate by e-mail with our Directors; information concerning our Board Committees; Committee Charters; Charter of the Lead Independent Director; and transactions in Pfizer securities by Directors and Officers are available on our website. We will provide any of the foregoing information without charge upon written request to our Corporate Secretary, Pfizer Inc., 235 East 42nd Street, New York, NY 10017. We will disclose any future amendments to, or waivers from, provisions of the Pfizer Policies on Business Conduct affecting our Chief Executive Officer, Chief Financial Officer and Principal Accounting Officer on our website as promptly as practicable, as may be required under applicable SEC and NYSE rules. Information relating to shareholder services, including the Computershare Investment Program, book-entry share ownership and direct deposit of dividends, is also available on our website.

## FORWARD-LOOKING INFORMATION AND FACTORS THAT MAY AFFECT FUTURE RESULTS

This Form 10-K contains forward-looking statements. We also provide forward-looking statements in other materials we release to the public, as well as public oral statements. Given their forward-looking nature, these statements involve substantial risks, uncertainties and potentially inaccurate assumptions.

We have tried, wherever possible, to identify such statements by using words such as "will," "may," "could," "likely," "ongoing," "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," "assume," "target," "forecast," "guidance," "goal," "objective," "aim," "seek," "potential" and other words and terms of similar meaning or by using future dates.

We include forward-looking information in our discussion of the following, among other topics:

- our anticipated operating and financial performance, reorganizations, business plans, strategy and prospects;
- expectations for our product pipeline, in-line products and product candidates, including anticipated regulatory submissions, data read-outs, study starts, approvals, clinical trial results and other developing data, revenue contribution, growth, performance, timing of exclusivity and potential benefits;
- strategic reviews, capital allocation objectives, dividends and share repurchases;
- plans for and prospects of our acquisitions, dispositions and other business development activities, and our ability to successfully capitalize on these opportunities;
- sales, expenses, interest rates, foreign exchange rates and the outcome of contingencies, such as legal proceedings;
- expectations for impact of or changes to existing or new government regulations or laws;
- our ability to anticipate and respond to macroeconomic, geopolitical, health and industry trends, pandemics, acts of war and other large-scale crises; and
- manufacturing and product supply.

In particular, forward-looking information in this Form 10-K includes statements relating to specific future actions and effects, including, among others, our efforts to respond to COVID-19, including our development of a vaccine to help prevent COVID-19 and an oral COVID-19 treatment, the forecasted revenue contribution of Comirnaty and the potential number of doses that we and BioNTech believe can be manufactured and/or delivered; the forecasted revenue contribution of Paxlovid and the potential number of treatment courses that we believe can be manufactured; our expectations regarding the impact of COVID-19 on our business; the expected patent term for Comirnaty and Paxlovid; the expectations for ongoing revenue streams from Comirnaty and Paxlovid; the expected impact of patent expiries and competition from generic manufacturers; the expected pricing pressures on our products and the anticipated impact to our business; the availability of raw materials for 2022; the expected charges and/or costs in connection with the spin-off of the Upjohn Business and its combination with Mylan; the benefits expected from our business development transactions; our anticipated liquidity position; the anticipated costs and savings from certain of our initiatives, including our Transforming to a More Focused Company program; our planned capital spending; and the expected benefit payments and employer contributions for our benefit plans.

Given their nature, we cannot assure that any outcome expressed in these forward-looking statements will be realized in whole or in part. Actual outcomes may vary materially from past results and those anticipated, estimated, implied or projected. These forward-looking statements may be affected by underlying assumptions that may prove inaccurate or incomplete, or by known or unknown risks and uncertainties, including those described in this section and in the *Item 1A. Risk Factors* section in this Form 10-K.

Therefore, you are cautioned not to unduly rely on forward-looking statements, which speak only as of the date of this Form 10-K. We undertake no obligation to update forward-looking statements, whether as a result of new information, future events or otherwise, except as required by applicable securities law. You are advised, however, to consult any further disclosures we make on related subjects.

Some of the factors that could cause actual results to differ are identified below, as well as those discussed in the *Item 1A. Risk Factors* section in this Form 10-K and within MD&A. We note these factors for investors as permitted by the Private Securities Litigation Reform Act of 1995. The occurrence of any of the risks identified below or in the *Item 1A. Risk Factors* section in this Form 10-K, or other risks currently unknown, could have a material adverse effect on our business, financial condition or results of operations, or we may be required to increase our accruals for contingencies. It is not possible to predict or identify all such factors. Consequently, you should not consider the following to be a complete discussion of all potential risks or uncertainties:

*Risks Related to Our Business, Industry and Operations, and Business Development:*

- the outcome of R&D activities, including, the ability to meet anticipated pre-clinical or clinical endpoints, commencement and/or completion dates for our pre-clinical or clinical trials, regulatory submission dates, and/or regulatory approval or launch dates; the possibility of unfavorable pre-clinical and clinical trial results, including the possibility of unfavorable new pre-clinical or clinical data and further analyses of existing pre-clinical or clinical data; the risk that pre-clinical and clinical trial data are subject to differing interpretations and assessments, including during the peer review/publication process, in the scientific community generally, and by regulatory authorities; and whether and when additional data from our pipeline programs will be published in scientific journal publications, and if so, when and with what modifications and interpretations;
- our ability to successfully address comments received from regulatory authorities such as the FDA or the EMA, or obtain approval for new products and indications from regulators on a timely basis or at all; regulatory decisions impacting labeling, including the scope of indicated patient populations, product dosage, manufacturing processes, safety and/or other matters, including decisions relating to emerging developments regarding potential product impurities; the impact of recommendations by technical or advisory committees; and the timing of pricing approvals and product launches;
- claims and concerns that may arise regarding the safety or efficacy of in-line products and product candidates, including claims and concerns that may arise from the outcome of post-approval clinical trials, which could impact marketing approval, product labeling, and/or availability or commercial potential, including uncertainties regarding the commercial or other impact of the results of the Xeljanz ORAL Surveillance (A3921133) study or actions by regulatory authorities based on analysis of ORAL Surveillance or other data, including on other JAK inhibitors in our portfolio;
- the success and impact of external business development activities, including the ability to identify and execute on potential business development opportunities; the ability to satisfy the conditions to closing of announced transactions in the anticipated time frame or at all; the ability to realize the anticipated benefits of any such transactions in the anticipated time frame or at all; the

potential need for and impact of additional equity or debt financing to pursue these opportunities, which could result in increased leverage and/or a downgrade of our credit ratings; challenges integrating the businesses and operations; disruption to business and operations relationships; risks related to growing revenues for certain acquired products; significant transaction costs; and unknown liabilities;

- competition, including from new product entrants, in-line branded products, generic products, private label products, biosimilars and product candidates that treat or prevent diseases and conditions similar to those treated or intended to be prevented by our in-line products and product candidates;

- the ability to successfully market both new and existing products, including biosimilars;

- difficulties or delays in manufacturing, sales or marketing; supply disruptions, shortages or stock-outs at our facilities or third-party facilities that we rely on; and legal or regulatory actions;

- the impact of public health outbreaks, epidemics or pandemics (such as the COVID-19 pandemic), including the impact of vaccine mandates where applicable, on our business, operations and financial condition and results, including impacts on our employees, manufacturing, supply chain, sales and marketing, R&D and clinical trials;

- risks and uncertainties related to our efforts to develop a vaccine to help prevent COVID-19 and an oral COVID-19 treatment, as well as challenges related to their manufacturing, supply and distribution;

- trends toward managed care and healthcare cost containment, and our ability to obtain or maintain timely or adequate pricing or favorable formulary placement for our products;

- interest rate and foreign currency exchange rate fluctuations, including the impact of possible currency devaluations in countries experiencing high inflation rates;

- any significant issues involving our largest wholesale distributors or government customers, which account for a substantial portion of our revenues;

- the impact of the increased presence of counterfeit medicines or vaccines in the pharmaceutical supply chain;

- any significant issues related to the outsourcing of certain operational and staff functions to third parties; and any significant issues related to our JVs and other third-party business arrangements;

- uncertainties related to general economic, political, business, industry, regulatory and market conditions including, without limitation, uncertainties related to the impact on us, our customers, suppliers and lenders and counterparties to our foreign-exchange and interest-rate agreements of challenging global economic conditions and recent and possible future changes in global financial markets;

- any changes in business, political and economic conditions due to actual or threatened terrorist activity, civil unrest or military action;

- the impact of product recalls, withdrawals and other unusual items, including uncertainties related to regulator-directed risk evaluations and assessments;

- trade buying patterns;

- the risk of an impairment charge related to our intangible assets, goodwill or equity-method investments;

- the impact of, and risks and uncertainties related to, restructurings and internal reorganizations, as well as any other corporate strategic initiatives, and cost-reduction and productivity initiatives, each of which requires upfront costs but may fail to yield anticipated benefits and may result in unexpected costs or organizational disruption;

*Risks Related to Government Regulation and Legal Proceedings:*

- the impact of any U.S. healthcare reform or legislation or any significant spending reductions or cost controls affecting Medicare, Medicaid or other publicly funded or subsidized health programs or changes in the tax treatment of employer-sponsored health insurance that may be implemented;

- U.S. federal or state legislation or regulatory action and/or policy efforts affecting, among other things, pharmaceutical product pricing, intellectual property, reimbursement or access or restrictions on U.S. direct-to-consumer advertising; limitations on interactions with healthcare professionals and other industry stakeholders; as well as pricing pressures for our products as a result of highly competitive insurance markets;

- legislation or regulatory action in markets outside of the U.S., including China, affecting pharmaceutical product pricing, intellectual property, reimbursement or access, including, in particular, continued government-mandated reductions in prices and access restrictions for certain biopharmaceutical products to control costs in those markets;

- the exposure of our operations globally to possible capital and exchange controls, economic conditions, expropriation and other restrictive government actions, changes in intellectual property legal protections and remedies, as well as political unrest, unstable governments and legal systems and inter-governmental disputes;

- legal defense costs, insurance expenses, settlement costs and contingencies, including those related to actual or alleged environmental contamination;

- the risk and impact of an adverse decision or settlement and the adequacy of reserves related to legal proceedings;

- the risk and impact of tax related litigation;

- governmental laws and regulations affecting our operations, including, without limitation, changes in laws and regulations or their interpretation, including, among others, changes in tax laws and regulations internationally and in the U.S., including, among others, potential adoption of global minimum taxation requirements and potential changes to existing tax law by the current U.S. Presidential administration and Congress;

*Risks Related to Intellectual Property, Technology and Security:*

- any significant breakdown or interruption of our information technology systems and infrastructure (including cloud services);
- any business disruption, theft of confidential or proprietary information, extortion or integrity compromise resulting from a cyber-attack;
- the risk that our currently pending or future patent applications may not be granted on a timely basis or at all, or any patent-term extensions that we seek may not be granted on a timely basis, if at all; and
- our ability to protect our patents and other intellectual property, including against claims of invalidity that could result in LOE, unasserted intellectual property claims and in response to any pressure, or legal or regulatory action by, various stakeholders or governments that could potentially result in us not seeking intellectual property protection for or agreeing not to enforce or being restricted from enforcing intellectual property related to our products, including our vaccine to help prevent COVID-19 and our oral COVID-19 treatment.

## PART I

### ITEM 1.        BUSINESS



### ABOUT PFIZER

Pfizer Inc. is a research-based, global biopharmaceutical company. We apply science and our global resources to bring therapies to people that extend and significantly improve their lives through the discovery, development, manufacture, marketing, sale and distribution of biopharmaceutical products worldwide. We work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. We collaborate with healthcare providers, governments and local communities to support and expand access to reliable, affordable healthcare around the world. The Company was incorporated under the laws of the State of Delaware on June 2, 1942.

Most of our revenues come from the manufacture and sale of biopharmaceutical products. We believe that our medicines and vaccines provide significant value for healthcare providers and patients, through improved treatment of diseases, improvements in health, wellness and productivity as well as by reducing other healthcare costs, such as emergency room or hospitalization. We seek to enhance the value of our medicines and vaccines and actively engage in dialogues about how we can best work with patients, physicians and payers to prevent and treat disease and improve outcomes. We seek to maximize patient access and evaluate our pricing arrangements and contracting methods with payers to minimize adverse impact on our revenues within the current legal and pricing structures.

We are committed to fulfilling our purpose: *Breakthroughs that change patients' lives.* Our purpose fuels everything we do and reflects both our passion for science and our commitment to patients. Pfizer's growth strategy is driven by five "Bold Moves" that help us deliver breakthroughs for patients and create value for shareholders and other stakeholders:

1. *Unleash the power of our people;*
2. *Deliver first-in-class science;*
3. *Transform our go-to-market model;*
4. *Win the digital race in pharma;* and
5. *Lead the conversation.*

In addition, Pfizer continues to enhance its ESG strategy, which is focused on six areas where we see opportunities to create a meaningful impact over the next decade: product innovation; equitable access and pricing; product quality and safety; diversity, equity and inclusion; climate change; and business ethics.

We are committed to strategically capitalizing on growth opportunities, primarily by advancing our own product pipeline and maximizing the value of our existing products, but also through various business development activities. We view our business development activity as an enabler of our strategies and seek to generate growth by pursuing opportunities and transactions that have the potential to strengthen our business and our capabilities. We assess our business, assets and scientific capabilities/portfolio as part of our regular, ongoing portfolio review process and also continue to consider business development activities that will help advance our business strategy.

Our significant recent business development activities in 2021 include, among others: (i) the July 2021 global collaboration with Arvinas to develop and commercialize ARV-471, an investigational oral PROTAC® (PROteolysis TArgeting Chimera) estrogen receptor protein degrader (the estrogen receptor is a well-known disease driver in most breast cancers); (ii) the November 2021 collaboration and license agreement with Biohaven to acquire rights to commercialize rimegepant and zavegepant for the treatment and prevention of migraines outside of the U.S. upon approval; (iii) the November 2021 acquisition of Trillium, a clinical stage immuno-oncology company developing innovative potential therapies for the treatment of cancer; and (iv) the December 2021 research collaboration with Beam to utilize Beam's in vivo base editing programs, which use mRNA and lipid nanoparticles, for three targets for rare genetic diseases of the liver, muscle and central nervous system. In addition, in December 2021, we entered into a definitive agreement to acquire Arena, a clinical stage company developing innovative potential therapies for the treatment of several immuno-inflammatory diseases. On February 2, 2022, Arena shareholders voted to approve the proposed acquisition, which is targeted to close in the first half of 2022, subject to review under antitrust laws and other customary closing conditions. For a further discussion of our strategy and our business development initiatives, see the *Overview of Our Performance, Operating Environment, Strategy and Outlook* section within MD&A and *Note 2.*

In 2020 and 2021, our business, operations and financial condition and results were impacted by the COVID-19 pandemic. To confront the public health challenge posed by the pandemic, we have made some important advances, including, the development of a vaccine to help prevent

COVID-19 and an oral COVID-19 treatment. For additional information, see the *Overview of Our Performance, Operating Environment, Strategy and Outlook—COVID-19 Pandemic* section within MD&A and the *Item 1A. Risk Factors—COVID-19 Pandemic* section in this Form 10-K.

## COMMERCIAL OPERATIONS

Following (i) the spin-off and combination of the Upjohn Business (which was our global, primarily off-patent branded and generics business) with Mylan in 2020, which created a new global pharmaceutical company, Viatris, and (ii) the formation of the Consumer Healthcare JV with GSK in 2019, we saw the culmination of Pfizer's transformation into a more focused, global leader in science-based innovative medicines and vaccines, and beginning in the fourth quarter of 2020, we operated as a single operating segment engaged in the discovery, development, manufacturing, marketing, sale and distribution of biopharmaceutical products worldwide. At the beginning of our fiscal fourth quarter 2021, we reorganized our commercial operations and began to manage our commercial operations through a new global structure consisting of two operating segments, each led by a single manager: Biopharma, our innovative science-based biopharmaceutical business, and PC1, our global contract development and manufacturing organization and a leading supplier of specialty active pharmaceutical ingredients.

Our Biopharma business includes the following therapeutic areas and key products:

| Therapeutic Area | Description | Key Products |
|---|---|---|
| *Vaccines* | Includes innovative vaccines across all ages—infants, adolescents and adults—in pneumococcal disease, meningococcal disease, tick-borne encephalitis and COVID-19, with a pipeline focus on infectious diseases with significant unmet medical need. | Comirnaty/BNT162b2*, the Prevnar family*, Nimenrix, FSME/IMMUN-TicoVac and Trumenba |
| *Oncology* | Includes innovative oncology brands of biologics, small molecules, immunotherapies and biosimilars across a wide range of cancers. | Ibrance*, Xtandi*, Inlyta*, Sutent, Retacrit, Lorbrena and Braftovi |
| *Internal Medicine* | Includes innovative brands in cardiovascular metabolic and women's health, as well as regional brands. | Eliquis* and the Premarin family |
| *Hospital*** | Includes our global portfolio of sterile injectable and anti-infective medicines, as well as an oral COVID-19 treatment. | Sulperazon, Medrol, Zavicefta, Zithromax, Vfend, Panzyga and Paxlovid |
| *Inflammation & Immunology* | Includes innovative brands and biosimilars for chronic immune and inflammatory diseases. | Xeljanz*, Enbrel (outside the U.S. and Canada)*, Inflectra, Eucrisa/Staquis and Cibinqo |
| *Rare Disease* | Includes innovative brands for a number of therapeutic areas with rare diseases, including amyloidosis, hemophilia and endocrine diseases. | Vyndaqel/Vyndamax*, BeneFIX and Genotropin |

\*   Each of Prevnar 13/Prevenar 13, Ibrance, Eliquis, Xeljanz and Enbrel recorded direct product and/or Alliance revenues of more than $1 billion in 2021, 2020 and 2019. Each of Comirnaty/BNT162b2 and Inlyta recorded direct product and/or Alliance revenues of more than $1 billion in 2021. Each of Xtandi and Vyndaqel/Vyndamax recorded direct product and/or Alliance revenues of more than $1 billion in 2021 and 2020. Comirnaty/BNT162b2, Eliquis and Xtandi include Alliance revenues and direct sales. Prevnar family include revenues from Prevnar 13/Prevenar 13 (pediatric and adult) and Prevnar 20 (adult).

\*\*  Prior to the fourth quarter of 2021, PC1 had been managed within the Hospital therapeutic area. Also, on December 31, 2021, we completed the sale of our Meridian subsidiary, which was part of the Hospital therapeutic area prior to its sale. See *Note 1A* for additional information.

For additional information on our operating segments and products, see *Note 17* and for additional information on the key operational revenue drivers of our business, see the *Analysis of the Consolidated Statements of Income* section within MD&A. For a discussion of the risks associated with our dependence on certain of our major products, see the *Item 1A. Risk Factors—Concentration* section in this Form 10-K.

## COLLABORATION AND CO-PROMOTION

We use collaboration and/or co-promotion arrangements to enhance our development, R&D, sales and distribution of certain biopharmaceutical products, which include, among others, the following:

• **Comirnaty/BNT162b2** is an mRNA-based coronavirus vaccine to help prevent COVID-19, which is being jointly developed and commercialized with BioNTech. Pfizer and BioNTech equally share the costs of development for the Comirnaty program. Comirnaty/BNT162b2 has been granted an approval or an authorization in many countries around the world in populations varying by country. We also share gross profits equally from commercialization of Comirnaty/BNT162b2 and are working jointly with BioNTech in our respective territories to commercialize the vaccine worldwide (excluding China, Hong Kong, Macau and Taiwan), subject to regulatory authorizations or approvals market by market. For discussion on Comirnaty/BNT162b2, see the *Overview of Our Performance, Operating Environment, Strategy and Outlook—COVID-19 Pandemic* section within MD&A.

• **Eliquis** (apixaban) is part of the Novel Oral Anticoagulant market and was jointly developed and commercialized with BMS as an alternative treatment option to warfarin in appropriate patients. We fund between 50% and 60% of all development costs depending on the study, and profits and losses are shared equally except in certain countries where we commercialize Eliquis and pay a percentage of net sales to BMS. In certain smaller markets we have full commercialization rights and BMS supplies the product to us at cost plus a percentage of the net sales to end-customers.

• **Xtandi** (enzalutamide) is an androgen receptor inhibitor that blocks multiple steps in the androgen receptor signaling pathway within tumor cells that is being developed and commercialized in collaboration with Astellas. We share equally in the gross profits and losses related to U.S. net sales and also share equally all Xtandi commercialization costs attributable to the U.S. market, subject to certain exceptions. In addition, we share certain development and other collaboration expenses. For international net sales we receive royalties based on a tiered percentage.

• **Bavencio** (avelumab) is a human anti-programmed death ligand-1 (PD-L1) antibody that is being developed and commercialized in collaboration with Merck KGaA. We jointly fund the majority of development and commercialization costs and split profits equally related to net sales generated from any products containing avelumab.

• **Orgovyx** (relugolix) is an oral gonadotropin-releasing hormone (GnRH) receptor antagonist for the treatment of adult patients with advanced prostate cancer that is being developed and commercialized with Myovant. The companies are also collaborating on **Myfembree** (relugolix 40

mg, estradiol 1.0 mg, and norethindrone acetate 0.5 mg) for heavy menstrual bleeding associated with uterine fibroids in premenopausal women and the management of moderate to severe pain associated with endometriosis. The companies will equally share profits and allowable expenses in the U.S. and Canada for Orgovyx and Myfembree, with Myovant bearing our share of allowable expenses up to a maximum of $50 million in 2022. Myovant will remain responsible for regulatory interactions and drug supply and continue to lead clinical development for the relugolix combination tablet.

Revenues associated with these arrangements are included in Alliance revenues (except in certain markets where we have direct sales and except for the majority of revenues for Comirnaty/BNT162b2, which are included as direct product revenues). In addition, we have collaboration arrangements for the development and commercialization of certain pipeline products that are in development stage, including, among others, (i) with BioNTech to develop a modified mRNA-based vaccine for the prevention of varicella zoster (Shingles), and (ii) with Valneva to co-develop and commercialize Valneva's Lyme disease vaccine candidate, VLA15. For further discussion of collaboration and co-promotion agreements, see the *Item 1A. Risk Factors—Collaborations and Other Relationships with Third Parties* section in this Form 10-K and *Notes 2* and *17.*

## RESEARCH AND DEVELOPMENT

R&D is at the heart of fulfilling our purpose to deliver breakthroughs that change patients' lives as we work to translate advanced science and technologies into the therapies that may be the most impactful for patients. The discovery and development of drugs, vaccines and biological products are time consuming, costly and unpredictable. In addition to discovering and developing new products, our R&D efforts seek to add value to our existing products by improving their effectiveness and ease of dosing and by discovering potential new indications.

*Our R&D Priorities and Strategy.* Our R&D priorities include:

- delivering a pipeline of highly differentiated medicines and vaccines where we have a unique opportunity to bring the most important new therapies to patients in need;

- advancing our capabilities that can position us for long-term R&D leadership; and

- advancing new models for partnerships with creativity, flexibility and urgency to deliver innovation to patients as quickly as possible.

To that end, our R&D primarily focuses on our main therapeutic areas.

While a significant portion of our R&D is internal, we also seek promising chemical and biological lead molecules and innovative technologies developed by others to incorporate into our discovery and development processes or projects, as well as our product lines. We do so by entering into collaboration, alliance and license agreements with universities, biotechnology companies and other firms as well as through acquisitions and investments. These collaboration, alliance and license agreements and investments allow us to share knowledge, risk and cost. They also enable us to access external scientific and technological expertise, as well as provide us the opportunity to advance our own products and in-licensed or acquired products. For information on certain of these collaborations, alliances and license arrangements and investments, see *Note 2.*

*Our R&D Operations.* In 2021, we continued to strengthen our global R&D operations and pursue strategies to improve R&D productivity to achieve a sustainable pipeline that is positioned to deliver value in the near term and over time. Our R&D activity is conducted through various platform functions that operate in parallel within our global operations, including the following:

- **WRDM.** Research units within WRDM are generally responsible for research and early-stage development assets for our business (assets that have not yet achieved proof-of-concept) and are organized by therapeutic area to enhance flexibility, cohesiveness and focus. We can rapidly redeploy resources within a research unit and between various projects to leverage, as necessary, common skills, expertise or focus.

- **GPD.** Our GPD organization is a unified center for clinical development and regulatory activities that is generally responsible for the clinical development strategy and operational execution of clinical trials for late-stage clinical assets in Pfizer's pipeline.

- **Science-based platform-services organizations within WRDM.** These organizations provide technical expertise and other services to various R&D projects, and are organized into science-based functions. These organizations allow us to react more quickly and effectively to evolving needs by sharing resources among projects, candidates and targets across therapeutic areas and phases of development. Examples of these platform organizations include Pharmaceutical Sciences and Medicine Design, and Worldwide Medical and Safety.

We manage R&D operations on a total-company basis through our platform functions described above. Specifically, the Portfolio Strategy & Investment committee, composed of senior executives, is accountable for aligning resources among all of our WRDM, GPD and R&D projects and for seeking to ensure optimal capital allocation across the innovative R&D portfolio. We believe that this approach also serves to maximize accountability and flexibility.

We do not disaggregate total R&D expense by development phase or by therapeutic area since, as described above, we do not manage our R&D operations by development phase or by therapeutic area. Further, as we are able to adjust a significant portion of our spending quickly, we believe that any prior-period information about R&D expense by development phase or by therapeutic area would not necessarily be representative of future spending.

For additional information, see the *Costs and Expenses—Research and Development (R&D) Expenses* section within MD&A and *Note 17.*

*Our R&D Pipeline.* The process of drug and biological product discovery from initiation through development and to potential regulatory approval is lengthy and can take more than ten years. As of February 8, 2022, we had the following number of projects in various stages of R&D:



Development of a single compound is often pursued as part of multiple programs. While our drug candidates may or may not receive regulatory approval, new candidates entering clinical development phases are the foundation for future products. Information concerning several of our drug candidates in development, as well as supplemental filings for existing products, is set forth in the *Product Developments* section within MD&A. For information on the risks associated with R&D, see the *Item 1A. Risk Factors—Research and Development* section of this Form 10-K.

## INTERNATIONAL OPERATIONS

Our operations are conducted globally, and we sell our products in over 125 countries. Emerging markets are an important component of our strategy for global leadership, and our commercial structure recognizes that the demographics and rising economic power of the fastest-growing emerging markets are becoming more closely aligned with the profile found within developed markets. Urbanization and the rise of the middle class in emerging markets provide potential growth opportunities for our products.

Revenues from operations outside the U.S. of $51.5 billion accounted for 63% of our total revenues in 2021. Revenues exceeded $500 million in each of 21, 8 and 10 countries outside the U.S. in 2021, 2020 and 2019, respectively, with the increase in the number of countries in 2021 primarily driven by Comirnaty/BNT162b2. By total revenues, Japan was our largest national market outside the U.S. in 2021. For a geographic breakdown of revenues, see the *Analysis of the Consolidated Statements of Income—Revenues by Geography* section within MD&A and the table captioned *Geographic Information* in *Note 17B*.



Our international operations are subject to risks inherent in carrying on business in other countries. For additional information, see the *Item 1A. Risk Factors—Global Operations* and *Item 1. Business—Government Regulation and Price Constraints* sections in this Form 10-K.

## SALES AND MARKETING

Our prescription biopharmaceutical products are sold principally to wholesalers, but we also sell directly to retailers, hospitals, clinics, government agencies and pharmacies. In the U.S., we primarily sell our vaccines directly to the federal government, CDC, wholesalers, individual provider offices, retail pharmacies and integrated delivery systems. Outside the U.S., we primarily sell our vaccines to government and non-government institutions. Certain of these government contracts may be renegotiated or terminated at the discretion of a government entity. In addition, our contracts with government and supranational organizations for the sales of Comirnaty/BNT162b2 and Paxlovid, which are on a committed basis, represented a significant amount of revenues in 2021. We also seek to gain access for our products on formularies, which are lists of approved medicines available to members of healthcare programs or PBMs. PBMs use various benefit designs, such as tiered co-pays for formulary products, to drive utilization of products in preferred formulary positions. We may also work with payers on disease management programs that help to develop tools and materials to educate patients and physicians on key disease areas. For information on our significant customers, see *Note 17C*.

We promote our products to healthcare providers and patients. Through our marketing organizations, we explain the approved uses, benefits and risks of our products to healthcare providers and patients; MCOs that provide insurance coverage, such as hospitals, integrated delivery systems, PBMs and health plans; and employers and government agencies who hire MCOs to provide health benefits to their employees. In the U.S., we market directly to consumers through direct-to-consumer advertising that seeks to communicate the approved uses, benefits and risks of our products while motivating people to have meaningful conversations with their doctors. In addition, we sponsor general advertising to educate the public on disease awareness, prevention and wellness, important public health issues and our patient assistance programs.

## PATENTS AND OTHER INTELLECTUAL PROPERTY RIGHTS

*Patents.* We own or license a number of patents covering pharmaceutical and other products, their uses, formulations, and product manufacturing processes.

Patents for individual products extend for varying periods according to the date of patent filing or grant and the legal term of patents in the various countries where patent protection is obtained. The scope of protection afforded by a patent can vary from country to country and depends on the patent type, the scope of its patent claims and the availability of legal remedies. Patent term extensions (PTE) may be available in some countries to compensate for a loss of patent term due to delay in a product's approval due to the regulatory requirements. One of the primary considerations in limiting our operations in some countries outside the U.S. is the lack of effective intellectual property protection for our products, although international and U.S. free trade agreements have included some improved global protection of intellectual property rights. For additional information, see the *Item 1. Business—Government Regulation and Price Constraints* section in this Form 10-K.

In various markets, a period of regulatory exclusivity may be provided for drugs or vaccines upon approval. The scope and term of such exclusivity will vary but, in general, the period will run concurrently with the term of any existing patent rights associated with the drug at the time of approval.

Based on current sales, and considering the competition with products sold by our competitors, the patent rights we consider most significant in relation to our business as a whole, together with the year in which the basic product patent expires, are as follows:

| Product | U.S. Basic Product Patent Expiration Year[1] | Major Europe Basic Product Patent Expiration Year[1] | Japan Basic Product Patent Expiration Year[1] |
|---|---|---|---|
| Chantix/Champix | 2020[2] | 2021[2] | 2022 |
| Sutent | 2021[3] | 2022[3] | 2024 |
| Inlyta | 2025 | 2025 | 2025 |
| Xeljanz | 2025 | 2028[4] | 2025 |
| Prevnar 13/Prevenar 13 | 2026 | [5] | 2029 |
| Eliquis[6] | 2026 | 2026 | 2026 |
| Ibrance | 2027 | 2028 | 2028 |
| Xtandi[7] | 2027 | [7] | [7] |
| Vyndaqel/Vyndamax/Vynmac | 2024 (2028 pending PTE) | 2026 | 2026/2029[8] |
| Xalkori | 2029 | 2027 | 2028 |
| Besponsa | 2030 | 2028 | 2028[4] |
| Braftovi[9] | 2031 (2031 pending PTE) | [9] | [9] |
| Mektovi[9] | 2031[10] | [9] | [9] |
| Bavencio[11] | 2033 | 2032 | 2033 |
| Lorbrena | 2033 | 2034 | 2036 |
| Prevnar 20/Apexxnar | 2033 (2035 pending PTE) | 2033 | 2033[12] |
| Cibinqo | 2034 | 2034[13] | 2034 (2038 pending PTE) |
| Comirnaty | [14] | [14], [15] | [14] |
| Paxlovid | [16] | [16] | [16] |

[1]   Unless otherwise indicated, the years pertain to the basic product patent expiration, including granted PTEs, supplementary protection certificates (SPC) or pediatric exclusivity periods. SPCs are included when granted in three out of five major European markets (France, Germany, Italy, Spain and the U.K.). Noted in parentheses is the projected year of expiry of the earliest pending patent term extension in the U.S. or Japan and/or SPC application in Europe, the term of which, if granted, may be shorter than originally requested due to a number of factors. In some instances, there are later-expiring patents relating to our products which may or may not protect our product from generic or biosimilar competition after the expiration of the basic patent.

[2]   The basic product patent for Chantix expired in the U.S. in November 2020 and in Europe in September 2021.

[3]   The basic product patent for Sutent expired in the U.S. in August 2021 and in Europe in January 2022.

[4]   Expiry is provided by regulatory exclusivity in this market.

[5]   The Europe patent that covers the combination of the 13 serotype conjugates of Prevenar 13 was revoked following an opposition and has now been withdrawn. There are other Europe patents and pending applications covering the combination, various aspects of the manufacturing process, and the combination of serotype conjugates of Prevenar 13 that remain in force.

[6]   Eliquis was developed and is being commercialized in collaboration with BMS. For Eliquis in the U.S., two patents listed in the FDA Orange Book, the composition of matter patent claiming apixaban specifically and a formulation patent, were challenged by numerous generic companies and were the subject of patent infringement litigation. Prior to the resolution of the litigation in our favor on both challenged patents, we and BMS settled with a number of these generic companies (settled generic companies) while continuing to litigate against three remaining generic companies (remaining generic companies). As a result of the litigation, the remaining generic companies are not permitted to launch their products until the 2031 expiration date of the formulation patent. Under the terms of the settlement agreements, the permitted date of launch for the settled generic companies under these patents is April 1, 2028.

Both patents may be subject to subsequent challenges. While we cannot predict the outcome of any potential future litigation, these are the alternatives that might occur: (a) if both patents are upheld in future litigation, through appeal, the permitted date of launch for the settled generic companies under these patents would remain April 1, 2028; (b) if the formulation patent is held invalid or not infringed in future litigation, through appeal, the settled generic companies and any successful future litigant would be permitted to launch on November 21, 2026; or (c) if both patents are held invalid or not infringed in future litigation, through appeal, the settled generic companies and any successful future litigant could launch products immediately upon such an adverse decision.

Refer to *Note 16A1* for more information.

(7) Xtandi is being developed and commercialized in collaboration with Astellas, which has exclusive commercialization rights for Xtandi outside the U.S. Pfizer receives tiered royalties as a percentage of international Xtandi net sales.

(8) Vyndaqel (tafamidis meglumine) basic patent expiry in Japan is August 2026 for treatment of polyneuropathy. Vynmac (tafamidis) was approved in Japan for treatment of cardiomyopathy with regulatory exclusivity expiring March 2029.

(9) We have exclusive rights to Braftovi and Mektovi in the U.S. The Pierre Fabre Group has exclusive rights to commercialize both products in Europe and Ono Pharmaceutical Co., Ltd. has exclusive rights to commercialize both products in Japan. We receive royalties from The Pierre Fabre Group and Ono Pharmaceutical Co., Ltd. on sales of Braftovi and Mektovi outside the U.S.

(10) Mektovi U.S. expiry is provided by a method of use patent.

(11) Bavencio is being developed and commercialized in collaboration with Merck KGaA.

(12) Product not yet approved or authorized in this market.

(13) An SPC has been filed for Cibinqo in the U.K. with expected expiry in 2036 based on the September 2021 approval. Cibinqo was approved in other major European markets in December 2021.

(14) The basic product patent application for Comirnaty has been filed in these markets. If granted, a full term is expected in these markets. Comirnaty is being developed and commercialized in collaboration with BioNTech.

(15) Pfizer does not have co-promotion rights for Comirnaty in Germany.

(16) The basic product patent application for Paxlovid has been filed in these markets. If granted, a full term is expected in these markets.

*Loss of Intellectual Property Rights.* The loss, expiration or invalidation of intellectual property rights, patent litigation settlements with manufacturers and the expiration of co-promotion and licensing rights can have a material adverse effect on our revenues. Once patent protection has expired or has been lost prior to the expiration date as a result of a legal challenge, we typically lose exclusivity on these products, and generic and biosimilar pharmaceutical manufacturers generally produce identical or highly similar products and sell them for a lower price. The date at which generic or biosimilar competition commences may be different from the date that the patent or regulatory exclusivity expires. However, when generic or biosimilar competition does commence, the resulting price competition can substantially decrease our revenues for the impacted products, often in a very short period of time. Also, if one of our product-related patents is found to be invalid by judicial, court or regulatory or administrative proceedings, generic or biosimilar products could be introduced, resulting in the erosion of sales of our existing products.

We continue to vigorously defend our patent rights against infringement, and we will continue to support efforts that strengthen worldwide recognition of patent rights while taking necessary steps to help ensure appropriate patient access. For additional information, see the *Item 1A. Risk Factors—Competitive Products, —Intellectual Property Protection* and *—Third-Party Intellectual Property Claims* sections in this Form 10-K and *Note 16A1.*

Certain of our products have experienced patent-based expirations or loss of regulatory exclusivity in certain markets in the last few years, and we expect certain products to face increased generic competition over the next few years. For additional information on the impact of LOEs on our revenues, see the *Analysis of the Consolidated Statements of Income—Revenues—Selected Product Discussion* section within MD&A.

*Trademarks.* Our products are sold under brand-name and logo trademarks and trade dress. Registrations generally are for fixed, but renewable, terms and protection is provided in some countries for as long as the mark is used while in others, for as long as it is registered. Protecting our trademarks is of material importance to Pfizer.

## COMPETITION

Our business is conducted in intensely competitive and often highly regulated markets. Many of our products face competition in the form of branded or generic drugs or biosimilars that treat similar diseases or indications. The principal forms of competition include efficacy, safety, ease of use and cost. Though the means of competition vary among our products, demonstrating the value of our products is a critical factor for success.

We compete with other companies that manufacture and sell products that treat or prevent diseases or indications similar to those treated or prevented by our major products. These competitors include other worldwide research-based biopharmaceutical companies, smaller research companies with more limited therapeutic focus and generic drug and biosimilar manufacturers. Our competitors also may devote substantial funds and resources to R&D and their successful R&D could result in erosion of the sales of our existing products and potential sales of products in development, as well as unanticipated product obsolescence. In addition, several of our competitors operate without large R&D expenses and make a regular practice of challenging our product patents before their expiration.

To address competitive trends we continually emphasize innovation, which is underscored by our multi-billion-dollar investment in R&D, as well as our business development transactions, both designed to result in a strong product pipeline. Our investment in research continues even after drug or vaccine approval as we seek to further demonstrate the value of our products for the conditions they treat or prevent, as well as potential new applications. We educate patients, physicians, payers and global health authorities on the benefits and risks of our medicines and vaccines, and seek to continually enhance the organizational effectiveness of our biopharmaceutical functions, including to accurately and ethically launch and market our products to our customers.

Operating conditions have also shifted as a result of increased global competitive pressures, industry regulation and cost containment. We continue to evaluate, adapt and improve our organization and business practices in an effort to better meet customer and public needs. We believe that we have taken an industry-leading role in evolving our approaches to U.S. direct-to-consumer advertising, interactions with, and payments to, healthcare professionals and medical education grants. We also continue to sponsor programs to address patient affordability and access barriers, as we strive to advance fundamental health system change through our support for better healthcare solutions.

Our vaccines may face competition, including from the introduction of alternative vaccines or "next-generation" vaccines prior to or after the expiration of their patents, which may adversely affect our future results.

Our biosimilars, which include biosimilars of certain inflammation & immunology and oncology biologic medicines, compete with branded products from competitors, as well as other generics and biosimilars manufacturers. We seek to maximize the opportunity to establish a "first-to-

market" or early market position for our biosimilars to provide customers a lower-cost alternative immediately when available and also to potentially provide us with higher levels of sales and profitability until other competitors enter the market.

*Generic Products.* Generic pharmaceutical manufacturers pose one of the biggest competitive challenges to our branded small molecule products because they can market a competing version of our product after the expiration or loss of our patent and often charge much less. Several competitors regularly challenge our product patents before their expiration. Generic competitors often operate without large R&D expenses, as well as without costs of conveying medical information about products to the medical community. In addition, the FDA approval process exempts generics from costly and time-consuming clinical trials to demonstrate their safety and efficacy, allowing generic manufacturers to rely on the safety and efficacy data of the innovator product. In China, for example, we expect to continue to face intensified competition by certain generic manufacturers in 2022 and beyond, which may result in price cuts and volume loss of some of our products. In addition, generic versions of competitors' branded products may also compete with our products.

MCOs that focus primarily on the immediate cost of drugs often favor generics over brand-name drugs. Many governments also encourage the use of generics as alternatives to brand-name drugs in their healthcare programs, including Medicaid in the U.S., and U.S. laws generally allow, and in some cases require, pharmacists to substitute generic drugs for brand-name drugs. In a small subset of states, prescribing physicians are able to expressly prevent such substitution.

*Biosimilars.* Certain of our biologic products, including Enbrel (we market Enbrel outside the U.S. and Canada), already face, or may face in the future, competition from biosimilars (also referred to as follow-on biologics). Biosimilars are versions of biologic medicines that have been developed and proven to be highly similar to the original biologic in terms of safety and efficacy and that have no clinically meaningful differences in safety, purity or potency. Biosimilars have the potential to offer high-quality, lower-cost alternatives to innovative biologic medicines. In the U.S., biosimilars referencing innovative biologic products are approved under the U.S. Public Health Service Act.

## PRICING PRESSURES AND MANAGED CARE ORGANIZATIONS

*Commercial Pricing Pressures.* Pricing and access pressures in the commercial sector continue to be significant. Overall, there is increasing pressure on U.S. providers to deliver healthcare at a lower cost and to ensure that those expenditures deliver demonstrated value in terms of health outcomes. Many employers have adopted high deductible health plans, which can increase out-of-pocket costs for medicines. This trend is likely to continue. Private third-party payers, such as health plans, increasingly challenge pharmaceutical product pricing, which could result in lower prices, lower reimbursement rates and a reduction in demand for our products. Pricing pressures also may occur as a result of highly competitive insurance markets. Healthcare provider purchasers, directly or through group purchasing organizations, are seeking enhanced discounts or implementing more rigorous bidding or purchasing review processes.

Longer term, we foresee a shift in focus away from fee-for-service payments towards outcomes-based payments and risk-sharing arrangements that reward providers for cost reductions and improved patient outcomes. These new payment models can, at times, lead to lower prices for, and restricted access to, new medicines. At the same time, these models can also promote utilization of drugs by encouraging physicians to screen and diagnose and consider drugs as a means of forestalling more costly medical interventions.

In light of the COVID-19 pandemic and related large-scale healthcare disruptions, we expect value-based payment models may have reduced participation if the incentives to participate are reduced or eliminated. Financially weakened hospitals may weigh their ability to take on the financial risk of downside models. In contrast, providers in more advanced value-based models, such as full capitation, a fixed amount paid in advance per patient per unit of time-period, generally found their revenues remained steady during the pandemic, which may ultimately encourage the growth of such models.

We believe medicines and vaccines are the most efficient and effective use of healthcare dollars based on the value they deliver to the overall healthcare system. We work with law makers and advocate for solutions that effectively improve patient health outcomes, lower costs to the healthcare system, and help ensure access to medicines and vaccines within an efficient and affordable healthcare system. This includes assessing our go-to market model to address patient affordability challenges. We have engaged with major payors and the U.S. government to explore opportunities to improve access and reimbursement in an effort to drive pro-patient policies. In addition, in response to the evolving U.S. and global healthcare spending landscape, we work with health authorities, health technology assessment and quality measurement bodies and major U.S. payers throughout the product-development process to better understand how these entities value our compounds and products. Further, we are developing stronger internal capabilities focused on demonstrating the value of the medicines and vaccines that we discover or develop, register and manufacture, by recognizing patterns of usage of our medicines and vaccines and competitor medicines and vaccines along with patterns of healthcare costs.

For information on government pricing pressures, see the *Item 1. Business—Government Regulation and Price Constraints* and *Item 1A. Risk Factors—Pricing and Reimbursement* sections in this Form 10-K.

*Managed Care Organizations.* The evolution of managed care in the U.S. has been a major factor in the competitiveness of the healthcare marketplace. Approximately 302 million people in the U.S. now have some form of health insurance coverage, and the marketing of prescription drugs and vaccines to both consumers and the entities that manage coverage in the U.S. continues to grow in importance. In particular, the influence of MCOs has increased in recent years due to the growing number of patients receiving coverage through MCOs. At the same time, consolidation in the MCO industry has resulted in fewer, even larger MCOs, which enhances those MCOs' ability to negotiate pricing and increases their importance to our business. Since MCOs seek to contain and reduce healthcare expenditures, their growing influence has increased pressure on drug prices as well as revenues.

MCOs typically negotiate prices with pharmaceutical providers by using formularies (which are lists of approved medicines available to MCO members), clinical protocols (which require prior authorization for a branded product if a generic product is available or require the patient to first fail on one or more generic products before permitting access to a branded medicine), volume purchasing, long-term contracts and their ability to influence volume and market share of prescription drugs. In addition, by placing branded medicines on higher-tier or non-preferred status in their formularies, MCOs transfer a portion of the cost to the patient, resulting in significant patient out-of-pocket expenses. This financial disincentive is a tool for MCOs to manage drug costs and channel patients to medicines preferred by the MCOs. The ACA has accelerated payment reform by distributing risk across MCOs and other stakeholders in care delivery with the intent of improving quality while reducing costs, which creates

pressure on MCOs to tie reimbursement to defined outcomes. We are closely monitoring these newer approaches and developing appropriate strategies to respond to them.

The breadth of the products covered by formularies can vary considerably from one MCO to another, and many formularies include alternative and competitive products for treatment of particular medical conditions. MCOs also emphasize primary and preventive care, out-patient treatment and procedures performed at doctors' offices and clinics as ways to manage costs. Hospitalization and surgery, typically the most expensive forms of treatment, are carefully managed, and drugs that can reduce the need for hospitalization, professional therapy or surgery may become favored first-line treatments for certain diseases.

Exclusion of a product from a formulary or other MCO-implemented restrictions can significantly impact drug usage in the MCO patient population and beyond. Consequently, pharmaceutical companies compete to gain access to formularies for their products, typically on the basis of unique product features, such as greater efficacy, better patient ease of use, or fewer side effects, as well as the overall cost of the therapy. We have been generally, although not universally, successful in having our major products included on MCO formularies. However, increasingly our branded products are being placed on the higher tiers or in a non-preferred status. For additional information, see the *Item 1A. Risk Factors—Managed Care Trends* section in this Form 10-K.

## RAW MATERIALS

We procure raw materials essential to our business from numerous suppliers worldwide. In general, these materials have been available in sufficient quantities to support our demand and in many cases are available from multiple suppliers. No significant impact to our operations due to the availability of raw materials is currently anticipated in 2022. However, we are seeing an increase in overall demand in the industry for certain components and raw materials with the potential to constrain available supply, which could have a future impact on our business. We are continuing to monitor and implement mitigation strategies in an effort to reduce any potential risk or impact, including active supplier management, qualification of additional suppliers and advanced purchasing to the extent possible.

## GOVERNMENT REGULATION AND PRICE CONSTRAINTS

We are subject to extensive regulation by government authorities in the countries in which we do business. This includes laws and regulations governing the operations of biopharmaceutical companies, such as the approval, manufacturing and marketing of products, pricing (including discounts and rebates) and health information privacy, among others. These laws and regulations may require administrative guidance for implementation, and a failure to comply could subject us to legal and/or administrative actions. Enforcement measures may include substantial fines and/or penalties, orders to stop non-compliant activities, criminal charges, warning letters, product recalls or seizures, delays in product approvals, exclusion from participation in government programs or contracts as well as limitations on conducting business in applicable jurisdictions, and could result in harm to our reputation and business. For additional information, see *Note 16A.* Compliance with these laws and regulations may be costly, and may require significant technical expertise and capital investment to ensure compliance. While capital expenditures or operating costs for compliance with government regulations cannot be predicted with certainty, we do not currently anticipate they will have a material effect on our capital expenditures or competitive position.

*In the United States*

*Drug and Biologic Regulation.* The FDA, pursuant to the FFDCA, the Public Health Service Act and other federal statutes and regulations, extensively regulates pre- and post-marketing activities related to our biopharmaceutical products. The regulations govern areas such as the safety and efficacy of medicines and vaccines, clinical trials, advertising and promotion, quality control, manufacturing, labeling, distribution, post-marketing safety surveillance and reporting, and record keeping. Other U.S. federal agencies, including the DEA, also regulate certain of our products and activities.

For a biopharmaceutical company to market a drug or a biologic product, including vaccines, in the U.S., the FDA must evaluate whether the product is safe and effective for its intended use. If the FDA determines that the drug or biologic is safe and effective, the FDA will approve the product's NDA or BLA (or supplemental NDA or supplemental BLA), as appropriate.

A drug or biologic may be subject to postmarketing commitments, which are studies or clinical trials that the product sponsor agrees to conduct, or postmarketing requirements, which are studies or clinical trials that are required as a condition of approval. In addition, we are also required to report adverse events and comply with cGMPs (the FDA regulations that govern all aspects of manufacturing quality for pharmaceuticals) and the Drug Supply Chain Security Act (the law that, among other things, sets forth requirements related to product tracing, product identifiers and verification for manufacturers, wholesale distributors, repackagers and dispensers to facilitate the tracing of product through the pharmaceutical distribution supply chain), as well as advertising and promotion regulations. For additional information, see the *Item 1A. Risk Factors—Development, Regulatory Approval and Marketing of Products* and *—Post-Authorization/Approval Data* sections in this Form 10-K.

In the context of public health emergencies, like the COVID-19 pandemic, we may apply to the FDA for an EUA, which if granted, allows for the distribution and use of our products during the declared emergency, in accordance with the conditions set forth in the EUA, unless the EUA is otherwise terminated by the government. Although the criteria for an EUA differ from the criteria for approval of an NDA or BLA, EUAs nevertheless require the development and submission of data to satisfy the relevant FDA standards, and a number of ongoing obligations. The FDA generally expects EUA holders to work toward submission of full applications, such as a BLA or an NDA, as soon as possible.

*Biosimilar Regulation.* The FDA is responsible for approval of biosimilars. Innovator biologics are entitled to 12 years of market exclusivity by statute, and biosimilars applications may not be submitted until four years after the approval of the reference innovator biologic.

*Sales and Marketing Regulations.* Our marketing practices are subject to state laws, as well as federal laws, such as the Anti-Kickback Statute and False Claims Act, intended to prevent fraud and abuse in the healthcare industry. The Anti-Kickback Statute generally prohibits corruptly soliciting, offering, receiving, or paying anything of value to generate business. The False Claims Act generally prohibits anyone from knowingly and willingly presenting, or causing to be presented, any claims for payment for goods or services, including to government payers, such as Medicare and Medicaid, that are false or fraudulent and generally treat claims generated through kickbacks as false or fraudulent. The federal government and states also regulate sales and marketing activities and financial interactions between manufacturers and healthcare providers, requiring disclosure to government authorities and the public of such interactions, and the adoption of compliance standards or programs. State

attorneys general have also taken action to regulate the marketing of prescription drugs under state consumer protection and false advertising laws.

*Pricing, Reimbursement and Access Regulations.* Pricing and reimbursement for our products depend in part on government regulation. Any significant efforts at the federal or state levels to reform the healthcare system by changing the way healthcare is provided or funded or more directly impose controls on drug pricing, government reimbursement, and access to medicines and vaccines on public and private insurance plans could have a material impact on us.

In addition, in order to have our products covered by Medicaid, we must offer discounts or rebates on purchases of pharmaceutical products under various federal and state programs. We also must report specific prices to government agencies. The calculations necessary to determine the prices reported are complex and the failure to do so accurately may expose us to enforcement measures. See the discussion regarding rebates in the *Analysis of the Consolidated Statements of Income—Revenues by Geography* section within MD&A and *Note 1H.*

Government and private payers routinely seek to manage utilization and control the costs of our products, and there is considerable public and government scrutiny of pharmaceutical pricing. Efforts by states and the federal government to regulate prices or payment for pharmaceutical products, including proposed actions to facilitate drug importation, limit reimbursement to lower international reference prices, require deep discounts, and require manufacturers to report and make public price increases and sometimes a written justification for the increase, could adversely affect our business if implemented. We expect to see continued focus by Congress and the Biden Administration on regulating pricing which could result in legislative and regulatory changes designed to control costs. For example, there is proposed legislation that, if enacted, would allow Medicare to negotiate prices for certain prescription drugs, as well as require that penalties be paid by manufacturers who raise drug prices faster than inflation. In addition, changes to the Medicaid program or the federal 340B drug pricing program, which imposes ceilings on prices that drug manufacturers can charge for medications sold to certain health care facilities, could have a material impact on our business. For example, certain changes issued in a final rule by the Centers for Medicare & Medicaid Services (CMS) in December 2020 to the Medicaid Drug Rebate Program could increase our Medicaid rebate obligations and increase the discounts we extend to 340B covered entities. Additional changes to the 340B program are undergoing review and their status is unclear. For additional information, see the *Item 1A. Risk Factors—Pricing and Reimbursement* section in this Form 10-K.

A majority of states use preferred drug lists to manage access to pharmaceutical products under Medicaid, including some of our products. For example, access to our products under the Medicaid managed care programs typically is determined by the health plans with which state Medicaid agencies contract to provide services to beneficiaries. States seek to control healthcare costs related to Medicaid and other state healthcare programs, including the implementation of supplemental rebate agreements under the Medicaid drug rebate program tied to patient outcomes. States' budgets were impacted less by the COVID-19 pandemic than expected and are generally growing. We expect states to seek cost cutting within Medicaid, which may focus on managed care capitation payments and/or formulary management. States may also advance drug-pricing initiatives with a focus on affordability review boards, financial penalties related to pricing practices, manufacturer pricing and reporting requirements, as well as regulation of prescription drug assistance or copay accumulator programs in the commercial market. Payers may promote generic drugs and biosimilars more aggressively to generate savings and attempt to stimulate additional price competition. In addition, we expect that consolidation and integration among pharmacy chains, wholesalers and PBMs will increase pricing pressures in the industry. For additional information, see the *Item 1A. Risk Factors—Managed Care Trends* section in this Form 10-K.

*Anti-Corruption.* The FCPA prohibits U.S. corporations and their representatives from offering, promising, authorizing or making payments to any foreign government official, government staff member, political party or political candidate to obtain or retain business abroad. The scope of the FCPA includes interactions with certain healthcare professionals in many countries. Other countries have enacted similar anti-corruption laws and/or regulations.

*Data Privacy.* The collection and use of personal data by us is increasingly important to our business and is subject to various federal and state privacy and data security laws and regulations, including oversight by various regulatory and other governmental bodies. Such laws and regulations continue to evolve and are increasingly being enforced vigorously.

### Outside the United States

*New Drug Approvals.* In the EU, the EMA conducts the scientific evaluation, supervision and safety monitoring of our innovative medicinal products, and employs a centralized procedure for approval for the EU and the European Economic Area (EEA) countries. In the U.K., the Medicines and Healthcare products Regulatory Agency is the sole regulatory authority. In Japan, the PMDA is involved in a wide range of regulatory activities, including clinical studies, approvals, post-marketing reviews and pharmaceutical safety. In China, the NMPA is the primary regulatory authority for approving and supervising medicines. Health authorities in many middle- and lower-income countries require marketing approval by a recognized regulatory authority (e.g., the FDA or EMA) before they begin to conduct their application review process and/or issue their final approval.

*Pharmacovigilance.* In the EU, the EMA's PRAC is responsible for reviewing and making recommendations on product safety issues. Outside developed markets, pharmacovigilance requirements vary and are generally not as extensive, but there is a trend toward increasing regulation.

*Pricing and Reimbursement.* Certain governments, including in the different EU member states, the U.K., Japan, China, Canada and South Korea, provide healthcare at low-to-zero direct cost to consumers at the point of care and have significant power to regulate pharmaceutical prices or patient reimbursement levels to control costs for the government-sponsored healthcare system, particularly under recent global financing pressures. Governments globally may use a variety of measures to control costs, including proposing price reform or legislation, cross country collaboration and procurement, price cuts, mandatory rebates, health technology assessments, forced localization as a condition of market access, "international reference pricing" (i.e., the practice of a country linking its regulated medicine prices to those of other countries), QCE processes and VBP. In addition, the international patchwork of price regulation, differing economic conditions and incomplete value assessments across countries has led to varying access to quality medicines in many markets and some third-party trade in our products between countries. Several important multilateral organizations such as the WHO are increasing scrutiny of international pharmaceutical pricing through policy recommendations and sponsorship of programs, such as "The Oslo Medicines Initiative" which is planning a high-level meeting in 2022 to agree on WHO Europe Member States' commitments to ensure "affordability for high-priced medicines". In November 2020, the EC published its new Pharmaceutical Strategy for Europe which envisions a broad range of new initiatives and legislation including a significant focus on affordability and access to medicines.

In China, pricing pressures have increased in recent years because of an overall focus on healthcare cost containment with government officials emphasizing improved health outcomes, healthcare reform and decreased drug prices as key indicators of progress towards reform. For patented products, drug prices have decreased dramatically as a result of adding innovative drugs (including oncology medicines) to the National Reimbursement Drug List (NRDL). In the off-patent space, numerous local generics have been officially deemed bioequivalent under a QCE process that required domestically-manufactured generic drugs to pass a test to assess their bioequivalence to a qualified reference drug (typically the originator drug). A centralized VBP program, a tender process where a certain portion of included molecule volumes are guaranteed to tender winners and is intended to contain healthcare costs by driving utilization of generics that have passed QCE, has resulted in dramatic price cuts for off-patent medicines. Furthermore, the Chinese government has discussed moving toward efforts to unify the reimbursement price between QCE-approved generic medicines and the applicable original medicines, which the government currently plans to implement within the next few years. We and most off-patent originators have mostly not been successful in the VBP bidding process. The government has indicated that additional post-LOE drugs could be subjected to VBP qualification in future rounds. While certain details of future QCE expansion have been made available, we are unable to determine the impact on our business and financial condition until the initiation of these future rounds.

*Healthcare Provider Transparency and Disclosures.* Several countries have implemented laws requiring (or industry trade associations have recommended) disclosure of transfers of value made by pharmaceutical companies to healthcare providers and/or healthcare organizations, such as academic teaching hospitals.

*Intellectual Property.* Reliable patent protection and enforcement around the world are among the key factors we consider for continued business and R&D investment. The WTO Agreement on Trade Related Aspects of Intellectual Property Rights (WTO-TRIPS) requires participant countries to provide patent and other intellectual property-related protection for pharmaceutical products by law, with an exemption provided for least-developed countries until 2033. While some countries have made improvements, we still face patent grant, enforcement and other intellectual property challenges in many countries.

While the global intellectual property policy environment has generally improved following WTO-TRIPS and bilateral/multilateral trade agreements, our growth and ability to bring new product innovation to patients depends on further progress in intellectual property protection. In certain developed international markets, governments maintain relatively effective intellectual property policies. However, in the EU, pursuant to the ongoing review of pharmaceutical intellectual property and regulatory incentives, legislative change may result in the reduction of certain protections. In several emerging market countries, governments have used intellectual property policies as a tool to force innovators to accept less than fair value for medicines, as well as to advance industrial policy and localization goals. Discussions are ongoing at the WTO that seek to limit intellectual property protections within the context of the COVID-19 pandemic response.

Considerable political and economic pressure has weakened current intellectual property protection in some countries and has led to policies such as more restrictive standards for obtaining patents and more difficult procedures for patenting biopharmaceutical inventions, restrictions on patenting certain types of inventions, revocation of patents, laws or regulations that promote or provide broad discretion to issue a compulsory license, weak intellectual property enforcement and failure to implement effective regulatory data protection.

Our industry advocacy efforts focus on seeking a fair and transparent business environment for foreign manufacturers, underscoring the importance of strong intellectual property systems for local innovative industries and helping improve patients' access to innovative medicines and vaccines.

*Data Privacy.* Outside of the U.S., many countries have privacy and data security laws and regulations concerning the collection and use of personal data, including but not limited to, the EU's General Data Protection Regulations and China's Personal Information Protection Law. The legislative and regulatory framework for privacy and data protection issues worldwide is also rapidly evolving as countries continue to adopt new and updated privacy and data security laws. The interpretation and application of such laws and regulations remain uncertain and continue to evolve. In addition, enforcement of such laws and regulations is increasing.

## ENVIRONMENTAL MATTERS

Our operations are affected by national, state and/or local environmental laws. We have made, and intend to continue to make, the expenditures necessary for compliance with applicable laws. We also are cleaning up environmental contamination from past industrial activity at certain sites. We incurred capital and operational expenditures in 2021 for environmental compliance purposes and for the clean-up of certain past industrial activity as follows: $55 million in environment-related capital expenditures and $152 million in other environment-related expenses.

While capital expenditures or operating costs for environmental compliance cannot be predicted with certainty, we do not currently anticipate they will have a material effect on our capital expenditures or competitive position. See also *Note 16A3.*

Climate change presents risks to our operations, including the potential for additional regulatory requirements and associated costs, the potential for more frequent and severe weather events, and water availability challenges that may impact our facilities and those of our suppliers. We cannot provide assurance that physical risks to our facilities or supply chain due to climate change will not occur in the future. We periodically review our vulnerability to potential weather-related risks and other natural disasters and update our assessments accordingly. Based on our reviews, we do not believe these potential risks are material to our operations at this time.

## HUMAN CAPITAL

Our purpose is: *Breakthroughs that change patients' lives.* These breakthroughs are delivered through the relentless collaboration of our talented workforce. As of December 31, 2021, we employed approximately 79,000 people worldwide, with approximately 29,000 based in the U.S. Women compose approximately 49% of our global workforce, and approximately 34% of our U.S.-based employees are individuals with ethnically diverse backgrounds.

Our continued success links directly to the commitment, engagement and performance of our employees. It is important that we not only attract and retain the best and brightest diverse talent, but also ensure they remain engaged and can thrive in an environment that is committed to helping them grow, succeed and contribute directly to achieving our purpose. As part of these efforts, we strive for an inclusive and empowering work environment, adopting practices to simplify processes and remove needless complexity, rewarding both performance and leadership skills,

fostering career growth and internal mobility and offering competitive compensation and benefits programs that encourage mental and physical well being.

*Core Values.* To fully realize Pfizer's purpose we have established a clear set of goals regarding what we need to achieve for patients and how we will go about achieving them. The "how" is represented by four simple, powerful company values – *Courage*, *Excellence*, *Equity* and *Joy*. Each value defines our company and our culture:

• *Courage*: Breakthroughs start by challenging convention – especially in the face of uncertainty or adversity. This happens when we think big, speak up and are decisive.

• *Excellence*: We can only change patients' lives when we perform at our best together. This happens when we focus on what matters, agree who does what and measure outcomes.

• *Equity*: Every person deserves to be seen, heard and cared for. This happens when we are inclusive, act with integrity and reduce health care disparities.

• *Joy*: We give ourselves to our work, and it also gives to us. We find joy when we take pride, recognize one another and have fun.

*Diversity, Equity and Inclusion.* At Pfizer, every person deserves to be seen, heard and cared for, and we work to further this goal by bringing together people with different backgrounds, perspectives and experiences. Our commitments to equity consist of specific actions to help foster a more inclusive environment within Pfizer, including, among others: (i) building a more inclusive colleague experience through representation and meaningful connections; (ii) advancing equitable health outcomes by evaluating our work through the lens of the communities we serve, (iii) providing resources on allyship and the science behind inclusion to support all colleagues in having courageous conversations about equity, race and the avoidance of bias; (iv) working to help transform society with external diversity, equity and inclusion partnerships, including deploying capital, engaging diverse suppliers and amplifying equity initiatives; and (v) working to help ensure demographics of clinical trials correlate to those of the countries where trials are taking place.

*Colleague Engagement.* To attract, develop and inspire the brightest talent, we aim to support our colleagues by engaging and partnering with them to help ensure they feel they are part of a community. We understand the importance of continuously listening and responding to colleague feedback and our annual engagement survey, Pfizer Pulse, provides a forum for our colleagues to give structured feedback about their colleague experience. Through this survey, we measure and track key areas of the overall colleague experience and equip leaders with actionable insights for discussion and follow up. Regular topics in the survey include: (i) employee engagement, such as colleagues' commitment to and advocacy for Pfizer; (ii) purpose, including how colleagues' work connects with our purpose; (iii) inclusion, such as having a climate in which diverse perspectives are valued; and (iv) growth, including the ability for colleagues to gain new experiences that align with their individual career goals.

In 2021, we continued to maintain low turnover rates relative to the pharmaceutical industry and in our 2021 Pfizer Pulse survey, on average, 90% of colleagues reported feeling engaged, as measured by pride in working at Pfizer, willingness to recommend Pfizer as a great place to work and intent to stay. In addition, 92% of the colleagues agreed that their daily work contributes to our purpose. While we are slightly behind in our Bold Moves goal to create room for meaningful work, we continue to make progress on simplifying processes and removing needless complexity. We have committed to tangible actions and principles that incorporate the similar behaviors and mindset we used to develop a COVID-19 vaccine in an accelerated timeline. These behaviors include working with urgency and overcoming bureaucracy, as well as believing in our purpose, trusting in one another and being transparent.

*Performance, Leadership and Growth.* We are committed to helping our colleagues reach their full potential by rewarding both their performance and leadership skills and by providing opportunities for growth and development. Our performance management approach—called Performance and Leadership Insights—is based on six-month semesters during which our colleagues and their managers set goals, receive feedback and meet to discuss performance. These conversations are meant to help colleagues grow and develop by evaluating performance (what the colleague achieved, measured by outcomes), leadership (how they achieved it, taking into account Pfizer's values of courage, excellence, equity and joy), and identifying areas of growth that help move colleagues towards fulfilling their career goals and their potential. Our commitments to colleague development consist of specific actions to encourage non-linear career growth paths for all colleagues, including (i) a common language around growth—along with a guiding framework—to help colleagues identify their next best growth experience, (ii) tools and resources to encourage growth conversations and offer transparency on the sources of growth available, and (iii) a variety of programs including mentoring, job rotations, experiential project roles, skill-based volunteering and learning resources focused on various topics, including leadership and management skills and industry- and job-specific learning, as well as general business, manufacturing, finance and technology skills.

*Health, Safety and Well-Being.* Protecting the health, safety and well-being of colleagues and contingent workers, all of whom are essential to delivering our business objectives, is an integral part of how we operate. Our Global Environment, Health & Safety (EHS) Policy and supporting standards outline our approach to assessment, evaluation, elimination, and mitigation of EHS risks across our operations. COVID-19 pandemic preparedness and response continues to be a key focus to help ensure on-site workers at our commercial, manufacturing and research sites remain safe and healthy while continuing to support work from home arrangements for colleagues who can work remotely. As part of these efforts, we (i) implemented a vaccination program for colleagues and their families in the U.S. and 23 other countries where employer vaccination programs were possible, (ii) partnered with and launched Thrive Global, a wellness and organizational change initiative with a primary focus on colleague mental health and wellness, and (iii) hosted educational webinars and information sessions on mental health and well-being, nutrition and work life balance through our employee assistance program provider.

*Pay Equity.* Our commitment to pay equity for all colleagues is based in our value of *Equity* and our intention to continue to build a diverse and inclusive workforce. We are committed to equitable pay practices at Pfizer for employees based on role, education, experience, performance, and location and we conduct and report publicly on pay equity on an annual basis.

Additional information regarding our human capital programs and initiatives is available in the "About—Careers" section of Pfizer's website and our ESG Report.

## ITEM 1A.        RISK FACTORS

*This section describes the material risks to our business, which should be considered carefully in addition to the other information in this report and our other filings with the SEC. Investors should be aware that it is not possible to predict or identify all such factors and that the following is*

*not meant to be a complete discussion of all potential risks or uncertainties. Additionally, our business is subject to general risks applicable to any company, such as economic conditions, geopolitical events, extreme weather and natural disasters. If known or unknown risks or uncertainties materialize, our business operations, financial condition, operating results (including components of our financial results), cash flows, prospects, reputation or credit ratings could be adversely affected now and in the future, potentially in a material way. The following discussion of risk factors contains forward-looking statements, as discussed in the Forward-Looking Information and Factors that May Affect Future Results section in this Form 10-K.*

## RISKS RELATED TO OUR BUSINESS, INDUSTRY AND OPERATIONS:

### MANAGED CARE TRENDS

Private payers, such as health plans, and other managed care entities, such as PBMs, continue to take action to manage the utilization and costs of drugs. The negotiating power of MCOs and other private third-party payers has increased due to consolidation, and they, along with governments, increasingly employ formularies to control costs and encourage utilization of certain drugs, including through the use of formulary inclusion or favorable formulary placement. These initiatives have increased consumers' interest and input in medication choices, as they pay for a larger portion of their prescription costs and may cause them to favor lower-cost generic alternatives. We may fail to obtain or maintain timely or adequate pricing or formulary placement of our products, or fail to obtain such formulary placement at favorable pricing.

The growing availability and use of innovative specialty pharmaceutical medicines that treat rare or life-threatening conditions, which typically have smaller patient populations, combined with their relative higher cost as compared to other types of pharmaceutical products, also has generated increased payer interest in developing cost-containment strategies targeted to this sector.

Third-party payers also use additional measures such as new-to-market blocks, exclusion lists, indication-based pricing and value-based pricing/contracting to improve their cost containment efforts. Such payers are also increasingly imposing utilization management tools, such as clinical protocols, requiring prior authorization for a branded product if a generic product is available or requiring the patient to first fail on one or more generic products before permitting access to a branded medicine. As the U.S. private third-party payer market consolidates further and as more drugs become available in generic form, we may face greater pricing pressure from private third-party payers as they continue to drive more of their patients to use lower cost generic alternatives.

Also, business arrangements in this area are subject to a high degree of government scrutiny, and available safe harbors under applicable federal and state fraud and abuse laws are subject to change through legislative and regulatory action, as well as evolving judicial interpretations. Our approach to these arrangements may also be informed by such government and industry guidance.

### COMPETITIVE PRODUCTS

Competitive product launches may erode future sales of our products, including our existing products and those currently under development, or result in unanticipated product obsolescence. Such launches continue to occur, and potentially competitive products are in various stages of development. We cannot predict with accuracy the timing or impact of the introduction of competitive products that treat diseases and conditions like those treated by our in-line products and product candidates.

In addition, competition from manufacturers of generic drugs, including from generic versions of competitors' branded products that lose their market exclusivity, is a major challenge for our branded products. Certain of our products have experienced significant generic competition over the last few years. For additional information, see the *Item 1. Business—Patents and Other Intellectual Property Rights* section in this Form 10-K. In China, we expect to continue to face intense competition by certain generic manufacturers, which may result in price cuts and volume loss of some of our products.

In addition, our patented products may face generic competition before patent exclusivity expires, including upon the "at-risk" launch (despite pending patent infringement litigation against the generic product) by a manufacturer of a generic version of one of our patented products. Generic manufacturers have filed applications with the FDA seeking approval of product candidates that they claim do not infringe our patents or claim that our patents are not valid; these include candidates that would compete with, among other products, Ibrance and Xeljanz. Our licensing and collaboration partners also face challenges by generic drug manufacturers to patents covering products for which we have licenses or co-promotion rights.

We may become subject to competition from biosimilars referencing our biologic products if competitors are able to obtain marketing approval for such biosimilars.

We also commercialize biosimilar products that compete with products of others, including other biosimilar products. The entry to the market of competing biosimilars is expected to increase pricing pressures on our biosimilar products. Uptake of our biosimilars may be lower due to various factors, such as anti-competitive practices, access challenges where our product may not receive appropriate coverage/reimbursement access or remains in a disadvantaged position relative to an innovator product, physician reluctance to prescribe biosimilars for existing patients taking the innovative product, or misaligned financial incentives.

For additional information on competition our products face, see the *Item 1. Business—Competition* section in this Form 10-K.

### CONCENTRATION

We recorded direct product and/or Alliance revenues of more than $1 billion for each of nine products that collectively accounted for 75% of our total revenues in 2021. In particular, Comirnaty/BNT162b2 accounted for 45% of our total revenues in 2021. For additional information, see *Notes 1* and *17*. If these products or any of our other major products were to experience loss of patent protection (if applicable), changes in prescription or vaccination growth rates, material product liability litigation, unexpected side effects or safety concerns, regulatory proceedings, negative publicity affecting doctor or patient confidence, pressure from existing competitive products, changes in labeling, pricing and access pressures or supply shortages or if a new, more effective product should be introduced, the adverse impact on our revenues could be significant. In particular, certain of our products have experienced patent-based expirations or loss of regulatory exclusivity in certain markets in the last few years, and patents covering a number of our best-selling products are, or have been, the subject of pending legal challenges. For additional information on our patents, see the *Item 1. Business—Patents and Other Intellectual Property Rights* section in this Form 10-K. For Comirnaty/BNT162b2 and

Paxlovid, while we believe that these products have the potential to provide ongoing revenue streams for Pfizer for the foreseeable future, revenues of these products following the COVID-19 pandemic are not at the similar levels as those being generated during the pandemic. For information on additional risks associated with Comirnaty/BNT162b2 and Paxlovid, see the *COVID-19 Pandemic* section below.

In addition, we sell our prescription pharmaceutical products principally through wholesalers in the U.S. For additional information, see *Note 17C*. If one of our significant biopharmaceutical wholesalers should encounter financial or other difficulties, it might decrease the amount of business the wholesaler does with us and/or we might be unable to timely collect all the amounts that the wholesaler owes us or at all, which could negatively impact our results of operations. In addition, we expect that consolidation and integration of pharmacy chains and wholesalers will increase competitive and pricing pressures on pharmaceutical manufacturers, including us.

## RESEARCH AND DEVELOPMENT

The discovery and development of new products, as well as the development of additional uses for existing products, are necessary for the continued strength of our business. Our product lines must be replenished over time to offset revenue losses when products lose exclusivity or market share, as well as to provide for earnings growth, primarily through internal R&D or through collaborations, acquisitions, JVs, licensing or other arrangements. Growth depends in large part on our ability to identify and develop new products or new indications for existing products that address unmet medical needs and receive reimbursement from payers. However, balancing current growth, investment for future growth and the delivery of shareholder return remains a major challenge. The costs of product development continue to be high, as are regulatory requirements in many therapeutic areas, which may affect the number of candidates we are able to fund as well as the sustainability of the R&D portfolio. Decisions made early in the development process of a drug or vaccine candidate can have a substantial impact on the marketing strategy and payer reimbursement possibilities if the candidate receives regulatory approval. We try to plan clinical trials prudently and to reasonably anticipate and address challenges, but there is no assurance that an optimal balance between trial conduct, speed and desired outcome will be achieved.

Additionally, our product candidates can fail at any stage of the R&D process, and may not receive regulatory approval even after many years of R&D. We may fail to correctly identify indications for which our science is promising or allocate R&D investment resources efficiently, and failure to invest in the right technology platforms, therapeutic areas, product classes, geographic markets and/or licensing opportunities could adversely impact the productivity of our pipeline. Further, even if we identify areas with the greatest commercial potential, the scientific approach may not succeed despite the significant investment required for R&D, and the product may not be as competitive as expected because of the highly dynamic market environment and the hurdles in terms of access and reimbursement. For example, our gene therapy product candidates are based on a novel technology with only a few gene therapies approved to date, which makes it difficult to predict the time and cost of development and the ability to obtain regulatory approval. Further, gene therapy may face difficulties in gaining the acceptance of patients or the medical community.

## GLOBAL OPERATIONS

We operate on a global scale and could be affected by currency fluctuations, capital and exchange controls, global economic conditions including inflation, expropriation and other restrictive government actions, changes in intellectual property legal protections and remedies, trade regulations, tax laws and regulations and procedures and actions affecting approval, production, pricing, and marketing of, reimbursement for and access to our products, as well as impacts of political or civil unrest or military action, including the current conflict between Russia and Ukraine, terrorist activity, unstable governments and legal systems, inter-governmental disputes, public health outbreaks, epidemics, pandemics, natural disasters or disruptions related to climate change.

Some emerging market countries may be particularly vulnerable to periods of financial or political instability or significant currency fluctuations or may have limited resources for healthcare spending. As a result of these and other factors, our strategy to grow in emerging markets may not be successful, and growth rates in these markets may not be sustainable.

Government financing and economic pressures can lead to negative pricing pressure in various markets where governments take an active role in setting prices, access criteria (e.g., through health technology assessments) or other means of cost control. For additional information on government pricing pressures, see the *Item 1. Business—Government Regulation and Price Constraints* section in this Form 10-K.

We continue to monitor the global trade environment and potential trade conflicts and impediments that could impact our business. If trade restrictions or tariffs reduce global economic activity, potential impacts could include declining sales; increased costs; volatility in foreign exchange rates; a decline in the value of our financial assets and pension plan investments; required increases of our pension funding obligations; increased government cost control efforts; delays or failures in the performance of customers, suppliers and other third parties on whom we may depend for the performance of our business; and the risk that our allowance for doubtful accounts may not be adequate.

We operate in many countries and transact in over 100 different currencies. Changes in the value of those currencies relative to the U.S. dollar, or high inflation in these countries, can impact our revenues, costs and expenses and our financial guidance. Significant portions of our revenues, costs and expenses, as well as our substantial international net assets, are exposed to exchange rate changes. 63% of our total 2021 revenues were derived from international operations, including 29% from Europe and 19% from China, Japan and the rest of Asia. Future changes in exchange rates or economic conditions and the impact they may have on our results of operations, financial condition or business are difficult to predict. For additional information about our exposure to foreign currency risk, see the *Analysis of Financial Condition, Liquidity, Capital Resources and Market Risk* section within MD&A.

In addition, our borrowing, pension benefit and postretirement benefit obligations and interest-bearing investments, are subject to risk from changes in interest and exchange rates. The risks related to interest-bearing investments and borrowings and the measures we have taken to help contain them are discussed in the *Analysis of Financial Condition, Liquidity, Capital Resources and Market Risk* section within MD&A and *Note 7E*. For additional details on critical accounting estimates and assumptions for our benefit plans, see the *Significant Accounting Policies and Application of Critical Accounting Estimates and Assumptions—Benefit Plans* section within MD&A and *Note 11*.

From time to time, we issued variable rate debt based on LIBOR, or undertook interest rate swaps that contain a variable element based on LIBOR. The U.K. Financial Conduct Authority announced in 2017 that it will no longer compel banks to submit rates used to calculate LIBOR after 2021. This deadline was extended until June 2023 for a number of key U.S. dollar benchmark maturities (including the 1-month and 3-month

LIBOR rates). The U.S. Federal Reserve has selected the Secured Overnight Funding Rate (SOFR) as the preferred alternate rate and the transition away from LIBOR will continue despite the extended timeline. We are planning for this transition and will amend any contracts to accommodate the SOFR rate where required. We do not expect the transition to have significant impact on our business or financial condition.

## PRODUCT MANUFACTURING, SALES AND MARKETING RISKS

We could encounter difficulties or delays in our supply chain, product manufacturing and distribution networks, as well as sales or marketing, due to regulatory actions, shut-downs, work stoppages or strikes, approval delays, withdrawals, recalls, penalties, supply disruptions, shortages or stock-outs at our facilities or third-party facilities that we rely on, reputational harm, the impact to our facilities due to health pandemics or natural or man-made disasters, including as a result of climate change, product liability or unanticipated costs. Examples of such difficulties or delays include the inability to increase production capacity commensurate with demand; challenges related to component materials to maintain supply and/or appropriate quality standards throughout our supply network and/or comply with applicable regulations; inability to supply certain products due to voluntary product recalls (as is the case with Chantix); and supply chain disruptions at our facilities or at a supplier or vendor. In addition, we engage contract manufacturers, and, from time to time, our contract manufacturers may face difficulties or are unable to manufacture our products at the necessary quantity or quality levels.

Regulatory agencies periodically inspect our manufacturing facilities, as well as third-party facilities that we rely on, to evaluate compliance with cGMP or other applicable requirements. Failure to comply with these requirements may subject us to possible legal or regulatory actions, such as warning letters, suspension of manufacturing, seizure of product, injunctions, debarment, product recalls, delays or denials of product approvals, import bans or denials of import certifications.

In July and August 2021, Pfizer recalled 16 lots of Chantix in the U.S. due to the presence of a nitrosamine, N-nitroso-varenicline, at or above the FDA interim acceptable intake limit. In September 2021, Pfizer expanded its voluntary recall in the U.S. to include all lots of Chantix. We currently also have a voluntary recall across multiple markets and a global pause in shipments of Chantix. Technical solutions are being pursued to reduce nitrosamine levels in Chantix to enable return to market. Nitrosamines are impurities common in water and foods and everyone is exposed to some level of nitrosamines. In response to requests from various regulatory authorities, manufacturers across the pharmaceutical industry, including Pfizer, are evaluating their product portfolios for the potential for the presence or formation of nitrosamines. This may lead to additional recalls or other market actions for Pfizer products.

## COLLABORATIONS AND OTHER RELATIONSHIPS WITH THIRD PARTIES

We depend on third-party collaborators, service providers, and others in the research, development, manufacturing and commercialization of our products and product candidates and also enter into JVs and other business development transactions. To achieve expected longer-term benefits, we may make substantial upfront payments as part of these transactions, which may negatively impact our reported earnings or cash flows. We rely heavily on these parties for multiple aspects of our drug development, manufacturing and commercialization activities, but we do not control many aspects of those activities. We also outsource certain services, including activities related to transaction processing, accounting, information technology, manufacturing, clinical trial recruitment and execution, clinical lab services, non-clinical research, safety services, integrated facilities management and other areas. Failure by one or more of the third-party collaborators, service providers and others to complete activities on schedule or in accordance with our expectations or to meet their contractual or other obligations to us; failure of one or more of these parties to comply with applicable laws or regulations; or any disruption in the relationships between us and these parties, could delay or prevent the development, approval, manufacturing or commercialization of our products and product candidates, expose us to suboptimal quality of service delivery or deliverables, result in repercussions such as missed deadlines or other timeliness issues, erroneous data and supply disruptions, and could also result in non-compliance with legal or regulatory requirements or industry standards or subject us to reputational harm, all with potential negative implications for our product pipeline and business. Further, our Alliance revenues will be adversely affected by the termination or expiration of collaboration and co-promotion agreements that we have entered into and that we may enter into from time to time. For information on additional risks specific to our Consumer Healthcare JV, see the *Consumer Healthcare JV with GSK* section below.

## COUNTERFEIT PRODUCTS

Our reputation and promising pipeline render our medicines and vaccines prime targets for counterfeiters. Counterfeit medicines and vaccines pose a significant risk to patient health and safety because of the conditions under which they are manufactured—often in unregulated, unlicensed, uninspected and unsanitary sites—as well as the lack of regulation of their contents. Failure to mitigate this threat could adversely impact Pfizer's patients, potentially causing them harm. This, in turn, may result in the loss of patient confidence in the Pfizer name and in the integrity of our medicines and vaccines, and potentially impact our business through lost sales, product recalls, and possible litigation.

The prevalence of counterfeit medicines is an industry-wide issue due to a variety of factors, including the adoption of e-commerce, which increased during the COVID-19 pandemic, greatly enhancing consumers' ability to obtain prescriptions and other medical treatments via the internet in lieu of traditional brick and mortar pharmacies or authorized full-service internet pharmacies. The internet exposes patients to greater risk as it is a preferred vehicle for dangerous counterfeit offers and scams because of consumers' misplaced trust with certain e-commerce retailers coupled with the anonymity the internet affords counterfeiters. While counterfeiters generally target any medicine or vaccine boasting strong demand, we have observed heightened counterfeit and fraud attempts to our COVID-19 vaccine, as well as other products potentially utilized in the treatment of COVID-19.

We consistently invest in an enterprise-wide strategy to aggressively combat counterfeit threats by educating patients and health care providers about the risks, investing in innovative technologies to detect and disrupt sophisticated internet offers and scams, proactively monitoring and interdicting supply with the help of law enforcement; and advising legislators and regulators. However, our efforts and those of others may not be entirely successful, and the presence of counterfeit medicines may continue to increase.

## RISKS RELATED TO GOVERNMENT REGULATION AND LEGAL PROCEEDINGS:

### PRICING AND REIMBURSEMENT

U.S. and international governmental regulations that mandate price controls or limitations on patient access to our products or establish prices paid by government entities or programs for our products impact our business, and our future results could be adversely affected by changes in such regulations or policies. The adoption of restrictive price controls in new jurisdictions, more restrictive controls in existing jurisdictions or the failure to obtain or maintain timely or adequate pricing could also adversely impact revenue. We expect pricing pressures will continue globally.

In the U.S., pharmaceutical product pricing is subject to government and public scrutiny and calls for reform, and many of our products are subject to increasing pricing pressures as a result. We expect to see continued focus by the Federal government on regulating pricing which could result in legislative and regulatory changes designed to control costs. Some states have implemented, and others are considering, patient access constraints or cost cutting under the Medicaid program, and some are considering measures that would apply to broader segments of their populations that are not Medicaid-eligible. State legislatures also have continued to focus on addressing drug costs, generally by increasing price transparency or limiting drug price increases. Measures to regulate prices or payment for pharmaceutical products, including legislation on drug importation, could adversely affect our business. For additional information on U.S. pricing and reimbursement, see the *Item 1. Business—Government Regulation and Price Constraints* section in this Form 10-K.

We encounter similar regulatory and legislative issues in most other countries in which we operate. In certain markets, such as in EU member states, the U.K., Japan, China, Canada and South Korea, governments have significant power as large single payers to regulate prices, access criteria, or impose other means of cost control, particularly as a result of recent global financing pressures. For example, the QCE and VBP tender process in China has resulted in dramatic price cuts for off-patent medicines. For additional information regarding these government initiatives, see the *Item 1. Business—Government Regulation and Price Constraints* section in this Form 10-K. We anticipate that these and similar initiatives will continue to increase pricing pressures in China and elsewhere in the future. In addition, in many countries, with respect to our vaccines, we participate in a tender process for selection in national immunization programs. Failure to secure participation in national immunization programs or to obtain acceptable pricing in the tender process could adversely affect our business. We also anticipate pricing pressures will be amplified by COVID-19 induced budget deficits and focus on pricing for COVID-19 treatments and vaccines.

### U.S. HEALTHCARE REGULATION

The U.S. healthcare industry is highly regulated and subject to frequent and substantial changes. Any significant efforts at the U.S. federal or state levels to reform the healthcare system by changing the way healthcare is provided or funded could have a material impact on us. For additional information on U.S. healthcare regulation, see the *Item 1. Business—Government Regulation and Price Constraints* section in this Form 10-K.

Other U.S. federal or state legislative or regulatory action and/or policy efforts could adversely affect our business, including, among others, general budget control actions, changes in patent laws, the importation of prescription drugs to the U.S. at prices that are regulated by foreign governments, revisions to reimbursement of biopharmaceuticals under government programs that could reference international prices or require new discounts, limitations on interactions with healthcare professionals and other industry stakeholders, or the use of comparative effectiveness methodologies that could be implemented in a manner that focuses primarily on cost differences and minimizes the therapeutic differences among pharmaceutical products and restricts access to innovative medicines.

A reduction of U.S. federal spending on entitlement programs, including Medicare and Medicaid, may affect payment for our products or services provided using our products. Any other significant spending reductions or cost controls affecting Medicare, Medicaid or other publicly funded or subsidized health programs that may be implemented could have an adverse impact on our results of operations.

### DEVELOPMENT, REGULATORY APPROVAL AND MARKETING OF PRODUCTS

The discovery and development of drugs, vaccines and biological products are time consuming, costly and unpredictable. The outcome is inherently uncertain and involves a high degree of risk due to the following factors, among others:

- The process from early discovery to design and adequate implementation of clinical trials to regulatory approval can take many years.

- Product candidates can and do fail at any stage of the process, including as the result of unfavorable pre-clinical and clinical trial results, or unfavorable new pre-clinical or clinical data and further analyses of existing pre-clinical or clinical data, including results that may not support further clinical development of the product candidate or indication.

- We may need to amend our clinical trial protocols or conduct additional clinical trials under certain circumstances, for example, to further assess appropriate dosage or collect additional safety data.

- We may not be able to meet anticipated pre-clinical or clinical endpoints, commencement and/or completion dates for our pre-clinical or clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates.

- We may not be able to successfully address all the comments received from regulatory authorities such as the FDA and the EMA, or be able to obtain approval for new products and indications from regulators.

Regulatory approvals of our products depend on myriad factors, including regulatory determinations as to the product's safety and efficacy. In the context of public health emergencies like the COVID-19 pandemic, regulators evaluate various factors and criteria to potentially allow for marketing authorization on an emergency or conditional basis. Additionally, clinical trial and other product data are subject to differing interpretations and assessments by regulatory authorities. As a result of regulatory interpretations and assessments or other developments that occur during the review process, and even after a product is authorized or approved for marketing, a product's commercial potential could be adversely affected by potential emerging concerns or regulatory decisions regarding or impacting labeling or marketing, manufacturing processes, safety and/or other matters, including decisions relating to emerging developments regarding potential product impurities.

We may not be able to receive or maintain favorable recommendations by technical or advisory committees, such as the ACIP or any FDA Advisory Committee that may be convened to review our applications such as EUAs, NDAs or BLAs, which may impact the potential marketing and use of our products. Further, claims and concerns that may arise regarding the safety and efficacy of in-line products and product candidates can negatively impact product sales, and potentially lead to product recalls or withdrawals, including regulator-directed risk evaluations and

assessments, and/or consumer fraud, product liability and other litigation and claims. Further regulatory agency requirements may result in a more challenging, expensive and lengthy regulatory approval process than anticipated due to requests for, among other things, additional or more extensive clinical trials prior to granting approval, or increased post-approval requirements. For these and other reasons discussed in this Risk Factors section, we may not obtain the approvals we expect within the timeframe we anticipate, or at all.

## POST-AUTHORIZATION/APPROVAL DATA

As a condition to granting marketing authorization or approval of a product, the FDA may require additional clinical trials or other studies. The results generated in these trials could result in the loss of marketing approval, changes in labeling, and/or new or increased concerns about the side effects, efficacy or safety. Regulatory agencies in countries outside the U.S. often have similar regulations and may impose comparable requirements. Post-marketing studies and clinical trials, whether conducted by us or by others, whether mandated by regulatory agencies or conducted voluntarily, and other emerging data about products, such as adverse event reports, may also adversely affect the availability or commercial potential of our products. Further, if safety or efficacy concerns are raised about a product in the same class as one of our products, those concerns could implicate the entire class; and this, in turn, could have an adverse impact on the availability or commercial viability of our product(s) as well as other products in the class. The potential regulatory and commercial implications of post-marketing study results typically cannot immediately be determined. For example, in December 2021, in light of the results from the completed required postmarketing safety study of Xeljanz, ORAL Surveillance (A3921133), the U.S. label for Xeljanz was revised. Updates include a new boxed warning for major adverse cardiovascular events (MACE) and updated boxed warnings regarding mortality, malignancies and thrombosis (with corresponding updates to applicable warnings and precautions). In addition, indications for the treatment of adults with moderately to severely active RA or active PsA, and patients who are two years of age and older with active polyarticular course juvenile idiopathic arthritis have been revised; Xeljanz is now indicated in patients who have had inadequate response or intolerance to one or more tumor necrosis factor blockers. In addition, at the request of the EC, the PRAC of the EMA has adopted a referral procedure under Article 20 of Regulation (EC) No 726/2004 to assess safety information relating to oral JAK inhibitors authorized for inflammatory diseases, including Xeljanz and Cibinqo, which is ongoing. We continue to work with regulatory agencies to review the full results and analyses of ORAL Surveillance and their impact on product labeling.

The terms of our EUA for Comirnaty require that we conduct post-authorization observational studies in patients at least 5 years of age or older who received a booster dose, or other populations of interest including healthcare workers, pregnant women, immunocompromised individuals, and subpopulations with specific comorbidities. Additionally, in relation to the FDA approval for Comirnaty, we are required to complete certain postmarketing study requirements and commitments by 2024 as identified in the August 2021 approval letter. The terms of our EUA for Paxlovid require monitoring for convergence of global viral variants of SARS-CoV-2 and potential assessment of Paxlovid activity against identified global variants of interest. Additionally, in relation to the potential FDA approval for Paxlovid, we are required to complete certain other analyses and studies as identified in the December 2021 authorization letter.

## LEGAL MATTERS

We are and may be involved in various legal proceedings, including patent litigation, product liability and other product-related litigation, including personal injury, consumer, off-label promotion, securities, antitrust and breach of contract claims, commercial and other asserted and unasserted matters, environmental, government investigations, employment, tax litigation and other legal proceedings that arise from time to time in the ordinary course of our business. Litigation is inherently unpredictable, and excessive verdicts do occur. Although we believe that our claims and defenses in matters in which we are a defendant are substantial, we could in the future incur judgments, enter into settlements or revise our expectations regarding the outcome of certain matters, and such developments could have a material adverse effect on our results of operations.

Claims against our patents include challenges to the coverage and/or validity of our patents on various products or processes. There can be no assurance as to the outcome of these matters, and a loss in any of these cases could result in a loss of patent protection for the product at issue, which could lead to a significant loss of sales of that product and could materially affect future results of operations.

Government investigations and actions could result in substantial fines and/or criminal charges and civil penalties, limitations on our ability to conduct business in applicable jurisdictions, corporate integrity or deferred prosecution agreements and other disciplinary actions, as well as reputational harm, including as a result of increased public interest in the matter. In addition, in a qui tam lawsuit in which the government declines to intervene, the relator may still pursue a suit for the recovery of civil damages and penalties on behalf of the government.

Our sales and marketing activities and the pricing of our products are subject to extensive regulation under the FFDCA, the Medicaid Drug Rebate Program, the FCPA and other federal and state statutes, including those discussed elsewhere in this Form 10-K, as well as the Anti-Kickback Statute, anti-bribery laws, the False Claims Act, and similar laws in international jurisdictions. In addition to the potential for changes to relevant laws, the compliance and enforcement landscape is informed by government litigation, settlement precedent, advisory opinions, and special fraud alerts. Our approach to certain practices may evolve over time in light of these types of developments. Requirements or industry standards in the U.S. and certain jurisdictions abroad require pharmaceutical manufacturers to track and disclose financial interactions with healthcare professionals and healthcare providers and can increase government and public scrutiny of such financial interactions. If an interaction is found to be improper, government enforcement actions and penalties could result. Like many companies in our industry, we have from time-to-time received, and may receive in the future, inquiries and subpoenas and other types of information demands from government authorities. In addition, we have been subject to claims and other actions related to our business activities, brought by governmental authorities, as well as consumers and private payers. In some instances, we have incurred significant expense, civil payments, fines and other adverse consequences as a result of these claims, actions and inquiries. Such claims, actions and inquiries may relate to alleged non-compliance with laws and regulations associated with the dissemination of product (approved and unapproved) information, potentially resulting in government enforcement action and reputational damage. This risk may be heightened by digital marketing, including social media, mobile applications and blogger outreach.

In connection with the resolution of a U.S. government investigation concerning independent copay assistance organizations that provide financial assistance to Medicare patients, in 2018, we entered into a Corporate Integrity Agreement (CIA) with the Office of the Inspector General of the U.S. Department of Health and Human Services, which is effective for a period of five years. In the CIA, we agreed to implement and/or maintain certain compliance program elements to promote compliance with federal healthcare program requirements. Breaches of the CIA could result in severe sanctions against us.

We and certain of our subsidiaries are also subject to numerous contingencies arising in the ordinary course of business relating to legal claims and proceedings, including environmental contingencies. Amounts recorded for legal and environmental contingencies can result from a complex series of judgments about future events and uncertainties and can rely heavily on estimates and assumptions. While we have accrued for worldwide legal liabilities, no guarantee exists that additional costs will not be incurred beyond the amounts accrued.

For additional information, including information regarding certain legal proceedings in which we are involved in, see *Note 16A*.

## RISKS RELATED TO INTELLECTUAL PROPERTY, TECHNOLOGY AND SECURITY:

### INTELLECTUAL PROPERTY PROTECTION

Our success largely depends on our ability to market technologically competitive products. We rely and expect to continue to rely on a combination of intellectual property, including patent, trademark, trade dress, copyright, trade secret and domain name protection laws, as well as confidentiality and license agreements, to protect our intellectual property and proprietary rights. If we fail to obtain and maintain adequate intellectual property protection, we may not be able to prevent third parties from launching generic or biosimilar versions of our branded products, from using our proprietary technologies or from marketing products that are very similar or identical to ours. Our currently pending or future patent applications may not result in issued patents or be granted on a timely basis. Similarly, any term extensions that we seek may not be granted on a timely basis, if at all. For example, in May 2021, the Brazilian Supreme Court voted to invalidate Article 40 of Brazil's Patent Law, which guaranteed a minimum 10-year patent term from patent grant, and to give retroactive effect to such decision. In addition, our issued patents may not contain claims sufficiently broad to protect us against claims regarding validity, enforceability, scope and effective term made by parties with similar technologies or products or provide us with any competitive advantage, including exclusivity in a particular product area.

Further, legal or regulatory action by various stakeholders or governments could potentially result in us not seeking intellectual property protection for or agreeing not to enforce or being restricted from enforcing intellectual property related to our products. Discussions are ongoing at the WTO regarding the role of intellectual property in the context of the COVID-19 pandemic response. This includes a proposal that would release WTO members from their obligation under WTO-TRIPS to grant and enforce various types of intellectual property protection on health products and technology in relation to the prevention, containment or treatment of COVID-19. In May 2021 and again in November 2021, the Biden Administration called on countries to waive intellectual property protections on COVID-19 vaccines.

The scope of our patent claims also may vary between countries, as individual countries have distinct patent laws, and our ability to enforce our patents depends on the laws of each country, its enforcement practices, and the extent to which certain countries engage in policies or practices that weaken a country's intellectual property framework (e.g., laws or regulations that promote or provide broad discretion to issue a compulsory license). In countries that provide some form of regulatory exclusivity, mechanisms exist permitting some form of challenge to our patents by competitors or generic drug marketers prior to or immediately following the expiration of such regulatory exclusivity, and generic companies are employing aggressive strategies, such as "at risk" launches that challenge our patent rights. Most of the suits involve claims by generic drug manufacturers that patents covering our products, uses, processes or dosage forms are invalid and/or do not cover the product of the generic or biosimilar drug manufacturer. Independent actions have been filed alleging that our assertions of, or attempts to enforce, patent rights with respect to certain products constitute unfair competition and/or violations of antitrust laws. Such claims may also be brought as counterclaims to actions we bring to enforce our patents. We are also party to other patent damages suits in various jurisdictions pursuant to which generic drug manufacturers, payers, governments or other parties are seeking damages from us for alleged delay of generic entry. We also are often involved in other proceedings, such as inter partes review, post-grant review, re-examination or opposition proceedings, before the U.S. Patent and Trademark Office, the European Patent Office, or other foreign counterparts relating to our intellectual property or the intellectual property rights of others. Also, if one of our patents or a competitors' patents is found to be invalid in such proceedings, generic or biosimilar products could be introduced into the market resulting in the erosion of sales of our existing products. For additional information, including information regarding certain legal proceedings in which we are involved, see *Note 16A1*. Further, if we are unable to maintain our existing license agreements or other agreements pursuant to which third parties grant us rights to intellectual property, our operating results and financial condition could be adversely affected.

We currently hold trademark registrations and have trademark applications pending in many jurisdictions, any of which may be the subject of a governmental or third-party objection, which could prevent the maintenance or issuance of the trademark. As our products mature, our reliance on our trademarks and trade dress to differentiate us from our competitors increases and, as a result, our business could be adversely affected if we are unable to prevent third parties from adopting, registering or using trademarks and trade dress that infringe, dilute or otherwise violate our rights. We seek to protect our proprietary information, including our trade secrets and proprietary know-how, by requiring our employees, consultants, other advisors and other third parties to execute proprietary information and confidentiality agreements upon the commencement of their relationship with us. Despite these efforts and precautions, we may be unable to prevent a third-party from copying or otherwise obtaining and using our trade secrets or our other intellectual property without authorization, and legal remedies may not adequately compensate us for the damages caused by such unauthorized use. Further, others may independently and lawfully develop substantially similar or identical products that circumvent our intellectual property by means of alternative designs or processes or otherwise.

### THIRD-PARTY INTELLECTUAL PROPERTY CLAIMS

A properly functioning intellectual property regime is essential to our business model. We are committed to respecting the valid intellectual property rights of other companies, but the patent granting process is imperfect. Accordingly, the pursuit of valid business opportunities may require us to challenge intellectual property rights held by others that we believe were improperly granted, including challenges through negotiation and litigation, and such challenges may not always be successful.

Part of our business depends upon identifying biosimilar opportunities and launching products to take advantage of those opportunities, which may involve litigation, associated costs and time delays, and may ultimately not be successful. These opportunities may arise in situations where patent protection of equivalent branded products has expired or been declared invalid, or where products do not infringe the patents of others. In some circumstances we may take action, such as litigation, asserting that our products do not infringe patents of existing products or that those patents are invalid or unenforceable in order to achieve a "first-to-market" or early market position for our products.

Third parties may claim that our products infringe one or more patents owned or controlled by them. Claims of intellectual property infringement can be costly and time-consuming to resolve, may delay or prevent product launches, and may result in significant royalty payments or damages.

For example, our R&D in a therapeutic area may not be first and another company or entity may have obtained relevant patents before us. We are involved in patent-related disputes with third parties over our attempts to market pharmaceutical products. Once we have final regulatory approval of the related products, we may decide to commercially market these products even though associated legal proceedings (including any appeals) have not been resolved (i.e., "at-risk" launch). If one of our marketed products is found to infringe valid patent rights of a third party, such third party may be awarded significant damages or royalty payments, or we may be prevented from further sales of that product. Such damages may be enhanced as much as three-fold if we or one of our subsidiaries is found to have willfully infringed valid patent rights of a third party.

## INFORMATION TECHNOLOGY AND SECURITY

Significant disruptions of information technology systems or breaches of information security could adversely affect our business. We extensively rely upon sophisticated information technology systems (including cloud services) to operate our business. We produce, collect, process, store and transmit large amounts of confidential information (including personal information and intellectual property), and we deploy and operate an array of technical and procedural controls to maintain the confidentiality, integrity and availability of such confidential information. We have outsourced significant elements of our operations, including significant elements of our information technology infrastructure and, as a result, we manage relationships with many third-party providers who may or could have access to our confidential information. We rely on technology developed, supplied and/or maintained by third-parties that may make us vulnerable to "supply chain" style cyber-attacks. Further, technology and security vulnerabilities of acquisitions, business partners or third-party providers may not be identified during due diligence or soon enough to mitigate exploitation. The size and complexity of our information technology and information security systems, and those of our third-party providers (and the large amounts of confidential information that is present on them), make such systems potentially vulnerable to service interruptions or to security breaches from inadvertent or intentional actions by our employees or contingent workers, providers, or malicious attackers. As a global pharmaceutical company, our systems and assets are the target of frequent cyber-attacks. Such cyber-attacks are of ever-increasing levels of sophistication and are made by groups and individuals with a wide range of motives (including, but not limited to, industrial espionage) and expertise, including organized criminal groups, "hacktivists," nation states and others. Due to the nature of some of these attacks, there is a risk that they may remain undetected for a period of time. While we have invested in the protection of data and information technology, our efforts may not prevent service interruptions, extortion, theft of confidential or proprietary information, compromise of data integrity or unauthorized information disclosure. Any such interruption or breach of our systems could adversely affect our business operations and/or result in the loss of confidential information or intellectual property, and could result in financial, legal, business and reputational harm to us. We maintain cyber liability insurance; however, this insurance may not be sufficient to cover the financial, legal, business or reputational losses that may result from an interruption or breach of our systems.

## RISKS RELATED TO BUSINESS DEVELOPMENT:

## BUSINESS DEVELOPMENT ACTIVITIES

We expect to enhance our in-line products and product pipeline through various forms of business development, which can include alliances, licenses, JVs, collaborations, equity- or debt-based investments, dispositions, divestments, mergers and acquisitions. The success of these activities is dependent on the availability and accurate cost/benefit evaluation of appropriate opportunities, competition from others that are seeking similar opportunities and our ability to successfully identify, structure and execute transactions, including the ability to satisfy closing conditions in the anticipated timeframes or at all, and successfully integrate acquisitions. Pursuing these opportunities may require us to obtain additional equity or debt financing, which could result in increased leverage and/or a downgrade of our credit ratings. Where we acquire debt or equity securities as all or part of the consideration for business development activities, the value of those securities will fluctuate, and may depreciate. We may not control a company in which we invest, and, as a result, we will have limited ability to determine its management, operational decisions and policies. Further, while we seek to mitigate risks and liabilities of such transactions through, among other things, due diligence, there may be risks and liabilities that such efforts fail to discover, that are not disclosed to us, or that we inadequately assess. The success of any of our acquisitions will depend, when applicable, on our ability to realize anticipated benefits from integrating these businesses with us. We, for example, may fail to achieve cost savings anticipated with certain of these acquisitions, or such cost savings within the expected time frame. Similarly, the accretive impact anticipated from certain of these acquisitions may not be realized or may be delayed. Integration of these businesses may result in the loss of key employees, the disruption of ongoing business, including third-party relationships, or inconsistencies in standards, controls, procedures and policies. We also may fail to generate the expected revenue growth for the acquired business. Expected revenue from acquired products and product candidates also may be constrained by developments outside of our control. Unsuccessful clinical trials, regulatory hurdles and commercialization challenges may adversely impact revenue and income contribution from products and product candidates, including those acquired in these acquisitions.

## SPIN-OFF AND COMBINATION OF UPJOHN WITH MYLAN

We may not realize some or all of the expected benefits of the spin-off and combination (the Transactions) of the Upjohn Business with Mylan, which resulted in the creation of Viatris in November 2020, due to many factors, including, among others, strategic adjustments required to reflect the nature of our business following the Transactions, increased risks resulting from us becoming a company that is a more focused, innovative science-based biopharmaceutical products business and the possibility that we may not achieve our strategic objectives. In addition, we have agreed to provide certain transition services to Viatris, generally for an initial period of 24 months following the completion of the Transactions (with certain possibilities for extension). These obligations under the transition services agreements may divert our focus and resources that would otherwise be invested into maintaining or growing our business.

## CONSUMER HEALTHCARE JV WITH GSK

In 2019, we and GSK combined our respective consumer healthcare businesses into a JV that operates globally under the GSK Consumer Healthcare name. Although we have certain consent, board representation and other governance rights, we are a minority owner of the JV and do not control the JV, its management or its policies. As a result, our ability to realize the anticipated benefits of the transaction depend upon GSK's operation and management of the JV. In addition, the JV is subject to risks that are different than the risks associated with our business. Many of these risks are outside GSK's or the JV's control and could materially impact the business, financial condition and results of operations of the JV.

In June 2021, GSK announced that it intends to demerge at least 80% of its 68% ownership interest in the JV in mid-2022, subject to GSK shareholder approval. Following the demerger, the JV is expected to be an independent, listed company on the London Stock Exchange with American Depositary Receipts to be listed in the U.S., in which Pfizer would initially hold a 32% ownership interest and GSK may hold up to a 13.6% ownership interest. Notwithstanding GSK's announcement, the demerger may not be completed within expected time periods or at all, and both the timing and success of the demerger (or any other separation and public listing transaction), will be subject to prevailing market conditions and other factors at the time of such transaction. Any future distribution or sale of our stake in the JV will similarly be subject to prevailing market conditions and other factors at the time of such transaction. Our ability to complete any such future distribution or sale may also be impacted by the size of our retained stake at the time. The uncertainty relating to any separation and public listing transactions (including the announced demerger), their implementation, their timing and their yet to be determined effects on the JV's business may subject us and the JV to risks and uncertainties that may adversely affect our business and financial results.

## GENERAL RISKS:

### COVID-19 PANDEMIC

Our business, operations and financial condition and results have been and may continue to be impacted by the COVID-19 pandemic to varying degrees. The pandemic has presented a number of risks and challenges for our business, including, among others: impacts due to travel limitations and mobility restrictions; manufacturing disruptions and delays; supply chain disruptions and shortages, including challenges related to reliance on third-party suppliers resulting in reduced availability of materials or components used in the development, manufacturing, distribution or administration of our products; disruptions to pipeline development and clinical trials, including difficulties or delays in enrolling certain clinical trials, retaining clinical trial participants, accessing needed supplies, and accruing a sufficient number of cases in certain clinical trials; decreased product demand, due to reduced numbers of in-person meetings with prescribers, patient visits with physicians, vaccinations and elective surgeries, resulting in fewer new prescriptions or refills of existing prescriptions and reduced demand for products used in procedures; reduced product demand as a result of unemployment or increased focus on COVID-19 vaccination; challenges presented by reallocating personnel and R&D, manufacturing and other resources to assist in responding to the pandemic; costs associated with the COVID-19 pandemic, including practices intended to reduce the risk of transmission, increased supply chain costs and additional R&D costs incurred in our efforts to develop a vaccine to help prevent COVID-19 and an oral COVID-19 treatment; challenges related to our business development initiatives, including potential delays or disruptions related to regulatory approvals; interruptions or delays in the operations of regulatory authorities, which may delay potential approval of new products we are developing, potential label expansions for existing products and the launch of newly-approved products; challenges operating in a virtual work environment; increased cyber incidents such as phishing, social engineering and malware attacks; challenges related to our intellectual property, both domestically and internationally, including in response to any pressure or legal or regulatory action that could potentially result in us not seeking intellectual property protection for, licensing, or agreeing not to enforce or being restricted from enforcing, intellectual property rights related to our products, including our vaccine to help prevent COVID-19 and an oral COVID-19 treatment; challenges related to conducting oversight and monitoring of regulated activities in a remote or virtual environment; challenges related to our human capital and talent development, including challenges in attracting, hiring and retaining highly skilled and diverse workforce; challenges related to vaccine mandates; and other challenges presented by disruptions to our normal operations in response to the pandemic, as well as uncertainties regarding the duration and severity of the pandemic and its impacts, and government or regulatory actions to contain the virus or control the supply of medicines and vaccines.

We also face risks and uncertainties related to our efforts to develop and commercialize a vaccine to help prevent COVID-19 and an oral COVID-19 treatment, as well as challenges related to their manufacturing, supply and distribution, including, among others:

- uncertainties inherent in R&D, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as risks associated with pre-clinical and clinical data (including the Phase 1/2/3 or Phase 4 data for BNT162b2 or any other vaccine candidate in the BNT162 program or Paxlovid or any other future COVID-19 treatment) in any of our studies in pediatrics, adolescents or adults or real world evidence, including the possibility of unfavorable new pre-clinical, clinical or safety data and further analyses of existing pre-clinical, clinical or safety data or further information regarding the quality of pre-clinical, clinical or safety data, including by audit or inspection;

- the ability to produce comparable clinical or other results for BNT162b2 or Paxlovid, including the rate of effectiveness and/or efficacy, safety and tolerability profile observed to date, in additional analyses of the Phase 3 trial for BNT162b2 or Paxlovid and additional studies, in real-world data studies or in larger, more diverse populations following commercialization;

- the ability of BNT162b2 or any future vaccine to prevent, or Paxlovid or any other future COVID-19 treatment to be effective against, COVID-19 caused by emerging virus variants;

- the risk that more widespread use of the vaccine or Paxlovid will lead to new information about efficacy, safety or other developments, including the risk of additional adverse reactions, some of which may be serious;

- the risk that pre-clinical and clinical trial data are subject to differing interpretations and assessments, including during the peer review/publication process, in the scientific community generally, and by regulatory authorities;

- whether and when additional data from the BNT162 mRNA vaccine program, Paxlovid or other programs will be published in scientific journal publications and, if so, when and with what modifications and interpretations;

- whether regulatory authorities will be satisfied with the design of and results from these and any future pre-clinical and clinical studies;

- whether and when submissions to request emergency use or conditional marketing authorizations for BNT162b2 or any potential future vaccines in additional populations, for a booster dose for BNT162b2 or any potential future vaccines (including potential future annual boosters or re-vaccinations), and/or biologics license and/or EUA applications or amendments to any such applications may be filed in particular jurisdictions for BNT162b2 or any other potential vaccines, and if obtained, whether or when such EUA or licenses will expire or terminate;

- whether and when submissions to request emergency use or conditional marketing authorizations for Paxlovid or any other future COVID-19 treatment and/or any drug applications for any indication for Paxlovid or any other future COVID-19 treatment may be filed in any jurisdiction, and if obtained, whether or when such EUA or licenses will expire or terminate;

- whether and when any application that may be pending or filed for BNT162b2 or other vaccines that may result from the BNT162 program, Paxlovid or any other future COVID-19 treatment or any other COVID-19 program may be approved by particular regulatory authorities, which will depend on myriad factors, including making a determination as to whether the vaccine's or drug's benefits outweigh its known risks and determination of the vaccine's or drug's efficacy and, if approved, whether it will be commercially successful;

- decisions by regulatory authorities impacting labeling or marketing, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of a vaccine or drug, including development of products or therapies by other companies;
- disruptions in the relationships between us and our collaboration partners, clinical trial sites or third-party suppliers, including our relationship with BioNTech;
- the risk that other companies may produce superior or competitive products;
- the risk that demand for any products may be reduced or no longer exist;
- the possibility that COVID-19 will diminish in severity or prevalence, or disappear entirely;
- risks related to the availability of raw materials to manufacture or test any such products;
- challenges related to our vaccine's formulation, dosing schedule and attendant storage, distribution and administration requirements, including risks related to storage and handling after delivery by us;
- the risk that we may not be able to successfully develop other vaccine formulations, booster doses or potential future annual boosters or re-vaccinations or new variant-specific vaccines;
- the risk that we may not be able to recoup costs associated with our R&D and manufacturing efforts;
- risks associated with any changes in the way we approach or provide research funding for the BNT162 program, Paxlovid or any other COVID-19 program;
- challenges and risks associated with the pace of our development programs;
- the risk that we may not be able to maintain or scale up manufacturing capacity on a timely basis or maintain access to logistics or supply channels commensurate with global demand for our vaccine or any treatment for COVID-19, which would negatively impact our ability to supply the estimated numbers of doses of our vaccine or treatment courses of Paxlovid within the projected time periods;
- whether and when additional supply or purchase agreements will be reached;
- uncertainties regarding the ability to obtain recommendations from vaccine or treatment advisory or technical committees and other public health authorities and uncertainties regarding the commercial impact of any such recommendations;
- pricing and access challenges for such products;
- challenges related to public confidence or awareness of our COVID-19 vaccine or Paxlovid, including challenges driven by misinformation, access, concerns about clinical data integrity and prescriber and pharmacy education;
- trade restrictions;
- potential third-party royalties or other claims related to our COVID-19 vaccine or Paxlovid; and
- competitive developments.

Further, the COVID-19 pandemic, and the volatile global economic conditions stemming from the pandemic, could precipitate or amplify the other risks that we identify in this Risk Factors section, which could adversely affect our business, operations and financial condition and results.

We are continuing to monitor the latest developments regarding the COVID-19 pandemic and its effects on our business, operations and financial condition and results, and have made certain assumptions regarding the COVID-19 pandemic for purposes of our operational planning and financial projections, including assumptions regarding the duration, severity and the global macroeconomic impact of the pandemic, as well as COVID-19 vaccine and oral COVID-19 treatment supply and contracts, which remain dynamic. Despite careful tracking and planning, we are unable to accurately predict the extent of the impact of the pandemic on our business, operations and financial condition and results due to the uncertainty of future developments. In particular, we believe the ultimate impact on our business, operations and financial condition and results will be affected by the speed and extent of the continued spread of the coronavirus globally, the emergence of additional virus variants, the duration of the pandemic, new information regarding the severity and incidence of COVID-19, the safety, efficacy and availability of vaccines and treatments for COVID-19, the rate at which the population becomes vaccinated against COVID-19, the global macroeconomic impact of the pandemic and governmental or regulatory actions to contain the virus or control supply of medicines and vaccines. The pandemic may also affect our business, operations or financial condition and results in a manner that is not presently known to us or that we currently do not consider as presenting significant risks.

## MARKET FLUCTUATIONS IN OUR EQUITY AND OTHER INVESTMENTS

Changes in fair value of certain equity investments need to be recognized in net income that may result in increased volatility of our income. For additional information, see *Note 4* and the *Analysis of Financial Condition, Liquidity, Capital Resources and Market Risk* section within MD&A.

Our pension benefit obligations and postretirement benefit obligations are subject to volatility from changes in fair value of equity investments and other investment risk in the assets funding these plans. For additional information, see the *Significant Accounting Policies and Application of Critical Accounting Estimates and Assumptions—Benefit Plans* section within MD&A and *Note 11*.

## COST AND EXPENSE CONTROL AND NONORDINARY EVENTS

Growth in costs and expenses, changes in product and geographic mix and the impact of acquisitions, divestitures, restructurings, internal reorganizations, product withdrawals, recalls and other unusual events that could result from evolving business strategies, evaluation of asset realization and organizational restructuring could adversely affect future results. Such risks and uncertainties include, in particular, our ability to realize the projected benefits of our cost-reduction and productivity initiatives, other corporate strategic initiatives and any acquisitions, divestitures or other initiatives, as well as potential disruption of ongoing business.

## INTANGIBLE ASSETS, GOODWILL AND EQUITY-METHOD INVESTMENTS

Our consolidated balance sheet contains significant amounts of intangible assets, including IPR&D and goodwill. For IPR&D assets, the risk of failure is significant, and there can be no certainty that these assets ultimately will yield successful products. Our ability to realize value on these significant investments is often contingent upon, among other things, regulatory approvals and market acceptance. As such, we expect that many of these IPR&D assets will become impaired and/or be written off at some time in the future if the associated R&D effort is abandoned or is curtailed. For goodwill, all reporting units can confront events and circumstances that can lead to a goodwill impairment charge such as, among other things, unanticipated competition, an adverse action or assessment by a regulator, a significant adverse change in legal matters or in the

business climate and/or a failure to replace the contributions of products that lose exclusivity. Our other intangible assets, including developed technology rights and brands, face similar risks for impairment. Our equity-method investments may also be subject to impairment charges that may result from the occurrence of unexpected adverse events or management decisions that impact our estimates of expected cash flows to be generated from these investments. We may recognize impairment charges as a result of a weak economic environment, events related to particular customers or asset types, challenging market conditions or decisions by management. Any such impairment charge of our intangible assets, goodwill and equity-method investments may be significant. For additional details, see the S*ignificant Accounting Policies and Application of Critical Accounting Estimates and Assumptions* section within MD&A.

## CHANGES IN LAWS AND ACCOUNTING STANDARDS

Our future results could be adversely affected by changes in laws and regulations or their interpretation, including, among others, changes in accounting standards, tax laws and regulations internationally and in the U.S. (including, among other things, any potential adoption of global minimum taxation requirements and any potential changes to existing tax law and regulations by the Biden Administration and Congress), competition laws, privacy laws and environmental laws in the U.S. and other countries. For additional information on changes in tax laws or rates or accounting standards, see the *Provision/(Benefit) for Taxes on Income* and *New Accounting Standards* sections within MD&A and *Note 1B*.

## ITEM 2.          PROPERTIES

We own and lease space globally for sales and marketing, customer service, regulatory compliance, R&D, manufacturing and distribution and corporate enabling functions. In many locations, our business and operations are co-located to achieve synergy and operational efficiencies. Our global headquarters are located in New York City. We continue to advance our global workplace strategy to provide workplaces that enable collaboration and foster innovation. As of December 31, 2021, we had 327 owned and leased properties, amounting to approximately 41 million square feet.

We expect to relocate our global headquarters to the Spiral, an office building in the Hudson Yards neighborhood of New York City, with occupancy expected beginning in the second half of 2022. In April 2018, we entered into an agreement to lease space at this property. In July 2018, we completed the sale of our current headquarters in New York City. We remain in a lease-back arrangement with the buyer while we complete our relocation.

Our PGS platform function is headquartered in various locations, with leadership teams primarily in New York City and in Peapack, New Jersey. As of December 31, 2021, PGS had responsibility for 39 plants around the world, including in Belgium, Germany, India, Ireland, Italy, Japan, Singapore and the U.S., which manufacture products for our business. PGS expects to exit three of these sites over the next several years. PGS also operates multiple distribution facilities around the world.

In general, we believe that our properties, including the principal properties described above, are well-maintained, adequate and suitable for their current requirements and for our operations in the foreseeable future. See *Note 9* for amounts invested in land, buildings and equipment.

## ITEM 3.          LEGAL PROCEEDINGS

Certain legal proceedings in which we are involved are discussed in *Note 16A*.

## INFORMATION ABOUT OUR EXECUTIVE OFFICERS

The executive officers of the Company are set forth in this table. Each holds the office or offices indicated until his or her successor is chosen and qualified at the regular meeting of the BOD to be held on the date of the 2022 Annual Meeting of Shareholders, or until his or her earlier death, resignation or removal. Each of the executive officers is a member of the Pfizer Executive Leadership Team.

| Name | Age | Position |
|------|-----|----------|
| Albert Bourla | 60 | Chairman of the Board since January 2020 and Chief Executive Officer since January 2019. Chief Operating Officer from January 2018 until December 2018. Group President, Pfizer Innovative Health from June 2016 until December 2017. Group President, Global Innovative Pharma Business (responsible for Vaccines, Oncology and Consumer Healthcare since 2014) from February 2016 until June 2016. President and General Manager of Established Products Business Unit from December 2010 until December 2013. Our Director since February 2018. |
| William Carapezzi | 64 | Executive Vice President, Global Business Services and Transformation since June 2020. Senior Vice President of Global Business Operations from June 2013 until June 2020. Senior Vice President of Global Tax from 2008 until June 2013. |
| Frank A. D'Amelio | 64 | Chief Financial Officer, Executive Vice President since January 2022. Chief Financial Officer and Executive Vice President, Global Supply from June 2020 until December 2021. Chief Financial Officer, Executive Vice President, Business Operations and Global Supply from November 2018 until June 2020. Executive Vice President, Business Operations and Chief Financial Officer from December 2010 until October 2018. Senior Vice President and Chief Financial Officer from September 2007 until December 2010. Director of Zoetis Inc. and Humana Inc. and Chair of the Humana Inc. Board of Directors' Audit Committee. |
| Mikael Dolsten | 63 | Chief Scientific Officer, President, Worldwide Research, Development and Medical since January 2019. President of Worldwide Research and Development from December 2010 until December 2018. Senior Vice President; President of Worldwide Research and Development from May 2010 until December 2010. Senior Vice President; President of Pfizer BioTherapeutics Research & Development Group from October 2009 until May 2010. Director of Agilent Technologies, Inc, and Vimian Group AB. |

| Name | Age | Position |
|------|-----|----------|
| Lidia Fonseca | 53 | Chief Digital and Technology Officer, Executive Vice President since January 2019. Chief Information Officer and Senior Vice President of Quest Diagnostics Incorporated from 2014 to 2018. Senior Vice President of Laboratory Corporation of America Holdings from 2008 until March 2013. Director of Tegna, Inc. |
| Angela Hwang | 56 | Group President, Pfizer Biopharmaceuticals Group since January 2019. Group President, Pfizer Essential Health from January 2018 until December 2018. Global President, Pfizer Inflammation and Immunology from January 2016 until December 2017. Regional Head, U.S. Vaccines from January 2014 until December 2015. Vice President, Emerging Markets for the Primary Care therapeutic area from September 2011 until December 2013. Director of United Parcel Service, Inc. |
| Rady A. Johnson | 60 | Chief Compliance, Quality and Risk Officer, Executive Vice President since January 2019. Executive Vice President, Chief Compliance and Risk Officer from December 2013 until December 2018. Senior Vice President and Associate General Counsel from October 2006 until December 2013. |
| Douglas M. Lankler | 56 | General Counsel, Executive Vice President since December 2013. Corporate Secretary from January 2014 until February 2014. Executive Vice President, Chief Compliance and Risk Officer from February 2011 until December 2013. Executive Vice President, Chief Compliance Officer from December 2010 until February 2011. |
| Aamir Malik | 46 | Chief Business Innovation Officer, Executive Vice President since August 2021. Various U.S. geographic leadership roles with McKinsey & Company from 2019 to 2021; previously co-led McKinsey & Company's Global Pharmaceuticals & Medical Products practice from 2015 to 2018. |
| Michael McDermott | 56 | Chief Global Supply Officer, Executive Vice President since January 2022. President of Pfizer Global Supply from 2018 until 2021. Vice President of Pfizer Global Supply from 2014 until 2018. Vice President of the Biotechnology Unit from 2012 until 2014. |
| Payal Sahni | 47 | Chief People Experience Officer, Executive Vice President since January 2022. Chief Human Resources Officer, Executive Vice President from June 2020 to December 2021. From May 2016 until June 2020 served as Senior Vice President of Human Resources for multiple operating units. Vice President of Human Resources, Vaccines, Oncology & Consumer from 2015 until 2016. Ms. Sahni has served in a number of positions in the Human Resources organization with increasing responsibility since joining Pfizer in 1997. |
| Sally Susman | 60 | Chief Corporate Affairs Officer, Executive Vice President since January 2019. Executive Vice President, Corporate Affairs (formerly Policy, External Affairs and Communications) from December 2010 until December 2018. Senior Vice President, Policy, External Affairs and Communications from December 2009 until December 2010. Director of WPP plc. |

## PART II

**ITEM 5.    MARKET FOR THE COMPANY'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

The principal market for our common stock is the NYSE. Our common stock currently trades on the NYSE under the symbol "PFE". As of February 22, 2022, there were 133,758 holders of record of our common stock.

The following summarizes purchases of our common stock during the fourth quarter of 2021[a]:

| Period | Total Number of Shares Purchased[b] | Average Price Paid per Share[b] | Total Number of Shares Purchased as Part of Publicly Announced Plan | Approximate Value of Shares that May Yet Be Purchased Under the Plan[a] |
|--------|-----|-----|-----|-----|
| October 4 through October 31, 2021 | 8,817 | $  44.74 | — | $  5,292,881,709 |
| November 1 through November 30, 2021 | 4,687 | $  44.71 | — | $  5,292,881,709 |
| December 1 through December 31, 2021 | 33,186 | $  55.35 | — | $  5,292,881,709 |
| Total | 46,690 | $  52.27 | — | |

[a] See *Note 12.*
[b] Represents (i) 44,604 shares of common stock surrendered to the Company to satisfy tax withholding obligations in connection with the vesting of awards under our long-term incentive programs and (ii) the open market purchase by the trustee of 2,086 shares of common stock in connection with the reinvestment of dividends paid on common stock held in trust for employees who deferred receipt of performance share awards.

**PEER GROUP PERFORMANCE GRAPH**

The following graph assumes a $100 investment on December 31, 2016, and reinvestment of all dividends, in each of the Company's Common Stock, the S&P 500 Index, and a composite peer group of the major U.S. and European-based pharmaceutical companies, which are: AbbVie Inc., Amgen Inc., AstraZeneca PLC, Bristol-Myers Squibb Company, Eli Lilly and Company, GlaxoSmithKline plc, Johnson & Johnson, Merck & Co., Inc., Novartis AG, Roche Holding AG and Sanofi SA.



**Five Year Performance**

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| PFIZER | $100.0 | $115.8 | $144.5 | $134.5 | $139.1 | **$232.0** |
| PEER GROUP | $100.0 | $117.3 | $126.7 | $154.0 | $160.4 | **$186.9** |
| S&P 500 | $100.0 | $121.8 | $116.5 | $153.1 | $181.3 | **$233.3** |

**ITEM 6.**        [RESERVED]

**ITEM 7.**      **MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**OVERVIEW OF OUR PERFORMANCE, OPERATING ENVIRONMENT, STRATEGY AND OUTLOOK**

**Financial Highlights**

The following is a summary of certain financial performance metrics (in billions, except per share data):



\* For additional information regarding Adjusted diluted EPS (which is a non-GAAP financial measure), including reconciliations of certain GAAP reported to non-GAAP adjusted information, see the *Non-GAAP Financial Measure: Adjusted Income* section within MD&A.

References to operational variances pertain to period-over-period changes that exclude the impact of foreign exchange rates. Although foreign exchange rate changes are part of our business, they are not within our control and since they can mask positive or negative trends in the business, we believe presenting operational variances excluding these foreign exchange changes provides useful information to evaluate our results.

**Our Business and Strategy**

Most of our revenues come from the manufacture and sale of biopharmaceutical products. With the formation of the Consumer Healthcare JV in 2019 and the spin-off of our former Upjohn Business in the fourth quarter of 2020, Pfizer transformed into a more focused, global leader in science-based innovative medicines and vaccines and beginning in the fourth quarter of 2020 operated as a single operating segment engaged in the discovery, development, manufacturing, marketing, sale and distribution of biopharmaceutical products worldwide. At the beginning of our fiscal fourth quarter of 2021, we reorganized our commercial operations and began to manage our commercial operations through a new global structure consisting of two operating segments: Biopharma and PC1. Biopharma is the only reportable segment. On December 31, 2021, we completed the sale of our Meridian subsidiary, and beginning in the fourth quarter of 2021, the financial results of Meridian are reflected as discontinued operations for all periods presented. Beginning in the fourth quarter of 2020, the financial results of the Upjohn Business and the Mylan-Japan collaboration were reflected as discontinued operations for all periods presented. Prior-period information has been restated to reflect our current organizational structure. See *Note 1A* and *Item 1. Business—Commercial Operations* of this Form 10-K for additional information. We expect to incur costs of approximately $700 million in connection with separating Upjohn, of which, approximately 75% has been incurred since inception and through December 31, 2021. These charges include costs and expenses related to separation of legal entities and transaction costs.

**Transforming to a More Focused Company:** We have undertaken efforts to ensure our cost base and support model align appropriately with our new operating structure. While certain direct costs transferred to the Consumer Healthcare JV and to the Upjohn Business in connection with the spin-off, there are indirect costs which did not transfer. We are taking steps to restructure our corporate enabling functions to appropriately support our business, R&D and PGS platform functions. In addition, we are transforming our commercial go-to-market model in the way we engage patients and physicians. See the *Costs and Expenses—Restructuring Charges and Other Costs Associated with Acquisitions and Cost-Reduction/Productivity Initiatives* section of this MD&A.

**R&D:** We believe we have a strong pipeline and are well-positioned for future growth. R&D is at the heart of fulfilling our purpose to deliver breakthroughs that change patients' lives as we work to translate advanced science and technologies into the therapies that may be the most impactful for patients. Innovation, drug discovery and development are critical to our success. In addition to discovering and developing new

products, our R&D efforts seek to add value to our existing products by improving their effectiveness and ease of dosing and by discovering potential new indications. See the *Item 1. Business—Research and Development* section of this Form 10-K for our R&D priorities and strategy.

We seek to leverage a strong pipeline, organize around expected operational growth drivers and capitalize on trends creating long-term growth opportunities, including:

- an aging global population that is generating increased demand for innovative medicines and vaccines that address patients' unmet needs;
- advances in both biological science and digital technology that are enhancing the delivery of breakthrough new medicines and vaccines; and
- the increasingly significant role of hospitals in healthcare systems.

## Our Business Development Initiatives

We are committed to strategically capitalizing on growth opportunities, primarily by advancing our own product pipeline and maximizing the value of our existing products, but also through various business development activities. We view our business development activity as an enabler of our strategies and seek to generate growth by pursuing opportunities and transactions that have the potential to strengthen our business and our capabilities. We assess our business, assets and scientific capabilities/portfolio as part of our regular, ongoing portfolio review process and also continue to consider business development activities that will help advance our business strategy.

Our significant recent business development activities that closed or are targeted to close in 2022 include:

Acquisition of Arena

In December 2021, we and Arena announced that the companies entered into a definitive agreement under which we will acquire Arena, a clinical stage company developing innovative potential therapies for the treatment of several immuno-inflammatory diseases. Under the terms of the agreement, we will acquire all outstanding shares of Arena for $100 per share in an all-cash transaction for a total equity value of approximately $6.7 billion. On February 2, 2022, Arena shareholders voted to approve the proposed acquisition, which is targeted to close in the first half of 2022, subject to review under antitrust laws and other customary closing conditions.

Collaboration with Biohaven

In November 2021, we entered into a collaboration and license agreement and related sublicense agreement with Biohaven Pharmaceutical Holding Company Ltd., Biohaven Pharmaceutical Ireland DAC and BioShin Limited (collectively, Biohaven) pursuant to which we acquired rights to commercialize rimegepant and zavegepant for the treatment and prevention of migraines outside of the U.S., subject to regulatory approval. Rimegepant is currently commercialized in the U.S., Israel, and the U.A.E. under the brand name Nurtec® ODT, with certain additional applications pending outside of the U.S. Biohaven will continue to lead R&D globally and we have the exclusive right to commercialization globally, outside of the U.S. Upon the closing of the transaction, which occurred on January 4, 2022, we paid Biohaven $500 million, including an upfront payment of $150 million and an equity investment of $350 million. Biohaven is also eligible to receive up to $740 million in non-U.S. commercialization milestone payments, in addition to tiered double-digit royalties on net sales outside of the U.S. In addition to the milestone payments and royalties above, we will also reimburse Biohaven for the portion of certain additional milestone payments and royalties due to third parties in accordance with preexisting Biohaven agreements, which are attributed to ex-U.S. sales.

For additional information, including discussion of recent significant business development activities, see *Note 2*.

## Our 2021 Performance

### *Revenues*

*Revenues* increased $39.6 billion, or 95%, to $81.3 billion in 2021 from $41.7 billion in 2020, reflecting an operational increase of $38.4 billion, or 92%, as well as a favorable impact of foreign exchange of $1.2 billion, or 3%. Excluding direct sales and alliance revenues of Comirnaty and sales of Paxlovid, revenues increased 6% operationally, reflecting strong growth in Eliquis, Biosimilars, PC1, Vyndaqel/Vyndamax, the Hospital therapeutic area, Inlyta and Xtandi, partially offset by declines in the Prevnar family, Chantix/Champix, Enbrel and Sutent.

The following outlines the components of the net change in revenues:



See the *Analysis of the Consolidated Statements of Income—Revenues by Geography* and *Revenues—Selected Product Discussion* sections within MD&A for more information, including a discussion of key drivers of our revenue performance. For information regarding the primary indications or class of certain products, see *Note 17C*.

*Income from Continuing Operations Before Provision/(Benefit) for Taxes on Income*

The increase in *Income from continuing operations before provision/(benefit) for taxes on income* of $17.3 billion in 2021, compared to 2020, was primarily attributable to: (i) higher revenues, (ii) net periodic benefit credits in 2021 versus net periodic benefit costs in 2020, (iii) lower asset impairment charges, and (iv) higher net gains on equity securities, partially offset by (v) increases in: *Cost of sales, Research and development expenses* and *Selling, informational and administrative expenses*.

See the *Analysis of the Consolidated Statements of Income* within MD&A and *Note 4* for additional information.

For information on our tax provision and effective tax rate, see the *Provision/(Benefit) for Taxes on Income* section within MD&A and *Note 5*.

## Our Operating Environment

We, like other businesses in our industry, are subject to certain industry-specific challenges. These include, among others, the topics listed below. See also the *Item 1. Business—Government Regulation and Price Constraints* and *Item 1A. Risk Factors* sections of this Form 10-K.

*Regulatory Environment—Pipeline Productivity*

Our product lines must be replenished to offset revenue losses when products lose exclusivity or market share or to respond to healthcare and innovation trends, as well as to provide for earnings growth. As a result, we devote considerable resources to our R&D activities which, while essential to our growth, incorporate a high degree of risk and cost, including whether a particular product candidate or new indication for an in-line product will achieve the desired clinical endpoint or safety profile, will be approved by regulators or will be successful commercially. We conduct clinical trials to provide data on safety and efficacy to support the evaluation of a product's overall benefit-risk profile for a particular patient population. In addition, after a product has been approved or authorized and launched, we continue to monitor its safety as long as it is available to patients. This includes postmarketing trials that may be conducted voluntarily or pursuant to a regulatory request to gain additional medical knowledge. For the entire life of the product, we collect safety data and report safety information to the FDA and other regulatory authorities. Regulatory authorities may evaluate potential safety concerns and take regulatory actions in response, such as updating a product's labeling, restricting its use, communicating new safety information to the public, or, in rare cases, requiring us to suspend or remove a product from the market. The commercial potential of in-line products may be negatively impacted by post-marketing developments.

*Intellectual Property Rights and Collaboration/Licensing Rights*

The loss, expiration or invalidation of intellectual property rights, patent litigation settlements with manufacturers and the expiration of co-promotion and licensing rights can have a material adverse effect on our revenues. Certain of our products have experienced patent-based expirations or loss of regulatory exclusivity in certain markets in the last few years, and we expect certain products to face increased generic competition over the next few years. While additional patent expiries will continue, we expect a moderate impact of reduced revenues due to patent expiries from 2022 through 2025. We continue to vigorously defend our patent rights against infringement, and we will continue to support efforts that strengthen worldwide recognition of patent rights while taking necessary steps to help ensure appropriate patient access.

For additional information on patent rights we consider most significant to our business as a whole, see the *Item 1. Business—Patents and Other Intellectual Property Rights* section in this Form 10-K. For a discussion of recent developments with respect to patent litigation, see *Note 16A1*.

*Regulatory Environment/Pricing and Access—Government and Other Payer Group Pressures*

The pricing of medicines by pharmaceutical manufacturers and the cost of healthcare, which includes medicines, medical services and hospital services, continues to be important to payers, governments, patients, and other stakeholders. Federal and state governments and private third-party payers in the U.S. continue to take action to manage the utilization of drugs and cost of drugs, including increasingly employing formularies to control costs by taking into account discounts in connection with decisions about formulary inclusion or favorable formulary placement. We consider a number of factors impacting the pricing of our medicines and vaccines. Within the U.S., we often engage with patients, doctors and healthcare plans. We also often provide significant discounts from the list price to insurers, including PBMs and MCOs. The price that patients pay in the U.S. for prescribed medicines and vaccines is ultimately set by healthcare providers and insurers. Governments globally may use a variety of measures to control costs, including proposing pricing reform or legislation, cross country collaboration and procurement, price cuts, mandatory rebates, health technology assessments, forced localization as a condition of market access, "international reference pricing" (i.e., the practice of a country linking its regulated medicine prices to those of other countries), QCE processes and VBP. In the U.S., we expect to see continued focus by Congress and the Biden Administration on regulating pricing which could result in legislative and regulatory changes designed to control costs. For example, there is proposed legislation that, if enacted, would allow Medicare to negotiate prices for certain prescription drugs, as well as require that penalties be paid by manufacturers who raise drug prices faster than inflation. Also, certain changes proposed by the CMS in December 2020 to the Medicaid program and 340B drug pricing program, which imposes ceilings on prices that drug manufacturers can charge for medications sold to certain health care facilities, could increase our Medicaid rebate obligations and increase the discounts we extend to 340B covered entities if they go into effect. Additional changes to the 340B program are undergoing review and their status is unclear. We anticipate that these and similar initiatives will continue to increase pricing pressures globally. For additional information, see the *Item 1. Business—Pricing Pressures and Managed Care Organizations* and *—Government Regulation and Price Constraints* sections in this Form 10-K.

*Product Supply*

We periodically encounter supply delays, disruptions or shortages, including due to voluntary product recalls such as our recent Chantix recall. For information on our recent Chantix recall and risks related to product manufacturing, see the *Item 1A. Risk Factors—Product Manufacturing, Sales and Marketing Risks* section in this Form 10-K.

## The Global Economic Environment

In addition to the industry-specific factors discussed above, we, like other businesses of our size and global extent of activities, are exposed to economic cycles. Certain factors in the global economic environment that may impact our global operations include, among other things, currency fluctuations, capital and exchange controls, global economic conditions including inflation, restrictive government actions, changes in intellectual property, legal protections and remedies, trade regulations, tax laws and regulations and procedures and actions affecting approval,

production, pricing, and marketing of, reimbursement for and access to our products, as well as impacts of political or civil unrest or military action, including the current conflict between Russia and Ukraine, terrorist activity, unstable governments and legal systems, inter-governmental disputes, public health outbreaks, epidemics, pandemics, natural disasters or disruptions related to climate change. Government pressures can lead to negative pricing pressure in various markets where governments take an active role in setting prices, access criteria or other means of cost control.

## COVID-19 Pandemic

The COVID-19 pandemic has impacted our business, operations and financial condition and results.

### *Our Response to COVID-19*

Pfizer has helped lead the global effort to confront the COVID-19 pandemic by advancing a vision for industry-wide collaboration while making significant investments in breakthrough science and global manufacturing.

- *Comirnaty/BNT162b2*:
  - We have collaborated with BioNTech to jointly develop Comirnaty/BNT162b2, a mRNA-based coronavirus vaccine to help prevent COVID-19. The FDA has approved Comirnaty in the U.S. to prevent COVID-19 in individuals 16 years of age and older as a two-dose primary series (30 µg per dose). Comirnaty is the first COVID-19 vaccine to be granted approval by the FDA and had previously been available to this patient population in the U.S. under an EUA since December 2020. The vaccine is also available to individuals 5 to 15 years old under an EUA granted by the FDA in 2021 (10 µg per dose for children 5 through 11 years of age (October 2021) and 30 µg per dose for individuals 12 years of age and older (May 2021)). The FDA has also authorized for emergency use: (i) a third dose of Comirnaty/BNT162b2 in certain immunocompromised individuals 5 years of age and older and (ii) Comirnaty/BNT162b2 as a booster dose in individuals 12 years of age and older. Comirnaty/BNT162b2 has also been granted an approval or an authorization in many other countries around the world in populations varying by country. We continue to evaluate our vaccine, including for additional pediatric indications, and the short- and long-term efficacy of Comirnaty. We are also studying vaccine candidates to potentially prevent COVID-19 caused by new and emerging variants, such as the Omicron variant, or an updated vaccine as needed.
  - In 2021, we manufactured more than three billion doses and, in fiscal 2021, delivered 2.2 billion doses around the world. Pfizer and BioNTech expect we can manufacture up to four billion doses in total by the end of 2022. The companies have entered into agreements to supply pre-specified doses of Comirnaty in 2022 with multiple developed and emerging countries around the world and are continuing to deliver doses of Comirnaty to governments under such agreements. We also signed agreements with multiple countries to supply Comirnaty doses in 2023 and are currently negotiating similar potential agreements with multiple other countries. We anticipate delivering at least two billion doses to low- and middle-income countries by the end of 2022—one billion that was delivered in 2021 and one billion expected to be delivered in 2022, with the possibility to increase those deliveries if more orders are placed by these countries for 2022. One billion of the aforementioned doses to low- and middle-income countries are being supplied to the U.S. government at a not-for-profit price to be donated to the world's poorest nations at no charge to those countries.
  - As of February 8, 2022, we forecasted approximately $32 billion in revenues for Comirnaty in 2022, with gross profit to be split evenly with BioNTech, which includes doses expected to be delivered in fiscal 2022 under contracts signed as of late-January 2022.
- *Paxlovid*:
  - In December 2021, the FDA authorized the emergency use of Paxlovid, a novel oral COVID-19 treatment, which is a SARS-CoV2-3CL protease inhibitor and is co-administered with a low dose of ritonavir, for the treatment of mild-to-moderate COVID-19 in adults and pediatric patients (12 years of age and older weighing at least 40 kg [88 lbs]) with positive results of direct SARS-CoV-2 viral testing, and who are at high risk for progression to severe COVID-19, including hospitalization or death. The FDA based its decision on clinical data from the Phase 2/3 EPIC-HR (Evaluation of Protease Inhibition for COVID-19 in High-Risk Patients), which enrolled non-hospitalized adults aged 18 and older with confirmed COVID-19 who are at increased risk of progressing to severe illness. Paxlovid has been granted an authorization or approval in many other countries.
  - We continue to evaluate Paxlovid in other populations, including in patients with a confirmed diagnosis of SARS-CoV-2 infection who are at standard risk (i.e., low risk of hospitalization or death) (Phase 2/3 EPIC-SR (Evaluation of Protease Inhibition for COVID-19 in Standard Risk Patients)) and in adults living in the same household as someone with a confirmed COVID-19 infection (Phase 2/3 EPIC-PEP (Evaluation of Protease Inhibition for COVID-19 in Post-Exposure Prophylaxis)).
  - We have entered into agreements with multiple countries to supply pre-specified courses of Paxlovid, such as the U.S. and U.K., and have initiated bilateral outreach to approximately 100 countries around the world. Additionally, we have signed a voluntary non-exclusive license agreement with the Medicines Patent Pool (MPP) for Paxlovid. Under the terms of the agreement, MPP can grant sublicenses to qualified generic medicine manufacturers worldwide to manufacture and supply Paxlovid to 95 low- and middle-income countries, covering up to approximately 53% of the world's population.
  - Pfizer plans to manufacture up to 120 million treatment courses by the end of 2022, depending on the global need, which will be driven by advance purchase agreements, with 30 million courses expected to be produced in the first half of 2022 and the remaining 90 million courses expected to be produced in the second half of 2022.
  - As of February 8, 2022, we forecasted approximately $22 billion of revenues for Paxlovid in 2022, which includes treatment courses expected to be delivered in fiscal 2022, primarily relating to supply contracts signed or committed as of late-January 2022.
- *IV Protease Inhibitor*:
  - In February 2022, we discontinued the global clinical development program for PF-07304814, an intravenously administered SARS-CoV-2 main protease inhibitor being evaluated in adults hospitalized with severe COVID-19. This decision was made based on a totality of information, including a careful review of early data and a thorough assessment of the candidate's potential to successfully fulfill patient needs. Dosing of PF-07304814 in the National Institutes of Health's ongoing Accelerating COVID-19 Therapeutic Interventions and Vaccines (ACTIV)-3 study has ceased.

### *Impact of COVID-19 on Our Business and Operations*

As part of our on-going monitoring and assessment, we have made certain assumptions regarding the pandemic for purposes of our operational planning and financial projections, including assumptions regarding the duration, severity and the global macroeconomic impact of the pandemic,

as well as COVID-19 vaccine and oral COVID-19 treatment supply and contracts, which remain dynamic. Despite careful tracking and planning, we are unable to accurately predict the extent of the impact of the pandemic on our business, operations and financial condition and results due to the uncertainty of future developments. We are focused on all aspects of our business and are implementing measures aimed at mitigating issues where possible, including by using digital technology to assist in operations for our commercial, manufacturing, R&D and corporate enabling functions globally.

Apart from our introduction of Comirnaty/BNT162b2 and Paxlovid, our business and operations have been impacted by the pandemic in various ways. Our portfolio of products experienced varying impacts from the pandemic in 2021. For example, certain of our vaccines such as the Prevnar family were impacted by disruptions to healthcare activity related to COVID-19, including the prioritization of primary and booster vaccination campaigns for COVID-19. For some products such as Vyndaqel/Vyndamax, we continued to see postponement of elective and diagnostic procedures in 2021 due to COVID-19, which may subside in 2022 as COVID-19 vaccination and booster rates continue to increase and/or if COVID-19 cases subside. On the other hand, some products such as Ibrance saw accelerating demand in 2021 as the delays in diagnosis and treatment initiations caused by the COVID-19 pandemic show signs of recovery across several international markets. For detail on the impact of the COVID-19 pandemic on certain of our products, see the *Analysis of the Consolidated Statements of Income—Revenues by Geography* and *Revenues—Selected Product Discussion* sections within this MD&A.

In 2021, engagement with healthcare professionals started to return to pre-pandemic levels and we continue to review and assess epidemiological data to inform in-person engagements with healthcare professionals and to help ensure the safety of our colleagues, customers and communities. As part of our commitment to engaging our customers in the manner they prefer, we are also taking a hybrid approach of virtual and in person engagements and saw customer response to both approaches. During the pandemic, we adapted our promotional platform by amplifying our digital capabilities to reach healthcare professionals and customers to provide critical education and information, including increasing the scale of our remote engagement. Most of our colleagues who are able to perform their job functions outside of our facilities continue to temporarily work remotely, while certain colleagues in the PGS and WRDM organizations continue to work onsite and are subject to strict protocols intended to reduce the risk of transmission. As of December 31, 2021, more than 96% of our U.S. employee population had been fully vaccinated or received an approved exception. Also, in 2021 and to date, we have not seen a significant disruption to our supply chain, and all of our manufacturing sites globally have continued to operate at or near normal levels. However, we are seeing an increase in overall demand in the industry for certain components and raw materials potentially constraining available supply, which could have a future impact on our business. We are continuing to monitor and implement mitigation strategies in an effort to reduce any potential risk or impact including active supplier management, qualification of additional suppliers and advanced purchasing to the extent possible. Certain of our clinical trials were impacted by the COVID-19 pandemic in 2021, which included, in some cases, challenges related to recruiting clinical trial participants and accruing cases in certain studies. Our clinical trials also progressed in this challenging environment through innovation, such as decentralized visits (e.g., telemedicine and home visits) to accommodate participants' ability to maintain scheduled visits, as well as working with suppliers to manage the shortage of certain clinical supplies.

We will continue to pursue efforts to maintain the continuity of our operations while monitoring for new developments related to the pandemic. Future developments could result in additional favorable or unfavorable impacts on our business, operations or financial condition and results. If we experience significant disruption in our manufacturing or supply chains or significant disruptions in clinical trials or other operations, or if demand for our products is significantly reduced as a result of the COVID-19 pandemic, we could experience a material adverse impact on our business, operations and financial condition and results.

For additional information, please see the *Item 1A. Risk Factors—COVID-19 Pandemic* section of this Form 10-K.

## SIGNIFICANT ACCOUNTING POLICIES AND APPLICATION OF CRITICAL ACCOUNTING ESTIMATES AND ASSUMPTIONS

Following is a discussion about the critical accounting estimates and assumptions impacting our consolidated financial statements. Also, see *Note 1D*.

For a description of our significant accounting policies, see *Note 1*. Of these policies, the following are considered critical to an understanding of our consolidated financial statements as they require the application of the most subjective and the most complex judgments: Acquisitions (*Note 1E*); Fair Value (*Note 1F*); Revenues (*Note 1H*); Asset Impairments (*Note 1M*); Tax Assets and Liabilities and Income Tax Contingencies (*Note 1Q*); Pension and Postretirement Benefit Plans (*Note 1R*); and Legal and Environmental Contingencies (*Note 1S*).

For a discussion of a recently adopted accounting standard and a change in accounting principle related to our pension and postretirement plans, see *Notes 1B and 1C*.

### *Acquisitions*

We account for acquired businesses using the acquisition method of accounting, which requires, among other things, that most assets acquired and liabilities assumed be recognized at their estimated fair value as of the acquisition date. For further detail on acquisition accounting, see *Note 1E*. Historically, intangible assets have been the most significant fair values within our business combinations. For further information on our process to estimate the fair value of intangible assets, see *Asset Impairments* below.

### *Revenues*

Our gross product revenues are subject to a variety of deductions, which generally are estimated and recorded in the same period that the revenues are recognized. Such variable consideration represents chargebacks, rebates, sales allowances and sales returns. These deductions represent estimates of the related obligations and, as such, knowledge and judgment are required when estimating the impact of these revenue deductions on gross sales for a reporting period. Historically, adjustments to these estimates to reflect actual results or updated expectations, have not been material to our overall business and generally have been less than 1% of revenues. Product-specific rebates, however, can have a significant impact on year-over-year individual product revenue growth trends. If any of our ratios, factors, assessments, experiences or judgments are not indicative or accurate estimates of our future experience, our results could be materially affected. The potential of our estimates to vary (sensitivity) differs by program, product, type of customer and geographic location. However, estimates associated with U.S. Medicare, Medicaid and performance-based rebates are most at risk for material adjustment because of the extensive time delay

between the recording of the accrual and its ultimate settlement, an interval that can generally range up to one year. Because of this lag, our recording of adjustments to reflect actual amounts can incorporate revisions of several prior quarters. Rebate accruals are product specific and, therefore for any period, are impacted by the mix of products sold as well as the forecasted channel mix for each individual product. For further information, see the *Analysis of the Consolidated Statements of Income—Revenue Deductions* section within MD&A and *Note 1H*.

*Asset Impairments*

We review all of our long-lived assets for impairment indicators throughout the year. We perform impairment testing for indefinite-lived intangible assets and goodwill at least annually and for all other long-lived assets whenever impairment indicators are present. When necessary, we record charges for impairments of long-lived assets for the amount by which the fair value is less than the carrying value of these assets. Our impairment review processes are described in *Note 1M*.

Examples of events or circumstances that may be indicative of impairment include:

- A significant adverse change in legal factors or in the business climate that could affect the value of the asset. For example, a successful challenge of our patent rights would likely result in generic competition earlier than expected.
- A significant adverse change in the extent or manner in which an asset is used such as a restriction imposed by the FDA or other regulatory authorities that could affect our ability to manufacture or sell a product.
- An expectation of losses or reduced profits associated with an asset. This could result, for example, from a change in a government reimbursement program that results in an inability to sustain projected product revenues and profitability. This also could result from the introduction of a competitor's product that impacts projected revenue growth, as well as the lack of acceptance of a product by patients, physicians and payers. For IPR&D projects, this could result from, among other things, a change in outlook based on clinical trial data, a delay in the projected launch date or additional expenditures to commercialize the product.

*Identifiable Intangible Assets*

We use an income approach, specifically the discounted cash flow method to determine the fair value of intangible assets, other than goodwill. We start with a forecast of all the expected net cash flows associated with the asset, which incorporates the consideration of a terminal value for indefinite-lived assets, and then we apply an asset-specific discount rate to arrive at a net present value amount. Some of the more significant estimates and assumptions that impact our fair value estimates include: the amount and timing of the projected net cash flows, which includes the expected impact of competitive, legal and/or regulatory forces on the projections and the impact of technological advancements and risk associated with IPR&D assets, as well as the selection of a long-term growth rate; the discount rate, which seeks to reflect the various risks inherent in the projected cash flows; and the tax rate, which seeks to incorporate the geographic origin of the projected cash flows.

While all intangible assets other than goodwill can face events and circumstances that can lead to impairment, those that are most at risk of impairment include IPR&D assets (approximately $3.1 billion as of December 31, 2021) and newly acquired or recently impaired indefinite-lived brand assets. IPR&D assets are high-risk assets, given the uncertain nature of R&D. Newly acquired and recently impaired indefinite-lived assets are more vulnerable to impairment as the assets are recorded at fair value and are then subsequently measured at the lower of fair value or carrying value at the end of each reporting period. As such, immediately after acquisition or impairment, even small declines in the outlook for these assets can negatively impact our ability to recover the carrying value and can result in an impairment charge.

*Goodwill*

Our goodwill impairment review work as of December 31, 2021 concluded that none of our goodwill was impaired and we do not believe the risk of impairment is significant at this time.

In our review, we first assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. Qualitative factors that we consider include, for example, macroeconomic and industry conditions, overall financial performance and other relevant entity-specific events. If we conclude that it is more likely than not that the fair value of a reporting unit is less than its carrying value, we then perform a quantitative fair value test.

When we are required to determine the fair value of a reporting unit, we typically use the income approach. The income approach is a forward-looking approach to estimating fair value and relies primarily on internal forecasts. Within the income approach, we use the discounted cash flow method. We start with a forecast of all the expected net cash flows for the reporting unit, which includes the application of a terminal value, and then apply a reporting unit-specific discount rate to arrive at a net present value amount. Some of the more significant estimates and assumptions inherent in this approach include: the amount and timing of the projected net cash flows, which includes the expected impact of technological risk and competitive, legal and/or regulatory forces on the projections, as well as the selection of a long-term growth rate; the discount rate, which seeks to reflect the various risks inherent in the projected cash flows; and the tax rate, which seeks to incorporate the geographic diversity of the projected cash flows.

For all of our reporting units, there are a number of future events and factors that may impact future results and that could potentially have an impact on the outcome of subsequent goodwill impairment testing. For a list of these factors, see the *Forward-Looking Information and Factors That May Affect Future Result*s and the *Item 1A. Risk Factors* sections in this Form 10-K.

*Benefit Plans*

For a description of our different benefit plans, see *Note 11*.

Our assumptions reflect our historical experiences and our judgment regarding future expectations that have been deemed reasonable by management. The judgments made in determining the costs of our benefit plans can materially impact our results of operations.

The following provides (i) at the end of each year, the expected annual rate of return on plan assets for the following year, (ii) the actual annual rate of return on plan assets achieved in each year, and (iii) the weighted-average discount rate used to measure the benefit obligations at the end of each year for our U.S. pension plans and our international pension plans[a]:

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| **U.S. Pension Plans** | | | |
| Expected annual rate of return on plan assets | 6.3 % | 6.8 % | 7.0 % |
| Actual annual rate of return on plan assets | 9.2 | 14.1 | 22.6 |
| Discount rate used to measure the plan obligations | 2.9 | 2.6 | 3.3 |
| **International Pension Plans** | | | |
| Expected annual rate of return on plan assets | 3.1 | 3.4 | 3.6 |
| Actual annual rate of return on plan assets | 11.4 | 9.7 | 10.7 |
| Discount rate used to measure the plan obligations | 1.6 | 1.5 | 1.7 |

[a] For detailed assumptions associated with our benefit plans, see *Note 11B*.

*Expected Annual Rate of Return on Plan Assets*

The assumptions for the expected annual rate of return on all of our plan assets reflect our actual historical return experience and our long-term assessment of forward-looking return expectations by asset classes, which is used to develop a weighted-average expected return based on the implementation of our targeted asset allocation in our respective plans.

The expected annual rate of return on plan assets for our U.S. plans and the majority of our international plans is applied to the fair value of plan assets at each year-end and the resulting amount is reflected in our net periodic benefit costs in the following year.

The following illustrates the sensitivity of net periodic benefit costs to a 50 basis point decline in our assumption for the expected annual rate of return on plan assets, holding all other assumptions constant (in millions, pre-tax):

| Assumption | Change | Increase in 2022 Net Periodic Benefit Costs |
|---|---|---|
| Expected annual rate of return on plan assets | 50 basis point decline | $133 |

The actual return on plan assets was approximately $2.6 billion during 2021.

*Discount Rate Used to Measure Plan Obligations*

The weighted-average discount rate used to measure the plan obligations for our U.S. defined benefit plans is determined at least annually and evaluated and modified, as required, to reflect the prevailing market rate of a portfolio of high-quality fixed income investments, rated AA/Aa or better, that reflect the rates at which the pension benefits could be effectively settled. The discount rate used to measure the plan obligations for our international plans is determined at least annually by reference to investment grade corporate bonds, rated AA/Aa or better, including, when there is sufficient data, a yield-curve approach. These discount rate determinations are made in consideration of local requirements. The measurement of the plan obligations at the end of the year will affect the amount of service cost, interest cost and amortization expense reflected in our net periodic benefit costs in the following year.

The following illustrates the sensitivity of net periodic benefit costs and benefit obligations to a 10 basis point decline in our assumption for the discount rate, holding all other assumptions constant (in millions, pre-tax):

| Assumption | Change | Decrease in 2022 Net Periodic Benefit Costs | Increase to 2021 Benefit Obligations |
|---|---|---|---|
| Discount rate | 10 basis point decline | $16 | $442 |

The change in the discount rates used in measuring our plan obligations as of December 31, 2021 resulted in a decrease in the measurement of our aggregate plan obligations by approximately $786 million.

*Income Tax Assets and Liabilities*

Income tax assets and liabilities include income tax valuation allowances and accruals for uncertain tax positions. For additional information, see *Notes 1Q* and *5,* as well as the *Analysis of Financial Condition, Liquidity, Capital Resources and Market Risk* section within MD&A.

*Contingencies*

We and certain of our subsidiaries are subject to numerous contingencies arising in the ordinary course of business, including tax, legal contingencies and guarantees and indemnifications. For additional information, see *Notes 1Q*, *1S*, *5D* and *16*.

## ANALYSIS OF THE CONSOLIDATED STATEMENTS OF INCOME

### Revenues by Geography

The following presents worldwide revenues by geography:

| | | | | | | | | | | % Change | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Year Ended December 31, | | | | | | | | | | | |
| | Worldwide | | | U.S. | | | International | | | Worldwide | | U.S. | | International | |
| (MILLIONS) | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 | **21/20** | 20/19 | **21/20** | 20/19 | **21/20** | 20/19 |
| Operating segments: | | | | | | | | | | | | | | | |
| Biopharma | $ **79,557** | $ 40,724 | $ 38,013 | $ **29,221** | $ 21,055 | $ 18,901 | $ **50,336** | $ 19,670 | $ 19,112 | **95** | 7 | **39** | 11 | **156** | 3 |
| Pfizer CentreOne | **1,731** | 926 | 810 | **524** | 400 | 437 | **1,206** | 526 | 374 | **87** | 14 | **31** | (8) | **129** | 41 |
| Consumer Healthcare | **—** | — | 2,082 | **—** | — | 988 | **—** | — | 1,094 | **—** | (100) | **—** | (100) | **—** | (100) |
| Total revenues | $ **81,288** | $ 41,651 | $ 40,905 | $ **29,746** | $ 21,455 | $ 20,326 | $ **51,542** | $ 20,196 | $ 20,579 | **95** | 2 | **39** | 6 | **155** | (2) |

*2021 v. 2020*

The following provides an analysis of the change in worldwide revenues by geographic areas in 2021:

| (MILLIONS) | Worldwide | U.S. | International |
|---|---|---|---|
| Operational growth/(decline): | | | |
| Growth from Comirnaty, Eliquis, Biosimilars, Vyndaqel/Vyndamax, the Hospital therapeutic area, Inlyta and Xtandi, partially offset by a decline from the Prevnar family, while Xeljanz and Ibrance were flat. See the *Analysis of the Consolidated Statements of Income—Revenues—Selected Product Discussion* within MD&A for additional analysis | $ **38,546** | $ **8,802** | $ **29,744** |
| Growth from PC1 primarily reflecting manufacturing of legacy Upjohn products for Viatris under manufacturing and supply agreements and certain Comirnaty-related manufacturing activities performed on behalf of BioNTech. See the *Analysis of the Consolidated Statements of Income—Revenues—Selected Product Discussion* within MD&A for additional analysis | **780** | **124** | **656** |
| Lower revenues for Chantix/Champix, Enbrel and Sutent: <br>• The decrease for Chantix/Champix was driven by the voluntary recall across multiple markets in the second half of 2021 and the ongoing global pause in shipments of Chantix due to the presence of N-nitroso-varenicline above an acceptable level of intake set by various global regulators, the ultimate timing for resolution of which may vary by country, and the negative impact of the COVID-19 pandemic resulting in a decline in patient visits to doctors for preventive health purposes <br>• The decrease for Enbrel internationally primarily reflects continued biosimilar competition, which is expected to continue <br>• The decrease for Sutent primarily reflects lower volume demand in the U.S. resulting from its loss of exclusivity in August 2021, as well as continued erosion as a result of increased competition in certain international developed markets | **(869)** | **(501)** | **(368)** |
| Other operational factors, net | **(27)** | **(134)** | **106** |
| Operational growth, net | **38,429** | **8,291** | **30,137** |
| Favorable impact of foreign exchange | **1,208** | **—** | **1,208** |
| *Revenues* increase/(decrease) | $ **39,637** | $ **8,291** | $ **31,346** |

Emerging markets revenues increased $12.3 billion, or 147%, in 2021 to $20.7 billion from $8.4 billion in 2020, reflecting an operational increase of $12.2 billion, or 145%, and a favorable impact from foreign exchange of approximately 2%. The operational increase in emerging markets was primarily driven by revenues from Comirnaty and growth from certain products in the Hospital therapeutic area, Eliquis and PC1, partially offset by a decline from the Prevnar family.

*2020 v. 2019*

The following provides an analysis of the change in worldwide revenues by geographic areas in 2020:

| (MILLIONS) | | Worldwide | | U.S. | | International |
|---|---|---|---|---|---|---|
| Operational growth/(decline): | | | | | | |
| Growth from Vyndaqel/Vyndamax, Eliquis, Biosimilars, Ibrance, Inlyta, Xeljanz, Xtandi, the Hospital therapeutic area and the Prevnar family | $ | 3,560 | $ | 2,132 | $ | 1,428 |
| Growth from PC1 in international markets driven by growth of certain key accounts as well new contract manufacturing activities | | 114 | | (36) | | 151 |
| Impact of completion of the Consumer Healthcare JV transaction. Revenues in 2019 reflect seven months of Consumer Healthcare business domestic operations and eight months of international operations, and none in 2020 | | (2,082) | | (988) | | (1,094) |
| Lower revenues for Enbrel internationally, primarily reflecting continued biosimilar competition in most developed Europe markets, as well as in Japan and Brazil, all of which is expected to continue | | (320) | | — | | (320) |
| Decline from Chantix/Champix reflecting the negative impact of the COVID-19 pandemic resulting in a decline in patient visits to doctors for preventive health purposes as well as the loss of patent protection in the U.S. in November 2020 | | (185) | | (183) | | (2) |
| Other operational factors, net | | (9) | | 205 | | (214) |
| Operational growth/(decline), net | | 1,078 | | 1,129 | | (50) |
| Unfavorable impact of foreign exchange | | (331) | | — | | (331) |
| *Revenues* increase/(decrease) | $ | 746 | $ | 1,129 | $ | (383) |

Revenues for 2020 included an estimated unfavorable impact of approximately $700 million, or 2%, due to COVID-19, primarily reflecting lower demand for certain products in China and unfavorable disruptions to wellness visits for patients in the U.S., which negatively impacted prescribing patterns for certain products, partially offset by increased U.S. demand for certain sterile injectable products and increased adult uptake for the Prevnar family in certain international markets, resulting from greater vaccine awareness for respiratory illnesses, and U.S. revenues for Comirnaty.

Emerging markets revenues decreased $456 million, or 5%, in 2020 to $8.4 billion, from $8.8 billion in 2019, and were relatively flat operationally, reflecting an unfavorable impact of foreign exchange of 5% on emerging markets revenues. The relatively flat operational performance was primarily driven by growth from Eliquis, the Prevnar family, Ibrance and Zavicefta, offset by lower revenues for Consumer Healthcare, reflecting the July 31, 2019 completion of the Consumer Healthcare JV transaction.

*Revenue Deductions*

Our gross product revenues are subject to a variety of deductions, which generally are estimated and recorded in the same period that the revenues are recognized. These deductions represent estimates of related obligations and, as such, knowledge and judgment are required when estimating the impact of these revenue deductions on gross sales for a reporting period. Historically, adjustments to these estimates to reflect actual results or updated expectations, have not been material to our overall business and generally have been less than 1% of revenues. Product-specific rebates, however, can have a significant impact on year-over-year individual product revenue growth trends.

The following presents information about revenue deductions:

| (MILLIONS) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2021** | | 2020 | | 2019 |
| Medicare rebates | $ | **726** | $ | 647 | $ | 628 |
| Medicaid and related state program rebates | | **1,214** | | 1,136 | | 1,259 |
| Performance-based contract rebates | | **3,253** | | 2,660 | | 2,332 |
| Chargebacks | | **6,122** | | 4,531 | | 3,411 |
| Sales allowances | | **4,809** | | 3,835 | | 3,776 |
| Sales returns and cash discounts | | **1,054** | | 924 | | 878 |
| Total | $ | **17,178** | $ | 13,733 | $ | 12,284 |

Revenue deductions are primarily a function of product sales volume, mix of products sold, contractual or legislative discounts and rebates.

For information on our accruals for revenue deductions, including the balance sheet classification of these accruals, see *Note 1H.*

**Revenues—Selected Product Discussion**

**Biopharma**

| (MILLIONS) | Global Revenues | Region | Revenue Year Ended Dec. 31, 2021 | 2020 | % Change Total | Oper. | Operational Results Commentary |
|---|---|---|---|---|---|---|---|
| **Product** | **$36,781** | U.S. | $ 7,809 | $ 154 | * | | |
| **Comirnaty**(a) | * | Int'l. | 28,972 | — | * | | * Driven by global uptake, following a growing number of regulatory approvals and temporary authorizations. |
| | | Worldwide | 36,781 | $ 154 | * | * | |
| | **$5,970** | U.S. | $ 3,160 | $ 2,688 | 18 | | Global growth driven primarily by continued increased adoption in non-valvular atrial fibrillation and oral anti-coagulant market share gains, as well as a favorable adjustment related to the Medicare "coverage gap" provision resulting from lower than previously expected discounts in prior periods. |
| **Eliquis** | Up 19% | Int'l. | 2,810 | 2,260 | 24 | 21 | |
| | (operationally) | Worldwide | 5,970 | $ 4,949 | 21 | 19 | |
| | **$5,437** | U.S. | $ 3,418 | $ 3,634 | (6) | | Flat performance driven primarily by accelerating demand internationally as the delays in diagnosis and treatment initiations caused by the COVID-19 pandemic show signs of recovery across several international markets, offset by a decline in the U.S., primarily driven by an increase in the proportion of patients accessing Ibrance through our Patient Assistance Program. |
| **Ibrance** | Flat | Int'l. | 2,019 | 1,758 | 15 | 12 | |
| | | Worldwide | 5,437 | $ 5,392 | 1 | — | |
| | **$5,272** | | | | | | Decline primarily resulting from:<br>• the normalization of demand in Germany and certain other developed markets following significantly increased adult demand in 2020 resulting from greater vaccine awareness for respiratory illnesses due to the COVID-19 pandemic;<br>• the adult indication due to disruptions to healthcare activity related to COVID-19, including the prioritization of primary and booster vaccination campaigns for COVID-19 in the U.S.;<br>• the continued impact of the lower remaining unvaccinated eligible adult population in the U.S. and the June 2019 change to the ACIP recommendation for the Prevnar 13 adult indication to shared clinical decision-making; and<br>• a decline in the pediatric indication internationally due to disruptions to healthcare activity related to COVID-19. |
| **Prevnar family** | Down 11% | | | | | | |
| | (operationally) | | | | | | |
| | | U.S. | $ 2,701 | $ 2,930 | (8) | | This decline was partially offset by:<br>• U.S. growth in the pediatric indication, driven by government purchasing patterns, which was partially offset by disruptions to healthcare activity related to COVID-19. |
| | | Int'l. | 2,571 | 2,920 | (12) | (13) | |
| | | Worldwide | 5,272 | $ 5,850 | (10) | (11) | |
| | **$2,455** | | | | | | Flat performance as a decline in the U.S. was offset by operational growth internationally. The decline in the U.S. was primarily driven by:<br>• the negative impact of data from a long-term safety study, which resulted in JAK class labeling issued by the FDA in December 2021;<br>• an unfavorable change in channel mix toward lower-priced channels, despite a 2% increase in underlying demand, driven by growth in our UC and PsA indications; and<br>• continued investments to improve formulary positioning and unlock access to additional patient lives. |
| **Xeljanz** | Flat | U.S. | $ 1,647 | $ 1,706 | (3) | | |
| | (operationally) | | | | | | The decline in the U.S. was offset by:<br>• operational growth internationally mainly driven by continued uptake in the UC indication in certain developed markets. |
| | | Int'l. | 808 | 731 | 11 | 8 | |
| | | Worldwide | $ 2,455 | $ 2,437 | 1 | — | |
| | **$2,015** | U.S. | $ 909 | $ 613 | 48 | | |
| **Vyndaqel/ Vyndamax** | Up 55% | Int'l. | 1,106 | 675 | 64 | 61 | Growth primarily driven by continued strong uptake of the ATTR-CM indication in the U.S., developed Europe and Japan. |
| | (operationally) | Worldwide | $ 2,015 | $ 1,288 | 56 | 55 | |
| | **$1,185** | U.S. | $ 1,185 | $ 1,024 | 16 | | |
| **Xtandi** | Up 16% | Int'l. | — | — | — | — | Growth primarily driven by strong demand across the mCRPC, nmCRPC and mCSPC indications. |
| | (operationally) | Worldwide | $ 1,185 | $ 1,024 | 16 | 16 | |
| | **$1,002** | U.S. | $ 599 | $ 523 | 15 | | |
| **Inlyta** | Up 26% | Int'l. | 403 | 264 | 53 | 49 | Growth primarily reflects continued adoption in developed Europe and the U.S. of combinations of certain immune checkpoint inhibitors and Inlyta for the first-line treatment of patients with advanced RCC. |
| | (operationally) | Worldwide | $ 1,002 | $ 787 | 27 | 26 | |

| (MILLIONS) Product | Global Revenues | Region | Revenue Year Ended Dec. 31, 2021 | 2020 | % Change Total | Oper. | Operational Results Commentary |
|---|---|---|---|---|---|---|---|
| | $2,343 | U.S. | $ 1,561 | $ 899 | 74 | | |
| Biosimilars | Up 51% | Int'l. | 782 | 628 | 25 | 19 | Growth primarily driven by recent oncology monoclonal antibody biosimilar launches and growth from Retacrit in the U.S. |
| | (operationally) | Worldwide | $ 2,343 | $ 1,527 | 53 | 51 | |
| | $7,301 | U.S. | $ 2,688 | $ 2,705 | (1) | | |
| Hospital | Up 5% | Int'l. | 4,613 | 4,073 | 13 | 9 | Growth primarily driven by the anti-infectives portfolio in international markets, primarily as a result of recent launches of Zavicefta and Cresemba. |
| | (operationally) | Worldwide | $ 7,301 | $ 6,777 | 8 | 5 | |

## Pfizer CentreOne

| (MILLIONS) Operating Segment | Global Revenues | Region | Revenue Year Ended Dec. 31, 2021 | 2020 | % Change Total | Oper. | Operational Results Commentary |
|---|---|---|---|---|---|---|---|
| | $1,731 | U.S. | $ 524 | $ 400 | 31 | | |
| PC1 | Up 84% | Int'l. | 1,206 | 526 | 129 | 125 | Growth primarily reflects manufacturing of legacy Upjohn products for Viatris under manufacturing and supply agreements and certain Comirnaty-related manufacturing activities performed on behalf of BioNTech. |
| | (operationally) | Worldwide | $ 1,731 | $ 926 | 87 | 84 | |

(a) Comirnaty includes direct sales and alliance revenues related to sales of the Pfizer-BioNTech COVID-19 vaccine, which are recorded within our Vaccines therapeutic area. It does not include revenues for certain Comirnaty-related manufacturing activities performed on behalf of BioNTech, which are included in the PC1 contract development and manufacturing organization. Revenues related to these manufacturing activities totaled $320 million for 2021 and $0 million in 2020.

* Calculation is not meaningful or results are equal to or greater than 100%.

See the *Item 1. Business—Patents and Other Intellectual Property Rights* section in this Form 10-K for information regarding the expiration of various patent rights, *Note 16* for a discussion of recent developments concerning patent and product litigation relating to certain of the products discussed above and *Note 17C* for additional information regarding the primary indications or class of the selected products discussed above.

## Costs and Expenses

Costs and expenses follow:

| (MILLIONS) | Year Ended December 31, 2021 | 2020 | 2019 | % Change 21/20 | 20/19 |
|---|---|---|---|---|---|
| *Cost of sales* | $ 30,821 | $ 8,484 | $ 8,054 | * | 5 |
| Percentage of *Revenues* | 37.9 % | 20.4 % | 19.7 % | | |
| *Selling, informational and administrative expenses* | 12,703 | 11,597 | 12,726 | 10 | (9) |
| *Research and development expenses* | 13,829 | 9,393 | 8,385 | 47 | 12 |
| *Amortization of intangible assets* | 3,700 | 3,348 | 4,429 | 11 | (24) |
| *Restructuring charges and certain acquisition-related costs* | 802 | 579 | 601 | 38 | (4) |
| *Other (income)/deductions—net* | (4,878) | 1,219 | 3,497 | * | (65) |

* Calculation is not meaningful or results are equal to or greater than 100%.

### Cost of Sales

*2021 v. 2020*

*Cost of sales* increased $22.3 billion, primarily due to:

• the impact of Comirnaty, which includes a charge for the 50% gross profit split with BioNTech and applicable royalty expenses;

• increased sales volumes of other products, driven mostly by PC1; and

• the unfavorable impact of foreign exchange and hedging activity on intercompany inventory.

The increase in *Cost of sales* as a percentage of revenues was primarily due to all of the factors discussed above, partially offset by an increase in alliance revenues, which have no associated cost of sales.

*2020 v. 2019*

*Cost of sales* increased $431 million, primarily due to:

• increased sales volumes;

• an increase in royalty expenses, due to an increase in sales of related products; and

• an unfavorable impact of incremental costs incurred in response to the COVID-19 pandemic; and

• an unfavorable impact of foreign exchange and hedging activity on intercompany inventory,

partially offset by:

• the favorable impact of the July 31, 2019 completion of the Consumer Healthcare JV transaction.

The increase in *Cost of sales* as a percentage of revenues was primarily due to all of the factors discussed above, partially offset by an increase in alliance revenues, which have no associated cost of sales.

## *Selling, Informational and Administrative (SI&A) Expenses*

### *2021 v. 2020*

SI&A expenses increased $1.1 billion, mostly due to:

• increased product-related spending across multiple therapeutic areas;

• costs related to Comirnaty, driven by a higher provision for healthcare reform fees based on sales; and

• an increase in costs related to implementing our cost-reduction/productivity initiatives,

partially offset by:

• lower spending on Chantix following the loss of patent protection in the U.S. in November 2020.

### *2020 v. 2019*

SI&A expenses decreased $1.1 billion, mostly due to:

• the favorable impact of the July 31, 2019 completion of the Consumer Healthcare JV transaction;

• lower spending for corporate enabling functions;

• lower spending on sales and marketing activities due to the impact of the COVID-19 pandemic; and

• lower investments across the Internal Medicine and Inflammation & Immunology portfolios,

partially offset by:

• an increase in costs related to implementing our cost-reduction/productivity initiatives; and

• an increase in business and legal entity alignment costs.

## *Research and Development (R&D) Expenses*

### *2021 v. 2020*

R&D expenses increased $4.4 billion, primarily due to:

• a charge for acquired IPR&D related to our acquisition of Trillium;

• a net increase in charges for upfront and milestone payments on collaboration and licensing arrangements, driven by payments to Arvinas and Beam; and

• increased investments across multiple therapeutic areas, including additional spending related to the development of the oral COVID-19 treatment program.

### *2020 v. 2019*

R&D expenses increased $1.0 billion, mainly due to:

• costs related to our collaboration agreement with BioNTech to co-develop a COVID-19 vaccine, including an upfront payment to BioNTech and a premium paid on our equity investment in BioNTech;

• a net increase in upfront payments, mainly related to Myovant and Valneva; and

• increased investments towards building new capabilities and driving automation,

partially offset by:

• a net reduction of upfront and milestone payments associated with the acquisition of Therachon and Akcea in 2019.

## *Amortization of Intangible Assets*

### *2021 v. 2020*

Amortization of intangible assets increased $353 million, primarily due to amortization of capitalized Comirnaty sales milestones to BioNTech.

### *2020 v. 2019*

Amortization of intangible assets decreased $1.1 billion, mainly due the non-recurrence of amortization of fully amortized assets and the impairment of Eucrisa in the fourth quarter of 2019, partially offset by the increase in amortization of intangible assets from our acquisition of Array.

For additional information, see *Notes 2A* and *10A*.

## *Restructuring Charges and Other Costs Associated with Acquisitions and Cost-Reduction/Productivity Initiatives*

### *Transforming to a More Focused Company Program*

For a description of our program, as well as the anticipated and actual costs, see *Note 3*. The program savings discussed below may be rounded and represent approximations. In connection with restructuring our corporate enabling functions, we expect gross cost savings of $1.0 billion, or net cost savings, excluding merit and inflation growth and certain real estate cost increases, of $700 million, to be achieved primarily from 2021 through 2022. In connection with transforming our marketing strategy, we expect net cost savings of $1.3 billion, to be achieved primarily from

2022 through 2024. In connection with manufacturing network optimization, we expect net cost savings of $550 million to be achieved primarily from 2020 through 2023.

Certain qualifying costs for this program were recorded in 2021 and 2020, and in the fourth quarter of 2019, and are reflected as Certain Significant Items and excluded from our non-GAAP measure of Adjusted Income. See the *Non-GAAP Financial Measure: Adjusted Income* section of this MD&A.

In addition to this program, we continuously monitor our operations for cost reduction and/or productivity opportunities, especially in light of the losses of exclusivity and the expiration of collaborative arrangements for various products.

### *Other (Income)/Deductions—Net*

*2021 v. 2020*

Other income—net increased $6.1 billion, mainly due to:

• net periodic benefit credits recorded in 2021 versus net periodic benefit costs recorded in 2020;

• lower asset impairment charges;

• higher net gains on equity securities; and

• net gains on asset disposals in 2021 versus net losses in 2020.

*2020 v. 2019*

Other deductions—net decreased $2.3 billion, mainly due to:

• lower asset impairment charges;

• lower business and legal entity alignment costs;

• higher Consumer Healthcare JV equity method income;

• lower charges for certain legal matters; and

• higher income from collaborations, out-licensing arrangements and sales of compound/product rights,
  partially offset by:

• higher net losses on asset disposals.

See *Note 4* for additional information.

### *Provision/(Benefit) for Taxes on Income*

| | | Year Ended December 31, | | | % Change | |
|---|---|---|---|---|---|---|
| (MILLIONS) | **2021** | 2020 | 2019 | | **21/20** | 20/19 |
| *Provision/(benefit) for taxes on income* | $ **1,852** | $ 370 | $ 583 | | * | (36) |
| Effective tax rate on continuing operations | **7.6 %** | 5.3 % | 5.2 % | | | |

\* Indicates calculation not meaningful or result is equal to or greater than 100%.

For information about our effective tax rate and the events and circumstances contributing to the changes between periods, as well as details about discrete elements that impacted our tax provisions, see *Note 5*.

### *Discontinued Operations*

For information about our discontinued operations, see *Note 2B*.

### PRODUCT DEVELOPMENTS

A comprehensive update of Pfizer's development pipeline was published as of February 8, 2022 and is available at www.pfizer.com/science/drug-product-pipeline. It includes an overview of our research and a list of compounds in development with targeted indication and phase of development, as well as mechanism of action for some candidates in Phase 1 and all candidates from Phase 2 through registration.

The following provides information about significant marketing application-related regulatory actions by, and filings pending with, the FDA and regulatory authorities in the EU and Japan.

The table below includes only approvals for products that have occurred in the last twelve months and does not include approvals that may have occurred prior to that time. The table includes filings with regulatory decisions pending (even if the filing occurred outside of the last twelve-month period).

| PRODUCT | DISEASE AREA | APPROVED/FILED* | | |
|---|---|---|---|---|
| | | **U.S.** | **EU** | **JAPAN** |
| Comirnaty/BNT162b2 (PF-07302048)(a) | Immunization to prevent COVID-19 (16 years of age and older) | **BLA** Aug. 2021 | **CMA** Dec. 2020 | **Approved** Feb. 2021 |
| | Immunization to prevent COVID-19 (12-15 years of age) | **EUA** May 2021 | **CMA** May 2021 | **Approved** May 2021 |
| | Immunization to prevent COVID-19 (booster) | **EUA** Sep. 2021 | **CMA** Oct. 2021 | **Approved** Nov. 2021 |
| | Immunization to prevent COVID-19 (5-11 years of age) | **EUA** Oct. 2021 | **CMA** Nov. 2021 | **Approved** Jan. 2022 |
| Bavencio (avelumab)(b) | First-line maintenance urothelial cancer | | **Approved** Jan. 2021 | **Approved** Feb. 2021 |
| Xtandi (enzalutamide)(c) | mCSPC | | **Approved** April 2021 | |
| Cibinqo (abrocitinib) | Atopic dermatitis | **Approved** Jan. 2022 | **Approved** Dec. 2021 | **Approved** Sep. 2021 |
| Xeljanz (tofacitinib) | Ankylosing spondylitis | **Approved** Dec. 2021 | **Approved** Nov. 2021 | |
| Myfembree (relugolix fixed dose combination)(d) | Uterine fibroids (combination with estradiol and norethindrone acetate) | **Approved** May 2021 | | |
| | Endometriosis (combination with estradiol and norethindrone acetate) | **Filed** Sep. 2021 | | |
| Lorbrena/Lorviqua (lorlatinib) | First-line ALK-positive NSCLC | **Approved** Mar. 2021 | **Approved** Jan. 2022 | **Approved** Nov. 2021 |
| Ngenla (somatrogon)(e) | Pediatric growth hormone deficiency | **Filed** Jan. 2022 | **Approved** Feb. 2022 | **Approved** Jan. 2022 |
| Prevnar 20/Apexxnar (Vaccine)(f) | Immunization to prevent invasive and non-invasive pneumococcal infections (adults) | **Approved** June 2021 | **Approved** Feb. 2022 | |
| TicoVac (Vaccine) | Immunization to prevent tick-borne encephalitis | **Approved** Aug. 2021 | | |
| Paxlovid (nirmatrelvir [PF-07321332]; ritonavir)(g) | COVID-19 infection (high risk population) | **EUA** Dec. 2021 | **CMA** Jan. 2022 | **Approved** Feb. 2022 |
| Rimegepant(h) | Acute migraine | | **Filed** Feb. 2021 | |
| | Migraine prevention | | **Filed** Feb. 2021 | |

\* For the U.S., the filing date is the date on which the FDA accepted our submission. For the EU, the filing date is the date on which the EMA validated our submission.

(a) Being developed in collaboration with BioNTech. Prior to BLA, Comirnaty/BNT162b2 for ages 16 and up was available in the U.S. pursuant to an EUA from the FDA on December 11, 2020. In December 2021, a supplemental BLA was submitted to the FDA requesting to expand the approval of Comirnaty to include individuals ages 12 through 15 years. In February 2022, following a request from the FDA, a rolling submission seeking to amend the EUA to include children 6 months through 4 years of age (6 months to <5 years of age) was initiated as we wait for data evaluating a third 3 μg dose given at least two months after the second dose of the two-dose series in this age group. A booster dose received EUA from the FDA on September 22, 2021 for individuals 65 years of age and older, individuals 18 through 64 years of age at high risk of severe COVID-19, and individuals 18 through 64 years of age with frequent institutional or occupational exposure to SARS-CoV-2. In addition, in October 2021, the FDA authorized for emergency use a booster dose to eligible individuals who have completed primary vaccination with a different authorized COVID-19 vaccine. Subsequently, the FDA expanded the booster EUA: (i) in November 2021 to include individuals 18 years of age and older, (ii) in December 2021 to include individuals 16 years of age and older and (iii) in January 2022 to include individuals 12 years of age and older as well as individuals 5 through 11 years of age who have been determined to have certain kinds of immunocompromise. A booster dose received conditional marketing authorization from the EMA in October 2021 for individuals 18 years of age and older and may be given to individuals 5 years and older with a severely weakened immune system, at least 28 days after their second dose. A booster dose received approval in Japan in November 2021 for 18 years of age and older.

(b) Being developed in collaboration with Merck KGaA, Germany.

(c) Being developed in collaboration with Astellas.

(d) Being developed in collaboration with Myovant.

(e) Being developed in collaboration with OPKO. In January 2022, Pfizer and OPKO received a Complete Response Letter (CRL) from the FDA for the BLA for somatrogon. Pfizer is evaluating the CRL and will work with the FDA to determine an appropriate path forward in the U.S.

(f) In October 2021, the CDC's ACIP voted to recommend Prevnar 20 for routine use in adults. Specifically, the ACIP voted to recommend the following: (i) adults 65 years of age or older who have not previously received a pneumococcal conjugate vaccine or whose previous vaccination history is unknown should receive a pneumococcal conjugate vaccine (either pneumococcal 20-valent conjugate vaccine (PCV20) or pneumococcal 15-valent conjugate vaccine (PCV15)). If PCV15 is used, this should be followed by a dose of pneumococcal polysaccharide vaccine (PPSV23); and (ii) adults aged 19 years of age or older with certain underlying medical conditions or other risk factors who have not previously received a pneumococcal conjugate vaccine or whose previous vaccination history is unknown should receive a pneumococcal conjugate vaccine (either PCV20 or PCV15). If PCV15 is used, this should be followed by a dose of PPSV23. The

recommendations were published in the Morbidity and Mortality Weekly Report on January 28, 2022. The publication also notes "for adults who have received pneumococcal conjugate vaccine (PCV13) but have not completed their recommended pneumococcal vaccine series with PPSV23, one dose of Prevnar 20 may be used if PPSV23 is not available."

(g) In December 2021, the FDA authorized the emergency use of Paxlovid for the treatment of mild-to-moderate COVID-19 in adults and pediatric patients (12 years of age and older weighing at least 40 kg [88 lbs]) with positive results of direct SARS-CoV-2 viral testing, and who are at high risk for progression to severe COVID-19, including hospitalization or death. In January 2022, the EMA approved the CMA of Paxlovid for treating COVID-19 in adults who do not require supplemental oxygen and who are at increased risk of the disease becoming severe.

(h) Under a commercialization arrangement with Biohaven.

In September 2021, the FDA issued a Drug Safety Communication (DSC) related to Xeljanz/Xeljanz XR and two competitors' arthritis medicines in the same drug class, based on its completed review of the ORAL Surveillance trial. The DSC stated that the FDA will require revisions to the Boxed Warnings for each of these medicines to include information about the risks of serious heart-related events, cancer, blood clots, and death. In addition, the DSC indicated the FDA's intention to limit approved uses of these products to certain patients who have not responded or cannot tolerate one or more tumor necrosis factor (TNF) blockers. In December 2021, in light of the results from the completed required postmarketing safety study of Xeljanz, ORAL Surveillance (A3921133), the U.S. label for Xeljanz was revised. In addition, at the request of the EC, the PRAC of the EMA has adopted a referral procedure under Article 20 of Regulation (EC) No 726/2004 to assess safety information relating to oral JAK inhibitors authorized for inflammatory diseases, including Xeljanz and Cibinqo, which is ongoing. For additional information, see *Item 1A. Risk Factors—Post-Authorization/Approval Data*.

In China, the following products received regulatory approvals in the last twelve months: Cresemba for fungal infection and Besponsa for second line acute lymphoblastic leukemia, both in December 2021.

The following provides information about additional indications and new drug candidates in late-stage development:

| | PRODUCT/CANDIDATE | PROPOSED DISEASE AREA |
|---|---|---|
| **LATE-STAGE CLINICAL PROGRAMS FOR ADDITIONAL USES AND DOSAGE FORMS FOR IN-LINE AND IN-REGISTRATION PRODUCTS** | Ibrance (palbociclib)[a] | ER+/HER2+ metastatic breast cancer |
| | Xtandi (enzalutamide)[b] | Non-metastatic high-risk castration sensitive prostate cancer |
| | Talzenna (talazoparib) | Combination with Xtandi (enzalutamide) for first-line mCRPC |
| | | Combination with Xtandi (enzalutamide) for DNA Damage Repair (DDR)-deficient mCSPC |
| | PF-06482077 (Vaccine) | Immunization to prevent invasive and non-invasive pneumococcal infections (pediatric) |
| | somatrogon (PF-06836922)[c] | Adult growth hormone deficiency |
| | Braftovi (encorafenib) and Erbitux® (cetuximab)[d] | First-line BRAF^V600E-mutant mCRC |
| | Myfembree (relugolix fixed dose combination)[e] | Combination with estradiol and norethindrone acetate for contraceptive efficacy |
| | Braftovi (encorafenib) and Mektovi (binimetinib) and Keytruda® (pembrolizumab)[f] | BRAF^V600E-mutant metastatic or unresectable locally advanced melanoma |
| | Comirnaty/BNT162b2 (PF-07302048)[g] | Immunization to prevent COVID-19 (children 2 to <5 years of age) |
| | | Immunization to prevent COVID-19 (infants 6 months to <24 months) |
| | Paxlovid (nirmatrelvir [PF-07321332]; ritonavir) | COVID-19 Infection (standard risk population) |
| | | COVID-19 Infection (post exposure prophylaxis) |
| | aztreonam-avibactam (PF-06947387) | Treatment of infections caused by Gram-negative bacteria |
| **NEW DRUG CANDIDATES IN LATE-STAGE DEVELOPMENT** | fidanacogene elaparvovec (PF-06838435)[h] | Hemophilia B |
| | giroctocogene fitelparvovec (PF-07055480)[i] | Hemophilia A |
| | PF-06425090 (Vaccine) | Immunization to prevent primary clostridioides difficile infection |
| | PF-06886992 (Vaccine) | Immunization to prevent serogroups meningococcal infection (adolescent and young adults) |
| | PF-06928316 (Vaccine) | Immunization to prevent respiratory syncytial virus infection (maternal) |
| | | Immunization to prevent respiratory syncytial virus infection (older adults) |
| | PF-07265803 | Dilated cardiomyopathy due to Lamin A/C gene mutation |
| | ritlecitinib (PF-06651600) | Alopecia areata |
| | sasanlimab (PF-06801591) | Combination with Bacillus Calmette-Guerin for non-muscle-invasive bladder cancer |
| | fordadistrogene movaparvovec (PF-06939926) | Duchenne muscular dystrophy |
| | marstacimab (PF-06741086) | Hemophilia |
| | elranatamab (PF-06863135) | Multiple myeloma, double-class exposed |
| | Omicron-based mRNA vaccine[g] | Immunization to prevent COVID-19 (adults) |

(a) Being developed in collaboration with The Alliance Foundation Trials, LLC.
(b) Being developed in collaboration with Astellas.
(c) Being developed in collaboration with OPKO.
(d) Erbitux® is a registered trademark of ImClone LLC. In the EU, we are developing in collaboration with the Pierre Fabre Group. In Japan, we are developing in collaboration with Ono Pharmaceutical Co., Ltd.
(e) Being developed in collaboration with Myovant.
(f) Keytruda® is a registered trademark of Merck Sharp & Dohme Corp.
(g) Being developed in collaboration with BioNTech.

(h) Being developed in collaboration with Spark Therapeutics, Inc.
(i) Being developed in collaboration with Sangamo Therapeutics, Inc.

In February 2022, Pfizer and Merck KGaA, Darmstadt, Germany (Merck KGaA) provided an update on the Phase 3 JAVELIN Lung 100 trial, which assessed the safety and efficacy of two dosing regimens of avelumab monotherapy compared with platinum-based doublet chemotherapy as first-line treatment in patients with metastatic NSCLC whose tumors express PD-L1. While avelumab showed clinical activity in this population, the study did not meet the primary endpoints of overall survival and progression-free survival in the high PD-L1+population for either of the avelumab dosing regimens evaluated. The safety profile for avelumab in this trial was consistent with that observed in the overall JAVELIN clinical development program. Avelumab is not approved for the treatment of any patients with NSCLC. The outcome of the JAVELIN Lung 100 trial has no bearing on any of avelumab's currently-approved indications. Full results of the study will be shared at a future date.

In the fourth quarter of 2021, enrollment was stopped in C4591015 Study (a Phase 2/3 placebo controlled randomized observer-blind study to evaluate the safety, tolerability, and immunogenicity of BNT162b2 against COVID-19 in healthy pregnant women 18 years of age and older). This study was developed prior to availability or recommendation for COVID-19 vaccination in pregnant women. The environment changed during 2021 and by September 2021, COVID-19 vaccines were recommended by applicable recommending bodies (e.g., ACIP in the U.S.) for pregnant women in all participating/planned countries, and as a result the enrollment rate declined significantly. With the declining enrollment, the study had insufficient sample size to assess the primary immunogenicity objective and continuation of this placebo controlled study could no longer be justified due to global recommendations. This proposal was shared with and agreed to by FDA and EMA.

For additional information about our R&D organization, see the *Item 1. Business—Research and Development* section of this Form 10-K.

## NON-GAAP FINANCIAL MEASURE: ADJUSTED INCOME

Adjusted income is an alternative measure of performance used by management to evaluate our overall performance in conjunction with other performance measures. As such, we believe that investors' understanding of our performance is enhanced by disclosing this measure. We use Adjusted income, certain components of Adjusted income and Adjusted diluted EPS to present the results of our major operations—the discovery, development, manufacture, marketing, sale and distribution of biopharmaceutical products worldwide—prior to considering certain income statement elements as follows:

| Measure | Definition | Relevance of Metrics to Our Business Performance |
|---|---|---|
| Adjusted income | *Net income attributable to Pfizer Inc. common shareholders*(a) before the impact of purchase accounting for acquisitions, acquisition-related items, discontinued operations and certain significant items | • Provides investors useful information to: ◦ evaluate the normal recurring operational activities, and their components, on a comparable year-over-year basis ◦ assist in modeling expected future performance on a normalized basis |
| Adjusted cost of sales, Adjusted selling, informational and administrative expenses, Adjusted research and development expenses, Adjusted amortization of intangible assets and Adjusted other (income)/deductions—net | *Cost of sales, Selling, informational and administrative expenses, Research and development expenses, Amortization of intangible assets and Other (income)/deductions—net* (a), each before the impact of purchase accounting for acquisitions, acquisition-related items, discontinued operations and certain significant items, which are components of the Adjusted income measure | • Provides investors insight into the way we manage our budgeting and forecasting, how we evaluate and manage our recurring operations and how we reward and compensate our senior management(b) |
| Adjusted diluted EPS | *EPS attributable to Pfizer Inc. common shareholders—diluted* (a) before the impact of purchase accounting for acquisitions, acquisition-related items, discontinued operations and certain significant items | |

(a) Most directly comparable GAAP measure.
(b) The short-term incentive plans for substantially all non-sales-force employees worldwide are funded from a pool based on our performance, measured in significant part by three metrics, one of which is Adjusted diluted EPS, which is derived from Adjusted income and accounts for 40% of the bonus pool funding tied to financial performance. Additionally, the payout for performance share awards is determined in part by Adjusted net income, which is derived from Adjusted income. The bonus pool funding, which is largely based on financial performance, may be modified by our R&D performance as measured by four metrics relating to our pipeline and may be further modified by our Compensation Committee's assessment of other factors.

Adjusted income and its components and Adjusted diluted EPS are non-GAAP financial measures that have no standardized meaning prescribed by GAAP and, therefore, are limited in their usefulness to investors. Because of their non-standardized definitions, they may not be comparable to the calculation of similar measures of other companies and are presented to permit investors to more fully understand how management assesses performance. A limitation of these measures is that they provide a view of our operations without including all events during a period, and do not provide a comparable view of our performance to peers. These measures are not, and should not be viewed as, substitutes for their directly comparable GAAP measures of *Net income attributable to Pfizer Inc. common shareholders*, components of *Net income attributable to Pfizer Inc. common shareholders* and *EPS attributable to Pfizer Inc. common shareholders—diluted*, respectively. See the accompanying reconciliations of certain GAAP reported to non-GAAP adjusted information—certain line items for 2021, 2020 and 2019 below.

We also recognize that, as internal measures of performance, these measures have limitations, and we do not restrict our performance-management process solely to these measures. We also use other tools designed to achieve the highest levels of performance. For example, our R&D organization has productivity targets, upon which its effectiveness is measured. In addition, total shareholder return, both on an absolute basis and relative to a publicly traded pharmaceutical index, plays a significant role in determining payouts under certain of our incentive compensation plans.

*Purchase Accounting Adjustments*

Adjusted income excludes certain significant purchase accounting impacts resulting from business combinations and net asset acquisitions. These impacts can include the incremental charge to cost of sales from the sale of acquired inventory that was written up to fair value, amortization related to the increase in fair value of the acquired finite-lived intangible assets, and to a much lesser extent, depreciation related to the increase/decrease in fair value of the acquired fixed assets, amortization related to the increase in fair value of acquired debt, and the fair value changes for contingent consideration. Therefore, the Adjusted income measure includes the revenues earned upon the sale of the acquired products without considering the acquisition cost of those products.

The exclusion of amortization attributable to acquired intangible assets provides management and investors an alternative view of our results by providing a degree of parity to internally developed intangible assets for which R&D costs have been expensed. However, we have not factored in the impacts of any other differences that might have occurred if we had discovered and developed those intangible assets on our own, such as different R&D costs, timelines or resulting sales; accordingly, this approach does not intend to be representative of the results that would have occurred if we had discovered and developed the acquired intangible assets internally.

*Acquisition-Related Items*

Adjusted income excludes acquisition-related items, which are comprised of transaction, integration, restructuring charges and additional depreciation costs for business combinations because these costs are unique to each transaction and represent costs that were incurred to restructure and integrate businesses as a result of an acquisition. We have made no adjustments for resulting synergies.

The significant costs incurred in connection with a business combination result primarily from the need to eliminate duplicate assets, activities or employees—a natural result of acquiring a fully integrated set of activities. For this reason, we believe that such costs incurred can be viewed differently in the context of an acquisition from those costs incurred in other, more normal, business contexts. The integration and restructuring costs for a business combination may occur over several years, with the more significant impacts typically ending within three years of the relevant transaction. Because of the need for certain external approvals for some actions, the span of time needed to achieve certain restructuring and integration activities can be lengthy.

*Discontinued Operations*

Adjusted income excludes the results of discontinued operations, as well as any related gains or losses on the disposal of such operations. We believe that this presentation is meaningful to investors because, while we review our therapeutic areas and product lines for strategic fit with our operations, we do not build or run our business with the intent to continue those parts of our business. Restatements due to discontinued operations do not impact compensation or change the Adjusted income measure for the compensation in respect of the restated periods, but are presented for consistency across all periods.

*Certain Significant Items*

Adjusted income excludes certain significant items representing substantive and/or unusual items that are evaluated individually on a quantitative and qualitative basis. Certain significant items may be highly variable and difficult to predict. Furthermore, in some cases it is reasonably possible that they could reoccur in future periods. For example, although major non-acquisition-related cost-reduction programs are specific to an event or goal with a defined term, we may have subsequent programs based on reorganizations of the business, cost productivity or in response to LOE or economic conditions. Legal charges to resolve litigation are also related to specific cases, which are facts and circumstances specific and, in some cases, may also be the result of litigation matters at acquired companies that were inestimable, not probable or unresolved at the date of acquisition. Gains and losses on equity securities have a very high degree of inherent market volatility, which we do not control and cannot predict with any level of certainty and because we do not believe including these gains and losses assists investors in understanding our business or is reflective of our core operations and business. Unusual items represent items that are not part of our ongoing business; items that, either as a result of their nature or size, we would not expect to occur as part of our normal business on a regular basis; items that would be non-recurring; or items that relate to products we no longer sell. See the *Reconciliations of GAAP Reported to Non-GAAP Adjusted Information—Certain Line Items* below for a non-inclusive list of certain significant items.

Beginning in 2021, we exclude pension and postretirement actuarial remeasurement gains and losses from our measure of Adjusted income because of their inherent market volatility, which we do not control and cannot predict with any level of certainty and because we do not believe including these gains and losses assists investors in understanding our business or is reflective of our core operations and business.

*Reconciliations of GAAP Reported to Non-GAAP Adjusted Information—Certain Line Items*

**2021**

*Data presented will not (in all cases) aggregate to totals.*

| IN MILLIONS, EXCEPT PER COMMON SHARE DATA | Cost of sales | Selling, informational and administrative expenses | Research and development expenses | Amortization of intangible assets | Other (income)/deductions—net | Net income attributable to Pfizer Inc. common shareholders(a) | Earnings per common share attributable to Pfizer Inc. common shareholders—diluted |
|---|---|---|---|---|---|---|---|
| **GAAP reported** | $ 30,821 | $ 12,703 | $ 13,829 | $ 3,700 | $ (4,878) | $ 21,979 | $ 3.85 |
| Purchase accounting adjustments(b) | 25 | (3) | 6 | (3,088) | (114) | 3,175 | |
| Acquisition-related items | — | — | — | — | — | 52 | |
| Discontinued operations(c) | — | — | — | — | — | 585 | |
| Certain significant items: | | | | | | | |
| Restructuring charges/(credits) and implementation costs and additional depreciation—asset restructuring(d) | (108) | (450) | (1) | — | — | 1,309 | |
| Certain asset impairments(e) | — | — | — | — | (86) | 86 | |
| Upfront and milestone payments on collaborative and licensing arrangements(f) | — | — | (1,056) | — | — | 1,056 | |
| (Gains)/losses on equity securities(g) | — | — | — | — | 1,338 | (1,338) | |
| Actuarial valuation and other pension and postretirement plan (gains)/losses(g) | — | — | — | — | 1,601 | (1,601) | |
| Asset acquisitions of IPR&D(h) | — | — | (2,240) | — | — | 2,240 | |
| Other | (52) | (141) | (15) | — | (334) (i) | 542 | |
| Income tax provision—Non-GAAP items | | | | | | (2,848) | |
| Non-GAAP adjusted | $ 30,685 | $ 12,110 | $ 10,523 | $ 613 | $ (2,473) | $ 25,236 | $ 4.42 |

**2020**

*Data presented will not (in all cases) aggregate to totals.*

| IN MILLIONS, EXCEPT PER COMMON SHARE DATA | Cost of sales | Selling, informational and administrative expenses | Research and development expenses | Amortization of intangible assets | Other (income)/deductions—net | Net income attributable to Pfizer Inc. common shareholders(a) | Earnings per common share attributable to Pfizer Inc. common shareholders—diluted |
|---|---|---|---|---|---|---|---|
| **GAAP reported** | $ 8,484 | $ 11,597 | $ 9,393 | $ 3,348 | $ 1,219 | $ 9,159 | $ 1.63 |
| Purchase accounting adjustments(b) | 18 | (2) | 5 | (3,064) | (75) | 3,117 | |
| Acquisition-related items | — | — | — | — | — | 44 | |
| Discontinued operations(c) | — | — | — | — | — | (2,879) | |
| Certain significant items: | | | | | | | |
| Restructuring charges/(credits) and implementation costs and additional depreciation—asset restructuring(d) | (61) | (197) | 2 | — | — | 791 | |
| Certain asset impairments(e) | — | — | — | — | (1,691) | 1,691 | |
| Upfront and milestone payments on collaborative and licensing arrangements(f) | — | — | (454) | — | — | 454 | |
| (Gains)/losses on equity securities(g) | — | — | — | — | 557 | (557) | |
| Actuarial valuation and other pension and postretirement plan (gains)/losses(g) | — | — | — | — | (1,092) | 1,092 | |
| Asset acquisitions of IPR&D(h) | — | — | (50) | — | — | 50 | |
| Other | (56) | (292) (i) | (24) | — | (697) (i) | 1,063 | |
| Income tax provision—Non-GAAP items | | | | | | (1,299) | |
| Non-GAAP adjusted | $ 8,386 | $ 11,106 | $ 8,872 | $ 284 | $ (1,779) | $ 12,727 | $ 2.26 |

2019

*Data presented will not (in all cases) aggregate to totals.*

| IN MILLIONS, EXCEPT PER COMMON SHARE DATA | Cost of sales | Selling, informational and administrative expenses | Research and development expenses | Amortization of intangible assets | Other (income)/deductions—net | Net income attributable to Pfizer Inc. common shareholders[a] | Earnings per common share attributable to Pfizer Inc. common shareholders—diluted |
|---|---|---|---|---|---|---|---|
| **GAAP reported** | $ 8,054 | $ 12,726 | $ 8,385 | $ 4,429 | $ 3,497 | $ 16,026 | $ 2.82 |
| Purchase accounting adjustments[b] | 19 | 2 | 4 | (4,158) | (21) | 4,153 | |
| Acquisition-related items | — | (2) | — | — | — | 185 | |
| Discontinued operations[c] | — | — | — | — | — | (6,056) | |
| Certain significant items: | | | | | | | |
| Restructuring charges/(credits) and implementation costs and additional depreciation—asset restructuring[d] | (89) | (73) | (30) | — | — | 611 | |
| Certain asset impairments[e] | — | — | — | — | (2,757) | 2,757 | |
| Upfront and milestone payments on collaborative and licensing arrangements[f] | — | — | (279) | — | — | 279 | |
| (Gains)/losses on equity securities[g] | — | — | — | — | 415 | (415) | |
| Actuarial valuation and other pension and postretirement plan (gains)/losses[g] | — | — | — | — | (750) | 750 | |
| (Gain) on completion of Consumer Healthcare JV transaction | — | — | — | — | — | (8,107) | |
| Asset acquisitions of IPR&D[h] | — | — | (337) | — | — | 337 | |
| Other | (118) | (190) | (18) | — | (1,007) [i] | 1,333 | |
| Income tax provision—Non-GAAP items | | | | | | (797) | |
| **Non-GAAP adjusted** | $ 7,865 | $ 12,463 | $ 7,726 | $ 271 | $ (623) | $ 11,056 | $ 1.95 |

(a) Items that reconcile GAAP Reported to Non-GAAP Adjusted balances are shown pre-tax and include discontinued operations. Our effective tax rates for GAAP reported income from continuing operations were: 7.6% in 2021, 5.3% in 2020 and 5.2% in 2019. See *Note 5*. Our effective tax rates on Non-GAAP adjusted income were: 15.3% in 2021, 13.7% in 2020 and 16.0% in 2019.

(b) Purchase accounting adjustments include items such as the incremental charge to cost of sales from the sale of acquired inventory that was written up to fair value, amortization related to the increase in fair value of the acquired fixed-lived intangible assets, depreciation related to the increase/decrease in fair value of the acquired fixed assets, amortization related to the increase in fair value of acquired debt, and the fair value changes for contingent consideration. For all years presented, primarily consists of amortization of intangible assets.

(c) Relates primarily to the spin-off of our Upjohn Business, and our sale of Meridian. See *Note 2B*.

(d) Includes employee termination costs, asset impairments and other exit costs related to our cost-reduction and productivity initiatives not associated with acquisitions. See *Note 3*.

(e) Includes intangible asset impairment charges. For 2020, $900 million is related to IPR&D assets acquired from Array and $528 million is related to Eucrisa. For 2019, $2.6 billion is related to Eucrisa. See *Note 4*.

(f) Primarily includes the following charges: (i) for 2021, an upfront payment to Arvinas and a premium paid on our equity investment in Arvinas totaling $706 million, a $300 million upfront payment to Beam and a $50 million net upfront payment to BioNTech; (ii) for 2020, a payment of $151 million representing the expense portion of an upfront payment to Myovant, an upfront payment to Valneva of $130 million, an upfront payment to BioNTech and a premium paid on our equity investment in BioNTech totaling $98 million, as well as a $75 million milestone payment to Akcea; and (iii) for 2019, an upfront license fee payment of $250 million to Akcea.

(g) (Gains)/losses on equity securities, and actuarial valuation and other pension and postretirement plan (gains)/losses are removed from adjusted earnings due to their inherent market volatility.

(h) Primarily includes payments for acquired IPR&D. For 2021, includes a $2.1 billion charge related to our acquisition of Trillium, which was accounted for as an asset acquisition, and a $177 million charge related to an asset acquisition completed in the second quarter of 2021. For 2019, included a $337 million charge related to our acquisition of Therachon, which was accounted for as an asset acquisition.

(i) For 2021, the total of $334 million primarily includes: (i) charges representing our equity-method accounting pro rata share of restructuring charges and costs of preparing for separation from GSK of $185 million recorded by the Consumer Healthcare JV and (ii) charges for certain legal matters of $162 million. For 2020, the total of $697 million primarily included: (i) charges of $367 million, which represent our equity-method accounting pro rata share of transaction-specific restructuring and business combination accounting charges recorded by the Consumer Healthcare JV, and (ii) losses on asset disposals of $238 million. For 2019, the total of $1.0 billion primarily included: (i) $300 million of business and legal entity alignment costs for consulting, legal, tax and advisory services associated with the design, planning and implementation of our then new business structure, effective in the beginning of 2019, (ii) charges for certain legal matters of $291 million, (iii) charges of $152 million for external incremental costs, such as transaction costs and costs to separate our Consumer Healthcare business into a separate legal entity associated with the formation of the Consumer Healthcare JV, (iv) net losses on early retirement of debt of $138 million and (v) charges of $112 million representing our equity-method accounting pro rata share of restructuring and business combination accounting charges recorded by the Consumer Healthcare JV.

(j) For 2020, amounts in *Selling, informational and administrative expenses* of $292 million primarily include costs for consulting, legal, tax and advisory services associated with a non-recurring internal reorganization of legal entities.

**ANALYSIS OF THE CONSOLIDATED STATEMENTS OF CASH FLOWS**

*Cash Flows from Continuing Operations*

| (MILLIONS) | Year Ended December 31, | | | Drivers of change |
|---|---|---|---|---|
| | **2021** | 2020 | 2019 | |
| Cash provided by/(used in): | | | | |

**Operating activities from continuing operations: $ 32,922  $ 10,540  $ 7,015**

*2021 v. 2020*

The change was driven primarily by higher net income adjusted for non-cash items, the payment for the acquisition of Trillium, a decrease in contributions to pension plans, and the impact of timing of receipts and payments in the ordinary course of business, mostly from an increase in cash flows from Other current liabilities driven by: (i) a $9.7 billion accrual for the gross profit split due to BioNTech, (ii) an increase in royalties payable, as well as (iii) an increase in deferred revenues for advance payments in 2021 for Comirnaty.

The change in *Other Adjustments, net*, is mostly due to an increase in unrealized gains on equity securities.

*2020 v. 2019*

The change was driven mainly by higher net income adjusted for non-cash items, advanced payments in 2020 for Comirnaty recorded in deferred revenue, the upfront cash payment associated with our acquisition of Therachon in 2019, and the upfront cash payment associated with our licensing agreement with Akcea in 2019, partially offset by an increase in benefit plan contributions.

The change also reflects the impact of timing of receipts and payments in the ordinary course of business.

The change in *Other adjustments, net* was driven primarily by an increase in equity method dividends received, partially offset by an increase in equity income and increases in net unrealized gains on equity securities.

**Investing activities from continuing operations: $ (22,534)  $ (4,162)  $ (3,825)**

*2021 v. 2020*

The change was driven mainly by a $24.7 billion increase in purchases of short-term investments with original maturities of greater than three months and a $9.0 billion increase in net purchases of short-term investments with original maturities of three months or less, partially offset by a $16.4 billion increase in redemptions of short-term investments with original maturities of greater than three months.

*2020 v. 2019*

The change was driven mostly by a $6.0 billion decrease in net proceeds from short-term investments with original maturities of three months or less and $2.7 billion in net purchases of short-term investments with original maturities of greater than three months in 2020 (compared to $2.3 billion net proceeds from short-term investments with original maturities of greater than three months in 2019), partially offset by the cash used to acquire Array, net of cash acquired, of $10.9 billion in 2019.

**Financing activities from continuing operations: $ (9,816)  $ (21,640)  $ (8,485)**

*2021 v. 2020*

The change was driven mostly by a $9.8 billion net reduction in repayments of short-term borrowings with maturities of greater than three months, a $4.0 billion decrease in net payments on short-term borrowings with maturities of three months or less and a $2.0 billion reduction in repayments of long-term debt, partially offset by a $4.2 billion decrease in proceeds from issuances of long-term debt.

*2020 v. 2019*

The change was driven mostly by $14.0 billion net payments of short-term borrowings in 2020 (compared to $10.6 billion net proceeds raised from short-term borrowings in 2019) and an increase in cash dividends paid of $397 million, partially offset by a decrease in purchases of common stock of $8.9 billion, lower repayments on long-term debt of $2.8 billion, and an increase in issuances of long-term debt of $280 million.

*Cash Flows from Discontinued Operations*

Cash flows from discontinued operations primarily relate to our former Meridian subsidiary, Upjohn Business and the Mylan-Japan collaboration (see *Note 2B*). In 2020, net cash provided by financing activities from discontinued operations primarily reflects issuances of long-term debt.

**ANALYSIS OF FINANCIAL CONDITION, LIQUIDITY, CAPITAL RESOURCES AND MARKET RISK**

Due to our significant operating cash flows, which is a key strength of our liquidity and capital resources and our primary funding source, as well as our financial assets, access to capital markets, revolving credit agreements, and available lines of credit, we believe that we have, and will maintain, the ability to meet our liquidity needs to support ongoing operations, our capital allocation objectives, and our contractual and other obligations for the foreseeable future.

We focus efforts to optimize operating cash flows through achieving working capital efficiencies that target accounts receivable, inventories, accounts payable, and other working capital. Excess cash from operating cash flows is invested in money market funds and available-for-sale debt securities which consist of primarily high-quality, highly liquid, well-diversified debt securities. We have taken, and will continue to take, a conservative approach to our financial investments and monitoring of our liquidity position in response to market changes. We typically maintain cash and cash equivalent balances and short-term investments which, together with our available revolving credit facilities, are in excess of our commercial paper and other short-term borrowings.

Additionally, we may obtain funding through short-term or long-term sources from our access to the capital markets, banking relationships and relationships with other financial intermediaries to meet our liquidity needs.

| Diverse sources of funds: | Related disclosure presented in this Form 10-K |
|---|---|
| Internal sources: | |
| • Operating cash flows | *Consolidated Statements of Cash Flows – Operating Activities* and the *Analysis of the Consolidated Statements of Cash Flows* within MD&A |
| • Cash and cash equivalents | *Consolidated Balance Sheets* |
| • Money market funds | *Note 7A* |
| • Available-for-sale debt securities | *Note 7A, 7B* |
| External sources: | |
| Short-term funding: | |
| • Commercial paper | *Note 7C* |
| • Revolving credit facilities | *Note 7C* |
| • Lines of credit | *Note 7C* |
| Long-term funding: | |
| • Long-term debt | *Note 7D* |
| • Equity | *Consolidated Statements of Equity* and *Note 12* |

For additional information about the sources and uses of our funds and capital resources for the years ended December 31, 2021 and 2020, see the *Analysis of the Consolidated Statements of Cash Flows* in this MD&A.

In August 2021, we completed a public offering of $1 billion aggregate principal amount of senior unsecured sustainability notes. We are using the net proceeds to finance or refinance, in whole or in part as follows: R&D expenses related to our COVID-19 vaccines, capital expenditures in connection with the manufacture and distribution of COVID-19 vaccines and our other projects that have environmental and/or social benefits. For additional information, see *Note 7D*.

*Credit Ratings*

The cost and availability of financing are influenced by credit ratings, and increases or decreases in our credit rating could have a beneficial or adverse effect on financing. Our long-term debt is rated high-quality by both S&P and Moody's. In November 2020, upon the completion of the Upjohn separation, both Moody's and S&P lowered our long-term debt rating one notch to 'A2' and 'A+', respectively, and our short-term rating remained unchanged. S&P continues to rate our long-term debt rating outlook as Stable since November 2020, while Moody's recently upgraded our long-term debt rating outlook to Positive in December 2021.

The current ratings assigned to our commercial paper and senior unsecured long-term debt:

| NAME OF RATING AGENCY | Pfizer Short-Term Rating | Pfizer Long-Term Rating | Outlook/Watch |
|---|---|---|---|
| Moody's | P-1 | A2 | Positive |
| S&P | A-1+ | A+ | Stable |

A security rating is not a recommendation to buy, sell or hold securities and the rating is subject to revision or withdrawal at any time by the rating organization. Each rating should be evaluated independently of any other rating.

*Capital Allocation Framework*

Our capital allocation framework is devised to facilitate (i) the achievement of medical breakthroughs through R&D investments and business development activities and (ii) returning capital to shareholders through dividends and share repurchases. See the *Overview of Our Performance, Operating Environment, Strategy and Outlook—Our Business and Strategy* section of this MD&A.

Our current and projected dividends provide a return to shareholders while maintaining sufficient capital to invest in growing our business. Our dividends are not restricted by debt covenants. While the dividend level remains a decision of Pfizer's BOD and will continue to be evaluated in the context of future business performance, we currently believe that we can support future annual dividend increases, barring significant unforeseen events. In December 2021, our BOD declared a first-quarter dividend of $0.40 per share, payable on March 4, 2022, to shareholders of record at the close of business on January 28, 2022. The first-quarter 2022 cash dividend will be our 333rd consecutive quarterly dividend.

See *Note 12* for information on the shares of our common stock purchased and the cost of purchases under our publicly announced share-purchase plans, including our accelerated share repurchase agreements. At December 31, 2021, our remaining share-purchase authorization was approximately $5.3 billion.

*Off-Balance Sheet Arrangements, Contractual, and Other Obligations*

In the ordinary course of business, (i) we enter into off-balance sheet arrangements that may result in contractual and other obligations and (ii) in connection with the sale of assets and businesses and other transactions, we often indemnify our counterparties against certain liabilities that

may arise in connection with the transaction or that are related to events and activities. For more information on guarantees and indemnifications, see *Note 16B.*

Additionally, certain of our co-promotion or license agreements give our licensors or partners the rights to negotiate for, or in some cases to obtain under certain financial conditions, co-promotion or other rights in specified countries with respect to certain of our products. Furthermore, collaboration, licensing or other R&D arrangements may give rise to potential milestone payments. Payments under these agreements generally become due and payable only upon the achievement of certain development, regulatory and/or commercialization milestones, which may span several years and which may never occur.

Our significant contractual and other obligations as of December 31, 2021 consisted of:

- Long-term debt, including current portion (see *Note 7*) and related interest payments;
- Estimated cash payments related to the TCJA repatriation estimated tax liability (see *Note 5*). Estimated future payments related to the TCJA repatriation tax liability that will occur after December 31, 2021 total $8.3 billion, of which an estimated $750 million is to be paid in the next twelve months and an estimated $7.6 billion is to be paid in periods thereafter;
- Certain commitments totaling $5.2 billion, of which an estimated $1.5 billion is to be paid in the next twelve months, and $3.7 billion in periods thereafter (see *Note 16C*);
- Purchases of property plant and equipment (see *Note 9*). In 2022, we expect to spend approximately $3.3 billion on property, plant and equipment; and
- Future minimum rental commitments under non-cancelable operating leases (see *Note 15*).

*Global Economic Conditions*

Our Venezuela and Argentina operations function in hyperinflationary economies. The impact to Pfizer is not considered material. For additional information on the global economic environment, see the *Item 1A. Risk Factors—Global Operations* section in this Form 10-K.

*Market Risk*

We are subject to foreign exchange risk, interest rate risk, and equity price risk. The objective of our financial risk management program is to minimize the impact of foreign exchange rate and interest rate movements on our earnings. We address such exposures through a combination of operational means and financial instruments. For more information on how we manage our foreign exchange and interest rate risks, see *Notes 1G* and *7E*, as well as the *Item 1A. Risk Factors—Global Operations* section in this Form 10-K for key currencies in which we operate. Our sensitivity analyses of such risks are discussed below.

Foreign Exchange Risk—The fair values of our financial instrument holdings are analyzed at year-end to determine their sensitivity to foreign exchange rate changes. In this analysis, holding all other assumptions constant and assuming that a change in one currency's rate relative to the U.S. dollar would not have any effect on another currency's rates relative to the U.S. dollar, if the dollar were to appreciate against all other currencies by 10%, as of December 31, 2021, the expected adverse impact on our net income would not be significant.

Interest Rate Risk—The fair values of our financial instrument holdings are analyzed at year-end to determine their sensitivity to interest rate changes. In this analysis, holding all other assumptions constant and assuming a parallel shift in the interest rate curve for all maturities and for all instruments, if there were a one hundred basis point decrease in interest rates as of December 31, 2021, the expected adverse impact on our net income would not be significant.

Equity Price Risk—We hold equity securities with readily determinable fair values in life science companies as a result of certain business development transactions. While we are holding such securities, we are subject to equity price risk, and this may increase the volatility of our income in future periods due to changes in the fair value of equity investments. From time to time, we will sell such equity securities based on our business considerations, which may include limiting our price risk. Our equity securities with readily determinable fair values are analyzed at year-end to determine their sensitivity to equity price rate changes. In this sensitivity analysis, the expected adverse impact on our net income would not be significant.

*LIBOR*

For information on interest rate risk and LIBOR, see the *Item 1A. Risk Factors—Global Operations* section in this Form 10-K. We do not expect the transition to an alternative rate to have a material impact on our liquidity or financial resources.

## NEW ACCOUNTING STANDARDS

*Recently Adopted Accounting Standard*

See *Note 1B.*

**Recently Issued Accounting Standards, Not Adopted as of December 31, 2021**

| Standard/Description | Effective Date | Effect on the Financial Statements |
|---|---|---|
| **Reference rate reform** provides temporary optional expedients and exceptions to the guidance for contracts, hedging relationships, and other transactions that reference LIBOR or another reference rate expected to be discontinued after 2021 because of reference rate reform.<br><br>The new guidance provides the following optional expedients:<br><br>1. Simplify accounting analyses under current U.S. GAAP for contract modifications.<br><br>2. Simplify the assessment of hedge effectiveness and allow hedging relationships affected by reference rate reform to continue.<br><br>3. Allow a one-time election to sell or transfer debt securities classified as held to maturity that reference a rate affected by reference rate reform. | Elections can be adopted prospectively at any time through December 31, 2022. | We are assessing the impact, but currently, we do not expect this new guidance to have a material impact on our consolidated financial statements. |
| **Accounting for contract assets and contract liabilities from contracts with customers** requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606. This new guidance will generally result in the acquirer recognizing contract assets and contract liabilities at the same amounts that were recorded by the acquiree. Previously, these amounts were recognized by the acquirer at fair value as of the acquisition date. | January 1, 2023. Early adoption is permitted. | We do not expect this new guidance to have a material impact on our consolidated financial statements. |

## ITEM 7A.        QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The information required by this Item is incorporated by reference to the discussion in the *Analysis of Financial Condition, Liquidity, Capital Resources and Market Risk* section within MD&A.

ITEM 8.　　　　　　FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**Report of Independent Registered Public Accounting Firm**

**To the Board of Directors and Shareholders**
**Pfizer Inc.:**

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of Pfizer Inc. and Subsidiary Companies (the Company) as of December 31, 2021 and 2020, the related consolidated statements of income, comprehensive income, equity, and cash flows for each of the years in the three-year period ended December 31, 2021, and the related notes (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2021, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated February 24, 2022 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

*Change in Accounting Principle*

As discussed in Note 1C to the consolidated financial statements, the Company has elected to change its method of accounting for pension and postretirement plans in 2021 to immediately recognize actuarial gains and losses in the consolidated statements of income.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

*Critical Audit Matters*

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Evaluation of the U.S. Medicare, Medicaid, and performance-based contract rebates accrual*

As discussed in Note 1H to the consolidated financial statements, the Company records estimated deductions for Medicare, Medicaid, and performance-based contract rebates (collectively, U.S. rebates) as a reduction to gross product revenues. The accrual for U.S. rebates is recorded in the same period that the corresponding revenues are recognized. The length of time between when a sale is made and when the U.S. rebate is paid by the Company can be as long as one year, which increases the need for significant management judgment and knowledge of market conditions and practices in estimating the accrual.

We identified the evaluation of the U.S. rebates accrual as a critical audit matter because the evaluation of the product-specific experience ratio assumption involved especially challenging auditor judgment. The product-specific experience ratio assumption relates to estimating which of the Company's revenue transactions will ultimately be subject to a related rebate.

The following are the primary procedures we performed to address this critical audit matter. We evaluated the design and tested the operating effectiveness of certain internal controls over the Company's U.S. rebates accrual process related to the development of the product-specific experience ratio assumptions. We estimated the U.S. rebates accrual using internal information and historical data and compared the result to the Company's estimated U.S. rebates accrual. We evaluated the Company's ability to accurately estimate the accrual for U.S. rebates by comparing historically recorded accruals to the actual amount that was ultimately paid by the Company.

*Evaluation of gross unrecognized tax benefits*

As discussed in Notes 5D and 1Q, the Company's tax positions are subject to audit by local taxing authorities in each respective tax jurisdiction, and the resolution of such audits may span multiple years. Since tax law is complex and often subject to varied interpretations and judgments, it is uncertain whether some of the Company's tax positions will be sustained upon audit. As of December 31, 2021, the Company has recorded gross unrecognized tax benefits, excluding associated interest, of $6.1 billion.

**Report of Independent Registered Public Accounting Firm**

We identified the evaluation of the Company's gross unrecognized tax benefits as a critical audit matter because a high degree of audit effort, including specialized skills and knowledge, and complex auditor judgment was required in evaluating the Company's interpretation of tax law and its estimate of the ultimate resolution of its tax positions.

The following are the primary procedures we performed to address this critical audit matter. We evaluated the design and tested the operating effectiveness of an internal control over the Company's liability for unrecognized tax position process related to (1) interpretation of tax law, (2) evaluation of which of the Company's tax positions may not be sustained upon audit, and (3) estimation and recording of the gross unrecognized tax benefits. We involved tax and valuation professionals with specialized skills and knowledge who assisted in evaluating the Company's interpretation of tax laws, including the assessment of transfer pricing practices in accordance with applicable tax laws and regulations. We inspected settlements with applicable taxing authorities, including assessing the expiration of statutes of limitations. We tested the calculation of the liability for uncertain tax positions, including an evaluation of the Company's assessment of the technical merits of tax positions and estimates of the amount of tax benefits expected to be sustained.

*Evaluation of product and other product-related litigation*

As discussed in Notes 1S and 16 to the consolidated financial statements, the Company is involved in product liability and other product-related litigation, which can include personal injury, consumer, off-label promotion, securities, antitrust and breach of contract claims, among others. Certain of these pending product and other product-related legal proceedings could result in losses that could be substantial. The accrued liability and/or disclosure for the pending product and other product-related legal proceedings requires a complex series of judgments by the Company about future events, which involves a number of uncertainties.

We identified the evaluation of product and other product-related litigation as a critical audit matter. Challenging auditor judgment was required to evaluate the Company's judgments about future events and uncertainties.

The following are the primary procedures we performed to address this critical audit matter. We evaluated the design and tested the operating effectiveness of certain internal controls over the Company's product liability and other product-related litigation processes, including controls related to (1) the evaluation of information from external and internal legal counsel, (2) forward-looking expectations, and (3) new legal proceedings, or other legal proceedings not currently reserved or disclosed. We read letters received directly from the Company's external and internal legal counsel that described the Company's probable or reasonably possible legal contingency to pending product and other product-related legal proceedings. We inspected the Company's minutes from meetings of the Audit Committee, which included the status of key litigation matters. We evaluated the Company's ability to estimate its monetary exposure to pending product and other product-related legal proceedings by comparing historically recorded liabilities to actual monetary amounts incurred upon resolution of prior legal matters. We analyzed relevant publicly available information about the Company, its competitors, and the industry.



We have not been able to determine the specific year that we or our predecessor firms began serving as the Company's auditor, however, we are aware that we or our predecessor firms have served as the Company's auditor since at least 1942.

New York, New York

*February 24, 2022*

**Consolidated Statements of Income**
Pfizer Inc. and Subsidiary Companies

|  |  | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| (MILLIONS, EXCEPT PER COMMON SHARE DATA) | | **2021** | | 2020 | 2019 |
| Revenues | $ | **81,288** | $ | 41,651 $ | 40,905 |
| Costs and expenses: | | | | | |
| Cost of sales[a] | | **30,821** | | 8,484 | 8,054 |
| Selling, informational and administrative expenses[a] | | **12,703** | | 11,597 | 12,726 |
| Research and development expenses[a] | | **13,829** | | 9,393 | 8,385 |
| Amortization of intangible assets | | **3,700** | | 3,348 | 4,429 |
| Restructuring charges and certain acquisition-related costs | | **802** | | 579 | 601 |
| (Gain) on completion of Consumer Healthcare JV transaction | | **—** | | (6) | (8,107) |
| Other (income)/deductions—net | | **(4,878)** | | 1,219 | 3,497 |
| Income from continuing operations before provision/(benefit) for taxes on income | | **24,311** | | 7,036 | 11,321 |
| Provision/(benefit) for taxes on income | | **1,852** | | 370 | 583 |
| Income from continuing operations | | **22,459** | | 6,666 | 10,738 |
| Discontinued operations—net of tax | | **(434)** | | 2,529 | 5,318 |
| Net income before allocation to noncontrolling interests | | **22,025** | | 9,195 | 16,056 |
| Less: Net income attributable to noncontrolling interests | | **45** | | 36 | 29 |
| Net income attributable to Pfizer Inc. common shareholders | $ | **21,979** | $ | 9,159 $ | 16,026 |
| Earnings per common share—basic: | | | | | |
| Income from continuing operations attributable to Pfizer Inc. common shareholders | $ | **4.00** | $ | 1.19 $ | 1.92 |
| Discontinued operations—net of tax | | **(0.08)** | | 0.46 | 0.95 |
| Net income attributable to Pfizer Inc. common shareholders | $ | **3.92** | $ | 1.65 $ | 2.88 |
| Earnings per common share—diluted: | | | | | |
| Income from continuing operations attributable to Pfizer Inc. common shareholders | $ | **3.93** | $ | 1.18 $ | 1.89 |
| Discontinued operations—net of tax | | **(0.08)** | | 0.45 | 0.94 |
| Net income attributable to Pfizer Inc. common shareholders | $ | **3.85** | $ | 1.63 $ | 2.82 |
| Weighted-average shares—basic | | **5,601** | | 5,555 | 5,569 |
| Weighted-average shares—diluted | | **5,708** | | 5,632 | 5,675 |

[a] Exclusive of amortization of intangible assets, except as disclosed in *Note 1M*.

See Accompanying Notes.

**Consolidated Statements of Comprehensive Income**
Pfizer Inc. and Subsidiary Companies

|  | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| (MILLIONS) | | **2021** | | 2020 | | 2019 |
| Net income before allocation to noncontrolling interests | $ | **22,025** | $ | 9,195 | $ | 16,056 |
| Foreign currency translation adjustments, net | | **(682)** | | 772 | | 675 |
| Reclassification adjustments | | **—** | | (17) | | (288) |
| | | **(682)** | | 755 | | 387 |
| Unrealized holding gains/(losses) on derivative financial instruments, net | | **526** | | (582) | | 476 |
| Reclassification adjustments for (gains)/losses included in net income[a] | | **134** | | 21 | | (664) |
| | | **660** | | (561) | | (188) |
| Unrealized holding gains/(losses) on available-for-sale securities, net | | **(355)** | | 361 | | (1) |
| Reclassification adjustments for (gains)/losses included in net income[b] | | **(30)** | | (188) | | 39 |
| | | **(384)** | | 173 | | 38 |
| Benefit plans: prior service (costs)/credits and other, net | | **116** | | 52 | | (7) |
| Reclassification adjustments related to amortization of prior service costs and other, net | | **(154)** | | (176) | | (181) |
| Reclassification adjustments related to curtailments of prior service costs and other, net | | **(74)** | | — | | (2) |
| Other | | **(2)** | | — | | 1 |
| Other comprehensive income/(loss), before tax | | **(113)** | | (124) | | (189) |
| Tax provision/(benefit) on other comprehensive income/(loss) | | **(519)** | | 243 | | 48 |
| | | **71** | | (227) | | 178 |
| Other comprehensive income/(loss) before allocation to noncontrolling interests | $ | **(589)** | $ | 471 | $ | (130) |
| Comprehensive income/(loss) before allocation to noncontrolling interests | $ | **21,435** | $ | 9,666 | $ | 15,926 |
| Less: Comprehensive income/(loss) attributable to noncontrolling interests | | **43** | | 27 | | 18 |
| Comprehensive income/(loss) attributable to Pfizer Inc. | $ | **21,393** | $ | 9,639 | $ | 15,908 |

[a] Reclassified into *Other (income)/deductions—net* and *Cost of sales*. See *Note 7E*.
[b] Reclassified into *Other (income)/deductions—net*.

See Accompanying Notes.

**Consolidated Balance Sheets**
Pfizer Inc. and Subsidiary Companies

| (MILLIONS, EXCEPT PER COMMON SHARE DATA) | As of December 31, | |
| | 2021 | 2020 |
| --- | --- | --- |
| Assets | | |
| Cash and cash equivalents | $ 1,944 | $ 1,786 |
| Short-term investments | 29,125 | 10,437 |
| Trade accounts receivable, less allowance for doubtful accounts: 2021—$492; 2020—$508 | 11,479 | 7,913 |
| Inventories | 9,059 | 8,020 |
| Current tax assets | 4,266 | 3,264 |
| Other current assets | 3,820 | 3,646 |
| Total current assets | 59,693 | 35,067 |
| Equity-method investments | 16,472 | 16,856 |
| Long-term investments | 5,054 | 3,406 |
| Property, plant and equipment | 14,882 | 13,745 |
| Identifiable intangible assets | 25,146 | 28,337 |
| Goodwill | 49,208 | 49,556 |
| Noncurrent deferred tax assets and other noncurrent tax assets | 3,341 | 2,383 |
| Other noncurrent assets | 7,679 | 4,879 |
| Total assets | $ 181,476 | $ 154,229 |
| Liabilities and Equity | | |
| Short-term borrowings, including current portion of long-term debt: 2021—$1,636; 2020—$2,002 | $ 2,241 | $ 2,703 |
| Trade accounts payable | 5,578 | 4,283 |
| Dividends payable | 2,249 | 2,162 |
| Income taxes payable | 1,266 | 1,049 |
| Accrued compensation and related items | 3,332 | 3,049 |
| Deferred revenues | 3,067 | 1,113 |
| Other current liabilities | 24,939 | 11,561 |
| Total current liabilities | 42,671 | 25,920 |
| Long-term debt | 36,195 | 37,133 |
| Pension benefit obligations | 3,489 | 4,766 |
| Postretirement benefit obligations | 235 | 645 |
| Noncurrent deferred tax liabilities | 349 | 4,063 |
| Other taxes payable | 11,331 | 11,560 |
| Other noncurrent liabilities | 9,743 | 6,669 |
| Total liabilities | 104,013 | 90,756 |
| Commitments and Contingencies | | |
| Preferred stock, no par value, at stated value; 27 shares authorized; no shares issued or outstanding at December 31, 2021 and December 31, 2020 | — | — |
| Common stock, $0.05 par value; 12,000 shares authorized; issued: 2021—9,471; 2020—9,407 | 473 | 470 |
| Additional paid-in capital | 90,591 | 88,674 |
| Treasury stock, shares at cost: 2021—3,851; 2020—3,840 | (111,361) | (110,988) |
| Retained earnings | 103,394 | 90,392 |
| Accumulated other comprehensive loss | (5,897) | (5,310) |
| Total Pfizer Inc. shareholders' equity | 77,201 | 63,238 |
| Equity attributable to noncontrolling interests | 262 | 235 |
| Total equity | 77,462 | 63,473 |
| Total liabilities and equity | $ 181,476 | $ 154,229 |

See Accompanying Notes.

**Consolidated Statements of Equity**
Pfizer Inc. and Subsidiary Companies

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | PFIZER INC. SHAREHOLDERS | | | | | |
| | Preferred Stock | | Common Stock | | | Treasury Stock | | | | | | |
| (MILLIONS, EXCEPT PREFERRED SHARES) | Shares | Stated Value | Shares | Par Value | Add'l Paid-In Capital | Shares | Cost | Retained Earnings | Accum. Other Comp. Loss | Share-holders' Equity | Non-controlling Interests | Total Equity |
| Balance, January 1, 2019 | 478 | $ 19 | 9,332 | $ 467 | $ 86,253 | (3,615) | $ (101,610) | $ 83,527 | $ (5,249) | $ 63,407 | $ 351 | $ 63,758 |
| Net income | | | | | | | | 16,026 | | 16,026 | 29 | 16,056 |
| Other comprehensive income/(loss), net of tax | | | | | | | | | (118) | (118) | (11) | (130) |
| Cash dividends declared, per share: $1.46 | | | | | | | | | | | | |
| Common stock | | | | | | | | (8,174) | | (8,174) | | (8,174) |
| Preferred stock | | | | | | | | (1) | | (1) | | (1) |
| Noncontrolling interests | | | | | | | | | | — | (6) | (6) |
| Share-based payment transactions | | | 37 | 2 | 1,219 | (8) | (326) | | | 894 | | 894 |
| Purchases of common stock | | | | | | (213) | (8,865) | | | (8,865) | | (8,865) |
| Preferred stock conversions and redemptions | (47) | (2) | | | (3) | — | 1 | | | (4) | | (4) |
| Other | | | | | (40) | — | — | 19 | | (21) | (60) | (81) |
| Balance, December 31, 2019 | 431 | 17 | 9,369 | 468 | 87,428 | (3,835) | (110,801) | 91,397 | (5,367) | 63,143 | 303 | 63,447 |
| Net income | | | | | | | | 9,159 | | 9,159 | 36 | 9,195 |
| Other comprehensive income/(loss), net of tax | | | | | | | | | 480 | 480 | (9) | 471 |
| Cash dividends declared, per share: $1.53 | | | | | | | | | | | | |
| Common stock | | | | | | | | (8,571) | | (8,571) | | (8,571) |
| Preferred stock | | | | | | | | — | | — | | |
| Noncontrolling interests | | | | | | | | | | — | (91) | (91) |
| Share-based payment transactions | | | 37 | 2 | 1,261 | (6) | (218) | | | 1,044 | | 1,044 |
| Preferred stock conversions and redemptions[a] | (431) | (17) | | | (15) | 1 | 31 | | | (1) | | (1) |
| Distribution of Upjohn Business[b] | | | | | | | | (1,592) | (423) | (2,015) | (3) | (2,018) |
| Other | | | | | — | — | — | — | | — | (1) | (1) |
| Balance, December 31, 2020 | — | — | 9,407 | 470 | 88,674 | (3,840) | (110,988) | 90,392 | (5,310) | 63,238 | 235 | 63,473 |
| Net income | | | | | | | | 21,979 | | 21,979 | 45 | 22,025 |
| Other comprehensive income/(loss), net of tax | | | | | | | | | (587) | (587) | (3) | (589) |
| Cash dividends declared, per share: $1.57 | | | | | | | | | | | | |
| Common stock | | | | | | | | (8,816) | | (8,816) | | (8,816) |
| Preferred stock | | | | | | | | | | — | | |
| Noncontrolling interests | | | | | | | | | | — | (8) | (8) |
| Share-based payment transactions | | | 64 | 3 | 1,917 | (11) | (373) | (77) | | 1,470 | | 1,470 |
| Other | | | | | — | — | — | (85) | | (85) | (7) | (92) |
| Balance, December 31, 2021 | — | $ — | 9,471 | $ 473 | $ 90,591 | (3,851) | $ (111,361) | $ 103,394 | $ (5,897) | $ 77,201 | $ 262 | $ 77,462 |

(a) See *Note 12.*
(b) See *Note 2B.*

See Accompanying Notes.

**Consolidated Statements of Cash Flows**
Pfizer Inc. and Subsidiary Companies

| (MILLIONS) | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | 2020 | 2019 |
| Operating Activities | | | |
| Net income before allocation to noncontrolling interests | **$ 22,025** | $ 9,195 | $ 16,056 |
| Discontinued operations—net of tax | **(434)** | 2,529 | 5,318 |
| Net income from continuing operations before allocation to noncontrolling interests | **22,459** | 6,666 | 10,738 |
| Adjustments to reconcile net income before allocation to noncontrolling interests to net cash provided by operating activities: | | | |
| Depreciation and amortization | **5,191** | 4,681 | 5,755 |
| Asset write-offs and impairments | **276** | 2,049 | 2,889 |
| TCJA impact | **—** | — | (323) |
| Gain on completion of Consumer Healthcare JV transaction, net of cash conveyed[a] | **—** | (6) | (8,254) |
| Deferred taxes from continuing operations | **(4,293)** | (1,575) | 561 |
| Share-based compensation expense | **1,182** | 755 | 687 |
| Benefit plan contributions in excess of expense/income | **(3,123)** | (1,242) | (55) |
| Other adjustments, net | **(1,573)** | (479) | (1,080) |
| Other changes in assets and liabilities, net of acquisitions and divestitures: | | | |
| Trade accounts receivable | **(3,811)** | (1,275) | (1,124) |
| Inventories | **(1,125)** | (778) | (1,071) |
| Other assets | **(1,057)** | (137) | 847 |
| Trade accounts payable | **1,242** | 355 | (341) |
| Other liabilities | **18,721** | 2,768 | 861 |
| Other tax accounts, net | **(1,166)** | (1,240) | (3,074) |
| Net cash provided by operating activities from continuing operations | **32,922** | 10,540 | 7,015 |
| Net cash provided by/(used in) operating activities from discontinued operations | **(343)** | 3,863 | 5,572 |
| Net cash provided by operating activities | **32,580** | 14,403 | 12,588 |
| Investing Activities | | | |
| Purchases of property, plant and equipment | **(2,711)** | (2,226) | (2,046) |
| Purchases of short-term investments | **(38,457)** | (13,805) | (6,835) |
| Proceeds from redemptions/sales of short-term investments | **27,447** | 11,087 | 9,183 |
| Net (purchases of)/proceeds from redemptions/sales of short-term investments with original maturities of three months or less | **(8,088)** | 920 | 6,925 |
| Purchases of long-term investments | **(1,068)** | (597) | (201) |
| Proceeds from redemptions/sales of long-term investments | **649** | 723 | 232 |
| Acquisitions of businesses, net of cash acquired | **—** | — | (10,861) |
| Other investing activities, net[a] | **(305)** | (265) | (223) |
| Net cash provided by/(used in) investing activities from continuing operations | **(22,534)** | (4,162) | (3,825) |
| Net cash provided by/(used in) investing activities from discontinued operations | **(12)** | (109) | (120) |
| Net cash provided by/(used in) investing activities | **(22,546)** | (4,271) | (3,945) |
| Financing Activities | | | |
| Proceeds from short-term borrowings | **—** | 12,352 | 16,455 |
| Principal payments on short-term borrowings | **—** | (22,197) | (8,378) |
| Net (payments on)/proceeds from short-term borrowings with original maturities of three months or less | **(96)** | (4,129) | 2,551 |
| Proceeds from issuance of long-term debt | **997** | 5,222 | 4,942 |
| Principal payments on long-term debt | **(2,004)** | (4,003) | (6,806) |
| Purchases of common stock | **—** | — | (8,865) |
| Cash dividends paid | **(8,729)** | (8,440) | (8,043) |
| Other financing activities, net | **16** | (444) | (342) |
| Net cash provided by/(used in) financing activities from continuing operations | **(9,816)** | (21,640) | (8,485) |
| Net cash provided by/(used in) financing activities from discontinued operations | **—** | 11,991 | — |
| Net cash provided by/(used in) financing activities | **(9,816)** | (9,649) | (8,485) |
| Effect of exchange-rate changes on cash and cash equivalents and restricted cash and cash equivalents | **(59)** | (8) | (32) |
| Net increase/(decrease) in cash and cash equivalents and restricted cash and cash equivalents | **159** | 475 | 125 |
| Cash and cash equivalents and restricted cash and cash equivalents, at beginning of period | **1,825** | 1,350 | 1,225 |
| Cash and cash equivalents and restricted cash and cash equivalents, at end of period | **$ 1,983** | $ 1,825 | $ 1,350 |

- Continued -

**Consolidated Statements of Cash Flows**
Pfizer Inc. and Subsidiary Companies

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2021** | | 2020 | | 2019 |
| Supplemental Cash Flow Information | | | | | | |
| Cash paid/(received) during the period for: | | | | | | |
| Income taxes | $ | **7,427** | $ | 3,153 | $ | 3,664 |
| Interest paid | | **1,467** | | 1,641 | | 1,587 |
| Interest rate hedges | | **(2)** | | (20) | | (42) |
| Non-cash transactions: | | | | | | |
| Right-of-use assets obtained in exchange for lease liabilities | $ | **1,943** | $ | 410 | $ | 314 |
| 32% equity-method investment in the Consumer Healthcare JV received in exchange for contributing Pfizer's Consumer Healthcare business[a] | | **—** | | — | | 15,711 |

[a] The $8.3 billion *Gain on completion of Consumer Healthcare JV transaction, net of cash conveyed* reflects the receipt of a 32% equity-method investment in the new company initially valued at $15.7 billion in exchange for net assets contributed of $7.6 billion and is presented in operating activities net of $146 million cash conveyed that is reflected in *Other investing activities, net.* See *Note 2C.*

See Accompanying Notes.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

### Note 1. Basis of Presentation and Significant Accounting Policies

*A. Basis of Presentation*

The consolidated financial statements include the accounts of our parent company and all subsidiaries and are prepared in accordance with U.S. GAAP. The decision of whether or not to consolidate an entity for financial reporting purposes requires consideration of majority voting interests, as well as effective economic or other control over the entity. Typically, we do not seek control by means other than voting interests. For subsidiaries operating outside the U.S., the financial information is included as of and for the year ended November 30 for each year presented. Pfizer's fiscal year-end for U.S. subsidiaries is as of and for the year ended December 31 for each year presented. Substantially all unremitted earnings of international subsidiaries are free of legal and contractual restrictions. All significant transactions among our subsidiaries have been eliminated.

At the beginning of our fiscal fourth quarter of 2021, we reorganized our commercial operations and began to manage our commercial operations through a new global structure consisting of two operating segments, each led by a single manager: Biopharma, our innovative science-based biopharmaceutical business and PC1, our global contract development and manufacturing organization and a leading supplier of specialty active pharmaceutical ingredients. See *Note 17*. On December 31, 2021, we completed the sale of our Meridian subsidiary, the manufacturer of EpiPen and other auto-injector products. Prior to its sale, Meridian was managed within the Hospital therapeutic area. Beginning in the fourth quarter of 2021, the financial results of Meridian are reflected as discontinued operations for all periods presented. On December 21, 2020, Pfizer and Viatris completed the termination of a pre-existing strategic collaboration between Pfizer and Mylan for generic drugs in Japan (the Mylan-Japan collaboration) pursuant to an agreement dated November 13, 2020, and we transferred related inventories and operations that were part of the Mylan-Japan collaboration to Viatris. On November 16, 2020, we completed the spin-off and the combination of our Upjohn Business with Mylan to form Viatris. Beginning in the fourth quarter of 2020, the financial results of the Upjohn Business and the Mylan-Japan collaboration were reflected as discontinued operations for all periods presented. The assets and liabilities associated with Meridian and the Mylan-Japan collaboration are classified as assets and liabilities of discontinued operations as of December 31, 2020. Upon completion of the spin-off of the Upjohn Business on November 16, 2020, the Upjohn assets and liabilities were derecognized from our consolidated balance sheet and are reflected in *Retained Earnings–Distribution of Upjohn Business* in the consolidated statement of equity. Prior to the spin-off of the Upjohn Business in November 2020, the Upjohn Business, the Mylan-Japan collaboration and Meridian were managed as part of our former Upjohn operating segment. With the separation of the Upjohn Business, the Mylan-Japan collaboration and Meridian, as well as the formation of the Consumer Healthcare JV in 2019, Pfizer transformed into a more focused, global leader in science-based innovative medicines and vaccines. Certain prior year amounts have been reclassified to conform with the current year presentation. In addition, other acquisitions and business development activities completed in 2021, 2020 and 2019 impacted financial results in the periods presented. See *Note 2*.

Certain amounts in the consolidated financial statements and associated notes may not add due to rounding. All percentages have been calculated using unrounded amounts.

*B. New Accounting Standard Adopted in 2021*

On January 1, 2021, we adopted a new accounting standard for income tax that eliminates certain exceptions to the guidance related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. The new guidance also simplifies aspects of the accounting for franchise taxes and enacted changes in tax laws or rates and clarifies the accounting for transactions that result in a step-up in the tax basis of goodwill. The adoption of this guidance did not have a material impact on our consolidated financial statements.

*C. Change in Accounting Principle*

In the first quarter of 2021, we adopted a change in accounting principle to a more preferable policy under U.S. GAAP to immediately recognize actuarial gains and losses arising from the remeasurement of our pension and postretirement plans (MTM Accounting). Under the prior policy, we deferred recognition of these gains and losses in *Accumulated other comprehensive loss*. The accumulated actuarial gains/losses outside of a "corridor" were then amortized into net periodic benefit costs over the average remaining service period or the average life expectancy of participants. This change has been applied to all pension and postretirement plans on a retrospective basis for all prior periods presented, and as of January 1, 2019, resulted in a cumulative effect decrease to *Retained earnings* of $6.0 billion, with a corresponding offset to *Accumulated other comprehensive loss*. Each time a pension or postretirement plan is remeasured, the actuarial gain or loss is recognized immediately and classified as *Other (income)/deductions—net*.

We believe that MTM Accounting is a more preferable policy as it provides improved transparency of results and performance, better alignment with fair value accounting principles and a better reflection of current economic and interest rate trends on plan investments and assumptions and the actuarial impact of plan remeasurements.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

The impacts of the adjustments on our consolidated financial statements are summarized as follows:

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2021 | | | 2020 | | | 2019 | | |
| (MILLIONS, EXCEPT PER COMMON SHARE DATA) | Previous Accounting Principle | Impact of Change | As Reported | Previous Accounting Principle | Impact of Change | As Adjusted | Previous Accounting Principle | Impact of Change | As Adjusted |
| **Consolidated Statements of Income:** | | | | | | | | | |
| (Gain) on completion of Consumer Healthcare JV transaction | $ — | $ — | $ — | $ (6) | $ — | $ (6) | $ (8,086) | $ (21) | $ (8,107) |
| Other (income)/deductions—net | (2,820) | (2,058) | (4,878) | 672 | 547 | 1,219 | 3,264 | 233 | 3,497 |
| Income from continuing operations before provision/(benefit) for taxes on income | 22,253 | 2,058 | 24,311 | 7,584 | (547) | 7,036 | 11,533 | (212) | 11,321 |
| Provision/(benefit) for taxes on income | 1,399 | 453 | 1,852 | 496 | (125) | 370 | 631 | (48) | 583 |
| Discontinued operations—net of tax | (434) | — | (434) | 2,564 | (35) | 2,529 | 5,400 | (82) | 5,318 |
| Net income before allocation to noncontrolling interests | 20,420 | 1,605 | 22,025 | 9,652 | (457) | 9,195 | 16,302 | (246) | 16,056 |
| Net income attributable to Pfizer Inc. common shareholders | 20,374 | 1,605 | 21,979 | 9,616 | (457) | 9,159 | 16,273 | (246) | 16,026 |
| *Earnings per common share—basic:* | | | | | | | | | |
| Income from continuing operations attributable to Pfizer Inc. common shareholders | $ 3.71 | $ 0.29 | $ 4.00 | $ 1.27 | $ (0.08) | $ 1.19 | $ 1.95 | $ (0.03) | $ 1.92 |
| Discontinued operations—net of tax | (0.08) | — | (0.08) | 0.46 | (0.01) | 0.46 | 0.97 | (0.01) | 0.95 |
| Net income attributable to Pfizer Inc. common shareholders | 3.63 | 0.29 | 3.92 | 1.73 | (0.08) | 1.65 | 2.92 | (0.04) | 2.88 |
| *Earnings per common share—diluted:* | | | | | | | | | |
| Income from continuing operations attributable to Pfizer Inc. common shareholders | $ 3.65 | $ 0.28 | $ 3.93 | $ 1.25 | $ (0.07) | $ 1.18 | $ 1.92 | $ (0.03) | $ 1.89 |
| Discontinued operations—net of tax | (0.08) | — | (0.08) | 0.46 | (0.01) | 0.45 | 0.95 | (0.01) | 0.94 |
| Net income attributable to Pfizer Inc. common shareholders | 3.57 | 0.28 | 3.85 | 1.71 | (0.08) | 1.63 | 2.87 | (0.04) | 2.82 |

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2021 | | | 2020 | | | 2019 | | |
| (MILLIONS) | Previous Accounting Principle | Impact of Change | As Reported | Previous Accounting Principle | Impact of Change | As Adjusted | Previous Accounting Principle | Impact of Change | As Adjusted |
| **Consolidated Statements of Comprehensive Income:** | | | | | | | | | |
| *Foreign currency translation adjustments, net* | $ (731) | $ 49 | $ (682) | $ 957 | $ (185) | $ 772 | $ 654 | $ 21 | $ 675 |
| Benefit plans: actuarial gains/(losses), net | 1,565 | (1,565) | — | (1,128) | 1,128 | — | (826) | 826 | — |
| Reclassification adjustments related to amortization | 285 | (285) | — | 276 | (276) | — | 241 | (241) | — |
| Reclassification adjustments related to settlements, net | 209 | (209) | — | 278 | (278) | — | 274 | (274) | — |
| Other | 49 | (49) | — | (189) | 189 | — | 22 | (22) | — |
| Tax provision/(benefit) on other comprehensive income/(loss) | 545 | (475) | 71 | (349) | 122 | (227) | 115 | 63 | 178 |
| **Consolidated Statements of Cash Flows:** | | | | | | | | | |
| Deferred taxes from continuing operations | $ (4,746) | $ 453 | $ (4,293) | $ (1,449) | $ (125) | $ (1,575) | $ 609 | $ (48) | $ 561 |
| Benefit plan contributions in excess of expense/income | (1,065) | (2,058) | (3,123) | (1,790) | 547 | (1,242) | (288) | 233 | (55) |

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2021 | | | 2020 | | |
| (MILLIONS) | Previous Accounting Principle | Impact of Change | As Reported | Previous Accounting Principle | Impact of Change | As Adjusted |
| **Consolidated Balance Sheets:** | | | | | | |
| *Noncurrent deferred tax assets and other noncurrent tax assets* | $ 3,320 | $ 22 | $ 3,341 | $ 2,383 | $ — | $ 2,383 |
| *Other noncurrent assets* | 7,679 | — | 7,679 | 4,879 | — | 4,879 |
| *Pension benefit obligations* | 3,489 | — | 3,489 | 4,766 | — | 4,766 |
| *Retained earnings* | 101,789 | 1,605 | 103,394 | 96,770 | (6,378) | 90,392 |
| *Accumulated other comprehensive loss* | (4,313) | (1,583) | (5,897) | (11,688) | 6,378 | (5,310) |

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

*D. Estimates and Assumptions*

In preparing these financial statements, we use certain estimates and assumptions that affect reported amounts and disclosures. These estimates and assumptions can impact all elements of our financial statements. For example, in the consolidated statements of income, estimates are used when accounting for deductions from revenues, determining the cost of inventory that is sold, allocating cost in the form of depreciation and amortization, and estimating restructuring charges and the impact of contingencies, as well as determining provisions for taxes on income. On the consolidated balance sheets, estimates are used in determining the valuation and recoverability of assets, and in determining the reported amounts of liabilities, all of which also impact the consolidated statements of income. Certain estimates of fair value and amounts recorded in connection with acquisitions, revenue deductions, impairment reviews, restructuring-associated charges, investments and financial instruments, valuation allowances, pension and postretirement benefit plans, contingencies, share-based compensation, and other calculations can result from a complex series of judgments about future events and uncertainties and can rely heavily on estimates and assumptions.

Our estimates are often based on complex judgments and assumptions that we believe to be reasonable, but that can be inherently uncertain and unpredictable. If our estimates and assumptions are not representative of actual outcomes, our results could be materially impacted. As future events and their effects cannot be determined with precision, our estimates and assumptions may prove to be incomplete or inaccurate, or unanticipated events and circumstances may occur that might cause us to change those estimates and assumptions. We are subject to risks and uncertainties that may cause actual results to differ from estimated amounts, such as changes in the healthcare environment, competition, litigation, legislation and regulations. We regularly evaluate our estimates and assumptions using historical experience and expectations about the future. We adjust our estimates and assumptions when facts and circumstances indicate the need for change.

*E. Acquisitions*

Our consolidated financial statements include the operations of acquired businesses after the completion of the acquisitions. We account for acquired businesses using the acquisition method of accounting, which requires, among other things, that most assets acquired and liabilities assumed be recognized at their estimated fair values as of the acquisition date and that the fair value of acquired IPR&D be recorded on the balance sheet. Transaction costs are expensed as incurred. Any excess of the consideration transferred over the assigned values of the net assets acquired is recorded as goodwill. When we acquire net assets that do not constitute a business, as defined in U.S. GAAP, no goodwill is recognized and acquired IPR&D is expensed in *Research and development expenses.*

Contingent consideration in a business combination is included as part of the acquisition cost and is recognized at fair value as of the acquisition date. Fair value is generally estimated by using a probability-weighted discounted cash flow approach. See *Note 16D*. Any liability resulting from contingent consideration is remeasured to fair value at each reporting date until the contingency is resolved. These changes in fair value are recognized in earnings in *Other (income)/deductions—net.*

*F. Fair Value*

We measure certain assets and liabilities at fair value, either upon initial recognition or for subsequent accounting or reporting. We estimate fair value using an exit price approach, which requires, among other things, that we determine the price that would be received to sell an asset or paid to transfer a liability in an orderly market. The determination of an exit price is considered from the perspective of market participants, considering the highest and best use of non-financial assets and, for liabilities, assuming that the risk of non-performance will be the same before and after the transfer.

When estimating fair value, depending on the nature and complexity of the asset or liability, we may use one or all of the following techniques:

• Income approach, which is based on the present value of a future stream of net cash flows.

• Market approach, which is based on market prices and other information from market transactions involving identical or comparable assets or liabilities.

• Cost approach, which is based on the cost to acquire or construct comparable assets, less an allowance for functional and/or economic obsolescence.

Our fair value methodologies depend on the following types of inputs:

• Quoted prices for identical assets or liabilities in active markets (Level 1 inputs).

• Quoted prices for similar assets or liabilities in active markets, or quoted prices for identical or similar assets or liabilities in markets that are not active, or inputs other than quoted prices that are directly or indirectly observable, or inputs that are derived principally from, or corroborated by, observable market data by correlation or other means (Level 2 inputs).

• Unobservable inputs that reflect estimates and assumptions (Level 3 inputs).

The following inputs and valuation techniques are used to estimate the fair value of our financial assets and liabilities:

• Available-for-sale debt securities—third-party matrix-pricing model that uses significant inputs derived from or corroborated by observable market data and credit-adjusted yield curves.

• Equity securities with readily determinable fair values—quoted market prices and observable NAV prices.

• Derivative assets and liabilities—third-party matrix-pricing model that uses inputs derived from or corroborated by observable market data. Where applicable, these models use market-based observable inputs, including interest rate yield curves to discount future cash flow amounts, and forward and spot prices for currencies. The credit risk impact to our derivative financial instruments was not significant.

• Money market funds—observable NAV prices.

We periodically review the methodologies, inputs and outputs of third-party pricing services for reasonableness. Our procedures can include, for example, referencing other third-party pricing models, monitoring key observable inputs (like benchmark interest rates) and selectively performing test-comparisons of values with actual sales of financial instruments.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

*G. Foreign Currency Translation*

For most of our international operations, local currencies have been determined to be the functional currencies. We translate functional currency assets and liabilities to their U.S. dollar equivalents at exchange rates in effect as of the balance sheet date and income and expense amounts at average exchange rates for the period. The U.S. dollar effects that arise from changing translation rates are recorded in *Other comprehensive income/(loss)*. The effects of converting non-functional currency monetary assets and liabilities into the functional currency are recorded in *Other (income)/deductions—net*. For operations in highly inflationary economies, we translate monetary items at rates in effect as of the balance sheet date, with translation adjustments recorded in *Other (income)/deductions—net*, and we translate non-monetary items at historical rates.

*H. Revenues and Trade Accounts Receivable*

*Revenue Recognition*—We record revenues from product sales when there is a transfer of control of the product from us to the customer. We typically determine transfer of control based on when the product is shipped or delivered and title passes to the customer.

*Our Sales Contracts*—Sales on credit are typically under short-term contracts. Collections are based on market payment cycles common in various markets, with shorter cycles in the U.S. Sales are adjusted for sales allowances, chargebacks, rebates and sales returns and cash discounts. Sales returns occur due to LOE, product recalls or a changing competitive environment.

*Deductions from Revenues*—Our gross product revenues are subject to a variety of deductions, which generally are estimated and recorded in the same period that the revenues are recognized. Such variable consideration represents chargebacks, rebates, sales allowances and sales returns. These deductions represent estimates of the related obligations and, as such, knowledge and judgment is required when estimating the impact of these revenue deductions on gross sales for a reporting period.

*Provisions for pharmaceutical sales returns*—Provisions are based on a calculation for each market that incorporates the following, as appropriate: local returns policies and practices; historical returns as a percentage of sales; an understanding of the reasons for past returns; estimated shelf life by product; an estimate of the amount of time between shipment and return or lag time; and any other factors that could impact the estimate of future returns, such as LOE, product recalls or a changing competitive environment. Generally, returned products are destroyed, and customers are refunded the sales price in the form of a credit.

We record sales incentives as a reduction of revenues at the time the related revenues are recorded or when the incentive is offered, whichever is later. We estimate the cost of our sales incentives based on our historical experience with similar incentives programs to predict customer behavior.

The following outlines our common sales arrangements:

- *Customers*—Our prescription pharmaceutical products are sold principally to wholesalers, but we also sell directly to retailers, hospitals, clinics, government agencies and pharmacies. In the U.S., we primarily sell our vaccines products directly to the federal government, CDC, wholesalers, individual provider offices, retail pharmacies, and integrated delivery networks. Outside the U.S., we primarily sell our vaccines to government and non-government institutions. Prescription pharmaceutical products that ultimately are used by patients are generally covered under governmental programs, managed care programs and insurance programs, including those managed through PBMs, and are subject to sales allowances and/or rebates payable directly to those programs. Those sales allowances and rebates are generally negotiated, but government programs may have legislated amounts by type of product (e.g., patented or unpatented).

Specifically:

- In the U.S., we sell our products principally to distributors and hospitals. We also have contracts with managed care programs or PBMs and legislatively mandated contracts with the federal and state governments under which we provide rebates based on medicines utilized by the lives they cover. We record provisions for Medicare, Medicaid, and performance-based contract pharmaceutical rebates based upon our experience ratio of rebates paid and actual prescriptions written during prior periods. We apply the experience ratio to the respective period's sales to determine the rebate accrual and related expense. This experience ratio is evaluated regularly to ensure that the historical trends are as current as practicable. We estimate discounts on branded prescription drug sales to Medicare Part D participants in the Medicare "coverage gap," also known as the "doughnut hole," based on the historical experience of beneficiary prescriptions and consideration of the utilization that is expected to result from the discount in the coverage gap. We evaluate this estimate regularly to ensure that the historical trends and future expectations are as current as practicable. For performance-based contract rebates, we also consider current contract terms, such as changes in formulary status and rebate rates.

- Outside the U.S., the majority of our pharmaceutical sales allowances are contractual or legislatively mandated and our estimates are based on actual invoiced sales within each period, which reduces the risk of variations in the estimation process. In certain European countries, rebates are calculated on the government's total unbudgeted pharmaceutical spending or on specific product sales thresholds and we apply an estimated allocation factor against our actual invoiced sales to project the expected level of reimbursement. We obtain third-party information that helps us to monitor the adequacy of these accruals.

- Provisions for pharmaceutical chargebacks (primarily reimbursements to U.S. wholesalers for honoring contracted prices and legislated discounts to third parties) closely approximate actual amounts incurred, as we settle these deductions generally within two to five weeks of incurring the liability.

We recorded direct product sales and/or Alliance revenues of more than $1 billion for each of nine products in 2021, for each of seven products in 2020 and for each of six products in 2019. In the aggregate, these direct products sales and/or alliance product revenues represented 75% of our revenues in 2021, 54% of our revenues in 2020 and 49% of our revenues in 2019. See *Note 17B* for additional information. The loss or expiration of intellectual property rights can have a significant adverse effect on our revenues as our contracts with customers will generally be at lower selling prices and lower volumes due to added generic competition. We generally provide for higher sales returns during the period in which individual markets begin to near the loss or expiration of intellectual property rights.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

Our accruals for Medicare, Medicaid and related state program and performance-based contract rebates, chargebacks, sales allowances and sales returns and cash discounts are as follows:

| (MILLIONS) | As of December 31, | |
| --- | --- | --- |
| | **2021** | 2020 |
| Reserve against *Trade accounts receivable, less allowance for doubtful accounts* | $ **1,077** | $ 861 |
| ***Other current liabilities***: | | |
| Accrued rebates | **3,811** | 3,017 |
| Other accruals | **528** | 432 |
| ***Other noncurrent liabilities*** | **433** | 399 |
| Total accrued rebates and other sales-related accruals | $ **5,850** | $ 4,708 |

Taxes collected from customers relating to product sales and remitted to governmental authorities are excluded from *Revenues*.

*Trade Accounts Receivable*—Trade accounts receivable are stated at their net realizable value. The allowance for credit losses reflects our best estimate of expected credit losses of the receivables portfolio determined on the basis of historical experience, current information, and forecasts of future economic conditions. In developing the estimate for expected credit losses, trade accounts receivables are segmented into pools of assets depending on market (U.S. versus international), delinquency status, and customer type (high risk versus low risk and government versus non-government), and fixed reserve percentages are established for each pool of trade accounts receivables.

In determining the reserve percentages for each pool of trade accounts receivables, we considered our historical experience with certain customers and customer types, regulatory and legal environments, country and political risk, and other relevant current and future forecasted macroeconomic factors. These credit risk indicators are monitored on a quarterly basis to determine whether there have been any changes in the economic environment that would indicate the established reserve percentages should be adjusted, and are considered on a regional basis to reflect more geographic-specific metrics. Additionally, write-offs and recoveries of customer receivables are tracked against collections on a quarterly basis to determine whether the reserve percentages remain appropriate. When management becomes aware of certain customer-specific factors that impact credit risk, specific allowances for known troubled accounts are recorded. Trade accounts receivable are written off after all reasonable means to collect the full amount (including litigation, where appropriate) have been exhausted.

During 2021 and 2020, additions to the allowance for credit losses, write-offs and recoveries of customer receivables were not material to our consolidated financial statements.

*I. Collaborative Arrangements*

Payments to and from our collaboration partners are presented in our consolidated statements of income based on the nature of the arrangement (including its contractual terms), the nature of the payments and applicable accounting guidance. Under co-promotion agreements, we record the amounts received for our share of gross profits from our collaboration partners as alliance revenues, a component of *Revenues*, when our collaboration partners are the principal in the transaction and we receive a share of their net sales or profits. Alliance revenues are recorded as we perform co-promotion activities for the collaboration and the collaboration partners sell the products to their customers. The related expenses for selling and marketing these products including reimbursements to or from our collaboration partners for these costs are included in *Selling, informational and administrative expenses*. In collaborative arrangements where we manufacture a product for our collaboration partners, we record revenues when we transfer control of the product to our collaboration partners. In collaboration arrangements where we are the principal in the transaction, we record amounts paid to collaboration partners for their share of net sales or profits earned, and all royalty payments to collaboration partners as *Cost of sales*. Royalty payments received from collaboration partners are included in *Other (income)/deductions—net*.

Reimbursements to or from our collaboration partners for development costs are typically recorded in *Research and development expenses*. Upfront payments and pre-approval milestone payments due from us to our collaboration partners in development stage collaborations are recorded as *Research and development expenses*. Milestone payments due from us to our collaboration partners after regulatory approval has been attained for a medicine are recorded in *Identifiable intangible assets—Developed technology rights*. Upfront and pre-approval milestone payments earned from our collaboration partners by us are recognized in *Other (income)/deductions—net* over the development period for the products, when our performance obligations include providing R&D services to our collaboration partners. Upfront, pre-approval and post-approval milestone payments earned by us may be recognized in *Other (income)/deductions—net* immediately when earned or over other periods depending upon the nature of our performance obligations in the applicable collaboration. Where the milestone event is regulatory approval for a medicine, we generally recognize milestone payments due to us in the transaction price when regulatory approval in the applicable jurisdiction has been attained. We may recognize milestone payments due to us in the transaction price earlier than the milestone event in certain circumstances when recognition of the income would not be probable of a significant reversal.

*J. Cost of Sales and Inventories*

Inventories are recorded at the lower of cost or net realizable value. The cost of finished goods, work in process and raw materials is determined using average actual cost. We regularly review our inventories for impairment and reserves are established when necessary.

*K. Selling, Informational and Administrative Expenses*

Selling, informational and administrative expenses are expensed as incurred. Among other things, these expenses include the internal and external costs of marketing, advertising, shipping and handling, information technology and legal defense. Advertising expenses totaled approximately $2.0 billion in 2021, $1.8 billion in 2020 and $2.3 billion in 2019. Production costs are expensed as incurred and the costs of TV, radio, and other electronic media and publications are expensed when the related advertising occurs.

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

*L. Research and Development Expenses*

R&D costs are expensed as incurred. These expenses include the costs of our proprietary R&D efforts, as well as costs incurred in connection with certain licensing arrangements. Before a compound receives regulatory approval, we record upfront and milestone payments we make to third parties under licensing arrangements as expense. Upfront payments are recorded when incurred, and milestone payments are recorded when the specific milestone has been achieved. Once a compound receives regulatory approval, we record any milestone payments in *Identifiable intangible assets, less accumulated amortization* and, unless the asset is determined to have an indefinite life, we typically amortize the payments on a straight-line basis over the remaining agreement term or the expected product life cycle, whichever is shorter.

*M. Amortization of Intangible Assets, Depreciation and Certain Long-Lived Assets*

Long-lived assets include:

- *Property, plant and equipment*, less accumulated depreciation—These assets are recorded at cost, including any significant improvements after purchase, less accumulated depreciation. Property, plant and equipment assets, other than land and construction in progress, are depreciated on a straight-line basis over the estimated useful life of the individual assets. Depreciation begins when the asset is ready for its intended use. For tax purposes, accelerated depreciation methods are used as allowed by tax laws.

- *Identifiable intangible assets, less accumulated amortization*—These assets are recorded at fair value at acquisition. Intangible assets with finite lives are amortized on a straight-line basis over their estimated useful lives. Intangible assets with indefinite lives are not amortized until a useful life can be determined.

- *Goodwill*—Goodwill represents the excess of the consideration transferred for an acquired business over the assigned values of its net assets. Goodwill is not amortized.

Amortization of finite-lived acquired intangible assets that contribute to our ability to sell, manufacture, research, market and distribute products, compounds and intellectual property is included in *Amortization of intangible assets* as these intangible assets benefit multiple business functions. Amortization of intangible assets that are for a single function and depreciation of property, plant and equipment are included in *Cost of sales, Selling, informational and administrative expenses* and/or *Research and development expenses,* as appropriate.

We review our long-lived assets for impairment indicators throughout the year. We perform impairment testing for indefinite-lived intangible assets and goodwill at least annually and for all other long-lived assets whenever impairment indicators are present. When necessary, we record impairments of long-lived assets for the amount by which the fair value is less than the carrying value of these assets.

Specifically:

- For finite-lived intangible assets, such as developed technology rights, and for other long-lived assets, such as property, plant and equipment, whenever impairment indicators are present, we calculate the undiscounted value of the projected cash flows for the asset, or asset group, and compare this estimated amount to the carrying amount. If the carrying amount is greater, we record an impairment loss for the excess of book value over fair value. In addition, in all cases of an impairment review, we reevaluate the remaining useful lives of the assets and modify them, as appropriate.

- For indefinite-lived intangible assets, such as brands and IPR&D assets, when necessary, we determine the fair value of the asset and record an impairment loss, if any, for the excess of book value over fair value. In addition, in all cases of an impairment review other than for IPR&D assets, we re-evaluate whether continuing to characterize the asset as indefinite-lived is appropriate.

- For goodwill, when necessary, we determine the fair value of each reporting unit and record an impairment loss, if any, for the excess of the book value of the reporting unit over the implied fair value.

*N. Restructuring Charges and Other Costs Associated with Acquisitions and Cost-Reduction/Productivity Initiatives*

We may incur restructuring charges in connection with acquisitions when we implement plans to restructure and integrate the acquired operations or in connection with our cost-reduction and productivity initiatives.

- In connection with acquisition activity, we typically incur costs associated with executing the transactions, integrating the acquired operations (which may include expenditures for consulting and the integration of systems and processes), and restructuring the combined company (which may include charges related to employees, assets and activities that will not continue in the combined company); and

- In connection with our cost-reduction/productivity initiatives, we typically incur costs and charges for site closings and other facility rationalization actions, workforce reductions and the expansion of shared services, including the development of global systems.

Included in *Restructuring charges and certain acquisition-related costs* are all restructuring charges, as well as certain other costs associated with acquiring and integrating an acquired business. If the restructuring action results in a change in the estimated useful life of an asset, that incremental impact is classified in *Cost of sales, Selling, informational and administrative expenses* and/or *Research and development expenses*, as appropriate. Employee termination costs are generally recorded when the actions are probable and estimable and include accrued severance benefits, pension and postretirement benefits, many of which may be paid out during periods after termination. Transaction costs, such as banking, legal, accounting and other similar costs incurred in connection with a business acquisition are expensed as incurred.

Our business and platform functions may be impacted by these actions, including sales and marketing, manufacturing and R&D, as well as our corporate enabling functions (such as digital, global real estate operations, legal, finance, human resources, worldwide public affairs, compliance and worldwide procurement).

*O. Cash Equivalents and Statement of Cash Flows*

Cash equivalents include items almost as liquid as cash, such as certificates of deposit and time deposits with maturity periods of three months or less when purchased. If items meeting this definition are part of a larger investment pool, we classify them as *Short-term investments*.

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

Cash flows for financial instruments designated as fair value or cash flow hedges may be included in operating, investing or financing activities, depending on the classification of the items being hedged. Cash flows for financial instruments designated as net investment hedges are classified according to the nature of the hedging instrument. Cash flows for financial instruments that do not qualify for hedge accounting treatment are classified according to their purpose and accounting nature.

*P. Investments and Derivative Financial Instruments*

The classification of an investment depends on the nature of the investment, our intent and ability to hold the investment, and the degree to which we may exercise influence. Our investments are primarily comprised of the following:

• Public equity securities with readily determinable fair values, which are carried at fair value, with changes in fair value reported in *Other (income)/deductions—net*.

• Available-for-sale debt securities, which are carried at fair value, with changes in fair value reported in *Other comprehensive income/(loss)* until realized.

• Held-to-maturity debt securities, which are carried at amortized cost.

• Private equity securities without readily determinable fair values and where we have no significant influence are measured at cost minus any impairment and plus or minus changes resulting from observable price changes in orderly transactions for the identical or a similar investment of the same issuer.

• For equity investments in common stock or in-substance common stock where we have significant influence over the financial and operating policies of the investee, we use the equity-method of accounting. Under the equity-method, we record our share of the investee's income and expenses in *Other (income)/deductions—net*. The excess of the cost of the investment over our share of the underlying equity in the net assets of the investee as of the acquisition date is allocated to the identifiable assets and liabilities of the investee, with any remaining excess amount allocated to goodwill. Such investments are initially recorded at cost, which is the fair value of consideration paid and typically does not include contingent consideration.

Realized gains or losses on sales of investments are determined by using the specific identification cost method.

We regularly evaluate all of our financial assets for impairment. For investments in debt and equity, when a decline in fair value, if any, is determined, an impairment charge is recorded and a new cost basis in the investment is established.

Derivative financial instruments are carried at fair value in various balance sheet categories (see *Note 7A*), with changes in fair value reported in *Net income* or, for derivative financial instruments in certain qualifying hedging relationships, in *Other comprehensive income/(loss)* (see *Note 7E*).

*Q. Tax Assets and Liabilities and Income Tax Contingencies*

Tax Assets and Liabilities

*Current tax assets* primarily include (i) tax effects for intercompany transfers of inventory within our combined group, which are recognized in the consolidated statements of income when the inventory is sold to a third party and (ii) income tax receivables that are expected to be recovered either via refunds from taxing authorities or reductions to future tax obligations.

Deferred tax assets and liabilities are recognized for the expected future tax consequences of differences between the financial reporting and tax bases of assets and liabilities using enacted tax rates and laws. We provide a valuation allowance when we believe that our deferred tax assets are not recoverable based on an assessment of estimated future taxable income that incorporates ongoing, prudent and feasible tax-planning strategies, that would be implemented, if necessary, to realize the deferred tax assets. Amounts recorded for valuation allowances requires judgments about future income which can depend heavily on estimates and assumptions. All deferred tax assets and liabilities within the same tax jurisdiction are presented as a net amount in the noncurrent section of our consolidated balance sheet.

The TCJA subjects a U.S. shareholder to current tax on global intangible low-taxed income earned by certain foreign subsidiaries. The FASB Staff Q&A, Topic 740, No. 5, *Accounting for Global Intangible Low-Taxed Income*, states that we are permitted to make an accounting policy election to either recognize deferred taxes for temporary basis differences expected to reverse as global intangible low-taxed income in future years or provide for the tax expense related to such income in the year the tax is incurred. We elected to recognize deferred taxes for temporary differences expected to reverse as global intangible low-taxed income in future years.

Other non-current tax assets primarily represent our estimate of the potential tax benefits in one tax jurisdiction that could result from the payment of income taxes in another tax jurisdiction. These potential benefits generally result from cooperative efforts among taxing authorities, as required by tax treaties to minimize double taxation, commonly referred to as the competent authority process. The recoverability of these assets, which we believe to be more likely than not, is dependent upon the actual payment of taxes in one tax jurisdiction and, in some cases, the successful petition for recovery in another tax jurisdiction.

*Other taxes payable* as of December 31, 2021 and 2020 include liabilities for uncertain tax positions and the noncurrent portion of the repatriation tax liability for which we elected payment over eight years through 2026. For additional information, see *Note 5D* for uncertain tax positions and *Note 5A* for the repatriation tax liability and other estimates and assumptions in connection with the TCJA.

Income Tax Contingencies

We account for income tax contingencies using a benefit recognition model. If we consider that a tax position is more likely than not to be sustained upon audit, based solely on the technical merits of the position, we recognize all or a portion of the benefit. We measure the benefit by determining the amount that is greater than 50% likely of being realized upon settlement, presuming that the tax position is examined by the taxing authority with full knowledge of all relevant information.

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

We regularly monitor our position and subsequently recognize the unrecognized tax benefit: (i) if there are changes in tax law, analogous case law or there is new information that sufficiently raise the likelihood of prevailing on the technical merits of the position to "more likely than not"; (ii) if the statute of limitations expires; or (iii) there is a completion of an audit resulting in a favorable settlement of that tax year with the appropriate agency. Liabilities for uncertain tax positions are classified as current only when we expect to pay cash within the next 12 months. Interest and penalties, if any, are recorded in *Provision/(benefit) for taxes on income* and are classified on our consolidated balance sheet with the related tax liability.

Our assessments are based on estimates and assumptions that have been deemed reasonable by management, but our estimates of unrecognized tax benefits and potential tax benefits may not be representative of actual outcomes, and variation from such estimates could materially affect our financial statements in the period of settlement or when the statutes of limitations expire, as we treat these events as discrete items in the period of resolution.

*R. Pension and Postretirement Benefit Plans*

The majority of our employees worldwide are covered by defined benefit pension plans, defined contribution plans or both. In the U.S., we have both IRC-qualified and supplemental (non-qualified) defined benefit plans and defined contribution plans, as well as other postretirement benefit plans consisting primarily of medical insurance for retirees and their eligible dependents. We recognize the overfunded or underfunded status of each of our defined benefit plans as an asset or liability. The obligations are generally measured at the actuarial present value of all benefits attributable to employee service rendered, as provided by the applicable benefit formula. Our pension and other postretirement obligations may be determined using assumptions such as discount rate, expected annual rate of return on plan assets, expected employee turnover and participant mortality. For our pension plans, the obligation may also include assumptions as to future compensation levels. For our other postretirement benefit plans, the obligation may include assumptions as to the expected cost of providing medical insurance benefits, as well as the extent to which those costs are shared with the employee or others (such as governmental programs). Plan assets are measured at fair value. Net periodic pension and postretirement benefit costs other than the service costs are recognized in *Other (income)/deductions—net*.

*S. Legal and Environmental Contingencies*

We and certain of our subsidiaries are subject to numerous contingencies arising in the ordinary course of business, such as patent litigation, product liability and other product-related litigation, commercial litigation, environmental claims and proceedings, government investigations and guarantees and indemnifications. In assessing contingencies related to legal and environmental proceedings that are pending against the Company, or unasserted claims that are probable of being asserted, we record accruals for these contingencies to the extent that we conclude that a loss is both probable and reasonably estimable. If some amount within a range of loss appears to be a better estimate than any other amount within the range, we accrue that amount. Alternatively, when no amount within a range of loss appears to be a better estimate than any other amount, we accrue the lowest amount in the range. We record anticipated recoveries under existing insurance contracts when recovery is assured.

*T. Share-Based Payments*

Our compensation programs can include share-based payments. Generally, grants under share-based payment programs are accounted for at fair value and these fair values are generally amortized on a straight-line basis over the vesting terms with the related costs recorded in *Cost of sales, Selling, informational and administrative expenses* and/or *Research and development expenses*, as appropriate.

## Note 2. Acquisitions, Divestitures, Equity-Method Investments, Licensing Arrangements and Collaborative Arrangements

*A. Acquisitions*

Trillium

On November 17, 2021, we acquired all of the issued and outstanding common stock not already owned by Pfizer of Trillium, a clinical stage immuno-oncology company developing therapies targeting cancer immune evasion pathways and specific cell targeting approaches, for a price of $18.50 per share in cash, for total consideration of $2.0 billion, net of cash acquired. As a result, Trillium became our wholly owned subsidiary. We previously held a 2% ownership investment in Trillium. Trillium's lead program, TTI-622, is an investigational fusion protein that is designed to block the inhibitory activity of CD47, a molecule that is overexpressed by a wide variety of tumors.

We accounted for the transaction as an asset acquisition since the lead asset, TTI-622, represented substantially all of the fair value of the gross assets acquired, which exclude cash acquired. At the acquisition date, we recorded a $2.1 billion charge representing an acquired IPR&D asset with no alternative future use in *Research and development expenses*, of which the $2.0 billion net cash consideration is presented as a cash outflow from operating activities. In connection with this acquisition, we recorded $256 million of assets acquired primarily consisting of cash and investments. Liabilities assumed were approximately $81 million.

Array

On July 30, 2019, we acquired Array, a commercial stage biopharmaceutical company focused on the discovery, development and commercialization of targeted small molecule medicines to treat cancer and other diseases of high unmet need, for $48 per share in cash. The total fair value of the consideration transferred was $11.2 billion ($10.9 billion, net of cash acquired). In addition, $157 million in payments to Array employees for the fair value of previously unvested stock options was recognized as post-closing compensation expense and recorded in *Restructuring charges and certain acquisition-related costs* (see *Note 3*). We financed the majority of the transaction with debt and the balance with existing cash.

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

Array's portfolio includes Braftovi (encorafenib) and Mektovi (binimetinib), a broad pipeline of targeted cancer medicines in different stages of R&D, as well as a portfolio of out-licensed medicines, which may generate milestones and royalties over time.

The final allocation of the consideration transferred to the assets acquired and the liabilities assumed was completed in 2020. In connection with this acquisition, we recorded: (i) $6.3 billion in *Identifiable intangible assets*, consisting of $2.0 billion of *Developed technology rights* with a useful life of 16 years, $2.8 billion of *IPR&D* and $1.5 billion of *Licensing agreements and other* ($1.2 billion for technology in development—indefinite-lived licensing agreements and $360 million for developed technology—finite-lived licensing agreements with a useful life of 10 years), (ii) $6.1 billion of *Goodwill*, (iii) $1.1 billion of net deferred tax liabilities and (iv) $451 million of assumed long-term debt, which was paid in full in 2019.

In 2020, we recorded measurement period adjustments to the estimated fair values initially recorded in 2019, which resulted in a reduction in *Identifiable intangible assets* of approximately $900 million with a corresponding change to *Goodwill* and net deferred tax liabilities. The measurement period adjustments were recorded to better reflect market participant assumptions about facts and circumstances existing as of the acquisition date and did not have a material impact on our consolidated statement of income for the year ended December 31, 2020.

Therachon

On July 1, 2019, we acquired all the remaining shares of Therachon, a privately-held clinical-stage biotechnology company focused on rare diseases, with assets in development for the treatment of achondroplasia, a genetic condition and the most common form of short-limb dwarfism, for $340 million upfront, plus potential milestone payments of up to $470 million contingent on the achievement of key milestones in the development and commercialization of the lead asset. We accounted for the transaction as an asset acquisition since the lead asset represented substantially all the fair value of the gross assets acquired. The total fair value of the consideration transferred for Therachon was $322 million, which consisted of $317 million of cash and our previous $5 million investment in Therachon. In connection with this asset acquisition, we recorded a charge of $337 million in *Research and development expenses*.

*B. Divestitures*

Meridian

On December 31, 2021, we completed the sale of our Meridian subsidiary for approximately $51 million in cash and recognized a loss of approximately $167 million, net of tax, in *Discontinued operations—net of tax*. In connection with the sale, Pfizer and the purchaser of Meridian entered into various agreements to provide a framework for our relationship after the sale, including interim TSAs and a manufacturing supply agreement (MSA). The TSAs primarily involve Pfizer providing services related to information technology, among other activities, and are generally expected to be for terms of no more than 12 to 18 months post sale. The MSA is for a term of three years post sale with a two year extension period. No amounts were recorded under the above arrangements in 2021.

Upjohn Separation and Combination with Mylan

On November 16, 2020, we completed the spin-off and the combination of the Upjohn Business with Mylan (the Transactions) to form Viatris.

The Transactions were structured as an all-stock, Reverse Morris Trust transaction. Specifically, (i) we contributed the Upjohn Business to a wholly owned subsidiary, which was renamed Viatris, so that the Upjohn Business was separated from the remainder of our business (the Separation), (ii) following the Separation, we distributed, on a pro rata basis, all of the shares of Viatris common stock held by Pfizer to Pfizer stockholders as of the November 13, 2020 record date, such that each Pfizer stockholder as of the record date received approximately 0.124079 shares of Viatris common stock per share of Pfizer common stock (the Distribution); and (iii) immediately after the Distribution, the Upjohn Business combined with Mylan in a series of transactions in which Mylan shareholders received one share of Viatris common stock for each Mylan ordinary share held by such shareholder, subject to any applicable withholding taxes (the Combination). Prior to the Distribution, Viatris made a cash payment to Pfizer equal to $12.0 billion as partial consideration for the contribution of the Upjohn Business to Viatris. As of the closing of the Combination, Pfizer stockholders owned approximately 57% of the outstanding shares of Viatris common stock, and Mylan shareholders owned approximately 43% of the outstanding shares of Viatris common stock, in each case on a fully diluted, as-converted and as-exercised basis. The Transactions are generally expected to be tax free to Pfizer and Pfizer stockholders for U.S. tax purposes. Beginning November 16, 2020, Viatris operates both the Upjohn Business and Mylan as an independent publicly traded company, which is traded under the symbol "VTRS" on the NASDAQ.

In connection with the Transactions, in June 2020, Upjohn Inc. and Upjohn Finance B.V. completed privately placed debt offerings of $7.45 billion and €3.60 billion aggregate principal amounts, respectively, (approximately $11.4 billion) of senior unsecured notes and entered into other financing arrangements, including a $600 million delayed draw term loan agreement and a revolving credit facility agreement for up to $4.0 billion. Proceeds from the debt offerings and other financing arrangements were used to fund the $12.0 billion cash distribution Viatris made to Pfizer prior to the Distribution. We used the cash distribution proceeds to pay down commercial paper borrowings and redeem the $1.15 billion aggregate principal amount outstanding of our 1.95% senior unsecured notes that were due in June 2021 and $342 million aggregate principal amount outstanding of our 5.80% senior unsecured notes that were due in August 2023, before the maturity date. Interest expense for the $11.4 billion in debt securities incurred during 2020 is included in *Discontinued operations—net of tax*. Following the Separation and Combination of the Upjohn Business with Mylan, we are no longer the obligor or guarantor of any Upjohn debt or Upjohn financing arrangements.

As a result of the spin-off of the Upjohn Business, we distributed net assets of $1.6 billion as of November 16, 2020, which was reflected as a reduction to *Retained earnings* and reflects the change in accounting principle in the first quarter of 2021 to MTM Accounting. See *Note 1C*. Of this amount, $412 million represents cash transferred to the Upjohn Business, with the remainder considered a non-cash activity in the consolidated statement of cash flows for the year ended December 31, 2020. The spin-off also resulted in a net increase to *Accumulated other comprehensive loss* of $423 million for the derecognition of net gains on foreign currency translation adjustments of $397 million and prior service net credits associated with benefit plans of $26 million, which were reclassified to *Retained earnings*.

As a result of the separation of Upjohn, we incurred separation-related costs of $434 million in 2020 and $83 million in 2019, which are included in *Discontinued operations—net of tax*. These costs primarily relate to professional fees for regulatory filings and separation activities within finance, tax, legal and information system functions as well as investment banking fees.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

In connection with the Transactions, Pfizer and Viatris entered into various agreements to effect the Separation and Combination to provide a framework for our relationship after the Combination, including a separation and distribution agreement, interim operating models, including agency arrangements, MSAs, TSAs, a tax matters agreement, and an employee matters agreement, among others. The interim agency operating model arrangements primarily include billings, collections and remittance of rebates that we are performing on a transitional basis on behalf of Viatris. Under the MSAs, Pfizer or Viatris, as the case may be, manufactures, labels and packages products for the other party. The terms of the MSAs range in initial duration from four to seven years post-Separation. The TSAs primarily involve Pfizer providing services to Viatris related to finance, information technology and human resource infrastructure and are generally expected to be for terms of no more than three years post-Separation. The amounts recorded under the above agreements were not material to our consolidated results of operations in 2021 and 2020. In addition, Pfizer and Mylan had a pre-existing arms-length commercial agreement, which is continuing with Viatris and is not material to Pfizer's consolidated financial statements.

Net amounts due from Viatris under the above agreements were $53 million as of December 31, 2021 and $401 million as of December 31, 2020. The cash flows associated with the above agreements are included in *Net cash provided by operating activities from continuing operations,* except for a $277 million payment to Viatris made in 2021 pursuant to terms of the separation agreement, which is reported in *Other financing activities, net,* and was recorded as a payable to Viatris in *Other current liabilities* as of December 31, 2020.

Components of *Discontinued operations—net of tax:*

| (MILLIONS) | | Year Ended December 31,[a] | | | | |
|---|---|---|---|---|---|---|
| | | **2021** | | 2020 | | 2019 |
| Revenues | $ | **277** | $ | 7,572 | $ | 10,845 |
| Costs and expenses: | | | | | | |
| Cost of sales | | **204** | | 2,106 | | 2,173 |
| Selling, informational and administrative expenses | | **26** | | 1,682 | | 1,624 |
| Research and development expenses | | **9** | | 224 | | 265 |
| Amortization of intangible assets | | **45** | | 224 | | 181 |
| Restructuring charges and certain acquisition-related costs | | **2** | | 29 | | 146 |
| Other (income)/deductions—net | | **365** | | 428 | | 401 |
| Pre-tax income/(loss) from discontinued operations | | **(375)** | | 2,879 | | 6,056 |
| Provision/(benefit) for taxes on income | | **(107)** | | 349 | | 738 |
| Income/(loss) from discontinued operations—net of tax | | **(268)** | | 2,529 | | 5,318 |
| Pre-tax loss on sale of discontinued operations | | **(211)** | | — | | — |
| Benefit for taxes on income | | **(44)** | | — | | — |
| Loss on sale of discontinued operations—net of tax | | **(167)** | | — | | — |
| *Discontinued operations—net of tax* | $ | **(434)** | $ | 2,529 | $ | 5,318 |

[a] In 2021, *Discontinued operations—net of tax* primarily includes (i) the operations of Meridian prior to its sale on December 31, 2021 recognized in Income/(loss) from discontinued operations—net of tax, which includes a pre-tax amount for a Multi-District Litigation relating to EpiPen against the Company in the U.S. District Court for the District of Kansas for $345 million; and (ii) the after tax loss of $167 million related to the sale of Meridian recognized in Loss on sale of discontinued operations—net of tax. To a much lesser extent, *Discontinued operations—net of tax* in 2021 also includes the operations of the Mylan-Japan collaboration prior to its termination on December 21, 2020 and post-closing adjustments directly related to our former Upjohn and Nutrition discontinued businesses, including adjustments for tax, benefits and legal-related matters recognized in transitional loss from discontinued operations—net of tax. In 2020 and 2019, *Discontinued operations—net of tax* relates to the operations of the Upjohn Business, Meridian and the Mylan-Japan collaboration and includes the change in accounting principle in the first quarter of 2021 to MTM Accounting. See *Note 1C.* In 2020, *Discontinued operations—net of tax* includes pre-tax interest expense of $116 million associated with the U.S. dollar and Euro denominated senior unsecured notes issued by Upjohn Inc. and Upjohn Finance B.V. in the second quarter of 2020 and pre-tax charges of $223 million related to the remeasurement of Euro debt issued by Upjohn Finance B.V. in the second quarter of 2020.

Components of assets and liabilities of discontinued operations and other assets held for sale:

| (MILLIONS) | | As of December 31,[a] | | |
|---|---|---|---|---|
| | | **2021** | | 2020 |
| Current assets of discontinued operations and other assets held for sale—*Other current assets* | $ | **25** | $ | 215 |
| Property, plant and equipment | $ | **—** | $ | 155 |
| Identifiable intangible assets | | **—** | | 134 |
| Other noncurrent assets | | **—** | | 29 |
| Noncurrent assets of discontinued operations—*Other noncurrent assets* | $ | **—** | $ | 319 |
| Current liabilities of discontinued operations—*Other current liabilities* | $ | **—** | $ | 74 |
| Noncurrent liabilities of discontinued operations—*Other noncurrent liabilities* | $ | **—** | $ | 16 |

[a] Amounts as of December 31, 2021 represent property, plant and equipment held for sale. Amounts as of December 31, 2020 primarily relate to discontinued operations of our former Meridian subsidiary and the Mylan-Japan collaboration.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

*C. Equity-Method Investments*

Formation of Consumer Healthcare JV

On July 31, 2019, we completed a transaction in which we and GSK combined our respective consumer healthcare businesses into a new JV that operates globally under the GSK Consumer Healthcare name. In exchange, we received a 32% equity stake in the new company and GSK owns the remaining 68%. Upon closing, we deconsolidated our Consumer Healthcare business and recognized a pre-tax gain of $8.1 billion ($5.4 billion, net of tax) in the third quarter of 2019 in *(Gain) on completion of Consumer Healthcare JV transaction* for the difference in the fair value of our 32% equity stake and the carrying value of our Consumer Healthcare business. Our financial results and our Consumer Healthcare segment's operating results for 2019 reflect seven months of Consumer Healthcare segment domestic operations and eight months of Consumer Healthcare segment international operations. The financial results for 2021 and 2020 do not reflect any contribution from the Consumer Healthcare business.

In valuing our investment in the Consumer Healthcare JV, we used discounted cash flow techniques. Some of the more significant estimates and assumptions inherent in this approach include: the amount and timing of the projected net cash flows, which include the expected impact of competitive, legal or regulatory forces on the products; the long-term growth rate, which seeks to project the sustainable growth rate over the long term; the discount rate, which seeks to reflect our best estimate of the various risks inherent in the projected cash flows; and the tax rate, which seeks to incorporate the geographic diversity of the projected cash flows.

We are accounting for our interest in the Consumer Healthcare JV as an equity-method investment. The carrying value of our investment in the Consumer Healthcare JV is $16.3 billion as of December 31, 2021 and $16.7 billion as of December 31, 2020 and is reported as a private equity investment in *Equity-method investments* as of December 31, 2021 and 2020. The Consumer Healthcare JV is a foreign investee whose reporting currency is the U.K. pound, and therefore we translate its financial statements into U.S. dollars and recognize the impact of foreign currency translation adjustments in the carrying value of our investment and in other comprehensive income. The decrease in the value of our investment from December 31, 2020 to December 31, 2021 is primarily due to dividends totaling $499 million, as well as $384 million in pre-tax foreign currency translation adjustments (see *Note 6*), partially offset by our share of the JV's earnings. We record our share of earnings from the Consumer Healthcare JV on a quarterly basis on a one-quarter lag in *Other (income)/deductions—net* commencing from August 1, 2019. Our total share of the JV's earnings generated in the fourth quarter of 2020 and the first nine months of 2021, which we recorded in our operating results in 2021, was $495 million. Our total share of the JV's earnings generated in the fourth quarter of 2019 and the first nine months of 2020, which we recorded in our operating results in 2020, was $417 million. Our total share of two months of the JV's earnings generated in the third quarter of 2019, which we recorded in our operating results in the fourth quarter of 2019, was $47 million. As of the July 31, 2019 closing date, we estimated that the fair value of our investment in the Consumer Healthcare JV was $15.7 billion and that 32% of the underlying equity in the carrying value of the net assets of the Consumer Healthcare JV was $11.2 billion, resulting in an initial basis difference of approximately $4.5 billion. In the fourth quarter of 2019, we preliminarily completed the allocation of the basis difference, which resulted from the excess of the initial fair value of our investment over the underlying equity in the carrying value of the net assets of the JV, primarily to inventory, definite-lived intangible assets, indefinite-lived intangible assets, related deferred tax liabilities and equity method goodwill within the investment account. During the fourth quarter of 2019, the Consumer Healthcare JV revised the initial carrying value of the net assets of the JV and our 32% share of the underlying equity in the carrying value of the net assets of the Consumer Healthcare JV was reduced to $11.0 billion and our initial basis difference was increased to $4.8 billion. The adjustment was allocated to equity method goodwill within the investment account. We began recording the amortization of basis differences allocated to inventory, definite-lived intangible assets and related deferred tax liabilities in *Other (income)/deductions—net* commencing August 1, 2019. The total amortization and adjustment of basis differences resulting from the excess of the initial fair value of our investment over the underlying equity in the carrying value of the net assets of the JV is included in *Other (income)/deductions—net* and was not material to our results of operations in the periods presented. See *Note 4*. Amortization of basis differences on inventory and related deferred tax liabilities was completely recognized by the second quarter of 2020. Basis differences on definite-lived intangible assets and related deferred tax liabilities are being amortized over the lives of the underlying assets, which range from 8 to 20 years.

As a part of Pfizer in 2019, pre-tax income on a management basis for the Consumer Healthcare business was $654 million through July 31, 2019.

Summarized financial information for our equity method investee, the Consumer Healthcare JV, as of September 30, 2021, the most recent period available, and as of September 30, 2020 and for the periods ending September 30, 2021, 2020, and 2019 is as follows:

| (MILLIONS) | September 30, 2021 | | September 30, 2020 |
|---|---|---|---|
| Current assets | $ | 6,890 | $ | 6,614 |
| Noncurrent assets | | 39,445 | | 38,361 |
| Total assets | $ | 46,335 | $ | 44,975 |
| Current liabilities | $ | 5,133 | $ | 5,246 |
| Noncurrent liabilities | | 5,218 | | 5,330 |
| Total liabilities | $ | 10,351 | $ | 10,576 |
| Equity attributable to shareholders | $ | 35,705 | $ | 34,154 |
| Equity attributable to noncontrolling interests | | 279 | | 245 |
| Total net equity | $ | 35,984 | $ | 34,400 |

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

| (MILLIONS) | For the Twelve Months Ending September 30, 2021 | For the Twelve Months Ending September 30, 2020 | For the Two Months Ending September 30, 2019 |
|---|---|---|---|
| Net sales | $ 12,836 | $ 12,720 | $ 2,161 |
| Cost of sales | (4,755) | (5,439) | (803) |
| Gross profit | $ 8,081 | $ 7,281 | $ 1,358 |
| Income from continuing operations | 1,614 | 1,350 | 152 |
| Net income | 1,614 | 1,350 | 152 |
| Income attributable to shareholders | 1,547 | 1,307 | 148 |

Investment in ViiV

In 2009, we and GSK created ViiV, which is focused on research, development and commercialization of human immunodeficiency virus (HIV) medicines. We own approximately 11.7% of ViiV, and prior to 2016 we accounted for our investment under the equity method due to the significant influence that we have over the operations of ViiV through our board representation and minority veto rights. We suspended application of the equity method to our investment in ViiV in 2016 when the carrying value of our investment was reduced to zero due to the recognition of cumulative equity method losses and dividends. Since 2016, we have recognized dividends from ViiV as income in *Other (income)/deductions—net* when earned, including dividends of $166 million in 2021, $278 million in 2020 and $220 million in 2019 (see *Note 4*).

Summarized financial information for our equity method investee, ViiV, as of December 31, 2021 and 2020 and for the years ending December 31, 2021, 2020, and 2019 is as follows:

| (MILLIONS) | As of December 31, 2021 | As of December 31, 2020 |
|---|---|---|
| Current assets | $ 3,608 | $ 3,283 |
| Noncurrent assets | 3,563 | 3,381 |
| Total assets | $ 7,171 | $ 6,664 |
| Current liabilities | $ 3,497 | $ 3,028 |
| Noncurrent liabilities | 6,536 | 6,370 |
| Total liabilities | $ 10,033 | $ 9,398 |
| Total net equity/(deficit) attributable to shareholders | $ (2,862) | $ (2,734) |

| (MILLIONS) | Year Ended December 31, 2021 | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
|---|---|---|---|
| Net sales | $ 6,380 | $ 6,224 | $ 6,139 |
| Cost of sales | (682) | (574) | (516) |
| Gross profit | $ 5,698 | $ 5,650 | $ 5,623 |
| Income from continuing operations | 2,040 | 2,012 | 3,398 |
| Net income | 2,040 | 2,012 | 3,398 |
| Income attributable to shareholders | 2,040 | 2,012 | 3,398 |

*D. Licensing Arrangements*

Agreement with Valneva

On April 30, 2020, we signed an agreement to co-develop and commercialize Valneva's Lyme disease vaccine candidate, VLA15, which covers six serotypes that are prevalent in North America and Europe. Valneva and Pfizer will work closely together throughout the development of VLA15. Valneva is eligible to receive a total of up to $308 million in cash payments from us consisting of a $130 million upfront payment, which was paid and recorded in *Research and development expenses* in our second quarter of 2020, as well as $35 million in development milestones and $143 million in early commercialization milestones. Under the terms of the agreement, Valneva will fund 30% of all development costs through completion of the development program, and in return we will pay Valneva tiered royalties. We will lead late-stage development and have sole control over commercialization.

Agreement with Akcea

On October 4, 2019, we entered into a worldwide exclusive licensing agreement for AKCEA-ANGPTL3-LRx, an investigational antisense therapy being developed to treat patients with certain cardiovascular and metabolic diseases, with Akcea, a wholly-owned subsidiary of Ionis. The transaction closed in November 2019 and we made an upfront payment of $250 million to Akcea, which was recorded in *Research and development expenses* in our fourth quarter of 2019. On January 31, 2022, we and Ionis announced the discontinuation of the Pfizer-led clinical development program for the licensed product and that we would be returning the rights to the licensed product to Ionis.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

*E. Collaborative Arrangements*

We enter into collaborative arrangements with respect to in-line medicines, as well as medicines in development that require completion of research and regulatory approval. Collaborative arrangements are contractual agreements with third parties that involve a joint operating activity, typically a research and/or commercialization effort, where both we and our partner are active participants in the activity and are exposed to the significant risks and rewards of the activity. Our rights and obligations under our collaborative arrangements vary. For example, we have agreements to co-promote pharmaceutical products discovered by us or other companies, and we have agreements where we partner to co-develop and/or participate together in commercializing, marketing, promoting, manufacturing and/or distributing a drug product.

Collaboration with Beam

On December 24, 2021, we entered into a multi-year research collaboration with Beam to utilize Beam's in vivo base editing programs, which use mRNA and lipid nanoparticles, for three targets for rare genetic diseases of the liver, muscle and central nervous system. Under the terms of the agreement, Beam conducts all research activities through development candidate selection for three undisclosed targets, which are not included in Beam's existing programs, and we may opt in to obtain exclusive licenses to each development candidate. Beam has a right to opt in, at the end of phase 1/2 studies, upon the payment by Beam of an option exercise fee, to a global co-development and co-commercialization agreement with respect to one program licensed under the collaboration pursuant to which we and Beam would share net profits as well as development and commercialization costs in a 65%/35% ratio (Pfizer/Beam). Upon entering into the agreement, we recorded $300 million in *Research and development expenses* in the fourth quarter of 2021 for an upfront payment due to Beam, and if we exercise our opt in to licenses for all three targets, Beam would be eligible for up to an additional $1.05 billion in development, regulatory and commercial milestone payments for a potential total deal consideration of up to $1.35 billion. Beam is also eligible to receive royalties on global net sales for each licensed program.

Collaboration with Arvinas

On July 21, 2021, we entered into a global collaboration with Arvinas to develop and commercialize ARV-471, an investigational oral PROTAC® (PROteolysis TArgeting Chimera) estrogen receptor protein degrader. The estrogen receptor is a well-known disease driver in most breast cancers. In connection with the agreement, we made an upfront cash payment of $650 million to Arvinas and we made a $350 million equity investment in the common stock of Arvinas. We recognized $706 million for the upfront payment and a premium paid on our equity investment in *Research and development expenses* in our third quarter of 2021. Arvinas is also eligible to receive up to $400 million in approval milestones and up to $1 billion in commercial milestones. The companies will equally share worldwide development costs, commercialization expenses and profits. As of December 31, 2021, we held a 6.5% equity stake of Arvinas.

Collaboration with Myovant

On December 26, 2020, we entered into a collaboration with Myovant to jointly develop and commercialize Orgovyx (relugolix) in advanced prostate cancer and Myfembree (relugolix 40 mg, estradiol 1.0 mg, and norethindrone acetate 0.5 mg) in women's health in the U.S. and Canada. We also received an exclusive option to commercialize relugolix in oncology outside the U.S. and Canada, excluding certain Asian countries, which we declined to exercise. Under the terms of the agreement, the companies will equally share profits and allowable expenses for Orgovyx and Myfembree in the U.S. and Canada, with Myovant bearing our share of allowable expenses up to a maximum of $100 million in 2021 and up to a maximum of $50 million in 2022. We record our share of gross profits as Alliance revenue. Myovant remains responsible for regulatory interactions and drug supply and continues to lead clinical development for Myfembree. Myovant is entitled to receive up to $4.35 billion, including an upfront payment of $650 million, which was made in December 2020, $200 million in potential regulatory milestones for FDA approvals for Myfembree in women's health, of which $100 million was paid to Myovant in July 2021 and recognized as *Identifiable intangible assets—Developed technology rights*, and tiered sales milestones of up to $3.5 billion in total for prostate cancer and for the combined women's health indications. In connection with this transaction, in 2020 we recognized $499 million in *Identifiable intangible assets—Developed technology rights* and $151 million in *Research and development expenses* representing the relative fair value of the portion of the upfront payment allocated to the approved indication and unapproved indications of the product, respectively.

Collaboration with CStone

On September 29, 2020, we entered into a strategic collaboration with CStone to address oncological needs in China. The collaboration encompasses our $200 million upfront equity investment in CStone, the development and commercialization of CStone's sugemalimab (CS1001, PD-L1 antibody) in mainland China, and a framework between the companies to bring additional oncology assets to the Greater China market. The transaction closed on October 9, 2020. As of December 31, 2021, we held a 9.8% equity stake of CStone.

Collaborations with BioNTech

On December 30, 2021, we entered into a new research, development and commercialization agreement to develop a potential first mRNA-based vaccine for the prevention of shingles (herpes zoster virus) based on BioNTech's proprietary mRNA technology and our antigen technology. Under the terms of the agreement, we agreed to pay BioNTech $225 million, including an upfront cash payment of $75 million and an equity investment of $150 million. BioNTech is eligible to receive future regulatory and sales milestone payments of up to $200 million. In return, BioNTech agreed to pay us $25 million for our proprietary antigen technology. The net upfront payment to BioNTech was recorded to *Research and development expenses* in our fourth quarter of 2021. We and BioNTech will share development costs. We will have commercialization rights to the potential vaccine worldwide, excluding Germany, Turkey and certain developing countries where BioNTech will have commercialization rights. We and BioNTech will share gross profits from commercialization of any product.

On April 9, 2020, we signed a global agreement with BioNTech to co-develop a mRNA-based coronavirus vaccine program, BNT162b2, aimed at preventing COVID-19 infection. In connection with the April 2020 agreement, we made an upfront cash payment of $72 million and an equity investment in the common stock of BioNTech of $113 million. We recognized $98 million for the upfront payment and a premium paid on the equity investment in *Research and development expenses* in our second quarter of 2020. BioNTech became eligible to receive potential milestone payments of up to $563 million for a total consideration of $748 million. Under the terms of this agreement, we and BioNTech share gross profits and development costs equally after approval and successful commercialization of the vaccine, and we were responsible for all of

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

the development costs until commercialization of the vaccine. Thereafter, BioNTech was to repay us its 50 percent share of these development costs through reductions in gross profit sharing and milestone payments to BioNTech over time. On January 29, 2021, we and BioNTech signed an amended version of the April 2020 agreement. Under the January 2021 agreement, BioNTech paid us their 50 percent share of prior development costs in a lump sum payment during the first quarter of 2021. Further R&D costs are being shared equally. We have collaboration rights to the vaccine worldwide, excluding Germany and Turkey where BioNTech markets and distributes the vaccine under the agreement with us, and excluding China, Hong Kong, Macau and Taiwan, which are subject to a separate collaboration between BioNTech and Shanghai Fosun Pharmaceutical (Group) Co., Ltd. We recognize *Revenues* and *Cost of sales* on a gross basis in markets where we are commercializing the vaccine and we record our share of gross profits related to sales of the vaccine by BioNTech in Germany and Turkey in Alliance revenues.

We made an additional investment of $50 million in common stock of BioNTech as part of an underwritten equity offering by BioNTech, which closed in July 2020. As of December 31, 2021, we held an equity stake of 2.5% of BioNTech.

Summarized Financial Information for Collaborative Arrangements

The following provides the amounts and classification of payments (income/(expense)) between us and our collaboration partners:

| (MILLIONS) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2021** | | 2020 | | 2019 |
| *Revenues*—Revenues[a] | $ | **590** | $ | 284 | $ | 305 |
| *Revenues*—Alliance revenues[b] | | **7,652** | | 5,418 | | 4,648 |
| Total revenues from collaborative arrangements | $ | **8,241** | $ | 5,703 | $ | 4,953 |
| *Cost of sales*[c] | $ | **(16,169)** | $ | (61) | $ | (52) |
| *Selling, informational and administrative expenses*[d] | | **(175)** | | (194) | | (176) |
| *Research and development expenses*[e] | | **(742)** | | (192) | | 104 |
| *Other income/(deductions)—net*[f] | | **820** | | 567 | | 362 |

[a] Represents sales to our partners of products manufactured by us.
[b] Substantially all relates to amounts earned from our partners under co-promotion agreements. The increase in 2021 reflects increases in alliance revenues from Comirnaty, Eliquis and Xtandi, while the increase in 2020 reflects increases in alliance revenues from Eliquis and Xtandi.
[c] Primarily relates to amounts paid to collaboration partners for their share of net sales or profits earned in collaboration arrangements where we are the principal in the transaction, and cost of sales for inventory purchased from our partners. The increase in 2021 is primarily related to Comirnaty.
[d] Represents net reimbursements to our partners for selling, informational and administrative expenses incurred.
[e] Primarily relates to upfront payments and pre-approval milestone payments earned by our partners as well as net reimbursements.
[f] Primarily relates to royalties from our collaboration partners.

The amounts outlined in the above table do not include transactions with third parties other than our collaboration partners, or other costs for the products under the collaborative arrangements.

## Note 3. Restructuring Charges and Other Costs Associated with Acquisitions and Cost-Reduction/Productivity Initiatives

In 2019, we substantially completed several multi-year initiatives focused on positioning us for future growth and creating a simpler, more efficient operating structure within each business.

### *A. Transforming to a More Focused Company Program*

With the formation of the Consumer Healthcare JV in 2019 and the spin-off of our Upjohn Business in the fourth quarter of 2020, Pfizer has transformed into a more focused, global leader in science-based innovative medicines and vaccines. We have undertaken efforts to ensure our cost base and support model align appropriately with our new operating structure. While certain direct costs transferred to the Consumer Healthcare JV and to the Upjohn Business in connection with the spin-off, there are indirect costs which did not transfer. This program is primarily composed of the following three initiatives:

- We are taking steps to restructure our corporate enabling functions to appropriately support our business, R&D and PGS platform functions. We expect costs, primarily related to restructuring our corporate enabling functions, to total $1.6 billion, with substantially all costs to be cash expenditures. Actions include, among others, changes in location of certain activities, expanded use and co-location of centers of excellence and shared services, and increased use of digital technologies. The associated actions and the specific costs will primarily include severance and benefit plan impacts, exit costs as well as associated implementation costs.

- In addition, we are transforming our commercial go-to market model in the way we engage patients and physicians. We expect costs of $1.1 billion, with substantially all costs to be cash expenditures. Actions include, among others, centralization of certain activities and enhanced use of digital technologies. The costs for this effort primarily include severance and associated implementation costs.

- We are also optimizing our manufacturing network under this program and incurring one-time costs for cost-reduction initiatives related to our manufacturing operations. We expect to incur costs of $800 million, with approximately 25% of the costs to be non-cash. The costs for this effort include, among other things, severance costs, implementation costs, product transfer costs, site exit costs, as well as accelerated depreciation.

The program costs discussed above are expected to be incurred primarily from 2020 through 2022, and may be rounded and represent approximations.

From the start of this program in the fourth quarter of 2019 through December 31, 2021, we incurred costs of $2.2 billion, of which $856 million is associated with Biopharma ($712 million in 2021, $79 million in 2020 and $64 million in 2019).

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

*B. Key Activities*

In 2021 and 2020, we incurred costs of $1.3 billion and $838 million, respectively, composed primarily of the Transforming to a More Focused Company program. In 2019, we incurred costs of $820 million composed of $548 million for the 2017-2019 and Organizing for Growth initiatives, $288 million for the integration of Array, $94 million for the integration of Hospira, and $87 million for the Transforming to a More Focused Company program, partially offset by income of $197 million, primarily due to the reversal of certain accruals upon the effective favorable settlement of an IRS audit for multiple tax years and other acquisition-related initiatives.

The following summarizes acquisitions and cost-reduction/productivity initiatives costs and credits:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
| (MILLIONS) | **2021** | 2020 | 2019 |
| Restructuring charges/(credits): | | | |
| Employee terminations | $ **680** | $ 474 | $ 108 |
| Asset impairments | **53** | 66 | 69 |
| Exit costs/(credits) | **8** | (6) | 50 |
| Restructuring charges/(credits)[a] | **741** | 535 | 227 |
| Transaction costs[b] | **20** | 10 | 63 |
| Integration costs and other[c] | **41** | 34 | 311 |
| *Restructuring charges and certain acquisition-related costs* | **802** | 579 | 601 |
| Net periodic benefit costs/(credits) recorded in *Other (income)/deductions—net*[d] | **(63)** | 3 | 23 |
| Additional depreciation—asset restructuring recorded in our consolidated statements of income as follows[e]: | | | |
| *Cost of sales* | **63** | 21 | 29 |
| *Selling, informational and administrative expenses* | **23** | — | 3 |
| *Research and development expenses* | **—** | (3) | 8 |
| Total additional depreciation—asset restructuring | **87** | 17 | 40 |
| Implementation costs recorded in our consolidated statements of income as follows[f]: | | | |
| *Cost of sales* | **45** | 40 | 61 |
| *Selling, informational and administrative expenses* | **426** | 197 | 73 |
| *Research and development expenses* | **1** | 1 | 22 |
| Total implementation costs | **472** | 238 | 156 |
| Total costs associated with acquisitions and cost-reduction/productivity initiatives | $ **1,298** | $ 838 | $ 820 |

[a] Represents acquisition-related costs ($9 million credit in 2021 and $192 million credit in 2019) and cost reduction initiatives ($750 million charge in 2021, $535 million charge in 2020, and $418 million charge in 2019). 2021 and 2020 charges mainly represent employee termination costs for our Transforming to a More Focused Company cost-reduction program. 2019 restructuring charges mainly represent employee termination costs for cost-reduction and productivity initiatives, partially offset by the reversal of certain accruals related to our acquisition of Wyeth upon the effective favorable settlement of an IRS audit for multiple tax years (see *Note 5B*). The employee termination costs for 2019 were primarily for our improvements to operational effectiveness as part of the realignment of our business structure, and also included employee termination costs for the Transforming to a More Focused Company cost-reduction program.
[b] Represents external costs for banking, legal, accounting and other similar services.
[c] Represents external, incremental costs directly related to integrating acquired businesses, such as expenditures for consulting and the integration of systems and processes, and certain other qualifying costs. 2021 costs primarily related to our acquisition of Trillium. 2020 costs primarily related to our acquisition of Array. 2019 costs mainly related to our acquisitions of Array, including $157 million in payments to Array employees for the fair value of previously unvested stock options that was recognized as post-closing compensation expense (see *Note 2A*), and Hospira.
[d] Amounts include the impact of a change in accounting principle. See *Note 1C*.
[e] Represents the impact of changes in the estimated useful lives of assets involved in restructuring actions.
[f] Represents external, incremental costs directly related to implementing our non-acquisition-related cost-reduction/productivity initiatives.

The following summarizes the components and changes in restructuring accruals:

| (MILLIONS) | Employee Termination Costs | Asset Impairment Charges | Exit Costs | Accrual |
| --- | --- | --- | --- | --- |
| Balance, January 1, 2020 | $ 770 | $ — | $ 46 | $ 816 |
| Provision | 474 | 66 | (6) | 535 |
| Utilization and other[a] | (462) | (66) | (25) | (554) |
| Balance, December 31, 2020[b] | 782 | — | 15 | 798 |
| **Provision** | **680** | **53** | **8** | **741** |
| **Utilization and other**[a] | **(449)** | **(53)** | **34** | **(468)** |
| **Balance, December 31, 2021**[c] | $ **1,014** | $ **—** | $ **57** | $ **1,071** |

[a] Includes adjustments for foreign currency translation.
[b] Included in *Other current liabilities* ($628 million) and *Other noncurrent liabilities* ($169 million).
[c] Included in *Other current liabilities* ($816 million) and *Other noncurrent liabilities* ($255 million).

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

### Note 4. Other (Income)/Deductions—Net

Components of *Other (income)/deductions—net* include:

| | Year Ended December 31, | | |
|---|---|---|---|
| (MILLIONS) | **2021** | 2020 | 2019 |
| Interest income | **$ (36)** | $ (73) | $ (225) |
| Interest expense[a] | **1,291** | 1,449 | 1,573 |
| Net interest expense | **1,255** | 1,376 | 1,348 |
| Royalty-related income | **(857)** | (770) | (646) |
| Net (gains)/losses on asset disposals | **(99)** | 237 | (32) |
| Net (gains)/losses recognized during the period on equity securities[b] | **(1,344)** | (540) | (454) |
| Income from collaborations, out-licensing arrangements and sales of compound/product rights[c] | **(396)** | (326) | (168) |
| Net periodic benefit costs/(credits) other than service costs[d] | **(2,547)** | 311 | 305 |
| Certain legal matters, net[e] | **182** | 28 | 292 |
| Certain asset impairments[f] | **86** | 1,691 | 2,792 |
| Business and legal entity alignment costs[g] | **—** | — | 300 |
| Consumer Healthcare JV equity method (income)/loss[h] | **(471)** | (298) | (17) |
| Other, net[i] | **(687)** | (491) | (224) |
| *Other (income)/deductions—net* | **$ (4,878)** | $ 1,219 | $ 3,497 |

[a] Capitalized interest totaled $108 million in 2021, $96 million in 2020 and $88 million in 2019.
[b] 2021 gains include, among other things, unrealized gains of $1.6 billion related to investments in BioNTech and Cerevel. 2020 gains included, among other things, unrealized gains of $405 million related to investments in BioNTech and SpringWorks Therapeutics, Inc. (SpringWorks). 2019 gains included, among other things, unrealized gains of $295 million related to investments in Cortexyme, Inc. and SpringWorks.
[c] 2021 includes, among other things, $188 million of net collaboration income from BioNTech related to the COVID-19 vaccine and $97 million of milestone income from multiple licensees. 2020 included, among other things, (i) a $75 million upfront payment received from our sale of our CK1 assets to Biogen, (ii) $40 million of milestone income from Puma Biotechnology, Inc. related to Neratinib regulatory approvals in the EU, (iii) $30 million of milestone income from Lilly related to the first commercial sale in the U.S. of LOXO-292 for the treatment of RET fusion-positive NSCLC and (iv) $108 million in milestone income from multiple licensees. 2019 included, among other things, $78 million in milestone income from Mylan Pharmaceuticals Inc. related to the FDA's approval and launch of Wixela Inhub®, a generic of Advair Diskus®(fluticasone propionate and salmeterol inhalation powder) and $52 million in milestone income from multiple licensees.
[d] Amounts include the impact of a change in accounting principle. See *Notes 1C and 11.* In 2019, other non-service cost components' activity related to the Consumer Healthcare JV transaction, such as gain on settlements, were recorded in *(Gain) on completion of Consumer Healthcare JV transaction.*
[e] Includes legal reserves for certain pending legal matters.
[f] 2020 represents intangible asset impairment charges associated with our Biopharma segment: (i) $900 million related to IPR&D assets for unapproved indications of certain cancer medicines, acquired in our Array acquisition, and reflected, among other things, updated commercial forecasts; (ii) $528 million related to Eucrisa, a finite-lived developed technology right acquired in our Anacor acquisition, and reflected updated commercial forecasts mainly reflecting competitive pressures; and (iii) $263 million related to finite-lived developed technology rights for certain generic sterile injectables acquired in our Hospira acquisition, and reflected updated commercial forecasts mainly reflecting competitive pressures.
  2019 primarily included intangible asset impairment charges of $2.8 billion, mainly composed of $2.6 billion, related to Eucrisa, and reflected updated commercial forecasts mainly reflecting competitive pressures.
[g] Mainly represents incremental costs for the design, planning and implementation of our then new business structure, effective in the beginning of 2019, and primarily includes consulting, legal, tax and other advisory services.
[h] See *Note 2C.*
[i] 2021 includes, among other things, (i) income net of costs associated with TSAs of $288 million; (ii) dividend income of $166 million from our investment in ViiV and (iii) charges of $142 million, reflecting the change in the fair value of contingent consideration. 2020 included, among other things, (i) dividend income of $278 million from our investment in ViiV; (ii) income net of costs associated with TSAs of $114 million and (iii) charges of $105 million, reflecting the change in the fair value of contingent consideration. 2019 included, among other things, (i) dividend income of $220 million from our investment in ViiV; (ii) charges of $152 million for external incremental costs, such as transaction costs and costs to separate our Consumer Healthcare business into a separate legal entity, associated with the formation of the Consumer Healthcare JV; and (iii) net losses on early retirement of debt of $138 million.

The asset impairment charges included in *Other (income)/deductions—net* are based on estimates of fair value.

### Note 5. Tax Matters

*A. Taxes on Income from Continuing Operations*

Components of *Income from continuing operations before provision/(benefit) for taxes on income* include:

| | Year Ended December 31, | | |
|---|---|---|---|
| (MILLIONS) | **2021** | 2020 | 2019 |
| United States | **$ 6,064** | $ (2,887) | $ 7,332 |
| International | **18,247** | 9,924 | 3,988 |
| *Income from continuing operations before provision/(benefit) for taxes on income[a], [b]* | **$ 24,311** | $ 7,036 | $ 11,321 |

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

(a) 2021 v. 2020—The domestic income in 2021 versus domestic loss in 2020 was mainly related to Comirnaty income, lower asset impairment charges, net periodic benefit credits in 2021 versus net periodic benefit costs in 2020 and higher net gains from equity securities, partially offset by higher R&D expenses. The increase in the international income was primarily related to Comirnaty income, net periodic benefit credits in 2021 versus net periodic benefit costs in 2020 and lower asset impairment charges.

(b) 2020 v. 2019—The domestic loss in 2020 versus domestic income in 2019 was mainly related to the non-recurrence of the gain on the completion of the Consumer Healthcare JV transaction as well as higher asset impairment charges and higher R&D expenses. The increase in the international income was primarily related to the non-recurrence of the write off of assets contributed to the Consumer Healthcare JV as well as lower asset impairment charges and lower amortization of intangible assets.

Components of *Provision/(benefit) for taxes on income* based on the location of the taxing authorities include:

| | | | Year Ended December 31, | |
|---|---|---|---|---|
| (MILLIONS) | | **2021** | 2020 | 2019 |
| United States | | | | |
| Current income taxes: | | | | |
| Federal | $ | **3,342** | $ 372 | $ (1,887) |
| State and local | | **34** | 56 | (186) |
| Deferred income taxes: | | | | |
| Federal | | **(3,850)** | (1,164) | 1,254 |
| State and local | | **(491)** | (131) | 276 |
| Total U.S. tax benefit | | **(964)** | (867) | (543) |
| TCJA | | | | |
| Current income taxes | | **—** | — | (135) |
| Deferred Income taxes | | **—** | — | (187) |
| Total TCJA tax benefit | | **—** | — | (323) |
| International | | | | |
| Current income taxes | | **2,769** | 1,517 | 2,418 |
| Deferred income taxes | | **48** | (279) | (969) |
| Total international tax provision | | **2,816** | 1,237 | 1,449 |
| *Provision/(benefit) for taxes on income* | $ | **1,852** | $ 370 | $ 583 |

Amounts discussed below are rounded to the nearest hundred million and represent approximations.

We elected, with the filing of our 2018 U.S. Federal Consolidated Income Tax Return, to pay our initial estimated $15 billion repatriation tax liability on accumulated post-1986 foreign earnings over eight years through 2026. The third annual installment of this liability was paid by its April 15, 2021 due date. The fourth annual installment is due April 18, 2022 and is reported in current *Income taxes payable* as of December 31, 2021. The remaining liability is reported in noncurrent *Other taxes payable*. Our obligations may vary as a result of changes in our uncertain tax positions and/or availability of attributes such as foreign tax and other credit carryforwards.

The changes in *Provision/(benefit) for taxes on income* impacting the effective tax rate year-over-year are summarized below:

*2021 v. 2020*

The higher effective tax rate in 2021 was mainly the result of:

• the change in the jurisdictional mix of earnings primarily related to Comirnaty; and

• lower tax benefits related to the impairment of intangible assets,

partially offset by:

• certain initiatives executed in the third quarter of 2021 associated with our investment in the Consumer Healthcare JV with GSK based on estimates and assumptions that we believe to be reasonable.

*2020 v. 2019*

The higher effective tax rate in 2020 was mainly the result of:

• the non-recurrence of the $1.4 billion tax benefits, representing taxes and interest, recorded in 2019 due to the favorable settlement of an IRS audit for multiple tax years;

• the non-recurrence of the tax benefits related to certain tax initiatives associated with the implementation of our then new business structure; and

• the non-recurrence of the tax benefits recorded in 2019 as a result of additional guidance issued by the U.S. Department of Treasury related to the TCJA, as well as:

• lower tax benefits related to the impairment of intangible assets,

partially offset by:

• the non-recurrence of the tax expense of $2.7 billion recorded in the third quarter of 2019 associated with the gain on the completion of the Consumer Healthcare JV transaction; and

• the favorable change in the jurisdictional mix of earnings as a result of operating fluctuations in the normal course of business.

In all years, federal, state and international net tax liabilities assumed or established as part of a business acquisition are not included in *Provision/(benefit) for taxes on income* (see Note 2A).

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

*B. Tax Rate Reconciliation*

The reconciliation of the U.S. statutory income tax rate to our effective tax rate for *Income from continuing operations* follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2021** | 2020 | 2019 |
| U.S. statutory income tax rate | **21.0 %** | 21.0 % | 21.0 % |
| TCJA impact[a] | **—** | — | (2.9) |
| Taxation of non-U.S. operations [b], [c] | **(4.3)** | (9.9) | (4.7) |
| Tax settlements and resolution of certain tax positions[a] | **(0.4)** | (2.7) | (14.0) |
| Completion of Consumer Healthcare JV transaction[a] | **—** | — | 8.3 |
| Certain Consumer Healthcare JV initiatives[a] | **(6.0)** | — | — |
| U.S. R&D tax credit | **(0.5)** | (1.4) | (0.8) |
| Interest[d] | **0.4** | 1.1 | 0.6 |
| All other, net[e] | **(2.6)** | (2.8) | (2.3) |
| Effective tax rate for income from continuing operations | **7.6 %** | 5.3 % | 5.2 % |

[a] See *Note 5A*.
[b] For taxation of non-U.S. operations, this rate impact reflects the income tax rates and relative earnings in the locations where we do business outside the U.S., together with the U.S. tax cost on our international operations, changes in uncertain tax positions not included in the reconciling item called "Tax settlements and resolution of certain tax positions," as well as changes in valuation allowances. Specifically: (i) the jurisdictional location of earnings is a significant component of our effective tax rate each year, and the rate impact of this component is influenced by the specific location of non-U.S. earnings and the level of such earnings as compared to our total earnings; (ii) the U.S. tax implications of our foreign operations is a significant component of our effective tax rate each year and generally offsets some of the reduction to our effective tax rate each year resulting from the jurisdictional location of earnings; (iii) the impact of changes in uncertain tax positions not included in the reconciling item called "Tax settlements and resolution of certain tax positions" is a component of our effective tax rate each year that can result in either an increase or decrease to our effective tax rate. The jurisdictional mix of earnings, which includes the impact of the location of earnings as well as the U.S. tax cost on our international operations, can vary as a result of operating fluctuations in the normal course of business and as a result of the extent and location of other income and expense items, such as restructuring charges, asset impairments and gains and losses on strategic business decisions. See also *Note 5A* for the components of pre-tax income and *Provision/(benefit) for taxes on income*, which is based on the location of the taxing authorities, and for information about settlements and other items impacting *Provision/(benefit) for taxes on income*.
[c] In all years, the reduction in our effective tax rate is a result of the jurisdictional location of earnings and is largely due to lower tax rates in certain jurisdictions, as well as manufacturing and other incentives for our subsidiaries in Singapore and, to a lesser extent, in Puerto Rico. We benefit from Puerto Rican tax incentives pursuant to a grant that expires during 2029. Under such grant, we are partially exempt from income, property and municipal taxes. In Singapore, we benefit from incentive tax rates effective through 2047 on income from manufacturing and other operations.
[d] Includes changes in interest related to our uncertain tax positions not included in the reconciling item called "Tax settlements and resolution of certain tax positions".
[e] All other, net is primarily due to routine business operations.

*C. Deferred Taxes*

Components of our deferred tax assets and liabilities, shown before jurisdictional netting, follow:

| | **2021 Deferred Tax\*** | | 2020 Deferred Tax\* | |
| --- | --- | --- | --- | --- |
| (MILLIONS) | Assets | (Liabilities) | Assets | (Liabilities) |
| Prepaid/deferred items[a] | $ **4,086** | $ **(456)** | $ 3,114 | $ (336) |
| Inventories | **408** | **(56)** | 276 | (25) |
| Intangible assets[b] | **1,778** | **(4,577)** | 793 | (5,355) |
| Property, plant and equipment[c] | **117** | **(1,647)** | 211 | (1,220) |
| Employee benefits[d] | **1,594** | **(178)** | 1,981 | (124) |
| Restructurings and other charges | **303** | **—** | 291 | — |
| Legal and product liability reserves | **373** | **—** | 382 | — |
| Net operating loss/tax credit carryforwards[e] | **1,431** | **—** | 1,761 | — |
| Unremitted earnings | **—** | **(45)** | — | (46) |
| State and local tax adjustments | **197** | **—** | 171 | — |
| Investments[f] | **70** | **(689)** | 130 | (3,545) |
| All other | **89** | **(68)** | 80 | (76) |
| | **10,446** | **(7,714)** | 9,190 | (10,726) |
| Valuation allowances | **(1,462)** | **—** | (1,586) | |
| Total deferred taxes | $ **8,983** | $ **(7,714)** | $ 7,604 | $ (10,726) |
| Net deferred tax asset/(liability)[g] | $ **1,269** | | $ | (3,123) |

\*   The deferred tax assets and liabilities associated with global intangible low-taxed income are included in the relevant categories. See *Note 1Q*.
[a] The increase in net deferred tax assets in 2021 is primarily related to temporary differences associated with Comirnaty royalty accruals and the result of operating lease ROU liabilities recognized during the period.
[b] The increase in the deferred tax assets is primarily due to the acquisition of intangible assets relating to Trillium and the decrease in the 2021 deferred tax liabilities is primarily the result of amortization of intangible assets.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

(c) The increase in net deferred tax liabilities in 2021 is primarily the result of operating lease ROU assets recognized during the period. See *Note 15*.
(d) The decrease in net deferred tax assets in 2021 is primarily the result of favorable pension plan asset performance reported in the period. See *Note 11A*.
(e) The amounts in 2021 and 2020 are reduced for unrecognized tax benefits of $3.0 billion and $3.0 billion, respectively, where we have net operating loss carryforwards, similar tax losses, and/or tax credit carryforwards that are available, under the tax law of the applicable jurisdiction, to settle any additional income taxes that would result from the disallowance of a tax position.
(f) The decrease in net deferred tax liabilities in 2021 is primarily due to certain initiatives executed in the third quarter of 2021 associated with our investment in the Consumer Healthcare JV.
(g) In 2021, *Noncurrent deferred tax assets and other noncurrent tax assets* ($1.6 billion), and *Noncurrent deferred tax liabilities* ($0.3 billion). In 2020, *Noncurrent deferred tax assets and other noncurrent tax assets* ($0.9 billion), and *Noncurrent deferred tax liabilities* ($4.1 billion).

We have carryforwards, primarily related to net operating and capital losses, general business credits, foreign tax credits and charitable contributions, which are available to reduce future U.S. federal and/or state, as well as international, income taxes payable with either an indefinite life or expiring at various times from 2022 to 2041. Certain of our U.S. net operating losses and general business credits are subject to limitations under IRC Section 382.

As of December 31, 2021, we have not made a U.S. tax provision on $55.0 billion of unremitted earnings of our international subsidiaries. As these earnings are intended to be indefinitely reinvested overseas, the determination of a hypothetical unrecognized deferred tax liability as of December 31, 2021 is not practicable. The amount of indefinitely reinvested earnings is based on estimates and assumptions and subject to management evaluation, and is subject to change in the normal course of business based on operational cash flow, completion of local statutory financial statements and the finalization of tax returns and audits, among other things. Accordingly, we regularly update our earnings and profits analysis for such events.

*D. Tax Contingencies*

For a description of our accounting policies associated with accounting for income tax contingencies, see *Note 1Q*.

Uncertain Tax Positions

As tax law is complex and often subject to varied interpretations, it is uncertain whether some of our tax positions will be sustained upon audit. As of December 31, 2021, we had $4.5 billion and as of December 31, 2020, we had $4.3 billion in net unrecognized tax benefits, excluding associated interest.

• Tax assets for uncertain tax positions primarily represent our estimate of the potential tax benefits in one tax jurisdiction that could result from the payment of income taxes in another tax jurisdiction. These potential benefits generally result from cooperative efforts among taxing authorities, as required by tax treaties to minimize double taxation, commonly referred to as the competent authority process. The recoverability of these assets, which we believe to be more likely than not, is dependent upon the actual payment of taxes in one tax jurisdiction and, in some cases, the successful petition for recovery in another tax jurisdiction. As of December 31, 2021, we had $1.5 billion in assets associated with uncertain tax positions. These amounts were included in *Noncurrent deferred tax assets and other noncurrent tax assets* ($1.4 billion) and *Other taxes payable* ($105 million). As of December 31, 2020, we had $1.3 billion in assets associated with uncertain tax positions. These amounts were included in *Noncurrent deferred tax assets and other noncurrent tax assets* ($1.1 billion), *Noncurrent deferred tax liabilities* ($122 million) and *Other taxes payable* ($46 million).

• Substantially all of these unrecognized tax benefits, if recognized, would impact our effective income tax rate.

The reconciliation of the beginning and ending amounts of gross unrecognized tax benefits follows:

| (MILLIONS) | 2021 | 2020 | 2019 |
|---|---|---|---|
| Balance, beginning | $ (5,595) | $ (5,381) | $ (6,259) |
| Acquisitions | — | 37 | (44) |
| Divestitures(a) | — | 265 | — |
| Increases based on tax positions taken during a prior period(b) | (111) | (232) | (36) |
| Decreases based on tax positions taken during a prior period(b), (c) | 103 | 64 | 1,109 |
| Decreases based on settlements for a prior period(d) | 24 | 15 | 100 |
| Increases based on tax positions taken during the current period(b) | (550) | (411) | (383) |
| Impact of foreign exchange | 22 | (72) | 25 |
| Other, net(b), (e) | 40 | 120 | 107 |
| Balance, ending(f) | $ (6,068) | $ (5,595) | $ (5,381) |

(a) For 2020, related to the separation of Upjohn. See *Note 2B*.
(b) Primarily included in *Provision/(benefit) for taxes on income*.
(c) Primarily related to effectively settling certain issues with the U.S. and foreign tax authorities. See *Note 5A*.
(d) Primarily related to cash payments and reductions of tax attributes.
(e) Primarily related to decreases as a result of a lapse of applicable statutes of limitations.
(f) In 2021, included in *Income taxes payable* ($19 million), *Other current assets* ($42 million) *Noncurrent deferred tax assets and other noncurrent tax assets* ($3.0 billion), *Noncurrent deferred tax liabilities* ($5 million) and *Other taxes payable* ($3.0 billion). In 2020, included in *Income taxes payable* ($34 million), *Noncurrent deferred tax assets and other noncurrent tax assets* ($18 million), *Noncurrent deferred tax liabilities* ($3.0 billion) and *Other taxes payable* ($2.5 billion).

• Interest related to our unrecognized tax benefits is recorded in accordance with the laws of each jurisdiction and is recorded primarily in *Provision/(benefit) for taxes on income*. In 2021 and 2020, we recorded net increases in interest of $108 million and $89 million, respectively. In 2019, we recorded a net decrease in interest of $564 million, resulting primarily from a settlement with the IRS. Gross accrued interest totaled $601 million as of December 31, 2021 (reflecting a decrease of $1 million as a result of cash payments) and gross

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

accrued interest totaled $493 million as of December 31, 2020 (reflecting a decrease of $5 million as a result of cash payments and a decrease of $75 million relating to the separation of Upjohn). In 2021 and 2020, these amounts were substantially all included in *Other taxes payable*. Accrued penalties are not significant. See also *Note 5A*.

**Status of Tax Audits and Potential Impact on Accruals for Uncertain Tax Positions**

The U.S. is one of our major tax jurisdictions, and we are regularly audited by the IRS. With respect to Pfizer, the IRS has issued Revenue Agent's Reports (RARs) for tax years 2011-2013 and 2014-2015. We are not in agreement with the RARs and are currently appealing certain disputed issues. Tax years 2016-2018 are currently under audit. Tax years 2019-2021 are open, but not under audit. All other tax years are closed. In addition to the open audit years in the U.S., we have open audit years in certain major international tax jurisdictions such as Canada (2013-2021), Europe (2011-2021, primarily reflecting Ireland, the U.K., France, Italy, Spain and Germany), Asia Pacific (2011-2021, primarily reflecting China, Japan and Singapore) and Latin America (1998-2021, primarily reflecting Brazil).

Any settlements or statutes of limitations expirations could result in a significant decrease in our uncertain tax positions. We estimate that it is reasonably possible that within the next 12 months, our gross unrecognized tax benefits, exclusive of interest, could decrease by as much as $75 million, as a result of settlements with taxing authorities or the expiration of the statutes of limitations. Our assessments are based on estimates and assumptions that have been deemed reasonable by management, but our estimates of unrecognized tax benefits and potential tax benefits may not be representative of actual outcomes, and variation from such estimates could materially affect our financial statements in the period of settlement or when the statutes of limitations expire, as we treat these events as discrete items in the period of resolution. Finalizing audits with the relevant taxing authorities can include formal administrative and legal proceedings, and, as a result, it is difficult to estimate the timing and range of possible changes related to our uncertain tax positions, and such changes could be significant.

*E. Tax Provision/(Benefit) on Other Comprehensive Income/(Loss)*

Components of the *Tax provision/(benefit) on other comprehensive income/(loss)* include:

| | | | Year Ended December 31, | |
| --- | --- | --- | --- | --- |
| (MILLIONS) | | **2021** | 2020 | 2019 |
| Foreign currency translation adjustments, net[a] | $ | **43** | $ (119) | $ 260 |
| Unrealized holding gains/(losses) on derivative financial instruments, net | | **84** | (88) | 83 |
| Reclassification adjustments for (gains)/losses included in net income | | **29** | (25) | (125) |
| | | **114** | (113) | (42) |
| Unrealized holding gains/(losses) on available-for-sale securities, net | | **(44)** | 45 | — |
| Reclassification adjustments for (gains)/losses included in net income | | **(4)** | (24) | 5 |
| | | **(48)** | 22 | 5 |
| Benefit plans: prior service (costs)/credits and other, net | | **27** | 12 | (1) |
| Reclassification adjustments related to amortization of prior service costs and other, net | | **(47)** | (31) | (43) |
| Reclassification adjustments related to curtailments of prior service costs and other, net | | **(17)** | — | (1) |
| Other | | **(1)** | 1 | — |
| | | **(38)** | (17) | (45) |
| Tax provision/(benefit) on other comprehensive income/(loss) | $ | **71** | $ (227) | $ 178 |

(a) Taxes are not provided for foreign currency translation adjustments relating to investments in international subsidiaries that are expected to be held indefinitely.

## Note 6. Accumulated Other Comprehensive Loss, Excluding Noncontrolling Interests

The following summarizes the changes, net of tax, in *Accumulated other comprehensive loss*[a]:

| | | Net Unrealized Gains/(Losses) | | Benefit Plans | |
| --- | --- | --- | --- | --- | --- |
| (MILLIONS) | Foreign Currency Translation Adjustments | Derivative Financial Instruments | Available-For-Sale Securities | Prior Service (Costs)/ Credits and Other | Accumulated Other Comprehensive Income/(Loss) |
| Balance, January 1, 2019 | $ (6,075) | $ 167 | $ (68) | $ 728 | $ (5,249) |
| Other comprehensive income/(loss)[b] | 139 | (146) | 33 | (144) | (118) |
| Balance, December 31, 2019 | (5,936) | 20 | (35) | 584 | (5,367) |
| Other comprehensive income/(loss)[b] | 883 | (448) | 151 | (106) | 480 |
| Distribution of Upjohn Business[c] | (397) | — | — | (26) | (423) |
| Balance, December 31, 2020 | (5,450) | (428) | 116 | 452 | (5,310) |
| Other comprehensive income/(loss)[b] | **(722)** | **547** | **(336)** | **(75)** | **(587)** |
| **Balance, December 31, 2021** | **$ (6,172)** | **$ 119** | **$ (220)** | **$ 377** | **$ (5,897)** |

(a) Amounts include the impact of a change in accounting principle. See *Note 1C*.
(b) Amounts do not include foreign currency translation adjustments attributable to noncontrolling interests. Foreign currency translation adjustments include net losses in 2021 and net gains in 2020 and 2019 related to our equity-method investment in the Consumer Healthcare JV (see *Note 2C*), and the impact of our net investment hedging program.
(c) For more information, see *Note 2B*.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

**Note 7. Financial Instruments**

*A. Fair Value Measurements*

Financial Assets and Liabilities Measured at Fair Value on a Recurring Basis and Fair Value Hierarchy, using a Market Approach:

| (MILLIONS) | As of December 31, 2021 | | | As of December 31, 2020 | | |
|---|---|---|---|---|---|---|
| | Total | Level 1 | Level 2 | Total | Level 1 | Level 2 |
| **Financial assets:** | | | | | | |
| **Short-term investments** | | | | | | |
| Classified as equity securities with readily determinable fair values: | | | | | | |
| Money market funds | $ 5,365 | $ — | $ 5,365 | $ 567 | $ — | $ 567 |
| Classified as available-for-sale debt securities: | | | | | | |
| Government and agency—non-U.S. | 17,318 | — | 17,318 | 7,719 | — | 7,719 |
| Government and agency—U.S. | 4,050 | — | 4,050 | 982 | — | 982 |
| Corporate and other | 647 | — | 647 | 1,008 | — | 1,008 |
| | 22,014 | — | 22,014 | 9,709 | — | 9,709 |
| Total short-term investments | 27,379 | — | 27,379 | 10,276 | — | 10,276 |
| **Other current assets** | | | | | | |
| Derivative assets: | | | | | | |
| Interest rate contracts | 4 | — | 4 | 18 | — | 18 |
| Foreign exchange contracts | 704 | — | 704 | 234 | — | 234 |
| Total other current assets | 709 | — | 709 | 251 | — | 251 |
| **Long-term investments** | | | | | | |
| Classified as equity securities with readily determinable fair values[a] | 3,876 | 3,849 | 27 | 2,809 | 2,776 | 32 |
| Classified as available-for-sale debt securities: | | | | | | |
| Government and agency—non-U.S. | 465 | — | 465 | 6 | — | 6 |
| Government and agency—U.S. | 6 | — | 6 | 121 | — | 121 |
| Corporate and other | 50 | — | 50 | — | — | — |
| | 521 | — | 521 | 128 | — | 128 |
| Total long-term investments | 4,397 | 3,849 | 548 | 2,936 | 2,776 | 160 |
| **Other noncurrent assets** | | | | | | |
| Derivative assets: | | | | | | |
| Interest rate contracts | 16 | — | 16 | 117 | — | 117 |
| Foreign exchange contracts | 242 | — | 242 | 5 | — | 5 |
| Total derivative assets | 259 | — | 259 | 122 | — | 122 |
| Insurance contracts[b] | 808 | — | 808 | 693 | — | 693 |
| Total other noncurrent assets | 1,067 | — | 1,067 | 814 | — | 814 |
| Total assets | $ 33,552 | $ 3,849 | $ 29,703 | $ 14,278 | $ 2,776 | $ 11,501 |
| **Financial liabilities:** | | | | | | |
| **Other current liabilities** | | | | | | |
| Derivative liabilities: | | | | | | |
| Foreign exchange contracts | $ 476 | $ — | $ 476 | $ 501 | $ — | $ 501 |
| Total other current liabilities | 476 | — | 476 | 501 | — | 501 |
| **Other noncurrent liabilities** | | | | | | |
| Derivative liabilities: | | | | | | |
| Foreign exchange contracts | 405 | — | 405 | 599 | — | 599 |
| Total other noncurrent liabilities | 405 | — | 405 | 599 | — | 599 |
| Total liabilities | $ 881 | $ — | $ 405 | $ 1,100 | $ — | $ 1,100 |

[a] Long-term equity securities of $194 million as of December 31, 2021 and $190 million as of December 31, 2020 were held in restricted trusts for U.S. non-qualified employee benefit plans.
[b] Includes life insurance policies held in restricted trusts for U.S. non-qualified employee benefit plans. The underlying invested assets in these contracts are marketable securities, which are carried at fair value, with changes in fair value recognized in *Other (income)/deductions—net* (see *Note 4*).

Financial Assets and Liabilities Not Measured at Fair Value on a Recurring Basis

The carrying value of Long-term debt, excluding the current portion was $36 billion as of December 31, 2021 and $37 billion as of December 31, 2020. The estimated fair value of such debt, using a market approach and Level 2 inputs, was $42 billion as of December 31, 2021 and $46 billion as of December 31, 2020.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

The differences between the estimated fair values and carrying values of held-to-maturity debt securities, private equity securities, long-term receivables and short-term borrowings not measured at fair value on a recurring basis were not significant as of December 31, 2021 and 2020. The fair value measurements of our held-to-maturity debt securities and short-term borrowings are based on Level 2 inputs. The fair value measurements of our long-term receivables and private equity securities are based on Level 3 inputs.

*B. Investments*

Total Short-Term, Long-Term and Equity-Method Investments

The following summarizes our investments by classification type:

| (MILLIONS) | As of December 31, | |
| --- | --- | --- |
| | **2021** | 2020 |
| **Short-term investments** | | |
| Equity securities with readily determinable fair values(a) | $ **5,365** | $ 567 |
| Available-for-sale debt securities | **22,014** | 9,709 |
| Held-to-maturity debt securities | **1,746** | 161 |
| *Total Short-term investments* | $ **29,125** | $ 10,437 |
| **Long-term investments** | | |
| Equity securities with readily determinable fair values | $ **3,876** | $ 2,809 |
| Available-for-sale debt securities | **521** | 128 |
| Held-to-maturity debt securities | **34** | 37 |
| Private equity securities at cost(b) | **623** | 432 |
| *Total Long-term investments* | $ **5,054** | $ 3,406 |
| **Equity-method investments** | **16,472** | 16,856 |
| Total long-term investments and equity-method investments | $ **21,526** | $ 20,262 |
| Held-to-maturity cash equivalents | $ **268** | $ 89 |

(a) As of December 31, 2021 and 2020, includes money market funds primarily invested in U.S. Treasury and government debt.
(b) Represent investments in the life sciences sector.

Debt Securities

At December 31, 2021, our investment portfolio consisted of debt securities issued across diverse governments, corporate and financial institutions, which are investment-grade. The contractual or estimated maturities, are as follows:

| | As of December 31, 2021 | | | | | | | | As of December 31, 2020 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Gross Unrealized | | | Maturities (in Years) | | | | | Gross Unrealized | | |
| (MILLIONS) | Amortized Cost | Gains | Losses | Fair Value | Within 1 | Over 1 to 5 | Over 5 | | Amortized Cost | Gains | Losses | Fair Value |
| Available-for-sale debt securities | | | | | | | | | | | | |
| Government and agency—non-U.S. | $ 18,032 | $ 13 | $ (263) | $ 17,783 | $ 17,318 | $ 465 | $ — | $ | 7,593 | $ 136 | $ (4) | $ 7,725 |
| Government and agency—U.S. | 4,056 | — | (1) | 4,055 | 4,050 | 6 | — | | 1,104 | — | (1) | 1,103 |
| Corporate and other | 698 | — | (1) | 697 | 647 | 50 | — | | 1,006 | 2 | — | 1,008 |
| Held-to-maturity debt securities | | | | | | | | | | | | |
| Time deposits and other | 947 | — | — | 947 | 917 | 18 | 11 | | 283 | — | — | 283 |
| Government and agency—non-U.S. | 1,102 | — | — | 1,102 | 1,097 | 4 | 1 | | 5 | — | — | 5 |
| Total debt securities | $ 24,835 | $ 14 | $ (265) | $ 24,584 | $ 24,029 | $ 543 | $ 13 | $ | 9,991 | $ 138 | $ (5) | $ 10,124 |

Any expected credit losses to these portfolios would be immaterial to our financial statements.

Equity Securities

The following presents the calculation of the portion of unrealized (gains)/losses that relates to equity securities, excluding equity method investments, held at the reporting date:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| (MILLIONS) | **2021** | 2020 | 2019 |
| Net (gains)/losses recognized during the period on equity securities(a) | $ **(1,344)** | $ (540) | $ (454) |
| Less: Net (gains)/losses recognized during the period on equity securities sold during the period | **(80)** | (24) | (25) |
| Net unrealized (gains)/losses during the reporting period on equity securities still held at the reporting date(b) | $ **(1,264)** | $ (515) | $ (429) |

(a) Reported in *Other (income)/deductions—net. See Note 4.*
(b) Included in net unrealized gains are observable price changes on equity securities without readily determinable fair values. As of December 31, 2021, there were cumulative impairments and downward adjustments of $97 million and upward adjustments of $156 million. Impairments, downward and upward adjustments were not significant in 2021, 2020 and 2019.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

*C. Short-Term Borrowings*

Short-term borrowings include:

| | As of December 31, | |
|---|---|---|
| (MILLIONS) | **2021** | 2020 |
| Commercial paper | $ **—** | $ 556 |
| Current portion of long-term debt, principal amount | **1,636** | 2,004 |
| Other short-term borrowings, principal amount[a] | **605** | 145 |
| Total short-term borrowings, principal amount | **2,241** | 2,705 |
| Net unamortized discounts, premiums and debt issuance costs | **—** | (2) |
| Total *Short-term borrowings, including current portion of long-term debt*, carried at historical proceeds, as adjusted | $ **2,241** | $ 2,703 |

[a] Primarily includes cash collateral. See *Note 7F.*

The weighted-average effective interest rate on commercial paper outstanding was approximately 0.13% as of December 31, 2020.

As of December 31, 2021, we had access to a $7 billion committed U.S. revolving credit facility expiring in 2026, which may be used for general corporate purposes including to support our commercial paper borrowings. In addition to the U.S. revolving credit facility, our lenders have provided us an additional $360 million in lines of credit, of which $322 million expire within one year. Essentially all lines of credit were unused as of December 31, 2021.

*D. Long-Term Debt*

The following outlines our senior unsecured long-term debt and the weighted-average stated interest rate by maturity:

| | As of December 31, | |
|---|---|---|
| (MILLIONS) | **2021** | 2020 |
| Notes due 2022 (1.0% for 2020)[a] | $ **—** | $ 1,728 |
| Notes due 2023 (3.2% for 2021 and 2020) | **2,550** | 2,550 |
| Notes due 2024 (3.9% for 2021 and 2020) | **2,250** | 2,250 |
| Notes due 2025 (0.8% for 2021 and 2020) | **750** | 750 |
| Notes due 2026 (2.9% for 2021 and 2020) | **3,000** | 3,000 |
| Notes due 2027 (2.1% for 2021 and 2.0% for 2020) | **1,051** | 1,121 |
| Notes due 2028-2032 (3.1% for 2021 and 3.4% for 2020) | **6,660** | 5,660 |
| Notes due 2033-2037 (5.6% for 2021 and 2020) | **4,250** | 4,250 |
| Notes due 2038-2042 (5.5% for 2021 and 2020) | **6,079** | 6,086 |
| Notes due 2043-2047 (3.7% for 2021 and 2020) | **4,858** | 4,878 |
| Notes due 2048-2050 (3.6% for 2021 and 2020) | **3,500** | 3,500 |
| Total long-term debt, principal amount | **34,948** | 35,774 |
| Net fair value adjustments related to hedging and purchase accounting | **1,438** | 1,562 |
| Net unamortized discounts, premiums and debt issuance costs | **(195)** | (207) |
| Other long-term debt | **4** | 4 |
| Total long-term debt, carried at historical proceeds, as adjusted | $ **36,195** | $ 37,133 |
| Current portion of long-term debt, carried at historical proceeds, as adjusted (not included above) (1.0% for 2021 and 2.6% for 2020) | $ **1,636** | $ 2,002 |

[a] Reclassified to the current portion of long-term debt.

Our long-term debt outlined in the above table is generally redeemable by us at any time at varying redemption prices plus accrued and unpaid interest.

Issuances

In August 2021, we issued the following senior unsecured notes at an effective interest rate of 1.79%:

| (MILLIONS) | | Principal |
|---|---|---|
| | | **As of** |
| Interest Rate | Maturity Date | **December 31, 2021** |
| 1.750%[a] | August 18, 2031 | $ **1,000** |

[a] The notes may be redeemed by us at any time, in whole, or in part, at a redemption price plus accrued and unpaid interest.

In May 2020, we completed a public offering of $4.0 billion aggregate principal amount of senior unsecured notes with a weighted-average effective interest rate of 2.11% and in March 2020, we completed a public offering of $1.25 billion aggregate principal amount of senior unsecured notes with a weighted-average effective interest rate of 2.67%.

In March 2019, we completed a public offering of $5.0 billion aggregate principal amount of senior unsecured notes with a weighted-average effective interest rate of 3.57%.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

Retirements

In November 2020, we repurchased all $1.15 billion and $342 million principal amount outstanding of the 1.95% senior unsecured notes due June 2021 and 5.80% senior unsecured notes due August 2023 and recorded a total net loss of $36 million, in *Other (income)/deductions—net*. See *Note 2B*.

In March 2020, we repurchased at par all $1.065 billion principal amount outstanding of our senior unsecured notes due in 2047.

In January 2019, we repurchased all €1.1 billion ($1.3 billion) principal amount outstanding of the 5.75% euro-denominated debt due June 2021 at a redemption value of €1.3 billion ($1.5 billion). We recorded a net loss of $138 million in *Other (income)/deductions—net*, which included the related termination of cross currency swaps.

*E. Derivative Financial Instruments and Hedging Activities*

Foreign Exchange Risk

A significant portion of our revenues, earnings and net investments in foreign affiliates is exposed to changes in foreign exchange rates. Where foreign exchange risk is not offset by other exposures, we manage our foreign exchange risk principally through the use of derivative financial instruments and foreign currency debt. These financial instruments serve to mitigate the impact on net income as a result of remeasurement into another currency, or against the impact of translation into U.S. dollars of certain foreign exchange-denominated transactions.

The derivative financial instruments primarily hedge or offset exposures in the euro, U.K. pound, Japanese yen and Canadian dollar.

- We hedge a portion of our forecasted intercompany inventory sales denominated in euro, Japanese yen, Canadian dollar, Chinese renminbi, U.K. pound and Australian dollar for up to two years.
- Under certain market conditions, we may seek to protect against possible declines in the reported net investments of our foreign business entities.

Changes in fair value are reported in earnings or in *Other comprehensive income/(loss)*, depending on the nature and purpose of the financial instrument (hedge or offset relationship). For certain foreign exchange contracts, we exclude an amount from the assessment of hedge effectiveness and recognize the excluded amount through an amortization approach in earnings. The hedge relationships are as follows:

- Generally, we recognize the gains and losses on foreign exchange contracts that are designated as fair value hedges in earnings upon the recognition of the change in fair value of the hedged item. We also recognize the offsetting foreign exchange impact attributable to the hedged item in earnings.
- Generally, we record in *Other comprehensive income/(loss)* gains or losses on foreign exchange contracts that are designated as cash flow hedges and reclassify those amounts into earnings in the same period or periods during which the hedged transaction affects earnings.
- We record in *Other comprehensive income/(loss) —Foreign currency translation adjustments, net* the foreign exchange gains and losses related to foreign exchange-denominated debt and foreign exchange contracts designated as a hedge of our net investments in foreign subsidiaries and reclassify those amounts into earnings upon the sale or substantial liquidation of our net investments.
- For foreign exchange contracts not designated as hedging instruments, we recognize the gains and losses immediately into earnings along with the earnings impact of the items they generally offset. These contracts take the opposite currency position of that reflected on the balance sheet to counterbalance the effect of any currency movement.

Interest Rate Risk

Our interest-bearing investments and borrowings are subject to interest rate risk. Depending on market conditions, we may change the profile of our outstanding debt or investments by entering into derivative financial instruments like interest rate swaps, either to hedge or offset the exposure to changes in the fair value of hedged items with fixed interest rates, or to convert variable rate debt or investments to fixed rates. The derivative financial instruments primarily hedge U.S. dollar fixed-rate debt.

We recognize the change in fair value on interest rate contracts that are designated as fair value hedges in earnings, as well as the offsetting earnings impact of the hedged risk attributable to the hedged item.

The following summarizes the fair value of the derivative financial instruments and notional amounts (including those reported as part of discontinued operations):

| (MILLIONS) | As of December 31, 2021 | | | As of December 31, 2020 | | |
|---|---|---|---|---|---|---|
| | | Fair Value | | | Fair Value | |
| | Notional | Asset | Liability | Notional | Asset | Liability |
| *Derivatives designated as hedging instruments:* | | | | | | |
| Foreign exchange contracts[a] | $ 29,576 | $ 787 | $ 717 | $ 24,369 | $ 145 | $ 1,005 |
| Interest rate contracts | 2,250 | 21 | — | 1,950 | 135 | — |
| | | 808 | 717 | | 280 | 1,005 |
| *Derivatives not designated as hedging instruments:* | | | | | | |
| Foreign exchange contracts | $ 21,419 | 160 | 164 | $ 15,063 | 94 | 95 |
| Total | | $ 968 | $ 881 | | $ 373 | $ 1,100 |

[a] The notional amount of outstanding foreign exchange contracts hedging our intercompany forecasted inventory sales was $4.8 billion as of December 31, 2021 and $5.0 billion as of December 31, 2020.

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

The following summarizes information about the gains/(losses) incurred to hedge or offset operational foreign exchange or interest rate risk exposures (including those reported as part of discontinued operations):

| | Gains/(Losses) Recognized in OID[a] | | Gains/(Losses) Recognized in OCI[a] | | Gains/(Losses) Reclassified from OCI into OID and COS[a] | |
| | | | Year Ended December 31, | | | |
| (MILLIONS) | **2021** | 2020 | **2021** | 2020 | **2021** | 2020 |
|---|---|---|---|---|---|---|
| Derivative Financial Instruments in Cash Flow Hedge Relationships: | | | | | | |
| Foreign exchange contracts[b] | $ **—** | $ — | $ **488** | $ (649) | $ **(173)** | $ (77) |
| Amount excluded from effectiveness testing and amortized into earnings[c] | **—** | — | **38** | 55 | **38** | 57 |
| Derivative Financial Instruments in Fair Value Hedge Relationships: | | | | | | |
| Interest rate contracts | **(7)** | 369 | **—** | — | **—** | — |
| Hedged item | **7** | (369) | **—** | — | **—** | — |
| Derivative Financial Instruments in Net Investment Hedge Relationships: | | | | | | |
| Foreign exchange contracts | **—** | — | **468** | (501) | **—** | — |
| Amount excluded from effectiveness testing and amortized into earnings[c] | **—** | — | **52** | 181 | **109** | 154 |
| Non-Derivative Financial Instruments in Net Investment Hedge Relationships:[d] | | | | | | |
| Foreign currency short-term borrowings | **—** | — | **78** | 8 | **—** | — |
| Foreign currency long-term debt | **—** | — | **86** | (183) | **—** | — |
| Derivative Financial Instruments Not Designated as Hedges: | | | | | | |
| Foreign exchange contracts | **(192)** | 178 | **—** | — | **—** | — |
| All other net[c] | **—** | — | **1** | 12 | **1** | (1) |
| | $ **(192)** | $ 178 | $ **1,210** | $ (1,077) | $ **(25)** | $ 133 |

[a] OID = Other (income)/deductions—net, included in *Other (income)/deductions—net* in the consolidated statements of income. COS = Cost of Sales, included in *Cost of sales* in the consolidated statements of income. OCI = Other comprehensive income/(loss), included in the consolidated statements of comprehensive income.
[b] The amounts reclassified from OCI into COS were:
  • a net loss of $89 million in 2021; and
  • a net gain of $172 million in 2020 (including a gain of $22 million reported in *Discontinued operations—net of tax*).
  The remaining amounts were reclassified from OCI into OID. Based on year-end foreign exchange rates that are subject to change, we expect to reclassify a pre-tax gain of $362 million within the next 12 months into income. The maximum length of time over which we are hedging our exposure to the variability in future foreign exchange cash flows is approximately 21 years and relates to foreign currency debt.
[c] The amounts reclassified from OCI were reclassified into OID.
[d] Short-term borrowings and long-term debt include foreign currency borrowings which are used as net investment hedges. The short-term borrowings carrying value as of December 31, 2021 was $1.1 billion. The long-term debt carrying values as of December 31, 2021 and December 31, 2020 were $844 million and $2.1 billion, respectively.

The following summarizes cumulative basis adjustments to our long-term debt in fair value hedges:

| | As of December 31, 2021 | | | As of December 31, 2020 | | |
| | | Cumulative Amount of Fair Value Hedging Adjustment Increase/(Decrease) to Carrying Amount | | | Cumulative Amount of Fair Value Hedging Adjustment Increase/(Decrease) to Carrying Amount | |
| (MILLIONS) | Carrying Amount of Hedged Assets/Liabilities[a] | Active Hedging Relationships | Discontinued Hedging Relationships | Carrying Amount of Hedged Assets/Liabilities[a] | Active Hedging Relationships | Discontinued Hedging Relationships |
|---|---|---|---|---|---|---|
| *Long-term debt* | $ **2,233** | $ **16** | $ **1,154** | $ 2,016 | $ 117 | $ 1,149 |

[a] Carrying amounts exclude the cumulative amount of fair value hedging adjustments.

### *F. Credit Risk*

On an ongoing basis, we monitor and review the credit risk of our customers, financial institutions and exposures in our investment portfolio.

With respect to our trade accounts receivable, we monitor the creditworthiness of our customers to which we grant credit in the normal course of business. In general, there is no requirement for collateral from customers. For additional information on our trade accounts receivable and

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

allowance for credit losses, see *Note 1H*. A significant portion of our trade accounts receivable balances are due from wholesalers and governments. For additional information on our trade accounts receivables with significant customers, see *Note 17C*.

With respect to our investments, we monitor concentrations of credit risk associated with government, government agency, and corporate issuers of securities. Investments are placed in instruments that are investment grade and are primarily short in duration. Exposure limits are established to limit a concentration with any single credit counterparty. As of December 31, 2021, the largest investment exposures in our portfolio represent primarily sovereign debt instruments issued by the U.S., Canada, Japan, U.K., Germany, France, Australia, and Switzerland.

With respect to our derivative financial instrument agreements with financial institutions, we do not expect to incur a significant loss from failure of any counterparty. Derivative financial instruments are executed under International Swaps and Derivatives Association (ISDA) master agreements with credit-support annexes that contain zero threshold provisions requiring collateral to be exchanged daily depending on levels of exposure. As a result, there are no significant concentrations of credit risk with any individual financial institution. As of December 31, 2021, the aggregate fair value of these derivative financial instruments that are in a net payable position was $372 million, for which we have posted collateral of $382 million with a corresponding amount reported in *Short-term investments*. As of December 31, 2021, the aggregate fair value of our derivative financial instruments that are in a net receivable position was $477 million, for which we have received collateral of $581 million with a corresponding amount reported in *Short-term borrowings, including current portion of long-term debt*.

### Note 8. Other Financial Information

*A. Inventories*

The following summarizes the components of *Inventories*:

| | | As of December 31, | |
|---|---|---|---|
| (MILLIONS) | | **2021** | 2020 |
| Finished goods | $ | **3,641** | $ 2,867 |
| Work in process | | **4,424** | 4,436 |
| Raw materials and supplies | | **994** | 716 |
| *Inventories*[a] | $ | **9,059** | $ 8,020 |
| Noncurrent inventories not included above[b] | $ | **939** | $ 890 |

[a] The change from December 31, 2020 reflects increases for certain products, including inventory build for new product launches (primarily Comirnaty), network strategy and supply recovery, partially offset by decreases due to market demand.
[b] Included in *Other noncurrent assets*. There are no recoverability issues for these amounts.

*B. Other Current Liabilities*

*Other current liabilities* includes, among other things, amounts payable to BioNTech for the gross profit split for Comirnaty, which totaled $9.7 billion as of December 31, 2021 and $25 million as of December 31, 2020.

### Note 9. Property, Plant and Equipment (PP&E)

The following summarizes the components of *Property, plant and equipment*:

| | Useful Lives | As of December 31, | |
|---|---|---|---|
| (MILLIONS) | (Years) | **2021** | 2020 |
| Land | - | $ **423** | $ 443 |
| Buildings | 33-50 | **9,001** | 8,998 |
| Machinery and equipment | 8-20 | **12,252** | 11,000 |
| Furniture, fixtures and other | 3-12.5 | **4,457** | 4,484 |
| Construction in progress | - | **3,822** | 3,481 |
| | | **29,955** | 28,406 |
| Less: Accumulated depreciation | | **15,074** | 14,661 |
| *Property, plant and equipment* | | $ **14,882** | $ 13,745 |

The following provides long-lived assets by geographic area:

| | As of December 31, | |
|---|---|---|
| (MILLIONS) | **2021** | 2020 |
| Property, plant and equipment | | |
| United States | $ **8,385** | $ 7,666 |
| Developed Europe | **5,094** | 4,775 |
| Developed Rest of World | **347** | 413 |
| Emerging Markets | **1,056** | 890 |
| *Property, plant and equipment* | $ **14,882** | $ 13,745 |

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

### Note 10. Identifiable Intangible Assets and Goodwill

*A. Identifiable Intangible Assets*

The following summarizes the components of *Identifiable intangible assets*:

| | As of December 31, 2021 | | | As of December 31, 2020 | | |
|---|---|---|---|---|---|---|
| (MILLIONS) | Gross Carrying Amount | Accumulated Amortization | Identifiable Intangible Assets, less Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization | Identifiable Intangible Assets, less Accumulated Amortization |
| Finite-lived intangible assets | | | | | | |
| Developed technology rights(a) | $ 73,346 | $ (53,732) | $ 19,614 | $ 73,040 | $ (50,532) | $ 22,508 |
| Brands | 922 | (807) | 115 | 922 | (774) | 148 |
| Licensing agreements and other | 2,284 | (1,299) | 985 | 2,292 | (1,187) | 1,106 |
| | 76,552 | (55,838) | 20,714 | 76,255 | (52,493) | 23,762 |
| Indefinite-lived intangible assets | | | | | | |
| Brands | 827 | | 827 | 827 | | 827 |
| IPR&D | 3,092 | | 3,092 | 3,175 | | 3,175 |
| Licensing agreements and other | 513 | | 513 | 573 | | 573 |
| | 4,432 | | 4,432 | 4,575 | | 4,575 |
| Identifiable intangible assets(b) | $ 80,984 | $ (55,838) | $ 25,146 | $ 80,830 | $ (52,493) | $ 28,337 |

(a) The increase in the gross carrying amount primarily reflects $500 million of capitalized Comirnaty sales milestones to BioNTech, partially offset by net losses from foreign currency translation adjustments.
(b) The decrease is primarily due to amortization, partially offset by the capitalization of the Comirnaty milestones described above.

*Developed Technology Rights*

Developed technology rights represent the cost for developed technology acquired from third parties and can include the right to develop, use, market, sell and/or offer for sale the product, compounds and intellectual property that we have acquired with respect to products, compounds and/or processes that have been completed. We possess a well-diversified portfolio of hundreds of developed technology rights across therapeutic categories, representing our commercialized products. The significant components of developed technology rights are the following: Xtandi, Prevnar 13/Prevenar 13 Infant, Braftovi/Mektovi, Premarin, Prevnar 13/Prevenar 13 Adult, Eucrisa, Orgovyx, Zavicefta, Tygacil, Bavencio, Merrem/Meronem and Comirnaty. Also included in this category are the post-approval milestone payments made under our alliance agreements for certain prescription pharmaceutical products.

*Brands*

Brands represent the cost for tradenames and know-how, as the products themselves do not receive patent protection. Indefinite-lived brands include Medrol and Depo-Medrol, while finite-lived brands include Zavedos and Depo-Provera.

*IPR&D*

IPR&D assets represent R&D assets that have not yet received regulatory approval in a major market. The significant components of IPR&D are the following: the program for the oral poly adenosine diphosphate (ADP) ribose polymerase inhibitor for the treatment of patients with germline BRCA-mutated advanced breast cancer acquired as part of the Medivation acquisition and assets acquired in connection with the Array acquisition. IPR&D assets are required to be classified as indefinite-lived assets until the successful completion or the abandonment of the associated R&D effort. Accordingly, during the development period after the date of acquisition, these assets are not amortized until approval is obtained in a major market, typically either the U.S. or the EU, or in a series of other countries, subject to certain specified conditions and management judgment. At that time, we will determine the useful life of the asset, reclassify it out of IPR&D and begin amortization. If the associated R&D effort is abandoned, the related IPR&D assets will likely be written-off, and we will record an impairment charge.

IPR&D assets are high-risk assets, given the uncertain nature of R&D. Accordingly, we expect that many of these IPR&D assets will become impaired and be written-off at some time in the future.

*Licensing Agreements*

Licensing agreements for developed technology and for technology in development primarily relate to out-licensing arrangements acquired from third parties, including the Array acquisition. These assets represent the cost for the license, where we acquired the right to future royalties and/or milestones upon development or commercialization by the licensing partner. A significant component of the licensing arrangements are for out-licensing arrangements with a number of partners for oncology technology in varying stages of development that have not yet received regulatory approval in a major market. Accordingly, during the development period after the date of acquisition, each of these assets is classified as indefinite-lived intangible assets and will not be amortized until approval is obtained in a major market. At that time we will determine the useful life of the asset, reclassify the respective licensing arrangement asset to finite-lived intangible asset and begin amortization. If the development effort is abandoned, the related licensing asset will likely be written-off, and we will record an impairment charge.

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

*Amortization*

The weighted-average life for each of our total finite-lived intangible assets is approximately 8 years, and for the largest component, developed technology rights, is approximately 7 years. Total amortization expense for finite-lived intangible assets was $3.7 billion in 2021, $3.4 billion in 2020 and $4.5 billion in 2019.

The following provides the expected annual amortization expense:

| (MILLIONS) | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|
| Amortization expense | $ 3,279 | $ 2,936 | $ 2,686 | $ 2,500 | $ 2,449 |

*B. Goodwill*

The following summarizes the components and changes in the carrying amount of *Goodwill*:

| (MILLIONS) | Total[a] |
|---|---|
| Balance, January 1, 2020 | $ 48,181 |
| Additions[b] | 727 |
| Other[c] | 648 |
| Balance, December 31, 2020 | 49,556 |
| **Additions** | — |
| **Other[c]** | (348) |
| **Balance, December 31, 2021** | $ 49,208 |

[a] As a result of the reorganization of our commercial operations during the fourth quarter of 2021 (see *Note 17*), we were required to estimate the relative fair values of our PC1 and Hospital organizations to determine any reallocation of goodwill. We completed this analysis and determined that no goodwill was required to be reallocated. As a result, our entire goodwill balance continues to be assigned within the Biopharma reportable segment.

[b] Additions primarily represent the impact of measurement period adjustments related to our Array acquisition (see *Note 2A*).

[c] Other represents the impact of foreign exchange.

## Note 11. Pension and Postretirement Benefit Plans and Defined Contribution Plans

The majority of our employees worldwide are eligible for retirement benefits provided through defined benefit pension plans, defined contribution plans or both. In the U.S., we sponsor both IRC-qualified and supplemental (non-qualified) defined benefit plans and defined contribution plans. A qualified plan meets the requirements of certain sections of the IRC, and, generally, contributions to qualified plans are tax deductible. A qualified plan typically provides benefits to a broad group of employees with restrictions on discriminating in favor of highly compensated employees with regard to coverage, benefits and contributions. A supplemental (non-qualified) plan provides additional benefits to certain employees. In addition, we provide medical insurance benefits to certain retirees and their eligible dependents through our postretirement plans.

As discussed in *Note 1C*, we adopted a change in accounting principle to a more preferable policy under U.S. GAAP to immediately recognize actuarial gains and losses arising from the remeasurement of pension and postretirement plans. This change has been applied to all pension and postretirement plans on a retrospective basis for all prior periods presented.

*A. Components of Net Periodic Benefit Costs and Changes in Other Comprehensive Income/(Loss)*

The following summarizes the components of net periodic benefit cost/(credit), including those reported as part of discontinued operations for 2020 and 2019, and the changes in *Other comprehensive income/(loss)* for our benefit plans:

| | Pension Plans | | | | | | Postretirement Plans | | |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. | | | International | | | | | |
| | | | | Year Ended December 31, | | | | | |
| (MILLIONS) | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 |
| Service cost | **$ —** | $ — | $ — | **$ 130** | $ 146 | $ 125 | **$ 36** | $ 38 | $ 37 |
| Interest cost | **455** | 533 | 676 | **146** | 164 | 215 | **29** | 49 | 75 |
| Expected return on plan assets | **(1,052)** | (1,015) | (890) | **(327)** | (314) | (318) | **(39)** | (36) | (33) |
| Amortization of prior service cost/(credit) | **(2)** | (3) | (4) | **(1)** | (3) | (4) | **(151)** | (170) | (173) |
| Actuarial (gains)/losses[a] | **(684)** | 1,152 | 284 | **(690)** | 148 | 669 | **(167)** | (165) | (118) |
| Curtailments | **—** | — | (4) | **(4)** | — | (1) | **(82)** | — | (62) |
| Special termination benefits | **17** | 1 | 20 | **—** | — | — | **2** | — | 2 |
| Net periodic benefit cost/(credit) reported in income | **(1,265)** | 668 | 82 | **(746)** | 141 | 686 | **(372)** | (282) | (271) |
| Cost/(credit) reported in *Other comprehensive income/(loss)* | **2** | 5 | 4 | **4** | 5 | 21 | **107** | 114 | 164 |
| Cost/(credit) recognized in *Comprehensive income* | **$ (1,264)** | $ 674 | $ 86 | **$ (742)** | $ 145 | $ 707 | **$ (265)** | $ (168) | $ (107) |

[a] Reflects actuarial remeasurement gains in 2021, primarily due to favorable plan asset performance and increases in discount rates, and actuarial remeasurement losses in 2020 and 2019, primarily due to decreases in discount rates partially offset by favorable plan asset performance.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

The components of net periodic benefit cost/(credit) other than the service cost component are included in *Other (income)/deductions—net* (see *Note 4*).

*B. Actuarial Assumptions*

| | Pension Plans | | | | | | Postretirement Plans | | |
| | U.S. | | | International | | | | | |
| (PERCENTAGES) | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| Weighted-average assumptions used to determine net periodic benefit cost: | | | | | | | | | |
| Discount rate: | | | | | | | | | |
|   Pension plans/postretirement plans | **2.6 %** | 3.3 % | 4.4 % | | | | **2.5 %** | 3.2 % | 4.3 % |
|   Interest cost | | | | **1.2 %** | 1.5 % | 2.2 % | | | |
|   Service cost | | | | **1.4 %** | 1.6 % | 2.4 % | | | |
| Expected return on plan assets | **6.8 %** | 7.0 % | 7.2 % | **3.4 %** | 3.6 % | 3.9 % | **6.8 %** | 7.0 % | 7.3 % |
| Rate of compensation increase[a] | | | | **2.9 %** | 2.9 % | 1.4 % | | | |
| Weighted-average assumptions used to determine benefit obligations at fiscal year-end: | | | | | | | | | |
| Discount rate | **2.9 %** | 2.6 % | 3.3 % | **1.6 %** | 1.5 % | 1.7 % | **2.9 %** | 2.5 % | 3.2 % |
| Rate of compensation increase[a] | | | | **2.8 %** | 2.9 % | 1.4 % | | | |

[a] The rate of compensation increase is not used to determine the net periodic benefit cost and benefit obligation for the U.S. pension plans as these plans are frozen.

All of the assumptions are reviewed on at least an annual basis. We revise these assumptions based on an annual evaluation of long-term trends as well as market conditions that may have an impact on the cost of providing retirement benefits.

The weighted-average discount rate for our U.S. defined benefit plans is determined annually and evaluated and modified to reflect at year-end the prevailing market rate of a portfolio of high-quality fixed income investments, rated AA/Aa or better that reflect the rates at which the pension benefits could be effectively settled. For our international plans, the discount rates are set by benchmarking against investment grade corporate bonds rated AA/Aa or better, including, when there is sufficient data, a yield curve approach. These rate determinations are made consistent with local requirements. Overall, the yield curves used to measure the benefit obligations at year-end 2021 resulted in higher discount rates as compared to the prior year.

The following provides the healthcare cost trend rate assumptions for our U.S. postretirement benefit plans:

| | As of December 31, | |
| | **2021** | 2020 |
|---|---|---|
| Healthcare cost trend rate assumed for next year | **6.0 %** | 5.6 % |
| Rate to which the cost trend rate is assumed to decline | **4.0 %** | 4.5 % |
| Year that the rate reaches the ultimate trend rate | **2045** | 2037 |

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

*C. Obligations and Funded Status*

The following provides: (i) an analysis of the changes in our benefit obligations, plan assets and funded status of our benefit plans, including those reported as part of discontinued operations for 2020, (ii) the funded status recognized in our consolidated balance sheets and (iii) the pre-tax components of cumulative amounts recognized in *Accumulated other comprehensive loss*:

| | Pension Plans | | | | Postretirement Plans | |
|---|---|---|---|---|---|---|
| | U.S. | | International | | | |
| | | | Year Ended December 31, | | | |
| (MILLIONS) | **2021** | 2020 | **2021** | 2020 | **2021** | 2020 |
| Change in benefit obligation[a] | | | | | | |
| Benefit obligation, beginning | $ **18,306** | $ 17,886 | $ **12,001** | $ 11,059 | $ **1,238** | $ 1,667 |
| Service cost | **—** | — | **130** | 146 | **36** | 38 |
| Interest cost | **455** | 533 | **146** | 164 | **29** | 49 |
| Employee contributions | **—** | — | **10** | 8 | **78** | 88 |
| Plan amendments | **—** | 2 | **—** | 2 | **(116)** | (56) |
| Changes in actuarial assumptions and other[b] | **(331)** | 2,112 | **89** | 702 | **(117)** | (132) |
| Foreign exchange impact | **—** | — | **(298)** | 646 | **1** | 2 |
| Upjohn spin-off[c] | **—** | (1,016) | **3** | (320) | **—** | (218) |
| Acquisitions/divestitures/other, net | **—** | — | **—** | — | **—** | — |
| Curtailments and special termination benefits | **17** | 1 | **(2)** | — | **(8)** | — |
| Settlements | **(785)** | (767) | **(47)** | (34) | **—** | — |
| Benefits paid | **(512)** | (445) | **(374)** | (372) | **(147)** | (201) |
| Benefit obligation, ending[a] | **17,150** | 18,306 | **11,657** | 12,001 | **995** | 1,238 |
| Change in plan assets | | | | | | |
| Fair value of plan assets, beginning | **16,094** | 14,586 | **9,811** | 8,956 | **588** | 519 |
| Actual return on plan assets | **1,405** | 1,974 | **1,106** | 868 | **89** | 69 |
| Company contributions | **143** | 1,433 | **451** | 197 | **145** | 113 |
| Employee contributions | **—** | — | **10** | 8 | **78** | 88 |
| Foreign exchange impact | **—** | — | **(229)** | 462 | **—** | — |
| Upjohn spin-off[c] | **—** | (687) | **2** | (270) | **—** | — |
| Acquisitions/divestitures, net | **—** | — | **—** | (6) | **—** | — |
| Settlements | **(785)** | (767) | **(47)** | (34) | **—** | — |
| Benefits paid | **(512)** | (445) | **(374)** | (372) | **(147)** | (201) |
| Fair value of plan assets, ending | **16,346** | 16,094 | **10,729** | 9,811 | **753** | 588 |
| Funded status—Plan assets less than benefit obligation | $ **(805)** | $ (2,211) | $ **(928)** | $ (2,191) | $ **(241)** | $ (651) |
| Amounts recorded in our consolidated balance sheet: | | | | | | |
| Noncurrent assets | $ **447** | $ — | $ **1,480** | $ 522 | $ **—** | $ — |
| Current liabilities | **(138)** | (127) | **(33)** | (31) | **(6)** | (6) |
| Noncurrent liabilities | **(1,113)** | (2,084) | **(2,376)** | (2,681) | **(235)** | (645) |
| Funded status | $ **(805)** | $ (2,211) | $ **(928)** | $ (2,191) | $ **(241)** | $ (651) |
| Pre-tax components of cumulative amounts recognized in *Accumulated other comprehensive loss:* | | | | | | |
| Prior service (costs)/credits | $ **(6)** | $ (4) | $ **(35)** | $ (31) | $ **581** | $ 688 |
| Information related to the funded status of pension plans with an ABO in excess of plan assets[d]: | | | | | | |
| Fair value of plan assets | $ **120** | $ 16,094 | $ **1,304** | $ 6,674 | | |
| ABO | **1,371** | 18,306 | **3,344** | 8,961 | | |
| Information related to the funded status of pension plans with a PBO in excess of plan assets[d]: | | | | | | |
| Fair value of plan assets | $ **120** | $ 16,094 | $ **1,381** | $ 6,735 | | |
| PBO | **1,371** | 18,306 | **3,789** | 9,447 | | |

[a] For the U.S. pension plans, the benefit obligation is both the PBO and ABO as these plans are frozen and future benefit accruals no longer increase with future compensation increases. For the international pension plans, the benefit obligation is the PBO. The ABO for our international pension plans was $11.2 billion in 2021 and $11.5 billion in 2020. For the postretirement plans, the benefit obligation is the ABO.
[b] Primarily includes actuarial gains resulting from increases in discount rates in 2021, offset by increases in inflation assumptions in 2021 for the international plans, and actuarial losses resulting from decreases in discount rates in 2020.
[c] For more information, see *Note 2B*.
[d] Our main U.S. qualified plan and many of our international plans were overfunded as of December 31, 2021.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

*D. Plan Assets*

The following provides the components of plan assets, including those reported as part of discontinued operations for 2020:

| | | As of December 31, 2021 | | | | | As of December 31, 2020 | | | | |
| | | | Fair Value | | | | | Fair Value | | | |
| (MILLIONS EXCEPT TARGET ALLOCATION PERCENTAGE) | Target Allocation Percentage | Total | Level 1 | Level 2 | Level 3 | Assets Measured at NAV[a] | Total | Level 1 | Level 2 | Level 3 | Assets Measured at NAV[a] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| U.S. pension plans | | | | | | | | | | | |
| Cash and cash equivalents | 0-10% | $ 1,326 | $ 78 | $ 1,248 | $ — | $ — | $ 781 | $ 70 | $ 711 | $ — | $ — |
| Equity securities: | 20-40% | | | | | | | | | | |
| Global equity securities | | 2,273 | 2,233 | 38 | 2 | — | 3,241 | 3,213 | 27 | 1 | — |
| Equity commingled funds | | 1,352 | — | 1,152 | — | 200 | 1,325 | — | 1,110 | — | 215 |
| Fixed income securities: | 45-75% | | | | | | | | | | |
| Corporate debt securities | | 5,566 | 18 | 5,548 | — | — | 6,499 | 23 | 6,476 | — | — |
| Government and agency obligations[b] | | 2,533 | — | 2,533 | — | — | 1,555 | — | 1,555 | — | — |
| Fixed income commingled funds | | 38 | — | 38 | — | — | 23 | — | 23 | — | — |
| Other investments: | 5-20% | | | | | | | | | | |
| Partnership investments[c] | | 2,079 | 3 | — | — | 2,076 | 1,431 | — | — | — | 1,431 |
| Insurance contracts | | 158 | — | 158 | — | — | 190 | — | 190 | — | — |
| Other commingled funds[d] | | 1,019 | — | 10 | — | 1,009 | 1,049 | — | — | 11 | 1,038 |
| Total | 100 % | $ 16,346 | $ 2,332 | $ 10,726 | $ 2 | $ 3,286 | 16,094 | $ 3,306 | $ 10,103 | $ 1 | 2,684 |
| International pension plans | | | | | | | | | | | |
| Cash and cash equivalents | 0-10% | $ 541 | $ 191 | $ 346 | $ — | $ 3 | $ 407 | $ 61 | $ 346 | $ — | $ — |
| Equity securities: | 10-20% | | | | | | | | | | |
| Equity commingled funds | | 1,453 | — | 1,386 | — | 67 | 2,051 | — | 1,681 | — | 370 |
| Fixed income securities: | 45-70% | | | | | | | | | | |
| Corporate debt securities | | 1,187 | — | 1,187 | — | — | 925 | — | 925 | — | — |
| Government and agency obligations[b] | | 2,415 | — | 2,415 | — | — | 1,334 | — | 1,334 | — | — |
| Fixed income commingled funds | | 2,266 | — | 1,138 | — | 1,128 | 2,484 | — | 1,217 | — | 1,267 |
| Other investments: | 15-35% | | | | | | | | | | |
| Partnership investments[c] | | 107 | — | 2 | — | 106 | 69 | — | 3 | — | 66 |
| Insurance contracts | | 1,329 | — | 56 | 1,273 | — | 1,027 | — | 57 | 969 | 1 |
| Other[d] | | 1,431 | — | 141 | 404 | 886 | 1,514 | — | 117 | 393 | 1,003 |
| Total | 100 % | $ 10,729 | $ 191 | $ 6,672 | $ 1,677 | $ 2,189 | 9,811 | $ 61 | $ 5,681 | $ 1,362 | 2,707 |
| U.S. postretirement plans[e] | | | | | | | | | | | |
| Cash and cash equivalents | 0-5% | $ 85 | $ 3 | $ 82 | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Insurance contracts | 95-100% | 669 | — | 669 | — | — | 588 | — | 588 | — | — |
| Total | 100 % | $ 753 | $ 3 | $ 750 | $ — | $ — | $ 588 | $ — | $ 588 | $ — | $ — |

[a] Certain investments that are measured at NAV per share (or its equivalent) have not been classified in the fair value hierarchy. The NAV amounts presented in this table are intended to permit reconciliation of the fair value hierarchy to the amounts presented for the total pension benefits plan assets.
[b] Government and agency obligations are inclusive of repurchase agreements.
[c] Mainly includes investments in private equity, private debt, public equity limited partnerships, and, to a lesser extent, real estate and venture capital.
[d] Mostly includes investments in hedge funds and real estate.
[e] Reflects postretirement plan assets, which support a portion of our U.S. retiree medical plans.

The following provides an analysis of the changes in our more significant investments valued using significant unobservable inputs, including those reported as part of discontinued operations for 2020:

| | International Pension Plans | |
| | Year Ended December 31, | |
| (MILLIONS) | 2021 | 2020 |
|---|---|---|
| Fair value, beginning | $ 1,362 | $ 1,342 |
| Actual return on plan assets: | | |
| Assets held, ending | 23 | 22 |
| Purchases, sales, and settlements, net | 52 | (47) |
| Transfer into/(out of) Level 3 | 265 | (13) |
| Exchange rate changes | (24) | 58 |
| Fair value, ending | $ 1,677 | $ 1,362 |

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

The following methods and assumptions were used to estimate the fair value of our pension and postretirement plans' assets:

- Cash and cash equivalents: Level 1 investments may include cash, cash equivalents and foreign currency valued using exchange rates. Level 2 investments may include short-term investment funds which are commingled funds priced at a stable NAV by the administrator of the funds.

- Equity securities: Level 1 investments may include individual securities that are valued at the closing price or last trade reported on the major market on which they are traded. Level 1 and Level 2 investments may include commingled funds that have a readily determinable fair value based on quoted prices on an exchange or a published NAV derived from the quoted prices in active markets of the underlying securities. Level 3 investments may include individual securities that are unlisted, delisted, suspended, or illiquid and are typically valued using their last available price.

- Fixed income securities: Level 1 investments may include individual securities that are valued at the closing price or last trade reported on the major market on which they are traded. Level 2 investments may include commingled funds that have a readily determinable fair value based on observable prices of the underlying securities. Level 2 investments may include corporate bonds, government and government agency obligations and other fixed income securities valued using bid evaluation pricing models or quoted prices of securities with similar characteristics. Level 3 investments may include securities that are valued using alternative pricing sources, such as investment managers or brokers, which use proprietary pricing models that incorporate unobservable inputs.

- Other investments: Level 1 investments may include individual securities that are valued at the closing price or last trade reported on the major market on which they are traded. Level 2 investments may include Insurance contracts which invest in interest bearing cash, U.S. government securities and corporate debt instruments. Level 3 investments may include securities or insurance contracts that are valued using alternative pricing sources, such as investment managers or brokers, which use proprietary pricing models that incorporate unobservable inputs.

Equity securities, Fixed income securities and Other investments may each be combined into commingled funds. Most commingled funds are valued to reflect the interest in the fund based on the reported year-end NAV. Partnership and Other investments are valued based on year-end reported NAV (or its equivalent), with adjustments as appropriate for lagged reporting of up to three months.

Certain investments are authorized to include derivatives, such as equity or bond futures, swaps, options and currency futures or forwards for managing risks and exposures.

Global plan assets are managed with the objective of generating returns that will enable the plans to meet their future obligations, while seeking to manage net periodic benefit costs and cash contributions over the long-term. We utilize long-term asset allocation ranges in the management of our plans' invested assets. Our long-term return expectations are developed based on a diversified, global investment strategy that takes into account historical experience, as well as the impact of portfolio diversification, active portfolio management, and our view of current and future economic and financial market conditions. As market conditions and other factors change, we may adjust our targets accordingly and our asset allocations may vary from the target allocations.

*E. Cash Flows*

It is our practice to fund amounts for our qualified pension plans that are at least sufficient to meet the minimum requirements set forth in applicable employee benefit laws and local tax laws.

The following provides the expected future cash flow information related to our benefit plans:

| (MILLIONS) | Pension Plans | | | | Postretirement Plans | |
| --- | --- | --- | --- | --- | --- | --- |
| | | U.S. | | International | | |
| Expected employer contributions: | | | | | | |
| 2022 | $ | 138 | $ | 177 | $ | 74 |
| Expected benefit payments: | | | | | | |
| 2022 | $ | 1,296 | $ | 384 | $ | 78 |
| 2023 | | 1,155 | | 372 | | 73 |
| 2024 | | 1,140 | | 383 | | 69 |
| 2025 | | 1,089 | | 392 | | 66 |
| 2026 | | 1,058 | | 397 | | 68 |
| 2027–2031 | | 4,908 | | 2,124 | | 359 |

The above table reflects the total U.S. and international plan benefits projected to be paid from the plans or from our general assets under the current actuarial assumptions used for the calculation of the benefit obligation.

*F. Defined Contribution Plans*

We have defined contribution plans in the U.S. and other countries. For the majority of the U.S. defined contribution plans, employees may contribute a portion of their salaries and bonuses to the plans, and we match, in cash, a portion of the employee contributions. We also offer a Retirement Savings Contribution (RSC) which is an annual non-contributory employer contribution in the U.S. and Puerto Rico. We recorded charges related to the employer contributions to global defined contribution plans of $732 million in 2021, $685 million in 2020 and $659 million in 2019.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

## Note 12. Equity

### A. Common Stock Purchases

We purchase our common stock through privately negotiated transactions or in the open market as circumstances and prices warrant. Purchased shares under each of the share-purchase plans, which are authorized by our BOD, are available for general corporate purposes. In December 2017, the BOD authorized a $10 billion share repurchase program, which was exhausted in the first quarter of 2019. In December 2018, the BOD authorized another $10 billion share repurchase program to be utilized over time and share repurchases commenced thereunder in the first quarter of 2019.

In February 2019, we entered into an ASR with Goldman Sachs & Co. LLC to repurchase $6.8 billion of our common stock pursuant to our previously announced share repurchase authorization. We paid $6.8 billion and received an initial delivery of 130 million shares of common stock, which represented approximately 80% of the notional amount of the ASR. In August 2019, the ASR with Goldman Sachs & Co. LLC was completed resulting in Goldman Sachs & Co. LLC owing us an additional 33.5 million shares of our common stock. The average price paid for all of the shares delivered under the ASR was $41.42 per share. The common stock received is included in *Treasury stock*.

The following provides the number of shares of our common stock purchased and the cost of purchases under our publicly announced share purchase plans, including our ASR:

| | Year Ended December 31, | | |
|---|---|---|---|
| (SHARES IN MILLIONS, DOLLARS IN BILLIONS) | **2021** | 2020 | 2019[a] |
| Shares of common stock purchased | — | — | 213 |
| Cost of purchase | $ — | $ — | $ 8.9 |

[a] Represents shares purchased pursuant to the ASR with Goldman Sachs & Co. LLC entered into in February 2019, as well as open market share repurchases of $2.1 billion.

Our remaining share-purchase authorization was approximately $5.3 billion at December 31, 2021.

### B. Preferred Stock and Employee Stock Ownership Plans

Prior to May 4, 2020, we had outstanding Series A convertible perpetual preferred stock (the Series A Preferred Stock) that was held by an ESOP trust (the Trust). All outstanding shares of Series A Preferred Stock were converted, at the direction of the independent fiduciary under the Trust and in accordance with the certificate of designations for the Series A Preferred Stock, into shares of our common stock on May 4, 2020. The Trust received an aggregate of 1,070,369 shares of our common stock upon conversion, with zero shares of Series A Preferred Stock remaining outstanding as a result of the conversion. In December 2020, we filed a certificate of elimination and a restated certificate of incorporation with the Delaware Secretary of State, which eliminated the Series A Preferred Stock.

Since May 4, 2020, we have one ESOP that holds common stock of the Company (Common ESOP). As of December 31, 2021, all shares of common stock held by the Common ESOP have been allocated to the Pfizer U.S. defined contribution plan participants. The compensation cost related to the Common ESOP was $19 million in 2021, $19 million in 2020 and $20 million in 2019.

## Note 13. Share-Based Payments

Our compensation programs can include share-based payment awards with value that is determined by reference to the fair value of our shares and that provide for the grant of shares or options to acquire shares or similar arrangements. Our share-based awards are designed based on competitive survey data or industry peer groups used for compensation purposes, and are allocated between different long-term incentive awards, generally in the form of Total Shareholder Return Units (TSRUs), Restricted Stock Units (RSUs), Portfolio Performance Shares (PPSs), Performance Share Awards (PSAs), Breakthrough Performance Awards (BPAs) and Stock Options, as determined by the Compensation Committee.

The 2019 Stock Plan (2019 Plan) replaced and superseded the 2014 Plan. It provides for 400 million shares, in addition to shares remaining under the 2014 Plan, to be authorized for grants. The 2019 Plan provides that the number of stock options, TSRUs, RSUs, or performance-based awards that may be granted to any one individual during any 36-month period is limited to 20 million shares, and that RSUs count as three shares, PPSs, PSAs and BPAs count as three shares times the maximum potential payout, while TSRUs and stock options count as one share, toward the maximum shares available under the 2019 Plan. As of December 31, 2021, 315 million shares were available for award. Although not required to do so, we have used authorized and unissued shares and, to a lesser extent, treasury stock to satisfy our obligations under these programs.

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

A summary of the awards and valuation details:

| Awarded to | Terms | Valuation | Recognition and Presentation |
|---|---|---|---|
| **Total Shareholder Return Units (TSRUs)[a], [b]** | | | |
| Senior and other key management and select employees | • Entitle the holder to receive shares of our common stock with a value equal to the difference between the defined settlement price and the grant price, plus the dividend equivalents accumulated during the five or seven-year term, if and to the extent the total value is positive.<br><br>• Settlement price is the average closing price of our common stock during the 20 trading days ending on the fifth or seventh anniversary of the grant, as applicable; the grant price is the closing price of our common stock on the date of the grant.<br><br>• Automatically settle on the fifth or seventh anniversary of the grant but vest on the third anniversary of the grant. | As of the grant date using a Monte Carlo simulation model | Amortized on a straight-line basis over the vesting term into *Cost of sales, Selling, informational and administrative expenses,* and/or *Research and development expenses,* as appropriate. |
| **Restricted Stock Units (RSUs)** | | | |
| Select employees | • Entitle the holder to receive a specified number of shares of our common stock, including dividend equivalents that are reinvested into additional RSUs.<br><br>• For RSUs granted, in virtually all instances, the units vest on the third anniversary of the grant date assuming continuous service from the grant date. | As of the grant date using the closing price of our common stock | Amortized on a straight-line basis over the vesting term into *Cost of sales, Selling, informational and administrative expenses,* and/or *Research and development expenses,* as appropriate. |
| **Portfolio Performance Shares (PPSs)** | | | |
| Select employees | • Entitle the holder to receive, at the end of the performance period, shares of our common stock, if any, including shares resulting from dividend equivalents earned on such shares.<br><br>• For PPSs granted, the awards vest on the third anniversary of the grant assuming continuous service from the grant date and the number of shares paid, if any, depends on the achievement of predetermined goals related to Pfizer's long-term product portfolio during a three or five-year performance period from the year of the grant date, as applicable.<br><br>• The number of shares that may be earned ranges from 0% to 200% of the initial award depending on goal achievement over the performance period. | As of the grant date using the intrinsic value method using the closing price of our common stock | Amortized on a straight-line basis over the vesting term into *Cost of sales, Selling, informational and administrative expenses* and/or *Research and development expenses,* as appropriate, and adjusted each reporting period, as necessary, to reflect changes in the price of our common stock, the number of shares that are probable of being earned, and management's assessment of the probability that the specified performance criteria will be achieved. |
| **Performance Share Awards (PSAs)** | | | |
| Senior and other key management | • Entitle the holder to receive, at the end of the performance period, shares of our common stock (retirees) earned, if any, or an equal value in cash (active colleagues), including dividend equivalents on shares earned, dependent upon the achievement of predetermined goals related to two measures:<br>  a. Adjusted net income over three one-year periods; and<br>  b. TSR as compared to the NYSE ARCA Pharmaceutical Index (DRG Index) over the three-year performance period.<br><br>• PSAs vest on the third anniversary of the grant assuming continuous service from the grant date.<br><br>• The award that may be earned ranges from 0% to 200% of the target award depending on goal achievement over the performance period. | As of the grant date using the intrinsic value method using the closing price of our common stock | Amortized on a straight-line basis over the vesting term into *Cost of sales, Selling, informational and administrative expenses,* as appropriate, and adjusted each reporting period, as necessary, to reflect changes in the price of our common stock, the number of shares that are probable of being earned and management's assessment of the probability that the specified performance criteria will be achieved. |
| **Breakthrough Performance Awards (BPAs)** | | | |
| Select employees identified as instrumental in delivering medicines to patients (excluding executive officers) | • Entitle the holder to receive, at the end of the performance period, shares of our common stock, if any, including shares resulting from dividend equivalents earned on such shares.<br><br>• For BPAs granted, the awards, if earned/vested, are settled at the end of the performance period, but no earlier than the one-year anniversary of the date of grant and dependent upon the achievement of the respective predetermined performance goals related to advancing Pfizer's product pipeline during the performance period.<br><br>• The number of shares that may be earned ranges from 0% to 600% of the target award depending on the level and timing of goal achievement over the performance period. | As of the grant date using the intrinsic value method using the closing price of our common stock | Amortized on a straight-line basis over the probable vesting term into *Cost of sales, Selling, informational and administrative expenses,* and/or *Research and development expenses,* as appropriate, and adjusted each reporting period, as necessary, to reflect changes in the price of our common stock, the number of shares that are probable of being earned and management's assessment of the probability that the specified performance criteria will be achieved and/or management's assessment of the probable vesting term. |

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

| Awarded to | Terms | Valuation | Recognition and Presentation |
|---|---|---|---|
| **Stock Options** | | | |
| Select employees | • Entitle the holder to purchase a specified number of shares of our common stock at a price per share equal to the closing market price of our common stock on the date of grant, for a period of time when vested.<br>• Since 2016, only a limited set of non-U.S. employees received stock option grants. No stock options were awarded to senior and other key management in any period presented.<br>• Stock options vest on the third anniversary of the grant assuming continuous service from the grant date and have a contractual term of 10 years. | As of the grant date using the Black-Scholes-Merton option-pricing model | Amortized on a straight-line basis over the vesting term into *Cost of sales, Selling, informational and administrative expenses,* and/or *Research and development expenses,* as appropriate. |

(a) Retirement-eligible holders, as defined in the grant terms, can convert their TSRUs, when vested, into Profit Units (PTUs) with a conversion ratio based on a calculation used to determine the shares at TSRU settlement. The PTUs are entitled to earn Dividend Equivalent Units (DEUs), and the PTUs and DEUs will be settled in our common stock on the TSRUs' original settlement date and will be subject to the terms and conditions of the original grant including forfeiture provisions.

(b) In 2017, Performance Total Shareholder Return Units (PTSRUs) were awarded to the Former Chairman and Chief Executive Officer (1,444,395 PTSRUs) and 361,099 PTSRUs were awarded to the Group President, Chief Business Officer (former role Group President Pfizer Innovative Health) at a grant price of $30.31 and at a GDFV of $5.54 per PTSRU. In addition to having the same characteristics and valuation methodology of TSRUs, PTSRU grants require special service and performance conditions.

The following provides data related to all TSRU, RSU, PPS, PSA and stock option activity:

| (MILLIONS, EXCEPT FAIR VALUE OF SHARES VESTED PER TSRU AND STOCK OPTION) | **TSRUs** | | | **RSUs** | | | **PPSs** | | | **PSAs** | | | **Stock Options** | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year Ended December 31, | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 |
| Total fair value of shares vested(a) | **$7.26** | $6.22 | $8.52 | **$304** | $334 | $454 | **$181** | $119 | $136 | **$33** | $25 | $64 | **$4.86** | $3.56 | $5.98 |
| Total intrinsic value of options exercised or share units converted | **$594** | $84 | $175 | | | | **$228** | $224 | $245 | | | | **$584** | $293 | $261 |
| Cash received upon exercise | | | | | | | | | | | | | **$795** | $425 | $394 |
| Tax benefits realized from exercise | | | | | | | | | | | | | **$106** | $55 | $47 |
| Compensation cost recognized, pre-tax(b) | **$259** | $287 | $294 | **$281** | $272 | $275 | **$535** | $180 | $114 | **$76** | $31 | $28 | **$5** | $6 | $7 |
| Total compensation cost related to nonvested awards not yet recognized, pre-tax | **$187** | $224 | $229 | **$271** | $228 | $241 | **$175** | $104 | $87 | **$54** | $32 | $34 | **$3** | $4 | $5 |
| Weighted-average period over which cost is expected to be recognized (years) | **1.6** | 1.6 | 1.6 | **1.8** | 1.7 | 1.7 | **1.8** | 1.8 | 1.8 | **1.8** | 1.9 | 1.8 | **1.6** | 1.7 | 1.6 |

(a) Weighted-average GDFV per TSRUs and stock options.
(b) TSRU includes expense for PTSRUs, which is not significant for all years presented.

Total share-based payment expense was $1.2 billion, $780 million and $718 million in 2021, 2020 and 2019, respectively, which includes pre-tax share-based payment expense included in *Discontinued operations—net of tax* of $2 million, $25 million and $32 million in 2021, 2020 and 2019, respectively. Tax benefit for share-based compensation expense was $227 million, $141 million and $137 million in 2021, 2020 and 2019, respectively.

The table above excludes total expense due to the modification for share-based awards in connection with our cost reduction/productivity initiatives, which was not significant for all years presented and is recorded in *Restructuring charges and certain acquisition-related costs* (see *Note 3*). Amounts capitalized as part of inventory cost were not significant for any period presented.

Summary of the weighted-average assumptions used in the valuation of TSRUs and stock options:

| Year Ended December 31, | **TSRUs** | | | **Stock Options** | | |
|---|---|---|---|---|---|---|
| | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 |
| **Expected dividend yield** (based on a constant dividend yield during the expected term) | **4.51 %** | 4.36 % | 3.27 % | **4.51 %** | 4.36 % | 3.27 % |
| **Risk-free interest rate** (based on interpolated yield on U.S. Treasury zero-coupon issues) | **0.93 %** | 1.15 % | 2.55 % | **1.27 %** | 1.25 % | 2.66 % |
| **Expected stock price volatility** (based on implied volatility, after consideration of historical volatility) | **26.53 %** | 20.99 % | 18.34 % | **26.54 %** | 20.97 % | 18.34 % |
| **TSRUs contractual/stock options expected term, years** (based on historical exercise and post-vesting termination patterns for stock options) | **5.15** | 5.12 | 5.13 | **6.75** | 6.75 | 6.75 |

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

Summary of all TSRU, RSU, PPS, PSA and BPA activity during 2021 (with the shares granted representing the maximum award that could be achieved for PPSs, PSAs and BPAs):

| | TSRUs | | | RSUs | | PPSs[a] | | PSAs | | BPAs | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | TSRUs | Per TSRU, Weighted Average | | Shares | Weighted Avg. | Shares | Weighted Avg. | Shares | Weighted Avg. | Shares | Weighted Avg. |
| | | GDFV | Grant Price | | GDFV per share | | Intrinsic Value per share | | Intrinsic Value per share | | Intrinsic Value per share |
| | *(Thousands)* | | | *(Thousands)* | | *(Thousands)* | | *(Thousands)* | | *(Thousands)* | |
| Nonvested, December 31, 2020 | 129,844 $ | 6.90 $ | 32.94 | 23,692 $ | 35.50 | 20,077 $ | 36.81 | 5,264 $ | 36.81 | — $ | — |
| Granted | 34,522 | 7.26 | 33.83 | 10,893 | 34.31 | 8,632 | 33.82 | 1,798 | 33.82 | 1,165 | 38.73 |
| Vested | (44,888) | 7.21 | 30.54 | (8,747) | 34.66 | (6,095) | 33.88 | (984) | 33.85 | — | |
| Reinvested dividend equivalents | | | | 956 | 41.33 | | | | | | |
| Forfeited | (4,879) | 6.77 | 33.78 | (1,255) | 35.17 | (1,133) | 41.45 | (924) | 34.43 | (306) | 47.47 |
| Nonvested, December 31, 2021 | 114,599 $ | 6.90 $ | 34.12 | 25,540 $ | 35.52 | 21,480 $ | 59.05 | 5,154 $ | 59.05 | 859 $ | 59.05 |

(a) Vested and non-vested shares outstanding, but not paid as of December 31, 2021 were 34.1 million.

Summary of TSRU and PTU information as of December 31, 2021[a], [b]:

| | TSRUs *(Thousands)* | PTUs *(Thousands)* | Weighted-Average Grant Price Per TSRU | Weighted-Average Remaining Contractual Term *(Years)* | Aggregate Intrinsic Value *(Millions)* |
|---|---|---|---|---|---|
| **TSRUs Outstanding** | 206,996 | — $ | 31.71 | 2.2 $ | 5,969 |
| **TSRUs Vested** | 92,398 | — | 28.72 | 0.8 | 2,946 |
| **TSRUs Expected to vest**[c] | 110,476 | — | 34.16 | 3.3 | 2,910 |
| **TSRUs exercised and converted to PTUs** | — | 3,074 $ | — | 0.8 $ | 182 |

(a) In 2021, we settled 46,060,346 TSRUs with a weighted-average grant price of $23.04 per unit.
(b) In 2021, 7,093,787 TSRUs with a weighted-average grant price of $27.41 per unit were converted into 2,943,737 PTUs.
(c) The number of TSRUs expected to vest takes into account an estimate of expected forfeitures.

Summary of all stock option activity during 2021:

| | Shares *(Thousands)* | Weighted-Average Exercise Price Per Share | Weighted-Average Remaining Contractual Term *(Years)* | Aggregate Intrinsic Value *(Millions)* |
|---|---|---|---|---|
| Outstanding, December 31, 2020 | 75,402 $ | 28.31 | | |
| **Granted** | 779 | 33.82 | | |
| **Exercised** | (31,036) | 25.75 | | |
| **Forfeited** | (89) | 34.39 | | |
| **Expired** | (181) | 20.27 | | |
| **Outstanding, December 31, 2021** | 44,874 | 30.20 | 2.7 $ | |
| **Vested and expected to vest, December 31, 2021**[b] | 44,747 | 30.19 | 2.7 | |
| **Exercisable, December 31, 2021** | 41,583 $ | 29.81 | 2.3 $ | |

(a) Market price of our underlying common stock less exercise price.
(b) The number of options expected to vest takes into account an estimate of expected forfeitures.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

**Note 14. Earnings Per Common Share Attributable to Pfizer Inc. Common Shareholders**

The following presents the detailed calculation of *EPS*:

| | Year Ended December 31, | | |
|---|---|---|---|
| (IN MILLIONS) | **2021** | 2020 | 2019 |
| EPS Numerator—Basic | | | |
| Income from continuing operations attributable to Pfizer Inc. | **$ 22,414** | $ 6,630 | $ 10,708 |
| Less: Preferred stock dividends—net of tax | **—** | — | 1 |
| Income from continuing operations attributable to Pfizer Inc. common shareholders | **22,414** | 6,630 | 10,708 |
| Discontinued operations—net of tax | **(434)** | 2,529 | 5,318 |
| Net income attributable to Pfizer Inc. common shareholders | **$ 21,979** | $ 9,159 | $ 16,025 |
| EPS Numerator—Diluted | | | |
| Income from continuing operations attributable to Pfizer Inc. common shareholders and assumed conversions | **$ 22,414** | $ 6,630 | $ 10,708 |
| Discontinued operations—net of tax, attributable to Pfizer Inc. common shareholders and assumed conversions | **(434)** | 2,529 | 5,318 |
| Net income attributable to Pfizer Inc. common shareholders and assumed conversions | **$ 21,979** | $ 9,159 | $ 16,026 |
| EPS Denominator | | | |
| Weighted-average number of common shares outstanding—Basic | **5,601** | 5,555 | 5,569 |
| Common-share equivalents: stock options, stock issuable under employee compensation plans convertible preferred stock and accelerated share repurchase agreements | **107** | 77 | 106 |
| Weighted-average number of common shares outstanding—Diluted | **5,708** | 5,632 | 5,675 |
| Anti-dilutive common stock equivalents[a] | **2** | 4 | 2 |

[a] These common stock equivalents were outstanding for the periods presented, but were not included in the computation of diluted EPS for those periods because their inclusion would have had an anti-dilutive effect.

Allocated shares held by the Common ESOP, including reinvested dividends, are considered outstanding for EPS calculations and the eventual conversion of allocated preferred shares held by the Preferred ESOP was assumed in the diluted EPS calculation until the conversion date, which occurred in May 2020. See *Note 12*.

**Note 15. Leases**

We lease real estate, fleet, and equipment for use in our operations. Our leases generally have lease terms of 1 to 30 years, some of which include options to terminate or extend leases for up to 5 to 10 years or on a month-to-month basis. We include options that are reasonably certain to be exercised as part of the determination of lease terms. We may negotiate termination clauses in anticipation of any changes in market conditions, but generally these termination options have not been exercised. Residual value guarantees are generally not included within our operating leases with the exception of some fleet leases. In addition to base rent payments, the leases may require us to pay directly for taxes and other non-lease components, such as insurance, maintenance and other operating expenses, which may be dependent on usage or vary month-to-month. Variable lease payments amounted to $381 million in 2021, $380 million in 2020 and $326 million in 2019. We elected the practical expedient to not separate non-lease components from lease components in calculating the amounts of ROU assets and lease liabilities for all underlying asset classes.

We determine if an arrangement is a lease at inception of the contract and we perform the lease classification test as of the lease commencement date. ROU assets represent our right to use an underlying asset for the lease term and lease liabilities represent our obligation to make lease payments arising from the lease. Operating lease ROU assets and liabilities are recognized at commencement date based on the present value of lease payments over the lease term. As most of our leases do not provide an implicit rate, we use our estimated incremental borrowing rate based on the information available at commencement date in determining the present value of future payments.

For operating leases, the ROU assets and liabilities in our consolidated balance sheets follows:

| | | As of December 31, | |
|---|---|---|---|
| (MILLIONS) | Balance Sheet Classification | **2021** | 2020 |
| ROU assets | *Other noncurrent assets* $ | **2,839** $ | 1,386 |
| Lease liabilities (short-term) | *Other current liabilities* | **449** | 320 |
| Lease liabilities (long-term) | *Other noncurrent liabilities* | **2,510** | 1,108 |

Components of total lease cost includes:

| | Year Ended December 31, | | |
|---|---|---|---|
| (MILLIONS) | **2021** | 2020 | 2019 |
| Operating lease cost | **$ 548** | $ 432 | $ 421 |
| Variable lease cost | **381** | 380 | 326 |
| Sublease income | **(41)** | (40) | (45) |
| Total lease cost | **$ 888** | $ 772 | $ 702 |

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

Other supplemental information follows:

| | As of December 31, | |
|---|---|---|
| (MILLIONS) | **2021** | 2020 |
| Operating leases | | |
| Weighted-Average Remaining Contractual Lease Term (Years) | **12** | 6.9 |
| Weighted-Average Discount Rate | **2.8 %** | 2.9 % |

| | Year Ended December 31, | | |
|---|---|---|---|
| (MILLIONS) | **2021** | 2020 | 2019 |
| Cash paid for amounts included in the measurement of lease liabilities: | | | |
| Operating cash flows from operating leases | $ **387** | $ 333 | $ 338 |
| (Gains)/losses on sale and leaseback transactions, net | **1** | (3) | (29) |

The following reconciles the undiscounted cash flows for the first five years and total of the remaining years to the operating lease liabilities recorded in the consolidated balance sheet as of December 31, 2021:

| (MILLIONS) | |
|---|---|
| Period | Operating Lease Liabilities |
| Next one year[a] | $ **520** |
| 1-2 years | **417** |
| 2-3 years | **322** |
| 3-4 years | **279** |
| 4-5 years | **217** |
| Thereafter | **1,865** |
| Total undiscounted lease payments | **3,621** |
| Less: Imputed interest | **661** |
| Present value of minimum lease payments | **2,960** |
| Less: Current portion | **449** |
| Noncurrent portion | $ **2,510** |

[a] Reflects lease payments due within 12 months subsequent to the balance sheet date.

### Note 16. Contingencies and Certain Commitments

We and certain of our subsidiaries are subject to numerous contingencies arising in the ordinary course of business, including tax and legal contingencies. The following outlines our legal contingencies. For a discussion of our tax contingencies, see *Note 5B*.

*A. Legal Proceedings*

Our legal contingencies include, but are not limited to, the following:

- Patent litigation, which typically involves challenges to the coverage and/or validity of patents on various products, processes or dosage forms. An adverse outcome could result in loss of patent protection for a product, a significant loss of revenues from that product or impairment of the value of associated assets. We are the plaintiff in the majority of these actions.

- Product liability and other product-related litigation related to current or former products, which can include personal injury, consumer, off-label promotion, securities, antitrust and breach of contract claims, among others, and often involves highly complex issues relating to medical causation, label warnings and reliance on those warnings, scientific evidence and findings, actual, provable injury and other matters.

- Commercial and other asserted or unasserted matters, which can include acquisition-, licensing-, intellectual property-, collaboration- or co-promotion-related and product-pricing claims and environmental claims and proceedings, can involve complexities that will vary from matter to matter.

- Government investigations, which often are related to the extensive regulation of pharmaceutical companies by national, state and local government agencies in the U.S. and in other jurisdictions.

Certain of these contingencies could result in increased expenses and/or losses, including damages, royalty payments, fines and/or civil penalties, which could be substantial, and/or criminal charges.

We believe that our claims and defenses in matters in which we are a defendant are substantial, but litigation is inherently unpredictable and excessive verdicts do occur. We do not believe that any of these matters will have a material adverse effect on our financial position. However, we could incur judgments, enter into settlements or revise our expectations regarding the outcome of matters, which could have a material adverse effect on our results of operations and/or our cash flows in the period in which the amounts are accrued or paid.

We have accrued for losses that are both probable and reasonably estimable. Substantially all of our contingencies are subject to significant uncertainties and, therefore, determining the likelihood of a loss and/or the measurement of any loss can be complex. Consequently, we are unable to estimate the range of reasonably possible loss in excess of amounts accrued. Our assessments, which result from a complex series of judgments about future events and uncertainties, are based on estimates and assumptions that have been deemed reasonable by management, but that may prove to be incomplete or inaccurate, and unanticipated events and circumstances may occur that might cause us to change those estimates and assumptions.

# Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

Amounts recorded for legal and environmental contingencies can result from a complex series of judgments about future events and uncertainties and can rely heavily on estimates and assumptions. For proceedings under environmental laws to which a governmental authority is a party, we have adopted a disclosure threshold of $1 million in potential or actual governmental monetary sanctions.

The principal pending matters to which we are a party are discussed below. In determining whether a pending matter is a principal matter, we consider both quantitative and qualitative factors to assess materiality, such as, among others, the amount of damages and the nature of other relief sought, if specified; our view of the merits of the claims and of the strength of our defenses; whether the action purports to be, or is, a class action and, if not certified, our view of the likelihood that a class will be certified by the court; the jurisdiction in which the proceeding is pending; whether related actions have been transferred to multidistrict litigation; any experience that we or, to our knowledge, other companies have had in similar proceedings; whether disclosure of the action would be important to a reader of our financial statements, including whether disclosure might change a reader's judgment about our financial statements in light of all of the information that is available to the reader; the potential impact of the proceeding on our reputation; and the extent of public interest in the matter. In addition, with respect to patent matters in which we are the plaintiff, we consider, among other things, the financial significance of the product protected by the patent(s) at issue. Some of the matters discussed below include those which management believes that the likelihood of possible loss in excess of amounts accrued is remote.

*A1. Legal Proceedings—Patent Litigation*

We are involved in suits relating to our patents, including but not limited to, those discussed below. Most involve claims by generic drug manufacturers that patents covering our products (or those of our collaboration/licensing partners to which we have licenses or co-promotion rights and to which we may or may not be a party), processes or dosage forms are invalid and/or do not cover the product of the generic drug manufacturer. Also, counterclaims, as well as various independent actions, have been filed alleging that our assertions of, or attempts to enforce, patent rights with respect to certain products constitute unfair competition and/or violations of antitrust laws. In addition to the challenges to the U.S. patents that are discussed below, patent rights to certain of our products or those of our collaboration/licensing partners are being challenged in various other jurisdictions. For example, some of our collaboration or licensing partners face challenges to the validity of their patent rights in non-U.S. jurisdictions. We are also party to patent damages suits in various jurisdictions pursuant to which generic drug manufacturers, payers, governments or other parties are seeking damages from us for allegedly causing delay of generic entry.

We also are often involved in other proceedings, such as inter partes review, post-grant review, re-examination or opposition proceedings, before the U.S. Patent and Trademark Office, the European Patent Office, or other foreign counterparts relating to our intellectual property or the intellectual property rights of others. Also, if one of our patents is found to be invalid but such proceedings, generic or competitive products could be introduced into the market resulting in the erosion of sales of our existing products. For example, several of the patents in our pneumococcal vaccine portfolio were challenged in inter partes review and post-grant review proceedings in the U.S. In 2017, the Patent Trial and Appeal Board (PTAB) initiated proceedings with respect to two of our pneumococcal vaccine patents. However, the PTAB declined to initiate proceedings as to two other pneumococcal vaccine patents; those two patents, and one other patent, were challenged in federal court in Delaware. In September 2021, Pfizer and a challenger entered into a settlement and license agreement, resolving all worldwide legal proceedings involving that challenger, related to our pneumococcal vaccine patents. Other challenges to pneumococcal vaccine patents remain pending at the PTAB and outside the U.S. The invalidation of any of the patents in our pneumococcal portfolio could potentially allow additional competitor vaccines into the marketplace. In the event that any of the patents are found valid and infringed, a competitor's vaccine might be prohibited from entering the market or a competitor might be required to pay us a royalty.

We are also subject to patent litigation pursuant to which one or more third parties seek damages and/or injunctive relief to compensate for alleged infringement of its patents by our commercial or other activities. For example, our Hospira subsidiaries are involved in patent and patent-related disputes over their attempts to bring generic pharmaceutical and biosimilar products to market. If one of our marketed products is found to infringe valid patent rights of a third party, such third party may be awarded significant damages or royalty payments, or we may be prevented from further sales of that product. Such damages may be enhanced as much as three-fold if we or one of our subsidiaries is found to have willfully infringed valid patent rights of a third party.

## Actions In Which We Are The Plaintiff

### EpiPen
In 2010, King, which we acquired in 2011 and is a wholly-owned subsidiary, brought a patent-infringement action against Sandoz in the U.S. District Court for the District of New Jersey in connection with Sandoz's abbreviated new drug application (ANDA) filed with the FDA seeking approval to market an epinephrine injectable product. Sandoz is challenging patents, which expire in 2025, covering the next-generation autoinjector for use with epinephrine that is sold under the EpiPen brand name.

### Xeljanz (tofacitinib)
Beginning in 2017, we brought patent-infringement actions against several generic manufacturers that filed separate ANDAs with the FDA seeking approval to market their generic versions of tofacitinib tablets in one or both of 5 mg and 10 mg dosage strengths, and in both immediate and extended release forms. To date, we have settled actions with several manufacturers on terms not material to us. The remaining actions continue in the U.S. District Court for the District of Delaware as described below.

In January 2021, we brought a separate patent-infringement action against Aurobindo Pharma Limited (Aurobindo) asserting the infringement and validity of the patent covering the active ingredient expiring in December 2025 and the patent covering a polymorphic form of tofacitinib expiring in 2023, which Aurobindo challenged in its ANDA seeking approval to market a generic version of tofacitinib 5 mg and 10 mg tablets.

In October 2021, we brought a separate patent-infringement action against Sinotherapeutics Inc. (Sinotherapeutics) asserting the infringement and validity of our patent covering extended release formulations of tofacitinib that was challenged by Sinotherapeutics in its ANDA seeking approval to market a generic version of tofacitinib 11 mg extended release tablets.

In February 2022, we brought a separate patent-infringement action against Teva Pharmaceuticals USA, Inc. (Teva) asserting the infringement and validity of our patent covering extended release formulations of tofacitinib that was challenged by Teva in its ANDA seeking approval to market a generic version of tofacitinib 22 mg extended release tablets.

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

In February 2022, we brought a separate patent-infringement action against Slayback Pharma LLC (Slayback) asserting the infringement and validity of our compound patent covering the active ingredient that was challenged by Slayback in its ANDA seeking approval to market a generic version of tofacitinib oral solution 1 mg/mL.

**Inlyta (axitinib)**

In 2019, Glenmark Pharmaceuticals Ltd. (Glenmark) notified us that it had filed an ANDA with the FDA seeking approval to market a generic version of Inlyta. Glenmark asserts the invalidity and non-infringement of the crystalline form patent for Inlyta that expires in 2030. In 2019, we filed suit against Glenmark in the U.S. District Court for the District of Delaware, asserting the validity and infringement of the crystalline form patent for Inlyta.

**Ibrance (palbociclib)**

Beginning in September 2020, we received correspondence from several generic companies notifying us that they would seek approval to market generic versions of Ibrance capsules. The generic companies assert the invalidity and non-infringement of our crystalline form patent which expires in 2034. Beginning in October 2020, we brought patent infringement actions against each of these generic companies in various federal courts, asserting the validity and infringement of the crystalline form patent. We have settled with one of these generic companies on terms not material to the company.

Beginning in January 2021, several generic companies notified us that they had filed ANDAs with the FDA seeking approval to market generic versions of Ibrance tablets. The generic companies are challenging some or all of the following patents: (i) the composition of matter patent expiring in 2027; (ii) the composition of matter patent expiring in 2023; (iii) the method of use patent expiring in 2023; (iv) the crystalline form patent expiring in 2034; and (v) a tablet formulation patent expiring in 2036. We brought patent infringement actions against each of the generic filers in various federal courts, asserting the validity and infringement of the patents challenged by the generic companies.

**Eucrisa**

Beginning in September 2021, several generic companies notified us that they had filed ANDAs with the FDA seeking approval to market generic versions of Eucrisa. The companies assert the invalidity and non-infringement of a composition of matter patent expiring in 2026, two method of use patents expiring in 2027, and one other method of use patent expiring in 2030. In September 2021, we brought patent infringement actions against the generic filers in the U.S. District Court for the District of Delaware, asserting the validity and infringement of the patents challenged by the generic companies.

**Matter Involving Our Collaboration/Licensing Partners**

**Eliquis**

In 2017, twenty-five generic companies sent BMS Paragraph-IV certification letters informing BMS that they had filed ANDAs seeking approval of generic versions of Eliquis, challenging the validity and infringement of one or more of the three patents listed in the Orange Book for Eliquis. One of the patents expired in December 2019 and the remaining patents currently are set to expire in 2026 and 2031. Eliquis has been jointly developed and is being commercialized by BMS and Pfizer. BMS and Pfizer filed patent-infringement actions against all generic filers in the U.S. District Court for the District of Delaware and the U.S. District Court for the District of West Virginia, asserting that each of the generic companies' proposed products would infringe each of the patent(s) that each generic filer challenged. Some generic filers challenged only the 2031 patent, some challenged both the 2031 and 2026 patent, and one generic company challenged all three patents. In August 2020, the U.S. District Court for the District of Delaware ruled that both the 2026 patent and the 2031 patent are valid and infringed by the proposed generic products. In August and September 2020, the generic filers appealed the District Court's decision to the U.S. Court of Appeals for the Federal Circuit. Prior to the August 2020 ruling, we and BMS settled with certain of the companies on terms not material to us, and we and BMS may settle with other generic companies in the future. In September 2021, the U.S. Court of Appeals for the Federal Circuit affirmed the District Court's decision.

*A2. Legal Proceedings—Product Litigation*

We are defendants in numerous cases, including but not limited to those discussed below, related to our pharmaceutical and other products. Plaintiffs in these cases seek damages and other relief on various grounds for alleged personal injury and economic loss.

**Asbestos**

Between 1967 and 1982, Warner-Lambert owned American Optical Corporation (American Optical), which manufactured and sold respiratory protective devices and asbestos safety clothing. In connection with the sale of American Optical in 1982, Warner-Lambert agreed to indemnify the purchaser for certain liabilities, including certain asbestos-related and other claims. Warner-Lambert was acquired by Pfizer in 2000 and is a wholly owned subsidiary of Pfizer. Warner-Lambert is actively engaged in the defense of, and will continue to explore various means of resolving, these claims.

Numerous lawsuits against American Optical, Pfizer and certain of its previously owned subsidiaries are pending in various federal and state courts seeking damages for alleged personal injury from exposure to products allegedly containing asbestos and other allegedly hazardous materials sold by Pfizer and certain of its previously owned subsidiaries.

There also are a small number of lawsuits pending in various federal and state courts seeking damages for alleged exposure to asbestos in facilities owned or formerly owned by Pfizer or its subsidiaries.

**Effexor**

Beginning in 2011, actions, including purported class actions, were filed in various federal courts against Wyeth and, in certain of the actions, affiliates of Wyeth and certain other defendants relating to Effexor XR, which is the extended-release formulation of Effexor. The plaintiffs in each of the class actions seek to represent a class consisting of all persons in the U.S. and its territories who directly purchased, indirectly purchased or reimbursed patients for the purchase of Effexor XR or generic Effexor XR from any of the defendants from June 14, 2008 until the time the defendants' allegedly unlawful conduct ceased. The plaintiffs in all of the actions allege delay in the launch of generic Effexor XR in the U.S. and its territories, in violation of federal antitrust laws and, in certain of the actions, the antitrust, consumer protection and various other laws of certain states, as the result of Wyeth fraudulently obtaining and improperly listing certain patents for Effexor XR in the Orange Book, enforcing certain patents for Effexor XR and entering into a litigation settlement agreement with a generic drug manufacturer with respect to Effexor XR. Each of the plaintiffs seeks treble damages (for itself in the individual actions or on behalf of the putative class in the

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

purported class actions) for alleged price overcharges for Effexor XR or generic Effexor XR in the U.S. and its territories since June 14, 2008. All of these actions have been consolidated in the U.S. District Court for the District of New Jersey.

In 2014, the District Court dismissed the direct purchaser plaintiffs' claims based on the litigation settlement agreement, but declined to dismiss the other direct purchaser plaintiff claims. In 2015, the District Court entered partial final judgments as to all settlement agreement claims, including those asserted by direct purchasers and end-payer plaintiffs, which plaintiffs appealed to the U.S. Court of Appeals for the Third Circuit. In 2017, the U.S. Court of Appeals for the Third Circuit reversed the District Court's decisions and remanded the claims to the District Court.

### Lipitor
Beginning in 2011, purported class actions relating to Lipitor were filed in various federal courts against, among others, Pfizer, certain Pfizer affiliates, and, in most of the actions, Ranbaxy Laboratories Ltd. (Ranbaxy) and certain Ranbaxy affiliates. The plaintiffs in these various actions seek to represent nationwide, multi-state or statewide classes consisting of persons or entities who directly purchased, indirectly purchased or reimbursed patients for the purchase of Lipitor (or, in certain of the actions, generic Lipitor) from any of the defendants from March 2010 until the cessation of the defendants' allegedly unlawful conduct (the Class Period). The plaintiffs allege delay in the launch of generic Lipitor, in violation of federal antitrust laws and/or state antitrust, consumer protection and various other laws, resulting from (i) the 2008 agreement pursuant to which Pfizer and Ranbaxy settled certain patent litigation involving Lipitor and Pfizer granted Ranbaxy a license to sell a generic version of Lipitor in various markets beginning on varying dates, and (ii) in certain of the actions, the procurement and/or enforcement of certain patents for Lipitor. Each of the actions seeks, among other things, treble damages on behalf of the putative class for alleged price overcharges for Lipitor (or, in certain of the actions, generic Lipitor) during the Class Period. In addition, individual actions have been filed against Pfizer, Ranbaxy and certain of their affiliates, among others, that assert claims and seek relief for the plaintiffs that are substantially similar to the claims asserted and the relief sought in the purported class actions described above. These various actions have been consolidated for pre-trial proceedings in a Multi-District Litigation in the U.S. District Court for the District of New Jersey.

In September 2013 and 2014, the District Court dismissed with prejudice the claims of the direct purchasers. In October and November 2014, the District Court dismissed with prejudice the claims of all other Multi-District Litigation plaintiffs. All plaintiffs have appealed the District Court's orders dismissing their claims with prejudice to the U.S. Court of Appeals for the Third Circuit. In addition, the direct purchaser class plaintiffs appealed the order denying their motion to amend the judgment and for leave to amend their complaint to the Court of Appeals. In 2017, the Court of Appeals reversed the District Court's decisions and remanded the claims to the District Court.

Also, in 2013, the State of West Virginia filed an action in West Virginia state court against Pfizer and Ranbaxy, among others, that asserts claims and seeks relief on behalf of the State of West Virginia and residents of that state that are substantially similar to the claims asserted and the relief sought in the purported class actions described above.

### EpiPen (Direct Purchaser)
In February 2020, a lawsuit was filed in the U.S. District Court for the District of Kansas against Pfizer, its affiliates King and Meridian, and various Mylan entities, on behalf of a purported U.S. nationwide class of direct purchaser plaintiffs who purchased EpiPen devices directly from the defendants. Plaintiffs in this action generally allege that Pfizer and Mylan conspired to delay market entry of generic EpiPen through the settlement of patent litigation regarding EpiPen, and thereby delayed market entry of generic EpiPen in violation of federal antitrust law. Plaintiffs seek treble damages for alleged overcharges for EpiPen since 2011. In July 2021, the District Court granted defendants' motion to dismiss the direct purchaser complaint, without prejudice. In September 2021, plaintiffs filed an amended complaint.

### Nexium 24HR and Protonix
A number of individual and multi-plaintiff lawsuits have been filed against Pfizer, certain of its subsidiaries and/or other pharmaceutical manufacturers in various federal and state courts alleging that the plaintiffs developed kidney-related injuries purportedly as a result of the ingestion of certain proton pump inhibitors. The cases against Pfizer involve Protonix and/or Nexium 24HR and seek compensatory and punitive damages and, in some cases, treble damages, restitution or disgorgement. In 2017, the federal actions were ordered transferred for coordinated pre-trial proceedings to a Multi-District Litigation in the U.S. District Court for the District of New Jersey. As part of our Consumer Healthcare JV transaction with GSK, the JV has agreed to assume, and to indemnify Pfizer for, liabilities arising out of such litigation to the extent related to Nexium 24HR.

### Docetaxel
- *Personal Injury Action*

A number of lawsuits have been filed against Hospira and Pfizer in various federal and state courts alleging that plaintiffs who were treated with Docetaxel developed permanent hair loss. The significant majority of the cases also name other defendants, including the manufacturer of the branded product, Taxotere. Plaintiffs seek compensatory and punitive damages.

In 2016, the federal cases were transferred for coordinated pre-trial proceedings to a Multi-District Litigation in the U.S. District Court for the Eastern District of Louisiana.

- *Mississippi Attorney General Government Action*

In 2018, the Attorney General of Mississippi filed a complaint in Mississippi state court against the manufacturer of the branded product and eight other manufacturers including Pfizer and Hospira, alleging, with respect to Pfizer and Hospira, a failure to warn about a risk of permanent hair loss in violation of the Mississippi Consumer Protection Act. The action seeks civil penalties and injunctive relief.

### Zantac
A number of lawsuits have been filed against Pfizer in various federal and state courts alleging that plaintiffs developed various types of cancer, or face an increased risk of developing cancer, purportedly as a result of the ingestion of Zantac. The significant majority of these cases also name other defendants that have historically manufactured and/or sold Zantac. Pfizer has not sold Zantac since 2006, and only sold an OTC version of the product. Plaintiffs seek compensatory and punitive damages.

In February 2020, the federal actions were transferred for coordinated pre-trial proceedings to a Multi-District Litigation in the U.S. District Court for the Southern District of Florida. Plaintiffs in the Multi-District Litigation have filed against Pfizer and many other defendants a master personal injury complaint, a consolidated consumer class action complaint alleging, among other things, claims under consumer protection

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

statutes of all 50 states, and a medical monitoring complaint seeking to certify medical monitoring classes under the laws of 13 states. Plaintiffs previously had filed a consolidated third-party payor class action complaint alleging violation of the federal Racketeer Influenced and Corrupt Organizations Act (RICO) statute and seeking reimbursement for payments made for the prescription version of Zantac, but the Multi-District Litigation court dismissed that complaint; Plaintiffs have appealed the dismissal to the U.S. Court of Appeals for the Eleventh Circuit. In addition, (i) Pfizer has received service of Canadian class action complaints naming Pfizer and other defendants, and seeking compensatory and punitive damages for personal injury and economic loss, allegedly arising from the defendants' sale of Zantac in Canada; and (ii) the State of New Mexico and the Mayor and City Council of Baltimore separately filed civil actions against Pfizer and many other defendants in state court, alleging various state statutory and common law claims in connection with the defendants' alleged sale of Zantac in those jurisdictions. In April 2021, a Judicial Council Coordinated Proceeding was created in the Superior Court of California in Alameda County to coordinate personal injury actions against Pfizer and other defendants filed in California state court.

**Chantix**

Beginning in August 2021, a number of putative class actions have been filed against Pfizer in various U.S. federal courts following Pfizer's voluntary recall of Chantix due to the presence of a nitrosamine, N-nitroso-varenicline. Plaintiffs assert that they suffered economic harm purportedly as a result of purchasing Chantix or generic varenicline medicines sold by Pfizer. Plaintiffs seek to represent nationwide and state-specific classes and seek various remedies, including damages and medical monitoring. Similar putative class actions have been filed in Canada and Israel, where the product brand is Champix.

*A3. Legal Proceedings—Commercial and Other Matters*

**Monsanto-Related Matters**

In 1997, Monsanto Company (Former Monsanto) contributed certain chemical manufacturing operations and facilities to a newly formed corporation, Solutia Inc. (Solutia), and spun off the shares of Solutia. In 2000, Former Monsanto merged with Pharmacia & Upjohn Company to form Pharmacia. Pharmacia then transferred its agricultural operations to a newly created subsidiary, named Monsanto Company (New Monsanto), which it spun off in a two-stage process that was completed in 2002. Pharmacia was acquired by Pfizer in 2003 and is a wholly owned subsidiary of Pfizer.

In connection with its spin-off that was completed in 2002, New Monsanto assumed, and agreed to indemnify Pharmacia for, any liabilities related to Pharmacia's former agricultural business. New Monsanto has defended and/or is defending Pharmacia in connection with various claims and litigation arising out of, or related to, the agricultural business, and has been indemnifying Pharmacia when liability has been imposed or settlement has been reached regarding such claims and litigation.

In connection with its spin-off in 1997, Solutia assumed, and agreed to indemnify Pharmacia for, liabilities related to Former Monsanto's chemical businesses. As the result of its reorganization under Chapter 11 of the U.S. Bankruptcy Code, Solutia's indemnification obligations relating to Former Monsanto's chemical businesses are primarily limited to sites that Solutia has owned or operated. In addition, in connection with its spin-off that was completed in 2002, New Monsanto assumed, and agreed to indemnify Pharmacia for, any liabilities primarily related to Former Monsanto's chemical businesses, including, but not limited to, any such liabilities that Solutia assumed. Solutia's and New Monsanto's assumption of, and agreement to indemnify Pharmacia for, these liabilities apply to pending actions and any future actions related to Former Monsanto's chemical businesses in which Pharmacia is named as a defendant, including, without limitation, actions asserting environmental claims, including alleged exposure to polychlorinated biphenyls. Solutia and/or New Monsanto are defending Pharmacia in connection with various claims and litigation arising out of, or related to, Former Monsanto's chemical businesses, and have been indemnifying Pharmacia when liability has been imposed or settlement has been reached regarding such claims and litigation.

**Environmental Matters**

In 2009, we submitted a revised site-wide feasibility study with regard to the Wyeth Holdings Corporation (formerly, American Cyanamid Company) discontinued industrial chemical facility in Bound Brook, New Jersey. In 2011, Wyeth Holdings Corporation executed an Administrative Settlement Agreement and Order on Consent for Removal Action (the 2011 Administrative Settlement Agreement) with the U.S. Environmental Protection Agency (EPA) with regard to the Bound Brook facility. In accordance with the 2011 Administrative Settlement Agreement, we completed construction of an interim remedy. In 2012, the EPA issued a final remediation plan for the Bound Brook facility's main plant area. In 2013, Wyeth Holdings Corporation (now Wyeth Holdings LLC) entered into an Administrative Settlement Agreement and Order on Consent with the EPA to allow us to undertake detailed engineering design of the remedy for the main plant area and to perform a focused feasibility study for two adjacent lagoons. In 2015, the U.S., on behalf of the EPA, filed a complaint and consent decree with the federal District Court for the District of New Jersey that allows Wyeth Holdings LLC to complete the design and to implement the remedy for the main plant area. The consent decree (which supersedes the 2011 Administrative Settlement Agreement) was entered by the District Court in 2015. In 2018, the EPA issued a final remediation plan for the two adjacent lagoons. In 2019, Wyeth Holdings LLC entered into an Administrative Settlement Agreement and Order on Consent with the EPA to allow us to undertake detailed engineering design of the remedy for the lagoons. In September 2021, the U.S., on behalf of the EPA, filed a complaint and consent decree with the federal District Court for the District of New Jersey, which the court approved in November 2021, that will allow Wyeth Holdings LLC to complete the design and implement the remedy for the two adjacent lagoons.

We have accrued for the estimated costs of the site remedies for the Bound Brook facility.

We are a party to a number of other proceedings brought under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, and other state, local or foreign laws in which the primary relief sought is the cost of past and/or future remediation.

**Contracts with Iraqi Ministry of Health**

In 2017, a number of U.S. service members, civilians, and their families brought a complaint in the U.S. District Court for the District of Columbia against a number of pharmaceutical and medical devices companies, including Pfizer and certain of its subsidiaries, alleging that the defendants violated the U.S. Anti-Terrorism Act. The complaint alleges that the defendants provided funding for terrorist organizations through their sales practices pursuant to pharmaceutical and medical device contracts with the Iraqi Ministry of Health, and seeks monetary relief. In July 2020, the District Court granted defendants' motions to dismiss and dismissed all of plaintiffs' claims. In January 2022, the Court of Appeals reversed the District Court's decision. In February 2022, the defendants filed for en banc review of the Court of Appeals' decision.

## Notes to Consolidated Financial Statements
Pfizer Inc. and Subsidiary Companies

**Allergan Complaint for Indemnity**

In 2019, Pfizer was named as a defendant in a complaint, along with King, filed by Allergan Finance LLC (Allergan) in the Supreme Court of the State of New York, asserting claims for indemnity related to Kadian, which was owned for a short period by King in 2008, prior to Pfizer's acquisition of King in 2010. This suit was voluntarily discontinued without prejudice in January 2021.

**Breach of Contract—Xalkori/Lorbrena**

We are a defendant in a breach of contract action brought by New York University (NYU) in the Supreme Court of the State of New York (Supreme Court). NYU alleges that it is entitled to royalties on Pfizer's sales of Xalkori under the terms of a Research and License Agreement between NYU and Sugen, Inc. Sugen, Inc. was acquired by Pharmacia in August 1999, and Pharmacia was acquired by Pfizer in 2003 and is a wholly owned subsidiary of Pfizer. The action was originally filed in 2013. In 2015, the Supreme Court dismissed the action and, in 2017, the New York State Appellate Division reversed the decision and remanded the proceedings to the Supreme Court. In January 2020, the Supreme Court denied both parties' summary judgment motions.

In October 2020, NYU filed a separate breach of contract action against Pfizer alleging that it is entitled to royalties on sales of Lorbrena under the terms of the same NYU-Sugen, Inc. Research and Licensing Agreement. In February 2022, the parties reached an agreement to settle both breach of contract actions on terms not material to Pfizer.

**Viatris Securities Litigation**

In October 2021, a putative class action was filed in the Court of Common Pleas of Allegheny County, Pennsylvania on behalf of former Mylan N.V. shareholders who received Viatris common stock in exchange for Mylan shares in connection with the spin-off of the Upjohn Business and its combination with Mylan (the Transactions). Viatris, Pfizer, and certain of each company's current and former officers, directors and employees are named as defendants. The complaint alleges that the defendants violated certain provisions of the Securities Act of 1933 in connection with certain disclosures made in or omitted from the registration statement and related prospectus issued in connection with the Transactions. Plaintiff seeks damages, costs and expenses and other equitable and injunctive relief.

*A4. Legal Proceedings—Government Investigations*

We are subject to extensive regulation by government agencies in the U.S., other developed markets and multiple emerging markets in which we operate. Criminal charges, substantial fines and/or civil penalties, limitations on our ability to conduct business in applicable jurisdictions, corporate integrity or deferred prosecution agreements, as well as reputational harm and increased public interest in the matter could result from government investigations in the U.S. and other jurisdictions in which we do business. In addition, in a qui tam lawsuit in which the government declines to intervene, the relator may still pursue a suit for the recovery of civil damages and penalties on behalf of the government. Among the investigations by government agencies are the matters discussed below.

**Greenstone Investigations**

• *U.S. Department of Justice Antitrust Division Investigation*

Since July 2017, the U.S. Department of Justice's Antitrust Division has been investigating our former Greenstone generics business. We believe this is related to an ongoing broader antitrust investigation of the generic pharmaceutical industry. We have produced records relating to this investigation.

• *State Attorneys General and Multi-District Generics Antitrust Litigation*

In April 2018, Greenstone received requests for information from the Antitrust Department of the Connecticut Office of the Attorney General. In May 2019, Attorneys General of more than 40 states plus the District of Columbia and Puerto Rico filed a complaint against a number of pharmaceutical companies, including Greenstone and Pfizer. The matter has been consolidated with a Multi-District Litigation in the Eastern District of Pennsylvania. As to Greenstone and Pfizer, the complaint alleges anticompetitive conduct in violation of federal and state antitrust laws and state consumer protection laws. In June 2020, the State Attorneys General filed a new complaint against a large number of companies, including Greenstone and Pfizer, making similar allegations, but concerning a new set of drugs. This complaint was transferred to the Multi-District Litigation in July 2020. The Multi-District Litigation also includes civil complaints filed by private plaintiffs and state counties against Pfizer, Greenstone and a significant number of other defendants asserting allegations that generally overlap with those asserted by the State Attorneys General.

**Subpoena relating to Manufacturing of Quillivant XR**

In October 2018, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York (SDNY) seeking records relating to our relationship with another drug manufacturer and its production and manufacturing of drugs including, but not limited to, Quillivant XR. We have produced records pursuant to the subpoena.

**Government Inquiries relating to Meridian Medical Technologies**

In February 2019, we received a civil investigative demand from the U.S. Attorney's Office for the SDNY. The civil investigative demand seeks records and information related to alleged quality issues involving the manufacture of auto-injectors at the Meridian site. In August 2019, we received a HIPAA subpoena from the U.S. Attorney's Office for the Eastern District of Missouri seeking similar records and information. We are producing records in response to these requests.

**U.S. Department of Justice/SEC Inquiry relating to Russian Operations**

In June 2019, we received an informal request from the U.S. Department of Justice's FCPA Unit seeking documents relating to our operations in Russia. In September 2019, we received a similar request from the SEC's FCPA Unit. We have produced records pursuant to these requests.

**Docetaxel—Mississippi Attorney General Government Investigation**

See *Legal Proceedings—Product Litigation—Docetaxel—Mississippi Attorney General Government Investigation* above for information regarding a government investigation related to Docetaxel marketing practices.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

**U.S. Department of Justice Inquiries relating to India Operations**

In March 2020, we received an informal request from the U.S. Department of Justice's Consumer Protection Branch seeking documents relating to our manufacturing operations in India, including at our former facility located at Irrungattukottai in India. In April 2020, we received a similar request from the U.S. Attorney's Office for the SDNY regarding a civil investigation concerning operations at our facilities in India. We are producing records pursuant to these requests.

**U.S. Department of Justice/SEC Inquiry relating to China Operations**

In June 2020, we received an informal request from the U.S. Department of Justice's FCPA Unit seeking documents relating to our operations in China. In August 2020, we received a similar request from the SEC's FCPA Unit. We are producing records pursuant to these requests.

**Zantac—State of New Mexico and Mayor and City Council of Baltimore Civil Actions**

See *Legal Proceedings—Product Litigation—Zantac* above for information regarding civil actions separately filed by the State of New Mexico and the Mayor and City Council of Baltimore alleging various state statutory and common law claims in connection with the defendants' alleged sale of Zantac in those jurisdictions.

*A5. Legal Proceedings—Matters Resolved During 2021*

During 2021, certain matters, including the matter discussed below, were resolved or became the subject of definitive settlement agreements or settlement agreements-in-principle.

**EpiPen**
Beginning in 2017, purported class actions were filed in various federal courts by indirect purchasers of EpiPen against Pfizer, and/or its current and former affiliates King and Meridian, and/or various entities affiliated with Mylan, and Mylan former Chief Executive Officer, Heather Bresch. The plaintiffs in these actions represent U.S. nationwide classes comprising persons or entities who paid for any portion of the end-user purchase price of an EpiPen between 2009 until the cessation of the defendants' allegedly unlawful conduct. Against Pfizer and/or its affiliates, plaintiffs in these actions generally allege that Pfizer's and/or its affiliates' settlement of patent litigation regarding EpiPen delayed market entry of generic EpiPen in violation of federal and various state antitrust laws. At least one lawsuit also alleges that Pfizer and/or Mylan violated RICO. Plaintiffs also filed various federal antitrust, state consumer protection and unjust enrichment claims against, and relating to conduct attributable solely to, Mylan and/or its affiliates regarding EpiPen. Plaintiffs seek treble damages for alleged overcharges for EpiPen since 2011. In 2017, all of these indirect purchase actions were consolidated for coordinated pre-trial proceedings in a Multi-District Litigation in the U.S. District Court for the District of Kansas with other EpiPen-related actions against Mylan and/or its affiliates to which Pfizer, King and Meridian are not parties. In July 2021, Pfizer and plaintiffs filed a stipulation of settlement to resolve the Multi-District Litigation for $345 million. The District Court approved the settlement in November 2021, and the payment was made in accordance with the terms of the settlement agreement.

*B. Guarantees and Indemnifications*

In the ordinary course of business and in connection with the sale of assets and businesses and other transactions, we often indemnify our counterparties against certain liabilities that may arise in connection with the transaction or that are related to events and activities prior to or following a transaction. If the indemnified party were to make a successful claim pursuant to the terms of the indemnification, we may be required to reimburse the loss. These indemnifications are generally subject to various restrictions and limitations. Historically, we have not paid significant amounts under these provisions and, as of December 31, 2021, the estimated fair value of these indemnification obligations has been included in our financial statements and is not material to Pfizer.

In addition, in connection with our entry into certain agreements and other transactions, our counterparties may agree to indemnify us. For example, in November 2020, we and Mylan completed the transaction to spin-off our Upjohn Business and combine it with Mylan to form Viatris. As part of the transaction and as previously disclosed, Viatris has agreed to assume, and to indemnify Pfizer for, liabilities arising out of certain matters.

We have also guaranteed the long-term debt of certain companies that we acquired and that now are subsidiaries of Pfizer. See *Note 7D.*

*C. Certain Commitments*

As of December 31, 2021, we had commitments totaling $5.2 billion that are legally binding and enforceable. These commitments include payments relating to potential milestone payments deemed reasonably likely to occur, and purchase obligations for goods and services.

See *Note 5A* for information on the TCJA repatriation tax liability.

*D. Contingent Consideration for Acquisitions*

We may be required to make payments to sellers for certain prior business combinations that are contingent upon future events or outcomes. See *Note 1E.* The estimated fair value of contingent consideration as of December 31, 2021 is $697 million, of which $135 million is recorded in *Other current liabilities* and $563 million in *Other noncurrent liabilities,* and as of December 31, 2020 is $689 million, of which $123 million is recorded in *Other current liabilities* and $566 million in *Other noncurrent liabilities.* The increase in the contingent consideration balance from December 31, 2020 is primarily due to fair value adjustments, partially offset by payments made upon the achievement of certain sales-based milestones.

*E. Insurance*

Our insurance coverage reflects market conditions (including cost and availability) existing at the time it is written, and our decision to obtain insurance coverage or to self-insure varies accordingly. Depending upon the cost and availability of insurance and the nature of the risk involved, the amount of self-insurance may be significant. The cost and availability of coverage have resulted in self-insuring certain exposures, including product liability. If we incur substantial liabilities that are not covered by insurance or substantially exceed insurance

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

coverage and that are in excess of existing accruals, there could be a material adverse effect on our cash flows or results of operations in the period in which the amounts are paid and/or accrued.

**Note 17. Segment, Geographic and Other Revenue Information**

*A. Segment Information*

We regularly review our operating segments and the approach used by management to evaluate performance and allocate resources. With the formation of the Consumer Healthcare JV in 2019 and the completion of the spin-off of our Upjohn Business in the fourth quarter of 2020, Pfizer transformed into a more focused, global leader in science-based innovative medicines and vaccines and beginning in the fourth quarter of 2020 operated as a single operating segment engaged in the discovery, development, manufacturing, marketing, sale and distribution of biopharmaceutical products worldwide. At the beginning of our fiscal fourth quarter of 2021, we reorganized our commercial operations and began to manage our commercial operations through a new global structure consisting of two operating segments, each led by a single manager: Biopharma, our innovative science-based biopharmaceutical business and PC1, our global contract development and manufacturing organization and a leading supplier of specialty active pharmaceutical ingredients. Biopharma is a science-based medicines business that includes six therapeutic areas – Oncology, Inflammation & Immunology, Rare Disease, Hospital, Vaccines and Internal Medicine. The Hospital therapeutic area commercializes our global portfolio of sterile injectable and anti-infective medicines.

Each operating segment has responsibility for its commercial activities. Regional commercial organizations market, distribute and sell our products and are supported by global platform functions that are responsible for the research, development, manufacturing and supply of our products and global corporate enabling functions. Biopharma receives its R&D services from GPD and WRDM. These services include IPR&D projects for new investigational products and additional indications for in-line products. Each business has a geographic footprint across developed and emerging markets. Our chief operating decision maker uses the revenues and earnings of the operating segments, among other factors, for performance evaluation and resource allocation. Biopharma is the only reportable segment. We have revised prior-period information (Revenues and Earnings, as defined by management) to conform to the current management structure.

Other Costs and Business Activities

Certain pre-tax costs are not allocated to our operating segment results, such as costs associated with the following:

- WRDM—the R&D and Medical expenses managed by our WRDM organization, which is generally responsible for research projects for our Biopharma portfolio until proof-of-concept is achieved and then for transitioning those projects to the GPD organization for possible clinical and commercial development. R&D spending may include upfront and milestone payments for intellectual property rights. The WRDM organization also has responsibility for certain science-based and other platform-services organizations, which provide end-to-end technical expertise and other services to the various R&D projects, as well as the Worldwide Medical and Safety group, which ensures that Pfizer provides all stakeholders—including patients, healthcare providers, pharmacists, payers and health authorities—with complete and up-to-date information on the risks and benefits associated with Pfizer products so that they can make appropriate decisions on how and when to use Pfizer's medicines.

- GPD—the costs associated with our GPD organization, which is generally responsible for clinical trials from WRDM in the Biopharma portfolio, including late-stage portfolio spend. GPD also provides technical support and other services to Pfizer R&D projects. GPD is responsible for facilitating all regulatory submissions and interactions with regulatory agencies.

- Corporate and Other Unallocated—the costs associated with (i) corporate enabling functions (such as digital, global real estate operations, legal, finance, human resources, worldwide public affairs, compliance and worldwide procurement, among others), all strategy, business development, portfolio management and valuation capabilities, patient advocacy activities and certain compensation and other corporate costs, such as interest income and expense, and gains and losses on investments; (ii) overhead expenses primarily associated with our manufacturing (which include manufacturing variances associated with production) operations that are not directly assessed to an operating segment, as business unit (segment) management does not manage these costs; and (iii) our share of earnings from the Consumer Healthcare JV.

- Certain transactions and events such as (i) purchase accounting adjustments, where we incur expenses associated with the amortization of fair value adjustments to inventory, intangible assets and PP&E; (ii) acquisition-related items, where we incur costs for executing the transaction, integrating the acquired operations and restructuring the combined company; and (iii) certain significant items, representing substantive and/or unusual, and in some cases recurring, items (such as pension and postretirement actuarial remeasurement gains and losses, gains on the completion of joint venture transactions, restructuring charges, legal charges or net gains or losses on investments in equity securities) that are evaluated on an individual basis by management and that, either as a result of their nature or size, would not be expected to occur as part of our normal business on a regular basis. Such items can include, but are not limited to, non-acquisition-related restructuring costs, as well as costs incurred for legal settlements, asset impairments and disposals of assets or businesses, including, as applicable, any associated transition activities.

The operating results of PC1, our global contract development and manufacturing organization, and through July 31, 2019 our former Consumer Healthcare business are included in Other business activities.

Segment Assets

We manage our assets on a total company basis, not by operating segment, as our operating assets are shared or commingled. Therefore, our chief operating decision maker does not regularly review any asset information by operating segment and, accordingly, we do not report asset information by operating segment. Total assets were $181 billion as of December 31, 2021 and $154 billion as of December 31, 2020.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

Selected Income Statement Information

The following table provides selected income statement information by reportable segment:

| | Revenues | | | Earnings[a] | | | Depreciation and Amortization[b] | | |
|---|---|---|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | | Year Ended December 31, | | |
| (MILLIONS OF DOLLARS) | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 | **2021** | 2020 | 2019 |
| Reportable Segment: | | | | | | | | | |
| Biopharma | $ **79,557** | $ 40,724 | $ 38,013 | $ **40,226** | $ 27,089 | $ 24,419 | $ **1,439** | $ 1,013 | $ 978 |
| Other business activities[c] | **1,731** | 926 | 2,892 | **(10,396)** | (12,308) | (11,216) | **598** | 603 | 592 |
| Reconciling Items: | | | | | | | | | |
| Purchase accounting adjustments | **—** | — | — | **(3,175)** | (3,117) | (4,153) | **3,067** | 3,047 | 4,145 |
| Acquisition-related costs | **—** | — | — | **(52)** | (44) | (185) | **—** | — | 3 |
| Certain significant items[d] | **—** | — | — | **(2,292)** | (4,584) | 2,456 | **87** | 18 | 37 |
| | $ **81,288** | $ 41,651 | $ 40,905 | $ **24,311** | $ 7,036 | $ 11,321 | $ **5,191** | $ 4,681 | $ 5,755 |

(a) *Income from continuing operations before provision/(benefit) for taxes on income.* Biopharma's earnings include dividend income from our investment in ViiV of $166 million in 2021, $278 million in 2020 and $220 million in 2019.

(b) Certain production facilities are shared. Depreciation is allocated based on estimates of physical production. Amounts here relate solely to the depreciation and amortization associated with continuing operations.

(c) Other business activities include revenues and costs associated with PC1, as well as costs associated with global WRDM and GPD platform functions, global corporate enabling functions and other corporate items, as noted above, that we do not allocate to our operating segments. In 2019, Other business activities also include revenues and costs associated with our former Consumer Healthcare business through July 31, 2019. See *Note 2C.*

(d) Certain significant items are substantive and/or unusual, and in some cases recurring, items (as noted above) that, either as a result of their nature or size, would not be expected to occur as part of our normal business on a regular basis. For Earnings in 2021, includes, among other items: (i) a $2.1 billion charge for IPR&D related to our acquisition of Trillium, which was accounted for as an asset acquisition and recorded in *Research and development expenses,* (ii) restructuring charges/(credits) and implementation costs and additional depreciation—asset restructuring of $1.3 billion ($450 million recorded in *Selling, informational and administrative expenses* and the remaining amount primarily recorded in *Restructuring charges and certain acquisition-related costs*) and (iii) upfront and milestone payments on collaborative and licensing arrangements of $1.1 billion recorded in *Research and development expenses,* partially offset by (iv) actuarial valuation and other pension and postretirement plan gains of $1.6 billion recorded in *Other (income)/deductions—net* and (v) gains on equity securities of $1.3 billion recorded in *Other (income)/deductions—net.* For Earnings in 2020, includes, among other items; (i) charges of $1.7 billion related to certain asset impairments recorded in *Other (income)/deductions—net,* (ii) actuarial valuation and other pension and postretirement plan losses of $1.1 billion recorded in *Other (income)/deductions—net* and (iii) restructuring charges/(credits) and implementation costs and additional depreciation—asset restructuring of $791 million ($197 million recorded in *Selling, informational and administrative expenses* and the remaining amount primarily recorded in *Restructuring charges and certain acquisition-related costs*). For Earnings in 2019, includes, among other items: (i) a pre-tax gain of $8.1 billion recorded in *(Gain) on completion of Consumer Healthcare JV transaction* associated with the completion of the Consumer Healthcare JV transaction, partially offset by (ii) charges of $2.8 billion related to certain asset impairments recorded in *Other (income)/deductions—net* and (iii) actuarial valuation and other pension and postretirement plan losses of $750 million recorded in *Other (income)/deductions—net.* For additional information, see *Notes 2A, 2C, 3* and *4.*

*B. Geographic Information*

The following summarizes revenues by geographic area:

| | Year Ended December 31, | | |
|---|---|---|---|
| (MILLIONS) | **2021** | 2020 | 2019 |
| United States | $ **29,746** | $ 21,455 | $ 20,326 |
| Developed Europe | **18,336** | 7,788 | 7,729 |
| Developed Rest of World | **12,506** | 4,036 | 4,022 |
| Emerging Markets | **20,701** | 8,372 | 8,828 |
| *Revenues* | $ **81,288** | $ 41,651 | $ 40,905 |

Revenues exceeded $500 million in each of 21, 8 and 10 countries outside the U.S. in 2021, 2020 and 2019, respectively. The U.S. is the only country to contribute more than 10% of total revenue in 2021, 2020 and 2019. As a percentage of revenues, our largest national market outside the U.S. was Japan, which contributed 9% of total revenue in 2021 and 6% in each of 2020 and 2019.

We and our collaboration partner, BioNTech, have entered into agreements to supply pre-specified doses of Comirnaty with multiple developed and emerging nations around the world and are continuing to deliver doses of Comirnaty under such agreements. We currently sell the Comirnaty vaccine directly to government and government sponsored customers. This includes supply agreements entered into in November 2020 and February and May 2021 with the EC on behalf of the different EU member states and certain other countries. Each EU member state submits its own Comirnaty vaccine order to us and is responsible for payment pursuant to terms of the supply agreements negotiated by the EC.

*C. Other Revenue Information*

Significant Customers

Our prescription pharmaceutical products are sold principally to wholesalers, but we also sell directly to retailers, hospitals, clinics, government agencies and pharmacies. In the U.S., we primarily sell our vaccine products directly to the federal government, CDC, wholesalers, individual provider offices, retail pharmacies and integrated delivery networks. Outside the U.S., we primarily sell our vaccines to government and non-government institutions.

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

The following summarizes revenue, as a percentage of total revenues, for our three largest U.S. wholesaler customers:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | 2020 | 2019 |
| McKesson, Inc. | **9 %** | 16 % | 15 % |
| AmerisourceBergen Corporation | **7 %** | 14 % | 11 % |
| Cardinal Health, Inc. | **5 %** | 10 % | 9 % |

Collectively, our three largest U.S. wholesaler customers represented 24%, 30% and 25% of total trade accounts receivable as of December 31, 2021, 2020 and 2019.

Additionally, revenues from the U.S. government represented 13% of total revenues for 2021, and primarily represent sales of Comirnaty. Accounts receivable from the U.S. government represented 12% of total trade accounts receivable as of December 31, 2021, and primarily relate to sales of Comirnaty.

Significant Product Revenues

The following provides detailed revenue information for several of our major products:

(MILLIONS)

| PRODUCT | PRIMARY INDICATION OR CLASS | | 2021 | | 2020 | | 2019 |
|---|---|---|---|---|---|---|---|
| **TOTAL REVENUES**[a] | | $ | **81,288** | $ | 41,651 | $ | 40,905 |
| **PFIZER BIOPHARMACEUTICALS GROUP (BIOPHARMA)**[a], [b] | | $ | **79,557** | $ | 40,724 | $ | 38,013 |
| **Vaccines** | | $ | **42,625** | $ | 6,575 | $ | 6,504 |
| | Active immunization to prevent COVID-19 | | | | | | |
| Comirnaty direct sales and alliance revenues | | | **36,781** | | 154 | | — |
| Prevnar family[c] | Pneumococcal disease | | **5,272** | | 5,850 | | 5,847 |
| Nimenrix | Meningococcal ACWY disease | | **193** | | 221 | | 230 |
| FSME-IMMUN/TicoVac | Tick-borne encephalitis disease | | **185** | | 196 | | 220 |
| Trumenba | Meningococcal B disease | | **118** | | 112 | | 135 |
| All other Vaccines | Various | | **74** | | 42 | | 73 |
| **Oncology** | | $ | **12,333** | $ | 10,867 | $ | 9,014 |
| Ibrance | HR-positive/HER2-negative metastatic breast cancer | | **5,437** | | 5,392 | | 4,961 |
| Xtandi alliance revenues | mCRPC, nmCRPC, mCSPC | | **1,185** | | 1,024 | | 838 |
| Inlyta | Advanced RCC | | **1,002** | | 787 | | 477 |
| Sutent | Advanced and/or metastatic RCC, adjuvant RCC, refractory GIST (after disease progression on, or intolerance to, imatinib mesylate) and advanced pancreatic neuroendocrine tumor | | **673** | | 819 | | 936 |
| Bosulif | Philadelphia chromosome–positive chronic myelogenous leukemia | | **540** | | 450 | | 365 |
| Xalkori | ALK-positive and ROS1-positive advanced NSCLC | | **493** | | 544 | | 530 |
| Ruxience[d] | Non-hodgkin's lymphoma, chronic lymphocytic leukemia, granulomatosis with polyangiitis (Wegener's Granulomatosis) and microscopic polyangiitis | | **491** | | 170 | | (1) |
| Retacrit[d] | Anemia | | **444** | | 386 | | 225 |
| Zirabev[d] | Treatment of mCRC; unresectable, locally advanced, recurrent or metastatic NSCLC; recurrent glioblastoma; metastatic RCC; and persistent, recurrent or metastatic cervical cancer | | **444** | | 143 | | 1 |
| Lorbrena | ALK-positive metastatic NSCLC | | **266** | | 204 | | 115 |
| Aromasin | Post-menopausal early and advanced breast cancer | | **211** | | 148 | | 136 |
| Trazimera[d] | HER-positive breast cancer and metastatic stomach cancers | | **197** | | 98 | | 6 |
| Besponsa | Relapsed or refractory B-cell acute lymphoblastic leukemia | | **192** | | 182 | | 157 |
| Braftovi | In combination with Mektovi for metastatic melanoma in patients with a BRAF[V600E/K] mutation and, in combination with Erbitux® (cetuximab), for the treatment of BRAF[V600E]-mutant mCRC after prior therapy | | **187** | | 160 | | 48 |
| Bavencio alliance revenues | Locally advanced or metastatic urothelial carcinoma; metastatic Merkel cell carcinoma; immunotherapy and tyrosine kinase inhibitor combination for patients with advanced RCC | | **178** | | 80 | | 49 |
| Mektovi | In combination with Braftovi for metastatic melanoma in patients with a BRAF[V600E/K] mutation | | **155** | | 142 | | 49 |
| All other Oncology | Various | | **238** | | 137 | | 122 |
| **Internal Medicine** | | $ | **9,329** | $ | 9,003 | $ | 8,790 |
| Eliquis alliance revenues and direct sales | Nonvalvular atrial fibrillation, deep vein thrombosis, pulmonary embolism | | **5,970** | | 4,949 | | 4,220 |
| Premarin family | Symptoms of menopause | | **563** | | 680 | | 734 |
| Chantix/Champix | An aid to smoking cessation treatment in adults 18 years of age or older | | **398** | | 919 | | 1,107 |
| BMP2 | Development of bone and cartilage | | **266** | | 274 | | 287 |
| Toviaz | Overactive bladder | | **238** | | 252 | | 250 |
| Pristiq | Depression | | **187** | | 171 | | 176 |
| All other Internal Medicine | Various | | **1,706** | | 1,758 | | 2,016 |

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

| (MILLIONS) | | Year Ended December 31, | | |
|---|---|---|---|---|
| PRODUCT | PRIMARY INDICATION OR CLASS | 2021 | 2020 | 2019 |
| **Hospital**[a] | | $ **7,301** | $ 6,777 | $ 6,695 |
| Sulperazon | Bacterial infections | **683** | 618 | 684 |
| Medrol | Anti-inflammatory glucocorticoid | **432** | 402 | 469 |
| Zavicefta | Bacterial infections | **413** | 212 | 108 |
| Fragmin | Treatment/prevention of venous thromboembolism | **305** | 252 | 253 |
| Zithromax | Bacterial infections | **278** | 276 | 336 |
| Vfend | Fungal infections | **267** | 270 | 346 |
| Tygacil | Bacterial infections | **200** | 160 | 197 |
| Precedex | Sedation agent in surgery or intensive care | **177** | 260 | 155 |
| Zyvox | Bacterial infections | **173** | 222 | 251 |
| Paxlovid | COVID-19 Infection (high risk population) | **76** | — | — |
| IVIg Products[e] | Various | **430** | 376 | 275 |
| All other Anti-infectives | Various | **1,453** | 1,294 | 1,396 |
| All other Hospital | Various | **2,412** | 2,435 | 2,225 |
| **Inflammation & Immunology (I&I)** | | $ **4,431** | $ 4,567 | $ 4,733 |
| Xeljanz | RA, PsA, UC, active polyarticular course juvenile idiopathic arthritis, ankylosing spondylitis | **2,455** | 2,437 | 2,242 |
| Enbrel (Outside the U.S. and Canada) | RA, juvenile idiopathic arthritis, PsA, plaque psoriasis, pediatric plaque psoriasis, ankylosing spondylitis and nonradiographic axial spondyloarthritis | **1,185** | 1,350 | 1,699 |
| Inflectra/Remsima[d] | Crohn's disease, pediatric Crohn's disease, UC, pediatric UC, RA in combination with methotrexate, ankylosing spondylitis, PsA and plaque psoriasis | **657** | 659 | 625 |
| All other I&I | Various | **134** | 121 | 167 |
| **Rare Disease** | | $ **3,538** | $ 2,936 | $ 2,278 |
| Vyndaqel/Vyndamax | ATTR-cardiomyopathy and polyneuropathy | **2,015** | 1,288 | 473 |
| BeneFIX | Hemophilia B | **438** | 454 | 488 |
| Genotropin | Replacement of human growth hormone | **389** | 427 | 498 |
| Refacto AF/Xyntha | Hemophilia A | **304** | 370 | 426 |
| Somavert | Acromegaly | **277** | 277 | 264 |
| All other Rare Disease | Various | **115** | 120 | 129 |
| **PFIZER CENTREONE**[b] | | $ **1,731** | $ 926 | $ 810 |
| **CONSUMER HEALTHCARE BUSINESS**[f] | | $ **—** | $ — | $ 2,082 |
| **Total Alliance revenues** | | $ **7,652** | 5,418 | 4,648 |
| **Total Biosimilars**[d] | | $ **2,343** | 1,527 | 911 |
| **Total Sterile Injectable Pharmaceuticals**[g] | | $ **5,746** | 5,315 | 5,013 |

[a] On December 31, 2021, we completed the sale of our Meridian subsidiary. Prior to its sale, Meridian was managed as part of the Hospital therapeutic area. On November 16, 2020, we completed the spin-off and the combination of our Upjohn Business with Mylan to form Viatris. On December 21, 2020, Pfizer and Viatris completed the termination of the Mylan-Japan collaboration. Beginning in the fourth quarter of 2021, the financial results of Meridian are reflected as discontinued operations for all periods presented. Beginning in the fourth quarter of 2020, the financial results of the Upjohn Business and Mylan-Japan collaboration were reflected as discontinued operations for all periods presented. Prior-period financial information has been restated, as appropriate. See *Note 1A.*

[b] At the beginning of our fiscal fourth quarter of 2021, we reorganized our commercial operations and began to manage our commercial operations through a new global structure consisting of two operating segments, each led by a single manager: Biopharma, our innovative science-based biopharmaceutical business and PC1. PC1, which previously had been managed within the Hospital therapeutic area, includes revenues from our contract manufacturing, including certain Comirnaty-related manufacturing activities performed on behalf of BioNTech ($320 million for 2021 and $0 million for 2020 and 2019), and active pharmaceutical ingredient sales operation, as well as revenues related to our manufacturing and supply agreements with former legacy Pfizer businesses/partnerships, including but not limited to, transitional manufacturing and supply arrangements with Viatris following the spin-off of the Upjohn Business. We have revised prior period information to conform to the current management structure.

[c] Prevnar family include revenues from Prevnar 13/Prevenar 13 (pediatric and adult) and Prevnar 20 (adult).

[d] Biosimilars are highly similar versions of approved and authorized biological medicines and primarily include revenues from Inflectra/Remsima, Ruxience, Retacrit, Zirabev and Trazimera.

[e] Intravenous immunoglobulin (IVIg) products include the revenues from Panzyga, Octagam and Cutaquig.

[f] On July 31, 2019, our Consumer Healthcare business, an OTC medicines business, was combined with GSK's consumer healthcare business to form a new consumer healthcare JV. See *Note 2C.*

[g] Total Sterile Injectable Pharmaceuticals represents the total of all branded and generic injectable products in the Hospital therapeutic area, including anti-infective sterile injectable pharmaceuticals.

Remaining Performance Obligations

Contracted revenue expected to be recognized from remaining performance obligations for firm orders in long-term contracts to supply Comirnaty to our customers totals $34.4 billion as of December 31, 2021, which includes amounts received in advance and deferred and amounts that will be invoiced as we deliver the product to our customers in future periods. Of this amount, we expect to recognize revenue of

**Notes to Consolidated Financial Statements**
Pfizer Inc. and Subsidiary Companies

$22.3 billion in 2022, $11.8 billion in 2023 and $265 million in 2024. Remaining performance obligations exclude arrangements with an original expected contract duration of less than one year.

<u>Deferred Revenues</u>

Our deferred revenues primarily relate to advance payments received or receivable in connection with contracts that we entered into during 2021 and 2020 with various government or government sponsored customers in international markets for supply of Comirnaty. The deferred revenues associated with the advance payments related to Comirnaty total $3.3 billion as of December 31, 2021 and $957 million as of December 31, 2020, with $3.0 billion and $249 million recorded in current liabilities and noncurrent liabilities, respectively as of December 31, 2021, and $957 million recorded in current liabilities as of December 31, 2020. The increase in the Comirnaty deferred revenues during 2021 was the result of additional advance payments received as we entered into new or amended contracts or as we invoiced customers in advance of vaccine deliveries less amounts recognized in *Revenues* as we delivered doses to our customers. During 2021, we recognized in revenue substantially all of the balance of Comirnaty deferred revenues as of December 31, 2020. The Comirnaty deferred revenues as of December 31, 2021 will be recognized in *Revenues* proportionately as we deliver doses of the vaccine to our customers and satisfy our performance obligation under the contracts, with the amounts included in current liabilities expected to be recognized in *Revenues* within the next 12 months, and the amounts included in noncurrent liabilities expected to be recognized in *Revenues* in 2023 and in the first quarter of 2024. Deferred revenues associated with contracts for other products were not significant as of December 31, 2021 or 2020.

## Selected Quarterly Financial Data (Unaudited)

Pfizer Inc. and Subsidiary Companies

| (MILLIONS, EXCEPT PER COMMON SHARE DATA) | | Quarter | | |
| --- | --- | --- | --- | --- |
| | First | Second | Third | Fourth |
| **2021**[a] | | | | |
| Revenues | $ 14,516 | $ 18,899 | $ 24,035 | $ 23,838 |
| Costs and expenses[b] | 8,802 | 11,951 | 15,546 | 19,876 |
| Restructuring charges and certain acquisition-related costs[c] | 22 | (1) | 646 | 135 |
| Income/(loss) from continuing operations before provision/(benefit) for taxes on income/(loss) | 5,692 | 6,949 | 7,843 | 3,827 |
| Provision/(benefit) for taxes on income/(loss)[d] | 808 | 1,123 | (328) | 249 |
| Income/(loss) from continuing operations | 4,885 | 5,825 | 8,171 | 3,578 |
| Discontinued operations—net of tax[e] | 1 | (236) | (13) | (187) |
| Net income/(loss) before allocation to noncontrolling interests | 4,886 | 5,589 | 8,159 | 3,391 |
| Less: Net income attributable to noncontrolling interests | 9 | 26 | 12 | (2) |
| Net income/(loss) attributable to Pfizer Inc. common shareholders | $ 4,877 | $ 5,563 | $ 8,146 | $ 3,393 |
| Earnings/(loss) per common share—basic: | | | | |
| Income/(loss) from continuing operations attributable to Pfizer Inc. common shareholders | $ 0.87 | $ 1.04 | $ 1.45 | $ 0.64 |
| Discontinued operations—net of tax | — | (0.04) | — | (0.03) |
| Net income/(loss) attributable to Pfizer Inc. common shareholders | $ 0.87 | $ 0.99 | $ 1.45 | $ 0.60 |
| Earnings/(loss) per common share—diluted: | | | | |
| Income/(loss) from continuing operations attributable to Pfizer Inc. common shareholders | $ 0.86 | $ 1.02 | $ 1.43 | $ 0.62 |
| Discontinued operations—net of tax | — | (0.04) | — | (0.03) |
| Net income/(loss) attributable to Pfizer Inc. common shareholders | $ 0.86 | $ 0.98 | $ 1.42 | $ 0.59 |

[a] Business development activities impacted our results of operations in 2021. See *Note 1A*.

[b] The fourth quarter historically reflects higher costs in *Cost of sales, Selling, informational and administrative expenses* and *Research and development expenses. Cost of sales* for all quarters reflects higher costs for Comirnaty. The fourth quarter includes a $2.1 billion charge for IPR&D expense associated with the acquisition of Trillium, as well as other upfront and milestone payments on collaboration and licensing arrangements. See *Notes 2A, D* and *E*.

[c] The third and fourth quarters of 2021 primarily include employee termination costs associated with our Transforming to a More Focused Company program. See *Note 3*.

[d] All periods reflect a change in the jurisdictional mix of earnings primarily related to Comirnaty. The third quarter of 2021 reflects benefits resulting from certain initiatives executed in the third quarter of 2021 associated with our investment in the Consumer Healthcare JV with GSK. See *Note 5A*.

[e] All periods include the operating results of Meridian prior to its sale on December 31, 2021 and to a lesser extent post-closing adjustments directly related to prior discontinued businesses. The second quarter of 2021 includes a pre-tax charge of $345 million to resolve a legal matter related to Meridian and the fourth quarter of 2021 includes an after tax loss of $167 million related to the sale of Meridian. See *Note 2B*.

Basic and diluted EPS are computed independently for each of the periods presented. Accordingly, the sum of the quarterly EPS amounts may not agree to the total for the year.

## Selected Quarterly Financial Data (Unaudited)

Pfizer Inc. and Subsidiary Companies

| | | Quarter | | |
|---|---|---|---|---|
| (MILLIONS, EXCEPT PER COMMON SHARE DATA) | First | Second | Third | Fourth |
| 2020[a] | | | | |
| Revenues | $ 10,007 | $ 9,795 | $ 10,215 | $ 11,634 |
| Costs and expenses[b] | 7,100 | 6,389 | 9,635 | 10,917 |
| Restructuring charges and certain acquisition-related costs | 54 | 360 | 2 | 163 |
| (Gain) on completion of Consumer Healthcare JV transaction | (6) | — | — | — |
| Income/(loss) from continuing operations before provision/(benefit) for taxes on income/(loss) | 2,859 | 3,046 | 577 | 554 |
| Provision/(benefit) for taxes on income/(loss) | 358 | 425 | (334) | (80) |
| Income/(loss) from continuing operations | 2,501 | 2,621 | 911 | 634 |
| Discontinued operations—net of tax[c] | 863 | 876 | 566 | 224 |
| Net income/(loss) before allocation to noncontrolling interests | 3,364 | 3,497 | 1,477 | 857 |
| Less: Net income attributable to noncontrolling interests | 9 | 8 | 8 | 11 |
| Net income/(loss) attributable to Pfizer Inc. common shareholders | $ 3,355 | $ 3,489 | $ 1,469 | $ 847 |
| Earnings/(loss) per common share—basic: | | | | |
| Income/(loss) from continuing operations attributable to Pfizer Inc. common shareholders | $ 0.45 | $ 0.47 | $ 0.16 | $ 0.11 |
| Discontinued operations—net of tax | 0.16 | 0.16 | 0.10 | 0.04 |
| Net income/(loss) attributable to Pfizer Inc. common shareholders | $ 0.60 | $ 0.63 | $ 0.26 | $ 0.15 |
| Earnings/(loss) per common share—diluted: | | | | |
| Income/(loss) from continuing operations attributable to Pfizer Inc. common shareholders | $ 0.44 | $ 0.47 | $ 0.16 | $ 0.11 |
| Discontinued operations—net of tax | 0.15 | 0.16 | 0.10 | 0.04 |
| Net income/(loss) attributable to Pfizer Inc. common shareholders | $ 0.60 | $ 0.62 | $ 0.26 | $ 0.15 |

[a] Business development activities impacted our results of operations in 2020. See *Note 1A*.
[b] The first quarter historically reflects higher costs in *Cost of sales, Selling, informational and administrative expenses* and *Research and development expenses*. Certain asset impairments totaled $900 million in the third quarter of 2020 and $791 million in the fourth quarter of 2020 recorded in *Other (income)/deductions—net*. See *Note 4*.
[c] Operating results of the Upjohn Business through November 16, 2020, the date of the spin-off and combination with Mylan, the Mylan-Japan collaboration and Meridian are presented as discontinued operations in all periods presented. See *Note 2B*.

Basic and diluted EPS are computed independently for each of the periods presented. Accordingly, the sum of the quarterly EPS amounts may not agree to the total for the year.

## ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A.    CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

As of the end of the period covered by this Form 10-K, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures are effective in alerting them in a timely manner to material information required to be disclosed in our periodic reports filed with the SEC.

### Changes in Internal Controls

During our most recent fiscal quarter, there has not been any change in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

**Report of Independent Registered Public Accounting Firm**

**To the Board of Directors and Shareholders**
**Pfizer Inc.:**

*Opinion on Internal Control Over Financial Reporting*

We have audited Pfizer Inc. and Subsidiary Companies' (the Company) internal control over financial reporting as of December 31, 2021, based on criteria established in *Internal Control—Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2021 and 2020, the related consolidated statements of income, comprehensive income, equity, and cash flows for each of the years in the three-year period ended December 31, 2021, and the related notes (collectively, the consolidated financial statements), and our report dated February 24, 2022 expressed an unqualified opinion on those consolidated financial statements.

*Basis for Opinion*

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

*Definition and Limitations of Internal Control Over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.



New York, New York
*February 24, 2022*

**Management's Report on Internal Control Over Financial Reporting**

### Management's Report

We prepared and are responsible for the financial statements that appear in this Form 10-K. These financial statements are in conformity with accounting principles generally accepted in the United States of America and, therefore, include amounts based on informed judgments and estimates. We also accept responsibility for the preparation of other financial information that is included in this document.

### Report on Internal Control Over Financial Reporting

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States of America. The Company's internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate. Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2021. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control—Integrated Framework (2013)*. Based on our assessment and those criteria, management believes that the Company maintained effective internal control over financial reporting as of December 31, 2021.

The Company's independent auditors have issued their auditors' report on the Company's internal control over financial reporting. That report appears above in this Form 10-K.

**Albert Bourla**
Chairman and Chief Executive Officer

**Frank D'Amelio**
Principal Financial Officer

**Jennifer B. Damico**
Principal Accounting Officer

*February 24, 2022*

## PART III

**ITEM 10.**         **DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

Information about our Directors is incorporated by reference from the discussion under the heading *Item 1—Election of Directors* in our Proxy Statement. Information about the Pfizer Policies on Business Conduct governing our employees, including our Chief Executive Officer, Chief Financial Officer and Principal Accounting Officer, and the Code of Business Conduct and Ethics for Members of the Board of Directors, is incorporated by reference from the discussions under the headings *Governance—Pfizer Policies on Business Conduct* and *—Code of Conduct for Directors* in our Proxy Statement. Information regarding the procedures by which our shareholders may recommend nominees to our Board of Directors is incorporated by reference from the discussion under the headings *Item 1—Election of Directors—Criteria for Board Membership* and *Annual Meeting Information—Submitting Proxy Proposals and Director Nominations for the 2023 Annual Meeting* in our Proxy Statement. Information about our Audit Committee, including the members of the Committee, and our Audit Committee financial experts, is incorporated by reference from the discussion under the heading *Governance—Board and Committee Information—Board Committees—The Audit Committee* in our Proxy Statement. The balance of the information required by this item is contained in the discussion entitled *Information about Our Executive Officers* in this Form 10-K.

**ITEM 11.**         **EXECUTIVE COMPENSATION**

Information about Director and executive compensation is incorporated by reference from the discussion under the headings *Non-Employee Director Compensation*; *Executive Compensation*; and *Governance—Board and Committee Information—Board Committees—The Compensation Committee—Compensation Committee Interlocks and Insider Participation* in our Proxy Statement.

**ITEM 12.**         **SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

Information required by this item is incorporated by reference from the discussion under the headings *Executive Compensation—Compensation Tables—Equity Compensation Plan Information* and *Securities Ownership* in our Proxy Statement.

**ITEM 13.**         **CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

Information about certain relationships and transactions with related parties is incorporated by reference from the discussion under the headings *Governance—Other Governance Practices and Policies—Related Person Transactions and Indemnification* and *—Transactions with Related Persons* in our Proxy Statement. Information about director independence is incorporated by reference from the discussion under the heading *Item 1—Election of Directors—Director Independence* in our Proxy Statement.

**ITEM 14.**         **PRINCIPAL ACCOUNTING FEES AND SERVICES**

Our independent registered public accounting firm is KPMG LLP, New York, NY, Auditor Firm ID: 185. Information about the fees for professional services rendered by our independent registered public accounting firm in 2021 and 2020 is incorporated by reference from the discussion under the heading *Item 2—Ratification of Selection of Independent Registered Public Accounting Firm—Audit and Non-Audit Fees* in our Proxy Statement. Our Audit Committee's policy on pre-approval of audit and permissible non-audit services of our independent registered public accounting firm is incorporated by reference from the discussion under the heading *Item 2—Ratification of Selection of Independent Registered Public Accounting Firm—Policy on Audit Committee Pre-Approval of Audit and Permissible Non-Audit Services* in our Proxy Statement.

## PART IV

**ITEM 15.            EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

**15(a)(1) Financial Statements.** The following consolidated financial statements, related notes, report of independent registered public accounting firm and supplementary data are set forth in *Item 8. Financial Statements and Supplementary Data* in this Form 10-K:

- Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements
- Consolidated Statements of Income
- Consolidated Statements of Comprehensive Income
- Consolidated Balance Sheets
- Consolidated Statements of Equity
- Consolidated Statements of Cash Flows
- Notes to Consolidated Financial Statements
- Selected Quarterly Financial Data (Unaudited)

**15(a)(2) Financial Statement Schedules.** Schedules are omitted because they are not required or because the information is provided elsewhere in the financial statements. The financial statements of unconsolidated subsidiaries are omitted because, considered in the aggregate, they would not constitute a significant subsidiary.

**15(a)(3) Exhibits.** These exhibits are available upon request. Requests should be directed to our Corporate Secretary, Pfizer Inc., 235 East 42nd Street, New York, New York 10017. The exhibit numbers preceded by an asterisk (*) indicate exhibits filed with this Form 10-K. All other exhibit numbers indicate exhibits filed by incorporation by reference. Exhibit numbers 10.1 through 10.44 are management contracts or compensatory plans or arrangements.

| | |
|---|---|
| 2.1 | Stock and Asset Purchase Agreement, dated December 19, 2018, by and among us, GlaxoSmithKline plc and GlaxoSmithKline Consumer Healthcare Holdings Limited is incorporated by reference from our 2018 Annual Report on Form 10-K. (Pursuant to Item 601(b)(2) of Regulation S-K, the registrant hereby agrees to supplementally furnish to the SEC upon request any omitted schedule or exhibit to the Stock and Asset Purchase Agreement.) |
| 2.2 | Business Combination Agreement, dated as of July 29, 2019, by and among us, Upjohn Inc., Utah Acquisition Sub Inc., Mylan N.V., Mylan I B.V. and Mylan II B.V. is incorporated by reference from our Current Report on Form 8-K filed on July 29, 2019. (Pursuant to Item 601(b)(2) of Regulation S-K, the registrant hereby agrees to supplementally furnish to the SEC upon request any omitted schedule or exhibit to the Business Combination Agreement.) |
| 2.3 | Amendment No. 1 to the Business Combination Agreement, dated as of May 29, 2020, by and among us, Upjohn Inc., Utah Acquisition Sub Inc., Mylan N.V., Mylan I B.V. and Mylan II B.V. is incorporated by reference from our Current Report on Form 8-K filed on June 1, 2020. (Pursuant to Item 601(b)(2) of Regulation S-K, the registrant hereby agrees to supplementally furnish to the SEC upon request any omitted schedule or exhibit to the Amendment No. 1 to the Business Combination Agreement.) |
| 2.4 | Separation and Distribution Agreement, dated as of July 29, 2019, by and between us and Upjohn Inc. is incorporated by reference from our Current Report on Form 8-K filed on July 29, 2019. (Pursuant to Item 601(b)(2) of Regulation S-K, the registrant hereby agrees to supplementally furnish to the SEC upon request any omitted schedule or exhibit to the Separation and Distribution Agreement.) |
| 2.5 | Amendment No. 1 to the Separation and Distribution Agreement, dated as of February 18, 2020, by and between us and Upjohn Inc. is incorporated by reference from our 2019 Annual Report on Form 10-K. (Pursuant to Item 601(b)(2) of Regulation S-K, the registrant hereby agrees to supplementally furnish to the SEC upon request any omitted schedule or exhibit to the Amendment No. 1 to the Separation and Distribution Agreement.) |
| 2.6 | Amendment No. 2 to the Separation and Distribution Agreement, dated as of May 29, 2020, by and between us and Upjohn Inc. is incorporated by reference from our Current Report on Form 8-K filed on June 1, 2020. (Pursuant to Item 601(b)(2) of Regulation S-K, the registrant hereby agrees to supplementally furnish to the SEC upon request any omitted schedule or exhibit to the Amendment No. 2 to the Separation and Distribution Agreement.) |
| 2.7 | Amendment No. 3 to the Separation and Distribution Agreement, dated as of September 18, 2020, by and between us and Upjohn Inc. is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended September 27, 2020. (Pursuant to Item 601(b)(2) of Regulation S-K, the registrant hereby agrees to supplementally furnish to the SEC upon request any omitted schedule or exhibit to the Amendment No. 3 to the Separation and Distribution Agreement.) |
| 2.8 | Amendment No. 4 to the Separation and Distribution Agreement, dated as of November 15, 2020, by and between us and Upjohn Inc. is incorporated by reference from our 2020 Annual Report on Form 10-K. (Pursuant to Item 601(b)(2) of Regulation S-K, the registrant hereby agrees to supplementally furnish to the SEC upon request any omitted schedule or exhibit to the Amendment No. 4 to the Separation and Distribution Agreement.) |
| 3.1 | Our Restated Certificate of Incorporation dated December 14, 2020, is incorporated by reference from our Current Report on Form 8-K filed on December 14, 2020. |
| 3.2 | Our By-laws, as amended December 18, 2017, are incorporated by reference from our Current Report on Form 8-K filed on December 21, 2017. |
| 4.1 | Indenture, dated as of January 30, 2001, between us and The Chase Manhattan Bank, is incorporated by reference from our Current Report on Form 8-K filed on January 30, 2001. |



4.2    First Supplemental Indenture, dated as of March 24, 2009, between us and The Bank of New York Mellon (successor to JPMorgan Chase Bank, N.A. (formerly JPMorgan Chase Bank, formerly The Chase Manhattan Bank)), as trustee, to Indenture dated as of January 30, 2001, is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended June 28, 2009.

4.3    Second Supplemental Indenture, dated as of June 2, 2009, between us and The Bank of New York Mellon (successor to JPMorgan Chase Bank, N.A. (formerly JPMorgan Chase Bank, formerly The Chase Manhattan Bank)), as trustee, to Indenture dated as of January 30, 2001, is incorporated by reference from our Current Report on Form 8-K filed on June 3, 2009.

4.4    Third Supplemental Indenture, dated as of June 3, 2013, between us and The Bank of New York Mellon (successor to JPMorgan Chase Bank, N.A. (formerly JPMorgan Chase Bank, formerly The Chase Manhattan Bank)), as trustee, to Indenture dated as of January 30, 2001, is incorporated by reference from our Current Report on Form 8-K filed on June 3, 2013.

4.5    Fourth Supplemental Indenture, dated as of May 15, 2014, between us and The Bank of New York Mellon (successor to JPMorgan Chase Bank, N.A. (formerly JPMorgan Chase Bank, formerly The Chase Manhattan Bank)), as trustee, to Indenture dated as of January 30, 2001, is incorporated by reference from our Current Report on Form 8-K report filed on May 15, 2014.

4.6    Fifth Supplemental Indenture, dated as of October 5, 2015, between us and The Bank of New York Mellon (successor to JPMorgan Chase Bank, N.A. (formerly JPMorgan Chase Bank, formerly The Chase Manhattan Bank)), as trustee, to Indenture dated as of January 30, 2001, is incorporated by reference from our Current Report on Form 8-K report filed on October 6, 2015.

4.7    Sixth Supplemental Indenture, dated as of June 3, 2016, between us and The Bank of New York Mellon (formerly The Bank of New York (successor to JPMorgan Chase Bank, N.A. (formerly JPMorgan Chase Bank, formerly The Chase Manhattan Bank (National Association)))), as trustee, to Indenture dated as of January 30, 2001, is incorporated by reference from our Current Report on Form 8-K report filed on June 3, 2016.

4.8    Seventh Supplemental Indenture, dated as of November 21, 2016, between us and The Bank of New York Mellon (formerly The Bank of New York (successor to JPMorgan Chase Bank, N.A. (formerly JPMorgan Chase Bank, formerly The Chase Manhattan Bank (National Association)))), as trustee, to Indenture dated as of January 30, 2001, is incorporated by reference from our Current Report on Form 8-K report filed on November 21, 2016.

4.9    Eighth Supplemental Indenture, dated as of March 17, 2017, among us, The Bank of New York Mellon (formerly The Bank of New York (successor to JPMorgan Chase Bank, N.A. (formerly JPMorgan Chase Bank, formerly The Chase Manhattan Bank (successor to the Chase Manhattan Bank (National Association)))), as trustee, and The Bank of New York Mellon, London Branch, as paying agent, to Indenture dated as of January 30, 2001, is incorporated by reference from our Current Report on Form 8-K report filed on March 17, 2017.

4.10    Ninth Supplemental Indenture, dated as of March 6, 2017, among us, The Bank of New York Mellon (formerly The Bank of New York (successor to JPMorgan Chase Bank, N.A. (formerly JPMorgan Chase Bank, formerly The Chase Manhattan Bank (National Association)))), as trustee, and The Bank of New York Mellon, London Branch, as paying agent and calculation agent, to Indenture dated as of January 30, 2001, is incorporated by reference from our Current Report on Form 8-K report filed on March 6, 2017.

4.11    Tenth Supplemental Indenture, dated as of December 19, 2017, among us, The Bank of New York Mellon (formerly The Bank of New York (successor to JPMorgan Chase Bank, N.A. (formerly JPMorgan Chase Bank, formerly The Chase Manhattan Bank (National Association)))), as trustee, and The Bank of New York Mellon, London Branch, as paying agent, to Indenture dated as of January 30, 2001, is incorporated by reference from our Current Report on Form 8-K report filed on December 19, 2017.

4.12    Indenture, dated as of April 10, 1992, between Wyeth (formerly American Home Products Corporation) and The Bank of New York Mellon (as successor to JPMorgan Chase Bank, N.A.), as trustee, is incorporated by reference from Wyeth's Registration Statement on Form S-3, filed on January 18, 1995.

4.13    Supplemental Indenture, dated as of October 13, 1992, between Wyeth and The Bank of New York Mellon (as successor to JPMorgan Chase Bank, N.A.), as trustee, is incorporated by reference from Wyeth's Registration Statement on Form S-3, filed on January 18, 1995.

4.14    Fifth Supplemental Indenture, dated as of December 16, 2003, between Wyeth and The Bank of New York Mellon (as successor to JPMorgan Chase Bank, N.A.), as trustee, is incorporated by reference from Wyeth's 2003 Annual Report on Form 10-K.

4.15    Sixth Supplemental Indenture, dated as of November 14, 2005, between Wyeth and The Bank of New York Mellon (as successor to JPMorgan Chase Bank, N.A.), as trustee, is incorporated by reference from Wyeth's Current Report on Form 8-K filed on November 15, 2005.

4.16    Seventh Supplemental Indenture, dated as of March 27, 2007, between Wyeth and The Bank of New York Mellon (as successor to JPMorgan Chase Bank, N.A.), as trustee, is incorporated by reference from Wyeth's Current Report on Form 8-K filed on March 28, 2007.

4.17    Eighth Supplemental Indenture, dated as of October 30, 2009, between Wyeth, us and The Bank of New York Mellon (as successor to JPMorgan Chase Bank, formerly The Chase Manhattan Bank), as trustee, to Indenture dated as of April 10, 1992 (as amended on October 13, 1992), is incorporated by reference from our Current Report on Form 8-K filed on November 3, 2009.

4.18    Indenture, dated as of September 7, 2018, between us and The Bank of New York Mellon, as trustee, is incorporated by reference from our Current Report on Form 8-K filed on September 7, 2018.

4.19    First Supplemental Indenture, dated as of September 7, 2018, between us and The Bank of New York Mellon, as trustee, is incorporated by reference from our Current Report on Form 8-K filed on September 7, 2018.

4.20    Second Supplemental Indenture, dated as of March 11, 2019, between us and The Bank of New York Mellon, as trustee, is incorporated by reference from our Current Report on Form 8-K filed on March 11, 2019.

4.21    Third Supplemental Indenture, dated as of March 27, 2020, between us and The Bank of New York Mellon, as trustee, is incorporated by reference from our Current Report on Form 8-K filed on March 27, 2020.

| 4.22 | Fourth Supplemental Indenture, dated as of May 28, 2020, between us and The Bank of New York Mellon, as trustee, is incorporated by reference from our Current Report on Form 8-K filed on May 28, 2020. |
| 4.23 | Fifth Supplemental Indenture, dated as of August 18, 2021 between us and The Bank of New York Mellon, as trustee, is incorporated by reference from our Current Report on Form 8-K filed on August 18, 2021. |
| *4.24 | Description of Pfizer's Securities. |
| 4.25 | Except as set forth in Exhibits 4.1-24 above, the instruments defining the rights of holders of long-term debt securities of the Company and its subsidiaries have been omitted. We agree to furnish to the SEC, upon request, a copy of each instrument with respect to issuances of long-term debt of the Company and its subsidiaries. |
| 10.1 | 2001 Stock and Incentive Plan is incorporated by reference from our Proxy Statement for the 2001 Annual Meeting of Shareholders. |
| 10.2 | Pfizer Inc. 2004 Stock Plan, as Amended and Restated is incorporated by reference from our 2011 Annual Report on Form 10-K. |
| 10.3 | Amendment No. 1 to Pfizer 2004 Stock Plan is incorporated by reference from our 2020 Annual Report on Form 10-K. |
| 10.4 | Pfizer Inc. 2014 Stock Plan is incorporated by reference from our Proxy Statement for the 2014 Annual Meeting of Shareholders. |
| 10.5 | Amendment No. 1 to Pfizer Inc. 2014 Stock Plan is incorporated by reference from our 2020 Annual Report on Form 10-K. |
| 10.6 | Form of Acknowledgment and Consent and Summary of Key Terms for Grants of RSUs, TSRUs, PPSs and PSAs is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended March 29, 2020. |
| 10.7 | Form of Executive Grant Letter is incorporated by reference from our 2015 Annual Report on Form 10-K. |
| 10.8 | Pfizer Consolidated Supplemental Pension Plan for United States and Puerto Rico Employees is incorporated by reference from our 2017 Annual Report on Form 10-K. |
| 10.9 | Amendment No. 1 to the Pfizer Consolidated Supplemental Pension Plan for United States and Puerto Rico Employees is incorporated by reference from our 2018 Annual Report on Form 10-K. |
| 10.10 | Amendment No. 2 to the Pfizer Consolidated Supplemental Pension Plan for United States and Puerto Rico Employees is incorporated by reference from our 2020 Annual Report on Form 10-K. |
| 10.11 | Pfizer Supplemental Savings Plan is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended April 3, 2016. |
| 10.12 | Amendment No. 1 to the Pfizer Supplemental Savings Plan (Amended and Restated as of January 1, 2016), is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended October 1, 2017. |
| 10.13 | Amendment No. 2 to the Pfizer Supplemental Savings Plan is incorporated by reference from our 2017 Annual Report on Form 10-K. |
| 10.14 | Amendment No. 3 to the Pfizer Supplemental Savings Plan is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended September 30, 2018. |
| 10.15 | Amendment No. 4 to the Pfizer Supplemental Savings Plan is incorporated by reference from our 2018 Annual Report on Form 10-K. |
| 10.16 | Amendment No. 5 to the Pfizer Supplemental Savings Plan is incorporated by reference from our 2018 Annual Report on Form 10-K. |
| 10.17 | Amendment No. 6 to the Pfizer Supplemental Savings Plan is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended June 30, 2019. |
| 10.18 | Amendment No. 7 to the Pfizer Supplemental Savings Plan is incorporated by reference from our 2019 Annual Report on Form 10-K. |
| 10.19 | Amendment No. 8 to the Pfizer Supplemental Savings Plan is incorporated by reference from our 2020 Annual Report on Form 10-K. |
| 10.20 | Amendment No. 9 to the Pfizer Supplemental Savings Plan is incorporated by reference from our 2020 Annual Report on Form 10-K. |
| 10.21 | Amended and Restated Pfizer Inc. Global Performance Plan is incorporated by reference from our 2020 Annual Report on Form 10-K. |
| 10.22 | Amended and Restated Deferred Compensation Plan is incorporated by reference from our 2012 Annual Report on Form 10-K. |
| 10.23 | Amendment to Amended and Restated Deferred Compensation Plan, dated June 20, 2013, is incorporated by reference from our 2013 Annual Report on Form 10-K. |
| 10.24 | Amendment No. 2 to Amended and Restated Deferred Compensation Plan, dated April 27, 2016, is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended July 3, 2016. |
| 10.25 | Amendment No. 3 to Amended and Restated Deferred Compensation Plan is incorporated by reference from our 2020 Annual Report on Form 10-K. |
| 10.26 | Wyeth 2005 (409A) Deferred Compensation Plan (frozen as of January 2012), together with certain Amendments, is incorporated by reference from our 2013 Annual Report on Form 10-K. |
| 10.27 | Amendment No. 2 to Wyeth 2005 (409A) Deferred Compensation Plan is incorporated by reference from our 2020 Annual Report on Form 10-K. |
| 10.28 | Amended and Restated Wyeth Supplemental Employee Savings Plan (effective as of January 1, 2005 and frozen as of January 2012), together with all material Amendments is incorporated by reference from our 2011 Annual Report on Form 10-K. |
| 10.29 | Amendment to Amended and Restated Wyeth Supplemental Employee Savings Plan, dated June 20, 2013, is incorporated by reference from our 2013 Annual Report on Form 10-K. |
| 10.30 | The form of Indemnification Agreement with each of our non-employee Directors is incorporated by reference from our 1996 Annual Report on Form 10-K. |

| | |
|---|---|
| 10.31 | The form of Indemnification Agreement with each of the Named Executive Officers identified in our Proxy Statement for the 2021 Annual Meeting of Shareholders is incorporated by reference from our 1997 Annual Report on Form 10-K. |
| 10.32 | Letter to Frank A. D'Amelio regarding replacement pension benefit dated August 22, 2007 is incorporated by reference from our Current Report on Form 8-K filed on August 22, 2007. |
| 10.33 | Pfizer Inc. Executive Severance Plan is incorporated by referenced from our Current Report on Form 8-K filed on February 20, 2009. |
| 10.34 | Amendment No. 1 to the Pfizer Inc. Executive Severance Plan is incorporated by reference from our 2018 Annual Report on Form 10-K. |
| 10.35 | Amendment No. 2 to the Pfizer Inc. Executive Severance Plan is incorporated by reference from our 2019 Annual Report on Form 10-K. |
| 10.36 | Amendment No. 3 to the Pfizer Inc. Executive Severance Plan is incorporated by reference from our 2020 Annual Report on Form 10-K. |
| 10.37 | Annual Retainer Unit Award Plan (for Non-Employee Directors) (frozen as of March 1, 2006) as amended, is incorporated by reference from our 2008 Annual Report on Form 10-K. |
| 10.38 | Nonfunded Deferred Compensation and Unit Award Plan for Non-Employee Directors, as amended, is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended September 28, 2014. |
| 10.39 | Form of Special Award Letter Agreement is incorporated by reference from our Current Report on Form 8-K filed on October 28, 2009. |
| 10.40 | Offer Letter to G. Mikael Dolsten, dated April 6, 2009, is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended April 3, 2011. |
| 10.41 | Form of Special Performance-Based Incentive Award Letter is incorporated by reference from our 2017 Annual Report on Form 10-K. |
| 10.42 | Form of Special Performance-Based Incentive Grant Letter is incorporated by reference from our 2017 Annual Report on Form 10-K. |
| 10.43 | Pfizer Inc. 2019 Stock Plan is incorporated by reference from our Proxy Statement for the 2019 Annual Meeting of Shareholders. |
| 10.44 | Time Sharing Agreement, dated July 9, 2020, between Pfizer Inc. and Albert Bourla is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended June 28, 2020. |
| *21 | Subsidiaries of the Company. |
| 22 | Subsidiary Issuers of Guaranteed Securities is incorporated by reference from our Quarterly Report on Form 10-Q for the period ended April 4, 2021. |
| *23 | Consent of Independent Registered Public Accounting Firm. |
| *24 | Power of Attorney (included as part of signature page). |
| *31.1 | Certification by the Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| *31.2 | Certification by the Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| *32.1 | Certification by the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| *32.2 | Certification by the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| Exhibit 101: | |
| *101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| *101.SCH | Inline XBRL Taxonomy Extension Schema |
| *101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase |
| *101.LAB | Inline XBRL Taxonomy Extension Label Linkbase |
| *101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase |
| *101.DEF | Inline XBRL Taxonomy Extension Definition Document |
| 104 | Cover Page Interactive Data File - the cover page interactive data file does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |

## ITEM 16.    FORM 10-K SUMMARY

None.

### SIGNATURES

Under the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, this report was signed on behalf of the Registrant by the authorized person named below.

**Pfizer Inc.**

Dated: February 24, 2022

By:      /S/   MARGARET M. MADDEN

**Margaret M. Madden**
**Senior Vice President and Corporate Secretary**
**Chief Governance Counsel**

We, the undersigned directors and officers of Pfizer Inc., hereby severally constitute Douglas M. Lankler and Margaret M. Madden, and each of them singly, our true and lawful attorneys with full power to them and each of them to sign for us, in our names in the capacities indicated below, any and all amendments to this Annual Report on Form 10-K filed with the Securities and Exchange Commission.

Under the requirements of the Securities Exchange Act of 1934, this report was signed by the following persons on behalf of the Registrant and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /S/   ALBERT BOURLA<br>**Albert Bourla** | Chairman and Chief Executive Officer<br>(Principal Executive Officer) | February 22, 2022 |
| /S/   FRANK A. D'AMELIO<br>**Frank A. D'Amelio** | Chief Financial Officer, Executive Vice President (Principal Financial Officer) | February 22, 2022 |
| /S/   JENNIFER B. DAMICO<br>**Jennifer B. Damico** | Senior Vice President and Controller<br>(Principal Accounting Officer) | February 22, 2022 |
| /S/   RONALD E. BLAYLOCK<br>**Ronald E. Blaylock** | Director | February 22, 2022 |
| /S/   SUSAN DESMOND-HELLMANN<br>**Susan Desmond-Hellmann** | Director | February 22, 2022 |
| /S/   JOSEPH J. ECHEVARRIA<br>**Joseph J. Echevarria** | Director | February 22, 2022 |
| /S/   SCOTT GOTTLIEB<br>**Scott Gottlieb** | Director | February 22, 2022 |
| /S/   HELEN H. HOBBS<br>**Helen H. Hobbs** | Director | February 22, 2022 |
| /S/   SUSAN HOCKFIELD<br>**Susan Hockfield** | Director | February 22, 2022 |
| /S/   DAN R. LITTMAN<br>**Dan R. Littman** | Director | February 22, 2022 |
| /S/   SHANTANU NARAYEN<br>**Shantanu Narayen** | Director | February 22, 2022 |
| /S/   SUZANNE NORA JOHNSON<br>**Suzanne Nora Johnson** | Director | February 22, 2022 |
| /S/   JAMES QUINCEY<br>**James Quincey** | Director | February 22, 2022 |
| /S/   JAMES C. SMITH<br>**James C. Smith** | Director | February 22, 2022 |

**EXHIBIT 4.24**

**DESCRIPTION OF THE REGISTRANT'S SECURITIES REGISTERED PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934**

As of February 24, 2022 Pfizer Inc. has common stock, the 0.250% Notes due 2022 (the 2022 notes) and the 1.000% Notes due 2027 (the 2027 notes and together with the 2022 notes, the notes) registered under Section 12 of the Securities Exchange Act of 1934, as amended. The following descriptions of our common stock and the notes are summaries and do not purport to be complete. The description of our common stock is subject to and qualified in its entirety by reference to our restated certificate of incorporation (the Certificate of Incorporation), and our bylaws, as amended (the Bylaws), and the description of the notes is subject to and qualified in its entirety by reference to the base indenture (as defined below) and the ninth supplemental indenture (as defined below), each of which are incorporated by reference as an exhibit to the Annual Report on Form 10-K of which this Exhibit 4.24 is a part. We encourage you to read our Certificate of Incorporation, our Bylaws, the applicable provisions of the Delaware General Corporation Law (the DGCL), the base indenture and the ninth supplemental indenture for additional information. References in this section to "Pfizer," "we," "us" and "our" are to Pfizer Inc., unless otherwise stated or the context so requires.

**DESCRIPTION OF CAPITAL STOCK**

**Common Stock**

Under the Certificate of Incorporation, we are authorized to issue up to 12 billion shares of common stock, par value $0.05 per share. The common stock is not redeemable, does not have any conversion rights and is not subject to call. Holders of shares of common stock have no preemptive rights to maintain their percentage of ownership in future offerings or sales of our stock. Holders of shares of common stock have one vote per share in all elections of Directors and on all other matters submitted to a vote of our stockholders. The holders of common stock are entitled to receive dividends, if any, as and when may be declared from time to time by our Board of Directors, out of funds legally available therefor. Upon liquidation, dissolution or winding up of our affairs, the holders of common stock will be entitled to participate equally and ratably, in proportion to the number of shares held, in our net assets available for distribution to holders of common stock. The shares of common stock currently outstanding are fully paid and nonassessable. The common stock is traded on the New York Stock Exchange under the trading symbol "PFE."

**Preferred Stock**

Under the Certificate of Incorporation, we are authorized to issue up to 27 million shares of preferred stock, without par value. The preferred stock may be issued in one or more series, and the Board of Directors of Pfizer is expressly authorized (i) to fix the descriptions, powers, preferences, rights, qualifications, limitations, and restrictions with respect to any series of preferred stock and (ii) to specify the number of shares of any series of preferred stock.

**Anti-takeover Effects of the Certificate of Incorporation, By-laws and Delaware Law**

*Certificate of Incorporation and Bylaws.* Various provisions contained in the Certificate of Incorporation and the Bylaws could delay or discourage some transactions involving an actual or potential change in control of us or a change in our management and may limit the ability of our stockholders to remove current management or approve transactions that our stockholders may deem to be in their best interests. Among other things, these provisions:

- limit the right of stockholders to call special meetings of stockholders to holders of at least 10% of the total number of shares of stock entitled to vote on the matter to be brought before the proposed special meeting;

- authorize our Board of Directors to establish one or more series of preferred stock without stockholder approval;

- authorize the Board to issue dividends in the form of stock purchase or similar rights, including rights that would have the effect of making an attempt to acquire us more costly;

- grant to the Board of Directors, and not to the stockholders, the sole power to set the number of Directors;

- require that any action required or permitted to be taken by our stockholders must be effected at a duly called annual or special meeting of stockholders and may not be effected by any consent in writing; and

- subject to the rights of the holders of any one or more series of preferred stock then outstanding, allow our Directors, and not our stockholders, to fill vacancies on our Board of Directors, including vacancies resulting from the removal of one or more Directors or an increase in the number of Directors constituting the whole Board of Directors.

*Delaware Law.* We are a Delaware corporation and consequently are also subject to certain anti-takeover provisions of the DGCL. Subject to certain exceptions, Section 203 of the DGCL prevents a publicly-held Delaware corporation from engaging in a "business combination" with any "interested stockholder" for three years following the date that the person became an interested stockholder, unless (a) the interested stockholder attained such status with the approval of the corporation's board of directors, (b) upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, exclusive of shares owned by directors who are also officers and by certain employee stock plans or (c) at or subsequent to such time, the business combination is approved by the board of directors and authorized by the affirmative vote at a stockholders' meeting, and not by written consent, of at least 66-2/3% of the outstanding voting stock which is not owned by the interested stockholder. A "business combination" includes, among other things, a merger or consolidation involving the corporation and the "interested stockholder" and the sale of more than 10% of the corporation's assets. In general, an "interested stockholder" is any entity or person beneficially owning 15% or more of the corporation's outstanding voting stock, and any entity or person affiliated with or controlling or controlled by such entity or person. Section 203 makes it more difficult for an interested stockholder to effect various business combinations with a corporation for a three-year period. This statute could prohibit or delay mergers or other takeover or change in control attempts not approved in advance by our Board of Directors, and, as a result, could discourage attempts to acquire us, which could depress the market price of our common stock.

## DESCRIPTION OF DEBT SECURITIES

Reference should be made to the indenture dated as of January 30, 2001, between Pfizer and The Bank of New York Mellon (formerly known as The Bank of New York), as successor to JPMorgan Chase Bank (formerly known as The Chase Manhattan Bank), as trustee, which we refer to as the "base indenture," as supplemented by the ninth supplemental indenture dated as of March 6, 2017, among Pfizer Inc., The Bank of New York Mellon, as trustee, and The Bank of New York Mellon, London Branch, as paying agent, which we refer to as the "ninth supplemental indenture." When we refer to the "indenture," we mean the base indenture, as supplemented by the ninth supplemental indenture. The following description is a summary of selected portions of the base indenture and the ninth supplemental indenture. It does not restate the base indenture or the ninth supplemental indenture, and those documents, not this description, define the rights of a holder of the notes.

### Principal, Maturity and Interest

The 2022 notes were limited to €1,000,000,000 aggregate principal amount and the 2027 notes were limited to €750,000,000 aggregate principal amount. The 2022 notes will mature on March 6, 2022 and the 2027 notes will mature on March 6, 2027. We issued the notes in denominations of €100,000 and in integral multiples of €1,000 in excess thereof.

Interest on the 2022 notes accrues at the annual rate of 0.250% and interest on the 2027 notes accrues at the annual rate of 1.000%. Interest on the notes is payable on March 6 of each year. Interest on the notes is computed on the basis of the actual number of days in the period for which interest is being calculated and the actual number of days from and including the last date on which interest was paid on the notes to, but excluding, the next scheduled interest payment date. This payment convention is referred to as ACTUAL/ACTUAL (ICMA) (as defined in the rulebook of the International Capital Market Association).

We make each interest payment to the holders of record of the notes at the close of business on the 15th calendar day (whether or not a business day) preceding the relevant interest payment date.

The Bank of New York Mellon, London Branch, acts as our paying agent with respect to the notes. Upon notice to the trustee, we may change any paying agent. Payments of principal, interest and premium, if any, will be made by us through the paying agent to Euroclear Bank S.A./N.V. (the "Euroclear Operator"), as operator of the Euroclear System ("Euroclear") and/or Clearstream Banking, Société Anonyme, Luxembourg ("Clearstream") as described under "—Book-Entry."

**Issuance in Euros**

Principal, premium, if any, and interest payments and additional amounts, if any, in respect of the notes are payable in euros.

If the euro is unavailable to us due to the imposition of exchange controls or other circumstances beyond our control or the euro is no longer used by the then member states of the European Monetary Union that have adopted the euro as their currency or for the settlement of transactions by public institutions within the international banking community, then all payments in respect of the notes will be made in U.S. dollars until the euro is again available to us or so used. In such circumstances, the amount payable on any date in euros will be converted to U.S. dollars on the basis of the most recently available market exchange rate for euros, as determined by us in our sole discretion. Any payment in respect of the notes so made in U.S. dollars does not constitute an event of default under the indenture or the notes. Neither the trustee nor the paying agent is responsible for obtaining exchange rates, effecting conversions or otherwise handling redenominations.

**Payment of Additional Amounts**

All payments in respect of the notes are made by or on behalf of us without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature, imposed or levied by the United States or any taxing authority thereof or therein, unless such withholding or deduction is required by law. If such withholding or deduction is required by law, we pay to a beneficial owner who is not a United States person such additional amounts on the notes as are necessary in order that the net payment of the principal of, and premium or redemption price, if any, and interest on, such notes to such beneficial owner, after such withholding or deduction (including any withholding or deduction on such additional amounts), will not be less than the amount provided in such notes to be then due and payable; provided, however, that the foregoing obligation to pay additional amounts will not apply:

a) to any tax, assessment or other governmental charge that would not have been imposed but for the beneficial owner, or a fiduciary, settlor, beneficiary, member or shareholder of the beneficial owner if the beneficial owner is an estate, trust, partnership or corporation, or a person holding a power over an estate or trust administered by a fiduciary holder, being considered as (i) having a current or former connection with the United States (other than a connection arising solely as a result of the ownership of such notes, the receipt of any payment or the enforcement of any rights thereunder), including being or having been a citizen or resident of the United States, or being or having been engaged in a trade or business in the United States or having or having had a permanent establishment in the United States; (ii) being a controlled foreign corporation related to Pfizer directly, indirectly or constructively through stock ownership for U.S. federal income tax purposes; (iii) being an owner of a 10% or greater interest in voting stock of Pfizer within the meaning of Section 871(h)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or any successor provision; or (iv) being a bank receiving payments on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business;

b) to any holder that is not the sole beneficial owner of such notes, or a portion of such notes, or that is a fiduciary, partnership or limited liability company, but only to the extent that a beneficiary or settlor with respect to the fiduciary, a beneficial owner or a member of the partnership or limited liability company would not have been entitled to the payment of an additional amount had the beneficiary, settlor, beneficial owner or member received directly from Pfizer its beneficial or distributive share of the payment;

c) to any tax, assessment or other governmental charge imposed by reason of the holder's or beneficial owner's past or present status as a passive foreign investment company, a controlled foreign corporation, a foreign tax exempt organization or a personal holding company with respect to the United States or as a corporation that accumulates earnings to avoid U.S. federal income tax;

d) to any tax, assessment or other governmental charge that would not have been imposed but for the failure of the holder or beneficial owner of the applicable notes to comply with any applicable certification, identification or information reporting requirements concerning the nationality, residence, identity or connection with the United States of the holder or beneficial owner of such notes, if compliance is timely requested by Pfizer and required by statute, by regulation of the United States or any taxing authority therein or by an applicable income tax treaty to which the United States is a party as a precondition to exemption from such tax, assessment or other governmental charge;

e) to any tax, assessment or other governmental charge that is imposed otherwise than by withholding or deducting from the payment;

3

f)   to any estate, inheritance, gift, sales, transfer, wealth, capital gains or personal property tax or similar tax, assessment or other governmental charge;

g)   to any tax, assessment or other governmental charge required to be withheld by any paying agent from any payment of principal of or interest on any such note, if such payment can be made without such withholding by at least one other paying agent in a Member State of the European Union;

h)   to any tax, assessment or other governmental charge that is imposed or withheld solely by reason of a change in law, regulation, or administrative or judicial interpretation that becomes effective more than 15 days after the payment becomes due or is duly provided for, whichever occurs later;

i)   to any tax, assessment or other governmental charge that would not have been imposed but for the presentation by the holder of any note, where presentation is required, for payment on a date more than 30 days after the date on which payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later, except to the extent that the holder or beneficial owner thereof would have been entitled to additional amounts had the note been presented for payment on the last day of such 30 day period;

j)   to any withholding or deduction that is imposed on a payment pursuant to Sections 1471 through 1474 of the Code and related Treasury regulations and pronouncements or any successor provisions thereto (that are substantively comparable and not materially more onerous to comply with) and any regulations or official law, agreement or interpretations thereof in any jurisdiction implementing an intergovernmental approach thereto; or

k)   in the case of any combination of the above listed items.

Except as specifically provided under this heading "—Payment of Additional Amounts," we are not required to make any payment for any tax, duty, assessment or governmental charge of whatever nature imposed by any government or a political subdivision or taxing authority of or in any government or political subdivision.

As used under this heading "—Payment of Additional Amounts" and under the heading "—Optional Redemption of 2022 Notes and 2027 Notes; Redemption for Tax Reasons; No Sinking Fund," the term "United States" means the United States of America, any state thereof, and the District of Columbia, and the term "United States person" means (i) any individual who is a citizen or resident of the United States for U.S. federal income tax purposes, (ii) a corporation, partnership or other entity created or organized in or under the laws of the United States, any state thereof or the District of Columbia (other than a partnership that is not treated as a United States person for U.S. federal income tax purposes), (iii) any estate the income of which is subject to U.S. federal income taxation regardless of its source, or (iv) any trust if a U.S. court can exercise primary supervision over the administration of the trust and one or more United States persons can control all substantial trust decisions, or if a valid election is in place to treat the trust as a United States person.

## Ranking

The notes are unsecured general obligations of Pfizer and rank equally with all other unsecured and unsubordinated indebtedness of Pfizer from time to time outstanding.

## Listing

The notes are listed on the NYSE. We have no obligation to maintain such listing, and we may delist the notes at any time.

## Covenants

The indenture contains a provision that restricts our ability to consolidate with or merge into any other person or convey or transfer our properties and assets as an entirety or substantially as an entirety to any other person. The indenture does not restrict our ability to convey or transfer our properties and assets other than as an entirety or substantially as an entirety to any other person. See "Article VIII - Consolidation, Merger, Conveyance or Transfer" in the base indenture. The indenture contains no other restrictive covenants, including those that would afford holders of the notes protection in the event of a highly-leveraged transaction involving Pfizer or any of its affiliates or other events involving us that may adversely affect our creditworthiness or the value of the notes. The indenture also does not contain any covenants relating to total indebtedness, interest coverage, stock repurchases, recapitalizations,

4

dividends and distributions to shareholders, current ratios or acquisitions and divestitures. The notes do not have the benefit of covenants that relate to subsidiary guarantees, liens and sale leaseback transactions that apply to other of our existing unsecured and unsubordinated notes.

Pfizer may, without the consent of the holders of notes of any series, issue additional notes having the same ranking and the same interest rate, maturity and other terms as the notes of any series (except for the issue date and the public offering price). Any additional notes having such similar terms, together with the notes of the applicable series, will constitute a single series of debt securities under the indenture. No additional notes of any series may be issued if an event of default has occurred with respect to the notes of that series. Pfizer will not issue any additional notes intended to form a single series with the notes of any series, unless such further notes will be fungible with all notes of the same series for U.S. federal income tax purposes.

**Optional Redemption of 2022 Notes and 2027 Notes; Redemption for Tax Reasons; No Sinking Fund**

At our option, we may redeem the 2022 notes or the 2027 notes (together, the redemption notes), in whole, at any time, or in part, from time to time, prior to February 6, 2022 (one month prior to the maturity date) with respect to the 2022 notes and December 6, 2026 (three months prior to the maturity date) with respect to the 2027 notes. The redemption price will be equal to the greater of the following amounts:

- 100% of the principal amount of the redemption notes being redeemed on the redemption date; and

- the sum of the present values of the remaining scheduled payments of principal and interest on the redemption notes being redeemed on that redemption date (not including the amount, if any, of accrued and unpaid interest to, but excluding, the redemption date) discounted to the redemption date on an annual basis at a rate equal to the sum of the Comparable Government Bond Rate plus (a) 15 basis points in the case of the 2022 notes and (b) 15 basis points in the case of the 2027 notes;

plus, in each case, accrued and unpaid interest on the redemption notes being redeemed to, but excluding, the redemption date.

At any time on or after February 6, 2022 (one month prior to the maturity date) with respect to the 2022 notes and December 6, 2026 (three months prior to the maturity date) with respect to the 2027 notes, we may redeem such series of redemption notes, in whole or in part, at a redemption price equal to 100% of the principal amount of the redemption notes to be redeemed, plus in each case, accrued and unpaid interest on the redemption notes being redeemed to, but excluding, the redemption date.

Notwithstanding the foregoing, installments of interest on the applicable redemption notes that are due and payable on interest payment dates falling on or prior to a redemption date will be payable on the interest payment date to the registered holders as of the close of business on the relevant record date according to the applicable redemption notes and the indenture. The redemption prices for the redemption notes will be calculated on the basis of a 365-day year or a 366-day year, as applicable, and the actual number of days elapsed.
We will mail notice of any redemption at least 10 days, but not more than 60 days, before the redemption date to each registered holder of the redemption notes to be redeemed. Once notice of redemption is mailed, the redemption notes called for redemption will become due and payable on the redemption date at the applicable redemption price, plus accrued and unpaid interest applicable to such redemption notes to, but excluding, the redemption date.

"Comparable Government Bond" means, in relation to any Comparable Government Bond Rate calculation, at the discretion of an Independent Investment Banker, a German government bond whose maturity is closest to the maturity of the redemption notes to be redeemed, or if such independent investment bank in its discretion determines that such similar bond is not in issue, such other German government bond as such Independent Investment Banker may, with the advice of three brokers of, and/or market makers in, German government bonds selected by us, determine to be appropriate for determining the Comparable Government Bond Rate.

"Comparable Government Bond Rate" means the price, expressed as a percentage (rounded to three decimal places, with 0.0005 being rounded upwards), at which the gross redemption yield on the fixed rate notes to be redeemed, if they were to be purchased at such price on the third business day prior to the date fixed for redemption, would be equal to the gross redemption yield on such business day of the Comparable Government Bond on the basis of the middle market price of the Comparable Government Bond prevailing at 11:00 a.m. (London time) on such business day as determined by an Independent Investment Banker.

5

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by us to act as the "Independent Investment Banker."

"Reference Treasury Dealer" means each of Barclays Bank PLC, BNP Paribas, Goldman, Sachs & Co. and J.P. Morgan Securities plc (or their respective affiliates that are Primary Treasury Dealers), and their respective successors; provided, however, that if any of the foregoing shall cease to be a broker or dealer of, and/or market maker in, German government bonds (a "Primary Treasury Dealer"), we will substitute therefor another Primary Treasury Dealer.

On and after the redemption date, interest will cease to accrue on the redemption notes or any portion of the redemption notes called for redemption (unless we default in the payment of the redemption price and accrued and unpaid interest). On or before the redemption date, we will deposit with a paying agent (or the trustee) money sufficient to pay the redemption price of and accrued and unpaid interest on the redemption notes to be redeemed on that date. If fewer than all of the redemption notes of any series are to be redeemed, the redemption notes to be redeemed shall be selected by Euroclear and/or Clearstream, in the case of redemption notes represented by a global security, or by the trustee by a method the trustee deems to be fair and appropriate, in the case of redemption notes that are not represented by a global security.

The notes are not entitled to the benefit of a sinking fund.

**Redemption for Tax Reasons**

If, as a result of any change in, or amendment to, the laws (or any regulations or rulings promulgated under the laws) of the United States (or any taxing authority thereof or therein), or any change in, or amendments to, an official position regarding the application or interpretation of such laws, regulations or rulings, which change or amendment is announced or becomes effective on or after February 28, 2017, we become or, based upon a written opinion of independent tax counsel of recognized standing selected by us, will become obligated to pay additional amounts as described herein under the heading "—Payment of Additional Amounts" with respect to any series of the notes, then we may at our option, having given not less than 10 nor more than 60 days prior notice to holders, redeem, in whole, but not in part, the applicable series of notes at a redemption price equal to 100% of the principal amount, together with accrued and unpaid interest (including any additional amounts) on such notes to, but excluding, the redemption date.

**Book-Entry**

*Global Clearance and Settlement*

The notes of each series were issued in the form of one or more global notes in fully registered form, without coupons, and are deposited with, or on behalf of, a common depositary, and registered in the name of the nominee of the common depositary, for, and in respect of interests held through, Euroclear and Clearstream. Except as described herein, certificates will not be issued in exchange for beneficial interests in the global notes representing the notes.

Except as set forth below, the global notes representing the notes may be transferred, in whole and not in part, only to Euroclear or Clearstream or their respective nominees.

Beneficial interests in the global notes representing the notes are represented, and transfers of such beneficial interests are effected, through accounts of financial institutions acting on behalf of beneficial owners as direct or indirect participants in Euroclear or Clearstream. Those beneficial interests are in denominations of €100,000 and integral multiples of €1,000 in excess thereof. Investors may hold the notes directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems.

For so long as any series of the notes is represented by a global note deposited with, and registered in the name of a nominee for, a common depositary for Euroclear and/or Clearstream, each person (other than Euroclear or Clearstream) who is for the time being shown in the records of Euroclear or of Clearstream as the holder of a particular nominal amount of the notes (in which regard any certificate or other document issued by Euroclear or Clearstream as to the nominal amount of the notes standing to the account of any person shall be conclusive and binding for all purposes save in the case of manifest error) shall upon their receipt of a certificate or other document be treated by Pfizer and the trustee as the holder of such nominal amount of the notes and the registered holder of the global note representing such notes shall be deemed not to be the holder for all purposes other than with respect to the payment of principal or interest on such nominal amount of the notes, for which purpose the registered holder of the relevant global note shall be treated by Pfizer and the trustee as the holder of such nominal amount of notes in

accordance with and subject to the terms of the global note representing the notes, and the expressions "noteholder" and "holder of notes" and related expressions shall be construed accordingly.

The information in this section concerning Euroclear and Clearstream Banking and their book-entry systems and procedures has been obtained from sources that we believe to be reliable. We are not responsible for the accuracy or completeness of this information.

We have been advised by Clearstream and Euroclear, respectively, as follows:

Clearstream has advised that:

• It is incorporated under the laws of Luxembourg and licensed as a bank and professional depositary. Clearstream holds securities for its participating organizations and facilitates the clearance and settlement of securities transactions among its participants through electronic book-entry changes in accounts of its participants, thereby eliminating the need for physical movement of certificates.

• Clearstream provides to its participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream interfaces with domestic markets in several countries.

• Clearstream has established an electronic bridge with the Euroclear Operator to facilitate the settlement of trades between the nominees of Clearstream and Euroclear.

• As a registered bank in Luxembourg, Clearstream is subject to regulation by the Luxembourg Commission for the Supervision of the Financial Sector.

• Clearstream customers are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations and may include the underwriters. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through, or maintain a custodial relationship with, a Clearstream participant, either directly or indirectly.

Distributions with respect to the notes held beneficially through Clearstream will be credited to cash accounts of Clearstream participants in accordance with its rules and procedures.

Euroclear has advised that:

• It was created in 1968 to hold securities for its participants and to clear and settle transactions between Euroclear participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash.

• Euroclear includes various other services, including securities lending and borrowing and interfaces with domestic markets in several countries.

• Euroclear is operated by the Euroclear Operator. All operations are conducted by the Euroclear Operator, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear Operator.

• Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related operating procedures of Euroclear, and applicable Belgian law (collectively, the "Terms and Conditions"). The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions only on behalf of Euroclear participants, and has no records of or relationship with persons holding through Euroclear participants.

• Euroclear participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries and may include the underwriters. Indirect access to Euroclear is also

7

available to other firms that clear through or maintain a custodial relationship with a Euroclear participant, either directly or indirectly.

Distributions with respect to the notes held beneficially through Euroclear will be credited to the cash accounts of Euroclear participants in accordance with the Terms and Conditions.

*Euroclear and Clearstream Arrangements*

So long as Euroclear or Clearstream or their nominee or their common depositary is the registered holder of the global notes representing the notes, Euroclear, Clearstream or such nominee, as the case may be, will be considered the sole owner or holder of the notes represented by such global notes for all purposes under the indenture and the notes. Payments of principal, interest and additional amounts, if any, in respect of the global notes representing the notes are made to Euroclear, Clearstream, such nominee or such common depositary, as the case may be, as registered holder thereof. Neither Pfizer nor the trustee, or any affiliate of any of the above or any person by whom any of the above is controlled (as such term is defined in the Securities Act) has any responsibility or liability for any records relating to or payments made on account of beneficial ownership interests in the global notes representing the notes or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

Distributions of principal, premium, if any, and interest with respect to the global notes representing the notes are credited in euros to the extent received by Euroclear or Clearstream from the paying agent to the cash accounts of Euroclear or Clearstream customers in accordance with the relevant system's rules and procedures.

Because Euroclear and Clearstream can only act on behalf of participants, who in turn act on behalf of indirect participants, the ability of a person having an interest in the global notes representing the notes to pledge such interest to persons or entities which do not participate in the relevant clearing system, or otherwise take actions in respect of such interest, may be affected by the lack of a physical certificate in respect of such interest.

*Secondary Market Trading*

Because the purchaser determines the place of delivery, it is important to establish at the time of trading of any notes where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

We understand that secondary market trading between Clearstream and/or Euroclear participants occurs in the ordinary way following the applicable rules and operating procedures of Clearstream and Euroclear. Secondary market trading is settled using procedures applicable to conventional eurobonds in global registered form.

The holder of the notes should be aware that investors are only able to make and receive deliveries, payments and other communications involving the notes through Clearstream and Euroclear on days when those systems are open for business. Those systems may not be open for business on days when banks, brokers and other institutions are open for business in the United States.

In addition, because of time-zone differences, there may be problems with completing transactions involving Clearstream and Euroclear on the same business day as in the United States. U.S. investors who wish to transfer their interests in the notes, or to make or receive a payment or delivery of the notes, on a particular day, may find that the transactions are not performed until the next business day in Luxembourg or Brussels, depending on whether Clearstream or Euroclear is used.

Clearstream or Euroclear credits payments to the cash accounts of Clearstream customers or Euroclear participants, as applicable, in accordance with the relevant system's rules and procedures, to the extent received by its depositary. Clearstream or the Euroclear Operator, as the case may be, takes any other action permitted to be taken by a holder under the indenture on behalf of a Clearstream customer or Euroclear participant only in accordance with its relevant rules and procedures.

Clearstream and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of the notes among participants of Clearstream and Euroclear. However, they are under no obligation to perform or continue to perform those procedures, and they may discontinue those procedures at any time.

8

*Exchange of Global Notes for Certificated Notes*

Subject to certain conditions, the notes represented by the global notes are exchangeable for certificated notes in definitive form of like tenor in minimum denominations of €100,000 principal amount and multiples of €1,000 in excess thereof if:

- the common depositary notifies us that it is no longer willing or able to act as a depositary for such global notes or ceases to be a clearing agency registered under the Exchange Act and we fail to appoint a successor common depositary within 90 days;

- an event of default has occurred and is continuing and the common depositary requests the issuance of certificated notes; or

- we determine not to have the notes represented by a global note.

In all cases, certificated notes delivered in exchange for any global note or beneficial interest therein will be registered in the names, and issued in any approved denominations, requested by or on behalf of the common depositary (in accordance with its customary procedures).

Payments (including principal, premium and interest) and transfers with respect to the notes in certificated form may be executed at the office or agency maintained for such purpose in London (initially the corporate trust office of the paying agent) or, at our option, by check mailed to the holders thereof at the respective addresses set forth in the register of holders of the notes (maintained by the registrar), provided that all payments (including principal, premium and interest) on the notes in certificated form, for which the holders thereof have given wire transfer instructions, are required to be made by wire transfer of immediately available funds to the accounts specified by the holders thereof. No service charge is made for any registration of transfer, but payment of a sum sufficient to cover any tax or governmental charge payable in connection with such registration may be required.

## Modification of Indenture

Under the indenture, the rights of the holders of the notes may be modified through a supplemental indenture if the holders of a majority in aggregate principal amount of the outstanding notes of all series affected by the modification (voting as one class) consent to it. No modification of the maturity date or principal or interest payment terms, no modification of the currency for payment, no impairment of the right to sue for the enforcement of payment at the maturity of the debt security, no modification of any conversion rights, no modification reducing the percentage required for any such supplemental indenture or the percentage required for the waiver of certain defaults, and no modification of the foregoing provisions or any other provisions relating to the waiver of past defaults or the waiver of certain covenants, is effective against any holder without its consent.

## Events of Default

Each of the following will constitute an Event of Default under the indenture with respect to the notes of the applicable series:

- we fail to make the principal or any premium payment on any note of such series when due;

- we fail to make any sinking fund payment for 60 days after payment was due by the terms of any note of such series;

- we fail to pay interest on any note of such series for 60 days after payment was due;

- we fail to perform any other covenant in the indenture and this failure continues for 90 days after we receive written notice of it; or

- we, or a court, take certain actions relating to the bankruptcy, insolvency or reorganization of our company.

A default under our other indebtedness will not be a default under the indenture for the notes, and a default under one series of the notes will not necessarily be a default under another series. The trustee may withhold notice to the holders of notes of the applicable series of any default (except for defaults that involve our failure to pay principal or interest) if it considers such withholding of notice to be in the best interests of the holders.

9

If an Event of Default with respect to outstanding notes of any series occurs and is continuing, then the trustee or the holders of at least 33% in principal amount of outstanding notes of that series may declare, in a written notice, the principal amount (or, if any of the notes of that series are original issue discount securities, such portion of the principal amount of such notes) plus accrued and unpaid interest on all notes of that series to be immediately due and payable. At any time after a declaration of acceleration with respect to notes of any series has been made, the holders of a majority in principal amount of the outstanding notes of such series may rescind and annul the acceleration if:

• the holders act before the trustee has obtained a judgment or decree for payment of the money due;

• we have paid or deposited with the trustee a sum sufficient to pay overdue interest and overdue principal other than the accelerated interest and principal; and

• we have cured or the holders have waived all Events of Default, other than the non-payment of accelerated principal and interest with respect to notes of that series, as provided in the indenture.

If a default in the performance or breach of the indenture shall have occurred and be continuing, the holders of not less than a majority in principal amount of the outstanding notes of all series affected thereby, by notice to the trustee, may waive any past Event of Default or its consequences under the indenture. However, an Event of Default cannot be waived with respect to any series of notes in the following two circumstances:

• a failure to pay the principal of, and premium, if any, or interest on any security or in the payment of any sinking fund installment; or

• a covenant or provision that cannot be modified or amended without the consent of each holder of outstanding notes of that series.

Other than its duties in case of a default, the trustee is not obligated to exercise any of its rights or powers under the indenture at the request, order or direction of any holders, unless the holders offer the trustee reasonable indemnity. Holders of a majority in principal amount outstanding of any series of notes may, subject to certain limitations, direct the time, method and place of conducting any proceeding or any remedy available to the trustee, or exercising any power conferred upon the trustee, for such applicable series of notes.

We are required to deliver an annual officers' certificate to the trustee, stating whether we are in default in the performance and observance of any of the terms, provisions and conditions of the indenture, and, if we are in default, specifying all such defaults and the nature and status thereof.

**Defeasance**

When we use the term defeasance, we mean discharge from some or all of our obligations under the indenture. Subject to certain additional conditions, if we irrevocably deposit with the trustee sufficient cash or government securities to pay the principal, interest, any premium and any other sums due to the stated maturity date or a redemption date of the notes of a particular series, then at our option:

• we will be discharged from our obligations with respect to the notes of such series; or

• we will no longer be under any obligation to comply with certain restrictive covenants under the indenture, and certain events of default will no longer apply to us.

To exercise our defeasance option, we must deliver to the trustee an officer's certificate and an opinion of counsel, each stating that all conditions precedent related to the defeasance have been complied with.

**EXHIBIT 21**

The following is a list of subsidiaries of the Company as of December 31, 2021 omitting some subsidiaries which, considered in the aggregate, would not constitute a significant subsidiary.

| Company Name | Where Incorporated or Organized |
| --- | --- |
| Agouron Pharmaceuticals, LLC | California |
| AH Robins LLC | Delaware |
| AHP Manufacturing B.V. | Netherlands |
| Alpharma Pharmaceuticals LLC | Delaware |
| American Food Industries LLC | Delaware |
| Amplyx Pharmaceuticals, Inc. | Delaware |
| Anacor Pharmaceuticals, Inc. | Delaware |
| Array BioPharma Inc. | Delaware |
| Bamboo Therapeutics, Inc. | Delaware |
| Blue Whale Re Ltd. | Vermont |
| C.P. Pharmaceuticals International C.V. | Netherlands |
| CICL Corporation | Delaware |
| COC I Corporation | Delaware |
| Coley Pharmaceutical GmbH | Germany |
| Coley Pharmaceutical Group, Inc. | Delaware |
| Cyanamid de Argentina, S.A. | Delaware |
| Cyanamid de Colombia, S.A. | Delaware |
| Distribuidora Mercantil Centro Americana, S.A. | Delaware |
| Encysive Pharmaceuticals Inc. | Delaware |
| Farminova Produtos Farmaceuticos de Inovacao, Lda. | Portugal |
| FoldRx Pharmaceuticals, LLC | Delaware |
| Fort Dodge Manufatura Ltda. | Brazil |
| G. D. Searle & Co. Limited | United Kingdom |
| G. D. Searle International Capital LLC | Delaware |
| Genetics Institute, LLC | Delaware |
| GenTrac, Inc. | Wisconsin |
| GI Europe, Inc. | Delaware |
| GI Japan, Inc. | Delaware |
| Hospira Adelaide Pty Ltd | Australia |
| Hospira Australia Pty Ltd | Australia |
| Hospira Benelux BVBA | Belgium |
| Hospira Holdings (S.A.) Pty Ltd | Australia |
| Hospira Limited | Hong Kong |
| Hospira Philippines, Inc. | Philippines |
| Hospira Pte. Ltd. | Singapore |
| Hospira Puerto Rico, LLC | Delaware |
| Hospira UK Limited | United Kingdom |
| Hospira Worldwide, LLC | Delaware |
| Hospira Zagreb d.o.o. | Croatia |
| Hospira, Inc. | Delaware |
| InnoPharma, Inc. | Delaware |

| | |
|---|---|
| International Affiliated Corporation LLC | Delaware |
| John Wyeth & Brother Limited | United Kingdom |
| King Pharmaceuticals Holdings LLC | Delaware |
| King Pharmaceuticals LLC | Delaware |
| King Pharmaceuticals Research and Development, LLC | Delaware |
| Laboratoires Pfizer, S.A. | Morocco |
| Laboratorios Pfizer Ltda. | Brazil |
| Laboratórios Pfizer, Lda. | Portugal |
| Laboratorios Wyeth LLC | Pennsylvania |
| Laboratorios Wyeth S.A. | Venezuela |
| Mayne Pharma IP Holdings (Euro) Pty Ltd | Australia |
| Medivation Field Solutions LLC | Delaware |
| Medivation LLC | Delaware |
| Medivation Neurology LLC | Delaware |
| Medivation Prostate Therapeutics LLC | Delaware |
| Medivation Services LLC | Delaware |
| Medivation Technologies LLC | Delaware |
| Monarch Pharmaceuticals, LLC | Tennessee |
| MTG Divestitures LLC | Delaware |
| Neusentis Limited | United Kingdom |
| PAH USA IN8 LLC | Delaware |
| Parke Davis Limited | Hong Kong |
| Parke, Davis & Company LLC | Michigan |
| Parkedale Pharmaceuticals, Inc. | Michigan |
| PBG Puerto Rico LLC | Puerto Rico |
| P-D Co., LLC | Delaware |
| Peak Enterprises LLC | Delaware |
| PF Argentum Acquisition ULC | Canada |
| PF Consumer Healthcare Holdings LLC | Delaware |
| PF Consumer Healthcare Holdings US Inc. | Delaware |
| PF Czech Republic Holdings B.V. | Netherlands |
| PF Finland Holdings B.V. | Netherlands |
| PF OFG Ireland 2 B.V. | Netherlands |
| PF OFG South Korea 1 B.V. | Netherlands |
| PF OFG South Korea 2 B.V. | Netherlands |
| PF PR Holdings C.V. | Netherlands |
| PF PRISM C.V. | Netherlands |
| PF PRISM Holdings B.V. | Netherlands |
| PF PRISM IMB B.V. | Netherlands |
| PFE Wyeth-Ayerst (Asia) LLC | Delaware |
| Pfizer | France |
| Pfizer (China) Research and Development Co. Ltd. | People's Republic China |
| Pfizer (Malaysia) Sdn Bhd | Malaysia |
| Pfizer (Perth) Pty Ltd | Australia |
| Pfizer (Thailand) Limited | Thailand |
| PFIZER (VIETNAM) LIMITED COMPANY | Vietnam |

| | |
|---|---|
| Pfizer (Wuhan) Research and Development Co. Ltd. | People's Republic China |
| Pfizer AB | Sweden |
| Pfizer Afrique de L'Ouest | Senegal |
| Pfizer AG | Switzerland |
| Pfizer Anti-Infectives AB | Sweden |
| Pfizer ApS | Denmark |
| Pfizer AS | Norway |
| Pfizer Asia Manufacturing Pte. Ltd. | Singapore |
| Pfizer Australia Holdings B.V. | Netherlands |
| Pfizer Australia Holdings Pty Limited | Australia |
| Pfizer Australia Investments Pty Limited | Australia |
| Pfizer Australia Pty Ltd | Australia |
| Pfizer B.V. | Netherlands |
| Pfizer Biopharma Egypt LLC | Egypt |
| Pfizer Biopharmaceuticals Egypt LLC | Egypt |
| Pfizer Bolivia S.A. | Bolivia |
| Pfizer Canada ULC / Pfizer Canada SRI | Canada |
| Pfizer Chile S.A. | Chile |
| Pfizer Cia. Ltda. | Ecuador |
| Pfizer Colombia Spinco I LLC | Pennsylvania |
| Pfizer Consumer Healthcare | United Kingdom |
| Pfizer Cork Limited | Ireland |
| Pfizer Corporation Austria Gesellschaft m.b.H. | Austria |
| Pfizer Corporation Hong Kong Limited | Hong Kong |
| Pfizer Corporation S. de R.L. | Panama |
| Pfizer Croatia d.o.o. | Croatia |
| Pfizer Deutschland GmbH | Germany |
| Pfizer Development B.V. | Netherlands |
| Pfizer Development LLC | Delaware |
| Pfizer Development LP | United Kingdom |
| Pfizer Development Services (UK) Limited | United Kingdom |
| Pfizer East India B.V. | Netherlands |
| Pfizer Eastern Investments B.V. | Netherlands |
| Pfizer Export B.V. | Netherlands |
| Pfizer Europe MA EEIG | Belgium |
| Pfizer Export Company | Ireland |
| Pfizer Finance Share Service (Dalian) Co., Ltd. | People's Republic China |
| Pfizer France International Investments | France |
| Pfizer Free Zone Panama, S. de R.L. | Panama |
| Pfizer Global Holdings B.V. | Netherlands |
| Pfizer Global Supply Japan Inc. | Japan |
| Pfizer Global Trading | Ireland |
| Pfizer Gulf FZ-LLC | United Arab Emirates |
| Pfizer H.C.P. Corporation | New York |
| Pfizer Health AB | Sweden |
| Pfizer Health Solutions Inc. | Delaware |

| | |
|---|---|
| Pfizer Healthcare India Private Limited | India |
| Pfizer Healthcare Ireland | Ireland |
| Pfizer Hellas, A.E. | Greece |
| Pfizer Himalaya Holdings Coöperatief U.A. | Netherlands |
| Pfizer Holding France | France |
| Pfizer Holdings Corporation | Delaware |
| Pfizer Holdings International Corporation | Delaware |
| Pfizer Holdings International Luxembourg (PHIL) SARL | Luxembourg |
| Pfizer Innovations AB | Sweden |
| Pfizer Innovations LLC | Russia |
| Pfizer International LLC | New York |
| Pfizer International Operations | France |
| Pfizer Investment Capital Unlimited Company | Ireland |
| Pfizer Investment Co. Ltd. | People's Republic China |
| Pfizer Ireland PFE Holding 1 LLC | Delaware |
| Pfizer Ireland PFE Holding 2 LLC | Delaware |
| Pfizer Ireland Pharmaceuticals | Ireland |
| Pfizer Ireland Ventures Unlimited Company | Ireland |
| Pfizer Italia S.r.l. | Italy |
| Pfizer Japan Inc. | Japan |
| Pfizer Laboratories (Pty) Limited | South Africa |
| Pfizer Laboratories Limited | Kenya |
| Pfizer Leasing Ireland Limited | Ireland |
| Pfizer Leasing UK Limited | United Kingdom |
| Pfizer Limited | India |
| Pfizer Limited | Taiwan |
| Pfizer Limited | United Kingdom |
| Pfizer Luxco Holdings SARL | Luxembourg |
| Pfizer Luxembourg Global Holdings S.à r.l. | Luxembourg |
| Pfizer Luxembourg SARL | Luxembourg |
| Pfizer Manufacturing Austria G.m.b.H. | Austria |
| Pfizer Manufacturing Belgium N.V. | Belgium |
| Pfizer Manufacturing Deutschland GmbH | Germany |
| Pfizer Manufacturing Deutschland Grundbesitz GmbH & Co. KG | Germany |
| Pfizer Manufacturing Holdings LLC | Delaware |
| Pfizer Manufacturing Ireland Unlimited Company | Ireland |
| Pfizer Manufacturing LLC | Delaware |
| Pfizer Manufacturing Services | Ireland |
| Pfizer MAP Holding, Inc. | Delaware |
| Pfizer Medicamentos Genericos e Participacoes Ltda. | Brazil |
| Pfizer Mexico Holding B.V. | Netherlands |
| Pfizer New Zealand Limited | New Zealand |
| Pfizer North America Services LLC | Delaware |
| Pfizer OTC B.V. | Netherlands |
| Pfizer Overseas LLC | Delaware |

4

| | |
|---|---|
| Pfizer Oy | Finland |
| Pfizer Pakistan Limited | Pakistan |
| Pfizer PFE AsiaPac Holding B.V. | Netherlands |
| Pfizer PFE CIA. Ltda. | Ecuador |
| Pfizer PFE Eastern Investments B.V. | Netherlands |
| Pfizer PFE Global Holdings B.V. | Netherlands |
| Pfizer PFE İlaçları Anonim Şirketi | Turkey |
| Pfizer PFE Pharmaceuticals Israel Holding LLC | Delaware |
| Pfizer PFE Pharmaceuticals Israel Ltd. | Israel |
| Pfizer PFE Service Company Holding B.V. | Netherlands |
| Pfizer PFE Spain B.V. | Netherlands |
| Pfizer PFE UK Holding 4 LP | United Kingdom |
| Pfizer Pharm Algerie | Algeria |
| Pfizer Pharma GmbH | Germany |
| Pfizer Pharma PFE GmbH | Germany |
| Pfizer Pharmaceutical (Wuxi) Co., Ltd. | People's Republic China |
| Pfizer Pharmaceutical Trading Limited Liability Company (a/k/a Pfizer Kft. or Pfizer LLC) | Hungary |
| Pfizer Pharmaceuticals Global B.V. | Netherlands |
| Pfizer Pharmaceuticals Israel Ltd. | Israel |
| Pfizer Pharmaceuticals Korea Limited | Republic of Korea |
| Pfizer Pharmaceuticals Science and Technology Co., Ltd. | People's Republic China |
| Pfizer Pigments Inc. | Delaware |
| Pfizer Polska Sp. z.o.o. | Poland |
| Pfizer Private Limited | Singapore |
| Pfizer Production LLC | Delaware |
| Pfizer Products Inc. | Connecticut |
| Pfizer Products India Private Limited | India |
| Pfizer R&D Holding B.V. | Netherlands |
| Pfizer R&D Japan G.K. | Japan |
| Pfizer R&D UK Limited | United Kingdom |
| Pfizer Research (NC), Inc. | Delaware |
| Pfizer Romania SRL | Romania |
| Pfizer S.A. | Peru |
| Pfizer S.A.S. | Colombia |
| Pfizer S.G.P.S. Lda. | Portugal |
| Pfizer S.R.L. | Argentina |
| Pfizer S.r.l. | Italy |
| Pfizer SA (Belgium) | Belgium |
| Pfizer Saudi Limited | Saudi Arabia |
| Pfizer Service Company BVBA | Belgium |
| Pfizer Service Company Ireland Unlimited Company | Ireland |
| Pfizer Shared Services Unlimited Company | Ireland |
| Pfizer Shareholdings Intermediate SARL | Luxembourg |
| Pfizer Singapore Holding Pte. Ltd. | Singapore |
| Pfizer Specialties Limited | Nigeria |

| | |
|---|---|
| Pfizer SRB d.o.o. | Serbia |
| Pfizer Trading Polska sp.z.o.o. | Poland |
| Pfizer Transactions LLC | Delaware |
| Pfizer Tunisie SA | Tunisia |
| Pfizer Vaccines LLC | Delaware |
| Pfizer Venezuela, S.A. | Venezuela |
| Pfizer Ventures (US) LLC | Delaware |
| Pfizer Ventures LLC | Delaware |
| Pfizer Worldwide Services Unlimited Company | Ireland |
| Pfizer Zona Franca, S.A. | Costa Rica |
| Pfizer, Inc. | Philippines |
| Pfizer, S.A. | Costa Rica |
| Pfizer, S.A. de C.V. | Mexico |
| Pfizer, S.L. | Spain |
| Pfizer, spol. s r.o. | Czech Republic |
| Pharmacia & Upjohn Company LLC | Delaware |
| Pharmacia & Upjohn LLC | Delaware |
| Pharmacia Brasil Ltda. | Brazil |
| Pharmacia Hepar LLC | Delaware |
| Pharmacia Inter-American LLC | Pennsylvania |
| Pharmacia International B.V. | Netherlands |
| Pharmacia Limited | United Kingdom |
| Pharmacia LLC | Delaware |
| PHIVCO Corp. | Delaware |
| PHIVCO Holdco S.à r.l. | Luxembourg |
| PIMB OFG Spain Holding, S.L. | Spain |
| PRISM Holdings B.V. | Netherlands |
| PT. Pfizer Indonesia | Indonesia |
| Purepac Pharmaceutical Holdings LLC | Delaware |
| Renrall LLC | Wyoming |
| Rinat Neuroscience Corp. | Delaware |
| Roerig S.A. | Chile |
| Searle Laboratorios, Lda. | Portugal |
| Servicios P&U, S. de R.L. de C.V. | Mexico |
| Shiley LLC | California |
| Sinergis Farma-Produtos Farmaceuticos, Lda. | Portugal |
| Solinor LLC | Delaware |
| Sugen LLC | Delaware |
| Tabor LLC | Delaware |
| Trillium Therapeutics ULC | Canada |
| Trillium Therapeutics USA, LLC | Delaware |
| Upjohn Laboratorios Lda. | Portugal |
| Vicuron Holdings LLC | Delaware |
| Warner Lambert del Uruguay S.A. | Uruguay |
| Warner-Lambert Company GmbH | Switzerland |
| Warner-Lambert Company LLC | Delaware |

| | |
|---|---|
| W-L LLC | Delaware |
| Wyeth Ayerst Inc. | Delaware |
| Wyeth Ayerst S.à r.l. | Luxembourg |
| Wyeth Farma, S.A. | Spain |
| Wyeth Holdings LLC | Maine |
| Wyeth Industria Farmaceutica Ltda. | Brazil |
| Wyeth Lederle S.r.l. | Italy |
| Wyeth LLC | Delaware |
| Wyeth Pakistan Limited | Pakistan |
| Wyeth Pharmaceuticals FZ-LLC | United Arab Emirates |
| Wyeth Pharmaceuticals LLC | Delaware |
| Wyeth Subsidiary Illinois Corporation | Illinois |
| Wyeth Whitehall Export GmbH | Austria |
| Wyeth-Ayerst (Asia) LLC | Delaware |
| Wyeth-Ayerst International LLC | Delaware |
| Wyeth-Ayerst Promotions Limited | Delaware |

7

**EXHIBIT 23**

**Consent of Independent Registered Public Accounting Firm**

To the Board of Directors
Pfizer Inc.:

We consent to the incorporation by reference in the registration statements listed below of Pfizer Inc. and Subsidiary Companies (Pfizer Inc.) of our reports dated February 24, 2022, with respect to the consolidated balance sheets of Pfizer Inc. as of December 31, 2021 and 2020, the related consolidated statements of income, comprehensive income, equity, and cash flows for each of the years in the three-year period ended December 31, 2021, and the related notes, and the effectiveness of internal control over financial reporting as of December 31, 2021, which reports appear in the 2021 Annual Report on Form 10-K of Pfizer Inc.

-Form S-8 dated October 27, 1983 (File No. 2-87473),
-Form S-8 dated March 22, 1990 (File No. 33-34139),
-Form S-8 dated January 24, 1991 (File No. 33-38708),
-Form S-8 dated November 18, 1991 (File No. 33-44053),
-Form S-8 dated May 27, 1993 (File No. 33-49631),
-Form S-8 dated May 19, 1994 (File No. 33-53713),
-Form S-8 dated October 5, 1994 (File No. 33-55771),
-Form S-8 dated December 20, 1994 (File No. 33-56979),
-Form S-8 dated March 29, 1996 (File No. 333-02061),
-Form S-8 dated September 25, 1997 (File No. 333-36371),
-Form S-8 dated June 19, 2000 (File No. 333-39606),
-Form S-8 dated April 27, 2001 (File No. 333-59660),
-Form S-8 dated April 16, 2003 (File No. 333-104582),
-Form S-8 dated November 18, 2003 (File No. 333-110571),
-Form S-8 dated December 18, 2003 (File No. 333-111333),
-Form S-8 dated April 26, 2004 (File No. 333-114852),
-Form S-8 dated March 1, 2007 (File No. 333-140987),
-Form S-4 dated March 27, 2009 (File No. 333-158237),
-Form S-8 dated October 16, 2009 (File No. 333-162519),
-Form S-8 dated October 16, 2009 (File No. 333-162520),
-Form S-8 dated October 16, 2009 (File No. 333-162521),
-Form S-8 dated March 1, 2010 (File No. 333-165121),
-Form S-8 dated March 2, 2015 (File No. 333-202437),
-Form S-4 dated September 3, 2015 (File No. 333-206758),
-Form S-8 dated August 8, 2019 (File No. 333-233166), and
-Form S-3 ASR dated February 26, 2021 (File No. 333-253605)

/s/ KPMG LLP
New York, New York February 24, 2022

**EXHIBIT 31.1**

**Certification by the Chief Executive Officer Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Albert Bourla, certify that:

1. I have reviewed this Annual Report on Form 10-K of Pfizer Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2022

/s/ ALBERT BOURLA
**Albert Bourla**
**Chairman and Chief Executive Officer**

**EXHIBIT 31.2**

**Certification by the Chief Financial Officer Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Frank A. D'Amelio, certify that:

1.    I have reviewed this Annual Report on Form 10-K of Pfizer Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 24, 2022

/s/ FRANK A. D'AMELIO
**Frank A. D'Amelio**
**Chief Financial Officer, Executive Vice President**

**EXHIBIT 32.1**

**Certification by the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

Pursuant to 18 U.S.C. Section 1350, I, Albert Bourla, hereby certify that, to the best of my knowledge, the Annual Report on Form 10-K of Pfizer Inc. for the year ended December 31, 2021 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, and that the information contained in that Report fairly presents, in all material respects, the financial condition and results of operations of Pfizer Inc.

/s/ ALBERT BOURLA
**Albert Bourla**
**Chairman and Chief Executive Officer**

February 24, 2022

This certification accompanies this Annual Report on Form 10-K pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such Act, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.

**EXHIBIT 32.2**

**Certification by the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

Pursuant to 18 U.S.C. Section 1350, I, Frank A. D'Amelio, hereby certify that, to the best of my knowledge, the Annual Report on Form 10-K of Pfizer Inc. for the year ended December 31, 2021 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, and that the information contained in that Report fairly presents, in all material respects, the financial condition and results of operations of Pfizer Inc.

/s/ FRANK A. D'AMELIO
**Frank A. D'Amelio**
**Chief Financial Officer, Executive Vice President**

February 24, 2022

This certification accompanies this Annual Report on Form 10-K pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such Act, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.

# EXHIBIT 7

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use COMIRNATY safely and effectively. See full prescribing information for COMIRNATY.**

**COMIRNATY® (COVID-19 Vaccine, mRNA) suspension for injection, for intramuscular use**
**Initial U.S. Approval: 2021**

--------------------- **RECENT MAJOR CHANGES** ---------------------

Dosage and Administration, Preparation for Administration (2.1)     12/2021

--------------------- **INDICATIONS AND USAGE** ---------------------
COMIRNATY is a vaccine indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older. (1)

------------------ **DOSAGE AND ADMINISTRATION** ------------------
- COMIRNATY supplied in multiple dose vials with purple caps and labels with purple borders MUST BE DILUTED before use. (2.1)
- For intramuscular injection only. (2.2)
- COMIRNATY is administered intramuscularly as a series of 2 doses (0.3 mL each) 3 weeks apart. (2.3)

------------------ **DOSAGE FORMS AND STRENGTHS** ------------------
Suspension for injection. After preparation, a single dose is 0.3 mL. (3)

------------------------ **CONTRAINDICATIONS** ------------------------
Known history of a severe allergic reaction (e.g., anaphylaxis) to any component of COMIRNATY. (4)

------------------ **WARNINGS AND PRECAUTIONS** ------------------
- Postmarketing data demonstrate increased risks of myocarditis and pericarditis, particularly within 7 days following the second dose. (5.2)
- Syncope (fainting) may occur in association with administration of injectable vaccines, including COMIRNATY. Procedures should be in place to avoid injury from fainting. (5.4)

------------------------ **ADVERSE REACTIONS** ------------------------
- In clinical studies of participants 16 through 55 years of age, the most commonly reported adverse reactions (≥10%) were pain at the injection site (88.6%), fatigue (70.1%), headache (64.9%), muscle pain (45.5%), chills (41.5%), joint pain (27.5%), fever (17.8%), and injection site swelling (10.6%). (6.1)
- In clinical studies of participants 56 years of age and older, the most commonly reported adverse reactions (≥10%) were pain at the injection site (78.2%), fatigue (56.9%), headache, (45.9%), muscle pain (32.5%), chills (24.8%), joint pain (21.5%), injection site swelling (11.8%), fever (11.5%), and injection site redness (10.4%). (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Pfizer Inc. at 1-800-438-1985 or VAERS at 1-800-822-7967 or http://vaers.hhs.gov.**
**See 17 for PATIENT COUNSELING INFORMATION.**
**Revised: 12/2021**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***
**1 INDICATIONS AND USAGE**
**2 DOSAGE AND ADMINISTRATION**
    2.1 Preparation for Administration
    2.2 Administration Information
    2.3 Vaccination Schedule

**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
    5.1 Management of Acute Allergic Reactions
    5.2 Myocarditis and Pericarditis
    5.3 Syncope
    5.4 Altered Immunocompetence
    5.5 Limitation of Effectiveness
**6 ADVERSE REACTIONS**
    6.1 Clinical Trials Experience
    6.2 Postmarketing Experience
**8 USE IN SPECIFIC POPULATIONS**
    8.1 Pregnancy
    8.2 Lactation
    8.4 Pediatric Use
    8.5 Geriatric Use
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
    12.1 Mechanism of Action
**13 NONCLINICAL TOXICOLOGY**
    13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**
\* Sections or subsections omitted from the full prescribing information are not listed.

---

**FULL PRESCRIBING INFORMATION**

**1 INDICATIONS AND USAGE**

COMIRNATY is a vaccine indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older.

**2 DOSAGE AND ADMINISTRATION**

For intramuscular injection only.

**2.1 Preparation for Administration**

The storage, preparation, and administration information in this Prescribing Information apply to COMIRNATY for individuals 16 years of age and older supplied in multiple dose vials with <u>purple caps and labels with a purple borders, which **MUST BE DILUTED** before use</u>.

**COMIRNATY Multiple Dose Vial with Purple Cap and Label with a Purple Border**

| Age Range | Dilution Information | Doses Per Vial After Dilution | Dose Volume |
|---|---|---|---|
| 16 years and older | Dilute with 1.8 mL sterile 0.9% Sodium Chloride Injection, USP prior to use | 6 | 0.3 mL |

<u>Dose Preparation</u>

Each vial **MUST BE DILUTED** before administering the vaccine.

- COMIRNATY multiple dose vial with a purple cap and label with a purple border contains a volume of 0.45 mL, supplied
  as a frozen suspension that does not contain preservative. Each vial must be thawed before dilution.
- Vials may be thawed in the refrigerator [2°C to 8°C (35°F to 46°F)] or at room temperature [up to 25°C (77°F)] *[see How Supplied/Storage and Handling (16)]*.
- Refer to thawing instructions in the panels below.

<u>Dilution</u>

- Dilute the vial contents using 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP to form COMIRNATY. Do not add more than 1.8 mL of diluent.
- ONLY use sterile 0.9% Sodium Chloride Injection, USP as the diluent. <u>Do not use bacteriostatic 0.9% Sodium Chloride Injection or any other diluent.</u>
- Vials of sterile 0.9% Sodium Chloride Injection, USP are provided but shipped separately. Use the provided diluent or another sterile 0.9% Sodium Chloride Injection, USP as the diluent.
  - Provided diluent vials are single-use only; discard after 1.8 mL is withdrawn;
  - If another sterile 0.9% Sodium Chloride Injection, USP is used as the diluent, discard after 1.8 mL is withdrawn.
  - Do not dilute more than 1 vial of COMIRNATY using the same diluent vial.
- After dilution, 1 vial of COMIRNATY contains 6 doses of 0.3 mL each.
- Refer to dilution and dose preparation instructions in the panels below.

| Dilution and Preparation Instructions |
|---|
| **COMIRNATY Vial with Purple Cap and Label with Purple Border – Vial Verification** |



**Purple cap**

DILUTE BEFORE USE

Date / Time:

✓**Purple plastic cap and label with purple border.**

- Verify that the vial of COMIRNATY has a purple plastic cap and a label with a purple border.

| **COMIRNATY Vial with Purple Cap and Label with Purple Border – Thawing Prior to Dilution** |
|---|



No more than 2 hours at room temperature (up to 25°C/77°F).

- Thaw vial(s) of COMIRNATY before dilution either by:
  - Allowing vial(s) to thaw in the refrigerator [2°C to 8°C (35°F to 46°F)]. A carton of vials may take up to 3 hours to thaw, and thawed vials can be stored in the refrigerator for up to 1 month.
  - Allowing vial(s) to sit at room temperature [up to 25°C (77°F)] for 30 minutes.
- Using either thawing method, vials must reach room temperature before dilution and must be diluted within 2 hours.



- Before dilution invert vaccine vial gently 10 times.
- <u>Do not shake.</u>
- Inspect the liquid in the vial prior to dilution. The liquid is a white to off-white suspension and may contain <u>white to off-white opaque amorphous particles</u>.
- Do not use if liquid is discolored or if other particles are observed.

**Gently × 10**

**COMIRNATY Vial with Purple Cap and Label with Purple Border – Dilution**



**Add 1.8 mL of sterile 0.9% sodium chloride injection, USP.**

- ONLY use sterile 0.9% Sodium Chloride Injection, USP as the diluent.
- Withdraw 1.8 mL of diluent into a transfer syringe (21-gauge or narrower needle).
- Add 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP into the vaccine vial.

- Equalize vial pressure before removing the needle from the vaccine vial by withdrawing 1.8 mL air into the empty diluent syringe.



**Pull back plunger to 1.8 mL to remove air from vial.**



**Gently × 10**

- Gently invert the vial containing COMIRNATY 10 times to mix.
- <u>Do not shake</u>.
- Inspect the vaccine in the vial.
- The vaccine will be an off-white suspension. Do not use if vaccine is discolored or contains particulate matter.



**Record the date and time of dilution. Use within 6 hours after dilution.**

- Record the date and time of dilution on the COMIRNATY vial label.
- Store between 2°C to 25°C (35°F to 77°F).
- Discard any unused vaccine 6 hours after dilution.

**COMIRNATY Vial with Purple Cap and Label with Purple Border –**
**Preparation of Individual 0.3 mL Doses**

| | |
|---|---|
| <br>**Withdraw 0.3 mL dose of vaccine.** | • Withdraw 0.3 mL of COMIRNATY preferentially using low dead-volume syringes and/or needles.<br>• Each dose must contain 0.3 mL of vaccine.<br>• If the amount of vaccine remaining in a single vial cannot provide a full dose of 0.3 mL, discard the vial and any excess volume.<br>• Administer immediately. |

After dilution, vials of COMIRNATY with purple caps and labels with purple borders contain 6 doses of 0.3 mL of vaccine. Low dead-volume syringes and/or needles can be used to extract 6 doses from a single vial. If standard syringes and needles are used, there may not be sufficient volume to extract 6 doses from a single vial. Irrespective of the type of syringe and needle,

- each dose must contain 0.3 mL of vaccine.
- if the amount of vaccine remaining in the vial cannot provide a full dose of 0.3 mL, discard the vial and any excess volume.
- do not pool excess vaccine from multiple vials.

## 2.2 Administration Information

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit. The vaccine will be an off-white suspension. Do not administer if vaccine is discolored or contains particulate matter.

Administer a single 0.3 mL dose of COMIRNATY intramuscularly.

## 2.3 Vaccination Schedule

COMIRNATY is administered intramuscularly as a series of 2 doses (0.3 mL each) 3 weeks apart.

There are no data available on the interchangeability of COMIRNATY with COVID-19 vaccines from other manufacturers to complete the vaccination series. Individuals who have received 1 dose of COMIRNATY should receive a second dose of COMIRNATY to complete the vaccination series.

## 3 DOSAGE FORMS AND STRENGTHS

COMIRNATY is a suspension for injection. After preparation, each dose of COMIRNATY supplied in vials with purple caps and labels with purple borders is 0.3 mL.

## 4 CONTRAINDICATIONS

Do not administer COMIRNATY to individuals with known history of a severe allergic reaction (e.g., anaphylaxis) to any component of the COMIRNATY *[see Description (11)]*.

## 5 WARNINGS AND PRECAUTIONS

### 5.1 Management of Acute Allergic Reactions

Appropriate medical treatment used to manage immediate allergic reactions must be immediately available in the event an acute anaphylactic reaction occurs following administration of COMIRNATY.

## 5.2 Myocarditis and Pericarditis

Postmarketing data demonstrate increased risks of myocarditis and pericarditis, particularly within 7 days following the second dose. The observed risk is higher among males under 40 years of age than among females and older males. The observed risk is highest in males 12 through 17 years of age. Although some cases required intensive care support, available data from short-term follow-up suggest that most individuals have had resolution of symptoms with conservative management. Information is not yet available about potential long-term sequelae. The CDC has published considerations related to myocarditis and pericarditis after vaccination, including for vaccination of individuals with a history of myocarditis or pericarditis (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html).

## 5.3 Syncope

Syncope (fainting) may occur in association with administration of injectable vaccines, including COMIRNATY. Procedures should be in place to avoid injury from fainting.

## 5.4 Altered Immunocompetence

Immunocompromised persons, including individuals receiving immunosuppressant therapy, may have a diminished immune response to the COMIRNATY.

## 5.5 Limitation of Effectiveness

COMIRNATY may not protect all vaccine recipients.

## 6 ADVERSE REACTIONS

In clinical studies, the most commonly reported (≥10%) adverse reactions in participants 16 through 55 years of age following any dose were pain at the injection site (88.6%), fatigue (70.1%), headache (64.9%), muscle pain (45.5%), chills (41.5%), joint pain (27.5%), fever (17.8%), and injection site swelling (10.6%).

In clinical studies, the most commonly reported (≥10%) adverse reactions in participants 56 years of age and older following any dose were pain at the injection site (78.2%), fatigue (56.9%), headache, (45.9%), muscle pain (32.5%), chills (24.8%), joint pain (21.5%), injection site swelling (11.8%), fever (11.5%), and injection site redness (10.4%).

## 6.1 Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a vaccine cannot be directly compared to rates in the clinical trials of another vaccine and may not reflect the rates observed in practice.

The safety of COMIRNATY was evaluated in participants 16 years of age and older in 2 clinical studies conducted in Germany (Study 1), United States, Argentina, Brazil, Turkey, South Africa, and Germany (Study 2). Study BNT162-01 (Study 1) was a Phase 1/2, 2-part, dose-escalation trial that enrolled 60 participants, 18 through 55 years of age and 36 participants, 56 through 85 years of age. Study C4591001 (Study 2) is a Phase 1/2/3 multicenter, multinational, randomized, saline placebo-controlled, double-blinded (Phase 2/3), dose-finding, vaccine candidate-selection and efficacy study that has enrolled approximately 44,047 participants (22,026 COMIRNATY; 22,021 placebo) 16 years of age or older (including 378 and 376 participants 16 through 17 years of age in the vaccine and placebo groups, respectively). Upon issuance of the Emergency Use Authorization (December 11, 2020) for COMIRNATY, participants were unblinded to offer placebo participants COMIRNATY. Participants were unblinded in a phased manner over a period of months to offer placebo participants COMIRNATY. Study 2 also included 200 participants with confirmed stable human immunodeficiency virus (HIV) infection; HIV-positive participants are included in safety population disposition but are summarized separately in safety analyses. Confirmed stable HIV infection was defined as documented viral load <50 copies/mL and CD4 count >200 cells/mm$^3$ within 6 months before enrollment, and on stable antiretroviral therapy for at least 6 months.

At the time of the analysis of the ongoing Study 2 with a data cut-off of March 13, 2021, there were 25,651 (58.2%) participants (13,031 COMIRNATY and 12,620 placebo) 16 years of age and older followed for ≥4 months after the second dose.

Participants 16 years and older in the reactogenicity subset were monitored for solicited local and systemic reactions and use of antipyretic medication after each vaccination in an electronic diary. Participants are being monitored for unsolicited adverse events, including serious adverse events, throughout the study [from Dose 1 through 1 month (all unsolicited adverse events) or 6 months (serious adverse events) after the last vaccination].

Demographic characteristics in Study 2 were generally similar with regard to age, gender, race, and ethnicity among participants who received COMIRNATY and those who received placebo. Overall, among the total participants who received either COMIRNATY or placebo, 50.9% were male, 49.1% were female, 79.3% were 16 through 64 years of age, 20.7% were 65 years of age and older, 82.0% were White, 9.6% were Black or African American, 25.9% were Hispanic/Latino, 4.3% were Asian, and 1.0% were American Indian or Alaska Native.

<u>Local and Systemic Adverse Reactions Solicited in the Study 2</u>

Table 1 and Table 2 present the frequency and severity of reported solicited local and systemic reactions, respectively, within 7 days following each dose of COMIRNATY and placebo in the subset of participants 16 through 55 years of age included in the safety population who were monitored for reactogenicity with an electronic diary.

Table 3 and Table 4 present the frequency and severity of reported solicited local and systemic reactions, respectively, within 7 days of each dose of COMIRNATY and placebo for participants 56 years of age and older.

In participants 16 through 55 years of age after receiving Dose 2, the mean duration of pain at the injection site was 2.5 days (range 1 to 70 days), for redness 2.2 days (range 1 to 9 days), and for swelling 2.1 days (range 1 to 8 days) for participants in the COMIRNATY group. In participants 56 years of age and older after receiving Dose 2, the mean duration of pain at the injection site was 2.4 days (range 1 to 36 days), for redness 3.0 days (range 1 to 34 days), and for swelling 2.6 days (range 1 to 34 days) for participants in the COMIRNATY group.

**Table 1: Study 2 – Frequency and Percentages of Participants with Solicited Local Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 16 Through 55 Years of Age – Reactogenicity Subset of the Safety Population[*]**

| | COMIRNATY Dose 1 N[†]=2899 n[‡] (%) | Placebo Dose 1 N[†]=2908 n[‡] (%) | COMIRNATY Dose 2 N[†]=2682 n[‡] (%) | Placebo Dose 2 N[†]=2684 n[‡] (%) |
|---|---|---|---|---|
| Redness[§] | | | | |
| Any (>2.0 cm) | 156 (5.4) | 28 (1.0) | 151 (5.6) | 18 (0.7) |
| Mild | 113 (3.9) | 19 (0.7) | 90 (3.4) | 12 (0.4) |
| Moderate | 36 (1.2) | 6 (0.2) | 50 (1.9) | 6 (0.2) |
| Severe | 7 (0.2) | 3 (0.1) | 11 (0.4) | 0 |
| Swelling[§] | | | | |
| Any (>2.0 cm) | 184 (6.3) | 16 (0.6) | 183 (6.8) | 5 (0.2) |
| Mild | 124 (4.3) | 6 (0.2) | 110 (4.1) | 3 (0.1) |
| Moderate | 54 (1.9) | 8 (0.3) | 66 (2.5) | 2 (0.1) |
| Severe | 6 (0.2) | 2 (0.1) | 7 (0.3) | 0 |
| Pain at the injection site[¶] | | | | |
| Any | 2426 (83.7) | 414 (14.2) | 2101 (78.3) | 312 (11.6) |
| Mild | 1464 (50.5) | 391 (13.4) | 1274 (47.5) | 284 (10.6) |
| Moderate | 923 (31.8) | 20 (0.7) | 788 (29.4) | 28 (1.0) |

Notes: Reactions were collected in the electronic diary (e-diary) from Day 1 to Day 7 after vaccination.
No Grade 4 solicited local reactions were reported in participants 16 through 55 years of age.

[*] Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

[†] N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction was the same, therefore, this information was included in the column header.

[‡] n = Number of participants with the specified reaction.

[§] Mild: >2.0 to ≤5.0 cm; Moderate: >5.0 to ≤10.0 cm; Severe: >10.0 cm.

[¶] Mild: does not interfere with activity; Moderate: interferes with activity; Severe: prevents daily activity.

| | COMIRNATY Dose 1 N[†]=2899 n[‡] (%) | Placebo Dose 1 N[†]=2908 n[‡] (%) | COMIRNATY Dose 2 N[†]=2682 n[‡] (%) | Placebo Dose 2 N[†]=2684 n[‡] (%) |
|---|---|---|---|---|
| Severe | 39 (1.3) | 3 (0.1) | 39 (1.5) | 0 |

Notes: Reactions were collected in the electronic diary (e-diary) from Day 1 to Day 7 after vaccination.

No Grade 4 solicited local reactions were reported in participants 16 through 55 years of age.

\* Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

† N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction was the same, therefore, this information was included in the column header.

‡ n = Number of participants with the specified reaction.

§ Mild: >2.0 to ≤5.0 cm; Moderate: >5.0 to ≤10.0 cm; Severe: >10.0 cm.

¶ Mild: does not interfere with activity; Moderate: interferes with activity; Severe: prevents daily activity.

**Table 2: Study 2 – Frequency and Percentages of Participants with Solicited Systemic Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 16 Through 55 Years of Age – Reactogenicity Subset of the Safety Population\***

| | COMIRNATY Dose 1 N[†]=2899 n[‡] (%) | Placebo Dose 1 N[†]=2908 n[‡] (%) | COMIRNATY Dose 2 N[†]=2682 n[‡] (%) | Placebo Dose 2 N[†]=2684 n[‡] (%) |
|---|---|---|---|---|
| Fever | | | | |
| ≥38.0°C | 119 (4.1) | 25 (0.9) | 440 (16.4) | 11 (0.4) |
| ≥38.0°C to 38.4°C | 86 (3.0) | 16 (0.6) | 254 (9.5) | 5 (0.2) |
| >38.4°C to 38.9°C | 25 (0.9) | 5 (0.2) | 146 (5.4) | 4 (0.1) |
| >38.9°C to 40.0°C | 8 (0.3) | 4 (0.1) | 39 (1.5) | 2 (0.1) |
| >40.0°C | 0 | 0 | 1 (0.0) | 0 |
| Fatigue§ | | | | |
| Any | 1431 (49.4) | 960 (33.0) | 1649 (61.5) | 614 (22.9) |
| Mild | 760 (26.2) | 570 (19.6) | 558 (20.8) | 317 (11.8) |
| Moderate | 630 (21.7) | 372 (12.8) | 949 (35.4) | 283 (10.5) |
| Severe | 41 (1.4) | 18 (0.6) | 142 (5.3) | 14 (0.5) |
| Headache§ | | | | |
| Any | 1262 (43.5) | 975 (33.5) | 1448 (54.0) | 652 (24.3) |
| Mild | 785 (27.1) | 633 (21.8) | 699 (26.1) | 404 (15.1) |
| Moderate | 444 (15.3) | 318 (10.9) | 658 (24.5) | 230 (8.6) |
| Severe | 33 (1.1) | 24 (0.8) | 91 (3.4) | 18 (0.7) |
| Chills§ | | | | |
| Any | 479 (16.5) | 199 (6.8) | 1015 (37.8) | 114 (4.2) |
| Mild | 338 (11.7) | 148 (5.1) | 477 (17.8) | 89 (3.3) |
| Moderate | 126 (4.3) | 49 (1.7) | 469 (17.5) | 23 (0.9) |
| Severe | 15 (0.5) | 2 (0.1) | 69 (2.6) | 2 (0.1) |
| Vomiting¶ | | | | |
| Any | 34 (1.2) | 36 (1.2) | 58 (2.2) | 30 (1.1) |
| Mild | 29 (1.0) | 30 (1.0) | 42 (1.6) | 20 (0.7) |
| Moderate | 5 (0.2) | 5 (0.2) | 12 (0.4) | 10 (0.4) |
| Severe | 0 | 1 (0.0) | 4 (0.1) | 0 |
| Diarrhea# | | | | |
| Any | 309 (10.7) | 323 (11.1) | 269 (10.0) | 205 (7.6) |
| Mild | 251 (8.7) | 264 (9.1) | 219 (8.2) | 169 (6.3) |

| | COMIRNATY<br>Dose 1<br>N[†]=2899<br>n[‡] (%) | Placebo<br>Dose 1<br>N[†]=2908<br>n[‡] (%) | COMIRNATY<br>Dose 2<br>N[†]=2682<br>n[‡] (%) | Placebo<br>Dose 2<br>N[†]=2684<br>n[‡] (%) |
|---|---|---|---|---|
| Moderate | 55 (1.9) | 58 (2.0) | 44 (1.6) | 35 (1.3) |
| Severe | 3 (0.1) | 1 (0.0) | 6 (0.2) | 1 (0.0) |
| New or worsened muscle pain[§] | | | | |
| Any | 664 (22.9) | 329 (11.3) | 1055 (39.3) | 237 (8.8) |
| Mild | 353 (12.2) | 231 (7.9) | 441 (16.4) | 150 (5.6) |
| Moderate | 296 (10.2) | 96 (3.3) | 552 (20.6) | 84 (3.1) |
| Severe | 15 (0.5) | 2 (0.1) | 62 (2.3) | 3 (0.1) |
| New or worsened joint pain[§] | | | | |
| Any | 342 (11.8) | 168 (5.8) | 638 (23.8) | 147 (5.5) |
| Mild | 200 (6.9) | 112 (3.9) | 291 (10.9) | 82 (3.1) |
| Moderate | 137 (4.7) | 55 (1.9) | 320 (11.9) | 61 (2.3) |
| Severe | 5 (0.2) | 1 (0.0) | 27 (1.0) | 4 (0.1) |
| Use of antipyretic or pain medication[þ] | 805 (27.8) | 398 (13.7) | 1213 (45.2) | 320 (11.9) |

Notes: Reactions and use of antipyretic or pain medication were collected in the electronic diary (e-diary) from Day 1 to Day 7 after each dose.

No Grade 4 solicited systemic reactions were reported in participants 16 through 55 years of age.

* Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

† N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction or use of antipyretic or pain medication was the same, therefore, this information was included in the column header.

‡ n = Number of participants with the specified reaction.

§ Mild: does not interfere with activity; Moderate: some interference with activity; Severe: prevents daily activity.

¶ Mild: 1 to 2 times in 24 hours; Moderate: >2 times in 24 hours; Severe: requires intravenous hydration.

# Mild: 2 to 3 loose stools in 24 hours; Moderate: 4 to 5 loose stools in 24 hours; Severe: 6 or more loose stools in 24 hours.

þ Severity was not collected for use of antipyretic or pain medication.


**Table 3: Study 2 – Frequency and Percentages of Participants with Solicited Local Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 56 Years of Age and Older – Reactogenicity Subset of the Safety Population***

| | COMIRNATY<br>Dose 1<br>N[†]=2008<br>n[‡] (%) | Placebo<br>Dose 1<br>N[†]=1989<br>n[‡] (%) | COMIRNATY<br>Dose 2<br>N[†]=1860<br>n[‡] (%) | Placebo<br>Dose 2<br>N[†]=1833<br>n[‡] (%) |
|---|---|---|---|---|

Notes: Reactions were collected in the electronic diary (e-diary) from Day 1 to Day 7 after vaccination.

No Grade 4 solicited local reactions were reported in participants 56 years of age and older.

* Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

† N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction was the same, therefore, the information was included in the column header.

‡ n = Number of participants with the specified reaction.

§ Mild: >2.0 to ≤5.0 cm; Moderate: >5.0 to ≤10.0 cm; Severe: >10.0 cm.

¶ Mild: does not interfere with activity; Moderate: interferes with activity; Severe: prevents daily activity.

| | COMIRNATY<br>Dose 1<br>N[†]=2008<br>n[‡] (%) | Placebo<br>Dose 1<br>N[†]=1989<br>n[‡] (%) | COMIRNATY<br>Dose 2<br>N[†]=1860<br>n[‡] (%) | Placebo<br>Dose 2<br>N[†]=1833<br>n[‡] (%) |
|---|---|---|---|---|
| **Redness[§]** | | | | |
| Any (>2.0 cm) | 106 (5.3) | 20 (1.0) | 133 (7.2) | 14 (0.8) |
| Mild | 71 (3.5) | 13 (0.7) | 65 (3.5) | 10 (0.5) |
| Moderate | 30 (1.5) | 5 (0.3) | 58 (3.1) | 3 (0.2) |
| Severe | 5 (0.2) | 2 (0.1) | 10 (0.5) | 1 (0.1) |
| **Swelling[§]** | | | | |
| Any (>2.0 cm) | 141 (7.0) | 23 (1.2) | 145 (7.8) | 13 (0.7) |
| Mild | 87 (4.3) | 11 (0.6) | 80 (4.3) | 5 (0.3) |
| Moderate | 52 (2.6) | 12 (0.6) | 61 (3.3) | 7 (0.4) |
| Severe | 2 (0.1) | 0 | 4 (0.2) | 1 (0.1) |
| **Pain at the injection site[¶]** | | | | |
| Any (>2.0 cm) | 1408 (70.1) | 185 (9.3) | 1230 (66.1) | 143 (7.8) |
| Mild | 1108 (55.2) | 177 (8.9) | 873 (46.9) | 138 (7.5) |
| Moderate | 296 (14.7) | 8 (0.4) | 347 (18.7) | 5 (0.3) |
| Severe | 4 (0.2) | 0 | 10 (0.5) | 0 |

Notes: Reactions were collected in the electronic diary (e-diary) from Day 1 to Day 7 after vaccination.

No Grade 4 solicited local reactions were reported in participants 56 years of age and older.

\* Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

† N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction was the same, therefore, the information was included in the column header.

‡ n = Number of participants with the specified reaction.

§ Mild: >2.0 to ≤5.0 cm; Moderate: >5.0 to ≤10.0 cm; Severe: >10.0 cm.

¶ Mild: does not interfere with activity; Moderate: interferes with activity; Severe: prevents daily activity.

**Table 4: Study 2 – Frequency and Percentages of Participants with Solicited Systemic Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 56 Years of Age and Older – Reactogenicity Subset of the Safety Population[\*]**

| | COMIRNATY<br>Dose 1<br>N[†]=2008<br>n[‡] (%) | Placebo<br>Dose 1<br>N[†]=1989<br>n[‡] (%) | COMIRNATY<br>Dose 2<br>N[†]=1860<br>n[‡] (%) | Placebo<br>Dose 2<br>N[†]=1833<br>n[‡] (%) |
|---|---|---|---|---|
| **Fever** | | | | |
| ≥38.0°C | 26 (1.3) | 8 (0.4) | 219 (11.8) | 4 (0.2) |
| ≥38.0°C to 38.4°C | 23 (1.1) | 3 (0.2) | 158 (8.5) | 2 (0.1) |
| >38.4°C to 38.9°C | 2 (0.1) | 3 (0.2) | 54 (2.9) | 1 (0.1) |
| >38.9°C to 40.0°C | 1 (0.0) | 2 (0.1) | 7 (0.4) | 1 (0.1) |
| >40.0°C | 0 | 0 | 0 | 0 |
| **Fatigue[§]** | | | | |
| Any | 677 (33.7) | 447 (22.5) | 949 (51.0) | 306 (16.7) |
| Mild | 415 (20.7) | 281 (14.1) | 391 (21.0) | 183 (10.0) |
| Moderate | 259 (12.9) | 163 (8.2) | 497 (26.7) | 121 (6.6) |
| Severe | 3 (0.1) | 3 (0.2) | 60 (3.2) | 2 (0.1) |
| Grade 4 | 0 | 0 | 1 (0.1) | 0 |
| **Headache[§]** | | | | |
| Any | 503 (25.0) | 363 (18.3) | 733 (39.4) | 259 (14.1) |
| Mild | 381 (19.0) | 267 (13.4) | 464 (24.9) | 189 (10.3) |

| | COMIRNATY Dose 1 N[†]=2008 n[‡] (%) | Placebo Dose 1 N[†]=1989 n[‡] (%) | COMIRNATY Dose 2 N[†]=1860 n[‡] (%) | Placebo Dose 2 N[†]=1833 n[‡] (%) |
|---|---|---|---|---|
| Moderate | 120 (6.0) | 93 (4.7) | 256 (13.8) | 65 (3.5) |
| Severe | 2 (0.1) | 3 (0.2) | 13 (0.7) | 5 (0.3) |
| Chills[§] | | | | |
| Any | 130 (6.5) | 69 (3.5) | 435 (23.4) | 57 (3.1) |
| Mild | 102 (5.1) | 49 (2.5) | 229 (12.3) | 45 (2.5) |
| Moderate | 28 (1.4) | 19 (1.0) | 185 (9.9) | 12 (0.7) |
| Severe | 0 | 1 (0.1) | 21 (1.1) | 0 |
| Vomiting[¶] | | | | |
| Any | 10 (0.5) | 9 (0.5) | 13 (0.7) | 5 (0.3) |
| Mild | 9 (0.4) | 9 (0.5) | 10 (0.5) | 5 (0.3) |
| Moderate | 1 (0.0) | 0 | 1 (0.1) | 0 |
| Severe | 0 | 0 | 2 (0.1) | 0 |
| Diarrhea[#] | | | | |
| Any | 168 (8.4) | 130 (6.5) | 152 (8.2) | 102 (5.6) |
| Mild | 137 (6.8) | 109 (5.5) | 125 (6.7) | 76 (4.1) |
| Moderate | 27 (1.3) | 20 (1.0) | 25 (1.3) | 22 (1.2) |
| Severe | 4 (0.2) | 1 (0.1) | 2 (0.1) | 4 (0.2) |
| New or worsened muscle pain[§] | | | | |
| Any | 274 (13.6) | 165 (8.3) | 537 (28.9) | 99 (5.4) |
| Mild | 183 (9.1) | 111 (5.6) | 229 (12.3) | 65 (3.5) |
| Moderate | 90 (4.5) | 51 (2.6) | 288 (15.5) | 33 (1.8) |
| Severe | 1 (0.0) | 3 (0.2) | 20 (1.1) | 1 (0.1) |
| New or worsened joint pain[§] | | | | |
| Any | 175 (8.7) | 124 (6.2) | 353 (19.0) | 72 (3.9) |
| Mild | 119 (5.9) | 78 (3.9) | 183 (9.8) | 44 (2.4) |
| Moderate | 53 (2.6) | 45 (2.3) | 161 (8.7) | 27 (1.5) |
| Severe | 3 (0.1) | 1 (0.1) | 9 (0.5) | 1 (0.1) |
| Use of antipyretic or pain medication[Þ] | 382 (19.0) | 224 (11.3) | 688 (37.0) | 170 (9.3) |

Notes: Reactions and use of antipyretic or pain medication were collected in the electronic diary (e-diary) from Day 1 to Day 7 after each dose.

The only Grade 4 solicited systemic reaction reported in participants 56 years of age and older was fatigue.

* Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

† N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. N for each reaction or use of antipyretic or pain medication was the same, therefore was included in the column header.

‡ n = Number of participants with the specified reaction.

§ Mild: does not interfere with activity; Moderate: some interference with activity; Severe: prevents daily activity; Grade 4 reactions were defined in the clinical study protocol as emergency room visit or hospitalization for severe fatigue, severe headache, severe chills, severe muscle pain, or severe joint pain.

¶ Mild: 1 to 2 times in 24 hours; Moderate: >2 times in 24 hours; Severe: requires intravenous hydration; Grade 4 emergency visit or hospitalization for severe vomiting.

# Mild: 2 to 3 loose stools in 24 hours; Moderate: 4 to 5 loose stools in 24 hours; Severe: 6 or more loose stools in 24 hours; Grade 4: emergency room or hospitalization for severe diarrhea.

Þ Severity was not collected for use of antipyretic or pain medication.

In participants with chronic, stable HIV infection the frequencies of solicited local and systemic adverse reactions were similar to or lower than those observed for all participants 16 years of age and older.

Unsolicited Adverse Events

Overall, 11,253 (51.1%) participants in the COMIRNATY group and 11,316 (51.4%) participants in the placebo group had follow-up time between ≥4 months to <6 months after Dose 2 in the blinded placebo-controlled follow-up period with an additional 1,778 (8.1%) and 1,304 (5.9%) with ≥6 months of blinded follow-up time in the COMIRNATY and placebo groups, respectively.

A total of 12,006 (54.5%) participants originally randomized to COMIRNATY had ≥6 months total (blinded and unblinded) follow-up after Dose 2.

In an analysis of all unsolicited adverse events reported following any dose, through 1 month after Dose 2, in participants 16 years of age and older (N=43,847; 21,926 COMIRNATY group vs. 21,921 placebo group), those assessed as adverse reactions not already captured by solicited local and systemic reactions were nausea (274 vs. 87), malaise (130 vs. 22), lymphadenopathy (83 vs. 7), asthenia (76 vs. 25), decreased appetite (39 vs. 9), hyperhidrosis (31 vs. 9), lethargy (25 vs. 6), and night sweats (17 vs. 3).

In analyses of all unsolicited adverse events in Study 2 from Dose 1 up to the participant unblinding date, 58.2% of study participants had at least 4 months of follow-up after Dose 2. Among participants 16 through 55 years of age who received at least 1 dose of study vaccine, 12,995 of whom received COMIRNATY and 13,026 of whom received placebo, unsolicited adverse events were reported by 4,396 (33.8%) participants in the COMIRNATY group and 2,136 (16.4%) participants in the placebo group. In a similar analysis in participants 56 years of age and older that included 8,931 COMIRNATY recipients and 8,895 placebo recipients, unsolicited adverse events were reported by 2,551 (28.6%) participants in the COMIRNATY group and 1,432 (16.1%) participants in the placebo group. Among participants with confirmed stable HIV infection that included 100 COMIRNATY recipients and 100 placebo recipients, unsolicited adverse events were reported by 29 (29%) participants in the COMIRNATY group and 15 (15%) participants in the placebo group. The higher frequency of reported unsolicited adverse events among COMIRNATY recipients compared to placebo recipients was primarily attributed to events that are consistent with adverse reactions solicited among participants in the reactogenicity subset (Table 3 and Table 4).

Throughout the placebo-controlled safety follow-up period, Bell's palsy (facial paralysis) was reported by 4 participants in the COMIRNATY group and 2 participants in the placebo group. Onset of facial paralysis was Day 37 after Dose 1 (participant did not receive Dose 2) and Days 3, 9, and 48 after Dose 2. In the placebo group the onset of facial paralysis was Day 32 and Day 102. Currently available information is insufficient to determine a causal relationship with the vaccine. In the analysis of blinded, placebo-controlled follow-up, there were no other notable patterns or numerical imbalances between treatment groups for specific categories of non-serious adverse events (including other neurologic or neuro-inflammatory, and thrombotic events) that would suggest a causal relationship to COMIRNATY. In the analysis of unblinded follow-up, there were no notable patterns of specific categories of non-serious adverse events that would suggest a causal relationship to COMIRNATY.

*Serious Adverse Events*

In Study 2, among participants 16 through 55 years of age who had received at least 1 dose of vaccine or placebo (COMIRNATY =12,995; placebo = 13,026), serious adverse events from Dose 1 up to the participant unblinding date in ongoing follow-up were reported by 103 (0.8%) COMIRNATY recipients and 117 (0.9%) placebo recipients. In a similar analysis, in participants 56 years of age and older (COMIRNATY = 8,931; placebo = 8,895), serious adverse events were reported by 165 (1.8%) COMIRNATY recipients and 151 (1.7%) placebo recipients who received at least 1 dose of COMIRNATY or placebo, respectively. In these analyses, 58.2% of study participants had at least 4 months of follow-up after Dose 2. Among participants with confirmed stable HIV infection serious adverse events from Dose 1 up to the participant unblinding date in ongoing follow-up were reported by 2 (2%) COMIRNATY recipients and 2 (2%) placebo recipients.

In the analysis of blinded, placebo-controlled follow-up, there were no notable patterns between treatment groups for specific categories of serious adverse events (including neurologic, neuro-inflammatory, and thrombotic events) that would suggest a causal relationship to COMIRNATY. In the analysis of unblinded follow-up, there were no notable patterns of specific categories of serious adverse events that would suggest a causal relationship to COMIRNATY.

## 6.2 Postmarketing Experience

The following adverse reactions have been identified during postmarketing use of COMIRNATY, including under Emergency Use Authorization. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to vaccine exposure.

Cardiac Disorders: myocarditis, pericarditis

Gastrointestinal Disorders: diarrhea, vomiting

Immune System Disorders: severe allergic reactions, including anaphylaxis, and other hypersensitivity reactions (e.g., rash, pruritus, urticaria, angioedema)

# 8 USE IN SPECIFIC POPULATIONS

## 8.1 Pregnancy

There is a pregnancy exposure registry that monitors pregnancy outcomes in women exposed to COMIRNATY during pregnancy. Women who are vaccinated with COMIRNATY during pregnancy are encouraged to enroll in the registry by visiting https://mothertobaby.org/ongoing-study/covid19-vaccines/.

<u>Risk Summary</u>

All pregnancies have a risk of birth defect, loss, or other adverse outcomes. In the US general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2% to 4% and 15% to 20%, respectively. Available data on COMIRNATY administered to pregnant women are insufficient to inform vaccine-associated risks in pregnancy.

A developmental toxicity study has been performed in female rats administered the equivalent of a single human dose of COMIRNATY on 4 occasions; twice prior to mating and twice during gestation. These studies revealed no evidence of harm to the fetus due to the vaccine *(see Animal Data)*.

<u>Data</u>

*Animal Data*

In a developmental toxicity study, 0.06 mL of a vaccine formulation containing the same quantity of nucleoside-modified messenger ribonucleic acid (mRNA) (30 mcg) and other ingredients included in a single human dose of COMIRNATY was administered to female rats by the intramuscular route on 4 occasions: 21 and 14 days prior to mating, and on gestation days 9 and 20. No vaccine-related adverse effects on female fertility, fetal development, or postnatal development were reported in the study.

## 8.2 Lactation

<u>Risk Summary</u>

It is not known whether COMIRNATY is excreted in human milk. Data are not available to assess the effects of COMIRNATY on the breastfed infant or on milk production/excretion. The developmental and health benefits of breastfeeding should be considered along with the mother's clinical need for COMIRNATY and any potential adverse effects on the breastfed child from COMIRNATY or from the underlying maternal condition. For preventive vaccines, the underlying maternal condition is susceptibility to disease prevented by the vaccine.

## 8.4 Pediatric Use

Safety and effectiveness of COMIRNATY in individuals 16 through 17 years of age is based on safety and effectiveness data in this age group and in adults *[see Adverse Reactions (6) and Clinical Studies (14.1)]*.

The safety and effectiveness of COMIRNATY in individuals younger than 16 years of age have not been established.

## 8.5 Geriatric Use

Of the total number of COMIRNATY recipients in Study 2 as of March 13, 2021 (N = 22,026), 20.7% (n = 4,552) were 65 years of age and older and 4.2% (n = 925) were 75 years of age and older *[see Clinical Studies (14.1)]*. No overall differences in safety or effectiveness were observed between these recipients and younger recipients.

# 11 DESCRIPTION

COMIRNATY (COVID-19 Vaccine, mRNA) is a sterile suspension for injection for intramuscular use. COMIRNATY is supplied as a frozen suspension in multiple dose vials with purple caps and labels with purple borders; each vial must be diluted with 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP prior to use to form the vaccine. Each 0.3 mL dose of COMIRNATY supplied in multiple dose vials with purple caps and labels with purple borders contains 30 mcg of a nucleoside-modified messenger RNA (mRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2.

Each 0.3 mL dose of the COMIRNATY supplied in multiple dose vials with purple caps and labels with purple borders also includes the following ingredients: lipids (0.43 mg ((4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate), 0.05 mg 2-(polyethylene glycol 2000)-N,N-ditetradecylacetamide, 0.09 mg 1,2-distearoyl-sn-glycero-3-phosphocholine, and

0.2 mg cholesterol), 0.01 mg potassium chloride, 0.01 mg monobasic potassium phosphate, 0.36 mg sodium chloride, 0.07 mg dibasic sodium phosphate dihydrate, and 6 mg sucrose. The diluent (sterile 0.9% Sodium Chloride Injection, USP) contributes an additional 2.16 mg sodium chloride per dose.

COMIRNATY does not contain preservative.

The vial stoppers are not made with natural rubber latex.

# 12 CLINICAL PHARMACOLOGY

## 12.1 Mechanism of Action

The nucleoside-modified mRNA in COMIRNATY is formulated in lipid particles, which enable delivery of the mRNA into host cells to allow expression of the SARS-CoV-2 S antigen. The vaccine elicits an immune response to the S antigen, which protects against COVID-19.

# 13 NONCLINICAL TOXICOLOGY

## 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

COMIRNATY has not been evaluated for the potential to cause carcinogenicity, genotoxicity, or impairment of male fertility. In a developmental toxicity study in rats with COMIRNATY there were no vaccine-related effects on female fertility *[see Use in Specific Populations (8.1)]*.

# 14 CLINICAL STUDIES

Efficacy in Participants 16 Years of Age and Older

Study 2 is an ongoing, multicenter, multinational, randomized, placebo-controlled, observer-blind, dose-finding, vaccine candidate–selection, and efficacy study in participants 12 years of age and older. Randomization was stratified by age: 12 through 15 years of age, 16 through 55 years of age, or 56 years of age and older, with a minimum of 40% of participants in the ≥56-year stratum. The study excluded participants who were immunocompromised and those who had previous clinical or microbiological diagnosis of COVID-19. Participants with preexisting stable disease, defined as disease not requiring significant change in therapy or hospitalization for worsening disease during the 6 weeks before enrollment, were included as were participants with known stable infection with HIV, hepatitis C virus (HCV), or hepatitis B virus (HBV).

In Study 2, based on data accrued through March 13, 2021, approximately 44,000 participants 16 years of age and older were randomized equally and received 2 doses of COMIRNATY or placebo. Participants are planned to be followed for up to 24 months, for assessments of safety and efficacy against COVID-19.

Overall, among the total participants who received COMIRNATY or placebo, 51.4% or 50.3% were male and 48.6% or 49.7% were female, 79.1% or 79.2% were 16 through 64 years of age, 20.9% or 20.8% were 65 years of age and older, 81.9% or 82.1% were White, 9.5% or 9.6% were Black or African American, 1.0% or 0.9% were American Indian or Alaska Native, 4.4% or 4.3% were Asian, 0.3% or 0.2% Native Hawaiian or other Pacific Islander, 25.6% or 25.4% were Hispanic/Latino, 73.9% or 74.1% were non-Hispanic/Latino, 0.5% or 0.5% did not report ethnicity, 46.0% or 45.7% had comorbidities [participants who have 1 or more comorbidities that increase the risk of severe COVID-19 disease: defined as subjects who had at least 1 of the Charlson comorbidity index category or body mass index (BMI) ≥30 kg/m$^2$], respectively. The mean age at vaccination was 49.8 or 49.7 years and median age was 51.0 or 51.0 in participants who received COMIRNATY or placebo, respectively.

Efficacy Against COVID-19

The population for the analysis of the protocol pre-specified primary efficacy endpoint included 36,621 participants 12 years of age and older (18,242 in the COMIRNATY group and 18,379 in the placebo group) who did not have evidence of prior infection with SARS-CoV-2 through 7 days after the second dose. The population in the protocol pre-specified primary efficacy analysis included all participants 12 years of age and older who had been enrolled from July 27, 2020, and followed for the development of COVID-19 through November 14, 2020. Participants 18 through 55 years of age and 56 years of age and older began enrollment from July 27, 2020, 16 through 17 years of age began enrollment from September 16, 2020, and 12 through 15 years of age began enrollment from October 15, 2020.

For participants without evidence of SARS-CoV-2 infection prior to 7 days after Dose 2, vaccine efficacy against confirmed COVID-19 occurring at least 7 days after Dose 2 was 95.0% (95% credible interval: 90.3, 97.6), which met the pre-specified

The population for the updated vaccine efficacy analysis included participants 16 years of age and older who had been enrolled from July 27, 2020, and followed for the development of COVID-19 during blinded placebo-controlled follow-up through March 13, 2021, representing up to 6 months of follow-up after Dose 2. There were 12,796 (60.8%) participants in the COMIRNATY group and 12,449 (58.7%) in the placebo group followed for ≥4 months after Dose 2 in the blinded placebo-controlled follow-up period.

SARS-CoV-2 variants of concern identified from COVID-19 cases in this study include B.1.1.7 (Alpha) and B.1.351 (Beta). Representation of identified variants among cases in vaccine versus placebo recipients did not suggest decreased vaccine effectiveness against these variants.

The updated vaccine efficacy information is presented in Table 5.

**Table 5: Vaccine Efficacy – First COVID-19 Occurrence From 7 Days After Dose 2, by Age Subgroup – Participants 16 Years of Age and Older Without Evidence of Infection and Participants With or Without Evidence of Infection Prior to 7 Days After Dose 2 – Evaluable Efficacy (7 Days) Population During the Placebo-Controlled Follow-up Period**

| First COVID-19 occurrence from 7 days after Dose 2 in participants without evidence of prior SARS-CoV-2 infection[*] | | |
|---|---|---|
| **Subgroup** | **COMIRNATY N[†]=19,993 Cases n1[‡] Surveillance Time[§] (n2[¶])** | **Placebo N[†]=20,118 Cases n1[‡] Surveillance Time[§] (n2[¶])** | **Vaccine Efficacy % (95% CI[#])** |
| All participants | 77 6.092 (19,711) | 833 5.857 (19,741) | 91.1 (88.8, 93.1) |
| 16 through 64 years | 70 4.859 (15,519) | 709 4.654 (15,515) | 90.5 (87.9, 92.7) |
| 65 years and older | 7 1.233 (4192) | 124 1.202 (4226) | 94.5 (88.3, 97.8) |
| **First COVID-19 occurrence from 7 days after Dose 2 in participants with or without[*] evidence of prior SARS-CoV-2 infection** | | |
| **Subgroup** | **COMIRNATY N[†]=21,047 Cases n1[‡] Surveillance Time[§] (n2[¶])** | **Placebo N[†]=21,210 Cases n1[‡] Surveillance Time[§] (n2[¶])** | **Vaccine Efficacy % (95% CI[#])** |
| All participants | 81 6.340 (20,533) | 854 6.110 (20,595) | 90.9 (88.5, 92.8) |
| 16 through 64 years | 74 5.073 (16,218) | 726 4.879 (16,269) | 90.2 (87.5, 92.4) |
| 65 years and older | 7 1.267 (4315) | 128 1.232 (4326) | 94.7 (88.7, 97.9) |

Note: Confirmed cases were determined by Reverse Transcription-Polymerase Chain Reaction (RT-PCR) and at least 1 symptom consistent with COVID-19 (symptoms included: fever; new or increased cough; new or increased shortness of breath; chills; new or increased muscle pain; new loss of taste or smell; sore throat; diarrhea; vomiting).

[*] Participants who had no evidence of past SARS-CoV-2 infection (i.e., N-binding antibody [serum] negative at Visit 1 and SARS-CoV-2 not detected by NAAT [nasal swab] at Visits 1 and 2), and had negative NAAT (nasal swab) at any unscheduled visit prior to 7 days after Dose 2 were included in the analysis.

[†] N = Number of participants in the specified group.

[‡] n1 = Number of participants meeting the endpoint definition.

[§] Total surveillance time in 1000 person-years for the given endpoint across all participants within each group at risk for the endpoint. Time period for COVID-19 case accrual is from 7 days after Dose 2 to the end of the surveillance period.

[¶] n2 = Number of participants at risk for the endpoint.

# Two-sided confidence interval (CI) for vaccine efficacy is derived based on the Clopper and Pearson method adjusted to the surveillance time.

Subgroup analyses of vaccine efficacy (although limited by small numbers of cases in some subgroups) did not suggest meaningful differences in efficacy across genders, ethnic groups, geographies, or for participants with obesity or medical comorbidities associated with high risk of severe COVID-19.

Efficacy Against Severe COVID-19

Efficacy analyses of secondary efficacy endpoints supported benefit of COMIRNATY in preventing severe COVID-19. Vaccine efficacy against severe COVID-19 is presented only for participants with or without prior SARS-CoV-2 infection (Table 6) as the COVID-19 case counts in participants without prior SARS-CoV-2 infection were the same as those in participants with or without prior SARS-CoV-2 infection in both the COMIRNATY and placebo groups.

**Table 6: Vaccine Efficacy – First Severe COVID-19 Occurrence in Participants 16 Years of Age and Older With or Without[*] Prior SARS-CoV-2 Infection Based on Protocol[†] or Centers for Disease Control and Prevention (CDC)[‡] Definition From 7 Days After Dose 2 – Evaluable Efficacy (7 Days) Population During the Placebo-Controlled Follow-up**

| Vaccine Efficacy – First Severe COVID-19 Occurrence | | | |
|---|---|---|---|
| | COMIRNATY Cases n1[§] Surveillance Time[¶] (n2[#]) | Placebo Cases n1[§] Surveillance Time[¶] (n2[#]) | Vaccine Efficacy % (95% CI[b]) |
| 7 days after Dose 2[b] | 1 6.353 (20,540) | 21 6.237 (20,629) | 95.3 (70.9, 99.9) |
| Vaccine Efficacy – First Severe COVID-19 Occurrence Based on CDC Definition | | | |
| | COMIRNATY Cases n1[§] Surveillance Time[¶] (n2[#]) | Placebo Cases n1[§] Surveillance Time[¶] (n2[#]) | Vaccine Efficacy % (95% CI[b]) |
| 7 days after Dose 2[b] | 0 6.345 (20,513) | 31 6.225 (20,593) | 100 (87.6, 100.0) |

Note: Confirmed cases were determined by Reverse Transcription-Polymerase Chain Reaction (RT-PCR) and at least 1 symptom consistent with COVID-19 (symptoms included: fever; new or increased cough; new or increased shortness of breath; chills; new or increased muscle pain; new loss of taste or smell; sore throat; diarrhea; vomiting).

* Participants who had no evidence of past SARS-CoV-2 infection (i.e., N-binding antibody [serum] negative at Visit 1 and SARS-CoV-2 not detected by NAAT [nasal swab] at Visits 1 and 2), and had negative NAAT (nasal swab) at any unscheduled visit prior to 7 days after Dose 2 were included in the analysis.

† Severe illness from COVID-19 is defined in the protocol as confirmed COVID-19 and presence of at least 1 of the following:

- Clinical signs at rest indicative of severe systemic illness (respiratory rate ≥30 breaths per minute, heart rate ≥125 beats per minute, saturation of oxygen ≤93% on room air at sea level, or ratio of arterial oxygen partial pressure to fractional inspired oxygen <300 mm Hg);
- Respiratory failure [defined as needing high-flow oxygen, noninvasive ventilation, mechanical ventilation or extracorporeal membrane oxygenation (ECMO)];
- Evidence of shock (systolic blood pressure <90 mm Hg, diastolic blood pressure <60 mm Hg, or requiring vasopressors);
- Significant acute renal, hepatic, or neurologic dysfunction;
- Admission to an Intensive Care Unit;
- Death.

‡ Severe illness from COVID-19 as defined by CDC is confirmed COVID-19 and presence of at least 1 of the following:

- Hospitalization;
- Admission to the Intensive Care Unit;
- Intubation or mechanical ventilation;
- Death.

§  n1 = Number of participants meeting the endpoint definition.
¶  Total surveillance time in 1000 person-years for the given endpoint across all participants within each group at risk for the endpoint. Time period for COVID-19 case accrual is from 7 days after Dose 2 to the end of the surveillance period.
#  n2 = Number of participants at risk for the endpoint.
þ  Two-side confidence interval (CI) for vaccine efficacy is derived based on the Clopper and Pearson method adjusted to the surveillance time.


# 16 HOW SUPPLIED/STORAGE AND HANDLING

COMIRNATY Suspension for Intramuscular Injection, multiple dose vials with purple caps and labels with purple borders are supplied in a carton containing 25 multiple dose vials (NDC 0069-1000-03) or 195 multiple dose vials (NDC 0069-1000-02). A 0.9% Sodium Chloride Injection, USP diluent is provided but shipped separately, and should be stored at controlled room temperature 20°C to 25°C (68°F to 77°F) [see USP Controlled Room Temperature]. The provided 0.9% Sodium Chloride Injection, USP diluent will be supplied either as cartons of 10 mL single-use vials manufactured by Hospira, Inc (NDC 0409-4888-10), or 2 mL single-use vials manufactured by Fresenius Kabi USA, LLC (NDC 63323-186-02).

After dilution, 1 vial contains 6 doses of 0.3 mL.

During storage, minimize exposure to room light, and avoid exposure to direct sunlight and ultraviolet light.

Do not refreeze thawed vials.

<u>Frozen Vials Prior to Use</u>

Cartons of COMIRNATY multiple dose vials with purple caps labels with purple borders arrive in thermal containers with dry ice. Once received, remove the vial cartons immediately from the thermal container and preferably store in an ultra-low temperature freezer between -90°C to -60°C (-130°F to -76°F) until the expiry date printed on the label.

Alternatively, vials may be stored at -25°C to -15°C (-13°F to 5°F) for up to 2 weeks. Vials must be kept frozen and protected from light, in the original cartons, until ready to use. Vials stored at -25°C to -15°C (-13°F to 5°F) for up to 2 weeks may be returned 1 time to the recommended storage condition of -90°C to -60°C (-130°F to -76°F). Total cumulative time the vials are stored at -25°C to -15°C (-13°F to 5°F) should be tracked and should not exceed 2 weeks.

If an ultra-low temperature freezer is not available, the thermal container in which COMIRNATY arrives may be used as <u>temporary</u> storage when consistently re-filled to the top of the container with dry ice. <u>Refer to the re-icing guidelines packed in the original thermal container for instructions regarding the use of the thermal container for temporary storage</u>. The thermal container maintains a temperature range of -90°C to -60°C (-130°F to -76°F). Storage of the vials between -96°C to -60°C (-141°F to -76°F) is not considered an excursion from the recommended storage condition.

<u>Transportation of Frozen Vials</u>

If local redistribution is needed and full cartons containing vials cannot be transported at -90°C to -60°C (-130°F to -76°F), vials may be transported at -25°C to -15°C (-13°F to 5°F). Any hours used for transport at -25°C to -15°C (-13°F to 5°F) count against the 2-week limit for storage at -25°C to -15°C (-13°F to 5°F). Frozen vials transported at -25°C to -15°C (-13°F to 5°F) may be returned 1 time to the recommended storage condition of -90°C to -60°C (-130°F to -76°F).

<u>Thawed Vials Before Dilution</u>

*Thawed Under Refrigeration*

Thaw and then store undiluted vials in the refrigerator [2°C to 8°C (35°F to 46°F)] for up to 1 month. A carton of 25 vials or 195 vials may take up to 2 or 3 hours, respectively, to thaw in the refrigerator, whereas a fewer number of vials will thaw in less time.

*Thawed at Room Temperature*

For immediate use, thaw undiluted vials at room temperature [up to 25°C (77°F)] for 30 minutes. Thawed vials can be handled in room light conditions.

Vials must reach room temperature before dilution.

Undiluted vials may be stored at room temperature for no more than 2 hours.

<u>Transportation of Thawed Vials</u>

Available data support transportation of 1 or more thawed vials at 2°C to 8°C (35°F to 46°F) for up to 12 hours.

<u>Vials After Dilution</u>

After dilution, store vials between 2°C to 25°C (35°F to 77°F) and use within 6 hours from the time of dilution. During storage, minimize exposure to room light, and avoid exposure to direct sunlight and ultraviolet light. Any vaccine remaining in vials must be discarded after 6 hours. Do not refreeze.

## 17 PATIENT COUNSELING INFORMATION

Inform vaccine recipient of the potential benefits and risks of vaccination with COMIRNATY.

Inform vaccine recipient of the importance of completing the 2 dose vaccination series.

There is a pregnancy exposure registry for COMIRNATY. Encourage individuals exposed to COMIRNATY around the time of conception or during pregnancy to register by visiting https://mothertobaby.org/ongoing-study/covid19-vaccines/.

Advise vaccine recipient to report any adverse events to their healthcare provider or to the Vaccine Adverse Event Reporting System at 1-800-822-7967 and www.vaers.hhs.gov.

This product's labeling may have been updated. For the most recent prescribing information, please visit https://dailymed.nlm.nih.gov/dailymed/.

Manufactured for
BioNTech Manufacturing GmbH
An der Goldgrube 12
55131 Mainz, Germany



Manufactured by
Pfizer Inc., New York, NY 10017

LAB-1448-2.0

US Govt. License No. 2229

Revised: 12/2021

Pfizer Laboratories Div Pfizer Inc

# EXHIBIT 8

ADVERTISEMENT



Laboratory chemicals now on o

Shop now

SCROLL TO CONTINUE WITH CONTENT

ADVERTISEMENT

**MOST POPULAR IN PHARMACEUTICALS**

**Drug companies are investing big in psychedelics, but can they engineer o the trip?**

**New weight-loss drugs could shift the scales**

**Without these lipid shells, there would be no mRNA vaccines for COVID-19**

**How Does Acetaminophen Work? Researchers Still Aren't Sure**

**Drug Testing And 'Caine' Drugs**

**How Pfizer scientists transformed an old drug lead into a COVID-19 antivira**

SCROLL TO CONTINUE WITH CONTENT

DRUG DELIVERY | COVID-19

# Without these lipid shells, there would be no mRNA vaccines for COVID-19

Fragile mRNA molecules used in COVID-19 vaccines can't get into cells on their own. They owe their success to lipid nanoparticles that took decades to refine

*by* **Ryan Cross**

March 6, 2021 | A version of this story appeared in **Volume 99, Issue 8**



**Credit: Acuitas Therapeutics**

A lipid nanoparticle (LNP) containing messenger RNA (mRNA) enters a cell through an endosome (right). When the LNP is inside the acidic endosome (middle), the ionizable lipids become positively charged and help release the LNP and mRNA into the cell's cytoplasm. Once free, the mRNA is translated by ribosomes to make proteins (left).

essenger RNA (mRNA) is having a moment. This year, hundreds of millions of people will receive shots of the **Pfizer-BioNTech** or **Moderna vaccines for COVID-19**. The crucial ingredient in each injection is mRNA, short-lived strands of

genetic material that prompt our cells to start making SARS-CoV-2 proteins, which in turn help our immune systems develop antibodies that prevent future infections. Thanks to decades of scientific perseverance, billions of dollars of investment in the technology, and **previous work on coronaviruses**, the vaccine makers were able to design their vaccines and prove their safety and efficacy in under a year.

**Related: Everything we know about the COVID-19 coronavirus**

The **success of these COVID-19 vaccines** is remarkable and was far from guaranteed. mRNA is incredibly delicate. Enzymes in the environment and in our bodies are quick to chop mRNA into pieces, making lab experiments difficult and the delivery of mRNA to our cells daunting. On top of that, mRNA strands are large and negatively charged and can't simply waltz across the protective lipid membranes of cells. Many scientists **thought the technology would never work**.

"There were many, many skeptics," says Frank DeRosa, who began working with mRNA in 2008 and is now chief technology officer at Translate Bio, a firm developing mRNA vaccines with Sanofi. "People used to say that if you looked at it wrong it would fall apart."

Luckily, scientists found a solution. To protect the fragile molecule as it sneaks into cells, they turned to a delivery technology with origins older than the idea of mRNA therapy itself: tiny balls of fat called lipid nanoparticles, or LNPs.

LNPs used in the COVID-19 vaccines contain just four ingredients: ionizable lipids whose positive charges bind to the negatively charged backbone of mRNA, pegylated lipids that help stabilize the particle, and phospholipids and cholesterol molecules that contribute to the particle's structure. Thousands of these four components encapsulate mRNA, shield it from destructive enzymes, and shuttle it into cells, where the mRNA is unloaded and used to make proteins. Although the concept seems simple, perfecting it was far from straightforward.

MOST POPULAR IN PHARMACEUTICALS

Drug companies are investing big in psychedelics, but can they engineer the trip?

New weight-loss drugs could shift the scales

Without these lipid shells, there would be no mRNA vaccines for COVID-19

How Does Acetaminophen Work? Researchers Still Aren't Sure

Drug Testing And 'Caine' Drugs

How Pfizer scientists transformed an old drug lead into a COVID-19 antiviral

 

**I**t is a tremendous vindication for everyone working in controlled drug delivery.

— **Robert Langer,** *chemical engineer, Massachusetts Institute of Technology*

Over more than 3 decades, promising lipids studied in the lab often failed to live up to their potential when tested in animals or humans. Positively charged lipids are inherently toxic, and companies struggled for years before landing on formulations that were safe and effective. When injected intravenously, the particles invariably accumulated in the liver, and delivery to other organs is still an obstacle. Reliably manufacturing consistent LNPs was another challenge, and **producing the raw materials** needed to make the particles is a limiting factor in the production of COVID-19 vaccines today.

LNP development has been a headache, but without this packaging, mRNA vaccines would be nothing. "It is the unsung hero of the whole thing," says Giuseppe Ciaramella, who was head of infectious diseases at Moderna from 2014 to 2018.

The vaccines, appropriately celebrated as a first for mRNA technology, are also a milestone for the nanoparticle field. Although **the first drug based on an LNP** was approved by the US Food and Drug Administration for a rare genetic disease in 2018, the two authorized mRNA vaccines for COVID-19 present a far bigger opportunity for the nanoparticles than even the field's founders can imagine. "It is a tremendous vindication for everyone working in controlled drug delivery," says Robert Langer, a chemical engineer at the Massachusetts Institute of Technology.

"LNPs will be going into millions of arms over the course of this year," says University of British Columbia nanoparticle scientist Pieter Cullis. "What was a fringe field back in the 1980s has turned into something that is mainstream now."

## THE DELIVERY DILEMMA

Modern LNPs can be traced back to work on simpler systems called liposomes, hollow lipid spheres often made of just two or three kinds of lipids. In the early 1980s, Cullis found that cancer drugs could diffuse into these liposomes and get trapped in the hollow core. When injected into animals with cancer, the liposomes would slip through the leaky vasculature of tumors, enter cells, and unleash a drug. Cullis, and several others, started companies with the hope that liposomes could safely deliver otherwise toxic drugs into tumors in humans.

Progress was slowed by issues with stability and manufacturing. The first liposome-based drug eventually was approved by the FDA in 1995, but by then Cullis and many in the field had moved on to a new challenge: using lipid particles to deliver nucleic acids such as DNA and RNA.

  **The devil is absolutely in the details as far as LNPs are concerned.**

— **Giuseppe Ciaramella,** *former head of infectious diseases, Moderna*

At the time, scientists were enamored by advances in genetics that were promising to cure diseases by giving someone new genes or turning disease-causing genes off. Figuring out how to deliver these nucleic acid therapies—either DNA or RNA—into cells was a major challenge and required something more sophisticated than a conventional liposome. Cullis knew that adding positively charged lipids to the liposomes would help balance the negatively charged nucleic acids, but there was a problem. "There are no cationic lipids in nature," Cullis says. "And we knew we couldn't use permanently positively charged lipids because they are so damn toxic." Those lipids would rip cell membranes apart, he adds.

A solution came from new lipids that were charged only under certain conditions. During the late '90s and through the first decade of the 2000s, Cullis, his colleagues at Inex Pharmaceuticals, and the Inex spin-off Protiva Biotherapeutics developed ionizable lipids that are positively charged at an acidic pH but neutral in the blood. The group also created a new way to manufacture nanoparticles with these lipids, using microfluidics to mix lipids dissolved in ethanol with nucleic acids dissolved in an acidic buffer. When the streams of those two solutions merged, the components spontaneously formed lipid nanoparticles, which, unlike the hollow liposomes, were densely packed with lipids and nucleic acids. The process was simple in theory, but getting the machine to reliably spit out consistent LNPs was difficult.

LNPs that looked good in the lab often floundered in the clinic, however. The first versions of ionizable lipids were still toxic. And early formulations of the nanoparticles didn't degrade fast enough, causing them to accumulate after repeated injections. Protiva found that one of its experimental LNP therapies caused a more severe immune reaction in humans than it had in the lab, and the company pinned pegylated lipids as a major factor.

**Related: This was mRNA's breakout year, and scientists are just getting started**

Pegylated lipids, in which polyethylene glycol (PEG) strands are attached to lipid heads, have several functions in a nanoparticle. PEG helps control the particle size during formulation, prevents the particles from aggregating in storage, and initially shields the particles from being detected by immune system proteins in the body, according to James Heyes, a former Protiva scientist. Heyes is now chief scientific officer of the LNP company Genevant Sciences—a firm with origins in Protiva.

### MOST POPULAR IN PHARMACEUTICALS

**Drug companies are investing big in psychedelics, but can they engineer out the trip?**

**New weight-loss drugs could shift the scales**

**Without these lipid shells, there would be no mRNA vaccines for COVID-19**

**How Does Acetaminophen Work? Researchers Still Aren't Sure**

**Drug Testing And 'Caine' Drugs**

**How Pfizer scientists transformed an old drug lead into a COVID-19 antiviral**



SPONSORED CONTENT

**Optimize your Jacketed Lab Reactors & Thermoregulator**

by Heidolph North America

But PEG also has liabilities. It prevents LNPs from binding to proteins that help shuttle them into cells. Because PEG extends particles' life span in the body, the immune system has more time to spot the particles and start mounting an antibody response. And although PEG is found in many cosmetic, drug, and food products, scientists hypothesize that some people could develop antibodies to PEG and that giving those individuals an injection of PEG-coated nanoparticles could trigger an anaphylactic reaction.

## ESCAPE FROM THE ENDOSOME

By 2005, the development of better and safer LNPs was **driven by excitement for a new technology, called small interfering RNA (siRNA), for selectively silencing genes**. Alnylam Pharmaceuticals, which became the leading siRNA company, quickly realized that existing nanoparticles were not very good at helping siRNA get into cells. The company struck multiple partnerships to make new LNPs, including with Protiva in 2005 and Inex in 2006. The groups made more than 300 ionizable lipids, first optimizing the fatty tails, then tweaking the ionizable head group and the linker region in between. The work was grueling, and lipids that made great nanoparticles in a petri dish would often flop in animal studies. "You can have 50 different ionizable lipids that all deliver effectively to cells in culture, and 49 of them won't work a damn in vivo," recalls Thomas Madden, who worked at Inex and is now CEO of Acuitas Therapeutics.

LNPs take advantage of a natural process called receptor-mediated endocytosis to get into cells, Madden explains. Upon binding to a cell, the nanoparticle becomes encapsulated in an even bigger lipid bubble—an organelle called an endosome. The endosome's acidic interior protonates the heads of the ionizable lipids, making them positively charged. That positive charge triggers a change in the shape of the nanoparticle, which scientists think helps it break free from the endosome and ultimately release its RNA cargo into the cell's cytoplasm. Once released, the RNA is free to do its job.



SPONSORED CONTENT

**Automation for Large Scale Rotary Evaporation**

by Heidolph North America

The most effective nanoparticles were ones that the body mistook as low-density lipoprotein (LDL) cholesterol—commonly called bad cholesterol. Proteins that recognize LDL cholesterol in the blood bound to some of Alnylam's nanoparticles and carried them to LDL receptors on liver cells, which then caused the cells to engulf the nanoparticles in an endosome. It was the kind of complex interplay that studies in a petri dish missed.

"A lot of work has gone into studying what happens inside a cell, but trying to understand the transport that occurs before these nanoparticles reach their cells is another question entirely," says Kathryn Whitehead, a

## PARTS LIST

**MOST POPULAR IN PHARMACEUTICALS**

**Drug companies are investing big in psychedelics, but can they engineer out the trip?**

**New weight-loss drugs could shift the scales**

**Without these lipid shells, there would be no mRNA vaccines for COVID-19**

**How Does Acetaminophen Work? Researchers Still Aren't Sure**

**Drug Testing And 'Caine' Drugs**

**How Pfizer scientists transformed an old drug lead into a COVID-19 antiviral**



Pegylated lipid

Ionizable lipid

Phospholipid

Cholesterol

Nucleic acid
(siRNA shown)

Credit: Genevant Sciences

A lipid nanoparticle (LNP) contains hundreds of small interfering RNA (siRNA) molecules, each surrounded by ionizable lipids, phospholipids, and cholesterol. The outside of the particle is coated in pegylated lipids. LNPs for messenger RNA (mRNA) are made with similar ingredients but contain only a few mRNA strands.

**MOST POPULAR IN PHARMACEUTICALS**

**Drug companies are investing big in psychedelics, but can they engineer out the trip?**

**New weight-loss drugs could shift the scales**

**Without these lipid shells, there would be no mRNA vaccines for COVID-19**

**How Does Acetaminophen Work? Researchers Still Aren't Sure**

**Drug Testing And 'Caine' Drugs**

**How Pfizer scientists transformed an old drug lead into a COVID-19 antiviral**

nanoparticle scientist at Carnegie Mellon University. As a consequence, "we don't even screen in vitro anymore," she says. "I find it more informative to test directly in an animal."

Even some of the LNPs that worked well in animals proved too toxic for the repeated dosing required of many siRNA therapies. "The biggest issue was trying to find the right balance between systems that were effective but also safe and tolerable," says Marian Gindy, executive director of pharmaceutical sciences at Merck & Co., who led the RNA formulation team from 2008 until Merck ended its siRNA programs in 2013. "And I would say that is still the biggest challenge in this area."

ADVERTISEMENT

By 2010, Alnylam had landed on a winning ionizable lipid known as MC3. Nanoparticles based on MC3 required about one-thousandth the dose of LNPs made using older ionizable lipids. Alnylam used the new formulation in patisiran (Onpattro), its treatment for a rare disease called hereditary transthyretin-mediated amyloidosis. In 2018, patisiran became **the first approved siRNA drug** and the first approved therapy delivered via LNPs. But the drug requires an 80 min infusion every 3 weeks and pretreatment with multiple anti-inflammatory drugs to minimize reactions to the nanoparticle. By the time patisiran was showing promise in the clinic, Alnylam had set most of its LNP work aside in favor of a new chemical conjugation technology that it used to deliver its other siRNA therapies subcutaneously.

## A LAUNCHPAD FOR MRNA

For a brief time, new work on LNPs fell out of favor—that is, until new companies that were focused on mRNA brought fresh energy to the field. BioNTech, founded in 2008, and Moderna, founded in 2010, promised to be able to use mRNA to produce any protein in the body, as either a therapeutic or a vaccine. In the past decade, mRNA garnered **billions of dollars of investment**. Discovering how to deliver those mRNA strands into cells was a problem from day 1, but prior experience with siRNA provided a launching pad.

"Early on people recognized that the same lipids used for siRNA could also be useful for mRNA," says Daniel Anderson, a nanomedicine and biomaterials scientist at MIT. His group began collaborating with the rare-disease company Shire Pharmaceuticals to encapsulate mRNA that encoded protein therapies to treat rare liver diseases.

**Related: Delivering The Promise**

The off-the-shelf LNP formulations designed for siRNA worked for mRNA occasionally but not very well, says Romesh Subramanian, who led a team at Alexion Pharmaceuticals that worked on mRNA therapies with Moderna from 2014 to 2017. siRNA molecules are like short rods, with two rows of about 20 nucleotides each, he explains. mRNA, in contrast, can easily span thousands of nucleotides, wind into complex shapes, and change the properties of the LNP in ways that are hard to predict.

After realizing that MC3 wouldn't cut it for mRNA delivery, Moderna invested significant resources into building a better ionizable lipid. "There was a group of chemists put on this right away to build novel cationic lipids," says Ciaramella, the former head of infectious diseases at Moderna. "It is kind of like a small-molecule drug discovery engine, but on steroids." The team made about 100 ionizable lipids and introduced ester linkages into the carbon chains of the lipids to help make them more biodegradable, he recalls. Tweaking the ratio of the four lipids in the nanoparticles altered the LNPs' distribution in the body. "The devil is absolutely in the details as far as LNPs are concerned," Ciaramella says. "But once you optimize it for one organ, you can change out the mRNA with minimal optimization."

**MOST POPULAR IN PHARMACEUTICALS**

**Drug companies are investing big in psychedelics, but can they engineer out the trip?**

**New weight-loss drugs could shift the scales**

**Without these lipid shells, there would be no mRNA vaccines for COVID-19**

**How Does Acetaminophen Work? Researchers Still Aren't Sure**

**Drug Testing And 'Caine' Drugs**

**How Pfizer scientists transformed an old drug lead into a COVID-19 antiviral**

**MC3**



**ALC-0315**



**SM-102**

That adaptability is key. For example, Moderna recently made an updated version of its COVID-19 vaccine for a **new variant of the coronavirus** first identified in South Africa. In that vaccine, which must still undergo clinical testing, the mRNA code is slightly changed to match the genetic code of the new strain of the virus, but the LNP formulation remains the same. Now that the company knows its nanoparticle works, it can use it over and over again for different vaccines.

But details on how Moderna arrived at its optimal formulation in the first place are scant. The company did not grant an interview to talk about its nanoparticle development, and neither did Pfizer or BioNTech. For its COVID-19 vaccine, Moderna ultimately used an ionizable lipid that it calls SM-102, which it first described in a 2018 study on alternatives to MC3. Pfizer and BioNTech licensed an ionizable lipid called ALC-0315 from Acuitas.

Those ionizable lipids, which are remarkably similar in structure, were discovered while the firms were optimizing LNPs for systemic administration and delivery to the liver—not the intramuscular injection of a vaccine. Experts point out that optimizing the nanoparticles for vaccination could lead to shots that require lower doses, which could ease the manufacturing burden amid a pandemic. New lipids and nanoparticle formulations will likely take too long to develop to make a difference during this pandemic, but Moderna, BioNTech, and others are continuing to look for better ways to get mRNA into cells for a variety of applications.

## AN LNP RESURGENCE

The pandemic has reinvigorated interest in continuing to refine LNPs. Small firms dedicated to the nanoparticles are getting more calls from larger drug companies that want to use their lipids. Effective LNPs could be crucial for new mRNA vaccines, mRNA therapies, DNA gene therapies, and even CRISPR gene-editing thrapies.



SPONSORED CONTENT

### A Multidetector Approach

by Agilent Technologies

**MOST POPULAR IN PHARMACEUTICALS**

**Drug companies are investing big in psychedelics, but can they engineer the trip?**

**New weight-loss drugs could shift the scales**

**Without these lipid shells, there would be no mRNA vaccines for COVID-19**

**How Does Acetaminophen Work? Researchers Still Aren't Sure**

**Drug Testing And 'Caine' Drugs**

**How Pfizer scientists transformed an old drug lead into a COVID-19 antiviral**

"Everyone is trying to figure out the next big ionizable lipid," says Gaurav Sahay, a nanoparticle scientist at Oregon State University.. But he thinks that nanoparticle researchers should also start paying more attention to the other components of an LNP. Sahay says his lab found that using alternative versions of cholesterol molecules could dramatically improve delivery. And although both the Moderna and Pfizer-BioNTech vaccines use the same standard phospholipid, swapping out this ingredient for a different phospholipid could lead to nanoparticles that reach different cells in the body, Whitehead says.

"Delivery into specific cell and tissue populations is still a huge challenge for the field," says Yizhou Dong, a nanoparticle researcher at the Ohio State University. Right now, intravenous injections of nanoparticles can easily reach the liver, and intramuscular injections for vaccines are taken up by immune cells. Some companies are working on experimental formulations for aerosolized delivery to the lungs, but the rest of the body remains out of reach, and the demand for targeted delivery is high. In late February, the **CRISPR base-editing** company **Beam Therapeutics**, where Ciaramella is president and chief scientific officer, **paid $120 million** to acquire the start-up Guide Therapeutics, which is focused on LNP discovery and has a system for finding particles that target specific cells of the body.

**Related: Delivering RNA Interference**

"There was this time when LNPs went through the dark ages," says Thomas Barnes, CEO of the mRNA company **Orna Therapeutics**. "I think there is going to be a bit of a renaissance in these ionizable lipids and that the world is going to get excited about LNPs again."

For now, the success of the COVID-19 vaccines is a sweet victory. "It is a little surreal, honestly," Anderson says. "It is something that we went from just being excited about to something that my mom got in a shot in January."

Chemical & Engineering News
ISSN 0009-2347
Copyright © 2022 American Chemical Society

## YOU MIGHT ALSO LIKE...



**This was mRNA's breakout year, and scientists are just getting started**



**Delivering The Promise**



**Delivering RNA Interference**



**Next Level Hit Identification**
by Schrodinger

## JOIN THE CONVERSATION

✉ **Contact the reporter**

✏ **Submit a Letter to the Editor for publication**

🐦 **Engage with us on Twitter**

## MOST POPULAR IN PHARMACEUTICALS

**Drug companies are investing big in psychedelics, but can they engineer o the trip?**

**New weight-loss drugs could shift the scales**

**Without these lipid shells, there would be no mRNA vaccines for COVID-19**

**How Does Acetaminophen Work? Researchers Still Aren't Sure**

**Drug Testing And 'Caine' Drugs**

**How Pfizer scientists transformed an old drug lead into a COVID-19 antiviral**

# EXHIBIT 9





## Pfizer and BioNTech Announce Further Details on Collaboration to Accelerate Global COVID-19 Vaccine Development

- *Pfizer and BioNTech to jointly develop COVID-19 vaccine, initially in the United States and Europe, and scale-up manufacturing capacity to support global supply*
- *Potential to supply millions of vaccine doses by the end of 2020 subject to technical success of the development program and approval by regulatory authorities, and then rapidly scale up capacity to produce hundreds of millions of doses in 2021.*
- *BioNTech will contribute multiple mRNA vaccine candidates as part of its BNT162 COVID-19 vaccine program, which are expected to enter human testing in April 2020*
- *Pfizer will contribute its leading global vaccine clinical research and development, regulatory, manufacturing and distribution infrastructure and capabilities*
- *BioNTech will receive an upfront payment of $185 million, including an equity investment of approximately $113 million, and be eligible to receive future milestone payments of up to $563 million for a potential total consideration of $748 million*



April 09, 2020 07:50 AM Eastern Daylight Time

MAINZ, Germany & NEW YORK--(BUSINESS WIRE)--BioNTech SE (Nasdaq: BNTX, "BioNTech" or "the Company"), and Pfizer Inc. (NYSE: PFE) today disclosed additional details of their collaboration to advance candidates from BioNTech's mRNA vaccine program, previously announced on March 17, 2020.

The collaboration aims to rapidly advance multiple COVID-19 vaccine candidates into human clinical testing based on BioNTech's proprietary mRNA vaccine platforms, with the objective of ensuring rapid worldwide access to the vaccine, if approved. The collaboration will leverage Pfizer's broad expertise in vaccine research and development, regulatory capabilities, and global manufacturing and distribution network.

The two companies plan to jointly conduct clinical trials for the COVID-19 vaccine candidates initially in the United States and Europe across multiple sites. BioNTech and Pfizer intend to initiate the first clinical trials as early as the end of April 2020, assuming regulatory clearance.

During the clinical development stage, BioNTech and its partners will provide clinical supply of the vaccine from its GMP-certified mRNA manufacturing facilities in Europe. BioNTech and Pfizer will work together to scale-up manufacturing capacity at risk to provide worldwide supply in response to the pandemic. BioNTech and Pfizer will also work jointly to commercialize the vaccine worldwide (excluding China, which is already covered by BioNTech's collaboration with Fosun Pharma) upon regulatory approval.

"Combatting the COVID-19 pandemic will require unprecedented collaboration across the innovation ecosystem, with companies coming together to unite capabilities like never before," said Mikael Dolsten, Chief Scientific Officer and President, Worldwide Research, Development & Medical, Pfizer. "I am proud of Pfizer's collaboration with BioNTech and

have every confidence in our ability to harness the power of science — together — to fight forth a potential vaccine that the world needs as quickly as possible."

"We have already started working with Pfizer on our COVID-19 vaccine and are pleased to announce these further details of our ongoing collaboration, which reflects both companies' strong commitment to move quickly to bring a safe and efficacious vaccine to patients worldwide," says Co-Founder and CEO of BioNTech, Ugur Sahin, M.D.

Under the terms of the agreement, Pfizer will pay BioNTech $185 million in upfront payments, including a cash payment of $72 million and an equity investment of $113 million. BioNTech is eligible to receive future milestone payments of up to $563 million for a potential total consideration of $748 million. Pfizer and BioNTech will share development costs equally. Initially, Pfizer will fund 100 percent of the development costs, and BioNTech will repay Pfizer its 50 percent share of these costs during the commercialization of the vaccine.

**About Pfizer: Breakthroughs That Change Patients' Lives**

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of health care products, including innovative medicines and vaccines. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 150 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.Pfizer.com. In addition, to learn more, please visit us on www.Pfizer.com and follow us on Twitter at @Pfizer and @Pfizer News, LinkedIn, YouTube and like us on Facebook at Facebook.com/Pfizer.

**Pfizer Disclosure Notice**

The information contained in this release is as of April 9, 2020. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about Pfizer's efforts to combat COVID-19, BioNTech's mRNA vaccine program, BNT162, a collaboration between BioNTech and Pfizer to develop a potential COVID-19 vaccine and manufacturing capacity, including their potential benefits, and the expected timing of clinical trials and potential supply, that involves substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as the possibility of unfavorable new clinical data and further analyses of existing clinical data; the risk that clinical trial data are subject to differing interpretations and assessments by regulatory authorities; whether regulatory authorities will be satisfied with the design of and results from the clinical studies; whether and when any biologics license applications may be filed in any jurisdictions for any potential vaccine candidates under the collaboration; whether and when any such applications may be approved by regulatory authorities, which will depend on myriad factors, including making a determination as to whether the product's benefits outweigh its known risks and determination of the product's efficacy and, if approved, whether any such vaccine candidates will be commercially successful; decisions by regulatory authorities impacting labeling, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of any such vaccine candidates, including development of products or therapies by other companies; manufacturing capabilities or capacity; uncertainties regarding the ability to obtain recommendations from vaccine technical committees and other public health authorities regarding any such vaccine candidates and uncertainties regarding the commercial impact of any such recommendations; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2019 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at www.sec.gov and www.pfizer.com.

## About BioNTech

Biopharmaceutical New Technologies (BioNTech) is a next generation immunotherapy company pioneering novel therapies for cancer, infectious diseases and rare diseases. The company exploits a wide array of computational discovery and therapeutic drug platforms for the rapid development of novel biopharmaceuticals. Based on its deep expertise in mRNA vaccine development and in-house manufacturing capabilities, BioNTech and its collaborators are developing multiple mRNA vaccine candidates for a range of infectious diseases alongside its diverse oncology pipeline. Its broad portfolio of product candidates includes individualized and off-the-shelf mRNA-based therapies, innovative chimeric antigen receptor T cells, bi-specific checkpoint immuno-modulators, targeted cancer antibodies and small molecules. BioNTech has established a broad set of relationships with multiple global pharmaceutical collaborators, including Eli Lilly and Company, Genmab, Sanofi, Bayer Animal Health, Genentech, a member of the Roche Group, Genevant, Fosun Pharma, and Pfizer.

For more information, please visit www.BioNTech.de

**BioNTech Forward-looking statements**

This press release contains "forward-looking statements" of BioNTech within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include, but may not be limited to, BioNTech's efforts to combat COVID-19, the ability of BioNTech and Pfizer to co-develop and co-commercialize a vaccine for COVID-19, the ability of BioNTech and Pfizer to develop manufacturing capacity, BioNTech's potential COVID-19 mRNA vaccine, BNT162, an agreement regarding the co-development and co-commercialization by Pfizer and BioNTech of BNT162, including its potential benefits and the expected timing of a Phase 1 trial of BNT162. Any forward-looking statements in this press release are based on BioNTech's current expectations and beliefs of future events, and are subject to a number of risks and uncertainties that could cause actual results to differ materially and adversely from those set forth in or implied by such forward-looking statements. These risks and uncertainties include, but are not limited to: competition to create a vaccine for Covid-19 and potential difficulties. For a discussion of these and other risks and uncertainties, see the section entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in BioNTech's Annual Report on Form 20-F filed with the SEC on March 31, 2020 which has been filed with the SEC and is available on the SEC's website at www.sec.gov. All information in this press release is as of the date of the release, and BioNTech undertakes no duty to update this information unless required by law.

# Contacts
**Pfizer Contacts**

Media Relations
Amy Rose (U.S.)
+1 (212) 733-7410
amy.rose@pfizer.com

Lisa O'Neill (UK)
+44 7929339560
lisa.o'neill@pfizer.com

Investor Relations
Ryan Crowe
+1 (212) 733-8160
ryan.crowe@pfizer.com

**BioNTech Contacts:**

Media Relations
Jasmina Alatovic
Senior Manager Global External Communications
+49 (0)6131 9084 1513 or +49 (0)151 1978 1385
Media@biontech.de

Investor Relations
Sylke Maas, Ph.D.
VP Investor Relations & Business Strategy
+49 (0)6131 9084 1074
Investors@biontech.de

# EXHIBIT 10

EX-10.45 9 d939702dex1045.htm EX-10.45

Exhibit 10.45

Execution Version

**THE SYMBOL "[***]" DENOTES PLACES WHERE CERTAIN
IDENTIFIED INFORMATION HAS BEEN EXCLUDED FROM
THE EXHIBIT BECAUSE IT IS BOTH (i) NOT MATERIAL, AND
(ii) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE
COMPANY IF PUBLICLY DISCLOSED**

COLLABORATION AGREEMENT

by and between

**PFIZER INC.**

and

**BIONTECH SE**

**March 17, 2020**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | SCOPE OF COLLABORATION | 19 |
| 3. | LICENSES | 19 |
| 4. | COMMERCIALIZATION | 27 |
| 5. | PAYMENTS AND FUNDING | 27 |
| 6. | RESEARCH AND DEVELOPMENT PLAN | 33 |
| 7. | CONTRACT GOVERNANCE | 34 |
| 8. | MANUFACTURING | 39 |
| 9. | DEVELOPMENT, REGULATORY AND PHARMACOVIGILANCE | 41 |
| 10. | INTELLECTUAL PROPERTY | 48 |
| 11. | CONFIDENTIALITY | 58 |
| 12. | REPRESENTATIONS AND WARRANTIES | 62 |
| 13. | GOVERNMENT APPROVALS; TERM AND TERMINATION | 70 |
| 14. | CHANGE OF CONTROL | 74 |
| 15. | LIMITATION ON LIABILITY, INDEMNIFICATION AND INSURANCE | 75 |
| 16. | MISCELLANEOUS | 78 |

i

## COLLABORATION AGREEMENT

This Collaboration Agreement (the "Agreement") is entered into as of March 17, 2020 (the "Effective Date"), by and between Pfizer Inc., a corporation organized and existing under the laws of Delaware and having a principal place of business at 235 East 42nd Street, New York, New York, 10017 United States ("Pfizer") and BioNTech SE, a corporation organized and existing under the laws of Germany and having a place of business at An der Goldgrube 12, D-55131 Mainz, Germany ("BioNTech"). Pfizer and BioNTech may each be referred to herein individually as a "Party" and collectively as the "Parties".

WHEREAS, BioNTech owns or otherwise Controls (as defined below) certain patents, patent applications, technology, know-how, scientific and technical information and other proprietary rights and information relating to the identification, research and development of Candidates (as defined below) in the Field (as defined below) for delivery via Delivery Technology (as defined below);

WHEREAS, Pfizer has extensive experience and expertise in the development and commercialization of pharmaceutical and biopharmaceutical products;

WHEREAS, in view of the current COVID-19 crisis, Pfizer and BioNTech wish to engage in expedited collaborative research and development pursuant to the Research and Development Plan (as defined below) to identify and develop Candidates for inclusion in the Product, seek expedited regulatory approval for such Product, and launch such Product in all countries of the Territory (as defined below) as quickly as reasonably possible; and

WHEREAS, Pfizer and BioNTech wish that Pfizer Commercializes the Product in all countries of the Territory, subject to BioNTech having the right to exclusively commercialize the Product in the BioNTech Commercialization Territory.

NOW THEREFORE, in consideration of the mutual promises and covenants set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## 1.    DEFINITIONS

As used in this Agreement, the following terms will have the meanings set forth below:

1.1. "Affiliate" means any entity directly or indirectly controlled by, controlling, or under common control with, a Person, but only for so long as such control will continue. For purposes of this definition, "control" (including, with correlative meanings, "controlled by", "controlling" and "under common control with") means (a) possession, direct or indirect, of the power to direct or cause direction of the management or policies of an entity (whether through ownership of securities or other ownership interests, by contract or otherwise), or (b) beneficial ownership of more than 50% of the voting securities or other ownership or general partnership interest (whether directly or pursuant to any option, warrant or other similar arrangement) or other comparable equity interests of an entity; *provided*, *however*, that where an entity owns a majority of the voting power necessary to elect a majority of the board of directors or other governing board of another entity, but is restricted from electing such majority by contract or otherwise, such entity will not be considered to be in control of such other entity until such time as such restrictions are no longer in effect. Notwithstanding the foregoing, for the purposes of this Agreement, AT Impf GmbH, having its place of business at Rosenheimer Platz 6, 81669 Munich, Germany, and any entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with AT Impf GmbH (other than BioNTech SE or any entity that is directly or indirectly controlled by BioNTech SE) (collectively, the "Impf Group") shall not be considered Affiliates of BioNTech.

1

1.2. "<u>Anti-Corruption Laws</u>" means all applicable anti-bribery and anti-corruption laws and regulations, including the U.S. Foreign Corrupt Practices Act of 1977, the U.K. Bribery Act 2010, and the local laws and regulations of any countries in which Candidates or Products, payments or services will be provided or procured under or pursuant to this Agreement.

1.3. "<u>Applicable Data Protection Law</u>" means all applicable personal data protection laws, rules and regulations, including the EU General Data Protection Regulation ("GDPR").

1.4. "<u>Bankruptcy Code</u>" means Section 101(35A) of Title 11 of the United States Code, as amended, or such other legislation, Law or code with effect in another jurisdiction to which BioNTech or its Affiliates is subject having equivalent or reasonably similar purpose or provisions to the foregoing.

1.5. "<u>Binding Obligation</u>" means, with respect to a Party (a) any oral or written agreement or arrangement that binds or affects such Party's operations or property, including any assignment, license agreement, loan agreement, guaranty, or financing agreement, (b) the provisions of such Party's charter, bylaws or other organizational documents or (c) any order, writ, injunction, decree or judgment of any court or Governmental Authority entered against such Party or by which any of such Party's operations or property are bound.

1.6. "<u>BioNTech Commercialization Territory</u>" means (a) Germany and Turkey, until such time, on a country by country basis, a BioNTech Territory Exit Option is exercised by BioNTech in respect of one or both of those countries; (b) those countries, on a country by country basis, which become Pfizer Exit Countries (if any); and (c) those countries within the Developing Countries Territory for so long as BioNTech or its Affiliate or designee pursuant to the relevant Third Party Funder agreement undertakes Commercialization of the Product in such countries.

1.7. "<u>BioNTech Improvement</u>" means any Research and Development Program Technology, regardless of inventorship, that is a modification or improvement made to the RNA Technology or RNA Process Technology and (a) would also be applicable to one or more candidates or products in addition to or other than the Candidates or Products (b) is not predominantly directed to the Pfizer Technology and (c) could have reasonably been developed without the aid, use or application of Pfizer Materials, Pfizer Improvements or Pfizer's Confidential Information or any improvements or enhancements thereto.

1.8. "<u>BioNTech Know-How</u>" means [***].

1.9. "<u>BioNTech Materials</u>" means any tangible materials (but not information about or contained in such materials) owned or Controlled by BioNTech that relate to or embody the BioNTech Know-How or BioNTech Patent Rights.

2

1.10. "BioNTech Patent Right" means any Patent Right (other than Pfizer Patent Rights or Patent Rights jointly owned by BioNTech and Pfizer pursuant to Section 10.2) in any form and whether pending or issued that (a) is Controlled by BioNTech or any of its Affiliates as of the Effective Date or comes into the Control of BioNTech or any of its Affiliates during the Term (other than, in either case, through the grant of a license by Pfizer) and (b) claims any BioNTech Know-How.

1.11. "BioNTech Technology" means the BioNTech Patent Rights, BioNTech Materials, BioNTech Know-How. For avoidance of doubt, BioNTech Technology includes all Intellectual Property Rights Controlled by BioNTech pursuant to the Fosun Agreement.

1.12. "BioNTech Territory Exit Option" is defined in Schedule 4.1.

1.13. "BioNTech Third Party Agreement" means any agreement between BioNTech (or any of its Affiliates) and any Third Party (such Third Party, a "Third Party Licensor") that (a) relates to any of the BioNTech Technology or Research and Development Program Technology, or (b) otherwise grants a license or otherwise transfers any right to practice under any Patent Rights or Know-How, in each case that relate to the Candidates or Products or activities under this Agreement. For clarity, all Current Licenses shall be deemed BioNTech Third Party Agreements hereunder and all Current Licensors shall be deemed Third Party Licensors hereunder.

1.14. "Biologics License Application" or "BLA" means an application requesting permission from the FDA to introduce, or deliver for introduction, a biological product into interstate commerce, or any similar application or submission for marketing authorization of a product filed with a Regulatory Authority to obtain Regulatory Approval for such product in a country or group of countries.

1.15. "Biosimilar Notice" means a copy of any application submitted by a Third Party to the FDA under 42 U.S.C. § 262(k) of the Public Health Service Act (or, in the case of a country of the Territory outside the United States, any similar law) for Regulatory Approval of a biopharmaceutical product, which application identifies a Product as the Reference Product with respect to such product, and other information that describes the process or processes used to manufacture the biopharmaceutical product.

1.16. "Business Day" means a day other than a Saturday, Sunday or bank or other public holiday in New York, New York, USA or Mainz, Germany.

1.17. "Candidate" means an immunogenic composition in the Field that comprises Unmodified RNA Technology, Modified RNA Technology or Replicon Technology that (a) is Developed pursuant to the Research and Development Plan, (b) is Controlled by BioNTech as of the Effective Date or from time to time during the Term or (c) subject to Section 4.1, is Exploited by any of the Parties or their Affiliates pursuant to this Agreement, the Commercialization Terms and the Commercialization Agreement. Those Candidates Controlled by BioNTech and existing as of the Effective Date are set forth in Schedule 1.17.

1.18. "Calendar Quarter" means the respective periods of three consecutive calendar months ending on March 31, June 30, September 30 and December 31.

1.19. "Calendar Year" means any twelve (12) month period beginning on January 1 and ending on the next subsequent December 31.

1.20. "Capex Costs" means any capital expenditure costs associated with (a) the Research and Development Program or (b) the build-out, establishment, construction, expansion or investment in any Manufacturing facilities.

3

1.21. "Change of Control" means, with respect to a Party (a) the acquisition of beneficial ownership, directly or indirectly, by any Person (other than such Party or an Affiliate of such Party, and other than by virtue of obtaining irrevocable proxies) of securities or other voting interest of such Party representing of the combined voting power of such Party's then outstanding securities or other voting interests, (b) any merger, reorganization, consolidation or business combination involving such Party with a Third Party that results in the holders of beneficial ownership (other than by virtue of obtaining irrevocable proxies) of the voting securities or other voting interests of such Party (or, if applicable, the ultimate parent of such Party) immediately prior to such merger, reorganization, consolidation or business combination ceasing to hold beneficial ownership of at least 50% of the combined voting power of the surviving entity immediately after such merger, reorganization, consolidation or business combination, (c) any sale, lease, exchange, contribution or other transfer (in one transaction or a series of related transactions) of all or substantially all of the assets of such Party to which this Agreement relates, other than a sale or disposition of such assets to an Affiliate of such Party or (d) the approval of any plan or proposal for the liquidation or dissolution of such Party (other than in circumstances where such Party is deemed a Debtor pursuant to Section 13.7).

1.22. "Clinical Trial" means a human clinical study conducted on sufficient numbers of human subjects that is designed to (a) establish that a pharmaceutical product is reasonably safe for continued testing, (b) investigate the safety and efficacy of the pharmaceutical product for its intended use, and to define warnings, precautions and adverse reactions that may be associated with the pharmaceutical product in the dosage range to be prescribed or (c) support Regulatory Approval of such pharmaceutical product or label expansion of such pharmaceutical product. Without limiting the foregoing, Clinical Trial includes any Phase I Clinical Trial, Phase II Clinical Trial, Phase III Clinical Trial or other expedited clinical trial conducted by or on behalf of one or both Parties in connection with this Agreement.

1.23. "Combination Product" means a product comprising a Candidate or Product in combination with one or more other therapeutically active ingredients (which includes any prophylactic activity) that are co-formulated as part of the same dosage form or packaged and administered to patient together. For the avoidance of doubt, adjuvants, including molecular adjuvants, are not considered therapeutically active ingredients for the purposes of this definition regardless of whether or not such adjuvant is packaged together with a Candidate or Product but in a separate container.

1.24. "Commercialization Agreement" means the definitive agreement pursuant to which (i) Pfizer shall be licensed to Commercialize the Product on the Commercialization Terms and (ii) BioNTech shall retain and have rights to Commercialize the Product in the BioNTech Commercialization Territory; such agreement to be entered into between the Parties in accordance with the provisions of Section 4 and Schedule 4.1.

1.25. "Commercialize" or "Commercializing" means to market, promote, distribute, offer for sale, sell, have sold, import, have imported, export, have exported or otherwise commercialize a compound or product. When used as a noun, "Commercialization" and "Commercialized" means any and all activities involved in Commercializing.

1.26. "Commercially Reasonable Efforts" means, with respect to the efforts to be expended by a Party with respect to any objective, those reasonable, good faith efforts to accomplish such objective as such Party would normally use to accomplish a similar objective under similar circumstances, in particular taking into account the then-current urgency of the COVID-19 crisis. With respect to any efforts relating to the Development, Regulatory Approval or Commercialization of a Candidate or Product by a Party, generally or with respect to any particular country in the Territory, a Party will be deemed to have exercised Commercially Reasonable Efforts if such Party has exercised those efforts normally used by such Party having regard to the circumstances, in the relevant country, with respect to a compound or protein, product

4

or product candidate, as applicable (a) of similar modality Controlled by such Party, (b) to which such Party has similar rights, (c) which is of similar market potential in such country, and (d) which is at a similar stage in its development or product life cycle, as any Candidate or Product, in each case, taking into account all Relevant Factors in effect at the time such efforts are to be expended. Further, to the extent that the performance of a Party's obligations hereunder is adversely affected by the other Party's failure to perform its obligations hereunder, the impact of such performance failure will be taken into account in determining whether such Party has used its Commercially Reasonable Efforts to perform any such affected obligations.

1.27. "<u>Compassionate Use Purposes</u>" means, with respect to the Product, providing Product under compassionate or emergency use or expanded access programs, including pursuant to an emergency use authorization granted by a Governmental Authority or Regulatory Authority, or in jurisdictions or to vulnerable populations experiencing emergency pandemic, or crisis epidemic, coronavirus conditions.

1.28. "<u>Competitive Product</u>" means a pharmaceutical product that incorporates an immunogenic composition comprising RNA in the Field that is intended to be, has been, or is being Exploited by a Third Party. For avoidance of doubt, Competitive Product does not include Product (a) Commercialized by or on behalf of BioNTech in the BioNTech Commercialization Territory pursuant to this Agreement or the Commercialization Agreement, as applicable; or (b) Commercialized outside of the Territory in accordance with the terms of the Fosun Agreement.

1.29. "<u>Compliance</u>" means the adherence by the Parties in all material respects to all applicable Laws and Party Specific Regulations, in each case with respect to the activities to be conducted under this Agreement.

1.30. "<u>Confidential Information</u>" means, with respect to each Party, all Know-How or other information, including proprietary information and materials (whether or not patentable) regarding or embodying such Party's or its Representatives' technology, products, business information or objectives, that is communicated by or on behalf of the Disclosing Party to the Receiving Party or its permitted recipients, on or after the Effective Date, but only to the extent that: (a) such Know-How or other information in written form is marked in writing as "confidential" at the time of disclosure, (b) such Know-How or other information disclosed orally or in non-tangible form is identified by the Disclosing Party as "confidential" at the time of disclosure or within 30 days thereafter, or (c) such Know-How or other information (regardless of the form of disclosure) is disclosed in circumstances of confidence or would be understood by the Parties, exercising reasonable business judgment, to be confidential. Confidential Information does not include any Know-How or other information to the extent the Receiving Party can demonstrate by competent proof that such Know-How or other information (a) was already known by the Receiving Party (other than under an obligation of confidentiality to the Disclosing Party) at the time of disclosure by or on behalf of the Disclosing Party, (b) was generally available to the public or otherwise part of the public domain at the time of its disclosure to the Receiving Party, (c) became generally available to the public or otherwise part of the public domain after its disclosure to the Receiving Party, other than through any act or omission of the Receiving Party in breach of its obligations under this Agreement, (d) was disclosed to the Receiving Party, other than under an obligation of confidentiality, by a Third Party who had no obligation to the Disclosing Party not to disclose such information to the Receiving Party or (e) was independently discovered or developed by or on behalf of the Receiving Party without the use of any Confidential Information belonging to the Disclosing Party. The terms and conditions of this Agreement will be considered Confidential Information of both Parties. Joint Know-How shall be deemed Confidential Information of either Party and either Party shall be deemed the Receiving Party in respect of Joint Know-How.

<div align="center">5</div>

1.31. "Control" or "Controlled" means with respect to any Intellectual Property Right or material (including any Patent Right, Know-How or other data, information or material), the ability (whether by sole, joint or other ownership interest, license or otherwise, other than pursuant to this Agreement) to, without violating the terms of any agreement with a Third Party, grant a license or sublicense or provide access or other right in as provided in this Agreement, to or under such Intellectual Property Right or material.

1.32. "Conversion Costs" means [***].

1.33. "Copyright" means any copyright which pertains to the promotional materials and literature utilized by Pfizer in connection with the Commercialization of Products in the Territory.

1.34. "Cover", "Covered" or "Covering" means, with respect to (a) a given Candidate or Product and Patent Right, that a valid claim of such Patent Right would, absent a license thereunder or ownership thereof, be infringed by the making, sale, offer for sale or importation of such Candidate or Product and (b) a given Candidate or Product and Know-How, that such Know-How would, absent a license thereunder or ownership thereof, be misappropriated or misused by the use or making of such Candidate or Product.

1.35. "Current Good Manufacturing Practices" or "cGMP" means all applicable standards and applicable Laws relating to manufacturing practices for products (including ingredients, testing, storage, handling, intermediates) promulgated by the U.S. Food and Drug Administration and any other governmental authority (including, European Union or member state level and Japan), including, but not limited to, standards in the form of applicable laws, guidelines, advisory opinions and compliance policy guides, and current interpretations of the applicable authority or agency thereof (as applicable to pharmaceutical and biological products and ingredients), as the same may be updated, supplemented or amended from time to time, in each case of those jurisdictions in which the products are Manufactured.

1.36. "Current Licenses" means any agreement (a) that BioNTech or its Affiliates has entered into prior to the Effective Date with a Third Party and (b) pursuant to which BioNTech or its Affiliates are (i) granted rights to any BioNTech Technology as of the Effective Date or (ii) granted a license or otherwise transferred any right to practice under any Patent Rights or Know-How, in each case that relate to the Candidates or Products or activities under this Agreement. BioNTech's Current Licenses are disclosed on Schedule 1.36.

1.37. "Current Licensor" means any Third Party that is a party to a Current License.

6

1.38. "Delivery Technology" means the BioNTech Know-How applicable to formulating nucleic acids to enable the delivery of such nucleic acids to target cells *in vivo*. For clarity, Delivery Technology does not include [***].

1.39. "Develop", "Developed" or "Developing" means to discover, research or otherwise develop or improve a process, compound or product, including planning and conducting non-clinical and clinical research and development activities prior to Regulatory Approval or any research or development conducted after receipt of Regulatory Approval, including those required by any Regulatory Authority to maintain any Regulatory Approval. When used as a noun, "Development" means any and all activities involved in Developing.

1.40. "Developing Countries Territory" means, to the extent BioNTech or any of its Affiliates receive Third Party funding from [***] to fund Development or Manufacturing of the Candidates or Products pursuant to this Agreement, those countries listed in Schedule 1.40 which are also defined in the relevant funding documents as "Developing Countries"; *provided* that if prior to the execution of such funding documents, the price of any medicinal product (including the Product) in any country within Schedule 1.40 is made relevant as a reference price for the sale of the Product in any country outside of the countries listed within Schedule 1.40, then such country shall be automatically removed as a country within Schedule 1.40, unless otherwise mutually agreed in writing by the Parties.

1.41. "Development Budget" means the budget to be agreed and updated by the JSC for all activities, costs and expenses that are to be funded as Shared Development Costs, and which initial budget for the first [***] of this Agreement is to be agreed between the Parties in accordance with Section 2.2.

1.42. "EMA" means the European Medicines Agency or any successor agency thereto.

1.43. "Expedited Trial Pathway" means a Clinical Trial protocol or pathway recognized or authorized by any Regulatory Authority for the emergency or expedited approval of medicines for human use, as opposed to a traditional Clinical Trial.

1.44. "Exploit" means to Develop, Manufacture, Commercialize, use or otherwise exploit. Cognates of the word "Exploit" will have correlative meanings.

1.45. "FD&C Act" means the United States Federal Food, Drug, and Cosmetic Act, as amended, and the rules and regulations promulgated thereunder.

1.46. "FDA" means the United States Food and Drug Administration or any successor agency thereto.

1.47. "Field" means immunogenic compositions comprising RNA encoding a SARS-CoV-2 polypeptide or fragment thereof, including naturally occurring or engineered variants thereof, for prophylaxis against COVID-19 in humans.

1.48. "Flu Collaboration License" means the separate research collaboration and license agreement between, inter alia, the Parties for the development and commercialization of immunogenic compositions comprising RNA that encodes at least one Antigen for prophylaxis against influenza in humans dated July 20, 2018, as amended.

7

1.49. "Fosun" means Shanghai Fosun Pharmaceutical Industrial Development, Co. Ltd, a company incorporated in China, and having a place of business at No. 1289 Yishan Road, Shanghai, China.

1.50. "Fosun Agreement" means the Development and License Agreement concluded between BioNTech and Fosun on March 13, 2020.

1.51. "Funding Event" means (a) the BioNTech Deferred Development Costs have been repaid in full (other than solely through the payment of the Regulatory Approval Milestone in the event that the then-current Development Budget contemplates the expenditure of additional funds for the continued Development of the Product); (b) a Change of Control of BioNTech; or (c) the date notice is served by either Party to terminate this Agreement in accordance with Section 13.

1.52. "Future License" means an agreement approved by the Parties (a) that BioNTech or its Affiliates enters into on or after the Effective Date with a Third Party or (b) that Pfizer or its Affiliates enters into on or after the Effective Date; which in the case of (a) and (b) grants a license (sublicensable in accordance with the licenses granted hereunder) to that Third Party's ("Future Licensor") Patent Rights for the Commercialization of the Candidates or Products by BioNTech and Pfizer in the Field, and which license is applicable to the Candidates or Products and is necessary to avoid, overcome or settle any potential or actual infringement of those Third Party Patent Rights.

1.53. "GAAP" means United States generally accepted accounting principles, consistently applied.

1.54. "GEIA" means the German Employee Invention Act.

1.55. "GEIA Technology" means all BioNTech Technology and Research and Development Program Technology invented by employees of BioNTech or its Affiliates (solely or jointly with employees of Third Parties) under the jurisdiction of GEIA.

1.56. "Government" or "Governmental Authority" is to be broadly interpreted and includes (a) any national, federal, state, local, regional or foreign government, or level, branch, or subdivision thereof; (b) any multinational or public international organization or authority; (c) any ministry, department, bureau, division, authority, agency, commission, or body entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power; (d) any court, tribunal, or governmental arbitrator or arbitral body; (e) any government-owned or controlled institution or entity; (f) any enterprise or instrumentality performing a governmental function; and (g) any political party.

1.57. "Government Official", to be broadly interpreted, means (a) any elected or appointed government official (e.g., a member of a ministry of health), (b) any employee or person acting for or on behalf of a government official, Governmental Authority, or other enterprise performing a governmental function, (c) any political party, candidate for public office, officer, employee, or person acting for or on behalf of a political party or candidate for public office, (d) any member of a military or a royal or ruling family, and (e) any employee or person acting for or on behalf of a public international organization (e.g., the United Nations). For clarity, healthcare providers employed by Government-owned or -controlled hospitals, or a person serving on a healthcare committee that advises a Government, will be considered Government Officials.

1.58. "Gross Profit" means [***].

8

1.59. "<u>GxP</u>" means, collectively, all relevant good practice quality guidelines and regulations, encompassing such internationally recognized standards as Good Manufacturing Practice (GMP), Good Clinical Practice (GCP), Good Laboratory Practice (GLP), Good Distribution Practice (GDP), and Good Review Practice (GRP).

1.60. "<u>HCP</u>" or "<u>Healthcare Professional</u>" includes any physician, nurse, pharmacist, or other person who may administer, prescribe, purchase or recommend pharmaceutical products or other healthcare products.

1.61. "<u>Human Material</u>" means any biological samples of one or more Subjects collected, provided or utilized by BioNTech during the Research and Development Plan pursuant to this Agreement.

1.62. "<u>ICF</u>" means an informed consent form that was approved by a qualified Institutional Review Board or Independent Ethics Committee ("<u>IRB / IEC</u>") in accordance with all applicable Laws and recognized international standards for the protection of human research subjects.

1.63. "IFRS" means International Financing Reporting Standards, as in effect from time to time, together with its pronouncements thereon from time to time, consistently applied.

1.64. "<u>IND</u>" means an Investigational New Drug Application submitted under the FD&C Act, or an analogous application or submission with any analogous agency or Regulatory Authority outside of the United States for the purposes of obtaining permission to conduct Clinical Trials.

1.65. "<u>Intellectual Property Rights</u>" means any and all (a) Patent Rights, (b) proprietary rights in Know-How, including trade secret rights, (c) proprietary rights associated with works of authorship and software, including copyrights, moral rights, and copyrightable works, and all applications, registrations, and renewals relating thereto, and derivative works thereof, (d) other forms of proprietary or intellectual property rights however denominated throughout the world, other than trademarks, service marks, trade names, domain names and other indicators of origin.

1.66. "<u>Joint Steering Committee</u>" or "<u>JSC</u>" means the steering committee described in Section 7.3.1.

1.67. "<u>Joint Know-How</u>" means any Research and Development Program Know-How, whether or not patentable, made or created jointly by (a) BioNTech or any of its Representatives and (b) Pfizer or any of its Representatives, which does not constitute BioNTech Know-How, Product Know-How or Pfizer Know-How.

1.68. "<u>Joint Patent Rights</u>" means Research and Development Program Patent Rights that claim or disclose any invention included in Joint Know-How.

1.69. "<u>Joint Technology</u>" means the Joint Know-How and the Joint Patent Rights.

1.70. "<u>Know-How</u>" means any proprietary invention, discovery, development, data, information, process, method, technique, technology, result, cell line, cell, antibody or other protein, compound, probe, nucleic acid, (including RNAi) or other sequences or other know-how, whether or not patentable, and any physical embodiments of any of the foregoing or any information contained in any of the foregoing.

9

1.71. "<u>Law</u>" means any law, statute, rule, regulation, order, judgment or ordinance of any Governmental Authority, including all applicable Anti-Corruption Laws, accounting and recordkeeping laws, and laws relating to interactions with HCPs and Government Officials. For the avoidance of doubt, any specific references to any applicable Law or any portion thereof shall be deemed to include all then-current amendments thereto or any replacement or successor law, statute, standard, ordinance, code, rule, regulation, resolution, promulgation, order, writ, judgment, injunction, decree, stipulation, ruling or determination thereto.

1.72. "<u>MA Holder</u>" means, on a country by country basis within the Territory, the Party (or its Affiliate or designee under its control) that holds the Regulatory Approval required for the Commercialization of the Product in such country.

1.73. "<u>Major EU Market Country</u>" means any of France, Germany, Italy, Spain or the United Kingdom.

1.74. "<u>Major Market Country</u>" means the Major EU Market Countries, the United States and Japan.

1.75. "<u>Manufacture</u>" or "<u>Manufacturing</u>" means to make, produce, manufacture, process, fill, finish, package, label, perform quality assurance testing, release, ship or store, and for the purposes of further Manufacturing, distribute, import or export, a compound or product or any component thereof. When used as a noun, "Manufacture", "Manufactured" or "Manufacturing" means any and all activities involved in Manufacturing a compound or protein, device or product or any component thereof.

1.76. "<u>Manufacturing Costs</u>" means [***].

1.77. "<u>Manufacturing Plan</u>" means the plan for establishing Manufacturing and the Manufacturing facilities, as well as the Manufacturing obligations of each Party, in respect of the Candidates and Products, as such plan may be updated and modified from time to time with the unanimous consent of the JSC, and which initial plan for the first [***] of this Agreement is to be agreed between the Parties in accordance with Section 2.2.

10

1.78. "<u>Manufacturing Variances</u>" means [***].

1.79. "<u>Materials</u>" means the Pfizer Materials or the BioNTech Materials, as the context requires.

1.80. "<u>Modified RNA</u>" means an mRNA that has been modified by the incorporation of one or more modified nucleosides, excluding the 5' CAP.

1.81. "<u>Modified RNA Technology</u>" means the BioNTech Know-How applicable to Modified RNA. For clarity, Modified RNA Technology does not include [***].

1.82. "<u>Mutation</u>" means [***].

1.83. "<u>Net Sales</u>" means with respect to a Product [***].

[***]

11

[***]

1.84. "<u>Patent Rights</u>" means any and all (a) issued patents, (b) pending patent applications, including all provisional applications, non-provisional applications, substitutions, continuations, continuations-in-part, divisions and renewals, applications sharing a priority claim and all patents granted thereon, (c) patents-of-addition, reissues, reexaminations and extensions or restorations by existing or future extension or restoration mechanisms, including patent term adjustments, patent term extensions, supplementary protection certificates or the equivalent thereof, (d) inventor's certificates, (e) other forms of government-issued rights substantially similar to any of the foregoing and (f) United States and foreign counterparts of any of the foregoing.

1.85. "<u>Party Specific Regulations</u>" means all non-monetary judgments, decrees, orders or similar decisions issued by any Governmental Authority specific to a Party, and all consent decrees, corporate integrity agreements, or other agreements or undertakings of any kind by a Party with any Governmental Authority, in each case as the same may be in effect from time to time and applicable to a Party's activities contemplated by this Agreement.

1.86. "<u>Person</u>" means an individual, sole proprietorship, partnership, limited partnership, limited liability partnership, corporation, limited liability company, business trust, joint stock company, trust, incorporated association, joint venture or similar entity or organization, including a government or political subdivision or department or agency of a government.

1.87. "<u>Personal Data</u>" means any information relating to an identified or identifiable natural person as further specified in Art. 4 no. 1 of the GDPR.

1.88. "<u>Pfizer Commercialization Territory</u>" means the Territory, except for countries within the BioNTech Commercialization Territory from time to time.

1.89. "<u>Pfizer Exit Countries</u>" means, on a country by country basis, those countries out of the United Arab Emirates and South-East Asia where Pfizer elects, pursuant to the Commercialization Terms or Commercialization Agreement, not to Commercialize the Product pursuant to any Pfizer Exit Option.

1.90. "<u>Pfizer Improvements</u>" means any Research and Development Program Technology, regardless of inventorship, that is a modification or improvement to the Pfizer Technology and (a) would also be applicable to one or more candidates or products in addition to or other than the Candidates or Products, (b) is not predominantly directed to the Candidates or Products or the RNA Technology or RNA Process Technology and (c) could have reasonably been developed without the aid, use or application of BioNTech Materials, BioNTech Know-How or BioNTech's Confidential Information or any improvements or enhancements thereto.

1.91. "<u>Pfizer Know-How</u>" means [***]

12

[***]

1.92. "<u>Pfizer Patent Right</u>" means any Patent Right (other than Patent Rights jointly owned by BioNTech and Pfizer pursuant to Section 10.2) in any form and whether pending or issued that (a) is Controlled by Pfizer or any of its Affiliates on the Effective Date or that comes into the Control of Pfizer or any of its Affiliates during the Term (other than, in either case, through the grant of a license by BioNTech), and (b) claims any Pfizer Know-How.

1.93. "<u>Pfizer Quarter</u>" means each of the four (4) thirteen (13) week periods (a) with respect to the United States, commencing on January 1 of any Pfizer Year and (b) with respect to any country in the Territory other than the United States, commencing on December 1 of any Pfizer Year. Wherever non-country specific timelines are specified in this Agreement in reference to a Pfizer Quarter, such reference shall be deemed to be made to the Pfizer Year applicable in the United States.

1.94. "<u>Pfizer Technology</u>" means the Pfizer Patent Rights, Pfizer Materials and Pfizer Know-How.

1.95. "<u>Pfizer Year</u>" means the twelve (12) month fiscal periods observed by Pfizer (a) commencing on January 1 with respect to the USA; and (b) commencing on December 1 with respect to any country in the Territory other than the USA.

1.96. "<u>Phase I Clinical Trial</u>" means a Clinical Trial that generally provides for the first introduction into humans of a pharmaceutical product with the primary purpose of determining safety, metabolism and pharmacokinetic properties and clinical pharmacology of such product, in a manner that is generally consistent with 21 CFR § 312.21(a), as amended (or its successor regulation), provided, however, a Phase I Clinical Trial does not include any study generally characterized by the FDA as an "exploratory IND study" in CDER's Guidance for Industry, Investigators, and Reviewers Exploratory IND Studies, January 2006, irrespective of whether or not such study is actually performed in the United States or under an IND. A so-called Phase I/II Clinical Trial shall be deemed to be a Phase I Clinical Trial unless such trial, when completed, allows Pfizer to proceed directly to a Phase III Clinical Trial.

1.97. "<u>Phase II Clinical Trial</u>" means a Clinical Trial, the principal purpose of which is to make a preliminary determination as to whether a pharmaceutical product is safe for it intended use and to obtain sufficient information about such product's efficacy, in a manner that is generally consistent with 21 CFR § 312.21(b), as amended (or its successor regulation), to permit the design of further Clinical Trials.

1.98. "<u>Phase III Clinical Trial</u>" means a pivotal Clinical Trial with a defined dose or a set of defined doses of a pharmaceutical product designed to ascertain efficacy and safety of such product, in a manner that is generally consistent with 21 CFR § 312.21(c), as amended (or its successor regulation), for the purpose of enabling the preparation and submission of an NDA.

1.99. "<u>Price Approval</u>" means, in any country where a Governmental Authority authorizes reimbursement for, or approves or determines pricing for, pharmaceutical products, receipt (or, if required to make such authorization, approval or determination effective, publication) of such reimbursement authorization or pricing approval or determination (as the case may be).

1.100. "<u>Product</u>" means any pharmaceutical product in a formulation suitable for administration to humans that [***].

13

1.101. "Product Know-How" means any Research and Development Program Know-How that is predominantly directed to the composition of matter, treatment with, or the delivery of, Manufacture, form, formulation, or use of a Candidate or Product in the Field and is not generally applicable to compositions or products in addition to or other than a Candidate or Product.

1.102. "Product Materials" means all raw materials (including, without limitation, active pharmaceutical ingredients and excipients, vectors, plasmids and mRNA), labeling or packaging materials and components needed for the Manufacture and supply of a given Candidate or Product.

1.103. "Product Patent Rights" means any Patent Right that claims any invention included in Product Know-How.

1.104. "Product Technology" means the Product Know-How and Product Patent Rights.

1.105. "Public Health Service Act" or "PHS Act" means the United States Public Health Service Act (42 U.S.C. 201 *et seq*), as amended from time to time (including any rules and regulations promulgated thereunder) or any subsequent or superseding law, statute or regulation.

1.106. "RNA" means ribonucleic acid.

1.107. "RNA Process Technology" means the BioNTech Know-How used to Manufacture Candidates or Products.

1.108. "RNA Technology" means Replicon Technology, Unmodified RNA Technology, Modified RNA Technology and Delivery Technology that is, in each case, used by BioNTech in the Research and Development Program

1.109. "Regulatory Approval" means all technical, medical and scientific licenses, registrations, authorizations and approvals (including approvals of INDs, NDAs, BLAs, supplements and amendments, pre- and post- approvals and labeling approvals) of any Regulatory Authority, necessary or useful for the use, Development, Manufacture, and Commercialization of a pharmaceutical or biopharmaceutical product in a regulatory jurisdiction, including commercially reasonable Price Approvals and commercially reasonable Third Party reimbursement approvals.

1.110. "Regulatory Authority" means, with respect to a country in the Territory, any national (e.g., the FDA), supra-national (e.g., the European Commission, the Council of the European Union, or the European Medicines Agency), regional, state or local regulatory agency, department, bureau, commission, council or other Governmental Authority involved in the granting of a Regulatory Approval or, to the extent required in such country, Price Approval, for pharmaceutical products in such country.

1.111. "Relevant Factors" means all relevant factors that may affect the Development, Regulatory Approval or Commercialization of a Candidate or Product, including (as applicable): [***]

14

[***]

1.112. "Replicon" means an RNA molecule(s) that comprises a gene encoding a polymerase that can, when the RNA molecule(s) is introduced into a cell, replicate the same or a different RNA molecule(s), that also comprises a gene or a sequence encoding at least one non-human polypeptide that is capable of eliciting an immune response (an "Antigen") and does not comprise the full set of genes required to make an infectious virus and is capable, when introduced into a cell, of expressing detectable levels of the encoded Antigen.

1.113. "Replicon Product" means any Product comprising Replicon Technology.

1.114. "Replicon Technology" means the BioNTech Know-How applicable to Replicons. For clarity, Replicon Technology does not include Modified RNA Technology, Unmodified RNA Technology or Delivery Technology.

1.115. "Representatives" means (a) with respect to Pfizer, Pfizer, its Affiliates, its Sublicensees and subcontractors, and each of their respective officers, directors, employees, consultants, contractors and agents and (b) with respect to BioNTech, BioNTech, its Affiliates, its Sublicensees and subcontractors, and each of their respective officers, directors, employees, consultants, contractors and agents.

1.116. "Research and Development Plan" means the research and development plan to define the Development activities pursuant to the collaboration anticipated under this Agreement, which plan is initially to be agreed between the Parties in accordance with Section 2.2 for the first [***] of activities under this Agreement, and as may be amended from time to time pursuant to Section 6.1.

1.117. "Research and Development Program" means the program of collaboration between the Parties to Develop and Manufacture Candidates and Products in the Field, including the activities described in the Research and Development Plan.

1.118. "Research and Development Program Know-How" means any and all Know-How, Candidates and Products, whether or not patentable, made or created solely by or on behalf of either Party or its Representatives in the conduct of activities under the Research and Development Plan or made jointly by or on behalf of (a) BioNTech or its Representatives and (b) Pfizer or its Representatives in the conduct of activities under the Research and Development Plan.

1.119. "Research and Development Program Patent Rights" means any and all Patent Rights claiming or disclosing any invention included in Research and Development Program Know-How.

1.120. "Research and Development Program Technology" means the Research and Development Program Patent Rights and Research and Development Program Know-How.

1.121. "Residual Knowledge" means knowledge, techniques, experience and Know-How that (a) are, or are based on, any Confidential Information of the Disclosing Party and (b) are retained in the unaided memory of any authorized Representative of the Receiving Party after having access to such Confidential Information. An individual's memory will be considered to be unaided if the individual has not intentionally memorized the Confidential Information for the purpose of retaining and subsequently using or disclosing it.

15

1.122. "Shared Development Cost" means [***].

1.123. "Signing Date" means April 9, 2020.

1.124. "South-East Asia" means [***].

1.125. "Subject" means the individual donor of the Human Material or of the original tissues from which the Human Material was derived.

1.126. "Sublicensee" means any Person to whom a Party grants or has granted, directly or indirectly, a license or sublicense of any of the same Intellectual Property Rights licensed to such Party by the other Party under this Agreement in accordance with Section 3.6. For the avoidance of doubt, distributors used by a Party to Commercialize Product in a country or region shall not be regarded a Sublicensees.

1.127. "Tax" means all corporation tax, advance corporation tax, income tax, capital gains tax, value added tax, customs and other import duties, inheritance tax, purchase tax, capital duties, social insurance contributions, foreign taxation and duties and all penalties, charges and interest relating to any of the foregoing or resulting from a failure to comply with the provisions of any enactment relating to any of the foregoing.

1.128. "Territory" means worldwide, except for the People's Republic of China (including Hong Kong SAR and Macau SAR) and Taiwan.

1.129. "Third Party" means any Person other than Pfizer, BioNTech or their respective Affiliates.

1.130. "Third Party License Payment" shall mean a payment due to a Third Party Licensor or Future Licensor pursuant to a Current License or Future License, as applicable, that is [***]. For the avoidance of doubt, [***]

16

[***].

1.131. "<u>Trademark</u>" means any trademark, trade name, service mark, service name, brand, domain name, trade dress, logo, slogan or other indicia of origin or ownership, including the goodwill and activities associated with each of the foregoing.

1.132. "<u>Transfer Price</u>" shall mean [***] of the Manufacturing Cost of such Candidate or Product, subject to any different percentage between [***] as determined by the JCC, to be applied for Products to be supplied to the Developing Countries Territory or to take account of any supply requirements of any Governmental Authority within the Territory or pursuant to the terms and conditions of any funding agreement with a Third Party Funder.

1.133. "<u>Unmodified RNA</u>" means an mRNA that [***].

1.134. "<u>Unmodified RNA Technology</u>" means the BioNTech Know-How applicable to Unmodified RNA. For clarity, Unmodified RNA Technology does not include Replicon Technology, Modified RNA Technology or Delivery Technology.

1.135. "<u>UPC Agreement</u>" means the treaty Agreement on the Unified Patent Court signed 19 February 2013, as may be amended or superseded from time.

1.136. The following terms are defined in the section of this Agreement listed opposite each term:

| Defined Term | Section in Agreement |
| --- | --- |
| Acquirer | 14.2.2 |
| Acquisition Program | 14.1.1 |
| Additional Patent Jurisdictions | 10.3.1.1 |
| Affected Party | 14.1 |
| Agreement | Preamble |
| Alliance Managers | 7.1 |
| Audited Party | 5.10 |
| Auditing Party | 5.10 |
| BARDA | 5.5.1 |
| BioNTech | Preamble |
| BioNTech Deferred Development Costs | 5.4.2 |
| BioNTech Enforcement Patent Rights | 10.4.2 |
| BioNTech Indemnified Party | 15.2 |
| BioNTech JSC Members | 7.3.1 |
| BioNTech Prosecution Patent Rights | 10.3.1.1 |
| Capex Funding | 5.5.1 |

17

| Defined Term | Section in Agreement |
|---|---|
| Change of Control Party | 11.7 |
| Commercialization Terms | 4.1 |
| Consequential Damages | 15.1 |
| Competitive Product Infringement | 10.4.3 |
| Continuing Party | 10.3.2 |
| Cure Plan | 3.7.3 |
| Debtor | 13.7.1 |
| Declining Party | 10.3.2 |
| Disputed Matter | 7.3.5 |
| Disclosing Party | 11.1 |
| Enforcement Action | 10.4.1 |
| Effective Date | Preamble |
| Equity Investment | 5.2 |
| Force Majeure | 16.3 |
| FTO Action | 10.7.1 |
| Global Trade Control Laws | 16.10 |
| Impf Group | 1.1 |
| Incremental Withholding Tax | 5.7.1 |
| Indemnified Party | 15.4.1 |
| Indemnifying Party | 15.4.1 |
| Infringement Claim | 10.8 |
| IRB / IEC | 1.62 |
| JSC Chair | 7.3.2 |
| Key Patent Jurisdictions | 10.3.1.1 |
| Lead Development Party | 9.1.1 |
| Lead Party | 5.5.1 |
| Liabilities | 15.2 |
| Licensed Activities | 10.7.1 |
| Litigation Conditions | 15.4.2 |
| Marketing Authorization Applications | 9.2.2 |
| Notice of Dispute | 16.11.1 |
| Party or Parties | Preamble |
| Patent Committee | 10.1 |
| Patent Term Extension | 10.3.4 |
| Pfizer | Preamble |
| Pfizer Indemnified Party | 15.3 |
| Pfizer JSC Members | 7.3.1 |
| Pfizer Materials | 7.4.1 |
| Pharmacovigilance Agreement | 9.2.7 |
| Prosecution Proceedings | 10.3.5 |
| Policies | 12.3.20 |
| Program Director and Program Directors | 7.2 |
| Reference Product Sponsor | 10.4.6.2 |
| Receiving Party | 11.1 |
| Regulatory Approval Milestone | 5.3 |
| Restricted Market | 16.10.1 |
| Restricted Parties | 16.10.2 |
| Restricted Party List | 16.10.2 |
| Review Period | 11.5.2 |
| ROW | 9.1.1 |

18

| Defined Term | Section in Agreement |
|---|---|
| Term | 13.2 |
| Third Party Claim | 15.4.1 |
| Third Party Funder | 5.5.1 |
| Third Party Licensor | 1.12 |
| Upfront Payment | 5.1 |
| VAT | 5.7.2 |
| Withholding Tax | 5.7.1 |

## 2. SCOPE OF COLLABORATION

2.1. Scope of Collaboration. Subject to the terms and conditions of this Agreement, the Parties shall (a) cooperate in good faith to conduct their respective activities under the Agreement; and (b) establish one or more committees as described in Article 7 of this Agreement to oversee and coordinate the Development, Manufacture and Commercialization of Candidates and Products in the Territory.

2.2. Initial Research and Development Plan and Manufacturing Plan. Commencing on the Signing Date each Party shall, acting reasonably and in good faith, negotiate and seek to agree binding versions of the Research and Development Plan, Development Budget and the Manufacturing Plan, which shall be agreed by [***]. The Research and Development Plan to be agreed shall reflect the requirements described in Sections 6.1 and 6.2.

## 3. LICENSES.

3.1. Research Licenses.

3.1.1. **Research License from BioNTech to Pfizer**. Subject to the terms and conditions of this Agreement, effective as of the Effective Date, BioNTech on behalf of itself and its Affiliates hereby grants (and will procure that its Affiliates grant) to Pfizer a sole license under the BioNTech Technology to use, have used, Develop, have Developed, Manufacture, and have Manufactured [***] Candidates and Products within the Territory [***].

3.1.2. **Research License from Pfizer to BioNTech**. Subject to the terms and conditions of this Agreement, effective as of the Effective Date, Pfizer on behalf of itself and its Affiliates hereby grants (and will procure that its Affiliates grant) to BioNTech a sole license under the Pfizer Technology to use, have used, Develop, have Developed, Manufacture, and have Manufactured [***] (a) Candidates and Products and within the Territory [***], and (b) Candidates or products identical to any Product within the Field for their Development (but not Manufacture) outside the Territory by or on behalf of BioNTech (including by Fosun or its Affiliates) pursuant to the Fosun Agreement. With respect to (b) above, such license shall (i) exclude and prohibit the disclosure and license by BioNTech of Pfizer Technology used for Manufacture or formulation of the Candidate or Products, other than to the extent necessary for Fosun or its Affiliates to undertake fill/finish of a product identical to any Product in China or to comply with information requirements of the China National Medical Products Administration relating to such product required under applicable Law; and (ii) automatically terminate on the termination or expiration of the Fosun Agreement and will, unless earlier terminated, survive the termination or expiration of this Agreement in those circumstances described in Section 13.

19

3.1.3. **Scope of Research Licenses**. Each of the licenses granted under Section 3.1.1 and 3.1.2 is (a) a sole license, such that the applicable licensor Party shall not grant a Third Party (unless it is necessary for the Third Party undertaking a fee-for-service Development or Manufacturing activity on its behalf pursuant to this Agreement) a license under the same Intellectual Property Rights for any Exploitation within the Field and within the Territory in respect of any product, whether or not it is a Candidate or Product; (b) royalty-free; (c) sub-licensable in accordance with and subject to Section 3.6; (d) non-assignable, in whole or part, other than where a Party's benefit under this Agreement may be assigned pursuant to Section 16.1; and (e) granted subject to the provisions of this Agreement, and for the duration of the Term or until termination or expiry of this Agreement if earlier, unless otherwise specified herein.

3.2. Licenses for Commercial Manufacturing.

3.2.1. **License from BioNTech to Pfizer.** Subject to the terms and conditions of this Agreement, effective as of the Effective Date, BioNTech on behalf of itself and its Affiliates hereby grants (and will procure that its Affiliates grant) to Pfizer a non-exclusive license under the BioNTech Technology to Manufacture and have Manufactured Candidates and Products for use within the Territory and, subject to Section 3.4, Commercialization within the Territory in any indication.

3.2.2. **License from Pfizer to BioNTech.** Subject to the terms and conditions of this Agreement, effective as of the Effective Date, Pfizer on behalf of itself and its Affiliates hereby grants (and will procure that its Affiliates grant) to BioNTech a non-exclusive license under the Pfizer Technology to Manufacture and have Manufactured (a) Candidates and Products for Commercialization within the Territory in accordance with Section 3.4 in any indication and (b) Candidates and products identical to any Product within the Field for their use and Commercialization outside the Territory by BioNTech or Fosun and its Affiliates pursuant to the Fosun Agreement. With respect to (b) above, such license shall (i) exclude and prohibit the disclosure and license by BioNTech of Pfizer Technology used for Manufacture or formulation of the Candidate or Product, other than to the extent necessary for Fosun or its Affiliates to (x) undertake fill/finish of a product identical to any Product in China or (y) comply with information requirements of the China National Medical Products Administration relating to such product required under applicable Law; and (ii) shall automatically terminate on the termination or expiration of the Fosun Agreement and will, unless earlier terminated, survive the termination or expiration of this Agreement in those circumstances described in Section 13.

3.2.3. **Scope of Commercial Manufacturing Licenses**. Each of the licenses granted under Section 3.2.1 and 3.2.2 is (a) royalty-free; (b) sub-licensable in accordance with and subject to Section 3.6; (c) non-assignable, in whole or part, other than where a Party's benefit under this Agreement may be assigned pursuant to Section 16.1; and (d) granted subject to the provisions of this Agreement, and for the duration of the Term or until termination or expiry of this Agreement if earlier, unless otherwise specified herein.

20

3.3. <u>Regulatory Dossier Licenses</u>.

3.3.1. **License from BioNTech to Pfizer**. Effective as of the Effective Date, in respect of the Drug Master Files, Regulatory Approvals and Regulatory Documentation (as defined in the Fosun Agreement), BioNTech hereby grants to Pfizer a sole license to rely upon and make reference to such Drug Master Files, Regulatory Approvals and Regulatory Documentation (and the data referenced therein), to use the same in respect of any application for, and maintaining, any Regulatory Approvals (as defined in this Agreement) filed by Pfizer pursuant to this Agreement in respect of Candidates or Products. The license granted under this Section 3.3.1 is (a) royalty-free; (b) sub-licensable in accordance with and subject to Section 3.6; (c) non-assignable, in whole or part, other than where a Party's benefit under this Agreement may be assigned pursuant to Section 16.1; and (d) granted subject to the provisions of this Agreement, and for the duration of the Term or until termination or expiry of this Agreement if earlier, unless otherwise specified herein. BioNTech shall procure disclosure of such Drug Master Files, Regulatory Approvals and Regulatory Documentation upon Pfizer's request. Without limiting any of the foregoing, but subject to Section 3.10, BioNTech shall be permitted to use such Drug Master Files, Regulatory Approvals and Regulatory Documentation (to the extent not comprising Pfizer's Technology or Pfizer's Confidential Information) with respect to any application for or maintenance of any Regulatory Approvals outside the Field.

3.4. <u>Commercialization Licenses</u>.

3.4.1. **License from BioNTech to Pfizer**. Subject to the terms and conditions of this Agreement, and the terms of Schedule 4.1 until the Parties execute the Commercialization Agreement, BioNTech on behalf of itself and its Affiliates hereby grants (and will procure that its Affiliates grant) to Pfizer an exclusive (even as to BioNTech) license under the BioNTech Technology to Commercialize and have Commercialized Products within the Pfizer Commercialization Territory in any indication. The foregoing license shall be subject to the terms of the Commercialization Agreement once executed.

3.4.2. **License from Pfizer to BioNTech**. Subject to the terms and conditions of this Agreement, and the terms of Schedule 4.1 until the Parties execute the Commercialization Agreement, Pfizer on behalf of itself and its Affiliates hereby grants (and will procure that its Affiliates grant) to BioNTech a license under the Pfizer Technology to Commercialize and have Commercialized (a) Products within the BioNTech Commercialization Territory in any indication, which license shall be granted on a sole basis; and (b) products identical to any Product within the Field but outside the Territory by BioNTech or by Fosun or its Affiliates pursuant to the Fosun Agreement. With respect to (b) above, such license shall (i) be sole; (ii) royalty-bearing; (iii) exclude and prohibit the disclosure and license by BioNTech of Pfizer Technology used for Manufacture or formulation of any Candidate or Product, other than to the extent necessary for Fosun or its Affiliates to (x) undertake fill/finish of a product identical to any Product in China or (y) comply with information requirements of the China National Medical Products Administration relating to such product required under applicable Law; and (iv) shall automatically terminate on the termination or expiration of the Fosun Agreement and will, unless earlier terminated, survive the termination or expiration of this Agreement in those circumstances described in Section 13.

3.4.3. **Scope of Commercialization Licenses**. Each of the licenses granted under Section 3.4.1 and 3.4.2 is (a) sub-licensable in accordance with and subject to Section 3.6; (b) non-assignable, in whole or part, other than where a Party's benefit under this Agreement may be assigned pursuant to Section 16.1; and (c) granted subject to the provisions of this Agreement, the Commercialization Agreement upon its execution, Schedule 4.1 and for the duration of the Term or until termination or expiry of this Agreement if earlier, unless otherwise specified herein. Furthermore, [***].

21

3.4.4. **Financial Provisions for Commercialization**. The license under:

    3.4.4.1. Section 3.4.1 and 3.4.2(a) is royalty-free but each is subject to the Gross Profit share set out in the Commercialization Terms; and

    3.4.4.2. Section 3.4.2(b) shall be royalty bearing at a rate of (i) [***] percent of net sales of the product(s) sold pursuant to the Fosun Agreement where such product(s) is Covered by any Pfizer Patent Right or any Joint Patent Rights (ii) if, or when, (i) does not apply, then [***] percent of net sales of the product(s) sold pursuant to the Fosun Agreement where such product(s) is Covered by any Pfizer Know-How or any Joint Know-How with net sales having the same definition, *mutatis mutandis*, to Net Sales under this Agreement, with sales and royalty reporting every Pfizer Quarter, payments on a Pfizer Quarter basis, and Pfizer having audit rights comparable with those under this Agreement); *provided*, *however*, that (a) during the period in which a generic or biosimilar equivalent to such product(s) is Commercialized in any part of the territory that is the subject of the Fosun Agreement, the royalty under (i) above shall be reduced by [***]; or (b) if the gross profit share earned by BioNTech in connection with sale of products under the Fosun Agreement is lower than the royalty amount to be paid to Pfizer hereunder in respect of those same sales, then no royalty shall be payable hereunder for those sales. The foregoing royalty obligations shall commence on the first commercial sale of the product(s) sold pursuant to the Fosun Agreement, and extend (a) with respect to the royalty under (i) for so long as such product(s) is Covered by any such Patent Rights (until such Patent Right expires, is surrendered, or is otherwise irrevocably revoked or declared invalid), and (b) with respect to the royalty under (ii), the [***] anniversary of the date of the first commercial sale of such product(s) in the territory that is the subject of the Fosun Agreement; and in each case, such provision shall survive the termination or expiry of this Agreement.

3.5. <u>Additional Licenses</u>.

    3.5.1. **To Pfizer**. Without limiting any other license or sublicense granted under this Agreement or the Commercialization Agreement and subject to the terms and conditions of this Agreement, BioNTech on behalf of itself and its Affiliates, effective as of the Effective Date, hereby grants (and will procure that its Affiliates grant) to Pfizer a non-exclusive, royalty-free, fully paid-up, sublicensable license under all BioNTech Improvements and Product Technology that were solely or jointly made or invented by Pfizer Representatives to use, have used, Develop, have Developed, Manufacture, have Manufactured, Commercialize, have Commercialized and otherwise Exploit any products or processes outside the Field. In addition to the obligations set forth in Section 3.10 for the avoidance of doubt, the license granted in this Section 3.5.1 shall not include or imply a right of Pfizer to use any of BioNTech's Confidential Information (that is not a BioNTech Improvement or Product Technology) outside the Field.

    3.5.2. **To BioNTech**.

        3.5.2.1. Without limiting any other license or sublicense granted under this Agreement or the Commercialization Agreement and subject to the terms and conditions of this Agreement, Pfizer, effective as of the Effective

<div align="center">22</div>

Date, hereby grants to BioNTech a non-exclusive, royalty-free, fully paid-up, sublicensable license under all Pfizer Improvements that were solely or jointly invented by BioNTech Representatives to use, have used, Develop, have Developed, Manufacture, have Manufactured, Commercialize, have Commercialized and otherwise Exploit any products or processes outside the Field.

3.5.2.2. Without limiting any other license or sublicense granted under this Agreement or the Commercialization Agreement and subject to the terms and conditions of this Agreement, Pfizer, effective as of the Effective Date, hereby grants to BioNTech a non-exclusive, royalty-free, fully paid-up, sublicensable license under Pfizer's interest in the Research and Development Program Technology to use, have used, Develop, have Developed, Manufacture, have Manufactured, Commercialize, have Commercialized and otherwise Exploit any products or processes outside the Field.

3.5.2.3. For the avoidance of doubt, the licenses granted in this Section 3.5.2 shall not include or imply a right of BioNTech to use any Pfizer Confidential Information (that is not a Pfizer Improvement or Research and Development Program Technology) outside the Field, but remain subject to the obligations set forth in Section 3.10.

3.6. <u>Sublicensees</u>. Either Party shall have the right to grant sublicenses and, as applicable, sub-sublicenses under and subject to the rights granted to it under this Section 3 to (a) its Affiliates; (b) permitted Third Party subcontractors which such Party uses to undertake services for, or to perform its obligations under, this Agreement, the Commercialization Terms and the Commercialization Agreement; (c) Sublicensees in respect of Manufacturing, provided that, other than where a sublicense is required by a Governmental Authority or pursuant to a Third Party Funder agreement, the sublicensing Party shall (i) discuss the proposed use of a Third Party with the other Party, and take into account any reasonable views, objections or comments with respect to the proposed Third Party; (ii) impose industry standard obligations of confidentiality and non-use on the Third Party with respect to the other Party's Confidential Information, and limit the disclosure of that other Party's Confidential Information so far as is reasonably necessary; and (iii) not, where Pfizer is the sublicensing Party, subcontract Manufacturing of the Product [***] without BioNTech's prior consent (such consent not to be unreasonably withheld); and (d) distributors of the Product in the Territory; and (e) in the case of BioNTech, and subject to the restrictions in Sections 3.1, 3.2, and 3.4 and the terms of Section 11, Fosun and any of Fosun's Affiliates pursuant to the Fosun Agreement for Commercialization in the Field outside the Territory. In respect of any and all such sublicenses (or sub-sublicenses):

3.6.1. the sublicensing Party shall be responsible for failure by its Sublicensees to comply with the terms and conditions of this Agreement;

3.6.2. the rights sublicensed under the sublicense may not be further sublicensed by the Sublicensee;

3.6.3. the sublicensing Party shall notify the other Party in writing of any sublicenses granted to Third Parties (other than Fosun);

23

3.6.4. in the event of a sublicense in respect of the Commercialization of Product, shall provide a copy of the relevant sublicense agreement to the other Party upon request which may be redacted to delete provisions not applicable to the calculation of Gross Profits; and

3.6.5. unless otherwise agreed between the Parties on a case-by-case basis, all sublicenses shall automatically terminate (and the sublicensing Party shall ensure that all sublicenses automatically terminate) upon termination (for whatever reason) or expiry of a license granted hereunder, but only to the extent necessary to terminate the sublicense in so far as it corresponds to any terminated or expired licenses granted in this Agreement.

3.7. BioNTech Current Licenses.

3.7.1. **Maintenance of Current Licenses.** BioNTech will maintain in full effect and will perform all of its obligations in a timely manner under each of the Current Licenses. Absent Pfizer's prior written consent (which may be provided, conditioned or withheld in Pfizer's sole discretion), BioNTech will not terminate, modify or amend any Current License in any manner that would adversely affect any of the rights granted or that may be granted to Pfizer under this Agreement or that would impose any obligations upon Pfizer hereunder (including any increase in Third Party License Payments) that are in addition to those obligations that would exist under this Agreement based on the Current Licenses as they exist on the Effective Date or adversely affect BioNTech's ability to perform its obligations under this Agreement. Further, BioNTech will not take any action or omit to take any action that would cause it to be in breach of any Current License or that would give rise to a right of any Current Licensor to terminate the applicable Current License.

3.7.2. **Communications and Performance.** Notwithstanding anything to the contrary in this Agreement, BioNTech will use Commercially Reasonable Efforts to facilitate any communications between Pfizer and any Current Licensor required for Pfizer to exercise the rights granted to it pursuant to Section 3 and will use Commercially Reasonable Efforts to cause each applicable Current Licensor to perform all of its obligations under the applicable Current License.

3.7.3. **Breach of Current License by BioNTech.** If BioNTech receives notification of any actual or potential breach or otherwise becomes aware of its breach of any Current License (and if uncured, such breach could give rise to the termination of the applicable Current License), then BioNTech will immediately notify Pfizer of such breach. To the extent that any act or omission on the part of Pfizer is the cause of such breach of a Current License, Pfizer will take all actions and provide BioNTech with all cooperation necessary to cure such breach, in each case as reasonably requested by BioNTech and at Pfizer's sole cost and expense. To the extent that Pfizer is not the cause of such breach of a Current License, BioNTech will have the first opportunity to cure such breach in accordance with a plan to be mutually agreed upon by the Parties in writing, acting reasonably (each, a "Cure Plan"). If (a) BioNTech, at any time, is not using diligent efforts to cure such breach pursuant to the applicable Cure Plan or (b) BioNTech is unable to cure such breach in accordance with the applicable Cure Plan or it becomes reasonably apparent that BioNTech will not be able to cure such breach pursuant to the applicable Cure Plan, then Pfizer may, at its election and in its sole discretion and without prejudice to its other remedies against BioNTech, act reasonably to cure such breach and BioNTech will take all actions and provide Pfizer with all cooperation to cure such breach, in each case as directed by Pfizer. Further, if Pfizer is not the cause of such breach of a Current License, then BioNTech will, at Pfizer's sole election, (i) reimburse Pfizer for all out-of-pocket costs and expenses incurred by or on behalf of Pfizer or any of its Representatives in connection with curing such breach; or (ii) permit Pfizer, under the Commercialization Agreement, to offset any such costs and expenses incurred by or on behalf of Pfizer or any of Pfizer's Representatives in connection with curing such breach against Pfizer's future payment obligations to BioNTech (or any of its successor or assigns) under this Agreement.

24

3.7.4. **Termination of any Current License**. In the event that any Current License is terminated by the applicable Current Licensor and this Agreement, as of the effective date of such termination, has not otherwise been terminated, Pfizer, to the extent permitted by such Current License (or if not permitted or addressed in such Current License, to the extent permitted by the applicable Current Licensor), will have the right without prejudice to its other remedies against BioNTech, at Pfizer's election, to convert the sublicenses granted under this Agreement by BioNTech to Pfizer under such Current License to a direct license from the applicable Current Licensor to Pfizer on the terms and conditions contained in such Current License (with Pfizer assuming the applicable obligations of BioNTech thereunder) or such other terms and conditions as may be negotiated by Pfizer and the applicable Current Licensor. In the event Pfizer enters into any such direct license with a Current Licensor, BioNTech will, at Pfizer's sole election and without prejudice to its other remedies hereunder:

3.7.4.1. in respect of royalties payable by Pfizer under such direct license to the Current Licensor, to the extent such royalties are due in connection with the sale of Candidates or Products hereunder, reimburse to Pfizer the difference between (a) the amount that would have been payable by BioNTech to the Current Licensor under the Current License if the Current License had not been terminated and (b) the amount that would have to be reimbursed by Pfizer to BioNTech in accordance with the terms of the Commercialization Agreement; or

3.7.4.2. permit Pfizer to offset any such reimbursement amounts (to the extent not reimbursed pursuant to clause (a) above), against Pfizer's future payment obligations to BioNTech (or any of its successor or assigns) under the Commercialization Agreement.

3.7.5. **Consents and Waivers**. BioNTech represents, warrants and covenants to Pfizer that, to the extent any terms and conditions of this Agreement do not (or will not at any time during the Term) conform to any requirements relating to the grant of sublicenses under any Current License, it has obtained the irrevocable consent (or, if applicable, the waiver of any resultant conflict) from the applicable Current Licensor that is necessary to permit the activities contemplated under this Agreement, including, such that BioNTech may grant the applicable sublicenses granted or to be granted hereunder and perform all of its obligations hereunder and Pfizer may exercise all of its rights and perform all of its obligations hereunder, in each case, without breaching the applicable Current License. In the event that any provision in any Current License which conflicts with this Agreement or adversely impacts the activities contemplated under this Agreement comes to the attention of either BioNTech or Pfizer or which otherwise, at any time during the Term, would cause the representation, warranty and covenant set forth in the preceding sentence to be untrue, BioNTech, in consultation with Pfizer, will obtain any and all additional required consents or waivers from the applicable Current Licensor(s) which may be necessary to align the conflicting provision(s) of the applicable Current License with this Agreement and to permit the activities contemplated by this Agreement.

3.7.6. **Exceptions to the Fosun Agreements**. If BioNTech (as opposed to Pfizer) has breached the Fosun Agreement [***]. In addition, in respect of the Fosun Agreement (i) [***]; and (ii) [***].

<div align="center">25</div>

3.7.7. **Reduction in Royalties**. BioNTech shall use reasonable efforts to obtain any reductions or waivers in royalties or other payments due under the Current Licenses that could constitute Third Party License Payments due to the pandemic status of COVID-19 or with respect to countries or populations experiencing emergency pandemic or crisis epidemic, coronavirus conditions, including taking into account any restrictions on pricing for the Product based on applicable Law and funding agreements with Third Party Funders. For the avoidance of doubt, BioNTech does not guarantee that any such reductions or waivers can be obtained from such licensors.

3.8. Third Party Agreements. Each Party will be solely responsible for all obligations (including royalty and payment obligations) that relate to Candidates, Products, BioNTech Technology or Pfizer Technology under its or its Affiliates' own agreements with Third Parties that are in effect on or prior to the Effective Date, including the Current Licenses for which BioNTech has sole responsibility.

3.9. No Implied Rights. Except as expressly provided in this Agreement, neither Party will be deemed to have granted the other Party (by implication, estoppel or otherwise) any right, title, license or other interest in or with respect to any Patent Rights, Know-How or other Intellectual Property Rights or information Controlled by such Party.

3.10. Exclusivity.

3.10.1. **Mutual Exclusivity.** Except if otherwise permitted by the unanimous consent of the JSC, during the Term, neither Party shall, and shall procure that its Affiliates shall not, itself or with or on behalf of a Third Party, Develop, have Developed, Manufacture, have Manufactured, Commercialize, have Commercialized or otherwise Exploit or have Exploited any [***] in the Field within the Territory, except that each Party may continue any existing agreement with a Third Party for non-clinical research within the Field with academic institutions and consortia. For avoidance of doubt, the foregoing exclusivity obligation shall not apply to (a) [***]; (b) [***]; (c) [***]; or (d) [***].

3.10.2. **Exclusivity of the Licenses**. Without prejudice to the licenses granted by BioNTech pursuant to this Section 3 or pursuant to the Commercialization Agreement, BioNTech shall not, and shall procure that its Affiliates shall not, grant any license, permission, waiver, covenant not to sue, or other right to use or Exploit any of the BioNTech Technology within the Field and within the Territory that would conflict with or erode any of Pfizer's rights hereunder.

26

3.10.3. **Exclusivity in the Product**. Except pursuant to this Agreement or the Commercialization Terms or Commercialization Agreement, neither Party shall, and shall procure that its respective Affiliates shall not, itself or with or on behalf of a Third Party, Develop, have Developed, Manufacture, have Manufactured, Commercialize, have Commercialized or otherwise Exploit (a) any Candidate Controlled by BioNTech as of the Effective Date within the Field; or (b) any Candidate that, as a consequence of the Development under this Agreement, becomes Controlled by BioNTech after the Effective Date, for any field; or (c) any Product for any field or application; in each case (a), (b) and (c) other than for non-clinical research purposes, or within the Field pursuant to the Fosun Agreement.

## 4.    COMMERCIALIZATION

4.1. <u>Commercialization Agreement</u>. With respect to Commercialization, the Parties have agreed to the terms set forth in Schedule 4.1 ("<u>Commercialization Terms</u>") and will, for [***] following the Signing Date (or any other time period agreed by the Parties in writing), negotiate and execute a definitive Commercialization Agreement reflecting such Commercialization Terms. Such agreement shall be negotiated in good faith and acting reasonably, and shall set forth the rights and responsibilities of the Parties in connection with the Commercialization of the Products and which shall be consistent with the Commercialization Terms. If the Commercialization Agreement is not executed within the [***] period the Parties will prioritize and engage in additional discussions to conclude and execute the Commercialization Agreement as soon as possible.

4.2. <u>Commercialization Rights Pending Agreement</u>. If a definitive Commercialization Agreement is not executed before the Product is first ready to be Commercialized in the Territory, each Party may still commence and continue with the Commercialization of the Product in its respective Commercialization territory, but shall do so subject to the provisions of the Commercialization Terms until the Commercialization Agreement is executed.

## 5.    PAYMENTS AND FUNDING.

5.1. <u>Upfront Payment</u>. Pfizer shall make a one-time, non-refundable (without limiting Pfizer's right to claim for damages under this Agreement) payment of Seventy-two Million Dollars ($72,000,000) to BioNTech ("<u>Upfront Payment</u>") within thirty (30) days of receipt of BioNTech's invoice (such invoice to be delivered on or following the Signing Date), but not before the Research and Development Plan, Development Budget and Manufacturing Plan are agreed between the Parties in accordance with Section2.2, which payment shall be dedicated to activities to be performed under the Research and Development Plan.

5.2. <u>Equity Investment</u>. Pfizer and BioNTech shall enter into an "Investment Agreement" contemporaneously with this Agreement pursuant to which Pfizer agrees to subscribe for shares in BioNTech in consideration for an investment amount of One Hundred and Thirteen Million Dollars ($113,000,000) based on a price per share of $47.53, subject to the conditions as prescribed in such Investment Agreement ("<u>Equity Investment</u>").

5.3. <u>Regulatory Milestone Payment</u>. Within [***] of the date upon which either BioNTech or Pfizer first obtains all Regulatory Approvals required for the Commercialization of the Product in a Major Market Country in the Territory, Pfizer shall pay BioNTech a one-time, non-refundable (without limiting Pfizer's right to claim for damages under this Agreement) milestone payment of [***] Dollars (US$[***]) ("<u>Regulatory Approval Milestone</u>"), which shall be automatically applied to repayment of, and offset against, the BioNTech Deferred Development Costs, and to the extent that at such time the BioNTech Deferred Development Costs are less than the value of the Regulatory Approval Milestone any difference shall be paid to BioNTech.

27

5.4. Sharing of Development Costs.

5.4.1. **Shared Development Costs.** Except as otherwise provided herein, each Party shall bear fifty percent (50%) of all Shared Development Costs.

5.4.2. **BioNTech Deferred Development Costs**. Without prejudice to Section 5.4.1, BioNTech's share of the Shared Development Costs incurred in accordance with the binding parts of the Development Budget, Research and Development Plan and the Manufacturing Plan, and this Agreement, and which are not funded by a Third Party Funder, shall be funded initially by way of an interest free repayable loan from Pfizer unless and until there is a Funding Event ("BioNTech Deferred Development Costs"). Following a Funding Event, BioNTech shall thereafter fund its share of the Shared Development Costs in accordance with Section 5.4.4. The BioNTech Deferred Development Costs shall be funded by Pfizer but shall be subject to the reporting and reconciliation provisions of Section 5.4.4. The BioNTech Deferred Development Costs shall be repayable through (a) the Regulatory Approval Milestone, if paid pursuant to Section 5.3; (b) a proportion of the Commercialization Sales Milestone Payments (as defined and described in Schedule 4.1); (c) Pfizer's retention of the Enhanced Profit Share element of Gross Profits pursuant to the Commercialization Terms set out in the Commercialization Terms and (d) an immediate lump sum paid by BioNTech upon (i) Change of Control of BioNTech pursuant to Section 14.1.3.3, provided that the most recent published annual group net income, published prior to the date of such Change of Control, of the Third Party acquiring BioNTech is [***] Dollars or (ii) termination of this Agreement for BioNTech's breach or its bankruptcy or insolvency. If this Agreement is terminated by Pfizer pursuant to its right under Section 13.4, the BioNTech Deferred Development Costs shall cease to be repayable by BioNTech.

5.4.3. **Budgeting of Shared Development Costs.** The Parties shall agree on, and regularly update (if required), the Development Budget through the JSC. As soon as either Party determines that it is likely to overspend on the binding part of the Development Budget that is allocated to that Party by more than [***], it shall inform the JSC accordingly, and shall only be entitled to incur such overrun costs as Shared Development Costs pursuant to Section 5.4.1 and 5.4.2 upon the JSC's mutual consent.

5.4.4. **Reporting and Reconciliation.** Wherever possible and practicable, prior to any Funding Event any external Shared Development Costs incurred in accordance with the binding parts of the Development Budget shall initially be invoiced to and borne by Pfizer, but shall be subject to reimbursement in accordance with this Section 5.4.4. All other Shared Development Costs incurred in accordance with the binding parts of the Development Budget shall initially be borne by the Party incurring such costs and shall thereafter be subject to reimbursement in accordance with this Section 5.4.4. Each Party shall report to the other Party, within [***] after the end of each Pfizer US Quarter, the Shared Development Costs incurred by such Party during such Pfizer Quarter. Such report shall specify in reasonable detail all amounts included in such Shared Development Costs during such Pfizer Quarter (broken down by activity), and out-of-pocket costs shall be allocated to the extent possible to a specific activity in the applicable binding part of the Research and Development Plan. Each such report shall enable the receiving Party to compare the reported Shared Development Costs against the applicable binding part of the Development Budget previously approved by the JSC, on both a quarterly basis and a cumulative basis for each activity. The Parties shall seek to resolve any questions related to such accounting statements within [***] following receipt by each Party of the other Party's report hereunder. Following such resolution, BioNTech shall prepare a reconciliation report for the Shared Development Costs for such Pfizer Quarter (including as against the binding parts of the Development Budget) and shall either (a) deliver an invoice to Pfizer for any amounts due to

28

BioNTech as a result of reconciliation or (b) notify Pfizer that it should issue an invoice to BioNTech for any amounts due to Pfizer as a result of reconciliation. Any such invoice from BioNTech to Pfizer shall be payable within [***] from receipt by Pfizer. Prior to any Funding Event, any such invoice from Pfizer to BioNTech shall not be payable upon receipt, but shall be accounted as BioNTech Deferred Development Costs and shall be payable in accordance with the mechanism described in Section 5.4.2. Following any Funding Event, any such such invoice from Pfizer to BioNTech shall be payable within [***] from receipt by Pfizer.

5.4.5. **Capex Costs**. Notwithstanding anything else in this Agreement, each Party shall be solely responsible for its own Capex Costs and any capital expenditures required in connection with this Agreement or the Commercialization Agreement.

5.4.6. **Other Costs.** Except as expressly set forth otherwise in this Agreement), each Party will bear all costs and expenses it incurs in connection with its activities under this Agreement.

5.5. Third Party Funding.

5.5.1. **Third Party Funders.** Pfizer and BioNTech shall, in good faith and acting collaboratively, seek funding from one or more Third Parties for such Third Party to provide financial support to the collaboration between the Parties under this Agreement (each, a "Third Party Funder"). For each potential Third Party Funder, the Parties will agree on (a) the Party to lead the communications and discussions with such Third Party Funder (the "Lead Party") and (b) the activities, costs or expenses for which funding support shall be sought (e.g. funding for Development costs, funding in support of a Party's Capex Costs ("Capex Funding") or both). An initial list of potential Third Party Funders and their allocation as between the Parties is set forth in Schedule 5.5. Notwithstanding the foregoing, Pfizer shall be entitled to secure funding from, and shall be the Lead Party in discussions with, [***], in the event that Pfizer, in its sole discretion, [***], and BioNTech shall be entitled to secure funding from, and shall be the Lead Party in discussions with, [***], in the event that BioNTech, in its sole discretion, chooses to seek funding from [***].

5.5.2. **Discussions with Funders.** The Lead Party will lead any discussions with such Third Parties in any country, provided that the Lead Party will provide regular updates to the JSC and keep the JSC reasonably informed of the status and any developments in such discussions, and shall, at the other Party's reasonable request, update the other Party on any such discussions. The Lead Party shall conduct any such discussions and draft and file any applications for any Third Party Funding in good faith and acting reasonably with respect to its requests for such funding. Where legally possible and unless otherwise agreed between the Parties, each application for any Third Party funding shall be made in both Parties' name unless the Parties have agreed in advance pursuant to Section 5.5.1 that such application shall be in respect of one Party's Capex Funding alone, in which case such application may be made in that Party's own name alone. The Lead Party shall not enter into a written agreement with any Third Party Funder without prior written consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed) unless the Parties have agreed in advance pursuant to Section 5.5.1 that such agreement shall be in respect of that Lead Party's Capex Funding alone, in which case the Lead Party can conclude such Third Party Funder agreement without consent from the other Party. Notwithstanding the foregoing, (a) Pfizer shall be entitled to seek any funding from [***] without requiring BioNTech's consent; and (b) BioNTech shall be entitled to seek any funding from [***] without requiring Pfizer's consent. Pfizer and BioNTech acknowledge and agree that there is no guaranty that any Lead Party will be successful in securing any funding from any Third Party Funder or that any specific amount of funding will be obtained.

29

5.5.3. **Allocation of Funds and Balancing Payment.** To the extent possible, any Third Party funding to the extent it relates to activities in relation to which the Parties have agreed to treat the associated Development costs as Shared Development Cost shall be shared equally between the Parties. If such sharing is not possible, a balancing adjustment shall be made in favor of the other Party to the Shared Development Costs to reflect [***] percent of such funding that that Party receives from the Third Party Funder provided that doing so does not breach any applicable Laws or the terms of such funding. Each Party shall promptly report to the other Party in writing if and when it receives any payments from any Third Party Funder funding that relates to activities, costs or expenses that are Shared Development Costs.

5.5.4. **Not Applicable to Loans.** For the avoidance of doubt, this Section 5.5 shall not apply to any traditional loans provided by any Third Party to a Party provided that (a) such loans are repayable by the borrower Party and not, directly or indirectly, by the other Party; (b) this Agreement, the Commercialization Agreement, any other agreement ancillary to this Agreement or the Commercialization Agreement, the BioNTech Technology, Product Technology and Product are not provided as security for, or otherwise encumbered by way of, such loan (excluding, for clarity, any tangible assets). Each Party shall be entitled to seek any such loans from any Third Party without any obligations to the other Party.

5.6. Records and Accounting Principles. Each Party shall keep books and records of any of Shared Development Costs and any Third Party funding in accordance with good industry practice and GAAP or IFRS, as applicable. Each Party shall determine Shared Development Costs using its standard accounting procedures, consistently applied and in accordance with GAAP or IFRS, as applicable (provided that the application of such procedures results, on balance, in outcomes that are fair and equitable to both Parties taking into consideration the interests of both Parties as reflected in this Agreement). All personnel costs of either Party or its Affiliates are excluded from Shared Development Costs.

5.7. Taxes.

5.7.1. **Withholding Taxes**. The Parties agree to use reasonable efforts to cooperate with one another and use commercially reasonable efforts to avoid or reduce, to the extent permitted by applicable Law, tax withholding or similar obligations in respect of royalties, milestone payments, and other payments made by the paying Party to the receiving Party under this Agreement ("Withholding Taxes"). If Withholding Taxes are imposed on any compensation under this Agreement, the liability for such Withholding Taxes shall be the sole responsibility of the receiving Party, and the paying Party shall (a) deduct or withhold such Withholding Taxes from the payment made to the receiving Party, (b) timely pay such Withholding Taxes to the proper taxing authority, and (c) send proof of payment to the receiving Party within [***] following such payment. Each Party shall comply with (or provide the other Party with) any certification, identification or other reporting requirements that may be reasonably necessary in order for the paying Party to not withhold Withholding Taxes or to withhold Withholding Taxes at a reduced rate under an applicable bilateral income tax treaty. Each Party shall provide the other with commercially reasonable assistance to enable the recovery, as permitted by applicable Law, of Withholding Taxes or similar obligations resulting from payments made under this Agreement, such recovery to be for the benefit of the Party bearing the cost of such Withholding Taxes under this Section 5.6 (Taxes and Withholding). Notwithstanding the foregoing, if as a result of any assignment or sublicense by the paying Party, any change in the paying Party's tax residency, any change in the entity that originates the payment, or any failure on the part of the paying Party to comply with applicable

30

Law with respect to Withholding Taxes (including filing or record retention requirements), Withholding Taxes are imposed that would not otherwise have been imposed ("Incremental Withholding Taxes"), then the paying Party shall be solely responsible for the amount of such Incremental Withholding Taxes and shall increase the amounts payable to the receiving Party so that the receiving Party receives a sum equal to the sum which it would have received had there been no such imposition of Incremental Withholding Taxes.

5.7.2. **Value Added Tax**. All payments between the Parties under this Agreement are exclusive of applicable statutory value added tax or similar taxes ("VAT"), if any, which shall be listed separately on each invoice. If and to the extent any VAT will become payable due to any supplies or services rendered under this Agreement and if and to the extent such VAT is to be paid by the Party providing the supply or service to the competent tax authorities, the receiving Party shall pay an amount equal to such VAT to the providing Party upon receipt of a valid invoice allowing for the recovery of such VAT.

5.7.3. **Other**. Except as otherwise set forth in this Section 5.7, each Party shall be solely responsible for the payment of all Taxes imposed on such Party's income arising directly or indirectly from the activities of the Parties under this Agreement.

5.8. Currency, Source of Payments. All amounts payable and calculations under this Agreement will be in United States dollars, [***]. As applicable, all costs and expenses will be translated into United States dollars at the exchange rate used by the relevant Party for public financial accounting purposes. If, due to restrictions or prohibitions imposed by national or international authority, a given payment cannot be made as provided under this Section 5.8, the Parties will consult with a view to finding a prompt and acceptable solution. If the Parties are unable to identify a mutually acceptable solution regarding such payment, then the Party owing the relevant payment may elect, in its sole discretion, to deliver such payment in the relevant jurisdiction and in the local currency of the relevant jurisdiction.

5.9. Method of Payment. Except as permitted pursuant to Section 5.8, each payment hereunder will be made by electronic transfer in immediately available funds via either a bank wire transfer, an ACH (automated clearing house) mechanism, or any other means of electronic funds transfer, at the paying Party's election, to such bank account as the receiving Party will designate in writing to the other Party within [***] of the Signing Date, and thereafter at least [***] before the payment is due. All invoice or billing related questions in relation to Pfizer should be referred to Pfizer's Accounting Department at 800.601.1357 or go to the Accounts Payable Invoice Portal at ap.pfizer.com. Unless otherwise specified herein, each invoice is payable within [***] of receipt of the relevant invoice.

5.10. Audits. Upon [***] prior notice from a Party (the "Auditing Party"), the other Party (the "Audited Party") will permit an independent certified public accounting firm of nationally recognized standing selected by the Auditing Party and reasonably acceptable to the Audited Party, to examine, [***], the relevant books and records of the Audited Party and its Affiliates (and where possible, its subcontractors) as may be reasonably necessary to verify the amounts reported by the Audited Party in accordance with Sections 5.4 and 5.5. An examination by the Auditing Party under this Section 5.10 will occur not more than [***] and will be limited to the pertinent books and records for any Calendar Year ending not more than [***] before the date of the request. The accounting firm will be provided access to such books and records at the Audited Party's or its Affiliates' facility(ies) where such books and records are normally kept and such examination will be conducted during the Audited Party's or its Affiliates' normal business hours. The Audited Party may require the accounting firm to sign a reasonably acceptable non-disclosure agreement before providing the accounting firm with access to the Audited Party's or its Affiliates' facilities or records. Upon completion of the audit, the accounting firm will provide both Pfizer and BioNTech the same written report disclosing any discrepancies in the reports submitted by the Audited Party, and, in each case, the specific details concerning any discrepancies. No other information will be provided to the Auditing Party.

31

5.10.1. **Underpayments/Overpayments**. If such accounting firm concludes that there are errors in how Shared Development Costs have been charged, allocated or reclaimed, or Third Party funding has not been allocated in accordance with this Agreement by the Audited Party, then adjustments shall be made in accordance with the accounting firm's recommendations in a reconciliation of Shared Development Costs and any overpayment or underpayment by the Audited Party shall be rectified either by a refund to, or payment by, the Audited Party from or to the Auditing Party within [***] of the date the Audited Party receives such accountant's written report. Further, if the amount of any overpayment or overallocation to the Audited Party exceeds more than [***] of the amount that was properly payable due or allocated to the Audited Party, then the Audited Party will reimburse the Auditing Party for the Auditing Party's out-of-pocket costs in connection with the audit.

5.10.2. **Confidentiality**. Notwithstanding any provision of this Agreement to the contrary, all reports and financial information of the Audited Party or its Affiliates which are provided to or subject to review by the Auditing Party will be deemed to be Confidential Information of the Audited Party and subject to the provisions of Section 11.1.

5.11. <u>No Guaranty of Success</u>.

5.11.1. Pfizer and BioNTech acknowledge and agree that any milestone payments pursuant to BioNTech hereunder or under the Commercialization Terms: (a) have been included in this Agreement on the basis that they are only payable or otherwise relevant if a certain Product is successfully Developed or Commercialized in accordance with the applicable milestone or event, as applicable; (b) are solely intended to allocate amounts that may be achieved upon successful Development or Commercialization of such Product as applicable, between Pfizer and BioNTech; (c) are not intended to be used as a measure of damages if this Agreement is terminated for any reason; and (d) will only be triggered, and will only be relevant as provided, in accordance with the terms and conditions of such provisions.

5.11.2. Pfizer and BioNTech further acknowledge and agree that nothing in this Agreement, or in any document or presentation provided by Pfizer to BioNTech prior to the Effective Date will be construed as representing any estimate or projection of (a) the successful Development or Commercialization of any Product under this Agreement, (b) the number of Products that will or may be successfully Developed or Commercialized under this Agreement, (c) anticipated sales or the actual value of any Products that may be successfully Developed or Commercialized under this Agreement or (d) the damages, if any, that may be payable if this Agreement is terminated for any reason.

5.11.3. Neither Party makes any representation, warranty or covenant, either express or implied, to the other Party that (a) it will successfully Develop, Manufacture, Commercialize or continue to Develop, Manufacture or Commercialize any Product in any country, (b) if Commercialized, that any Product will achieve any particular sales level, whether in any individual country or cumulatively throughout the Territory or (c) it will devote, or cause to be devoted, any level of diligence or resources to Developing, Manufacturing or Commercializing any Product in any country, or in the Territory.

32

6.    **RESEARCH AND DEVELOPMENT PLAN**

    6.1. Scope of Development and Updating of Plans. Pfizer and BioNTech will collaborate during the Term to conduct research to identify, Develop and evaluate Candidates and Products within the Field in accordance with the binding parts of the Research and Development Plan, the Development Budget, the Manufacturing Plan, and the terms and conditions set forth in this Section 6. The Research and Development Plan may be modified by agreement and approval of the JSC pursuant to Section 7, provided that the JSC shall have no right or authority to (a) modify the Research and Development Plan in a way not permitted under Section 7.3; or (b) modify the Research and Development Plan so as to amend the contractual provisions of this Agreement. The initial [***] of each of the Research and Development Plan, the Manufacturing Plan and the Development Budget shall be agreed between the Parties by [***], the first [***] of each are binding upon the Parties and the second [***] are indicative but non-binding. At least [***] prior to the expiration of such initial [***] binding period, the JSC shall decide and mutually agree on the following [***] period of each of the Research and Development Plan, the Manufacturing Plan and the Development Budget which period, upon agreement, shall be binding upon the Parties subject to Section 7.3.4. At least [***] days prior to the expiration of the initial [***] period following the Effective Date, the JSC shall establish a rolling [***] process to decide on and update each of the Research and Development Plan, the Development Budget and the Manufacturing Plan for subsequent [***] periods, each of which shall be updated by the JSC no later than [***] prior to the expiration of the then binding [***] period.

    6.2. Research and Development Plan. The Research and Development Plan shall (a) include a broad non-binding overview of the first [***] of the planned Development program (specifying in reasonable detail all material Development activities) to generate the preclinical, clinical, CMC, regulatory and other information required for submitting a marketing authorization application for Regulatory Approval for the Candidate or Product and to achieve such Regulatory Approval for the Candidate or Product in one or more selected country(ies) of the Territory; (b) include a more detailed and binding part of the plan for the initial binding period described in Section 6.1, which will be updated in accordance with Section 6.1; and (c) set forth those obligations assigned to each Party with respect to the performance of the Development activities contemplated by such Research and Development Plan.

    6.3. Allocation of Responsibilities.

        6.3.1. **General**. Each Party will use Commercially Reasonable Efforts to perform its obligations and activities identified under the binding parts of the Research and Development Plan or as allocated to it by the JSC in a professional manner in accordance with any target dates set forth in Research and Development Plan. Further, each Party will perform its obligations under the binding parts of the Research and Development Plan or as allocated to it by the JSC in compliance with all Laws applicable to its activities under the Research and Development Plan.

        6.3.2. **Mutations**. If and to the extent Mutations of the SARS-CoV-2 virus arise [***]

        6.3.3. **Label Extensions**. If a Party wishes to extend the label or approved indication of any Product Developed hereunder to other indications (including any outside of the Field), it may so notify the JSC. In such event, the JSC shall discuss such label extension in good faith. If the JSC agrees by unanimous consent that Development should be undertaken to support the label extension, the Parties shall include the Development activities required to be undertaken to support

33

such label extension in the Research and Development Plan and, if appropriate, amend the Field accordingly to cover such extension. Any external cost or expense (other than Capex Cost) incurred by either Party (or its Affiliates) solely and specifically in connection with such Development activities [***].

6.3.4. **Subcontractors**. Either Party may subcontract its responsibilities under the binding parts of the Research and Development Plan or those allocated to it by the JSC without the other Party's prior written consent; *provided* that such Party shall be responsible for the management of all permitted subcontractors (which will include any Affiliate of a Party). The engagement of any Third Party subcontractor by a Party shall be in writing. The engagement of any subcontractor (whether Affiliate or Third Party) shall not relieve such Party of its obligations under this Agreement or the binding parts of the Research and Development Plan. Any agreement between the Party or its Affiliate and a subcontractor pertaining to the Research and Development Plan activities shall be consistent with the provisions of this Agreement including (a) an obligation to assign all Intellectual Property Rights generated during its performance of such Research and Development Plan to the Party free of any encumbrance such that the Party may fulfil its obligations hereunder and (b) terms and conditions under which such Third Party is obligated to preserve the confidentiality of the Research and Development Program, Research and Development Program Technology and any Confidential Information are at least as restrictive as those described in Section 11.2.1.

6.3.5. **Flexibility of Resources**. Due to practical consequences arising from the outbreak of the virus that is the subject of the Field, it may become difficult or temporarily impossible (including as classified as a force majeure event) for a Party to fulfil all of its responsibilities under the Research and Development Plan or as allocated to it by the JSC. Accordingly, a Party, in its effort to collaborate, may therefore agree to swap, substitute or perform any of the other Party's responsibilities that were allocated to it in the Research and Development Plan or by the JSC. The JSC shall be responsible for coordinating any such changes, which must be finally approved in writing by the Parties where the change results in a Party taking on additional financial cost and responsibility.

6.3.6. **Personnel Matters**. Each Party acknowledges and agrees that it is solely responsible for the compensation of its personnel assigned to the Research and Development Plan, and shall be responsible for withholding all national, state, local or other applicable taxes and similar items for such personnel. Each Party also shall be responsible for all other of its employer related obligations, including providing appropriate insurance coverage and employee benefits, and making all other deductions required by law affecting the gross wages of each of its employees. BioNTech personnel assigned to the Research and Development Plan activities are not nor shall they be deemed to be employees of Pfizer, and Pfizer personnel assigned to the Research and Development Plan activities are not nor shall they be deemed to be employees of BioNTech.

# 7. CONTRACT GOVERNANCE.

7.1. Alliance Managers. Each Party will appoint a single individual to act as the primary point of contact between the Parties to support the activities under the Research and Development Plan and the Manufacturing Plan (the "Alliance Managers"). Each Party may change its designated Alliance Manager at any time upon written notice to the other Party. As of the Effective Date, the Alliance Manager for Pfizer will be [***] and the Alliance Manager for BioNTech will be [***]. The Alliance Managers will:

34

7.1.1. use good faith efforts to attend (either in person or by telecommunications) all meetings of the JSC, but will be non-voting members at such meetings; and

7.1.2. be the first point of referral for all matters of conflict resolution and bring disputes to the attention of the JSC in a timely manner.

7.2. <u>Program Directors</u>. Each Party will appoint a program director to oversee all activities conducted under the Research and Development Plan (each, a "<u>Program Director</u>"). Each Party may change its designated Program Director at any time upon written notice to the other Party. The Program Directors will coordinate the efforts of their respective Party in conducting activities under the Research and Development Plan. As of the Effective Date, the Program Directors for Pfizer and BioNTech are [***], respectively.

7.3. <u>Joint Steering Committee</u>.

7.3.1. **Composition**. As of the Effective Date, the Parties will establish a Joint Steering Committee, comprised of at least [***] representatives of BioNTech (including the Alliance Manager for BioNTech) and at least [***] representatives of Pfizer (including the Alliance Manager for Pfizer). The JSC representatives for each of Pfizer and BioNTech will be referred to herein as the "<u>Pfizer JSC Members</u>" and the "<u>BioNTech JSC Members</u>" respectively. As of the Effective Date, the Pfizer JSC Members shall be [***] and the BioNTech JSC Members shall [***].

Each Party may replace its representatives to the JSC at any time upon notice to the other Party, *provided that* at all times an equal number of representatives from each Party are appointed to the JSC and each Party shall be responsible for ensuring any replaced representative is fully briefed and apprised of the Research and Development Program. Each Party shall procure that its JSC representatives shall make themselves available to attend JSC meetings upon reasonable notice and in accordance with this Agreement. Each Party may invite non-voting employees and consultants to attend meetings of the JSC. All members of the JSC and any invitees of either Party described above will agree in writing to be bound to obligations of confidentiality and assignment of Intellectual Property Rights no less restrictive than those that bind the Parties under this Agreement.

7.3.2. **Committee Chair**. The JSC will be chaired by a BioNTech JSC Member (the "<u>JSC Chair</u>"). BioNTech may replace the JSC Chair at any time upon notice to Pfizer. The responsibilities of the JSC Chair will be:

7.3.2.1.    to notify each Party at least [***] Business Days in advance of each JSC meeting;

7.3.2.2.    to collect and organize agenda items for each JSC meeting; and

<div align="center">35</div>

> 7.3.2.3.    to prepare the written minutes of each JSC meeting and circulate such minutes for review and approval by the Parties and identify action items to be carried out by the Parties.

7.3.3. **Meetings**. Until the initiation of a Phase I Clinical Trial or Expedited Trial Pathway, the JSC shall meet at least weekly, unless otherwise unanimously agreed. Thereafter, the JSC will meet on at least bi-weekly basis (or less or more frequently as the JSC so determines), either in-person or by audio or video teleconference. Meetings of the JSC will occur at such times and places as mutually agreed by the Parties. Any sub-committees or working groups established in accordance with Section 7.3.4 may meet via audio or video teleconference on a regular basis and in-person at such times and places as the Parties may agree. Meetings of the JSC will only occur if at least two representatives of each Party are present at the meeting or participating by teleconference or videoconference. Each Party will be responsible for, and will not be entitled to any reimbursement from the other Party with respect to, any and all personnel costs or expenses (including travel expenses) which are incurred by or on behalf of its personnel in connection with participation in any JSC meetings or sub-committee or working group meetings, or any other travel required to be undertaken by either Party's personnel in connection with the performance of the Agreement. The JSC Chair will use good faith efforts to (a) prepare and circulate to BioNTech and Pfizer each JSC meeting agenda on or before the day prior to the scheduled date for each JSC meeting and (b) circulate for review and approval by BioNTech and Pfizer written minutes of each JSC meeting within [***] Business Days after such meeting. The Parties will agree on the minutes of each meeting promptly, but in no event later than the day before the next meeting of the JSC.

7.3.4. **Responsibilities**. The JSC will coordinate and provide operational and strategic oversight of the Development and Manufacturing activities to be performed under the Research and Development Plan and the Manufacturing Plan by each Party and, within such scope will:

> 7.3.4.1.    review and approve all proposals of whether to seek funding from a Third Party Funder, and the terms of any proposed agreement with a Third Party Funder, which (with the exceptions specified in Section 5.5.2 for [***] and [***]) will require unanimous consent of the JSC;

> 7.3.4.2.    monitor and assess the progress of activities under the Research and Development Plan and the Manufacturing Plan;

> 7.3.4.3.    decide on the Candidates or Products that will be studied in the Clinical Trials;

> 7.3.4.4.    decide on the design of the Clinical Trials, including the protocol governing the Clinical Trials;

> 7.3.4.5.    decide on and revise and approve any revisions of the Research and Development Plan, the Development Budget and the Manufacturing Plan (including in accordance with the mechanism described in Section 6.1 and any adjustments pursuant to Section 6.3.3 and 6.3.5), each of which shall require unanimous consent of the JSC except as expressly set forth in Section 7.3.5;

36

7.3.4.6.      discuss any Intellectual Property Rights of a Third Party which may be relevant to Candidates and Products;

7.3.4.7.      oversee the Development of Manufacturing processes relating to the Candidates or Products, establishment of Manufacturing capacity, and endorse a strategy for Manufacturing Candidates and Product for both the Clinical Trials and planned Commercialization;

7.3.4.8.      review and discuss all preclinical data and data arising from Clinical Trials investigating the Candidate or Product in the Territory, including adverse events;

7.3.4.9.      review and discuss all preclinical data and data arising from Clinical Trials under the Fosun Agreement, including adverse events;

7.3.4.10.    form such other committees and sub-committees as the JSC may deem appropriate, such as a Joint Development Committee, a Joint Manufacturing Committee and the like, *provided that* the JSC may, with unanimous consent, delegate decision-making authority (that is within the JSC's own authority) relevant to such committee's and sub-committee's area of expertise only (and the Parties agree that they will form Joint Manufacturing Committee within [***] days of the Effective Date);

7.3.4.11.    address such other matters relating to the activities of the Parties under the Research and Development Plan or the Manufacturing Plan as either Party may bring before the JSC, including any matters that are expressly for the JSC to decide as provided in this Agreement;

7.3.4.12.    agree on a Development Budget, as well as any amendments to such budgets, provided that the Development Budget and any amendments to it shall require unanimous consent of the JSC;

7.3.4.13.    discuss, collaborate on and oversee any applications for Regulatory Approvals in respect of the Candidates and Products, both within and outside the Territory;

7.3.4.14.    discuss, collaborate on and agree on mutations pursuant to Section 6.3.2 or any label extension pursuant to Section 6.3.3, each of which must be agreed by unanimous consent of the JSC; and

7.3.4.15.    attempt to resolve any disputes between the Parties with respect to (a) the performance of activities under the Research and Development Plan or the Manufacturing Plan on an informal basis or (b) matters before the Patent Committee, in each case subject to Section 7.3.5.

7.3.5. **Decision-making**. Notwithstanding the number of Pfizer JSC Members or BioNTech JSC Members, each Party will have one (1) vote, and the JSC will make decisions on a unanimous basis. The JSC will use good faith efforts to reach agreement on any and all matters properly brought before it. If, despite such good faith efforts, the JSC is unable to reach unanimous

37

agreement on a particular matter, within [***] days after the JSC first meets to consider such matter, or such later date as may be mutually acceptable to the Parties (each such matter, a "<u>Disputed Matter</u>"), then:

     7.3.5.1.    Pfizer will have final decision making authority in relation to all decisions applicable to the Execution Task where the Decision Making Right is allocated to Pfizer as set out in Schedule 7.3.5; and

     7.3.5.2.    BioNTech will have final decision-making authority in relation to all decisions applicable to the Execution Task where the Decision Making Right is allocated to BioNTech as set out in Schedule 7.3.5; and

     7.3.5.3.    all other Disputed Matters (including those for which the Decision Making Right is identified as Mutual) shall be subject to the Parties reaching unanimous or mutual consent ( including in respect of the Development Budget).

The Parties agree that the JSC will further refine the details of the decision-making rights and processes in accordance with Schedule 7.3.5 and the terms of this Agreement.

     7.3.6. **Limits on JSC Authority**. Notwithstanding any provision of this Section 7 to the contrary, (a) each Party will retain the rights, powers and discretion granted to it under this Agreement and no such rights, powers, or discretion will be delegated to or vested in the JSC unless such delegation or vesting of rights is expressly provided for in this Agreement or the Parties expressly so agree in writing, (b) except with respect to modifications to the Research and Development Plan or Manufacturing Plan permitted as set forth in Section 7.3.4.5, the JSC will not have the power to amend this Agreement or otherwise modify or waive compliance with this Agreement in any manner and (c) neither Party will require the other Party to (i) breach any obligation or agreement that such other Party may have with or to a Third Party to the extent such obligation or agreement existed prior to the Effective Date or (ii) perform any activities that are materially different or greater in scope or more costly than those provided for in the Research and Development Plan then in effect. For avoidance of doubt, a joint committee will be formed under the Commercialization Agreement to provide operational and strategic oversight of the Commercialization.

     7.3.7. **JSC Term**. The JSC will be dissolved upon expiration of the Term.

    7.4. <u>Materials and Permitted Activities</u>.

     7.4.1. **Transfer**. From time to time during the Term, Pfizer shall provide BioNTech with tangible chemical or biological materials (the "<u>Pfizer Materials</u>") and BioNTech may provide Pfizer with BioNTech Materials for the other Party's use in accordance with binding parts of the Research and Development Plan. The Party providing its Materials represents and warrants to the other Party that, as of the date of delivery of the Material (a) [***], (b) [***] and (c) [***]. [***].

<div align="center">38</div>

7.4.2. **Title to Materials**. All right, title and interest in and to the providing Party's Materials (including any modifications or progeny thereof) will remain the sole and exclusive property of such Party notwithstanding the transfer to and use by other Party of the same.

7.4.3. **Permitted Activities.** Notwithstanding anything to the contrary in this Agreement save for each Party's exclusivity obligations and restrictions (including those at Sections 3.1 and 3.10), nothing in this Agreement shall be deemed to prevent or restrict in any way the ability of either Party or its Affiliates to conduct any activities in the Territory, which activities would be allowed under any safe harbor, research exemption, government or executive declaration of urgent public health need, or similar right available in law or equity if conducted by a Third Party.

7.4.4. **Return of Proprietary Materials**. Upon termination or expiration of the Term, each Party receiving the other Party's Materials hereunder shall, either destroy or return all unused Materials to the providing Party.

## 8. MANUFACTURING

8.1. <u>Development of Manufacture Process</u>. BioNTech and Pfizer shall jointly Develop a scalable process for Manufacture of Candidates and Products in the Field in the Territory in accordance with the binding parts of the Research and Development Plan and the Manufacturing Plan.

8.2. <u>Manufacture of Candidates and Products</u>. Each Party will use Commercially Reasonable Efforts to perform its obligations and activities identified under the binding parts of the Manufacturing Plan or as allocated to it by the JSC in a professional manner in accordance with any target dates set forth in the Manufacturing Plan. Further, each Party will perform its obligations under the binding parts of the Manufacturing Plan or as allocated to it by the JSC in compliance with all Laws applicable to its activities under the Manufacturing Plan. Pfizer and BioNTech will collaborate in the build-up of Manufacturing capacity for the Manufacturing of Candidates and Products for clinical and commercial purposes in accordance with the binding parts of the Manufacturing Plan and the terms and conditions set forth in this Section 8. The Manufacturing Plan may be modified by unanimous consent of the JSC pursuant to Section 7. Unless otherwise agreed in the Manufacturing Plan, at a minimum Pfizer will be responsible for the build-up of its Manufacturing site(s) in the USA for quantities of Product to be agreed as part of the Manufacturing Plan and the commercial supply agreement for such site, and at a minimum BioNTech will be responsible for the extension of its Manufacturing sites in Mainz and Idar-Oberstein for quantities of Product to be agreed as part of the Manufacturing Plan and the commercial supply agreement for such sites. [***] The Manufacturing Plan may also consider one or both Parties engaging Third Party contract manufacturing organizations as a source of Manufacturing. In addition, promptly after the Effective Date, the Parties will agree on a technology transfer plan and continue to perform the technology transfer that the Parties have already started prior to the Effective Date to enable Manufacturing by Pfizer. For the avoidance of doubt, to the extent the technology transferred under this Agreement is identical to the technology to be transferred pursuant to the Flu Collaboration License, the Parties shall cooperate to minimize any duplication of technology transfer efforts under the Flu Collaboration License that unreasonably would be duplicative, wasteful or unnecessary.

39

8.3. <u>Quality Requirements</u>. Each Party that undertakes or subcontracts any Manufacturing activities in respect of the Candidates or Products, whether for the purposes of this Agreement, the Clinical Trials or pursuant to the commercial supply agreements shall ensure that all Manufacturing activities are undertaken in accordance with (a) applicable GxP standards, applicable Laws, and other regulatory and manufacturing good practice (including record and sample keeping, deviation reporting, testing and quality requirements); and (b) the requirements of the applicable Quality Agreement.

8.4. <u>Manufacturing Agreements</u>.

8.4.1. **Clinical Supply**. Within [***] following the Effective Date, the Parties shall enter into an agreement for clinical supply, as required to ensure the Clinical Trials planned can proceed on the timelines set forth in the binding parts of the Research and Development Plan. All clinical supply of Candidates and Products shall be charged at the Manufacturing Costs. In addition, the Parties will negotiate in good faith and mutually agree on a Quality Agreement with respect to such clinical supply agreement.

8.4.2. **Commercial Supply**. Furthermore, the Parties will negotiate in good faith and mutually agree on one or more commercial supply agreement(s) and Quality Agreement(s) simultaneously with the negotiation of the Commercialization Terms. The commercial supply agreement(s) shall be in accordance with the following commercial terms:

8.4.2.1.    The Manufacturing Party shall be entitled to charge the Transfer Price for each batch of Product delivered in accordance with the relevant commercial supply agreement. Such Transfer Price shall be invoiced by the Manufacturing Party upon delivery of the Products and shall be payable by the other Party within [***] from receipt of such invoice.

8.4.2.2.    The Transfer Price shall be adjusted on a yearly basis for all commercial supply agreements in accordance with relevant cost developments.

8.4.2.3.    The Parties will work together, subject to and observing applicable Laws, and agree the volumes of Product Materials to be purchased from Third Party suppliers for the purposes of this Agreement and to [***] of either Party to source the other Party's requirements for such Product Materials for its Manufacturing activities pursuant to this Agreement and the Commercialization Agreement, which sourced Product Materials shall then be sold, at cost, to that other Party [***].

8.4.2.4.    [***]

40

8.4.3. The supply agreements to be entered into between the Parties pursuant to Sections 8.4.1 and 8.4.2, or the Commercialization Agreements if more appropriate, shall include appropriate accounting mechanisms to allow for true-up payments in respect of (i) Manufacturing Costs, including to account for any mark up on the Manufacturing Costs of Product Materials where permitted in the definition of Manufacturing Costs, and (ii) Manufacturing Variances.

8.5. <u>Allocation of Responsibilities</u>. Section 6.3.1 and Sections 6.3.4 to 6.3.6 shall apply *mutatis mutandis* in respect of each Party's responsibilities under the Manufacturing Plan.

## 9.    **DEVELOPMENT, REGULATORY AND PHARMACOVIGILANCE.**

9.1. <u>Development Matters.</u>

9.1.1. **Allocation of Development and Regulatory Responsibility.** The Development of Candidates and Products shall be conducted by the Parties, under the direction and oversight of the JSC (and, as applicable, the Joint Development Committee), in accordance with the applicable Research and Development Plan and Development Budget. Pursuant to the initial Research and Development Plan, the Parties shall identify a strategy for Development of the Candidates and Products in the Territory that identifies the Party that is leading the clinical Development of the Candidates or Products in a country in the Territory (the "<u>Lead Development Party</u>"). Notwithstanding the foregoing, the Parties have agreed that (a) Pfizer shall lead the clinical aspects of Development of Candidates and Products in the USA, and (b) BioNTech shall lead the clinical aspects of Development of Candidates and Products in the EU. BioNTech shall be the sponsor and IND/CTA holder for all Clinical Trials in the Territory, in each case, subject to a mutually agreeable strategy with respect to the Development of Candidates and Products. For any Clinical Trial for which Pfizer is the Lead Development Party (but is not the sponsor of such Clinical Trials), BioNTech shall have delegated to Pfizer operational and day-to-day Development activities, decision-making authority and responsibility for such Clinical Trial, including those activities described in Schedule 9.1.1, subject to a protocol approved by unanimous consent by the JSC. For avoidance of doubt, the Lead Development Party shall conduct its Development activities in collaboration with and with active review of the other Party.

9.1.2. **Appointment of Lead Development Party for Future Clinical Trials.** At any time during the term of this Agreement, the JSC may determine by mutual consent that additional clinical Development of the Candidate and Product are warranted and, in such event, unless otherwise agreed by the JSC, (a) Pfizer shall be the Lead Development Party for each additional Clinical Trial in the USA, (b) BioNTech shall be the Lead Development Party for each additional Clinical Trial in the EU and (c) the JSC shall mutually agree on the appointment of one of the Parties to be the Lead Development Party for each additional Clinical Trial on a Clinical Trial-by-Clinical Trial basis in a country or region in the Territory other than the USA and EU ("<u>ROW</u>"), and subject to the mutually agreed upon strategy.

9.1.3. **Clinical Trials.** In respect of Clinical Trials for the Candidates or Products pursuant to this Agreement, the following shall apply:

9.1.3.1.    *GxP Standards*. Subject to Section 9.1.3.7, BioNTech as the sponsor for any Clinical Trial in respect of any Candidate or Product pursuant to this Agreement shall ensure the Clinical Trial is conducted in accordance with GxP and all applicable Laws, and will provide to the other Party any significant GxP or non-compliance issues relating to the protocol for such Clinical Trial, which arise or may be identified through monitoring,

41

9.1.3.2.    *Monitoring Plans*. A high-level strategy for monitoring Clinical Trials in respect of any Candidate or Product pursuant to this Agreement will be agreed by the JSC within [***] following the Effective Date. The Lead Development Party of the Clinical Trial will notify the other Party if there are any amendments required to such monitoring plan, and provide such other Party with an opportunity to review and comment on any such amendments, and any amendments shall only be made following approval by the JSC.

9.1.3.3.    *IRB/IEC Approval*. BioNTech as the sponsor and Regulatory Approval holder of the Clinical Trials shall ensure that the Clinical Trial is approved by and subject to continuing oversight by an appropriate Institutional Review Board (IRB) or Independent Ethics Committee (IEC), except that BioNTech shall delegate this responsibility to Pfizer for any Clinical Trial for which Pfizer is the Lead Development Party. The Lead Development Party shall provide documentation of both the initial IRB/IEC approval of the final protocol to the other Party and annual renewals of that approval if such renewals are required. To the extent a Party receives notice of any withdrawal or suspension of IRB/IEC approval during the term of this Agreement, it will promptly inform the other Party

9.1.3.4.    *Informed Consent*. BioNTech as the sponsor and Regulatory Approval holder for each applicable Clinical Trial will obtain informed consent for each Clinical Trial subject in accordance with the applicable informed consent document and applicable Law and will inform and obtain express consent from each Clinical Trial subject that the data arising from such Clinical Trial may be used in accordance with the terms of this Agreement (including its export from the European Union and its processing by Pfizer or other Third Parties in accordance with the terms of this Agreement and Law), provided however, that BioNTech shall delegate this responsibility to Pfizer for those Clinical Trials for which Pfizer is the Lead Development Party. Notwithstanding the foregoing, the Lead Development Party will share the informed consent document with the other Party for such other Party's review and comment prior to its use in a Clinical Trial in a country in the Territory.

9.1.3.5.    *Sponsorship*. Where the Lead Development Party (or its Affiliate or designee) is not the sponsor of a Clinical Trial or Regulatory Approval holder, such Lead Development Party shall not represent to any Third Party, including any Clinical Trial subjects, that the Lead Development Party or its Affiliates are a sponsor.

9.1.3.6.    *Reporting*. BioNTech is solely responsible for any and all safety reporting and regulatory obligations associated with the conduct of the Clinical Trial for which it is the sponsor, including, but not limited to, obtaining and maintaining Regulatory Approvals for the conduct of the Clinical Trials, provided, however, that BioNTech shall delegate the safety reporting and regulatory obligations associated with the conduct of each Clinical Trial in the Territory to Pfizer subject to Section 9.3.

<div align="center">42</div>

9.1.3.7.    *Delegation*. Notwithstanding the responsibilities of BioNTech as IND/CTA holder or sponsor of Clinical Trials, where Pfizer is the Lead Development Party for a Clinical Trial Pfizer shall conduct its activities in compliance with GxP and applicable Law with respect to each of the activities which have been delegated to Pfizer pursuant to Schedule 9.1.1.

9.2. <u>Regulatory Matters.</u>

9.2.1. **Lead Development Party.** The JSC shall agree on a strategy to allocate operational responsibility for regulatory activities relating to each Candidate or Product to a Lead Development Party by reference to the country or region within the Territory for which that Party is to act as the Lead Development Party in respect of a Clinical Trial for one or more Candidates or Products. The JSC's initial allocation shall be that Lead Development Party for regulatory activities relating to each Candidate or Product in the EU shall be BioNTech, and the Lead Development Party for regulatory activities relating to each Candidate or Product in the USA shall be Pfizer. Subject to the JSC's mutual consent to seek Regulatory Approval in one or more countries or regions in the ROW, Pfizer shall be the Lead Development Party for regulatory activities relating to each Candidate or Product in such country or region in the ROW. If the JSC cannot agree on whether Regulatory Approval shall be sought for any country or region in the ROW, the Party that wishes to seek Regulatory Approval in such country or region shall be entitled to be the Lead Development Party for regulatory activities relating to each Candidate or Product in such country or region and seek such Regulatory Approval at its own cost. The JSC may vary from the foregoing allocations by mutual consent. The other Party shall cooperate with the Lead Development Party, at its reasonable request, with respect to any regulatory matters for which the Regulatory Approval holder is responsible or to whom regulatory matters have been delegated.

9.2.2. **Regulatory Communications and Filings.** Pfizer shall prepare, file in BioNTech's name, diligently prosecute to grant, and maintain all applications for Regulatory Approvals ("<u>Marketing Authorization Applications</u>") and all Regulatory Approvals obtained therefrom in respect of any Candidates or Products in USA and, subject to Section 9.2.1, the ROW. BionTech shall prepare, file in BioNTech's name, diligently prosecute to grant, and maintain all applications for Marketing Authorization Applications and all Regulatory Approvals obtained therefrom in respect of any Candidates or Products in EU. The JSC may vary from the foregoing allocations by mutual consent. In accordance with Section 9.2.1, each Party shall cooperate with the other Party with respect to any and all regulatory matters for which the other Party is responsible pursuant to this Agreement or the Research and Development Plan. Unless exigent action is required with respect to a given filing before a Regulatory Authority concerning a Candidate or Product, or a material communication with a Regulatory Authority concerning the same, the Party submitting such Marketing Authorization Application shall provide the other Party with copies of all filings relating to such Marketing Authorization Application prior to submission within a reasonable amount of time (but not less than [***] Business Days) to allow such Party to review and comment on such filings, and the Party submitting such Marketing Authorization Application shall consider all comments and proposed revisions from the other Party in good faith prior to submission. The Party responsible for filing such Regulatory Approvals shall consult with the other Party regarding, and keep the other Party informed of, the status of the preparation of all Marketing Authorization Applications and the prosecution thereof, including any material communications

43

that it receives with respect to the same. Upon request of the other Party, the Lead Development Party responsible for filing applications for such Regulatory Approvals shall provide to the other Party copies of all final Marketing Authorization Applications and filings relating thereto that it submits. The foregoing provisions of this Section 9.2.2 shall also apply to material and substantive communications with Regulatory Authorities.

9.2.3. **Regulatory Meetings.** The Lead Development Party shall consult with the other Party reasonably in advance of the date of any anticipated meeting with a Regulatory Authority relating to any Marketing Authorization Applications or Regulatory Approvals in respect of any Candidate or Product and shall consider any timely and reasonable recommendations made by the other Party in preparation for such meeting. The Parties agree that Pfizer, as the Lead Development Party for the regulatory activities in the USA and ROW shall lead interactions with the Regulatory Authority in the USA and ROW, while BioNTech as the Lead Development Party for the EU, shall lead interactions with the Regulatory Authority in Germany and the EU. The Parties agree that the Party who has been appointed by the JSC as the Lead Development Party shall lead interactions with respect to countries or regions in the Territory. Upon the request of the other Party, and to the extent legally permissible and not opposed by the relevant Regulatory Authority, the Lead Development Party shall permit the other Party to attend any and all meetings with the applicable Regulatory Authority concerning the Candidate or Product. [***]

9.2.4. **Manufacturing Matters.** Where Pfizer is the Lead Development Party and responsible for preparing the filings for Regulatory Approval, BioNTech shall provide all reasonable assistance to Pfizer in such filings, including preparation of the CMC portions of the Common Technical Document in English and supporting ancillary cGMP documents and analytical data as required to meet specific regulatory filing and approval requirements. Each Party shall promptly provide the other with copies of material written correspondence as reasonably necessary to permit each Party to comply with its relevant regulatory obligations described in the Agreement or as otherwise reasonably requested.

9.2.5. **Ownership of Regulatory Filings, Market Authorization Approvals and Pricing and Reimbursement Approvals.** Unless otherwise required under applicable Law or determined by unanimous consent of the JSC (or the JCC with respect to Commercialization Agreement, as applicable), all Regulatory Approvals directed to a Candidate or Product in a country in the Territory and all applications therefor shall be made or held in the name of and owned by BioNTech. Notwithstanding the foregoing BioNTech may, upon giving reasonable notice to Pfizer, elect to transfer to Pfizer or any of its Affiliates one or more Regulatory Approvals in the Territory directed to a Candidate or Product and Pfizer will not withhold its agreement to such transfer if Pfizer or any of its Affiliates is already Commercializing a Pfizer vaccine product in such country and is permitted to hold Regulatory Approvals in such country. Recognizing that the transfer of the foregoing responsibilities or the responsibilities described in 9.2.1 and 9.2.2 and Regulatory Approvals as the case may be requires time, coordination and effort, the Parties will agree a reasonable transition plan for each such transfer and during the transfer period BioNTech shall continue to perform its obligations as Lead Development Party or owner of the Regulatory Approval.

44

9.2.6. **Notice of Regulatory Investigation or Inquiry.** If any Regulatory Authority (i) contacts a Party with respect to the alleged improper Development, Manufacture, or Commercialization of a Candidate or Product in the Territory, (ii) conducts, or gives notice of its intent to conduct, an inspection at a Party's facilities used in the Development or Manufacturing of a Candidate or Product, or (iii) takes, or gives notice of its intent to take, any other regulatory action with respect to any activity of a Party that could reasonably be expected to adversely affect any Development, Manufacture or Commercialization activities with respect to a Candidate or Product in the Territory, then such Party shall promptly notify the other Party of such contact, inspection or notice. The inspected Party shall provide such other Party with copies of all pertinent information and documentation issued by any such Regulatory Authority within [***] Business Days of receipt, and, to the extent practicable, the JSC or appropriate subcommittee. Such other Party shall have the right to (a) be present at any such inspection, and (b) review and comment upon in advance any responses of the inspected Party that pertain to a Candidate or Product or a Party's activities hereunder.

9.2.7. **Pharmacovigilance and Pharmacovigilance Agreement.**

    9.2.7.1.    As soon as practicably possible following the Signing Date the Parties shall form a Joint Safety Committee to (a) review and approve each investigator's brochure for the clinical Development of Candidates and Products, (b) review and approve all aggregated data Drug Safety Update Reports, annual IND reports, and other period reports to Governmental Authorities information regarding patient safety (including adverse drug) experiences that are or may be associated with Candidates or Products, (c) review, discuss and agree the outputs of each Party's periodic Candidate and Product related benefit/risk analysis, and (d) such other patient safety-related activities as the Parties may delegate to it from time to time.

    9.2.7.2.    So long as BioNTech holds the necessary INDs/CTAs/Regulatory Approvals and is acting as sponsor in a country or region in the Territory, BioNTech may initiate clinical Development of the Candidates and Products in the EU prior to the Parties entering into a pharmacovigilance agreement. In such circumstances BioNTech shall be responsible for collecting, monitoring, evaluating, sharing and reporting to applicable Governmental Authorities in the EU information regarding patient safety (including adverse drug) experiences that are or may be associated with Candidates or Products. BioNTech shall be responsible for maintaining a suitable safety database.

    9.2.7.3.    By no later than the approval of the Investigational New Drug (IND) for Candidate(s) with FDA, the Parties shall have entered into a pharmacovigilance agreement ("Pharmacovigilance Agreement") reflecting the terms set forth in Section 9.3 and Schedule 9.2.7.

    9.2.7.4.    Following the filing of the IND for Candidate(s) with FDA:

<div align="center">45</div>

(a)     should BioNTech require Pfizer to take over certain activities in relation to collecting, monitoring, evaluating, sharing and reporting to applicable Governmental Authorities, but excluding Ethics Committees, information regarding patient safety (including adverse drug) experiences that are or may be associated with Candidates or Products in the EU, the Parties shall agree and execute an amendment to the Pharmacovigilance Agreement to (i) reflect the additional activities and responsibilities the Parties have agreed Pfizer will perform in the EU, and (ii) set out the procedures the Parties have agreed upon to allow for the reconciliation of BioNTech's safety database with Pfizer's safety database. The effectiveness of the amendment shall be conditional upon BioNTech delivering to Pfizer (x) confirmation from the relevant Governmental Authorities in the EU that they have accepted an amendment to the clinical trial protocol for any on-going clinical trial of Candidates or Product in the EU to reflect the necessary changes (as agred with Pfizer) in responsibilities and contact information for collecting, monitoring, evaluating, sharing and reporting of information regarding patient safety (including adverse drug) experiences, and (y) written confirmation from BioNTech that it has amended the relevant clinical trial agreements to reflect the change in pharmacovigilance provider and trained the investigators on the new reporting procedures; and,

(b)     BioNTech through their Agreement with Fosun shall ensure that Fosun, via BioNTech, deliver to Pfizer (x) a copy of a due diligence report on Fosun's safety data reporting system reasonably acceptable to Pfizer in terms of findings made, (y) a copy of the pharmacovigilance agreement between BioNTech and Fosun which, inter alia, provides for delivery to Pfizer of fully assessed, translated (into English) CIOMS forms for all SAEs: Death / life threatening SUSARs – 5 Business Days from Day 0 (Day 0 being receipt by Fosun from the clinical investigator), or 10 days for all other SAEs, [***] and (z) details of the quality management system used with Fosun to ensure that if late inbound reports are received BioNTech can request root cause analysis and implementation of corrective and preventive actions by Fosun. The Parties agree that prior to Fosun's commencement of clinical activities by Fosun, BioNTech shall have entered into a written agreement with Fosun, reflecting the foregoing.

9.2.7.5.     The Pharmacovigilance Agreement and each amendment to it from time to time shall set forth the responsibilities and procedures for (i) collecting, monitoring, evaluating, sharing and reporting to applicable Governmental Authorities information regarding patient safety (including adverse drug) experiences that are or may be associated with Candidates or Products in the countries covered by that agreement and (ii) providing regulatory information to and support of the other Party

46

with regard to regulatory obligations, provided, that, each such agreement shall include the following guiding principles: acting as BioNTech's delegate for regulatory interactions, Pfizer shall primarily control the regulatory process and regulatory interactions in the countries covered by that agreement, provided, however that the Parties shall work together collaboratively to further the purposes of the collaboration and the activities described in this Agreement. Subject to the proviso in the foregoing sentence, to the extent there is any conflict between the terms and conditions of the Pharmacovigilance Agreement (as amended from time to time) and this Agreement with respect to safety or regulatory matters, the Pharmacovigilance Agreement shall control.

9.2.8. **Audits.** Each Party shall have the right, at its sole cost and expense, to perform audits of the other Party's pharmacovigilance, regulatory, and environmental, health and safety activities concerning any Candidates or Products under this Agreement, including each Party's oversight of any Third Party contracted to perform pharmacovigilance, regulatory or environmental health and safety activities as outlined in this Agreement and in compliance with applicable Laws, which audit right is exercisable at any time during the Term. Upon request, BioNTech shall provide Pfizer with a copy if its latest audit report on Fosun's pharmacovigilance activities.

9.3. Global Safety Database and Safety Reporting. Subject to Section 9.2.7, Pfizer shall maintain the global safety database for the Candidates and Products pursuant to this Agreement and the Commercialization Agreement. Provided that (a) BioNTech (subject to Section 9.1) will be the Lead Development Party with respect to Clinical Trials conducted in the EU, (b) BioNTech will hold a safety database to meet its sponsor responsibilities and regulatory responsibilities in the EU and to hold safety data reports received from China; (c) information shall be exchanged between Pfizer and BioNTech as described in the Pharmacovigilance Agreement to ensure alignment of information between the databases and (d) BioNTech will delegate its responsibilities for the collection, processing, assessment and safety reporting to Regulatory Authorities for all Clinical Trial(s) conducted pursuant to the Research and Development Plan in the Territory upon the approval of the IND for Candidate(s) with FDA. Notwithstanding the foregoing, such responsibility can only be delegated to and Pfizer can only accept this responsibility if the Clinical Trial sites for the Candidates and Products are reporting the safety data, including all individual Serious Adverse Events, translated into English, to Pfizer and for so long as Pfizer has access to all safety data, including all individual Serious Adverse Events, translated into English for any and all active Clinical Trials for the Candidates and Products, including products identical to Candidates or Products conducted under the terms and conditions of the Fosun Agreement (or subsequent agreements with other development partners) to allow Pfizer to meet its regulatory obligations as Lead Development Party in the Territory.

9.4. Product Complaints and Returns. The Parties' rights and obligations with respect to non-conformance and returns of Products shall be governed by, as and to the extent applicable, the applicable supply agreement, the global Quality Agreement, or the Pharmacovigilance Agreement.

9.5. Clinical Trial Register. BioNTech shall, in accordance with Law and its internal policies, register, and publish the summaries and results of, Clinical Trials relating to the Candidate or Product on a clinical trial register maintained by it (or an equivalent register), or as otherwise required by Law. If Pfizer is the Lead Development Party for a Clinical Trial, Pfizer shall prepare such summaries and results in accordance with its internal policies and in a timely manner so as to allow the summaries and results to be published within the mandatory time period, and provide such summaries and results to BioNTech for review and comment. Pfizer will give reasonable consideration to any such comments. BioNTech shall publish such summaries and results on a clinical trial register maintained by it (or an equivalent register), within the mandatory time period.

47

9.6. <u>Regulatory Exclusivity.</u> The JSC shall oversee the process of applying for and securing exclusivity rights that may be available under the Law of countries in the Territory, including any data or market exclusivity periods such as those periods listed in the FDA's Orange Book or Purple Book (as applicable) or periods under national implementations of Article 10.1(a)(iii) of Directive 2001/EC/83 (including any pediatric exclusivity extensions or other forms of regulatory exclusivity that may be available), and all international equivalents.

9.7. <u>Liability</u>. Subject to Pfizer and its Affiliates compliance with the obligations set forth in Section 9.1.3.7 above, Pfizer and its Affiliates, employees, agents or representatives will not be liable to BioNTech or its Affiliates in respect of any act, omission, default or neglect on the part of Pfizer, its Affiliates, or their respective employees, agents or representatives in connection with the activities undertaken as a Lead Development Party where such activities are undertaken in good faith, unless liability arises from Pfizer's or its Affiliates, employees, agents or representatives gross negligence or willful misconduct.

9.8. <u>Objection Right</u>. Notwithstanding any other provision of this Section 9, as Regulatory Approval holder, BioNTech shall have the right to object to and oppose any intended action of Pfizer as Lead Development Party if BioNTech reasonably believes Pfizer's intended action to be contrary to applicable Law.

9.9. <u>Personal Data.</u> To the extent the Parties shall be required to share Personal Data in connection with this Agreement or the Commercialization Agreement, the Parties shall enter into a legally binding written agreement governing the Parties relationship and their processing activities as required by Applicable Data Protection Law.

## 10. **INTELLECTUAL PROPERTY**

10.1. <u>Patent Committee</u>. Within the first [***] following the Effective Date, or as otherwise agreed by the Parties, the Parties will establish a patent committee (the "<u>Patent Committee</u>"), comprised of at least one (1) representative of BioNTech and at least one (1) representative of Pfizer (which representative may be replaced by either Party at any time through written notice to the other Party). The Patent Committee shall coordinate all activities in relation to Patent Rights applicable to the terms of this Agreement. In particular, the Patent Committee shall:

10.1.1. coordinate all activities in relation to the filing and prosecution of Patent Rights relating to this Agreement pursuant to Sections 10.2.1 and 10.3.1 of this Agreement,

10.1.2. discuss any actual, potential or suspected infringement of such Patent Rights pursuant to Section 10.4.1, and

10.1.3. regularly review which BioNTech Patent Rights may be relevant to Candidates and Products.

10.1.4. The Patent Committee shall meet (either in-person or by audio or video conference) as often as determined by the Patent Committee as well as upon the reasonable request of either Party. It is acknowledged that particularly in the case of any Enforcement Action the Patent Committee may need to meet at very short notice and be required to expedite and make decisions very quickly and the Parties shall procure that the Patent Committee shall meet urgently

48

as quickly as reasonably required in connection with any Enforcement Action. The Patent Committee will be chaired by a Patent Committee member chosen by mutual agreement. The Patent Committee shall operate in good faith and acting reasonably. Sections 7.3.2 and 7.3.3, unless otherwise mutually agreed between the Parties, shall apply *mutatis mutandis*. The Patent Committee will use good faith efforts to reach agreement on all matters properly brought before it. If, despite such good faith efforts, the Patent Committee is unable to reach unanimous agreement on a particular matter, such matter shall be escalated to the JSC for final resolution and decisions of the JSC in this regard must be made by unanimous consent.

10.2. <u>Ownership of Intellectual Property</u>.

   10.2.1. **Ownership of Product Technology**. [***]

   10.2.2. **Ownership of BioNTech Improvements and Pfizer Improvements**. As between the Parties, (a) BioNTech will own all BioNTech Improvements and (b) Pfizer will own all Pfizer Improvements.

   10.2.3. **Ownership of other Research and Development Program Technology**. Except for BioNTech Improvements, Pfizer Improvements and [***] the ownership of other Research and Development Program Technology, will be allocated based on inventorship as defined under the Laws of the United States. Notwithstanding the foregoing, during the Term, and without prejudice to Section 10.3 the Parties (through the Patent Committee) shall cooperate and discuss in good faith with respect to the timing, scope and filing of any Patent Rights claiming or disclosing any Research and Development Program Technology.

   10.2.4. **Ownership of Joint Technology**. Subject to Section 10.2.1, 10.2.2 and 10.2.3, the Parties will jointly own any Joint Technology. Subject to (a) the grant of licenses or sublicenses under Section 3, (b) BioNTech's representations, warranties and covenants under Section 12 and (c) the Parties' other rights and obligations under this Agreement (including Section 3.10), each Party will be free to exploit, either itself or through the grant of licenses to Third Parties (which Third Party licenses may be further sublicensed), Joint Technology throughout the world without restriction, without the need to obtain further consent from or provide notice to the other Party, and without any duty to account or otherwise make any payment of any compensation to the other Party.

   10.2.5. **Ownership of Other Intellectual Property**. Except as set forth in Sections 10.2.1, 10.2.4, 10.2.2 and 10.2.1, each Party will own all right, title and interest in and to any and all Know-How, Patent Rights or other Intellectual Property Rights that such Party owns as of the Effective Date or otherwise acquires during the Term. For the purposes of determining ownership under this Agreement, as applicable, inventorship will be determined in accordance with United States patent laws.

10.3. <u>Patent Rights</u>.

   10.3.1. **Filing, Prosecution and Maintenance of Patent Rights.**

      10.3.1.1.    *Prosecution by BioNTech*. BioNTech will have the first right, and a Commercially Reasonable Efforts obligation, to file, prosecute and maintain the BioNTech Patent Rights owned by BioNTech or its Affiliates [***] and Patent Rights claiming BioNTech Improvements (together the "<u>BioNTech Prosecution Patent</u>

49

Rights") at BioNTech's sole expense using counsel of its own choice reasonably acceptable to Pfizer in Australia, Canada, the member states of the European Patent Convention including the Major EU Market Countries, Japan, the United States, Brazil, Russia, India, Mexico and South Korea ("Key Patent Jurisdictions"). Upon request of Pfizer, BioNTech shall file one or more BioNTech Prosecution Patent Rights in one or more jurisdictions other than the Key Patent Jurisdictions ("Additional Patent Jurisdictions"), and BioNTech will have the first right, and a Commercially Reasonable Efforts obligation, to file, prosecute and maintain such BioNTech Prosecution Patent Rights in such Additional Patent Jurisdictions at Pfizer's sole expense (until such time as Pfizer elects not to maintain such Patent Rights in such Additional Patent Jurisdictions whereupon BioNTech can elect to abandon or surrender the same or to continue the prosecution and maintenance of such Patent Rights at its own expense) using counsel of its own choice reasonably acceptable to Pfizer. BioNTech will keep Pfizer advised on the status of the preparation, filing, prosecution, and maintenance of the Patent Rights included within BioNTech Prosecution Patent Rights in all the jurisdictions where filed. Further, in respect of any jurisdiction, BioNTech will (a) allow Pfizer a reasonable opportunity and reasonable time to review and provide comments to BioNTech's patent counsel regarding relevant substantive communications to BioNTech and drafts of any responses or other proposed substantive filings by BioNTech before any applicable filings are submitted to any relevant patent office (or Governmental Authority) with respect to any BioNTech Prosecution Patent Rights and (b) reflect any reasonable and timely comments offered by Pfizer in any final filings submitted by BioNTech to any relevant patent office (or Governmental Authority) with respect to any BioNTech Prosecution Patent Rights. If BioNTech elects not to file a Patent Right included in the BioNTech Prosecution Patent Rights in any Key Patent Jurisdiction or Additional Patent Jurisdiction or elects to cease the prosecution or maintenance of one or more Patent Rights included in the BioNTech Prosecution Patent Rights in any Key Patent Jurisdiction or Additional Patent Jurisdiction and, as relevant, no Third Party has agreed to continue the prosecution or maintenance of such Patent Rights under agreements concluded before the Effective Date, BioNTech will provide Pfizer with written notice of its decision not to file, prosecute or maintain not less than [***] before any action is required to avoid abandonment or lapse. In the event of any such notice, if Pfizer elects to file or continue such prosecution or maintenance in the name of BioNTech at Pfizer's sole expense, (x) Pfizer shall be entitled to do so and take all steps in such prosecution and maintenance at its sole discretion; (y) BioNTech will reasonably cooperate to promptly transfer the necessary files and execute the necessary forms regarding such transfer and (z) Pfizer will keep BioNTech advised on the status of such filing, prosecution and maintenance and will reasonably consider any comments made by BioNTech in connection therewith. If Pfizer elects not to file or continue such prosecution or maintenance, then BioNTech may immediately abandon, allow to lapse, or omit to prosecute such Patent Right, as the case may be. BioNTech will promptly, and no later than [***] after written request by Pfizer, by written notice to Pfizer update Schedule 12.3.4 to identify all BioNTech Patent Rights to be added thereto.

50

10.3.1.2.    *Other Patent Rights.* Except as provided in Section 10.3.1.1, each Party will have the sole right, but not the obligation, to file, prosecute and maintain the Research and Development Program Patent Rights or other Patent Rights that it solely owns under this Agreement or to which it otherwise has control of prosecution rights in its sole discretion, provided that at a Party's reasonable request, the other Party will provide status or other requested information for any Research and Development Program Patent Right and will consider in good faith any recommendations made by such Party in regard to the filing, prosecution or maintenance of any such Patent Right.

10.3.1.3.    *Reference of Research and Development Program Know-How.* If a Party chooses to file, and thereafter prosecute and maintain, Patent Rights after the expiration of the Term, including any extension to the Term, that Party may use or incorporate Research and Development Program Know-How in the filing or prosecution of such Patent Rights filed after the Term, if it determines in its sole discretion that it is necessary or useful to use or incorporate such Research and Development Program Know-How.

10.3.2. **Joint Patent Rights**. In the event the Parties make any Joint Know-How, the Parties will promptly meet to discuss and determine, based on mutual consent, whether to seek patent protection thereon. Neither Party will file any Joint Patent Right without mutual consent. Unless otherwise agreed between the Parties, if the Parties decide to seek patent protection for any Joint Know-How: (a) BioNTech will have the first right, but not the obligation, to prepare, file, prosecute and maintain any Joint Patent Right predominantly relating to the RNA Technology or RNA Process Technology throughout the world, and (b) Pfizer will have the first right, but not the obligation, to prepare, file, prosecute and maintain any other Joint Patent Right throughout the world, in each case of (a) and (b) with the respective provisions of Section 10.3.1.1 to apply *mutatis mutandis* except as provided in this Section 10.3.2. The non-filing Party will reimburse the filing Party for 50% of the costs reasonably incurred by the filing Party in preparing, filing, prosecuting and maintaining such Joint Patent Rights, which reimbursement will be made pursuant to, and within 75 days of, invoices (including supporting documentation) submitted by the filing Party to the non-filing Party no more often than once per Pfizer Quarter. The non-prosecuting Party will cooperate with the prosecuting Party in taking reasonable measures to control costs and non-prosecuting Party shall be responsible for 100% of (x) any fees or costs related to any correspondence of outside counsel with or instructions to outside counsel by such Party (or any of such Party's Representatives) which is independent of joint prosecution efforts, or (y) any patent office fees, and associated counsel/agent fees and costs, for extensions which are not incurred at the request of, and not due to the actions of, the prosecuting Party. If, once the Parties have agreed to prepare and file an application of Joint Patent Rights, either Party (the "Declining Party") at any time thereafter declines to participate in the preparation, filing, prosecution or maintenance of any Joint Patent Right or share in the costs of filing, prosecuting and maintaining any Joint Patent Right, on a country-by-country basis, the Declining Party will provide the other Party (the "Continuing Party") with 30 days prior written notice to such effect, in which event, the Declining filing Party will (A) have no responsibility with respect to the filing, prosecution or maintenance of the applicable Joint Patent Right after the end of such 30 day period, (B) have no responsibility for any expenses incurred in connection with such Joint Patent Right after the end of such 30 day period and (C) if

51

the Continuing Party elects to continue filing, prosecution or maintenance, the Declining Party, upon the Continuing Party's request, will execute such documents and perform such acts, at the Continuing Party's expense, as may be reasonably necessary (1) to assign to the Continuing Party all of the Declining Party's right, title and interest in and to such Joint Patent Right and (2) to permit the Continuing Party to file, prosecute and maintain such Joint Patent Right at its sole expense. Where such Joint Patent Right is assigned to Pfizer as the Continuing Party, BioNTech will retain a non-exclusive, sublicensable, perpetual, irrevocable, royalty-free, fully paid-up worldwide right and license to practice and exploit such Patent Right for any and all purposes excluding, during the Term, in the Field; and where such Joint Patent Right is assigned to BioNTech as the Continuing Party, it will be excluded from the definition of BioNTech Patent Rights, and Pfizer will retain a non-exclusive, sublicensable, perpetual, irrevocable, royalty-free, fully paid-up worldwide right and license to practice and exploit such Joint Patent Right for any and all purposes.

10.3.3. **Prosecution by Third Party Licensors**. Except in the ordinary course of filing continuation applications, BioNTech shall not decline to pay for or participate in the filing, prosecution or maintenance of any Patent Right under any BioNTech Third Party Agreement in any Key Patent Jurisdiction (or other country to the extent doing so may result in BioNTech's loss of license to such Patent Right in such country), to the extent BioNTech is obligated to pay for, or has the right to participate in, such filing, prosecution or maintenance, that is included in the BioNTech Patent Rights and that, in Pfizer's reasonable opinion, covers any Candidate, Product or [***] in the Field in the Territory, and the loss of which would result in loss of right to or would materially diminish the overall protection of such Candidate or Product, without Pfizer's prior written consent, not to be unreasonably withheld or delayed.

10.3.4. **Patent Term Restoration and Extension**. Upon the request of either Party, the Parties will (through the Patent Committee) reasonably discuss patent term extension and supplemental protection certificate strategies in relation to Patent Rights Covering Candidates or Products at any time. Notwithstanding the above, within the time period specified by applicable Law upon receiving Regulatory Approval for a Product in any country in the Territory, [***]. [***]

10.3.5. **Clarifications**. For clarity, prosecution under this Section 10.3 includes opposition, revocation and post-grant review proceedings before the granting patent office or other patent office proceedings ("Prosecution Proceeding"). If such Prosecution Proceedings are concurrent with Third Party litigation under Section 10.4 and are applicable to or part of a coordinated enforcement of such rights, the prosecuting Party and the enforcing Party shall work together and closely align their prosecution and enforcement strategy in accordance with Section 10.5 (including the right for one Party to have final control as stipulated in Section 10.5).

10.3.6. **Liability**. To the extent that a Party is obtaining, prosecuting or maintaining a Patent Right or otherwise exercising its rights under this Section 10.3, such Party, and its Affiliates, employees, agents or representatives, will not be liable to the other Party in respect of any act, omission, default or neglect on the part of any such Party, or its Affiliates, employees, agents or representatives, in connection with such activities undertaken in good faith.

52

10.3.7. **Recording**. If either Party deems it necessary or useful to register or record this Agreement or evidence of this Agreement with any patent office or other appropriate Governmental Authority(ies) in one or more jurisdictions, the other Party will reasonably cooperate to execute and deliver to such Party any documents accurately reflecting or evidencing this Agreement that are necessary or useful, in such Party's reasonable judgment, to complete such registration or recordation.

10.3.8. **Joint Research Agreement**. This Agreement shall be understood to be a joint research agreement under 35 U.S.C. § 103(c)(3) for pre-AIA Patent Rights and 35 U.S.C. § 100(h) for post-AIA Patent Rights entered into for the purpose of researching, identifying and Developing Candidates and Products.

10.4. <u>Enforcement of Patent Rights</u>.

10.4.1. **Notification of Infringement and Decision about Enforcement Actions**. Each Party will promptly notify the other (through the Patent Committee) in the event of any actual, potential or suspected infringement of a patent under the BioNTech Patent Rights or Research and Development Program Patent Rights by any Third Party. In the event of any such notification, the Parties will (through the Patent Committee) discuss in good faith the relevant actual, potential and suspected infringement and the risks and chances of success as well as chances of settlement connected with the institution of any litigation or other step to remedy infringement (any such steps, or threat of or assertion or enforcement of a Patent Right being an "<u>Enforcement Action</u>") taking into account the possible uses of the relevant Patent Rights by each Party, its respective Affiliates or its or their licensees and the revenues relating to or impacted by such Patent Rights, with the goal to agree on whether or not any Enforcement Action should be taken and, if yes, to closely coordinate so far as reasonably possible their respective efforts and strategies. The Parties acknowledge that time shall be of the essence in connection with any Enforcement Action and each shall move urgently and expeditiously to discuss and seek agreement on any actual or proposed Enforcement Action.

10.4.2. **Enforcement of BioNTech Patent Rights and Product Patent Rights**. Subject to Section 10.4.1, and unless otherwise agreed between the Parties on a case-by-case basis, as between Pfizer and BioNTech, BioNTech shall have the first right, but not the obligation, to institute any Enforcement Action in connection with the BioNTech Patent Rights [***] in the Field in the Territory (the "<u>BioNTech Enforcement Patent Rights</u>"), and any such Enforcement Action will be at BioNTech's expense including BioNTech indemnifying and holding harmless Pfizer and its Affiliates from and against any adverse cost award, where Pfizer or its Affiliates consent to join any such Enforcement Action upon BioNTech's request, or where required by Law or where Pfizer or its Affiliates are enjoined by the counterparty. BioNTech shall not name as a party Pfizer or its Affiliates in any Enforcement Action without Pfizer's prior written consent. In any event, BioNTech will not, without the prior written consent of Pfizer, enter into any compromise or settlement relating to such litigation that (a) admits the invalidity or unenforceability of any BioNTech Enforcement Patent Right or (b) requires BioNTech to abandon any BioNTech Enforcement Patent Right. Upon the request of BioNTech, Pfizer shall have the sole discretion to decide whether or not to join as a party in any such Enforcement Action, and where it elects to do so it shall, at BioNTech's expense, join and cooperate with BioNTech in such Enforcement Action. Pfizer will have the right to consult with, and provide comments to, BioNTech about such Enforcement Action (irrespective of Pfizer or its Affiliate being a party to such Enforcement

53

Action), and to participate in and be represented by independent counsel in such Enforcement Action at Pfizer's own expense, and BioNTech shall take into account any reasonable comments provided by Pfizer in such Enforcement Action. Neither Party will incur any liability to the other Party (other than that related to a Party's indemnification obligation pursuant to Section 15) as a consequence of any Enforcement Action initiated or pursued pursuant to this Section 10.4 or any unfavorable decision resulting therefrom, including any decision holding any BioNTech Enforcement Patent Rights invalid or unenforceable. Any infringement recoveries resulting from such litigation or steps relating to a claim of Third Party infringement, after deducting BioNTech's out of pocket expenses (including counsel fees and expenses including any adverse cost award) in pursuing such claim, will be treated as Gross Profits for the purposes of the Commercialization Agreement.

10.4.3. **Pfizer's Enforcement Rights**. In respect of an infringement of any BioNTech Enforcement Patent Right in the Field in the Territory in connection with a Competitive Product ("Competitive Product Infringement"), if, following (a) discussion of any potential Enforcement Action pursuant to Section 10.4.1 and (b) a subsequent written request by Pfizer to initiate any Enforcement Action in connection with such Competitive Product Infringement, BioNTech does not initiate any Enforcement Action in connection with such Competitive Product Infringement within thirty (30) days following receipt of such notices, or as soon as possible and in any event no later than ten (10) Business Days if preliminary injunction proceedings are a potential or likely recourse to remedy the infringement), or ten (10) days before the time limit, if any, set forth in the applicable Laws for the filing of such actions, Pfizer shall have the right, but not the obligation, in place of BioNTech to institute any Enforcement Action in connection with such Competitive Product Infringement and any such Enforcement Action will be at Pfizer's expense and the provisions set forth in the first paragraph of this Section 10.4.2 shall apply *mutatis mutandis*. Pfizer's rights with respect to an Enforcement Action for BioNTech Enforcement Patent Rights other than Product Patent Rights shall be limited to (i) Major Market Countries; (ii) Enforcement Actions in countries in which a Competitive Product (or part thereof) reasonably believed to be designated for any Major Market Country is Manufactured; and (iii) Enforcement Actions in Belgium, Ireland or the Netherlands that are in parallel with Enforcement Actions in any of the Major EU Market Countries. [***]

10.4.4. **BioNTech Enforcement outside the Field and/or outside the Territory**. Subject to Section 10.4.1 and unless otherwise agreed between the Parties on a case-by-case basis, as between Pfizer and BioNTech, BioNTech shall have the sole right, but not the obligation, to institute any Enforcement Action outside the Field and/or outside the Territory in connection with any BioNTech Enforcement Patent Rights), and any such Enforcement Action will be at BioNTech's expense including BioNTech indemnifying and holding harmless Pfizer and its Affiliates from and against any adverse cost award, where Pfizer or its Affiliates consent to join any such Enforcement Action upon BioNTech's request, where required by Law or where Pfizer or its Affiliates are enjoined by the counterparty. BioNTech shall not name as a party Pfizer or its Affiliates in any Enforcement Action without Pfizer's prior written consent. In any event, BioNTech will not, without the prior written consent of Pfizer, enter into any compromise or settlement relating to such Enforcement Action that (i) admits the invalidity or unenforceability of any BioNTech Enforcement Patent Rights or (ii) requires BioNTech to abandon any BioNTech Enforcement Patent Rights. Upon the request of BioNTech, Pfizer shall have the sole discretion to decide whether or not to join as a party in any such Enforcement Action, and where it elects to do so it shall, at BioNTech's expense, join and cooperate with BioNTech in such Enforcement Action.

54

Pfizer will have the right to consult with, and provide comments to, BioNTech about such Enforcement Action (irrespective of Pfizer or its Affiliate being a party to such Enforcement Action), and to participate in and be represented by independent counsel in such Enforcement Action at Pfizer's own expense, and BioNTech shall take into account any reasonable comments provided by Pfizer in such Enforcement Action. Neither Party will incur any liability to the other Party (other than that related to a Party's indemnification obligation pursuant to Section 15 or otherwise in this sub-section) as a consequence of any Enforcement Action initiated or pursued pursuant to this Section 10.4.3 or any unfavorable decision resulting therefrom, including any decision holding any BioNTech Enforcement Patent Rights invalid or unenforceable.

10.4.5. **Pfizer Patent Rights.** Pfizer shall have the sole right, but not the obligation, to institute litigation or take other steps to remedy infringement in connection with any field in respect of any Patent Rights that it solely owns including any Pfizer Patent Right. In the event that any such Patent Rights are based on inventions made or created solely or jointly by BioNTech, its Affiliates or its Representatives acting on BioNTech's behalf, BioNTech shall provide reasonable assistance to Pfizer at Pfizer's expense in connection with such litigation.

10.4.6. **Biosimilar Notices.**

10.4.6.1.  *BioNTech Cooperation*. Upon Pfizer's request, BioNTech and Pfizer will use Commercially Reasonable Efforts to assist and cooperate with each other in (A) establishing a strategy for responding to requests for information from Regulatory Authorities and Third Party requestors and (B) preparing submissions responsive to any Biosimilar Notices received by Pfizer or BioNTech; *provided* that BioNTech will make the final decisions with respect to such strategy and any such responses.

10.4.6.2.  *Compliance with Biosimilar Notices*. The MA Holder will have the sole right in its discretion to comply with the applicable provisions of 42 U.S.C. § 262(l) (or any amendment or successor statute thereto), any similar statutory or regulatory requirement enacted in the future regarding biologic products in the United States, or any similar statutory or regulatory requirement in any non-U.S. country or other regulatory jurisdiction, in each case, with respect to any Biosimilar Notice received from any Third Party regarding any Product that is being Commercialized in the Field in the Territory in the applicable jurisdiction, and the exchange of information between any Third Party and such MA Holder pursuant to such requirements; *provided that*, prior to any submission of information by MA Holder to a Third Party, the other Party will have the right to review the patent information included in such proposed submission, and to make suggestions as to any changes to such patent information that Pfizer reasonably believes to be necessary; *provided further* that MA Holder will determine the final content of any such submission. In the case of a Product approved in the United States under the PHS Act (or, in the case of a country in the Territory other than the United States, any similar Law), to the extent permitted by applicable Law, the MA Holder, as the sponsor of the application for the Product, will be the "reference product sponsor" under the PHS Act. The MA Holder will give written notice to the other Party of receipt of a Biosimilar Notice received by MA Holder with respect to a Product, and MA Holder will consult with the other Party

55

with respect to the selection of any Patent Rights to be submitted pursuant to 42 U.S.C. § 262(l) (or any similar law in any country of the Territory outside the United States); *provided* that the MA Holder will have final say on such selection of Patent Rights. Such other Party agrees to be bound and will cause its Affiliates and use Commercially Reasonable Efforts to cause all Third Party Licensors to be bound by the confidentiality provisions of 42 U.S.C. § 262(l)(1)(B)(iii). In connection with any action brought by such other Party under this Section 10.4.6, such other Party, upon the MA Holder's request, will reasonably cooperate and will cause its Affiliates and use Commercially Reasonable Efforts to cause all Third Party Licensors to reasonably cooperate with MA Holder in any such action, including timely commencing or joining in any action brought by MA Holder under this Section 10.4.6.

10.4.7. **Unified Patent Court.** In respect of BioNTech Enforcement Patent Rights, for each and every such Patent Right having effect anywhere within any member state that was or is, from time to time, a signatory to the UPC Agreement, BioNTech shall have the sole discretion to decide whether to (a) opt in or opt out (and to opt in again), pursuant to Article 83 of the UPC Agreement, of the Unified Patent Court system; and (b) elect if such Patent Rights should, during their prosecution, be designated as a Unitary Patent or a European Patent. The other Party shall promptly do all things necessary and execute all documents and make all necessary elections required to give effect to such decision(s) or election(s).

10.4.8. **Settlement Cross-Licensing**. If pursuant to a bona fide settlement of any Enforcement Action or Infringement Claim controlled by Pfizer, Pfizer, with BioNTech's prior written consent, which shall not be unreasonably withheld, conditioned or delayed, grants to a Third Party (that was a party to the Enforcement Action or Infringement Claim) any sublicense to any of the Patent Rights licensed to Pfizer under this Agreement in respect of that Third Party's Competitive Product, then Pfizer shall pay to BioNTech (a) at a minimum, if such sublicense includes any of the rights granted to Pfizer under a Current License or future BioNTech Third Party Agreement (subject to Sections 3), all royalties due by BioNTech to the relevant Third Party for such sublicense under any Current License and Future BioNTech Third Party Agreement in respect of licensed sales of such Third Party Competitive Product and (b) all other royalties received by Pfizer shall be deemed Gross Profits. For the avoidance of doubt, should the Third Party as part of the same agreement grant any cross-license to Pfizer (sublicensable to BioNTech for the purposes of this Agreement) for any Candidates or Products, such cross-license shall not be deemed "non-cash" consideration for the purpose of the Net Sales definition.

10.5. <u>Other Actions by Third Parties</u>. Separate from Prosecution Proceedings, each Party will promptly notify the other Party in the event of any legal action by any Third Party involving any BioNTech Enforcement Patent Rights of which it becomes aware, including any nullity, revocation, declaratory judgment, interference, *inter partes* reexamination, reexamination or compulsory license proceeding. The right to defend against any such action shall be with the Party controlling the filing, prosecution and maintenance of the affected Patent Right (as determined in accordance with Section 10.3.1), and the provisions of Section 10.3.1 shall apply *mutatis mutandis* in respect of such defense. If any such action has been instituted by any Third Party in response to, or in connection with, any Enforcement Action pursuant to Section 10.4, or any Enforcement Action is to be pursued as a consequence of such action being instituted by any Third Party, the Party controlling the Enforcement Action and the Party controlling the defense shall work together and closely align their enforcement and defense strategy, which may include the (joint) appointment of the same patent counsel for all concurrent Third Party litigation and patent office proceedings taking into account the impact on enforcement and potential for revenues relating to such

56

Patent Rights, and in the absence of agreement, the enforcing Party shall have the final say over the Prosecution Proceedings in so far as the Prosecution Proceeding will adversely impact the ongoing enforcement of such right, subject to having given good faith consideration to the comments and suggestions of the prosecuting Party. Further details of such joint proceeding may be agreed between the Parties from time to time.

10.6. <u>Purple Book Listings</u>. To the extent of any BioNTech Enforcement Patent Rights, the Parties shall cooperate with each other to enable BioNTech to make filings with Regulatory Authorities, as required or allowed in connection with (a) in the United States, the FDA's Purple Book and the Biologics Price Competition and Innovation Act and (b) outside the United States, under the national implementations of Article 10.1(a)(iii) of Directive 2001/EC/83 or other international equivalents thereof within the Territory. Pfizer shall consider BioNTech's reasonable requests in connection therewith, including meeting any submission deadlines, in each case, to the extent required or permitted by applicable Law.

10.7. <u>Allegations of Infringement and Right to Seek Third Party Licenses</u>.

10.7.1. **Notice.** If either Party becomes aware that the Development, Manufacture, Commercialization or use of any Candidate or Product, the practice of any BioNTech Technology or Research and Development Program Technology in the Field, or the exercise of any other right granted by BioNTech to Pfizer or any of its Affiliates or Sublicensees hereunder (collectively, the "<u>Licensed Activities</u>") is alleged by a Third Party to infringe, misappropriate or otherwise violate such Third Party's Patent Rights or other Intellectual Property Rights or either Party otherwise identifies any Third Party Patent Rights or other Intellectual Property Rights that may be relevant to such Licensed Activities (collectively, an "<u>FTO Action</u>"), such Party will, as soon as reasonably practicable, notify the other Party in writing and the Parties will discuss the FTO Action in good faith to determine and agree upon a resolution of the same.

10.7.2. **Option to Negotiate.** If the Parties determine that to resolve the FTO Action it is necessary or useful to obtain a license under one or more Patent Rights or other Intellectual Property Rights Controlled by a Third Party, then [***]; will negotiate and enter into a license or other agreement with such Third Party in close coordination with the other Party. If the Parties do not agree that a license from a Third Party is necessary or useful to resolve the FTO Action, the Party who considers a license is necessary or useful to resolve the FTO Action shall be entitled to negotiate and enter into a license or other agreement with such Third Party, but shall do so keeping the other Party reasonably informed. [***] [***].

57

10.8. <u>Third Party Infringement Suits</u>. Each of the Parties will promptly notify the other in the event that any Third Party files any suit or brings any other action alleging patent infringement by Pfizer or BioNTech or any of their respective Affiliates or Sublicensees with respect to the Development, Manufacture, Commercialization or use of any Candidate or Product or the practice of any BioNTech Technology or Research and Development Program Technology (any such suit or other action referred to herein as an "<u>Infringement Claim</u>"). In the case of any Infringement Claim against Pfizer (including its Affiliates or Sublicensees) alone, or against both Pfizer and BioNTech (including their respective Affiliates), Pfizer will have the right, but not the obligation, to control the defense of such Infringement Claim, including control over any related litigation, settlement, appeal or other disposition arising in connection therewith. BioNTech, upon request of Pfizer, agrees to cooperate with Pfizer at Pfizer's expense. BioNTech will have the right to consult with Pfizer concerning any Infringement Claim and to participate in and be represented by independent counsel in any associated litigation in which BioNTech is a party at BioNTech's own expense. If Pfizer elects to control the defense of any Infringement Claim and BioNTech is obligated under Section 15.3 to indemnify Pfizer (including any Pfizer Indemnified Party) with respect to such Infringement Claim, then (a) Pfizer will bear 100% of its own attorneys' fees incurred in investigating, preparing or defending such Infringement Claim notwithstanding the provisions of Section 15.3 and (b) BioNTech will otherwise indemnify Pfizer and any applicable Pfizer Indemnified Parties to the full extent provided for under Section 15.3, provided that Pfizer shall not enter into any compromise or settlement with the Third Party in respect of such Infringement Claim without BioNTech's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) where such compromise or settlement requires the payment of monetary penalty or damages that are indemnified by BioNTech under this Agreement. In the case of any Infringement Claim against BioNTech alone, Pfizer will have the right to consult with BioNTech concerning such Infringement Claim and Pfizer, upon request of BioNTech, will reasonably cooperate with BioNTech at BioNTech's expense. Neither Party will enter into any compromise or settlement in respect of an Infringement Claim admitting or implying that the Development, Manufacture, Commercialization or use of any Candidate or Product or the practice of any BioNTech Technology or Research and Development Program Technology infringes Third Party patents without the other Party's written consent.

## 11. **CONFIDENTIALITY**

11.1. <u>Confidentiality</u>. Except to the extent expressly authorized by this Agreement, the Parties agree that, during the Term and for [***] years thereafter (except to the extent a longer period is required by a Current License applicable for such Confidential Information disclosed pursuant to that Current License), each Party (the "<u>Receiving Party</u>") receiving any Confidential Information of the other Party (the "<u>Disclosing Party</u>") hereunder will: (a) keep the Disclosing Party's Confidential Information confidential; (b) not disclose, or permit the disclosure of, the Disclosing Party's Confidential Information; and (c) not use, or permit to be used, the Disclosing Party's Confidential Information for any purpose other than as expressly permitted under the terms of this Agreement (including under any license or right of use granted hereunder).

11.2. <u>Authorized Disclosure</u>.

11.2.1. **Disclosure to Party Representatives**. Notwithstanding the foregoing provisions of Section 11.1, the Receiving Party may disclose Confidential Information belonging to the Disclosing Party to the Receiving Party's Representatives who (a) have a need to know such Confidential Information in connection with the performance of the Receiving Party's obligations or the exercise of the Receiving Party's rights under this Agreement and (b) have agreed in writing to non-disclosure and non-use provisions with respect to such Confidential Information that are at least as restrictive as those set forth in this Section 10.1.

58

11.2.2. **Disclosure to Third Parties**. Notwithstanding the foregoing provisions of Section 11.1, each Party may disclose Confidential Information belonging to the other Party to the extent such disclosure is reasonably necessary:

11.2.2.1. to Governmental Authorities to the extent useful, to (a) obtain or maintain Regulatory Approvals for any Candidate or Product within the Territory; or (b) obtain or maintain Regulatory Approvals for a product comprising a Candidate in the Field outside of the Territory; and (c) in order to respond to inquiries, requests or investigations (i) relating to Candidates or Products or this Agreement within the Territory; or (ii) relating to any product comprising a Candidate in the Field outside of the Territory; *provided, however*, that BioNTech may not disclose any Pfizer Confidential Information to Fosun or its Affiliates without the prior written consent of Pfizer, other than to the extent necessary for Fosun or its Affiliates (or such other collaboration partner in or for China) to undertake fill/finish of a product identical to any Product in China or to comply with information requirements of the China National Medical Products Administration relating to such product required under applicable Law, in each case so far as such use is licensed under Sections 3.4.2(b) or 3.4.4(b);

11.2.2.2. to outside consultants (including any professional advisor), potential acquisition partners (including any potential successors in interest), private investors or financing sources, contractors, advisory boards, managed care organizations, and non-clinical and clinical investigators, in each case to the extent useful to develop, register or market any Candidate or Product within the Territory; *provided* that the Receiving Party will obtain the same confidentiality obligations from such Third Parties as it obtains with respect to its own similar types of confidential information;

11.2.2.3. in connection with filing or prosecuting Research and Development Program Patent Rights, Product Patent Rights or Trademark rights as permitted by this Agreement;

11.2.2.4. in connection with any prosecution or litigation actions or defenses undertaken pursuant to Section 10 or any other litigation directly related to a Candidate or Product in the Field in the Territory;

11.2.2.5. subject to the provisions of Section 11.5.2, in connection with or included in scientific presentations and publications relating to Candidates or Products, including abstracts, posters, journal articles and the like, and posting results of and other information about clinical trials to clinicaltrials.gov or PhRMA websites;

11.2.2.6. by either Party in respect of Confidential Information belonging to the other Party (including the terms of the Agreement) to any bona fide or potential subcontractor under this Agreement in connection with the Development of the Candidate or Product in the Territory, in each case who has agreed in writing to non-disclosure and non-use provisions with respect to such Confidential Information that are at least as restrictive as those set forth in this Section 10.1; and

<div align="center">59</div>

11.2.2.7.   to the extent necessary or useful in order to enforce its rights under this Agreement.

Notwithstanding anything herein to the contrary, each Party acknowledges and agrees that the use by a Party of the other Party's Confidential Information disclosed under the Flu Collaboration License in the performance of this Agreement is not a breach of the confidentiality obligations under this Agreement or the Flu Collaboration License, and vice versa. If a Party deems it reasonably necessary to disclose Confidential Information belonging to the other Party pursuant to clause (a) or any of clauses (c) through (e) of this Section 11.2.2, then the Disclosing Party will to the extent possible give reasonable advance written notice of such disclosure to the other Party and take such measures to ensure confidential treatment of such information as is reasonably required by the other Party, at the other Party's expense.

11.3.  <u>SEC Filings and Other Disclosures</u>**.** Either Party may disclose the terms of this Agreement and make any other public written disclosure regarding the existence of, or performance under, this Agreement, to the extent required, in the reasonable opinion of such Party's legal counsel, to comply with (a) applicable Law, including the rules and regulations promulgated by the United States Securities and Exchange Commission or (b) any equivalent Governmental Authority, securities exchange or securities regulator in any country. Before disclosing this Agreement or any of the terms hereof pursuant to this Section 11.3, the Parties will consult with one another on the terms of this Agreement to be redacted in making any such disclosure, with the Party disclosing pursuant to this Section 11.3 providing as much advance notice as is feasible under the circumstances, and giving consideration to the comments of the other Party. Further, if a Party discloses this Agreement or any of the terms hereof in accordance with this Section 11.3, such Party will, at its own expense, seek such confidential treatment of confidential portions of this Agreement and such other terms, as may be reasonably requested by the other Party and limit its disclosure of such Confidential Information to only that required to comply with applicable Law.

11.4.  <u>Residual Knowledge Exception</u>**.** Notwithstanding any provision of this Agreement to the contrary, Residual Knowledge will not be considered Confidential Information for purposes of this Section 10.1; <u>provided</u> that, for clarity, a Party's rights to Residual Knowledge hereunder shall not include the right to practice any Patent Right owned or Controlled by the other Party that claims such Residual Knowledge unless otherwise expressly granted in another provision of this Agreement or in another agreement between the Parties.

11.5.  <u>Public Announcements; Publications</u>**.**

11.5.1.  **Announcements**. Except as may be expressly permitted under Section 11.3, neither Party will make any public announcement regarding this Agreement without the prior written approval of the other Party. The Parties agree that the Parties will issue a mutually agreed upon joint press release regarding the signing of this Agreement following the Signing Date.

11.5.2.  **Publications**. During the Term, each Party will submit to the other Party for review and approval (such approval not to be unreasonably withheld, delayed or conditioned) any proposed publication or public presentation proposed by a Party or its Affiliates or any of their respective Representatives that relates to the activities conducted under this Agreement, including the Research and Development Plan ; *provided* that notwithstanding the requirement for approval (a) neither Party shall be prevented from submitting any publication or making a presentation in respect of a Clinical Trial for which the Party is either the IND holder or the Lead Development Party to

60

the extent such publication or presentation is required under applicable Law or such Party's internal publication policies, but such publishing Party shall not disclose the other Party's confidential information in respect of its technology and Intellectual Property Rights, and shall take on board and reasonably consider any reasonable requests of the other Party with respect to such proposed publication or presentation; (b) the Party whose approval is sought shall not unreasonably withhold or condition such approval; and (c) nothing shall prohibit a Party from making any press release or statement where required pursuant to applicable Law or stock exchange rule, subject to such publishing Party shall take on board and reasonably consider any reasonable requests of the other Party with respect to such proposed publication or presentation. Each Party's review and approval will be conducted only for the purposes of identifying if confidential information should be modified or deleted so as to preserve the value of the technology owned by such Party or its Affiliates and the rights granted to each Party hereunder. Written copies of such proposed publication or presentation required to be submitted hereunder will be submitted as soon as practically possible before submission for publication or presentation (the "Review Period"). The reviewing Party will provide its comments with respect to such publications and presentations within 7 Business Days of its receipt of such written copy. The Review Period may be extended for an additional 10 Business Days in the event a Party can, within 7 Business Days of receipt of the written copy, demonstrate reasonable need for such extension including for the preparation and filing of patent applications. Each Party will comply with standard academic practice regarding authorship of scientific publications and recognition of contribution of other parties in any publication governed by this Section 11.5.2, including International Committee of Medical Journal Editors standards regarding authorship and contributions.

11.6. Non-Disclosure in China. For the avoidance of doubt, nothing in this Agreement authorizes or permits BioNTech to disclose to Fosun, its Affiliates or any other collaboration partner in or for China any Pfizer Confidential Information without the prior written consent of Pfizer other than to the extent necessary for Fosun or its Affiliates (or such other collaboration partner in or for China) to undertake fill/finish of a product identical to any Product in China or to comply with information obligations required by the China National Medical Products Administration relating to such product in accordance with applicable Law, in each case so far as such use is licensed under Sections 3.4.2(b) or 3.4.4(b).

11.7. Obligations in Connection with Change of Control. If a Party is subject to a Change of Control or if a Party or any of its Affiliates acquires or merges with a Third Party during the Term ("Change of Control Party"), such Change of Control Party will, and it will cause its Representatives to, ensure that no Confidential Information of the other Party is released to (a) any Affiliate of the Change of Control Party that becomes an Affiliate of the Change of Control Party as a result of the Change of Control or (b) any other Representatives of the Change of Control Party (or of the relevant surviving entity of such Change of Control) who become Representatives of the Change of Control Party as a result of the Change of Control, unless such Affiliate or other Representatives, as applicable, have signed individual confidentiality agreements which include equivalent obligations to those set out in this Section 11. Upon occurrence of a Change of Control, the Change of Control Party will promptly notify the other Party, share with the other Party the policies, procedures and technical and organizational measures it plans to implement in order to protect the confidentiality of the other Party's Confidential Information prior to such implementation and make any adjustments to such policies and procedures that are reasonably requested by the other Party.

61

**12.    REPRESENTATIONS AND WARRANTIES**

12.1. <u>Mutual Representations and Warranties</u>. Each of BioNTech and Pfizer hereby represents and warrants to the other Party that:

12.1.1. it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization;

12.1.2. the execution, delivery and performance of this Agreement by such Party has been duly authorized by all requisite action under the provisions of its charter, bylaws and other organizational documents, and does not require any action or approval by any of its shareholders or other holders of its voting securities or voting interests;

12.1.3. it has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

12.1.4. this Agreement has been duly executed and is a legal, valid and binding obligation on each Party, enforceable against such Party in accordance with its terms; and

12.1.5. the execution, delivery and performance by such Party of this Agreement and its compliance with the terms and provisions hereof does not and will not conflict with or result in a breach of or default under any Binding Obligation existing as of the Effective Date.

12.2. <u>Mutual Covenants</u>. In addition to the covenants made by the Parties elsewhere in this Agreement, each of BioNTech and Pfizer hereby covenants to the other Party that, from the Effective Date until expiration or termination of this Agreement it will perform its obligations under this Agreement in compliance with applicable Laws.

12.3. <u>Representations and Warranties of BioNTech</u>. BioNTech hereby represents and warrants to Pfizer that, unless otherwise disclosed in <u>Schedule 12.3</u> (or otherwise as accepted to have been disclosed between BioNTech's external counsel and Pfizer's external counsel other than in writing), and provided that those provisions of the Current Licenses set forth in <u>Schedule 1.36</u> shall be deemed disclosed against the representations and warranties given by BioNTech at sections 12.3.1, 12.3.2, 12.3.4, 12.3.10 and 12.3.11 of this Agreement and provided further that all disclosures made under the Flu Collaboration License shall be deemed disclosed also under this Agreement:

12.3.1. as of the Signing Date, except with respect to BioNTech Technology Controlled by BioNTech pursuant to a Current License, BioNTech or its Affiliates are the sole and exclusive owner of the BioNTech Technology, and all BioNTech Technology is free and clear of any claims, liens, charges or encumbrances;

12.3.2. as of the Signing Date, BioNTech has, and to its knowledge will have, the full right, power and authority to (a) grant all of the right, title and interest in the licenses and other rights granted or to be granted to Pfizer, Pfizer's Affiliates or Pfizer's Sublicensees under this Agreement and (b) perform its obligations under this Agreement;

12.3.3. <u>Schedule 1.17</u> sets forth a true and complete list of all Candidates relevant to the Field discovered, developed or Controlled by BioNTech or its Affiliates on or prior to the Signing Date;

12.3.4. as of the Signing Date, (a) <u>Schedule 12.3.4</u> sets forth a true and complete list of all Patent Rights (i) owned or otherwise Controlled by BioNTech or its Affiliates or (ii) to which BioNTech or its Affiliates have been granted or otherwise transferred any right to practice under, in each case of (i) and (ii), that relate to the Candidates, the Products, the BioNTech Technology, or the Parties' activities in the Research and Development Program, (b) each such Patent Right is in full force and effect and, so far as BioNTech is aware, valid and enforceable, (c) BioNTech or

62

its Affiliates have timely paid, or caused the appropriate Third Parties to pay, all filing and renewal fees payable with respect to such Patent Rights; (d) BioNTech Controls all Patent Rights listed in <u>Schedule 12.3.4</u>; and (e) other than those licensed hereunder, there are no other Patent Rights owned or Controlled by BioNTech that Candidates or Products would infringe;

12.3.5. as of the Signing Date, BioNTech is not aware of any material adverse event, or medical or scientific concern or doubt regarding the safety, contraindications or effectiveness of the use of the BioNTech Technology or the Candidates that have not previously been disclosed in writing to Pfizer;

12.3.6. to BioNTech's knowledge as of the Signing Date, (a) no Third Party (i) is infringing any BioNTech Patent Right or (ii) has challenged or threatened in writing to challenge the ownership, scope, validity or enforceability of, or BioNTech's or any Current Licensor's rights in or to, any BioNTech Patent Right (including, by way of example, through the institution or written threat of institution of interference, nullity or similar invalidity proceedings before the United States Patent and Trademark Office or any analogous foreign Governmental Authority);

12.3.7. as of the Signing Date, BioNTech has independently developed all BioNTech Know-How and BioNTech Materials or otherwise has a valid right to use, and to permit Pfizer, Pfizer's Affiliates and Pfizer's Sublicensees to use, the BioNTech Know-How and BioNTech Materials for all permitted purposes under this Agreement;

12.3.8. except with respect to BioNTech Technology Controlled by BioNTech pursuant to a Current License, BioNTech or its Affiliates have obtained from all inventors of BioNTech Technology existing as of the Signing Date, valid and enforceable agreements assigning to BioNTech or its Affiliates each such inventor's entire right, title and interest in and to all such BioNTech Technology (except to the extent applicable Law provides that all right, title and interest in and to such BioNTech Technology automatically vests in BioNTech or its Affiliates by operation of law);

12.3.9. in respect of BioNTech Technology solely or jointly owned by BioNTech existing as of the Signing Date, neither BioNTech nor its Affiliates are subject to any funding agreement with any government or Governmental Authority;

12.3.10. as of the Effective Date (a) there are no BioNTech Third Party Agreements other than the Current Licenses set forth in <u>Schedule 1.36</u>, (b) true and complete copies of each Current License (other than the Fosun Agreement) have been provided to Pfizer, (c) except as provided in the Current Licenses, no Third Party has any right, title or interest in or to, or any license under, any BioNTech Technology in the Field, (d) no rights granted by or to BioNTech or its Affiliates under any Current License conflict with any right or license granted to Pfizer or its Affiliates hereunder and (e) BioNTech and its Affiliates are in compliance in all material respects with all Current Licenses;

12.3.11. as of the Signing Date, to BioNTech's knowledge, the use by BioNTech or Pfizer (or their respective Affiliates or Sublicensees) of the BioNTech Technology in accordance with this Agreement, and the Development, Manufacture or Commercialization of those Candidates listed in <u>Schedule 1.17</u> or Products incorporating such Candidates in accordance with this Agreement (a) does not and will not infringe any Patent Right of any Third Party or (b) will not infringe the claims of any published Third Party pending Patent Right when and if such claims issue;

<div align="center">63</div>

12.3.12. as of the Effective Date, there is no (a) written claim, demand, suit, proceeding, arbitration, inquiry, investigation or other legal action of any nature, civil, criminal, regulatory or otherwise, pending or, to BioNTech's knowledge, made or threatened (irrespective of whether or not in writing) against BioNTech or any of its Affiliates or (b) judgment or settlement against or owed by BioNTech or any of its Affiliates, in each case in connection with the BioNTech Technology, the Current Licenses, any Candidate or Product or relating to the transactions contemplated by this Agreement;

12.3.13. as of the Signing Date, BioNTech and its Affiliates (a) have claimed and remunerated all employee inventions of their respective employees comprised within the GEIA Technology in accordance with the provisions of the GEIA; and (b) are entitled to unrestrictedly claim all rights to employee inventions of their employees comprised within the GEIA Technology;

12.3.14. as of the Signing Date, BioNTech has obtained all necessary assignment documents for the BioNTech Technology inventions in its files and maintains written track records of the proper claiming of any inventions made by employees of BioNTech, its Affiliates or Third Parties included in BioNTech Technology or Research and Development Program Technology by the employer and/or the proper assignment of the inventors of their rights in the invention, including the right to claim priority to said invention, to the employer;

12.3.15. as of the Signing Date, BioNTech has no knowledge of (a) any inequitable conduct or fraud on any patent office with respect to any of the BioNTech Patent Rights or (b) any Person (other than Persons identified in the applicable patent applications or patents, as inventors of inventions disclosed in the BioNTech Patent Rights) who claims to be an inventor of an invention disclosed in the BioNTech Patent Rights;

12.3.16. as of the Signing Date, BioNTech and its Affiliates are not, and to BioNTech's knowledge, no Current Licensor or Representative of BioNTech (in each case, as applicable) is, debarred by any Regulatory Authority or the subject of debarment proceedings by any Regulatory Authority and, in the course of the discovery or pre-clinical development of any Candidate or Product, BioNTech and its Affiliates have not and, to the knowledge of BioNTech, no Current Licensor or Representative of BioNTech (in each case, as applicable) have used any employee or consultant that is debarred by any Regulatory Authority or, to the knowledge of BioNTech, is the subject of debarment proceedings by any Regulatory Authority;

12.3.17. BioNTech, its Affiliates, and to BioNTech's knowledge, all third parties and Representatives acting on BioNTech's behalf, have and will comply in all material respects with all applicable Law and accepted pharmaceutical industry business practices in connection with this Agreement, including, to the extent applicable, the FD&C Act (21 U.S.C. § 301, et seq.), the Anti-Kickback Statute (42 U.S.C. § 1320a-7b), Civil Monetary Penalty Statute (42 U.S.C. § 1320a-7a), the False Claims Act (31 U.S.C. § 3729 et seq.), comparable state statutes, the regulations promulgated under all such statutes, and the regulations issued by the FDA, consistent with the 'Compliance Program Guidance for Pharmaceutical Manufacturers' published by the Office of Inspector General, U.S. Department of Health and Human Services;

12.3.18. with respect to any Candidates, Products, or payments or services provided under this Agreement, BioNTech, its Affiliates, and to its knowledge all third parties and Representatives acting on BioNTech's behalf, have not taken and will not during the Term take any action directly or indirectly to offer, promise or pay, or authorize the offer or payment of, any money or anything of value in order to improperly or corruptly seek to influence any Government Official or any other person in order to gain an improper advantage, and has not accepted, and will not accept in the future such payment;

64

12.3.19. BioNTech, its Affiliates, and to its knowledge all third parties and Representatives acting on BioNTech's behalf, have and will continue to comply with the laws and regulations of the countries where it operates, including Anti-Corruption Laws, accounting and record keeping laws, and laws relating to interactions with HCPs, Governments and Government Officials;

12.3.20. BioNTech has implemented policies and procedures, including but not limited to anti-corruption policies and procedures, commensurate with its current risk profile, and shall review said policies from time to time setting out rules governing interactions with HCPs and Government Officials, engagement of Third Parties, including, where appropriate, due diligence ("Policies"), and its Policies will mandate a robust set of internal controls, including accounting controls, designed to ensure the making and keeping of fair and accurate books, records and accounts, on its operations around the world and apply worldwide to all its employees, subsidiaries, and Third Parties acting on its behalf to provide reasonable assurance that BioNTech, its subsidiaries and such Third Parties will comply with Laws, including but not limited to Anti-Corruption Laws to the extent required by such Laws. BioNTech will reasonably monitor its operations and the operations of its Affiliates with the purpose of ensuring its Policies are effective at the reasonable assurance level and make necessary changes from time to time, in particular as its business activities expand;

12.3.21. the Impf Group does not own or Control any Intellectual Property Rights used by BioNTech or that BioNTech may reasonably require or be useful to exploitation of any of the RNA Technology.

12.4. <u>Accuracy of Representations and Warranties</u>.

12.4.1. BioNTech will take no action which would render any representation or warranty made by BioNTech and contained in Section 12.1 or Section 12.2 inaccurate or untrue; <u>provided</u> that such covenant shall not apply to representations and warranties expressly given as of the Effective Date;

12.4.2. BioNTech will promptly notify Pfizer of any lawsuits, claims, administrative actions, regulatory inquiries or investigations, or other proceedings asserted or commenced against BioNTech or its Representatives involving in any material way the ability of BioNTech to deliver the rights, licenses and sublicenses granted herein; and

12.4.3. BioNTech will promptly notify Pfizer in writing of any facts or circumstances which come to its attention and which cause, or through the passage of time may cause, any of the representations and warranties contained in Section 12.1, Section 12.2, Section 16.10 or otherwise in this Agreement to be untrue or misleading in any material respect at any time during the Term; and in addition to the foregoing, with regard to any of the representations under Section 16.10, BioNTech will suspend all affected activities (including making any related payments) under this Agreement, unless and until Pfizer determines that such activities may be resumed; <u>provided</u> that such covenant shall not apply to representations and warranties expressly given as of the Effective Date.

65

12.5. <u>BioNTech Covenants</u>. In addition to the covenants made by BioNTech elsewhere in this Agreement, BioNTech hereby covenants to Pfizer that, from the Effective Date until expiration or termination of this Agreement:

12.5.1. BioNTech will not, and will cause its Affiliates not to (a) license, sell or assign (other than in a connection with a permitted assignment of this Agreement by BioNTech pursuant to Section 16.1) or otherwise transfer to any Person (other than Pfizer or its Affiliates or Sublicensees pursuant to the terms of this Agreement) any BioNTech Technology or Research and Development Program Technology (or agree to do any of the foregoing) or (b) incur or permit to exist, with respect to any BioNTech Technology or Research and Development Program Technology, any lien, encumbrance, charge, security interest, mortgage, liability, assignment, grant of license or other Binding Obligation, in each case of (a) and (b) that is inconsistent with the licenses and other rights granted (or that may be granted) to Pfizer or its Affiliates under this Agreement;

12.5.2. Except as explicitly permitted under this Agreement, BioNTech will not (a) take, or omit to take, any action that diminishes the rights under the BioNTech Technology or Research and Development Program Technology granted (or that may be granted) to Pfizer or Pfizer's Affiliates under this Agreement or (b) take, or omit to take, any action that is reasonably necessary to avoid diminishing the rights under the BioNTech Technology or Research and Development Program Technology granted (or that may be granted) to Pfizer or Pfizer's Affiliates under this Agreement (for the avoidance of doubt, BioNTech shall not be in breach of the covenants set forth in this Section 12.5.2 due to any reasonable act or position taken in connection with the filing, prosecution, maintenance, defense or enforcement of BioNTech Technology or Research and Development Program Technology as permitted in Section 10);

12.5.3. BioNTech will (a) not enter into any BioNTech Third Party Agreement that adversely affects (i) the rights granted (or that may be granted) to Pfizer, Pfizer's Affiliates or Sublicensees hereunder or (ii) BioNTech's ability to fully perform its obligations hereunder; (b) not amend or otherwise modify any BioNTech Third Party Agreement (including any Current License) or consent or waive rights with respect thereto in any manner that (A) adversely affects the rights granted (or that may be granted) to Pfizer or Pfizer's Affiliates or Sublicensees hereunder or (B) BioNTech's ability to fully perform its obligations hereunder; (c) promptly furnish Pfizer with true and complete copies of all (1) amendments to the Current Licenses and (2) BioNTech Third Party Agreements and related amendments executed following the Effective Date (in each case with redactions only in respect of sensitive information which is not relevant for the purposes of this Agreement); (d) remain, and cause its Affiliates to remain, in compliance in all material respects with all BioNTech Third Party Agreements; and (e) furnish Pfizer with copies of all notices received by BioNTech or its Representatives relating to any alleged breach or default by BioNTech or its Representatives under any BioNTech Third Party Agreement within ten (10) Business Days after receipt thereof (in each case with redactions only in respect of sensitive information which is not relevant for the purposes of this Agreement); and

12.5.4. BioNTech will not enter into or otherwise allow itself or its Representatives to be subject to any agreement or arrangement, other than the Current Licenses, which limits the ownership or licensed rights of Pfizer or its Affiliates with respect to, or limits the ability of Pfizer or its Affiliates to grant a license, sublicense or access, or provide or provide access or other rights in, to or under, any Intellectual Property Right or material (including any Patent Right, Know-How or other data or information), in each case, that would, but for such agreement or arrangement, be included in the rights licensed or assigned (or that may be licensed or assigned) to Pfizer or its Affiliates pursuant to this Agreement

66

12.5.5. BioNTech and its Affiliates will maintain or obtain valid and enforceable agreements with or from all inventors of BioNTech Technology or Research and Development Program Technology who are employed by or otherwise acting on behalf of BioNTech or its Affiliates assigning to BioNTech or its Affiliates each such inventor's entire right, title and interest in and to all such BioNTech Technology or Research and Development Program Technology (except to the extent applicable Law provides that all right, title and interest in and to such BioNTech Technology or Research and Development Program Technology automatically vests in BioNTech or its Affiliates by operation of law).

12.5.6. BioNTech will unrestrictedly claim and remunerate (and procure that its Affiliates will unrestrictedly claim and remunerate) all employee inventions of their respective employees comprised within the GEIA Technology in accordance with the provisions of the GEIA.

12.5.7. In respect of GEIA Technology created after the Effective Date to which Pfizer shall obtain a license hereunder, BioNTech will use Commercially Reasonable Efforts (and will procure that its Affiliates use Commercially Reasonable Efforts) to conclude agreements with BioNTech employee inventors regarding the respective inventions by which the respective inventors: (a) waive the employer's obligation to release the employee invention and to enable the employee inventor upon request to apply for foreign Intellectual Property Rights for such foreign countries in which it does not intend to apply for Intellectual Property Rights (Sec. 14 GEIA); and (b) waive the employer's obligation to notify the employee inventor and to transfer the right in the invention to the employee inventor at the latter's request and expense, if it does not intend to pursue the application for the grant on an Intellectual Property Right for the invention any further or if it does not want to maintain the Intellectual Property Right granted for the job-related invention (Sec. 16 GEIA); and (c) waive the employer's obligation to acknowledge protectability of the invention in case the employer decides not to file a registration, but to keep the invention secret (Sec. 17 GEIA);

12.5.8. To the extent BioNTech Technology or Research and Development Program Technology is created after the Effective Date by inventors employed by or acting on behalf of BioNTech's or its Affiliates' Third Party subcontractors, BioNTech will (a) use Commercially Reasonable Efforts (and will procure that its Affiliates use Commercially Reasonable Efforts) to obtain valid and enforceable agreements with their respective Third Party subcontractors imposing on their Third Party subcontractors the obligation to claim the rights in the invention in accordance with applicable Law and to conclude agreements with its employee inventors assigning to the respective Third Party subcontractor each such inventor's entire right, title and interest in and to all such BioNTech Technology or Research and Development Program Technology (except to the extent applicable Law provides that all right, title and interest in and to such BioNTech Technology or Research and Development Program Technology automatically vests in the Third Party subcontractor by operation of law) and, (b) to the extent GEIA applies to such BioNTech Technology or Research and Development Program Technology, use Commercially Reasonable Efforts to obtain a waiver of inventor in his rights in Sec. 14, 16 and 17 GEIA;

12.5.9. with respect to any BioNTech Technology or Research and Development Program Technology to which Pfizer shall obtain a license hereunder that is made after the Effective Date in the jurisdiction of the GEIA by an inventor on behalf of BioNTech or its Affiliates who is employed by a university pursuant to Sec. 42 GEIA (e.g. university professors, research assistants), BioNTech will use Commercially Reasonable Efforts (and will procure that its Affiliates use Commercially Reasonable Efforts) to obtain valid and enforceable trifold agreements with such inventor and the respective university by which the university (a) waives its entire right, title and interest in and to that BioNTech Technology or Research and Development Program Technology made by the

67

inventor, (b) the inventor assigns its rights, title and interest in and to that BioNTech Technology or Research and Development Program Technology to BioNTech or its Affiliates, (c) the inventor waives its rights pursuant to Sec. 14, 16 and 17 GEIA as well as (d) waives its negative publication right (Sec. 42 Nr. 2 GEIA) vis-a-vis BioNTech or its Affiliates;

12.5.10. with respect to animals used in conducting activities under this Agreement, BioNTech will, and will cause its Affiliates and permitted subcontractors to, comply with its policies on animal care and use which shall be no less strict than Pfizer's Corporate Policy regarding Animal Care and Use, attached hereto as Exhibit C (except where in conflict with applicable Law);

12.5.11. with respect to Human Material used, including collection or transfer, by BioNTech, its Affiliates or permitted subcontractors in conducting activities under this Agreement, (a) such use shall be in accordance with the binding part of the Research and Development Plan and shall be within the scope of and consistent with its ethical approval policies, (b) BioNTech will, and will cause its Affiliates or permitted subcontractors to, handle and use the Human Material in accordance with all applicable Laws and the ICF, which shall permit Pfizer to use the Human Material for the research purposes contemplated by this Agreement, (c) BioNTech will provide the ICF to Pfizer upon request by Pfizer, (d) the Human Material will be used for research purposes only and not be used for treatment of or administration to humans and (e) if BioNTech procures any Human Material from a Third Party such as a sample bank, it will ensure that the collection and transfer of the Human Material and the use of the Human Material for purposes of the Research and Development Plan is in accordance with all applicable Laws and recognized international standards for the protection of human research subjects;

12.5.12. BioNTech shall, at all times, maintain and enforce a compliance and ethics program containing adequate systems, policies and procedures for the detection, investigation, documentation, and remediation of any allegations, reports or findings related to a potential violation of applicable Law, including Anti-Corruption Laws, with respect to the Candidates, Products, payments and services under this Agreement, which policies shall be not less strict than Pfizer's Anti-Bribery and Anti-Corruption Principles attached hereto as Exhibit B. Such policies and procedures should set out rules governing interactions with HCPs, Government Officials, the engagement of Third Parties, and where appropriate, conducting due diligence, and the investigation, documentation and remediation of any allegations, reports or findings related to a potential violation of applicable Laws, and BioNTech shall, upon Pfizer's request, require any persons acting on behalf of BioNTech in connection with this Agreement to complete anti-corruption compliance training provided by Pfizer, and will notify Pfizer of any persons that require or may require such training during the Term of this Agreement;

12.5.13. if BioNTech finds, following an investigation, credible evidence of a violation of any applicable policies and procedures that are designed to ensure compliance with any applicable Laws, including any criminal, civil or administrative laws or regulations, or violations of policies or procedures related to scientific misconduct or data integrity, BioNTech shall promptly inform Pfizer of the occurrence and the steps taken by BioNTech to remediate the occurrence; and

12.5.14. in it undertaking, sponsoring, or having regulatory oversight over any Clinical Trials, BioNTech shall ensure and procure that all documentation for such Clinical Trials shall comply with, and take advantage of, any applicable Laws that serve to limit product liability claims and losses having regard to the pandemic status of COVID-19, including any requirements under any declarations pursuant to the Public Readiness and Emergency Preparedness (PREP) Act in the USA or any equivalent, similar or comparable legislation in the Territory.

68

12.6. Pfizer Covenants. In addition to the covenants made by Pfizer elsewhere in this Agreement, Pfizer hereby covenants to BioNTech that, from the Effective Date until expiration or termination of this Agreement,

12.6.1. Pfizer and its Affiliates maintain or will obtain valid and enforceable agreements with or from all inventors of Pfizer Improvements or Research and Development Program Technology who are employed by or otherwise acting on behalf of Pfizer or its Affiliates valid and enforceable agreements assigning to Pfizer or its Affiliates each such inventor's entire right, title and interest in and to all such Pfizer Improvements or Research and Development Program Technology (except to the extent applicable Law provides that all right, title and interest in and to such Pfizer Improvements or Research and Development Program Technology automatically vests in Pfizer or its Affiliates by operation of law), and Pfizer and its Affiliates have made or will make any payments owing to any such inventors in respect of any Pfizer Improvements or Research and Development Program Technology or any other Person that is required in connection with the creation or exploitation of or transfer of rights to such Pfizer Improvements or Research and Development Program Technology;

12.6.2. with respect to Human Material used, including collection or transfer, by Pfizer, its Affiliates or permitted subcontractors in conducting activities under this Agreement, (a) such use shall be within the scope of and consistent with its ethical approval policies, (b) Pfizer will, and will cause its Affiliates or permitted subcontractors to, handle and use the Human Material in accordance with all applicable Laws and the ICF, (c) Pfizer will provide the ICF to BioNTech upon request by BioNTech, (d) the Human Material will be used for research purposes only and not be used for treatment of or administration to humans and (e) if Pfizer procures any Human Material from a Third Party such as a sample bank, it will ensure that the collection and transfer of the Human Material and the use of the Human Material for purposes of the Research and Development Plan is in accordance with all applicable Laws and recognized international standards for the protection of human research subjects; and

12.6.3. Pfizer will comply with the provisions of the Current Licenses set forth in Schedule 1.36 in respect of BioNTech Technology sublicensed to Pfizer under the respective Current Licenses insofar as Pfizer is using such BioNTech Technology;

12.6.4. Pfizer shall comply with its Anti-Bribery and Anti-Corruption Principles attached hereto as Exhibit B and its Corporate Policy regarding Animal Care and Use, attached hereto as Exhibit C; and

12.6.5. in it undertaking, sponsoring, or having regulatory oversight over any Clinical Trials, Pfizer shall ensure and procure that all documentation for such Clinical Trials shall comply with, and take advantage of, any applicable Laws that serve to limit product liability claims and losses having regard to the pandemic status of COVID-19, including any requirements under any declarations pursuant to the Public Readiness and Emergency Preparedness (PREP) Act in the USA or any equivalent, similar or comparable legislation in the Territory.

12.7. Notifications. During the Term. BioNTech will promptly notify Pfizer in writing or orally in the event that it learns of:

12.7.1. any prior art or other facts that BioNTech believes would result in the invalidity or unenforceability of any of the claims included in any of the BioNTech Patent Rights or Research and Development Program Patent Rights; or

69

12.7.2. any inequitable conduct or fraud on the patent office with respect to any of the BioNTech Patent Rights or Research and Development Program Patent Rights; or

12.7.3. any Person (other than Persons identified as inventors of inventions disclosed in the BioNTech Patent Rights or Research and Development Program Patent Rights) who claims to be an inventor of an invention disclosed in the BioNTech Patent Rights or Research and Development Program Patent Rights; and

12.7.4. any lawsuits, claims, administrative actions, government inquiries or investigations, or other proceedings related to the activities contemplated under this Agreement.

12.8. <u>Representation by Legal Counsel</u>. Each Party hereto represents that it has been represented by legal counsel in connection with this Agreement and acknowledges that it has participated in the drafting hereof. In interpreting and applying the terms and provisions of this Agreement, the Parties agree that no presumption will exist or be implied against the Party which drafted such terms and provisions.

12.9. <u>BioNTech's knowledge</u>. All references in this Section 12 to BioNTech's knowledge (or equivalent) shall refer to the actual knowledge after reasonable internal inquiry of BioNTech's management comprising those individuals set forth in <u>Schedule 12.9</u>.

12.10. <u>Disclaimer</u>. THE FOREGOING REPRESENTATIONS AND WARRANTIES OF EACH PARTY ARE IN LIEU OF ANY OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE HEREBY SPECIFICALLY EXCLUDED AND DISCLAIMED.

13.    **GOVERNMENT APPROVALS; TERM AND TERMINATION**

13.1. <u>Government Approvals</u>. Each of BioNTech and Pfizer will cooperate with the other Party and to make all registrations, filings and applications, to give all notices and to obtain as soon as practicable all governmental or other consents, transfers, approvals, orders, qualifications authorizations, permits and waivers, if any, and to do all other things necessary or useful for the consummation of the transactions as contemplated hereby including the collection of Human Material.

13.2. <u>Term</u>. The term of this Agreement (the "<u>Term</u>") will commence on the Effective Date and shall continue, unless terminated earlier in accordance with this Section 13, until the later of (a) completion of all Development and Manufacturing obligations of each Party set out herein; and (b) the termination or expiry of the Commercialization Agreement or, in the absence of a Commercialization Agreement, Pfizer ceasing to pursue Commercialization activities pursuant to the Commercialization Terms.

13.3. <u>Termination for Cause by a Party</u>. Either Party may terminate this Agreement for cause, at any time during the Term, by giving written notice to the other Party in the event that such other Party commits a material breach of its obligations under this Agreement and such material breach remains uncured for at least 90 days, in each case measured from the date written notice of such material breach is given to Pfizer; *provided, however,* that if any breach is not reasonably curable within [***] and if the Party accused of breach is making a bona fide effort/using Commercially Reasonable Efforts to cure such breach, such termination will be delayed for a time period to be agreed by both Parties in order to permit the Party accused of a breach a reasonable period of time to cure such breach. If the alleged material breach relates to non-payment of any amount due under this Agreement, the cure period will be tolled pending resolution of any bona fide dispute between the Parties as to whether such payment is due.

70

13.4. <u>Termination by Pfizer Convenience</u>. [***], Pfizer may terminate this Agreement for convenience upon [***] prior written notice (which notice period may be shortened by BioNTech in BioNTech's sole discretion through written notice to Pfizer at any time after BioNTech's receipt of such termination notice) without any liability to BioNTech.

13.5. <u>Termination by Pfizer for</u> [***]

13.6. <u>Effects of Termination</u>.

13.6.1. **Termination for Cause by a Party.** In the event that a Party terminates this Agreement for cause pursuant to Section 13.3, all rights and obligations of each Party hereunder will cease (including all rights and licenses and sublicenses granted by either Party to the other Party hereunder, and all sublicenses granted to Affiliates or Third Parties under the rights granted hereunder), except as otherwise expressly provided herein.

13.6.2. **Termination for Pfizer's Convenience**. Upon Pfizer's termination pursuant to Section 13.4 (a) [***]; and (b) [***].

13.6.3. **No Effect on Related Agreements.** Unless explicitly agreed otherwise, termination or expiration of this Agreement shall not affect any other agreements concluded hereunder, including the Commercialization Agreement or any Manufacturing agreements pursuant to Article 8.

13.6.4. **Continuation of Pfizer Licenses.** Except in the event of Pfizer's termination pursuant to Section 13.3 or 13.7.1, (a) [***], (b) [***], (c) [***], and (d) [***].

71

13.6.5. **Exclusivity.** In the event of Pfizer's termination pursuant to Section 13.3 or 13.7, the Parties' obligations pursuant to Section 3.10.3 shall survive the termination or expiration of this Agreement for a period of [***] years provided that BioNTech shall not be prevented from using the Product within the Field. In the event of Pfizer's termination pursuant to Section 13.4 or 13.5, Pfizer shall not be entitled to enter into any collaboration or license agreement with any Third Party to Develop or Commercialize in the Territory an immunogenic composition comprising mRNA in the Field for a period of [***] months commencing on the date of the termination notice served by Pfizer, provided that such obligation shall not (i) restrict Pfizer's or its Affiliates' right to work as contract manufacturer for a Third Party, (ii) prohibit Pfizer or its Affiliate from acquiring any Third Party, or being acquired by any Third Party, that at the time of acquisition is active in the Development or Commercialization of an immunogenic composition comprising mRNA in the Field, or (iii) prohibit Pfizer or its Affiliate from undertaking non-clinical research work.

13.6.6. **Accrued Rights.** Expiration or termination of this Agreement for any reason will be without prejudice to any right which will have accrued to the benefit of either Party prior to such termination, including damages arising from any breach under this Agreement. Expiration or termination of this Agreement will not relieve either Party from any obligation which is expressly indicated to survive such expiration or termination.

13.6.7. **Survival Period**. The following sections, together with any sections that expressly survive, will survive expiration or termination of this Agreement for any reason: Sections 1 (Definitions), 3.5 (additional licenses), 5.4.2(a) through (d) only (Repayment of BioNTech Deferred Development Costs) (except in the event of a termination by Pfizer pursuant to Section 13.4), 5.6 (Records and Accounting Principles), 5.7.1 (Withholding Taxes), 5.10 (Audits), 5.10.1 (Underpayments/Overpayments), 5.10.2 (Confidentiality), 7.4.2 (Title to Pfizer Materials and BioNTech Materials), 7.4.4 (Return of Proprietary Materials), 9.2.5, first sentence only (Ownership of Regulatory Filings), 9.7 (Liability), 10.2 (Ownership of Intellectual Property), 10.3.1.2, 10.3.1.3 and 10.3.2 (Filing, Prosecution and Maintenance of Patent Rights), 11 (Confidentiality), 13.6 (Effects of Termination), 13.7 (Provision for Insolvency), 15.1 (No Consequential Damages), 15.2 (Indemnification by Pfizer), 15.3 (Indemnification by BioNTech), 15.4 (Procedure), 16 (Miscellaneous) and, to the extent an Enforcement Action or Infringement Claim is active, live or pending at the time of expiry or termination, Sections 10.4 or 10.8, as applicable.

13.7. <u>Provision for Insolvency</u>.

13.7.1. **Termination Right**. BioNTech will be deemed a "<u>Debtor</u>" under this Agreement if, at any time during the Term (a) a case is commenced by or against BioNTech under the Bankruptcy Code, (b) BioNTech files for or is subject to the institution of bankruptcy, reorganization, liquidation or receivership proceedings (other than a case under the Bankruptcy Code), (c) BioNTech assigns all or a substantial portion of its assets for the benefit of creditors, (d) a receiver or custodian is appointed for BioNTech's business or (e) a substantial portion of BioNTech's business is subject to attachment or similar process; *provided, however*, that in the case of any involuntary case under the Bankruptcy Code, BioNTech will not be deemed a Debtor if the

<center>72</center>

case is dismissed within 60 days after the commencement thereof. If BioNTech is deemed a Debtor, then Pfizer may terminate this Agreement by providing written notice to BioNTech. If Pfizer terminates this Agreement pursuant this Section 13.7.1, then: (i) all licenses granted to Pfizer under this Agreement will become irrevocable and perpetual, and Pfizer will have no further obligations to BioNTech under this Agreement other than (A) those obligations that expressly survive termination in accordance with Section 13.6.7 and (B) an obligation to pay royalties with respect to Net Sales of Products in an amount equal to 100% of the amount that would otherwise have been payable under this Agreement, such amount to be paid in accordance with and subject to the other terms of this Agreement governing the payment of royalties; (ii) such termination will not be construed to limit BioNTech's right to receive payments that accrued before the effective date of such termination; (iii) Pfizer will have the right to offset, against any payment owing to BioNTech as provided for under clause (i), above, any damages found or agreed by the Parties to be owed by BioNTech to Pfizer; and (iv) nothing in this Section 13.7.1 will limit any other remedy Pfizer may have for any breach by BioNTech of this Agreement.

13.7.2. **Rights to Intellectual Property**. All rights and licenses now or hereafter granted by BioNTech to Pfizer under or pursuant to any Section of this Agreement, including Sections3.1.1, 3.2.1, 3.3, 3.4.1 and 3.5.1 and Section 10 hereof, are rights to "intellectual property" (as defined in the Bankruptcy Code). The Parties hereto acknowledge and agree that the payments provided for under Sections 5 and all other payments by Pfizer to BioNTech hereunder or under the Commercialization Agreement do not constitute royalties within the meaning of Section 365(n) of the Bankruptcy Code or relate to licenses of intellectual property hereunder. If (a) a case under the Bankruptcy Code is commenced by or against BioNTech, (b) this Agreement is rejected as provided in the Bankruptcy Code and (c) Pfizer elects to retain its rights hereunder as provided in Section 365(n) of the Bankruptcy Code, then BioNTech (in any capacity, including debtor-in-possession) and its successors and assigns (including any trustee) will provide to Pfizer all Intellectual Property Rights licensed hereunder, and agrees to grant and hereby grants to Pfizer and its Affiliates a right to access and to obtain possession of and to benefit from and, in the case of any chemical or biological material or other tangible item of which there is a fixed or limited quantity, to obtain a pro rata portion of, each of the following to the extent related to any Candidate or Product, or otherwise related to any right or license granted under or pursuant to this Agreement: (i) copies of pre-clinical and clinical research data and results; (ii) all of the following (to the extent that any of the following are so related): BioNTech Materials, cell lines, antibodies, assays, reagents and other biological materials; (iii) samples or Candidates and Products; (iv) BioNTech Technology, Product Technology, and RNA Technology, (v) laboratory notes and notebooks; (vi) Candidate and Product data or filings, and (vii) rights of reference in respect of filings for and Regulatory Approvals, all of which constitute "embodiments" of intellectual property pursuant to Section 365(n) of the Bankruptcy Code, and (viii) all other embodiments of such intellectual property, whether any of the foregoing are in BioNTech's possession or control or in the possession and control of any Third Party but which BioNTech has the right to access or benefit from and to make available to Pfizer. BioNTech will not interfere with the exercise by Pfizer or its Affiliates of rights and licenses to Intellectual Property Rights licensed hereunder and embodiments thereof in accordance with this Agreement and agrees to use Commercially Reasonable Efforts to assist Pfizer and its Affiliates to obtain such Intellectual Property Rights and embodiments thereof in the possession or control of Third Parties as reasonably necessary or useful for Pfizer or its Affiliates or Sublicensees to exercise such rights and licenses in accordance with this Agreement.

13.7.3. **No Limitation of Rights**. All rights, powers and remedies of Pfizer provided in this Section 13.7 are in addition to and not in substitution for any and all other rights, powers and remedies now or hereafter existing at Law or in equity (including the Bankruptcy Code) in the event of the commencement of a case under the Bankruptcy Code involving BioNTech. To the extent

73

equivalent rights exist under the Bankruptcy Code existing from time to time in the jurisdiction where BioNTech is established the foregoing provisions shall be interpreted in accordance with such equivalent rights, and where such equivalent rights to not exist Pfizer shall be entitled to avail of itself all remedies and rights available to it as a creditor and licensee of Intellectual Property Rights under such local Bankruptcy Code.

## 14.   CHANGE OF CONTROL

14.1. Change of Control. If a Change of Control occurs with respect to a Party and a Third Party during the Term, or if a Party or any of its Affiliates acquires or merges with a Third Party during the Term, (in either case such Party being the "Affected Party"):

14.1.1. if such Third Party is, at the time of such Change of Control or acquisition or merger, conducting activities that would cause the Affected Party or one of its Affiliates to violate Section 3.10.1 (such activities, a "Acquisition Program"), then such Affected Party or such Third Party shall be permitted to continue such Acquisition Program and such continuation will not constitute a violation of Section 3.10.1;

14.1.2. the provisions of Section 11.7 shall apply and no Confidential Information of the other Party or its Affiliates may be disclosed to the Third Party and shall not be used in any Acquisition Program (if any) and the Affected Party shall implement and maintain, in accordance with such Affected Party's internal commercially reasonable practices, an information and personnel barrier between the working teams involved in the day to day conduct of such Affected Party's internal program of Development and Manufacture of Candidates and Products under this Agreement, and any activities of the Third Party, including under any Acquisition Program; and

14.1.3. if BioNTech is the Affected Party then:

14.1.3.1. [***];

14.1.3.2. [***];

14.1.3.3. [***];

74

14.1.3.4. [\*\*\*]; and

14.1.3.5. [\*\*\*].

14.2. <u>Effects of Change of Control</u>. In the event of a Change of Control of BioNTech by during the Term, the following provisions of this Section 14 shall also apply:

14.2.1. **BioNTech Intellectual Property.** All BioNTech Technology and Research and Development Program Technology, Controlled by BioNTech immediately prior to such BioNTech Change of Control shall continue to be BioNTech Technology and Research and Development Program Technology licensed to Pfizer for purposes of this Agreement.

14.2.2. **Existing Acquirer Intellectual Property**. Patent Rights and Know-How that were Controlled by the entity acquiring BioNTech or such entity's Affiliates that were not Affiliates of BioNTech prior to such BioNTech Change of Control (collectively, the "<u>Acquirer</u>") shall not be included within the licenses granted to Pfizer hereunder.

14.2.3. **Independent Intellectual Property**. Patent Rights and Know-How that, following such BioNTech Change of Control, are developed, made or otherwise acquired or Controlled by the Acquirer outside of the Research and Development Plan or the Manufacturing Plan and without use of Pfizer's Technology, Pfizer's Confidential Information, Research and Development Program Technology, BioNTech Improvements or BioNTech Technology shall not be included within the Research and Development Program Technology or BioNTech Technology or BioNTech Third Party Agreements (it being understood, however, for the avoidance of doubt, that all BioNTech Technology, Research and Development Program Technology, and Intellectual Property Rights developed by BioNTech or the Acquirer in the course of, or used by BioNTech or the Acquirer under the Research and Development Plan or used in the Manufacture of the Candidates or Products by BioNTech shall be licensed to Pfizer pursuant to the licenses set forth in this Agreement).

14.2.4. **Research and Development Program Technology.** No Research and Development Program Technology Controlled by Pfizer including Pfizer Improvements shall be licensed or sub-licensable to the Acquirer, and no Confidential Information of Pfizer or its Representatives shall be disclosed to the Acquirer, in each case without the prior written consent of Pfizer.

14.2.5. **Effect on Certain Agreement Provisions**. From and after the effective date of a BioNTech Change of Control by a Specified Person, the Acquirer shall not be considered an "Affiliate" for the purposes of this Agreement, provided that the Acquirer does not engage in any activities otherwise restricted under Section 3.10 using any Research and Development Program Technology, Pfizer Technology, Pfizer Improvements or Confidential Information of Pfizer.

## 15. **LIMITATION ON LIABILITY, INDEMNIFICATION AND INSURANCE**

15.1. <u>No Consequential Damages</u>**.** Except with respect to liability arising from a breach of Sections 10 or 10.1, from any willful misconduct or intentionally wrongful act, or to the extent such Party may be required to indemnify the other Party under this Section 15, in no event will either Party or its Representatives be liable under this Agreement for any special (only as related to indirect, incidental or

75

consequential damages), indirect, incidental, consequential or punitive damages, whether in contract, warranty, tort, negligence, strict liability or otherwise, including loss of indirect profits or revenue suffered by the other Party or any of its Representatives. Without limiting the generality of the foregoing, "consequential damages" will be deemed to include, and neither Party will be liable to the other Party or any of such other Party's Representatives or stockholders for any damages based on or measured by loss of projected or speculative future sales of the Products, any development, regulatory, launch or sales threshold milestone payments due or any other unearned, speculative or otherwise contingent payments provided for in this Agreement.

15.2. <u>Indemnification by Pfizer</u>. Pfizer will indemnify, defend and hold harmless BioNTech, each of its Affiliates, and each of its and its Affiliates' employees, officers, directors and agents (each, a "<u>BioNTech Indemnified Party</u>") from and against any and all claims, causes, or allegations (whether threatened or pending), judgments, expenses, damages, liabilities, obligations, fees (including the reasonable fees of attorneys and other consulting or testifying professionals), costs and losses (collectively, "<u>Liabilities</u>") that the BioNTech Indemnified Party may be required to pay to one or more Third Parties resulting from or arising out of (a) use of the Pfizer Technology, Pfizer Materials, and/or Pfizer Know-How disclosed by or on behalf of Pfizer in accordance with the rights licensed under this Agreement, (b) use of the Pfizer name or logo in accordance with the rights licensed under this Agreement or (c) the material breach by Pfizer of any of its representations, warranties or covenants set forth in Section 7.4.1, Section 12.1 or Section 12.2 or Section 12.6; except, in each case, to the extent caused by the negligence, recklessness or intentional acts of BioNTech or any BioNTech Indemnified Party.

15.3. <u>Indemnification by BioNTech</u>. BioNTech will indemnify, defend and hold harmless Pfizer, its Affiliates, Sublicensees, contractors, distributors and each of its and their respective employees, officers, directors and agents (each, a "<u>Pfizer Indemnified Party</u>") from and against any and all Liabilities that the Pfizer Indemnified Party may be required to pay to one or more Third Parties resulting from or arising out of (a) use of the BioNTech Technology [***], BioNTech Materials, and/or BioNTech Know-How disclosed by or on behalf of BioNTech in accordance with the rights licensed under this Agreement, (b) the Candidates or Products in accordance with the rights licensed under this Agreement, save to the extent the Liabilities are in respect of (i) the exploitation of Pfizer Technology infringing a Third Party Patent Right or (ii) [***]; (c) use of the BioNTech name or logo in accordance with the rights licensed under this Agreement, (d) rights or obligations under the GEIA relating to inventions made by employees of BioNTech or its Affiliates or Third Party Licensors in relation to BioNTech Technology or Research and Development Program Technology used in any Candidate or Product; or (e) the material breach by BioNTech or any of its Representatives of any of its representations, warranties or covenants set forth in Section 9, Section 12.1, Section 12.2, Section 12.3, or Section 12.5 except to the extent caused by the negligence, recklessness or intentional acts of Pfizer or any Pfizer Indemnified Party.

15.4. <u>Procedure</u>.

15.4.1. **Notice**. Each Party will notify the other Party in writing in the event it becomes aware of a claim for which indemnification may be sought hereunder. In the event that any Third Party asserts a claim or other proceeding (including any governmental investigation) with respect to any matter for which a Party (the "<u>Indemnified Party</u>") is entitled to indemnification hereunder (a "<u>Third Party Claim</u>"), then the Indemnified Party will promptly notify the Party obligated to indemnify the Indemnified Party (the "<u>Indemnifying Party</u>") thereof; *provided, however,* that no delay on the part of the Indemnified Party in notifying the Indemnifying Party will relieve the Indemnifying Party from any obligation hereunder unless (and then only to the extent that) the Indemnifying Party is prejudiced thereby.

76

15.4.2. **Control**. Subject to either Party's right to control any actions described in Section 10 (even where the other Party is the Indemnifying Party), the Indemnifying Party will have the right, exercisable by notice to the Indemnified Party within ten Business Days after receipt of notice from the Indemnified Party of the commencement of or assertion of any Third Party Claim, to assume direction and control of the defense, litigation, settlement, appeal or other disposition of the Third Party Claim (including the right to settle the claim solely for monetary consideration) with counsel selected by the Indemnifying Party and reasonably acceptable to the Indemnified Party; provided that (a) the Indemnifying Party has sufficient financial resources, in the reasonable judgment of the Indemnified Party, to satisfy the amount of any adverse monetary judgment that is sought, (b) the Third Party Claim seeks solely monetary damages and (c) the Indemnifying Party expressly agrees in writing that as between the Indemnifying Party and the Indemnified Party, the Indemnifying Party will be solely obligated to satisfy and discharge the Third Party Claim in full (the conditions set forth in clauses (a), (b) and (c) above are collectively referred to as the "Litigation Conditions"). Within ten Business Days after the Indemnifying Party has given notice to the Indemnified Party of its exercise of its right to defend a Third Party Claim, the Indemnified Party will give notice to the Indemnifying Party of any objection thereto based upon the Litigation Conditions. If the Indemnified Party reasonably so objects, the Indemnified Party will continue to defend the Third Party Claim, at the expense of the Indemnifying Party, until such time as such objection is withdrawn. If no such notice is given, or if any such objection is withdrawn, the Indemnifying Party will be entitled, at its sole cost and expense, to assume direction and control of such defense, with counsel selected by the Indemnifying Party and reasonably acceptable to the Indemnified Party. During such time as the Indemnifying Party is controlling the defense of such Third Party Claim, the Indemnified Party will cooperate, and will cause its Affiliates and agents to cooperate upon request of the Indemnifying Party, in the defense or prosecution of the Third Party Claim, including by furnishing such records, information and testimony and attending such conferences, discovery proceedings, hearings, trials or appeals as may reasonably be requested by the Indemnifying Party. In the event that the Indemnifying Party does not satisfy the Litigation Conditions or does not notify the Indemnified Party of the Indemnifying Party's intent to defend any Third Party Claim within ten Business Days after notice thereof, the Indemnified Party may (without further notice to the Indemnifying Party) undertake the defense thereof with counsel of its choice and at the Indemnifying Party's expense (including reasonable, out-of-pocket attorneys' fees and costs and expenses of enforcement or defense). The Indemnifying Party or the Indemnified Party, as the case may be, will have the right to join in (including the right to conduct discovery, interview and examine witnesses and participate in all settlement conferences), but not control, at its own expense, the defense of any Third Party Claim that the other party is defending as provided in this Agreement.

15.4.3. **Settlement**. The Indemnifying Party will not, without the prior written consent of the Indemnified Party, enter into any compromise or settlement that commits the Indemnified Party to take, or to forbear to take, any action. The Indemnified Party will have the sole and exclusive right to settle any Third Party Claim, on such terms and conditions as it deems reasonably appropriate, to the extent such Third Party Claim involves equitable or other non-monetary relief, but will not have the right to settle such Third Party Claim to the extent such Third Party Claim involves monetary damages without the prior written consent of the Indemnifying Party. Each of the Indemnifying Party and the Indemnified Party will not make any admission of liability in respect of any Third Party Claim without the prior written consent of the other party, and the Indemnified Party will use reasonable efforts to mitigate Liabilities arising from such Third Party Claim.

77

15.5. <u>Insurance</u>. Each Party further agrees to obtain and maintain, during the Term, commercial general liability insurance, including products liability insurance (or clinical trials insurance, if applicable), with minimum "A-" A.M. Best rated insurance carriers to cover its indemnification obligations under Section 15.2 or Section 15.3, as applicable, in each case with limits of not less than $[***] ([***] U.S. Dollars) per occurrence and in the aggregate. All deductibles and retentions will be the responsibility of the named insured. Within [***] days of the Effective Date, BioNTech will amend its existing insurance policies in such a way that (a) Pfizer Inc. and its Affiliates will be indemnified as principal on BioNTech's commercial general liability and products liability policies (or clinical trials insurance, if applicable) and (b) Pfizer Inc. and its Affiliates will be provided a waiver of subrogation on BioNTech's commercial general liability and products liability policies (or clinical trials insurance, if applicable). For U.S. exposures, additional insured status on BioNTech's commercial general liability and products liability policies shall be via form CG20101185 or its equivalent. Products liability coverage shall be maintained for three years following termination of this Agreement. To the extent of its culpability or negligence, all coverages of BioNTech will be primary and non-contributing with any similar insurance, carried by Pfizer. Notwithstanding any provision of this Section 15.5 to the contrary, Pfizer may meet its obligations under this Section 15.5 through self-insurance. Neither Party's insurance will be construed to create a limit of liability with respect to its indemnification obligations under this Section 15.

# 16. <u>MISCELLANEOUS</u>

16.1. <u>Assignment</u>. Neither this Agreement nor any interest hereunder will be assignable by a Party without the prior written consent of the other Party, except as follows: (a) subject to the provisions of this Agreement in respect of Change of Control, as applicable, a Party may assign its rights and obligations under this Agreement by way of sale of itself or the sale of the portion of its business to which this Agreement relates, through merger, sale of assets and/or sale of stock or ownership interest, *provided that* the assignee will expressly agree to be bound by such Party's obligations under this Agreement and that such sale is not primarily for the benefit of its creditors, (b) such Party may assign its rights and obligations under this Agreement to any of its Affiliates, *provided that* the assignee will expressly agree to be bound by such Party's obligations under this Agreement and that Party will remain liable for all of its rights and obligations under this Agreement. In addition, Pfizer may assign its rights and obligations under this Agreement to a Third Party where Pfizer or its Affiliate is required, or makes a good faith determination based on advice of counsel, to divest a Product in order to comply with Law or the order of any Governmental Authority as a result of a merger or acquisition, *provided that* the assignee will expressly agree to be bound by Pfizer's obligations under this Agreement. Each Party will promptly notify the other Party of any assignment or transfer under the provisions of this Section 16.1. This Agreement will be binding upon the successors and permitted assigns of the Parties and the name of a Party appearing herein will be deemed to include the names of such Party's successors and permitted assigns to the extent necessary to carry out the intent of this Agreement. Any assignment not in accordance with this Section 16.1 will be void.

16.2. <u>Further Actions</u>. Each Party agrees to execute, acknowledge and deliver such further instruments, and to do all such other acts, as may be necessary or appropriate in order to carry out the purposes and intent of the Agreement.

16.3. <u>Force Majeure</u>. Each Party will be excused from the performance of its obligations under this Agreement to the extent that such performance is prevented by force majeure (defined below) and the nonperforming Party promptly provides notice of the prevention to the other Party. Such excuse will be continued so long as the condition constituting force majeure continues and the nonperforming Party takes Commercially Reasonable Efforts to remove the condition. For purposes of this Agreement, "force majeure" will include conditions beyond the control of the Parties, including an act of God, voluntary or involuntary compliance with any regulation, Law or order of any government, war, act of terror, civil commotion, labor strike or lock-out, epidemic, failure or default of public utilities or common carriers, destruction of production facilities or materials by fire, earthquake, storm or like catastrophe.

78

16.4. <u>Interpretation</u>. Except where the context expressly requires otherwise, (a) the use of any gender herein will be deemed to encompass references to either or both genders, and the use of the singular will be deemed to include the plural (and vice versa), (b) the words "include", "includes" and "including" will be deemed to be followed by the phrase "without limitation", (c) the word "will" will be construed to have the same meaning and effect as the word "shall", (d) any definition of or reference to any agreement, instrument or other document herein will be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (e) any reference herein to any Person will be construed to include the Person's successors and assigns, (f) the words "herein", "hereof" and "hereunder", and words of similar import, will be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (g) all references herein to Sections, Exhibits or Schedules will be construed to refer to Sections, Exhibits or Schedules of this Agreement, and references to this Agreement include all Exhibits and Schedules hereto, (h) the word "notice" means notice in writing (whether or not specifically stated) and will include notices, consents, approvals and other written communications contemplated under this Agreement, (i) provisions that require that a Party, the Parties or any committee hereunder "agree," "consent" or "approve" or the like will require that such agreement, consent or approval be specific and in writing, whether by written agreement, letter, approved minutes or otherwise (excluding e-mail or instant messaging, but a signed PDF document being acceptable), (j) references to any specific law, rule or regulation, or article, section or other division thereof, will be deemed to include the then-current amendments thereto or any replacement or successor law, rule or regulation thereof, and (k) the term "or" will be interpreted in the inclusive sense commonly associated with the term "and/or".

16.5. <u>Notices</u>. Any notice or notification required or permitted to be provided pursuant to the terms and conditions of this Agreement (including any notice of force majeure, breach, termination, change of address, etc.) will be in writing and will be deemed given upon receipt if delivered personally or by facsimile transmission (receipt verified), and upon delivery if mailed by registered or certified mail or courier. Where delivery occurs outside normal working hours, notice will be deemed given at the start of normal working hours on the next Business Day. Notice shall be given to the Parties at the following addresses or facsimile numbers (or at such other address or facsimile number for a Party as will be specified by like notice, *provided, however*, that notices of a change of address will be effective only upon receipt thereof):

All correspondence to Pfizer will be addressed as follows:

> Pfizer Inc.
> Notices: [***]

> with a copy to:

> Pfizer Inc.
> Notices: Pfizer Legal Division
> [***]

<div align="center">79</div>

[***]

To help expedite Pfizer's awareness and response, copies of notices may be provided to Pfizer by email but must be supplemented by one of the following methods: (a) personal delivery, (b) first class certified mail with return receipt requested, or (c) next-day delivery by major international courier, with confirmation of delivery. Electronic copies may be sent via email to [***].

All correspondence to BioNTech will be addressed as follows:

BioNTech SE
[***]

16.6. <u>Amendment</u>. No amendment, modification or supplement of any provision of this Agreement will be valid or effective unless made in writing and signed by a duly authorized officer of each Party.

16.7. <u>Waiver</u>. No provision of this Agreement will be waived by any act, omission or knowledge of a Party or its agents or employees except by an instrument in writing expressly waiving such provision and signed by a duly authorized officer of the waiving Party. The waiver by either of the Parties of any breach of any provision hereof by the other Party will not be construed to be a waiver of any succeeding breach of such provision or a waiver of the provision itself.

16.8. <u>Severability</u>. If any clause or portion thereof in this Agreement is for any reason held to be invalid, illegal or unenforceable, the same will not affect any other portion of this Agreement, as it is the intent of the Parties that this Agreement will be construed in such fashion as to maintain its existence, validity and enforceability to the greatest extent possible. In any such event, this Agreement will be construed as if such clause of portion thereof had never been contained in this Agreement, and there will be deemed substituted therefor such provision as will most nearly carry out the intent of the Parties as expressed in this Agreement to the fullest extent permitted by applicable Law.

16.9. <u>Descriptive Headings</u>. The descriptive headings of this Agreement are for convenience only and will be of no force or effect in construing or interpreting any of the provisions of this Agreement.

16.10. <u>Global Trade Control Laws</u>. The Parties acknowledge that certain activities covered by or performed under this Agreement may be subject to laws, regulations or orders regarding economic sanctions, import controls or export controls ("<u>Global Trade Control Laws</u>"). Each of the Parties will perform all activities under this Agreement in compliance with all applicable Global Trade Control Laws. Furthermore, with respect to the activities performed under this Agreement, each of the Parties represents, warrants and covenants that:

16.10.1. Each Party will not, for activities under this Agreement, (a) engage in any such activities in a Restricted Market; (b) involve individuals ordinarily resident in a Restricted Market; or (c) include companies, organizations, or Governmental Authorities from or located in a Restricted Market. "<u>Restricted Market</u>" for purposes of this Agreement means the Crimean Peninsula, Cuba, the Donbass Region, Iran, North Korea, Sudan, and Syria, or any other country or region sanctioned by the United States or European Union.

80

16.10.2. Each Party represents and warrants that it is not a Restricted Party and is not owned or controlled by a Restricted Party. With respect to activities performed under this Agreement, neither Party will engage or delegate to any Restricted Parties for any activities under this Agreement. Each Party will screen all relevant Third Parties involved by such Party in the activities under this Agreement under the relevant Restricted Party Lists. "Restricted Parties" for purposes of this Agreement means any individual or entity on any of the following "Restricted Party Lists": the list of sanctioned entities maintained by the United Nations; the Specially Designated Nationals List and the Sectoral Sanctions Identifications List of the U.S. Treasury Department's Office of Foreign Assets Control; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List of the U.S. Department of Commerce; entities subject to restrictive measures and the Consolidated List of Persons, Groups and Entities Subject to E.U. Financial Sanctions, as implemented by the E.U. Common Foreign & Security Policy; the List of Excluded Individuals / Entities published by the U.S. Health and Human Services' Office of Inspector General; any lists of prohibited or debarred parties established under the U.S. Federal Food Drug and Cosmetic Act; the list of parties suspended or debarred from contracting with the U.S. government; and similar lists of restricted parties maintained by the Governmental Authorities of the countries that have jurisdiction over the activities conducted under this Agreement.

16.10.3. Neither Party will knowingly transfer to the other Party any goods, software, technology or services that are (a) controlled under the U.S. International Traffic in Arms Regulations or at a level other than EAR99 under the U.S. Export Administration Regulations; or (b) specifically identified as an E.U. Dual Use Item or on an applicable export control list of another country.

16.11. Dispute Resolution. If any dispute or disagreement arises between Pfizer and BioNTech in respect of this Agreement, they will follow the following procedures in an attempt to resolve the dispute or disagreement:

16.11.1. The Party claiming that such a dispute exists will give notice in writing ("Notice of Dispute") to the other Party of the nature of the dispute.

16.11.2. Within 30 days of receipt of a Notice of Dispute and in advance of any meeting pursuant to Section 16.11.3, the receiving Party will provide a written response to the other Party's claims regarding the dispute.

16.11.3. Within 45 days of receipt of a Notice of Dispute, the Chief Scientific Officer, Vaccine Research and Development of Pfizer and the Chief Scientific Officer of BioNTech AG will meet at a mutually agreed-upon time and location for the purpose of resolving such dispute to discuss the dispute or disagreement.

Notwithstanding any provision of this Agreement to the contrary, either Party may immediately initiate litigation in any court of competent jurisdiction seeking any remedy at law or in equity, including the issuance of a preliminary, temporary or permanent injunction, to preserve or enforce its rights under this Agreement. The provisions of this Section 16.11 will survive for five years from the date of termination or expiration of this Agreement.

16.12. Governing Law. This Agreement is governed by, and all disputes arising under or in connection with this Agreement shall be resolved in accordance with, laws of England and Wales, without regard to conflict of law principles thereof.

81

16.13. <u>Consent to Jurisdiction and Venue</u>. The Parties irrevocably submit to the exclusive jurisdiction of the courts of England and Wales as regards any claim, dispute or matter (whether contractual or non-contractual) arising out of or in connection with this Agreement (including its formation). Notwithstanding the foregoing, this clause shall not prevent either Party from being entitled to seek urgent interim or emergency relief (such as a preliminary injunction) before any other court of competent jurisdiction in respect of any claim, dispute or matter (whether contractual or non-contractual) arising out of or in connection with this Agreement (including its formation).

16.14. <u>Entire Agreement</u>. This Agreement constitutes and contains the complete, final and exclusive understanding and agreement of the Parties and cancels and supersedes any and all prior negotiations, correspondence, understandings and agreements, whether oral or written, between the Parties respecting the subject matter hereof and thereof, including (a) that certain [***] (which is hereby terminated effective as of the Effective Date, *provided that* such Confidential Disclosure Agreement will continue to govern the treatment of Confidential Information disclosed by the Parties prior to the Effective Date in accordance with its terms), (b) that certain [***] (which is hereby terminated effective as of the Effective Date, *provided that* the terms of this Agreement shall also apply to all activities made under the [***] (which is hereby terminated effective as of the Effective Date).

16.15. <u>Flu Collaboration</u>. Except as provided in Section 8.2, nothing in this Agreement varies, amends or otherwise supersedes or replaces the provisions and rights under the Flu Collaboration License, and the Flu Collaboration License and this Agreement shall be treated as separate arm's length transactions.

16.16. <u>Independent Contractors</u>. Both Parties are independent contractors under this Agreement. Nothing herein contained will be deemed to create an employment, agency, joint venture or partnership relationship between the Parties hereto or any of their agents or employees, or any other legal arrangement that would impose liability upon one Party for the act or failure to act of the other Party. Neither Party will have any express or implied power to enter into any contracts or commitments or to incur any liabilities in the name of, or on behalf of, the other Party, or to bind the other Party in any respect whatsoever.

16.17. <u>Counterparts</u>. This Agreement may be executed in two (2) counterparts, each of which will be an original and both of which will constitute together the same document. Counterparts may be signed and delivered by facsimile or digital (e.g., PDF) file, each of which will be binding when received by the applicable Party.

16.18. <u>No Third Party Rights or Obligations</u>. No provision of this Agreement will be deemed or construed in any way to result in the creation of any rights or obligation in any Person not a Party to this Agreement, and this Agreement does not give rise to any rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement. However, Pfizer may decide, in its sole discretion, to use one or more of its Affiliates to perform its obligations and duties hereunder, *provided that* Pfizer will remain liable hereunder for the performance by any such Affiliates of any such obligations.

*(Signature page follows)*

82

IN WITNESS WHEREOF, authorized representatives of the Parties have duly executed this Agreement as of the Effective Date to be effective as of the Effective Date.

**PFIZER INC.**

By    _____

Name:

Title:

**BIONTECH SE**

By    _____

Name:

Title:

By    _____

Name:

Title:

[Signature page to Collaboration Agreement]

**Exhibit A**

**Research and Development Plan**

To be agreed by the Parties in accordance with Section 2.2 and added after the Signing Date.

84

**Exhibit B**

**PFIZER ANTI-BRIBERY AND ANTI-CORRUPTION PRINCIPLES**

Pfizer has a longstanding corporate policy that prohibits colleagues or anyone acting on our behalf from providing any payment or benefit to any person or entity in order to improperly influence a government official or to gain an unfair business advantage. Pfizer is committed to performing with integrity, and acting ethically and legally in accordance with all applicable laws and regulations, including, but not limited to, anti-bribery and anti-corruption laws. We expect the same commitment from the consultants, agents, representatives or other companies and individuals acting on our behalf ("Business Associates"), as well as those acting on behalf of Business Associates, in connection with work for Pfizer.

**Bribery of Government Officials**

Most countries have laws that forbid making, offering or promising any payment or anything of value (directly or indirectly) to a government official when the payment is intended to influence an official act or decision to award or retain business. Under Pfizer's policies, "government official" is broadly interpreted and includes: (i) any elected or appointed government official (e.g., a member of a ministry of health); (ii) any employee or person acting for or on behalf of a government official, agency, or enterprise performing a governmental function; (iii) any political party, candidate for public office, officer, employee, or person acting for or on behalf of a political party or candidate for public office; or (iv) an employee or person acting for or on behalf of a public international organization (e.g., the United Nations). "Government" is meant to include all levels and subdivisions of governments (i.e., local, regional, or national and administrative, legislative, or executive). Because this definition of "government official" is so broad, it is likely that Business Associates will interact with a government official in the ordinary course of their business on behalf of Pfizer. For example, doctors employed by government-owned hospitals would be considered "government officials" under Pfizer's policies.

The U.S. Foreign Corrupt Practices Act of 1977 (the "FCPA") prohibits making, promising, or authorizing the making of a payment or providing anything of value to a non-U.S. government official to improperly or corruptly induce that official to make any governmental act or decision to assist a company in obtaining or retaining business, or to otherwise obtain an improper advantage. The FCPA also prohibits a company or person from using another company or individual to engage in any of the foregoing activities. As a U.S. company, Pfizer must comply with the FCPA and could be held liable as a result of acts committed anywhere in the world by a Business Associate.

**Anti-Bribery and Anti-Corruption Principles Governing Interactions with Governments and Government Officials**

Business Associates must communicate and abide by the following principles with regard to their interactions with governments and government officials:

- Business Associates, and those acting on their behalf in connection with work for Pfizer, may not directly or indirectly make, promise, or authorize the making of a corrupt payment or provide anything of value to any government official to induce that government official to make any governmental act or decision to help Pfizer obtain or retain business. Business Associates, and those acting on their behalf in connection with work for Pfizer, may never make a payment to or offer a government official any item or benefit, regardless of value, as an improper inducement for such government official to approve, reimburse, prescribe, or purchase a Pfizer product, to influence the outcome of a clinical trial, or otherwise improperly to benefit Pfizer's business activities.

- Business Associates, and those acting on their behalf in connection with work for Pfizer, need to understand whether local laws, regulations, or operating procedures (including requirements imposed by government entities such as government-owned hospitals or research institutions) impose any limits, restrictions, or disclosure requirements on compensation, financial support, donations, or gifts that may be provided to government officials. Business Associates, and those acting on their behalf in connection with work for Pfizer, must take into account and comply with any applicable restrictions in conducting their Pfizer-related activities. If a Business Associate is uncertain as to the meaning or applicability of any identified limits, restrictions, or disclosure requirements with respect to interactions with government officials, that Business Associate should consult with his or her primary Pfizer contact before undertaking their activities.

85

- Business Associates, and those acting on their behalf in connection with work for Pfizer, are not permitted to offer facilitation payments. A "facilitation payment" is a nominal, unofficial payment to a government official for the purpose of securing or expediting the performance of a routine, non-discretionary governmental action. Examples of facilitation payments include payments to expedite the processing of licenses, permits or visas for which all paperwork is in order. In the event that a Business Associate, or someone acting on their behalf in connection with work for Pfizer, receives or becomes aware of a request or demand for a facilitation payment or bribe in connection with work for Pfizer, the Business Associate shall report such request or demand promptly to his or her primary Pfizer contact before taking any further action.

## Commercial Bribery

Bribery and corruption can also occur in non-government, business to business relationships. Most countries have laws which prohibit offering, promising, giving, requesting, receiving, accepting, or agreeing to accept money or anything of value in exchange for an improper business advantage. Examples of prohibited conduct could include, but are not limited to, the provision of inappropriate gifts or hospitality, kickbacks, or investment opportunities offered to improperly induce the purchase of goods or services. Pfizer colleagues are not permitted to offer, give, solicit or accept bribes, and we expect our Business Associates, and those acting on their behalf in connection with work for Pfizer, to abide by the same principles.

## Anti-Bribery and Anti-Corruption Principles Governing Interactions with Private Parties and Pfizer Colleagues

Business Associates must communicate and abide by the following principles with regard to their interactions with private parties and Pfizer colleagues:

- Business Associates, and those acting on their behalf in connection with work for Pfizer, may not directly or indirectly make, promise, or authorize the making of a corrupt payment or provide anything of value to any person to induce that person to provide an unlawful business advantage for Pfizer.

- Business Associates, and those acting on their behalf in connection with work for Pfizer, may not directly or indirectly, solicit, agree to accept, or receive a payment or anything of value as an improper inducement in connection with their business activities performed for Pfizer.

- Pfizer colleagues are not permitted to receive gifts, services, perks, entertainment, or other items of more than token or nominal monetary value from Business Associates, and those acting on their behalf in connection with work for Pfizer. Moreover, gifts of nominal value are only permitted if they are received on an infrequent basis and only at appropriate occasions.

## Reporting Suspected or Actual Violations

Business Associates, and those acting on behalf in connection with work for Pfizer, are expected to raise concerns related to potential violations of these International Anti-Bribery and Anti-Corruption Principles or the law. Such reports can be made to a Business Associate's primary point of contact at Pfizer, or if an Associate prefers, to Pfizer's Compliance Group, by e-mail at corporate.compliance@pfizer.com or by phone at 1-212-733-3026.

**Exhibit C**

**Pfizer's Corporate Policy regarding Animal Care and Use (v. 1.2, June 18, 2017)**

## BACKGROUND

Pfizer is dedicated to helping people and animals live longer, healthier lives through the discovery and development of breakthrough medicines and therapies. Animal-based biomedical research in the pharmaceutical industry remains a vital component of the discovery, evaluation and regulatory processes, which lead to the development of products that save or improve human lives throughout the world. Pfizer's Animal Care and Use policy reflects our absolute commitment that all animals used by our business are treated humanely. This means that any research involving animals is conducted only after appropriate ethical consideration and review. This review ensures that we provide a high level of care to all animals used, and that a scientifically appropriate and validated alternative to the use of animals is not available.

### Why We Conduct Animal-based Biomedical Research

Pfizer is ethically and legally obliged to rigorously evaluate potential new medicines and therapies. Many of these evaluations can be, and are, accomplished by techniques that do not require the use of animals. However, given the present state of scientific knowledge, testing potential new medicines and therapies in animals is frequently critical to their evaluation, and is required by regulatory authorities worldwide to ensure the quality, efficacy and safety of the medicines we discover.

### Pfizer's Commitment to Ethical and Humane Treatment of Animals

Pfizer accepts its responsibility to use animals in a humane and ethical manner and expects all Colleagues to treat animals with respect. We approach the use of animals in our business with a high level of humane and ethical concern for those animals. All use is carefully planned and conducted in such a way as to minimize or avoid pain, distress, or discomfort to the animals. Every proposed use is thoroughly evaluated before being undertaken as the health and well-being of all animals under our care is a primary concern. Similarly, we expect any Third Party organization we engage to conduct animal-based research on our behalf to adhere to this Policy and to comply with all applicable laws and regulations.

### Pfizer's Commitment to Alternatives to Animal-based Biomedical Research

Pfizer is fully committed to the development and use of scientifically validated alternative testing methods that are acceptable to regulatory authorities and do not compromise patient safety or the effectiveness of our medicines. Pfizer continues to engage and lead cross-industry efforts aimed at developing and refining new in-vitro testing and predictive informatics-based systems that hold promise for future reduction of animal usage. Pfizer works directly with regulators and through pharmaceutical trade organizations to increase the recognition and acceptance of alternative models where such alternatives can be used appropriately.

## POLICY

For as long as it remains necessary to use animals in the discovery, development, evaluation and production of new medicines, we commit to maintaining high standards in the humane treatment of these animals. Significantly, we embrace the principles known as the "3Rs" of animal research first proposed in 1959 by Russell and Burch to describe the use of alternatives in animal research. These are:

**Replacement** of animal experiments with non-animal experiments such as mathematical models, computer simulations, and in-vitro biological systems wherever appropriate; and where animals must be used;
**Reduction** of the numbers of animals used in each study, and of the number of studies involving animals, to the absolute minimum necessary to obtain valid results and achieve our research objectives; and
**Refinement** of procedures involving animals to minimize the potential for pain and distress.

87

In addition to the 3R's, and to further assure we maintain high standards for our animals, we have adopted the following guidelines:

- When animal experimentation is necessary, great care is taken to choose the most appropriate animal species for the research and to optimize the study design to ensure that the results will be as meaningful as possible.

- Non-human primates will only be used when scientifically justified, for example in cases where other species will not provide sufficiently close analogues to the biological pathways and responses expected in humans.

- All studies are carefully designed to gain the maximum information from the fewest number of animals possible.

- Each proposed use of animals is reviewed and approved by a panel of objective experts prior to performing any experiments to ensure that the use of the animals is consistent with sound scientific practices and ethical considerations.

- Our standards of animal care and welfare meet or exceed those required by applicable local, national, or international laws and regulations.

- We regularly monitor our animals for signs of ill health or distress and take prompt action wherever appropriate. We make veterinary care available to our animals at all times.

- Our veterinarians and scientists evaluate every proposed animal procedure with an emphasis on eliminating or minimizing any potential for pain or distress which may be experienced by the animals.

- We train all Colleagues involved in the care, welfare and use of animals to ensure (a) that they are competent in the care of the animals and in the procedures required to complete the proposed work; (b) that they are aware of the ethical issues involved in the use of animals; and (c) that they demonstrate respect and humane treatment towards the animals in their care.

- We expect our contract research organizations, collaborators and vendors to maintain similar high standards. Parties conducting animal based research for Pfizer at their facilities are required to adhere to this Policy and to comply with all applicable laws and regulations. We perform welfare audits of Third Party facilities in accordance with our quality assurance policies.

- Because respect is a key tenant in our use of animals, we have also established standards regarding the use of animals in the marketing of Pfizer products. If advertisements featuring animals are used, any animal shown should be healthy and in a natural or appropriate setting. Non-human primates should not be used in the advertising of Pfizer products, and other wild animals will also not be used unless they are shown in their natural setting or portrayed through animation or computer-generated graphics.

This Policy represents Pfizer's commitment to high-quality animal care and welfare throughout our business, and to the replacement, reduction and refinement of the use of animals in research. We are equally committed to bringing important and safe new medicines to patients.

88

### Schedule 1.17

### Candidates

| [***] | [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|-------|
| [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] |

89

**Schedule 1.36**

**Current Licenses**

[***]

90

### Schedule 1.40

### Developing Countries List

| | |
|---|---|
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| | [***] |
| | [***] |
| | [***] |

91

**Schedule 1.41**

**Initial Development Budget**

To be agreed by the Parties in accordance with Section 2.2 and added after the Signing Date.

92

**Schedule 1.77**

**Initial Manufacturing Plan**

To be agreed by the Parties in accordance with Section 2.2 and added after the Signing Date.

93

**Schedule 4.1**

**Commercialization Agreement Term Sheet**

[***]

| | |
|---|---|
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |

94

[***]

[***]          [***]

[***]

[***]

[***]

95

[***]            [***]

[***]            [***]

[***]            [***]

[***]            [***]

96

[***]

[***]

[***]

[***]

[***]    [***]

[***]

[***]

97

[***]

[***]                [***]

[***]                [***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

98

[***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

99

[***]

[***]

[***]                    [***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

100

[***]

[***]

[***]

[***]

[***]

[***]

[***] [***]

[***]

[***]

[***]

[***]

[***]

101

[***]

[***]                [***]

[***]

[***]                [***]

[***]

[***]

102

[***]

[***]            [***]

[***]            [***]

                 [***]

                 [***]

                      [***]

                      [***]

                                          103

[***]

[***]

[***]

[***]

104

[***]

[***]

[***]                    [***]

[***]

[***]

[***]

[***]

[***]

[***]

105

[***]          [***]
[***]          [***]
               [***]
[***]          [***]
               [***]
[***]          [***]

106

|            | [***]  |
| [***]      | [***]  |
| [***]      | [***]  |
| [***]      | [***]  |
| [***]      | [***]  |
| [***]      | [***]  |
| [***]      | [***]  |
| [***]      | [***]  |

107

**ANNEX A**
**ABAC Compliance Certification**

[I/I on behalf of Party] hereby certify:

1.  [I have/Party has] communicated our *International Anti-Bribery and Anti-Corruption Principles* to all persons acting on [my/its] behalf in connection with work under this Agreement, including any agents, contractors, or subcontractors;

2.  With respect to any [Products], payments, or [Services] provided under this Agreement, [Party] has not taken any action directly or indirectly to (i) offer, promise, provide, or authorize the offer or provision of money or anything of value, in order to improperly or corruptly seek to influence any Government Official or any other person in order to obtain or retain business or any other improper business advantage; (ii) request or accept any such improper payment; or (iii) cause a violation of any applicable Anti-Corruption Law. For example, this includes providing any inducement for such Government Official or person to approve, reimburse, prescribe, or purchase a [Product], to influence the outcome of a clinical trial, or otherwise to benefit [Counterparty]'s business activities improperly;

3.  [Party] has ensured that it and every agent, contractor, or subcontractor performing [Services] in connection with the Agreement has agreed to comply with and be bound by the provisions of the Agreement;

4.  [Party has] met all relevant disclosure obligations required under the Agreement; and

5.  To the extent requested by Pfizer, any persons acting on behalf of [me/Party] in connection with the Agreement, have completed anti-corruption compliance training provided by Pfizer.

COMPANY NAME: _____

NAME: _____

TITLE: _____

DATE: _____

108

**Schedule 5.5**

**Potential Third Party Funders**

[***]

109

**Schedule 7.3.5**

**Decision-Making Rights**

| [***] | [***] | [***] | [***] |
|---|---|---|---|
| [***] | [***] | | |
| | | [***] | |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] |

110

| [***] | [***] | [***] | [***] |
| --- | --- | --- | --- |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | |
| [***] | [***] | [***] | |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | |
| [***] | [***] | [***] | |

111

| | | | |
|---|---|---|---|
| [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | |
| [***] | | | |
| [***] | | | |
| [***] | [***] | [***] | |
| [***] | [***] | [***] | |

<div align="center">[***]</div>

<div align="center">112</div>

### Schedule 9.1.1

### Responsiblities delegated to Pfizer in the USA or other countries in the Territory where it is the Lead Development Party

Subject to the Agreement, the activities delegated to Pfizer will be managed within Pfizer's quality systems including:

[***]

113

**Schedule 9.2.7**

**Pharmacovigilance Agreement Term Sheet**

[***]

114

**Schedule 12.3**

**Disclosures**

[***] _____

[***] _____

[***] _____

[***] _____

[***] _____

[***] _____

| [***] | [***] | [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|-------|-------|
| [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |

115

| | | | | | |
|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |

[***]

[***]

116

**Schedule 12.3.4**

**BioNTech Patent Rights existing as of the Effective Date**

117

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

118

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

119

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

120

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

121

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

122

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

123

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

124

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

125

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |

126

| | [***] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

127

|  | [***] |  |  |  |  |  |  | [***] |
|---|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |

128

|  |  |  |  |  |  |  |  | [***] |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

129

|  |  |  |  |  |  |  |  | [***] |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |  |  | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|  |  |  |  |  |  |  |  | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

130

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

131

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

132

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

133

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |

134

| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] [***] |

135

| | | | | | | | | [***] |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

136

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | | | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |

137

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |

138

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |

139

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |

140

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |

141

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

142

| | [***] | | | | | | [***] |
|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

143

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |

144

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |

145

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |

146

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] |       |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] |       | [***] |
|       |       |       |       |       |       |       |       | [***] |

147

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |

148

| | [***] | | | | | | |
|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | | | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***]<br>[***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

149

| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

150

|  | [***] |  |  |  |  |  |  | [***] |
|---|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |

151

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
| | [***] | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] |

152

| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

153

| | | | | | | | | [***] |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |

154

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| | | | | | | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] [***] | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |
| [***] | [***] | [***] | [***] | [***] | [***] | | | [***] |

155

**Schedule 12.9**

**BioNTech Management with Knowledge**

[\*\*\*]

156

# EXHIBIT 11

BioNTech and Pfizer announce regulatory approval from German authority Paul-Ehrlich-Institut to commence first clinical trial of COVID-19 vaccine candidates | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 785 of 923 PageID #: 800





## BioNTech and Pfizer announce regulatory approval from German authority Paul-Ehrlich-Institut to commence first clinical trial of COVID-19 vaccine candidates

Wednesday, April 22, 2020 - 12:00am

- *First COVID-19-related clinical trial to start in Germany*
- *Initial dose escalation phase to target dose range of 1µg to 100µg*
- *Clinical supply from BioNTech's GMP-certified mRNA production facilities in Europe*
- *Four vaccine candidates to enter clinical development*

MAINZ, Germany and NEW YORK , April 22, 2020 (GLOBE NEWSWIRE) -- BioNTech SE (Nasdaq: BNTX, "BioNTech" or "the Company") and Pfizer Inc. (NYSE: PFE), have announced today that the German regulatory authority, the Paul-Ehrlich-Institut, has approved the Phase 1/2 clinical trial for BioNTech's BNT162 vaccine program to prevent COVID-19 infection. BioNTech and Pfizer are jointly developing BNT162. The trial is the first clinical trial of a COVID-19 vaccine candidate to start in Germany , and is part of a global development program. Pfizer and BioNTech will also conduct trials for BNT162 in the United States upon regulatory approval, which is expected shortly.

The four vaccine candidates are the first candidates from BioNTech's COVID-19-focused project "Lightspeed", each representing different mRNA formats and target antigens. Two of the four vaccine candidates include a nucleoside modified mRNA (modRNA), one includes a uridine containing mRNA (uRNA), and the fourth vaccine candidate utilizes self-amplifying mRNA (saRNA). Each mRNA format is combined with a lipid nanoparticle (LNP) formulation. The larger spike sequence is included in two of the vaccine candidates, and the smaller optimized receptor binding domain (RBD) from the spike protein is included in the other two candidates. The RBD-based candidates contain the piece of the spike that is thought to be most important for eliciting antibodies that can inactivate the virus.

The dose escalation portion of the Phase 1/2 trial will include approximately 200 healthy subjects between the ages of 18 to 55 and will target a dose range of 1 µg to 100 µg aiming to determine the optimal dose for further studies as well as evaluate the safety and immunogenicity of the vaccine. The study will also evaluate the effects of repeated immunization for three of the four vaccine candidates which utilize uRNA or modRNA. Subjects with a higher risk for a severe COVID-19 infection will be included in the second part of the study.

"We are pleased to have completed pre-clinical studies in Germany and will soon initiate this first-in-human trial ahead of

BioNTech and Pfizer announce regulatory approval from German authority Paul-Ehrlich-Institut to commence first clinical trial of COVID-19 vaccine candidates | Pfizer

our expectations. The speed with which we were able to move from the start of the program to trial initiation speaks to the high level of engagement from everyone involved," says **CEO and Co-founder of BioNTech , Ugur Sahin .**

"Pfizer and BioNTech's partnership has mobilized our collective resources with extraordinary speed in the face of this worldwide challenge," said **Albert Bourla , Pfizer Chairman and CEO** . "Now that the work in Germany can commence, we are looking forward to and actively preparing for the potential start of this unique and robust clinical study program in the United States in the near future."

During the clinical development stage, BioNTech will provide its partners clinical supply of the vaccine from its GMP-certified mRNA manufacturing facilities in Europe .

BioNTech is also collaborating with Fosun Pharma to develop BNT162 in China , where the companies expect to conduct trials.

**BioNTech Conference Call and Webcast**

BioNTech will host a conference call and webcast Thursday, April 23, 2020 at 08:00 a.m. EDT ( 2:00 p.m. CEST ). The slide presentation and audio of the webcast will be available via the following link: https://edge.media-server.com/mmc/p/b9xow5kn

To participate in the conference call, please dial the following numbers 15-20 minutes prior to the start of the webcast and provide the Conference ID: 8534807

United States international:          +1 (646) 741 3167

United States domestic (toll-free):  +1 (877) 870 9135

Germany :                            +49 (0) 692 2222 625

Standard International :              +44 (0) 2071 928338

The slide presentation and audio of the webcast will be available on BioNTech's website https://biontech.de/ in the "Events & Presentations" page of the Investor Relations section. A replay of the webcast will be available shortly after the conclusion of the call and archived in the same section of the BioNTech's website.

**About BioNTech**

Biopharmaceutical New Technologies ( BioNTech ) is a next generation immunotherapy company pioneering novel therapies for cancer and other serious diseases. The Company exploits a wide array of computational discovery and therapeutic drug platforms for the rapid development of novel biopharmaceuticals. Its broad portfolio of oncology product candidates includes individualized and off-the-shelf mRNA-based therapies, innovative chimeric antigen receptor T cells, bi-specific checkpoint immuno-modulators, targeted cancer antibodies and small molecules. Based on its deep expertise in mRNA vaccine development and in-house manufacturing capabilities, BioNTech and its collaborators are developing multiple mRNA vaccine candidates for a range of infectious diseases alongside its diverse oncology pipeline. BioNTech has established a broad set of relationships with multiple global pharmaceutical collaborators, including Eli Lilly and Company, Genmab, Sanofi, Bayer Animal Health , Genentech , a member of the Roche Group, Genevant, Fosun Pharma, and Pfizer.

For more information, please visit www.BioNTech.de .

**BioNTech Forward-looking statements**

This press release contains "forward-looking statements" of BioNTech within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include, but may not be limited to, statements concerning: BioNTech's efforts to combat COVID-19; the planned next steps in BioNTech's project Lightspeed ; the timing to initiate clinical trials of BNT162 in Germany ; collaborations between BioNTech and Pfizer , and BioNTech and Fosun Pharma, to develop a potential COVID-19 vaccine; the expected timing of clinical trials of BNT 162 in the United States and China ; and the ability of BioNTech to supply the quantities of BNT162 to support clinical development. Any forward-looking statements in this press release are based on BioNTech current expectations and beliefs of future events, and are subject to a number of risks and uncertainties that could cause actual results to differ materially and adversely from those set forth in or implied by such forward-looking statements. These risks and uncertainties include, but are not limited to: competition to create a vaccine for Covid-19 and potential difficulties. For a discussion of these and other risks and uncertainties, see BioNTech's Annual Report on Form 20-F filed with the SEC on March 31, 2020 , which has been filed with the SEC and is available on the SEC's website at www.sec.gov . All information in this press release is as of the date of the release, and BioNTech undertakes no duty to update this information unless required by law.

**About Pfizer Inc. : Breakthroughs That Change Patients' Lives**

BioNTech and Pfizer announce regulatory approval from German authority Paul-Ehrlich-Institut to commence first clinical trial of COVID-19 vaccine candidates | Pfizer

Case 1:22-cv-00336-UNA    Document 1-1    Filed 03/17/22    Page 787 of 923 PageID #: 802

At Pfizer , we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of health care products, including innovative medicines and vaccines. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 150 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.Pfizer.com . In addition, to learn more, please visit us on www.Pfizer.com and follow us on Twitter at @Pfizer and @Pfizer News , LinkedIn , YouTube and like us on Facebook at Facebook.com/Pfizer .

**Pfizer Disclosure Notice**

The information contained in this release is as of April 22, 2020 . Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about Pfizer's efforts to combat COVID-19, BioNTech's mRNA vaccine program, BNT162, a collaboration between BioNTech and Pfizer to develop a potential COVID-19 vaccine and the expected timing of clinical trials, including their potential benefits, that involves substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as the possibility of unfavorable new clinical data and further analyses of existing clinical data; the risk that clinical trial data are subject to differing interpretations and assessments by regulatory authorities; whether regulatory authorities will be satisfied with the design of and results from the clinical studies; whether and when any biologics license applications may be filed in any jurisdictions for any potential vaccine candidates under the collaboration; whether and when any such applications may be approved by regulatory authorities, which will depend on myriad factors, including making a determination as to whether the product's benefits outweigh its known risks and determination of the product's efficacy and, if approved, whether any such vaccine candidates will be commercially successful; decisions by regulatory authorities impacting labeling, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of any such vaccine candidates, including development of products or therapies by other companies; manufacturing capabilities or capacity; uncertainties regarding the ability to obtain recommendations from vaccine technical committees and other public health authorities regarding any such vaccine candidates and uncertainties regarding the commercial impact of any such recommendations; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2019 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at http://www.sec.gov/ and www.Pfizer.com .

**BioNTech Media Relations**
Jasmina Alatovic
Senior Manager Global External Communications
Tel: +49 (0)6131 9084 7640 or +49 (0)151 1978 1385
E-mail: Media@biontech.de

**BioNTech Investor Relations**
Sylke Maas , Ph.D.
VP Investor Relations & Business Strategy
Tel: +49 (0)6131 9084 1074
E-mail: Investors@biontech.de

**Pfizer Media Relations**
Amy Rose ( U.S. )
+1 (212) 733-7410
amy.rose@pfizer.com

Lisa O'Neill ( UK )
+44 7929339560
lisa.o'neill@pfizer.com

BioNTech and Pfizer announce regulatory approval from German authority Paul-Ehrlich-Institut to commence first clinical trial of COVID-19 vaccine candidates | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 788 of 923 PageID #: 803

**Pfizer Investor Relations**

Ryan Crowe

+1 (212) 733-8160

ryan.crowe@pfizer.com

Research and Pipeline    Vaccines

Investors

Careers

Media

Partners

Grant Seekers

Health Care Professionals

Business to Business

Privacy Statement

Terms of Use

Contact Us

© 2022 Pfizer Inc. All rights reserved

# EXHIBIT 12

Pfizer and BioNTech Dose First Participants in the U.S. as Part of Global COVID-19 mRNA Vaccine Development Program | Pfizer

Case 1:22-cv-00336-UNA    Document 1-1    Filed 03/17/22    Page 790 of 923 PageID #: 805





# Pfizer and BioNTech Dose First Participants in the U.S. as Part of Global COVID-19 mRNA Vaccine Development Program

Tuesday, May 05, 2020 - 06:45am

*First participants dosed at NYU Grossman School of Medicine and University of Maryland School of Medicine*

*Pfizer and BioNTech ramping up manufacturing capabilities to further increase production capacity in 2020/2021*

NEW YORK & MAINZ, Germany--(BUSINESS WIRE)-- Pfizer Inc. (NYSE: PFE) and BioNTech SE (Nasdaq: BNTX) announced today that the first participants have been dosed in the U.S. in the Phase 1/2 clinical trial for the BNT162 vaccine program to prevent COVID-19. The trial is part of a global development program, and the dosing of the first cohort in Germany was completed last week.

This press release features multimedia. View the full release here: https://www.businesswire.com/news/home/20200505005474/en/

The Phase 1/2 study is designed to determine the safety, immunogenicity and optimal dose level of four mRNA vaccine candidates evaluated in a single, continuous study. The dose level escalation portion (Stage 1) of the Phase 1/2 trial in the U.S. will enroll up to 360 healthy subjects into two age cohorts (18-55 and 65-85 years of age). The first subjects immunized in Stage 1 of the study will be healthy adults 18-55 years of age. Older adults will only be immunized with a given dose level of a vaccine candidate once testing of that candidate and dose level in younger adults has provided initial evidence of safety and immunogenicity. Sites currently dosing participants include NYU Grossman School of Medicine and the University of Maryland School of Medicine, with the University of Rochester Medical Center/Rochester Regional Health and Cincinnati Children's Hospital Medical Center to begin enrollment shortly.

"With our unique and robust clinical study program underway, starting in Europe and now the U.S., we look forward to advancing quickly and collaboratively with our partners at BioNTech and regulatory authorities to bring a safe and

## Multimedia Materials

Download B-Roll Video

Pfizer COVID-19 Vaccine Clinical Trial Manufacturing Infographic

Pfizer COVID-19 mRNA Vaccine Infographic

Pfizer and BioNTech Dose First Participants in the U.S. as Part of Global COVID-19 mRNA Vaccine Development Program | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 791 of 923 PageID #: 806

efficacious vaccine to the patients who need it most. The short, less than four-month timeframe in which we've been able to move from pre-clinical studies to human testing is extraordinary and further demonstrates our commitment to dedicating our best-in-class resources, from the lab to manufacturing and beyond, in the battle against COVID-19," said Albert Bourla, Chairman and CEO, Pfizer.

Pfizer and BioNTech's development program includes four vaccine candidates, each representing a different combination of mRNA format and target antigen. The novel design of the trial allows for the evaluation of the various mRNA candidates simultaneously in order to identify the safest and potentially most efficacious candidate in a greater number of volunteers, in a manner that will facilitate the sharing of data with regulatory authorities in real time.

"It is encouraging that we have been able to leverage more than a decade of experience in developing our mRNA platforms to initiate a global clinical trial in multiple regions for our vaccine program in such a short period. We are optimistic that advancing multiple vaccine candidates into human trials will allow us to identify the safest, most effective vaccination options against COVID-19," said CEO and Co-founder of BioNTech, Ugur Sahin.

During the clinical development stage, BioNTech will provide clinical supply of the vaccine from its GMP-certified mRNA manufacturing facilities in Europe.

In anticipation of a successful clinical development program, Pfizer and BioNTech are working to scale up production for global supply. Pfizer plans to activate its extensive manufacturing network and invest at risk in an effort to produce an approved COVID-19 vaccine as quickly as possible for those most in need around the world. The breadth of this program should allow production of millions of vaccine doses in 2020, increasing to hundreds of millions in 2021. Pfizer-owned sites in three U.S. states (Massachusetts, Michigan and Missouri) and Puurs, Belgium have been identified as manufacturing centers for COVID-19 vaccine production, with more sites to be selected. Through its existing mRNA production sites in Mainz and Idar-Oberstein, Germany, BioNTech plans to ramp up its production capacity to provide further capacities for a global supply of the potential vaccine.

BioNTech and Pfizer will work jointly to commercialize the vaccine worldwide upon regulatory approval (excluding China, where BioNTech has a collaboration with Fosun Pharma for BNT162 for both clinical development and commercialization).

**About Pfizer: Breakthroughs That Change Patients' Lives**

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of health care products, including innovative medicines and vaccines. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 170 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.Pfizer.com. In addition, to learn more, please visit us on www.Pfizer.com and follow us on Twitter at @Pfizer and @Pfizer_News, LinkedIn, YouTube and like us on Facebook at Facebook.com/Pfizer.

**Pfizer Disclosure Notice**

The information contained in this release is as of May 5, 2020. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about Pfizer's efforts to combat COVID-19, BioNTech's mRNA vaccine program, BNT162, a collaboration between BioNTech and Pfizer to develop a potential COVID-19 vaccine and manufacturing capacity, including their potential benefits, and the expected timing of clinical trials and potential supply, that involves substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as the possibility of unfavorable new clinical data and further analyses of existing clinical data; the risk that clinical trial data are subject to differing interpretations and assessments by regulatory authorities; whether regulatory authorities will be satisfied with the design of and results from the clinical studies; whether and when any biologics license applications may be filed in any jurisdictions for any potential vaccine candidates under the collaboration; whether and when any such applications may be approved by regulatory authorities, which will depend on myriad factors, including making a determination as to whether the product's benefits outweigh its known risks and determination of the product's efficacy and, if approved, whether any such vaccine candidates will be commercially successful; decisions by

Pfizer and BioNTech Dose First Participants in the U.S. as Part of Global COVID-19 mRNA Vaccine Development Program | Pfizer

Case 1:22-cv-00336-UNA    Document 1-1    Filed 03/17/22    Page 792 of 923 PageID #: 807

regulatory authorities impacting labeling, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of any such vaccine candidates, including development of products or therapies by other companies; manufacturing capabilities or capacity; uncertainties regarding the ability to obtain recommendations from vaccine technical committees and other public health authorities regarding any such vaccine candidates and uncertainties regarding the commercial impact of any such recommendations; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2019 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at www.sec.gov and www.pfizer.com.

**About BioNTech**

Biopharmaceutical New Technologies (BioNTech) is a next generation immunotherapy company pioneering novel therapies for cancer and other serious diseases. The Company exploits a wide array of computational discovery and therapeutic drug platforms for the rapid development of novel biopharmaceuticals. Its broad portfolio of oncology product candidates includes individualized and off-the-shelf mRNA-based therapies, innovative chimeric antigen receptor T cells, bi-specific checkpoint immuno-modulators, targeted cancer antibodies and small molecules. Based on its deep expertise in mRNA vaccine development and in-house manufacturing capabilities, BioNTech and its collaborators are developing multiple mRNA vaccine candidates for a range of infectious diseases alongside its diverse oncology pipeline. BioNTech has established a broad set of relationships with multiple global pharmaceutical collaborators, including Eli Lilly and Company, Genmab, Sanofi, Bayer Animal Health, Genentech, a member of the Roche Group, Genevant, Fosun Pharma, and Pfizer. For more information, please visit www.BioNTech.de.

**BioNTech Forward-looking statements**

This press release contains "forward-looking statements" of BioNTech within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include, but may not be limited to, statements concerning: BioNTech's efforts to combat COVID-19; the timing to initiate clinical trials of BNT162; collaborations between BioNTech and Pfizer, and BioNTech and Fosun Pharma, to develop a potential COVID-19 vaccine; and the ability of BioNTech to supply the quantities of BNT162 to support clinical development and, if approved, market demand. Any forward-looking statements in this press release are based on BioNTech current expectations and beliefs of future events, and are subject to a number of risks and uncertainties that could cause actual results to differ materially and adversely from those set forth in or implied by such forward-looking statements. These risks and uncertainties include, but are not limited to: competition to create a vaccine for Covid-19 and potential difficulties. For a discussion of these and other risks and uncertainties, see BioNTech's Annual Report on Form 20-F filed with the SEC on March 31, 2020, which has been filed with the SEC and is available on the SEC's website at www.sec.gov. All information in this press release is as of the date of the release, and BioNTech undertakes no duty to update this information unless required by law.

View source version on businesswire.com: https://www.businesswire.com/news/home/20200505005474/en/

**Pfizer Contacts**

Media Relations
Amy Rose
+1 (212) 733-7410
amy.rose@pfizer.com

Investor Relations
Chuck Triano
+1 (212) 733-3901
Charles.E.Triano@Pfizer.com

**BioNTech Contacts**

Media Relations
Jasmina Alatovic
Senior Manager Global External Communications
+49 (0)6131 9084 1513 or +49 (0)151 1978 1385

Media@biontech.de

Investor Relations
Sylke Maas, Ph.D.
VP Investor Relations & Business Strategy
+49 (0)6131 9084 1074
Investors@biontech.de

Source: Pfizer Inc.

# Multimedia Materials



**Pfizer_2020_COVID_FIH_Announcement_r3_v1**
2:40

Pfizer COVID-19 Vaccine Clinical Trial Manufacturing Infographic

Pfizer COVID-19 mRNA Vaccine Infographic

Research and Pipeline    Vaccines

Investors

Careers

Media

Partners

Grant Seekers

Health Care Professionals

Business to Business

Privacy Statement

Terms of Use

Contact Us

© 2022 Pfizer Inc. All rights reserved

Pfizer and BioNTech Dose First Participants in the U.S. as Part of Global COVID-19 mRNA Vaccine Development Program | Pfizer

Case 1:22-cv-00336-UNA    Document 1-1    Filed 03/17/22    Page 794 of 923 PageID #: 809

# EXHIBIT 13

Pfizer and BioNTech Granted FDA Fast Track Designation for Two Investigational mRNA-based Vaccine Candidates Against SARS-CoV-2 | Pfizer

Case 1:22-cv-00336-UNA    Document 1-1    Filed 03/17/22    Page 796 of 923 PageID #: 811





## Pfizer and BioNTech Granted FDA Fast Track Designation for Two Investigational mRNA-based Vaccine Candidates Against SARS-CoV-2

Monday, July 13, 2020 - 06:45am

*Anticipated large, global Phase 2b/3 safety and efficacy study may begin as early as July 2020*

NEW YORK & MAINZ, Germany--(BUSINESS WIRE)-- Pfizer Inc. (NYSE: PFE) and BioNTech SE (Nasdaq: BNTX, "BioNTech") today announced that two of the companies' four investigational vaccine candidates from their BNT162 mRNA-based vaccine program (BNT162b1 and BNT162b2) being developed to help protect against SARS-CoV-2 (the virus that causes COVID-19), received Fast Track designation from the U.S. Food and Drug Administration (FDA). BNT162b1 and BNT162b2 are the two most advanced vaccine candidates in the BNT162 program currently being evaluated in ongoing Phase 1/2 clinical studies in the United States and Germany.

This press release features multimedia. View the full release here: https://www.businesswire.com/news/home/20200713005168/en/

Fast Track is a process designed to facilitate the development, and expedite the review, of new drugs and vaccines that are intended to treat or prevent serious conditions that have the potential to address an unmet medical need.[i] This designation was granted based on preliminary data from Phase 1/2 studies that are currently ongoing in the United States and Germany as well as animal immunogenicity studies. The companies released early data from the ongoing U.S. Phase 1/2 study for the product candidate BNT162b1 on July 1, 2020. The manuscript is available on the online preprint server medRxiv and is concurrently undergoing scientific peer-review for potential publication. Early data from the German trial of BNT162b1 are expected to be released in July.

The BNT162 program is evaluating at least four experimental vaccines, each of which represent a unique combination of messenger RNA (mRNA) format and target antigen. BNT162b1 and BNT162b2 are both nucleoside modified RNAs, formulated in lipid nanoparticles. BNT162b1 encodes an optimized SARS-CoV-2 receptor-binding domain (RBD) antigen, while BNT162b2 encodes an optimized SARS-CoV-2 full-length spike protein antigen.

"The FDA's decision to grant these two COVID-19 vaccine candidates Fast Track designation signifies an important milestone in the efforts to develop a safe and effective vaccine against SARS-CoV-2," said **Peter Honig, Senior Vice**

Pfizer and BioNTech Granted FDA Fast Track Designation for Two Investigational mRNA-based Vaccine Candidates Against SARS-CoV-2 | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 797 of 923 PageID #: 812

**President, Global Regulatory Affairs, Pfizer**. "We look forward to continue working closely with the FDA throughout the clinical development of this program, Project Lightspeed, to evaluate the safety and efficacy of these vaccine candidates."

"We are pleased to have received Fast Track designation from the FDA for two of our vaccine candidates and look forward to working closely with the FDA, along with our partner Pfizer, to expedite the clinical development path forward," said **Özlem Türeci, Chief Medical Officer at BioNTech**.

The Project Lightspeed vaccine development program is based on BioNTech's proprietary mRNA-based technology platforms and supported by Pfizer's global vaccine development capabilities. The BNT162 vaccine candidates are undergoing clinical studies and are not currently approved for distribution anywhere in the world. Pfizer and BioNTech are committed to developing these novel vaccines with pre-clinical and clinical data at the forefront of all decision-making of both companies. Subject to regulatory approval, the companies are expecting to start a Phase 2b/3 trial as soon as later this month and are anticipating enrolling up to 30,000 subjects. If the ongoing studies are successful, and the vaccine candidate receives regulatory approval, the companies currently expect to manufacture up to 100 million doses by the end of 2020 and potentially more than 1.2 billion doses by the end of 2021.

**About Pfizer: Breakthroughs That Change Patients' Lives**

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of health care products, including innovative medicines and vaccines. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 150 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.pfizer.com. In addition, to learn more, please visit us on www.pfizer.com and follow us on Twitter at @Pfizer and @Pfizer_News, LinkedIn, YouTube, and like us on Facebook at Facebook.com/Pfizer.

**Pfizer Disclosure Notice**

The information contained in this release is as of July 13, 2020. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about Pfizer's efforts to combat COVID-19, the BNT162 mRNA vaccine program, and a collaboration between BioNTech and Pfizer to develop a potential COVID-19 vaccine, including their potential benefits, and anticipated publication of data, manufacturing and distribution and the expected timing of clinical trials, that involves substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as the possibility of unfavorable new preclinical or clinical trial data and further analyses of existing preclinical or clinical trial data; risks associated with preliminary data; the risk that clinical trial data are subject to differing interpretations and assessments, including during the peer review/publication process, in the scientific community generally, and by regulatory authorities; whether the scientific journal publications referenced above will occur and, if so, when and with what modifications; whether regulatory authorities will be satisfied with the design of and results from these and future preclinical and clinical studies; whether and when any biologics license applications may be filed in any jurisdictions for any potential vaccine candidates under the collaboration; whether and when any such applications may be approved by regulatory authorities, which will depend on myriad factors, including making a determination as to whether the product's benefits outweigh its known risks and determination of the product's efficacy and, if approved, whether any such vaccine candidates will be commercially successful; decisions by regulatory authorities impacting labeling, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of any such vaccine candidates, including development of products or therapies by other companies; manufacturing capabilities or capacity, including whether the estimated numbers of doses can be manufactured within the projected time periods indicated; uncertainties regarding the ability to obtain recommendations from vaccine technical committees and other public health authorities regarding any such vaccine candidates and uncertainties regarding the commercial impact of any such recommendations; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2019 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent

Pfizer and BioNTech Granted FDA Fast Track Designation for Two Investigational mRNA-based Vaccine Candidates Against SARS-CoV-2 | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 798 of 923 PageID #: 813

reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at www.sec.gov and www.pfizer.com.

**About BioNTech**

Biopharmaceutical New Technologies is a next generation immunotherapy company pioneering novel therapies for cancer and other serious diseases. The Company exploits a wide array of computational discovery and therapeutic drug platforms for the rapid development of novel biopharmaceuticals. Its broad portfolio of oncology product candidates includes individualized and off-the-shelf mRNA-based therapies, innovative chimeric antigen receptor T cells, bi-specific checkpoint immuno-modulators, targeted cancer antibodies and small molecules. Based on its deep expertise in mRNA vaccine development and in-house manufacturing capabilities, BioNTech and its collaborators are developing multiple mRNA vaccine candidates for a range of infectious diseases alongside its diverse oncology pipeline. BioNTech has established a broad set of relationships with multiple global pharmaceutical collaborators, including Genmab, Sanofi, Bayer Animal Health, Genentech, a member of the Roche Group, Genevant, Fosun Pharma, and Pfizer.

For more information, please visit www.BioNTech.de.

**BioNTech Forward-looking Statements**

This press release contains "forward-looking statements" of BioNTech within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include, but may not be limited to, statements concerning: BioNTech's efforts to combat COVID-19; the timing to initiate clinical trials of BNT162 and any expedited review resulting from Fast Track designation; collaborations between BioNTech and Pfizer, and BioNTech and Fosun Pharma, to develop a potential COVID-19 vaccine; and the ability of BioNTech to supply the quantities of BNT162 to support clinical development and, if approved, market demand. Any forward-looking statements in this press release are based on BioNTech current expectations and beliefs of future events, and are subject to a number of risks and uncertainties that could cause actual results to differ materially and adversely from those set forth in or implied by such forward-looking statements. These risks and uncertainties include, but are not limited to: competition to create a vaccine for COVID-19 and potential difficulties. For a discussion of these and other risks and uncertainties, see BioNTech's Annual Report on Form 20-F filed with the SEC on March 31, 2020, which has been filed with the SEC and is available on the SEC's website at www.sec.gov. All information in this press release is as of the date of the release, and BioNTech undertakes no duty to update this information unless required by law.

[i] U.S. Food and Drug Administration Fast Track https://www.fda.gov/ForPatients/Approvals/Fast/ucm405399.htm

View source version on businesswire.com: https://www.businesswire.com/news/home/20200713005168/en/

**Pfizer Media Relations**
Amy Rose
+1 (212) 733-7410
Amy.Rose@pfizer.com

**Pfizer Investor Relations**
Chuck Triano
+1 (212) 733-3901
Charles.E.Triano@pfizer.com

**BioNTech Media Relations**
Jasmina Alatovic
+49 (0)6131 9084 1513 or +49 (0)151 1978 1385
Media@biontech.de

**BioNTech Investor Relations**
Sylke Maas, Ph.D.
+49 (0)6131 9084 1074
Investors@biontech.de

Source: Pfizer Inc.

Vaccines

Pfizer and BioNTech Granted FDA Fast Track Designation for Two Investigational mRNA-based Vaccine Candidates Against SARS-CoV-2 | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 799 of 923 PageID #: 814

Investors

Careers

Media

Partners

Grant Seekers

Health Care Professionals

Business to Business

Privacy Statement

Terms of Use

Contact Us

© 2022 Pfizer Inc. All rights reserved

# EXHIBIT 14

Pfizer and BioNTech Choose Lead mRNA Vaccine Candidate Against COVID-19 and Commence Pivotal Phase 2/3 Global Study | Pfizer

Case 1:22-cv-00336-UNA    Document 1-1    Filed 03/17/22    Page 801 of 923 PageID #: 816

☰



# Pfizer and BioNTech Choose Lead mRNA Vaccine Candidate Against COVID-19 and Commence Pivotal Phase 2/3 Global Study

Monday, July 27, 2020 - 05:15pm

- *Companies advance nucleoside-modified messenger RNA (modRNA) candidate BNT162b2, which encodes an optimized SARS-CoV-2 full-length spike glycoprotein, at a 30µg dose level in a 2 dose regimen into Phase 2/3 Study*
- *Candidate and dose level selection informed by preclinical and clinical data obtained in Phase 1/2 studies conducted in the U.S. (C4591001) and Germany (BNT162-01)*
- *The Phase 2/3 study protocol follows all the U.S. Food and Drug Administration (FDA) guidance on clinical trial design for COVID-19 vaccine studies.*
- *Phase 2/3 study of up to 30,000 participants aged 18 – 85 years started in the U.S. and expected to include approximately 120 sites globally*
- *Trial regions to include areas with significant expected SARS-CoV-2 transmission to assess whether investigational vaccine candidate, BNT162b2, is effective in preventing COVID-19*
- *Assuming clinical success, Pfizer and BioNTech on track to seek regulatory review as early as October 2020 and, if regulatory authorization or approval is obtained, plan to supply up to 100 million doses by the end of 2020 and approximately 1.3 billion doses by the end of 2021*

NEW YORK & MAINZ, Germany--(BUSINESS WIRE)-- Pfizer Inc. (NYSE: PFE) and BioNTech SE (Nasdaq: BNTX) today announced the start of a global (except for China) Phase 2/3 safety and efficacy clinical study to evaluate a single nucleoside-modified messenger RNA (modRNA) candidate from their BNT162 mRNA-based vaccine program against SARS-CoV-2.

This press release features multimedia. View the full release here:
https://www.businesswire.com/news/home/20200727005800/en/

After extensive review of preclinical and clinical data from Phase 1/2 clinical trials, and in consultation with the U.S. Food and Drug Administration's Center for Biologics Evaluation and Research (CBER) and other global regulators, Pfizer and BioNTech have chosen to advance their BNT162b2 vaccine candidate into the Phase 2/3 study, at a 30 $\mu g$ dose level in a 2 dose regimen. BNT162b2, which recently received U.S. Food and Drug Administration (FDA) Fast Track designation,

Pfizer and BioNTech Choose Lead mRNA Vaccine Candidate Against COVID-19 and Commence Pivotal Phase 2/3 Global Study | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 802 of 923 PageID #: 817

encodes an optimized SARS-CoV-2 full length spike glycoprotein (S), which is the target of virus neutralizing antibodies.

"Our selection of the BNT162b2 vaccine candidate and its advancement into a Phase 2/3 study are the culmination of an extensive, collaborative and unprecedented R&D program involving Pfizer, BioNTech, clinical investigators, and study participants with a singular focus of developing a safe and effective COVID-19 RNA vaccine. The Phase 2/3 study protocol follows all the U.S. Food and Drug Administration (FDA) guidance on clinical trial design for COVID-19 vaccine studies," said Kathrin U. Jansen, Ph.D., Senior Vice President and Head of Vaccine Research & Development, Pfizer. "The initiation of the Phase 2/3 trial is a major step forward in our progress toward providing a potential vaccine to help fight the ongoing COVID-19 pandemic, and we look forward to generating additional data as the program progresses."

"Today, we are starting our late-stage global study, which will include up to 30,000 participants. We selected BNT162b2 as our lead candidate for this Phase 2/3 trial upon diligent evaluation of the totality of the data generated so far. This decision reflects our primary goal to bring a well-tolerated, highly effective vaccine to the market as quickly as possible, while we will continue to evaluate our other vaccine candidates as part of a differentiated COVID-19 vaccine portfolio," said Ugur Sahin, M.D., CEO and Co-Founder of BioNTech. "Many steps have been taken towards this important milestone and we would like to thank all those involved for their extraordinary commitment."

### About the BNT162b2 Candidate

During preclinical and clinical studies of four BNT162 RNA vaccine candidates, BNT162b1 and BNT162b2 emerged as strong candidates based on assessments of safety and immune response. Pfizer and BioNTech selected BNT162b2 as the candidate to progress to a Phase 2/3 study based on the totality of available data from our preclinical and clinical studies, including select immune response and tolerability parameters.

In the preclinical studies, BNT162b1 and BNT162b2 candidates induced favorable viral antigen specific CD4+ and CD8+T cell responses, high levels of neutralizing antibody in various animal species, and beneficial protective effects in a primate SARS-CoV-2 challenge model.

Preliminary clinical Phase 1/2 data from nearly 120 patients demonstrated a favorable overall tolerability profile for BNT162b2, as compared to BNT162b1, with generally mild to moderate and transient (1-2 days) systemic events, such as fever, fatigue and chills and no serious adverse events. Two 30 $\mu g$ doses of BNT162b2 elicited neutralizing geometric mean titers (GMTs) generally similar to the GMTs that were elicited by the BNT162b1 vaccine candidate, as reflected in data the companies have previously posted on a preprint server. In older adults (65-85 years of age), two 30 µg doses, spaced three weeks apart, elicited a neutralizing antibody GMT higher than the GMT in a panel of 38 sera from subjects who had contracted SARS-CoV-2. BNT162b2 vaccinated human participants displayed a favorable breadth of epitopes recognized in T cell responses specific to the SARS-CoV-2 antigen, as compared to the BNT162b1 candidate. BNT162b2 demonstrated concurrent induction of high magnitude CD4+ and CD8+ T cell responses. BNT162b2 elicited T cell responses against the receptor binding domain (RBD) and against the remainder of the spike glycoprotein that is not contained in the BNT162b1 vaccine candidate. The companies believe that immune recognition of more spike T cell epitopes may have the potential to generate more consistent responses across diverse populations and in older adults.

The companies are continuing to collect data from the Phase 1/2 trials for all four vaccine candidates and expect to submit data on BNT162b2 for peer review and potential publication in the near future. In keeping with their commitment to transparency, the companies intend to also post the manuscript on a preprint server at that time.

### About the Phase 2/3 Study

Pfizer and BioNTech finalized the Phase 2/3 study protocol in response to feedback from global regulators, including the FDA and the German Paul-Ehrlich-Institut. The Phase 2/3 study is an event driven trial that is planned to enroll up to 30,000 participants between 18 and 85 years of age. The companies plan to enroll a diverse population, including participants in areas where there is significant expected SARS-CoV-2 transmission.

The Phase 2/3 trial is designed as a 1:1 vaccine candidate to placebo, randomized, observer-blinded study to obtain safety, immune response, and efficacy data needed for regulatory review. The trial's primary endpoints will be prevention of COVID-19 in those who have not been infected by SARS-CoV-2 prior to immunization, and prevention of COVID-19 regardless of whether participants have previously been infected by SARS-CoV-2. Secondary endpoints include prevention of severe COVID-19 in those groups. The study also will explore prevention of infection by SARS-CoV-2, the virus that causes COVID-19. The primary efficacy analysis will be an event-driven analysis based on the number of participants with symptomatic COVID-19 disease. The trial design allows for interim analyses and unblinded reviews by an independent external Data Monitoring Committee.

By the end of the trial, the Phase 2/3 study is expected to be active at approximately 120 clinical investigational sites around the world, including 39 states across the United States and countries including Argentina, Brazil, and Germany. Investigator sites are selected based on factors including scientific expertise and capabilities, the epidemiology of the

Pfizer and BioNTech Choose Lead mRNA Vaccine Candidate Against COVID-19 and Commence Pivotal Phase 2/3 Global Study | Pfizer

Case 1:22-cv-00336-UNA    Document 1-1    Filed 03/17/22    Page 803 of 923 PageID #: 818

disease, and prior experience conducting clinical trials. For further information about this trial, visit ClinicalTrials.gov using the number NCT04368728.

Pfizer and BioNTech are committed to decreasing health disparities in underrepresented populations through the clinical trial process. To that end, many investigator sites are in diverse communities that have been disproportionately affected by COVID-19 so that individuals who have been most impacted have the opportunity to participate. The companies are also working together with investigator sites and advocacy partners to raise awareness about the importance of participation in this trial.

BNT162b2 remains under clinical study and is not currently approved for distribution anywhere in the world. If the Phase 2/3 trial is successful, Pfizer and BioNTech expect to be ready to seek Emergency Use Authorization or some form of regulatory approval as early as October 2020. If authorization or approval is obtained, the companies currently aim to supply globally up to 100 million doses by the end of 2020 and approximately 1.3 billion doses by the end of 2021.

### About Pfizer: Breakthroughs That Change Patients' Lives

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of health care products, including innovative medicines and vaccines. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 150 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.Pfizer.com. In addition, to learn more, please visit us on www.Pfizer.com and follow us on Twitter at @Pfizer and @Pfizer News, LinkedIn, YouTube and like us on Facebook at Facebook.com/Pfizer.

### Pfizer Disclosure Notice

The information contained in this release is as of July 27, 2020. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about Pfizer's efforts to combat COVID-19, the collaboration between BioNTech and Pfizer to develop a potential COVID-19 vaccine, the BNT162 mRNA vaccine program, and modRNA candidates BNT162b2 and BNT162b1 (including qualitative assessments of available data, potential benefits, expectations for clinical trials and timing of regulatory submissions, and anticipated manufacturing, supply and distribution), that involves substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as risks associated with preliminary data, including the possibility of unfavorable new preclinical or clinical trial data and further analyses of existing preclinical or clinical trial data that may be inconsistent with the data used for selection of the BNT162b2 vaccine candidate and dose level for the Phase 2/3 study; the risk that clinical trial data are subject to differing interpretations and assessments, including during the peer review/publication process, in the scientific community generally, and by regulatory authorities; whether and when data from the BNT162 mRNA vaccine program will be published in scientific journal publications and, if so, when and with what modifications; whether regulatory authorities will be satisfied with the design of and results from these and future preclinical and clinical studies; whether and when any biologics license and/or emergency use authorizationapplications may be filed in any jurisdictions for BNT162b2 or any other potential vaccine candidates; whether and when any such applications may be approved by regulatory authorities, which will depend on myriad factors, including making a determination as to whether the vaccine candidate's benefits outweigh its known risks and determination of the vaccine candidate's efficacy and, if approved, whether it will be commercially successful; decisions by regulatory authorities impacting labeling, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of a vaccine, including development of products or therapies by other companies; manufacturing capabilities or capacity, including whether the estimated numbers of doses can be manufactured within the projected time periods indicated; whether and when additional supply agreements will be reached; uncertainties regarding the ability to obtain recommendations from vaccine technical committees and other public health authorities and uncertainties regarding the commercial impact of any such recommendations; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2019 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent

Pfizer and BioNTech Choose Lead mRNA Vaccine Candidate Against COVID-19 and Commence Pivotal Phase 2/3 Global Study | Pfizer

Case 1:22-cv-00336-UNA    Document 1-1    Filed 03/17/22    Page 804 of 923 PageID #: 819

reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at www.sec.gov and www.pfizer.com.

**About BioNTech**

Biopharmaceutical New Technologies is a next generation immunotherapy company pioneering novel therapies for cancer and other serious diseases. The Company exploits a wide array of computational discovery and therapeutic drug platforms for the rapid development of novel biopharmaceuticals. Its broad portfolio of oncology product candidates includes individualized and off-the-shelf mRNA-based therapies, innovative chimeric antigen receptor T cells, bi-specific checkpoint immuno-modulators, targeted cancer antibodies and small molecules. Based on its deep expertise in mRNA vaccine development and in-house manufacturing capabilities, BioNTech and its collaborators are developing multiple mRNA vaccine candidates for a range of infectious diseases alongside its diverse oncology pipeline. BioNTech has established a broad set of relationships with multiple global pharmaceutical collaborators, including Genmab, Sanofi, Bayer Animal Health, Genentech, a member of the Roche Group, Genevant, Fosun Pharma, and Pfizer. For more information, please visit www.BioNTech.de.

**BioNTech Forward-looking statements**

This press release contains "forward-looking statements" of BioNTech within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include, but may not be limited to, statements concerning: BioNTech's efforts to combat COVID-19; the timing to initiate clinical trials of BNT162 and anticipated publication of data from these clinical trials; the potential number of sites and participants in our Phase 2/3 trial; the timing for any potential emergency use authorizations or approvals; the collaboration between BioNTech and Pfizer to develop a potential COVID-19 vaccine; our expectations regarding the potential characteristics of BNT162b2 in our Phase 2/3 trial and/or in commercial use based on data observations to date, including expected advantages over BNT162b1; and the ability of BioNTech to supply the quantities of BNT162 to support clinical development and, if approved, market demand, including our production estimates for 2020 and 2021. Any forward-looking statements in this press release are based on BioNTech current expectations and beliefs of future events, and are subject to a number of risks and uncertainties that could cause actual results to differ materially and adversely from those set forth in or implied by such forward-looking statements. These risks and uncertainties include, but are not limited to: competition to create a vaccine for COVID-19; the ability to produce comparable clinical results in larger and more diverse clinical trials; the ability to effectively scale our productions capabilities; and other potential difficulties. For a discussion of these and other risks and uncertainties, see BioNTech's Annual Report on Form 20-F filed with the SEC on March 31, 2020, which is available on the SEC's website at www.sec.gov. All information in this press release is as of the date of the release, and BioNTech undertakes no duty to update this information unless required by law.


View source version on businesswire.com: https://www.businesswire.com/news/home/20200727005800/en/

**Pfizer Contacts:**

Media Relations
Amy Rose
+1 (212) 733-7410
Amy.rose@pfizer.com

Investor Relations
Chuck Triano
+1 (212) 733-3901
Charles.E.Triano@Pfizer.com

**BioNTech Contacts:**

Media Relations
Jasmina Alatovic
+49 (0)6131 9084 1513 or +49 (0)151 1978 1385
Media@biontech.de

Investor Relations
Sylke Maas, Ph.D.
+49 (0)6131 9084 1074
Investors@biontech.de

Pfizer and BioNTech Choose Lead mRNA Vaccine Candidate Against COVID-19 and Commence Pivotal Phase 2/3 Global Study | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 805 of 923 PageID #: 820

Source: Pfizer Inc.

Research and Pipeline     Vaccines

Investors

Careers

Media

Partners

Grant Seekers

Health Care Professionals

Business to Business

Privacy Statement

Terms of Use

Contact Us

© 2022 Pfizer Inc. All rights reserved

# EXHIBIT 15

Pfizer and BioNTech Conclude Phase 3 Study of COVID-19 Vaccine Candidate, Meeting All Primary Efficacy Endpoints | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 807 of 923 PageID #: 822

☰



## Pfizer and BioNTech Conclude Phase 3 Study of COVID-19 Vaccine Candidate, Meeting All Primary Efficacy Endpoints

Wednesday, November 18, 2020 - 06:59am

- *Primary efficacy analysis demonstrates BNT162b2 to be 95% effective against COVID-19 beginning 28 days after the first dose;170 confirmed cases of COVID-19 were evaluated, with 162 observed in the placebo group versus 8 in the vaccine group*
- *Efficacy was consistent across age, gender, race and ethnicity demographics; observed efficacy in adults over 65 years of age was over 94%*
- *Safety data milestone required by U.S. Food and Drug Administration (FDA) for Emergency Use Authorization (EUA) has been achieved*
- *Data demonstrate vaccine was well tolerated across all populations with over 43,000 participants enrolled; no serious safety concerns observed; the only Grade 3 adverse event greater than 2% in frequency was fatigue at 3.8% and headache at 2.0%*
- *Companies plan to submit within days to the FDA for EUA and share data with other regulatory agencies around the globe*
- *The companies expect to produce globally up to 50 million vaccine doses in 2020 and up to 1.3 billion doses by the end of 2021*
- *Pfizer is confident in its vast experience, expertise and existing cold-chain infrastructure to distribute the vaccine around the world*

NEW YORK & MAINZ, Germany--(BUSINESS WIRE)-- Pfizer Inc. (NYSE: PFE) and BioNTech SE (Nasdaq: BNTX) today announced that, after conducting the final efficacy analysis in their ongoing Phase 3 study, their mRNA-based COVID-19 vaccine candidate, BNT162b2, met all of the study's primary efficacy endpoints. Analysis of the data indicates a vaccine efficacy rate of 95% (p<0.0001) in participants without prior SARS-CoV-2 infection (first primary objective) and also in participants with and without prior SARS-CoV-2 infection (second primary objective), in each case measured from 7 days after the second dose. The first primary objective analysis is based on 170 cases of COVID-19, as specified in the study protocol, of which 162 cases of COVID-19 were observed in the placebo group versus 8 cases in the BNT162b2 group. Efficacy was consistent across age, gender, race and ethnicity demographics. The observed efficacy in adults over 65 years of age was over 94%.

Pfizer and BioNTech Conclude Phase 3 Study of COVID-19 Vaccine Candidate, Meeting All Primary Efficacy Endpoints | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 808 of 923 PageID #: 823

This press release features multimedia. View the full release here:
https://www.businesswire.com/news/home/20201118005595/en/

There were 10 severe cases of COVID-19 observed in the trial, with nine of the cases occurring in the placebo group and one in the BNT162b2 vaccinated group.

To date, the Data Monitoring Committee for the study has not reported any serious safety concerns related to the vaccine. A review of unblinded reactogenicity data from the final analysis which consisted of a randomized subset of at least 8,000 participants 18 years and older in the phase 2/3 study demonstrates that the vaccine was well tolerated, with most solicited adverse events resolving shortly after vaccination. The only Grade 3 (severe) solicited adverse events greater than or equal to 2% in frequency after the first or second dose was fatigue at 3.8% and headache at 2.0% following dose 2. Consistent with earlier shared results, older adults tended to report fewer and milder solicited adverse events following vaccination.

In addition, the companies announced that the safety milestone required by the U.S. Food and Drug Administration (FDA) for Emergency Use Authorization (EUA) has been achieved. Pfizer and BioNTech plan to submit a request within days to the FDA for an EUA based on the totality of safety and efficacy data collected to date, as well as manufacturing data relating to the quality and consistency of the vaccine. These data also will be submitted to other regulatory agencies around the world.

"The study results mark an important step in this historic eight-month journey to bring forward a vaccine capable of helping to end this devastating pandemic. We continue to move at the speed of science to compile all the data collected thus far and share with regulators around the world," said Dr. Albert Bourla, Pfizer Chairman and CEO. "With hundreds of thousands of people around the globe infected every day, we urgently need to get a safe and effective vaccine to the world."

"We are grateful that the first global trial to reach the final efficacy analysis mark indicates that a high rate of protection against COVID-19 can be achieved very fast after the first 30 µg dose, underscoring the power of BNT162 in providing early protection," said Ugur Sahin, M.D., CEO and Co-founder of BioNTech. "These achievements highlight the potential of mRNA as a new drug class. Our objective from the very beginning was to design and develop a vaccine that would generate rapid and potent protection against COVID-19 with a benign tolerability profile across all ages. We believe we have achieved this with our vaccine candidate BNT162b2 in all age groups studied so far and look forward to sharing further details with the regulatory authorities. I want to thank all the devoted women and men who contributed to this historically unprecedented achievement. We will continue to work with our partners and governments around the world to prepare for global distribution in 2020 and beyond."

The Phase 3 clinical trial of BNT162b2 began on July 27 and has enrolled 43,661 participants to date, 41,135 of whom have received a second dose of the vaccine candidate as of November 13, 2020. Approximately 42% of global participants and 30% of U.S. participants have racially and ethnically diverse backgrounds, and 41% of global and 45% of U.S. participants are 56-85 years of age. A breakdown of the diversity of clinical trial participants can be found here from approximately 150 clinical trials sites in United States, Germany, Turkey, South Africa, Brazil and Argentina. The trial will continue to collect efficacy and safety data in participants for an additional two years.

Based on current projections, the companies expect to produce globally up to 50 million vaccine doses in 2020 and up to 1.3 billion doses by the end of 2021. Four of Pfizer's facilities are part of the manufacturing and supply chain; St. Louis, MO; Andover, MA; and Kalamazoo, MI in the U.S.; and Puurs in Belgium. BioNTech's German sites will also be leveraged for global supply.

Pfizer is confident in its vast experience, expertise and existing cold-chain infrastructure to distribute the vaccine around the world. The companies have developed specially designed, temperature-controlled thermal shippers utilizing dry ice to maintain temperature conditions of -70°C±10°C. They can be used be as temporary storage units for 15 days by refilling with dry ice. Each shipper contains a GPS-enabled thermal sensor to track the location and temperature of each vaccine shipment across their pre-set routes leveraging Pfizer's broad distribution network.

Pfizer and BioNTech plan to submit the efficacy and safety data from the study for peer-review in a scientific journal once analysis of the data is completed.

### About Pfizer: Breakthroughs That Change Patients' Lives

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of health care products, including innovative medicines and vaccines. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we

Pfizer and BioNTech Conclude Phase 3 Study of COVID-19 Vaccine Candidate, Meeting All Primary Efficacy Endpoints | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 809 of 923 PageID #: 824

collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 150 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.Pfizer.com. In addition, to learn more, please visit us on www.Pfizer.com and follow us on Twitter at @Pfizer and @Pfizer News, LinkedIn, YouTube and like us on Facebook at Facebook.com/Pfizer.

**Pfizer Disclosure Notice**

The information contained in this release is as of November 18, 2020. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about Pfizer's efforts to combat COVID-19, the collaboration between BioNTech and Pfizer to develop a potential COVID-19 vaccine, the BNT162 mRNA vaccine program, and modRNA candidate BNT162b2 (including qualitative assessments of available data, potential benefits, expectations for clinical trials, anticipated timing of regulatory submissions and anticipated manufacturing, distribution and supply), that involves substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as risks associated with clinical data (including the Phase 3 data that is the subject of this release), including the possibility of unfavorable new preclinical or clinical trial data and further analyses of existing preclinical or clinical trial data; the ability to produce comparable clinical or other results, including the rate of vaccine effectiveness and safety and tolerability profile observed to date, in additional analyses of the Phase 3 trial or in larger, more diverse populations upon commercialization; the risk that clinical trial data are subject to differing interpretations and assessments, including during the peer review/publication process, in the scientific community generally, and by regulatory authorities; whether and when data from the BNT162 mRNA vaccine program will be published in scientific journal publications and, if so, when and with what modifications; whether regulatory authorities will be satisfied with the design of and results from these and any future preclinical and clinical studies; whether and when any biologics license and/or emergency use authorization applications may be filed in any jurisdictions for BNT162b2 or any other potential vaccine candidates; whether and when any such applications may be approved by regulatory authorities, which will depend on myriad factors, including making a determination as to whether the vaccine candidate's benefits outweigh its known risks and determination of the vaccine candidate's efficacy and, if approved, whether it will be commercially successful; decisions by regulatory authorities impacting labeling, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of a vaccine, including development of products or therapies by other companies; disruptions in the relationships between us and our collaboration partners or third-party suppliers; risks related to the availability of raw materials to manufacture a vaccine; challenges related to our vaccine candidate's ultra-low temperature formulation and attendant storage, distribution and administration requirements, including risks related to handling after delivery by Pfizer; the risk that we may not be able to successfully develop non-frozen formulations; the risk that we may not be able to create or scale up manufacturing capacity on a timely basis or have access to logistics or supply channels commensurate with global demand for any potential approved vaccine, which would negatively impact our ability to supply the estimated numbers of doses of our vaccine candidate within the projected time periods indicated; whether and when additional supply agreements will be reached; uncertainties regarding the ability to obtain recommendations from vaccine technical committees and other public health authorities and uncertainties regarding the commercial impact of any such recommendations; uncertainties regarding the impact of COVID-19 on Pfizer's business, operations and financial results; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2019 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at www.sec.gov and www.pfizer.com.

**About BioNTech**

Biopharmaceutical New Technologies is a next generation immunotherapy company pioneering novel therapies for cancer and other serious diseases. The Company exploits a wide array of computational discovery and therapeutic drug platforms for the rapid development of novel biopharmaceuticals. Its broad portfolio of oncology product candidates includes individualized and off-the-shelf mRNA-based therapies, innovative chimeric antigen receptor T cells, bi-specific checkpoint immuno-modulators, targeted cancer antibodies and small molecules. Based on its deep expertise in mRNA vaccine development and in-house manufacturing capabilities, BioNTech and its collaborators are developing multiple mRNA vaccine candidates for a range of infectious diseases alongside its diverse oncology pipeline. BioNTech has established a broad set of relationships with multiple global pharmaceutical collaborators, including Genmab, Sanofi,

Pfizer and BioNTech Conclude Phase 3 Study of COVID-19 Vaccine Candidate, Meeting All Primary Efficacy Endpoints | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 810 of 923 PageID #: 825

Bayer Animal Health, Genentech, a member of the Roche Group, Regeneron, Genevant, Fosun Pharma, and Pfizer. For more information, please visit www.BioNTech.de.

**BioNTech Forward-looking statements**

This press release contains "forward-looking statements" of BioNTech within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include, but may not be limited to, statements concerning: BioNTech's efforts to combat COVID-19; the collaboration between BioNTech and Pfizer to develop a potential COVID-19 vaccine; our expectations regarding the potential characteristics of BNT162b2 in our Phase 2/3 trial and/or in commercial use based on data observations to date; the expected timepoint for additional readouts on efficacy data of BNT162b2 in our Phase 2/3 trial; the nature of the clinical data, which is subject to ongoing peer review, regulatory review and market interpretation; the timing for submission of data for, or receipt of, any potential Emergency Use Authorization; the timing for submission of manufacturing data to the FDA; and the ability of BioNTech to supply the quantities of BNT162 to support clinical development and, if approved, market demand, including our production estimates for 2020 and 2021. Any forward-looking statements in this press release are based on BioNTech current expectations and beliefs of future events, and are subject to a number of risks and uncertainties that could cause actual results to differ materially and adversely from those set forth in or implied by such forward-looking statements. These risks and uncertainties include, but are not limited to: the ability to meet the pre-defined endpoints in clinical trials; competition to create a vaccine for COVID-19; the ability to produce comparable clinical or other results, including our stated rate of vaccine effectiveness and safety and tolerability profile observed to date, in the remainder of the trial or in larger, more diverse populations upon commercialization; the ability to effectively scale our productions capabilities; and other potential difficulties. For a discussion of these and other risks and uncertainties, see BioNTech's Annual Report on Form 20-F filed with the SEC on March 31, 2020, which is available on the SEC's website at www.sec.gov. All information in this press release is as of the date of the release, and BioNTech undertakes no duty to update this information unless required by law.

View source version on businesswire.com: https://www.businesswire.com/news/home/20201118005595/en/

**Pfizer:**
Media Relations
Amy Rose
+1 (212) 733-7410
Amy.Rose@pfizer.com

Investor Relations
Chuck Triano
+1 (212) 733-3901
Charles.E.Triano@Pfizer.com

**BioNTech:**
Media Relations
Jasmina Alatovic
+49 (0)6131 9084 1513 or +49 (0)151 1978 1385
Media@biontech.de

Investor Relations
Sylke Maas, Ph.D.
+49 (0)6131 9084 1074
Investors@biontech.de

Source: Pfizer Inc.

Research and Pipeline    Vaccines

Investors

Grant Seekers                    Privacy Statement

Health Care Professionals        Terms of Use

Pfizer and BioNTech Conclude Phase 3 Study of COVID-19 Vaccine Candidate, Meeting All Primary Efficacy Endpoints | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 811 of 923 PageID #: 826

Careers

Media

Partners

Business to Business

Contact Us

© 2022 Pfizer Inc. All rights reserved

# EXHIBIT 16

☰



## Pfizer and BioNTech Celebrate Historic First Authorization in the U.S. of Vaccine to Prevent COVID-19

Friday, December 11, 2020 - 11:12pm

- *U.S. FDA authorizes COVID-19 mRNA vaccine for emergency use; companies are prepared to deliver first doses in the U.S. immediately*
- *Pfizer and BioNTech previously announced an agreement with the U.S. Government to supply doses in 2020 & 2021*
- *In collaboration with Operation Warp Speed, Pfizer and BioNTech, as well as other vaccine companies are expected to deliver hundreds of millions of vaccine doses to Americans by the end of 2021*
- *Historic science-driven efforts will seek to help bring an end to the most devastating pandemic in a century*
- *Pfizer and BioNTech expect to file a Biologics License Application for possible full regulatory approval in 2021*

NEW YORK & MAINZ, Germany--(BUSINESS WIRE)-- Pfizer Inc. (NYSE: PFE) and BioNTech SE (Nasdaq: BNTX) announced today that the U.S. Food and Drug Administration (FDA) has authorized the emergency use of the mRNA vaccine, BNT162b2, against COVID-19 in individuals 16 years of age or older. The vaccine is now authorized under an Emergency Use Authorization (EUA) while Pfizer and BioNTech gather additional data and prepare to file a planned Biologics License Application (BLA) with the FDA for a possible full regulatory approval in 2021.

This press release features multimedia. View the full release here:
https://www.businesswire.com/news/home/20201211005640/en/

Under Operation Warp Speed, the Department of Defense (DoD) in partnership with agencies within the Department of Health and Human Services (HHS), including the U.S. Centers for Disease Control and Prevention (CDC), will manage allocation and distribution of the vaccine in the U.S. This will be prioritized according to the populations identified by the CDC's Advisory Committee on Immunization Practices (ACIP) guidelines.

"Pfizer's purpose is breakthroughs that change patients' lives, and in our 171-year history there has never been a more urgent need for a breakthrough than today with hundreds of thousands of people continuing to suffer from COVID-19," said Albert Bourla, Chairman and Chief Executive Officer, Pfizer. "As a U.S. company, today's news brings great pride and tremendous joy that Pfizer has risen to the challenge to develop a vaccine that has the potential to help bring an end to this devastating pandemic. We have worked tirelessly to make the impossible possible, steadfast in our belief that

science will win."

"We founded BioNTech to develop new technologies and medicines that utilize the full potential of the immune system to fight serious diseases," said Ugur Sahin, M.D., CEO and Co-founder of BioNTech. "Today we are another step closer to our vision. We believe that today's Emergency Use Authorization, and the subsequent distribution of our vaccine that has demonstrated an efficacy rate of 95% and a favorable safety profile, will help to save lives across the United States and could accelerate a return to normality."

The FDA based its decision on the totality of scientific evidence shared by the companies, including data from a pivotal Phase 3 clinical study announced last month and published this week in *The New England Journal of Medicine*. The Phase 3 data demonstrated a vaccine efficacy rate of 95% in participants without prior SARS-CoV-2 infection (first primary objective) and also in participants with and without prior SARS-CoV-2 infection (second primary objective), in each case measured from 7 days after the second dose. The Data Monitoring Committee for the study has not reported any serious safety concerns related to the vaccine. Efficacy was consistent across age, gender, race and ethnicity demographics. All trial participants will continue to be monitored to assess long-term protection and safety for an additional two years after their second dose.

Pfizer and BioNTech appreciate the continued participation of the approximately 44,000 trial volunteers and remain committed to the companies' pledge to always make their safety and well-being the companies' top priority. The participants in our COVID-19 vaccine clinical trial are courageous volunteers who have made a personal and important choice to help make a difference during this pandemic. Pfizer and BioNTech plan to provide an option for trial participants who received the placebo to receive the vaccine at scheduled timepoints in the study. This vaccine transition option will be voluntary and will be implemented in alignment with the regulatory authorities where the trial is conducted.

In July 2020, Pfizer and BioNTech announced an agreement with the HHS and the DoD to meet the U.S. government's Operation Warp Speed program goal to deliver doses of a vaccine for COVID-19. With the vaccine being authorized for emergency use in the U.S., the companies will begin delivering the first doses in the U.S. immediately, with delivery fulfillment expected to be completed in 2021.

Please see Emergency Use Authorization (EUA) Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) and Full EUA Prescribing Information available at www.cvdvaccine.com.

**About the Phase 2/3 Study**

The ongoing Phase 3 clinical trial of BNT162b2, which is based on BioNTech's proprietary mRNA technology, has enrolled more than 44,000 participants, the vast majority of whom have received their second dose. A breakdown of the diversity of clinical trial participants can be found here from more than 150 clinical trial sites in the U.S., Germany, Turkey, South Africa, Brazil and Argentina.

The Phase 3 trial is designed as a 1:1 vaccine candidate to placebo, randomized, observer-blinded study to obtain safety, immune response, and efficacy data needed for regulatory review. The trial's primary endpoints are prevention of COVID-19 in those who have not been infected by SARS-CoV-2 prior to immunization, and prevention of COVID-19 regardless of whether participants have previously been infected by SARS-CoV-2. Secondary endpoints include prevention of severe COVID-19 in those groups. The study also will explore prevention of infection by SARS-CoV-2, the virus that causes COVID-19.

Data from this study, including longer term safety, comprehensive information on duration of protection, efficacy against asymptomatic SARS-CoV-2 infection, and safety and immunogenicity in adolescents 12 to 17 years of age will be gathered in the months ahead. Additional studies are planned to evaluate BNT162b2 in pregnant women, children younger than 12 years, and those in special risk groups, such as the immunocompromised.

**Manufacturing and Delivery Capabilities**

Pfizer and BioNTech continue to work in collaboration with governments and Ministries of Health around the world that will distribute the vaccine, subject to country authorization or approval and terms of supply agreements, to help ensure it can reach those most in need as quickly as possible. The companies are leveraging Pfizer's leading vaccine manufacturing and distribution capabilities to quickly scale, manufacture and distribute large quantities of the vaccine at high quality, complementing BioNTech's mRNA manufacturing expertise gained over almost a decade. Pfizer has a 171-year track record of researching, developing, manufacturing and delivering innovative medicines and vaccines to patients in need. Pfizer and BioNTech are confident in their ability to deliver the vaccine to people in the U.S. Based on current projections, Pfizer's and BioNTech's combined manufacturing network has the potential to supply globally up to 50 million vaccine doses in 2020 and up to 1.3 billion doses by the end of 2021 (subject to manufacturing capacity and regulatory approval or authorization).

Pfizer is leveraging three of its U.S. manufacturing sites to produce the COVID-19 vaccine – Saint Louis, Missouri, Andover, Massachusetts, and Kalamazoo, Michigan. Pfizer's Pleasant Prairie, Wisconsin and Puurs, Belgium sites are also being used.

Pfizer has vast experience and expertise in cold-chain shipping and has an established infrastructure to supply the vaccine worldwide, including distribution hubs that can store vaccine doses for up to six months. The company's distribution is built on a flexible just-in-time system that can ship the frozen vials quickly to designated points of vaccination at the time of need, minimizing the need for long term storage. Vaccination in a pandemic situation is expected to be rapid, and we do not expect that the product will need to be stored at any location for more than 30 days. To assure product quality, the companies have developed specially designed, temperature-controlled shippers for the vaccine, which can maintain recommended storage conditions (-70°C ±10°C) for extended periods of time with dry ice. The shipper can maintain temperature for 10 days unopened which allows for transportation to markets globally. Once open, a vaccination center may use the specially designed shippers as a temporary storage solution to maintain the recommended storage conditions (-70°C ±10°C) up to 30 days with re-icing every five days in accordance with the handling instructions. Each shipper contains a GPS-enabled thermal sensor to track the location and temperature of each vaccine shipment 24 hours a day, seven days a week. Once thawed, the vaccine vial can be stored safely for up to five days at refrigerated (2-8°C) conditions.

From the start of the research program earlier this year, Pfizer and BioNTech have successfully supplied and distributed their investigational vaccine to more than 150 clinical trial sites across the U.S., as well as Europe, Latin America and South Africa reaching approximately 44,000 participants. Based on their collective experience, the companies believe in their capability to distribute the vaccine globally upon approval or authorization. BioNTech will hold the regulatory approvals in the U.S., U.K., Canada and, if authorized, in the EU, and other countries. Pfizer will have marketing and distribution rights worldwide with the exception of China, Germany, and Turkey.

**AUTHORIZED USE:**

The Pfizer-BioNTech COVID19 Vaccine is authorized for use under an Emergency Use Authorization (EUA) for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARSCoV2) in individuals 16 years of age and older.

**IMPORTANT SAFETY INFORMATION:**

- Do not administer Pfizer BioNTech COVID-19 Vaccine to individuals with known history of a severe allergic reaction (e.g., anaphylaxis) to any component of the Pfizer BioNTech COVID-19 Vaccine

- Appropriate medical treatment used to manage immediate allergic reactions must be immediately available in the event an acute anaphylactic reaction occurs following administration of Pfizer BioNTech COVID-19 Vaccine

- Immunocompromised persons, including individuals receiving immunosuppressant therapy, may have a diminished immune response to the Pfizer BioNTech COVID-19 Vaccine

- The Pfizer BioNTech COVID-19 Vaccine may not protect all vaccine recipients

- In clinical studies, adverse reactions in participants 16 years of age and older included pain at the injection site (84.1%), fatigue (62.9%), headache (55.1%), muscle pain (38.3%), chills (31.9%), joint pain (23.6%), fever (14.2%), injection site swelling (10.5%), injection site redness (9.5%), nausea (1.1%), malaise (0.5%), and lymphadenopathy (0.3%)

- Severe allergic reactions have been reported following the Pfizer-BioNTech COVID-19 Vaccine during mass vaccination outside of clinical trials. Additional adverse reactions, some of which may be serious, may become apparent with more widespread use of the Pfizer-BioNTech COVID-19 Vaccine

- Available data on Pfizer BioNTech COVID-19 Vaccine administered to pregnant women are insufficient to inform vaccine-associated risks in pregnancy

- Data are not available to assess the effects of Pfizer BioNTech COVID-19 Vaccine on the breastfed infant or on milk production/excretion

- There are no data available on the interchangeability of the Pfizer BioNTech COVID 19 Vaccine with other COVID-19 vaccines to complete the vaccination series. Individuals who have received one dose of Pfizer BioNTech COVID-19 Vaccine should receive a second dose of Pfizer BioNTech COVID-19 Vaccine to complete the vaccination series

- Vaccination providers must report Adverse Events in accordance with the Fact Sheet to VAERS at https://vaers.hhs.gov/reportevent.html or by calling 1-800-822-7967. The reports should include the words "Pfizer-

BioNTech COVID-19 Vaccine EUA" in the description section of the report

- Vaccination Providers should review the Fact Sheet for mandatory requirements and Information to Provide to Vaccine Recipients/Caregivers and the Full EUA Prescribing Information for Requirements and Instructions for Reporting Adverse Events and Vaccine Administration Errors

Please see Emergency Use Authorization (EUA) Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) and Full EUA Prescribing Information available at www.cvdvaccine.com.

**About Pfizer: Breakthroughs That Change Patients' Lives**

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of health care products, including innovative medicines and vaccines. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 150 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.Pfizer.com. In addition, to learn more, please visit us on www.Pfizer.com and follow us on Twitter at @Pfizer and @Pfizer News, LinkedIn, YouTube and like us on Facebook at Facebook.com/Pfizer.

**Pfizer Disclosure Notice**

The information contained in this release is as of December 11, 2020. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about Pfizer's efforts to combat COVID-19, the collaboration between BioNTech and Pfizer to develop a COVID-19 vaccine, the BNT162 mRNA vaccine program and modRNA candidate BNT162b2 (including qualitative assessments of available data, potential benefits, expectations for clinical trials, an Emergency Use Authorization in the U.S., other regulatory submissions, the anticipated timing of regulatory submissions (including the anticipated timing of filing of a Biologics License Application in the U.S.), regulatory approval or authorization and anticipated manufacturing, distribution and supply) involving substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as risks associated with clinical data (including the Phase 3 data), including the possibility of unfavorable new preclinical or clinical trial data and further analyses of existing preclinical or clinical trial data; the ability to produce comparable clinical or other results, including the rate of vaccine effectiveness and safety and tolerability profile observed to date, in additional analyses of the Phase 3 trial and additional studies or in larger, more diverse populations upon commercialization; the risk that more widespread use of the vaccine will lead to new information about efficacy, safety, or other developments, including the risk of additional adverse reactions, some of which may be serious;the risk that clinical trial data are subject to differing interpretations and assessments, including during the peer review/publication process, in the scientific community generally, and by regulatory authorities; whether and when additional data from the BNT162 mRNA vaccine program will be published in scientific journal publications and, if so, when and with what modifications; whether regulatory authorities will be satisfied with the design of and results from these and any future preclinical and clinical studies; whether and when a Biologics License Application for BNT162b2 may be filed in the U.S. and whether and when other biologics license and/or emergency use authorization applications may be filed in particular jurisdictions for BNT162b2 or any other potential vaccines; whether and when any applications that may be pending or filed for BNT162b2 (including a potential Biologics License Application in the U.S.) may be approved by particular regulatory authorities, which will depend on myriad factors, including making a determination as to whether the vaccine's benefits outweigh its known risks and determination of the vaccine's efficacy and, if approved, whether it will be commercially successful; decisions by regulatory authorities impacting labeling, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of a vaccine, including development of products or therapies by other companies; disruptions in the relationships between us and our collaboration partners or third-party suppliers; risks related to the availability of raw materials to manufacture a vaccine; challenges related to our vaccine's ultra-low temperature formulation and attendant storage, distribution and administration requirements, including risks related to handling after delivery by Pfizer; the risk that we may not be able to successfully develop non-frozen formulations; the risk that we may not be able to create or scale up manufacturing capacity on a timely basis or have access to logistics or supply channels commensurate with global demand for our vaccine, which would negatively impact our ability to supply the estimated numbers of doses of our vaccine within the projected time periods indicated; whether and when additional

supply agreements will be reached; uncertainties regarding the ability to obtain recommendations from vaccine technical committees and other public health authorities and uncertainties regarding the commercial impact of any such recommendations; uncertainties regarding the impact of COVID-19 on Pfizer's business, operations and financial results; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2019 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at www.sec.gov and www.pfizer.com.

**About BioNTech**

Biopharmaceutical New Technologies is a next generation immunotherapy company pioneering novel therapies for cancer and other serious diseases. The Company exploits a wide array of computational discovery and therapeutic drug platforms for the rapid development of novel biopharmaceuticals. Its broad portfolio of oncology product candidates includes individualized and off-the-shelf mRNA-based therapies, innovative chimeric antigen receptor T cells, bi-specific checkpoint immuno-modulators, targeted cancer antibodies and small molecules. Based on its deep expertise in mRNA vaccine development and in-house manufacturing capabilities, BioNTech and its collaborators are developing multiple mRNA vaccine candidates for a range of infectious diseases alongside its diverse oncology pipeline. BioNTech has established a broad set of relationships with multiple global pharmaceutical collaborators, including Genmab, Sanofi, Bayer Animal Health, Genentech, a member of the Roche Group, Regeneron, Genevant, Fosun Pharma, and Pfizer. For more information, please visit www.BioNTech.de.

**BioNTech Forward-looking statements**

This press release contains "forward-looking statements" of BioNTech within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include, but may not be limited to, statements concerning: BioNTech's efforts to combat COVID-19; the collaboration between BioNTech and Pfizer to develop a potential COVID-19 vaccine; our expectations regarding the potential characteristics of BNT162b2 in our Phase 2/3 trial and/or in commercial use based on data observations to date; the expected timepoint for additional readouts on efficacy data of BNT162b2 in our Phase 2/3 trial; the nature of the clinical data, which is subject to ongoing peer review, regulatory review and market interpretation; the timing for submission of data for, or receipt of, any marketing approval or Emergency Use Authorization; the timing for submission of manufacturing data to the FDA; our contemplated shipping and storage plan, including our estimated product shelflife at various temperatures; and the ability of BioNTech to supply the quantities of BNT162 to support clinical development and, if approved, market demand, including our production estimates for 2020 and 2021. Any forward-looking statements in this press release are based on BioNTech current expectations and beliefs of future events, and are subject to a number of risks and uncertainties that could cause actual results to differ materially and adversely from those set forth in or implied by such forward-looking statements. These risks and uncertainties include, but are not limited to: the ability to meet the pre-defined endpoints in clinical trials; competition to create a vaccine for COVID-19; the ability to produce comparable clinical or other results, including our stated rate of vaccine effectiveness and safety and tolerability profile observed to date, in the remainder of the trial or in larger, more diverse populations upon commercialization; the ability to effectively scale our productions capabilities; and other potential difficulties.

For a discussion of these and other risks and uncertainties, see BioNTech's Quarterly Report for the Three and Nine Months Ended September 30, 2020, filed as Exhibit 99.2 to its Current Report on Form 6-K filed with the SEC on November 10, which is available on the SEC's website at www.sec.gov. All information in this press release is as of the date of the release, and BioNTech undertakes no duty to update this information unless required by law.

View source version on businesswire.com: https://www.businesswire.com/news/home/20201211005640/en/

**Pfizer Contacts:**
Media Relations
Amy Rose
+1 (212) 733-1226
PfizerMediaRelations@pfizer.com

Investor Relations
Chuck Triano
+1 (212) 733-3901

Charles.E.Triano@Pfizer.com

**BioNTech Contacts:**

Media Relations
Jasmina Alatovic
+49 89 62 81 75 46
Media@biontech.de

Investor Relations
Sylke Maas, Ph.D.
+49 (0)6131 9084 1074
Investors@biontech.de

Source: Pfizer Inc.

Vaccines

Investors

Careers

Media

Partners

Grant Seekers

Health Care Professionals

Business to Business

Privacy Statement

Terms of Use

Contact Us

© 2022 Pfizer Inc. All rights reserved

# EXHIBIT 17

☰



# Pfizer and BioNTech Receive First U.S. Authorization for Emergency Use of COVID-19 Vaccine in Adolescents

Monday, May 10, 2021 - 09:02pm

- *In a Phase 3 trial, the vaccine was 100% effective and generally well tolerated in participants aged 12 to 15 years*
- *Data also submitted to European Medicines Agency (EMA) and other global regulators, with additional authorizations expected in coming weeks*

NEW YORK & MAINZ, Germany--(BUSINESS WIRE)-- Pfizer Inc. (NYSE: PFE) and BioNTech SE (Nasdaq: BNTX) announced today that the U.S. Food and Drug Administration (FDA) has expanded the Emergency Use Authorization (EUA) for their COVID-19 vaccine to include individuals 12 to 15 years of age. This is the first COVID-19 vaccine authorized in the U.S. for use in this age group.

This press release features multimedia. View the full release here:
https://www.businesswire.com/news/home/20210510006021/en/

"Today's expansion of our EUA represents a significant step forward in helping the U.S. government broaden its vaccination program and help protect adolescents before the start of the next school year," said **Albert Bourla, Chairman and Chief Executive Officer, Pfizer**. "We are grateful to all of our clinical trial volunteers and their families, whose courage helped make this milestone possible. Together, we hope to help bring a sense of normalcy back to young people across the country and around the world."

The FDA based its decision on data from a pivotal Phase 3 clinical trial, which enrolled 2,260 participants aged 12 to 15 years. Topline results from this trial, announced on March 31, 2021, showed a vaccine efficacy of 100% in participants with or without prior SARS-CoV-2 infection and robust antibody responses. In the trial, the vaccine was also generally well tolerated. Participants will continue to be monitored for long-term protection and safety for an additional two years after their second dose.

As a next step following today's FDA decision, the U.S. Centers for Disease Control and Prevention's (CDC) Advisory Committee on Immunization Practices (ACIP) will meet to discuss recommendations for use of the Pfizer-BioNTech COVID-19 Vaccine in adolescents 12 to 15 years of age based on the amended EUA.

"Since securing the EUA in December for individuals 16 years and older, we have been working tirelessly to get our COVID-19 vaccine authorized around the world so that governments can provide it to as many people as possible," said **Ugur Sahin, M.D., CEO and Co-founder of BioNTech**. "Our work is not yet complete, as we continue our research into the use of our vaccine in pediatric populations. Our goal is to submit data for pre-school and school-age children in September."

Pfizer and BioNTech have submitted the data in adolescents 12 to 15 years of age for scientific peer review for potential publication. The data also have been submitted to other regulators around the world, including the European Medicines Agency (EMA).

In addition, the pediatric study evaluating the safety and efficacy of the Pfizer-BioNTech COVID-19 Vaccine in children 6 months to 11 years of age is ongoing. Pfizer and BioNTech expect to have definitive readouts and, subject to the data generated, submit for an EUA or a variation to Conditional Marketing Authorizations for two cohorts, including children 2-5 years of age and 5-11 years of age, in September. The readout and submission for the cohort of children 6 months to 2 years of age are expected in the fourth quarter.

The Pfizer-BioNTech COVID-19 Vaccine, which is based on BioNTech proprietary mRNA technology, was developed by both BioNTech and Pfizer. BioNTech is the Marketing Authorization Holder in the European Union, and the holder of emergency use authorizations or equivalents in the United States (together with Pfizer), United Kingdom, Canada and other countries in advance of a planned application for full marketing authorizations in these countries.

The Pfizer-BioNTech COVID-19 Vaccine has not been approved or licensed by the U.S. Food and Drug Administration (FDA), but has been authorized for emergency use by FDA under an Emergency Use Authorization (EUA) to prevent Coronavirus Disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) for use in individuals 12 years of age and older. The emergency use of this product is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of the medical product under Section 564 (b) (1) of the FD&C Act unless the declaration is terminated or authorization revoked sooner. Please see Emergency Use Authorization (EUA) Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) and Full EUA Prescribing Information available at www.cvdvaccine-us.com.

**AUTHORIZED USE IN THE U.S.:**

The Pfizer-BioNTech COVID19 Vaccine is authorized for use under an Emergency Use Authorization (EUA) for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 12 years of age and older.

**IMPORTANT SAFETY INFORMATION FROM U.S. FDA EMERGENCY USE AUTHORIZATION PRESCRIBING INFORMATION:**

- Do not administer Pfizer-BioNTech COVID-19 Vaccine to individuals with known history of a severe allergic reaction (eg, anaphylaxis) to any component of the Pfizer¯BioNTech COVID-19 Vaccine
- Appropriate medical treatment used to manage immediate allergic reactions must be immediately available in the event an acute anaphylactic reaction occurs following administration of Pfizer¯BioNTech COVID-19 Vaccine

  Monitor Pfizer-BioNTech COVID-19 Vaccine recipients for the occurrence of immediate adverse reactions according to the Centers for Disease Control and Prevention guidelines (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/managing-anaphylaxis.html)

- Syncope (fainting) may occur in association with administration of injectable vaccines, in particular in adolescents. Procedures should be in place to avoid injury from fainting
- Immunocompromised persons, including individuals receiving immunosuppressant therapy, may have a diminished immune response to the Pfizer¯BioNTech COVID-19 Vaccine
- The Pfizer-BioNTech COVID-19 Vaccine may not protect all vaccine recipients
- In clinical studies, adverse reactions in participants 16 years of age and older included pain at the injection site (84.1%), fatigue (62.9%), headache (55.1%), muscle pain (38.3%), chills (31.9%), joint pain (23.6%), fever (14.2%), injection site swelling (10.5%), injection site redness (9.5%), nausea (1.1%), malaise (0.5%), and lymphadenopathy (0.3%)
- In a clinical study, adverse reactions in adolescents 12 through 15 years of age included pain at the injection site (90.5%), fatigue (77.5%), headache (75.5%), chills (49.2%), muscle pain (42.2%), fever (24.3%), joint pain (20.2%), injection site swelling (9.2%), injection site redness (8.6%), lymphadenopathy (0.8%), and nausea (0.4%)
- Severe allergic reactions, including anaphylaxis, and other hypersensitivity reactions, diarrhea, vomiting, and pain in extremity (arm) have been reported following administration of the Pfizer-BioNTech COVID-19 Vaccine outside clinical trials

Additional adverse reactions, some of which may be serious, may become apparent with more widespread use of the Pfizer-BioNTech COVID-19 Vaccine

- Available data on Pfizer-BioNTech COVID-19 Vaccine administered to pregnant women are insufficient to inform vaccine-associated risks in pregnancy
- Data are not available to assess the effects of Pfizer-BioNTech COVID-19 Vaccine on the breastfed infant or on milk production/excretion

- There are no data available on the interchangeability of the Pfizer-BioNTech COVID-19 Vaccine with other COVID-19 vaccines to complete the vaccination series. Individuals who have received one dose of Pfizer¨BioNTech COVID-19 Vaccine should receive a second dose of Pfizer¨BioNTech COVID-19 Vaccine to complete the vaccination series
- Vaccination providers must report Adverse Events in accordance with the Fact Sheet to VAERS online at https://vaers.hhs.gov/reportevent.html. For further assistance with reporting to VAERS call 1-800-822-7967. The reports should include the words "Pfizer-BioNTech COVID-19 Vaccine EUA" in the description section of the report
- Vaccination providers should review the Fact Sheet for *Information to Provide to Vaccine Recipients/Caregivers* and *Mandatory Requirements for Pfizer-BioNTech COVID-19 Vaccine Administration Under Emergency Use Authorization*
- Before administration of Pfizer-BioNTech COVID-19 Vaccine, please see Emergency Use Authorization (EUA) Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) including Full EUA Prescribing Information available at www.cvdvaccine-us.com

**About Pfizer: Breakthroughs That Change Patients' Lives**

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of health care products, including innovative medicines and vaccines. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 170 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.Pfizer.com. In addition, to learn more, please visit us on www.Pfizer.com and follow us on Twitter at @Pfizer and @Pfizer News, LinkedIn, YouTube and like us on Facebook at Facebook.com/Pfizer.

**Pfizer Disclosure Notice**

The information contained in this release is as of May 10, 2021. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about Pfizer's efforts to combat COVID-19, the collaboration between BioNTech and Pfizer to develop a COVID-19 vaccine, the BNT162 mRNA vaccine program and the Pfizer-BioNTech COVID-19 Vaccine (BNT162b2) (including qualitative assessments of available data, potential benefits, expectations for clinical trials, the potential of BNT162b2 for adolescents 12 to 15 years of age, evaluation of BNT162b2 in children 6 months to 11 years old, anticipated timing of regulatory submissions, regulatory approvals or authorizations and anticipated manufacturing, distribution and supply) involving substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as risks associated with preclinical and clinical data (including the topline data outlined in this release), including the possibility of unfavorable new preclinical, clinical or safety data and further analyses of existing preclinical, clinical or safety data (including the topline data outlined in this release); the ability to produce comparable clinical or other results, including the rate of vaccine effectiveness and safety and tolerability profile observed to date, in additional analyses of the Phase 3 trial and additional studies or in larger, more diverse populations following commercialization; the ability of BNT162b2 to prevent COVID-19 caused by emerging virus variants; the risk that more widespread use of the vaccine will lead to new information about efficacy, safety, or other developments, including the risk of additional adverse reactions, some of which may be serious; the risk that preclinical and clinical trial data (including the topline data outlined in this release) are subject to differing interpretations and assessments, including during the peer review/publication process, in the scientific community generally, and by regulatory authorities; whether and when additional data from the BNT162 mRNA vaccine program (including the topline data outlined in this release) will be published in scientific journal publications and, if so, when and with what modifications and interpretations; whether regulatory authorities will be satisfied with the design of and results from these and any future preclinical and clinical studies; whether and when a Biologics License Application for BNT162b2 may be filed in the U.S. and whether and when other biologics license and/or emergency use authorization applications or amendments to

any such applications may be filed in particular jurisdictions for BNT162b2 or any other potential vaccines that may arise from the BNT162 program, and if obtained, whether or when such emergency use authorization or licenses will expire or terminate; whether and when any applications that may be pending or filed for BNT162b2 (including a potential Biologics License Application in the U.S. or any requested amendments to the emergency use or conditional marketing authorizations) or other vaccines that may result from the BNT162 program may be approved by particular regulatory authorities, which will depend on myriad factors, including making a determination as to whether the vaccine's benefits outweigh its known risks and determination of the vaccine's efficacy and, if approved, whether it will be commercially successful; decisions by regulatory authorities impacting labeling or marketing, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of a vaccine, including development of products or therapies by other companies; disruptions in the relationships between us and our collaboration partners, clinical trial sites or third-party suppliers; the risk that demand for any products may be reduced or no longer exist; risks related to the availability of raw materials to manufacture a vaccine; challenges related to our vaccine's ultra-low temperature formulation, two-dose schedule and attendant storage, distribution and administration requirements, including risks related to storage and handling after delivery by Pfizer; the risk that we may not be able to successfully develop other vaccine formulations; the risk that we may not be able to create or scale up manufacturing capacity on a timely basis or maintain access to logistics or supply channels commensurate with global demand for our vaccine, which would negatively impact our ability to supply the estimated numbers of doses of our vaccine within the projected time periods as previously indicated; whether and when additional supply agreements will be reached; uncertainties regarding the ability to obtain recommendations from vaccine advisory or technical committees and other public health authorities and uncertainties regarding the commercial impact of any such recommendations; challenges related to public vaccine confidence or awareness; uncertainties regarding the impact of COVID-19 on Pfizer's business, operations and financial results; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2020 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at www.sec.gov and www.pfizer.com.

**About BioNTech**

Biopharmaceutical New Technologies is a next generation immunotherapy company pioneering novel therapies for cancer and other serious diseases. The Company exploits a wide array of computational discovery and therapeutic drug platforms for the rapid development of novel biopharmaceuticals. Its broad portfolio of oncology product candidates includes individualized and off-the-shelf mRNA-based therapies, innovative chimeric antigen receptor T cells, bi-specific checkpoint immuno-modulators, targeted cancer antibodies and small molecules. Based on its deep expertise in mRNA vaccine development and in-house manufacturing capabilities, BioNTech and its collaborators are developing multiple mRNA vaccine candidates for a range of infectious diseases alongside its diverse oncology pipeline. BioNTech has established a broad set of relationships with multiple global pharmaceutical collaborators, including Genmab, Sanofi, Bayer Animal Health, Genentech, a member of the Roche Group, Regeneron, Genevant, Fosun Pharma, and Pfizer. For more information, please visit www.BioNTech.de.

**BioNTech Forward-looking Statements**

This press release contains "forward-looking statements" of BioNTech within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include, but may not be limited to, statements concerning: BioNTech's efforts to combat COVID-19; the collaboration between BioNTech and Pfizer to develop a COVID-19 vaccine (including a potential second booster dose of BNT162b2 and/or a potential booster dose of a variation of BNT162b2 having a modified mRNA sequence); the potential of BNT162b2 for adolescents 12 to 15 years of age; evaluation of BNT162b2 in children 6 months to 11 years old, anticipated timing of regulatory submissions, regulatory approvals or authorizations and anticipated manufacturing, distribution and supply); our expectations regarding the potential characteristics of BNT162b2 in our clinical trials and/or in commercial use based on data observations to date; the ability of BNT162b2 to prevent COVID-19 caused by emerging virus variants; the expected time point for additional readouts on efficacy data of BNT162b2 in our clinical trials; the nature of the clinical data, which is subject to ongoing peer review, regulatory review and market interpretation; the timing for submission of data for, or receipt of, any marketing approval or Emergency Use Authorization; our contemplated shipping and storage plan, including our estimated product shelf life at various temperatures; the risk that demand for any products may be reduced or no longer exist; the ability of BioNTech to supply the quantities of BNT162 to support clinical development and market demand, including our production estimates for 2021; and challenges related to public vaccine confidence or awareness. Any forward-looking statements in this press release are based on BioNTech's current expectations and beliefs of future events, and are subject to a number of risks and uncertainties that could cause actual results to differ materially and

adversely from those set forth in or implied by such forward-looking statements. These risks and uncertainties include, but are not limited to: the ability to meet the pre-defined endpoints in clinical trials; competition to create a vaccine for COVID-19; the ability to produce comparable clinical or other results, including our stated rate of vaccine effectiveness and safety and tolerability profile observed to date, in the remainder of the trial or in larger, more diverse populations upon commercialization; the ability to effectively scale our productions capabilities; and other potential difficulties.

For a discussion of these and other risks and uncertainties, see BioNTech's Annual Report on Form 20-F for the Year Ended December 31, 2020, filed with the SEC on March 30, 2021, which is available on the SEC's website at www.sec.gov. All information in this press release is as of the date of the release, and BioNTech undertakes no duty to update this information unless required by law.

View source version on businesswire.com: https://www.businesswire.com/news/home/20210510006021/en/

**Pfizer Contacts:**

**Media Relations**
Amy Rose
+1 (212) 733-7410
Amy.Rose@pfizer.com

**Investor Relations**
Chuck Triano
+1 (212) 733-3901
Charles.E.Triano@Pfizer.com

**BioNTech Contacts:**

**Media Relations**
Jasmina Alatovic
+49 (0)6131 9084 1513
Media@biontech.de

**Investor Relations**
Sylke Maas, Ph.D.
+49 (0)6131 9084 1074
Investors@biontech.de

Source: Pfizer Inc.

Vaccines

Investors

Careers

Media

Partners

Grant Seekers

Health Care Professionals

Business to Business

Privacy Statement

Terms of Use

Contact Us

© 2022 Pfizer Inc. All rights reserved

# EXHIBIT 18



# Pfizer-BioNTech COVID-19 Vaccine COMIRNATY® Receives Full U.S. FDA Approval for Individuals 16 Years and Older

Monday, August 23, 2021 - 11:57am

- *COMIRNATY is the first COVID-19 vaccine to be granted FDA approval*
- *Approval is based on a comprehensive submission package including six-month efficacy and safety data after second dose*
- *More than 1.2 billion Pfizer-BioNTech doses have been delivered to more than 120 countries or territories around the world since December 2020*

NEW YORK & MAINZ, Germany--(BUSINESS WIRE)-- Pfizer Inc. (NYSE: PFE) and BioNTech SE (Nasdaq: BNTX) today announced that the U.S. Food and Drug Administration (FDA) approved the Biologics License Application (BLA) for COMIRNATY® (COVID-19 Vaccine, mRNA) to prevent COVID-19 in individuals 16 years of age and older. COMIRNATY is the first COVID-19 vaccine to be granted approval by the FDA.

This press release features multimedia. View the full release here:
https://www.businesswire.com/news/home/20210823005499/en/

The vaccine has been available in the U.S. under Emergency Use Authorization (EUA) since December 11, 2020 (as the Pfizer-BioNTech COVID-19 Vaccine). The EUA permitted essential rollout of vaccine doses across the U.S. to help provide protection during the COVID-19 public health emergency, based on initial data from the pivotal Phase 3 clinical trial.

For FDA approval, Pfizer and BioNTech submitted a comprehensive data package that included longer-term follow-up data from the Phase 3 trial, where the vaccine's high efficacy and favorable safety profile were observed up to six months after the second dose. The BLA submission package also included the manufacturing and facilities data required for licensure. Pfizer and BioNTech completed submission of the BLA in May 2021, and the BLA was granted Priority Review in July 2021.

"Based on the longer-term follow-up data that we submitted, today's decision by the FDA affirms the efficacy and safety profile of our vaccine at a time when it is urgently needed. About 60 percent of eligible Americans are fully vaccinated,

and infection, hospitalization and death rates continue to rise rapidly among unvaccinated populations across the country," said Albert Bourla, Chairman and Chief Executive Officer, Pfizer. "I am hopeful this approval will help increase confidence in our vaccine, as vaccination remains the best tool we have to help protect lives and achieve herd immunity. Hundreds of millions of doses of our vaccine already have been administered in the U.S. since December 2020, and we look forward to continuing to work with the U.S. government to reach more Americans now that we have FDA approval."

"Today's full approval by the FDA underlines the vaccine's high efficacy and favorable safety profile," said Ugur Sahin, M.D., CEO and Co-founder of BioNTech. "Our companies have shipped more than one billion doses worldwide, and we will continue to work tirelessly to broaden the access to our vaccine and to be prepared for potential emerging escape variants."

As announced on August 16, Pfizer and BioNTech plan to seek licensure of a third, or booster, dose of COMIRNATY in individuals 16 years of age and older via a supplemental BLA. The companies also intend to submit a supplemental BLA to support potential full FDA approval of COMIRNATY in individuals 12 through 15 years of age once the required data out to six months after the second vaccine dose are available. In the meantime, the vaccine remains available to 12- to 15-year-olds under the Emergency Use Authorization (EUA) granted by the FDA on May 10, 2021. For individuals at least 12 years of age who have undergone solid organ transplantation, or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise, a third dose of the vaccine also remains available under EUA following an amendment by the FDA on August 12.

COMIRNATY, which is based on BioNTech's proprietary mRNA technology, was developed by both BioNTech and Pfizer. BioNTech is the Marketing Authorization Holder in the United States, the European Union and the United Kingdom, and the holder of emergency use authorizations or equivalents in the United States (jointly with Pfizer), Canada and other countries. Submissions to pursue regulatory approvals in those countries where emergency use authorizations or equivalent were initially granted are planned.

### Indication & Authorized Use

COMIRNATY® (COVID-19 Vaccine, mRNA) is an FDA-approved COVID-19 vaccine made by Pfizer for BioNTech.

- It is approved as a 2-dose series for prevention of COVID-19 in individuals 16 years of age and older
- It is also authorized under Emergency Use Authorization (EUA) to be administered for emergency use to:
    - prevent COVID-19 in individuals 12 through 15 years, and
    - provide a third dose to individuals 12 years of age and older who have been determined to have certain kinds of immunocompromise

The Pfizer-BioNTech COVID-19 Vaccine has received EUA from FDA to:

- prevent COVID-19 in individuals 12 years of age and older, and
- provide a third dose to individuals 12 years of age and older who have been determined to have certain kinds of immunocompromise

The FDA-approved COMIRNATY® (COVID-19 Vaccine, mRNA) and the EUA-authorized Pfizer-BioNTech COVID-19 Vaccine have the same formulation and can be used interchangeably to provide the COVID-19 vaccination series. An individual may be offered either COMIRNATY® (COVID-19 Vaccine, mRNA) or the Pfizer-BioNTech COVID-19 Vaccine to prevent coronavirus disease 2019 (COVID-19) caused by SARS-CoV-2.

### EUA Statement

This emergency use of the product has not been approved or licensed by FDA, but has been authorized by FDA under an Emergency Use Authorization (EUA) to prevent Coronavirus Disease 2019 (COVID-19) for use in individuals 12 years of age and older; and the emergency use of this product is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of the medical product under Section 564(b)(1) of the FD&C Act unless the declaration is terminated or authorization revoked sooner.

### Important Safety Information

Individuals should **not** get the Pfizer-BioNTech COVID-19 Vaccine if they:

- had a severe allergic reaction after a previous dose of this vaccine
- had a severe allergic reaction to any ingredient of this vaccine

Individuals should tell the vaccination provider about all of their medical conditions, including if they:

- have any allergies
- have had myocarditis (inflammation of the heart muscle) or pericarditis (inflammation of the lining outside the

heart)
- have a fever
- have a bleeding disorder or are on a blood thinner
- are immunocompromised or are on a medicine that affects the immune system
- are pregnant, plan to become pregnant, or are breastfeeding
- have received another COVID-19 vaccine
- have ever fainted in association with an injection

The vaccine may not protect everyone.

Side effects reported with the vaccine include:

- There is a remote chance that the vaccine could cause a severe allergic reaction
  - A severe allergic reaction would usually occur within a few minutes to one hour after getting a dose of the vaccine. For this reason, vaccination providers may ask individuals to stay at the place where they received the vaccine for monitoring after vaccination
  - Signs of a severe allergic reaction can include difficulty breathing, swelling of the face and throat, a fast heartbeat, a bad rash all over the body, dizziness, and weakness
  - If an individual experiences a severe allergic reaction, they should call 9-1-1 or go to the nearest hospital
- Myocarditis (inflammation of the heart muscle) and pericarditis (inflammation of the lining outside the heart) have occurred in some people who have received the vaccine. In most of these people, symptoms began within a few days following receipt of the second dose of the vaccine. The chance of having this occur is very low. Individuals should seek medical attention right away if they have any of the following symptoms after receiving the vaccine:
  - chest pain
  - shortness of breath
  - feelings of having a fast-beating, fluttering, or pounding heart
- Side effects that have been reported with the vaccine include:
  - severe allergic reactions; non-severe allergic reactions such as rash, itching, hives, or swelling of the face; myocarditis (inflammation of the heart muscle); pericarditis (inflammation of the lining outside the heart); injection site pain; tiredness; headache; muscle pain; chills; joint pain; fever; injection site swelling; injection site redness; nausea; feeling unwell; swollen lymph nodes (lymphadenopathy); diarrhea; vomiting; arm pain
- These may not be all the possible side effects of the vaccine. Serious and unexpected side effects may occur. The vaccine is still being studied in clinical trials. Call the vaccination provider or healthcare provider about bothersome side effects or side effects that do not go away

There is no information on the use of the vaccine with other vaccines.

Patients should always ask their healthcare providers for medical advice about adverse events. Individuals are encouraged to report negative side effects of vaccines to the US Food and Drug Administration (FDA) and the Centers for Disease Control and Prevention (CDC). Visit http://www.vaers.hhs.gov or call 1˜800˜822˜7967. In addition, side effects can be reported to Pfizer Inc. at www.pfizersafetyreporting.com or by calling 1-800-438-1985.

Please click here for full Prescribing Information (16+ years of age). Please click here for Fact Sheet for Vaccination Providers (12+ years of age).

**About Pfizer: Breakthroughs That Change Patients' Lives**

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of health care products, including innovative medicines and vaccines. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 170 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.Pfizer.com. In addition, to learn more, please visit us on www.Pfizer.com and follow us on Twitter at @Pfizer and @Pfizer News, LinkedIn, YouTube and like us on Facebook at Facebook.com/Pfizer.

**Pfizer Disclosure Notice**

The information contained in this release is as of August 23, 2021. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about Pfizer's efforts to combat COVID-19, the collaboration between

BioNTech and Pfizer to develop a COVID-19 vaccine, the BNT162 mRNA vaccine program and COMIRNATY (COVID-19 Vaccine, mRNA) (BNT162b2) (including the approval of the BLA for BNT162b2 to prevent COVID-19 in individuals 16 years of age and older in the U.S., a potential submission of a supplemental BLA for a potential booster dose of BNT162b2 in individuals 16 years of age and older, a potential supplemental BLA to support potential full FDA approval of BNT162b2 in individuals 12 through 15 years, qualitative assessments of available data, potential benefits, expectations for clinical trials, the anticipated timing of regulatory submissions, regulatory approvals or authorizations and anticipated manufacturing, distribution and supply) involving substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as risks associated with preclinical and clinical data (including the Phase 3 data), including the possibility of unfavorable new preclinical, clinical or safety data and further analyses of existing preclinical, clinical or safety data; the ability to produce comparable clinical or other results, including the rate of vaccine effectiveness and safety and tolerability profile observed to date, in additional analyses of the Phase 3 trial and additional studies or in larger, more diverse populations following commercialization; the ability of BNT162b2 to prevent COVID-19 caused by emerging virus variants; the risk that more widespread use of the vaccine will lead to new information about efficacy, safety, or other developments, including the risk of additional adverse reactions, some of which may be serious; the risk that preclinical and clinical trial data are subject to differing interpretations and assessments, including during the peer review/publication process, in the scientific community generally, and by regulatory authorities; whether and when additional data from the BNT162 mRNA vaccine program will be published in scientific journal publications and, if so, when and with what modifications and interpretations; whether regulatory authorities will be satisfied with the design of and results from these and any future preclinical and clinical studies; whether and when the potential supplemental BLAs will be filed in any jurisdictions and whether and when other biologics license and/or emergency use authorization applications or amendments to any such applications may be filed in particular jurisdictions for BNT162b2 or any other potential vaccines that may arise from the BNT162 program, and if obtained, whether or when such emergency use authorization or licenses will expire or terminate; whether and when any applications that may be pending or filed for BNT162b2 (including the potential supplemental BLAs or any requested amendments to the emergency use or conditional marketing authorizations) or other vaccines that may result from the BNT162 program may be approved by particular regulatory authorities, which will depend on myriad factors, including making a determination as to whether the vaccine's benefits outweigh its known risks and determination of the vaccine's efficacy and, if approved, whether it will be commercially successful; decisions by regulatory authorities impacting labeling or marketing, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of a vaccine, including development of products or therapies by other companies; disruptions in the relationships between us and our collaboration partners, clinical trial sites or third-party suppliers; the risk that demand for any products may be reduced or no longer exist; risks related to the availability of raw materials to manufacture a vaccine; challenges related to our vaccine's ultra-low temperature formulation, two-dose schedule and attendant storage, distribution and administration requirements, including risks related to storage and handling after delivery by Pfizer; the risk that we may not be able to successfully develop other vaccine formulations, booster doses or new variant-specific vaccines; the risk that we may not be able to create or scale up manufacturing capacity on a timely basis or maintain access to logistics or supply channels commensurate with global demand for our vaccine, which would negatively impact our ability to supply the estimated numbers of doses of our vaccine within the projected time periods as previously indicated; whether and when additional supply agreements will be reached; uncertainties regarding the ability to obtain recommendations from vaccine advisory or technical committees and other public health authorities and uncertainties regarding the commercial impact of any such recommendations; challenges related to public vaccine confidence or awareness; uncertainties regarding the impact of COVID-19 on Pfizer's business, operations and financial results; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2020 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at www.sec.gov and www.pfizer.com.

**About BioNTech**

Biopharmaceutical New Technologies is a next generation immunotherapy company pioneering novel therapies for cancer and other serious diseases. The Company exploits a wide array of computational discovery and therapeutic drug platforms for the rapid development of novel biopharmaceuticals. Its broad portfolio of oncology product candidates includes individualized and off-the-shelf mRNA-based therapies, innovative chimeric antigen receptor T cells, bi-specific checkpoint immuno-modulators, targeted cancer antibodies and small molecules. Based on its deep expertise in mRNA

vaccine development and in-house manufacturing capabilities, BioNTech and its collaborators are developing multiple mRNA vaccine candidates for a range of infectious diseases alongside its diverse oncology pipeline. BioNTech has established a broad set of relationships with multiple global pharmaceutical collaborators, including Genmab, Sanofi, Bayer Animal Health, Genentech, a member of the Roche Group, Regeneron, Genevant, Fosun Pharma, and Pfizer. For more information, please visit www.BioNTech.de.

**BioNTech Forward-looking Statements**

This press release contains "forward-looking statements" of BioNTech within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include, but may not be limited to, statements concerning: BioNTech's efforts to combat COVID-19; the collaboration between BioNTech and Pfizer including the program to develop a COVID-19 vaccine and COMIRNATY (COVID-19 Vaccine, mRNA) (BNT162b2) (including the approval of the BLA for BNT162b2 to prevent COVID-19 in individuals 16 years of age and older in the U.S., a potential submission of a supplemental BLA for a potential booster dose of BNT162b2 in individuals 16 years of age and older and/or a potential booster dose of a variation of BNT162b2 having a modified mRNA sequence, a BLA to support potential full FDA approval of BNT162b2 in individuals 12 through 15 years, qualitative assessments of available data, potential benefits, expectations for clinical trials, the anticipated timing of regulatory submissions, regulatory approvals or authorizations and anticipated manufacturing, distribution and supply); our expectations regarding the potential characteristics of BNT162b2 in our clinical trials and/or in commercial use based on data observations to date; the ability of BNT162b2 to prevent COVID-19 caused by emerging virus variants; the expected time point for additional readouts on efficacy data of BNT162b2 in our clinical trials; the nature of the clinical data, which is subject to ongoing peer review, regulatory review and market interpretation; the timing for submission of data for, or receipt of, any marketing approval or Emergency Use Authorization; our contemplated shipping and storage plan, including our estimated product shelf life at various temperatures; and the ability of BioNTech to supply the quantities of BNT162 to support clinical development and market demand, including our production estimates for 2021. Any forward-looking statements in this press release are based on BioNTech current expectations and beliefs of future events, and are subject to a number of risks and uncertainties that could cause actual results to differ materially and adversely from those set forth in or implied by such forward-looking statements. These risks and uncertainties include, but are not limited to: the ability to meet the pre-defined endpoints in clinical trials; competition to create a vaccine for COVID-19; the ability to produce comparable clinical or other results, including our stated rate of vaccine effectiveness and safety and tolerability profile observed to date, in the remainder of the trial or in larger, more diverse populations upon commercialization; the ability to effectively scale our productions capabilities; and other potential difficulties.

For a discussion of these and other risks and uncertainties, see BioNTech's Annual Report as Form 20-F for the Year Ended December 31, 2020, filed with the SEC on March 30, 2021, which is available on the SEC's website at www.sec.gov. All information in this press release is as of the date of the release, and BioNTech undertakes no duty to update this information unless required by law.

View source version on businesswire.com: https://www.businesswire.com/news/home/20210823005499/en/

**Pfizer:**
Media Relations
Amy Rose
+1 (212) 733-7410
Amy.Rose@pfizer.com

Investor Relations
Christopher Stevo
+1 (212) 733-0437
Christopher.Stevo@pfizer.com

**BioNTech:**
Media Relations
Jasmina Alatovic
+49 (0)6131 9084 1513
Media@biontech.de

Investor Relations
Sylke Maas, Ph.D.
+49 (0)6131 9084 1074
Investors@biontech.de

Source: Pfizer Inc.

Vaccines

Investors

Careers

Media

Partners

Grant Seekers

Health Care Professionals

Business to Business

Privacy Statement

Terms of Use

Contact Us

© 2022 Pfizer Inc. All rights reserved

# EXHIBIT 19

Pfizer and BioNTech Receive First U.S. FDA Emergency Use Authorization of a COVID-19 Vaccine in Children Ages 5 Through 11 Years | Pfizer

Case 1:22-cv-00336-UNA    Document 1-1    Filed 03/17/22    Page 834 of 923 PageID #: 849

Science    Products    News    About



## Pfizer and BioNTech Receive First U.S. FDA Emergency Use Authorization of a COVID-19 Vaccine in Children Ages 5 Through 11 Years

Friday, October 29, 2021 - 05:45pm

- *Emergency Use Authorization (EUA) is supported by clinical data showing a favorable safety profile and high vaccine efficacy of **90.7**% in children 5 through 11 years of age during a period when Delta was the prevalent strain*
- *With this authorization, the Pfizer-BioNTech COVID-19 Vaccine is currently the only COVID-19 vaccine available in the U.S. for use in this age group*
- *FDA action represents an important milestone with the potential to help protect millions of school-aged children from COVID-19 infection*

Pfizer and BioNTech Receive First U.S. FDA Emergency Use Authorization of a COVID-19 Vaccine in Children Ages 5 Through 11 Years | Pfizer

NEW YORK & MAINZ, Germany--(BUSINESS WIRE)-- Pfizer Inc. (NYSE: PFE) and BioNTech SE (Nasdaq: BNTX) today announced that the U.S. Food and Drug Administration (FDA) has authorized for emergency use the Pfizer-BioNTech COVID-19 Vaccine for children 5 through 11 years of age (also referred to as 5 to <12 years). For this age group, the vaccine is to be administered in a two-dose regimen of 10-μg doses given 21 days apart. The 10-μg dose level was carefully selected based on safety, tolerability and immunogenicity data. This is the first COVID-19 vaccine authorized in the U.S. for individuals 5 through 11 years of age.

This press release features multimedia. View the full release here:
https://www.businesswire.com/news/home/20211029005549/en/

"This is a day so many parents, eager to protect their young children from this virus, have been waiting for," said Albert Bourla, Chairman and Chief Executive Officer, Pfizer. "Over 6 million children in the U.S. have been diagnosed with COVID-19 since the start of this pandemic, and a high number of young people continue to be infected every week. With this FDA authorization, we have achieved another key marker in our ongoing effort to help protect families and communities, and to get this disease under control."

"Today's emergency use authorization is supported by clinical data showing a favorable safety profile and high vaccine efficacy in children, underlining its potential to address a current public health need," said Ugur Sahin, M.D., CEO and Co-founder of BioNTech. "As children 5 through 11 get reacclimated to the new school year, both in and out of the classroom, our goal is to help keep them safe and protected and get them back to normalcy."

The FDA based its decision on data from a Phase 2/3 randomized, controlled trial that included ~4,500 children 5 through 11 years of age (2,268 from the original group and 2,379 from the supplemental safety group). Results from this trial were reviewed by the FDA Vaccines and Related Biological Products Advisory Committee (VRBPAC). In the trial, the vaccine demonstrated a favorable safety profile, robust immune responses and a vaccine efficacy rate of 90.7% in participants without prior SARS-CoV-2 infection, measured from 7 days after the second dose. The Data Monitoring Committee for the study has reviewed the data and has not identified any serious safety concerns related to the vaccine.

The companies will begin shipping 10-μg pediatric doses immediately, as directed by the U.S. government (ages referred to as 5y to <12y on the vial and 5 to <12 years on the carton). Eligible U.S. residents will continue to receive the vaccine for free, consistent with the U.S. government's commitment to free access to COVID-19 vaccines.

As a next step, the U.S. Centers for Disease Control and Prevention's (CDC) Advisory Committee on Immunization Practices (ACIP) will meet next week to discuss a potential recommendation for the use and rollout of the vaccine to children 5 through 11 years of age. Pediatric vaccinations are anticipated to start, subject to and, after, CDC endorses the ACIP recommendation.

Pfizer and BioNTech have submitted requests for authorization of their COVID-19 vaccine in this age group to other regulators around the world, including the European Medicines Agency. Initial data from the other two age cohorts in the ongoing Pfizer-BioNTech clinical trial in children – those 2 to <5 years of age and those 6 months to <2 years of age – are expected as soon as fourth quarter 2021 or early first quarter 2022.

The Pfizer-BioNTech COVID-19 Vaccine, which is based on BioNTech's proprietary mRNA technology, was developed by both BioNTech and Pfizer. BioNTech is the Marketing Authorization Holder in the United States, the European Union, the United Kingdom, Canada and the holder of emergency use authorizations or equivalents in the United States (jointly with Pfizer) and other countries. Submissions to pursue regulatory approvals in those countries where emergency use authorizations or equivalent were initially granted are planned or ongoing.

https://www.pfizer.com/news/press-release/press-release-detail/pfizer-and-biontech-receive-first-us-fda-emergency-use[3/11/2022 10:29:21 AM]

Pfizer and BioNTech Receive First U.S. FDA Emergency Use Authorization of a COVID-19 Vaccine in Children Ages 5 Through 11 Years | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 836 of 923 PageID #: 851

**U.S. INDICATION & AUTHORIZED USE**

HOW IS THE VACCINE GIVEN?

The vaccine will be given as an injection into the muscle.

Primary Series:

In individuals 5 years of age and older, the vaccine is administered as a 2-dose series, 3 weeks apart. In individuals 12 years of age and older, a third primary series dose may be administered at least 4 weeks after the second dose to individuals who are determined to have certain kinds of immunocompromise.

Booster Dose:

- A single booster dose of the vaccine may be administered at least 6 months after completion of a primary series to individuals:
  - 65 years of age and older
  - 18 through 64 years of age at high risk of severe COVID-19
  - 18 through 64 years of age with frequent institutional or occupational exposure to SARS-CoV-2
- A single booster dose of the vaccine may be administered to certain individuals who have completed primary vaccination with a different authorized COVID-19 vaccine. Individuals should check with their healthcare provider regarding eligibility for, and timing of, the booster dose

WHAT IS THE INDICATION AND AUTHORIZED USE?

The Pfizer-BioNTech COVID-19 Vaccine has received EUA from FDA to provide:

- a 2-dose primary series to individuals 5 years of age and older
- a third primary series dose to individuals 12 years of age and older who have been determined to have certain kinds of immunocompromise
- a single booster dose to the following individuals who have completed a primary series with Pfizer-BioNTech COVID-19 Vaccine or COMIRNATY®:
  - 65 years of age and older
  - 18 through 64 years of age at high risk of severe COVID-19
  - 18 through 64 years of age with frequent institutional or occupational exposure to SARS-CoV-2
- a single booster dose to eligible individuals who have completed primary vaccination with a different authorized COVID-19 vaccine. Booster eligibility and schedule are based on the labeling information of the vaccine used for the primary series

COMIRNATY® (COVID-19 Vaccine, mRNA) is an FDA-approved COVID-19 vaccine made by Pfizer for BioNTech.

- It is approved as a 2-dose series for prevention of COVID-19 in individuals 16 years of age and older
- It is also authorized under EUA to provide:
- a 2-dose primary series to individuals 12 through 15 years
- a third primary series dose to individuals 12 years of age and older who have been determined to have certain kinds of immunocompromise
- a single booster dose to the following individuals who have completed a primary series with Pfizer-BioNTech COVID-19 Vaccine or COMIRNATY®:
  - 65 years of age and older
  - 18 through 64 years of age at high risk of severe COVID-19

Pfizer and BioNTech Receive First U.S. FDA Emergency Use Authorization of a COVID-19 Vaccine in Children Ages 5 Through 11 Years | Pfizer

Case 1:22-cv-00336-UNA    Document 1-1    Filed 03/17/22    Page 837 of 923 PageID #: 852

18 through 64 years of age with frequent institutional or occupational exposure to SARS-CoV-2

- a single booster dose to eligible individuals who have completed primary vaccination with a different authorized COVID-19 vaccine. Booster eligibility and schedule are based on the labeling information of the vaccine used for the primary series

### EUA Statement

Emergency uses of the vaccine have not been approved or licensed by FDA, but have been authorized by FDA, under an Emergency Use Authorization (EUA) to prevent Coronavirus Disease 2019 (COVID-19) in individuals 5 years of age and older. The emergency uses are only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of the medical product under Section 564(b)(1) of the FD&C Act unless the declaration is terminated or authorization revoked sooner. Please see EUA Fact Sheets at [www.cvdvaccine-us.com](www.cvdvaccine-us.com)

### IMPORTANT SAFETY INFORMATION

Individuals should **not** get the vaccine if they:

- had a severe allergic reaction after a previous dose of this vaccine
- had a severe allergic reaction to any ingredient of this vaccine

Individuals should tell the vaccination provider about all of their medical conditions, including if they:

- have any allergies
- have had myocarditis (inflammation of the heart muscle) or pericarditis (inflammation of the lining outside the heart)
- have a fever
- have a bleeding disorder or are on a blood thinner
- are immunocompromised or are on a medicine that affects the immune system
- are pregnant, plan to become pregnant, or are breastfeeding
- have receivedanother COVID-19 vaccine
- Have ever fainted in association with an injection

The vaccine may not protect everyone.

Side effects reported with the vaccine include:

- There is a remote chance that the vaccine could cause a severe allergic reaction
  - A severe allergic reaction would usually occur within a few minutes to one hour after getting a dose of the vaccine. For this reason, vaccination providers may ask individuals to stay at the place where they received the vaccine for monitoring after vaccination
  - Signs of a severe allergic reaction can include difficulty breathing, swelling of the face and throat, a fast heartbeat, a bad rash all over the body, dizziness, and weakness
  - If an individual experiences a severe allergic reaction, they should call 9-1-1 or go to the nearest hospital
- Myocarditis (inflammation of the heart muscle) and pericarditis (inflammation of the lining outside the heart) have occurred in some people who have received the vaccine. In most of these people, symptoms began within a few days following receipt of the second dose of the vaccine. The chance of having this occur is very low. Individuals should seek medical attention right away if they have any of the following symptoms after receiving the vaccine:
  - chest pain
  - shortness of breath

Pfizer and BioNTech Receive First U.S. FDA Emergency Use Authorization of a COVID-19 Vaccine in Children Ages 5 Through 11 Years | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 838 of 923 PageID #: 853

- - feelings of having a fast-beating, fluttering, or pounding heart
- Additional side effects that have been reported with the vaccine include:
  - severe allergic reactions; non-severe allergic reactions such as rash, itching, hives, or swelling of the face; myocarditis (inflammation of the heart muscle); pericarditis (inflammation of the lining outside the heart); injection site pain; tiredness; headache; muscle pain; chills; joint pain; fever; injection site swelling; injection site redness; nausea; feeling unwell; swollen lymph nodes (lymphadenopathy); decreased appetite;diarrhea; vomiting; arm pain; fainting in association with injection of the vaccine
- These may not be all the possible side effects of the vaccine. Serious and unexpected side effects may occur. The possible side effects of the vaccine are still being studied in clinical trials. Call the vaccination provider or healthcare provider about bothersome side effects or side effects that do not go away

Data on administration of this vaccine at the same time as other vaccines have not yet been submitted to FDA. Individuals considering receiving this vaccine with other vaccines, should discuss their options with their healthcare provider.

Patients should always ask their healthcare providers for medical advice about adverse events. Individuals are encouraged to report negative side effects of vaccines to the US Food and Drug Administration (FDA) and the Centers for Disease Control and Prevention (CDC). Visit https://www.vaers.hhs.gov or call 1‑800‑ 822-7967. In addition, side effects can be reported to Pfizer Inc. at www.pfizersafetyreporting.com or by calling 1-800-438-1985.

Click for

Fact Sheets and Prescribing Information for individuals 12 years of age and older

**Full Prescribing Information (16 years of age and older)**
**EUA Fact Sheet for Vaccination Providers (12 years of age and older), Purple Cap**
**EUA Fact Sheet for Vaccination Providers (12 years of age and older), Gray Cap**
**Recipients and Caregivers Fact Sheet (12 years of age and older)**

Fact Sheets for individuals 5 through 11 years of age

**EUA Fact Sheet for Vaccination Providers (5 through 11 years of age), Orange Cap**
**Recipients and Caregivers Fact Sheet (5 through 11 years of age)**

**About Pfizer: Breakthroughs That Change Patients' Lives**

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of health care products, including innovative medicines and vaccines. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 170 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.Pfizer.com. In addition, to learn more, please visit us on www.Pfizer.com and follow us on Twitter at @Pfizer and @Pfizer News, LinkedIn, YouTube and like us on Facebook at Facebook.com/Pfizer.

**Pfizer Disclosure Notice**

Pfizer and BioNTech Receive First U.S. FDA Emergency Use Authorization of a COVID-19 Vaccine in Children Ages 5 Through 11 Years | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 839 of 923 PageID #: 854

The information contained in this release is as of October 29, 2021. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about Pfizer's efforts to combat COVID-19, the collaboration between BioNTech and Pfizer to develop a COVID-19 vaccine, the BNT162 mRNA vaccine program and COMIRNATY (COVID-19 Vaccine, mRNA) (BNT162b2) (including the potential in children 5 through 11 years of age (also referred to as 5 to <12 years) and emergency use authorization in the U.S., a study in children 6 months to 5 years of age, qualitative assessments of available data, potential benefits, expectations for clinical trials, the anticipated timing of data readouts, regulatory submissions, regulatory approvals or authorizations and anticipated manufacturing, distribution and supply) involving substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as risks associated with preclinical and clinical data (including the Phase 2/3 data), including the possibility of unfavorable new preclinical, clinical or safety data and further analyses of existing preclinical, clinical or safety data; the ability to produce comparable clinical or other results, including the rate of vaccine effectiveness and safety and tolerability profile observed to date, in additional analyses of the Phase 3 trial and additional studies or in larger, more diverse populations following commercialization; the ability of BNT162b2 to prevent COVID-19 caused by emerging virus variants; the risk that more widespread use of the vaccine will lead to new information about efficacy, safety, or other developments, including the risk of additional adverse reactions, some of which may be serious; the risk that preclinical and clinical trial data are subject to differing interpretations and assessments, including during the peer review/publication process, in the scientific community generally, and by regulatory authorities; whether and when additional data from the BNT162 mRNA vaccine program will be published in scientific journal publications and, if so, when and with what modifications and interpretations; whether regulatory authorities will be satisfied with the design of and results from these and any future preclinical and clinical studies; whether and when submissions to request emergency use or conditional marketing authorizations for BNT162b2 for ages <5 years, applications for ages 5 through 11 years or a potential booster dose and/or other biologics license and/or emergency use authorization applications or amendments to any such applications may be filed in particular jurisdictions for BNT162b2 or any other potential vaccines that may arise from the BNT162 program, and if obtained, whether or when such emergency use authorization or licenses will expire or terminate; whether and when any applications that may be pending or filed for BNT162b2 (including potential submissions for younger pediatric populations, a potential booster dose or any other requested amendments to the emergency use or conditional marketing authorizations) or other vaccines that may result from the BNT162 program may be approved by particular regulatory authorities, which will depend on myriad factors, including making a determination as to whether the vaccine's benefits outweigh its known risks and determination of the vaccine's efficacy and, if approved, whether it will be commercially successful; decisions by regulatory authorities impacting labeling or marketing, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of a vaccine, including development of products or therapies by other companies; disruptions in the relationships between us and our collaboration partners, clinical trial sites or third-party suppliers; the risk that demand for any products may be reduced or no longer exist; risks related to the availability of raw materials to manufacture a vaccine; challenges related to our vaccine's formulation, two-dose schedule and attendant storage, distribution and administration requirements, including risks related to storage and handling after delivery by Pfizer; the risk that we may not be able to successfully develop other vaccine formulations, booster doses or new variant-specific vaccines; the risk that we may not be able to create or scale up manufacturing capacity on a timely basis or maintain access to logistics or supply channels commensurate with global demand for our vaccine, which would negatively impact our ability to supply the estimated numbers of doses of our vaccine within the projected time periods as previously indicated; whether and when additional

Pfizer and BioNTech Receive First U.S. FDA Emergency Use Authorization of a COVID-19 Vaccine in Children Ages 5 Through 11 Years | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 840 of 923 PageID #: 855

supply agreements will be reached; uncertainties regarding the ability to obtain recommendations from vaccine advisory or technical committees and other public health authorities and uncertainties regarding the commercial impact of any such recommendations; challenges related to public vaccine confidence or awareness; uncertainties regarding the impact of COVID-19 on Pfizer's business, operations and financial results; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2020 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at www.sec.gov and www.pfizer.com.

**About BioNTech**

Biopharmaceutical New Technologies is a next generation immunotherapy company pioneering novel therapies for cancer and other serious diseases. The Company exploits a wide array of computational discovery and therapeutic drug platforms for the rapid development of novel biopharmaceuticals. Its broad portfolio of oncology product candidates includes individualized and off-the-shelf mRNA-based therapies, innovative chimeric antigen receptor T cells, bi-specific checkpoint immuno-modulators, targeted cancer antibodies and small molecules. Based on its deep expertise in mRNA vaccine development and in-house manufacturing capabilities, BioNTech and its collaborators are developing multiple mRNA vaccine candidates for a range of infectious diseases alongside its diverse oncology pipeline. BioNTech has established a broad set of relationships with multiple global pharmaceutical collaborators, including Genmab, Sanofi, Bayer Animal Health, Genentech, a member of the Roche Group, Regeneron, Genevant, Fosun Pharma, and Pfizer. For more information, please visit www.BioNTech.de.

**BioNTech Forward-looking Statements**

This press release contains "forward-looking statements" of BioNTech within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include, but may not be limited to, statements concerning: BioNTech's efforts to combat COVID-19; the collaboration between BioNTech and Pfizer including the program to develop a COVID-19 vaccine and COMIRNATY (COVID-19 Vaccine, mRNA) (BNT162b2) (including qualitative assessments of available data, potential benefits, expectations for clinical trials, the potential of BNT162b2 for children 5 through 11 years of age (also referred to as 5 to <12 years), evaluation of BNT162b2 in children 6 months to <5 years old, anticipated timing of regulatory submissions, regulatory approvals or authorizations and anticipated manufacturing, distribution and supply); our expectations regarding the potential characteristics of BNT162b2 in our clinical trials and/or in commercial use based on data observations to date; the ability of BNT162b2 to prevent COVID-19 caused by emerging virus variants; the expected time point for additional readouts on efficacy data of BNT162b2 in our clinical trials; the nature of the clinical data, which is subject to ongoing peer review, regulatory review and market interpretation; the timing for submission of data for, or receipt of, any marketing approval or Emergency Use Authorization; our contemplated shipping and storage plan, including our estimated product shelf life at various temperatures; and the ability of BioNTech to supply the quantities of BNT162 to support clinical development and market demand, including our production estimates for 2021. Any forward-looking statements in this press release are based on BioNTech current expectations and beliefs of future events, and are subject to a number of risks and uncertainties that could cause actual results to differ materially and adversely from those set forth in or implied by such forward-looking statements. These risks and uncertainties include, but are not limited to: the ability to meet the pre-defined endpoints in clinical trials; competition to create a vaccine for COVID-19; the ability to produce comparable clinical or other results, including our stated rate of vaccine effectiveness and safety and tolerability profile observed to date, in the remainder of the trial or in larger, more diverse populations upon commercialization; the ability to effectively scale our productions capabilities; and

Pfizer and BioNTech Receive First U.S. FDA Emergency Use Authorization of a COVID-19 Vaccine in Children Ages 5 Through 11 Years | Pfizer

Case 1:22-cv-00336-UNA    Document 1-1    Filed 03/17/22    Page 841 of 923 PageID #: 856

other potential difficulties.

For a discussion of these and other risks and uncertainties, see BioNTech's Annual Report as Form 20-F for the Year Ended December 31, 2020, filed with the SEC on March 30, 2021, which is available on the SEC's website at www.sec.gov. All information in this press release is as of the date of the release, and BioNTech undertakes no duty to update this information unless required by law.

View source version on businesswire.com: https://www.businesswire.com/news/home/20211029005549/en/

**Pfizer:**
Media Relations
+1 (212) 733-1226
PfizerMediaRelations@pfizer.com

Investor Relations
+1 (212) 733-4848
IR@pfizer.com

**BioNTech:**
Media Relations
Jasmina Alatovic
+49 (0)6131 9084 1513
Media@biontech.de

Investor Relations
Sylke Maas, Ph.D.
+49 (0)6131 9084 1074
Investors@biontech.de

Source: Pfizer Inc.

Vaccines

---

Related press releases

01.24.2022    Pfizer and BioNTech Publish Data from Two Laboratory Studies on COVID-19 Vaccine-induced Antibodies

Ability to Neutralize SARS-CoV-2 Omicron Variant

Vaccines

---

Pfizer and BioNTech Receive First U.S. FDA Emergency Use Authorization of a COVID-19 Vaccine in Children Ages 5 Through 11 Years | Pfizer

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 842 of 923 PageID #: 857

01.18.2022

Pfizer Shares In Vitro Efficacy of Novel COVID-19 Oral Treatment Against Omicron Variant

Vaccines

12.23.2021

Pfizer and BioNTech Submit Updated Longer-Term Follow-Up Data of COMIRNATY® in Adolescents 12 Through 15 Years of Age to EMA

Vaccines

See More Press Releases

Investors

Careers

Media

Partners

Grant Seekers

Health Care Professionals

Business to Business

Privacy Statement

Terms of Use

Contact Us

© 2022 Pfizer Inc. All rights reserved

# EXHIBIT 20



# Shot of a Lifetime: How Pfizer Developed its Own Raw Materials to Ensure a Steady Supply for the COVID-19 Vaccine



It was December 15, 2020 when Melissa French got the message: Pfizer needed large quantities of something called a cationic lipid that was critical to the COVID-19 vaccine. "This isn't an everyday lipid that's readily available," says French, who is a Project Manager with Pfizer Global Supply, and handles lipid production at a facility in Kalamazoo, Michigan. She was being asked to lead a team in producing large amounts of this important raw material.

The call wasn't a complete surprise. A number of her friends and colleagues had been working on the vaccine for several months, and French was prepared to leap at the opportunity when and if it arose. But first, she

had to deliver some challenging news to her family, including her partner, who also works at Pfizer, and their four children under age 11. "It was right before Christmas, and I'm like, I think Christmas is cancelled this year," recalls French.

# Built to scale

The process to create the lipid had already been devised by a Pfizer research and development facility in Groton, Conn. The team there knew the Michigan manufacturing facility—which was concurrently working hard at other aspects of vaccine production—had the right specialized equipment for making the lipids and had the space "and ability to produce the quantities needed. Now, it was just a matter of assembling the right team.

French has been working at Pfizer for 27 years, ever since she was studying biology at Western Michigan University. Across those decades, she'd worked in a number of different areas and met scores of colleagues at Pfizer. Now, she drew upon that experience to pull together a top-notch team who could complete in a matter of weeks a project that could normally take at least six months.

"This wasn't just any project. This was, on paper, an impossible project that we were being asked to do in the timeline that we knew we needed to do it in," says French. "Picking the right people and knowing we could do this together was key."

All told, she assembled a team of 50 people across 20 different areas, including operations, product technology, quality assurance, procurement and planning, to prepare for what's known as a "tech transfer" from the Groton facility. That means that they would adopt a comparable process and components—including equipment and ingredients—in Michigan that were already being used in Connecticut, to create the cationic lipid the Pfizer-BioNTech vaccine depends on.

This tiny fat glob, known as a functional lipid, is actually one of four lipids that make up the lipid nanoparticles that go into the vaccine. Without these lipid nanoparticles, in fact, there could be no Pfizer-BioNTech mRNA vaccine. That's because mRNA, which is the genetic material that teaches our cells to make the protein that will help our immune systems produce antibodies that helps to protect us from COVID-19, is incredibly delicate. It needs structure and protection to do its job in the human body, and lipids provide that. The cationic lipid, in particular, is the one that does the protecting. "It's the primary component of the lipid nanoparticle, so it was needed in much larger quantities," says French. If Pfizer were to manufacture the cationic lipid, itself, it would become an important component of building a reliable supply chain—and helping to protect against potential shortages—for vaccine production in the future.

Manufacturing the lipid involves multiple chemical reactions and a purification step. To expedite the timeline, the team found ways to consolidate steps when possible. "Oftentimes, you generate each chemical reaction and then 'isolate' or package the part of the product we need, step by step, reaction by reaction. And you do another reaction and you isolate the product. We found a way to keep the product in the tank and not have to package it between each reaction, which helped to expedite the process," she says.

The first batch was completed just nine weeks after Kalamazoo was selected as the site. French credits her colleagues for pulling off a task that, in the early days, seemed insurmountable. "I can't comment enough on the team I had. Every one of them was dedicated. You'd get online at night to check emails or to do something and everybody's systems indicated they were still online at 11 p.m. It was just such an amazing effort," she says.

# Making it count

As of July 2021, the Michigan facility was making nearly 20 kilograms of cationic lipids a week, which is enough for millions of doses of the vaccine. French, who's accustomed to being deep in the details of a manufacturing project, far away from the limelight, is still getting used to the attention that her unit has received. In February 2021, President Joe Biden toured the facility along with different national news outlets and members of Pfizer's executive leadership team. She's not one to let it go to her head, though, especially when there's still work to be done. "We continue to find ourselves with new challenges. And we're looking to optimize and maybe get new equipment to do it faster and make more," she says.

At home, the four kids are still too young to receive the vaccine. But they know their mom played an important role in it. And they understand, as much as they can: why her office door was often closed to them (unless there was an emergency) and why Christmas looked a little different last year. "We told them, 'The more Mom can work on this, the quicker we can get back to normal,'" says French.

But parental challenges and all, when French looks back, she's in awe of what her team has been able to do. "Sometimes you don't get time to think about the emotional pieces of it. But when you do, it's humbling to be a part of something that is changing how we're living. And not just my life, but everybody's," she says.

And she knows, without a doubt, that were she to do it over again, she wouldn't change a thing. "The long hours were absolutely worth it. Absolutely in 27 years, it's the most meaningful thing I've ever worked on. Without question."

**Read more from the Shot of a Lifetime series:**

- Shot of a Lifetime: How Pfizer and BioNTech Developed and Manufactured a COVID-19 Vaccine in Record Time
- Shot of a Lifetime: How Two Pfizer Manufacturing Plants Upscaled to Produce the COVID-19 Vaccine in Record Time
- Shot of a Lifetime: How Pfizer is Partnering with CMOs to Increase COVID-19 Vaccine Production and Reach More People

*Emergency uses of the vaccine have not been approved or licensed by FDA, but have been authorized by FDA, under an Emergency Use Authorization (EUA) to prevent Coronavirus Disease 2019 (COVID-19) in individuals 5 years of age and older. The emergency uses are only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of the medical*

*product under Section 564(b)(1) of the FD&C Act unless the declaration is terminated or authorization revoked sooner. Please see EUA Fact Sheets at* **www.cvdvaccine-us.com**.

COVID-19    Vaccines

 Kate Silver

Related Stories







**Our Purpose**

## The Meaning of Moonshot: Lessons in Leadership to Last a Lifetime

ON TUESDAY, DECEMBER 31, 2019, Chinese authorities alerted the World Health Organization to a mysterious virus causing pneumonia-like illness in a small cluster of patients in the city of Wuhan. Shortly after, the novel virus was identified as SARS-CoV-2.

covid19    COVID-19

COVID-19 Vaccine Efforts

**Your Health**

## What is a Variant?: Understanding the Virus Game-Changer

Viruses are different from one another in many ways, including how well they spread and which parts of the body they attack. One thing most viruses have in common, though, is that they have resourceful ways to survive our efforts to kill them. As they infect and reproduce in living things, their genetic makeup changes. Some changes, or mutations, can cause a virus to be more contagious or make the host more sick.

Vaccines

**Your Health**

## Skipped Childhood Immunizations Could Lead to Resurgence of Vaccine-Preventable Diseases

Childhood vaccination rates dropped drastically during the COVID-19 pandemic, and it could potentially mean a resurgence of diseases we've long had under control. Approximately 66% of children aged 5 months in the United States were up to date for all CDC-recommended childhood vaccines in 2016-2019. By May 2020, that number declined to 49.7%. 1

Health Equity    Pediatric Health

Vaccines

vaccines

 

Search More Stories



Investors

Careers

Media

Partners

Grant Seekers

Health Care Professionals

Business to Business

Privacy Statement

Terms of Use

Contact Us

© 2022 Pfizer Inc. All rights reserved

   

# EXHIBIT 21

International Journal of Pharmaceutics 601 (2021) 120586



Contents lists available at ScienceDirect

# International Journal of Pharmaceutics

journal homepage: www.elsevier.com/locate/ijpharm



Review

# mRNA-lipid nanoparticle COVID-19 vaccines: Structure and stability

Linde Schoenmaker [a], Dominik Witzigmann [b,c], Jayesh A. Kulkarni [b,c], Rein Verbeke [d], Gideon Kersten [a,e], Wim Jiskoot [a,e,*], Daan J.A. Crommelin [f,*]

[a] Division of BioTherapeutics, Leiden Academic Centre for Drug Research, Leiden University, 2300 RA Leiden, the Netherlands
[b] Department of Biochemistry and Molecular Biology, University of British Columbia, 2350 Health Sciences Mall, Vancouver, BC V6T 1Z3, Canada
[c] NanoMedicines Innovation Network (NMIN), University of British Columbia, Vancouver, BC, Canada
[d] Ghent Research Group on Nanomedicines, Faculty of Pharmacy, Ghent University, Ottergemsesteenweg 460, 9000 Ghent, Belgium
[e] Coriolis Pharma, Fraunhoferstrasse 18b, 82152 Martinsried, Germany
[f] Department of Pharmaceutics, Utrecht Institute for Pharmaceutical Sciences (UIPS), Faculty of Science, Utrecht University, Utrecht, the Netherlands

ARTICLE INFO

Keywords:
COVID-19
Lipid nanoparticle (LNP)
Lyophilization
mRNA
Shelf life
Storage stability
Structure
Vaccine

ABSTRACT

A drawback of the current mRNA-lipid nanoparticle (LNP) COVID-19 vaccines is that they have to be stored at (ultra)low temperatures. Understanding the root cause of the instability of these vaccines may help to rationally improve mRNA-LNP product stability and thereby ease the temperature conditions for storage. In this review we discuss proposed structures of mRNA-LNPs, factors that impact mRNA-LNP stability and strategies to optimize mRNA-LNP product stability. Analysis of mRNA-LNP structures reveals that mRNA, the ionizable cationic lipid and water are present in the LNP core. The neutral helper lipids are mainly positioned in the outer, encapsulating, wall. mRNA hydrolysis is the determining factor for mRNA-LNP instability. It is currently unclear how water in the LNP core interacts with the mRNA and to what extent the degradation prone sites of mRNA are protected through a coat of ionizable cationic lipids. To improve the stability of mRNA-LNP vaccines, optimization of the mRNA nucleotide composition should be prioritized. Secondly, a better understanding of the milieu the mRNA is exposed to in the core of LNPs may help to rationalize adjustments to the LNP structure to preserve mRNA integrity. Moreover, drying techniques, such as lyophilization, are promising options still to be explored.

## 1. Introduction

Of the many COVID-19 vaccines under development, the two vaccines that have shown the most promising results in preventing COVID-19 infection represent a new class of vaccine products: they are composed of messenger ribonucleic acid (mRNA) strands encapsulated in lipid nanoparticles (LNPs). The efficacy of these mRNA vaccines developed by BioNTech/Pfizer and Moderna is about 95% (Baden et al., 2021; Polack et al., 2020) and they were the first mRNA vaccines to receive 'emergency use authorization' (by FDA) and 'conditional approval' by EMA. These mRNA COVID-19 vaccines encode the viral Spike (S) glycoprotein of SARS-CoV-2 that includes two proline substitutions (K986P and V987P mutations), in order to stabilize the pre-fusion conformation of the glycoprotein (Wrapp et al., 2020). Upon intramuscular (IM) administration, the LNP system enables the uptake by host cells and the delivery of mRNA inside the cytosol, where the

translation of the mRNA sequence into the S protein occurs in the ribosomes. After post-translation processing by the host cells, the S protein is presented as a membrane-bound antigen in its prefusion conformation at the cellular surface, providing the antigen target for B cells. In addition, part of the temporally produced Spike proteins enter antigen presentation pathways, providing antigen recognition by T cells via MHC presentation of T-cell epitopes (Verbeke et al., 2021). The EMA assessment report formulates the mechanism of action of mRNA vaccines at the injection site as follows: 'Administration of LNP-formulated RNA vaccines IM results in transient local inflammation that drives recruitment of neutrophils and antigen presenting cells (APCs) to the site of delivery. Recruited APCs are capable of LNP uptake and protein expression and can subsequently migrate to the local draining lymph nodes where T cell priming occurs (EMA, 2020a).' Because of this inherent innate immune activity, it is not necessary to formulate the mRNA vaccines with additional adjuvants. Interestingly, Pfizer/

* Corresponding authors at: Division of BioTherapeutics, Leiden Academic Centre for Drug Research, Leiden University, Einsteinweg 55, 2333 CC Leiden, the Netherlands (W. Jiskoot). Department of Pharmaceutics, Faculty of Science, Utrecht University, Universiteitsweg 99, 3584 CG Utrecht, the Netherlands (D. Crommelin).

E-mail addresses: w.jiskoot@lacdr.leidenuniv.nl (W. Jiskoot), d.j.a.crommelin@uu.nl (D.J.A. Crommelin).

https://doi.org/10.1016/j.ijpharm.2021.120586
Received 24 March 2021; Received in revised form 5 April 2021; Accepted 6 April 2021
Available online 9 April 2021
0378-5173/© 2021 The Author(s). Published by Elsevier B.V. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

*L. Schoenmaker et al.*　　　　　　　　　　　　　　　　　　　　　　　　　　*International Journal of Pharmaceutics 601 (2021) 120586*

BioNTech and Moderna specifically use nucleoside-modified mRNA that decrease (rather than increase) the inherent mRNA immunogenicity, underlining the need to properly balance the innate immune activity of mRNA vaccines (see below). The *in vivo* antigen production post-administration that can be achieved with mRNA vaccines, together with the self-adjuvant properties of mRNA-LNP vaccines, ultimately leads to the efficient generation of neutralizing antibody responses and cellular immunity, decreasing the risk of developing COVID-19 for the vaccine recipients.

mRNA vaccines have several benefits over other types of vaccines. A general advantage of mRNA vaccines is that their development is relatively fast, as mRNA-LNPs are a true platform technology. After identification of the protective protein antigen(s) and sequencing the corresponding gene(s), the mRNA can be made within weeks (Jackson et al., 2020). As the mRNAs encoding different antigens are chemically and physically highly similar, formulation design and manufacturing processes of new mRNA vaccines follow the same steps (Petsch et al., 2012). Compared to replication deficient viral vectors, mRNA vaccines may be more efficacious for COVID-19 prevention. Unlike viral vector-based vaccines, they don't generate immunity against the carrier. In this regard mRNA vaccines are similar to desoxyribonucleic acid (DNA)-based vaccines. DNA vaccines, however, still have a minute chance of potential genome integration. Moreover, in contrast to mRNA vaccines, DNA vaccines have shown rather low immunogenicity in early clinical trials, possibly because DNA-based vaccines need to gain access to the nucleus to exert their action, complicating efficient delivery. Overall, flexible design, standardized production processes and relatively short-lived cytoplasmic presence make mRNA vaccines very powerful, especially in a pandemic situation with rapidly mutating viruses.

However, one of the greatest challenges encountered when developing mRNA vaccines is their poor stability. Currently, most mRNA vaccines are administered IM, where the mRNA that is taken up by host cells leads to antigen expression (Hassett et al., 2019). Early research on mRNA vaccines has demonstrated that naked mRNA is quickly degraded after administration (Pardi et al., 2015; Wayment-Steele et al., 2020). Consequently, over the last few years efforts were made to improve the *in vivo* stability of mRNA after administration. This led to ways to optimize the mRNA structure by slowing down its degradation (see under section 'mRNA stability'). Another successful and currently widely used approach is to encapsulate and protect the mRNA in LNPs (Pardi et al., 2015). This reduces premature mRNA degradation after administration and enhances delivery to the cytosol of antigen-presenting cells (Liang et al., 2017; Lindsay et al., 2019).

Although progress has been made to enhance the stability *in vivo* and efficacy of mRNA-LNP vaccines, much less attention has been paid to their stability during storage (Crommelin et al., 2021). In order to effectively distribute a vaccine worldwide, it should have a sufficiently long shelf life, preferably at refrigerator temperatures (2–8 °C) or above. Currently, hardly any data is available in the public domain on what happens when mRNA-LNP formulations are stored for long periods of time. Moreover, it is unclear to what extent entrapping mRNA within LNPs influences the storage stability of the mRNA vaccine. Additionally, very little is known about the structure and morphology of LNPs formulated with mRNA, the chemical stability of the LNP components and the colloidal stability of the mRNA-LNP system. What is known now is that in order to store the current mRNA COVID-19 vaccines for longer periods of time, they have to be frozen. The current mRNA COVID-19 vaccines of Moderna and BioNTech/Pfizer have to be kept between −15 and −25 °C and between −60 and −90 °C, respectively (EMA, 2020a, 2021). To date, the degradation processes and the reasons why storage temperature requirements differ, are not fully understood.

The requirement of storing the mRNA-LNPs in a frozen state hampers vaccine distribution. Especially, the very low temperature of −60 to −90 °C is a major obstacle when it comes to vaccine transport, storage and distribution among end-users worldwide. Most other vaccines can be stored at 2–8 °C. Clearly, there is a need and opportunity to find ways

of stabilizing mRNA-LNP vaccines to allow non-frozen storage. This review provides an overview of approaches to make mRNA vaccines more stable, so that they can be stored longer at less extreme temperatures. To explore the topic, the characteristics of mRNA-LNP vaccines and their influence on storage stability are discussed. This information is used to identify the reasons for mRNA vaccine instability and to explore technological options for stability improvement.

## 2. Overview of mRNA vaccines

The composition of mRNA-LNP vaccines is fundamental to their stability. In the development of vaccines against SARS-CoV-2, a variety of different mRNA vaccine candidates have been created. Currently, there are 10 different mRNA COVID-19 vaccines that have progressed to clinical trials (World Health Organization, 2021). The SARS-CoV-2 mRNA vaccines either use conventional mRNA or self-amplifying mRNA (SAM). There are currently three 'conventional' mRNA vaccines in use or in advanced clinical trials that encode the full S protein. These are the mRNA-1273 vaccine by Moderna, BNT162b2/Comirnaty by BioNTech/Pfizer and CVnCoV by CureVac (Table 1). A detailed comparison of these three mRNA COVID-19 vaccines including their differences and similarities in mRNA structure and LNP design has been provided in several other reviews (Kim et al., 2021; Verbeke et al., 2021). The following sections aim to give an overview of the function and characteristics of the mRNA component and the LNP delivery system in these vaccines, as they play a critical role in the stability of mRNA vaccines, both upon *in vivo* administration and during storage.

### 2.1.  mRNA engineering for optimum in vivo stability and translation capacity

Because of the negative charges on its phosphate groups, mRNA is a polyanionic macromolecule in pH ranges typically used for parenterals (Lipfert et al., 2014). A first obstacle for mRNA vaccines is that naked mRNA is quickly degraded upon injection by ribonucleases (RNase), which are abundant in the extracellular environment. Second, the internalization of mRNA inside the cell is detected by intracellular RNA sensors, including endosomal Toll-like receptors (TLR) and cytoplasmic nucleic acid sensors. Binding of mRNA to these host defense receptors activates innate immune pathways, leading to the expression of hundreds of genes. One the one hand, this may provide an adjuvant effect on the vaccine potency. On the other hand, it establishes an antiviral state in cells, which strongly reduces the mRNA intracellular stability and translation (Pepini et al., 2017). Following internalization, mRNA strands need to be recruited into the ribosomes to enable the expression of the encoded protein. The protein synthesis rate and the functional half-life of mRNA can be drastically increased through mRNA engineering. The typical elements of an mRNA strand for inclusion in an mRNA vaccine are schematically presented in Fig. 1.

Many efforts have been made to increase the *in vivo* stability and translation capacity of the mRNA molecule, while avoiding unwanted innate immune activation. One prevalent idea is that this can be achieved by optimizing the regulatory regions of the mRNA: the 5′ cap, poly-A tail and untranslated regions (UTRs). The UTRs are parts of the mRNA that flank the coding region of the mRNA and regulate its stability and translation. The poly-A tail also regulates stability, as its shortening and eventual removal leads to mRNA degradation. The 5′ cap structure is important for protein production and the recruitment of translation initiation factors (Pardi et al., 2018). Furthermore, mRNA with maximized GC (guanine-cytosine) content in combination with codon optimization, i.e., selection of 'frequent codons' in the coding region, leads to enhanced stability and translation (Thess et al., 2015). Another critical determinant is the secondary structure of mRNA, which can be stabilized by changing the primary sequence through codon optimizations and computational tools. Building secondary structures in the mRNA –except in the 5′ UTR region– by choosing 'highly structured

L. Schoenmaker et al.

International Journal of Pharmaceutics 601 (2021) 120586

**Table 1**
Information about the three mRNA-LNP drug products that are presently used or in clinical phase III trials. For comparison reasons, drug product information for Onpattro (an siRNA-LNP drug product) has been added.

| Category | siRNA | Pfizer-BioNTech mRNA vaccine | Moderna mRNA vaccine | Curevac mRNA vaccine candidate |
|---|---|---|---|---|
| **Name product** | Onpattro * patisiran | BNT162b2; Comirnaty | mRNA-1273 | CVnCoV |
| mRNA dose; route of administration | 0.3 mg/kg; intravenous | 30 μg; intramuscular | 100 μg; intramuscular | 12 μg; intramuscular |
| Lipid nanoparticle components | DLin-MC3-DMA: (6Z,9Z,28Z,31Z)-heptatriaconta-6,9,28,31-tetraen-19-yl-4-(dimethylamino) butanoate 1,2-Distearoyl-*sn*-glycero-3-phosphocholine (DSPC) PEG2000-DMG = Alpha-(3′-{[1,2-di(myristyloxy)propanoxy] carbonylamino}propyl)-ω-methoxy, polyoxyethylene Cholesterol | 0.43 mg ALC-0315 = (4-hydroxybutyl) azanediyl)bis (hexane-6,1-diyl)bis(2-hexyldecanoate) 0.05 mg ALC-0159 = 2-[(polyethylene glycol)-2000]-N,N ditetradecylacetamide 0.09 mg 1,2-Distearoyl-*sn*-glycero-3-phosphocholine (DSPC) 0.2 mg Cholesterol | SM-102 (heptadecan-9-yl 8-((2-hydroxyethyl) (6-oxo-6-(undecyloxy) hexyl) amino) octanoate} PEG2000-DMG = 1-monomethoxypolyethyleneglycol-2,3-dimyristylglycerol with polyethylene glycol of average molecular weight 2000 1,2-Distearoyl-*sn*-glycero-3 phosphocholine (DSPC) Cholesterol | Cationic lipid (Acuitas Therapeutics) Phospholipid Cholesterol PEG-lipid conjugate |
| Molar lipid ratios (%) ionizable cationic lipid : neutral lipid : cholesterol : PEG-ylated lipid | 50:10:38.5:1.5 | 46.3:9.4:42.7:1.6 | 50:10:38.5:1.5 | 50:10:38.5:1.5 |
| Molar N/P ratios[a] | 3 | 6 | 6[b] | 6[b] |
| Buffer | Potassium phosphate, monobasic, anhydrous Sodium phosphate, dibasic, heptahydrate pH ~ 7 | 0.01 mg Potassium dihydrogen phosphate 0.07 mg Disodium hydrogen phosphate dihydrate pH 7–8 | Tris (tromethamine) pH 7–8 | ? pH |
| Other excipients | Sodium chloride Water for injection | 0.01 mg Potassium chloride 0.36 mg Sodium chloride 6 mg Sucrose Water for injection | Sodium acetate Sucrose Water for injection | Saline |

*NDA 210922 ONPATTRO (patisiran) Lipid Complex Injection; Addendum to Drug Product Quality Review (FDA, 2017).
[a] N = ionizable cationic lipid (nitrogen), P = nucleotide (phosphate).
[b] Estimate.



**Fig. 1.** Structural elements of *in vitro* transcribed (IVT) mRNA. Each of these elements can be optimized and modified in order to modulate the stability, translation capacity, and immune-stimulatory profile of mRNA. Courtesy of Verbeke et al. (2019).

coding sequences' leads to higher translation *in vivo* as well, because of a longer functional half-life (Mauger et al., 2019). Alternatively, Mauger et al. demonstrated that the incorporation of naturally occurring modified uridines, such as the use of 1-methyl-pseudouridine (m1Ψ) instead of uridine, induces global changes in the secondary structure of mRNA which correlated with high protein expression. Importantly, the

L. Schoenmaker et al. International Journal of Pharmaceutics 601 (2021) 120586

introduction of these modified uridines inside the mRNA construct is currently the most efficient way to minimize the cellular recognition of mRNA by RNA-binding proteins that are involved in the innate immune reaction to foreign mRNA. This, in turn, enhances biological stability and translational capacity, while reducing the reactogenicity of mRNA vaccines. Moreover, there are also indications that m1Ψ increases base stacking and the melting point of mRNA, thereby making mRNA more stable (Mauger et al., 2019; Zhao and He, 2015). This could mean that the incorporation of 1mΨ, as is done for the COVID-19 vaccines from Moderna and BioNTech/Pfizer, also affects the stability of mRNA before administration. CureVac followed a different path, as outlined by Thess et al. (Thess et al., 2015). An interesting analysis of the choices CureVac made in engineering the CVnCoV mRNA was recently published (Hubert, 2021). However, even when these structural elements are optimized, IM injection of naked mRNA through a syringe does not lead to a robust immune response, probably because of the poor cell transfection capacity of naked mRNA and the susceptibility to RNase (Pardi et al., 2015). Importantly, this illustrates that optimization of only the mRNA structure is not sufficient for creating effective mRNA vaccines: additional protection and delivery systems are needed (Kauffman et al., 2016; Sahin et al., 2014).

The other type of mRNA vaccines, SAMs, do not only encode the target antigen but also RNA polymerase encoding 'self-amplifying' factors derived from Alphavirus. Typically, they consist of 9 kb mRNA nucleotides compared to 2–4 kb for non-replicating mRNA vaccines. The SAM vaccine candidates were developed with the intent of forgoing the typical 'prime-boost' regimen of a two-dose strategy and instead focusing on a single injection per recipient. Because of their replication competence, the injected dose for SAM vaccines is lower than for conventional mRNA vaccines and one dose might be sufficient for protection (Erasmus et al., 2020; Vogel et al., 2018). When SAMs are translated in the host cell, an RNA replicase synthesizes negative-sense RNA intermediates complementary to the coding mRNA template (Fig. 1). These are in turn transcribed to many coding mRNA molecules, leading to prolonged and enhanced antigen expression (Bloom et al., 2020). Both SAM vaccines encode the full S protein and the highest dose for these vaccines in clinical trials was more than tenfold lower than the typical doses used for the conventional mRNA vaccines (Ward and McCormack, 2021). The two SAM vaccines in clinical development are nCoVsaRNA by the Imperial College London and ARCT-021 by Arcturus/Duke-NUS (both as mRNA-LNP).

### 2.2. LNPs as delivery system

To overcome these transfection problems with naked mRNA, protecting delivery systems have been developed. Currently, the leading mRNA COVID-19 vaccines (Table 1) are all utilizing LNP technology. This illustrates the successes achieved with this type of nanoparticle to stabilize mRNA and successfully deliver it into cells (Pardi et al., 2015). The LNPs in mRNA COVID-19 vaccines consist of four main components (cf. Table 1): a neutral phospholipid, cholesterol, a polyethylene-glycol (PEG)-lipid, and an ionizable cationic lipid. The latter contains positively charged ionizable amine groups (at low pH) to interact with the anionic mRNA during particle formation and also facilitate membrane fusion during internalization (Evers et al., 2018; Reichmuth et al., 2016). In addition, PEG-lipid is used to control the particle size and act as a steric barrier to prevent aggregation during storage. Together with the mRNA, these components form particles of about 60–100 nm in size by using a rapid mixing production technique (Evers et al., 2018). The SARS-CoV-2 vaccine candidates nCoVsaRNA and ARCoV, for example, have average particle sizes of 75 nm and 89 nm, respectively (McKay et al., 2020; N.-N. Zhang et al., 2020).

A key aspect of LNPs and the characteristic that makes them different from liposomes (spherical vesicles with at least one lipid bilayer and an aqueous core) is the presence of lipids in the core, although data from several studies indicate that water is also present to some extent (Arteta

et al., 2018; Kulkarni et al., 2018; Brader et al., 2021). This would mean that the mRNA could be exposed to an aqueous environment, even when it is encapsulated. This type of core structure has been previously found in both unloaded and siRNA (small interfering RNA) containing LNPs, as demonstrated by cryogenic transmission electron microscopy (cryo-TEM) (Kulkarni et al., 2019, 2018). Similarly, studies of mRNA-LNPs have shown electron dense cores (Fig. 2) (Arteta et al., 2018; Eygeris et al., 2020; Leung et al., 2015; Patel et al., 2020; Tanaka et al., 2020). Thionine was used for cryo-TEM contrast enhancement (Brader et al., 2021).

Although their lipid core is a common feature of mRNA-LNPs, characteristics of the exact structure of this core and its dependence on lipid ingredients (molar ratios) and the localization of the mRNA are still under debate (see Fig. 3). mRNA is certainly located inside the LNPs, as determined by the RiboGreen assay. RiboGreen is a dye that exhibits fluorescence when bound to single stranded mRNA, but cannot enter the LNPs. In mRNA-LNP formulations, such as those used in mRNA vaccines, the fraction of accessible mRNA is very low (Arteta et al., 2018; Patel et al., 2020) and thus, encapsulation efficiencies, derived from Ribo-Green assays, are typically > 90%. Taken together, the cryo-TEM (Fig. 2) and encapsulation evidence shows that the mRNA-LNPs form nanoparticles with encapsulated mRNA that is protected from the external medium. There are 3 models proposed for the structure of mRNA encapsulated by LNPs; these mainly originate from siRNA-LNPs analysis (Fig. 3).

The dawn of mRNA vaccA limitation of this is that the encapsulated cargo affects the structure of LNPs: siRNA is very different from mRNA in structure and size (Table 2) and the molar N/P (ionizable cationic lipid over phosphate) molar ratios differ, 3 versus 6, respectively (Table 1). mRNA is at least 100-fold larger than siRNA and this affects the structure of the LNPs. Besides, there are indications that mRNA is located in the core of the LNPs and siRNA more towards the surface and mRNA can form 'blebs' (Fig. 2) (Viger-Gravel et al., 2018). The composition of the bleb part of the LNP is a matter of debate (Leung et al., 2015; Brader et al., 2021). The latter state: "mRNA can dissociate from the charged lipid to reside within a solvent-filled bleb compartment."

The multilamellar vesicle model for mRNA-LNPs (Fig. 3A) is unlikely to be correct. It does not correspond to the electron dense cores found by TEM of the mRNA-LNPs. Currently, most researchers hold the view that



**Fig. 2.** Cryo-TEM image of mRNA-LNP showing 'bleb' structures with distinctly different electron density. Adapted from Brader et al. (2021) with permission.

L. Schoenmaker et al.

International Journal of Pharmaceutics 601 (2021) 120586



**Fig. 3.** Schematic representation of the proposed models for siRNA-LNP and mRNA-LNP structure. A: multilamellar vesicles; B: nanostructure core; C: homogeneous core shell as discussed by Viger-Gravel et al. (2018). Courtesy of the authors.

**Table 2**
Differences between mRNA and siRNA molecules.

|  | mRNA | siRNA |
| --- | --- | --- |
| Molecular weight (g/mol) | $\geq 10^6$ | $10^4$ |
| Molecular conformation | Single stranded | Double stranded |
| 5′ end | 5′ cap | Phosphorylated 5′ end |
| 3′ end | Poly-A tail | Hydroxylated 3′ end |

mRNA-LNPs are best described by the core–shell model (Fig. 3B & C). This means that the nanoparticles have a surface layer and an amorphous, isotropic core. Viger-Gravel et al. used NMR spectroscopy to elucidate an LNP structure and they make the case that two types of core are possible (Viger-Gravel et al., 2018). They describe the model of an amorphous core containing water pores surrounded by inverted cationic lipids (Fig. 3B). They also postulate that the lipids in the core could be homogeneously dispersed with small water pockets in between (Fig. 3C). The latter corresponds more to the experimental results for their siRNA-LNPs and mRNA-LNPs.

Arteta et al. based their mRNA-LNP structure-model on cryo-TEM, small-angle X-ray scattering (SAXS) and small-angle neutron scattering (SANS) measurements. They found that 1,2-distearoyl-sn-glycero-3-phosphocholine (DSPC) and PEG-lipid as well as part of the ionizable cationic lipid and cholesterol are located on the surface of the LNPs. Inside the core, the main part of the ionizable cationic lipid, cholesterol (dependent on its concentration), water and mRNA are present. Interestingly, their research indicates that the isotropic LNP core consists for 24% (volume fraction) of water. They propose that mRNA is located inside water cylinders, which are surrounded by cationic lipids (Fig. 4). This would mean that the mRNA is –at least partly– exposed to water inside the LNPs, which likely contributes to its instability upon storage under non-frozen conditions (Arteta et al., 2018). Comparable results were reported by Sebastiani et al. (2021).

It would, therefore, be interesting to study how mRNA interacts with water and ionizable cationic lipids in the LNP. mRNA is hydrophilic; it can interact electrostatically and through hydrogen bonds with ionizable cationic lipids (apparent pKa < 6.5) (Buschmann et al., 2021). This depends on the pH inside the LNP. If the LNP shells are permeable to protons –which is likely, as ionized dyes such as 2-(p-toluidino)-6-naphthalene sulfonic acid (TNS) and thionine can enter the LNP core (Jayaraman et al., 2012; Brader et al., 2021) – the pH would be similar to the rest of the formulation, around 7 to 8, meaning that most of the ionizable cationic lipids would be uncharged. As the ionizable cationic lipids are stacked in the core, they may show polyelectrolyte behavior, leading to deviations of the Henderson-Hasselbalch equation, i.e., 'smearing out' of the titration curve (Pierrat and Lebeau, 2015).



**Fig. 4.** Schematic representation of the mRNA-water cylinders in the core of mRNA- LNPs (Arteta et al., 2018). Courtesy of the authors.

Moreover, interaction between the mRNA and the ionizable cationic lipids might affect the ionization behavior. For siRNA only weak electrostatic interactions were found with the ionizable cationic lipid, indicating that at least for siRNA-LNP formulations the pH inside approaches or equals the pH outside (Viger-Gravel et al., 2018). For mRNA-LNPs, no such experimental studies have been performed yet. A molecular dynamics simulation study of the complexation of mRNA and a cationic lipid demonstrated lipid-lipid cluster formation and lipid-mRNA cluster formation. Both electrostatic and hydrogen bonds were driving the cationic lipid and mRNA interactions (Rissanou et al., 2020).

Another interesting finding by Arteta et al. is that the shell of their mRNA-LNPs is a monolayer (Arteta et al., 2018; Verbeke et al., 2019). Other researchers propose that the outer shell of mRNA-LNPs consists of one or multiple bilayers, based on cryo-TEM analysis (Fig. 2) (Patel et al., 2020; Tanaka et al., 2020) or SANS (Sebastiani et al., 2021). These findings indicate that assessment of the nature of the mRNA-LNP shell with these techniques is difficult and/or that multiple types of mRNA-LNP structures may exist, dependent on, e.g., the nature of the lipids and the preparation protocol for the mRNA-LNPs. This, in turn, could have implications for the stability of different formulations. In conclusion, questions remain around the structure of mRNA-LNPs and the

Legend: cholesterol | DSPC | DMPE-PEG | DLin-MC3-DMA | $H_2O$ | siRNA

L. Schoenmaker et al. International Journal of Pharmaceutics 601 (2021) 120586

interactions between the encapsulated mRNA and the various lipid components.

Analysis of the components of the various mRNA-COVID-19 vaccines has shown that there are common features, but also significant differences (Table 1). The LNP formulation, the use of modified-nucleosides, the GC content and the differences in length between the conventional mRNA and SAM vaccines might influence the physical and chemical stability of these mRNA-COVID-19 vaccines during storage.

## 3. In vitro stability of mRNA vaccines

As mentioned in the introduction, one of the main obstacles for the distribution of the currently approved mRNA-COVID-19 vaccines is that they have to be stored in frozen form (cf. Crommelin et al., 2021). At refrigerator temperatures, 2–8 °C, the Pfizer/BioNTech and Moderna vaccines are stable for 5 and 30 days, respectively. Both companies provide detailed handling instructions for the end-user (EMA, 2020b, 2021). Interestingly, the vaccine candidate by CureVac is reported to be stable for 3 months at refrigerator temperatures and at −60 °C (CureVac, 2020). These are the only manufacturers who have released their long-term storage conditions at present. Such temperature requirements severely impact the logistics of the storage, transport, and distribution of these vaccines. However, to date little information on optimization of the stability of mRNA vaccines can be found in the public domain. This section aims to give an overview of the factors that influence the stability of the components of mRNA-LNP vaccines and discuss the methods to analyze this stability.

### 3.1. mRNA stability

One factor that strongly influences the required storage conditions is the stability of the mRNA. As discussed above under Section 2.1, the structure of the mRNA molecule is specifically designed to increase the translation of the target antigen in vivo. A special feature of mRNA is that even one change (strand break, or oxidation of the bases) in the long mRNA strand (typically between 1000 and 5000 nucleotides long) can stop translation (Klauer and van Hoof, 2012). This makes mRNA vaccines quite different from other vaccines in which small changes of the antigens do not necessarily have a measurable effect on their efficacy. Consequently, for mRNA vaccines, it is critical to monitor the integrity of the full molecule.

There are several ways in which mRNA degradation can occur; one can discern chemical and physical degradation. Chemical degradation encompasses the modifications of bonds in the mRNA molecule. Physical instability includes denaturation (loss of secondary and tertiary structure), which has different –likely less significant– consequences for the activity of mRNA than denaturation has for the activity of protein biologics. However, denaturation also comprises processes such as aggregation and precipitation, which negatively affect mRNA translation. In a review on the stability of nucleic acids Pogocki and Schöneich state

that chemical degradation plays a larger role in the degradation of small nucleic acids than physical instability and that is probably even more true for large structures such as mRNA (Pogocki and Schöneich, 2000).

Chemical degradation of mRNA in vitro mainly occurs through hydrolysis and oxidation. Hydrolysis predominantly occurs via the phosphodiester bonds that form the backbone of the mRNA molecule (Fig. 5). The 2′ OH group on the ribose plays a crucial role as the trans-esterification reaction leading to a mRNA strand break starts by a nucleophilic attack by the 2′OH group on the phosphate ester bond leading to a break at the P-O5′ ester bond (Fig. 5). This process requires water and can be catalyzed by nucleases, but also by the mRNA molecule itself and other exogenous factors like Brønsted acids and bases (Houseley and Tollervey, 2009; Pogocki and Schöneich, 2000). In two publications on mRNA hydrolysis the authors state that the base sequence and secondary structure of mRNA influence the rate of hydrolysis (Kaukinen et al., 2002; Mikkola et al., 2001). Specifically, base-stacking may decrease the cleavage rate of phosphodiester bonds. The 'average unpaired probability' of an mRNA molecule can be minimized. Specially designed algorithms that select nucleotide sequences for single stranded mRNA with maximum double stranded regions are available. In vitro stability is claimed to be significantly improved following this approach (Wayment-Steele et al., 2020). A difference between the CureVac, Pfizer/BioNTech and Moderna vaccines is that the latter two have single nucleoside incorporations of 1-methyl-pseudouridine. A previous study has shown that this modification improves RNA secondary structure stability (Mauger et al., 2019). CureVac uses GC-enrichment, which should have a similar effect (Hubert, 2021; Zhang et al., 2011).

Oxidation, in contrast, affects the nucleobases and to a lesser extent the sugar groups of the mRNA's ribose units. Oxidation can lead to the cleavage of bases, strand break and the alteration of the secondary structure of the mRNA (Pogocki and Schöneich, 2000). However, as stated before, hydrolysis appears to be accepted as the main factor driving mRNA degradation (Fabre et al., 2014).

### 3.2. Analyzing mRNA stability

As the integrity and purity of the mRNA are essential to safeguard efficacy and safety of mRNA vaccines, it is important to have tools to monitor these aspects. There are various attributes of the mRNA molecules that collectively determine whether the product can be used. The review by Poveda et al. highlights these attributes and briefly touches upon approaches that are used in general to measure and monitor them (Poveda et al., 2019).

Table 3 provides a comprehensive list of analytical methods to determine and monitor quality attributes and stability of mRNA vaccine bulk drug substance and final drug product. Quality specifications for the presently accepted mRNA-LNP COVID-19 products are still not available in the public domain. Leaked documents (through a cyber-attack of the EMA, just before the approval date in the UK and the



**Fig. 5.** Base-catalyzed intramolecular hydrolysis of the phosphodiester bond in RNA by way of a 2′,3′-cyclic phosphate. B denotes a Brønsted base. Redrawn from Pogocki and Schöneich (2000).

**Table 3**

Assays to determine and monitor mRNA drug substance and mRNA-LNP drug product quality attributes and stability.[1]

| Assay[2] | Attribute |
|---|---|
| **Characterizing DNA templates and RNA transcripts** | |
| DNA template sequencing/mRNA sequencing | Identification of mRNA |
| UV spectroscopy (A260 nm, A260/A280, A260/A230) | Quantification - purity dependent |
| Fluorescence-based assays (e.g., residual DNA) | Quantification – purity dependent |
| Agarose/acrylamide electrophoresis | Molecular mass, RNA integrity and quantification |
| Reverse transcriptase qPCR | Identification and quantification of mRNA |
| Western blot for dsRNA | Quality assessment |
| mRNA capping analysis | Quality assessment |
| mRNA polyadenylated tail analysis | Quality assessment |
| Chromatographic assays: RP-HPLC, SE-HPLC, IP-HPLC and IEX-HPLC | Quantity and quality assessment |
| **Characterizing mRNA-encoded translation products** | |
| In vitro translation - cell free medium | Translation into target protein |
| Messenger RNA evaluation using various cell-based systems | Translation product analysis and potential toxicity assay |
| **Characterizing mRNA-lipid complexes** | |
| DLS | Particle size (distribution) |
| Laser Doppler electrophoresis | Zeta potential |
| NTA/TRPS | Particle size (distribution) |
| SE-HPLC(-MALS) | Particle size distribution; assessing bound/unbound mRNA |
| Microscopy (cryo TEM, ESEM, AFM) | Nanoparticle morphology, particle size (distribution) |
| Gel or capillary electrophoresis | Assessing bound/unbound mRNA and surface charge |
| Chromatographic assays: RP-HPLC, SE-HPLC, IP-HPLC and IEX-HPLC / mass spectrometry | Quantification and integrity of lipids and/or mRNA; for some: assessing bound/unbound mRNA and molar mass |
| Fluorescent dyes | Encapsulation efficiency |
| **General pharmaceutical tests** | |
| | Appearance, pH, osmolality, endotoxin concentration, sterility |

[1] Adapted from Poveda et al, 2019; Muralidhara et al., 2016; Fan et al., 2021; Crommelin et al., 2021.

[2] Abbreviations: AF4, asymmetrical flow field-flow fractionation; AFM, atomic force microscopy; dsDNA, double stranded DNA; DLS, dynamic light scattering; ESEM, environmental scanning electron microscopy; IEX-HPLC, ion-exchange high performance liquid chromatography; IP-HPLC, ion-pair high performance liquid chromatography; MALS, multi-angle light scattering; NTA, nanoparticle tracking analysis; qPCR, quantitative polymerase chain reaction; RP-HPLC, reversed-phase high performance liquid chromatography; SE-HPLC, size-exclusion high performance liquid chromatography; TEM, transmission electron microscopy; TRPS, tunable resistive pulse sensing.

USA), which contain classified information on the quality of Comirnaty, mention percentages of mRNA integrity between 70 and 75% (Tinari, 2021) and the assessment report from the EMA reads: 'the quality of this medicinal product, submitted in the emergency context of the current (COVID-19) pandemic, is considered to be sufficiently consistent and acceptable.'

Here we elaborate on the techniques that are applicable for studying the integrity of mRNA and used for quality control (QC). An overview of quality documentation required by EU authorities for an Investigational Medicinal Products Dossier (IMPD) with a focus on mRNA vaccines is given by Schmidt and the interested reader is referred to that informative document for details (Schmid, 2017). Because many of the described methods are intended for assaying naked mRNA, whereas mRNA vaccines for COVID-19 are encapsulated in LNPs, for some assays the mRNA first needs to be released and isolated from the LNP. Potential effects of this isolation process can be taken into account by including proper controls.

Gel electrophoresis is a frequently used technique that can give information on the size and the integrity of the mRNA. When mRNA degrades and strand breaks occur, the mRNA strand becomes shorter. As a result, the intensity of the band at the expected mRNA length will decrease or the band will broaden, while new bands may appear. Using this approach Démoulins *et al.* analyzed the quality of SAM under RNase free conditions (Démoulins et al., 2017). Based on the gel electrophoresis data, they were able to determine whether the mRNA is of acceptable quality and stable. Commercial electrophoresis equipment is now available for high-throughput analysis of mRNA (Pocernich et al., 2019).

Recently, Zhang *et al.* showed that fluorescence correlation spectroscopy (FCS) can be used to monitor changes in mRNA size (H. Zhang et al., 2020). The Brownian motion of fluorescent mRNA gives an indication of its molecular weight. This technique, however, needs a fluorescent label, is not more accurate than gel electrophoresis and only detects mRNA degradation involving substantial changes in molecular weight, e.g., strand breaks.

Throughout the (bio)pharmaceutical industry chromatographic techniques form a powerful platform to monitor purity and stability of active pharmaceutical ingredients and drug products. However, the development of HPLC techniques for establishing purity and stability of mRNA molecules has been slow so far. Successful protocols for analyzing large mRNA molecules can be found in the patent literature as well as in publications where RP-HPLC, SE-HPLC, IP-HPLC and IEX-HPLC methods are described (Issa and Packer, 2019; Kanavarioti, 2019; Spivak et al., 2014). Some of these techniques can also be used for mRNA purification purposes (Kim et al., 2007; Levine et al., 2019). IEX-HPLC can be used for measuring free and LNP encapsulated mRNA. An orthogonal technique to establish the same parameter is the earlier mentioned Ribo-Green technique. Different outcomes, however, were found for the same mRNA-LNP product; the IEX-HPLC outcome correlated better with the *in vivo* readout than the RiboGreen data. This illustrates that even established techniques like the RiboGReen assay should be carefully validated on a case-by-case basis (Schariter et al., 2019).

mRNA degradation can also be analyzed by using the reverse transcription quantitative polymerase chain reaction (RT-qPCR). This approach quantifies the total amount of mRNA that can be transcribed into intact cDNA targets for PCR. This means that all degradation that prevents this can be quantified indirectly. In their evaluation of this technique, Brisco and Morley argue that it gives reliable quantitative results (Brisco and Morley, 2012). Another advantage of this method is that all types of degradation that affect transcription are taken into account, whereas the previously discussed techniques only look at mRNA size. However, RT-qPCR sometimes is less reliable due to the error rate of the enzymes that are used (Schmid, 2017). Other disadvantages of this approach are that it is not widely used and the different types of degradation cannot be distinguished from each other.

mRNA expression *in vitro* (in cells) is also used to analyze the integrity of mRNA (Zhang et al., 2020b; Zhao et al., 2020). By using mRNA that encodes a fluorescent protein, the mRNA integrity can indirectly be determined by measuring the fluorescence signal. This approach can assist in providing guiding principles for bioactive mRNA-LNP design and formulation development studies. Alternatively, the translation efficacy of mRNA encoding non-fluorescent antigens can be determined using an enzyme-linked immunosorbent assay (ELISA), or western blotting techniques as has been used previously to analyze the stability of mRNA encoding the receptor-binding domain (RBD) of SARS-CoV-2 (Zhang et al., 2020b). Advantages of this approach are that it gives the sum of the overall integrity of the formulation and everything that can influence the transcription of the mRNA. Disadvantages of this method are that it is not very precise, unable to show the type of mRNA damage, and time-consuming.

L. Schoenmaker et al.

*International Journal of Pharmaceutics 601 (2021) 120586*

### 3.3. LNP stability

Besides mRNA integrity, stability of LNPs is critical for the quality of mRNA-LNP vaccines. No information on LNP stability tests could be found for the present mRNA COVID-19 vaccines, but the siRNA-LNP formulation of Onpattro (patisaran) has a three-year shelf life when kept between 2° and 8 °C (EMA, 2018). There is a warning in this SMPC text that the dispersion should not be frozen. The composition of the Onpattro LNP system is: DLin-MC3-DMA, as ionizable cationic lipid: DSPC: cholesterol: PEG2000-C-DMG (see table 1) (mol-ratio 50:10:38.5:1.5 mol%); they are composition-wise similar to the LNPs in Comirnaty and mRNA-1273. A study on siRNA-LNPs composed of the lipidoid $306O_{13}$ instead of DLin-MC3-DMA, showed that in aqueous conditions the formulation remained stable at 2 °C for 156 days at pH 7 (Ball et al., 2016). Particle size and siRNA encapsulation for this formulation did not significantly change. Complementary research by Suzuki et al. showed that siRNA-LNPs are stable over the experimental period, i.e. 1.5 years, at 4 °C (Suzuki et al., 2015). Altogether, these data strongly indicate that instability of the mRNA, rather than LNP instability, determines the storage conditions and shelf life of the current mRNA-LNP COVID-19 vaccines.

The stability and quality attributes of liposomes and LNPs have been reviewed by Fan *et al.* (Fan et al., 2021). LNPs can undergo chemical and physical instability. Chemical instability comprises the degradation of the lipids in the LNPs that are susceptible to hydrolysis and oxidation. Lipid oxidation can occur in unsaturated fatty acid moieties (not present in Comirnaty and mRNA-1273) and with cholesterol, potentially as a result of a hydroperoxide attack, an impurity present in the PEG-group of PEG2000-C-DMG (Jaeger et al., 1994; Wang et al., 2019). Oxidative impurities may also result in oxidation of encapsulated mRNA. The carboxylic ester bonds in lipids, such as DSPC and the ionizable cationic lipids, are susceptible to temperature- and pH-dependent hydrolysis (Fig. 6).

Another key aspect of LNP stability is physical degradation. There are three main types of physical instability that can occur: aggregation, fusion, and leakage of the encapsulated pharmaceutical ingredient. Aggregation of LNPs during storage and fusion of LNPs has been reported (Ayat et al., 2019; Ball et al., 2016). To increase stability on the shelf, LNPs are often formulated with PEG-lipids (Burke et al., 2013; Ryals et al., 2020). The PEG-molecules at the surface prevent the individual LNPs from aggregating. The other type of physical degradation –leakage of the mRNA– mainly affects the stability of the encapsulated product. Of note, encapsulation efficiencies are typically > 90% and release of the RNA payload from LNPs during storage has not been reported (as measured with the RiboGreen test). mRNA that is not encapsulated ('naked mRNA') is hardly taken up by cells; besides, it degrades rapidly and is, therefore, not available for translation.

Hypersensitivity reactions –rarely observed upon intramuscular injection of the mRNA-LNP COVID-19 vaccines– may be related to the PEG-lipids. Therefore, alternative lipids to prevent aggregate formation have been investigated. Introduction of polysarcosine-modified lipids stabilized lipid-based systems against aggregation while reducing the immunostimulatory response (Nogueira et al., 2020). Additional testing is needed to establish whether such PEG-lipid alternatives improve the mRNA stability (e.g., owing to lack of peroxides).

### 3.4. Analyzing LNP stability

Analytical methods to monitor the stability of LNPs have been expertly reviewed in the previously mentioned article by Fan et al. and Kim et al. and we refer the interested reader to this literature source (Fan et al., 2021; Kim et al., 2021).

### 3.5. Which mRNA-LNP component is more unstable: The mRNA, the lipids, or the combination?

To date, several studies have investigated ways to stabilize mRNA and to stabilize LNPs during storage (Ball et al., 2016; Jones et al., 2007). It is, however, interesting to question which of these components is the bottleneck for stability. Is it the mRNA that degrades when the mRNA-LNP formulations are not frozen, are the LNPs causing the problem, or is it the combination of mRNA with the LNPs?

LNP systems entrapping chemically modified and highly stable siRNA molecules (e.g. Onpattro) have significantly longer shelf lives as compared to mRNA-LNP systems. This would suggest that not the LNP, but rather the mRNA is the current stability bottleneck.

To date, there is no research report available in the public domain on the integrity of both mRNA and LNPs in mRNA-LNP formulations. In the few studies in which the effect of storage is investigated, such as the research by Zhang *et al.* (N.-N. Zhang et al., 2020), long-term effects are not measured. Therefore, we will be looking first at the long-term stability of naked mRNA, with the caveat that this may be different from the stability of mRNA encapsulated in LNPs (see below).

In their review Pascolo *et al.* remark that aqueous solutions of naked mRNA can be stored at 4 °C for only a few days, provided that the mRNA is protected from degradation by contaminating ribonucleases by an RNase inhibitor (Pascolo, 2008). This seems to be in line with the current view of mRNA instability. The existing body of research on the long-term stability of naked mRNA suggests that mRNA needs to be frozen or dried in order to stay stable for longer periods of time.

In 2009, Roesler *et al.* show that the translation efficacy of mRNA encoding luciferase begins to decrease after 8 days or 16 days when stored –RNAse free– at room temperature as a liquid or in a lyophilized form, respectively. No efforts were made to optimize the formulations in terms of excipients and freeze drying conditions (Fig. 7) (Roesler et al., 2009). Conclusions about the long-term stability at refrigerator



**Fig. 6.** Lipids used in the mRNA-LNP COVID-19 vaccines BNT162b2 (Comirnaty) and mRNA-1273.

L. Schoenmaker et al.                                                                                                    International Journal of Pharmaceutics 601 (2021) 120586



**Fig. 7.** Stability of mRNA in water analysed by luciferase expression in transfected BHK-21 cells. Courtesy of Roesler et al. (2009).

temperatures can not been drawn from this study, as the stability was only followed for 32 days. There is also information based on theoretical cleavage rate calculations. Wayment-Steele *et al.* predict that mRNA (4000 nt) will have a half-life of 941 days when it is stored at pH 7.4 and 5 °C (Wayment-Steele et al., 2020). They do note that longer mRNA sequences, such as SAMs, are more prone to hydrolysis. Because this is a theoretical calculation that is only based on hydrolytic degradation kinetics, it might underestimate mRNA degradation, e.g., when trace amounts of RNase are present. More research into the stability of mRNA would have to be done to find a definitive answer.

Together, these studies indicate that in an aqueous solution mRNA likely is less stable than LNPs. However, it should be reiterated that results on these two components in isolation could differ from the situation of mRNA encapsulated by LNPs. As discussed in previous sections, mRNA is located inside the LNP core together with an ionizable cationic lipid, cholesterol and water (cf. Fig. 4) (Arteta et al., 2018). This would mean that the mRNA is in an aqueous environment and therefore is susceptible to hydrolysis. The mechanisms of hydrolysis might then be similar to those for mRNA in solution (Brader et al., 2021). However, on the other hand, mRNA inside the LNPs may be coated by the ionizable lipid through hydrophobic, hydrogen-bond and/or electrostatic interactions. In that case the mRNA might be more stable than naked mRNA dissolved in an aqueous medium. Without further studies, it can only be concluded that mRNA instability dictates storage conditions and drives the search for improved, more stable formulations.

### 3.6. Reasons for different storage conditions

Another interesting aspect of the current mRNA vaccines is that the reported storage temperatures and corresponding 'shelf lives' vary widely: from −80 °C to 2–8 °C and from days to months (Crommelin et al., 2021). Is it possible to identify a difference in the formulation of the mRNA vaccines that could cause this variation? Or, could the difference in storage conditions be related to the limitations of the thermostability testing protocol or a more guarded approach (Schmid, 2017)? This information is important, as insights into the factors that positively affect the stability may be an interesting starting point for the future design of thermostable mRNA vaccines.

Tom Madden, the CEO of Acuitas Therapeutics, stated that the Moderna and Pfizer/BioNTech mRNA vaccines likely have the same stability (Dolgin, 2020). Is it possible that the latter use a more conservative approach to ensure stability? Still, it is quite likely that the Pfizer/BioNTech mRNA-LNP vaccine, that currently has to be stored between −60 to −80 °C was also tested at higher temperatures and under refrigerated conditions as done by CureVac scientists (Stitz et al., 2017). Moreover, the analysis techniques in the stability tests could differ in sensitivity as could the acceptance criteria. Publication of the stability study reports would provide the answers and it would be

interesting to run comparative studies.

### 4. Opportunities for improving shelf life & storage conditions

When freezing is needed to keep a vaccine stable, distribution, storage and handling by the end-user are highly protocolized and costs increase. For distribution purposes, vaccine stability at refrigerator temperatures, 2–8 °C, would be a desired improvement. In the following section we will focus on research to achieve such storage conditions, as these are seen as a considerable inconvenience for large scale use of mRNA vaccines, such as in the COVID-19 pandemic.

### 4.1. Excipients

The conclusion from the previous section on the stability of mRNA vaccines is that in order to create more stable mRNA-LNP vaccines, stabilizing the mRNA is the first target. Obviously, any excipient used for mRNA-based vaccines must be RNase free. A review by Muralidhara *et al.* captures a lot of information on the impact of excipients and formulation milieu (Muralidhara et al., 2016).

Some of the excipients proposed by Muralidhara *et al.* are already used in the mRNA vaccines by Moderna and Pfizer/BioNTech. Excipients in the formulations serve as buffers, osmolytes and cryoprotectant or have a dual effect. Moderna, for example, uses a Tris–HCl buffer that would have an additional stabilizing effect on nucleic acid macromolecules as it is also a hydroxyl radical scavenger (EMA, 2021). When selecting these excipients, one should keep in mind that the product may need to be stored at sub-zero temperatures and excipients affect that milieu. The choice of the buffering system and osmolyte is important as the pH may change upon freezing, as has been shown for sodium phosphate buffered systems; a 3.5 pH-units drop occurs upon freezing. Histidine buffers are most 'pH-resistant' upon freezing. But still, the pH may drop 0.5 unit when cooling from 0 °C to −30 °C (Kolhe et al., 2010). And, another example, NaCl (osmolyte)-solutions have a eutectic temperature of −21 °C. Other excipients that could be added are antioxidants, non-reducing free radical scavengers (e.g., ethanol) or metal chelators (Evans et al., 2000). However, the question remains to what extent they indeed ameliorate the stability of mRNA-LNP formulations during storage below or above 0 °C.

pH optimization is also important for mRNA vaccine stability, as the pH influences the hydrolysis rate of mRNA and also LNP stability. Generally, mRNA is most stable in a weakly basic environment. The pH of the Moderna and Pfizer/BioNTech vaccines is between 7 and 8. Wayment-Steele et al. make the point that the apparent pH at the surface of the cationic, fully charged lipids could be higher than in the immediate surrounding aqueous medium (Wayment-Steele et al., 2020).

L. Schoenmaker et al.

*International Journal of Pharmaceutics 601 (2021) 120586*

### 4.2. Lyophilization

As the presence of water initiates degradation reactions in mRNA-LNPs, lyophilization would be a logical step to improve the long-term stability of mRNA-LNP formulations. The head of viral vaccines research at Pfizer, Philip Dormitzer, has already mentioned Pfizer's aspiration to use lyophilization for mRNA-LNP SARS-CoV-2 vaccines (Dolgin, 2020). Moreover, a lyophilized form of a mRNA-based cytomegalovirus vaccine (mRNA-1647) is used in a phase 2 clinical trial. It has a claimed shelf life at 5 °C of ≥ 18 months. However, no details on the formulation and production process can be found in the public domain (Moderna, 2021).

Freeze drying is widely used for live, attenuated virus vaccines (Hansen et al., 2015). It has also already been investigated for naked mRNA formulations, demonstrating its applicability and beneficial effect on mRNA stabilisation. Previous data by Jones *et al.* shows that freeze-dried mRNA formulated with trehalose is stable at 4 °C for up to 10 months (Jones et al., 2007). Lipid nanoparticles can be successfully freeze dried as well. During the freeze-drying process the structures are exposed to stress. Therefore, lyoprotectants that stabilize these colloidal particles should be included in the formulation. Sucrose or trehalose are used for that purpose (Abdelwahed et al., 2006). Thus, the studies with either mRNA or with LNPs suggest that lyophilization could be a possible way to increase the stability of the combination, mRNA-LNP, and could thereby allow for storage at higher temperatures than those currently required. However, lyophilization does have its downsides, as it requires reconstitution before administration and is a relatively expensive, energy- and time-consuming process. On the other hand, keeping the mRNA vaccines (deep)frozen also comes at a cost. Therefore, a logical next step is to investigate whether lyophilization is a viable option for mRNA-LNP formulations.

Shirane *et al.* freeze dried the ethanol-containing siRNA-LNP dispersion obtained immediately after LNP formation and found no difference between the gene knockdown efficiency of the freshly prepared (ethanol removed by ultrafiltration) and the reconstituted freeze-dried formulations *in vivo* (Shirane et al., 2018). These results show promise for the feasibility of lyophilization of mRNA-LNPs, while recognizing the structural differences between siRNA and mRNA.

There is little published data on the lyophilization of mRNA-LNPs, but there is one recent paper by Zhao *et al.* studying mRNA lipid-like nanoparticles (Zhao et al., 2020). They studied the effect of freeze-drying of these nanoparticles that contain an ionizable cationic lipid-like molecule. No details of the -freeze-drying process are provided. Contrary to the data on siRNA-LNPs obtained by Shirane et al., they found that after lyophilization and reconstitution the *in vitro* test showed no loss of activity, but the *in vivo* efficiency was lost. Thus, freeze-drying of mRNA-LNPs might be a more difficult task than previous research suggests. It would be helpful to elucidate the mechanism behind this nullification of *in vivo* efficiency. It could, for example, be that the formulation was suboptimal for freeze-drying or that the lyophilization process itself was flawed. The authors speculate that an alteration in the nanostructure of the mRNA-LLPs may have caused the low *in vivo* efficacy, as such a change could affect properties like the binding to serum proteins, which are absent in the *in vitro* study. Therefore, further improvement of the formulation excipients and freeze-drying conditions might lead to successful lyophilization of mRNA-LLPs.

Another approach, in case lyophilization of the fully prepared mRNA-LNPs complex is problematic, is to lyophilize naked mRNA and combine it with the LNPs shortly before administration. Ball *et al.* successfully followed the opposite approach by reconstituting freeze dried LNPs with siRNA/ethanol solutions (Ball et al., 2016). They correctly pointed out that: 'Unfortunately, the addition of ethanol to reconstitution solutions is often neither convenient nor practical, as dialysis into aqueous buffer would be required before use in animals or in the clinic' If one wishes to avoid freeze drying or organic solvents for the generation of active mRNA-LNPs, one may mix an 'empty' LNP aqueous suspension with 'fresh' mRNA and find that the mRNA is taken up and active (Leavitt et al., 2020).

Apart from challenges to preserve the integrity of mRNA-LNP through lyophilization, there are other hurdles such as the high energy consumption of the process and other costs, e.g., those related to the necessary, dramatic expansion of the lyophilization capacity worldwide in times of a pandemic. Therefore, it is worthwhile to consider alternative drying techniques. Only one publication could be found on spray drying of mRNA-LNPs where polymers (e.g., Eudragit) were needed as stabilizers for mRNA-LNPs to secure translation efficiency *in vivo* (Karve et al., 2020). Supercritical drying techniques would be another alternative for freeze-drying; they have been shown to be feasible –with their pros and cons– for other macromolecular biotech products, such as proteins (Jovanović et al., 2004).

## 5. Conclusions and prospects

This review outlines how different aspects of the current mRNA vaccine formulations influence their stability during storage. We conclude that exposure of mRNA to water likely is the main factor for mRNA vaccine instability. An implication of this is that decreasing the exposure to water would be a promising approach for improving mRNA vaccine stability.

The studies on mRNA-LNP structures indicate that the mRNA is located in the core of LNPs together with ionizable cationic lipid and water. This raises important questions about the possible shielding of the mRNA from water. It is, for example, unknown if and how the ionizable cationic lipids in the LNP interact with the mRNA. More work needs to be done to confirm the proposed structure and to understand the consequences. For instance, the pH inside the LNPs has been identified as an important characteristic to study in relation to stability. Another object of study would be to specifically analyze the type(s) of degradation that mRNA molecules undergo in their final formulation and whether sequence adjustment could help to maintain strand integrity. This could then also be coupled to characterization and optimization of the secondary and tertiary structure of mRNA, as there are indications that some folded structures are more stable.

This report is the first comprehensive survey of the factors behind mRNA-LNP vaccine instability. It also points towards solutions to address this instability and thereby may be of assistance to the development of more thermostable mRNA-LNP vaccines, alleviating a major barrier for the distribution of these vaccines.

## CRediT authorship contribution statement

**Linde Schoenmaker:** Conceptualization, Writing - review & editing. **Dominik Witzigmann:** Writing - review & editing. **Jayesh A. Kulkarni:** Writing - review & editing. **Rein Verbeke:** Writing - review & editing. **Gideon Kersten:** Writing - review & editing. **Wim Jiskoot:** Conceptualization, Writing - review & editing. **Daan Crommelin:** Conceptualization, Writing - review & editing.

## Declaration of Competing Interest

The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

## Acknowledgement

We acknowledge Mr. Oscar Escalona Rayo, Leiden University, for expertly redrawing Fig. 5.

L. Schoenmaker et al.

International Journal of Pharmaceutics 601 (2021) 120586

# References

Abdelwahed, W., Degobert, G., Stainmesse, S., Fessi, H., 2006. Freeze-drying of nanoparticles: Formulation, process and storage considerations. Adv. Drug Deliv. Rev. 58 (15), 1688–1713. https://doi.org/10.1016/j.addr.2006.09.017.

Yanez Arteta, M., Kjellman, T., Bartesaghi, S., Wallin, S., Wu, X., Kvist, A.J., Dabkowska, A., Székely, N., Radulescu, A., Bergenholtz, J., Lindfors, L., 2018. Successful reprogramming of cellular protein production through mRNA delivered by functionalized lipid nanoparticles. Proc. Natl. Acad. Sci. U. S. A. 115 (15), E3351–E3360. https://doi.org/10.1073/pnas.1720542115.

Ayat, N.R., Sun, Z., Sun, D.a., Yin, M., Hall, R.C., Vaidya, A.M., Liu, X., Schilb, A.L., Scheidt, J.H., Lu, Z.-R., 2019. Formulation of biocompatible targeted ECO/siRNA nanoparticles with long-term stability for clinical translation of RNAi. Nucleic Acid Ther. 29 (4), 195–207. https://doi.org/10.1089/nat.2019.0784.

Baden, L.R., El Sahly, H.M., Essink, B., Kotloff, K., Frey, S., Novak, R., Diemert, D., Spector, S.A., Rouphael, N., Creech, C.B., McGettigan, J., Khetan, S., Segall, N., Solis, J., Brosz, A., Fierro, C., Schwartz, H., Neuzil, K., Corey, L., Gilbert, P., Janes, H., Follmann, D., Marovich, M., Mascola, J., Polakowski, L., Ledgerwood, J., Graham, B.S., Bennett, H., Pajon, R., Knightly, C., Leav, B., Deng, W., Zhou, H., Han, S., Ivarsson, M., Miller, J., Zaks, T., 2021. Efficacy and safety of the mRNA-1273 SARS-CoV-2 vaccine. N. Engl. J. Med. 384 (5), 403–416. https://doi.org/10.1056/NEJMoa2035389.

Ball, R.L., Bajaj, P., Whitehead, K.A., 2016. Achieving long-term stability of lipid nanoparticles: examining the effect of pH, temperature, and lyophilization. Int. J. Nanomed. 12, 305–315. https://doi.org/10.2147/IJN.S123062.

Bloom, K., van den Berg, F., Arbuthnot, P., 2020. Self-amplifying RNA vaccines for infectious diseases. Gene Ther. 1–13 https://doi.org/10.1038/s41434-020-00204-y.

Brader, M.L., Williams, S.J., Banks, J.M., Hui, W.H., Zhou, Z.H., Jin, L., 2021. Encapsulation state of messenger RNA inside lipid nanoparticles. Biophys. J. https://doi.org/10.1016/j.bpj.2021.03.012.

Brisco, M.J., Morley, A.A., 2012. Quantification of RNA integrity and its use for measurement of transcript number. e144–e144 Nucleic Acids Res. 40. https://doi.org/10.1093/nar/gks588.

Burke, P.A., Gindy, M.E., Mathre, D.J., Kumar, V., Prud'homme, R.K., 2013. Preparation of Lipid Nanoparticles. US 2013/0037977.

Buschmann, M.D., Carrasco, M.J., Alishetty, S., Paige, M., Alameh, M.G., Weissman, D., 2021. Nanomaterial delivery systems for mRNA vaccines. Vaccines 9 (1), 65. https://doi.org/10.3390/vaccines9010065.

Crommelin, D.J.A., Anchordoquy, T.J., Volkin, D.B., Jiskoot, W., Mastrobattista, E., 2021. Addressing the cold reality of mRNA vaccine stability. J. Pharm. Sci. 110 (3), 997–1001. https://doi.org/10.1016/j.xphs.2020.12.006.

CureVac, 2020. CureVac's COVID-19 Vaccine Candidate, CVnCoV, Suitable for Standard Fridge Temperature Logistics [WWW Document]. URL https://www.curevac.com/en/2020/11/12/curevacs-covid-19-vaccine-candidate-cvncov-suitable-for-standard-fridge-temperature-logistics/ (accessed 3.19.21).

Démoulins, T., Englezou, P.C., Milona, P., Ruggli, N., Tirelli, N., Pichon, C., Sapet, C., Ebensen, T., Guzmán, C.A., McCullough, K.C., 2017. Self-Replicating RNA Vaccine Delivery to Dendritic Cells BT - RNA Vaccines: Methods and Protocols. In: Kramps, T., Elbers, K. (Eds.), RNA Vaccines. Springer New York, New York, NY, pp. 37–75. https://doi.org/10.1007/978-1-4939-6481-9_3.

Dolgin, E., 2020. COVID-19 vaccines poised for launch, but impact on pandemic unclear. Nat. Biotechnol. https://doi.org/10.1038/d41587-020-00022-y.

EMA, 2021. COVID-19 Vaccine Moderna: Summary of Product Characteristics [WWW Document]. accessed 3.18.21. https://www.ema.europa.eu/en/documents/product-information/covid-19-vaccine-moderna-epar-product-information_en.pdf.

EMA, 2020a. Assessment report Comirnaty Common name: COVID-19 mRNA vaccine (nucleoside-modified) [WWW Document]. accessed 3.18.21. https://www.ema.europa.eu/en/documents/assessment-report/comirnaty-epar-public-assessment-report_en.pdf.

EMA, 2020b. Comirnaty: Summary of Product Characteristics [WWW Document]. accessed 3.18.21. https://www.ema.europa.eu/en/documents/product-information/comirnaty-epar-product-information_en.pdf.

EMA, 2018. Onpattro: Summary of Product Characteristics [WWW Document]. accessed 3.19.21. https://www.ema.europa.eu/en/documents/product-information/onpattro-epar-product-information_en.pdf.

Erasmus, Jesse H., Khandhar, Amit P., O'Connor, Megan A., Walls, Alexandra C., Hemann, Emily A., Murapa, Patience, Archer, Jacob, Leventhal, Shanna, Fuller, James T., Lewis, Thomas B., Draves, Kevin E., Randall, Samantha, Guerriero, Kathryn A., Duthie, Malcolm S., Carter, Darrick, Reed, Steven G., Hawman, David W., Feldmann, Heinz, Gale, Michael, Veesler, David, Berglund, Peter, Fuller, Deborah Heydenburg, 2020. An Alphavirus-derived replicon RNA vaccine induces SARS-CoV-2 neutralizing antibody and T cell responses in mice and nonhuman primates. Sci. Transl. Med. 12 (555), eabc9396. https://doi.org/10.1126/scitranslmed.abc9396.

Evans, R.K., Xu, Z., Bohannon, K.E., Wang, B., Bruner, M.W., Volkin, D.B., 2000. Evaluation of degradation pathways for plasmid dna in pharmaceutical formulations via accelerated stability studies. J. Pharm. Sci. 89, 76–87. https://doi.org/10.1002/(SICI)1520-6017(200001)89:1<76::AID-JPS8>3.0.CO;2-U.

Evers, Martijn J.W., Kulkarni, Jayesh A., van der Meel, Roy, Cullis, Pieter R., Vader, Pieter, Schiffelers, Raymond M., 2018. State-of-the-art design and rapid-mixing production techniques of lipid nanoparticles for nucleic acid delivery. Small Methods 2 (9), 1700375. https://doi.org/10.1002/smtd.v2.910.1002/smtd.201700375.

Eygeris, Yulia, Patel, Siddharth, Jozic, Antony, Sahay, Gaurav, 2020. Deconvoluting lipid nanoparticle structure for messenger RNA delivery. Nano Lett. 20 (6), 4543–4549. https://doi.org/10.1021/acs.nanolett.0c01386 10.1021/acs.nanolett.0c01386.s001.

Fabre, Anne-Lise, Colotte, Marthe, Luis, Aurélie, Tuffet, Sophie, Bonnet, Jacques, 2014. An efficient method for long-term room temperature storage of RNA. Eur. J. Hum. Genet. 22 (3), 379–385. https://doi.org/10.1038/ejhg.2013.145.

Fan, Yuchen, Marioli, Maria, Zhang, Kelly, 2021. Analytical characterization of liposomes and other lipid nanoparticles for drug delivery. J. Pharm. Biomed. Anal. 192, 113642. https://doi.org/10.1016/j.jpba.2020.113642.

FDA, 2017. ONPATTRO (patisiran) Lipid Complex Injection Addendum to Drug Product Quality Review [WWW Document]. accessed 3.19.21. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2018/210922Orig1s000ChemR.pdf.

Hansen, L.J.J., Daoussi, R., Vervaet, C., Remon, J.-P., De Beer, T.R.M., 2015. Freeze-drying of live virus vaccines: a review. Vaccine 33 (42), 5507–5519. https://doi.org/10.1016/j.vaccine.2015.08.085.

Hassett, K.J., Benenato, K.E., Jacquinet, E., Lee, A., Woods, A., Yuzhakov, O., Himansu, S., Deterling, J., Geilich, B.M., Ketova, T., Mihai, C., Lynn, A., McFadyen, I., Moore, M.J., Senn, J.J., Stanton, M.G., Almarsson, Ö., Ciaramella, G., Brito, L.A., 2019. Optimization of lipid nanoparticles for intramuscular administration of mRNA vaccines. Mol. Ther. Nucleic Acids 15, 1–11. https://doi.org/10.1016/j.omtn.2019.01.013.

Houseley, Jonathan, Tollervey, David, 2009. The many pathways of RNA degradation. Cell 136 (4), 763–776. https://doi.org/10.1016/j.cell.2009.01.019.

Hubert, B., 2021. The CureVac Vaccine, and a brief tour through some of the wonders of nature [WWW Document]. URL https://berthub.eu/articles/posts/curevac-vaccine-and-wonders-of-biology/ (accessed 3.18.21).

Issa, W., Packer, M., 2019. METHODS FOR HPLC ANALYSIS. WO 2019/036685.

Jackson, N.A.C., Kester, K.E., Casimiro, D., Gurunathan, S., DeRosa, F., 2020. The promise of mRNA vaccines: a biotech and industrial perspective. npj Vaccines 5, 11. https://doi.org/10.1038/s41541-020-0159-8.

Jaeger, J., Sorensen, K., Wolff, S.P., 1994. Peroxide accumulation in detergents. J. Biochem. Biophys. Methods 29 (1), 77–81. https://doi.org/10.1016/0165-022X(94)90058-2.

Jayaraman, M., Ansell, S.M., Mui, B.L., Tam, Y.K., Chen, J., Du, X., Butler, D., Eltepu, L., Matsuda, S., Narayanannair, J.K., Rajeev, K.G., Hafez, I.M., Akinc, A., Maier, M.A., Tracy, M.A., Cullis, P.R., Madden, T.D., Manoharan, M., Hope, M.J., 2012. Maximizing the potency of siRNA lipid nanoparticles for hepatic gene silencing in vivo. Angew. Chemie Int. Ed. 51, 8529–8533. https://doi.org/10.1002/anie.201203263.

Jones, Kathryn J., Drane, Debbie, Gowans, Eric J. 2007. Long-term storage of DNA-free RNA for use in vaccine studies. Biotechniques 43 (5), 675–681. https://doi.org/10.2144/000112593.

Jovanović, Nataša, Bouchard, Andréanne, Hofland, Gerard W., Witkamp, Geert-Jan, Crommelin, Daan J.A., Jiskoot, Wim, 2004. Stabilization of proteins in dry powder formulations using supercritical fluid technology. Pharm. Res. 21 (11), 1955–1969. https://doi.org/10.1023/B:PHAM.0000048185.09483.e7.

Kanavarioti, A., 2019. HPLC methods for purity evaluation of man-made single-stranded RNAs. Sci. Rep. 9, 1019. https://doi.org/10.1038/s41598-018-37642-z.

Karve, S., DeRosa, F., Heartlein, M., Patel, Z., Sarode, A., 2020. DRY POWDER FORMULATIONS FOR MESSENGER RNA. US 2020/0022921.

Kauffman, K.J., Webber, M.J., Anderson, D.G., 2016. Materials for non-viral intracellular delivery of messenger RNA therapeutics. J. Control. Release 240, 227–234. https://doi.org/10.1016/j.jconrel.2015.12.032.

Kaukinen, U., Lyytikäinen, S., Mikkola, S., Lönnberg, H., 2002. The reactivity of phosphodiester bonds within linear single-stranded oligoribonucleotides is strongly dependent on the base sequence. Nucleic Acids Res. 30, 468–474. https://doi.org/10.1093/nar/30.2.468.

Kim, I., Mckenna, S.A., Puglisi, E.V., Puglisi, J.D., 2007. Rapid purification of RNAs using fast performance liquid chromatography (FPLC). RNA 13, 289–294. https://doi.org/10.1261/rna.342607.

Kim, J., Eygeris, Y., Gupta, M., Sahay, G., 2021. Self-assembled mRNA vaccines. Adv. Drug Deliv. Rev. 170, 83–112. https://doi.org/10.1016/j.addr.2020.12.014.

Klauer, A. Alejandra, van Hoof, Ambro, 2012. Degradation of mRNAs that lack a stop codon: a decade of nonstop progress. WIREs RNA 3 (5), 649–660. https://doi.org/10.1002/wrna.1124.

Kolhe, P., Amend, E.K., Singh, S., 2010. Impact of freezing on pH of buffered solutions and consequences for monoclonal antibody aggregation. Biotechnol. Prog. 26, 727–733. https://doi.org/10.1002/btpr.377.

Kulkarni, Jayesh A., Darjuan, Maria M., Mercer, Joanne E., Chen, Sam, van der Meel, Roy, Thewalt, Jenifer L., Tam, Yuen Yi C., Cullis, Pieter R., 2018. On the formation and morphology of lipid nanoparticles containing ionizable cationic lipids and siRNA. ACS Nano 12 (5), 4787–4795. https://doi.org/10.1021/acsnano.8b01516 10.1021/acsnano.8b01516.s001.

Kulkarni, Jayesh A., Witzigmann, Dominik, Leung, Jerry, Tam, Yuen Yi C., Cullis, Pieter R., 2019. On the role of helper lipids in lipid nanoparticle formulations of siRNA. Nanoscale 11 (45), 21733–21739. https://doi.org/10.1039/C9NR09347H.

Leavitt, B., Cullis, P., Petkau, T., Hill, A., Wagner, P., Kulkarni, J., 2020. Compositions and systems comprising transfection-competent vesicles free of organic-solvents and detergents and methods related thereto. WO/2020/077007.

Leung, Alex K.K., Tam, Yuen Yi C., Chen, Sam, Hafez, Ismail M., Cullis, Pieter R., 2015. Microfluidic mixing: a general method for encapsulating macromolecules in lipid nanoparticle systems. J. Phys. Chem. B 119 (28), 8698–8706. https://doi.org/10.1021/acs.jpcb.5b02891.

Levine, A., Ono, T., Hirose, T., 2019. HPLC Purification of mRNA with Reverse Phase and Size Exclusion Chromatography [WWW Document]. URL https://www.nacalai.co.jp/global/download/pdf/TIDES_2019_poster_mrna.pdf (accessed 3.19.21).

Liang, F., Lindgren, G., Lin, A., Thompson, E.A., Ols, S., Röhss, J., John, S., Hassett, K., Yuzhakov, O., Bahl, K., Brito, L.A., Salter, H., Ciaramella, G., Loré, K., 2017. Efficient targeting and activation of antigen-presenting cells in vivo after modified mRNA

L. Schoenmaker

International Journal of Pharmaceutics 601 (2021) 120586

vaccine administration in rhesus macaques. Mol. Ther. 25, 2635–2647. https://doi.org/10.1016/j.ymthe.2017.08.006.

Lindsay, Kevin E., Bhosle, Sushma M., Zurla, Chiara, Beyersdorf, Jared, Rogers, Kenneth A., Vanover, Daryll, Xiao, Peng, Araínga, Mariluz, Shirreff, Lisa M., Pitard, Bruno, Baumhof, Patrick, Villinger, Francois, Santangelo, Philip J., 2019. Visualization of early events in mRNA vaccine delivery in non-human primates via PET–CT and near-infrared imaging. Nat. Biomed. Eng. 3 (5), 371–380. https://doi.org/10.1038/s41551-019-0378-3.

Lipfert, Jan, Doniach, Sebastian, Das, Rhiju, Herschlag, Daniel, 2014. Understanding nucleic acid-ion interactions. Annu. Rev. Biochem. 83 (1), 813–841. https://doi.org/10.1146/annurev-biochem-060409-092720.

Mauger, David M., Cabral, B. Joseph, Presnyak, Vladimir, Su, Stephen V., Reid, David W., Goodman, Brooke, Link, Kristian, Khatwani, Nikhil, Reynders, John, Moore, Melissa J., McFadyen, Iain J., 2019. mRNA structure regulates protein expression through changes in functional half-life. Proc. Natl. Acad. Sci. 116 (48), 24075–24083. https://doi.org/10.1073/pnas.1908052116.

McKay, P.F., Hu, K., Blakney, A.K., Samnuan, K., Brown, J.C., Penn, R., Zhou, J., Bouton, C.R., Rogers, P., Polra, K., Lin, P.J.C., Barbosa, C., Tam, Y.K., Barclay, W.S., Shattock, R.J., 2020. Self-amplifying RNA SARS-CoV-2 lipid nanoparticle vaccine candidate induces high neutralizing antibody titers in mice. Nat. Commun. 11, 3523. https://doi.org/10.1038/s41467-020-17409-9.

Mikkola, S., Kaukinen, U., Lönnberg, H., 2001. The effect of secondary structure on cleavage of the phosphodiester bonds of RNA. Cell Biochem. Biophys. 34, 95–119. https://doi.org/10.1385/CBB:34:1:95.

Moderna, 2021. Cytomegalovirus (CMV) vaccine (mRNA-1647) [WWW Document]. URL https://investors.modernatx.com/static-files/693ffcac-b2fc-4f7e-91c5-0a9164e7c6dc (accessed 4.2.21).

Muralidhara, Bilikallahalli K., Baid, Rinku, Bishop, Steve M., Huang, Min, Wang, Wei, Nema, Sandeep, 2016. Critical considerations for developing nucleic acid macromolecule based drug products. Drug Discov. Today 21 (3), 430–444. https://doi.org/10.1016/j.drudis.2015.11.012.

Nogueira, Sara S., Schlegel, Anne, Maxeiner, Konrad, Weber, Benjamin, Barz, Matthias, Schroer, Martin A., Blanchet, Clement E., Svergun, Dmitri I., Ramishetti, Srinivas, Peer, Dan, Langguth, Peter, Sahin, Ugur, Haas, Heinrich, 2020. Polysarcosine-functionalized lipid nanoparticles for therapeutic mRNA delivery. ACS Appl. Nano Mater. 3 (11), 10634–10645. https://doi.org/10.1021/acsanm.0c01834.10.1021/acsanm.0c01834.s001.

Pardi, Norbert, Hogan, Michael J., Porter, Frederick W., Weissman, Drew, 2018. mRNA vaccines — a new era in vaccinology. Nat. Rev. Drug Discov. 17 (4), 261–279. https://doi.org/10.1038/nrd.2017.243.

Pardi, N., Tuyishime, S., Muramatsu, H., Kariko, K., Mui, B.L., Tam, Y.K., Madden, T.D., Hope, M.J., Weissman, D., 2015. Expression kinetics of nucleoside-modified mRNA delivered in lipid nanoparticles to mice by various routes. J. Control. Release 217, 345–351. https://doi.org/10.1016/j.jconrel.2015.08.007.

Pascolo, S., 2008. Vaccination with Messenger RNA (mRNA). In: Bauer, S., Hartmann, G. (Eds.), Toll-Like Receptors (TLRs) and Innate Immunity. Springer, Berlin, pp. 221–235. https://doi.org/10.1007/978-3-540-72167-3_11.

Patel, S., Ashwanikumar, N., Robinson, E., Xia, Y., Mihai, C., Griffith, J.P., Hou, S., Esposito, A.A., Ketova, T., Welsher, K., Joyal, J.L., Almarsson, Ö., Sahay, G., 2020. Naturally-occurring cholesterol analogues in lipid nanoparticles induce polymorphic shape and enhance intracellular delivery of mRNA. Nat. Commun. 11, 983. https://doi.org/10.1038/s41467-020-14527-2.

Pepini, T., Pulichino, A.-M., Carsillo, T., Carlson, A.L., Sari-Sarraf, F., Ramsauer, K., Debastis, J.C., Maruggi, G., Otten, G.R., Geall, A.J., Yu, D., Ulmer, J.B., Iavarone, C., 2017. Induction of an IFN-Mediated Antiviral Response by a Self-Amplifying RNA Vaccine: Implications for Vaccine Design. J. Immunol. 198, 4012 LP – 4024. https://doi.org/10.4049/jimmunol.1601877.

Petsch, Benjamin, Schnee, Margit, Vogel, Annette B., Lange, Elke, Hoffmann, Bernd, Voss, Daniel, Schlake, Thomas, Thess, Andreas, Kallen, Karl-Josef, Stitz, Lothar, Kramps, Thomas, 2012. Protective efficacy of in vitro synthesized, specific mRNA vaccines against influenza A virus infection. Nat. Biotechnol. 30 (12), 1210–1216. https://doi.org/10.1038/nbt.2436.

Pierrat, Philippe, Lebeau, Luc, 2015. Characterization of titratable amphiphiles in lipid membranes by fluorescence spectroscopy. Langmuir 31 (45), 12362–12371. https://doi.org/10.1021/acs.langmuir.5b03258.

Pocernich, C., Luttgeharm, K., Siembieda, S., 2019. Assessment of Long IVT mRNA Fragments with the Agilent Fragment Analyzer System [WWW Document]. URL https://cdn.technologynetworks.com/ep/pdfs/assessment-of-long-ivt-mrna-fragments-with-the-agilent-fragment-analyzer-system.pdf (accessed 3.18.21).

Pogocki, D., Schöneich, C., 2000. Chemical stability of nucleic acid-derived drugs. J. Pharm. Sci. 89, 443–456. https://doi.org/10.1002/(SICI)1520-6017(200004)89:4<443::AID-JPS2>3.0.CO;2-W.

Polack, Fernando P., Thomas, Stephen J., Kitchin, Nicholas, Absalon, Judith, Gurtman, Alejandra, Lockhart, Stephen, Perez, John L., Pérez Marc, Gonzalo, Moreira, Edson D., Zerbini, Cristiano, Bailey, Ruth, Swanson, Kena A., Roychoudhury, Satrajit, Koury, Kenneth, Li, Ping, Kalina, Warren V., Cooper, David, Frenck, Robert W., Hammitt, Laura L., Türeci, Özlem, Nell, Haylene, Schaefer, Axel, Ünal, Serhat, Tresnan, Dina B., Mather, Susan, Dormitzer, Philip R., Şahin, Uğur, Jansen, Kathrin U., Gruber, William C., 2020. Safety and efficacy of the BNT162b2 mRNA covid-19 vaccine. N. Engl. J. Med. 383 (27), 2603–2615. https://doi.org/10.1056/NEJMoa2034577.

Poveda, C., Biter, A.B., Bottazzi, M.E., Strych, U., 2019. Establishing preferred product characterization for the evaluation of RNA vaccine antigens. Vaccines 7, 131. https://doi.org/10.3390/vaccines7040131.

Reichmuth, Andreas M, Oberli, Matthias A, Jaklenec, Ana, Langer, Robert, Blankschtein, Daniel, 2016. mRNA vaccine delivery using lipid nanoparticles. Ther. Deliv. 7 (5), 319–334. https://doi.org/10.4155/tde-2016-0006.

Rissanou, Anastassia N., Ouranidis, Andreas, Karatasos, Kostas, 2020. Complexation of single stranded RNA with an ionizable lipid: an all-atom molecular dynamics simulation study. Soft Matter 16 (30), 6993–7005. https://doi.org/10.1039/D0SM00736F.

Roesler, Elisabeth, Weiss, Richard, Weinberger, Esther E., Fruehwirth, Angelika, Stoecklinger, Angelika, Mostböck, Sven, Ferreira, Fatima, Thalhamer, Josef, Scheiblhofer, Sandra, 2009. Immunize and disappear—Safety-optimized mRNA vaccination with a panel of 29 allergens. J. Allergy Clin. Immunol. 124 (5), 1070–1077.e11. https://doi.org/10.1016/j.jaci.2009.06.036.

Ryals, Renee C., Patel, Siddharth, Acosta, Chris, McKinney, Madison, Pennesi, Mark E., Sahay, Gaurav, Lewin, Alfred S., 2020. The effects of PEGylation on LNP based mRNA delivery to the eye. PLoS ONE 15 (10), e0241006. https://doi.org/10.1371/journal.pone.0241006.

Sahin, Ugur, Karikó, Katalin, Türeci, Özlem, 2014. MRNA-based therapeutics — developing a new class of drugs. Nat. Rev. Drug Discov. 13 (10), 759–780. https://doi.org/10.1038/nrd4278.

Schariter, J., Hassett, K., Smith, M., Almarsson, O., Brito, L., 2019. METHODS OF MAKING LIPID NANOPARTICLES. WO/2019/046809.

Schmid, A., 2017. Considerations for producing mRNA vaccines for clinical trials BT - RNA vaccines: methods and protocols. In: Kramps, T., Elbers, K. (Eds.), RNA Vaccines. Springer, New York, New York, NY, pp. 237–251. https://doi.org/10.1007/978-1-4939-6481-9_15.

Sebastiani, F., Yanez Arteta, M., Lerche, M., Porcar, L., Lang, C., Bragg, R.A., Elmore, C. S., Krishnamurthy, V.R., Russell, R.A., Darwish, T., Pichler, H., Waldie, S., Moulin, M., Haertlein, M., Forsyth, V.T., Lindfors, L., Cárdenas, M., 2021. Apolipoprotein E binding drives structural and compositional rearrangement of mRNA-containing lipid nanoparticles. ACS Nano. https://doi.org/10.1021/acsnano.0c10064.

Shirane, Daiki, Tanaka, Hiroki, Nakai, Yuta, Yoshioka, Hiroki, Akita, Hidetaka, 2018. Development of an alcohol dilution-lyophilization method for preparing lipid nanoparticles containing encapsulated siRNA. Biol. Pharm. Bull. 41 (8), 1291–1294. https://doi.org/10.1248/bpb.b18-00208.

Spivak, V.B., Sharokh, Z., Issa, W.J., 2014. ANALYSIS OF MRNA HETEROGENEITY AND STABILITY. WO 2014/144711.

Stitz, Lothar, Vogel, Annette, Schnee, Margit, Voss, Daniel, Rauch, Susanne, Mutzke, Thorsten, Ketterer, Thomas, Kramps, Thomas, Petsch, Benjamin, Rupprecht, Charles E., 2017. A thermostable messenger RNA based vaccine against rabies. PLoS Negl. Trop. Dis. 11 (12), e0006108. https://doi.org/10.1371/journal.pntd.0006108.

Suzuki, Y., Hyodo, K., Tanaka, Y., Ishihara, H., 2015. siRNA-lipid nanoparticles with long-term storage stability facilitate potent gene-silencing in vivo. J. Control. Release 220, 44–50. https://doi.org/10.1016/j.jconrel.2015.10.024.

Tanaka, Hiroki, Takahashi, Tatsunari, Konishi, Manami, Takata, Nae, Gomi, Masaki, Shirane, Daiki, Miyama, Ryo, Hagiwara, Shinya, Yamasaki, Yuki, Sakurai, Yu, Ueda, Keisuke, Higashi, Kenjirou, Moribe, Kunikazu, Shinsho, Eiji, Nishida, Ruka, Fukuzawa, Kaori, Yonemochi, Etsuo, Okuwaki, Koji, Mochizuki, Yuji, Nakai, Yuta, Tange, Kota, Yoshioka, Hiroki, Tamagawa, Shinya, Akita, Hidetaka, 2020. Self-degradable lipid-like materials based on "hydrolysis accelerated by the intra-particle enrichment of reactant (HyPER)" for messenger RNA delivery. Adv. Funct. Mater. 30 (34), 1910575. https://doi.org/10.1002/adfm.v30.3410.1002/adfm.201910575.

Thess, Andreas, Grund, Stefanie, Mui, Barbara L, Hope, Michael J, Baumhof, Patrick, Fotin-Mleczek, Mariola, Schlake, Thomas, 2015. Sequence-engineered mRNA without chemical nucleoside modifications enables an effective protein therapy in large animals. Mol. Ther. 23 (9), 1456–1464. https://doi.org/10.1038/mt.2015.103.

Tinari, S., 2021. The EMA covid-19 data leak, and what it tells us about mRNA instability. BMJ 372, n627. https://doi.org/10.1136/bmj.n627.

Verbeke, Rein, Lentacker, Ine, De Smedt, Stefaan C., Dewitte, Heleen, 2019. Three decades of messenger RNA vaccine development. Nano Today 28, 100766. https://doi.org/10.1016/j.nantod.2019.100766.

Verbeke, R., Lentacker, I., De Smedt, S.C., Dewitte, H., 2021. The dawn of mRNA vaccines: the COVID-19 case. J. Control. Release. https://doi.org/10.1016/j.jconrel.2021.03.043.

Viger-Gravel, Jasmine, Schantz, Anna, Pinon, Arthur C., Rossini, Aaron J., Schantz, Staffan, Emsley, Lyndon, 2018. Structure of lipid nanoparticles containing siRNA or mRNA by dynamic nuclear polarization-enhanced NMR spectroscopy. J. Phys. Chem. B 122 (7), 2073–2081. https://doi.org/10.1021/acs.jpcb.7b10795.10.1021/acs.jpcb.7b10795.s001.

Vogel, Annette B., Lambert, Laura, Kinnear, Ekaterina, Busse, David, Erbar, Stephanie, Reuter, Kerstin C., Wicke, Lena, Perkovic, Mario, Beissert, Tim, Haas, Heinrich, Reece, Stephen T., Sahin, Ugur, Tregoning, John S., 2018. Self-amplifying RNA vaccines give equivalent protection against influenza to mRNA vaccines but at much lower doses. Mol. Ther. 26 (2), 446–455. https://doi.org/10.1016/j.ymthe.2017.11.017.

Wang, Changguang, Siriwardane, Dumindika A., Jiang, Wenlei, Mudalige, Thilak, 2019. Quantitative analysis of cholesterol oxidation products and desmosterol in parenteral liposomal pharmaceutical formulations. Int. J. Pharm. 569, 118576. https://doi.org/10.1016/j.ijpharm.2019.118576.

Ward, D., McCormack, S., 2021. Clinical trial to assess the safety of a coronavirus vaccine in healthy men and women. ISRCTN. https://doi.org/10.1186/ISRCTN17072692.

Wayment-Steele, H.K., Kim, D.S., Choe, C.A., Nicol, J.J., Wellington-Oguri, R., Sperberg, R.A.P., Huang, P.-S., Das, R., 2020. Theoretical basis for stabilizing messenger RNA through secondary structure design. bioRxiv Prepr. Serv. Biol. 2020.08.22.262931. https://doi.org/10.1101/2020.08.22.262931.

*L. Schoenmaker et al.*

*International Journal of Pharmaceutics 601 (2021) 120586*

World Health Organization, 2021. Draft landscape and tracker of COVID-19 candidate vaccines [WWW Document]. accessed 3.18.21. https://www.who.int/publications/m/item/draft-landscape-of-covid-19-candidate-vaccines.

Wrapp, D., Wang, N., Corbett, K.S., Goldsmith, J.A., Hsieh, C.-L., Abiona, O., Graham, B. S., McLellan, J.S., 2020. Cryo-EM structure of the 2019-nCoV spike in the prefusion conformation. Science (80-.). 367, 1260 LP – 1263. https://doi.org/10.1126/science.abb2507.

Zhang, Heyang, Rombouts, Koen, Raes, Laurens, Xiong, Ranhua, De Smedt, Stefaan C., Braeckmans, Kevin, Remaut, Katrien, 2020a. Fluorescence-based quantification of messenger RNA and plasmid DNA decay kinetics in extracellular biological fluids and cell extracts. Adv. Biosyst. 4 (5), 2000057. https://doi.org/10.1002/adbi.v4.510.1002/adbi.202000057.

Zhang, J., Kuo, C.C.J., Chen, L., 2011. GC content around splice sites affects splicing through pre-mRNA secondary structures. BMC Genomics 12, 90. https://doi.org/10.1186/1471-2164-12-90.

Zhang, Na-Na, Li, Xiao-Feng, Deng, Yong-Qiang, Zhao, Hui, Huang, Yi-Jiao, Yang, Guan, Huang, Wei-Jin, Gao, Peng, Zhou, Chao, Zhang, Rong-Rong, Guo, Yan, Sun, Shi-Hui, Fan, Hang, Zu, Shu-Long, Chen, Qi, He, Qi, Cao, Tian-Shu, Huang, Xing-Yao, Qiu, Hong-Ying, Nie, Jian-Hui, Jiang, Yuhang, Yan, Hua-Yuan, Ye, Qing, Zhong, Xia, Xue, Xia-Lin, Zha, Zhen-Yu, Zhou, Dongsheng, Yang, Xiao, Wang, You-Chun, Ying, Bo, Qin, Cheng-Feng, 2020b. A Thermostable mRNA Vaccine against COVID-19. Cell 182 (5), 1271–1283.e16. https://doi.org/10.1016/j.cell.2020.07.024.

Zhao, Boxuan Simen, He, Chuan, 2015. Pseudouridine in a new era of RNA modifications. Cell Res. 25 (2), 153–154. https://doi.org/10.1038/cr.2014.143.

Zhao, Pengxuan, Hou, Xucheng, Yan, Jingyue, Du, Shi, Xue, Yonger, Li, Wenqing, Xiang, Guangya, Dong, Yizhou, 2020. Long-term storage of lipid-like nanoparticles for mRNA delivery. Bioact. Mater. 5 (2), 358–363. https://doi.org/10.1016/j.bioactmat.2020.03.001.

# EXHIBIT 22



Our STN: BL 125742/36                                 **SUPPLEMENT APPROVAL**

BioNTech Manufacturing GmbH
Attention: Amit Patel                               December 16, 2021
Pfizer Inc.
235 East 42nd Street
New York, NY 10017

Dear Mr. Patel:

We have approved your request submitted and received on November 18, 2021, to supplement your Biologics License Application (BLA) under section 351(a) of the Public Health Service Act for COVID-19 Vaccine, mRNA (COMIRNATY), to include a new 30 microgram dose formulation (Tris/Sucrose) of COMIRNATY manufactured at the Pfizer Manufacturing Belgium NV, Puurs, Belgium (Pfizer, Puurs) facility.

**LABELING**

We hereby approve the draft content of labeling including the Package Inserts submitted under amendment 10, dated December 13, 2021, and the draft carton and container labels submitted under amendment 6, dated December 9, 2021.

**CONTENT OF LABELING**

As soon as possible, but no later than 14 days from the date of this letter, please submit the final content of labeling (21 CFR 601.14) in Structured Product Labeling (SPL) format via the FDA automated drug registration and listing system, (eLIST) as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.  Content of labeling must be identical to the Package Inserts submitted on December 13, 2021. Information on submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As* at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible via publicly available labeling repositories.

**CARTON AND CONTAINER LABELS**

Please electronically submit final printed carton and container labels identical to the carton and container labels submitted on December 9, 2021, according to the guidance for industry *Providing Regulatory Submissions in Electronic Format — Certain Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-regulatory-submissions-electronic-format-certain-human-pharmaceutical-product-applications.

Page 2 – STN BL 125742/36 – Amit Patel

All final labeling should be submitted as Product Correspondence to this BLA, STN BL 125742, at the time of use and include implementation information on Form FDA 356h.

**ADVERTISING AND PROMOTIONAL LABELING**

You may submit two draft copies of the proposed introductory advertising and promotional labeling with Form FDA 2253 to the Advertising and Promotional Labeling Branch at the following address:

> Food and Drug Administration
> Center for Biologics Evaluation and Research
> Document Control Center
> 10903 New Hampshire Ave.
> WO71–G112
> Silver Spring, MD 20993-0002

You must submit copies of your final advertising and promotional labeling at the time of initial dissemination or publication, accompanied by Form FDA 2253 (21 CFR 601.12(f)(4)).

All promotional claims must be consistent with and not contrary to approved labeling. You should not make a comparative promotional claim or claim of superiority over other products unless you have substantial evidence or substantial clinical experience to support such claims (21 CFR 202.1(e)(6)).

Please submit an amendment to all pending supplemental applications for this BLA that include revised labeling incorporating a revised content of labeling that includes this change.

We will include information contained in the above-referenced supplement in your BLA file.

> Sincerely,

> Jerry P. Weir, Ph.D.
> Director
> Division of Viral Products
> Office of Vaccines
>   Research and Review
> Center for Biologics
>   Evaluation and Research

# EXHIBIT 23

**FDA NEWS RELEASE**

# Coronavirus (COVID-19) Update: December 17, 2021

**For Immediate Release:**

December 17, 2021

The U.S. Food and Drug Administration today announced the following actions taken in its ongoing response effort to the COVID-19 pandemic:

- On December 15, 2021, the FDA approved an abbreviated new drug application (ANDA 211538) for Vasopressin Injection (https://www.accessdata.fda.gov/scripts/cder/ob/results_product.cfm?Appl_Type=A&Appl_No=211538), 20 Units/mL Multiple Dose Vials, indicated to increase blood pressure in adults with vasodilatory shock (sudden relaxation of blood vessels) who remain hypotensive (low blood pressure) despite fluids and catecholamines (a class of neurotransmitters). The most common adverse reactions include decreased cardiac output, bradycardia (slow heart rate), tachyarrhythmias (rapid heart rate), hyponatremia (low sodium levels), and ischemia (inadequate blood supply to a part of the body). This action is the first approval of an ANDA for this product. The FDA recognizes the increased demand for certain products during the COVID-19 public health emergency, and we remain deeply committed to facilitating access to medical products to help address critical needs of the American public.

- On December 16, 2021, the FDA approved a manufacturing change for Comirnaty (COVID-19 Vaccine, mRNA) (https://www.fda.gov/vaccines-blood-biologics/comirnaty) to include a formulation that uses a different buffer. Buffers help maintain a vaccine's pH (a measure of how acidic or alkaline a solution is) and stability. This new formulation is more stable at refrigerated temperatures for longer periods of time, permitting greater flexibility for vaccination providers. This formulation of Comirnaty does not need to be diluted before use, thus, vaccination providers can more readily prepare and deliver appropriate doses. The new formulation contains Tris buffer, a commonly used buffer in other FDA-approved vaccines and biologics. The FDA previously authorized this vaccine formulation for the Pfizer-BioNTech COVID-19 Vaccine in October. The FDA-approved Comirnaty (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine authorized for Emergency Use Authorization (EUA) for individuals 12 years of age and older, when prepared according to their respective instructions for use, can be used interchangeably.

- Testing updates:
  - As of today, 422 tests and sample collection devices are authorized by the FDA under emergency use authorizations (EUAs). These include 292 molecular tests and sample collection devices, 89 antibody and other immune response tests and 41 antigen tests. There are 67 molecular authorizations and one antibody authorization that can be used with home-collected samples. There is one EUA for a molecular prescription at-home test, three EUAs for antigen prescription at-home tests, 11 EUAs for antigen over-the-counter (OTC) at-home tests and three EUAs for molecular OTC at-home tests.
  - The FDA has authorized 22 antigen tests and nine molecular tests for serial screening programs. The FDA has also authorized 720 revisions to EUA authorizations.

## Related Information

- COVID-19 Vaccines (/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-vaccines)
- Coronavirus Disease 2019 (COVID-19) (/emergency-preparedness-and-response/counterterrorism-and-emerging-threats/coronavirus-disease-2019-covid-19)

### ###

The FDA, an agency within the U.S. Department of Health and Human Services, protects the public health by assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

---

## Inquiries

**Media:**

✉ Alison Hunt (mailto:alison.hunt@fda.hhs.gov)

☏ 888-INFO-FDA

**Consumer:**

☏ 888-INFO-FDA

# EXHIBIT 24

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use COMIRNATY safely and effectively. See full prescribing information for COMIRNATY.**

**COMIRNATY® (COVID-19 Vaccine, mRNA) suspension for injection, for intramuscular use**
**Initial U.S. Approval: 2021**

--------------------------- **RECENT MAJOR CHANGES** ----------------------------
Dosage and Administration, Preparation for Administration (2.1)         12/2021

------------------------ **INDICATIONS AND USAGE** ----------------------------
COMIRNATY is a vaccine indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older. (1)

--------------------**DOSAGE AND ADMINISTRATION** ----------------------------
- COMIRNATY supplied in multiple dose vials with purple caps and labels with purple borders MUST BE DILUTED before use. (2.1)
- For intramuscular injection only. (2.2)
- COMIRNATY is administered intramuscularly as a series of 2 doses (0.3 mL each) 3 weeks apart. (2.3)

-------------------- **DOSAGE FORMS AND STRENGTHS**----------------------------
Suspension for injection. After preparation, a single dose is 0.3 mL. (3)

----------------------------- **CONTRAINDICATIONS** ----------------------------
Known history of a severe allergic reaction (e.g., anaphylaxis) to any component of COMIRNATY. (4)

---------------------- **WARNINGS AND PRECAUTIONS** ----------------------
- Postmarketing data demonstrate increased risks of myocarditis and pericarditis, particularly within 7 days following the second dose. (5.2)
- Syncope (fainting) may occur in association with administration of injectable vaccines, including COMIRNATY. Procedures should be in place to avoid injury from fainting. (5.4)

---------------------------- **ADVERSE REACTIONS** ----------------------------
- In clinical studies of participants 16 through 55 years of age, the most commonly reported adverse reactions (≥10%) were pain at the injection site (88.6%), fatigue (70.1%), headache (64.9%), muscle pain (45.5%), chills (41.5%), joint pain (27.5%), fever (17.8%), and injection site swelling (10.6%). (6.1)
- In clinical studies of participants 56 years of age and older, the most commonly reported adverse reactions (≥10%) were pain at the injection site (78.2%), fatigue (56.9%), headache, (45.9%), muscle pain (32.5%), chills (24.8%), joint pain (21.5%), injection site swelling (11.8%), fever (11.5%), and injection site redness (10.4%). (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Pfizer Inc. at 1-800-438-1985 or VAERS at 1-800-822-7967 or http://vaers.hhs.gov.**

**See 17 for PATIENT COUNSELING INFORMATION.**

**Revised: 12/2021**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**1    INDICATIONS AND USAGE**
**2    DOSAGE AND ADMINISTRATION**
    2.1    Preparation for Administration
    2.2    Administration Information
    2.3    Vaccination Schedule
**3    DOSAGE FORMS AND STRENGTHS**
**4    CONTRAINDICATIONS**
**5    WARNINGS AND PRECAUTIONS**
    5.1    Management of Acute Allergic Reactions
    5.2    Myocarditis and Pericarditis
    5.3    Syncope
    5.4    Altered Immunocompetence
    5.5    Limitation of Effectiveness
**6    ADVERSE REACTIONS**
    6.1    Clinical Trials Experience
    6.2    Postmarketing Experience

**8    USE IN SPECIFIC POPULATIONS**
    8.1    Pregnancy
    8.2    Lactation
    8.4    Pediatric Use
    8.5    Geriatric Use
**11    DESCRIPTION**
**12    CLINICAL PHARMACOLOGY**
    12.1    Mechanism of Action
**13    NONCLINICAL TOXICOLOGY**
    13.1    Carcinogenesis, Mutagenesis, Impairment of Fertility
**14    CLINICAL STUDIES**
**16    HOW SUPPLIED/STORAGE AND HANDLING**
**17    PATIENT COUNSELING INFORMATION**

\* Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

## 1   INDICATIONS AND USAGE

COMIRNATY is a vaccine indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older.

## 2   DOSAGE AND ADMINISTRATION

For intramuscular injection only.

### 2.1   Preparation for Administration

The storage, preparation, and administration information in this Prescribing Information apply to COMIRNATY for individuals 16 years of age and older supplied in multiple dose vials with purple caps and labels with a purple borders, which **MUST BE DILUTED** before use.

**COMIRNATY Multiple Dose Vial with Purple Cap and Label with a Purple Border**

| Age Range | Dilution Information | Doses Per Vial After Dilution | Dose Volume |
|---|---|---|---|
| 16 years and older | Dilute with 1.8 mL sterile 0.9% Sodium Chloride Injection, USP prior to use | 6 | 0.3 mL |

Dose Preparation

Each vial **MUST BE DILUTED** before administering the vaccine.

Prior to Dilution

- COMIRNATY multiple dose vial with a purple cap and label with a purple border contains a volume of 0.45 mL, supplied as a frozen suspension that does not contain preservative. Each vial must be thawed before dilution.
- Vials may be thawed in the refrigerator [2ºC to 8ºC (35ºF to 46ºF)] or at room temperature [up to 25ºC (77ºF)] *[see How Supplied/Storage and Handling (16)]*.
- Refer to thawing instructions in the panels below.

Dilution

- Dilute the vial contents using 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP to form COMIRNATY. Do not add more than 1.8 mL of diluent.
- ONLY use sterile 0.9% Sodium Chloride Injection, USP as the diluent. Do not use bacteriostatic 0.9% Sodium Chloride Injection or any other diluent.
- Vials of sterile 0.9% Sodium Chloride Injection, USP are provided but shipped separately. Use the provided diluent or another sterile 0.9% Sodium Chloride Injection, USP as the diluent.
  - Provided diluent vials are single-use only; discard after 1.8 mL is withdrawn.
  - If another sterile 0.9% Sodium Chloride Injection, USP is used as the diluent, discard after 1.8 mL is withdrawn.

2

- o Do not dilute more than 1 vial of COMIRNATY using the same diluent vial.
- After dilution, 1 vial of COMIRNATY contains 6 doses of 0.3 mL each.
- Refer to dilution and dose preparation instructions in the panels below.

| Dilution and Preparation Instructions | |
|---|---|
| **COMIRNATY Vial with Purple Cap and Label with Purple Border –** **Vial Verification** | |
| <br>✓ **Purple plastic cap and label with purple border.** | • Verify that the vial of COMIRNATY has a purple plastic cap and a label with a purple border. |
| **COMIRNATY Vial with Purple Cap and Label with Purple Border –** **Thawing Prior to Dilution** | |
|  | • Thaw vial(s) of COMIRNATY before dilution either by:<br>  o Allowing vial(s) to thaw in the refrigerator [2ºC to 8ºC (35ºF to 46ºF)]. A carton of vials may take up to 3 hours to thaw, and thawed vials can be stored in the refrigerator for up to 1 month.<br>  o Allowing vial(s) to sit at room temperature [up to 25ºC (77ºF)] for 30 minutes.<br>• Using either thawing method, vials must reach room temperature before dilution and must be diluted within 2 hours. |

| **Dilution and Preparation Instructions** | |
|---|---|
| <br>**Gently × 10** | • Before dilution invert vaccine vial gently 10 times.<br>• <u>Do not shake.</u><br>• Inspect the liquid in the vial prior to dilution. The liquid is a white to off-white suspension and may contain <u>white to off-white opaque amorphous particles</u>.<br>• Do not use if liquid is discolored or if other particles are observed. |
| **COMIRNATY Vial with Purple Cap and Label with Purple Border – Dilution** | |
| <br>**Add 1.8 mL of sterile 0.9% sodium chloride injection, USP.** | • ONLY use sterile 0.9% Sodium Chloride Injection, USP as the diluent.<br>• Withdraw 1.8 mL of diluent into a transfer syringe (21-gauge or narrower needle).<br>• Add 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP into the vaccine vial. |

**Dilution and Preparation Instructions**



**Pull back plunger to 1.8 mL to remove air from vial.**

- Equalize vial pressure before removing the needle from the vaccine vial by withdrawing 1.8 mL air into the empty diluent syringe.



**Gently × 10**

- Gently invert the vial containing COMIRNATY 10 times to mix.
- <u>Do not shake</u>.
- Inspect the vaccine in the vial.
- The vaccine will be an off-white suspension. Do not use if vaccine is discolored or contains particulate matter.

| | |
|---|---|
| **Dilution and Preparation Instructions** | |
| <br><br>**Record the date and time of dilution.**<br>**Use within 6 hours after dilution.** | • Record the date and time of dilution on the COMIRNATY vial label.<br>• Store between 2°C to 25°C (35°F to 77°F).<br>• Discard any unused vaccine 6 hours after dilution. |
| **COMIRNATY Vial with Purple Cap and Label with Purple Border – Preparation of Individual 0.3 mL Doses** | |
| <br><br>**Withdraw 0.3 mL dose of vaccine.** | • Withdraw <u>0.3 mL</u> of COMIRNATY preferentially using low dead-volume syringes and/or needles.<br>• Each dose must contain 0.3 mL of vaccine.<br>• If the amount of vaccine remaining in a single vial cannot provide a full dose of 0.3 mL, discard the vial and any excess volume.<br>• Administer immediately. |

After dilution, vials of COMIRNATY with purple caps and labels with purple borders contain 6 doses of 0.3 mL of vaccine. Low dead-volume syringes and/or needles can be used to extract 6 doses from a single vial. If standard syringes and needles are used, there may not be sufficient volume to extract 6 doses from a single vial. Irrespective of the type of syringe and needle,

- each dose must contain 0.3 mL of vaccine.
- if the amount of vaccine remaining in the vial cannot provide a full dose of 0.3 mL, discard the vial and any excess volume.
- do not pool excess vaccine from multiple vials.

## 2.2     Administration Information

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit. The vaccine will be an off-white suspension. Do not administer if vaccine is discolored or contains particulate matter.

Administer a single 0.3 mL dose of COMIRNATY intramuscularly.

## 2.3     Vaccination Schedule

COMIRNATY is administered intramuscularly as a series of 2 doses (0.3 mL each) 3 weeks apart.

There are no data available on the interchangeability of COMIRNATY with COVID-19 vaccines from other manufacturers to complete the vaccination series. Individuals who have received 1 dose of COMIRNATY should receive a second dose of COMIRNATY to complete the vaccination series.

## 3    DOSAGE FORMS AND STRENGTHS

COMIRNATY is a suspension for injection. After preparation, each dose of COMIRNATY supplied in vials with purple caps and labels with purple borders is 0.3 mL.

## 4    CONTRAINDICATIONS

Do not administer COMIRNATY to individuals with known history of a severe allergic reaction (e.g., anaphylaxis) to any component of the COMIRNATY *[see Description (11)]*.

## 5    WARNINGS AND PRECAUTIONS

## 5.1     Management of Acute Allergic Reactions

Appropriate medical treatment used to manage immediate allergic reactions must be immediately available in the event an acute anaphylactic reaction occurs following administration of COMIRNATY.

## 5.2     Myocarditis and Pericarditis

Postmarketing data demonstrate increased risks of myocarditis and pericarditis, particularly within 7 days following the second dose. The observed risk is higher among males under 40 years of age than among females and older males. The observed risk is highest in males 12 through 17 years of age. Although some cases required intensive care support, available data from short-term follow-up suggest that most individuals have had resolution of symptoms with conservative management. Information is not yet available about potential long-term sequelae. The CDC has published considerations related to myocarditis and pericarditis after vaccination, including for vaccination of individuals with a history of myocarditis or pericarditis (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html).

## 5.3     Syncope

Syncope (fainting) may occur in association with administration of injectable vaccines, including COMIRNATY. Procedures should be in place to avoid injury from fainting.

**5.4     Altered Immunocompetence**

Immunocompromised persons, including individuals receiving immunosuppressant therapy, may have a diminished immune response to the COMIRNATY.

**5.5     Limitation of Effectiveness**

COMIRNATY may not protect all vaccine recipients.

# 6   ADVERSE REACTIONS

In clinical studies, the most commonly reported (≥10%) adverse reactions in participants 16 through 55 years of age following any dose were pain at the injection site (88.6%), fatigue (70.1%), headache (64.9%), muscle pain (45.5%), chills (41.5%), joint pain (27.5%), fever (17.8%), and injection site swelling (10.6%).

In clinical studies, the most commonly reported (≥10%) adverse reactions in participants 56 years of age and older following any dose were pain at the injection site (78.2%), fatigue (56.9%), headache, (45.9%), muscle pain (32.5%), chills (24.8%), joint pain (21.5%), injection site swelling (11.8%), fever (11.5%), and injection site redness (10.4%).

## 6.1   Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a vaccine cannot be directly compared to rates in the clinical trials of another vaccine and may not reflect the rates observed in practice.

The safety of COMIRNATY was evaluated in participants 16 years of age and older in 2 clinical studies conducted in Germany (Study 1), United States, Argentina, Brazil, Turkey, South Africa, and Germany (Study 2). Study BNT162-01 (Study 1) was a Phase 1/2, 2-part, dose-escalation trial that enrolled 60 participants, 18 through 55 years of age and 36 participants, 56 through 85 years of age. Study C4591001 (Study 2) is a Phase 1/2/3 multicenter, multinational, randomized, saline placebo-controlled, double-blinded (Phase 2/3), dose-finding, vaccine candidate-selection and efficacy study that has enrolled approximately 44,047 participants (22,026 COMIRNATY; 22,021 placebo) 16 years of age or older (including 378 and 376 participants 16 through 17 years of age in the vaccine and placebo groups, respectively). Upon issuance of the Emergency Use Authorization (December 11, 2020) for COMIRNATY, participants were unblinded to offer placebo participants COMIRNATY. Participants were unblinded in a phased manner over a period of months to offer placebo participants COMIRNATY. Study 2 also included 200 participants with confirmed stable human immunodeficiency virus (HIV) infection; HIV-positive participants are included in safety population disposition but are summarized separately in safety analyses. Confirmed stable HIV infection was defined as documented viral load <50 copies/mL and CD4 count >200 cells/mm$^3$ within 6 months before enrollment, and on stable antiretroviral therapy for at least 6 months.

At the time of the analysis of the ongoing Study 2 with a data cut-off of March 13, 2021, there were 25,651 (58.2%) participants (13,031 COMIRNATY and 12,620 placebo) 16 years of age and older followed for ≥4 months after the second dose.

Participants 16 years and older in the reactogenicity subset were monitored for solicited local and systemic reactions and use of antipyretic medication after each vaccination in an electronic diary. Participants are being monitored for unsolicited adverse events, including serious adverse events, throughout the study [from Dose 1 through 1 month (all unsolicited adverse events) or 6 months (serious adverse events) after the last vaccination].

Demographic characteristics in Study 2 were generally similar with regard to age, gender, race, and ethnicity among participants who received COMIRNATY and those who received placebo. Overall, among the total participants who received either COMIRNATY or placebo, 50.9% were male, 49.1% were female, 79.3% were 16 through 64 years of age, 20.7% were 65 years of age and older, 82.0% were White, 9.6% were Black or African American, 25.9% were Hispanic/Latino, 4.3% were Asian, and 1.0% were American Indian or Alaska Native.

Local and Systemic Adverse Reactions Solicited in the Study 2

Table 1 and Table 2 present the frequency and severity of reported solicited local and systemic reactions, respectively, within 7 days following each dose of COMIRNATY and placebo in the subset of participants 16 through 55 years of age included in the safety population who were monitored for reactogenicity with an electronic diary.

Table 3 and Table 4 present the frequency and severity of reported solicited local and systemic reactions, respectively, within 7 days of each dose of COMIRNATY and placebo for participants 56 years of age and older.

In participants 16 through 55 years of age after receiving Dose 2, the mean duration of pain at the injection site was 2.5 days (range 1 to 70 days), for redness 2.2 days (range 1 to 9 days), and for swelling 2.1 days (range 1 to 8 days) for participants in the COMIRNATY group. In participants 56 years of age and older after receiving Dose 2, the mean duration of pain at the injection site was 2.4 days (range 1 to 36 days), for redness 3.0 days (range 1 to 34 days), and for swelling 2.6 days (range 1 to 34 days) for participants in the COMIRNATY group.

**Table 1:   Study 2 – Frequency and Percentages of Participants with Solicited Local Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 16 Through 55 Years of Age – Reactogenicity Subset of the Safety Population\***

| | COMIRNATY Dose 1 $N^a$=2899 $n^b$ (%) | Placebo Dose 1 $N^a$=2908 $n^b$ (%) | COMIRNATY Dose 2 $N^a$=2682 $n^b$ (%) | Placebo Dose 2 $N^a$=2684 $n^b$ (%) |
|---|---|---|---|---|
| Redness$^c$ | | | | |
| Any (>2.0 cm) | 156 (5.4) | 28 (1.0) | 151 (5.6) | 18 (0.7) |
| Mild | 113 (3.9) | 19 (0.7) | 90 (3.4) | 12 (0.4) |
| Moderate | 36 (1.2) | 6 (0.2) | 50 (1.9) | 6 (0.2) |
| Severe | 7 (0.2) | 3 (0.1) | 11 (0.4) | 0 |
| Swelling$^c$ | | | | |
| Any (>2.0 cm) | 184 (6.3) | 16 (0.6) | 183 (6.8) | 5 (0.2) |
| Mild | 124 (4.3) | 6 (0.2) | 110 (4.1) | 3 (0.1) |
| Moderate | 54 (1.9) | 8 (0.3) | 66 (2.5) | 2 (0.1) |
| Severe | 6 (0.2) | 2 (0.1) | 7 (0.3) | 0 |

|  | COMIRNATY Dose 1 N[a]=2899 n[b] (%) | Placebo Dose 1 N[a]=2908 n[b] (%) | COMIRNATY Dose 2 N[a]=2682 n[b] (%) | Placebo Dose 2 N[a]=2684 n[b] (%) |
|---|---|---|---|---|
| Pain at the injection site[d] | | | | |
| Any | 2426 (83.7) | 414 (14.2) | 2101 (78.3) | 312 (11.6) |
| Mild | 1464 (50.5) | 391 (13.4) | 1274 (47.5) | 284 (10.6) |
| Moderate | 923 (31.8) | 20 (0.7) | 788 (29.4) | 28 (1.0) |
| Severe | 39 (1.3) | 3 (0.1) | 39 (1.5) | 0 |

Notes: Reactions were collected in the electronic diary (e-diary) from Day 1 to Day 7 after vaccination.
No Grade 4 solicited local reactions were reported in participants 16 through 55 years of age.
* Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.
a. N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction was the same, therefore, this information was included in the column header.
b. n = Number of participants with the specified reaction.
c. Mild: >2.0 to ≤5.0 cm; Moderate: >5.0 to ≤10.0 cm; Severe: >10.0 cm.
d. Mild: does not interfere with activity; Moderate: interferes with activity; Severe: prevents daily activity.

**Table 2:   Study 2 – Frequency and Percentages of Participants with Solicited Systemic Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 16 Through 55 Years of Age – Reactogenicity Subset of the Safety Population\***

|  | COMIRNATY Dose 1 N[a]=2899 n[b] (%) | Placebo Dose 1 N[a]=2908 n[b] (%) | COMIRNATY Dose 2 N[a]=2682 n[b] (%) | Placebo Dose 2 N[a]=2684 n[b] (%) |
|---|---|---|---|---|
| Fever | | | | |
| ≥38.0°C | 119 (4.1) | 25 (0.9) | 440 (16.4) | 11 (0.4) |
| ≥38.0°C to 38.4°C | 86 (3.0) | 16 (0.6) | 254 (9.5) | 5 (0.2) |
| >38.4°C to 38.9°C | 25 (0.9) | 5 (0.2) | 146 (5.4) | 4 (0.1) |
| >38.9°C to 40.0°C | 8 (0.3) | 4 (0.1) | 39 (1.5) | 2 (0.1) |
| >40.0°C | 0 | 0 | 1 (0.0) | 0 |
| Fatigue[c] | | | | |
| Any | 1431 (49.4) | 960 (33.0) | 1649 (61.5) | 614 (22.9) |
| Mild | 760 (26.2) | 570 (19.6) | 558 (20.8) | 317 (11.8) |
| Moderate | 630 (21.7) | 372 (12.8) | 949 (35.4) | 283 (10.5) |
| Severe | 41 (1.4) | 18 (0.6) | 142 (5.3) | 14 (0.5) |
| Headache[c] | | | | |
| Any | 1262 (43.5) | 975 (33.5) | 1448 (54.0) | 652 (24.3) |
| Mild | 785 (27.1) | 633 (21.8) | 699 (26.1) | 404 (15.1) |
| Moderate | 444 (15.3) | 318 (10.9) | 658 (24.5) | 230 (8.6) |
| Severe | 33 (1.1) | 24 (0.8) | 91 (3.4) | 18 (0.7) |
| Chills[c] | | | | |
| Any | 479 (16.5) | 199 (6.8) | 1015 (37.8) | 114 (4.2) |
| Mild | 338 (11.7) | 148 (5.1) | 477 (17.8) | 89 (3.3) |
| Moderate | 126 (4.3) | 49 (1.7) | 469 (17.5) | 23 (0.9) |
| Severe | 15 (0.5) | 2 (0.1) | 69 (2.6) | 2 (0.1) |

| | COMIRNATY Dose 1 N[a]=2899 n[b] (%) | Placebo Dose 1 N[a]=2908 n[b] (%) | COMIRNATY Dose 2 N[a]=2682 n[b] (%) | Placebo Dose 2 N[a]=2684 n[b] (%) |
|---|---|---|---|---|
| Vomiting[d] | | | | |
| Any | 34 (1.2) | 36 (1.2) | 58 (2.2) | 30 (1.1) |
| Mild | 29 (1.0) | 30 (1.0) | 42 (1.6) | 20 (0.7) |
| Moderate | 5 (0.2) | 5 (0.2) | 12 (0.4) | 10 (0.4) |
| Severe | 0 | 1 (0.0) | 4 (0.1) | 0 |
| Diarrhea[e] | | | | |
| Any | 309 (10.7) | 323 (11.1) | 269 (10.0) | 205 (7.6) |
| Mild | 251 (8.7) | 264 (9.1) | 219 (8.2) | 169 (6.3) |
| Moderate | 55 (1.9) | 58 (2.0) | 44 (1.6) | 35 (1.3) |
| Severe | 3 (0.1) | 1 (0.0) | 6 (0.2) | 1 (0.0) |
| New or worsened muscle pain[e] | | | | |
| Any | 664 (22.9) | 329 (11.3) | 1055 (39.3) | 237 (8.8) |
| Mild | 353 (12.2) | 231 (7.9) | 441 (16.4) | 150 (5.6) |
| Moderate | 296 (10.2) | 96 (3.3) | 552 (20.6) | 84 (3.1) |
| Severe | 15 (0.5) | 2 (0.1) | 62 (2.3) | 3 (0.1) |
| New or worsened joint pain[e] | | | | |
| Any | 342 (11.8) | 168 (5.8) | 638 (23.8) | 147 (5.5) |
| Mild | 200 (6.9) | 112 (3.9) | 291 (10.9) | 82 (3.1) |
| Moderate | 137 (4.7) | 55 (1.9) | 320 (11.9) | 61 (2.3) |
| Severe | 5 (0.2) | 1 (0.0) | 27 (1.0) | 4 (0.1) |
| Use of antipyretic or pain medication[f] | 805 (27.8) | 398 (13.7) | 1213 (45.2) | 320 (11.9) |

Notes: Reactions and use of antipyretic or pain medication were collected in the electronic diary (e-diary) from Day 1 to Day 7 after each dose.

No Grade 4 solicited systemic reactions were reported in participants 16 through 55 years of age.

\* Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

a. N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction or use of antipyretic or pain medication was the same, therefore, this information was included in the column header.

b. n = Number of participants with the specified reaction.

c. Mild: does not interfere with activity; Moderate: some interference with activity; Severe: prevents daily activity.

d. Mild: 1 to 2 times in 24 hours; Moderate: >2 times in 24 hours; Severe: requires intravenous hydration.

e. Mild: 2 to 3 loose stools in 24 hours; Moderate: 4 to 5 loose stools in 24 hours; Severe: 6 or more loose stools in 24 hours.

f. Severity was not collected for use of antipyretic or pain medication.

**Table 3:**  **Study 2 – Frequency and Percentages of Participants with Solicited Local Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 56 Years of Age and Older – Reactogenicity Subset of the Safety Population\***

|  | COMIRNATY Dose 1 N[a]=2008 n[b] (%) | Placebo Dose 1 N[a]=1989 n[b] (%) | COMIRNATY Dose 2 N[a]=1860 n[b] (%) | Placebo Dose 2 N[a]=1833 n[b] (%) |
|---|---|---|---|---|
| Redness[c] | | | | |
| Any (>2.0 cm) | 106 (5.3) | 20 (1.0) | 133 (7.2) | 14 (0.8) |
| Mild | 71 (3.5) | 13 (0.7) | 65 (3.5) | 10 (0.5) |
| Moderate | 30 (1.5) | 5 (0.3) | 58 (3.1) | 3 (0.2) |
| Severe | 5 (0.2) | 2 (0.1) | 10 (0.5) | 1 (0.1) |
| Swelling[c] | | | | |
| Any (>2.0 cm) | 141 (7.0) | 23 (1.2) | 145 (7.8) | 13 (0.7) |
| Mild | 87 (4.3) | 11 (0.6) | 80 (4.3) | 5 (0.3) |
| Moderate | 52 (2.6) | 12 (0.6) | 61 (3.3) | 7 (0.4) |
| Severe | 2 (0.1) | 0 | 4 (0.2) | 1 (0.1) |
| Pain at the injection site[d] | | | | |
| Any (>2.0 cm) | 1408 (70.1) | 185 (9.3) | 1230 (66.1) | 143 (7.8) |
| Mild | 1108 (55.2) | 177 (8.9) | 873 (46.9) | 138 (7.5) |
| Moderate | 296 (14.7) | 8 (0.4) | 347 (18.7) | 5 (0.3) |
| Severe | 4 (0.2) | 0 | 10 (0.5) | 0 |

Notes: Reactions were collected in the electronic diary (e-diary) from Day 1 to Day 7 after vaccination.

No Grade 4 solicited local reactions were reported in participants 56 years of age and older.

\*   Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

a.  N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction was the same, therefore, the information was included in the column header.

b.  n = Number of participants with the specified reaction.

c.  Mild: >2.0 to ≤5.0 cm; Moderate: >5.0 to ≤10.0 cm; Severe: >10.0 cm.

d.  Mild: does not interfere with activity; Moderate: interferes with activity; Severe: prevents daily activity.

**Table 4:**  **Study 2 – Frequency and Percentages of Participants with Solicited Systemic Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 56 Years of Age and Older – Reactogenicity Subset of the Safety Population\***

|  | COMIRNATY Dose 1 N[a]=2008 n[b] (%) | Placebo Dose 1 N[a]=1989 n[b] (%) | COMIRNATY Dose 2 N[a]=1860 n[b] (%) | Placebo Dose 2 N[a]=1833 n[b] (%) |
|---|---|---|---|---|
| Fever | | | | |
| ≥38.0°C | 26 (1.3) | 8 (0.4) | 219 (11.8) | 4 (0.2) |
| ≥38.0°C to 38.4°C | 23 (1.1) | 3 (0.2) | 158 (8.5) | 2 (0.1) |
| >38.4°C to 38.9°C | 2 (0.1) | 3 (0.2) | 54 (2.9) | 1 (0.1) |
| >38.9°C to 40.0°C | 1 (0.0) | 2 (0.1) | 7 (0.4) | 1 (0.1) |
| >40.0°C | 0 | 0 | 0 | 0 |

| | COMIRNATY Dose 1 N[a]=2008 n[b] (%) | Placebo Dose 1 N[a]=1989 n[b] (%) | COMIRNATY Dose 2 N[a]=1860 n[b] (%) | Placebo Dose 2 N[a]=1833 n[b] (%) |
|---|---|---|---|---|
| Fatigue[c] | | | | |
| Any | 677 (33.7) | 447 (22.5) | 949 (51.0) | 306 (16.7) |
| Mild | 415 (20.7) | 281 (14.1) | 391 (21.0) | 183 (10.0) |
| Moderate | 259 (12.9) | 163 (8.2) | 497 (26.7) | 121 (6.6) |
| Severe | 3 (0.1) | 3 (0.2) | 60 (3.2) | 2 (0.1) |
| Grade 4 | 0 | 0 | 1 (0.1) | 0 |
| Headache[c] | | | | |
| Any | 503 (25.0) | 363 (18.3) | 733 (39.4) | 259 (14.1) |
| Mild | 381 (19.0) | 267 (13.4) | 464 (24.9) | 189 (10.3) |
| Moderate | 120 (6.0) | 93 (4.7) | 256 (13.8) | 65 (3.5) |
| Severe | 2 (0.1) | 3 (0.2) | 13 (0.7) | 5 (0.3) |
| Chills[c] | | | | |
| Any | 130 (6.5) | 69 (3.5) | 435 (23.4) | 57 (3.1) |
| Mild | 102 (5.1) | 49 (2.5) | 229 (12.3) | 45 (2.5) |
| Moderate | 28 (1.4) | 19 (1.0) | 185 (9.9) | 12 (0.7) |
| Severe | 0 | 1 (0.1) | 21 (1.1) | 0 |
| Vomiting[d] | | | | |
| Any | 10 (0.5) | 9 (0.5) | 13 (0.7) | 5 (0.3) |
| Mild | 9 (0.4) | 9 (0.5) | 10 (0.5) | 5 (0.3) |
| Moderate | 1 (0.0) | 0 | 1 (0.1) | 0 |
| Severe | 0 | 0 | 2 (0.1) | 0 |
| Diarrhea[e] | | | | |
| Any | 168 (8.4) | 130 (6.5) | 152 (8.2) | 102 (5.6) |
| Mild | 137 (6.8) | 109 (5.5) | 125 (6.7) | 76 (4.1) |
| Moderate | 27 (1.3) | 20 (1.0) | 25 (1.3) | 22 (1.2) |
| Severe | 4 (0.2) | 1 (0.1) | 2 (0.1) | 4 (0.2) |
| New or worsened muscle pain[e] | | | | |
| Any | 274 (13.6) | 165 (8.3) | 537 (28.9) | 99 (5.4) |
| Mild | 183 (9.1) | 111 (5.6) | 229 (12.3) | 65 (3.5) |
| Moderate | 90 (4.5) | 51 (2.6) | 288 (15.5) | 33 (1.8) |
| Severe | 1 (0.0) | 3 (0.2) | 20 (1.1) | 1 (0.1) |
| New or worsened joint pain[e] | | | | |
| Any | 175 (8.7) | 124 (6.2) | 353 (19.0) | 72 (3.9) |
| Mild | 119 (5.9) | 78 (3.9) | 183 (9.8) | 44 (2.4) |
| Moderate | 53 (2.6) | 45 (2.3) | 161 (8.7) | 27 (1.5) |
| Severe | 3 (0.1) | 1 (0.1) | 9 (0.5) | 1 (0.1) |
| Use of antipyretic or pain medication[f] | 382 (19.0) | 224 (11.3) | 688 (37.0) | 170 (9.3) |

Notes: Reactions and use of antipyretic or pain medication were collected in the electronic diary (e-diary) from Day 1 to Day 7 after each dose.

The only Grade 4 solicited systemic reaction reported in participants 56 years of age and older was fatigue.

\* Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

a. N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. N for each reaction or use of antipyretic or pain medication was the same, therefore was included in the column header.

b. n = Number of participants with the specified reaction.

| | COMIRNATY Dose 1 $N^a$=2008 $n^b$ (%) | Placebo Dose 1 $N^a$=1989 $n^b$ (%) | COMIRNATY Dose 2 $N^a$=1860 $n^b$ (%) | Placebo Dose 2 $N^a$=1833 $n^b$ (%) |
|---|---|---|---|---|

c.  Mild: does not interfere with activity; Moderate: some interference with activity; Severe: prevents daily activity; Grade 4 reactions were defined in the clinical study protocol as emergency room visit or hospitalization for severe fatigue, severe headache, severe chills, severe muscle pain, or severe joint pain.

d.  Mild: 1 to 2 times in 24 hours; Moderate: >2 times in 24 hours; Severe: requires intravenous hydration; Grade 4 emergency visit or hospitalization for severe vomiting.

e.  Mild: 2 to 3 loose stools in 24 hours; Moderate: 4 to 5 loose stools in 24 hours; Severe: 6 or more loose stools in 24 hours; Grade 4: emergency room or hospitalization for severe diarrhea.

f.  Severity was not collected for use of antipyretic or pain medication.

In participants with chronic, stable HIV infection the frequencies of solicited local and systemic adverse reactions were similar to or lower than those observed for all participants 16 years of age and older.

<u>Unsolicited Adverse Events</u>

Overall, 11,253 (51.1%) participants in the COMIRNATY group and 11,316 (51.4%) participants in the placebo group had follow-up time between ≥4 months to <6 months after Dose 2 in the blinded placebo-controlled follow-up period with an additional 1,778 (8.1%) and 1,304 (5.9%) with ≥6 months of blinded follow-up time in the COMIRNATY and placebo groups, respectively.

A total of 12,006 (54.5%) participants originally randomized to COMIRNATY had ≥6 months total (blinded and unblinded) follow-up after Dose 2.

In an analysis of all unsolicited adverse events reported following any dose, through 1 month after Dose 2, in participants 16 years of age and older (N=43,847; 21,926 COMIRNATY group vs. 21,921 placebo group), those assessed as adverse reactions not already captured by solicited local and systemic reactions were nausea (274 vs. 87), malaise (130 vs. 22), lymphadenopathy (83 vs. 7), asthenia (76 vs. 25), decreased appetite (39 vs. 9), hyperhidrosis (31 vs. 9), lethargy (25 vs. 6), and night sweats (17 vs. 3).

In analyses of all unsolicited adverse events in Study 2 from Dose 1 up to the participant unblinding date, 58.2% of study participants had at least 4 months of follow-up after Dose 2. Among participants 16 through 55 years of age who received at least 1 dose of study vaccine, 12,995 of whom received COMIRNATY and 13,026 of whom received placebo, unsolicited adverse events were reported by 4,396 (33.8%) participants in the COMIRNATY group and 2,136 (16.4%) participants in the placebo group. In a similar analysis in participants 56 years of age and older that included 8,931 COMIRNATY recipients and 8,895 placebo recipients, unsolicited adverse events were reported by 2,551 (28.6%) participants in the COMIRNATY group and 1,432 (16.1%) participants in the placebo group. Among participants with confirmed stable HIV infection that included 100 COMIRNATY recipients and 100 placebo recipients, unsolicited adverse events were reported by 29 (29%) participants in the COMIRNATY group and 15 (15%) participants in the placebo group. The higher frequency of reported unsolicited adverse events among COMIRNATY recipients compared to placebo recipients was primarily attributed to events that are consistent with adverse reactions solicited among participants in the reactogenicity subset (Table 3 and Table 4).

Throughout the placebo-controlled safety follow-up period, Bell's palsy (facial paralysis) was reported by 4 participants in the COMIRNATY group and 2 participants in the placebo group. Onset of facial paralysis was Day 37 after Dose 1 (participant did not receive Dose 2) and Days 3, 9, and 48 after Dose 2. In the placebo group the onset of facial paralysis was Day 32 and Day 102. Currently available information is insufficient to determine a causal relationship with the vaccine. In the analysis of blinded, placebo-controlled follow-up, there

were no other notable patterns or numerical imbalances between treatment groups for specific categories of non-serious adverse events (including other neurologic or neuro-inflammatory, and thrombotic events) that would suggest a causal relationship to COMIRNATY. In the analysis of unblinded follow-up, there were no notable patterns of specific categories of non-serious adverse events that would suggest a causal relationship to COMIRNATY.

*Serious Adverse Events*

In Study 2, among participants 16 through 55 years of age who had received at least 1 dose of vaccine or placebo (COMIRNATY =12,995; placebo = 13,026), serious adverse events from Dose 1 up to the participant unblinding date in ongoing follow-up were reported by 103 (0.8%) COMIRNATY recipients and 117 (0.9%) placebo recipients. In a similar analysis, in participants 56 years of age and older (COMIRNATY = 8,931; placebo = 8,895), serious adverse events were reported by 165 (1.8%) COMIRNATY recipients and 151 (1.7%) placebo recipients who received at least 1 dose of COMIRNATY or placebo, respectively. In these analyses, 58.2% of study participants had at least 4 months of follow-up after Dose 2. Among participants with confirmed stable HIV infection serious adverse events from Dose 1 up to the participant unblinding date in ongoing follow-up were reported by 2 (2%) COMIRNATY recipients and 2 (2%) placebo recipients.

In the analysis of blinded, placebo-controlled follow-up, there were no notable patterns between treatment groups for specific categories of serious adverse events (including neurologic, neuro-inflammatory, and thrombotic events) that would suggest a causal relationship to COMIRNATY. In the analysis of unblinded follow-up, there were no notable patterns of specific categories of serious adverse events that would suggest a causal relationship to COMIRNATY.

## 6.2   Postmarketing Experience

The following adverse reactions have been identified during postmarketing use of COMIRNATY, including under Emergency Use Authorization. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to vaccine exposure.

Cardiac Disorders: myocarditis, pericarditis
Gastrointestinal Disorders: diarrhea, vomiting
Immune System Disorders: severe allergic reactions, including anaphylaxis, and other hypersensitivity reactions (e.g., rash, pruritus, urticaria, angioedema)
Musculoskeletal and Connective Tissue Disorders: pain in extremity (arm)

## 8   USE IN SPECIFIC POPULATIONS

## 8.1   Pregnancy

There is a pregnancy exposure registry that monitors pregnancy outcomes in women exposed to COMIRNATY during pregnancy. Women who are vaccinated with COMIRNATY during pregnancy are encouraged to enroll in the registry by visiting https://mothertobaby.org/ongoing-study/covid19-vaccines/.

Risk Summary

All pregnancies have a risk of birth defect, loss, or other adverse outcomes. In the US general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2% to

4% and 15% to 20%, respectively. Available data on COMIRNATY administered to pregnant women are insufficient to inform vaccine-associated risks in pregnancy.

A developmental toxicity study has been performed in female rats administered the equivalent of a single human dose of COMIRNATY on 4 occasions; twice prior to mating and twice during gestation. These studies revealed no evidence of harm to the fetus due to the vaccine *(see Animal Data)*.

Data

*Animal Data*

In a developmental toxicity study, 0.06 mL of a vaccine formulation containing the same quantity of nucleoside-modified messenger ribonucleic acid (mRNA) (30 mcg) and other ingredients included in a single human dose of COMIRNATY was administered to female rats by the intramuscular route on 4 occasions: 21 and 14 days prior to mating, and on gestation days 9 and 20. No vaccine-related adverse effects on female fertility, fetal development, or postnatal development were reported in the study.

## 8.2   Lactation

Risk Summary

It is not known whether COMIRNATY is excreted in human milk. Data are not available to assess the effects of COMIRNATY on the breastfed infant or on milk production/excretion. The developmental and health benefits of breastfeeding should be considered along with the mother's clinical need for COMIRNATY and any potential adverse effects on the breastfed child from COMIRNATY or from the underlying maternal condition. For preventive vaccines, the underlying maternal condition is susceptibility to disease prevented by the vaccine.

## 8.4   Pediatric Use

Safety and effectiveness of COMIRNATY in individuals 16 through 17 years of age is based on safety and effectiveness data in this age group and in adults *[see Adverse Reactions (6) and Clinical Studies (14.1)]*.

The safety and effectiveness of COMIRNATY in individuals younger than 16 years of age have not been established.

## 8.5   Geriatric Use

Of the total number of COMIRNATY recipients in Study 2 as of March 13, 2021 (N = 22,026), 20.7% (n = 4,552) were 65 years of age and older and 4.2% (n = 925) were 75 years of age and older *[see Clinical Studies (14.1)]*. No overall differences in safety or effectiveness were observed between these recipients and younger recipients.

## 11   DESCRIPTION

COMIRNATY (COVID-19 Vaccine, mRNA) is a sterile suspension for injection for intramuscular use. COMIRNATY is supplied as a frozen suspension in multiple dose vials with purple caps and labels with purple borders; each vial must be diluted with 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP prior to use to form the vaccine. Each 0.3 mL dose of COMIRNATY supplied in multiple dose vials with purple caps and labels with purple borders contains 30 mcg of a nucleoside-modified messenger RNA (mRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2.

16

Each 0.3 mL dose of the COMIRNATY supplied in multiple dose vials with purple caps and labels with purple borders also includes the following ingredients: lipids (0.43 mg ((4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate), 0.05 mg 2-(polyethylene glycol 2000)-N,N-ditetradecylacetamide, 0.09 mg 1,2-distearoyl-sn-glycero-3-phosphocholine, and 0.2 mg cholesterol), 0.01 mg potassium chloride, 0.01 mg monobasic potassium phosphate, 0.36 mg sodium chloride, 0.07 mg dibasic sodium phosphate dihydrate, and 6 mg sucrose. The diluent (sterile 0.9% Sodium Chloride Injection, USP) contributes an additional 2.16 mg sodium chloride per dose.

COMIRNATY does not contain preservative.

The vial stoppers are not made with natural rubber latex.

## 12  CLINICAL PHARMACOLOGY

### 12.1  Mechanism of Action

The nucleoside-modified mRNA in COMIRNATY is formulated in lipid particles, which enable delivery of the mRNA into host cells to allow expression of the SARS-CoV-2 S antigen. The vaccine elicits an immune response to the S antigen, which protects against COVID-19.

## 13  NONCLINICAL TOXICOLOGY

### 13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility

COMIRNATY has not been evaluated for the potential to cause carcinogenicity, genotoxicity, or impairment of male fertility. In a developmental toxicity study in rats with COMIRNATY there were no vaccine-related effects on female fertility *[see Use in Specific Populations (8.1)]*.

## 14  CLINICAL STUDIES

Efficacy in Participants 16 Years of Age and Older

Study 2 is an ongoing, multicenter, multinational, randomized, placebo-controlled, observer-blind, dose-finding, vaccine candidate–selection, and efficacy study in participants 12 years of age and older. Randomization was stratified by age: 12 through 15 years of age, 16 through 55 years of age, or 56 years of age and older, with a minimum of 40% of participants in the ≥56-year stratum. The study excluded participants who were immunocompromised and those who had previous clinical or microbiological diagnosis of COVID-19. Participants with preexisting stable disease, defined as disease not requiring significant change in therapy or hospitalization for worsening disease during the 6 weeks before enrollment, were included as were participants with known stable infection with HIV, hepatitis C virus (HCV), or hepatitis B virus (HBV).

In Study 2, based on data accrued through March 13, 2021, approximately 44,000 participants 16 years of age and older were randomized equally and received 2 doses of COMIRNATY or placebo. Participants are planned to be followed for up to 24 months, for assessments of safety and efficacy against COVID-19.

Overall, among the total participants who received COMIRNATY or placebo, 51.4% or 50.3% were male and 48.6% or 49.7% were female, 79.1% or 79.2% were 16 through 64 years of age, 20.9% or 20.8% were 65 years of age and older, 81.9% or 82.1% were White, 9.5% or 9.6% were Black or African American, 1.0% or 0.9% were American Indian or Alaska Native, 4.4% or 4.3% were Asian, 0.3% or 0.2% Native Hawaiian or other

Pacific Islander, 25.6% or 25.4% were Hispanic/Latino, 73.9% or 74.1% were non-Hispanic/Latino, 0.5% or 0.5% did not report ethnicity, 46.0% or 45.7% had comorbidities [participants who have 1 or more comorbidities that increase the risk of severe COVID-19 disease: defined as subjects who had at least 1 of the Charlson comorbidity index category or body mass index (BMI) ≥30 kg/m$^2$], respectively. The mean age at vaccination was 49.8 or 49.7 years and median age was 51.0 or 51.0 in participants who received COMIRNATY or placebo, respectively.

Efficacy Against COVID-19

The population for the analysis of the protocol pre-specified primary efficacy endpoint included 36,621 participants 12 years of age and older (18,242 in the COMIRNATY group and 18,379 in the placebo group) who did not have evidence of prior infection with SARS-CoV-2 through 7 days after the second dose. The population in the protocol pre-specified primary efficacy analysis included all participants 12 years of age and older who had been enrolled from July 27, 2020, and followed for the development of COVID-19 through November 14, 2020. Participants 18 through 55 years of age and 56 years of age and older began enrollment from July 27, 2020, 16 through 17 years of age began enrollment from September 16, 2020, and 12 through 15 years of age began enrollment from October 15, 2020.

For participants without evidence of SARS-CoV-2 infection prior to 7 days after Dose 2, vaccine efficacy against confirmed COVID-19 occurring at least 7 days after Dose 2 was 95.0% (95% credible interval: 90.3, 97.6), which met the pre-specified success criterion. The case split was 8 COVID-19 cases in the COMIRNATY group compared to 162 COVID-19 cases in the placebo group.

The population for the updated vaccine efficacy analysis included participants 16 years of age and older who had been enrolled from July 27, 2020, and followed for the development of COVID-19 during blinded placebo-controlled follow-up through March 13, 2021, representing up to 6 months of follow-up after Dose 2. There were 12,796 (60.8%) participants in the COMIRNATY group and 12,449 (58.7%) in the placebo group followed for ≥4 months after Dose 2 in the blinded placebo-controlled follow-up period.

SARS-CoV-2 variants of concern identified from COVID-19 cases in this study include B.1.1.7 (Alpha) and B.1.351 (Beta). Representation of identified variants among cases in vaccine versus placebo recipients did not suggest decreased vaccine effectiveness against these variants.

The updated vaccine efficacy information is presented in Table 5.

**Table 5:   Vaccine Efficacy – First COVID-19 Occurrence From 7 Days After Dose 2, by Age Subgroup – Participants 16 Years of Age and Older Without Evidence of Infection and Participants With or Without Evidence of Infection Prior to 7 Days After Dose 2 – Evaluable Efficacy (7 Days) Population During the Placebo-Controlled Follow-up Period**

| | First COVID-19 occurrence from 7 days after Dose 2 in participants without evidence of prior SARS-CoV-2 infection* | | |
|---|---|---|---|
| Subgroup | COMIRNATY<br>N[a]=19,993<br>Cases<br>n1[b]<br>Surveillance Time[c] (n2[d]) | Placebo<br>N[a]=20,118<br>Cases<br>n1[b]<br>Surveillance Time[c] (n2[d]) | Vaccine Efficacy %<br>(95% CI[e]) |
| All participants | 77<br>6.092 (19,711) | 833<br>5.857 (19,741) | 91.1<br>(88.8, 93.1) |
| 16 through 64 years | 70<br>4.859 (15,519) | 709<br>4.654 (15,515) | 90.5<br>(87.9, 92.7) |
| 65 years and older | 7<br>1.233 (4192) | 124<br>1.202 (4226) | 94.5<br>(88.3, 97.8) |
| | First COVID-19 occurrence from 7 days after Dose 2 in participants with or without* evidence of prior SARS-CoV-2 infection | | |
| Subgroup | COMIRNATY<br>N[a]=21,047<br>Cases<br>n1[b]<br>Surveillance Time[c] (n2[d]) | Placebo<br>N[a]=21,210<br>Cases<br>n1[b]<br>Surveillance Time[c] (n2[d]) | Vaccine Efficacy %<br>(95% CI[e]) |
| All participants | 81<br>6.340 (20,533) | 854<br>6.110 (20,595) | 90.9<br>(88.5, 92.8) |
| 16 through 64 years | 74<br>5.073 (16,218) | 726<br>4.879 (16,269) | 90.2<br>(87.5, 92.4) |
| 65 years and older | 7<br>1.267 (4315) | 128<br>1.232 (4326) | 94.7<br>(88.7, 97.9) |

Note: Confirmed cases were determined by Reverse Transcription-Polymerase Chain Reaction (RT-PCR) and at least 1 symptom consistent with COVID-19 (symptoms included: fever; new or increased cough; new or increased shortness of breath; chills; new or increased muscle pain; new loss of taste or smell; sore throat; diarrhea; vomiting).

*   Participants who had no evidence of past SARS-CoV-2 infection (i.e., N-binding antibody [serum] negative at Visit 1 and SARS-CoV-2 not detected by NAAT [nasal swab] at Visits 1 and 2), and had negative NAAT (nasal swab) at any unscheduled visit prior to 7 days after Dose 2 were included in the analysis.

a.   N = Number of participants in the specified group.

b.   n1 = Number of participants meeting the endpoint definition.

c.   Total surveillance time in 1000 person-years for the given endpoint across all participants within each group at risk for the endpoint. Time period for COVID-19 case accrual is from 7 days after Dose 2 to the end of the surveillance period.

d.   n2 = Number of participants at risk for the endpoint.

e.   Two-sided confidence interval (CI) for vaccine efficacy is derived based on the Clopper and Pearson method adjusted to the surveillance time.

Subgroup analyses of vaccine efficacy (although limited by small numbers of cases in some subgroups) did not suggest meaningful differences in efficacy across genders, ethnic groups, geographies, or for participants with obesity or medical comorbidities associated with high risk of severe COVID-19.

Efficacy Against Severe COVID-19

Efficacy analyses of secondary efficacy endpoints supported benefit of COMIRNATY in preventing severe COVID-19. Vaccine efficacy against severe COVID-19 is presented only for participants with or without prior

SARS-CoV-2 infection (Table 6) as the COVID-19 case counts in participants without prior SARS-CoV-2 infection were the same as those in participants with or without prior SARS-CoV-2 infection in both the COMIRNATY and placebo groups.

**Table 6:   Vaccine Efficacy – First Severe COVID-19 Occurrence in Participants 16 Years of Age and Older With or Without\* Prior SARS-CoV-2 Infection Based on Protocol[†] or Centers for Disease Control and Prevention (CDC)[‡] Definition From 7 Days After Dose 2 – Evaluable Efficacy (7 Days) Population During the Placebo-Controlled Follow-up**

| Vaccine Efficacy – First Severe COVID-19 Occurrence | | |
|---|---|---|
| COMIRNATY Cases n1[a] Surveillance Time[b] (n2[c]) | Placebo Cases n1[a] Surveillance Time[b] (n2[c]) | Vaccine Efficacy % (95% CI[d]) |
| 7 days after Dose 2[d] | | |
| 1 6.353 (20,540) | 21 6.237 (20,629) | 95.3 (70.9, 99.9) |
| Vaccine Efficacy – First Severe COVID-19 Occurrence Based on CDC Definition | | |
| COMIRNATY Cases n1[a] Surveillance Time[b] (n2[c]) | Placebo Cases n1[a] Surveillance Time[b] (n2[c]) | Vaccine Efficacy % (95% CI[d]) |
| 7 days after Dose 2[d] | | |
| 0 6.345 (20,513) | 31 6.225 (20,593) | 100 (87.6, 100.0) |

Note: Confirmed cases were determined by Reverse Transcription-Polymerase Chain Reaction (RT-PCR) and at least 1 symptom consistent with COVID-19 (symptoms included: fever; new or increased cough; new or increased shortness of breath; chills; new or increased muscle pain; new loss of taste or smell; sore throat; diarrhea; vomiting).

\*   Participants who had no evidence of past SARS-CoV-2 infection (i.e., N-binding antibody [serum] negative at Visit 1 and SARS-CoV-2 not detected by NAAT [nasal swab] at Visits 1 and 2), and had negative NAAT (nasal swab) at any unscheduled visit prior to 7 days after Dose 2 were included in the analysis.

† Severe illness from COVID-19 is defined in the protocol as confirmed COVID-19 and presence of at least 1 of the following:
- Clinical signs at rest indicative of severe systemic illness (respiratory rate ≥30 breaths per minute, heart rate ≥125 beats per minute, saturation of oxygen ≤93% on room air at sea level, or ratio of arterial oxygen partial pressure to fractional inspired oxygen <300 mm Hg);
- Respiratory failure [defined as needing high-flow oxygen, noninvasive ventilation, mechanical ventilation or extracorporeal membrane oxygenation (ECMO)];
- Evidence of shock (systolic blood pressure <90 mm Hg, diastolic blood pressure <60 mm Hg, or requiring vasopressors);
- Significant acute renal, hepatic, or neurologic dysfunction;
- Admission to an Intensive Care Unit;
- Death.

‡ Severe illness from COVID-19 as defined by CDC is confirmed COVID-19 and presence of at least 1 of the following:
- Hospitalization;
- Admission to the Intensive Care Unit;
- Intubation or mechanical ventilation;
- Death.

a.   n1 = Number of participants meeting the endpoint definition.
b.   Total surveillance time in 1000 person-years for the given endpoint across all participants within each group at risk for the endpoint. Time period for COVID-19 case accrual is from 7 days after Dose 2 to the end of the surveillance period.
c.   n2 = Number of participants at risk for the endpoint.
d.   Two-side confidence interval (CI) for vaccine efficacy is derived based on the Clopper and Pearson method adjusted to the surveillance time.

## 16  HOW SUPPLIED/STORAGE AND HANDLING

COMIRNATY Suspension for Intramuscular Injection, multiple dose vials with purple caps and labels with purple borders are supplied in a carton containing 25 multiple dose vials (NDC 0069-1000-03) or 195 multiple

dose vials (NDC 0069-1000-02). A 0.9% Sodium Chloride Injection, USP diluent is provided but shipped separately, and should be stored at controlled room temperature 20°C to 25°C (68°F to 77°F) [see USP Controlled Room Temperature]. The provided 0.9% Sodium Chloride Injection, USP diluent will be supplied either as cartons of 10 mL single-use vials manufactured by Hospira, Inc (NDC 0409-4888-10), or 2 mL single-use vials manufactured by Fresenius Kabi USA, LLC (NDC 63323-186-02).

After dilution, 1 vial contains 6 doses of 0.3 mL.

During storage, minimize exposure to room light, and avoid exposure to direct sunlight and ultraviolet light.

Do not refreeze thawed vials.

<u>Frozen Vials Prior to Use</u>

Cartons of COMIRNATY multiple dose vials with purple caps labels with purple borders arrive in thermal containers with dry ice. Once received, remove the vial cartons immediately from the thermal container and preferably store in an ultra-low temperature freezer between -90ºC to -60ºC (-130ºF to -76ºF) until the expiry date printed on the label.

Alternatively, vials may be stored at -25°C to -15°C (-13°F to 5°F) for up to 2 weeks. Vials must be kept frozen and protected from light, in the original cartons, until ready to use. Vials stored at -25°C to -15°C (-13°F to 5°F) for up to 2 weeks may be returned 1 time to the recommended storage condition of -90ºC to -60ºC (-130ºF to -76ºF). Total cumulative time the vials are stored at -25°C to -15°C (-13°F to 5°F) should be tracked and should not exceed 2 weeks.

If an ultra-low temperature freezer is not available, the thermal container in which COMIRNATY arrives may be used as <u>temporary</u> storage when consistently re-filled to the top of the container with dry ice. <u>Refer to the re-icing guidelines packed in the original thermal container for instructions regarding the use of the thermal container for temporary storage</u>. The thermal container maintains a temperature range of -90ºC to -60ºC (-130ºF to -76ºF). Storage of the vials between -96°C to -60°C (-141°F to -76°F) is not considered an excursion from the recommended storage condition.

<u>Transportation of Frozen Vials</u>

If local redistribution is needed and full cartons containing vials cannot be transported at -90°C to -60°C (-130ºF to -76ºF), vials may be transported at -25°C to -15°C (-13°F to 5°F). Any hours used for transport at -25°C to -15°C (-13°F to 5°F) count against the 2-week limit for storage at -25°C to -15°C (-13°F to 5°F). Frozen vials transported at -25°C to -15°C (-13°F to 5°F) may be returned 1 time to the recommended storage condition of -90°C to -60°C (-130ºF to -76ºF).

<u>Thawed Vials Before Dilution</u>

*Thawed Under Refrigeration*

Thaw and then store undiluted vials in the refrigerator [2ºC to 8ºC (35ºF to 46ºF)] for up to 1 month. A carton of 25 vials or 195 vials may take up to 2 or 3 hours, respectively, to thaw in the refrigerator, whereas a fewer number of vials will thaw in less time.

*Thawed at Room Temperature*

For immediate use, thaw undiluted vials at room temperature [up to 25ºC (77ºF)] for 30 minutes. Thawed vials can be handled in room light conditions.

Vials must reach room temperature before dilution.

Undiluted vials may be stored at room temperature for no more than 2 hours.

<u>Transportation of Thawed Vials</u>

Available data support transportation of 1 or more thawed vials at 2°C to 8°C (35°F to 46°F) for up to 12 hours.

<u>Vials After Dilution</u>

After dilution, store vials between 2°C to 25°C (35°F to 77°F) and use within 6 hours from the time of dilution. During storage, minimize exposure to room light, and avoid exposure to direct sunlight and ultraviolet light. Any vaccine remaining in vials must be discarded after 6 hours. Do not refreeze.

## 17  PATIENT COUNSELING INFORMATION

Inform vaccine recipient of the potential benefits and risks of vaccination with COMIRNATY.

Inform vaccine recipient of the importance of completing the 2 dose vaccination series.

There is a pregnancy exposure registry for COMIRNATY. Encourage individuals exposed to COMIRNATY around the time of conception or during pregnancy to register by visiting https://mothertobaby.org/ongoing-study/covid19-vaccines/.

Advise vaccine recipient to report any adverse events to their healthcare provider or to the Vaccine Adverse Event Reporting System at 1-800-822-7967 and www.vaers.hhs.gov.

This product's labeling may have been updated. For the most recent prescribing information, please visit https://dailymed.nlm.nih.gov/dailymed/.

BIONTECH
Manufactured for
BioNTech Manufacturing GmbH
An der Goldgrube 12
55131 Mainz, Germany



Manufactured by
Pfizer Inc., New York, NY 10017

LAB-1448-1.3a

US Govt. License No. 2229

# EXHIBIT 25





*Review*

# Nanomaterial Delivery Systems for mRNA Vaccines

**Michael D. Buschmann** [1,*][image], **Manuel J. Carrasco** [1][image], **Suman Alishetty** [1], **Mikell Paige** [2], **Mohamad Gabriel Alameh** [3][image] and **Drew Weissman** [4]

1 Department of Bioengineering, George Mason University, 4400 University Drive, MS 1J7, Fairfax, VA 22030, USA; mcarras@masonlive.gmu.edu (M.J.C.); salishet@GMU.EDU (S.A.)
2 Department of Chemistry & Biochemistry, George Mason University, 4400 University Drive, Fairfax, VA 22030, USA; mpaige3@gmu.edu
3 Perelman School of Medicine, University of Pennsylvania, 130 Stemmler Hall, 3450 Hamilton Walk, Philadelphia, PA 19104, USA; Mg.Alameh@pennmedicine.upenn.edu
4 Perelman School of Medicine, University of Pennsylvania, 410B Hill Pavilion, 380 S. University Ave, Philadelphia, PA 19104, USA; dreww@pennmedicine.upenn.edu
* Correspondence: mbuschma@gmu.edu; Tel.: +1-703-755-5627

**Abstract:** The recent success of mRNA vaccines in SARS-CoV-2 clinical trials is in part due to the development of lipid nanoparticle delivery systems that not only efficiently express the mRNA-encoded immunogen after intramuscular injection, but also play roles as adjuvants and in vaccine reactogenicity. We present an overview of mRNA delivery systems and then focus on the lipid nanoparticles used in the current SARS-CoV-2 vaccine clinical trials. The review concludes with an analysis of the determinants of the performance of lipid nanoparticles in mRNA vaccines.

**Keywords:** mRNA; lipid nanoparticle; ionizable lipid; vaccine; SARS-CoV-2



**Citation:** Buschmann, M.D.; Carrasco, M.J.; Alishetty, S.; Paige, M.; Alameh, M.G.; Weissman, D. Nanomaterial Delivery Systems for mRNA Vaccines. *Vaccines* **2021**, *9*, 65. https://doi.org/10.3390/vaccines 9010065

Received: 27 December 2020
Accepted: 14 January 2021
Published: 19 January 2021

**Publisher's Note:** MDPI stays neutral with regard to jurisdictional claims in published maps and institutional affiliations.



**Copyright:** © 2021 by the authors. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (https:// creativecommons.org/licenses/by/ 4.0/).

## 1. Introduction

mRNA vaccines have been propelled to the center stage of the biotechnology and pharmaceutical industry by the COVID-19 pandemic. There are eight ongoing human trials for mRNA vaccines led by BioNTech/Pfizer, Moderna, CureVac, Sanofi/TranslateBio, Arcturus/Duke-NUS Medical School in Singapore, Imperial College London, Chulalongkorn University in Thailand, and Providence Therapeutics [1]. Remarkably, two of these trials have announced interim phase 3 trial results that report an efficacy providing a greater than 94% reduction in SARS-CoV-2 infection after 2 doses of 30 μg or 100 μg of an mRNA sequence encoding for a spike protein immunogen, delivered in a lipid nanoparticle [2,3]. The rapidity of vaccine development also exceeded expectations, with these results occurring only 10 months after the SARS-CoV-2 sequence was made publicly available. This success is a testament not only to the ability of the biotech and pharmaceutical industry to respond to an urgent and unmet global need, but also to the inherent capabilities of mRNA as a pharmaceutical modality, in this case a prophylactic vaccine. The purpose of this review is to overview the development of delivery systems for mRNA and then to summarize the preclinical and clinical findings of the SARS-CoV-2 mRNA vaccines and relate them to characteristics of the delivery system that contribute to their success. Several excellent reviews of mRNA delivery systems for vaccines and therapeutics that predate COVID-19 have been recently published [4–16].

Messenger RNA therapeutics have many advantages and several challenges compared to other pharmaceutical modalities, including small molecules, DNA, oligonucleotides, viral systems and proteins, including antibodies. The ability to mediate both stimulatory and inhibitory modes of action compared to oligonucleotides and most small molecule drug targets, and to express or replace defective proteins, expands the scope of potential indications for their use. Compared to DNA, mRNA only needs access to the cytoplasmic

ribosomal translation machinery rather than the nucleus and does not risk genomic integration. Compared to both proteins and viral systems, mRNA manufacturing is cell-free, faster, and the protein product bears native glycosylation and conformational properties. When combined with a lipid nanoparticle (LNP) delivery system, the nanostructural properties of the mRNA LNP also bear a resemblance to viral systems and circulating endogenous, lipid-containing chylomicrons in terms of their size, lipid envelope and, for viral systems, the internal genomic material that contributes to their application as delivery vehicles for vaccines and other therapeutics [17].

The challenges inherent to the mRNA platform are its intrinsic immunogenicity, susceptibility to enzymatic degradation, and almost negligible levels of cell uptake of naked mRNA. The innate immunogenicity of mRNA is due to the cellular detection of single- and double-stranded RNA by toll like receptors (TLRs)), helicase receptors, including retinoic acid-inducible gene I (RIG-I)-like receptors (RLRs), and others [18,19], which then signal through NF-κB and interferon (IFN) regulatory factors IRF3 and IRF7, which translocate to the nucleus to bind to the type I IFN gene promoter, inducing expression of type I IFNs (IFN-α and IFN-β), accompanied by proinflammatory cytokines, such as tumor necrosis factor-a (TNF-α), IL-6 and IL-12 [20]. The secreted interferons signal through their receptors and the JAK/STAT pathway in the same cell and adjacent cells to activate more than 300 IFN-stimulated genes, including the protein kinase PKR, as a general viral defense mechanism. Although this activation could be beneficial for mounting an immune response to mRNA vaccines, one immediate effect is the downregulation of translation through PKR phosphorylation of eIF2a, which impairs eIF2 activity, inhibiting mRNA translation and thus the protein synthesis of the immunogen [21]. The primary means of abrogating this innate immune response is by substituting naturally occurring nucleosides such as 1-methylpseudouridine [22] and other nucleosides present in transfer and ribosomal RNA (but not typically in mRNA) into the mRNA sequence, which then renders it undetectable via these innate immune sensors [23,24]. This nucleoside-modified immunosilencing mRNA platform is the basis of the mRNA technologies that have recently shown >94% efficacy in the BioNTech/Pfizer and Moderna SARS-CoV-2 vaccine trials, building upon previous trials for other pathogens, which are described in detail below. A second approach pursued by CureVac is sequence engineering involving codon optimization and uridine depletion [25] since TLR7 and TLR8 primarily recognize GU-rich single-stranded RNA sequences [26]. The second challenge for mRNA therapeutics is its susceptibility to nucleases, exemplified by a half-life in serum <5 min [27]. Although chemical modifications of siRNA are highly successful in improving stability and lowering immunogenicity [28], to date, they have not been successful for mRNA due to the sensitivity of the translation machinery to these modifications [29]. The third challenge for mRNA is the lack of cell uptake of naked mRNA in most cell types [30], with the exception of immature dendritic cells [31]. These last two challenges are addressed by the incorporation of a nucleoside-modified or sequence-engineered mRNA into a delivery system that both protects the mRNA from enzymatic attack and facilitates cellular uptake. For example, incorporation into lipid nanoparticles protects the mRNA from enzymatic attack and enhances cell uptake and expression by up to 1000-fold compared to naked mRNA when administered in animal models [32,33].

Therapeutic mRNA is produced by in vitro transcription (IVT) from a plasmid DNA backbone to produce a full length message bearing a 5′ cap, a 5′ untranslated sequence (UTR), the open reading frame coding for the protein of interest, the 3′UTR and a polyA tail [4]. The natural eukaryotic 5′ cap (cap0) is an inverted 7-methyl guanosine (m7G) linked to the first nucleotide of the mRNA by a 5′ to 5′ triphosphate. Cap0 protects endogenous mRNA from nuclease attack, is involved in nuclear export and binds to translation initiation factor 4 to start protein translation. Two additional 5′ caps have been identified (cap1 and cap2) that contain additional methyl groups on the second or third ribonucleotide and are less immunogenic than cap0 (and therefore preferred) [34]. A commonly used current capping method involves a co-transcriptional capping process resulting in cap1,

which possesses high translation and low immunogenicity [35]. The 5′UTR is involved in translation initiation and can contain a Kozak sequence as well as an internal ribosomal entry site for cap-independent translation [36]. The open reading frame is followed by the 3′UTR, which influences mRNA stability and durability of protein expression. The polyA tail is encoded at around 100 residues and helps initiate translation and delay degradation. IVT production of mRNA needs to be followed by careful purification to remove DNA and double-stranded RNA contaminants, which are immunogenic [37,38]. The mRNAs described above can be nucleoside modified or sequence engineered without nucleoside modification, but are not capable of self-replication. Self-amplifying mRNA (samRNA) capable of replication are also being tested in clinical trials for SARS-CoV-2 and are longer ~10 kb sequences since they contain four additionally encoded nonstructural genes, including an RNA-dependent RNA polymerase, which result in self-replication inside cells but do not produce an infectious particle since they lack structural genes [39]. samRNAs cannot be nucleoside modified since these modifications interfere with self-amplification. Due to the amplification process, samRNAs typically use lower doses (1–10 µg) in the current COVID-19 clinical trials compared to 30–100 µg for non-amplifying mRNA. Interestingly, all of the above categories of mRNA vaccines are currently being tested in human clinical trials for SARS-CoV-2 and are summarized in Table 1. All mRNA delivery systems in these clinical trials are lipid nanoparticles. The exact composition of the Pfizer-BioNTech LNP [40] and Moderna LNP [41] have been publicly disclosed, while some others have not. The others are all most likely similar to the Alnylam Onpattro™ product (described further below) but with a proprietary ionizable lipid, as is the case for those that are disclosed. Although the specific ionizable lipid used may not be known in all cases, its general class can be understood from journal and patent publications and is indicated in Table 1.

**Table 1.** Current human trials for SARS-CoV-2 using mRNA lipid nanoparticles. All mRNA vaccines in SARS-CoV-2 clinical trials use a lipid nanoparticle for delivery. The identity and composition of each has not been publicly disclosed, so their probable class (shown below) is based on the available literature and patent citations.

| Company | mRNA Type | Immunogen | mRNA Dose (µg) | Confirmed or Probable LNP Class | Publications |
|---|---|---|---|---|---|
| Moderna | nucleoside modified mRNA | membrane bound prefusion stabilized spike | 100 | Lipid H [42] confirmed in [41] | [43–46] |
| BioNTech Pfizer | nucleoside modified mRNA | membrane bound prefusion stabilized spike | 30 | Acuitas ALC-0315 [47] confirmed in [40] | [48–51] |
| CureVac | unmodified mRNA | membrane bound prefusion stabilized spike | 12 | Acuitas ALC-0315 [47] | [52,53] |
| TranslateBio Sanofi | unmodified mRNA | prefusion stabilized double mutant spike | 7.5 | ICE [54] or Cysteine [55] | [56] |
| Arcturus | self-amplifying mRNA | full length spike | 1–10 | Lipid 2,2 (8,8) 4C CH₃ [57] | [58] |
| Imperial College | self-amplifying mRNA | membrane bound prefusion stabilized spike | 1–10 | Acuitas A9 [59] | [60] |
| Chulalongkorn | nucleoside modified mRNA | secreted wild type spike | Not available | Genevant CL1 [61] | NA |

Prior to COVID-19, mRNA vaccines were used in preclinical and clinical studies for infectious diseases including influenza, zika, HIV, Ebola, rabies, chikungunya, malaria, genital herpes, toxoplasma gondii, and others. These studies are summarized in a number of excellent recent reviews [4,6,16,39].

## 2. Early Delivery Systems for mRNA Vaccines

Protamine, a mixture of small arginine-rich cationic proteins, has been used to form complexes with mRNA that improved transfection compared to naked mRNA [62]. Later, a mixture of free mRNA with protamine-complexed mRNA was introduced [63] since protamine-complexed mRNA partly inhibited protein expression [64]. Dynamic light scattering indicated that free mRNA have a size near 50 nm, while the protamine/mRNA

complexes were in the 250–350 nm range [63]. This approach was pursued by CureVac for a rabies vaccine candidate, CV7201, a lyophilized, temperature-stable non-modified mRNA composed of free and protamine-complexed mRNA encoding the rabies virus glycoprotein (RABV-G) [65]. In Balb/c mice, two doses of 10 µg and higher induced neutralizing titers greater than the WHO threshold of protection and administration of an 80 µg dose twice was protective against a lethal intracerebral challenge [66]. In a phase 1 human trial using doses 80–640 µg applied through intradermal and intramuscular routes, only a subgroup of participants who received three 80–400 ug doses using a particular injector device achieved the WHO neutralization titer threshold [67]. A serious adverse event (Bell's Palsy) occurred for one participant out of 101 at the highest dose and 5% of all participants experienced a solicited severe adverse event. The overall rate of all adverse events was high, with 97% experiencing injection site reactions and 78% a systemic adverse event. Given this suboptimal delivery with protamine complexed mRNA, CureVac adopted a lipid nanoparticle delivery system from Acuitas [47,68] and demonstrated greatly improved neutralizing titers at a 20-fold lower dose of 0.5 µg (vs. 10 µg for protamine complexed mRNA) in Balb/c mice and at a 10 µg dose in non-human primates [69]. Activation of T cell responses and the presence of IL-6 and TNF in the draining lymph nodes and injection sites indicated the role of the LNP in mediating the positive immune response. A clinical trial has been initiated (NCT03713086), with interim results expected to be reported in 2021.

A cationic nanoemulsion (CNE) was developed for mRNA delivery by combining the cationic lipid DOTAP with a commercial adjuvant (MF59) containing squalene, sorbitan trioleate, and polysorbate 80 in a citrate buffer of pH 6.5 [70]. The combined use of a self-amplifying mRNA encoding for respiratory syncytial virus glycoprotein (RSV-f) with an NP amine (from DOTAP) to phosphate ratio (of mRNA) of 7 resulted in an average 129-nm sized nanoparticle. One advantage of this approach is the ability to store CNE and mRNA separately and combine them only at the time of use. A 15-µg dose administered twice in Balb/c mice elicited neutralizing titers above that of an adjuvanted subunit vaccine. Detectable neutralization titers and T cell responses in non-human primates were achieved with two doses of 75 µg. Building on this concept, a separate group created a Nanostructured Lipid Carrier (NLC), which is a hybrid between a CNE and a lipid nanoparticle, consisting of a liquid oil phase, such as squalene, with a solid-phase lipid composed of a saturated triglyceride [71]. NLCs containing a self-amplifying mRNA encoding for a sika immunogen had a particle size of 40 nm and an NP ratio of 15 and were capable of generating protective neutralizing titers in C57BL/6 mice after a single injection of a dose as low as 0.1 µg or 0.01 µg.

## 3. Polymers for mRNA Delivery

Cationic polymers have been widely used for nucleic acid delivery for several decades, including for example poly(L-lysine), polyethylenimine (PEI), DEAE-dextran, poly(β-amino esters) (PBAE) and chitosan. In their simplest format, cationic polymers are mixed in excess with nucleic acid to form electrostatically bound cationic polyplexes. Although many polymers have been developed, they are not as advanced as lipid nanoparticles for nucleic acid delivery and the number of animal studies applying them successfully to vaccines is limited. PBAEs were co-formulated with polyethylene glycol (PEG)-lipids to form mRNA/PBAE/PEG–lipid nanoparticles that were capable of the functional delivery of mRNA to the lungs after intravenous administration in mice [72]. A biodegradable polymer, poly(amine-co-ester) (PACE) terpolymer, has been examined for mRNA delivery using erythropoietin as a reporter post-IV administration for gene delivery [73]. By controlling the molecular weight and end group chemistry, a 10 kDa member of the PACE family achieved the same in vitro transfection efficiency as TransIT, a potent but toxic colloidally unstable and large-sized commercial reference. In vivo expression of EPO at 20 µg IV was fivefold more potent than TransIT. Hyperbranched poly (beta amino esters) (hPBAEs) were synthesized for mRNA delivery to the lung by inhalation. hPBAE mRNA polyplexes were 137 nm in size and were able to transfect 25% of the lung endothelium when nebulized and

inhaled in mice without evident toxicity and with expression levels 10-fold that of branched PEI [74]. A disulfide-linked poly(amido amine), pABOL, was synthesized at molecular weights ranging from 8 kDa to 167 kDa and was able to form polydisperse nanocomplexes near 100 nm in size [75]. In vivo luciferase expression of these polyplexes using a self-amplifying mRNA reporter was similar to that of PEI after intramuscular administration. When delivered to mice with a hemagglutinin (HA) influenza immunogen in a prime-boost design, neutralizing titers were highest for the low molecular weight 8 kDa pABOL and exceeded those of PEI. The 8 kDa pABOL delivering 1 μg HA of self-amplifying mRNA was also partly protective against a lethal influenza challenge, preventing death but not preventing significant weight loss. This pABOL system was considered for the delivery of a self-amplifying mRNA immunogen for SARS-CoV-2 by the group at Imperial College London; however, delivery of a SARS-CoV-2 immunogen with pABOL was 1000X less potent than delivery of the same immunogen with an optimized lipid nanoparticle from Acuitas [59]. In total, 1μg of self-amplifying RNA in pABOL generated the same binding antibody and neutralization titers as 0.001 μg in an optimized lipid nanoparticle (Dr. Anna Blakney, personal communication). Many other polymer systems are capable of delivering mRNA in vitro or in vivo but remain to be tested in a vaccine context [76–84].

## 4. Development of Lipid Nanoparticles for the Current SARS-CoV-2 Clinical Trials

The earliest transfection reagent for mRNA was the quaternized cationic DOTAP combined with ionizable and fusogenic DOPE, adopted from DNA transfection [85] for the transfection of mRNA in numerous cell types [86]. Although effective in vitro, the permanently cationic quaternized ammonium group renders these large-sized lipoplexes rapidly cleared from circulation and from generally targeting lungs, as well as exhibiting toxicity. The forerunner of today's LNP was the stabilized plasmid–lipid particle (SPLP) that was formed by combining the fusogenic ionizable DOPE with a quaternized cationic lipid, DODAC, which electrostatically bound and encapsulated plasmid DNA, which was then coated with hydrophilic PEG to stabilize it in aqueous media and limit protein and cell interactions upon administration in vivo [87]. DOPE can be protonated in the endosome after cell uptake and, since it is cone-shaped, it can form an endosomolytic ion pair with endosomal phospholipids to facilitate endosomal release, a critical event for successful delivery [17]. The SPLP was then further developed as a Stabilized Nucleic Acid Lipid Particle (SNALP) containing siRNA that included four lipids: an ionizable rather than quaternized cationic lipid, a saturated bilayer forming quaternized zwitterionic lipid, DSPC, cholesterol and a PEG–lipid [88]. In addition to electrostatically binding to the nucleic acid, the ionizable lipid in the SNALPs played the role of the fusogenic lipid and became protonated in the endosome to form a membrane-destabilizing ion pair with an endosomal phospholipid. It is now known that DSPC helps form a stable bilayer underneath the PEG surface [89]. Cholesterol plays several roles, including filling gaps in the particle, limiting LNP–protein interactions and possibly promoting membrane fusion [90]. The ionizable lipid plays a central role by being neutral at physiological pH, thus eliminating any cationic charge in circulation, but becoming protonated in the endosome at pH ~6.5 to facilitate endosomal release. The development of the first siRNA product that was clinically approved in 2018 primarily focused on optimizing the ionizable lipid and, secondarily, the PEG–lipid and the ratios of the four lipids used in the LNP, as well as the LNP assembly and manufacturing procedure. An optimal number of unsaturated bonds in the C18 tail were found to be providing a dilinoleic acid tail linked by ethers to a dimethylamine headgroup [88], in accordance with the molecular shape hypothesis [12,91]. However, the introduction of a single linker to the dilinoleic acid tail, which had an optimized number of carbons from the dimethylamine head group to the linker, resulted in the pKa of the ionizable lipid in the LNP being near 6.4 for the ionizable lipid DLin-MC3-DMA [92,93]. The last step in the optimization was to tune the mole ratios of these lipids to 50/10/38.5/1.5 for MC3/DSPC/Cholesterol/PEG–lipid. Overall, this optimization process from DLin-DMA to DLin-MC3-DMA required more than 300 ionizable lipids to be screened in thousands of

formulations and resulted in a 200-fold increase in potency and a corresponding reduction in the effective dose in order to achieve durable suppression of the target gene >80% and a therapeutic window that permitted the clinical approval of Onpattro™ in 2018 [94,95]. This MC3 formulation developed for siRNA is the basis for the subsequent development of LNPs described below (Figure 1), which are now under emergency use after being approved for the delivery of SARS-CoV-2 mRNA vaccines.



PEG-lipid     Charged ionizable lipid
Cholesterol   Neutral ionizable lipid
DSPC

**Figure 1.** mRNA lipid nanoparticle structure. Recent studies using cryoelectron microscopy [96], small-angle neutron scattering and small-angle X-ray scattering [89] have shown that the mRNA Lipid nanoparticle includes low copy numbers of mRNA (1–10) and that the mRNA is bound by the ionizable lipid that occupies the central core of the LNP. The polyethylene glycol (PEG) lipid forms the surface of the lipid nanoparticle (LNP), along with DSPC, which is bilayer forming. Cholesterol and the ionizable lipid in charged and uncharged forms can be distributed throughout the LNP. Structural schematics of other delivery systems are available in a recent review [14].

Moderna carried out several preclinical [97–99] and clinical studies [97,100] using MC3 in the Onpattro formulation described above in order to deliver nucleoside-modified mRNA-encoded immunogens. MC3 was later identified [42,101] as the ionizable lipid in these studies comparing a new class of ionizable lipids to MC3. This new class includes Lipid H [42], which is the ionizable lipid SM-102 [41] in Moderna's SARS-CoV-2 product mRNA-1273 (Table 2). Using a nucleoside-modified mRNA-encoded immunogen for the Zika virus, the MC3 LNP was capable of protecting immunocompromised mice lacking type I and II interferon (IFN) signaling against a lethal challenge with one 10 µg dose or two 2 µg doses in a prime-boost design [99]. Similar results were obtained in immunocompetent mice pre-administered with an anti-ifnar1 blocking antibody to create a lethal model. In a series of influenza studies delivering nucleoside-modified mRNA-encoding hemagglutinin (HA) immunogens, the MC3 LNP delivered intradermally was capable of fully protecting mice against a lethal challenge with a single dose as low 0.4 µg, although post-challenge weight loss occurred even when up to 10 µg of a single dose was administered [97]. A single dose of 50 µg or 100 µg produced high HAI (hemagglutination inhibition assay) titers in ferrets, as did two doses of 200 or 400 µg in non-human primates. In a small number (23) of human subjects who received 100 µg doses, all had HAI titers >40 (the WHO correlate of protection) that were more than fourfold above the baseline at the beginning of the study. In a larger phase 1 trial using these same MC3 LNPs delivering two distinct nucleoside-modified mRNA-encoded HA immunogens, intramuscular injection of 100 µg of the H10N8 immunogen resulted in 100% of the 23 subjects having HAI titers >40 [100]. Although no life-threatening adverse events occurred, 3 of these 23 subjects experienced severe grade 3 adverse events. A planned 400 µg dose was discontinued after two of three

subjects experienced grade 3 adverse events, which met the study pause rules. At lower doses, the frequency and severity of adverse events diminished, although nearly every subject experienced at least one adverse event. These studies were promising, but also highlighted the relatively narrow therapeutic window to obtain protective immunizations at doses that do not cause a problematic number of adverse events. This is reminiscent of the narrow therapeutic window of the MC3 precursor, DLin-DMA, which needed an improved potency in order to lower the dose and still achieve efficacious gene knockdown.

**Table 2.** Ionizable lipids used in lipid nanoparticles. A key feature of the ionizable lipids used in lipid nanoparticles is that the pKa of the ionizable lipid in the LNP, as measured by the TNS dye-binding assay, should be in the range of 6–7. The theoretically calculated pKa of most of the ionizable groups is in the range of 8–9.5, as shown below on the nitrogen atoms, using commercial software that theoretically estimates these values in aqueous media. The 2–3 point drop in pKa from the theoretical value to the TNS value is due to the much higher energy of solvation of protons in the lipid phase, creating a pH increase of 2–3 points in the lipid compared to the aqueous phase, where pH is measured during the TNS assay [102].

| Name | Ionizable Lipid Structure and Theoretical pKas | TNS pKa |
|---|---|---|
| MC3 [92] |  | 6.4 |
| Lipid 319 [68] |  | 6.38 |
| C12-200 [103] |  | 6.96 |
| 5A2-SC8 [104] |  | 6.67 |
| 306Oi10 [105] |  | 6.4 |
| Moderna Lipid 5 [101] |  | 6.56 |
| Moderna Lipid H, SM-102 [42] |  | 6.75 |

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 899 of 923 PageID #: 914

**Table 2.** *Cont.*

| Name | Ionizable Lipid Structure and Theoretical pKas | TNS pKa |
|---|---|---|
| Acuitas A9 [59] |  | 6.27 |
| Acuitas ALC-0315 [47] |  | 6.09 |
| Arcturus Lipid 2,2 (8,8) 4C CH3 [57] |  | 6.69 |
| Genevant CL1[61] |  | NA |

Since siRNA products require repeated dosing for chronic diseases, there was a concern that the slow degradability of the dilinoleic alkyl tail in MC3 would cause accumulation and potential toxicity with repeated dosing. A biodegradable version of MC3, Lipid 319 (Table 2), was generated by replacing one of the two double bonds in each alkyl chain with a primary ester that can be easily degraded by esterases in vivo [68]. A half-life of less than an hour in the liver was noted for Lipid 319, while it maintained a gene silencing efficiency in the liver that was similar to MC3. The degradation products were confirmed in vivo, as well as their secretion and the nontoxic nature of Lipid 319. This study of Lipid 319 is cited in the preclinical and clinical studies for SARS-CoV-2 as representing the Acuitas LNP class used in the BioNTech [49] and CureVac [53,69] products, although the Acuitas LNP delivering the self-amplifying RNA in the Imperial College London trial [60] is cited as having been contained in a more recent patent application [59], represented here by Lipid A9 from Acuitas (Table 2). Recently, the identity of the Acuitas ionizable lipid in BioNTech's approved BNT162b2 was disclosed [40] as ALC-0315 (Table 2). An important aspect of these LNPs is that they were developed by screening mRNA expression in the liver following IV administration and may not yet be fully optimized for the intramuscular administration of mRNA-based vaccines.

Moderna recently developed a new class of ionizable lipids to replace MC3, primarily due to the above-mentioned concerns related to the slow degradability of MC3, but also with the effort of increasing their potency by enabling greater branching than the dilinoleic MC3 alkyl tail [42,101]. This new class of lipids has an ethanolamine ionizable head group, connected to both a single saturated tail containing a primary degradable ester—like that of Maier 2013—and a second saturated tail that branches after seven carbons into two saturated C8 tails using a less degradable secondary ester, as in Lipid 5 [101] (Table 2), optimized for IV administration to the liver, and a similar Lipid H [42] or SM-102, found to be optimal for the intramuscular (IM) administration of vaccines. Increased branching is a common feature pursued by Acuitas, as Lipid A9 has a total of five branched chains [59] (Table 2) vs. three for the Moderna LNPs. Increased branching is believed to create an ionizable lipid with a more cone-shaped structure, so that—when paired with the anionic phospholipid in the endosome—a greater membrane-disrupting ability will occur, following the molecular shape hypothesis outlined several decades ago [12,91]. When administered IV, Lipid 5 was not detectable in the liver at 24 h, while MC3 was present

in the liver at 71% of its initial dose, verifying the degradability of Lipid 5. Lipid 5 was three-fold more potent than MC3 in mice for luciferase expression and five-fold more potent in non-human primates for hEPO after IV administration. These increases in potency were consistent with and possibly caused by an increase in endosomal release, with up to 15% of the mRNA in the cell being released from the endosome for Lipid 5 versus 2.5% for MC3, the latter being similar to that previously measured for MC3 using siRNA [106]. However, cell uptake in these endosomal release experiments was fourfold higher for MC3 vs. Lipid 5 so that absolute amounts of released mRNA in the cytoplasm were similar for these two LNPs. The same ionizable lipid library was examined in intramuscular administration for vaccines and was similarly found to be degradable and quickly eliminated due to the primary ester and generally to have a 3–6 fold increase in potency in terms of protein expression or immunogenicity compared to MC3 for an influenza nucleoside-modified mRNA encoded immunogen in mice, although immunogenicity in non-human primates was identical to MC3 at a 5 µg prime-boost dose [42]. Lipid H or SM-102 (Table 2) was identified as the optimal candidate and structurally only differs from Lipid 5, identified as optimal for IV administration, by a two-carbon displacement of the primary ester. The pKa of Lipid 5 LNP was 6.56, while that of the Lipid H LNP was 6.68, suggesting that a slight increase in pKa may be beneficial for IM vs. IV administration, although this difference is within the variability of the assay. Histological examination of muscle injection sites in rats indicated that Lipid H LNPs attracted less of a neutrophil- and macrophage-enriched inflammatory infiltrate compared to MC3, which may reduce injection site reactogenicity in human trials [42].

## 5. mRNA Lipid Nanoparticles in the Current SARS-CoV-2 Clinical Trials

### 5.1. BioNTech/Pfizer

Acuitas ALC-0315 (Table 2) combined with DSPC, cholesterol and a PEG–lipid is the delivery system in the SARS-COV-2 trials of BioNTech [40]. CureVac and Imperial College London may also use ALC-0315, or possibly A9 (Table 2). BioNTech began developing its SARS-CoV-2 vaccine with four mRNA-encoded immunogens, two of which were nucleoside modified, one unmodified and one self-amplifying. Reports are available for the two nucleoside-modified mRNAs: BNT162b1 is a short ~1 kb sequence encoding the receptor-binding domain of the spike protein, modified by a foldon trimerization domain to increase immunogenicity by multivalent display. The longer 4.3 kb BNT162b2 encodes a diproline-stabilized, full-length, membrane-bound spike protein. BNT162b2 received EU and US emergency approval recently. In a preclinical study, binding antibodies and neutralization titers in mice were detectable after a single dose of 0.2, 1, and 5µg of BNT162b2, increasing by an order of magnitude from the lowest to the highest dose and eliciting strong antigen-specific Th1 IFNγ and IL-2 responses in CD4+ and CD8+ splenocytes with very low levels of Th2 cytokines [49]. Draining lymph nodes also contained high numbers of germinal center B cells and elevated counts of CD4+ and CD8+ T follicular helper (Tfh) cells, which were previously identified as partly induced by the LNP alone in mRNA LNP vaccines [33]. In non-human primates, prime-boost doses of either 30 µg or 100 µg elicited binding antibody and neutralization titers that were more than 10 fold those of a human convalescent panel and a strongly Th1-biased T cell response that is believed to be important to protect against vaccine-associated enhanced respiratory disease [107]. In a limited number (6) of challenged rhesus macaques, two doses of 100 µg rendered undetectable viral titers in bronchoalveolar lavage and from nasal swabs. A phase 1 clinical trial for the smaller mRNA-encoded immunogen BNT162b1 planned 10, 30 and 100 µg doses on day 1 and day 21. The intermediate dose of 30 µg induced antibody binding and neutralization titers that were 30-fold and threefold higher than those of a human convalescent panel, respectively. The 100 µg dose was not administered for the boost due to the presence of severe injection site pain after the first dose. Injection site pain was reported by 100% of subjects with the 30 µg boost, but at mild or moderate severity. Following the second vaccination at the 30 µg dose, nearly all subjects experienced mild or

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 901 of 923 PageID #: 916

moderate systemic adverse events of fever, chills or fatigue. This trial also demonstrated strong Th1-biased T cell responses from peripheral blood mononuclear cells [50]. A phase 2 trial compared both BNT162b1 and BNT162b2 in groups of younger (18–55 y) and older (65–85 y) subjects [51]. Binding and neutralizing antibody titers were slightly lower in the older subjects, but still exceeded those in a convalescent panel. The severity of adverse reactions was also reduced in the older versus younger subjects. A significant reduction by ~twofold in the frequency of systemic adverse events (fever, chills, fatigue) was found in BNT162b2 versus BNT162b1. It was this increase in the tolerability of BNT162b2 that drove its selection for the phase 3 trial, where a 94% effectiveness was recently announced, since 162 COVID-19 cases occurred in the placebo arm, while only 8 cases were found in the vaccinated group that received two 30 μg doses of BNT162b2 [3].

### 5.2. Moderna

The nucleoside-modified mRNA encoded immunogen in Moderna's studies is a transmembrane-anchored diproline-stabilized prefusion spike with a native furin cleavage site and is delivered in an LNP that follows the prototype MC3 LNP, but replaces MC3 with Lipid H (SM-102) [41,42]. This mRNA LNP (mRNA-1273) induced neutralizing antibodies in several mouse species when injected at 1 and 21 days with a 1μg dose, but not at a 0.1 μg dose [44]. The T cell response appeared to be a balanced Th1/Th2 response and viral titers in mice lungs and nasal turbinates in a mouse-adapted virus challenge model were reduced to baseline with two doses of 1 μg, but not with 0.1 μg. In rhesus macaques, 2 doses of 100 μg produced high binding and neutralizing titers and a Th1-biased response in peripheral blood that also involved a strong Tfh response [45]. Titers and T cell responses were significantly lower with two 10 μg doses. Similarly, the 100 μg dose was capable of reducing viral titers in bronchoalveolar lavages and nasal swabs to baseline, while 10 μg only did so in the lungs. In a phase 1 study with 15 patients per group receiving 2 doses of 25, 100 or 250 μg, separated by 4 weeks, binding and neutralization titers were ~10-fold higher than convalescent for the 100 μg dose, and about equivalent to convalescent at 25 μg [46]. Solicited adverse events were report by all subjects at the 100 μg and 250 μg doses and 3 of 14 in the 250 μg group reported severe adverse events and were discontinued. In a subsequent phase 1 study in older patients (56–71 y and above 71 y), the 25 μg and 100 μg doses were found to produce binding antibody titers above those of convalescent plasma, while neutralizing titers were equivalent at 100 μg, but lower than convalescent at 25 μg [43]. Most patients (~80%) still experienced adverse events after the second vaccination, even in the older age group. Analyses of peripheral blood showed a CD4 T cell response that was Th1 biased. The higher neutralization titers for the 100 μg dose vs. the 25 μg dose resulted in its selection for the phase 3 trial, where interim results announced a 94.5% efficacy with 90 cases of COVID-19 in the placebo group versus five in the vaccinated group [2]. An independent board conducted an interim analysis of Moderna's phase 3 trial and found that severe adverse events included fatigue in 9.7% of participants, muscle pain in 8.9%, joint pain in 5.2%, and headache in 4.5%, while, in the Pfizer/BioNTech phase 3 trial, the frequency was lower with fatigue at 3.8% and headache 2% [108].

### 5.3. CureVac

The CureVac mRNA LNP (CVnCoV) is a non-chemically modified, sequence-engineered mRNA encoding a diproline stabilized full-length S protein delivered in an Acuitas LNP, possibly using the ionizable lipid ALC-0315. The number of weeks between two doses was examined ranging, from 1 to 4 when using 2 μg doses in mice, where it was found that the longer intervals produced higher titers and T cell responses and a balanced Th1/Th2 response in Balb/c mice [53]. The second dose was required to produce neutralizing antibodies and two doses of 0.25 μg were insufficient to produce neutralizing antibodies. In Syrian golden hamsters, two 10 μg doses (but not 2 μg) were able to reduce viral titers in the lungs (but not nasal turbinates) to baseline. In a phase 1 clinical trial examining 2–12 μg doses, neutralizing titers reaching the levels of convalescent sera were only found at the

highest 12 µg dose, resulting in higher doses of 16 and 20 µg being included in the ongoing phase 2 trial [52]. All patients at the 12 µg dose experienced systemic adverse events after each dose, the majority being moderate and severe, while >80% experienced local injection site pain at the mild and moderate levels.

### 5.4. TranslateBio

Translate Bio uses a non-modified mRNA encoding a double mutant form of the diproline stabilized spike protein delivered in an LNP that is cited as being based on the ionizable lipid C12-200 [109], but may be a more recently synthesized candidate from the ICE- [110] or cysteine-based [55] ionizable lipid families. In Balb/c mice, two doses in the range of 0.2–10 µg resulted in binding and neutralization titers well above convalescent levels. In non-human primates 15, 45 and 135 µg doses all generated titers exceeding the human convalescent panel [56]. The immune response was also Th1 biased.

### 5.5. Arcturus

Arcturus uses a self-amplifying, full-length, unmodified mRNA encoding a pre-fusion SARS-CoV-2 full-length spike protein in an LNP that uses an ionizable lipid with a thioester to link the amine-bearing headgroup to lipid tails via two additional ester groups. Two possible ionizable lipids in this family are Lipid 10a (in Table 4 of [111]) or Lipid 2,2 (8,8) 4C CH3 (on p. 33 of [57]) (Table 2). The latter has three branches, resembling the Moderna Lipid H, but with a degradable thioester linked to the headgroup. A feature of self-amplifying mRNA was observed where luciferase reporter expression was maintained at a fairly constant level beyond one week of IM administration, while conventional mRNA expression fell quickly [58]. The vaccination alone surprisingly produced weight loss and increased clinical scores in C57BL/6 mice. Only a single dose at 2 µg or 10 µg (but not 0.2 µg) in mice was required to reach neutralization titers above 100 in a Th1-biased response with high levels of antigen-specific T cell responses. A single dose of 2 µg or 10 µg was also 100% protective in the K18-hACE2 lethal mouse challenge model, generating 100% survival with no weight loss and a reduction in lung and brain viral titers to baseline. Arcturus has completed a phase 1 clinical trial with doses from 1–10 µg and has chosen 7.5 µg for its phase 3 trial [112].

### 5.6. Imperial College London

Imperial College London uses a self-amplifying mRNA-encoded prefusion-stabilized spike protein delivered in an Acuitas LNP, which is described in the patent [59] represented by Lipid A9 [60] (Table 2). Remarkably high and dose-dependent antibody and neutralizing titers were obtained after two injections of doses in the range 0.01 µg to 10 µg in Balb/c mice. The response was strongly Th1 biased and the 10 and 1 µg doses produced threefold higher antigen-specific splenocyte responses compared to the lower 0.1 and 0.01 µg doses. A phase 1 clinical trial is about to start for this vaccine.

### 5.7. Chulalongkorn University, University of Pennsylvania

Chulalongkorn University, in collaboration with the University of Pennsylvania, is developing a native spike immunogen nucleoside-modified mRNA LNP using a Genevant LNP, likely CL1 Lipid [61]. They aim to begin phase 1 clinical trials in Q1 of 2021 and begin distribution of the vaccine in Q4 of 2021 to Thailand and seven surrounding low to moderate income countries.

*Vaccines* **2021**, *9*, 65

*5.8. Providence Therapeutics*

Providence therapeutics was granted a Health Canada notice of authorization to pursue human clinical trials for the PTX-COVID-19B mRNA LNP vaccine [113]. Preclinical studies of three mRNA candidates encoding the receptor-binding domain, the full-length spike with or without a mutation in the furin cleavage site, were administered at a dose of 20 µg in C57BL6 mice following a prime-boost regimen [114]. Preclinical data using an undisclosed lipid from Genevant, possibly similar to CL1 In Table 2, showed robust neutralization titers for the full length and the furin-mutated payloads, reminiscent of the data observed in [115]. Phase 1 clinical trials are scheduled to begin in Q1 of 2021, with manufacturing and distribution of the vaccine—pending regulatory approval—in the same year.

*5.9. Storage and Distribution*

Most RNA LNPs made in the laboratory are stable at 4 °C for several days, but then exhibit size increases and a gradual loss of bioactivity, such as luciferase expression [116]. A size increase over time from LNP aggregation has been commonly observed in previous siRNA LNP formulations [117]. In order to stabilize mRNA LNP vaccines for storage and distribution, a frozen format has been required to date. The Moderna COVID-19 vaccine needs to be stored from −25 °C to −15 °C, but is also stable between 2 °C and 8 °C for up to 30 days and between 8 °C and 25 °C for up to 12 h [118]. The Pfizer/BioNTech COVID-19 vaccine needs to be stored from −80 °C to −60 °C and then thawed and stored from 2 °C to 8 °C for up to 5 days prior to dilution with saline before injection [119]. The dry ice temperatures required for the Pfizer vaccine are more difficult to achieve during distribution and storage than the regular freezer temperature required by the Moderna vaccine. The reasons behind these temperature differences are not obvious since both vaccines contain similar high concentrations of sucrose as a cryoprotectant. The Moderna mRNA LNPs are frozen in two buffers, Tris and acetate [41], while the Pfizer/BioNTech vaccine only uses a phosphate buffer [40]. Phosphate buffers are known to be suboptimal for freezing due to their propensity to precipitate and cause abrupt pH changes upon the onset of ice crystallization [120,121]. Lyophilization has been challenging for mRNA LNPs [116]. However, Arcturus has stated that their COVID-19 mRNA vaccine is stable in a lyophilized format, which would presumably greatly simplify distribution, although the temperature stability of this lyophilized formulation has not yet been disclosed [122].

## 6. Lipidoid Nanoparticles

A number of lipid-like entities, termed lipidoids, were initially developed for siRNA delivery and subsequently used for mRNA delivery. One example is C12-200 (Table 2), which was selected from a large lipidoid family due to its high efficiency in hepatocyte gene silencing via IV administration [123]. For efficient liver-directed gene silencing, C12-200 was combined with the same lipids as the MC3 Onpattro prototype, namely 50% ionizable lipid, 10% DSPC, 38.5% cholesterol and 1.5% PEG–lipid. A later study found that the C12-200 delivery efficiency for mRNA to the same liver target could be increased sevenfold by reducing the percentage of ionizable lipid to 35%, but increasing the weight ratio of ionizable lipid to nucleic acid from 5 to 10 and replacing DSPC with the fusogenic unsaturated DOPE [103]. Interestingly, this optimized formulation increased mRNA expression sevenfold, but did not change the silencing efficiency for siRNA. C12-200, in this formulation, has also been studied for mRNA-mediated protein replacement therapy in mice and nonhuman primates [124], but was seen to generate a strong inflammatory response by histology when injected subcutaneously [109]. C12-200 is a small molecule dendrimer with five alkyl chains and five nitrogen atoms, three of which appear to be protonatable, according to ionization analyses that can be performed with commercial software such as ACDLabs Percepta (Table 2). Another dendrimer lipidoid, 5A2-SC8, was identified for high siRNA delivery efficiency to the liver in a separate screening process, and also has five nitrogen atoms and five short alkyl chains [125] (Table 2). The 5A2-SC8 lipidoid

had poor efficiency for mRNA delivery unless its formulation parameters were similarly changed by lowering the ionizable lipid mole fraction to 24%, using DOPE instead of DSPC, and increasing the other lipid proportions, but, at the same time, increasing the weight ratio of 5A2-SC8 to mRNA to 20 [104]. These formulation changes appear to be needed for these dendrimer-type lipidoids to be effective mRNA delivery vehicles, possibly since they have multiprotic head groups and a dendrimer structure. Another very high molecular weight modified dendrimer was used to deliver self-amplifying mRNA encoding immunogens for influenza, Ebola and toxoplasma gondii and was shown to be protective against all three pathogens in mice after a single, very high dose of 40 μg or prime-boost 4 μg injections, which is also a high dose for replicating RNA [126]. An interesting recent finding for a series of lipidoids was that an additional single carbon branch at the terminus of each of the four alkyl chains of this small, three-nitrogen dendrimer increased the potency of liver expression more than 10-fold compared to other lipidoids in this class [105]. There was no correlation of this increased potency with the LNP pKa, but there was a correlation with the absolute fluorescence of the TNS dye at pH 5, which indicates that the amplitude of protonation in the endosome correlates to mRNA expression, presumably by facilitating endosomal release. The additional carbon branch could also be expected to produce a more cone-shaped structure and thereby more membrane disruption according to the molecular shape hypothesis [12,91].

## 7. Intranasal Delivery of mRNA Lipid Nanoparticles

For mRNA vaccines, the vast majority of studies and all current clinical trials have used intramuscular administration, while intradermal administration has also been studied, usually in parallel with the intramuscular route. Although not highly developed to date, intranasal administration of vaccines presents advantages such as the activation of mucosal immunity, which is very relevant for respiratory pathogens, and a reduced reliance on needle-based immunizations. The MC3 LNP has been used to deliver a 4.5 kb nucleoside-modified sequence encoding the cystic fibrosis transmembrane conductance regulator (CFTR) to mice [127]. A luciferase reporter was successfully expressed in the lungs by pipetting a 12 μg dose into the nostrils for spontaneous inhalation. Then, in a transgenic CFTR knockout mouse, application of CFTR mRNA LNPs restored CFTR-mediated chloride secretion to conductive airway epithelia for at least 14 days. MC3 LNPs were used again in a subsequent study of delivery to the nasal epithelium by using a luciferase reporter. Here, the use of a nebulizer to create an aerosol using the LNPs was examined; however, aerosolization resulted in LNP aggregation, doubling their size to 170 nm and resulting in a loss of transfection activity in vitro [128]. As a result, the researchers decided to instill the LNPs into the nostrils and found the luciferase reporter mainly expressed in nasal epithelia, with some additional transfection in lung epithelia. This study highlighted the delivery challenges of obtaining uniform and high levels of mRNA transfection in nasal and lung epithelia. Intranasal delivery of mRNA LNPs was also achieved using the older DOTAP/cholesterol/PEG–lipid system combined with protamine to encapsulate non-modified mRNA-expressing cytokeratin 19 in order to provoke a cellular immune response and slow tumor growth in a Lewis lung cancer xenograft model in mice [129]. These LNPs were large, 170 nm in size, and cationic, with 10 mV zeta potential and the ability to transfect 30% of DC2.4 dendritic cells in vitro. Once the xenograft tumor was established, 10 μg of cytokeratin 14-encoding mRNA LNPs was intranasally instilled in 100 μL PBS once per week for 3 weeks, resulting in a very significant reduction in tumor volume growth compared to the PBS control. A nucleoside-modified mRNA encoding the influenza antigen H3N2-HA was delivered in another study using DOTAP/DOPE/PEG–lipid LNPs, as well as in the same LNP-bearing mannose as a ligand to facilitate uptake by macrophages and dendritic cells [130]. These LNPs were also large, at 200 nm, positively charged, at 15 mV zeta potential, and able to express luciferase in the lungs following intranasal instillation of a 12 μg dose. Two 12 μg doses of the H3N2-HA LNPs were instilled intranasally at weeks 0 and 3 in C57BL/6 mice that were subsequently challenged with a

lethal dose of H1N1. Both LNPs containing the mRNA-encoded immunogen were capable of complete protection, while the mannose-coated LNP appeared more able to also block weight loss. Intranasal administration of LNPs appears feasible, although the doses were higher than those reported for intramuscular administration and the method of installation or aerosolization still requires further development.

## 8. Delivery of mRNA LNPs Encoding Antibodies

More than 70 monoclonal antibodies (mAbs) are currently on the market, with global sales of 125 billion USD. The possibility of using mRNA-encoded antibodies may bring some advantages, including endogenous protein synthesis benefiting from native post-translation modifications and a simplified manufacturing method that does not require cell culture and extensive purification and characterization of the protein product [8]. The feasibility of delivering mRNA-encoded mAbs for passive immunization was shown by the encapsulation of purified nucleoside-modified mRNAs encoding the light and heavy chains of VRC01, a broadly neutralizing antibody against HIV-1, into Acuitas LNPs [131]. Balb/c mice receiving a 30 μg dose IV that would target hepatocytes expressed the mAbs for more than a week, with serum levels reaching 150 μg/mL, which was higher than that obtained by direct injection of 600 μg of the mAb, with weekly injections capable of maintaining a constant serum level above 40 μg/mL. Both a 30 μg and a 15 μg injection of the mRNA LNP could protect CD34-NSG humanized mice from an HIV-1 challenge given 24 h later, as indicated by analyses of serum for viral RNA copies 2 weeks post challenge. The feasibility of therapeutic non-modified mRNA-encoded antibodies was confirmed in a study by CureVac, also using Acuitas LNPs [25], where an IgG mAb with broad neutralization ability for a variety of rabies strains was chosen, as well as a heavy chain-only Vh domain-based (VHH) neutralizing agent against the botulinum toxin [132]. An mRNA-encoded rituximab, targeting CD20, the gold standard for treating non-Hodgkin's lymphoma, was also produced. The animal studies here used an Acuitas LNP that targeted hepatocytes by IV administration. A single administration of 40 μg in mice produced serum levels of IgG just above 10 μg/mL, which gradually declined to 1 μg/mL after 1 month. The same dose of the VHH single-domain neutralizing agent produced 10-fold higher levels, but with a much shorter half-life of several days due to the absence of the Fc region. Single IV administration of 40 μg in mice was also able to entirely protect mice when administered either 1 day before or 2 h after a lethal challenge of the rabies virus. Similarly, a 40 μg dose 6 h after a lethal botulinum toxin challenge entirely protected the animals. A third challenge model, where Raji-luc2 B-cell lymphoma cells were engrafted intravenously and allowed to grow for 4 days and then 10 or 50 μg of mRNA-encoded rituximab in the Acuitas LNP was administered five times over 18 days, resulted in all animals surviving this lethal tumor challenge and the 50 μg dose was able to entirely abrogate tumor growth.

Bispecific antibodies that recruit T cells to tumor cells were also encoded in modified mRNA constructs and delivered in vivo using a commercial transfection reagent, TransIT, which is not as efficient as current LNPs for liver delivery [133]. The mRNA construct could sustain circulating and bioactive bispecific antibodies for more than 6 days, while the same 5 μg dose of the protein-bispecific antibody was reduced to near baseline after one day. A second study was also carried out using bispecific antibodies in the VHH format, where one VHH that binds the conserved influenza A matrix protein 2 ectodomain (M2e) was genetically linked to a second VHH that specifically binds to the mouse Fcγ receptor IV (FcγRIV) in order to recruit innate immune cells expressing FcγRIV to influenza infected cells expressing M2e [134]. These nucleoside-modified mRNA constructs were delivered using DOTAP/cholesterol LNPs by intratracheal instillation into the mouse lung and, 4 h later, challenged with a lethal influenza virus dose. Most of the mice (80%) were protected from the lethal dose, although they did experience significant weight loss and the DOTAP/cholesterol mRNA nanoparticles resulted in a temporary influx of granulocytes in the lungs, combined with an increase in serum IL-6 cytokine levels. Finally, a potent

neutralizing antibody identified in the B cells of a survivor of chikungunya infection was encoded in a nucleoside-modified mRNA construct delivered in an LNP possibly containing MC3 or Lipid 5 [135]. Protection against viral challenge administrated 24 h pre-infusion in mice was achieved at 0.5 mg/kg (10 μg) IV for the mRNA-encoded mAb, while 2 mg/kg of the protein mAb was needed. Therapeutic protection by infusion at 4 h post infection was obtained at very high doses of 10 mg/kg (200 μg) in mice. Non-human primate studies found that very high doses up to 3 mg/kg (9 mg) produced minimal transient toxicity involving splenic enlargement and increased CCL2 serum levels, and the antibody was detectable for several months post infusion. Based on these results, Moderna initiated a phase 1 human trial and announced positive results where infusions of 0.1 and 0.3 mg/kg were well tolerated and resulted in serum levels of the mAb in the 1–14 μg/mL range that are expected to be protective against chikungunya virus for up to 16 weeks after a single dose [136].

## 9. Assembly and Structure of Lipid Nanoparticles

The current methods of mRNA lipid nanoparticle production utilize microfluidic or T-junction mixing to rapidly combine an ethanol phase containing the hydrophobic lipids and an aqueous phase that contains the mRNA in a buffer, such as acetic acid, at pH 4 (Figure 2). Prior methods, such as thin film hydration and ethanol injection, are generally not used since they result in heterogeneous larger-sized nanoparticles with lower mRNA encapsulation efficiency, which are difficult to scale up [95]. Microfluidic mixing has the advantage of being able to mix very small volumes of lipids in ethanol with mRNA in aqueous solutions (tens of μL) so that the screening of many components and formulation parameters is possible. T-mixing, on the other hand, is the general method of choice for the commercial production of large batches of mRNA LNPs, such as those in current clinical trials. A recent publication demonstrated that both methods result in LNPs of similar sizes and morphologies [96]. The rapid mixing of the two solutions is key in order to limit the resultant particle size to <100 nm, thus obviating the need for the size reduction methods (extrusion, sonication) required by other production methods [137]. The assembly and formation of the LNPs from these solutions is driven by both hydrophobic and electro-static forces, as depicted in Figure 2. The four lipids (ionizable lipid, DSPC, cholesterol, PEG–lipid) are initially soluble in ethanol without any counterions present so that the ionizable lipid is unprotonated and electrically neutral (Figure 2A). One volume of the lipid-containing ethanol solution is typically mixed with three volumes of mRNA in a pH = 4 aqueous acetate buffer so that when the lipids contact the aqueous buffer they become insoluble in a 3:1 water/ethanol solvent and the ionizable lipid becomes protonated and positively charged, which then drives it to electrostatically bind to the negatively charged phosphate backbone of the mRNA (Figure 2B), while the lipids become insoluble, forming a lipid particle encapsulating the mRNA in a primarily aqueous suspension. A key component in this process is the PEG–lipid, since the PEG chain is hydrophilic and thereby coats the particle and also determines its final thermodynamically stable size. By changing the mole fraction of PEG, the LNP size can be predictably controlled, for example, from 100 nm at a 0.5% mole fraction to 43 nm at a 3% mole fraction of PEG–lipid [89]. A recent critically important observation was that LNP structure and size continue to evolve post-mixing when the mRNA LNP suspension is either diluted in aqueous buffer or dialyzed against an aqueous buffer to both raise the pH and eliminate ethanol [96]. The initial mixing of aqueous and lipid phases produces a pH near 5.5, protonating the ionizable lipid, which has an LNP pKa of near 6.5 and allows mRNA binding and encapsulation (Figure 2B,C). Subsequent raising of the pH by dilution, dialysis or tangential flow filtration neutralizes the ionizable lipid until it is mainly uncharged at pH 7.4 (Figure 2D). As the ionizable lipid becomes neutral, it also becomes less soluble, resulting in the formation of larger hydrophobic lipid domains that drive the fusion process of the LNPs so that their size increases and the core of the LNP becomes an amorphous electron-dense phase, mainly containing the ionizable lipid bound to the mRNA. It was estimated that as many as 36 vesicles could fuse

*Vaccines* **2021**, *9*, 65

to form just one final LNP during this process (Figure 2C,D). The fusion was demonstrated using FRET pairs and the role of the PEG–lipid was further seen to occur during this process since adding the PEG–lipid after mixing controlled the final LNP size in the same way as adding the PEG–lipid before mixing [138]. This study and another study using neutron scattering methods have also shown that DSPC forms a bilayer just underneath the peripheral PEG layer in the LNP, whose central core is primarily the ionizable lipid bound to mRNA (Figure 2D). Cholesterol is thought to be distributed throughout the LNP [89].



**Figure 2.** mRNA lipid nanoparticle assembly is achieved by (**A**) rapid mixing in a microfluidic or T-junction mixer of four lipids (ionizable lipid, DSPC, cholesterol, PEG–lipid) in ethanol with mRNA in an aqueous buffer near pH4. (**B**) When the ionizable lipid meets the aqueous phase, it becomes protonated at a pH ~5.5, which is intermediate between the pKa of the buffer and that of the ionizable lipid. (**C**) The ionizable lipid then electrostatically binds the anionic phosphate backbone of the mRNA while it experiences hydrophobicity in the aqueous phase, driving vesicle formation and mRNA encapsulation. (**D**) After initial vesicle formation, the pH is raised by dilution, dialysis or filtration, which results in the neutralization of the ionizable lipid, rendering it more hydrophobic and thereby driving vesicles to fuse and causing the further sequestration of the ionizable lipid with mRNA into the interior of the solid lipid nanoparticles. The PEG–lipid content stops the fusion process by providing the LNP with a hydrophilic exterior, determining its thermodynamically stable size, and the bilayer forming DSPC is present just underneath this PEG–lipid layer.

## 10. Determinants of Performance of mRNA Delivery Systems for Vaccines

The determinants of performance for mRNA delivery systems are multifactorial and interacting and include: (1) their potency or ability to deliver to the appropriate cell and efficiently release mRNA to the cytoplasmic translational machinery; (2) their adjuvanticity, which can boost the immune response; and (3) the minimization of any contribution to adverse events or toxicity that could arise from excessive inflammation at the injection site or systemic distribution and off-target expression.

### 10.1. Dose

The potency of mRNA delivery systems is most easily appreciated by the large range of doses that are currently being pursued in SARS-CoV-2 clinical trials, from 1 to 100 μg (Table 1). Doses in human trials are clearly grouped into the higher 30–100 μg doses for nucleoside-modified RNA (Moderna, BioNTech), lower 7.5–20 μg doses for unmodified RNA (CureVac, Translate Bio), and even lower 1–10 μg doses for self-amplifying RNA (Arcturus, Imperial College of London). Two factors are at play in determining these doses: the level of neutralizing antibody titers and T cell responses achieved versus convalescent plasma, and the frequency and severity of adverse events incurred at each dose. There appears to be a fairly narrow window of acceptance where the doses required to achieve protection are also close to generating an unacceptable frequency and severity of adverse events, as evidenced by the discontinuation of the highest doses tested in all phase 1 clinical trials. Both modified nucleoside constructs tested in the BioNTech phase 1 trials had high neutralizing titers versus convalescent plasma, while the larger construct encoding the membrane-bound full-length spike protein had a lower frequency and severity of adverse events, leading to its selection for the phase 3 study. Notably, dose is represented as mass, while the molar dose is dependent on the length of the construct and, furthermore, the amount of mRNA actually being translated is a small fraction of either, depending on the efficiency and targeting properties of the delivery system.

In animal studies of prophylactic mRNA vaccines for infectious diseases, the initial doses capable of producing neutralizing antibodies or protection against viral challenge were quite high in the 10–80 μg range for mice when using protamine, dendrimers and early cationic lipid systems (Table 3). When the more recent LNPs were subsequently used, the dose required for neutralization in mice was considerably reduced to near the 1 μg level when given twice, while for non-modified mRNA the dose appears to be lower, near 0.25 μg. The dose can be lower again for self-amplifying mRNA, such as 0.1 μg given twice or 2 μg given once. In larger animal models (hamster, ferret and non-human primate), fewer studies are available and the doses fall into a wide range of 5 μg to 200 μg with no apparent pattern. Interestingly, when using body surface area to convert human doses to animal doses, a 100 μg dose for a 60 kg human would be equivalent to a 15 μg dose in a 3 kg rhesus macaque and to a 0.4 μg dose in a 20 g mouse [139], numbers that approximate those of LNPs in Tables 1 and 3. The delivery system clearly plays an important role in determining the effective dose. There is a strong desire to improve delivery efficiency in order to reduce dose and maintain potency since this is expected to reduce adverse event frequency and severity by reducing the local reactions and off-target effects of the mRNA and of the delivery vehicle. Reducing the dose will also lower the amount of raw material needed and the cost associated with vaccinating each individual. In particular, the current COVID-19 pandemic has brought into focus some significant supply chain and production capacity limitations of mRNA LNP vaccines that could be improved with more efficient delivery systems.

*Vaccines* **2021**, *9*, 65

**Table 3.** mRNA doses in in vivo prophylactic vaccination. The mRNA dose required to induce neutralizing antibody titers, or the dose that provides protection against viral challenge, is shown for different mRNA delivery systems and in different species. The advent of lipid nanoparticles (LNPs) for mRNA delivery reduced the required doses by ~10-fold compared to earlier delivery systems.

| Delivery System | mRNA Type | Species | Dose | Readout | Reference |
|---|---|---|---|---|---|
| Naked mRNA | non-modified | mouse | 80 µg twice | protection | [140] |
| Naked mRNA | self-amplifying | mouse | 1.25 µg twice | protection | [140] |
| Protamine | non-modified | mouse | 10 µg twice | neutralizing titers | [66] |
| Protamine | non-modified | mouse | 80 µg twice | protection | [66] |
| Modified Dendrimer | self-amplifying | mouse | 40 µg once or 4 µg twice | neutralizing titers | [126] |
| DOTAP/DOPE/PEG | nucleoside modified | mouse | 12 µg twice intranasal | neutralizing titers and protection | [130] |
| Cationic Nanoemulsion | self-amplifying | mouse | 15 µg twice | neutralizing titers | [70] |
| Nanostructured Lipid Carrier | self-amplifying | mouse | 0.1 µg once | neutralizing titers | [71] |
| LNP (Acuitas) | non-modified | mouse | 0.5 µg twice | neutralizing titer | [69] |
| LNP (MC3) | nucleoside-modified | mouse | 10 µg once or 2 µg twice | protection | [99] |
| LNP (MC3) | nucleoside-modified | mouse | 0.4 µg once | protection | [97] |
| LNP (Acuitas) | nucleoside-modified | mouse | 0.5 µg once | protection | [141] |
| LNP (Acuitas) | nucleoside-modified | mouse | 1 µg twice | neutralizing titers | [49] |
| LNP (Moderna) | nucleoside-modified | mouse | 1 µg twice | neutralizing titers and protection | [45] |
| LNP (Acuitas) | non-modified | mouse | 0.25 µg twice | neutralizing titers | [53] |
| LNP (Translate Bio) | non-modified | mouse | 0.2 µg twice | neutralizing titers | [56] |
| LNP (Arcturus) | self-amplifying | mouse | 2 µg once | neutralizing titers and protection | [58] |
| LNP (Acuitas) | self-amplifying | mouse | 0.1 µg twice | neutralizing titers | [60] |
| LNP (Acuitas) | non-modified | Syrian Hamster | 10 µg twice | protection | [53] |
| LNP (MC3) | nucleoside-modified | ferret | 50 µg once | neutralizing titers | [97] |
| Cationic Nanoemulsion | self-amplifying | non-human primate | 75 µg twice | neutralizing titers | [70] |
| LNP (MC3) | nucleoside-modified | non-human primate | 200 µg twice | neutralizing titers | [97] |
| LNP (MC3 or Moderna Lipid H) | nucleoside-modified | non-human primate | 5 µg twice | neutralizing titers | [42] |
| LNP (Acuitas) | nucleoside-modified | non-human primate | 30 µg twice | neutralizing titers | [49] |
| LNP (Moderna) | nucleoside-modified | non-human primate | 100 µg twice | neutralizing titers | [45] |
| LNP (Translate Bio) | non-modified | non-human primate | 15 µg twice | neutralizing titers | [56] |

### 10.2. Potency and Delivery Efficiency

There have been many studies that have attempted to identify structure–function relationships for LNP and other nucleic acid delivery systems. The most commonly cited feature of the LNP that determines its potency or delivery efficiency is its pKa. The pKa is the pH at which 50% of the ionizable lipid in the LNP is protonated. To date, the LNP pKa has only been measured with a dye-binding assay called TNS, which is negatively charged and experiences fluorescence enhancement upon binding a positively charged LNP [88]. Fluorescence measurement of LNPs incubated with TNS in buffers covering a wide range of pH values is used to deduce dye binding to surface charge and the pKa

estimated, where half of the maximal fluorescence is attained. It was well established that the MC3-based Onpattro LNP had an optimal pKa of 6.4 for silencing hepatocytes after IV administration [92]. There was a very sharp optimum in TNS pKa in the range of 6.2–6.8 for any LNP to effect hepatocyte silencing. An excellent model for explaining this pKa dependence was based on the ionizable lipid in the LNP being near neutral at pH 7.4 while, after internalization into a cell, the pH of the endosome will begin to drop as it evolves through the endolysosomal pathway, thereby progressively protonating the ionizable lipid, which will then bind to an anionic endogenous phospholipid of the endosome and disrupt its bilayer structure to release the mRNA into the cytoplasm for ribosomal loading [17]. Endosomal disruption requires an additional feature of the ionizable lipid, namely a cone-shaped morphology where the cross-section of the lipid tails is larger than that of its head group. This renders the ionizable lipid/endosomal phospholipid ion pair incompatible with a bilayer and more likely to form structures such as inverted hexagonal phases that can disrupt the endosomal membrane. This has been called the molecular shape hypothesis [91] and is the mechanism explaining why the introduction of one or two double bonds into a saturated C18 alkyl chain generates a more cone-shaped and less cylindrical morphology that is membrane disrupting and endosomolytic [88]. These two C18 linoleic acid tails, combined with an appropriately tuned pKa of the dimethylamine headgroup, are the defining features of the MC3 ionizable lipid. The ionizable lipids that have replaced MC3 for mRNA delivery conserve the pKa requirement, but pursue greater endosomolytic character by introducing more branching into the alkyl tails. Lipid H and Lipid 5 from Moderna, for example, have three alkyl tails, as does Lipid 2,2 (8,8) 4C CH3 from Arcturus, while Acuitas ALC-0315 has four and A9 has five alkyl tails (Table 2). This augmented cone-shaped morphology is presumably the reason why LNPs that incorporate these ionizable lipids are more efficient delivery vehicles with greater endosomal release.

Although LNP pKa and the molecular shape hypothesis are well established as contributing to LNP delivery efficiency, other factors are important as well, such as the stability of the PEG–lipid on the LNP surface, and the proportions of the four lipids in the ethanol solution, which ultimately determine the LNP ultrastructure. The PEG–lipid controls LNP size, as mentioned above, by providing a hydrophilic shell that limits vesicle fusion during assembly so that higher PEG–lipid concentrations produce smaller LNPs. For example, one study showed that varying the mole fraction of the PEG–lipid from 0.25% to 5% reduced the LNP size from 117 nm to 25 nm and that the optimal size for hepatocyte silencing was 78 nm, generated with 2.5% PEG–lipid [142]. Since the alkyl tail of the PEG–lipid had 14 carbons, it was not stably anchored to the LNP surface and was found to be gradually shed from the LNP in circulation, along with the shedding of the ionizable lipid MC3 and DSPC. This PEG shedding is thought to render the LNP transfection competent at some point, but, if too extreme, results in the rapid loss of the ionizable lipid and DSPC, which will negatively impact endosomal release. For example, by extending the alkyl tail to 18 carbons, the PEG–lipid did not shed, but was also not silenced in hepatocytes. On the other hand, adding higher concentrations of PEG to make smaller particles resulted in faster shedding, loss of the ionizable lipid and reduced silencing. The labile and dynamic nature of the LNP is currently only partly understood. Another study also found that an intermediate sized 64 nm diameter LNP made with 1.5% PEG–lipid was more efficient for mRNA delivery than a larger one at 100 nm (0.5% PEG–lipid), as well as a smaller LNP at 48 nm (3% PEG–lipid), similar to the study mentioned above [89]. However, by changing the mole ratios of the four lipids in order to conserve a calculated density of DSPC under the PEG layer of the LNP at the optimal value found in the 64 nm 1.5% PEG–lipid LNP, these authors were able to make larger 100 nm LNPs with a twofold increase in mRNA expression compared to the 64 nm-sized LNPs. Thus, in addition to the LNP pKa, ionizable lipid molecular shape and the dynamics of the PEG–lipid, more detailed features of the LNP ultrastructure and the state of each component are also important in determining potency.

### 10.3. Endosomal Release

Cell uptake and endosomal trafficking of siRNA-LNPs were studied in detail and are assumed to be similar to the uptake and endosomal trafficking of mRNA LNPs. With the MC3 LNP, a quantitative study using colloidal gold particle counting in electron microscopy showed that only 2% of siRNA that were in endosomes actually escaped from endosomes into the cytosol, resulting in a few thousand siRNA molecules per cell that were available for silencing [106]. This number was, however, in the same range as the estimated levels of functionally active siRNAs interacting with RISC per cell at therapeutically relevant concentrations. Thus, the vast majority of siRNA was destined for lysosomal degradation or recycling through multivesicular bodies (late endosomes) for release in the exosomes [143,144]. Increasing the endosomolytic behavior of LNPs is the central approach to improving delivery efficiency, mainly through pKa adjustment of the LNP and by increasing the cone-shaped morphology of the ionizable lipid. For the latter, Lipid H [42] and Lipid 5 [101], which contain three branches versus two in MC3, but with similar pKa, increased endosomal release fourfold compared to MC3. Endosomal release has not been reported for Acuitas ALC-0315; however, its hepatocyte silencing efficiency was 10-fold higher than MC3 [47], suggesting its more cone-shaped four-branch structure also had higher endosomal release. These newer generation ionizable lipids therefore appear to achieve a endosomal release, closer to 15% or higher compared to the 2–5% found for MC3 siRNA-LNPs. One of the challenges in this area is the lack of a reliable standardized endosomal release method that can be implemented broadly. Many methods have been developed, but are usually specific to only one lab group [42,101,145–149]. mRNA was also recently shown to undergo exocytosis in an amount that is similar to the amount released into the cytosol [150]. MC3 LNPs disassembled in late endosomes and NP 1 complexes of MC3 and the mRNA were repackaged into exosomes that were exported from the cell. These endo–exosomes maintained an mRNA delivery capacity that was similar to the original MC3 LNPs from which they were derived, but could traffic to different tissues and appeared to be less immune activating. The potential significance of this exosomal redistribution of mRNA delivered by LNPs remains to be explored.

### 10.4. Charge and Ligand Mediated Targeting

The early lipid nanoparticles using permanently charged cationic nonionizable lipids were large and, due to their permanent positive charge, were quickly opsonized and generally targeted the lung. The group at BioNTech reduced the amount of cationic DOTMA in DOTMA/DOPE mRNA LNPs until the net charge was negative due to an excess of anionic mRNA at NP ratios of less than one. Injecting these negatively charged and large 300 nm mRNA LNPs intravenously led to spleen targeting and mRNA expression in dendritic cells and they were able to mediate adaptive as well as type I IFN-mediated innate immune mechanisms for cancer immunotherapy [151]. Similarly, spleen-targeting mRNA LNPs were produced using the C12-200 prototype LNP, but replacing C12-200 with the small dendritic ionizable lipid Cf-Deg-Lin, which has four linoleic acid alkyl chains and four nitrogen atoms with a TNS pKa of 5.7. This very low pKa of the LNP would ensure that the ionizable lipid was not protonated until it reached a pH below 7, creating an LNP that would bear a net negative charge from the mRNA until quite late in the endosomal pathway and therefore similarly traffic to the spleen [152]. They found that the major cell population in the spleen to express the mRNA were B lymphocytes, where 7% of B lymphocytes were expressed the mRNA according to flow cytometric analyses. More recently, charge-mediated targeting was achieved using three different basic LNPs with MC3, C12-200, or 5A2-SC8 as ionizable lipids mixed in a certain mole fraction of a permanently cationic lipid (DOTAP) or a permanently anionic lipid (18PA) to endow the LNPs with a net positive, net negative or an intermediate near-neutral net charge [153]. Consistent with the above findings, highly positive LNPs targeted the lungs and highly negative LNPs targeted the spleen, while intermediate charge levels predominantly targeted the liver. Liver targeting

has been shown to depend on Apo-E binding to near-neutral liposomes or LNPs [154], which does not occur for negatively charged liposomes [155].

Notably, all of the above charge-mediated targeting studies have been done using IV administration and the routes typically used for vaccination, such as the intramuscular or intradermal routes, have not been examined. Most studies that analyze expression after intramuscular injection do, however, detect the systemic trafficking of mRNA LNPs, which are rapidly and strongly expressed in the liver, at the same time as they are expressed in muscle and draining lymph nodes [97,156,157]. These particular LNPs therefore seem to enter the vasculature and are subsequently expressed in liver hepatocytes due to passive ApoE-mediated targeting, which is not surprising since they were designed for hepatocyte targeting. This systemic distribution and expression of immunogens could, however, generate systemic cytokines, complement activation and lead to other potential undesirable effects that could amplify the frequency or severity of adverse events and/or impair immune response generation. Finally, only a limited number of studies have been carried out with ligand-mediated targeting of LNPs. Lung endothelial cell targeting was achieved by conjugating CD31 (PECAM) antibodies to the LNP and injecting intravascularly [158]. The liver hepatocyte-directed LNP then became largely redirected to the lung. A similar approach using a VCAM ligand successfully targeted LNPs to inflamed regions of the brain and alleviated TNF-$\alpha$-induced brain edema [159]. Dendritic cells in vitro were also more efficiently transfected using a mannosylated liposome, which may be a strategy applicable to vaccination [160]. Higher throughput screening methods to identify ligands targeting specific cell types have also been developed and may be applicable for the targeting of specific dendritic cell subsets [161,162].

### 10.5. Adjuvanticity of the Lipid Nanoparticle

The lipid nanoparticle is known to have its own adjuvant activity. A study in mice at a 10 $\mu$g dose and nonhuman primates at a 100 $\mu$g dose of nucleoside-modified mRNA LNPs (from Acuitas) encoding various immunogens showed increased numbers of antigen-specific T follicular helper (Tfh) cells and germinal center (GC B) cells compared to an inactivated virus [33]. Tfh cells drive immunoglobulin class switch, affinity maturation, and long-term B cell memory and plasma cells. An adjuvant property of the LNP itself was found when an FLuc mRNA LNP was co-administered with a protein subunit HA immunogen and increased germinal center B cell numbers fourfold, although the number of Tfh cells was not increased compared to the protein alone. The LNP thus appears to be amplifying GC B cell responses, in particular to a nucleoside-modified mRNA LNP. Another study using an asymmetric ionizable lipid from Merck investigated the use of LNPs as adjuvants for Hepatitis B protein subunit vaccines [163]. Co-administering LNPs with the protein subunit vaccine enhanced B cell responses to levels comparable to known vaccine adjuvants, including aluminum-based adjuvant, an oligonucleotide and a TLR4 agonist, 3-O-deacytyaledmonophosphoryl lipid A (MPL). The LNPs elicited potent antigen-specific CD4+ and CD8+ T cell responses and the Th1 vs. Th2 bias could be further influenced by the inclusion of additional adjuvants within the LNP. A follow-up study by this group using a Dengue virus immunogen found a similarly strong adjuvant activity in the LNP and that this activity depended on the presence of the ionizable lipid [164]. The lipid components in liposomes have also been previously recognized as having adjuvant activity in mucosal vaccines [165,166].

### 10.6. Injection Site Reactions, Safety, Tolerability, Reactogenicity of mRNA LNPs

A general safety study for MC3 nucleoside-modified mRNA LNPs expressing hEPO via IV administration to liver in rats and non-human primates found mild toxicological events up to 0.3 mg/kg, which is more than 10-fold the expected therapeutic dose [167]. The main findings in the rats were increased white blood cell counts, changes in the coagulation parameters at all doses, as well as liver injury. Non-human primates showed lymphocyte depletion accompanied by mild and reversible complement activation. These results

were in line with an earlier toxicological study of the same LNPs for siRNA delivery [168], where rat mortality was noted at 6 mg/kg, while the no observable effect level (NOAEL) was determined to be 1 mg/kg. Above 3 mg/kg elevations to serum chemistry parameters (ALT, AST, and TBIL), hematuria, and microscopic findings in the liver (vacuolation, inflammatory cell infiltrate, fibrosis, hemorrhage, and hepatocellular necrosis), spleen (lymphoid atrophy and necrosis) and kidney (tubular degeneration/regeneration) were noted. Safety findings in patients included infusion-related reactions (15% of patients, presumably complement mediated) and transient elevations of pro-inflammatory cytokines. Notably, the above doses administered IV, such as 0.3 mg/kg, are more than 10-fold higher than those in the current SARS-CoV-2 clinical trials that use IM administration. Nonetheless, these lower doses in the current human trials still induce a high frequency and sometimes moderate severity of both local injection site reactions and systemic adverse events. Currently, there is a paucity of published animal studies regarding correlates of these human adverse events in animals.

An extensive rhesus macaque study looking at the injection sites and trafficking of mRNA expression was performed using the MC3 LNP, delivering a nucleoside-modified mRNA encoding the influenza immunogen H10 mRNA intramuscularly or intradermally at a 50 µg dose [98]. They found a rapid cell infiltrate to the injection site within 4–24 h that could be driven by the LNP alone and was mainly composed of neutrophils and monocytes. The main cell types expressing mRNA were multiple monocyte and dendritic cell subsets at the injection sites and in the draining lymph nodes. Priming of T cell responses was restricted to the draining lymph nodes and the LNP alone did not induce CD80 in antigen-presenting cells. Ongoing generation of vaccine-specific CD4+ T cells occurred only in the vaccine-draining lymph nodes, where detection of mRNA-encoded antigens peaked at 24 h, whereas the antibody responses were sustained for weeks. Results consistent with the above were also reported using a non-modified mRNA encoding rabies virus glycoprotein G (RABV-G), delivered in an Acuitas LNP to mice with 0.5–10 µg doses and to non-human primates at 10 µg and 100 µg doses [69]. They also found that the LNP alone mediated cytokine generation in the muscle injection site and draining lymph nodes, but recognized that systemic detection of IL6 could occur due to trafficking through the blood and expression in the liver. Injection site erythema and edema were noted in the non-human primates at both 10 µg and 100 µg doses. It is also interesting to note that the LNPs used in mRNA delivery systems have a size with the range of 10–100 nm, which is known to be optimal for uptake into lymphatics, and that pegylation of lipids improves retention in lymphatics [169] and can reduce complement activation [109]. Since the emergency use approval of the Pfizer/BioNTech vaccine, there has been several observed incidences of acute anaphylaxis corresponding to 1 case in 100,000 vaccinations, which is about 10-fold the rate seen with other vaccines [170]. One possible source of this anaphylaxis is the prevalence of anti-PEG antibodies in the general population, which could trigger anaphylaxis in a patient subset due to the use of the PEG–lipid in LNPs. PEG-mediated anaphylaxis has been noted, for example, in a clinical contrast agent [171] and in a liposomal formulation of doxorubicin [172]. Nonetheless, the doses administered for the current SARS-CoV-2 vaccines correspond to a total PEG dose that is at least 15-fold lower than that found in those products, which seems to diminish this possibility. Another possibility is that the reactions are anaphylactoid in nature, but are non-specific responses to inflammation and other factors. A clinical study is underway to further elucidate this issue [173].

## 11. Conclusions

The progress of mRNA therapeutics has been extraordinary over the past two decades, beginning with the identification of means to control mRNA innate immunogenicity using modified nucleosides and sequence engineering, and the application of mRNA in vaccines and other therapeutic indications. The adoption of the lipid nanoparticle prototype from that used in siRNA delivery led to an order of magnitude improvement in delivery efficiency compared to previous systems and is continually improving, mainly due to the

design of new classes of ionizable lipids. Many aspects of mRNA LNP structure, function, potency, targeting and biological features, such as adjuvanticity, remain to be explored in order to fully exploit the potential of this powerful and transformative therapeutic modality.

**Funding:** This research received no external funding.

**Institutional Review Board Statement:** This review was completed with no external funding or requirement for Institutional Review.

**Informed Consent Statement:** Not applicable.

**Data Availability Statement:** No new data was generated.

**Conflicts of Interest:** The authors declare no conflict of interest.

## References

1.  Zimmer, C.; Corum, J.; Wee, S.-L. Coronavirus Vaccine Tracker. In *The New York Times*; The New York Times Company: New York, NY, USA, 2020.
2.  Moderna's COVID-19 Vaccine Candidate Meets its Primary Efficacy Endpoint in the First Interim Analysis of the Phase 3 COVE Study | Moderna, Inc. Available online: https://investors.modernatx.com/news-releases/news-release-details/modernas-covid-19-vaccine-candidate-meets-its-primary-efficacy/ (accessed on 29 November 2020).
3.  Pfizer and BioNTech Conclude Phase 3 Study of COVID-19 Vaccine Candidate, Meeting All Primary Efficacy Endpoints | BioNTech. Available online: https://investors.biontech.de/news-releases/news-release-details/pfizer-and-biontech-conclude-phase-3-study-covid-19-vaccine/ (accessed on 29 November 2020).
4.  Gómez-Aguado, I.; Rodríguez-Castejón, J.; Vicente-Pascual, M.; Rodríguez-Gascón, A.; Solinís, M.Á.; del Pozo-Rodríguez, A. Nanomedicines to Deliver mRNA: State of the Art and Future Perspectives. *Nanomaterials* **2020**, *10*, 364. [CrossRef]
5.  Hajj, K.A.; Whitehead, K.A. Tools for Translation: Non-Viral Materials for Therapeutic mRNA Delivery. *Nat. Rev. Mater.* **2017**, *2*, 17056. [CrossRef]
6.  Kowalski, P.S.; Rudra, A.; Miao, L.; Anderson, D.G. Delivering the Messenger: Advances in Technologies for Therapeutic mRNA Delivery. *Mol. Ther.* **2019**, *27*, 710–728. [CrossRef]
7.  Li, B.; Zhang, X.; Dong, Y. Nanoscale platforms for messenger RNA delivery. *Wiley Interdiscip. Rev. Nanomed. Nanobiotechnol.* **2018**, e1530. [CrossRef]
8.  Van Hoecke, L.; Roose, K. How mRNA Therapeutics Are Entering the Monoclonal Antibody Field. *J. Transl. Med.* **2019**, *17*, 54. [CrossRef]
9.  Wadhwa, A.; Aljabbari, A.; Lokras, A.; Foged, C.; Thakur, A. Opportunities and Challenges in the Delivery of mRNA-Based Vaccines. *Pharmaceutics* **2020**, *12*, 102. [CrossRef]
10. Wahane, A.; Waghmode, A.; Kapphahn, A.; Dhuri, K.; Gupta, A.; Bahal, R. Role of Lipid-Based and Polymer-Based Non-Viral Vectors in Nucleic Acid Delivery for Next-Generation Gene Therapy. *Molecules* **2020**, *25*, 2866. [CrossRef]
11. Wang, Y.; Yu, C. Emerging Concepts of Nanobiotechnology in mRNA Delivery. *Angew. Chem. Int. Ed.* **2020**. [CrossRef] [PubMed]
12. Witzigmann, D.; Kulkarni, J.A.; Leung, J.; Chen, S.; Cullis, P.R.; van der Meel, R. Lipid nanoparticle technology for therapeutic gene regulation in the liver. *Adv. Drug Deliv. Rev.* **2020**. [CrossRef] [PubMed]
13. Zhao, W.; Hou, X.; Vick, O.G.; Dong, Y. RNA delivery biomaterials for the treatment of genetic and rare diseases. *Biomaterials* **2019**, *217*, 119291. [CrossRef] [PubMed]
14. Pardi, N.; Hogan, M.J.; Porter, F.W.; Weissman, D. mRNA Vaccines—A New Era in Vaccinology. *Nat. Rev. Drug Discov.* **2018**, *17*, 261–279. [CrossRef]
15. Pardi, N.; Hogan, M.J.; Weissman, D. Recent Advances in mRNA Vaccine Technology. *Curr. Opin. Immunol.* **2020**, *65*, 14–20. [CrossRef] [PubMed]
16. Alameh, M.-G.; Weissman, D.; Pardi, N. Messenger RNA-Based Vaccines Against Infectious Diseases. In *Current Topics in Microbiology and Immunology*; Springer: Berlin/Heidelberg, Germany, 2020; pp. 1–35. [CrossRef]
17. Cullis, P.R.; Hope, M.J. Lipid Nanoparticle Systems for Enabling Gene Therapies. *Mol. Ther.* **2017**, *25*, 1467–1475. [CrossRef]
18. Chen, N.; Xia, P.; Li, S.; Zhang, T.; Wang, T.T.; Zhu, J. RNA sensors of the innate immune system and their detection of pathogens. *Iubmb Life* **2017**, *69*, 297–304. [CrossRef]
19. Tatematsu, M.; Funami, K.; Seya, T.; Matsumoto, M. Extracellular RNA Sensing by Pattern Recognition Receptors. *J. Innate Immun.* **2018**, *10*, 398–406. [CrossRef]
20. Devoldere, J.; Dewitte, H.; De Smedt, S.C.; Remaut, K. Evading Innate Immunity in Nonviral mRNA Delivery: Don't Shoot the Messenger. *Drug Discov. Today* **2016**, *21*, 11–25. [CrossRef]
21. García, M.A.; Meurs, E.F.; Esteban, M. The dsRNA protein kinase PKR: Virus and cell control. *Biochimie* **2007**, *89*, 799–811. [CrossRef]

Case 1:22-cv-00336-UNA   Document 1-1   Filed 03/17/22   Page 914 of 923 PageID #: 929

22. Andries, O.; Mc Cafferty, S.; De Smedt, S.C.; Weiss, R.; Sanders, N.N.; Kitada, T. N 1-Methylpseudouridine-Incorporated mRNA Outperforms Pseudouridine-Incorporated mRNA by Providing Enhanced Protein Expression and Reduced Immunogenicity in Mammalian Cell Lines and Mice. *J. Control. Release* **2015**, *217*, 337–344. [CrossRef] [PubMed]

23. Karikó, K.; Buckstein, M.; Ni, H.; Weissman, D. Suppression of RNA Recognition by Toll-like Receptors: The Impact of Nucleoside Modification and the Evolutionary Origin of RNA. *Immunity* **2005**, *23*, 165–175. [CrossRef] [PubMed]

24. Karikó, K.; Muramatsu, H.; Welsh, F.A.; Ludwig, J.; Kato, H.; Akira, S.; Weissman, D. Incorporation of Pseudouridine Into mRNA Yields Superior Nonimmunogenic Vector With Increased Translational Capacity and Biological Stability. *Mol. Ther.* **2008**, *16*, 1833–1840. [CrossRef] [PubMed]

25. Thess, A.; Grund, S.; Mui, B.L.; Hope, M.J.; Baumhof, P.; Fotin-Mleczek, M.; Schlake, T. Sequence-Engineered mRNA Without Chemical Nucleoside Modifications Enables an Effective Protein Therapy in Large Animals. *Mol. Ther.* **2015**, *23*, 1456–1464. [CrossRef] [PubMed]

26. Heil, F. Species-Specific Recognition of Single-Stranded RNA via Toll-like Receptor 7 and 8. *Science* **2004**, *303*, 1526–1529. [CrossRef] [PubMed]

27. Islam, M.A.; Xu, Y.; Tao, W.; Ubellacker, J.M.; Lim, M.; Aum, D.; Lee, G.Y.; Zhou, K.; Zope, H.; Yu, M.; et al. Restoration of Tumour-Growth Suppression in Vivo via Systemic Nanoparticle-Mediated Delivery of PTEN mRNA. *Nat. Biomed. Eng.* **2018**, *2*, 850–864. [CrossRef] [PubMed]

28. Behlke, M.A. Chemical Modification of siRNAs for In Vivo Use. *Oligonucleotides* **2008**, *18*, 305–320. [CrossRef]

29. Choi, J.; Indrisiunaite, G.; DeMirci, H.; Ieong, K.-W.; Wang, J.; Petrov, A.; Prabhakar, A.; Rechavi, G.; Dominissini, D.; He, C.; et al. 2′-O-methylation in mRNA disrupts tRNA decoding during translation elongation. *Nat. Struct. Mol. Biol.* **2018**, *25*, 208–216. [CrossRef]

30. Lorenz, C.; Fotin-Mleczek, M.; Roth, G.; Becker, C.; Dam, T.C.; Verdurmen, W.P.R.; Brock, R.; Probst, J.; Schlake, T. Protein Expression from Exogenous mRNA: Uptake by Receptor-Mediated Endocytosis and Trafficking via the Lysosomal Pathway. *RNA Biol.* **2011**, *8*, 627–636. [CrossRef]

31. Diken, M.; Kreiter, S.; Selmi, A.; Britten, C.M.; Huber, C.; Türeci, Ö.; Sahin, U. Selective uptake of naked vaccine RNA by dendritic cells is driven by macropinocytosis and abrogated upon DC maturation. *Gene Ther.* **2011**, *18*, 702–708. [CrossRef]

32. Oberli, M.A.; Reichmuth, A.M.; Dorkin, J.R.; Mitchell, M.J.; Fenton, O.S.; Jaklenec, A.; Anderson, D.G.; Langer, R.; Blankschtein, D. Lipid Nanoparticle Assisted mRNA Delivery for Potent Cancer Immunotherapy. *Nano Lett.* **2017**, *17*, 1326–1335. [CrossRef]

33. Pardi, N.; Hogan, M.J.; Naradikian, M.S.; Parkhouse, K.; Cain, D.W.; Jones, L.; Moody, M.A.; Verkerke, H.P.; Myles, A.; Willis, E.; et al. Nucleoside-Modified mRNA Vaccines Induce Potent T Follicular Helper and Germinal Center B Cell Responses. *J. Exp. Med.* **2018**, *215*, 1571–1588. [CrossRef]

34. Schlake, T.; Thess, A.; Thran, M.; Jordan, I. mRNA as Novel Technology for Passive Immunotherapy. *Cell. Mol. Life Sci.* **2019**, *76*, 301–328. [CrossRef]

35. CleanCap | TriLink BioTechnologies. Available online: https://www.trilinkbiotech.com/cleancap (accessed on 29 November 2020).

36. Yang, Y.; Wang, Z. IRES-mediated cap-independent translation, a path leading to hidden proteome. *J. Mol. Cell Biol.* **2019**, *11*, 911–919. [CrossRef] [PubMed]

37. Baiersdörfer, M.; Boros, G.; Muramatsu, H.; Mahiny, A.; Vlatkovic, I.; Sahin, U.; Karikó, K. A Facile Method for the Removal of dsRNA Contaminant from In Vitro-Transcribed mRNA. *Mol. Ther. Nucleic Acids* **2019**, *15*, 26–35. [CrossRef] [PubMed]

38. Karikó, K.; Muramatsu, H.; Ludwig, J.; Weissman, D. Generating the Optimal MRNA for Therapy: HPLC Purification Eliminates Immune Activation and Improves Translation of Nucleoside-Modified, Protein-Encoding mRNA. *Nucleic Acids Res.* **2011**, *39*, e142. [CrossRef] [PubMed]

39. Maruggi, G.; Zhang, C.; Li, J.; Ulmer, J.B.; Yu, D. mRNA as a Transformative Technology for Vaccine Development to Control Infectious Diseases. *Mol. Ther.* **2019**, *27*, 757–772. [CrossRef] [PubMed]

40. Pfizer-BioNTech Covid-19 Vaccine FDA EAU Letter of Authorization. Available online: https://www.fda.gov/media/144412/download (accessed on 14 December 2020).

41. mRNA-1273-P301-Protocol. Available online: https://www.modernatx.com/sites/default/files/mRNA-1273-P301-Protocol.pdf (accessed on 1 December 2020).

42. Hassett, K.J.; Benenato, K.E.; Jacquinet, E.; Lee, A.; Woods, A.; Yuzhakov, O.; Himansu, S.; Deterling, J.; Geilich, B.M.; Ketova, T.; et al. Optimization of Lipid Nanoparticles for Intramuscular Administration of mRNA Vaccines. *Mol. Ther. Nucleic Acids* **2019**, *15*, 1–11. [CrossRef]

43. Anderson, E.J.; Rouphael, N.G.; Widge, A.T.; Jackson, L.A.; Roberts, P.C.; Makhene, M.; Chappell, J.D.; Denison, M.R.; Stevens, L.J.; Pruijssers, A.J.; et al. Safety and Immunogenicity of SARS-CoV-2 mRNA-1273 Vaccine in Older Adults. *N. Engl. J. Med.* **2020**. [CrossRef]

44. Corbett, K.S.; Edwards, D.; Leist, S.R.; Abiona, O.M.; Boyoglu-Barnum, S.; Gillespie, R.A.; Himansu, S.; Schafer, A.; Ziwawo, C.T.; DiPiazza, A.T.; et al. SARS-CoV-2 mRNA Vaccine Development Enabled by Prototype Pathogen Preparedness. *bioRxiv* **2020**. [CrossRef]

45. Corbett, K.S.; Flynn, B.; Foulds, K.E.; Francica, J.R.; Boyoglu-Barnum, S.; Werner, A.P.; Flach, B.; O'Connell, S.; Bock, K.W.; Minai, M.; et al. Evaluation of the mRNA-1273 Vaccine against SARS-CoV-2 in Nonhuman Primates. *N. Engl. J. Med.* **2020**. [CrossRef]

46. Jackson, L.A.; Anderson, E.J.; Rouphael, N.G.; Roberts, P.C.; Makhene, M.; Coler, R.N.; McCullough, M.P.; Chappell, J.D.; Denison, M.R.; Stevens, L.J.; et al. An mRNA Vaccine against SARS-CoV-2—Preliminary Report. *N. Engl. J. Med.* **2020**. [CrossRef]

47. Novel Lipids and Lipid Nanoparticle Formulations for Delivery of Nucleic Acids. Available online: https://patents.google.com/patent/WO2017075531A1/en (accessed on 18 December 2020).

48. Mulligan, M.J.; Lyke, K.E.; Kitchin, N.; Absalon, J.; Gurtman, A.; Lockhart, S.P.; Neuzil, K.; Raabe, V.; Bailey, R.; Swanson, K.A.; et al. Phase 1/2 Study to Describe the Safety and Immunogenicity of a COVID-19 RNA Vaccine Candidate (BNT162b1) in Adults 18 to 55 Years of Age: Interim Report. *medRxiv* **2020**. [CrossRef]

49. Vogel, A.B.; Kanevsky, I.; Che, Y.; Swanson, K.A.; Muik, A.; Vormehr, M.; Kranz, L.M.; Walzer, K.C.; Hein, S.; Güler, A.; et al. A prefusion SARS-CoV-2 spike RNA vaccine is highly immunogenic and prevents lung infection in non-human primates. *bioRxiv* **2020**. [CrossRef]

50. Sahin, U.; Muik, A.; Derhovanessian, E.; Vogler, I.; Kranz, L.M.; Vormehr, M.; Baum, A.; Pascal, K.; Quandt, J.; Maurus, D.; et al. COVID-19 vaccine BNT162b1 elicits human antibody and T H 1 T cell responses. *Nature* **2020**, *586*, 594–599. [CrossRef]

51. Walsh, E.E.; Frenck, R.W.; Falsey, A.R.; Kitchin, N.; Absalon, J.; Gurtman, A.; Lockhart, S.; Neuzil, K.; Mulligan, M.J.; Bailey, R.; et al. Safety and Immunogenicity of Two RNA-Based Covid-19 Vaccine Candidates. *N. Engl. J. Med.* **2020**, *383*, 2439–2450. [CrossRef]

52. Kremsner, P.; Mann, P.; Bosch, J.; Fendel, R.; Gabor, J.J.; Kreidenweiss, A.; Kroidl, A.; Leroux-Roels, I.; Leroux-Roels, G.; Schindler, C.; et al. Phase 1 Assessment of the Safety and Immunogenicity of an mRNA- Lipid Nanoparticle Vaccine Candidate Against SARS-CoV-2 in Human Volunteers. *medRxiv* **2020**. [CrossRef]

53. Rauch, S.; Roth, N.; Schwendt, K.; Fotin-Mleczek, M.; Mueller, S.O.; Petsch, B. mRNA Based SARS-CoV-2 Vaccine Candidate CVnCoV Induces High Levels of Virus Neutralizing Antibodies and Mediates Protection in Rodents. *bioRxiv* **2020**. [CrossRef]

54. Ice-Based Lipid Nanoparticle Formulation for Delivery of mRNA. Available online: https://patents.google.com/patent/US202 00155691A1/ (accessed on 18 January 2021).

55. Derosa, F. Cystine Cationic Lipids. Available online: https://patents.google.com/patent/WO2020214946A1/ (accessed on 18 January 2021).

56. Kalnin, K.V.; Plitnik, T.; Kishko, M.; Zhang, J.; Zhang, D.; Beauvais, A.; Anosova, N.G.; Tibbitts, T.; DiNapoli, J.M.; Huang, P.-W.D.; et al. Immunogenicity of Novel mRNA COVID-19 Vaccine MRT5500 in Mice and Non-Human Primates. *bioRxiv* **2020**. [CrossRef]

57. Ionizable Cationic Lipid for Rna Delivery. Available online: https://patents.google.com/patent/US9670152B2/en (accessed on 18 January 2021).

58. De Alwis, R.; Gan, E.S.; Chen, S.; Leong, Y.S.; Tan, H.C.; Zhang, S.L.; Yau, C.; Matsuda, D.; Allen, E.; Hartman, P.; et al. A Single Dose of Self-Transcribing and Replicating RNA Based SARS-CoV-2 Vaccine Produces Protective Adaptive Immunity In Mice. *bioRxiv* **2020**. [CrossRef]

59. Lipids and Lipid Nanoparticle Formulations for Delivery of Nucleic Acids. Available online: https://patents.google.com/patent/US10221127B2/en (accessed on 18 January 2021).

60. McKay, P.F.; Hu, K.; Blakney, A.K.; Samnuan, K.; Brown, J.C.; Penn, R.; Zhou, J.; Bouton, C.R.; Rogers, P.; Polra, K.; et al. Self-amplifying RNA SARS-CoV-2 lipid nanoparticle vaccine candidate induces high neutralizing antibody titers in mice. *Nat. Commun.* **2020**, *11*, 3523. [CrossRef]

61. Lipid Nanoparticle Formulations. Available online: https://patents.google.com/patent/WO2020219941A1/ (accessed on 18 January 2021).

62. Hoerr, I.; Obst, R.; Rammensee, H.-G.; Jung, G. In vivo application of RNA leads to induction of specific cytotoxic T lymphocytes and antibodies. *Eur. J. Immunol.* **2000**, *30*, 1–7. [CrossRef]

63. Fotin-Mleczek, M.; Duchardt, K.M.; Lorenz, C.; Pfeiffer, R.; Ojkić-Zrna, S.; Probst, J.; Kallen, K.-J. Messenger RNA-based Vaccines With Dual Activity Induce Balanced TLR-7 Dependent Adaptive Immune Responses and Provide Antitumor Activity. *J. Immunother.* **2011**, *34*, 1–15. [CrossRef]

64. Scheel, B.; Braedel, S.; Probst, J.; Carralot, J.-P.; Wagner, H.; Schild, H.; Jung, G.; Rammensee, H.-G.; Pascolo, S. Immunostimulating capacities of stabilized RNA molecules. *Eur. J. Immunol.* **2004**, *34*, 537–547. [CrossRef]

65. Armbruster, N.; Jasny, E.; Petsch, B. Advances in RNA Vaccines for Preventive Indications: A Case Study of a Vaccine against Rabies. *Vaccines* **2019**, *7*, 132. [CrossRef] [PubMed]

66. Schnee, M.; Vogel, A.B.; Voss, D.; Petsch, B.; Baumhof, P.; Kramps, T.; Stitz, L. An mRNA Vaccine Encoding Rabies Virus Glycoprotein Induces Protection against Lethal Infection in Mice and Correlates of Protection in Adult and Newborn Pigs. *Plos Negl. Trop. Dis.* **2016**, *10*, e0004746. [CrossRef]

67. Alberer, M.; Gnad-Vogt, U.; Hong, H.S.; Mehr, K.T.; Backert, L.; Finak, G.; Gottardo, R.; Bica, M.A.; Garofano, A.; Koch, S.D.; et al. Safety and Immunogenicity of a mRNA Rabies Vaccine in Healthy Adults: An Open-Label, Non-Randomised, Prospective, First-in-Human Phase 1 Clinical Trial. *Lancet* **2017**, *390*, 1511–1520. [CrossRef]

68. Maier, M.A.; Jayaraman, M.; Matsuda, S.; Liu, J.; Barros, S.; Querbes, W.; Tam, Y.K.; Ansell, S.M.; Kumar, V.; Qin, J.; et al. Biodegradable Lipids Enabling Rapidly Eliminated Lipid Nanoparticles for Systemic Delivery of RNAi Therapeutics. *Mol. Ther.* **2013**, *21*, 1570–1578. [CrossRef] [PubMed]

69. Lutz, J.; Lazzaro, S.; Habbeddine, M.; Schmidt, K.E.; Baumhof, P.; Mui, B.L.; Tam, Y.K.; Madden, T.D.; Hope, M.J.; Heidenreich, R.; et al. Unmodified mRNA in LNPs Constitutes a Competitive Technology for Prophylactic Vaccines. *NPJ Vaccines* **2017**, *2*, 1–9. [CrossRef]

70. Brito, L.A.; Chan, M.; Shaw, C.A.; Hekele, A.; Carsillo, T.; Schaefer, M.; Archer, J.; Seubert, A.; Otten, G.R.; Beard, C.W.; et al. A Cationic Nanoemulsion for the Delivery of Next-generation RNA Vaccines. *Mol. Ther.* **2014**, *22*, 2118–2129. [CrossRef] [PubMed]

71. Erasmus, J.H.; Khandhar, A.P.; Guderian, J.; Granger, B.; Archer, J.; Archer, M.; Gage, E.; Fuerte-Stone, J.; Larson, E.; Lin, S.; et al. A Nanostructured Lipid Carrier for Delivery of a Replicating Viral RNA Provides Single, Low-Dose Protection against Zika. *Mol. Ther.* **2018**, *26*, 2507–2522. [CrossRef]

72. Kaczmarek, J.C.; Patel, A.K.; Kauffman, K.J.; Fenton, O.S.; Webber, M.J.; Heartlein, M.W.; DeRosa, F.; Anderson, D.G. Polymer–Lipid Nanoparticles for Systemic Delivery of mRNA to the Lungs. *Angew. Chem. Int. Ed.* **2016**, *55*, 13808–13812. [CrossRef] [PubMed]

73. Jiang, Y.; Gaudin, A.; Zhang, J.; Agarwal, T.; Song, E.; Kauffman, A.C.; Tietjen, G.T.; Wang, Y.; Jiang, Z.; Cheng, C.J.; et al. A "Top-down" Approach to Actuate Poly(Amine-Co-Ester) Terpolymers for Potent and Safe mRNA Delivery. *Biomaterials* **2018**, *176*, 122–130. [CrossRef] [PubMed]

74. Patel, A.K.; Kaczmarek, J.C.; Bose, S.; Kauffman, K.J.; Mir, F.; Heartlein, M.W.; DeRosa, F.; Langer, R.; Anderson, D.G. Inhaled Nanoformulated mRNA Polyplexes for Protein Production in Lung Epithelium. *Adv. Mater.* **2019**, *31*, 1805116. [CrossRef]

75. Blakney, A.K.; Zhu, Y.; McKay, P.F.; Bouton, C.R.; Yeow, J.; Tang, J.; Hu, K.; Samnuan, K.; Grigsby, C.L.; Shattock, R.J.; et al. Big Is Beautiful: Enhanced saRNA Delivery and Immunogenicity by a Higher Molecular Weight, Bioreducible, Cationic Polymer. *ACS Nano* **2020**, *14*, 5711–5727. [CrossRef]

76. Lallana, E.; Rios de la Rosa, J.M.; Tirella, A.; Pelliccia, M.; Gennari, A.; Stratford, I.J.; Puri, S.; Ashford, M.; Tirelli, N. Chitosan/Hyaluronic Acid Nanoparticles: Rational Design Revisited for RNA Delivery. *Mol. Pharm.* **2017**, *14*, 2422–2436. [CrossRef]

77. Li, J.; He, Y.; Wang, W.; Wu, C.; Hong, C.; Hammond, P.T. Polyamine-Mediated Stoichiometric Assembly of Ribonucleoproteins for Enhanced mRNA Delivery. *Angew. Chem. Int. Ed.* **2017**, *56*, 13709–13712. [CrossRef]

78. Li, J.; Wang, W.; He, Y.; Li, Y.; Yan, E.Z.; Zhang, K.; Irvine, D.J.; Hammond, P.T. Structurally Programmed Assembly of Translation Initiation Nanoplex for Superior mRNA Delivery. *ACS Nano* **2017**, *11*, 2531–2544. [CrossRef]

79. McKinlay, C.J.; Benner, N.L.; Haabeth, O.A.; Waymouth, R.M.; Wender, P.A. Enhanced mRNA Delivery into Lymphocytes Enabled by Lipid-Varied Libraries of Charge-Altering Releasable Transporters. *Proc. Natl. Acad. Sci. USA* **2018**, *115*, E5859–E5866. [CrossRef]

80. Soliman, O.Y.; Alameh, M.G.; De Cresenzo, G.; Buschmann, M.D.; Lavertu, M. Efficiency of Chitosan/Hyaluronan-Based mRNA Delivery Systems In Vitro: Influence of Composition and Structure. *J. Pharm. Sci.* **2020**, *109*, 1581–1593. [CrossRef]

81. Uchida, H.; Itaka, K.; Uchida, S.; Ishii, T.; Suma, T.; Miyata, K.; Oba, M.; Nishiyama, N.; Kataoka, K. Synthetic Polyamines to Regulate mRNA Translation through the Preservative Binding of Eukaryotic Initiation Factor 4E to the Cap Structure. *J. Am. Chem. Soc.* **2016**, *138*, 1478–1481. [CrossRef]

82. Wang, Y.; Tang, J.; Yang, Y.; Song, H.; Fu, J.; Gu, Z.; Yu, C. Functional Nanoparticles with a Reducible Tetrasulfide Motif to Upregulate mRNA Translation and Enhance Transfection in Hard-to-Transfect Cells. *Angew. Chem. Int. Ed.* **2020**, *59*, 2695–2699. [CrossRef]

83. Yoshinaga, N.; Cho, E.; Koji, K.; Mochida, Y.; Naito, M.; Osada, K.; Kataoka, K.; Cabral, H.; Uchida, S. Bundling mRNA Strands to Prepare Nano-Assemblies with Enhanced Stability Towards RNase for In Vivo Delivery. *Angew. Chem. Int. Ed.* **2019**, *58*, 11360–11363. [CrossRef] [PubMed]

84. Yoshinaga, N.; Uchida, S.; Naito, M.; Osada, K.; Cabral, H.; Kataoka, K. Induced Packaging of mRNA into Polyplex Micelles by Regulated Hybridization with a Small Number of Cholesteryl RNA Oligonucleotides Directed Enhanced in Vivo Transfection. *Biomaterials* **2019**, *197*, 255–267. [CrossRef]

85. Felgner, P.L.; Gadek, T.R.; Holm, M.; Roman, R.; Chan, H.W.; Wenz, M.; Northrop, J.P.; Ringold, G.M.; Danielsen, M. Lipofection: A highly efficient, lipid-mediated DNA-transfection procedure. *Proc. Natl. Acad. Sci. USA* **1987**, *84*, 7413–7417. [CrossRef]

86. Malone, R.W.; Felgner, P.L.; Verma, I.M. Cationic liposome-mediated RNA transfection. *Proc. Natl. Acad. Sci. USA* **1989**, *86*, 6077–6081. [CrossRef]

87. Wheeler, J.J.; Palmer, L.; Ossanlou, M.; MacLachlan, I.; Graham, R.W.; Zhang, Y.P.; Hope, M.J.; Scherrer, P.; Cullis, P.R. Stabilized plasmid-lipid particles: Construction and characterization. *Gene Ther.* **1999**, *6*, 271–281. [CrossRef]

88. Heyes, J.; Palmer, L.; Bremner, K.; MacLachlan, I. Cationic lipid saturation influences intracellular delivery of encapsulated nucleic acids. *J. Control. Release* **2005**, *107*, 276–287. [CrossRef]

89. Arteta, M.Y.; Kjellman, T.; Bartesaghi, S.; Wallin, S.; Wu, X.; Kvist, A.J.; Dabkowska, A.; Székely, N.; Radulescu, A.; Bergenholtz, J.; et al. Successful Reprogramming of Cellular Protein Production through mRNA Delivered by Functionalized Lipid Nanoparticles. *Proc. Natl. Acad. Sci. USA* **2018**, *115*, E3351–E3360. [CrossRef]

90. Cheng, X.; Lee, R.J. The role of helper lipids in lipid nanoparticles (LNPs) designed for oligonucleotide delivery. *Adv. Drug Deliv. Rev.* **2016**, *99*, 129–137. [CrossRef]

91. Gruner, S.M.; Cullis, P.R.; Hope, M.J.; Tilcock, C.P.S. Lipid Polymorphism:The Molecular Basis of Nonbilayer Phases. *Annu. Rev. Biophys. Biophys. Chem.* **1985**, *14*, 211–238. [CrossRef]

92. Jayaraman, M.; Ansell, S.M.; Mui, B.L.; Tam, Y.K.; Chen, J.; Du, X.; Butler, D.; Eltepu, L.; Matsuda, S.; Narayanannair, J.K.; et al. Maximizing the Potency of siRNA Lipid Nanoparticles for Hepatic Gene Silencing In Vivo. *Angew. Chem. Int. Ed.* **2012**, *51*, 8529–8533. [CrossRef]

93. Semple, S.C.; Akinc, A.; Chen, J.; Sandhu, A.P.; Mui, B.L.; Cho, C.K.; Sah, D.W.Y.; Stebbing, D.; Crosley, E.J.; Yaworski, E.; et al. Rational Design of Cationic Lipids for siRNA Delivery. *Nat. Biotechnol.* **2010**, *28*, 172–176. [CrossRef]

94. Akinc, A.; Maier, M.A.; Manoharan, M.; Fitzgerald, K.; Jayaraman, M.; Barros, S.; Ansell, S.; Du, X.; Hope, M.J.; Madden, T.D.; et al. The Onpattro story and the clinical translation of nanomedicines containing nucleic acid-based drugs. *Nat. Nanotechnol.* **2019**, *14*, 1084–1087. [CrossRef]

95. Evers, M.J.W.; Kulkarni, J.A.; van der Meel, R.; Cullis, P.R.; Vader, P.; Schiffelers, R.M. State-of-the-Art Design and Rapid-Mixing Production Techniques of Lipid Nanoparticles for Nucleic Acid Delivery. *Small Methods* **2018**, *2*, 1700375. [CrossRef]

96. Kulkarni, J.A.; Darjuan, M.M.; Mercer, J.E.; Chen, S.; van der Meel, R.; Thewalt, J.L.; Tam, Y.Y.C.; Cullis, P.R. On the Formation and Morphology of Lipid Nanoparticles Containing Ionizable Cationic Lipids and siRNA. *ACS Nano* **2018**, *12*, 4787–4795. [CrossRef]

97. Bahl, K.; Senn, J.J.; Yuzhakov, O.; Bulychev, A.; Brito, L.A.; Hassett, K.J.; Laska, M.E.; Smith, M.; Almarsson, Ö.; Thompson, J.; et al. Preclinical and Clinical Demonstration of Immunogenicity by mRNA Vaccines against H10N8 and H7N9 Influenza Viruses. *Mol. Ther.* **2017**, *25*, 1316–1327. [CrossRef]

98. Liang, F.; Lindgren, G.; Lin, A.; Thompson, E.A.; Ols, S.; Röhss, J.; John, S.; Hassett, K.; Yuzhakov, O.; Bahl, K.; et al. Efficient Targeting and Activation of Antigen-Presenting Cells In Vivo after Modified mRNA Vaccine Administration in Rhesus Macaques. *Mol. Ther.* **2017**, *25*, 2635–2647. [CrossRef]

99. Richner, J.M.; Himansu, S.; Dowd, K.A.; Butler, S.L.; Salazar, V.; Fox, J.M.; Julander, J.G.; Tang, W.W.; Shresta, S.; Pierson, T.C.; et al. Modified mRNA Vaccines Protect against Zika Virus Infection. *Cell* **2017**, *168*, 1114–1125.e10. [CrossRef]

100. Feldman, R.A.; Fuhr, R.; Smolenov, I.; Ribeiro, A.M.; Panther, L.; Watson, M.; Senn, J.J.; Smith, M.; Almarsson, Ö; Pujar, H.S.; et al. mRNA Vaccines against H10N8 and H7N9 Influenza Viruses of Pandemic Potential Are Immunogenic and Well Tolerated in Healthy Adults in Phase 1 Randomized Clinical Trials. *Vaccine* **2019**, *37*, 3326–3334. [CrossRef]

101. Sabnis, S.; Kumarasinghe, E.S.; Salerno, T.; Mihai, C.; Ketova, T.; Senn, J.J.; Lynn, A.; Bulychev, A.; McFadyen, I.; Chan, J.; et al. A Novel Amino Lipid Series for mRNA Delivery: Improved Endosomal Escape and Sustained Pharmacology and Safety in Non-Human Primates. *Mol. Ther.* **2018**, *26*, 1509–1519. [CrossRef]

102. Fernandez, M.S.; Fromherz, P. Lipoid pH indicators as probes of electrical potential and polarity in micelles. *J. Phys. Chem.* **1977**, *81*, 1755–1761. [CrossRef]

103. Kauffman, K.J.; Dorkin, J.R.; Yang, J.H.; Heartlein, M.W.; DeRosa, F.; Mir, F.F.; Fenton, O.S.; Anderson, D.G. Optimization of Lipid Nanoparticle Formulations for mRNA Delivery in Vivo with Fractional Factorial and Definitive Screening Designs. *Nano Lett.* **2015**, *15*, 7300–7306. [CrossRef]

104. Cheng, Q.; Wei, T.; Jia, Y.; Farbiak, L.; Zhou, K.; Zhang, S.; Wei, Y.; Zhu, H. Siegwart, D.J. Dendrimer-Based Lipid Nanoparticles Deliver Therapeutic FAH mRNA to Normalize Liver Function and Extend Survival in a Mouse Model of Hepatorenal Tyrosinemia Type I. *Adv. Mater.* **2018**, *30*, 1805308. [CrossRef]

105. Hajj, K.A.; Ball, R.L.; Deluty, S.B.; Singh, S.R.; Strelkova, D.; Knapp, C.M.; Whitehead, K.A. Branched-Tail Lipid Nanoparticles Potently Deliver mRNA In Vivo Due to Enhanced Ionization at Endosomal PH. *Small* **2019**, *15*, 1805097. [CrossRef]

106. Gilleron, J.; Querbes, W.; Zeigerer, A.; Borodovsky, A.; Marsico, G.; Schubert, U.; Manygoats, K.; Seifert, S.; Andree, C.; Stöter, M.; et al. Image-Based Analysis of Lipid Nanoparticle–Mediated siRNA Delivery, Intracellular Trafficking and Endosomal Escape. *Nat. Biotechnol.* **2013**, *31*, 638–646. [CrossRef]

107. Development and Licensure of Vaccines to Prevent COVID-19; Guidance for Industry. *U.S. Dep. Health Hum. Serv. Food Drug Adm. Cent. Biol. Eval. Res.*. 2020. Available online: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/development-and-licensure-vaccines-prevent-covid-19 (accessed on 1 December 2020).

108. Wadman, M. Public needs to prep for vaccine side effects. *Science* **2020**, *370*, 1022. [CrossRef]

109. Reichmuth, A.M.; Oberli, M.A.; Jaklenec, A.; Langer, R.; Blankschtein, D. mRNA Vaccine Delivery Using Lipid Nanoparticles. *Ther. Deliv.* **2016**, *7*, 319–334. [CrossRef]

110. Cleavable Lipids. Available online: https://patents.google.com/patent/US20200237671A1/ (accessed on 18 January 2021).

111. Rajappan, K.; Tanis, S.P.; Mukthavaram, R.; Roberts, S.; Nguyen, M.; Tachikawa, K.; Sagi, A.; Sablad, M.; Limphong, P.; Leu, A.; et al. Property-Driven Design and Development of Lipids for Efficient Delivery of siRNA. *J. Med. Chem.* **2020**, *63*, 12992–13012. [CrossRef]

112. Arcturus Therapeutics Announces Positive Interim ARCT-021 (LUNAR-COV19) Phase 1/2 Study Results for Both Single Shot and Prime-Boost Regimens, and Up to $220 Million in Additional Financial Commitments from Singapore | Arcturus Therapeutics, Inc. Available online: https://ir.arcturusrx.com/news-releases/news-release-details/arcturus-therapeutics-announces-positive-interim-arct-021-lunar (accessed on 28 November 2020).

113. Providence Therapeutics COVID-19 Vaccine Receives Health Canada Authorization to Begin Clinical Trials. Available online: http://www.providencetherapeutics.com/providence-therapeutics-covid-19-vaccine-receives-health-canada-authorization-to-begin-clinical-trials (accessed on 10 January 2021).

114. Providence Therapeutics Reports Supportive Preclinical Data for its COVID-19 Vaccine Candidate (PTX-COVID19-B). Available online: http://www.providencetherapeutics.com/providence-therapeutics-reports-supportive-preclinical-data-for-its-covid-19-vaccine-candidate-ptx-covid19-b (accessed on 10 January 2021).

115. Laczkó, D.; Hogan, M.J.; Toulmin, S.A.; Hicks, P.; Lederer, K.; Gaudette, B.T.; Castaño, D.; Amanat, F.; Muramatsu, H.; Oguin, T.H.; et al. A Single Immunization with Nucleoside-Modified mRNA Vaccines Elicits Strong Cellular and Humoral Immune Responses against SARS-CoV-2 in Mice. *Immunity* **2020**, *53*, 724–732.e7. [CrossRef]

116. Zhao, P.; Hou, X.; Yan, J.; Du, S.; Xue, Y.; Li, W.; Xiang, G.; Dong, Y. Long-term storage of lipid-like nanoparticles for mRNA delivery. *Bioact. Mater.* **2020**, *5*, 358–363. [CrossRef]

117. Gindy, M.E.; Feuston, B.; Glass, A.; Arrington, L.; Haas, R.M.; Schariter, J.; Stirdivant, S.M. Stabilization of Ostwald Ripening in Low Molecular Weight Amino Lipid Nanoparticles for Systemic Delivery of siRNA Therapeutics. *Mol. Pharm.* **2014**, *11*, 4143–4153. [CrossRef]

118. Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) Emergency Use Authorization (EUA) of the Moderna COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19). Available online: https://www.fda.gov/media/144637/download (accessed on 1 January 2021).

119. Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) Emergency Use Authorization (EUA) of the Pfizer-Biontech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19). Available online: https://www.fda.gov/media/144413/download (accessed on 1 January 2021).

120. Gómez, G.; Pikal, M.J.; Rodríguez-Hornedo, N. Effect of Initial Buffer Composition on pH Changes During Far-From-Equilibrium Freezing of Sodium Phosphate Buffer Solutions. *Pharm. Res.* **2001**, *18*, 90–97. [CrossRef]

121. Tang, X.C.; Pikal, M.J. Design of Freeze-Drying Processes for Pharmaceuticals: Practical Advice. *Pharm. Res.* **2004**, *21*, 191–200. [CrossRef] [PubMed]

122. Tides Presentation—Arctus Therapeutics, Inc. Available online: https://ir.arcturusrx.com/static-files/5f0c040f-872c-4e16-82ce-523ff083b708 (accessed on 1 January 2021).

123. Love, K.T.; Mahon, K.P.; Levins, C.G.; Whitehead, K.A.; Querbes, W.; Dorkin, J.R.; Qin, J.; Cantley, W.; Qin, L.L.; Racie, T.; et al. Lipid-like materials for low-dose, In Vivo gene silencing. *Proc. Natl. Acad. Sci. USA* **2010**, *107*, 1864–1869. [CrossRef] [PubMed]

124. DeRosa, F.; Smith, L.; Shen, Y.; Huang, Y.; Pan, J.; Xie, H.; Yahalom, B.; Heartlein, M.W. Improved Efficacy in a Fabry Disease Model Using a Systemic mRNA Liver Depot System as Compared to Enzyme Replacement Therapy. *Mol. Ther.* **2019**, *27*, 878–889. [CrossRef] [PubMed]

125. Zhou, K.; Nguyen, L.H.; Miller, J.B.; Yan, Y.; Kos, P.; Xiong, H.; Li, L.; Hao, J.; Minnig, J.T.; Zhu, H.; et al. Modular degradable dendrimers enable small RNAs to extend survival in an aggressive liver cancer model. *Proc. Natl. Acad. Sci. USA* **2016**, *113*, 520–525. [CrossRef]

126. Chahal, J.S.; Khan, O.F.; Cooper, C.L.; McPartlan, J.S.; Tsosie, J.K.; Tilley, L.D.; Sidik, S.M.; Lourido, S.; Langer, R.; Bavari, S.; et al. Dendrimer-RNA nanoparticles generate protective immunity against lethal Ebola, H1N1 influenza, and *Toxoplasma gondii* challenges with a single dose. *Proc. Natl. Acad. Sci. USA* **2016**, *113*, E4133–E4142. [CrossRef]

127. Robinson, E.; MacDonald, K.D.; Slaughter, K.; McKinney, M.; Patel, S.; Sun, C.; Sahay, G. Lipid Nanoparticle-Delivered Chemically Modified mRNA Restores Chloride Secretion in Cystic Fibrosis. *Mol. Ther.* **2018**, *26*, 2034–2046. [CrossRef]

128. Kim, J.; Jozic, A.; Sahay, G. Naturally Derived Membrane Lipids Impact Nanoparticle-Based Messenger RNA Delivery. *Cell. Mol. Bioeng.* **2020**. [CrossRef]

129. Mai, Y.; Guo, J.; Zhao, Y.; Ma, S.; Hou, Y.; Yang, J. Intranasal Delivery of Cationic Liposome-Protamine Complex mRNA Vaccine Elicits Effective Anti-Tumor Immunity. *Cell. Immunol.* **2020**, *354*, 104143. [CrossRef]

130. Zhuang, X.; Qi, Y.; Wang, M.; Yu, N.; Nan, F.; Zhang, H.; Tian, M.; Li, C.; Lu, H.; Jin, N. mRNA Vaccines Encoding the HA Protein of Influenza A H1N1 Virus Delivered by Cationic Lipid Nanoparticles Induce Protective Immune Responses in Mice. *Vaccines* **2020**, *8*, 123. [CrossRef]

131. Pardi, N.; Secreto, A.J.; Shan, X.; Debonera, F.; Glover, J.; Yi, Y.; Muramatsu, H.; Ni, H.; Mui, B.L.; Tam, Y.K.; et al. Administration of Nucleoside-Modified mRNA Encoding Broadly Neutralizing Antibody Protects Humanized Mice from HIV-1 Challenge. *Nat. Commun.* **2017**, *8*, 14630. [CrossRef]

132. Thran, M.; Mukherjee, J.; Pönisch, M.; Fiedler, K.; Thess, A.; Mui, B.L.; Hope, M.J.; Tam, Y.K.; Horscroft, N.; Heidenreich, R.; et al. mRNA Mediates Passive Vaccination against Infectious Agents, Toxins, and Tumors. *EMBO Mol. Med.* **2017**, *9*, 1434–1447. [CrossRef] [PubMed]

133. Stadler, C.R.; Bähr-Mahmud, H.; Celik, L.; Hebich, B.; Roth, A.S.; Roth, R.P.; Karikó, K.; Türeci, Ö.; Sahin, U. Elimination of Large Tumors in Mice by mRNA-Encoded Bispecific Antibodies. *Nat. Med.* **2017**, *23*, 815–817. [CrossRef] [PubMed]

134. Van Hoecke, L.; Verbeke, R.; De Vlieger, D.; Dewitte, H.; Roose, K.; Van Nevel, S.; Krysko, O.; Bachert, C.; Schepens, B.; Lentacker, I.; et al. mRNA Encoding a Bispecific Single Domain Antibody Construct Protects against Influenza A Virus Infection in Mice. *Mol. Ther. Nucleic Acids* **2020**, *20*, 777–787. [CrossRef] [PubMed]

135. Kose, N.; Fox, J.M.; Sapparapu, G.; Bombardi, R.; Tennekoon, R.N.; de Silva, A.D.; Elbashir, S.M.; Theisen, M.A.; Humphris-Narayanan, E.; Ciaramella, G.; et al. A Lipid-Encapsulated mRNA Encoding a Potently Neutralizing Human Monoclonal Antibody Protects against Chikungunya Infection. *Sci. Immunol.* **2019**, *4*. [CrossRef]

136. Moderna Announces Positive Phase 1 Results for the First Systemic Messenger RNA Therapeutic Encoding a Secreted Protein (mRNA-1944) | Moderna, Inc. Available online: https://investors.modernatx.com/news-releases/news-release-details/moderna-announces-positive-phase-1-results-first-systemic/ (accessed on 5 December 2020).

137. Belliveau, N.M.; Huft, J.; Lin, P.J.; Chen, S.; Leung, A.K.; Leaver, T.J.; Wild, A.W.; Lee, J.B.; Taylor, R.J.; Tam, Y.K.; et al. Microfluidic Synthesis of Highly Potent Limit-Size Lipid Nanoparticles for In Vivo Delivery of siRNA. *Mol. Ther. Nucleic Acids* **2012**, *1*, e37. [CrossRef]

138. Kulkarni, J.A.; Witzigmann, D.; Leung, J.; van der Meel, R.; Zaifman, J.; Darjuan, M.M.; Grisch-Chan, H.M.; Thöny, B.; Tam, Y.Y.; Cullis, P.R. Fusion-dependent formation of lipid nanoparticles containing macromolecular payloads. *Nanoscale* **2019**, *11*, 9023–9031. [CrossRef]

139. Nair, A.B.; Jacob, S. A simple practice guide for dose conversion between animals and human. *J. Basic Clin. Pharm.* **2016**, *7*, 27–31. [CrossRef]

140. Vogel, A.B.; Lambert, L.; Kinnear, E.; Busse, D.; Erbar, S.; Reuter, K.C.; Wicke, L.; Perkovic, M.; Beissert, T.; Haas, H.; et al. Self-Amplifying RNA Vaccines Give Equivalent Protection against Influenza to mRNA Vaccines but at Much Lower Doses. *Mol. Ther.* **2018**, *26*, 446–455. [CrossRef]

141. Freyn, A.W.; da Silva, J.R.; Rosado, V.C.; Bliss, C.M.; Pine, M.; Mui, B.L.; Tam, Y.K.; Madden, T.D.; de Souza Ferreira, L.C.; Weissman, D.; et al. A Multi-Targeting, Nucleoside-Modified mRNA Influenza Virus Vaccine Provides Broad Protection in Mice. *Mol. Ther.* **2020**, *28*, 1569–1584. [CrossRef]

142. Chen, S.; Tam, Y.Y.C.; Lin, P.J.C.; Sung, M.M.H.; Tam, Y.K.; Cullis, P.R. Influence of Particle Size on the in Vivo Potency of Lipid Nanoparticle Formulations of siRNA. *J. Control. Release* **2016**, *235*, 236–244. [CrossRef]

143. Patel, S.; Ashwanikumar, N.; Robinson, E.; DuRoss, A.; Sun, C.; Murphy-Benenato, K.E.; Mihai, C.; Almarsson, Ö.; Sahay, G. Boosting Intracellular Delivery of Lipid Nanoparticle-Encapsulated mRNA. *Nano Lett.* **2017**, *17*, 5711–5718. [CrossRef]

144. Sahay, G.; Querbes, W.; Alabi, C.; Eltoukhy, A.; Sarkar, S.; Zurenko, C.; Karagiannis, E.; Love, K.; Chen, D.; Zoncu, R.; et al. Efficiency of siRNA Delivery by Lipid Nanoparticles Is Limited by Endocytic Recycling. *Nat. Biotechnol.* **2013**, *31*, 653–658. [CrossRef]

145. Evans, B.C.; Hocking, K.M.; Kilchrist, K.V.; Wise, E.S.; Brophy, C.M.; Duvall, C.L. Endosomolytic Nano-Polyplex Platform Technology for Cytosolic Peptide Delivery To Inhibit Pathological Vasoconstriction. *ACS Nano* **2015**, *9*, 5893–5907. [CrossRef]

146. Jiang, Y.; Lu, Q.; Wang, Y.; Xu, E.; Ho, A.; Singh, P.; Wang, Y.; Jiang, Z.; Yang, F.; Tietjen, G.T.; et al. Quantitating Endosomal Escape of a Library of Polymers for mRNA Delivery. *Nano Lett.* **2020**, *20*, 1117–1123. [CrossRef]

147. Kilchrist, K.V.; Dimobi, S.C.; Jackson, M.A.; Evans, B.C.; Werfel, T.A.; Dailing, E.A.; Bedingfield, S.K.; Kelly, I.B.; Duvall, C.L. Gal8 Visualization of Endosome Disruption Predicts Carrier-Mediated Biologic Drug Intracellular Bioavailability. *ACS Nano* **2019**. [CrossRef]

148. Miao, L.; Lin, J.; Huang, Y.; Li, L.; Delcassian, D.; Ge, Y.; Shi, Y.; Anderson, D.G. Synergistic Lipid Compositions for Albumin Receptor Mediated Delivery of mRNA to the Liver. *Nat. Commun.* **2020**, *11*, 2424. [CrossRef]

149. Patel, S.; Kim, J.; Herrera, M.; Mukherjee, A.; Kabanov, A.V.; Sahay, G. Brief update on endocytosis of nanomedicines. *Adv. Drug Deliv. Rev.* **2019**, *144*, 90–111. [CrossRef]

150. Maugeri, M.; Nawaz, M.; Papadimitriou, A.; Angerfors, A.; Camponeschi, A.; Na, M.; Hölttä, M.; Skantze, P.; Johansson, S.; Sundqvist, M.; et al. Linkage between Endosomal Escape of LNP-mRNA and Loading into EVs for Transport to Other Cells. *Nat. Commun.* **2019**, *10*, 4333. [CrossRef]

151. Kranz, L.M.; Diken, M.; Haas, H.; Kreiter, S.; Loquai, C.; Reuter, K.C.; Meng, M.; Fritz, D.; Vascotto, F.; Hefesha, H.; et al. Systemic RNA delivery to dendritic cells exploits antiviral defence for cancer immunotherapy. *Nature* **2016**, *534*, 396–401. [CrossRef]

152. Fenton, O.S.; Kauffman, K.J.; Kaczmarek, J.C.; McClellan, R.L.; Jhunjhunwala, S.; Tibbitt, M.W.; Zeng, M.D.; Appel, E.A.; Dorkin, J.R.; Mir, F.F.; et al. Synthesis and Biological Evaluation of Ionizable Lipid Materials for the In Vivo Delivery of Messenger RNA to B Lymphocytes. *Adv. Mater.* **2017**, *29*, 1606944. [CrossRef]

153. Cheng, Q.; Wei, T.; Farbiak, L.; Johnson, L.T.; Dilliard, S.A.; Siegwart, D.J. Selective Organ Targeting (SORT) Nanoparticles for Tissue-Specific mRNA Delivery and CRISPR–Cas Gene Editing. *Nat. Nanotechnol.* **2020**, *15*, 313–320. [CrossRef] [PubMed]

154. Akinc, A.; Querbes, W.; De, S.; Qin, J.; Frank-Kamenetsky, M.; Jayaprakash, K.N.; Jayaraman, M.; Rajeev, K.G.; Cantley, W.L.; Dorkin, J.R.; et al. Targeted Delivery of RNAi Therapeutics With Endogenous and Exogenous Ligand-Based Mechanisms. *Mol. Ther.* **2010**, *18*, 1357–1364. [CrossRef] [PubMed]

155. Yan, X.; Kuipers, F.; Havekes, L.M.; Havinga, R.; Dontje, B.; Poelstra, K.; Scherphof, G.L.; Kamps, J.A.A.M. The role of apolipoprotein E in the elimination of liposomes from blood by hepatocytes in the mouse. *Biochem. Biophys. Res. Commun.* **2005**, *328*, 57–62. [CrossRef]

156. Hajj, K.A.; Melamed, J.R.; Chaudhary, N.; Lamson, N.G.; Ball, R.L.; Yerneni, S.S.; Whitehead, K.A. A Potent Branched-Tail Lipid Nanoparticle Enables Multiplexed mRNA Delivery and Gene Editing In Vivo. *Nano Lett.* **2020**, *20*, 5167–5175. [CrossRef]

157. Pardi, N.; Tuyishime, S.; Muramatsu, H.; Kariko, K.; Mui, B.L.; Tam, Y.K.; Madden, T.D.; Hope, M.J.; Weissman, D. Expression Kinetics of Nucleoside-Modified mRNA Delivered in Lipid Nanoparticles to Mice by Various Routes. *J. Control. Release* **2015**, *217*, 345–351. [CrossRef]

158. Parhiz, H.; Shuvaev, V.V.; Pardi, N.; Khoshnejad, M.; Kiseleva, R.Y.; Brenner, J.S.; Uhler, T.; Tuyishime, S.; Mui, B.L.; Tam, Y.K.; et al. PECAM-1 Directed Re-Targeting of Exogenous mRNA Providing Two Orders of Magnitude Enhancement of Vascular Delivery and Expression in Lungs Independent of Apolipoprotein E-Mediated Uptake. *J. Control. Release* **2018**, *291*, 106–115. [CrossRef]

159. Marcos-Contreras, O.A.; Greineder, C.F.; Kiseleva, R.Y.; Parhiz, H.; Walsh, L.R.; Zuluaga-Ramirez, V.; Myerson, J.W.; Hood, E.D.; Villa, C.H.; Tombacz, I.; et al. Selective targeting of nanomedicine to inflamed cerebral vasculature to enhance the blood–brain barrier. *Proc. Natl. Acad. Sci. USA* **2020**, *117*, 3405–3414. [CrossRef]

160. Perche, F.; Gosset, D.; Mével, M.; Miramon, M.-L.; Yaouanc, J.-J.; Pichon, C.; Benvegnu, T.; Jaffrès, P.-A.; Midoux, P. Selective gene delivery in dendritic cells with mannosylated and histidylated lipopolyplexes. *J. Drug Target.* **2011**, *19*, 315–325. [CrossRef]

161. Veiga, N.; Goldsmith, M.; Granot, Y.; Rosenblum, D.; Dammes, N.; Kedmi, R.; Ramishetti, S.; Peer, D. Cell Specific Delivery of Modified mRNA Expressing Therapeutic Proteins to Leukocytes. *Nat. Commun.* **2018**, *9*, 4493. [CrossRef]

162. Kedmi, R.; Veiga, N.; Ramishetti, S.; Goldsmith, M.; Rosenblum, D.; Dammes, N.; Hazan-Halevy, I.; Nahary, L.; Leviatan-Ben-Arye, S.; Harlev, M.; et al. A modular platform for targeted RNAi therapeutics. *Nat. Nanotechnol.* **2018**, *13*, 214–219. [CrossRef]

163. Swaminathan, G.; Thoryk, E.A.; Cox, K.S.; Meschino, S.; Dubey, S.A.; Vora, K.A.; Celano, R.; Gindy, M.; Casimiro, D.R.; Bett, A.J. A novel lipid nanoparticle adjuvant significantly enhances B cell and T cell responses to sub-unit vaccine antigens. *Vaccine* **2016**, *34*, 110–119. [CrossRef]

164. Swaminathan, G.; Thoryk, E.A.; Cox, K.S.; Smith, J.S.; Wolf, J.J.; Gindy, M.E.; Casimiro, D.R.; Bett, A.J. A Tetravalent Sub-unit Dengue Vaccine Formulated with Ionizable Cationic Lipid Nanoparticle induces Significant Immune Responses in Rodents and Non-Human Primates. *Sci. Rep.* **2016**, *6*, 1–17. [CrossRef]

165. Almeida, A.J.; Souto, E. Solid lipid nanoparticles as a drug delivery system for peptides and proteins. *Adv. Drug Deliv. Rev.* **2007**, *59*, 478–490. [CrossRef]

166. Yuki, Y.; Kiyono, H. New generation of mucosal adjuvants for the induction of protective immunity. *Rev. Med. Virol.* **2003**, *13*, 293–310. [CrossRef]

167. Sedic, M.; Senn, J.J.; Lynn, A.; Laska, M.; Smith, M.; Platz, S.J.; Bolen, J.; Hoge, S.; Bulychev, A.; Jacquinet, E.; et al. Safety Evaluation of Lipid Nanoparticle–Formulated Modified mRNA in the Sprague-Dawley Rat and Cynomolgus Monkey. *Vet. Pathol.* **2018**, *55*, 341–354. [CrossRef]

168. Barros, S.A.; Gollob, J.A. Safety profile of RNAi nanomedicines. *Adv. Drug Deliv. Rev.* **2012**, *64*, 1730–1737. [CrossRef] [PubMed]

169. Swartz, M.A. The physiology of the lymphatic system. *Adv. Drug Deliv. Rev.* **2001**, *50*, 3–20. [CrossRef]

170. Castells, M.C.; Phillips, E.J. Maintaining Safety with SARS-CoV-2 Vaccines. *N. Engl. J. Med.* **2020**. [CrossRef] [PubMed]

171. Muskula, P.R.; Main, M.L. Safety With Echocardiographic Contrast Agents. *Circ. Cardiovasc. Imaging* **2017**, *10*, e005459. [CrossRef]

172. Parhiz, H.; Khoshnejad, M.; Myerson, J.W.; Hood, E.; Patel, P.N.; Brenner, J.S.; Muzykantov, V.R. Unintended effects of drug carriers: Big issues of small particles. *Adv. Drug Deliv. Rev.* **2018**, *130*, 90–112. [CrossRef]

173. NIH Devising Study on Rare Allergic Reactions to Coronavirus Vaccine—The Washington Post. Available online: https://www.washingtonpost.com/health/covid-vaccine-allergic-reactions-study/2020/12/21/e01001d2-431a-11eb-b0e4-0f182923a025_story.html (accessed on 10 January 2021).

# EXHIBIT 26



# Calculation of Molecular Properties

originalSMILES
OCCCCOC(CCCCCCCC(C(CCCCCC)CCCCCCCC)=O)CCCCCCOC(C(CCCCCC)CCCCCCCCC)=O
miSMILES:
OCCCCN(CCCCCCOC(C(CCCCCC)CCCCCCCCC)=O)CCCCCCOC(C(CCCCCC)CCCCCCCCC)=O
((4-Hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate)



**Molinspiration property engine** v2021.10

| | |
|---|---|
| miLogP | 10.37 |
| TPSA | 76.08 |
| natoms | 54 |
| MW | 766.29 |
| nON | 6 |
| nOHNH | 1 |
| nviolations | 2 |
| nrotb | 46 |
| volume | 861.34 |

**Get data as text** (for copy / paste).

**Get 3D geometry** BETA

This was request 1 out of 1000 available this month for your site 65.96.110.54
With technology from Molinspiration you can easily setup similar service also directly on your intranet.
Comments or questions ? See our FAQ and do not hesitate to provide feedback or contact us by email !

New molecule    Predict bioactivity    About properties    MyMolecules    Molinspiration home

©2022 Molinspiration Cheminformatics Terms of service