# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALNYLAM PHARMACEUTICALS, INC. <br><br> Plaintiff, <br> v. <br><br> PFIZER, INC., PHARMACIA & UPJOHN CO. LLC, BIONTECH SE, and BIONTECH MANUFACTURING GMBH, <br><br> Defendants. | Civil Action No. 22-cv-336-CFC (CONSOLIDATED) |

## JOINT CLAIM CONSTRUCTION BRIEF

## **Table of Contents**

I.    Disputed Constructions.................................................................1

    A.    Introductions ...................................................................1

        1.    Alnylam's Introduction ..........................................1

            a.    Claim Construction ...................................1

            b.    Factual Overview .....................................2

        2.    Pfizer/BioNTech's Introduction.............................6

            a.    Claim Construction Introduction ......................6

            b.    Technology Background.................................10

    B.    "cationic lipid" ..............................................................15

        1.    Alnylam's Opening Position......................................15

        2.    Pfizer/BioNTech's Answering Position....................21

            a.    The Written Description Expressly Defines
               "CationicLipid."................................................22

            b.    Plaintiff's Construction Is Not the Plain and
               Ordinary Meaning. ........................................26

        3.    Alnylam's Reply Position ........................................28

            a.    Pfizer/BioNTech's Suggestion that The Written
               Description Expressly Defines "Cationic Lipid" Should be
               Rejected.........................................................28

            b.    Cationic Lipid Has a Plain and Ordinary Meaning ........33

        4.    Pfizer/BioNTech's Sur-Reply Position.....................34

            a.    The Intrinsic Evidence Supports Only Cationic
               Lipids with Protonatable, Not Neutral, Head Groups...............35

            b.    Plaintiff Failed to Establish that its Proposed
               Construction Is the Plain and Ordinary Meaning. ....................37

    C.    "head group".................................................................38

        1.    Alnylam's Opening Position......................................38

         2.    Pfizer/BioNTech's Answering Position....................41

            a.    The Claim Language Supports Defendants'
               Construction. ........................................................42

            b.    The Written Description Only Describes Cationic
               Lipids with Protonatable or Permanently Charged Head
               Groups. .........................................................43

c.    The Family Prosecution History Supports Defendants' Construction. ......................................................50

d.    There Is No Plain and Ordinary Meaning for Head Group. ...........................................................................51

e.    There Is No Intrinsic Evidence Support for Plaintiff's Construction. ..............................................52

3.    Alnylam's Reply Position .........................................................52

a.    Pfizer/BioNTech's Reliance on "Optionally" Language Is Incorrect ...............................................53

b.    Pfizer/BioNTech's "Written Description" Arguments Should be rejected ......................................54

c.    The Prosecution History of Related Patents Supports Alnylam's Proposed Construction, Not Pfizer/BioNTech's Proposed Construction ...........................................................59

d.    There is a Plain and Ordinary Meaning of Head Group ...............................................................................60

e.    Alnylam's Construction Would Not Lead to a "Nonsensical Result" ..............................................60

4.    Pfizer/BioNTech's Sur-Reply Position....................................61

a.    The Intrinsic Evidence Supports Only Protonatable, Not Neutral, Head Groups. ...................................62

b.    Plaintiff Failed to Establish that its Proposed Construction Is the Plain and Ordinary Meaning. ...................64

D.    "$R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl" .............................................66

1.    Alnylam's Opening Position ....................................................66

2.    Pfizer/BioNTech's Answering Position....................................72

a.    The Intrinsic Evidence Supports Defendants' Construction. ...............................................................72

b.    Plaintiff's Construction Runs Afoul of the Written Description. ...............................................................78

c.    Plaintiff's Reliance on the Plain and Ordinary Meaning Is Misplaced ...............................................81

3.    Alnylam's Reply Position .........................................................81

a.    The Claim Language Supports Alnylam's Construction ............................................................82

b.      Pfizer/BioNTech's Ignore Key Portions of the
Specification that Contradict Their Proposed Construction .....87

c.      The Prosecution History Supports Alnylam's
Construction ...............................................................................90

4.      Pfizer/BioNTech's Sur-Reply Position.....................................93

a.      Plaintiff Errs by Focusing on the Separate α-
Branching Limitation. ...............................................................94

b.      Defendants' Construction Does Not Render α-
Branching "Impossible."............................................................95

c.      Plaintiff's Reliance on Formula (II) Is Misplaced..........96

d.      Plaintiff's Focus on Certain "branched alkyl groups"
Is Misplaced. ............................................................................97

# Table of Authorities

**Page(s)**

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
   725 F.3d 1315 (Fed. Cir. 2013) ...........................................................20, 29, 36

*Acme Scale Co. v. LTS Scale Co.*, *LLC*,
   615 F. App'x 673 (Fed. Cir. 2015) ...............................................................*passim*

*Allergan, Inc. v. Apotex Inc.*,
   754 F.3d 952 (Fed. Cir. 2014) .....................................................................23, 30

*Alloc, Inc. v. ITC*,
   342 F.3d 1361 (Fed. Cir. 2003) .............................................................49, 50, 57

*Alnylam Pharmaceuticals, Inc. v. Moderna Inc*,
   C.A. No. 22-cv-335-CFC.................................................................................4

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   457 F.3d 1293 (Fed. Cir. 2006) ...................................................................17, 24

*Astrazeneca AB. v. Mut. Pharm. Co.*,
   384 F.3d 1333 (Fed. Cir. 2004) .............................................................24, 30, 76

*Aventis Pharm. Inc. v. Amino Chems. Ltd.*,
   715 F.3d 1363, 1373 (Fed. Cir. 2013) ...............................................................1

*Aylus Networks, Inc. v. Apple Inc.*,
   856 F.3d 1353 (Fed. Cir. 2017) ........................................................................1

*Boehringer Ingelheim Pharms., Inc. v. Hec Pharm Co.*,
   2017 WL 11633325 (D.N.J. Jan. 5, 2017)........................................................53

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
   749 F.3d 1349 (Fed. Cir. 2014) .............................................................23, 25, 32

*Cadence Pharms., Inc. v. Paddock Lab'ys Inc.*,
   886 F. Supp. 2d 445 (D. Del. 2012)..................................................................53

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002) ...............................................................21

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004) .............................................................36

*Conoco, Inc. v. Energy & Env't. Int'l, L.C.*,
    460 F.3d 1349 (Fed. Cir. 2006) .............................................18, 24, 92

*Gilead Scis., Inc. v. Lee*,
    778 F.3d 1341 (Fed. Cir. 2015) .............................................................46

*IBM Corp. v. Iancu*,
    759 F. App'x 1002 (Fed. Cir. 2019) .....................................................46

*Indacon, Inc. v. Facebook, Inc.*,
    824 F.3d 1352 (Fed. Cir. 2016) .............................................................51

*Intel Corp. v. Qualcomm Inc.*,
    21 F.4th 784 (Fed. Cir. 2021) .......................................................38, 43

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
    383 F.3d 1295 (Fed. Cir. 2004) .............................................22, 42, 51

*Knowles Elecs. LLC v. Iancu*,
    886 F.3d 1369 (Fed. Cir. 2018) .............................................18, 32, 70

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
    545 F.3d 1340 (Fed. Cir. 2008) .............................................................61

*Littelfuse, Inc. v. Mersen USA EP Corp.*,
    29 F.4th 1376 (Fed. Cir. 2022) .............................................................33

*Martek Biosciences Corp. v. Nutrovina, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) .....................................................76, 93

*Novartis Pharms. Corp. v. Par Pharm., Inc.*,
    No. CV 14-1494-RGA, 2015 WL 6126803 (D. Del. Oct. 16, 2015) ...........18, 24

*Osram GmbH v. Int'l Trade Comm'n*,
    505 F.3d 1351 (Fed. Cir. 2007) .............................................................34

*Pacing Techs. LLC v. Garmin Int'l Inc.*,
   778 F.3d 1021 (Fed. Cir. 2015) ....................................................48, 58

*Pharmacyclics LLC v. Acerta Pharma B.V.*,
   No. 17-CV-1582-RGA, 2019 WL 3713841 (D. Del. Aug. 7, 2019)..................17

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ....................................................*passim*

*In re Power Integrations, Inc.*,
   884 F.3d 1370 (Fed. Cir. 2018) ............................................47, 50, 57

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
   824 F.3d 999 (Fed. Cir. 2016) ......................................................29, 54

*Simpleair, Inc. v. Sony Ericsson Mobile Commc'ns AB*,
   820 F.3d 419 (Fed. Cir. 2016) ...........................................................94

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
   511 F.3d 1132 (Fed. Cir. 2007) ...................................................25, 32

*SkinMedica, Inc. v. Histogen Inc.*,
   727 F.3d 1187 (Fed. Cir. 2013) ...................................................47, 57

*Sonrai Memory Ltd. v. Kingston Tech. Co., Inc.*,
   2022 WL 3640302 (W.D. Tex. Aug. 23, 2022)................................18

*SSI Techs., LLC v. Dongguan Zhengyang Elec. Mech. LTD.*,
   59 F.4th 1328 (Fed. Cir. 2023) .............................................40, 49, 59

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) ...................................................41, 55

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015) ...................................................56, 64

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
   529 F.3d 1364 (Fed. Cir. 2008) ............................................26, 36, 97

*Trustees of Columbia Univ. in New York v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016) ...................................................47, 57

*V-Formation, Inc. v. Benetton Grp. SpA*,
  401 F.3d 1307 (Fed. Cir. 2005) ....................................................................10, 27

*Wasica Fin. GmBH v. Cont'l Auto. Sys., Inc*,
  853 F.3d 1272 (Fed. Cir. 2017) ..........................................................................20

**Statutes**

35 U.S.C. § 112 ................................................................................................29, 54

35 U.S.C. § 121 ......................................................................................................59

## I.    Disputed Constructions

### A.    <u>Introductions</u>

#### 1.    Alnylam's Introduction

##### a.    Claim Construction

Alnylam's '933 Patent and '979 Patent (collectively, the "Patents-in-Suit") cover groundbreaking technology that allowed for the development of RNA-based vaccines and therapies, including Pfizer/BioNTech's COVID-19 vaccine.[1]   The promise of nucleic acids as therapeutics was recognized long ago, but the ability to safely and effectively deliver nucleic acids remained elusive.   The core innovation of the Patents-in-Suit is a class of improved cationic lipids that can effectively deliver nucleic acid payloads and then biodegrade to aid in elimination from the body.

While the technology covered by the Patents-in-Suit is novel, the claim terms at issue are not.   These terms have plain and ordinary meanings that would have been well understood by a person of ordinary skill in the art ("POSA") at the time of the invention.[2]   Alnylam puts forth the plain and ordinary meanings of these terms,

---

[1] U.S. Patent No. 11,246,933 is Ex. A and U.S. Patent No. 11,382,979 is Ex. B of the Joint Claim Construction Chart. (D.I. 63).

[2] All of the claim construction terms raised in this brief were proposed by Pfizer/BioNTech, as it is Alnylam's position that all of the terms used in the claims should be afforded their ordinary and customary meaning.   "There is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1358 (Fed. Cir. 2017) (quoting *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013))

which are consistent with the intrinsic record, as well as standard extrinsic evidence such as chemistry textbooks.

Pfizer/BioNTech, in contrast, seeks to introduce overly and improperly limiting proposed constructions, presumably to manufacture non-infringement positions. Pfizer/BioNTech's constructions would, at best, limit the scope of the claims to preferred embodiments, or, at times, single embodiments. Absent lexicography or express disavowal, which do not exist here, any attempt to limit the claims as Pfizer/BioNTech proposes violates of the canons of claim construction.

b.    Factual Overview

Nucleic acids are the primary way cells store and transmit genetic information. The two main classes of nucleic acids are DNA (deoxyribonucleic acid) and RNA (ribonucleic acid). Beginning in the 1980s, scientists sought to develop medicines, including vaccines, using nucleic acids. But there was a challenge. Nucleic acids are fragile, making it difficult to deliver them to the target in the body without degradation. So, scientists had to develop a way to protect the nucleic acids – essentially to package them for safe delivery to the target.

Scientists knew that certain naturally occurring lipids form cell membranes, which act as protective bubbles around our cells. A key feature of these naturally

occurring protective membranes is that their hydrophobic tails[3] and less hydrophobic (and, therefore, more hydrophilic) regions called head groups allow the lipids to self-assemble in particular orientations in a process called aggregation. The hydrophobic tails are repelled from the water and arrange themselves on the inside of bilayers, while the less hydrophobic head groups preferentially interact with the water.

These naturally occurring lipids are negatively charged, meaning that they are attracted to positively charged molecules and repelled from other negatively charged molecules. Nucleic acids are also negatively charged. Therefore, while scientists could appreciate the desirable properties of the naturally occurring lipids, the nucleic acids would repel these lipids. To address this, scientists began to develop lipids that could be positively charged, also called cationic lipids, for the delivery of nucleic acids. These lipids had the same core features of the naturally occurring negatively charged lipids, including hydrophobic tails and less hydrophobic head groups. Early cationic lipids carried a permanent positive charge. These permanently positively charged lipids failed to provide a safe and effective delivery mechanism due to toxicity and other in vivo issues.

---

[3] Hydrophobic, or water-fearing, is a term chemists used to describe molecules or parts of molecules that repel water, whereas hydrophilic, or water-loving, is used to describe molecules or parts of molecules that preferentially interact with water. *See* Ex. F (McMurry – Organic Chemistry) at 63.

To address the toxicity and other issues, scientists, like the named inventors, began to develop lipids where the extent of the positive charge depended on the pH of the solution around the lipids.  Different parts of cells have different pH ranges, so scientists focused on calibrating lipids to have limited to no charge when it was beneficial, but also be charged at other times, to aid in the delivery of the nucleic acid payload.  Unfortunately, issues with toxicity and other in vivo properties persisted.

The inventions in the Patents-in-Suit addressed these issues.  The claimed lipids are comprised of three parts:  the head group, the central moiety, and at least two hydrophobic tails that are biodegradable.  One or more of the tails may be branched at the alpha-position[4] next to the biodegradable group.[5]  The illustration below provides a general structure[6]:

---

[4] "Alpha-position" is also written as "α-position."

[5]  The parties in *Alnylam Pharmaceuticals, Inc. v. Moderna Inc*, C.A. No. 22-cv-335-CFC (the "Moderna Matter") agree that "alpha branching" means "where the branching occurs at a carbon atom next to the [biodegradable/ester] group."

[6] Chemists often represent organic molecules with "skeletal structures," where the carbons and the hydrogens bonded to them are omitted for clarity.  *See* Ex. F (McMurry – Organic Chemistry) at 22-24.



This branching allowed for a higher number of total carbons in the tail while also limiting the length of the tails, for achieving optimal properties.

The claimed lipids also feature a group that can acquire an additional proton (*e.g.*, a hydrogen atom), which is also knowns as protonatable group. Because of the protonatable group, at certain pH ranges the lipids are positively charged and can attract negatively charged nucleic acids. These lipids encapsulate the nucleic acids in lipid nanoparticles ("LNPs"). These LNPs can be used to safely and effectively deliver nucleic acids, like the mRNA in Pfizer/BioNTech's COVID-19 vaccine.

All of these structures are reflected in the claim language. Claim 18 of the '933 Patent is illustrative and states:

> A *cationic lipid* comprising a primary group and two biodegradable hydrophobic tails, wherein
>
> > the primary group comprises (i) *a head group* that optionally comprises a primary, secondary, or tertiary amine, and (ii) *a central moiety* to which the head group and the two biodegradable hydrophobic tails are directly bonded;
> >
> > the central moiety is a central carbon or nitrogen atom;

*each biodegradable hydrophobic tail* independently has the formula -(hydrophobic chain)-(biodegradable group)-(hydrophobic chain), wherein the biodegradable group is —OC(O)— or —C(O)O—;

for at least one biodegradable hydrophobic tail, *the terminal hydrophobic chain in the biodegradable hydrophobic tail is a branched alkyl, where the branching occurs at the α-position relative to the biodegradable group and the biodegradable hydrophobic tail has the formula* —$R^{12}$-$M^1$-$R^{13}$, where $R^{12}$ is a $C_4$-$C_{14}$ alkylene or $C_4$-$C_{14}$ alkenylene, $M^1$ is the biodegradable group, $R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl, and the total carbon atom content of the tail —$R^{12}$-$M^1$-$R^{13}$ is 21 to 26;

in at least one hydrophobic tail, the biodegradable group is separated from a terminus of the hydrophobic tail by from 6 to 12 carbon atoms; and

the lipid has a pKa in the range of about 4 to about 11 and a logP of at least 10.1.

'933 Patent at Claim 18.

2.    Pfizer/BioNTech's Introduction

a.    Claim Construction Introduction

During the height of the worst public health emergency the world has seen in a century, Defendants worked tirelessly to develop a breakthrough COVID-19 vaccine. On December 11, 2020, the FDA authorized Defendants' vaccine as the first of its kind. Rather than attempting to address this global pandemic, Plaintiff chose a different course. In April 2021, shortly after Defendants' lipid structures

6

used in their vaccine were published,[7] Plaintiff repurposed a nearly decade-old patent family to try to cover one of Defendants' lipids.

The written description of the patent family and all the claims Plaintiff had previously pursued for a decade were directed to cationic lipids characterized by a protonatable head group (i.e., a head group that is capable of becoming positively charged depending on the pH). The lipids in Defendants' vaccine lack this characteristic. Unable to assert any issued claim in the family, and with knowledge of Defendants' lipids, Plaintiff pursued new claims in an attempt to cover different types of lipids with unprotonatable head groups—i.e., neutral head groups. Such lipids, however, are not described in the written description. Indeed, in its attempt to ensnare Defendants' product, Plaintiff has strayed so far from the written description that none of the over 1,000 specifically described cationic lipids set forth in the written description fall within the scope of the claims Plaintiff now asserts.

Plaintiff's constructions are a continuation of its strategy to stretch its repurposed patent family to cover Defendants' lipids. As a result, Plaintiff's constructions are overbroad, vague, and disconnected from the intrinsic evidence. A good example of the disconnect between Plaintiff's constructions and the written

---

[7] Defendants' lipid structure was published on April 9, 2021, and Plaintiff filed the application that issued as the '933 Patent on April 29, 2021.

description is Plaintiff's illustration of a lipid in its Opening Brief, which purports to show the "general structure" of "[t]he inventions in the Patents-in-Suit":



*Supra* at I.A.1.b.  Notably, this structure, which is the result of Plaintiff's litigation-driven constructions, does not appear anywhere in the specification.  The fact that the Patents-in-Suit include thousands of specifically described cationic lipid structures, yet Plaintiff could not find a single one that exemplifies the "inventions in the Patents-in-Suit" and supports its constructions, is telling.

Unsurprisingly, Plaintiff largely ignores the intrinsic evidence, including the express definitions its inventors chose over ten years ago.  Plaintiff attempts to gloss over the disconnect between its constructions and the intrinsic evidence by declaring that its constructions are the "plain and ordinary meaning."  But remarkably, Plaintiff does not support this assertion with any meaningful evidence.

The first term at issue, "cationic lipid," is expressly defined in the written description to include lipids having a protonatable head group, which is consistent

8

with the remainder of the written description and its vast number of embodiments. Whereas Defendants' construction is based on the express definition and embodiments of cationic lipids, Plaintiff disregards the definition and embodiments and now attempts to retroactively broaden the term to encompass lipids with neutral head groups, which are not described anywhere in the written description.

The second term at issue, "head group," involves a similar dispute. Defendants' construction reflects that the head group of the "cationic lipids" in the Patents-in-Suit is the part of the lipid that carries the positive charge and therefore must contain the protonatable group, consistent with all the intrinsic evidence. In contrast, Plaintiff's construction—"less hydrophobic than the hydrophobic tails"—is an attempt to capture neutral head groups, that is overbroad and unsubstantiated by the specification.

The third disputed term is "$R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl." Defendants' construction is based on the express structural definition of "branched alkyl" as applied to the discrete $R^{13}$ structure, as well as each specific embodiment of an $R^{13}$ branched alkyl in the written description. Here too, Plaintiff disregards its express definition and $R^{13}$ embodiments. Indeed, its construction is irreconcilable with the express definition.

b.    Technology Background

All three disputed terms—"cationic lipid," "head group," and "$R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl"—concern the structure of a "cationic lipid." Cationic lipids are one type of lipid that can be used to make a "lipid particle"—a protective bubble used to ensure that genetic material is delivered safely to its intended destination in a patient's cells.

i.    Cationic Lipids Generally

The meaning of "cationic lipid" has evolved over time. Initially, it was understood that "[a]ll cationic lipid molecules contain three functional domains: a positively charged head group, a hydrophobic region, and a linker that tethers the cationic group and hydrophobic groups." Ex. I, Tang & Hughes, *Synthesis of a Single-Tailed Cationic Lipid and Investigation of its Transfection*, 62 J. CONTROLLED RELEASE 345, 345–46 (1999) (ALNY-00955148–49) (emphasis added).[8] It is because these lipids had a permanent positively charged head group that they were called "cationic" lipids. The three-part structure of cationic lipids was presented in the literature in different ways and with varying terminology. Following is one early example:

---

[8] The publications cited in Defendants' technology background are references considered by the examiner during prosecution of the '933 Patent. They therefore "constitute[] intrinsic evidence." *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (collecting cases).



Ex. J, Chesnoy & Huang, *Structure and Function of Lipid-DNA Complexes for Gene Delivery*, 29 ANNUAL REV. BIOPHYSICAL BIMOLECULAR STRUCTURE 27, 29 (2000) (ALNY-00946768) (annotated).  Notably, the head group in this illustration carries a permanent positive charge, denoted by the (+) sign on the nitrogen ("N") atom. Nitrogen atoms are positively charged when bound to four other atoms.[9]  Plaintiff acknowledges this three-part structure and the presence of a permanent positive charge, but omits that the permanent charge is in the head group structure of the cationic lipids that were known at the time, as shown above.  *Supra* at I.A.1.b.

Eventually, cationic lipid research began to shift away from permanently charged head groups to protonatable head groups, because the former "were consistently less effective" than protonatable head groups.  *See*, *e.g.*, Ex. K, Jayaraman et al., *Maximizing the Potency of siRNA Lipid Nanoparticles for Hepatic*

---

[9] A nitrogen atom bound to four non-hydrogen atoms is called a "quaternary ammonium cation."

*Gene Silencing in Vivo*, 51 ANGEWANDTE CHEMIE INT'L ED. 8529, 8529 (2012) (ALNY-00954963).  A protonatable—i.e., "ionizable"—head group may have no charge at one pH, but becomes positively charged at a different pH.  One common example of a protonatable head group contains a nitrogen atom with *three*, instead of *four*, bonds.[10]  By 2012, several scientists (including all but one of the named inventors) had published papers characterizing various cationic lipids with protonatable nitrogen-containing head groups.  *See, e.g.*, Semple et al., *infra*; Jayaraman et al., *supra*.  Plaintiff also acknowledges this shift from permanently charged groups toward protonatable groups, but again, omits that the protonatable group is in the head group structure of the cationic lipids known at the time.  *Supra* at I.A.1.b.

The head-group nitrogen atom is commonly called an "amine" or "amino group," such that the head group may be termed an "amine head group" or an "amino head group" and the corresponding lipid an "amino lipid."  *See, e.g.*, Ex. K, Jayaraman et al., *supra*, at 8529 (ALNY-00954963); Ex. L, Semple et al., *Rational Design of Cationic Lipids for siRNA Delivery*, 28 NATURE BIOTECHNOLOGY 172, 173–74 (2010) (ALNY-00955118–19) (referencing "amine-based head group" and "amine head group").

---

[10] A nitrogen atom bound to three non-hydrogen atoms is called a "tertiary amine."

More recently, a different class of lipids used in Defendants' and Moderna's COVID-19 vaccines, and which are not described in the written description, gained prominence. Unlike earlier cationic lipids, which at first had permanently charged head groups and later protonatable head groups, this new lipid class only has protonatable groups in a region the Patents-in-Suit refer to as the "central moiety," which is adjacent to and connects the head group to the hydrophobic tails.

ii.    Cationic Lipids in the Written Description

The Patents-in-Suit focus on cationic lipids with protonatable head groups and provide a particular schema and terminology for the three-part cationic lipid structure: a "Head Group," a "Central Moiety," and "Hydrophobic Groups":



'933 Patent at 37:1–20 (Compound 1). The written description discloses millions of cationic lipids using eight generic formulas, as exemplified by Formula (I):

13

Formula (I)

'979 Patent at 2:15–23 (annotated). Formula (I) and the remaining Formulas have a nitrogen ("N") atom (red) in the head group (blue) that is bonded to the placeholders R', $R^1$, $R^2$ and $(R)_a$. In the permutation where "R' is absent," the head group nitrogen atom is a tertiary amine bound to only three other non-hydrogen atoms and is protonatable. *Id.* at 2:26. Because protonation depends on the pH of the surrounding environment, the written description uses the term "protonatable" to specifically reference groups "that may be protonated to form a cationic lipid at physiological pH." '933 Patent at 410:55–62. Such head groups are protonatable head groups.

As explained above, a nitrogen atom can have a maximum of four bonds. In the permutation of Formula (I) where "R' is . . . alkyl," *id.* at 2:24, the head group nitrogen atom is a quaternary ammonium cation that has four non-hydrogen bonds and thus, "carries a permanent positive charge." *Id.* at 396:35–36. It is always cationic—i.e., a "charged lipid" that is not protonatable. *Id.* at 396:32. While the written description acknowledges cationic lipids with such permanently charged head groups, its focus is on the newer family of cationic lipids with protonatable head groups.

14

B.    "cationic lipid"

| Term | Alnylam's Construction | Pfizer/BioNTech's Construction |
|---|---|---|
| Cationic lipid<br><br>'933 all asserted claims<br>'979 all asserted claims | Plain and ordinary meaning, which is "a lipid which may be protonated at physiological pH" | "a lipid having one or two fatty acid or fatty aliphatic chains and an amino acid containing head group that may be protonated to form a cationic lipid at physiological pH." |

1.    Alnylam's Opening Position

The term "cationic lipid" should be afforded its plain and ordinary meaning in light of the claims and the specification, which is "a lipid which may be protonated at physiological pH." There is no dispute between the parties that a cationic lipid is a lipid that may be protonated at physiological pH. Pfizer/BioNTech errs by reading in specific structures and functionality to the head group portion of the lipid, *i.e.*, "an amino acid containing head group that may be protonated," presumably to gain a potential non-infringement position.[11] There is nothing in the claims, the specification, or the prosecution history to support such a narrow reading of

---

[11] Pfizer/BioNTech also seeks to add in the limitation "having one or two fatty acid or fatty aliphatic chains." This limitation is unnecessary and deviates from the plain claim language "two biodegradable hydrophobic tails."

"cationic lipid."

The plain and ordinary meaning of cationic lipid is a lipid that may be protonated, that is, have a positive charge because a hydrogen atom (also called a proton) has attached to the molecule at physiological pH. The specification provides necessary context regarding this aspect of the claimed cationic lipids. *See* '933 Patent at 395:52-63 ("In certain embodiments, the cationic lipids have at least one protonatable or deprotonatable group, such that the lipid is positively charged at a pH at or below physiological pH (e.g. pH 7.4), and neutral at a second pH, preferably at or above physiological pH. Such lipids are also referred to as cationic lipids. It will, of course, be understood that the addition or removal of protons as a function of pH is an equilibrium process, and that the reference to a charged or a neutral lipid refers to the nature of the predominant species and does not require that all of the lipid be present in the charged or neutral form.").

Pfizer/BioNTech's construction limits the head group portion of the cationic lipid to require it to contain an amino acid. There is nothing in the plain claim language that states this requirement. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed.Cir.1998)) ("'The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'").

16

The specification is in accord.  Pfizer/BioNTech errs by reading an open-ended specification definition as close-ended.  Specifically, the specification points to an open-ended definition of "cationic lipid": "[a]s used herein, the term 'cationic lipid' *includes* those lipids having one or two fatty acid or fatty aliphatic chains and an amino acid containing head group that may be protonated to form a cationic lipid at physiological pH."  '933 Patent at 410:57-60 (emphasis added).  The phrase "includes" renders the definition open-ended, *e.g.*, may or may not *comprise* an amino acid.  It certainly is not close ended such that the lipid head group must *consist* of an amino acid containing head group, as Pfizer/BioNTech's construction wrongly requires.[12]

Black letter law is unequivocal on this point.  *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1302 (Fed. Cir. 2006) (describing "included" as a "non-limiting word"); *Pharmacyclics LLC v. Acerta Pharma B.V.*, No. 17-CV-1582-RGA, 2019 WL 3713841, at *6 (D. Del. Aug. 7, 2019) ("Like 'optionally,' the plain and ordinary meaning of 'include' is non-limiting").  The use of such non-limiting language cannot support the disavowal of groups other than amino acids.  *Acme Scale Co. v. LTS Scale Co., LLC*, 615 F. App'x 673, 679 (Fed. Cir. 2015) ("Rather, because the definition employs broad, inclusive, and non-limiting

---

[12]  Pfizer/BioNTech also errs by requiring the head group to be protonatable.  That incorrect argument is addressed in the next section on the claim term "head group."

expressions like 'broadly', 'include', 'such as', 'for example', and 'but not limited to,' the inclusion of devices such as forklifts, flatbed trucks and pallet trucks do not suggest that the '946 patent was intended to be limited strictly to these devices.")(internal quotations omitted); *Novartis Pharms. Corp. v. Par Pharm., Inc.*, No. CV 14-1494-RGA, 2015 WL 6126803, at *3 (D. Del. Oct. 16, 2015) ("the numerical percentage recited in the specification is preceded by the non-limiting phrase 'may conveniently be,' which weighs against adopting a claim construction that is limited to what follows the phrase."); s*ee also Conoco, Inc. v. Energy & Env't. Int'l, L.C.*, 460 F.3d 1349, 1357-58 (Fed. Cir. 2006) (The disavowal "must be clear . . . and cannot draw limitations into the claim from a preferred embodiment."); *Sonrai Memory Ltd. v. Kingston Tech. Co., Inc.*, No. 621CV01284ADADTG, 2022 WL 3640302, at *11 (W.D. Tex. Aug. 23, 2022) ("In particular, the alleged definitional passage uses permissive, non-limiting language… and expressly describes that this claim term includes other embodiments… Based on these reasons the Court does not find that this passage recites a clear definition.").

Confirming its error, Pfizer/BioNTech's proposed construction would read out hundreds of embodiments by requiring that the head group be "amino acid containing." *See Knowles Elecs. LLC v. Iancu*, 886 F.3d 1369, 1375 (Fed. Cir. 2018) (internal quotation omitted) ("[The] proffered construction would improperly read this embodiment out of the patent . . . . A claim construction that does not encompass

a disclosed embodiment is . . . rarely, if ever, correct.").  A POSA would understand that "amino acids" share several common features, including a carboxylic acid group, which is made up of a carbon double bonded to one oxygen (also called a carbonyl) and single bonded to another oxygen, as seen below:



*See also* Ex. G (Lehninger – Principles of Biochemistry) at 72-81.

The specification provides a list of the "representative head groups" presented in Table 2A at 61:25-67:20. None of these head groups contain a structure that a POSA would understand as an "amino acid" because none of those head groups contain a carbonyl group (*i.e.,* a carbon double bonded to an oxygen), much less a carboxylic acid group.  *See* '933 Patent at Table 2A at 61:25-67:20. Simply put, the

specification discloses representative head groups that are not "amino acid containing."

Likewise, there are hundreds of molecules identified in the specification as "cationic lipids" that do not contain a carbonyl group (a carbon double bonded to an oxygen) in the head group, much less an amino acid, such as:



**Head group**

*See* '933 Patent at 76:18-24; 97 (fifth structure – annotated – showing no carbonyl group in the head group); *see also* Ex. D (annotating columns 75 to 354 of the '933 Patent to indicate over 480 structures that do not contain an amino acid head group). A construction that reads out hundreds of embodiments cannot be correct.

In short, nothing in the claims or the specification require a construction that is narrower than the plain and ordinary meaning of cationic lipid. *See Wasica Fin. GmBH v. Cont'l Auto. Sys., Inc,* 853 F.3d 1272, 1281 (Fed. Cir. 2017) (quoting *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed. Cir. 2013) ("It is axiomatic that we will not narrow a claim term beyond its plain and ordinary meaning unless there is support for the limitation in the words of the claim, the

specification, or the prosecution history.").  Pfizer/BioNTech's construction errs by improperly limiting cationic lipid while Alnylam's plain and ordinary meaning is solidly grounded in the claim language and the specification.

### 2.    Pfizer/BioNTech's Answering Position

The parties' claim construction dispute with respect to "cationic lipid"[13] is narrow.  As Plaintiff acknowledges, the parties agree that a cationic lipid, as the term is used in the Patents-in-Suit, must have at least one protonatable group, and thus, be protonatable.  *Supra* at I.B.1.    The dispute concerns the location of the protonatable group.  Defendants contend that the head group must contain the protonatable group, whereas Plaintiff contends that the head group can be neutral, thereby permitting the protonatable group to exist elsewhere in the lipid. Defendants' construction reflects the express definition in the written description, which recites a protonatable head group, as well as the scope of protonatable cationic lipid embodiments, each and every one of which contains a protonatable head group.

---

[13] Plaintiff does not argue in its Opening Brief that the preamble language "cationic lipid" is not limiting.  In any case, "cationic lipid" provides antecedent basis for the term "lipid" that appears later in claim 18—i.e., "the lipid has a pKa . . ."—as well as for language in each dependent claim—e.g., "the cationic lipid of claim 1 . . ." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citing *Bell Commc'n Rsch., Inc. v. Vitalink Commc'n Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995)) ("[D]ependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention.").

In contrast, Plaintiff's construction is overly broad, capturing lipids with neutral head groups that are not described anywhere in the written description. Plaintiff declares that its construction is the plain and ordinary meaning, but fails to explain why that is the case. As explained above, and as Plaintiff acknowledges, the use of "cationic lipid" at the time of the alleged invention was changing, so there was no plain and ordinary meaning. "[A]bsent such an accepted meaning [in the art], we construe a claim term only as broadly as provided for by the patent itself." *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004). The written description here does not allow for a broad construction that includes lipids with neutral head groups.

> a.   The Written Description Expressly Defines "Cationic Lipid."

The first entry under the "Definitions" section of the written description expressly defines "cationic lipid":

> As used herein, the term "cationic lipid" includes those lipids having one or two fatty acid or fatty aliphatic chains and an amino acid containing *head group that may be protonated* to form a cationic lipid at physiological pH. In some embodiments, a cationic lipid is referred to as an "amino acid conjugate cationic lipid."

'933 Patent at 410:55–62 (emphasis added). Defendants' construction reflects this express definition. Where, as here, the inventors have defined a term in the written description, "the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d

1303, 1316 (Fed. Cir. 2005) (en banc); *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1356 (Fed. Cir. 2014) ("Under our precedent, the patentee's lexicography must govern the claim construction analysis.").  The Court should adopt Defendants' construction and hold Plaintiff to the definition its inventors chose to include in the written description.

Plaintiff counters that "includes" in the definition of "cationic lipid" renders the definition "open-ended."  *Supra* I.B.1.  As an initial matter, merely using "includes" does not negate an express definition.  *See, e.g.*, *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 957 (Fed. Cir. 2014) (finding the following definition to be lexicographic: "'Treating hair loss' *includes* arresting hair loss or reversing hair loss, or both, and promoting hair growth.").

Plaintiff's cited cases are not to the contrary.  For example, Plaintiff quotes the Appellee's argument in *Acme Scale Co. v. LTS Scale Co.*, that, "because the definition [of material handling vehicle] employs 'broad, inclusive, and non-limiting expressions like "broadly," "include," "such as," "for example," and "but not limited to,"' the inclusion of devices such as forklifts, flatbed trucks and pallet trucks do not suggest that the . . . patent was intended to be limited strictly to these devices."  615 F. App'x 673, 679 (Fed. Cir. 2015) (quoting Appellee's Br. 24).  The Court, however, rejected this argument and Appellee's broad construction in favor of a narrower construction limited to devices that can move and whose function is to

transport the material to be measured "in light of the subspecies of material handling transportation vehicles identified in the . . . patent." *Id*. This Court should likewise reject Plaintiff's broad construction in light of the express definition and the millions of cationic lipids described in the written description, none of which have neutral head groups.[14] *See, e.g., Astrazeneca AB. v. Mut. Pharm. Co.*, 384 F.3d 1333, 1340–41 (Fed. Cir. 2004) ("The fact that all of the solubilizers listed in the specification and used in the working examples were surfactants adds further support to the conclusion that the term 'solubilizer' in the claims should be limited, according to the definition employed in the specification, to surfactants.").

Even if the use of "includes" were to render the definition open-ended, as Plaintiff claims, the skilled artisan would not have understood it to capture lipids with neutral head groups because the written description—a skilled artisan's first stop to understand the invention's scope—never contemplates neutral head groups. *See* Section I.C.2.b, *infra*.[15] Rather, the most reasonable reading of "includes" is that the definition contemplates cationic lipids with permanently charged head

---

[14] Plaintiff's remaining cases, *supra* I.B.1, are also factually distinguishable. For example, most of the cases do not involve an express definition. *See, e.g., Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1302 (Fed. Cir. 2006); *Novartis Pharms. Corp. v. Par Pharm., Inc.*, C.A. No. 14-1494-RGA, 2015 WL 6126803, at *3 (D. Del. Oct. 16, 2015); *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1357–58 (Fed. Cir. 2006).

[15] Indeed, only years later after learning of the lipid structure of Defendants' breakthrough COVID-19 vaccine, did Plaintiff reimagine the word "includes" as a blank check to capture lipids not described in the written description.

24

groups and "includes" those with protonatable head groups. This is confirmed by the definition itself, which states that the head group "may be protonated *to form a cationic lipid*," thus expressly recognizing that "cationic lipid" also refers to lipids that already have a positive charge in the head group. '933 Patent at 410:59–60 (emphasis added). As explained above, *supra* at I.A.2.b, traditional cationic lipids had permanently charged head groups, and the inventors' lexicography clarifies that, in the Patents-in-Suit, "cationic lipid" also "include[s]" the newer types of lipids with protonatable head groups.[16]

Plaintiff also proffers the red-herring argument that the "amino acid containing" language in the express definition should not limit "cationic lipid" because it excludes certain embodiments. Defendants included "amino acid containing" in their construction because it is the language that the inventors chose when defining "cationic lipid." *See, e.g.*, *Braintree*, 749 F.3d at 1356 (enforcing lexicography despite argument that doing so excludes a preferred embodiment); *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138 (Fed. Cir. 2007) ("Example 10 is merely one of twenty-one distinct examples set out in the two specifications . . . . Where, as here, multiple embodiments are disclosed, we have

---

[16] Accordingly, Defendants do not object to a construction of "cationic lipid" that includes permanently charged head groups if the Court deems this additional language necessary for completeness—e.g., "a lipid having . . . a head group with a permanent positive charge or that may be protonated to form a cationic lipid at physiological pH."

previously interpreted claims to exclude embodiments where those embodiments are inconsistent with unambiguous language in the patent's specification or prosecution history."); *see also TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("Our precedent is replete with examples of subject matter that is included in the specification, but is not claimed.").  In any case, Plaintiff's argument that the "amino acid containing" language is not limiting does not support that the definition allows for neutral head groups, as Plaintiff now contends.

> b.    Plaintiff's Construction Is Not the Plain and Ordinary Meaning.

Plaintiff repeatedly declares that its construction is the plain and ordinary meaning of "cationic lipid."  *Supra* at I.B.1.  But Plaintiff's failure to explain why or provide any meaningful supporting evidence is glaring.  Plaintiff states without any explanation that the passage—"in *certain embodiments*, the cationic lipids have at least one protonatable or deprotonatable group"—"provides necessary context." *Id*.  But this passage is not an affirmative statement that a protonatable group can be anywhere in a cationic lipid, such that a cationic lipid can have a neutral head group. In any case, this single passage falls well short of establishing a plain and ordinary meaning, particularly given that the term "cationic lipid" had no single meaning.  *See supra* at I.A.1–2.

If anything, the various uses of the term "cationic lipid" in the art align with Defendants' construction.  Indeed, prior art references cited on the face of the

Patents-in-Suit define or otherwise use the term "cationic lipid" to refer to lipids with a protonatable or permanently charged head group.  *V-Formation*, 401 F.3d at 1311 (explaining that such references "constitute[] intrinsic evidence").

For example, Chesnoy & Huang (2000) uses "cationic lipid" to describe a tertiary (protonatable) or quaternary (permanently charged) ammonium in the head group:

> All cationic lipids are composed of three parts: a hydrophobic anchor, a linker, and <u>a head group</u> (Figure 1).
>
> ****
>
> <u>Head Group</u>: The number of charges on the head group determines whether the cationic lipid will be monovalent or multivalent. In monovalent lipids, the <u>head group consists of either tertiary or quaternary ammonium groups</u>.

Ex. J, 28-29; 31 (ALNY-00946767–946768; ALNY-00946770) (emphasis added).

Tang & Hughes (1999) similarly teaches that the head group contains the positive charge:

> "<u>All cationic lipid</u> molecules contain three functional domains: <u>a positive charged head group</u>, a hydrophobic region, and a linker that tethers the cationic group and hydrophobic groups."

Ex. I, 345-346 (ALNY-00955148–955149) (emphasis added).  These references do not contemplate that the head group of cationic lipids can be neutral, as Plaintiff now contends.

In short, Plaintiff is declaring that its construction is the plain and ordinary meaning because there is no intrinsic evidence to support its construction, but Plaintiff proffers *no* meaningful evidence of plain and ordinary meaning in its Opening Brief.

### 3.    Alnylam's Reply Position

The parties dispute both the meaning of "cationic lipid" and "head group." *See supra* at §I.C (dispute on "head group"). Alnylam addresses Pfizer/BioNTech's arguments in turn, but as the Court will quickly observe, the disputes are intertwined, and Pfizer/BioNTech's position hinges on its overly narrow proposed construction of "head group."

Alnylam's proposed construction of "cationic lipid" is consistent with its plain and ordinary meaning. Pfizer/BioNTech seeks to limit the construction of "cationic lipid" to read in additional limitations, including that the head group of the cationic lipid must be narrowly construed to be protonatable. Pfizer/BioNTech's construction also reads out hundreds of embodiments disclosed in the specification. Pfizer/BioNTech dismisses that inconvenient fact as a "red herring."

### a.    Pfizer/BioNTech's Suggestion that The Written Description Expressly Defines "Cationic Lipid" Should be Rejected.

Pfizer/BioNTech argues that the written description expressly defines "cationic lipid" in accordance with their overly narrow, non-infringement motivated,

claim construction (§I.C.2.a). [17]   They are incorrect.   Well-established case law

requires that claims should be given their plain and ordinary meaning except where

the patentee provides a clear definition to the contrary.   *See Innovative Props*, 725

F.3d at 1333.   Here, the specification does not contain the express lexicographic

language necessary to deviate from the plain and ordinary meaning of "cationic

lipid."

There is no dispute that the specifications include the following description of

cationic lipid:

> As used herein, the term "cationic lipid" *includes* those lipids having
> one or two fatty acid or fatty aliphatic chains and an amino acid
> containing head group that may be protonated to form a cationic lipid
> at physiological pH. In some embodiments, a cationic lipid is referred
> to as an "amino acid conjugate cationic lipid."

'933 Patent at 410:55–62 (emphasis added).

"Includes" is an open term, not a closed term.   Pfizer/BioNTech's case law

therefore misses the point.   For example, Pfizer/BioNTech failed to inform this Court

that in *Allergan*, "[a]ll parties, as well as the district court, agreed that the

specification provides an express definition for the term," and therefore, the Federal

---

[17]  To the extent that Pfizer/BioNTech is attempting to raise a veiled written
description argument under 35 U.S.C. § 112 here, their arguments are misdirected.
It is well-established that this Court need not take up invalidity questions under
Section 112 at this stage of the proceedings.   Rather, Courts only turn to a validity
analysis during claim construction as a last resort to construe otherwise ambiguous
claims.  *See Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC,* 824 F.3d 999,
1004 (Fed. Cir. 2016).

Circuit did not address what impact "includes" had on whether there was an express definition. *Allergan*, 754 F.3d at 957. There is no such agreement here, but there is a specification ripe with embodiments that Pfizer/BioNTech seeks to read out of the claims by improperly limiting includes, *infra*.

Pfizer/BioNTech's reliance on *Acme* is equally flawed. *Acme* did not address the open-ended use of "includes" in the context of a specification similar to that before this Court. Rather, the *Acme* court simply made the common-sense ruling that the attachment of a roller to a table does not make the table a vehicle, much less the "material handling vehicle" required by the claim language. *Id.* The court did not find, as Pfizer/BioNTech suggests, that a "material handling vehicle" must be limited to the disclosed examples – "a fork lift truck, a flatbed truck, or a pallet truck" or even to commercial transportation vehicles. *Id.*

Pfizer/BioNTech's reliance on *AstraZeneca* is also misplaced. Pfizer/BioNTech suggests that *AstraZeneca* supports their argument that "cationic lipid" should be limited to the disclosed examples. This is incorrect. The patent in *AstraZeneca* (1) used clear definitional language, not "including" language, (2) disparaged other potential options, and (3) used "especially preferred" when describing embodiments. *AstraZeneca*, 384 F.3d at 1339-41. In contrast, the specification here does not have clear definitional language, disparage other options,

or use "especially preferred" when describing the limitations Pfizer/BioNTech is attempting to import.

Pfizer/BioNTech's  last and somewhat desperate argument is that "includes" as used in the specification with respect to cationic lipids should be read to mean that cationic lipids may *only* include permanently positively charged lipids and lipids having one or two fatty acid or fatty aliphatic chains and an amino acid containing head group that may be protonated to form a cationic lipid at physiological pH. Pfizer/BioNTech cites no support in the specification or the case law to support this argument.    And, particularly when compared to the hundreds of disclosed embodiments that do not fall within those two categories, it must be rejected. *See supra* at 20 (Alnylam's Opening).

Pfizer/BioNTech's suggestion that the Court make this into a numbers game should also be rejected.  There are many examples in the specification.  There may even be more that would fall within Pfizer/BioNTech's proposed construction.  But if the Court limited the claims to Pfizer/BioNTech's construction it would read out hundreds of disclosed embodiments.

As discussed in Alnylam's Opening Position, there are over 480 specific embodiments which are described as "cationic lipids of the present invention,"  that do not have the "amino acid containing head group," which would be required by Pfizer/BioNTech's proposed construction.  *See* '933 Patent at 76:19-21; Ex. D

(highlighting the over 480 structures of the present invention lacking amino acid containing head groups).  It is black letter law that a "claim construction that does not encompass a disclosed embodiment is . . .  rarely, if ever, correct." *See Knowles Elecs.*, 886 F.3d at 1375 (internal quotation omitted).

When faced with clear evidence that Pfizer/BioNTech's proposed construction would import improper limitations into the claim and read out hundreds of embodiments, Defendants resorted to calling Alnylam's position a "red-herring argument." *See supra* at 25 (Pfizer/BioNTech's Answering).  Pfizer/BioNTech suggests that the Court ignore the excluded embodiments, arguing that the law allows this Court to import limitations even if it would exclude embodiments.  The Court should not follow.  The specification in *Braintree* used clear, definitional language, providing the requisite "highly persuasive evidentiary support." *Braintree*, 749 F.3d at 1356. Here, by stark comparison, the so-called definitional language in the specification is transparently open, merely explaining a type of cationic lipid that is included in the claimed invention.

Pfizer/BioNTech's  attempt to rely on portions of *Sinorgchem* to prop up their proposed construction is also misplaced.  In *Sinorgchem*, the court found that a  term was "expressly defined" in the specification, even though it excluded a single example. *Sinorgchem*, 511 F.3d at 1139.  Here, Pfizer/BioNTech's proposed construction would exclude hundreds of disclosed embodiments.  Further, the

*Sinorgchem* court observed that the sole embodiment that fell outside the district court's construction would not even have been apparent to a POSA, noting that it could "only be determined by a complex calculation." *Id.* at 1140. There is no comparable confusion or complexity here. Rather, on its face, the specification describes hundreds of embodiments excluded under Pfizer/BioNTech's proposed construction.

b.    Cationic Lipid Has a Plain and Ordinary Meaning

Pfizer/BioNTech also takes the position that "cationic lipid" has no plain and ordinary meaning. *See supra* at §I.B.2.b. Pfizer/BioNTech's only support for this position is two papers, one from 1999 and the other from 2000, that discuss certain cationic lipids. That does not mean that a POSA in 2011 would not know what a "cationic lipid" was. Nor does it mean that "cationic lipid" had no plain and ordinary meaning. A POSA in 2011 would understand meanings of "cationic" and "lipid," as well as the term "cationic lipid," as evidenced by dictionary definitions. A 2008 scientific dictionary defined "cationic lipid" in part as "made of 12–18 carbon atom chains and single or multiple cations of amines." Ex. M. There is no reference in this definition to the location of the cationic amine. This also comports with the dictionary definition of "cationic" and "lipid." *See Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1381–82 (Fed. Cir. 2022) (applying the meaning of individual words when construing claim term). The term "cationic" simply means

33

relating to or characterized by a cation, which in turn means an ion having a positive charge. Exs. N, O, and P. Cationic has been used in this way by scientists for almost a century. Exs. N and P. Similarly, the definition of lipid as a water insoluble organic compound, like fats and waxes, has existed for more than as century. Exs. Q and R.

Rather than address the clear plain and ordinary meaning, Pfizer/BioNTech points the Court to third-party prior art cited in Information Disclosure Statements during prosecution, but never discussed by either Alnylam or the examiner. The Federal Circuit has stated that it "is rare that references that were submitted with a disclosure document, but not even cited by the examiner, are probative of an intent to depart from the plain technical meaning of terms used in the specification and claims." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1357–58 (Fed. Cir. 2007); *see also Phillips*, 415 F.3d at 1317 (describing a patent's prosecution history as "less useful for claim construction purposes" than the specification). Because "cationic lipid" has a plain and ordinary meaning, the Court should not look to the references merely cited on the face of the patent, but never discussed during prosecution, to support a different construction.

### 4. Pfizer/BioNTech's Sur-Reply Position

The parties dispute whether "cationic lipid" should be construed consistent with the lexicographic definition to require a protonatable head group (Defendants'

construction) or broadened to include neutral head groups (Plaintiff's construction). Through two rounds of briefing, Plaintiff has not identified a single disclosure in the written description, prior art, or any other extrinsic evidence of a "cationic lipid" with a neutral head group to support its alleged "plain and ordinary meaning" construction. These sources, including Plaintiff's own extrinsic evidence "definition," only include examples where the positive charge is located in the head group, consistent with Defendants' construction.

> a.     The Intrinsic Evidence Supports Only Cationic Lipids with Protonatable, Not Neutral, Head Groups.

The written description expressly defines "cationic lipid" and makes no reference to neutral head groups. The term is the first entry under the "Definitions" section, it is offset by quotation marks, and the passage states "[a]s used herein" before providing the definition. '933 Patent at 410:55-60. This is not a mere "description," as Plaintiff suggests. *Supra* at I.B.3.a. It is the inventors' lexicographic definition, and it should be adopted by the Court. *Supra* at I.B.2.

Plaintiff asserts that the use of "includes" means the definition is open-ended. But even if correct (it is not, *supra* at I.B.2.a), this argument does not mean the term can be expanded beyond what the remainder of the written description supports. Indeed, the open-endedness of a disclosure is not evidence that it includes a specific unrecited feature without *some* support for the specific feature. Plaintiff has identified *no* intrinsic or extrinsic evidence here that justifies broadening the express

35

definition to include neutral head groups. In fact, there is no dispute that all the cationic lipid examples in the written description have protonatable (or permanently charged) head groups. And it is telling that the only specific lipid structure with a neutral head group that Plaintiff identifies as a "cationic lipid," *supra* at I.A.1.b, appears to be *hypothetical*—Plaintiff cites to nothing in the written description or prior art that discloses this lipid structure, let alone that describes it as a "cationic lipid."

Plaintiff also argues that Defendants' construction is wrong because the "amino acid containing" language, which comes verbatim from the lexicographic definition, excludes a number of embodiments. *Supra* at I.B.3. But the claims need not cover every disclosed embodiment. *TIP Systems*, 529 F.3d at 1373 ("Our precedent is replete with examples of subject matter that is included in the specification, but is not claimed."). And the patentee, as the patent drafter, should be held to its words, even if the result is "nonsensical." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).[18] Regardless, this argument is not relevant to the primary dispute: whether the head group of a cationic lipid is

---

[18] Moreover, any ambiguity should be construed against Plaintiff. *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1336 (Fed. Cir. 2013) (Plager, J., concurring) (advocating for application of *contra proferentem* in claim construction: "When a term is ambiguous . . . the ambiguity should be construed against the draftsman.").

protonatable or can be neutral.  It is only a distraction from the glaring absence of any intrinsic support for neutral head groups.[19]

                       b.      Plaintiff Failed to Establish that its Proposed Construction Is the Plain and Ordinary Meaning.

Plaintiff's Opening Brief contains no meaningful evidence of plain and ordinary meaning, and the new extrinsic evidence in its Reply Brief actually undercuts its position.

For example, Plaintiff highlights a dictionary definition for "cationic lipid" stating, in part, that cationic lipids have 12-18 carbon atom chains and amine cations. Ex. M.  Plaintiff incorrectly asserts that "there is no reference in this definition to the location of the cationic amine."  *Supra* at I.B.3.b.  Remarkably, Plaintiff overlooks that all three cationic lipid examples in the definition—DOTMA, DOGS, and DOPE—have a cationic amine *in the head group.*  Ex. J. at 29, 32 (DOTMA and DOGS); Ex. U, Lv et al., *Toxicity of Cationic Lipids and Cationic Polymers in Gene Delivery*, 114 J. CONTROLLED RELEASE, 100, 103 (2006) (DOPE).  Thus, like the written description, even Plaintiff's apparent best piece of extrinsic evidence only describes head groups *where the charge is in the head group* and never mentions uncharged neutral head groups.

---

[19] If Plaintiff believes that the "amino acid containing" language should be excluded from the construction, and the Court is inclined to agree, Defendants do not object.

Plaintiff's dictionary "definition" also contradicts the recited structural limitations of the claimed "cationic lipid." The "definition" requires "12-18 carbon atom chains," Ex. M, whereas the asserted claims require 21 to 26 carbon atom chains. '933 Patent at 538:32-33. This inconsistency—unaddressed by Plaintiff—confirms there was no plain and ordinary meaning.

Plaintiff's argument that neutral head groups are included within the scope of "cationic lipid" because they are not affirmatively excluded fails. Neither the intrinsic nor extrinsic evidence supports a meaning that encompasses neutral head groups. *Intel*, 21 F.4th at 793 ("[T]he question is what the contextually correct meaning *is*, not whether anything affirmatively limits an undisputed ordinary meaning.").

C.    <u>"head group"</u>

| Term | Alnylam's Construction | Pfizer/BioNTech's Construction |
|---|---|---|
| Head group<br><br>'933 all asserted claims<br>'979 all asserted claims | Plain and ordinary meaning, which is "a portion of the lipid molecule that is less hydrophobic than the hydrophobic tails" | "a group that may be protonated at physiological pH." |

1.    Alnylam's Opening Position

The term "head group" of the cationic lipid should be afforded its plain and ordinary meaning in light of the claims and the specification, which is "a portion of

the lipid molecule that is less hydrophobic than the hydrophobic tails." As with its error in limiting the cationic lipid to head groups that contain amino acid structures, Pfizer/BioNTech further errs by attempting to read into the claim term "head group" that it "may be protonated at physiological pH." This too is fatally flawed.

At the outset, nothing in the claim language itself states that the head group must be "protonatable." The claim language states: "the primary group comprises (i) a head group that optionally comprises a primary, secondary, or tertiary amine, and (ii) a central moiety to which the head group and the two biodegradable hydrophobic tails are directly bonded." '933 Patent at Claim 18. There is no claim requirement that the head group be protonatable. This plain claim language is consistent with the plain claim language in U.S. Patent 11,590,229, which is a continuation of the '933 Patent. There, the claims state "wherein the head group consists of a saturated aliphatic group and a hydroxyl group." *See* Ex. C ('229 Patent) at Claims 16, 28. A POSA would understand that these head groups are not protonatable at physiological pH. *See* Ex. H (Ege – Organic Chemistry Structure and Reactivity) at front cover (providing pKa values).

Pfizer/BioNTech's construction goes too far and attempts to limit the meaning to only specific types of less hydrophobic groups, *i.e.*, "positively-charged or protonatable group". The intrinsic evidence does not require such a limited construction. Presumably, Pfizer/BioNTech will point again to the open-ended

definition of cationic lipid to support its position. As discussed in "cationic lipid," *supra*, this open-ended definition is not limiting. *See* Section I.B.1.

Further, while the specification does provide examples where the head group is a protonatable group, it does not require it. For example, the specification states "[t]he head group can include an amine; for example an amine having a desired pKa . . . . The head group amine can be a cationic amine." '933 Patent at 32:48-56. This means that the head group can be an amine, which could be protonatable, but it does not have to be, as the word "can" clearly conveys.[20] In fact, the specification also unequivocally states "[o]ther head groups are suitable as well." '933 Patent at 32:63-64. Such open-ended language highlights the error in Pfizer/BioNTech's construction.

Reading the limitation into "head group" that it "may be protonated at physiological pH" is nothing more than an attempt to limit improperly the claim scope. Even when every embodiment in a specification contains a certain limitation, the claims are not so limited. *See SSI Techs., LLC v. Dongguan Zhengyang Elec. Mech. LTD.*, 59 F.4th 1328, 1336 (Fed. Cir. 2023) (citing *Teleflex, Inc. v. Ficosa N.*

---

[20] The parties in the Moderna Matter agree that "optionally comprises a primary, secondary, or tertiary amine" means "may or may not contain an amine, where the amine may be primary, secondary, or tertiary." Moderna therefore has agreed that the head group does not need to contain an amine. Without an amine, the head group may or may not be protonatable at physiological pH, highlighting again the error in Pfizer/BioNTech's construction that the head group is where the proton must attach.

*Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002) ("The specification of the '038 patent, however, contains no requirement regarding the size of the filter openings. Although *it is true that each embodiment disclosed* in the '038 patent contains a mesh filter, which has very small openings, the scope of a claim *is not ordinarily limited to preferred embodiments or specific examples in the specification*.") (emphasis added). Pfizer/BioNTech's construction is erroneous and violates basic canons of claim construction.

The plain and ordinary meaning of "head group" aligns most naturally with the plain claim language and the intrinsic evidence.

### 2.    Pfizer/BioNTech's Answering Position

As with "cationic lipid," the parties dispute whether the "head group" of cationic lipids must be protonatable.[21] Defendants' construction, which requires the protonatable group to be in the head group, is supported by the intrinsic evidence. In contrast, Plaintiff's overbroad construction, which encompasses neutral head groups, does not appear anywhere in the written description. Plaintiff again declares that its construction is the plain and ordinary meaning, but offers no supporting

---

[21] Defendants understand the dispute over "head group" to concern the head groups of protonatable cationic lipids, as per the parties' constructions of "cationic lipid." Nonetheless, as with "cationic lipid," Defendants do not object to a construction of this term that includes permanently charged groups if the Court deems this additional language necessary for completeness—e.g., "a group that has a permanent positive charge or may be protonated at physiological pH."

evidence. But if anything about "head group" can be gleaned from the art, it is that the "head group" carries the positive charge—whether permanent or achieved by protonation. *Supra* at I.B.2.b. This is precisely the feature Plaintiff disregards. Ultimately, because "head group" had no plain and ordinary meaning, the Court should construe "head group" consistent with the scope of the disclosure in the written description. *See Irdeto*, 383 F.3d at 1300 ("[A]bsent such an accepted meaning [in the art], we construe a claim term only as broadly as provided for by the patent itself.").

a. The Claim Language Supports Defendants' Construction.

Plaintiff contends "that nothing in the claim language itself states that the head group must be 'protonatable.'" *Supra* at I.C.1. But under Plaintiff's rationale, nothing in the claim language requires that the head group be "less hydrophobic than the hydrophobic tail." In fact, the plain language of the claims is consistent with Defendants' construction because it recites "a head group that optionally comprises a primary, secondary, or tertiary amine," which are protonatable groups. By contrast, the plain claim language never contemplates Plaintiff's construction. As Plaintiff acknowledges, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC*

*v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  The plain claim language here is aligned with Defendants' construction.

        b.    The Written Description Only Describes Cationic Lipids with Protonatable or Permanently Charged Head Groups.

Each protonatable cationic lipid described in the written description has a protonatable head group and each description of a protonatable group is specifically in the context of the head group.  In contrast, there are no examples of cationic lipid head groups that are neutral.  The written description "is the single best guide to the meaning of a disputed term" and "[u]sually, it is dispositive." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted).  Consistent use of a term in a specific way in the written description informs the proper construction. *See, e.g., Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 793 (Fed. Cir. 2021) ("We find this consistency compelling.").

For example, the "Summary" section in the written description describes eight generic cationic lipid formulas that cover millions of cationic lipids. '933 Patent at 2:13–16:44.  Importantly, every one of the millions of permutations of Formulas (I) through (VII) contains a protonatable or permanently charged head group, depending on the permutations at R'.  *Id*. at 2:7–15:65; Certificate of Correction. That is because each formula has a nitrogen atom in the head group that can only be a protonatable tertiary amine or a permanently charged quaternary ammonium cation.  *Id*.  The *constant* presence of such a head group across all cationic lipid

43

formulas, especially where most of the other positions are variable, would have instructed the skilled artisan that this is a required feature. Similarly, each time the written description provides a "preferred embodiment" for the head group, it is a protonatable head group. *Id.* at 3:38–15:30. The eighth and last generic formula depicts the "head group" and "central moiety" together as a "primary group" then identifies various "[r]epresentative primary groups" and "[r]epresentative asymmetrical cationic lipids," each of which contains a protonatable head group. *Id.* at 16:53–19:12.

The "Detailed Description" section of the written description follows suit. After noting that "[t]he following disclosure represents various embodiments" of Formulas (I) through (VIII), *id.* at 29:62–30:12, it lists 49 "suitable head groups," 57 "[s]uitable primary groups," and 60 "[r]epresentative headgroups." *Id.* at 37:30– 44:20, 61:22–67:20 (Table 2A). Again, all the head groups are protonatable or have a permanent positive charge. None are neutral.

The ensuing disclosure of "[o]ther cationic lipids of the present invention"— 319 columns describing well over 1,000 cationic-lipid structures—only includes lipids with head groups that are protonatable or permanently charged. *Id.* at 76:18– 395:52. Again, none have neutral head groups. Similarly, every working example describes cationic lipids with protonatable or permanently charged head groups. *Id.* at 414:31–533:21. Indeed, Examples 36 and 37, the only examples that use cationic

lipids in lipid particles, exclusively disclose cationic lipids with protonatable head groups. *Id.* at 521:14-534:27.

Consistent with the definition and the millions of embodiments, where the written description specifically discusses protonatable groups in the context of cationic lipid substructure, it does so *only* in the context of the head group:

> Additional embodiments include a cationic lipid having <u>a head group</u>, one or more <u>hydrophobic tails</u>, and <u>a central moiety</u> between the head group and the one or more tails. The <u>head group</u> can include an amine. . . . The <u>head group amine</u> can be a cationic amine; a primary, secondary, or tertiary amine; the <u>head group</u> can include one amine group (monoamine), two amine groups (diamine), three amine groups (triamine), or a larger number of amine groups, as in an oligoamine or polyamine. The <u>head group</u> can include a functional group that is less strongly basic than an amine, such as, for example, an imidazole, a pyridine, or a guanidinium group. The <u>head group</u> can be zwitterionic. Other head groups are suitable as well.

*Id.* at 32:45–64 (emphasis added). Despite referencing the "central moiety" and the "one or more tails," this passage discusses protonatable groups *only* in the context of the "head group," and every description of a head group includes a protonatable or permanently charged group. Plaintiff's argument that the phrase "can include an amine" means that an "amine" is not required misses the point. *Supra* at I.C.1. An "amine" is simply one type of protonatable group. Even if the passage does not require an amine *specifically*, there is no description in this passage that

45

contemplates neutral head groups for cationic lipids, as Plaintiff's construction allows.

Plaintiff also wrongly latches onto the last sentence—"[o]ther head groups are suitable as well"—to suggest that the written description contemplates countless structurally undefined and undescribed head groups, including neutral head groups. *Supra* at I.C.1. But this residual sentence is best understood as referring to additional types of amine head groups like the kind listed in the passage. *See, e.g.*, *Gilead Scis., Inc. v. Lee*, 778 F.3d 1341, 1347 (Fed. Cir. 2015) ("[U]nder the rule of *ejusdem generis*, which means 'of the same kind,' where an enumeration of specific things is followed by a general word or phrase, the general word or phrase is held to refer to things of the same kind as those specified."); *IBM Corp. v. Iancu*, 759 F. App'x 1002, 1007 (Fed. Cir. 2019) (applying *ejusdem generis* in claim construction context). Because the passage deals exclusively with examples of amine-including cationic head groups, the most reasonable reading of the last sentence is that other amine-including head groups beyond those listed can be used. Indeed, all protonatable cationic lipids described in the rest of the written description include protonatable head groups. Thus, the skilled artisan would have had no reason to think that the "other" cationic lipid head groups referenced in this passage include neutral head groups, as Plaintiff now contends.

Similarly, even when the written description discusses permanently charged lipids, specifically, it contemplates the positive charge only in the head group structure:

> In <u>particular embodiments, the lipids are charged lipids</u>. As used herein, the term <u>"charged lipid" includes, but is not limited to, those lipids</u> having one or two fatty acyl or fatty alkyl chains and <u>a quaternary amino head group</u>. The quaternary amine carries a permanent positive charge. <u>The head group can optionally include an ionizable group, such as a primary, secondary, or tertiary amine that may be protonated at physiological pH. The presence of the quaternary amine can alter the pKa of the ionizable group</u> relative to the pKa of the group in a structurally similar compound that lacks the quaternary amine (*e.g.*, the quaternary amine is replaced by a tertiary amine).

'933 Patent at 396:32-44 (emphases added).  Thus, the remainder of the written description is consistent with every cationic lipid embodiment because it describes the "head group" as the "cationic" structure that renders a lipid a "cationic lipid."

The written description's consistency in describing the head group as being protonatable rises to the level of a definition "by implication." *See, e.g.*, *Trustees of Columbia Univ. in New York v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) (quoting *Phillips*, 415 F.3d at 1321); *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1196 (Fed. Cir. 2013) (explaining that redefinition "can be affected through repeated and definitive remarks in the written description." (internal quotation marks omitted)); *see also In re Power Integrations, Inc.,* 884 F.3d 1370, 1377 (Fed. Cir. 2018) (reversing broad construction where "every embodiment

disclosed" had a certain feature and "nothing in the specification suggest[ed] that the claims can be stretched to cover a system" without the feature); *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (affirming construction incorporating limitation not expressly mentioned in claim where "all the figures and embodiments disclosed in the asserted patents imply . . . or . . . disclose" the limitation and "the patents do not show or suggest any systems without" the limitation).

Furthermore, the written description's repeated references to lipids with protonatable head groups, but never neutral head groups, as "the present invention" gives rise to a disclaimer or disavowal of claim scope. The Federal Circuit has "found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes . . .' or 'the present invention is . . . .'" *Pacing Techs. LLC v. Garmin Int'l Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) (citing *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013)). Here, the written description repeatedly uses such language regarding what the "present invention includes." '933 Patent at 37:21–42:48 (stating "[t]*he present invention includes* compounds composed of any combination of the head and hydrophobic groups listed below," where each head group example is a protonatable or permanently charged head group); *id*. 61:22–26 (stating "[t]*he present invention includes* compounds composed of any combination of the head, linker, hydrophobic chain I, and hydrophobic chain II groups listed

48

below," where each head group example is protonatable or permanently charged); *id.* at 76:18–20 ("Other cationic lipids *of the present invention include* [list of lipids with protonatable or permanently charged head groups]."). These repeated and unmistakable statements equating the invention to lipids with protonatable head groups give rise to a disclaimer.

Plaintiff appears to acknowledge that every single protonatable cationic lipid embodiment discloses a protonatable head group, but relies on *SSI Technologies, LLC v. Dongguan Zhengyang Electronic Mechanical Ltd.,* 59 F.4th 1328 (Fed. Cir. 2023) to argue that "even when every embodiment in a specification contains a certain limitation, the claims are not so limited." *Supra* at I.C.1. First, the patent at issue in *SSI Techs.* discloses only two relevant "filter" embodiments. In contrast here, the written description is exhaustive, describing eight generic formulas covering millions of protonatable cationic lipids, and well over 1,000 specifically disclosed embodiments of protonatable cationic lipids—*each* with a protonatable head group. Second, Plaintiff ignores that the court's main rationale in *SSI Techs.* was that "the <u>general references</u> to a 'filter' in the specification are <u>quite broad and do not reflect an intent to limit</u> the term 'filter' to the disclosed embodiments." *Id.* at 1336 (emphasis added). The court explained that "in view of those statements . . . we do not construe the term 'filter' to require openings that are smaller than a particular size." *Id.* In contrast here, the written description repeatedly describes

49

the "head group" as protonatable, and discusses protonatable groups specifically in the context of the "head group," while never contemplating neutral head groups. Thus, this case is analogous to *In re Power Integrations, Inc.* and *Alloc, Inc.*, where the Court included limitations present in every embodiment and not otherwise treated as optional in the remainder of the written description.

       c.     The Family Prosecution History Supports Defendants' Construction.

During prosecution of the parent applications to the Patents-in-Suit, which spanned several years, Plaintiff only pursued claims to cationic lipids according to one or more of Formulas (I)-(VIII), which as discussed *supra*, require a protonatable or permanently charged head group, which is consistent with Defendants' construction:

| Application No. | Cationic Lipid Claims |
|---|---|
| 61/568,133 | Formulas I, II, III, IV, V, VIA, VIB, VII, and specific compounds according to Formulas I-VIII. |
| 61/623,274 | Formulas I, II, III, IV, V, VIA, VIB, VII, and specific compounds according to Formulas I-VIII. |
| 13/708,383 | Formulas III, IIIA, IV, and specific compounds consistent with Formulas I-VIII. |
| 14/677,801 | Formulas III, IIIA, and IV. |
| 16/520,183 | Intermediary compounds for synthesizing cationic lipids. |

At no time did Plaintiff pursue claims to cationic lipids with neutral head groups. Nor is there any argument in the prosecution history suggesting that "cationic lipid" can have a neutral head group. Therefore, the prosecution history

does not support broadening the meaning of "head group" to include structures that are neutral, as Plaintiff's construction allows.

            d.     There Is No Plain and Ordinary Meaning for Head Group.

Plaintiff asserts that its construction is the "plain and ordinary meaning" of "head group" without proffering any supporting evidence, never mind sufficient evidence to overcome the clear use of "head group" in the written description. *Supra* at I.C.1. Nor could it, because "head group" had no plain and ordinary meaning. *See supra* I.C.2. Rather, the meaning of head group evolved as the art developed— for example, from permanently charged head groups to protonatable head groups, as described above. Because "head group" has no plain and ordinary meaning, it must be construed according to the embodiments of the written description. *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016) (concluding that, where "terms have no plain or established meaning to one of ordinary skill in the art," they "ordinarily cannot be construed broader than the disclosure in the specification." (citing *Irdeto*, 383 F.3d at 1300)); *Irdeto*, 383 F.3d at 1300-01 (limiting term to the scope of the specification where "the specification consistently uses the term 'group' to refer to a subset of all subscribers" and that "[n]owhere does the specification contemplate a single group made up of the entire subscriber base").

e.    There Is No Intrinsic Evidence Support for Plaintiff's Construction.

Plaintiff does not identify *any* intrinsic evidence to affirmatively support its construction—because there is none. Indeed, the written description never discusses the hydrophobicity of the head group in relation to the hydrophobic tails and does not provide any hydrophobicity measurements for any disclosed head group or hydrophobic tail.

Moreover, the skilled artisan would not have understood that any chemical structure that is "less hydrophobic than the hydrophobic tails" would be a suitable head group for the cationic lipids described in the written description. This would lead to nonsensical results. For example, a chemical structure with a net negative charge may be less hydrophobic than some hydrophobic tails but would not function as a head group for a cationic lipid, which has a positive charge.

In summary, Plaintiff is asking this Court to adopt a construction for "head group" for which it has proffered *no* evidence of plain and ordinary meaning and *no* intrinsic evidence to affirmatively support its construction. In contrast, Defendants' construction is fully aligned with every embodiment of a head group and the remainder of the written description and, accordingly, should be adopted.

3.    Alnylam's Reply Position

Pfizer/BioNTech has provided no evidence sufficient to support deviating from the plain and ordinary meaning of "head group." To support their overly

narrow construction, Pfizer/BioNTech misconstrues other portions of the claim language, ignores relevant portions of the specification, and misreads the prosecution history of related patents.

  a.  Pfizer/BioNTech's Reliance on "Optionally" Language Is Incorrect

Pfizer/BioNTech improperly relies on an optional claim limitation to bolster their construction of "head group." *See* supra at §I.C.3.a. Specifically, Pfizer/BioNTech cites the portion of Claim 18 of the '933 Patent[22] that recites "a head group that optionally comprises a primary, secondary, or tertiary amine" to suggest that the head group *must* include an amine. Their overly narrow construction of "head group" must be rejected.

The use of "optionally" in a claim does not limit the claim. Rather, "optionally" means "may or may not." *See Cadence Pharms., Inc. v. Paddock Lab'ys Inc.*, 886 F. Supp. 2d 445, 462 (D. Del. 2012) ("consistent with the plain meaning of the term 'optionally,' the steps recited in these clauses do not necessarily have to be performed in order to practice the claimed method"); *Boehringer Ingelheim Pharms., Inc. v. Hec Pharm Co.*, 2017 WL 11633325, at *6 (D.N.J. Jan. 5, 2017) (finding the term "[a]n oral tablet formulation comprising [a DPP-IV inhibitor]… optionally in combination with metformin, and a pharmaceutically

---

[22] None of the claims of the '979 Patent include any portion of this language, further belying Pfizer/BioNTech's argument.

acceptable carrier or diluent" to mean the inhibitor may or may not be combined with metformin and a carrier or diluent, but does not have to be so combined).

Thus, the plain meaning of the claim phrase is "may or may not contain an amine, where the amine may be primary, secondary, or tertiary." Of note, in the Moderna Matter, Moderna has agreed to this construction. *See* Moderna Claim Construction Briefing at § III.[23] Pfizer/BioNTech's proposed construction would effectively change the word in the claim – "optionally" – to be its opposite – a mandatory prescription that the "head group" must include an amine. That is improper.

> b.  Pfizer/BioNTech's "Written Description" Arguments Should be rejected

Pfizer/BioNTech takes the erroneous position that the "written description" only supports protonatable head groups.[24] *See supra* at §I.C.2.b. The specification is not so limited. Pfizer/BioNTech's reliance on the "written description" is fundamentally flawed because it overemphasizes the structural drawings, seemingly without reference to portions of the written specification that belie their proposed construction. The intrinsic record for claim construction includes "the written

---

[23] In contrast to Moderna, Pfizer/BioNTech did not seek a claim construction of the "optionally" phrase. Pfizer/BioNTech should not now be permitted to raise this as effectively a new term for construction.

[24] As with "cationic lipid," to the extent that Pfizer/BioNTech is attempting to turn claim construction into a dispute about the adequacy of the written description under 35 U.S.C. § 112, it is misplaced. *See Ruckus Wireless*, 824 F.3d at 1004.

description, the drawings, and the prosecution history." *Teleflex*, 299 F.3d at 1324. The Court must consider all the intrinsic evidence, including the written text. *See id.*

Pfizer/BioNTech points the Court to the parts of the specification that describe head groups that are protonatable at physiological pH. But Pfizer/BioNTech ignores the passage from the specification clearly indicating that protonatable head groups are permissive, not mandatory – *e.g.*, that "[t]he head group amine *can* be a cationic amine." (emphasis added). *See* '933 Patent at 32:48-56. In fact, the specification describes other head groups which would not be protonatable at physiological pH, noting that "[t]he head group can include a functional group that is less strongly basic than an amine, such as, for example, an imidazole, a pyridine, or a guanidinium group." '933 Patent at 32:60-63. Pyridine has a literature pKa value of 5.2, which is significantly below physiological pH, and therefore would not be meaningfully protonated at physiological pH, particularly when incorporated into a lipid particle. *See* Ex. H at front cover.[25] The specification goes on to add that "[o]ther head groups are suitable as well." '933 Patent at 32:63-64. This directly contradicts Pfizer/BioNTech's unnecessarily narrow proposed claim language because a pyridine head group would not be protonatable at physiological pH.

_____

[25] *See also* Ex. S at 7 (discussing how the pKa of lipids drops by two to three units when incorporated into a lipid particle).

Further, the later-issued '229 Patent shows that the specification contains support for non-protonatable head groups – that is, head groups that "consists of a saturated aliphatic group and a hydroxyl group."[26]  In the '229 continuation patent, which shares an identical specification, the examiner allowed claims to non-protonatable head groups.  Information in a later prosecution of related patents can be relevant to claim construction, where, as here, the terms are identical.  *Cf. Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("Such statements are legally relevant to the meaning one of skill in the art would attribute to the identical term.").

Pfizer/BioNTech's attempt to argue there is a "definition by implication" or disavowal should also be rejected.  *See supra* at 48 (Pfizer/BioNTech's Answering).  Pfizer/BioNTech's two interrelated arguments both fail.  The specification provides no support for an implied definition nor is there any evidence of disavowal.

Pfizer/BioNTech relies on the *Trustees* decision.  In *Trustees*, the court found a definition by implication where the only contradictory language patentee could

---

[26] The same claim language  of "wherein the head group consists of a saturated aliphatic group and a hydroxyl group" is also found in other issued patents in the same family.  U.S. Patent No. 11,633,479 at Claims 8, 12, and 19; U.S. Patent No. 11,633,480 at Claims 10 and 11; and U.S. Patent No. 11,612,657 at Claims 19 and 23.  This further evidences that the Examiner allowed multiple claims across several patents that were limited to non-protonatable head groups.

point to was "inconsistent and confusing."  *See Trustees*, 811 F.3d at 1366. Pfizer/BioNTech has pointed to no such language here.

Further, several cases Pfizer/BioNTech cites for "definition by implication" do not even find a definition by implication, but rather rely on evidence of disavowal. So, Pfizer/BioNTech shifts to suggest disavowal.  But the cases do not support that finding either.   The court in *SkinMedica* relied on "clear and unmistakable" disavowals by the patentee in finding disclaimer, not a definition by implication. *SkinMedica*, 727 F.3d at 1199.  Such disavowals do not exist regarding "head group."   Similarly, *Alloc* has no reference to a "definition by implication" as Pfizer/BioNTech proports it does.  Instead, the court in *Alloc* relied in part on claim language to support including "play" in the construction because the features recited in the claim language meant that "play is necessarily present."  *Alloc*, 342 F.3d at 1368.  Pfizer/BioNTech ignores *Alloc*'s reliance on claim language because there is no parallel language in the specification here that shows a protonatable head group is necessarily present.

Similarly, Pfizer/BioNTech's reliance on *Power Integration* is misplaced.  In that case, the Federal Circuit reversed the PTAB's construction because the PTAB used a dictionary definition, divorced from "any consideration of the disclosure in the specification."  *Power Integrations*, 884 F.3d at 1375-76.  By contrast, as discussed above, Alnylam's proposed construction is consistent with how "head

group" is used in the specification, and, as discussed below, comports with the plain and ordinary meaning of "head group."

Pfizer/BioNTech also misconstrues *Pacing Techs.* It is true that the court in *Pacing Techs.* stated, "[w]e have found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes ...' or 'the present invention is ...' or 'all embodiments of the present invention are....'" *Pacing Techs.*, 778 F.3d at 1024 (internal citations omitted). But the specification here does not use disavowal statements of the sort in *Pacing Tech.* In stark contrast, the specification says "[t]he present invention *includes* compounds composed of any combination of the head and hydrophobic groups listed below" '933 Patent at 37:21–23. And Pfizer/BioNTech chooses to omit the very next line, which states "*[s]ome* suitable head groups include those depicted in Table 1A," thereby showing the non-limiting nature of the examples. *Id.* at 37:25-26 (emphasis added). Finally, as discussed above, the specification clearly describes other, non-protonatable head groups, which further undercuts Pfizer/BioNTech's disavowal argument.

Alnylam's citation of *SSI* is not, as Pfizer/BioNTech suggests, an admission of anything about the specification here. Rather, Alnylam cited *SSI* for the proposition that claims should not be limited to the embodiments disclosed in the

specification, which is something Pfizer/BioNTech's proposed construction seeks to do. *See SSI*, 59 F.4th at 1336.

c.    The Prosecution History of Related Patents Supports Alnylam's Proposed Construction, Not Pfizer/BioNTech's Proposed Construction

Next, Pfizer/BioNTech argues that Alnylam's earlier prosecution of other related patents limits the scope of the term "head group." *See supra* at §1.C.2.c. It does not. Tellingly, Pfizer/BioNTech do not quote any language that offers a definition of "head group." Rather, they attempt to rely on the mere fact that the head groups in the claims of the related patents were protonatable. This is of no moment. Alnylam is not arguing that there cannot be protonatable "head groups" – rather, Alnylam argues that the head group may or may not include a protonatable head group. And Pfizer/BioNTech do not dispute that each of the "head groups" in the related patents is less hydrophobic than its respective tails, thereby further supporting Alnylam's construction.

Further, it is a basic principle of patent prosecution that different inventions should be put into different patent applications. *See* 35 U.S.C. § 121; MPEP § 803. The fact that Alnylam chose to prosecute claims to lipids with protonatable head groups first, and then to prosecute lipids with nitrogen central moieties (where the head group is not protonatable) is not relevant to claim construction, as evidenced by the fact that Pfizer/BioNTech cited no case law to support this argument.

59

d.    There is a Plain and Ordinary Meaning of Head Group

Pfizer/BioNTech take the position that "head group" has no plain and ordinary meaning. *See supra* at §I.C.2.d.  This is incorrect.  The term "head group" was well known in the art of lipid chemistry prior to 2011.  It is consistently used, regardless of the type of lipid, to indicate the hydrophilic region of lipid molecule, as opposed to the hydrophobic tails.  For example, the Dictionary of Science shows the less hydrophobic region as the "hydrophilic head" and the more hydrophobic region as the "hydrophobic tails":



Ex. T (Dictionary of Science) at 460 (depicting lipid bilayer) (annotated).

e.    Alnylam's Construction Would Not Lead to a "Nonsensical Result"

Pfizer/BioNTech's argument that Alnylam's proposed construction would allow "a chemical structure with a net negative charge may be less hydrophobic than some hydrophobic tails but would not function as a head group for a cationic lipid, which has a positive charge" is nothing but a strawman.  *See supra* at 53

60

(Pfizer/BioNTech Answer).  The term "head group" does not stand alone – it is read in the context of the claim language.  *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) ("this court does not interpret claim terms in a vacuum, devoid of the context of the claim as a whole").  The claim requires a cationic lipid – which the parties agree is a lipid that must be capable of having a positive charge.  That positive charge must reside in either the head group or the central moiety, as provided for in the independent claims.[27]  Further, the claims require a cationic lipid, which means that the balance of charge in the lipid must add up to a positive number.  Pfizer/BioNTech's suggestion of a "net negative" chemical structure would not fall within any of the asserted claims because it is not cationic.

### 4.   Pfizer/BioNTech's Sur-Reply Position

There is no dispute that the written description specifically discloses hundreds of protonatable head groups (Defendants' construction), so the Court must determine whether the written description also supports neutral head groups (Plaintiff's construction).  It does not.  Indeed, despite a written description spanning more than 500 columns, Plaintiff has yet to identify a single disclosure of a neutral head group.

---

[27] The independent claims permits either a central carbon or a central nitrogen. Where the central moiety is a carbon, the positive charge will be in the head group. When the central moiety is a nitrogen, the positive charge will be in the central moiety.

And Plaintiff's newly proffered extrinsic evidence in its Reply Brief actually contradicts its purported plain and ordinary meaning.

        a.    The Intrinsic Evidence Supports Only Protonatable, Not Neutral, Head Groups.

Defendants explained in detail how *every* general formula, "suitable head group[]," [s]uitable primary group[]," "[r]epresentative headgroup[]," 1,000+ specifically disclosed embodiments, and both examples (36 and 37) where cationic lipids were used in lipid nanoparticles contain lipids with a protonatable (or permanently charged) head group. *Supra* at I.C.2. Thus, Plaintiff's assertion that Defendants "overemphasize the structural drawings, seemingly without reference to portions of the written specification that belie their proposed construction" is plainly wrong. *Supra* at I.C.3.b.

Plaintiff never confronts this overwhelming volume of intrinsic evidence supporting Defendants' construction. Instead, Plaintiff plucks a single passage from the hundreds of pages of written description—"[t]he head group amine can be a cationic amine"—to argue incorrectly that protonatable groups in the head group are not mandatory. '933 Patent at 32:48-56. Defendants previously addressed this passage and explained that the written description teaches "the head group can include an amine" and an "amine" is one type of protonatable group. *Supra* at I.C.2.b. Thus, this passage merely teaches that the protonatable group in the head

group can be an "amine"; it never suggests that the head group can have no protonatable group at all.

Moreover, Defendants' Answering Brief explains why their construction is consistent with the written description's statement that "[o]ther head groups are suitable as well." *Id.* (noting that this sentence references other protonatable head groups consistent with the previously enumerated examples, not a categorically different type of head group—i.e., a neutral head group—nowhere contemplated in the written description). Plaintiff ignores Defendants' explanations.

Plaintiff's new pyridine-containing head group argument in its Reply Brief also misses the mark. *Supra* at I.C.3. Plaintiff admits that a pyridine is protonatable, but cursorily asserts that it is not "meaningfully" protonatable at physiological pH. Setting aside the indefiniteness of Plaintiff's "meaningfully" protonatable criteria, Plaintiff proffers nothing but unsubstantiated attorney argument that a pyridine is not "meaningfully" protonatable at physiological pH.

Furthermore, Plaintiff is wrong that Defendants argue that the "optionally comprises . . ." claim language is limiting. In response to Plaintiff's argument about the plain claim language, Defendants explained that the claim language is more consistent with their construction than Plaintiff's because the claim language references protonatable amine head groups, but never mentions the head group's hydrophobicity. *Supra* at I.C.2.a.

Plaintiff also argues that claims in "the later issued '229 Patent show[] that the specification contains support for non-protonatable head groups." *Supra* at I.C.3.b. But if that were true, Plaintiff could simply identify such support in the Patents-in-Suit, which share the same written description, rather than relying on litigation-driven claims drafted more than a decade after the original specification was filed.

Plaintiff's reliance on *Teva* to support its argument is misplaced. In *Teva*, the court held the patentee to specific arguments it made to the PTO to overcome rejections during prosecution of a child application that were inconsistent with the patentee's proposed construction of identical claim language in a parent patent. *Teva*, 789 F.3d at 1343-44. That is not the case here.

> **b.**     **Plaintiff Failed to Establish that its Proposed Construction Is the Plain and Ordinary Meaning.**

Plaintiff included no evidence of plain and ordinary meaning in its Opening Brief, and the new extrinsic evidence in its Reply Brief actually repudiates Plaintiff's construction.

Notably, Plaintiff appears to proffer a new plain and ordinary meaning in its Reply Brief. Plaintiff originally argued the plain and ordinary meaning was "a group that is less hydrophobic than the hydrophobic tails" but asserts in its Reply Brief that the head group "is consistently used . . . to indicate the hydrophilic region of [sic] lipid molecule, as opposed to the hydrophobic tail." *Supra at* I.C.3.d (citing

64

dictionary definition for "lipid bilayer"[28] that identifies lipids with "hydrophilic" heads).

But a "hydrophilic" head group is substantively different from, and incompatible with, Plaintiff's proffered plain and ordinary meaning construction in its Opening Brief. For example, Plaintiff's originally proposed construction allows the head group to be hydrophobic so long as it is "less hydrophobic than the hydrophobic tails." But if the head group is "hydrophilic," as Plaintiff contends in its Reply Brief, it *cannot* be hydrophobic. Plaintiff's struggle to pinpoint a plain and ordinary meaning for "head group" demonstrates that no such meaning existed.

Plaintiff's construction is also nonsensical because it captures lipids with negatively charged head groups, which are "less hydrophobic than the hydrophobic tails" and "hydrophilic." Plaintiff's response that "'head group' . . . is read in the context of the claim," which "requires a cationic lipid" that "must be capable of having a positive charge" does *not* resolve the problem. *Supra* at I.C.3.e. Plaintiffs' overbroad construction for "cationic lipid" allows for the central moiety to be positively charged and the head group to be negatively charged. *Id.* (arguing that the "positive charge must reside in either the head group *or the central moiety*") (emphasis added). This nonsensical outcome—i.e., a "cationic lipid" with a

---

[28] Plaintiff's inability to identify any prior art definition for "head group" is telling.

negatively charged head group—flows from Plaintiff's convoluted, litigation-driven construction.

D.    "R$^{13}$ is a branched C$_{10}$-C$_{20}$ alkyl"

| Term | Alnylam's Construction | Pfizer/BioNTech's Construction |
|---|---|---|
| R$^{13}$ is a branched C$_{10}$-C$_{20}$ alkyl<br><br>'933 all asserted claims<br>'979 all asserted claims | Plain and ordinary meaning, which is "R$^{13}$ is a saturated hydrocarbon moiety that has 10 to 20 carbons and is not a straight chain" | "R$^{13}$ is an alkyl group containing 10 to 20 carbon atoms in which one carbon atom in the group (1) is bound to at least three other carbon atoms in the group and (2) is not a ring of a cyclic group." |

1.    Alnylam's Opening Position

The terms "R$^{13}$ is a branched C$_{10}$-C$_{20}$ alkyl" should be afforded its plain and ordinary meaning in light of the claims and the specification, which is "R$^{13}$ is a saturated hydrocarbon moiety that has 10 to 20 carbons and is not a straight chain." The parties do not dispute that this term requires a saturated hydrocarbon moiety containing 10 to 20 carbons.[29]  Where the parties disagree is on the meaning of "branched."  Pfizer/BioNTech's proposed construction is fundamentally flawed because it attempts to require branched to mean a carbon that "is bound to at least

---

[29] The terms "alkyl" and "saturated hydrocarbon moiety" are effectively synonymous.  '933 Patent at 411:53-54 ("The terms 'alkyl' and 'alkylene' refer to a straight or branched chain saturated hydrocarbon moiety.").

three other carbon atoms in the group."  Pfizer/BioNTech's construction ignores not-limiting language, presumably to create a noninfringement position.[30]

Alnylam's construction is correct because it comports with the use of "branched [. . .] alkyl" in the claims.  Claim 18 of the '933 Patent recites, in part, that:

> each biodegradable hydrophobic tail independently has the formula -(hydrophobic chain)-(biodegradable group)-(hydrophobic chain), wherein the *biodegradable group is —OC(O)— or —C(O)O—*;
>
> for at least one biodegradable hydrophobic tail, the terminal hydrophobic chain in the biodegradable hydrophobic tail is *a branched alkyl, where the branching occurs at the α-position relative to the biodegradable group* and the biodegradable hydrophobic tail has the formula $—R^{12}-M^1-R^{13}$, where $R^{12}$ is a $C_4$-$C_{14}$ alkylene or $C_4$-$C_{14}$ alkenylene, *$M^1$ is the biodegradable group, $R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl*, and the total carbon atom content of the tail $—R^{12}-M^1-R^{13}$ is 21 to 26;

'933 Patent at Claim 18 (emphasis added).  Claim 18 defines the general formula of the hydrophobic tail as $R^{12}-M^1-R^{13}$, where $M^1$ is the biodegradable group, which can be either  —OC(O)— or —C(O)O—, and where $R^{13}$ is a branched alkyl that is branched at the α-position.[31]  The claim language allows either orientation of the

---

[30] Pfizer/BioNTech's construction arguably goes even future than the non-limiting language it relies on, by adding the requirement that those three carbons by "in the group."

[31] The parties in the Moderna Matter have agreed that "where the branching occurs at the α-position relative to the [biodegradable/ester] group" means "where the branching occurs at a carbon atom ***next to*** the [biodegradable/ester] group."

biodegradable group (the ester), which means that the carbon can bind to two other carbons or three:



Generic Formula of $R^{12}$-$M^1$-$R^{13}$

Where $M^1$ is $-C(O)O-$

Where $M^1$ is $-OC(O)-$

$\alpha$-Branching

In the two structures on the top right, the branching, as defined by the claim language, occurs at a carbon that is only connected to *two* other carbon atoms, as well as a hydrogen atom and an oxygen atom.  This understanding of branching is also consistent with the agreed to construction for "where the branching occurs at the $\alpha$-position relative to the [biodegradable/ester] group."

    This understanding that the patent claims are not limited to a carbon that bonds to three other carbons is consistent with the prosecution history of the '933 Patent:

    Such compounds with *branching* at the $\alpha$-position would have a moiety as shown below (assuming the biodegradable group is an ester and the variables p and q are integers):

See Ex. E ('311 Application File History, Oct. 14, 2021 Response to Non-Final Office Action) at 9-10 (distinguishing pending claims reciting branching at the α-position from prior art disclosing branching at the β- and γ-positions) (emphasis added).  This figure unequivocally shows a branched chain with a carbon bonded to just two other carbons.  It does not show a carbon bonded to three other carbons, as Pfizer/BioNTech's proposed construction improperly would require.

The specification further supports Alnylam's construction through its use of the plain and ordinary meaning "alkyl."

> The terms "*alkyl*" and "alkylene" refer to *a straight or branched chain saturated hydrocarbon moiety*. In one embodiment, the alkyl group is a straight chain saturated hydrocarbon. Unless otherwise specified, the "alkyl" or "alkylene" group contains from 1 to 24 carbon atoms. *Representative saturated straight chain alkyl groups include methyl, ethyl, n-propyl, n-butyl, n-pentyl, and n-hexyl. Representative saturated branched alkyl groups include isopropyl, sec-butyl, isobutyl, tert-butyl, and isopentyl*.

'933 Patent at 411:53-61 (emphasis added).  This plain and ordinary meaning of "alkyl," which is a saturated hydrocarbon moiety (*i.e.*, a chain of carbons and

hydrogens, where all the carbons are connected to each other via single bonds) that can be either straight or branched. '933 Patent at 411:53-55. From the representative examples, a POSA would understand that straight chain alkyl groups referred to a linear arrangement where substitution occurred at one end of chain (*i.e.*, "n-propyl, n-butyl"), whereas branched alkyl groups are substituted by removing a hydrogen atom from an internal carbon (*i.e.*, "isopropyl, sec-butyl, isobutyl"). *See* Ex. F (McMurry – Organic Chemistry) at Figure 3.3, 84 ("Just as *straight-chain alkyl groups* are generated *by removing a hydrogen from an end carbon, branched alkyl groups* are generated by removing a *hydrogen atom from an internal carbon*."). Pfizer/BioNTech's proposed construction would read out groups like isopropyl, sec-butyl, and isobutyl, because there is no carbon in those groups that have three carbons attached to it. *See Knowles*, 886 F.3d at 1375 (internal quotation omitted) ("[The] proffered construction would improperly read this embodiment out of the patent . . . . A claim construction that does not encompass a disclosed embodiment is . . . rarely, if ever, correct.").

Pfizer/BioNTech's construction takes a single sentence from the specification out of context and ignores the plain language of the claims. Specifically, Pfizer/BioNTech points to this statement: "*[u]nless otherwise specified*, the terms 'branched alkyl', 'branched alkenyl,' and 'branched alkynyl' refer to an alkyl, alkenyl, or alkynyl group in which one carbon atom in the group (1) is bound to at

least three other carbon atoms and (2) is not a ring atom of a cyclic group." '933 Patent at 412:13-18 (emphasis added).  Pfizer/BioNTech attempts to use this language to limit the claims' scope but ignores that the language begins with "unless otherwise specified." *See Acme Scale Co. v. LTS Scale Co*, 615 F. App'x at 679 ("Rather, because the definition employs broad, inclusive, and non-limiting expressions like 'broadly', 'include', 'such as', 'for example', and 'but not limited to,' the inclusion of devices such as forklifts, flatbed trucks and pallet trucks do not suggest that the '946 patent was intended to be limited strictly to these devices.")(internal quotations omitted).  As discussed above, the claims specify branching can occur on either side of biodegradable group, which means there is no requirement for a carbon atom to be bonded to three other atoms.  This is fully supported by the prosecution history that unequivocally shows a two-carbon bond and the specification's use of the term "alkyl."[32]  Further, there is no support in the specification for Pfizer/BioNTech's requirement that branched required that the carbon atom in the branched group "(1) is bound to at least three other carbon atoms *in the group*."  Pfizer/BioNTech's erroneous construction is contrary to the intrinsic record.  The Court should adopt the plain and ordinary meaning of the term.

---

[32] Other examples of the non-limiting nature of "branched alkyl" are found throughout the specification, including in Formula (II).  *See* '933 Patent at 3:63-5:36.

2.    Pfizer/BioNTech's Answering Position

The parties' dispute is narrow and concerns the structure that defines the discrete "$R^{13}$" group as a "branched alkyl."  At its core, the term's construction hinges on whether $R^{13}$ is an independent structural element of the claimed cationic lipid. Defendants' construction reflects the intrinsic evidence, which defines the $R^{13}$ "branched alkyl" as a distinct chemical group.  Thus, in order for $R^{13}$ to be branched, *one* carbon atom in the $R^{13}$ group must be bound to *at least three* other carbon atoms in the $R^{13}$ group, as explained below.  In contrast, Plaintiff's alleged plain and ordinary meaning construction broadens the term's scope to encompass alkyl groups in which (1) a carbon atom can be bound to only *two* carbon atoms, or (2) one of the three carbon atoms belongs to a structural group other than $R^{13}$, such as the neighboring $M^1$ group.  Once again, there is no plain and ordinary meaning for this claim language. The Court should reject Plaintiff's construction as incompatible with the express definition of "branched alkyl" and the specific examples of branched $R^{13}$ structures.

a.    The Intrinsic Evidence Supports Defendants' Construction.

i.    The Lexicography Controls and Establishes $R^{13}$ as an Independent Structural Element.

The written description includes an express structural definition for "branched alkyl":

> Unless otherwise specified, the terms "<u>branched alkyl</u>", "branched alkenyl", and "branched alkynyl" refer to an <u>alkyl</u>, alkenyl, or alkynyl <u>group in which one carbon atom in the group (1) is bound to at least three other carbon atoms and (2) is not a ring atom of a cyclic group</u>.

'933 Patent at 412:13-19 (emphases added). The express definition is clear; it requires *one* carbon atom to be bound to *at least three* other carbon atoms. Defendants' construction conforms to this structural definition.

Applying this express definition to the "$R^{13}$" structure requires "*one* carbon atom" *in the $R^{13}$ structure* to be bound to "*at least three* other carbon atoms" *in the $R^{13}$ structure* because $R^{13}$ is a discrete structure of the cationic lipids described in the Patents-in-Suit. This is reinforced by the plain claim language, which identifies "$R^{13}$" as a separate structure within the —$R^{12}$-$M^1$-$R^{13}$ formula and specifies that it is the $R^{13}$ structure, *specifically*, that is a "branched alkyl":

> [T]he biodegradable hydrophobic tail has the formula — $R^{12}$-$M^1$-$R^{13}$, where $R^{12}$ is a $C_4$-$C_{14}$ alkylene or $C_4$-$C_{14}$ alkenylene, $M^1$ is the biodegradable group, <u>$R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl</u> . . . .

*Id*. at 538:29-32 (emphasis added). The claim language independently describes the three structural elements of the hydrophobic tail, making it clear that atoms cannot be shared between the various groups: (1) $R^{12}$ is an "alkylene" or "alkenylene" group having 4–14 carbon atoms; (2) $M^1$ is a "biodegradable" group having two oxygen atoms and one carbon atom; and (3) $R^{13}$ "is a branched alkyl" having 10–20 carbon atoms. *Id*. at 538:23–32. In other words, a skilled artisan would have understood

73

that a carbon in the $M^1$ group is not one of the required 10–20 carbons in the $R^{13}$ group.

The remainder of the written description confirms that $R^{13}$ is an independent structural feature that does not contain overlapping constituent atoms with the adjacent $M^1$ group:



*Id.* at 61:4-21 (annotated); *see also id.* at 16:6–14. This figure shows that each tail has discrete structural elements (the green, blue, and red boxes mirror the discrete structural groups "$R^{12}$," "$M^1$," and "$R^{13}$," respectively).

Columns 55–60 of the '933 Patent, which *specifically* describe branched "$R^{13}$" structures are particularly instructive. *Id.* at 55:11–14 ("Other suitable tail groups includes [sic] those of the formula —$R^{12}$-$M^1$-$R^{13}$ <u>where . . . $R^{13}$ is a branched alkyl.</u>") (emphasis added). Indeed, during prosecution of the '933 Patent, Plaintiff identified

a section of the application from "page 46 (last 4 lines) to page 47," which corresponds to Column 55:26–50 of the patent and provides support for the —R$^{12}$-M$^1$-R$^{13}$ limitation.  *See* Ex. E, '933 Patent File History, *Office Action Response* at 9, Oct. 14, 2021.  In relevant part, that section states:

> In one preferred embodiment, <u>the branch in the alkyl</u> or alkenyl group is at the <u>δ-position or later</u> from the point of attachment of R$^{13}$ to the ester group. <u>Suitable</u> R$^{13}$ groups include, but are not limited to . . . .

'933 Patent at 55:46–50; 57:53–56 (emphasis added).  The δ-position refers to the fourth carbon atom from the M$^1$ group, which means the R$^{13}$ branching occurs at the fourth carbon or later.  Thus, the branching necessarily involves *one* carbon atom (red circle below) bound to *at least three* other carbon atoms (blue circles) *in the independent R$^{13}$ structure* as illustrated in the numerous embodiments of "[s]uitable" branched R$^{13}$ structures, including the following:



*Id.* 55:52–57:20 (annotated).[33]

---

[33] Although the written description uses the word "include" when listing "suitable" examples of R$^{13}$ branched alkyls, the express descriptions and numerous examples

Notably, the branching in every "suitable" branched $R^{13}$ structure at Columns 55–60 involves one carbon atom (red) bound to *at least three* other atoms (blue) *in the $R^{13}$ group*. *See id*. 57:51–58:39. Defendants' construction is consistent with the lexicography and the written description's teachings that $R^{13}$ is an independent chemical group in which one $R^{13}$ carbon is bound to three other $R^{13}$ carbons.

Plaintiff counters that the phrase "[u]nless otherwise specified" renders the express definition non-limiting. *Supra* I.D.1. But this argument, which relies on the losing party's position in *Acme Scale,* fails because the words "such as" or "for example" denote inclusiveness, whereas "unless otherwise specified" is contextually different and means that absent an affirmation to the contrary, the default express definition applies. Plaintiff points to no such affirmation with respect to the use of "branched alkyl" in the asserted claims. Accordingly, the Court should hold Plaintiff to the inventors' chosen definition of "branched alkyl" as applied to the $R^{13}$ structure. *See Martek Biosciences Corp. v. Nutrovina, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) (citing *Phillips*, 415 F.3d at 1321 (en banc)).

---

in the written description must be given meaning. *See Astrazeneca*, 384 F.3d at 1340–41. The skilled artisan would have understood that the written description's consistency in showing one carbon atom bound to *at least three* other carbons *in the $R^{13}$ structure* indicates a necessary feature of a branched $R^{13}$ alkyl group, especially when read in context with the express definition of "branched alkyl."

ii.    The Prosecution History Shows that $R^{13}$ Is an Independent Group.

The inventors' definition of "branched alkyl" and Defendants' construction are consistent with Plaintiff's efforts to overcome rejections based on prior-art structures, including the compound in International Publication WO11/153493 (WO'493) shown below:



See Ex. E, '933 Patent File History, *Office Action Response*, Oct. 14, 2021 at 9-11 (annotated). To distinguish this compound, Plaintiff added "[n]ew Claim 31," which limited "the $R^{13}$ group <u>after the ester group</u>" to 13–17 carbons and differed from the WO'493 compound with only "11 carbon atoms <u>after the ester group</u>" (shown in red). *Id*. (emphases added). The amendment shows Plaintiff understood that only

carbons *within the $R^{13}$ group*, i.e., outside of the ester group, count for purposes of identifying the number of $R^{13}$ carbons.

> b.    Plaintiff's Construction Runs Afoul of the Written Description.

In its Opening Brief, Plaintiff argues structural interpretations that are unrelated to, and nowhere evident from, its proposed construction, namely (1) "$R^{13}$" is a "branched alkyl" where one carbon atom is bound to only *two or more* other carbon atoms in the $R^{13}$ group, and (2) carbon atoms in the adjacent $M^1$ structure can contribute to the $R^{13}$ branching event. *See supra* at I.D.1. These interpretations are incompatible with the express definition of "branched alkyl," which requires *one* carbon atom to be bound to *at least three* other carbon atoms, '933 Patent at 412:13–19, and the examples of branched $R^{13}$ structures in Columns 55–60, all of which have one carbon atom bound to *at least three* other carbon atoms *in the $R^{13}$ structure* and never show carbon atoms in the $M^1$ structure contributing to the $R^{13}$ branching event. *See id*. 55:11–60:35. It is also inconsistent with the plain claim language, which recites "$R^{13}$ is a branched . . . alkyl" and describes the component atoms of $M^1$ and $R^{13}$ separately. In short, Plaintiff's positions cannot be reconciled with the description of $M^1$ and $R^{13}$ as independent substructures of a cationic lipid that do not have overlapping constituent atoms.

Rather than grappling with the disclosure at Columns 55–60, which specifically describe branched $R^{13}$ groups and which Plaintiff itself identified as

providing support for the —$R^{12}$-$M^1$-$R^{13}$ limitation during prosecution, Plaintiff focuses on evidence of little to no persuasive value.  For example, Plaintiff relies on text related to the "α-position" branching limitation to support its interpretations that *one* carbon atom only needs to be bound to *two or more* carbon atoms and that carbon atoms in the adjacent $M^1$ group can be considered.  *See supra* at I.D.1 ("$R^{13}$ is a branched alkyl that is branched at the α-position"; "the branching, as defined by the claim language, occurs at a carbon that is only connected to two other carbon atoms"; "The claim language allows *either orientation of the biodegradable group* (the ester), which means that *the carbon can bind to two other carbons or three*.").[34] These arguments are unpersuasive because they conflate the "$R^{13}$ is a branched . . . alkyl" limitation in dispute with the separate "α-position" branching limitation, which is not being construed.  The prosecution history Plaintiff cites also concerns the "α-position" branching limitation, *see supra id.*, but this argument fails for the same reason.  Plaintiff's reliance on intrinsic evidence related to the separate α-branching limitation underscores the lack of intrinsic evidence support for its "$R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl" construction.

Plaintiff also references the definition of "alkyl" in the written description—"a straight or branched chain saturated hydrocarbon moiety."  That definition,

---

[34] In Plaintiff's illustrations of different biodegradable group orientations where one carbon atom is bound to three other carbons atoms, one of the three other carbons is in the adjacent biodegradable ($M^1$) group.

however, is fully consistent with Defendants' construction and the express definition of "branched alkyl," and Plaintiff proffers no argument to the contrary.  Plaintiff also focuses on a passage in the written description that discusses "representative saturated branched alkyl groups includ[ing] isopropyl, sec-butyl, isobutyl, tert-butyl, and isopentyl" within the definition of "*alkyl*" to support its so-called plain-meaning construction.  *Supra* at I.D.1.  Plaintiff argues that Defendants' construction would read out the "isopropyl, sec-butyl, and isobutyl" groups, *id.*, which Plaintiff contends have one carbon atom bound to only two carbon atoms.  But there is no indication in this passage that the listed groups can be the branched $R^{13}$ structure.  Indeed, these "representative" groups, which have at most four carbon atoms, do not even meet the claimed $R^{13}$ structure limitation of 10 to 20 carbons.[35]  Thus, a skilled artisan would not have understood this passage as providing examples of branched $R^{13}$ structures.

Moreover, under Plaintiff's approach, which equates the recited "branched alkyl groups" with "branched alkyl," the inventors' own express definition of "branched alkyl" reads out several of the representative "branched alkyl groups" because it requires one carbon atom bound to *at least three* other carbon atoms.  Even if Plaintiff were correct that its own disclosures are incompatible, it fails to explain

---

[35] When the written description discusses branched $R^{13}$ structures, it contemplates at least 10 carbon atoms.  *See e.g.*, '933 Patent at 55:11-15; 55:39-40; 57:43-44.

why a skilled artisan would have relied on this one passage instead of the actual *express definition* of "branched alkyl" to understand what "$R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl" means.

        c.     Plaintiff's Reliance on the Plain and Ordinary Meaning Is Misplaced

Plaintiff declares that its construction is the plain and ordinary meaning, but once again fails to explain why or provide any meaningful supporting evidence; certainly none that can overcome the clear express definition of "branched alkyl" and the consistent examples of branched $R^{13}$ structures, all of which support Defendants' construction. Rather "$R^{13}$ is a branched . . . alkyl" is terminology that appears specifically in the family of the Patents-in-Suit and is not language that is generally used in the art. Thus, there is no plain and ordinary meaning for "$R^{13}$ is a branched $C_{10}$-$C_{20}$ alkyl." Because there is no justification for expanding the scope of the claim language beyond the express structural definition of "branched alkyl" and the examples of branched $R^{13}$ structures in the written description, the Court should reject Plaintiff's construction.

        3.     Alnylam's Reply Position

The dispute is over the proper construction of "branched . . . alkyl" in the context of the asserted claims that carry the limitation "where the branching occurs at the α-position relative to the biodegradable group." Pfizer/BioNTech contends that the alpha-branched alkyl must only bond to three carbons in $R^{13}$ and may not

include a bond to the carbon in the biodegradable portion of the molecule identified as $M^1$.  This argument (i) lacks textual basis in the claim itself, rendering the alpha-branching requirement meaningless, (ii) is contrary to the very diagram Pfizer/BioNTech relies upon, which shows an alpha-branched carbon binding to $M^1$, and (iii) lacks basis in the specification and the prosecution history of clear lexicography.

> a.    The Claim Language Supports Alnylam's Construction

As Alnylam originally argued above, Claim 18 defines the general formula of the hydrophobic tail as "$R^{12}$-$M^1$-$R^{13}$," where "$M^1$ is the biodegradable group," which can be either —OC(O)— or —C(O)O—, and where the carbon branching occurs at the "α-position [alpha or first carbon position] relative to the biodegradable group" ($M^1$).  '933 Patent, Claim 18.  This express language allows either orientation of the biodegradable group (—OC(O)— or —C(O)O—, *i.e.*, the ester of $M^1$), which means that the alpha-branched carbon can be bound to two other carbons and an oxygen or three other carbons, as shown below:

Generic Formula of $R^{12}$-$M^1$-$R^{13}$

Where $M^1$ is –C(O)O–

Where $M^1$ is –OC(O)–

α-Branching

There is no dispute that "alpha-position" means the first carbon where branching occurs after the biodegradable group. Indeed, Moderna agreed that "where the branching occurs at the α-position relative to the [biodegradable/ester] group" means "where the branching occurs at a carbon atom *next to* the [biodegradable/ester] group." Moderna Claim Construction Briefing at § III. Thus, even if branched alkyl is (incorrectly) limited to one carbon "bound to three other carbons," it plainly includes the lower right structure above where the alpha-position carbon bonds to three other carbons, including one in the biodegradable group.

Faced with this, and indeed with infringement, Pfizer/BioNTech advances a misplaced argument that a carbon that is alpha branched cannot be bound to any atom outside of $R^{13}$ because the "atoms cannot be shared" between $M^1$ and $R^{13}$. *See supra* at 76 (Pfizer/BioNTech's Answering).

83

Pfizer/BioNTech's entire argument is effectively based in its unsupported view that $R^{13}$ is "discrete." When determining the number of carbons in $R^{13}$, a POSA would look only within $R^{13}$ and to that extent, it is discrete. But that is of no relevance to determining whether a carbon is alpha branched. A POSA, Moderna, Alnylam, and the plain claim language all define and agree that alpha-branching occurs at the carbon next to ("relative to") the biodegradable group ("where the branching occurs at the α-position relative to the biodegradable group"). *See also infra* §I.D.3.b (discussing Formula (II)).

Pfizer/BioNTech's argument renders meaningless the claim language requiring alpha branching because it would be impossible for branching to occur at the alpha-position relative to $M^1$. Under Pfizer/BioNTech's' proposed construction, no carbon to which the alpha-position is bound may be found outside of $R^{13}$. There is no basis in the claim language for that result.

Pfizer/BioNTech's annotated figure from the specification does not support their reading of $R^{13}$ regarding branching. *See supra* at 78 (Pfizer/BioNTech's Answering). In fact – it supports Alnylam's position.



To be clear – there are no intervening atoms between $M^1$ and $R^{13}$. *See* '933 Patent at 60:50-61:20. Indeed, the specification shows the complete structure, depicted immediately before Pfizer/BioNTech's diagram, that the $R^{13}$ group is plainly bound directly to the biodegradable group $M^1$:

85

'933 Patent at 60:50-65.  Consistent with the above diagram, and directly contrary to Pfizer/BioNTech's position, the first carbon on the left in $R^{13}$ is shown to be directly bonded to $M^1$ confirming that the units work together.

Pfizer/BioNTech's annotated diagram *in fact* shows alpha-branching where the carbon is bound to two carbons, proving exactly Alnylam's construction that the alleged lexicography is not controlling.[36]   Moreover, Pfizer/BioNTech's drawing does not show an alpha-branched carbon bound to three other carbons in $R^{13}$, highlighting again the error in Pfizer/BioNTech's argument.

Pfizer/BioNTech then quotes language from the specification at 55:46-50 on "one preferred embodiment" invoking "δ " (delta) branching (fourth position carbon) and not *alpha* branching (first position carbon as the claim requires) as somehow dispositive.  *Supra* at 77 (Pfizer/BioNTech's Answering).  The difference is profound.  The specification's cited Greek letter "δ" (delta) "one preferred embodiment" identifies an $R^{13}$ delta branched structure with three carbons before it.

---

[36]   Alnylam incorporates by reference and refers the Court to its discussion of the claim language in Alnylam's Opening and Reply Sections in the *Moderna* litigation.  *See* Alnylam's Opening at §IV.C.1 and Alnylam's Reply at §IV.C.3 in *Alnylam v. Moderna*.  There,  Alnylam responds to the distinct argument that the alleged lexicography limits the claim to an alpha-branched carbon bound to three carbons and does not include binding to two carbons, which is incorrect.  *Id*.  Such incorporation by reference in this coordinated claim construction under the Court's Scheduling Order where the Pfizer/BioNTech have asserted a joint defense proceeding is appropriate.  D.I. 79.

By definition, therefore, all atoms to which a *delta* branch point are bound are within $R^{13}$ because the point of branching is four carbons away from $M^1$.

This differs from the claims' $R^{13}$ "α" (alpha) branched alkyl requirement where the point of branching is at the first carbon from $M^1$ and is therefore bonded directly to $M^1$. Pfizer/BioNTech's cherry-picked "delta" position argument violates the requirement that the claims must be read contextually as a whole, and not just as separate elements. *Phillips*, 415 F.3d at 1314 ("To begin with, the context in which a term is used in the asserted claim can be highly instructive."). It further violates basic canons of claim construction by reading into the claim an inapposite delta branched "one preferred embodiment." *Id*. at 323.[37]

b.  Pfizer/BioNTech's Ignore Key Portions of the Specification that Contradict Their Proposed Construction

Alnylam's construction is also consistent with the way the specification uses the term "branched alkyl" in Formula (II).[38] The specification recites "[i]n another embodiment, the cationic lipid is a compound of formula (II), which has a branched alkyl at the alpha-position adjacent to the biodegradable group (between the biodegradable group and the terminus of the tail, i.e., $Z^1$ o[r] $Z^2$)." '933 Patent at

---

[37]    Additional arguments around the prosecution history are addressed *infra*, in Section I.D.3.c.

[38] While Formula (II) is not the cationic lipids claimed in the asserted claims, it is representative of the language used in the claims and shows a consistent usage of "branched alkyl."

3:63-67.  The structure for Formula (II) shows that the point of branching is a carbon connected to a hydrogen, two carbons (in the form of $R^z$ and $Z^1/Z^2$), and the biodegradable group $M^1/M^2$, which can include either orientation of ester:



Formula (II)

'933 Patent at 4:1-5:35, Certificate of Correction.  This allows for a branched alkyl that is connected to two carbons, a hydrogen, and an oxygen, all within the $R^{13}$ group of the claims.  This further contradicts Pfizer/BioNTech's position that the alpha branched alkyl must bind to three carbons in $R^{13}$.

Pfizer/BioNTech argues that the specification's "representative … alkyl groups" would not teach a POSA anything about $R^{13}$ because they do not have enough carbons.  *See supra* at 82-83    (Pfizer/BioNTech Answering).  Pfizer/BioNTech seems to ignore what "representative" means and what a POSA would take from this passage. '933 Patent at    411:60-61.    Specifically, "[r]epresentative saturated branched alkyl groups" would teach a POSA what the specification means by "branched alkyl groups," which is a key part of the term being construed.  These representative branched alkyl groups teach a branched

carbon bonding to two carbons, not three, as Pfizer/BioNTech would have it. *See* Ex. F (McMurray) at 84-85.

The specification lists isopropyl as an example of a branched alkyl. '933 Patent at 411:60-61. A POSA would know that isopropyl alcohol is a common organic solvent that contains an isopropyl group connected to an -OH (or alcohol) group, which is shown below:



The point of branching is a carbon that is connected to two carbons, an oxygen, and hydrogen (which is not shown in standard drawings). *See* Ex. F (McMurry) at 84-85. Similarly, a sec-butyl group comprises at the point of branching a carbon connected to two carbons, an oxygen, and a hydrogen.

From this teaching, a POSA would understand that "branched alkyl" would include groups like the one depicted below that includes fifteen carbons and a branch point at the first carbon bonded to two carbons, a hydrogen, and an atom from the biodegradable group:



The specification depicts similar structures in Table 2E entitled "Representative hydrophobic chain II and/or iIa and combinations thereof":

R
n = 0-8
R = OMe, Me, Et, Pr

'933 Patent at 74:52-57 (where R could be a chain of one to three carbons).

        c.     The Prosecution History Supports Alnylam's Construction

Pfizer/BioNTech misconstrues the October 14, 2021 Office Action Response to support their position.  Pfizer/BioNTech states "[t]he amendment shows Plaintiff understood that only carbons *within the $R^{13}$ group*, *i.e.*, outside of the ester group, count for purposes of identifying the number of $R^{13}$ carbons."  *See supra* at 80 (Pfizer/BioNTech's Answering).  No one is disputing that the total number of carbons in $R^{13}$ is found by counting the number of carbons in $R^{13}$.  What the parties dispute is what it means for $R^{13}$ to be branched.  And Pfizer/BioNTech ignores the express depiction in the Office Action Response, viz.:

> Such compounds with *branching* at the α-position would have a moiety as shown below (assuming the biodegradable group is an ester and the variables p and q are integers):



*See* Ex. E ('311 Application File History, Oct. 14, 2021 Response to Non-Final Office Action) at 9-10 (emphasis added).  This express language and drawing shows that patentee pursued claims that covered alpha branching where the point of

branching was a carbon connected to two carbons and that the alpha branched carbon also included bonding to atoms in the biodegradable unit ($M^1$).

Pfizer/BioNTech misconstrues other portions of the prosecution history to support their overly narrow construction.  Alnylam has never disputed that a "branched alkyl" *could be* a carbon connected to three other carbons – rather, Alnylam disputes that (1) all "branched alkyl" compounds *must* contain a carbon connected to three other carbons and (2) that the prosecution in any way supports the notion that branching in $R^{13}$ requires all atoms directly bound to the branching point be within $R^{13}$.

Pfizer/BioNTech relies on a portion of prosecution history that references a preferred embodiment of delta branching in the specification to attempt to limit the term "branched alkyl." *See supra* at §I.D.2.b.ii (Pfizer/BioNTech Answering).  As discussed above, preferred embodiments do not constitute an express limitation or disavowal, particularly where patentee inserted the specific alpha branched structure addressed above. *See Conoco*, 460 F.3d at 1357-58 (The disavowal "must be clear . . . and cannot draw limitations into the claim from a preferred embodiment."). Pfizer/BioNTech also relies on structures in Columns 55-60, the majority of which were not cited in the Office Action Response referenced by Pfizer/BioNTech.

Finally, neither of the cases that Pfizer/BioNTech relies upon support their attempt  to read in this preferred embodiment. *Martek* is easily distinguished from

this issue because, unlike here, there is a clear lexicographic definition without exceptions. *Supra* at 79 (Pfizer/BioNTech's Answering); *see Martek*, 579 F.3d at 1380 (quoting specification stating, "The term 'animal' means any organism belonging to the kingdom Animalia."). In *Acme*, the court did not construe "material handling vehicle" to encompass only vehicle types exemplified in the subject patent; rather, the court held that a combination of a table and a roller found in the prior art was not a material handling vehicle. *Supra* at 78-9 (Pfizer/BioNTech's Answering); s*ee Acme*, 615 F. App'x at 679-680.

### 4.    Pfizer/BioNTech's Sur-Reply Position

Plaintiff no longer argues plain and ordinary meaning in its Reply Brief. Instead, Plaintiff: (1) conflates the disputed term—"$R^{13}$ is a branched $C_{10}$ to $C_{20}$ alkyl"—with the separate and independent α-branching limitation that is not being construed, (2) relies almost exclusively on disclosure related to α-branching for support,[39] and (3) ignores the most probative disclosure in the written description that specifically describes branching in the context of the $R^{13}$ structure. The Court should reject this strained approach and adopt Defendants' construction, which

---

[39] Plaintiff's arguments in Sections I.D.3.a (based on the claim language and the cationic lipid structure from the Patents-in-Suit), I.D.3.b (based on Formula (II)), and I.D.3.c (based on the prosecution history), all concern the α-branching limitation, *not* the "$R^{13}$" limitation at issue here.

tracks the inventors' express lexicography for "branched alkyl" as applied to the $R^{13}$ structure.

a.    Plaintiff Errs by Focusing on the Separate α-Branching Limitation.

Plaintiff incorrectly argues that the dispute relates to the proper construction of "branched [] alkyl" in the context of the α-branching limitation. *Supra* at I.D.3. The "$R^{13}$" branching limitation at issue is separate from the "terminal hydrophobic chain" α-branching limitation on which Plaintiff relies. First, because "$R^{13}$" is a different term, it is presumed to have a different meaning than "terminal hydrophobic chain." *Simpleair, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 431 (Fed. Cir. 2016) ("Different claim terms are presumed to have different meanings." (quoting *Bd. of Regents of Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008))). Further, the "$R^{13}$" branching limitation never refers back to the "terminal hydrophobic chain" α-branching limitation for antecedent basis. The written description also treats the terms differently—whereas it references "terminal hydrophobic chain" once, teaching that it can be branched at the α-, β-, γ-, or δ-carbon atom, '933 Patent at 24:52-57, it never describes "$R^{13}$" as branched at the α-carbon atom. *Id.* at 55:11-60:35.

Defendants relied on intrinsic evidence relevant to the disputed $R^{13}$ term (Columns 55 to 60 in the '933 Patent) because that is the *only* section that describes $R^{13}$ branched alkyl structures and it was specifically identified by Plaintiff to support

94

the —$R^{12}$-$M^1$-$R^{13}$ limitation during prosecution.  *Supra* at I.D.2.a.i.  This section

states "[o]ther suitable tail groups include those of the formula —$\underline{R^{12}}$-$\underline{M^1}$-$\underline{R^{13}}$, where

. . . $\underline{R^{13}\text{ is a branched alkyl}}$," indicating that tails according to formula —$R^{12}$-$M^1$-$R^{13}$

are a distinct category from those previously disclosed, including those with α-

branching on which Plaintiff relies.  '933 Patent at 55:11-60:35 (emphasis added).

Every example of $R^{13}$ branched alkyls that follows has branching where one carbon

atom in $R^{13}$ is bound to at least three other carbon atoms in $R^{13}$, which is consistent

with the inventors' lexicography and Defendants' construction.    Accordingly,

Plaintiff's allegation that Defendants "cherry-picked" this disclosure falls flat.

*Supra at* I.D.3.a.

> b.  Defendants' Construction Does Not Render α-Branching "Impossible."

Plaintiff incorrectly argues that, under Defendants' construction, "it would be

impossible for branching to occur at the α-position relative to $M^1$."[40]  *Supra* at

I.D.3.a.  The branching examples in Plaintiff's brief belie this argument.  Plaintiff

relies on extrinsic evidence—the below image—showing an α-branched carbon

bound to only two other carbons and a hydrogen (H) in $R^{13}$.  Nothing in the claims,

---

[40] Plaintiff also mischaracterizes Defendants' position as arguing that an α-branched carbon (1) "must only bond to three carbons in $R^{13}$ and may not include a bond to the carbon in the biodegradable portion of the molecule identified as $M^1$" and (2) "cannot be bound to any atom outside of $R^{13}$."  *Supra* at I.D.3; I.D.3.a.  An α-branched carbon can bind to an atom outside of $R^{13}$, but that atom, even if a carbon, does not count towards the requisite "three other carbon atoms" in the $R^{13}$ structure.

however, requires the α-carbon to be bound to a hydrogen.  Replacing the hydrogen, circled below, with a carbon satisfies both the α-branching and $R^{13}$ limitations because the α-carbon would be bound to three carbons in the $R^{13}$ group.



c.    Plaintiff's Reliance on Formula (II) Is Misplaced.

Plaintiff asserts that Formula (II) contradicts Defendants' construction because it purports to show a branched alkyl that has an α-branched carbon connected to only two other carbon atoms.  *Supra* at I.D.3.b.



Formula (II)

But Plaintiff concedes that Formula (II) "is not the cationic lipids claimed in the asserted claims." *See id.* n.35.  Formula (II) also does not utilize the $R^{12}$-$M^1$-$R^{13}$ terminology and does not discuss branching in the context of the $R^{13}$ structure.  And there is no requirement that the claims encompass all the written description's embodiments.  *TIP Sys.*, 529 F.3d at 1373.

        d.    Plaintiff's Focus on Certain "branched alkyl groups" Is Misplaced.

Plaintiff latches onto one generic sentence listing "representative saturated branched alkyl groups" to support its argument that an $R^{13}$ branched alkyl can include one carbon atom bound to two other carbon atoms.  *Supra* at I.D.3.b.  But this passage never indicates that such groups can be the $R^{13}$ branched alkyl structure, and in fact, none of the enumerated groups has enough carbons to satisfy the claimed 10 to 20 carbon limitation for $R^{13}$.  Further, Plaintiff's discussion of "isopropyl alcohol" and "sec-butanol" is unpersuasive because the cited passage does not identify those alcohols as representative branched alkyl groups.  *Id.*  Rather, the passage mentions "isopropyl" and "sec-butyl."  Plaintiff also ignores that three of the listed compounds—isobutyl, tert-butyl, and isopentyl—have a carbon bound to three other carbon atoms.  '933 Patent at 411:60-61.  Regardless, Plaintiff fails to explain why this one sentence should displace the express definition of "branched alkyl" and the portion of the written description at Columns 55 to 60 that specifically

describes branching in the context of $R^{13}$ and which the inventors identified during prosecution as providing support for the disputed term.

Dated: June 28, 2023

Respectfully submitted,

/s/ *Ethan H. Townsend*
Ethan H. Townsend (#5813)
MCDERMOTT WILL & EMERY LLP
The Nemours Building
1007 North Orange Street, 10th Floor
Wilmington, DE 19801

**OF COUNSEL:**

William G. Gaede, III
MCDERMOTT WILL & EMERY LLP
415 Mission Street, Suite 5600
San Francisco, CA 94105
(650) 815-7400

Sarah Chapin Columbia
Sarah J. Fischer
MCDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000

Ian B. Brooks
MCDERMOTT WILL & EMERY LLP
500 N. Capitol Street NW
Washington, DC 20003
(202) 756-8000

Bhanu K. Sadasivan, Ph.D.
MCDERMOTT WILL & EMERY LLP
650 Live Oak Avenue, Suite 300
Menlo Park, CA 94025-4885
(650) 815-7537

*Attorneys for Plaintiff*
*Alnylam Pharmaceuticals, Inc.*

/s/ *Alan R. Silverstein*
Arthur G. Connolly, III (#2667)
Alan R. Silverstein (#5066)
CONNOLLY GALLAGHER LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
(302) 757-7300

**OF COUNSEL:**

Sara Tonnies Horton
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, IL 60654
(312) 728-9040

Michael W. Johnson
Daniel Constantinescu
Brian W. Frino
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

*Attorneys for Pfizer Inc. and*
*Pharmacia*
*& Upjohn Co. LLC*

/s/ *Jeremy A. Tigan*
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

(302) 658-9200

**OF COUNSEL:**

Einar Stole
George F. Pappas
Megan P. Keane
Kaveh V. Saba
Douglas A. Behrens
Justin W. Burnam
Paul Enríquez
COVINGTON & BURLING LLP
One City Center
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Jennifer L. Robbins
Megan Hare
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1045
(212) 841-1000

*Attorneys for BioNTech SE and
BioNTech Manufacturing GmbH*

**WORD COUNT CERTIFICATION**

Pursuant to Paragraph 16 of the September 13, 2022, Scheduling Order (Dkt. 28), the undersigned counsel hereby certifies that Plaintiff's foregoing opening and reply briefs contain 4,480 and 5,459 words respectively and Defendant's answering and sur-reply briefs contain 8,165 and 2,750 respectively, which were counted by using the word count feature in Microsoft Word, in 14-point Times New Roman font.

*/s/ Ethan H. Townsend*
Ethan H. Townsend (#5813)

## CERTIFICATION OF SERVICE

The undersigned counsel certifies that a true and correct copy of the foregoing

document was served on June 28, 2023 on the following counsel via EMAIL.

Arthur G. Connolly, III (#2667)
Alan R. Silverstein (#5066)
1201 North Market Street, 20th Floor
Wilmington, DE 19801
302-757-7300
aconnolly@connollygallagher.com
asilverstein@connollygallagher.com

Michael W. Johnson
Dan Constantinescu
Jennifer Liu
Brian Frino
WILLKIE FARR & GALLAGHER
787 Seventh Avenue
New York, NY 10019
(212) 728 8000
mjohnson1@willkie.com
dconstantinescu@willkie.com
jliu1@willkie.com
bfrino@willkie.com

Sara Tonnies Horton
WILLKIE FARR & GALLAGHER
300 North LaSalle Drive
Chicago, IL 60654
(312)728 9040
shorton@willkie.com

*Attorneys for Defendants and*
*Counterclaimants Pfizer Inc.*
*and Pharmacia & Upjohn Co. LLC*

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

George F. Pappas, Einar Stole,
Megan P. Keane, Kaveh V. Saba,
Douglas A. Behrens, Justin W. Burnam,
Paul Enríquez
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000
gpappas@cov.com;    estole@cov.com;
mkeane@cov.com;    ksaba@cov.com;
jburnam@cov.com; dbehrens@cov.com;
penriquez@cov.com

Jennifer L. Robbins, Megan Hare
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
jrobbins@cov.com; mhare@cov.com

*Attorneys for Defendants BioNTech SE*
*and BioNTech Manufacturing GmbH*

/s/ Ethan H. Townsend
Ethan H. Townsend (#5813)