# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ALNYLAM PHARMACEUTICALS, INC.,   )
                                           )
         Plaintiff,                 )
                                           )
           v.                      )   Civil Action No. 22-336-CFC
                                           )   (CONSOLIDATED)
PFIZER INC., PHARMACIA & UPJOHN CO. )
LLC, BIONTECH SE, AND BIONTECH    )
MANUFACTURING GMBH,             )
                                         )
         Defendants.             )

## DECLARATION OF KATHRYN WHITEHEAD PH.D. IN SUPPORT OF DEFENDANTS' CLAIM CONSTRUCTION

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1
II.     QUALIFICATIONS, EXPERIENCE, AND MATERIALS REVIEWED ...................... 1
III.    SUMMARY OF OPINIONS ................................................................................ 3
IV.     APPLICABLE LEGAL STANDARDS .................................................................. 3
V.      PERSON OF ORDINARY SKILL IN THE ART .................................................... 4
VI.     TECHNICAL BACKGROUND ........................................................................... 5

        A.      Lipid Nanoparticles ................................................................... 5
        B.      Lipids in Drug Delivery Systems ................................................ 6

                i.      Sterols .......................................................................... 6
                ii.     Helper lipids ................................................................. 6
                iii.    PEG lipids .................................................................... 6
                iv.     Cationic lipids .............................................................. 7

VII.    THE PATENTS-IN-SUIT ................................................................................ 12

        A.      Asserted Claims ....................................................................... 12
        B.      Specification ........................................................................... 12

VIII.   OPINIONS .................................................................................................... 24

        A.      "head group" ........................................................................... 24

IX.     CONCLUSION .............................................................................................. 28

I, Kathryn Whitehead, Ph.D., have personal knowledge of the matters stated herein and, if called upon to testify as to those matters, I can competently do so.

## I.        INTRODUCTION

1.        I submit this expert declaration on behalf of Pfizer, Inc., Pharmacia & Upjohn Co. LLC, BioNTech SE, and BioNTech Manufacturing GmbH (collectively, "Defendants"). I have been asked to provide my opinion regarding the meaning of the claim term "head group" in U.S. Patent Nos. 11,246,933 (the "'933 patent") and 11,382,979 (the "'979 patent") (collectively, the "Patents-in-Suit"). I understand that Alnylam Pharmaceuticals, Inc. ("Plaintiff") has asserted the following claims of the Patents-in-Suit (the "Asserted Claims"):

| U.S. Patent No. | Asserted Claims |
|---|---|
| 11,246,933 | Claims 18, 19, 21–28 |
| 11,382,979 | Claims 1–4, 7, 9–20, 23, and 25–30 |

## II.        QUALIFICATIONS, EXPERIENCE, AND MATERIALS REVIEWED

2.        I am currently a Professor in the Departments of Chemical Engineering and Biomedical Engineering at Carnegie Mellon University in Pittsburgh, Pennsylvania, a position I have held since 2012. I received my bachelor's degree in chemical engineering from the University of Delaware in 2002 and my Ph.D. in chemical engineering from the University of California, Santa Barbara in 2007. After receiving my Ph.D., I was a Postdoctoral Fellow in the Koch Institute for Integrative Cancer Research at MIT from 2008–2012. While a Postdoctoral Fellow, I worked with Drs. Bob Langer and Daniel Anderson in developing non-viral delivery materials for RNA delivery, with a focus in lipid nanoparticles.

3.      My research in drug delivery systems has been competitively funded by grants from the National Institutes of Health (NIH), Defense Advanced Research Projects Agency (DARPA), National Science Foundation (NSF), and others. I have received numerous awards and honors for my research, including the Research Ingenuity Award from the FRAXA Research Foundation (2022), the Controlled Release Society Young Investigator Award (2021), the Curtis W. McGraw Research Award from the American Society for Engineering Education (2019), the NIH Director's New Innovator Award (2018), the DARPA Director's Fellowship (2018), and recognition as one of the Brilliant Ten by *Popular Science* (2015).

4.      I am an Elected Fellow of both the American Institute for Medical and Biological Engineering (AIMBE) and the Controlled Release Society, the latter of which is the preeminent international society for the field of drug delivery. I am a member of additional scientific organizations, including the American Association of Pharmaceutical Scientists, the American Association for the Advancement of Science, the American Institute of Chemical Engineers, the Center for Nucleic Acids Science and Technology at Carnegie Mellon University and the McGowan Institute for Regenerative Medicine at the University of Pittsburgh.

5.      I have authored 70 articles, including, for example, Kathryn A. Whitehead et al., *Knocking Down Barriers: Advances in siRNA Delivery*, 8 NATURE REVIEWS | DRUG DELIVERY 129 (Feb. 2009), and have been cited over 10,000 times, with an average of >160 citations per publication.  I have been an invited speaker at over 100 conferences, seminars, and symposia, including as a keynote and plenary speaker.

6.      My additional qualifications, including a complete list of papers I have published and co-authored, can be found on my *curriculum vitae*, attached as Appendix 1.

7.    I am being compensated at a rate of $700 per hour. My opinions are not dependent on any compensation that I receive in this case, and no part of this compensation due or received is contingent upon the outcome of this litigation.

8.    The opinions expressed in this declaration are based on my personal knowledge and experience in the field of lipid nanoparticle technology and drug delivery. I have also reviewed the Patents-in-Suit, the parties' identification of extrinsic evidence, the parties' proposed constructions, and the materials cited in this declaration. A complete list of the materials I reviewed is attached as Appendix 2.

## III.    SUMMARY OF OPINIONS

9.    In my opinion, a person of ordinary skill in the art ("POSA") as of the priority date for the Patents-in-Suit[1] would understand the claim term "head group" that appears in all Asserted Claims to mean—in view of the relevant intrinsic evidence (*e.g.*, the claims and specification)— "a group that may be protonated."

## IV.    APPLICABLE LEGAL STANDARDS

10.    In this section, I describe my understanding of certain legal standards. I have been informed of these legal standards by counsel for Defendants. I am not an attorney, and I am relying solely on counsel for these legal standards.

11.    I understand that claim construction is a matter of law and will be decided by the Court. I further understand that the relevant inquiry in claim construction is how a POSA would have understood the claim terms as of the earliest priority date, in the context of the particular claim in which it appears as well as in light of the patent specification, the prosecution history, and

---

[1] I understand there is a dispute between the parties as to the priority date for the Patents-in-Suit. My opinions are the same whether the priority date is December 7, 2011, as Plaintiff asserts, or December 7, 2012, as Defendants assert. Thus, for convenience, I will refer to the "priority date" as including either December 7, 2011, or December 7, 2012.

any other relevant intrinsic and extrinsic evidence. Put another way, I understand that a POSA cannot look at the ordinary meaning of the term in a vacuum. Rather, a POSA must look at the ordinary meaning of the claim term in the context of the written description and the prosecution history.

12.     I further understand that the patent specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise have to a POSA. In such cases, I understand that the patentee's definition usually controls. In addition, I understand that the prosecution history of a patent can inform the meaning of claim terms and should be considered when construing the claims.

13.     I understand that the Court may consider extrinsic evidence, such as technical dictionaries, treaties, and expert opinions to understand the underlying technology and the way in which claim terms would have been understood by a POSA as of the earliest priority date. However, such extrinsic evidence has lesser weight than the intrinsic evidence.

## V.     PERSON OF ORDINARY SKILL IN THE ART

14.     In determining the qualifications of a POSA, I understand that the following factors may be considered: (a) the type of problems encountered in the art; (b) the prior art solutions to those problems; (c) the rapidity with which innovations are made in the art; (d) the sophistication of the technology; and (e) the educational level of active workers in the field. I understand that none of these factors are dispositive and that they should be considered as a whole. I understand that the POSA is not a real individual, but rather a hypothetical individual (or team of individuals) having the qualities reflected by the factors above.

15.     In my opinion, and for the purposes of claim construction only, a POSA for the Patents-in-Suit as of the priority date would include a person who possesses a Ph.D. in the biological or chemical sciences or related disciplines, including in chemical engineering or

biomedical engineering, with 1–3 years of experience in developing lipid nanoparticle drug delivery systems. Alternatively, a POSA could have a B.S. in the biological or chemical sciences or related disciplines, including in chemical engineering or biomedical engineering, and at least 5 years of practical experience developing lipid nanoparticle drug delivery systems. The POSA would also be part of a team with members having expertise in other disciplines, such as the treatment of patients with nucleic acid delivery systems.

16.     I meet this definition of a POSA now and also as of the priority date in 2011/2012.

## VI.   TECHNICAL BACKGROUND

17.     In this section, I present a brief overview of the field of technology related to cationic lipids for nucleic acid delivery and lipid nanoparticles (LNPs) as of the priority date. This overview is not intended to be comprehensive. Rather, it provides a foundation for better understanding the disclosures related to cationic lipids for nucleic acid delivery in the Patents-in-Suit.

### A.     Lipid Nanoparticles

18.     A drug delivery system delivers medication to the place in the body where it is needed to produce a therapeutic result, ideally, without toxicity. LNPs are one type of delivery vehicle. *See, e.g.*, Kathryn A. Whitehead et al., *Knocking Down Barriers: Advances in siRNA Delivery*, 8 NATURE REVIEWS | DRUG DELIVERY 129, 132 (Feb. 2009). These particles ensure safe passage of the drug from the place of administration into the watery interior, or cytoplasm, of the target cell. *Id.* at Abstract, 132. Over the last several decades, lipid nanoparticles have been increasingly used to deliver therapeutic compounds, including nucleic acids. *See, e g.*, *id.* at 132–133.

19.     Nucleic acids cannot travel through the body and enter cells on their own for a few reasons, including (a) nucleic acids are prone to rapid degradation and clearance *in vivo* prior to

cell entry; and (b) nucleic acids cannot enter cells because of their negative charge, which causes them to be electrostatically repulsed by the cell membrane.

20.    In contrast, LNPs do not degrade as rapidly as nucleic acids in the body, and their surface charge at physiological pH (around pH 7.4) does not prohibit cell uptake. Additionally, the ability of LNPs to protonate in cell endosomes facilitates release of the nucleic acid cargo into the cell cytoplasm, where the nucleic acids are translated into proteins. As described in more detail below, the structure and composition of the LNP critically affects its function.

### B.    Lipids in Drug Delivery Systems

21.     There are several classes of lipids used in LNPs. As of the priority date, LNPs were understood to typically contain four types of lipids: sterols, helper lipids, PEG-lipids, and cationic lipids.

### i.    Sterols

22.    Sterols are stiff, hydrophobic molecules that are abundant in cell membranes. They reduce the molecular motion of hydrophobic lipid tails within the lipid bilayer, thus increasing cell membrane stability. This role in nature is analogous to their role in LNPs. The most commonly used sterol in LNP formulations is cholesterol.

### ii.    Helper lipids

23.    Helper lipids improve particle stability and enhance particle fusion with the endosomal membrane. Additionally, helper lipids influence particle surface charge, which in turn can affect biodistribution *in vivo.* Common examples of helper lipids include phospholipids such as DSPC and DOPE.

### iii.    PEG lipids

24.    Polyethylene glycol-conjugated lipids (PEG-lipids) influence particle size, stabilize particles during storage, and shield the particle from unwanted immune cell uptake. Common

PEG-lipids include, for example, a PEG chain with a molecular weight of 2,000 g/mol and two lipid tails containing 14 carbon atoms each.

### iv.   Cationic lipids

25.   I understand that the Court has construed the claim term "cationic lipid" as used in the Patents-in-Suit to mean "a lipid that is positively charged or that may be protonated at physiological pH." D.I. 109. For lipids that may be protonated at physiological pH, it is the functional ability of the lipid to become positively charged that makes that lipid cationic.

26.   Cationic lipids facilitate entrapment of anionic (*i.e.* negatively charged) nucleic acids like siRNA and endosomal release of the siRNA into the cell cytoplasm. During LNP formulation, the head group of the cationic lipid complexes with (*i.e.*, is attracted to) negatively charged siRNA, catalyzing a nanoprecipitation process that draws additional lipids into the particle through hydrophobic/hydrophilic interactions. The reason that the head group complexes with the siRNA is because the head group is positively charged and the siRNA is negatively charged, so the two attract each other. *See e.g.*, Jayaraman et al., *Maximizing the Potency of siRNA Lipid Nanoparticles for Hepatic Gene Silencing In Vivo*, 51 ANGEW. CHEM. INT. ED. 8529, 8529 (2012) (JCCB Ex. K, D.I. 86-11) ("First, through electrostatic interaction with polyamine nucleic acid, [the ionizable amino lipid] promotes the self-assembly of formulation components into macromolecular nanoparticles encapsulating the siRNA.").

27.   After encapsulating the nucleic acid, the LNP is injected into the body and travels to the target cells. Cell entry occurs through a process called endocytosis, in which the cell membrane wraps around the LNP to bring it inside. Once the LNP enters the cell, the cationic lipid is one of the main determinants of delivery efficacy. There, the LNP resides within a compartment called the endosome, which initially has the same pH as the extracellular fluid. The endosome gradually acidifies, which causes the protonation of the cationic lipid head groups in the LNP and

thus the LNP surface becomes positively charged. The positively charged LNP is then drawn to

the negatively charged endosomal membrane, and the cationic lipids interact with the negatively

charged lipids in the endosomal membrane, facilitating release of the siRNA into the cell

cytoplasm, where it carries out its therapeutic action. The figure below is from one of my

publications and illustrates this process:



Figure 2 | **Physiological barriers to the systemic delivery of small interfering RNA (siRNA) nanoparticles.** An injected nanoparticle must avoid filtration, phagocytosis and degradation in the bloodstream (**a**); be transported across the vascular endothelial barrier (**b**); diffuse through the extracellular matrix (**c**); be taken up into the cell (**d**); escape the endosome (**e**); and unpackage and release the siRNA to the RNA interference (RNAi) machinery (**f**).

Whitehead et al., *Knocking Down Barriers*, at 130, Figure. 2; *see also* Jayaraman ("following

endocytosis of LNPs by target cells, [the ionizable amino lipid] enables siRNA to escape the

endosomal compartment and access the cell cytoplasm."); Semple et al., *Rational Design of*

*Cationic Lipids for siRNA Delivery*, 28 NATURE BIOTECHNOLOGY 172, 173 (2010) (JCCB Ex. L,

D.I. 86-12) ("Given the importance of positive charge in the mechanism of action hypothesis guiding the lipid design, the effects of structural changes in the amine-based head groups were investigated.).

28.     Originally, cationic lipids had 3 distinct parts: (i) a ***cationic head***; (ii) a linker; and (iii) a lipophilic tail, in which the cationic head carried a permanent positive charge. That is, the head group was positively charged at all pH values. This is why a POSA understood these lipids to be "cationic." *See e.g.*, Tang & Hughes, *Synthesis of a Single-Tailed Cationic Lipid and Investigation of its Transfection*, 62 J. CONTROLLED RELEASE 345, 345–46 (1999) (JCCB Ex. I, D.I. 86-9) ("[a]ll cationic lipid molecules contain three functional domains: ***a positively charged head group***, a hydrophobic region, and a linker that tethers the cationic group and hydrophobic groups") (emphasis added).

29.     Similarly, the review article Chesnoy and Huang, *Structure and Function of Lipid-DNA Complexes for Gene Delivery*, 29 ANNUAL REV. BIOPHYS. BIOMOL. STRUCTURE 27, 28 (2000) (JCCB Ex. J, D.I. 86-10) explains that "[a]ll cationic lipids are composed of three parts: a hydrophobic anchor, a linker, and a head group (Figure 1)."  The phrase "hydrophobic anchor" refers to the hydrophobic tails.  Chesnoy and Huang then discuss each part of a cationic lipid in more detail.  In the subsection titled "Head Group," Chesnoy and Huang describes the head group in terms of the charge that it can carry:

> The number of charges on the head group determines whether the cationic lipid will be monovalent or multivalent. In monovalent lipids, the head group consists of either tertiary or quaternary ammonium groups.

*Id.* at 31. An ammonium group contains a nitrogen atom, and as I explain below, a tertiary ammonium group is protonatable and a quaternary ammonium group is permanently positively charged. In contrast to this description of head group, Chesnoy and Huang's subsection titled "Linker" describes a linker as "any chemical part" (regardless of charge) that connects the head

group with the tails. *Id.* at 30. The passage also specifies a "cationic head group" and describes the importance of that charge to the lipid's function in the context of nucleic acid delivery, which is to contact and complex with the negatively charged nucleic acid molecules:

> The linker represents any chemical part between the hydrophobic anchor and the head group. The linker is important in ensuring optimal contact between the cationic head group and the negatively charged phosphates of the DNA.

*Id.*

30.     The permanent positive charge of the cationic lipid was often conferred by a quaternary amine in the head group, which is the nitrogen-containing functional group shown below:



*See id.* at 29 (annotated). As denoted by the (+), the nitrogen atom carries a permanent positive charge because the nitrogen atom is bound to four other atoms, hence the term "quaternary" amine.

31.     Over time, the field evolved away from this original form. Cationic lipids with a permanently positive charge in the head group were used less than cationic lipids with a protonatable head group. This was because permanently charged cationic lipids were "consistently less effective" than "ionizable" (*i.e.*, protonatable) cationic lipids. *See* Jayaraman et al. at 8529.

32.     Even with this evolution, the basic structure of cationic lipids remained the same. Hundreds of examples of such cationic lipids are illustrated in the Patents-in-Suit, with the general structure shown below:

Hydrophobic Groups

Head Group

Central Moiety

'933 Patent at 37:1–20 (Compound 1). This illustration represents a POSA's understanding of protonatable cationic lipids in the field as of the priority date. As can be seen, the cationic lipid still has the same three distinct parts: (i) **head group** (except it is protonatable with a tertiary amine instead of being permanently positively charged with a quaternary amine); (ii) central moiety (also known as a linker); and (iii) hydrophobic groups/tails.

33.     Chemically, what is distinct about this representative protonatable cationic lipid compared to the original permanently positively charged cationic lipids is the bonding of the nitrogen atom in the head group. The nitrogen atom in the protonatable cationic lipid example from the Patents-in-Suit is bound to *three* non-hydrogen atoms, not *four* atoms like the quaternary amines of the original cationic lipids. This makes this amine group a tertiary amine. The practical result is that this cationic lipid is protonatable, *i.e.*, capable of being positively charged, at certain pH values, instead of being permanently positively charged. *See, e.g.*, Jayaraman at 8529, 8531, Table 1.

34.     Whether a cationic lipid is protonated is determined by the $pK_a$ of the entire cationic lipid. At a pH above the $pK_a$ of a cationic lipid, the majority of cationic lipids are neutrally charged. At a pH below the $pK_a$ of a cationic lipid, the majority of the cationic lipids are protonated and thus have a positive charge. *See id.* at 8529–30. As of the priority date, it was understood that the

pK$_a$ of a cationic lipid is determined primarily by the lipid's protonatable head group. The pK$_a$ is also affected by the other components of the lipid, like the linker or central moiety and the composition of the tails. As the protonatable group, the head group is the main factor in determining the pK$_a$ of the cationic lipid. *See, e.g.*, '933 patent at 32:49–55.

## VII.   THE PATENTS-IN-SUIT

### A.   Asserted Claims

35.     I understand Alnylam is asserting infringement of claims 18, 19, and 21–28 of the '933 patent, and claims 1–4, 7, 9–20, 23, and 25–30 of the '979 patent.

36.     Each of the Asserted Claims requires a "cationic lipid" and a "head group." Each asserted claim also distinguishes the "head group" from the "central moiety" and the "hydrophobic tails."

### B.   Specification

37.     I understand that the Patents-in-Suit share a common specification.  I have reviewed this common specification and summarize below the disclosures that a POSA would find relevant to the meaning of "head group." For simplicity, I cite to the '933 patent specification throughout my report when discussing both Patents-in-Suit.

38.     The Patents-in-Suit state that "[t]he present invention relates to a cationic lipid having one or more biodegradable groups located in a lipidic moiety (e.g., a hydrophobic chain) of the cationic lipid. These cationic lipids may be incorporated into a lipid particle for delivering an active agent, such as a nucleic acid." '933 patent at Abstract. The Patents-in-Suit state that "[t]here remains a need for improved cationic lipids and lipid nanoparticles for the delivery of oligonucleotides."[2] *Id*. at 1:61–62. The Patents-in-Suit tout as an advantage of the disclosed

---

[2] "[o]ligonucleotides" refers to short single or double stranded nucleic acids.

cationic lipids that they allow for "faster metabolism and removal of the lipid from the body following delivery of the active agent to a target area," which according to the Patents-in-Suit, results in "lower toxicity than similar lipids without the biodegradable groups." *Id.* at 2:2–6.

39.    Consistent with this description of the scope of the Patents-in-Suit, as I noted above, each of the Asserted Claims requires a "cationic lipid." A POSA would understand that the claimed inventions of the Patents-in-Suit are not broadly directed to lipids in general, but instead are directed to cationic lipids specifically. A POSA would further understand that the disclosed cationic lipids are intended for delivering "a nucleic acid." *Id.*

40.    The Patents-in-Suit disclose nine general structures of cationic lipids identified as Formulas I, II, III, IIIA, IV, V, VIA, VIB, and VII.  *Id.* at 2:7–15:67. These general formulas contain multiple variables designated by $R^1$, $R^2$, X, Y, and so on. *See id.*  For each of these variables, the Patents-in-Suit identify various substituents that can be used to form cationic lipids. *See, e.g.*, *id.* at 2:29–31 ("R1 and R2 are each, independently, optionally substituted alkyl, alkenyl, alkynyl, cycloalkylalkyl, heterocycle, or R10 (ii) R1 and R2, together with the nitrogen atom to which they are attached, form an optionally substituted heterocylic ring; or (iii) one of R1 and R2 is optionally substituted alkyl, alkenyl, alkynyl, cycloalkyl, cycloalkylalkyl, or heterocycle, and the other forms a 4-10 member heterocyclic ring or heteroaryl (e.g., a 6-member ring) with (a) the adjacent nitrogen atom and (b) the $(R)_a$ group adjacent to the nitrogen atom").

41.    Notably, as shown in the annotated structures below, Formulas I, II, III, IIIA, IV, V, VIA, VIB, and VII all require that the head group contains a nitrogen atom. A POSA would understand that these nitrogen-containing head groups are permanently positively charged or protonatable.



'933 Patent at 2:15

'933 Patent at 4:1

'933 Patent at 5:60

'933 Patent at 6:60

'933 Patent at 10:40

'933 Patent at 11:10

'933 Patent at 12:1

'933 Patent at 12:60

42.     In addition to the above Formulas, the Patents-in-Suit state that "[s]uitable head groups include those depicted in Table 1A," followed by over 50 examples of head groups. *Id.* at cols. 37–42. I have reviewed each of these head groups and, as with Formulas I, II, III, IIIA, IV, V, VIA, VIB, and VII, all these head groups contain a nitrogen. A POSA would understand that each of these nitrogen-containing head groups is protonatable or permanently positively charged.

43.     The Patents-in-Suit also disclose "[o]ther suitable primary groups," which consist of both a head group and a central moiety, followed by eight examples listed in Table 1B. *Id.* at

cols. 41–44. I have reviewed all the primary groups disclosed in Table 1B and they all include a nitrogen-containing head group. A POSA would understand that each of these nitrogen-containing head groups is protonatable.

44.     Table 2A of the Patents-in-Suit further discloses over 60 "[r]epresentative headgroups." *Id.* at cols. 61–67. I have reviewed all the head groups disclosed in Table 2A and they all include a nitrogen. A POSA would understand that each of these nitrogen-containing head groups is protonatable or permanently positively charged.

45.     The Patents-in-Suit further disclose over 1,000 examples of "cationic lipids of the present invention include[ing] those in Table 3." *Id.* at 76:18–19; cols. 75–396. I have reviewed all these examples of cationic lipids and they all include a nitrogen-containing head group. A POSA would understand that each of these nitrogen-containing head groups is protonatable or permanently positively charged.

46.     The Patents-in-Suit further disclose that the "cationic lipids [in Table 3] as well as those in the working examples (such as Examples 36 and 37) are suitable for forming nucleic acid-lipid particles." *Id.* at 76:22–25.

47.     In Example 36, the inventors performed testing on certain cationic lipids to "confirm potency and establish $ED_{50}$ levels," which relates to the efficacy of the cationic lipids. *Id.* at Ex. 36. Testing of $ED_{50}$ levels of cationic lipids is a common method used by POSAs to identify cationic lipids that worked best for their intended purpose. Prior to performing such a test, a POSA would not know whether or how well any particular cationic lipid functioned as intended. All the cationic lipids tested for efficacy in Example 36 contain a nitrogen in the head group. A POSA would understand that each of these nitrogen-containing head groups is protonatable.

48.     In Example 37, the inventors performed further experiments testing the hydrophobicity and stability of certain cationic lipids. *Id.* at Ex. 37. Again, all the cationic lipids tested in Example 37 contain a nitrogen in the head group. A POSA would understand that each of these nitrogen-containing head groups is protonatable.

49.     In addition to the drawings of head groups, primary groups, and cationic lipids that I have discussed above, the Patents-in-Suit summarize in a single paragraph the head groups that may be used in cationic lipids. *See id.* at 32:45–64. I have reproduced this paragraph from column 32 of the specification below:

> 45     Additional embodiments include a cationic lipid having a head group, one or more hydrophobic tails, and a central moiety between the head group and the one or more tails. The head group can include an amine; for example an amine having a desired $pK_a$. The $pK_a$ can be influenced by the
> 50     structure of the lipid, particularly the nature of head group; e.g., the presence, absence, and location of functional groups such as anionic functional groups, hydrogen bond donor functional groups, hydrogen bond acceptor groups, hydrophobic groups (e.g., aliphatic groups), hydrophilic groups
> 55     (e.g., hydroxyl or methoxy), or aryl groups. The head group amine can be a cationic amine; a primary, secondary, or tertiary amine; the head group can include one amine group (monoamine), two amine groups (diamine), three amine groups (triamine), or a larger number of amine groups, as in
> 60     an oligoamine or polyamine. The head group can include a functional group that is less strongly basic than an amine, such as, for example, an imidazole, a pyridine, or a guanidinium group. The head group can be zwitterionic. Other head groups are suitable as well.

50.     The head groups described in this column 32 paragraph are consistent with the drawings of head groups provided throughout the specification. Each of the head groups described in this column 32 paragraph contains a nitrogen atom, and each of the head groups is protonatable or permanently positively charged. I discuss these various head groups described in the column 32 paragraph in more detail below.

-16-

51.     The paragraph states: "The head group can include an amine; for example an amine having a desired pK$_a$. The pK$_a$ can be influenced by the structure of the lipid, particularly the nature of head group; e.g., the presence, absence, and location of functional groups such as anionic functional groups, hydrogen bond donor functional groups, hydrogen bond acceptor groups, hydrophobic groups (e.g., aliphatic groups), hydrophilic groups (e.g. hydroxyl or methoxy), or aryl groups." *Id.* at 32:48–55 (emphasis added). The drawings throughout the specification include a significant number of amines. For example, while the below head groups differ, they each contain at least one amine, which is a nitrogen-containing functional group:



*See* '933 patent at Table 1A.

52.     Next, the column 32 paragraph states "[t]he head group amine can be a cationic amine; a primary, secondary, or tertiary amine; the head group can include one amine group (monoamine), two amine groups (diamine), three amine groups (triamine), or a larger number of amine groups, as in an oligoamine or polyamine." *Id.* at 32:55–60. This sentence describes the various kinds of amines—and number of amines—that may be present in the head group.

53.    For example, a POSA would understand the specification's statement that "[t]he head group amine can be a cationic amine" to indicate that the amine functional group in the head group can be *permanently* charged, also known as a quaternary amine. *See id.* An example of such an amine is disclosed in the specification, highlighted in the red box below:



*See id.* at Scheme 1, col. 416.

54.    The specification's statement that "[t]he head group amine can be . . . a primary, secondary, or tertiary amine" describes different types of *protonatable* amines i.e., amines that are not permanently positively charged quaternary amines, but can become positively charged." *Id.* at 32:55–57. Examples of such protonatable amines are likewise disclosed in the specification and highlighted in the red boxes below:





-18-

*Id.* at Table 1A, 37:65; Table 3, col. 95.

55.     The statement that the head group may contain "two amine groups (diamine), three amine groups (triamine), or a larger number of amine groups, as in an oligoamine or polyamine" refers to the number of amine groups, and thus the number of nitrogen atoms. *Id.* at 32:57–60. The specification discloses examples with multiple amine groups, highlighted in the red boxes below:



*Id.* at Table 3, col. 85.

56.     The column 32 paragraph also states "[t]he head group can include a functional group that is less strongly basic than an amine, such as, for example, an imidazole, a pyridine, or a guanidinium group." *Id.* at 32:60–62. Each of these functional groups contains a nitrogen atom and is protonatable. These functional groups are also present in the various head groups disclosed in the drawings in the specification.

57.     I understand from counsel that Alnylam has argued that pyridine, imidazole, and guanidinium, are not "meaningfully" protonatable at physiological pH.  Markman Tr. at 57:7–23; 86:1–9. I understand this comment is referring to the fact that the $pK_a$ of pyridine—standing alone—is about 5.5, which is below physiological pH (*i.e.*, a pH of about 7.4).[3] *See* Pyridine,

---

[3] The $pK_a$ for imidazole is about 14.5, and the $pK_a$ for guanidinium is about 13.6. *See* Imidazole, WIKIPEDIA, https://en.wikipedia.org/wiki/Imidazole; Guanidine, WIKIPEDIA, https://en.wikipedia.org/wiki/Guanidine#Guanidinium_cation.   As such, a POSA would

WIKIPEDIA, https://en.wikipedia.org/wiki/Pyridine. But a POSA would not read the Patents-in-Suit's reference to pyridine in a vacuum, outside the context of how pyridine appears in the entire head group and in the cationic lipid as a whole. Thus, I will provide more context.

58.     First, by virtue of its nitrogen atom, pyridine is protonatable. Thus, a POSA would understand that a head group that contains pyridine can be protonated.

59.     Second, as I noted above, the pH at which a head group that includes a pyridine functional group becomes primarily protonatable requires analyzing the cationic lipid *as a whole*, including the *entire* head group. *See id.* at 32:49–55.

60.     Indeed, when the Patents-in-Suit disclose head groups that include the functional group pyridine, other amines are also included. As shown below and consistent with the column 32 paragraph, the head groups include both an amine (blue) and pyridine (yellow):



<hr />

understand that a cationic lipid with a head group that includes either imidazole or guanidinium alone would be protonatable, including at physiological pH 7.4.

*Id.* at col. 66. Tellingly, the Patents-in-Suit do not even disclose an embodiment of a complete cationic lipid that has pyridine in the head group.

61.     Similarly, where the Patents-in-Suit disclose head groups that include the functional groups imidazole and guanidinium (yellow), other amines (blue) are also present:



(where n is 0-5)





*Id.* at cols. 63, 65, 103–104.

62.     The column 32 paragraph also states "[t]he head group can be zwitterionic." *Id.* at 32:64. I understand the parties have agreed that zwitterionic head groups are not relevant to claim construction here. Markman Tr. at 29:16–30:17 ("neither party is suggesting that zwitterionic is relevant to the construction of the particular claims at issue."). In any case, zwitterionic head groups do have at least one positively charged/protonatable group.

63.     Finally, the column 32 paragraph states: "Other head groups are suitable as well." *Id.* at 32:63–64. Reading this sentence in view of the entire paragraph and the specification as a

whole, a POSA would understand this sentence to refer to other nitrogen-containing head groups that are either permanently positively charged or protonatable, beyond the limited number of such groups described in paragraph 32, consistent with every head group described earlier in the paragraph and throughout the Patents-in-Suit.

64.     Indeed, the specification includes examples of "suitable" and "representative" head groups  in addition to the ones disclosed in this column 32 paragraph. Just like every other head group in the specification, the "other" head groups not described in paragraph 32, but disclosed elsewhere in the specification are protonatable and contain a nitrogen atom, for example the following in Tables 1A and 2A:



Azetidine, *id.* at        Pyrollidine, *id.* at        Morpholine, *id.* at        Piperazine, *id.* at
62:25–33, Table 2A         62:26–44, Table 2A           65:11–15, Table 2A          66:23–29, Table 2A



Azetidine, *id.* at 38:55–59,
Table 1A

Piperidine, *id.* at 38:60–65,
Table 1A

65.     A POSA reading the column 32 paragraph would understand that it merely provides some examples of protonatable groups that a cationic lipid head group "can include." Every group described in the column 32 paragraph is protonatable, and as just discussed, the phrase "[o]ther head groups are suitable as well," would only be understood to cover other *protonatable* head groups, not non-protonatable head groups.

66.     Following the paragraph that discloses the head groups that may be used in the cationic lipids, the Patents-in-Suit include a paragraph that summarizes the central moieties that can be used. *Id.* at 32:65–33:10. I note that the Patents-in-Suit mention that the central moiety can contain a nitrogen atom. *Id.* at 32:65–66. However, a POSA would understand this paragraph to disclose that where the central moiety is a nitrogen atom, the head group of the cationic lipids still must be either permanently positively charged or protonatable. Indeed, the Patents-in-Suit disclose only two examples of central moieties containing nitrogen atoms (green), with both also including a head group that contains a protonatable amine (yellow):



*Id.* at 18:15–20, 18:35–40.

67.     Overall, every embodiment of a cationic lipid disclosed in the Patents-in-Suit contains a nitrogen-containing head group that is either permanently positively charged or is protonatable. In my opinion, the description in the column 32 paragraph of the Patents-in-Suit does not expand the scope of head groups identified and described in the specification. Instead, the column 32 paragraph simply summarizes the 1,000+ head group drawings and embodiments that are disclosed throughout the remaining sections of the specification that follow. Nothing in the column 32 paragraph or elsewhere in the Patents-in-Suit suggests that the head group of the cationic lipids used in the Patents-in-Suit can be anything but protonatable or permanently positively charged. This disclosure is consistent with how a POSA as of the priority date would understand the term "head group" in a cationic lipid.

## VIII.   OPINIONS

### A.       "head group"

The parties' competing constructions for "head group" are set forth below:

| TERM | PLAINTIFF'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|
| "head group" | Plain and ordinary meaning, which is "a portion of the lipid molecule that is less hydrophobic than the hydrophobic tails" | "a group that may be protonated" |

68.     The term "head group" appears in each of the Asserted Claims of the Patents-in-Suit (either expressly or by virtue of an independent claim). For example, claim 18 of the '933 patent recites "a cationic lipid comprising a primary group and two biodegradable hydrophobic tails, wherein: the primary group comprises (i) *a head group* that optionally comprises a primary,

secondary, or tertiary amine, and (ii) a central moiety to which the head group and two biodegradable hydrophobic tails are directly bonded; . . . ." *See* '933 patent, claim 18 (emphasis added). Claim 1 of the '979 patent recites "a lipid particle comprising: (i) a nucleic acid, (ii) 35–65 mol. % of a cationic lipid, . . . the cationic lipid comprises ***a head group***, two hydrophobic tails, and a central moiety to which the head group and the two hydrophobic tails are directly bonded . . ." *See* '979 patent, Claim 1.

69.     As discussed above in § VII, the Patents-in-Suit describe various compositions of head groups for cationic lipids in the column 32 paragraph. A POSA in the field of developing cationic lipids for nucleic acid delivery would understand each of these disclosures to describe a head group that is either protonatable or permanently positively charged. This understanding is reinforced by the fact that, as of the priority date, a POSA would have understood the term "head group" based on its function in a cationic lipid: protonation.

70.     Moreover, the more than 1,000 embodiments illustrated in the Patents-in-Suit all have protonatable or permanently positively charged head groups.

71.     As explained at ¶¶ 26–34, the presence of a positive charge in the head group was understood to be important for the proper formation of lipid particles and delivery of the nucleic acids into cells. In light of this understanding of the basic function of head groups of cationic lipids, there is nothing in the context of the entire specification that would have suggested to the POSA that anything other than protonatable or permanently positively charged head groups were contemplated in the Patents-in-Suit. Thus, in my opinion, this is how a POSA would define the cationic lipid head groups of the Patents-in-Suit.

72.     I understand Plaintiff argues that the "plain and ordinary meaning" of the term "head group" as of the priority date is "a portion of the lipid molecule that is less hydrophobic than

the hydrophobic tails." I do not believe this is an appropriate construction, especially in view of the intrinsic record.

73.     I agree the "head group" is a portion of the lipid molecule distinct from the hydrophobic tails and the central moiety. But as of the priority date, a POSA would have understood that cationic lipids were functionally driven by the positively charged (or protonatable) head group together with the hydrophobic tails—not by any difference in hydrophobicity between the head group and the tails. This is confirmed by the specification, which never discusses the hydrophobicity of the cationic lipid head groups. Therefore, a POSA would not understand the head groups of the claimed cationic lipids to be defined in the context of hydrophobicity.

74.     Moreover, Plaintiff's construction only requires that the head group be *less hydrophobic* than the hydrophobic tails. This vague characterization of the head group does not provide any meaningful description or characterization about the head group to a POSA. Even assuming the cationic lipid head groups of the Patents-in-Suit all had this characteristic of being less hydrophobic than the hydrophobic tails, a POSA as of the priority date would not consider this a *defining* characteristic of the head group in the context of nucleic acid delivery.

75.     In my opinion, Defendants' proposed construction of a "head group" meaning "a group that may be protonated" appropriately captures the well-known function of the head group in a cationic lipid as of the priority date, *i.e.*, the group that is positively charged or capable of being protonated. This construction, in my view, most accurately states the plain and ordinary meaning of "head group" to a skilled artisan in the field of cationic lipids for nucleic acid delivery, as of the priority date, and is consistent with the intrinsic record.

76.     Again, head groups—which are groups distinct from the central moiety and hydrophobic tails—were characterized in the field by their function, and more specifically, by their

positive charge or protonation. This explains why the specification does not describe any head group of a cationic lipid without either a permanently positive charge or a protonatable group, and it explains why every description of cationic lipid head groups in the Patents-in-Suit is done in terms of its protonation.

77.     Thus, in my opinion, a POSA would understand the term "head group" as used in the asserted claims of the Patents-in-Suit to mean "a group that may be protonated."  My opinion is based on the POSA's understanding of the term in the relevant art and the consistent use of the term and the head group examples in the patents.

## IX.   CONCLUSION

78.    I reserve the right to supplement or modify this Declaration based on any expert opinions that Plaintiff may later present or information that may be identified during the course of discovery.

79.    If I am called to testify, in connection with my anticipated testimony in this action, I may use as exhibits various documents produced in this case that refer or relate to the matters discussed in this Declaration. I have not yet selected the particular exhibits that might be used. In addition, I may create or assist in the creation of certain demonstrative evidence to assist me in testifying, and I reserve the right to do so, to further support the positions in this Declaration.

80.    I declare under penalty of perjury pursuant to the laws of the United States of America that the forgoing statements are true and correct.

Date: October 6, 2023

Kathryn A. Whitehead, Ph.D.