# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ALNYLAM PHARMACEUTICALS, INC., <br><br>         Plaintiff, <br>     v. <br><br> PFIZER, INC., PHARMACIA & UPJOHN CO. LLC, BIONTECH SE, and BIONTECH MANUFACTURING GMBH, <br><br>         Defendants. | Civil Action No. 22-cv-336-CFC (CONSOLIDATED) |

## JOINT CLAIM CONSTRUCTION BRIEF

# **Table of Contents**

I.     Lipid Terms Constructions ..................................................................1

II.    Disputed Constructions....................................................................2

       A.     Introductions.................................................................2

              1.     Alnylam's Introduction ..................................................2

              2.     Defendants' Introduction ...............................................7

       B.     "Head Group"..................................................................8

              1.     Alnylam's Opening Position.......................................9

              2.     Defendants' Answering Position ...........................21

              3.     Alnylam's Reply Position ......................................42

              4.     Defendants' Sur-Reply Position ............................57

       C.     "Vaccine" .......................................................................63

              1.     Alnylam's Opening Position.....................................64

              2.     Defendants' Answering Position ...........................69

              3.     Plaintiff's Reply Position ........................................80

              4.     Defendants' Sur-Reply Position ............................91

## Table of Authorities

Page(s)

**Cases**

*Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*,
2019 WL 1789463 (D.N.J. Apr. 24, 2019).........................................................55

*Align Tech., Inc. v. 3Shape A/S*,
2019 WL 4536562 (D. Del. Sept. 19, 2019).......................................................12

*Allen Eng'g Corp. v. Bartell Indus.*, Inc.,
299 F.3d 1336 (Fed. Cir. 2002) ..............................................................64, 81, 93

*Amgen Inc. v. Hospira, Inc.*,
2016 WL 7013483 (D. Del. Nov. 30, 2016) ..................................36, 55, 56, 62

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
618 F.3d 1354 (Fed. Cir. 2010) ...................................................................64, 81

*Applied Sci. & Tech., Inc. v. Advanced Energy Indus., Inc.*,
204 F. Supp. 2d 712 (D. Del. 2002)...............................................................84, 93

*Baxalta Inc. v. Genentech, Inc.*,
972 F.3d 1341 (Fed. Cir. 2020) ...................................................................12, 54

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002) ....................................................69, 81, 83, 91, 93

*CIAS, Inc. v. All. Gaming Corp.*,
504 F.3d 1356 (Fed. Cir. 2007) .........................................................................12

*Custom Accessories, Inc. v. Jeffrey–Allan Indus.*,
807 F.2d 955 (Fed. Cir. 1986) ...........................................................................48

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
8 F.4th 1331 (Fed. Cir. 2021) ............................................................................85

*Georgetown Rail Equip. Co. v. Holland L.P.*,
867 F.3d 1229 (Fed. Cir. 2017) ..............................................................64, 65, 93

*Guardant Health, Inc. v. Found. Med., Inc.*,
2019 WL 5677748 (D. Del. Nov. 1, 2019).........................................................54

*Infernal Tech., LLC v. Activision Blizzard Inc.*,
  2019 WL 4247227 (N.D. Tex. Sept. 6, 2019) ...............................................84, 93

*Littelfuse, Inc. v. Mersen USA EP Corp.*,
  29 F.4th 1376 (Fed. Cir. 2022) ...........................................................................11

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
  831 F.3d 1350 (Fed. Cir. 2016) ...........................................................35, 55, 62

*N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*,
  7 F.3d 1571 (Fed. Cir. 1993) ...............................................................................35

*NTP, Inc. v. Res. in Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005) ......................................................................70, 84

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
  778 F.3d 1021 (Fed. Cir. 2015) ......................................................................83, 92

*PACT XPP Schweiz AG v. Intel Corp.*,
  2020 WL 5821723 (D. Del. Sept. 30, 2020)........................................................85

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...................................................*passim*

*Pitney Bowes, Inc. v. Hewlett–Packard Co.*,
  182 F.3d 1305 (Fed. Cir. 1999) ..........................................................................69

*Process Control Corp. v. HydReclaim Corp.*,
  190 F.3d 1350 (Fed. Cir. 1999) ..........................................................................12

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
  739 F.3d 1367 (Fed. Cir. 2014) ..........................................................................69

*Rd. Widener, LLC v. Robert H. Finke & Sons, Inc.*,
  548 F. Supp. 3d 290 (N.D.N.Y. June 30, 2021) .................................................54

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ..........................................................................14

*Regents of Univ. of California v. Affymetrix, Inc.*,
  2018 WL 1466408 (S.D. Cal. Mar. 26, 2018)....................................................85

*Standard Oil Co. v. Am. Cyanamid Co.*,
   774 F.2d 448 (Fed. Cir. 1985) ...........................................................26

*The Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
   676 F. App'x 980 (Fed. Cir. 2017) ....................................................54

*Tris Pharma, Inc. v. Actavis Elizabeth LLC*,
   2018 WL 994878 (D. Del. Feb. 20, 2018)..................................55, 62

*USA Video Tech. Corp. v. Time Warner Cable, Inc.*,
   2007 WL 4365773 (E.D. Tex. Dec. 12, 2007) ..................................88

**Statutes**

35 U.S.C. § 112 ................................................................................*passim*

**Other Authorities**

MPEP 2163(I)(B) ................................................................................34

I.      Lipid Terms Constructions

The parties propose these constructions for the Lipid Terms based on the Court's claim construction for "cationic lipid" with regard to the '933 Patent and the '979 Patent—"a lipid compound that is positively charged or that may be protonated at physiological pH."   D.I. 109. The parties agree that no additional briefing is needed with regard to these Lipid Terms in the newer asserted family members— '229 Patent, '479 Patent, '480 Patent, and '657 Patent.  The parties further agree that each party has preserved its rights to argue constructions and positions consistent with the prior briefing for "cationic lipid" (see D.I. 86, 104, 109) with regard to these claim terms in any appeal from this case.

| Lipid Term | Construction |
|---|---|
| "cationic lipid compound"<br><br>Claims 4-6 of the '657 Patent | "a lipid compound that is positively charged or that may be protonated at physiological pH." |
| "lipid compound"<br><br>Claims 10-12 of the '479 Patent | "a lipid compound that is positively charged or that may be protonated at physiological pH." |
| "the lipid compound"<br><br>Claims 4-6 of the '657 Patent | "the lipid compound that is positively charged or that may be protonated at physiological pH." |
| "protonatable lipid compound"<br><br>Claims 27 and 28 of the '229 Patent; Claims 1-4, 11-15, and 17-19 of the '480 Patent; Claim 15-19, 22, 23, 26, 28 and 29 of the '657 Patent | "a lipid compound that may be protonated at physiological pH." |

II.    Disputed Constructions

A.    <u>Introductions</u>

1.    Alnylam's Introduction

Alnylam is a recognized pioneer in the development of RNA therapeutics and RNA delivery technology. Beginning more than a decade before the COVID pandemic, Alnylam began developing—and in time—patenting its critical lipid nanoparticle ("LNP") delivery technology for the safe and effective transport of delicate RNA materials to human cells.  Alnylam utilized its novel LNP technology to deliver the world's first approved RNAi therapeutic, ONPATTRO® (patisiran), which was launched in 2018. ONPATTRO® is currently approved for the treatment of polyneuropathy (a nervous system disorder) caused by an illness called hereditary ATTR (hATTR) amyloidosis.

Alnylam has also developed an additional delivery modality distinct from its LNP technology, termed GalNAc Delivery, which is utilized in four FDA approved products, GIVLAARI® (givosiran), approved in 2019, and OXLUMO® (lumasiran), approved in 2020, and AMVUTTRA® (vutrisiran), approved in 2022, all marketed by Alnylam, and LEQVIO® (inclisiran), approved in 2021, developed initially by Alnylam and licensed to Novartis.

Before the Court for claim construction are certain claim terms from Alnylam's '229 Patent, '657 Patent, '479 Patent, and '480 Patent ("Patents-at-Issue",

Exs. 1-4).[1]  The Patents-at-Issue cover groundbreaking technology that allowed for the development of RNA-based vaccines and therapies, including Defendants' COVID-19 Vaccine. The promise of nucleic acids as therapeutics was recognized long ago, but the ability to safely and effectively deliver nucleic acids remained elusive. The core innovation of the Patents-at-Issue is a class of improved cationic lipids: Alnylam invented a new class of protonatable lipids that, when formulated into lipid nanoparticles, effectively protect and deliver nucleic acid payloads and then biodegrade to aid in elimination from the body.  Pfizer publicly acknowledges that "[w]ithout these lipid nanoparticles, there could be no Pfizer-BioNTech mRNA vaccine." Ex. 17.

There are two terms before the Court for construction: (1) "head group" and (2) "vaccine." A person of ordinary skill in the art ("POSA") would readily understand these terms. Consequently, as Alnylam proposes, there is no reason for the Court to deviate from their ordinary and customary meanings. This is what the Federal Circuit requires.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) ("Because the patentee is required to define precisely what his invention is . . . it is unjust to the public, as well as an evasion of the law, to construe

---

[1] Two other patents, in the '933 Patent and the '979 Patent, are also in suit. They all share the same written description and are in the same patent family. A detailed factual background of this patent family and Alnylam's key discoveries has previously been provided to the Court.  *See* D.I. 86 at 2-6. The Court has already construed certain terms from the '933 and '979 Patents.  D.I. 103 and 109.

it in a manner different from the plain import of its terms.") (quotation marks omitted). In contrast, Defendants seek to use claim construction to read in limitations not present in the claim language. This does not comport with either the law or the scientific understanding of a POSA upon reading the intrinsic record.

Both of the terms appear in exemplary claims 27 and 28 of the '229 Patent:

27.  A *vaccine* comprising a lipid particle and a pharmaceutically acceptable diluent, excipient, or carrier, wherein the lipid particle comprises:

(i) a nucleic acid, wherein the nucleic acid comprises RNA,
(ii) 35-65 mol % of a protonatable lipid compound,
(iii) 3-12 mol % distearoylphosphatidylcholine (DSPC),
(iv) 15-45 mol % cholesterol, and
(v) 0.5-10 mol % of a PEG-modified lipid,

wherein the mol % is based on 100% total moles of lipids in the lipid particle,

wherein the protonatable lipid compound comprises a *head group*, hydrophobic tails, and a central moiety to which the *head group* and the hydrophobic tails are directly bonded, wherein:

the central moiety is a nitrogen atom;

the hydrophobic tails consist of two hydrophobic tails;

each of the two hydrophobic tails has the formula —$R^{12}$—$M^1$—$R^{13}$, wherein:

$R^{12}$ is a $C_4$-$C_{14}$ alkyl group, $M^1$ is —OC(O)—, and $R^{13}$ is a $C_{10}$-$C_{20}$ branched alkyl, wherein $R^{13}$ is branched at the alpha position relative to the —OC(O)— group;

the chain length of formula —$R^{12}$—$M^1$—$R^{13}$ is 17 atoms; and

4

the total carbon atom content of each hydrophobic tail is 21 to 26 carbon atoms.

28. The vaccine of claim 27, wherein the ***head group*** consists of a saturated aliphatic group and a hydroxyl group.

Claims 27 and 28 of the '229 Patent (emphasis added). A representative protonatable lipid compound of Claim 28 would have the following structural features, and is annotated to mirror the claim:[2]



The Court has construed the term "cationic lipid," as used in the '933 and '979 Patents, to mean "a lipid compound that is positively charged or that may be protonated at physiological pH." D.I. 109. The parties have agreed that the Court's construction of "cationic lipid" controls the constructions of the Lipid Terms in the

---

[2] This specific structure does not appear as a figure in the written description of the Patents-at-Issue but is consistent with the claims and terminology of the Patents-at-Issue.

other four patents.  *See supra* § I.  The Court's construction does not specify where in the molecule the cationic lipid may be protonated at physiological pH.

Regarding "head group," Alnylam has proposed it should be given its ordinary and customary meaning, which is "a portion of the lipid molecule that is less hydrophobic than the hydrophobic tails."  Defendants, meanwhile, seek to read in a limitation that the "head group" must be protonatable.  Defendants' proposed construction is incorrect because:

(i)   It is contrary to the plain claim language, in light of the Court's construction of "cationic lipid" and the parties' agreed to constructions of the Lipid Terms;

(ii) It is contrary to the ordinary and customary meaning of "head group" that has no such requirement; and

(iii) Is not supported by the written description, which plainly discloses the central moiety as a potential site of protonation and discloses head group structures that are not protonatable at physiological pH.

For "vaccine," Defendants argue, without a basis in law, that the presumption that preambles are non-limiting should be disregarded.  They also propose a construction that unnecessarily limits the ordinary and customary meaning of vaccine and is contrary to POSA's understanding that a vaccine stimulates the body's immune system to provide protection against disease.

6

2.      Defendants' Introduction

The parties propose two terms for construction: (1) "vaccine" in claims 27 and 28 of the '229 Patent and claim 6 of the '657 Patent; and (2) "head group" in all the asserted claims of the Patents-at-Issue.  The Patents-at-Issue are in the same patent family as the '933 and '979 Patents, and each of the Patents-at-Issue is a continuation from the '933 Patent, and thus shares the same specification.

Despite extensive briefing and multiple hearings regarding the "head group" term in the '933 and  '979 Patents, Plaintiff insists on re-briefing the term for the Patents-at-Issue while essentially rearguing the same evidence.   Defendants' position is that "head group" should be construed consistently across the family members in accordance with Federal Circuit case law.  That construction should be "a group that may be protonated" because that is consistent with the POSA's understanding of the term as of the priority date, and is fully aligned with the intrinsic evidence which teaches only cationic lipids having protonatable or otherwise positively charged head groups.

The term "vaccine," which appears in the preamble of claim 27 of the '229 Patent, is limiting at least because it recites necessary structure and provides antecedent basis for "[t]he vaccine" language in dependent claim 28.  Furthermore, the parties agree that "vaccine" should be given its plain and ordinary meaning, but disagree on what that meaning is.  Both parties rely on the Centers for Disease

Control and Prevention ("CDC") definition of "vaccine," but disagree over which CDC definition in time should apply.  Defendants propose the CDC's definition as of December 2011, the earliest effective filing date, consistent with claim construction law.  In contrast, Plaintiff proposes the CDC's current definition, which was adopted in 2021, ten years after the earliest effective filing date.  Plaintiff does not argue that the CDC's definition as of 2011 is incorrect, and its expert, Dr. Ravetch, does not address that definition.  Rather, Plaintiff only argues that the CDC's 2011 definition might confuse the jury with respect to infringement, an opinion that is notably absent from Dr. Ravetch's declaration.  *See* Ex. 6.  As explained below, Plaintiff's concern is unfounded.  Thus, Defendants ask the Court to hold that "vaccine" in the preamble of claim 27 is limiting and to adopt the plain and ordinary meaning of "vaccine" as of the earliest effective filing date.

B.    "Head Group"

| Term | Alnylam's Construction | Defendants' Construction |
|---|---|---|
| "head group" Claims 27 and 28 of the '229 Patent; Claims 4-6, 15-19, 22, 23, 26, 28, and 29 of the '657 Patent; Claims 10-12 of the '479 Patent; | Ordinary and customary meaning, which is "a portion of the lipid molecule that is less hydrophobic than the hydrophobic tails" | "a group that may be protonated." |

8

| Claims 1-4, 11-15, and 17-19 of the '480 Patent. | | |
|---|---|---|

1.      Alnylam's Opening Position

The term "head group" should be afforded its ordinary and customary meaning, in light of the claims and the written description of the Patents-at-Issue, which is "a portion of the lipid molecule that is less hydrophobic than the hydrophobic tails." The Court should adopt this construction because it is consistent with the Court's construction of "cationic lipid" and the parties' agreed-to constructions of the Lipid Terms, which do not require protonation to occur in the head group. This is bolstered by the lack of such an express claim requirement that the head group be protonatable, and the written description, which shows plainly that the central moiety may be the site of protonation.

a.      The Claim Language Supports Alnylam's Construction and Undermines Defendants' Construction

The claims themselves support Alnylam's proposed construction and show the failings of Defendants' proposed construction. During the first *Markman* hearing in this matter, the Court construed "cationic lipid" to mean "a lipid compound that is positively charged or that may be protonated at physiological pH." D.I. 109. The parties subsequently agreed that construction informed the constructions of the other Lipid Terms. *See* supra § I; *see also* D.I. 150. The agreed constructions of the Lipid

9

Terms highlight that protonatability is a property of the lipid as a whole – and not necessarily of the "head group." This is consistent with ordinary and customary meaning proposed by Alnylam.

Defendants now attempt to use "head group" as a vehicle for requiring a specific portion of the lipid to be protonatable (*i.e.*, the head group), despite the plain claim language to the contrary. The independent claim language *never* expressly states the requirement that the head group be protonatable. Rather, it calls for the lipid to be "protonatable" without specifying the location of the protonatable group. *See, e.g.*, claim 27 of the '229 Patent ("wherein the *protonatable lipid compound* comprises a head group, hydrophobic tails, and a central moiety to which the head group and the hydrophobic tails are directly bonded") (emphasis added). The protonatability of the lipid as whole, without reference to the head group itself, shows the error in Defendants reading a protonation requirement into head group. *Phillips*, 415 F.3d at 1314 ("To begin with, the context in which a term is used in the asserted claim can be highly instructive.").

Further, the claim language supports Alnylam's construction because it clearly discloses the central moiety as a cite for protonation, while not having that requirement for head group. Each of the claims at issue require that the central moiety to be a nitrogen. *See e.g.*, '229 Patent at Claim 27 ("the central moiety is a nitrogen atom.") That textual language identifying a nitrogen central moiety

expressly ascribes an atom that could be protonated in the central moiety. Kros[3] Decl. (Ex. 5) at ¶¶ 17, 56-58, 61. No such analogous textual language ascribing a potential protonatable group in the head group is present in the claim language.

The dependent claims also support Alnylam's construction and confirm the error of Defendants' attempts to read in a "protonatable" limitation into the term "head group." Those claims expressly require head groups that are not protonatable at physiological pH. Kros Decl. (Ex. 5) at ¶¶63-73. "By definition, an independent claim is broader than a claim that depends from it, so if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that embodiment as well." *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022). Because the dependent claims must be within the independent claims, Defendants' proposed construction fails.

The Federal Circuit has repeatedly held that any construction of an independent claim that would render claims that depend from it potentially invalid is disfavored and presumed to be improper. *See, e.g.*, *Littelfuse*, 29 F.4th at 1380 ("Otherwise, the dependent claims would have no scope and thus be meaningless. A

---

[3] Dr. Alexander Kros is Professor of Supramolecular Chemistry at the Leiden Institute of Chemistry in Leiden University in the Netherlands. He is a POSA with experience in lipid chemistry. His declaration cited herein is his October 6, 2023 Declaration that was submitted in conjunction with the head group briefing. *See* D.I. 124-1. While the citations of his declaration are to the '933 Patent, it shares the same written description as the Patents-at-Issue. His declaration, including exhibits, is attached as Ex. 5.

claim construction that leads to that result is generally disfavored."); *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1346 (Fed. Cir. 2020) ("The plain language of these dependent claims weighs heavily in favor of adopting Baxalta's broader claim construction . . . we reject the district court's construction which renders dependent claims invalid."); *Align Tech., Inc. v. 3Shape A/S*, No. CV 18-1949-LPS-CJB, 2019 WL 4536562, at *2 n.4 (D. Del. Sept. 19, 2019) (Noting that a construction that would "nullify" or "read out" a dependent claim is improper).  Defendants' proposed construction runs afoul of this presumption.  Further, this is not the case where the only construction consistent with the claim language and the written description would render the dependent claims potentially invalid.  *Cf., Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999) ("claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated.").

Alnylam's construction is consistent with the proper dependency of the dependent claims.  *Each* of the Patents-at-Issue includes dependent claims that limit "head group" to "wherein the head group *consists of* a saturated aliphatic group and a hydroxyl group."  '229 Patent at Claims 10, 16, 25, and 28; '657 Patent at 19 and 23; '479 Patent at Claims 8, 12, and 19;'480 Patent at Claims 10 and 11 (emphasis added).  "[C]onsists of" is a closed transitional phrase, which limits the head group to "a saturated aliphatic group" and "a hydroxyl group."  *See CIAS, Inc. v. All.*

*Gaming Corp.*, 504 F.3d 1356, 1361 (Fed. Cir. 2007) ("It is equally well understood in patent usage that 'consisting of' is closed-ended and conveys limitation and exclusion.").

As Dr. Kros explains, *neither* a saturated aliphatic group nor a hydroxyl group is protonatable at physiological pH.  Kros Decl. (Ex. 5) at ¶76.  Simply put, the dependent claim language expressly identifies a head group that a POSA would understand *is not protonatable at physiological pH* within the claimed cationic lipid, which, according to Defendants' proposed construction, would be required to have a protonatable head group.  Defendants' proposed construction cannot be correct, as it would require the head group to be both protonatable and only composed of groups that are not protonatable.  Kros Decl. (Ex. 5) at ¶77.  Defendants' proposed construction is erroneous while Alnylam's is consistent with the presumption of proper dependency.[4]

---

[4] Beginning in March 2023, during the original claim construction proceedings for the '933 Patent and the '979 Patent, Defendants proposed a construction for "head group" that included "at physiological pH."  After full briefing and a *Markman* hearing on the construction, Defendants dropped the "at physiological pH" from their construction in September 2023.  Despite attempts to seek clarification on Defendants' new construction, it remains unclear whether Defendants' current claim construction still requires the head group to be protonatable at physiological pH, or if Defendants intend some other standard to apply.  To the extent Defendants intend to impart some other pH into the construction of "head group," there is no support for such a construction in the intrinsic record.  Such a construction would violate the maxim that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the

13

The Court should reject Defendants' proposed construction in favor of Alnylam's for these reasons grounded in the claim language alone.

> **b.    The Ordinary and Customary Meaning of "Head Group" Is Consistent with Alnylam's Proposed Construction and Does Not Require the Head Group to Be Protonated**

Alnylam's proposed head group construction that it is "a portion of the lipid molecule that is less hydrophobic than the hydrophobic tails" is consistent with the ordinary and customary meaning of "head group" in the context of the Patents-at-Issue.

This ordinary and customary meaning is based on a POSA's understanding of naturally occurring lipids.  Kros Decl. (Ex. 5) at ¶¶32-47.  To provide background for a POSA's understanding of the term "head group," it is essential to understand the development of cationic lipids for use in the delivery of RNA and DNA from naturally occurring lipids.  *See* Kros Decl. (Ex. 5) at ¶¶21-27.  Specifically, POSAs were aware of several classes of naturally occurring lipids, like phospholipids and fatty acids, that have hydrophobic tails and less hydrophobic head groups.  *See* Kros Decl. (Ex. 5) at ¶¶25, 35-42.  Textbooks and other reference materials offer the following depictions of these lipids:

---

correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed. Cir. 1998)).



Ex. 7 (Britannica) at 19; *see also* Ex. 8 (Molecular Biology of the Cell) at 58-59; *see also* Kros Decl. (Ex. 5) at ¶¶37-39.

These naturally occurring lipids had many desirable properties, including their ability in water to form spheres and other shapes that could be used to encapsulate or otherwise surround other molecules. *See* Kros Decl. (Ex. 5) at ¶¶25, 41-42, 44-45. One such arrangement is a liposome. A liposome forms when two layers of phospholipids arrange themselves so that the head groups, which preferentially interact with water, form the inner and outer surfaces of the sphere, and the hydrophobic tails, which preferentially interact with each other to avoid the water, form an internal layer:



Decl. Ex. 7 (Britannica) at 26 (annotated to show the aqueous solution around and inside the liposome); *see also* Kros Decl. (Ex. 5) at ¶42.

Scientists used this property to create synthetic cationic lipids that could overcome the difficulties in protecting RNA and DNA during delivery.  *See* Kros Decl. (Ex. 5)  at ¶¶43-46.  The fundamental structure of these cationic lipids has hydrophobic tails and less hydrophobic heads, so that the lipids form protective lipid particles around the RNA or DNA.  *See* Kros Decl. (Ex. 5) at ¶¶43-46.

Defendants included several articles as part of their submission in the Joint Claim Construction Chart, implicitly identifying them as "intrinsic evidence."  These articles, which were submitted during prosecution of the Patents-at-Issue, are consistent with this common understanding that head groups are the portion of the lipid that is less hydrophobic than the tails.  *See* Kros Decl. (Ex. 5)  at ¶¶80-83; *see* D.I. 150 (listing articles). These articles accord with Alnylam's advanced ordinary

and customary meaning of the term "head group" in the context of the Patents-at-Issue, which is a "portion of the lipid molecule that is less hydrophobic than the hydrophobic tails." *See* Kros Decl. (Ex. 5) at ¶¶80-83.

The ordinary and customary meaning of head group further confirms the error in Defendants' attempt to limit protonation to that group. Protonatability is a separate concept from hydrophobicity/hydrophilicity. Kros Decl. (Ex. 5) at ¶¶24, 35-46, Appendix A, ¶11 n.32. There is no requirement in the art that the head group be protonatable, as protonation (acceptance of a positive charge) could just as well occur at the central moiety. Kros Decl. (Ex. 5) at ¶¶56-57. That is because the function of protonation is a separate function from aggregation – it is to bind the negatively charged RNA or DNA to the lipid. Kros Decl. (Ex. 5) at ¶46. Protonation may occur either in the head group or in the central moiety (or both) to perform the function of binding the negatively charged RNA or DNA. Kros Decl. (Ex. 5) at ¶46.

Prior art cited in patent prosecution shows the concept of a protonatable nitrogen central moiety combined with a non-protonatable head group at physiological pH:



Kros Decl. (Ex. 5)  at ¶ 58 (citing WO 2006/138380) (annotated).

The parties agree, and the Court's construction of "cationic lipid" requires, that the lipids described in the Patents-at-Issue need to be protonatable at physiological pH to accept nucleic acid material (*e.g.*, RNA) and act as a delivery mechanism in the claimed lipid particles. *See* Kros Decl. (Ex. 5) at ¶¶43-46; D.I. 150 (JCCC) at 12-13.  But as the evidence shows, the protonation site could be either in the head group or the central moiety.  *See* Kros Decl. (Ex. 5) at ¶¶48-62 (discussing intrinsic support generally); ¶58 (discussing prior art with the protonatable group in the central moiety rather than the head group).   The ordinary and customary understanding does not require protonatability to be in the "head group."  *See* Kros Decl. (Ex. 5) at ¶¶48-73.

> c.   The Specification of the Patents-at-Issue Supports Alnylam's Construction

The specification confirms that Alnylam's head group construction is correct for several reasons.  First, the claims themselves as read by a POSA support Alnylam's ordinary and customary construction.  *See* Kros Decl. (Ex. 5) at ¶¶52-58.  The claim language requires that the tails be "hydrophobic," but does not ascribe such a property to the head group and the central moiety. *See, e.g.*, '229 Patent at Claim 27; *see also* Kros Decl. (Ex. 5) at ¶¶52-58.  Therefore, they are less hydrophobic than the tails in accordance with the common understanding.  *See* Kros Decl. (Ex. 5) at ¶¶52-58.

Second, the claim language as read by a POSA does not support Defendants' limitation of requiring protonatability at the head group.  *See* Kros Decl. (Ex. 5) at ¶¶52-73  As discussed above, each of the claims at issue here requires both a head group and a nitrogen central moiety.  *See, e.g.*, Claim 27 of the '229 Patent ("the central moiety is a nitrogen atom").  These limitations accord with a POSA's understanding that the claimed cationic lipids could have either a protonatable central moiety (*e.g.*, a nitrogen atom) or a protonatable head group, or both.  *See* Kros Decl. (Ex. 5) at ¶¶48-49, 54.  Such ordinary scope aligns with the Court's construction of "cationic lipid," which has no reference to the location of protonatability.  *See* Kros Decl. (Ex. 5) at ¶55; *see supra* § II.B.1.b.

Third, a POSA reading the specification understands that the specification discloses examples of hydrophobic tails with less hydrophobic head groups.  For

example, the specification states that "[s]ome cationic lipids can be conveniently represented as a hydrophobic group combined via a central moiety (such as a carbon atom) with a headgroup." *See* '229 Patent at 36:64-67.  This confirms for a POSA that there is a hydrophobic region of the molecule (*i.e.*, the tails),  and, necessarily, a less hydrophobic region of the molecule (*i.e.*, the head group and central moiety). *See* Kros Decl. (Ex. 5) at ¶48.  Other specification disclosures convey to a POSA this common understanding.  *See* Kros Decl. (Ex. 5) at ¶¶48-49; *see e.g.*, '229 Patent at 37:1-38:20.

Fourth, the specification as read by a POSA confirms the error of Defendants' construction.  For example, column 17 provides a description of a "protonatable" "primary group" that "includes" a head group and a central moiety, and teaches that the central moiety could be a nitrogen atom, which one of skill understands could be protonatable. '229 Patent, 17:1-21; *see* Kros Decl. (Ex. 5) at ¶¶59-62.  Notably, this express specification language ascribes no requirement that the head group be protonated.  Rather, it states that the primary group "comprises a protonatable group," and then delineates the primary group into a head group and a central moiety without ascribing the protonatable functionality to the head group.  And this section includes a nitrogen as an exemplary central moiety, which a POSA would understand may be a protonation site in the central moiety nitrogen, leaving no need for protonation  in the head group.  *See* Kros Decl. (Ex. 5) at ¶62.

Column 32 provides several examples of different types of head groups, including some that are not protonatable at physiological pH.[5] *See* Kros Decl. (Ex. 5) at ¶¶63-73. The specification identifies suitable groups as being "hydroxyl" or "methoxy", which are understood by a POSA to be not protonatable at physiological pH. *See* '229 Patent at 32:57-63; Kros Decl. (Ex. 5) at ¶¶66, 70, 78. These structures, likewise called out in the dependent claims, *supra*, convey non-protonatable head groups at physiological pH.

Column 33 also calls out pyridines as potential less basic head groups. A POSA would understand such head groups are not protonatable for the biological cationic lipid compounds claimed. *See* Kros Decl. (Ex. 5) at ¶69; '229 Patent at 33:1-4. Such disclosure in the specification, and the lack of a protonatable head group requirement in the claim language, confirms the error in reading in Defendants' limiting construction that deviates from the ordinary and customary meaning of head group. *See* Kros Decl. (Ex. 5) at ¶70; *see* § II.B.1.b , *supra*.

## 2. Defendants' Answering Position

The parties dispute whether the "head group" is the end of a cationic lipid that "may be [i.e., is capable of being] protonated." Defendants' construction requires

---

[5] To the extent that Defendants' new construction no longer requires that the head group be protonatable at physiological pH, this still does not support the inclusion of the protonatability requirement into the construction of head group. Kros Decl. (Ex. 5) at ¶¶18-19, 66.

that the "head group" is capable of being positively charged or is positively charged. The extrinsic evidence shows that the POSA understood as of 2011 that the head group of a cationic lipid is protonatable.[6]  The intrinsic evidence, which describes only cationic lipid head groups that are protonatable, is fully aligned with the POSA's understanding.  Plaintiff points to no affirmative teaching in the original specification as filed in 2011 that the head group of a cationic lipid can be anything other than protonatable.  Instead, Plaintiff takes certain vague passages out of context from the overall written description and relies on self-serving inferences that are not grounded in the intrinsic record.

a.   The POSA Understood the Head Group of a Cationic Lipid to Be Protonatable

The POSA as of 2011 understood that cationic lipid head groups are protonatable because the cationic lipids being used at the time in the art had protonatable head groups and because the location of that positively-charged feature in the head group was believed to be functionally important for lipid-based drug delivery systems.

i.   The Prior Art of Record Shows that Cationic Lipid Head Groups Are Protonatable

---

[6] Defendants use the term "protonatable" in this brief to refer to both head groups that are capable of being positively charged (e.g., by having a tertiary amine) or are positively charged (e.g., by having a quaternary amine).

Defendants' prior art references, including references cited on the face of the patent, *categorically* describe the "head group" of cationic lipids as protonatable. For example, Tang & Hughes is a peer-reviewed article about cationic lipids for delivery published in 1999 in the Journal of Controlled Release.[7]  In the introduction section, the authors discuss cationic lipids generally and explain that "*[a]ll cationic lipid* molecules contain three functional domains: a *positive charged head group*, a hydrophobic region, and a linker that tethers the cationic group and hydrophobic groups."  Ex. 20 at 345-346 (emphasis added); *see also* Ex. 5 at ¶ 81, n. 27 (conceding that "Tang (1999) includes lipids with permanent positive charges and that are protonatable.").  Thus, Tang & Hughes teaches that *all* cationic lipids contain a *positively charged head group*.  Plaintiff relied on Dr. Kros, who declared that Tang & Hughes is from 1999 and does not represent the state of the art in 2011.  Ex. 5 at ¶ 81.  But Ramirez-Gordillo, a peer-reviewed article about cationic lipids for delivery published in 2011, contradicts Dr. Kros and shows that this was still the view as of 2011.  *See*, Ex. 21 at 2 ("*Cationic lipids . . . all share* three structural features: a *positively charged head group*, a hydrophobic anchor, and a linker between these.").  The teachings in these peer-reviewed publications, which reflect

---

[7] Dr. Whitehead identified the Journal of Controlled Release when asked by the Court about literature in the field of controlled release and described it as "the most well-cited, highest profile journal that is exclusively about drug delivery."  Ex. 24 at 21:21-22:9. Dr. Kros agreed that it is a "fine journal."  *Id*. at 130:1-7.

the POSA's knowledge, could not be more clear—***all cationic lipids have positively charged head groups***.  *See also* Ex. 22 at ALNY-00946768; Ex. 23 at ALNY-00954963.

In contrast, Plaintiff relies on the Encyclopedia Britannica and the WO '380 patent application, neither of which is instructive here as to the POSA's understanding of cationic lipid head groups.  The Encyclopedia Britannica is not a scientific publication.  Also, the section that Plaintiff relies on discusses naturally occurring lipids, such as phospholipids, generally and never mentions the synthetic "cationic lipids" at issue here, which function differently.[8]  Further, Plaintiff cherry-picked portions of a figure while leaving out others portions that belie its claim construction argument.  The following is the full figure from the Encyclopedia Britannica that Plaintiff relies on:

---

[8] Dr. Kros distinguished naturally occurring lipids from the synthetic cationic lipids. *See* Ex. 5 at ¶ 44; Ex. 24 at 100:5-9.



Ex. 7 at 1 (annotated).  Plaintiff pulled images of naturally occurring lipids from the right-most column, which is tellingly titled, "generic simplified depiction."  But Plaintiff failed to address the "structural formula" column, which shows that these same naturally occurring lipids have negative (blue circle) and/or positive charges (red circle) in the head group (pink highlight). Thus, Plaintiff's figure illustrates how even naturally occurring lipids have charged head groups, consistent with Defendants' construction.

Plaintiff's reliance on WO '380 is also not persuasive.  First, WO '380 is not representative of the knowledge of the POSA.  Rather, WO '380 reflects cutting-edge research from two of the most well-renowned groups in the world working on

lipid-based drug delivery systems at the time—i.e., the Langer lab and the Anderson lab at MIT.  And as everyone agrees, these were persons of extraordinary skill, to say the least. [9]  Thus, the cutting edge research that Dr. Langer and Dr. Anderson were seeking to patent was not representative of the knowledge of the POSA[10], who is "presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985).  Put simply: "The statutory emphasis is on a person of *ordinary* skill."  *Id.* (emphasis added); *see also* Ex. 18 at ¶ 15 (defining a POSA).

Second, Dr. Langer and Dr. Anderson never describe the technology and compounds disclosed in their WO '380 patent application as "cationic lipids."  Nor does WO '380 ever use the term "head group."[11]

---

[9] *See* Ex. 24 at 138:20-24 (Dr. Kros testified that "[t]hey are one of the lead - - one of the leading groups in the world on making systems to deliver drugs into patients."); *id*. at 185:18-22 (Plaintiff's counsel described them as "two of the most prominent scientists in this area,"); *id*. at 189:16-19. (Dr. Whitehead agreed with Plaintiff's counsel that "Dr. Langer and Dr. Anderson aren't just persons of ordinary skill in the art. They are really leaders in this field.").

[10] S*ee* Ex. 24 at 168:11-169:6 (Dr. Whitehead testified that WO '380 would not change her opinion about how a POSA would have understood "head group" as of 2011).

[11] A word search for "head group" using Adobe Acrobat Reader identified no results.

26

Third, patents and patent publications are not always reliable sources for the customary use of language because (1) such references  are generally written by patent-lawyers, (2) inventors are allowed to be their own lexicographers, and (3) these references are not peer-reviewed for scientific accuracy.  In contrast, scientific literature, such as Defendants' references, is written by scientists for the scientific community, including persons of *ordinary* skill, and is peer-reviewed for accuracy.

Therefore, the two pieces of prior art that Plaintiff relies on (a general encyclopedia and patent application) are not instructive.  Indeed, when questioned by the Court, neither Dr. Kros nor Dr. Whitehead identified general knowledge encyclopedias or patent applications as useful for understand the meaning of "head group."  *See generally* Ex. 24 at 11:14-13:13, 21:18-23:19; 134:18-21.[12]  Notably, despite filing four sets of briefs and providing expert testimony on "head group," Plaintiff has yet to point to a single instance where the prior art teaches that cationic lipids can have head groups that are not protonatable.

        ii.    It Was Understood that the Charge in the Head Group
                Was Important for Cationic Lipid Function

As Dr. Whitehead explained, the POSA as of 2011 understood that the location of the positive charge in the head group was important for cationic lipids to

---

[12] Dr. Kros never testified that he was aware of the WO '380 Publication before consulting on this litigation and on cross examination admitted that that Plaintiff provided it to him. Ex. 24 at 134:23-25.

function for lipid-based delivery of nucleic acids, including for example with respect to binding to negatively charged RNA and forming lipid nanoparticles. *See* Ex. 18 at ¶ 26; Ex. 24 at 160:7-162:7. Dr. Kros's testimony to the contrary—i.e., that the negatively charged RNA "doesn't care" whether the positive charge is in the head group or the central moiety[13] appears to be based on 10 years of hindsight and does not reflect what the POSA would have understood in 2011. Not only does Dr. Whitehead disagree (Ex. 24 at 160:7-162:7), but the prior art of record contradicts Dr. Kros's testimony.

Chesnoy & Huang, a peer-reviewed review article titled, "Structure and Function of Lipid-DNA Complexes for Gene Delivery," is directly on point. As a review article, it summarizes the general knowledge in the field at the time and is directed to the scientific community working in this field. Chesnoy & Huang explains in a section titled "Structure and Physical Properties of Cationic Lipids":

> The linker represents any chemical part between the hydrophobic anchor and the head group. The linker is important in ensuring *optimal contact between the cationic head group and the negatively charged phosphates of the DNA*.

Ex. 22 at ALNY-00956769 (emphasis added). Thus, Chesnoy & Huang reflects the POSA's understanding at the time that it is the positive charge in the head group of

---

[13] *See, e.g.*, Ex. 24 at 102:16-103:6.

the cationic lipid that interacts with the negatively charged nucleic acid.[14]  Indeed, despite discussing the linker in the same passage, Chesnoy & Huang only describes the linker as physically connecting the head group to the tails. [15]

Ramirez-Gordillo, discussed above, confirms that this was still the POSA's understanding in 2011:

> The *positively charged head group interacts with the phosphate backbone of DNA* to form a liposomal structure with a positive surface charge. The positive charge of the liposomal structure facilitates its interaction with the cell membrane, and the transfection complex enters the cell by the process of endocytosis.

Ex. 21 at 2 (emphasis added).  As with Chesnoy & Huang, Ramirez-Gordillo mentions the linker, but never suggests that the positive charge of a cationic lipid can be in the linker.  Rather, it only describes the linker as "between" the positively charged head group and the hydrophobic trials.  *See supra* at § II.B.2.a.i.

*** 

Thus, the prior art of record shows that the POSA understood that the head group of a cationic lipid is protonatable and that the presence of the charge in the head group was important for its function and supports Defendants' construction.

---

[14] Although Chesnoy & Huang specifically mentions DNA, RNA has the same negative charge.

[15] Dr. Kros conceded that the "art sometimes refers to a central moiety as a linker." Ex. 24 at 94:19-24.

      b.      The Intrinsic Evidence Is Aligned with the POSA's
              Knowledge and Supports Defendants' Construction

The intrinsic evidence is fully aligned with the prior art showing that cationic lipid head groups are protonatable.  Briefly, there is no dispute that every single example of a head group, whether disclosed as a stand-alone head group, part of a primary group, or part of a full cationic lipid, is protonatable.  And there can be no dispute that the only discussion of protonation of the disclosed cationic lipids is in the context of the head group region—there is no affirmative discussion of locating the protonation in the central moiety.  The only time that non-protonatable head groups appear is in certain litigation-driven dependent claims of the Patents-at-Issue—e.g., claim 28 of the '229 Patent—which were strategically drafted about a decade after the original specification was filed to try to ensnare Defendants' accused product.  Those claims reflect neither the POSA's understanding in 2011 nor the scope of the original specification (*See* Ex. 24 at 127:9-11 (Dr. Kros conceded that the "patent never says an uncharged head group is suitable for the claimed cationic lipids.")), and cannot be used to change the meaning of terms in the original specification to benefit the patent owner now.

      i.      The Later-Drafted Claim Language Is Not Probative of
              the Meaning of Head Group

Plaintiff's arguments concerning the claim language are based on (1) misunderstandings, (2) circular arguments, and (3) the handful of litigation-driven dependent claims discussed above.

First, Plaintiff's discussion of the Court's construction of "cationic lipid" in the '933 and the '979 Patents does not prove its construction of "head group." *Supra* at § II.B.1.a. Plaintiff argues only its construction is consistent with "cationic lipid." Not so. Defendants' construction simply clarifies that "head group" must have a positive charge as required by "cationic lipid."

Further, Plaintiff's assertions that the parties agreed to constructions for the "Lipid Terms" in the Later-Issued Patents are incorrect: *Supra* at § II.B.1.a ("The Court should adopt this construction because it is consistent with . . . the parties' agreed-to constructions of the Lipid Terms . . ."); supra at § II.B.1.a ("The agreed constructions of the Lipid Terms highlight . . .". Instead, the parties agreed that the Lipid Terms in the Patents-at-Issue and the "cationic lipid" term already construed by the Court in the '933 and the '979 Patents should be construed consistently, no additional briefing was needed, and preserved their rights "to argue constructions and positions consistent with the prior briefing for 'cationic lipid' (*see* D.I. 86, 104, 109) with regard to these [Lipid Terms] in any appeal from this case." D.I. 150 at 12 n.11. In fact, the Lipid Terms are listed as "Disputed Constructions" in the Joint Claim Construction Chart, D.I. 150, and not agreed.

Second, Plaintiff's argument that the claims "never expressly state[] the requirement that head group be protonatable" is circular because it presumes that Plaintiff's construction for "head group" is true—i.e., that the "head group" term itself does not require protonation.  In fact, the absence of such an express statement is consistent with Defendants' construction because it is inherent to the "head group" term.

Plaintiff is also wrong that the "claim language . . . clearly discloses the central moiety as a cite(sic) for protonation."  Neither the claims nor the remainder of the specification describe protonation at the central moiety; rather the central moiety is only described as a physical linker between the head group and the hydrophobic tails.  *See, e.g.*, Ex. 1 at 33:6-18.  Plaintiff points to no discussion of protonation or charge in the context of the central moiety.  Even where the claims and specification state that the central moiety can be a nitrogen atom, there is no indication that the nitrogen atom serves any purpose other than physically connecting the head group to the tails.[16]  *See* Ex. 1 at 33:6-18.  Rather, it is undisputed that the only two embodiments in the specification depicting a nitrogen atom in the central moiety each have a protonatable head group.  *See* Ex. 24 at 106:8-10 (Dr. Kros conceded

---

[16] On cross-examination, Dr. Kros conceded that the central moiety "simply connects the head group to the tails."  *See* Ex. 24 at 94:15-24.

that "the nitrogen central moieties in these examples are bound to protonatable head groups.").

This is in stark contrast to the specification's discussion of cationic lipid head groups having a desired pKa in the context of protonation. *See, e.g.*, Ex. 1 at 32:53-33:5. In particular, the specification explains that the "head group can include an amine; for an example an amine *having a desired pK$_a$*." *Id*. at 32:56-57 (emphasis added). Dr. Kros admitted that the "pKa determines the pH at which the amine is protonated," and that the "inventors are explaining that a desired pKa for an amine is an important feature of the head group." Ex. 24 at 114:11-17. Dr. Kros also conceded that "the specification never talks about the pKa of a nitrogen in a central moiety." *Id*. at 115:9-11. Thus, the specification discusses a "desired pka," and hence protonation, only in reference to the head group of a cationic lipid.

Third, Plaintiff's reliance on some later-drafted dependent claims in the Patents-at-Issue, which are expressly limited to non-protonatable head groups (e.g. '229 Patent claim 28), is also unpersuasive. Those claims were drafted a decade after the original specification was filed in 2011, and shortly after Defendants' lipids became publicly known. Claims drafted in 2022 say nothing about the knowledge of a POSA as of the priority date. Indeed, despite a decade of prosecution, Plaintiff never previously pursued such head group limitations. Plaintiff only pursued claims that were *expressly limited to protonatable head groups*, consistent with the POSA's

33

understanding of a cationic lipid head group at the time and the disclosure in the original specification.  Only after the components of Defendants' accused product became public in 2021 did Plaintiff prosecute dependent claims that depart from the POSA's understanding of a cationic lipid head group and the original specification— eventually completely reversing direction and drafting claims *expressly limited to nonprotonatable head groups*.[17]  The Court should not allow Plaintiff to change the meaning of "head group" in the original disclosure through strategic claim drafting in later patent applications after reviewing technology developed by competitors years later.[18]

The fact that Defendants' construction of "head group" would render these dependent claims in the Patents-at–Issue invalid does not change the calculus here. Such claims should, in fact, be invalidated at least under 35 U.S.C. § 112(d), as a matter of law.  There is Federal Circuit and District of Delaware precedent for this exact outcome, which is especially warranted here.

---

[17] *See, e.g.*, Ex. 34 at 4 ("wherein the head group *consists of a saturated aliphatic group and a hydroxyl group*") (emphasis added).

[18] The Court explained: "You can't draft patents later on to benefit your claim construction."  Ex. 24 at 138:5-6; *see also* MPEP 2163(I)(B) (regarding "New or Amended Claims": "The claims as filed in the original specification are part of the disclosure…. New or amended claims which introduce elements or limitations that are not supported by the as-filed disclosure violate the written description requirement.") (citations omitted).

For example, in *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, the Federal Circuit affirmed the district court's construction that independent claim 1 was limited to the recited closed group of resins, despite the fact that the construction was inconsistent with multiple dependent claims that expressly required a resin not recited in claim 1. 831 F.3d 1350, 1361-62 (Fed. Cir. 2016). The patent owner argued that "[b]ecause claim 10 includes the additional limitation of [a non-recited resin] . . ., it necessarily follows that claim 1 already permits the use of [the non-recited resin]," citing to case law for the proposition a court should "strive[] to reach a claim construction that does not render claim language in dependent claims meaningless," (*id*. at 1360) just like Plaintiff argues here. *Supra* at § II.B.1.a. The Federal Circuit rejected that argument, noting that "the language of a dependent claim cannot change the scope of an independent claim whose meaning is clear on its face." The Court further explained that that "'[w]hile it is true that dependent claims can aid in interpreting the scope of claims from which they depend, they are only an aid to interpretation and are not conclusive. The dependent claim tail cannot wag the independent claim dog.'" *Id*. (quoting *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993)). The Federal Circuit then affirmed the district court's holding that claim 10 is invalid under 35 U.S.C. § 112(d), because dependent claim 10 is inconsistent with the scope of independent claim 1, as the court construed it.

Similarly, in *Amgen Inc. v. Hospira, Inc.*, Judge Andrews adopted a construction for independent claim 1 requiring only one isoform even though that construction was inconsistent with the scope of dependent claim 8, which requires a mixture "consisting essentially of two or three" isoforms and then sua sponte invalidated dependent claim 8 under 35 U.S.C. § 112(d) because "it contradicts a limitation of claim 1." 2016 WL 7013483, at *2-4 (D. Del. Nov. 30, 2016) (Andrews, J.). The Court explained that "[w]here a limitation of a dependent claim is logically inconsistent with that of the independent claim, that is a 35 U.S.C. § 112, ¶ 4 problem." *Id.*, at *4.

The same outcome is warranted here, especially considering that any inconsistency between the proper construction of "head group" and some dependent claims results from Plaintiff's litigation-driven claim drafting and is a problem of its own making.

### ii.   The Written Description Teaches Only Protonatable Head Groups

The parties agree that every single cationic lipid head group embodiment in the written description is protonatable, consistent with Defendants' construction.[19] Conversely, the written description includes no disclosure of cationic lipid head

---

[19] Alnylam agrees. *See, e.g.*, Ex. 25 at 21:13– 24:11 ("Is there a written description of an embodiment with—where the head group is not protonatable? The answer is no.").

groups that are not protonatable.  Even the passages that Plaintiff relies on do not affirmatively describe such head groups for cationic lipids.  Rather, Plaintiff takes these passages out of the context of the full written description and makes various self-serving inferences, with no support in the intrinsic record, to read non-protonatable head groups into these passages.

For example, Plaintiff relies on passages from a paragraph at columns 32:53-33:5 of the '229 Patent[20], which describes the head groups of cationic lipids.  None of the passages affirmatively teach head groups that are not protonatable.  For example, it is undisputed that the "less strongly basic" functional groups—i.e., pyridine, imidazole, and guanidinium—which Plaintiff relies on, are all protonatable.[21]  It is also undisputed that "zwitterionic" head groups, by definition, have at least one protonatable group.[22]  Thus, these descriptions do not suggest that cationic lipid head groups can be non-protonatable.

Further, Plaintiff's argument that this paragraph teaches that the head group can be only a "hydroxyl" group or a "methoxy" group is wrong.  Not only does Plaintiff's argument contradict the science, it contradicts the plain words and sentence structure in the paragraph which make it clear that the "hydroxyl" and

---

[20] Previous briefing in this case cites to the corresponding paragraph in column 32:46-62 of the '933 Patent.
[21] Dr. Whitehead and Dr. Kros agreed.  *See* Ex. 24 at 175:4-14; *id*. at 124:10-25.
[22] Dr. Whitehead and Dr. Kros agreed.  *See* Ex. 24 at 175:15-24; *id*. at 126:10-21.

"methoxy" groups can be included in the head group *in addition to* a protonatable amine for the purpose of adjusting the amine's pKa, thus achieving "an *amine* with a desired pKa."[23]  *See* Ex. 1 at 32:56-63 (emphasis added).  There is nothing in this passage or anywhere else in the specification that suggests the head group can be a hydroxyl or a methoxy.[24]

Finally, the passage "other head groups are suitable as well" (1) is *not* on its face an affirmative teaching of non-protonatable head groups and (2) would have been read by the POSA in the context of the paragraph and the remainder of the written description which only teach examples of protonatable head groups.  Thus, the POSA would have understood based on his knowledge, and separately, on the written description that "suitable" refers to protonatable head groups.  *See, e.g.*, Ex. 24 at 175:25-177:2.  Plaintiff *infers* that this passage captures head groups that are not protonatable, but the passage never mentions such head groups and Plaintiff identifies no support in the intrinsic record for such an inference.  In fact, Dr. Kros conceded that the patent never states that uncharged head groups are "suitable":

> Q. The patent never says an uncharged head group is
> suitable for the claimed cationic lipids, correct?
>
> A. It does not say so.

---

[23] Dr. Whitehead agreed.  *See* Ex. 24 at 172:23-174:10.
[24] Dr. Kros conceded that there are no examples or hydroxyl or methoxy head groups. *See* Ex. 24 at 119:23-120:7.

Ex. 24 at 127:5-11.   Thus, as Dr. Whitehead explained, there is "nothing that suggests that you would have an uncharged head group" in this paragraph.  *Id*. at 177:3-8.

Similarly, Plaintiff's reliance on the paragraph discussing primary groups at column 17:5-21 in the '229 Patent is not probative here.  Plaintiff *infers* that the statement, "[primary group] comprises a protonatable group having a pKa of from about 4 to about 13 . . ." allows the protonatable group to be at the central moiety *instead of* in the head group.  But this passage does not affirmatively state that the central moiety can be protonatable.  And even if it did, there is no suggestion that the central moiety can be protonatable *instead of* the head group.  Rather, when the passage is read in the context of the remainder of the written description, which only describes protonatable head groups and never discusses pKa in the context of the central moiety, it is clear that the referenced "protonatable group with a pKa" is in the head group portion of the primary group.  *See* Ex. 24 at 177:18-178:4.

Nor does the statement that "[r]epresentative central moieties include . . . a central carbon atom, a central nitrogen atom . . ." suggest that the central moiety can be protonatable *instead of* the head group.  Ex. 1 at 17:17-18. First, there is no suggestion in this passage or anywhere else in the specification that a nitrogen central moiety has any function beyond physically linking the head group and tails.  Dr. Whitehead agreed:

39

> Q. Besides this linking function, does the patent ascribe any other functionality to the central moiety?
>
> A. No.

Ex. 24 at 178:14-179:6.  And even if the specification were to describe the central moiety as protonatable (it does not), it does not follow logically that the head group need not be protonatable, so Plaintiff's inference is incorrect.  Indeed, Dr. Kros conceded that this disclosure "doesn't say the protonatable group can be in the central moiety instead of in the head group."  *Id*. at 104:23-105:6.  Dr. Kros also conceded that the only two examples of primary groups in the specification with a nitrogen atom central moiety (Ex. 1 at 18:35-55) also have protonatable head groups (Ex. 24 at 105:10-106:10), which would have confirmed for the POSA that irrespective of what atom is at the central moiety, the head group must still be protonatable.

Thus, as Dr. Whitehead explained, the patent "tells us that we need to have a protonatable group within that primary group, and the head group is going to be that protonatable group because we have support, both in the rest of the specification that that's true, and it is also what a POSA would have understood, that the head group of a cationic lipid has a protonatable element."  *Id*. at 177:23-178:4.

### iii.    Plaintiff's Construction Is Overbroad

In addition to having no support in the intrinsic evidence or prior art, Plaintiff's construction "less hydrophobic than the hydrophobic tails" is wrong

because it is overbroad.  It fails to distinguish the head group of cationic lipids from the head groups other types of lipids.  Also, it fails to distinguish the head group from the primary group in the same lipid compound.

First, Plaintiff's construction is too broad because it is not specific to cationic lipid head groups.  For example, despite testifying that "head group" should be interpreted in the context of cationic lipids (*id*. at 92:20-93:21), Dr. Kros conceded that Plaintiff's construction is generic to many types of lipids.

> Q. And your construction broadly covers a trait that's common to many types of lipids, right?
>
> A. That is correct, yeah.
>
> Q. And your construction isn't focused on the head group of a cationic lipid in particular, correct?
>
> A. Yes.

*Id*. at 93:2-7;

> Q. . . . But your consideration of being less hydrophobic than the tails applies equally to cationic lipids as it does to naturally occurring lipids, correct?
>
> A. That is correct.

*Id*. at 100:10-14.  Thus, Plaintiff's construction is improper because it is directed to head groups of lipids generally, not to head groups of the recited cationic lipids.

41

Second, Plaintiff's construction is generic and fails to distinguish the head group from the primary group[25] within the same cationic lipid.   Dr. Kros acknowledged that the "primary group should be *less hydrophobic than the hydrophobic tails*."   *Id*. at 102:9-15 (emphasis added).   But that is the same construction that Plaintiff proposes for the separate "head group" structure.   Thus, Plaintiff's construction is insufficient to define the head group of cationic lipids.

*** 

The prior art of record, which expressly states that *all* cationic lipids have protonatable head groups, in combination with the original specification, which only affirmatively describes protonatable cationic lipid head groups, leads to only one reasonable conclusion—the proper construction of a cationic lipid "head group" as of the priority date must reflect the protonatable feature of the head group.   Thus, Defendants' construction is correct.

### 3.   Alnylam's Reply Position

Defendants misconstrue the evidence, the science, and the testimony of Alnylam's expert, Dr. Kros, attempting to prop up their overly narrow construction that has no basis in fact or law.   Nothing in Defendants' briefing supports their proposed construction or counsels against Alnylam's.   As with the '933 and '979

---

[25] The primary group includes the head group and the central moiety according to the Patents-at-Issue. *See* D.I. 86-1 at 16:53-55.

Patents, the Court must consider whether, in the exercise of claim construction, "head group" should be narrowed to require that it be protonatable.

> b. Defendants Attempt to Exploit the Vagueness of their Construction

Defendants have introduced additional confusion by declining to tell the Court whether their definition requires the head group be protonatable at physiological pH or simply at any pH.  It is important, yet Defendants have refused to commit to their position.  Rather than providing the requested clarity, Defendants instead exploit this ambiguity, making otherwise contradictory arguments.  Specifically, Defendants maintain that every single head group example in the patent is protonatable, while stating that "Defendants' construction simply clarifies that 'head group' must have a positive charge as required by 'cationic lipid.'"  Defts. Answering, 30-31.  Both statements cannot be true.  The positive charge "as required by 'cationic lipid'" must be considered at physiological pH.  Kros 2nd Decl.[26], ¶¶15-16.  The Patents-at-Issue include examples of pyridine, imidazole, hydroxyl, and methoxy head groups that are not protonatable at physiological pH.  *See* '229 Patent, 32:57-33:4; 64:1-33 (showing head groups with only pyridines and imidazole).  Kros 2nd Decl., ¶ 44.

---

[26] Dr. Kros's Reply Declaration is Ex. 53.  It is cited as Kros 2nd Decl. throughout.

Alnylam believes it is improper to read in any requirement of protonatability into "head group." However, if the Court does engage with Defendants' argument, it must be in the context of physiological pH, as it is otherwise meaningless.

c.    "Head Group" Does Not Require Protonatability

i.    The Concept of a "Head Group" Is So Fundamental that Any POSA Would Understand it

Defendants appear to misunderstand, or simply misrepresent, Dr. Kros's reliance on a standard encyclopedia. *See* Kros 2nd Decl., ¶18. Defendants attempt to discredit these standard teachings, suggesting that naturally occurring lipids are distinguishable from cationic lipids. *See* Defts. Answering, 24. The Court's construction of "cationic lipid" has addressed the sole factor distinguishing cationic lipids from other lipids – the requirement that the lipid as a whole needs to be positively charged/protonatable at physiological pH. D.I. 109. Turning to the head group, its core, necessary property is the same in naturally occurring and cationic lipids – it must interact with water. Defendants do not, and cannot, dispute this. Dr. Whitehead's paper confirms that cationic lipids have head groups that are less hydrophobic than the tails, as Alnylam's construction requires. Tr., 183:16-21.[27]

Defendants' analysis of the Britannica diagram is scientifically inaccurate. *See* Defts. Answering, 24-25. Defendants are correct that there is a positive charge

---

[27] D.I. 163.

and a negative charge in the depicted head group.  *Id*.  But that does not make the head group positively charged: the head group depicted is uncharged because the positive and the negative cancel out, resulting in a net zero charge.  Kros 2nd Decl., ¶¶19-20.

           ii.    The Prior Art Taught Both Protonatable and Non-Protonatable Head Groups in Cationic Lipids

The art at the priority date is not as limited as Defendants' attempt to paint it. Defendants rely on three publications–two that predate the priority date by a decade and one from a journal specializing in animal biology, not drug delivery.  A review of the art as of 2011 shows that a POSA would understand protonatable groups in cationic lipids could be in either the head group or central moiety, consistent with Alnylam's proposed construction.

Defendants quote Tang, stating that "all" cationic lipids contain a "*positive charged*" head group.  Defts. Answering, 23.  Similarly, Defendants rely on Chesnoy, from 2000.  However accurate these statements may have been in 1999/2000, Defendants ignore the subsequent developments, including cationic lipids with non-protonatable head groups combined with protonatable central moieties.  Kros 2nd Decl. ¶5.  Defendants use an incomplete quote from Rameriz-Gordillo to prop up their incorrect argument regarding the art in 2011, while ignoring that this is a single paper from an animal biology journal discussing commercially

available cationic lipids. Kros 2nd Decl., ¶¶35-36. This is not an accurate representation of a POSA's knowledge.[28] *Id.*

In 2002, Srilakshmi published on "cationic amphiphiles" for use in the DNA delivery. Ex. 54 (Srilakshmi), 90. Consistent with Alnylam's proposed construction, and contradicting Defendants', these cationic lipids contained a nitrogen central moiety and head groups that are not protonatable at physiological pH. Kros 2nd Decl., ¶22. The paper provides:



Ex. 54 (Srilakshmi), 89 (annotated). Like many early cationic lipids, the nitrogen was permanently positively charged. Srilakshmi concluded with describing the disclosed structures as "promising non-toxic cationic transfection lipids for future

---

[28] Defendants' reliance on Jayaraman is similarly flawed – Jayaraman discusses data comparing ionizable lipids to permanently positively charged lipids but that does not require all cationic lipids to have that charge in the head group. Kros 2nd Decl., ¶¶37, 40.

use in non-viral gene therapy." Ex. 54 (Srilakshmi), 94. This taught a POSA that cationic lipids with nitrogen central moieties and non-protonatable head groups could be used in delivery of nucliec acids. Kros 2nd Decl., ¶¶22-23.

Martin from 2005, which Defendants included in their Invalidity Contentions, showed a further evolution of the technology. It described a "cationic lipid as a positively charged amphiphile," consistent with Alnylam's proposed construction. Ex. 55, 378 (Martin) Kros 2nd Decl., ¶24. Martin disclosed the following lipids where the site of positive charge/protonation was the central nitrogen:



Ex. 55, 380 (Martin); Kros 2nd Decl., ¶24. None of these lipids have positively charged/protonatable (at physiological pH) head groups. Kros 2nd Decl., ¶24.

47

In 2006, Anderson's patent application explained that cationic lipids for nucleic acid delivery "typically have a hydrophobic half and a hydrophilic half," and that the disclosed lipids have an amine where "[t]he amine may be protonated or alkylated thereby forming a positively charged amine." Ex. 56 (Anderson 2006), [0005]; Kros 2nd Decl., ¶24. The amine in Anderson is the central moiety and the head group is not protonatable at physiological pH. D.I. 124-1 (Kros 1st Decl.), ¶58. Further, Anderson disclosed cationic lipids with nitrogen central moieties and head groups that could not be protonated at physiological pH that were synthesized, tested, and claimed. Ex. 56 (Anderson 2006), 37-38, [00268]-Table 2, [00269]-Table 3, [00271], Claims 83, 119; Kros 2nd Decl., ¶¶27-28. This work was subsequently published in a high-impact peer reviewed journal. Ex. 56 (Anderson 2008). To a POSA, this unequivocally teaches what was well-known in the art– that the protonatable group in a cationic lipid could be in the central moiety and the head group need not be protonatable. *Id*.

Defendants' criticism of Anderson as "not representative of the knowledge of the POSA" must be rejected. Defts. Answering, 25. *First*, Anderson is indisputably prior art published years before the priority date. *Second*, Defendants rely on Anderson in their obviousness arguments. Ex. 57 (Invalidity Contentions). *Third*, it is black letter law that POSAs are aware of all the prior art as of the priority date. *Custom Accessories, Inc. v. Jeffrey–Allan Indus.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

*Fourth*, that Anderson does not use the terms "head group" or "cationic lipid" is of no moment.  Defts. Answering, 26.  The Anderson references clearly describe lipids and depict head groups and central moiety positions.  Kros 2nd Decl., ¶26.

Defendants' attempt to discredit Anderson as just a patent application, rather than peer-reviewed paper, is meritless.  Patent applications are prior art.  In any event, the data from the application was published in a high-impact journal in 2008.  Ex. 58 (Anderson (2008)); Kros 2nd Decl., ¶¶29-32.  Dr. Whitehead, working with Anderson, also published another paper in 2011, including a disclosure of a cationic lipid with a nitrogen central moiety and a head group that was not protonatable at physiological pH.  Ex. 59 (Whitehead (2011)); Kros 2nd Decl., ¶33.

### iii.  Defendants Mischaracterize Cationic Lipids' Interactions with Nucleic Acids

There is no dispute that the claimed cationic lipids need to be either permanently positively charged or protonatable at physiological pH.  D.I. 109.  But that positive charge/protonatability need not be in the head group.  It can be in the central moiety.  Kros 2nd Decl., ¶¶42-43.  Dr. Whitehead did not disagree but suggested to this Court that a POSA would be unaware in 2011 that the positive charge/protonatability could be in the central moiety.  Tr. 166:11-13.  As shown above, that was simply untrue.

Defendants cite Chesnoy to challenge Dr. Kros's testimony that the RNA "doesn't care where the charge is."  Defts. Answering, 27-28.  First, Chesnoy does

49

not reflect the art in 2011, as it was published in 2000.  Second, Alnylam does not

dispute that a cationic lipid needs a positive charge/protonatable group to interact

with negatively charged nucleic acids.  Nor does it dispute the protonatable group

may be in the head group or in the central moiety.  Kros 2nd Decl., ¶38.  Similarly,

Defendants' argument regarding Ramierz-Gordillo, only supports the idea that when

the positive charge is in the head group, nucleic acids will interact with it.  Kros 2nd

Decl., ¶36.  This is not in dispute.

> d.  Defendants Ignore the Intrinsic Evidence that Contradicts their Construction
>
> > i.  The Written Description Discloses Head Groups that Are Not Protonatable at Physiological pH

Defendants do not directly address Alnylam's arguments regarding non-

protonatable head groups in the written description because they cannot.  Instead,

they rely on their shifting positions to obfuscate the issues.

The written description discloses head groups that are not protonatable at

physiological pH.[29]  Specifically, it provides the following intrinsic evidence, which

a POSA would understand supports Alnylam's proposed construction:

---

[29] Defendants attempt to downplay these disclosures by taking testimony of Dr. Kros out of context.  They cite his testimony where he truthfully answered that the written description did not specifically use the words "an uncharged head group is suitable for the claimed cationic lipids," while ignoring all of Dr. Kros's testimony on non-protonatable head groups. *See, e.g.,* Tr. 65:15-66:1, 70:15-74:23, 79:14-82:7, 106:19-107:8.

- The claim language provides another location for protonatability – the central moiety.  E.g., '229 Patent, claim 1 ("the central moiety is a nitrogen atom"); Tr.  67:16-68:17, 69:6-70:8 (Kros); Tr.  187:2-13 (Whitehead agreeing an amine nitrogen central moiety could serve as protonatable group); Kros 1st Decl.[30], ¶¶56-57.

- Column 17 provides disclosure of a protonatable primary group (head group plus central moiety), without any requirement that protonation occur at the head group.  '229 Patent 17:14-21; Kros 1st Decl. ¶59-60; Tr. 70:15-71:19 (Kros); Tr. 193:22-195:9 (Whitehead agreeing column 16 does not have language requiring that).  Further, it specifically provides that "in one embodiment," the "primary group" "includes (i) a head group and (ii) a central moiety (e.g., a carbon) to which both the hydrophobic tails are bonded.  Representative central moieties include . . . a central nitrogen[.]"  '229 Patent, 17:16-17; Tr. 70:15-71:19 (Kros); Kros. 1st Decl., ¶61.

- Column 32-33 of the '229 Patent provides specific examples of non-protonatable head groups at physiological pH, including hydroxyl and methoxy groups, as well as pyridine and imidazole.  '229 Patent, 32:57-

---

[30] Dr. Kros's first declaration cites to the '933 Patent, but the written description between it and the Patents-at-Issue is essentially the same, except for minor pagination differences.

33:4; Tr. 71:24-74:23 (Kros); Kros 1st Decl., ¶¶66, 68-70; Tr. 192:15-18, 201:20-25 (Whitehead cross).  Rather than address this, Defendants' hide behind the fact, which Alnylam does not dispute, that pyridine and imidazole are protonatable at some pH (well below physiological pH).  But the only relevant point is physiological pH.

- Column 33 provides disclosure of neutral, non-protonatable zwitterionic head groups.  '229 Patent, 33:4; Kros 2nd Decl., ¶45.

- Column 33 reiterates that the protonatable group (the nitrogen) may be in the central moiety.  '229 Patent, 33:6-7.

- Table 2A includes "representative" head groups that include pyridine and imidazole without additional nitrogens, which are not protonatable at physiological pH.  '229 Patent, 64:1-33; Tr. 79:14-82:7 (Kros); Kros 1st Decl., ¶¶63-73; Tr. 199:13-23; 200:9-15; 201:20-25 (Whitehead).

None of this is contradicted by the written description that discusses protonatable head groups.  Defendants attempt to rely on the written description disclosing the "head group can include an amine; for an example an amine having a desired pKa."  Defts. Answering, 33.  There is no dispute that there can be an amine in the head group, and if it is the site of protonation, it must have an appropriate pKa.  But this provides no basis to limit "head group" as Defendants request.

ii.   Defendants' Ignore the POSA's Knowledge

Perplexingly, Defendants appear to rely on the incorrect notion that a POSA would be wholly unaware of the chemical properties of a central nitrogen, suggesting that the Patents-at-Issue provide "no indication" that it would serve any purpose beyond a physical connector.   *See* Defts. Answering, 32.   Unsurprisingly, Defendants provide no cite to Dr. Whitehead or to science.   It is basic organic chemistry whether, and at what pH, an atom can be protonated.  Kros 2nd Decl., ¶42. It is so well known that it is found in tables in the front cover of basic textbooks.  Ex. 60 (Ege).  Further, it is settled law that patents are read through the eyes of a POSA, with all a POSA's knowledge and understanding of those words.  *See Phillips*, 415 F.3d at 1313.  A POSA, reading the entirety of the Patents-at-Issue, would know nitrogen central moieties described in the written description and the claims will serve as a site of protonation and that, where it does, the head group need not be protonatable.

e.   The Court Cannot Ignore the Dependent Claims

It is without question each of the Patents-at-Issue include dependent claims in which the head groups are not positively charged or protonatable.[31]   *Supra*,

---

[31] Defendants accuse Alnylam of expanding the scope of the disclosure by seeking, and receiving, claims to non-protonatable head groups.  *See* Defts. Answering, 34 n.18.  As discussed throughout this briefing, the written description supports these claims, which is why the U.S.P.T.O. issued them.

§II(A)(1); Kros 1st Decl. (Ex. 5) at ¶¶ 63-73.  A POSA would read the claims "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

Contrary to Defendants' inapplicable case law discussed below, robust Federal Circuit law supports using dependent claims in construing independent claims.  *Littlefuse*, 29 F.4th 1376,1379-80 (Fed. Cir. 2022) ("By definition, an independent claim is broader than a claim that depends from it, so if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that embodiment as well."); *Baxalta*, 972 F.3d at 1346 ("we reject the district court's construction which renders dependent claims invalid."); *The Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 676 F. App'x 980, 986 (Fed. Cir. 2017) (holding district court erred by construing an independent claim to read out a limitation required by a claim that depends from it).

District courts follow this guidance, stating that "[the Federal Circuit] has instructed that independent claims should not be construed to exclude material recited in dependent claims." *Guardant Health, Inc. v. Found. Med., Inc.*, 2019 WL 5677748, at *7 (D. Del. Nov. 1, 2019), R&R adopted, 2020 WL 1329513 (D. Del. Mar. 23, 2020); *Rd. Widener, LLC v. Robert H. Finke & Sons, Inc.*, 548 F. Supp. 3d 290, 305 (N.D.N.Y. June 30, 2021) ("There is a strong presumption against

construing a term which eliminates a claim."); *Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, 2019 WL 1789463, at *5 (D.N.J. Apr. 24, 2019).

Rather than address this law, Defendants invite the Court to use the claim construction process to invalidate validly issued claims, improperly relying on *Multilayer* and *Amgen*.  Defts. Answering, 35, 36.  The Court should not do so.  In *Multilayer,* the Federal Circuit addressed an independent claim with a Markush group and "consisting of" language (selected from a group consisting of A, B, and C) and a dependent claim with an element outside the Markush group (D).  The Court held that the Markush group in the independent claim was a "closed" group, and that therefore it could not, through claim construction, add another element (D), even though said element was recited in a dependent claim.  The Court then ruled the dependent claim invalid under §112(d). *Id*. at 1353.  Courts have limited the *Multilayer* decision to its facts.  *See, e.g.*, *Tris Pharma, Inc. v. Actavis Elizabeth LLC*, 2018 WL 994878, n.1 (D. Del. Feb. 20, 2018) (explaining *Multilayer* must only be applied in "certain circumstances not present in the instant case," like when the independent claim lacks a Markush group or the phrase "consisting of").  The claims here are not to Markush groups or any other analogous closed group.  Therefore, *Multilayer* is inapplicable.

*Amgen v. Hospira* is similarly off point.  The independent claim there was to a composition with one isoform selected from a group.  The dependent claim

required ("consisting essentially of") two or three isoforms.  The dependent claim*,* if it were allowed to stand, would have contradicted the independent claim.  *Amgen*, 2016 WL 7013483 at *4. Here, by contrast, the independent claims (1) expressly provide that the central moiety may be the site of protonatability; and (2) do not specify that the head group should be protonatable. Defendants' attempt to invalidate a dependent claim that describes and limits the independent claim term should be rejected.

f.      Alnylam's Construction Is Not Overbroad

Alnylam's construction does not "fail[] to distinguish between the 'head group' and 'primary group' in the same lipid compound."  Defts. Answering, 40-41. The Patents-at-Issue explain the primary group is the head group and central moiety. '229 Patent, 17:14-21; Kros 2nd Decl., ¶43.  A head group that is less hydrophobic than the tails means that the primary group will be as well, particularly, when, as here, the central moiety be a nitrogen atom.  *Id.*  The combination of the head group (which is less hydrophobic than the hydrophobic tails) and the central moiety (here, a nitrogen atom) will yield a primary group that is less hydrophobic than the hydrophobic tails.  *Id.*  This is consistent with the Patents-at-Issue and does not undermine Alnylam's proposed construction.

4.      Defendants' Sur-Reply Position

The intrinsic evidence here is determinative—it describes *only* the head group portion of a cationic lipid as having a "desired pKa," and *all* the cationic lipid head group examples are protonatable.  To the extent the Court even turns to extrinsic evidence, the prior art of record teaches that *all* cationic lipids have protonatable head groups.  Even *all* of Plaintiff's hand-picked references *always* use the term "head group" to refer to a protonatable portion of a cationic lipid; *no* reference of record uses "head group" to refer to non-protonatable portions of cationic lipids. Thus, the plain and ordinary meaning in view of the specification must reflect that the "head group" may be (i.e., is capable of being) protonatable.

a.      The Extrinsic Evidence Supports Defendants' Construction

Defendants agree with Plaintiff that for cationic lipids, "the concept of a 'head group' is so fundamental that any POSA would understand it." *Supra* at 44.  That is why the prior art clearly and categorically teaches that "*[a]ll cationic lipid* molecules contain … *a positive charged head group*, …." Ex. 20 at 345-346 (emphasis added); *see also* Ex. 22 at ALNY-00946768; ALNY-00946768.  Plaintiff critiques Tang because it is from 1999 and contends the art had changed by December 2011.  But Ramirez-Gordillo, published in October 2011, teaches the same principle: "*Cationic lipids* (such as Lipofectamine[TM] 2000 and Metafectene[®] Pro) *all share* … *a positively charged head group*." Ex. 21 at 2 (emphasis added).  None of Plaintiff's

responses to Ramirez-Gordillo (*supra* at 45, 50) change the fact that it is a peer-reviewed publication about nucleic acid drug delivery, including cationic lipid-based delivery.  Ex. 64 at ¶ 44-45.

Nor do Plaintiff's references teach that **cationic lipid** head groups can be uncharged.  As explained, the EB and MBC do not discuss "cationic lipids."  *Id.* at ¶¶ 20-21.  Similarly, the WO 2006/138380 (Ex. 56),[32] Anderson 2008 (Ex. 58), and Whitehead 2011 (Ex. 59) references concern different "lipid-like" compounds called "lipidoids," as Dr. Whitehead, who worked with lipidoids, explains.  *Id.* at ¶¶ 33-34, 38, and 42.  Thus, none of these references reflect the POSA's understanding of **cationic lipid** head groups.  *Id.* at ¶¶ 37, 41, and 43.  Perhaps realizing these deficiencies, Plaintiff introduces new extrinsic evidence, including additional references and a new expert declaration, at the 11th hour (which should have been served with Plaintiff's Opening Brief).  Plaintiff contends that these new references include structures having what it characterizes as non-protonatable head groups (*supra* at 46-47), but Plaintiff misses the point.  Regardless of the location of the nitrogen in these specific structures, these references define cationic lipid head

---

[32] Plaintiff notes that Defendants included the WO '380 reference in their invalidity contentions, but does not explain the significance.  There is none.  Defendants added WO '380 as a secondary reference **in response to** Plaintiff's contention that it is relevant to the Patents-In-Suit and out of an abundance of caution in view of this Court's strict standard for seeking leave to amend contentions.

groups as "cationic" (positively charged) and describe the head groups of the specific structures Plaintiff relies on as "cationic."

For example, the Martin reference teaches that cationic lipids have a "cationic" head group:

> [W]e aim to outline the recent progress in cationic lipid-mediated gene delivery by considering the lipids at the molecular level in terms of their ***three fundamental constituent parts: the cationic headgroup***, hydrophobic domain and connecting linker.

Ex. 55 at REF_ALN_00002053 (emphasis added); *see also* Ex. 64 at ¶ 28.  And the Martin structures that Plaintiff relies on appear in a section titled "Cationic Headgroup Design."  *Id*. at ¶ 30.  Similarly, Plaintiff ignores that Srilakshmi describes the DOMHAC and DOHEMAB structures, which Plaintiff contends have non-protonatable head groups, as having "cationic head groups":

> Recently, we reported four ... lipids namely, DHDEAB, MOOHAC, ***DOMHAC*** and ***DOHEMAB*** [13], in which aliphatic hydrocarbon tails ... were covalently linked to ***the cationic head groups*** either directly or via an ester group linker.

Ex. 54 at 88 (emphasis added); *see also* Ex. 64 at ¶ 24.

Thus, the few structures that Plaintiff relies on do not show that the plain and ordinary meaning of a cationic lipid "head group" encompasses non-protonatable head groups; instead, these references refer to the head groups therein as "cationic." Plaintiff still has not identified a single instance where the prior art uses the term

"head group," in the context of cationic lipids, to refer to non-protonatable structures or otherwise in a manner inconsistent with Defendants' construction. Yet such non-protonatable head groups are exactly what it wants to capture with its overbroad construction in an attempt to ensnare the accused product.

> b. The Intrinsic Evidence Only Teaches Protonatable Head Groups

There is no dispute that every single example of a cationic lipid head group in the specification is protonatable. *See supra* at 36. Nor is there any other teaching in the written description of non-protonatable cationic lipid head groups. *See id*. at 36-40. Dr. Kros conceded that the patent never states that uncharged head groups are "suitable":

> Q. The patent never says an uncharged head group is suitable for the claimed cationic lipids, correct?
>
> A. It does not say so.

Ex. 24 at 127:5-11. Plaintiff's bullet-point list of intrinsic evidence (*supra* at 51-52) stands out most for what it conspicuously lacks—any affirmative teaching of non-protonatable head groups. For example, the teaching that the central moiety can be a nitrogen atom in a list of options (and with no suggestion that protonatability at the central moiety has any significance) is *not* a teaching that the head group *need not*

60

be protonatable.[33]  *Supra at* 39-40.  Plaintiff's self-serving inference to the contrary is a logical fallacy, and undercut by the undisputed fact that the *only* examples with a nitrogen central moiety *also* have protonatable head groups.  *See supra* at 40.

Plaintiff infers that ambiguity in the statement—"Primary Group comprises a protonatable group" (Ex. 1 at 17:5-10)—is evidence that the protonation can occur at the central moiety instead of the head group.  But this description does not state that.  *See supra* at 39.  The remainder of the specification, which teaches and provides examples of only protonatable head groups (*see* Ex. 24 at 177:18-178:4) further undercuts Plaintiff's inference.  And Plaintiff's reference to zwitterionic head groups is of no consequence because, by definition, zwitterionic head groups have a positively charged or protonatable atom, thus meeting Defendants' construction.  *See* Ex. 24 at 175:15-24; 126:10-21.

Plaintiff misstates that the '229 Patent provides "specific examples" of nonprotonatable head groups "including hydroxyl and methoxy groups" at column 32:57-33:4 (Ex. 1).  As explained (*supra* at 37-38), hydroxyl and methoxy groups are not disclosed as head groups, but as functional groups that can be included in the head group ***in addition to*** a protonatable amine ***in order to influence the pKa of the amine***.  Ex. 1 at 32:56-63.  Both experts agree that the hydroxyl and methoxy groups

---

[33] Nor is it inconsistent with Defendants' construction, which simply requires the presence of a protonatable group in the head group irrespective of what is at the central moiety.   Ex. 64 at ¶ 16.

are described as functional groups that can influence the pKa of the amine.  Ex. 24 at 173:2-174:10; 115:12-116:13.

Lastly, Plaintiff's argument that some newly drafted dependent claims are inconsistent with Defendants' construction is not persuasive, as explained *supra* at 33-36.  Plaintiff fails to distinguish the Federal Circuit's *Multilayer Stretch* decision or Judge Andrews' *Amgen* decision in any meaningful way.  In both decisions, the courts construed independent claims narrowly despite inconsistencies between the narrow construction and dependent claims, and subsequently, invalidated the inconsistent dependent claims.  *See supra* at 35-36.  In fact, the Federal Circuit in *Multilayer Stretch* expressly rejected Plaintiff's argument that Defendants' construction is inconsistent with some dependent claims.  *Multilayer Stretch*, 831 F.3d at 1360.  In *Tris Pharma*, the Federal Circuit also rejected a similar argument, further undercutting Plaintiff's argument of inconsistent dependent claims.  2018 WL 994878, at *1 n.1  ("Here, the court will follow *Wright* and ***look to the specification, and not the dependent claim, to interpret claim 1's languag****e*.") (emphasis added).

Here, there is even more reason for the Court to follow the same approach, because (1) any inconsistency is the result of Plaintiff's attempt to repurpose a decade-old patent family to cover the accused product after the lipids therein became public (*see supr*a at 33-34), and (2) the inconsistent limitation in some dependent

claims—"wherein the head group consists of a saturated aliphatic group and a hydroxyl group" (e.g., '229 Patent claim 28)—has no written description support.

### c.   Defendant's Proposed Construction Is Clear

Plaintiff offers a new but incorrect argument that "if the Court does engage with Defendants' argument, it must be in the context of physiological pH, as it is otherwise meaningless." *Supra* at 44.  As Dr. Whitehead explained, while "cationic lipid" as a whole must be protonatable at physiological pH, requiring the "head group" to be protonatable at physiological pH ignores that other portions of the cationic lipid can influence the overall pKa of the lipid.  Ex. 18 at ¶ 34; Ex. 64 at ¶ 17.  Plaintiff also wrongly suggests Defendants' construction permits protonatability at "any pH." *Supra* at 43.  The experts agree that in the relevant field of art, protonatability is limited to a biologically relevant pH range.  Ex. 64 at ¶ 18; D.I 124-1 at 37 n.19; *see also* Ex. 1 at 17:5-12.

### C.   <u>"Vaccine"</u>

| Term | Alnylam's Construction | Defendants' Construction |
|---|---|---|
| "vaccine"<br><br>Claims 27 and 28 of the '229 Patent<br><br>Claim 6 of the '657 Patent | "Vaccine" in Claims 27 and 28 of the '229 Patent is non-limiting.<br><br>The term needs no construction; however, to the extent that the Court determines it does, it should be given its ordinary and customary | "Vaccine" in Claims 27 and 28 of the '229 Patent is limiting.<br><br>"Vaccine" should be given its plain and ordinary meaning: "A product that produces immunity therefore |

| | meaning, which is "a preparation that is used to stimulate the body's immune response against disease." | protecting the body from the disease." |
|---|---|---|

### 1.   Alnylam's Opening Position

The parties have two disputes regarding the term "vaccine."  First, the parties dispute whether the preambles are limiting. Alnylam submits they are not. Two of the three uses of "vaccine" in the asserted claims are in the preamble (claims 27 and 28 of the '229 Patent), which means "vaccine" is presumptively non-limiting in those claims.  Nothing about these claims suggests that the term "vaccine" is meant to be a limitation.  Second, Defendants' proposed construction unnecessarily limits all three claims where "vaccine" appears and would serve to confuse the jury.

### a.   "Vaccine" as Used in the Preamble Is Non-Limiting

A general principle of claim construction is that "the preamble does not limit the claims." *Allen Eng'g Corp. v. Bartell Indus.*, Inc., 299 F.3d 1336, 1346 (Fed. Cir. 2002) (citation omitted).  While the Federal Circuit has not set forth a specific test for determining whether a preamble is limiting, it has provided "some general principles to guide the inquiry."  *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017) (quoting *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010)).

"A preamble is not a claim limitation if the claim body 'defines a structurally complete invention . . .  and uses the preamble only to state a purpose or intended use for the invention.'"  *Georgetown Rail Equip.*, 867 F.3d at 1236 (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)).  Here, there can be no dispute that the claim defines a structurally complete invention – it provides a specific formula for the claimed lipid particle.  The use of "vaccine" in the preamble simply provides the "intended use" for the invention.  That is, that the claimed lipid particle can be used as a vaccine.  That, without more, does not make the preamble limiting.

While there is no bright-line test, the Federal Circuit has provided some guidance for what is required to overcome the presumption that a preamble is non-limiting.  The presumption may be overcome when the preamble "recites essential structure or steps; claims depend on a particular disputed preamble phrase for antecedent basis; the preamble is essential to understand limitations or terms in the claim body; the preamble recites additional structure or steps underscored as important by the specification; or there was clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art."  *Georgetown Rail Equip.*, 867 F.3d at 1236 (internal quotations omitted).

That is not the case here.  The term "vaccine" does not provide "essential structure or steps," nor is it the antecedent basis for any additional limitations.  It is not essential to the understanding of any claim limitation.  There was no reliance on

65

the preamble during prosecution.  None of the exceptions to the general rule that preambles are presumptively non-limiting apply.

          b.     Defendants' Proposed Construction Creates Unnecessary Ambiguity

Alnylam maintains that no construction of "vaccine" is necessary, as the term is well understood by both a POSA and by the lay juror.  To the extent a construction is necessary, Alnylam proposes that the Court adopt the current definition provided by the Centers for Disease Control, which is "a preparation that is used to stimulate the body's immune response against disease."  Ravetch Decl.[34] (Ex. 6) at ¶14; Ex. 16 (providing CDC definition).  As explained below, this definition is consistent with a POSA's understanding of the term vaccine.  Ravetch Decl. (Ex. 6) at ¶¶14-15.  It is also how Defendants have described their COVID-19 Vaccine to healthcare providers, the FDA, and their investors, highlighting the correctness of Alnylam's construction.  Ravetch Decl. (Ex. 6) at ¶16.

First, Defendants describe their accused product, COMIRNATY®, as a vaccine.  *See, e.g.*, Ex. 10 (COMIRNATY® 2023-2024 Formula Package Insert). They describe the function of their COMIRNATY® vaccine in terms of an "immune response."  The COMIRNATY® Package Insert specifically states that "[t]he

---

[34] Dr. Jeffery V. Ravetch is a Professor of Molecular Genetics and Immunology at Rockefeller University. He is a POSA with experience in vaccine technology and immunology. His Declaration, including his CV, is attached as Ex. 6.

vaccine *elicits an immune response* to the S antigen, which protects against COVID-19." *See, e.g.*, Ex. 10 (COMIRNATY® 2023-2024 Formula Package Insert) (emphasis added); *see also* Ravetch Decl. (Ex. 6) at ¶ 16.   Similarly, the COMIRNATY Safety and Effectiveness FAQ on the FDA website states that the FDA's rationale for the current vaccine dosing regimen is based on an "analysis of immune response data." Ex. 9 (Comirnaty (COVID-19 Vaccine, mRNA)); *see also* Ravetch Decl. (Ex. 6) at ¶17.

Defendants used the "immune response" of their vaccine to tout the success of their vaccine in clinical trials to the public – language that is the same as Alnylam's construction.  Ex. 14 (Pfizer Press Release November 4, 2022) ("Pfizer Inc. (NYSE: PFE) and BioNTech SE (Nasdaq: BNTX) today announced updated data from a Phase 2/3 clinical trial demonstrating a robust neutralizing *immune response* one-month after a 30-μg booster dose of the companies' Omicron BA.4/BA.5-adapted bivalent COVID-19 vaccine (Pfizer-BioNTech COVID-19 Vaccine, Bivalent (Original and Omicron BA.4/BA.5)). *Immune responses* against BA.4/BA.5 sublineages were substantially higher for those who received the bivalent vaccine compared to the companies' original COVID-19 vaccine, with a similar safety and tolerability profile between both vaccines.") (emphasis added); *see also* Ravetch Decl. (Ex. 6) at ¶ 17.

Second, independent scientists researching the effects of Defendants'
COVID-19 Vaccine use "immune response" to discuss their vaccine research, which
is consistent with Alnylam's construction. *See, e.g.,* Ex. 12 ("Our findings, obtained
with an independent study, suggest that two doses of Pfizer BioNTech (BNT162b2)
COVID-19 vaccine (Conmirnaty® [sic]) *induce an immune response* with the
production of anti-SARS-CoV-2 IgG antibodies in 100% of participants.")
(emphasis added) Ex. 11 ("To accommodate 2 distinctly different populations in this
study, we compared the *induction of immune responses* between young and older
vaccinees (< 60 years and > 80 years, respectively) who received their first and
second vaccinations on the same day.") (emphasis added); Ex. 13 ("*To better
characterize the effect of vaccination on the immune response* in SOTRs, we
assessed the B-cell and T cell responses in 16 SOTRs and in 23 immunocompetent
subjects (ICs), after the second dose of BNT162b2 vaccine.") (emphasis added); Ex.
15 ("Methods: In a multicentre prospective observational study*, we profiled the
immune response to the Pfizer BioNTech (BNT162b2) vaccine* in 5–11-year-old
children attending the University Pediatric Hospital of Padua and Bambino-Gesù
Hospital in Rome (Italy) from December-2021 to February-2023.") (emphasis
added).

Defendants' proposed construction of "vaccine" would create unnecessary
ambiguity that could confuse the jury. Specifically, Defendants' construction

requires "[a] product that *produces immunity* therefore protecting the body from the disease." (emphasis added). This is likely to confuse lay jurors into mistakenly believing that a "vaccine" according to the claims must fully protect a subject from contracting COVID-19 in order to be infringing. This is inconsistent with both a POSA's understanding of vaccines and Defendants' own statements, as discussed above. Alnylam's proposed construction should be adopted.

2.      Defendants' Answering Position

The term "vaccine" is limiting in the asserted claims and should be given its plain and ordinary meaning as of the effective filing date, which was the CDC's public definition of "vaccine" as of 2011.

a.      "Vaccine" Is Limiting

Plaintiff does not dispute that "vaccine" is limiting in claim 6 of the '657 Patent. "Vaccine" is also limiting in the preamble of independent claim 27 of the '229 Patent. "In general, a preamble limits the [claimed] invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)); *see also Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367 (Fed. Cir. 2014). Also, "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble

69

may act as a necessary component of the claimed invention." *Id*. at 1372 (quoting

*NTP, Inc. v. Res. in Motion, Ltd.*, 418 F.3d 1282 1306 (Fed. Cir. 2005)).   The

preamble here meets these circumstances and more.

First, "vaccine" provides necessary structural limitations to independent claim

27.  For example, claim 27 requires the claimed lipid particle to comprise "RNA."

Ex. 1 at 497:21-22.  Although there are different types of RNA (*see e.g.*, *Id*. at

378:28-57), not all RNA can function as a vaccine.   Only messenger RNA

("mRNA") can encode and express an antigen (e.g., a viral protein) to stimulate an

immune response and provide protection against a disease.  *See, e.g.*, Ex. 26 at 1

(reviewing the use of genetic vaccines and explaining that "[i]n contrast to vaccines

that employ recombinant bacteria or viruses, genetic vaccines consist only of DNA

(as plasmids) or *RNA (as mRNA)*, which is taken up by cells and translated into

protein.") (emphasis added).  Therefore, the term "vaccine" in the preamble of claim

27 of the '229 Patent necessarily limits the type of "RNA" that the claimed "lipid

particle" can comprise.

Plaintiff's assertion that "vaccine" describes the intended use of the recited

composition underscores the limiting nature of the term.   If "vaccine" were not

limiting, as Plaintiff contends, the scope of claim 27 of the '229 Patent would

encompass non-workable embodiments (e.g., siRNA)[35] that would be incapable of performing the very use that Plaintiff identifies.  Thus, "vaccine" does not merely recite the intended use of the claimed composition, but provides structural limitations with respect to the types of RNA that can be used.

Second, the term "vaccine" in the preamble of independent claim 27  provides the necessary antecedent basis for "[t]he vaccine" in dependent claim 28, which recites "[t]he vaccine of claim 27, wherein the head group consists of a saturated aliphatic group and a hydroxyl group."  Ex. 1 at 498:28.  Notably, claim 28 could have recited "*the lipid particle* of claim 27" or "*the protonatable lipid compound* of claim 27."  But the inventors chose to reference "vaccine" in claim 27, which evidences that "vaccine" is limiting not only in dependent claim 28, but also in the preamble of independent claim 27.

Third, had the inventors not intended to limit claim 27 of the '229 Patent to a "vaccine," they would have simply recited a  "pharmaceutical composition" like they did for claims 1 to 20 of the '229 Patent:

> A pharmaceutical composition comprising a lipid particle and a pharmaceutically acceptable diluent, excipient, or carrier, wherein the lipid particle comprises:

---

[35] siRNA functions to silence endogenous gene expression, and cannot be used to express exogenous antigens.

Ex. 1 at 493:44-46.  The inventors' use of the term "vaccine," which has specific structural and functional characteristics, in claims 21 to 30, instead of the generic phrase "pharmaceutical composition" used in claims 1 to 20 is evidence that the inventors intended "vaccine" to be limiting.

Fourth, the use of "vaccine" in sibling patents provides further evidence that "vaccine" in claim 27 of the '229 Patent is limiting.  For example, claim 1 of the '657 Patent recites "[a] *pharmaceutical composition* comprising . . ." Ex. 2 at 497:34-36 (emphasis added).  Claim 6 of the '657 patent, which depends from claim 1, further recites "wherein the pharmaceutical composition is a *vaccine*."  *Id*. at 498:33-34 (emphasis added).  As Plaintiff has conceded, "vaccine" in claim 6 is limiting because otherwise claim 6 would be superfluous. This is further evidence that the inventors intended to limit the scope of the claims in this patent family when using the term "vaccine."

For these reasons, "vaccine" is limiting in the asserted claims of the '299 Patent.

> b.  Defendants' Construction is the Plain and Ordinary Meaning as of the Effective Filing Date

Defendants' construction is the CDC's public definition of "vaccine" as of 2011 (Ex. 27) which reflects the plain and ordinary meaning of "vaccine" at the time. Ex. 19 at ¶¶ 14; 18.  The law is clear that claim terms are to be construed from the point of view of the POSA *as of the effective filing date of the patent.  Phillips*, 415

F.3d at 1313 ("We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.").  Notably, Plaintiff and its expert do not argue that Defendants' construction is incorrect, but merely that it might confuse the jury.

The CDC's definition for "vaccine" as of December 2011 was "[a] product that produces immunity therefore protecting the body from the disease."  Ex. 27 at 1.  This definition reflects the understanding at the time that a vaccine must be capable of producing an immune response that confers immune protection against a disease.  Ex. 19 at ¶¶ 14-15; 18.  For example, the POSA would have understood that an investigational drug product that is incapable of conferring immune protection against a disease would not be approved by the FDA as a "vaccine," even if it elicited an immune response per Plaintiff's construction.  *Id*. at ¶ 14.  Even Plaintiff's expert, Dr. Ravetch, admits that the POSA "would understand a vaccine to be a preparation given to a human or animal *to help protect* that human or animal against a particular disease by stimulating an immune response to that disease."  Ex. 6 at ¶15 (emphasis added).  Indeed, the purpose of vaccines is to provide immune protection to a disease.  Ex. 19 at ¶ 14.

The prior art supports that "immunity" and "protection" are definitional features of vaccines.  For example, scientific dictionary definitions from the time reflect the concepts of immunity and protection:  *See, e.g.*:

- Ex. 28, Chambers Dictionary of Science and Technology, 2007 ("Therapeutic material, treated to lose its virulence and containing antigens derived from one or more pathogenic organisms.  On administration to humans or other animals, the antigens will stimulate active immunity *and protect against infection* with these or related organisms.") (Emphasis added.)

- Ex. 29, Dictionary of Science, 2010 ("A liquid preparation of treated disease-producing microorganisms or their products used to stimulate an *immune response in the body *and so confer resistance to the disease . . . .*") (Emphasis added.)

- Ex. 30, Black's Medical Dictionary, 2010 ("The name applied generally to dead – or attenuated  . . . living – infectious material introduced into the body, with the object of *increasing its power to resist the disease*. (See also IMMUNITY.) Healthy people are inoculated with vaccine as a *protection* against a particular disease; this provokes their immune system to produce ANTIBODIES, which *will confer immunity against a subsequent attack of the disease*.") (Emphasis added.)

Similarly, prior art publications used the term "vaccine" consistent with the concept of providing protection.  *See, e.g.*, Ex. 31 at 706 ("Neutralizing antibodies are crucial for vaccine-mediated *protection* against viral diseases") (emphasis added); Ex. 32 at 17 ("To generate vaccine-mediated *protection* is a complex challenge") (emphasis added).

Neither Plaintiff nor its expert denies that Defendants' construction was the CDC's definition as of December 2011.  Nor does Plaintiff argue that there is

anything about the CDC's definition from 2011 that is incorrect. In fact, Plaintiff's expert does not address Defendants' definition at all.  Rather, Plaintiff's only argument for why the Court should not adopt the CDC's 2011 definition is that it would confuse the jury into "mistakenly believing that vaccine according to the claims must fully protect a subject from contracting COVID-19 in order to be infringing."

Defendants disagree that the CDC's 2011 definition would confuse the jury. Ex. 19 at ¶ 19.  The fact that the CDC adopted this public definition of "vaccine" shows that it believed the definition is sufficiently clear not only for the POSA, but also the general public.  And even if Plaintiff were correct that the CDC's 2011 definition could confuse the jury, that alone is not justification to forgo an otherwise correct construction.  Plaintiff cites to no case law where a Court refused to adopt a correct construction because of the possibility of confusion for the jury.  Indeed, it is the parties' responsibility to clearly explain the technical matters in this patent case and present their case to the jury.

        c.       Plaintiff's Construction Was Not the Plain and Ordinary Meaning as of the Effective Filing Date

Plaintiff's construction is improper because it is incomplete.  As Dr. Curiel explains, the plain language of Plaintiff's construction—"used to stimulate the body's immune response against disease"—does not appear to require any immune protection.  Ex. 19 at ¶ 21.  Although vaccines provide immune protection by

stimulating the body's immune response, stimulation of an immune response does not always result in immune protection. *Id*. Thus, Plaintiff's construction does not accurately capture the plain and ordinary meaning of "vaccine." *See id*.

The intrinsic evidence is inconsistent with Plaintiff's construction, which is focused specifically on "stimulat[ing] the body's immune response."[36] For example, the specification states that "the active agent can be a nucleic acid encoded with a product of interest, including but not limited to, . . . *vaccines* . . . ." Ex. 1 at 378:30-38 (emphasis added). Two sentences later, the specification provides additional examples: "[i]n another embodiment, the nucleic acid is an *immunostimulatory oligonucleotide* . . . .". *Id*. at 378:42-44 (emphasis added). The term "oligonucleotide" refers to a nucleic acid and the term "immunostimulatory" refers to the ability to stimulate the body's immune response. The separate references to nucleic acid "vaccines" versus "immunostimulatory oligonucleotides" as embodiments show that the inventors understood that the term "vaccine" requires more than just stimulating the body's immune response.

Plaintiff relies on paragraphs 14 and 15 of Dr. Ravetch's declaration to argue that its construction is consistent with the POSA's use of the term "vaccine." But these two paragraphs consist of generic assertions that simply parrot Plaintiff's attorney argument and provide no independent analysis by Dr. Ravetch or

---

[36] Alnylam points to no intrinsic evidence that supports its construction.

corroborating evidence from the relevant time period.  Further, Dr. Ravetch never opines that the plain and ordinary meaning of "vaccine" is, in fact, Plaintiff's construction, but rather that "vaccine has an ordinary and customary meaning that is *consistent with* Alnylam's proposed construction."  Ex. 6 at ¶ 14 (emphasis added). Plaintiff's expert's opinions are not convincing.

Plaintiff contends that its construction is the CDC's current definition, but the CDC provides more than just one definition.  For example, in a different section of the CDC's website titled "Vaccines and Immunizations," the CDC defines "vaccine" similarly to Defendants' construction:

> A suspension of live (usually attenuated) or inactivated microorganisms (e.g., bacteria or viruses), fractions of the agent, or genetic material of the *administered to induce immunity and prevent infectious diseases* and their sequelae.

Ex. 33 at 11 (https://www.cdc.gov/vaccines/terms/glossary.html)(emphasis added). Plaintiff does not explain why it chose one current CDC definition over the other.

Plaintiff's strategy of cherry-picking post-2021 statements about the Comirnaty vaccine, which mention "immune response," also fails.  As a first matter, the statements that Plaintiff points to are from 10 years *after* the effective filing date, and thus, not probative of the meaning of "vaccine" in 2011.  That is evidenced by the CDC's own evolving definition of "vaccine" from 2011 to the present.  Plaintiff's

failure to point to any independent prior art from the relevant time frame to corroborate its claim construction is telling.

The substance of such statements also does not support Plaintiff's construction. It is not surprising that documents concerning Comirnaty would include the phrase "immune response" because vaccines, such as Comirnaty, function by stimulating one or more of the body's immune responses to confer immune protection against a disease. Ex.19 at ¶ 22. Thus, the mere fact that the phrase "immune response" appears in documents discussing Comirnaty does not support Plaintiff's construction over Defendants' construction.

Further, the specific documents that Plaintiff relies on belie its construction. For example, the passage from the Comirnaty Package Insert that Plaintiff cites is ultimately focused on immune protection: "[t]he vaccine elicits an immune response to the S antigen, which *protects* against COVID-19." Ex. 10 at 20 (emphasis added). Plaintiff also points to the phrase "immune response" in Pfizer's November 4, 2022 Press Release, while ignoring the multiple references in that document to "immunity" and "protection" as the ultimate end-point. *See, e.g.*, Ex. 14 ("Our goal is to provide broader *immunity* against COVID-19"); ("higher level of *protection*") ("high levels of *protection*"); ("stronger *protection*") (emphasis added). Thus, these passages, which refer to the immune protection provided by Comirnaty, actually support Defendants' construction." Ex. 19 at ¶ 23.

Dr. Ravetch's opinion that Defendants "used immune response as a proxy for efficacy in order to gain FDA approval for their current booster doses" also cuts against Plaintiff.  Ex. 6 at ¶ 17.  First, the use of immune response as a *proxy* for efficacy only confirms that the ultimate feature of a vaccine is efficacy—i.e., protection.  Ex. 19 at ¶ 24.  Further, Dr. Ravetch leaves out that the reason "immune response" was used as a proxy for "efficacy" for later Comirnaty formulations, such as the one being discussed, is because earlier Comirnaty clinical trials had already established that the immune response elicited by Comiranty provides protection against COVID-19.  *Id.*

The remaining publications about Comirnaty that Alnylam relies on also discuss "immunity" and/or "protection."  *See, e.g.*, Ex. 11 at 2065 (". . . to ensure stronger long-lasting *immunity* and *protection* against infection."); Ex. 12 at 2 ("Vaccination will add another layer of *protection* because it is the most effective intervention to deal with the COVID-19 pandemic. . . ."); Ex. 13 at 2920 (". . . assessing only humoral response may underestimate the immunogenicity of the vaccine, so that additional evaluation of cell-mediated *immunity* is essential to estimate the response to the vaccine"); Ex. 15 ("highlighting the importance of boosting a pre-existing *immunity* to confer a longer durable *protection* against SARS-CoV-2 reinfection.") (emphases added).  Thus, nothing in these references supports Plaintiff's construction over Defendants' construction.

As a final matter, Plaintiff was required to put forth its affirmative case in its Opening Brief so that Defendants could respond. Plaintiff has not identified any intrinsic evidence or any extrinsic evidence from before the effective filing date of December 2011 to support its construction. Nor has Plaintiff or its expert identified anything that is incorrect about Defendants' construction. If Plaintiff's strategy is to spring upon Defendants new evidence or arguments in its Reply Brief under the guise of a response, the Court should not reward such gamesmanship and should strike or ignore such untimely presented evidence.

****

The Court should adopt Defendants' construction because it accurately reflects the POSA's understanding that a vaccine must be able to provide immune protection against a disease. In contrast, Plaintiff's construction is incomplete because it merely requires stimulating an immune response against a disease. Further, the Court should find that "vaccine" is limiting in the preamble of claim 27 of the '229 Patent.

### 3.    Plaintiff's Reply Position

Defendants' arguments to limit the preamble and to require a stringent level of efficacy for vaccine are unfounded. The preamble's "vaccine" is a non-limiting statement of intended use for the lipid particle set forth in the claim's body. Defendants' arguments to the contrary are belied by the written description and the

extrinsic scientific evidence, as Dr. Ravetch's Second Declaration (Ex. 35) demonstrates.  Likewise, Defendants' attempt to imbue limitations into "vaccine" to a high level of stringency lacks basis in the CDC's own statements, the scientific literature, and POSA's common experience.

> a.   "Vaccine" is Not Limiting in Claims 27 and 28 of the '229 Patent

"[G]enerally, the preamble does not limit the claims." *Allen Eng'g*, 299 F.3d at 1346; *Am. Med. Sys.*, 618 F.3d at 1358.  The preamble is non-limiting where the patentee has "define[d] a structurally complete invention in the claim body and use[d] the preamble only to state a purpose or intended use of the invention." *Catalina Mktg.*, 289 F.3d at 808 (quotation omitted).  Those are the facts here.

The term "vaccine" in the preamble indicates the intended purpose of the claims, the focus of which is a "structurally complete" lipid particle:

> 27. A vaccine *comprising a lipid particle* and a pharmaceutically acceptable diluent, excipient, or carrier, *wherein the lipid particle comprises*:

The claim body sets forth structural limitations for the *lipid particle* that may be used in a vaccine.  '229 Patent at 497:18-498:19. Lipid particle is limiting (following the word "comprising"), while vaccine (before "comprising") is directed to an intended purpose for the lipid particle (compared to other uses for the lipid particle in, *e.g.*, other pharmaceutical compositions).

This is not a situation where "limitations in the body of the claim rely upon and derive antecedent basis from the preamble." Defts. Answering, 69-70. No term in the claims' body derives antecedent basis from "vaccine."

This is also not a situation where the patent specification or the prosecution history indicates that "vaccine" is limiting. The specification lists a "vaccine" as one possible use for the claimed lipid particles. *See* '229 Patent at 378:28-38. The prosecution history is silent, and Defendants do not contend otherwise.

Defendants claim without expert support that the word "vaccine" necessarily limits the term "RNA" because only mRNA (and not siRNA) can be used in a vaccine. Defts. Answering, 70. Defendants rely on a solitary 1999 article for the proposition that vaccines use only "RNA (as mRNA)." *Id.* (citing Ex. 26). Defendants even go so far as to tell this Court that siRNA would be a "non-workable embodiment" in a lipid particle in a vaccine. *Id.* at 70-71.

Defendants' position, built on attorney argument and an outdated 1999 article, does not withstand scrutiny. Dr. Ravetch's declaration and pre-priority scientific papers from 2005-2010 (and post-priority articles) show siRNA is used in vaccine compositions. Ravetch 2nd Decl., ¶28, Exs. 45-52.[37] The older 1999 article Defendants rely upon is not reflective or definitive of POSA's knowledge as of 2011 on the use of siRNA. Ravetch 2nd Decl., ¶29 (addressing 1999 Ex. 26).

---

[37] "Ravetch 2nd Decl. refers to the Second Declaration of Jeffrey Ravetch, Ex. 35.

Simply stated, the art establishes that mRNA or siRNA may comprise an RNA used in the lipid particle in the context of vaccines. Ravetch 2nd Decl., ¶¶26, 28-29. As a comprising claim for the lipid particle, the RNA structure is complete. There is no "*clear reliance on those benefits or features [(of a vaccine)] as patentably significant*" to warrant overcoming the presumption that the preamble is non-limiting by effectively reconstruing RNA to be limited to mRNA. *Catalina*, 289 F.3d at 809 (emphasis added).

In any event, Plaintiffs have not asked, either as part of this claim construction process or otherwise, that the Court construe and limit the plain scope of RNA to mRNA in claim 27. DI. 63, 150. Injecting a potential new claim construction issue at this late stage is improper and should not be countenanced.

Next, Defendants argue that "vaccine" in the preamble of dependent claim 28 provides antecedent basis for "vaccine" in the preamble of claim 27 and is therefore limiting. Defts. Answering, 71. Not so. *First*, vaccine is in the preamble of both claim 27 and its dependent claim 28 and both describe a lipid particle composition that is structurally complete, and the term is therefore non-limiting, *supra*.

*Second*, claim 28's body limitation ("the head group") has antecedent basis in claim 27's distinct body limitation "head group," not to claim 28's preamble "vaccine." '229 Patent at 498:4 ("head group"), 498:20-21 ("wherein the head group consists of a saturated aliphatic group and a hydroxyl group"). *Cf. Pacing Techs.,*

*LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) (preamble may be limiting *if* the preamble term is a necessary antecedent to terms *within the claim body*).[38]

*Third*, claim 28's standard reference back to the independent claim by use of the phrase "the vaccine of claim 27" does not render the term "vaccine" limiting, contrary to Defendants' contention. Defts. Answering, 71. Rather, it is required for proper claim drafting. *See* 35 U.S.C. §112(d)("[A] claim in dependent form shall contain *a reference to a claim previously set forth* and then specify a further limitation of the subject matter claimed.") (emphasis added).

Defendants next speculate that the inventors must have "intended" vaccine to be limiting because they also used the term "pharmaceutical composition" in other claims. Defts. Answering, 71-72. A statement of intended purpose, *i.e.*, pharmaceutical composition, does not preclude other statements of intended purposes, *i.e.*, vaccines. Defendants provide no support for their speculation.

Courts routinely find where "the bodies of the claims at issue capture the key aspects of the invention without reference to the preambles" the preamble is non-limiting. *Infernal Tech., LLC v. Activision Blizzard Inc.*, 2019 WL 4247227, at *8 (N.D. Tex. Sept. 6, 2019); *Applied Sci. & Tech., Inc. v. Advanced Energy Indus.,*

---

[38] Defendants cite to *NTP*, 418 F.3d at 1306, but in that case, unlike here, the limitation appeared both in the preamble and in the body of the claim.

*Inc*., 204 F. Supp. 2d 712, 717 (D. Del. 2002) (finding preamble non-limiting where the claim body defines a structurally complete invention and "the preamble states only the intended use for the invention"). Here, where the body of the claim defines the key components of the claimed structure – the lipid particle – the term "vaccine" in the preamble is non-limiting.

Claims 27 and 28 of the '229 Patent can be clearly distinguished from cases where the preamble was necessary to describe the structure of the invention. *Cf. Regents of Univ. of California v. Affymetrix, Inc*., 2018 WL 1466408, at *13 (S.D. Cal. Mar. 26, 2018) (The term "aggregation sensor" in the preamble limiting because "the term 'aggregation sensor' is essential to understanding the limitations in the claim body and is underscored as important by the specification."); *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1342 (Fed. Cir. 2021) (preamble limiting for describing a "method for treating headache" when the patent contained "extensive discussions of such treatment in every section of the patents' written description").

Finally, Defendants argue that claim 6 of the '657 Patent's use of "vaccine" means that the term "vaccine" in claim 27 and 28 of the '229 patent is limiting. Defts. Answering, 72. Defendants provide no case support for this contention. The limiting nature of a term in a dependent claim does not mean that same term must be limiting in the preamble of an independent claim. *PACT XPP Schweiz AG v. Intel*

*Corp.*, 2020 WL 5821723, at *2 (D. Del. Sept. 30, 2020) ("[L]anguage in a preamble can be limiting as to a dependent claim but not as to the independent claim").

> b.    Defendant's Proposed Construction Would Create Unnecessary Confusion

Defendants' proposed construction is ambiguous and suggests that a vaccine always provides protection or immunity, which is incorrect.  Indeed, Alnylam's opening brief raised the ambiguity issue and Defendants' answer fails to clarify whether they are advocating for this extremist view.  Alnylam Br. at 68-69.

A vaccine does not provide 100% protection or immunity.  The CDC said so in 2011.  "*No vaccine is 100% effective*. . . . . For reasons related to the individual, *some will not develop immunity*."  Ex. 36 (the same 2011 CDC website referenced in Ex. 27 by Defendants) (emphasis added).  Defendants also said so.  *See, e.g.,* (Comirnaty package insert: "COMIRNATY *may not protect all vaccine recipients*") (emphasis added).  Ex. 10.  A POSA in 2011 would have a similar understanding. Ravetch 2nd Decl., ¶¶8-9, 11-14, 16-18, 20.

The CDC itself withdrew the definition proposed by Defendants to avoid the risk of confusion, "noting that the previous definition '*could be interpreted to mean that vaccines were 100% effective, which has never been the case for any vaccine*.'" Ex. 37, 42; Ravetch 2nd Decl., ¶¶11, 20. Alnylam's construction, from the CDC's 2020 definition, is the scientific understanding of vaccines as of the priority date. Ravetch 2nd Decl., ¶¶21-27.

Defendants provide no real response to Alnylam's concern about jury confusion. Defts. Answering, 75. Defendants state "that a vaccine must be capable of producing an immune response that confers immune protection against a disease." Defts. Answering, 73. Setting aside what the phrase "immune protection" means (a phrase that is not in either party's proposed construction and that Defendants' expert Dr. Curiel fails to define), Defendants appear to suggest that a vaccine must always protect. Ravetch 2nd Decl. ¶¶21-22. Defendants' referenced dictionary definitions, to the extent they even suggest a requirement for complete immunity and/or protection, are at odds with POSA, CDC and other medical dictionary definitions. Defts. Answering, 74; Ravetch 2nd Decl. ¶¶17-20.

Defendants' cited publications do not help —Defendants vaguely state that the publications use "the term 'vaccine' consistent with the concept of providing protection." Defts. Answering, 74. Defendants were aware of the CDC's "evolving definition of 'vaccine,'" Defts. Answering, 77-78, and the record from the CDC shows that it changed its 2011 definition to remove the possibility of confusion – not to reflect a change in the state of the art. Ravetch 2nd Decl., ¶¶11, 20, Exs. 37, 42. By failing to plainly state their position in their answer, Defendants have left Alnylam with no recourse to rebut any position Defendants take for the first time in their sur-reply brief.

Defendants' contention that jury confusion cannot justify rejecting their proposed definition is nonsensical.  Defts. Answering, 75.  The very purpose of claim construction is to assist the jury.  *USA Video Tech. Corp. v. Time Warner Cable, Inc.*, 2007 WL 4365773, at *12 (E.D. Tex. Dec. 12, 2007) (declining to construe a term to mean "call" because of "the court's concern [] that jury confusion may result from its use in claim construction.").

          c.     Alnylam's Construction Comports with A POSA's Understanding

Defendants do not challenge the correctness of Alnylam's construction. Rather, they suggest that Alnylam's construction is incomplete because – they say – it does not require any immune protection.  Defts. Answering, 75-76.  Setting aside what Defendants undefined wording "immune protection" means, *supra*, Defendants mischaracterize Alnylam's proposed construction.

Defendants suggest that Alnylam's proposed construction would encompass any immune response.  Defts. Answering, 75-79 (For example, "stimulation of an immune response does not always result in immune protection.").  Not so.  Alnylam's proposed construction – and the CDC – encompasses an immune response *against a disease*, not any immune response.  Ravetch 2nd Decl., ¶¶11-12, 14, 20.

As for Defendants' contention that Alnylam's (and the CDC's) construction does not include the word "protection," the CDC removed that word from its definition to avoid unnecessary confusion. Ex. 37, 42.  Adding back in "protection,"

as Defendants suggests, defeats the whole purpose of the CDC's thoughtful revised definition.

Intrinsic evidence supports Alnylam's construction, contrary to Defendants' argument. Defts. Answering, 76 (citing '229 Patent at 378:42-44). An immunostimulatory oligonucleotide stimulates an immune response as Defendants state, but a vaccine stimulates an immune response *against the disease*. Insofar as Defendants contend that simply stimulating any immune response is insufficient for a vaccine, Alnylam agrees—the immune response must be against the disease. Ravetch 2nd Decl., ¶6.

For that reason, a definition buried in the glossary in the CDC website that Defendants point to was not selected. Defts. Answering, 77. The CDC defined "vaccine" in its webpage which Alnylam adopted. Ex. 37, 42.

Defendants take issue with Alnylam's citing statements about Comirnaty as "mention[ing] immune response" and not supporting Alnylam's construction. Defts. Answering, 78-80. But Defendants ignore that each of these documents discusses Comirnaty eliciting an immune response against the disease, COVID-19, consistent with Alnylam's proposed construction. Ravetch 2nd Decl., ¶¶22-25. As Defendants note, the Comirnaty Package Insert provides that it is the "immune response to the S antigen, which protects against COVID-19." Defts. Answering, 78. In other words, it is the immune response to the S antigen of the COVID virus or against the disease

that is key.  Likewise, the Pfizer press release discusses eliciting "higher immune response" "against Omicron BA.4/BA.5 sublineages," *i.e.*, against the disease.  Ex. 14; Ravetch 2nd Decl., ¶24.  That these documents also include the words "protection" or "immunity," albeit in equivocal ("may not protect") or prophetic ("goal") terms, does not "belie" Alnylam's construction as Defendants contend.  Defts. Answering, 78-79.  They underscore that a construction of vaccine requiring 100% protection or immunity is incorrect.

Similarly, Defendants' use of immune response data as proxy for efficacy does not "cut[] against" Alnylam.  Defts. Answering, 79.  Instead, it indicates that evidence of complete protection through efficacy data is not necessary for a vaccine.  Ravetch 2nd Decl., ¶25.  Defendants contend that efficacy data was not provided because earlier clinical trials had "established that the immune response elicited by Comirnaty provides protection."  Defts. Answering, 79.  Even if true, Defendants *still had to provide immune response data for the booster doses* but did not have to show efficacy data.  Ex. 12, 15.  This again indicates the key metric is immune response against the disease.  To the extent Defendants are attempting to bootstrap protection into their definition through the efficacy requirement imposed by the FDA for approval, it should be rejected.  Defts. Answering, 79.  The FDA routinely approves vaccines that are not 100% effective.  Ravetch 2nd Decl., ¶¶9-11.

Likewise, the publications cited by both parties show that immune response against the disease is a key vaccine attribute.  Ravetch 2nd Decl., ¶¶19-20, 26.  While the publications mention "'immunity' and/or 'protection,'" the focus is on evaluating the immune response elicited against a disease by a vaccine.  Ravetch 2nd Decl., ¶26. Defts. Answering, 79. Defendants cite no document that provides otherwise.

Requiring that a vaccine must provide 100% protection or immunity is unsupported.  Alnylam's proposed construction does not impose this requirement and was provided by the CDC to avoid confusion and should be adopted.

### 4. Defendants' Sur-Reply Position

"Vaccine" is limiting, and Defendants' construction is the plain and ordinary meaning.

#### a. Vaccine Is Limiting

Plaintiff fails to rebut Defendants' argument that vaccine is limiting because it limits the "RNA" limitation to mRNA, and thus, is essential to understanding the mRNA limitation. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("when the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope").  Plaintiff does *not* deny that the only type of RNA that can function as a "vaccine" is mRNA, but responds

that "siRNA is used in vaccine compositions"[39] (*supra* at 82) relying on Dr. Ravetch's flawed opinion that "siRNA can be a part of a vaccine." Ex. 35 at ¶ 28. Dr. Curiel explains that Dr. Ravetch's opinion is wrong as shown by the very articles he relies on. Ex. 65 at ¶¶ 30-32. Those articles describe ***conceptual combination therapies*** that include (1) a vaccine product and (2) a ***separate*** siRNA therapeutic product used to modulate the immune response triggered by the vaccine. *Id*. That a different siRNA product could be co-administered with a vaccine does not mean it is "part of a vaccine." *Id*. For example, the Liu article treats the siRNA as ***separate from***, not "part of the vaccine"—"PEG BR647-NP efficiently delivered the ***vaccine*** and ***STAT3 siRNA*** to the tumor ...." Ex. 52 at 6619; Ex. 65 at ¶ 32.

Plaintiff also responds that, "[a]s a comprising claim for the lipid particle, the RNA structure is complete." *Supra* at 83. This is incorrect. Claim 27 recites a "vaccine" comprising a "lipid particle" comprising "RNA." Thus, the recited "RNA" is part of the ***vaccine***, and as explained above only mRNA can be "part of a vaccine." Ex. 65 at ¶ 32.

Additionally, "vaccine" in the preamble of claim 27 also provides antecedent basis for "[t]he vaccine" in dependent claim 28. *Pacing Techs.,* 778 F.3d at 1024

---

[39] The only explanation for why "siRNA is used in vaccine compositions" appears in Dr. Ravetch's Declaration which cites eight articles without explaining their substance. That is an improper workaround to the word limit, and the Court should strike paragraph 28 of Dr. Ravetch's declaration and Exhibits 45-52.

(finding preamble language limiting because it provided antecedent basis for dependent claim terms).   Plaintiff argues that "the vaccine" appears in the "preamble" of dependent claim 28 (*supra* at 83), but cites no case law supporting that "the vaccine" in dependent claim 28 is part of a "preamble."  Indeed, there is no transitional phrase (e.g., comprising of, etc.) in claim 28 delineating "[t]he vaccine" from the rest of the limiting claim language.

Plaintiff's reliance on 35 U.S.C. §112(d) to argue that "vaccine" is not limiting is misplaced.  *Supra* at 84.  That statutory language requires that a dependent claim "shall contain *a reference to a claim previously set forth* and then specify a further limitation of the subject matter claimed."  Here, dependent claim 28 meets that requirement by referencing previous "claim 27," and the remaining language, "the vaccine" and the "wherein" clause, is limiting.

Plaintiff's argument that "vaccine" recites the intended purpose is unfounded.  A "vaccine" is a structural composition necessary to understand other limitations, not an intended purpose.   The preamble language at issue in *Allen Eng'g*, *Georgetown Rail Equip.*, *Catalina Mktg.*, and *Infernal Tech., LLC*, (i.e., "fast steering," "mounted on …," "located at …," "shadow rendering"/"render shadows," respectively) did not recite a structural composition.  In *Applied Sci. & Tech.*, the preamble recited "an apparatus for dissociating gases," thus indicating the intended purpose.

Further, Plaintiff did not argue in its infringement contentions that "[a] vaccine" in the preamble of claim 27 is not limiting, but rather provided contentions for the "vaccine" limitation. *See, e.g.*, Ex. 66 at 1, 177.

> b. Defendants' Construction Is the Plain & Ordinary Meaning

Plaintiff's only issue with Defendants' proposed 2011 CDC definition of "vaccine" is that it could be misinterpreted by the jury to require "100% protection or immunity." *Supra* at 68-69, 86. This is a red herring. The definition has no such requirement, and Plaintiff admits the CDC's website at the time stated that "no vaccine is 100% effective." Ex. 36 at 4. Regardless, Defendants do not argue that "100% protection or immunity" is required.

Plaintiff does not contend that such misinterpretation is likely, but merely speculates that it could happen. But as Dr. Curiel explains, the 2011 CDC definition could not reasonably be interpreted by the layperson to require 100% protection or immunity (Ex. 65 at ¶¶ 5, 9-12). Even Plaintiff acknowledges that requiring 100% protection or immunity is an "extremist view." *Supra* at 86.

Nor does the CDC statement[40] that Plaintiff relies on indicate that such misinterpretation is reasonable. Ex. 65 at ¶ 10. As Dr. Curiel explains, the CDC changed the wording of its definition during the COVID-19 pandemic, when

---

[40] Plaintiff does not cite any CDC document for this statement.

vaccines were the subject of heightened public attention and misinformation, out of an abundance of caution. *Id.* In any case, the CDC statement explains that "[w]hile there have been slight changes in wording over time … those haven't impacted the overall definition." Ex. 37 at 2. Thus, the CDC's definition of "vaccine" has always and still requires conferring immunity, thereby protecting against a disease, just not 100% immunity or protection, which was never the case. Ex. 65 at ¶ 11.

Additionally, the claim construction analysis is performed from the perspective of the POSA. Plaintiff and Dr. Ravetch do not contend that the POSA would have misinterpreted the CDC's 2011 definition to require 100% protection and immunity. Rather, Plaintiff acknowledges that the POSA would have understood that no vaccine is 100% effective. *Supra* at 86; *see also* Ex. 35 at ¶ 27. Thus, the POSA, well aware that vaccines do not provide 100% protection or immunity, would not have understood the CDC to require such extreme features.

Plaintiff and Dr. Ravetch's only response to Defendants' technical dictionary definitions is to equivocate that they "may suggest a requirement for complete immunity and/or full protection." Ex. 35 at ¶ 17. As Dr. Curiel explains, those definitions do not recite such features, and the POSA would not have understood them to. Ex. 65 at ¶ 19. Even Plaintiff's dictionary definition recognizes the concept of protection. *Id.* at ¶ 20; Ex. 44 ("used to ***prevent and attenuate*** smallpox"; "[t]he ideal vaccine should be ***effective***, well-tolerated, ...") (emphases added). Also,

"vaccination," is defined as "[i]noculation with any *vaccine* ... to *establish resistance* to a specific infectious disease." *Id*. (emphasis added). Plaintiff's position, that the 2011 CDC definition *and* the various technical dictionaries of record do not reflect the plain and ordinary meaning at the time, is untenable. Ex. 65 at ¶¶ 19-20.

Furthermore, Plaintiff and Dr. Ravetch have not clarified whether Plaintiff's construction requires conferring any protection at all. To the extent Plaintiff contends its construction is the CDC's current definition, its construction must include the feature of conferring protection (albeit not 100% protection) because, as explained above, the CDC's current definition requires such a feature. Ex. 65 at ¶¶ 26-28.

Dated: March 6, 2024

Respectfully submitted,

McDERMOTT WILL & EMERY LLP

CONNOLLY GALLAGHER, LLP

/s/ Ethan H. Townsend

Ethan H. Townsend (#5813)
The Brandywine Building,
1000 North West Street, Suite 1400,
Wilmington, DE 19801
(302) 485-3910
ehtownsend@mwe.com

OF COUNSEL:

William G. Gaede, III
Anisa Noorassa
McDERMOTT WILL & EMERY LLP
415 Mission Street, Suite 5600
San Francisco, CA 94105

/s/ Alan R. Silverstein

Arthur G. Connolly, III (#2667)
Alan R. Silverstein (#5066)
1201 North Market Street, 20th Floor
Wilmington, DE 19801
(302) 757-7300
aconnolly@connollygallagher.com
asilverstein@connollygallagher.com

OF COUNSEL:

Sara Tonnies Horton
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, IL 60654

(650) 815-7400

Sarah Chapin Columbia
Sarah J. Fischer
MCDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000

Ian B. Brooks
Timothy Dunker
MCDERMOTT WILL & EMERY LLP
500 N. Capitol Street NW
Washington, DC 20003
(202) 756-8000

Bhanu K. Sadasivan
MCDERMOTT WILL & EMERY LLP
650 Live Oak Ave., Suite 300
Menlo Park, CA 94025-4885
(650) 815-7537

Mandy H. Kim
MCDERMOTT WILL & EMERY LLP
18585 Jamboree Road, Suite 250
Irvine, CA 92612-2565
(949) 757-6061

*Attorneys for Plaintiff
Alnylam Pharmaceuticals, Inc.*

(312) 728-9040

Michael Johnson
Dan Constantinescu
Brian Frino
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

*Attorneys for Defendants and
Counterclaimants Pfizer Inc. and
Pharmacia & Upjohn Co. LLC*

MORRIS, NICHOLS, ARSHT, & TUNNEL LLP

*/s/ Jeremy A. Tigan*
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
Jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

OF COUNSEL:

Charles B. Klein
Jovial Wong
Claire A. Fundakowski
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, DC 20036
(202) 282-5000

Katherine L. Kyman
Brian L. O'Gara
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
(312) 558-5600

Ashley Graham
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700

*Attorneys for Defendants BioNTech SE
and BioNTech Manufacturing GmbH*

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Paragraph 16 of the October 2, 2023, Scheduling Order (D.I. 122), the undersigned hereby certifies that the Plaintiff's foregoing opening and reply briefs contain 5,287 and 5,454 words respectively and Defendants' answering and sur-reply portions of the Joint Claim Construction Brief contains 8,235 and 2,747 words respectively in Times New Roman 14-point font, counted using Microsoft Word's word count feature.

/s/ <i>Ethan H. Townsend</i>
Ethan H. Townsend (#5813)

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that a true and correct copy of the foregoing

document was served on March 6, 2024 on the following counsel via EMAIL.

Arthur G. Connolly, III (#2667)
Alan R. Silverstein (#5066)
CONNOLLY GALLAGHER LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
(302) 757-7300
aconnolly@connollygallagher.com
asilverstein@connollygallagher.com

Sara Tonnies Horton
WILLKIE FARR & GALLAGHER
LLP
300 North LaSalle Drive
Chicago, IL 60654
(312) 728-9040

Michael Johnson
Dan Constantinescu
Brian Frino
WILLKIE FARR & GALLAGHER
LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

*Attorneys for Defendants and
Counterclaimants Pfizer Inc. and
Pharmacia & Upjohn Co. LLC*

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
MORRIS, NICHOLS, ARSHT, & TUNNEL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
Jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

Charles B. Klein
Jovial Wong
Claire A. Fundakowski
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, DC 20036
(202) 282-5000

Katherine L. Kyman
Brian L. O'Gara
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
(312) 558-5600

Ashley Graham
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700

*Attorneys for Defendants BioNTech SE
and BioNTech Manufacturing GmbH*

/s/ *Ethan H. Townsend*
Ethan H. Townsend (#5813)